1    ROBERT W. FERGUSON
     *Attorney General*
2
     RENE D. TOMISSER, WSBA #17509
3    *Senior Counsel*
     JEFFREY T. SPRUNG, WSBA #23607
4    ZACHARY P. JONES, WSBA #44557
     JOSHUA WEISSMAN, WSBA #42648
5    PAUL M. CRISALLI, WSBA #40681
     NATHAN K. BAYS, WSBA #43025
6    BRYAN M.S. OVENS, WSBA #32901*
          (*application for admission pending)
7    *Assistant Attorneys General*
     8127 W. Klamath Court, Suite A
8    Kennewick, WA 99336
     (509) 734-7285
9
                **UNITED STATES DISTRICT COURT**
10           **EASTERN DISTRICT OF WASHINGTON**
                          **AT RICHLAND**
11

12   STATE OF WASHINGTON;              NO.
     COMMONWEALTH OF VIRGINIA;
13   STATE OF COLORADO; STATE OF       COMPLAINT FOR
     DELAWARE; STATE OF ILLINOIS;      DECLARATORY AND
14   STATE OF MARYLAND;                INJUNCTIVE RELIEF
     COMMONWEALTH OF
15   MASSACHUSETTS; ATTORNEY
     GENERAL DANA NESSEL ON
16   BEHALF OF THE PEOPLE OF
     MICHIGAN; STATE OF
17   MINNESOTA; STATE OF
     NEVADA; STATE OF NEW
18   JERSEY; STATE OF NEW MEXICO;
     and STATE OF RHODE ISLAND,
19
              Plaintiffs,
20
         v.
21
     UNITED STATES DEPARTMENT
22   OF HOMELAND SECURITY, a

COMPLAINT FOR                    i
DECLARATORY AND
INJUNCTIVE RELIEF

1    federal agency; KEVIN K.
     McALEENAN, in his official capacity
2    as Acting Secretary of the United
     States Department of Homeland
3    Security; UNITED STATES
     CITIZENSHIP AND IMMIGRATION
4    SERVICES, a federal agency;
     KENNETH T. CUCCINELLI II, in his
5    official capacity as Acting Director of
     United States Citizenship and
6    Immigration Services,

7                    Defendants.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

COMPLAINT FOR                      ii                    ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                                              8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                                               Kennewick, WA 99336
                                                                   (509) 734-7285

1

## TABLE OF CONTENTS

2    I.    INTRODUCTION ................................................................1

3    II.   JURISDICTION AND VENUE ..........................................8

4    III.  PARTIES ............................................................................9

5    IV.   HISTORY OF THE PUBLIC CHARGE EXCLUSION ........13

6        A.    Origins of Public Charge Exclusion in Colonial, State, and Federal
              Statutes ...................................................................14

7        B.    Early Administrative and Judicial Precedent on Public Charge....17

8        C.    Modern Regulatory Framework.....................................19

9              1.    Immigration and Nationality Act of 1952 ..........................20

10             2.    Current public charge legal framework ...............................23

11             3.    Illegal Immigration Reform and Immigrant Responsibility
                    Act of 1996 .........................................................26

12

13             4.    Personal Responsibility and Work Opportunity Act of
                    1996 ...................................................................27

14

15             5.    Agency guidance ....................................................30

16    V.    THE DEPARTMENT'S PUBLIC CHARGE RULE ..............36

17        A.    The Trump Administration's Anti-Immigration Agenda ..............37

18        B.    Rulemaking History ....................................................41

19        C.    The Department's Proposed Public Charge Rule .........................45

20        D.    Plaintiff States' Opposition to Proposed Rule ..............................49

21             1.    Comments to proposed rule .......................................49

22             2.    White House involvement and review ................................52

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

iii

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

E.  The Final Rule...................................................................................54

    1.  Summary of the Final Rule.................................................56

        a.  Applicability of the Rule...........................................56

        b.  Definitions of "public charge" and "public benefit".57

        c.  Heavily weighted negative factors...........................58

        d.  Heavily weighted positive factors............................60

        e.  Other criteria.............................................................61

        f.  Other provisions.......................................................62

    2.  The Department's failure to provide reasoned analysis, examine relevant data, or address public comments' significant concerns............................................................64

        a.  Definition of public charge......................................64

        b.  The 12-month public benefit threshold....................65

        c.  Heavily weighted negative factors...........................67

        d.  Private health insurance............................................69

        e.  Nonimmigrant applications for change of status or extension of stay.......................................................71

        f.  Application to lawful permanent residents returning from 180-day trips abroad.........................................72

        g.  Disparate impact.......................................................73

        h.  Credit history and financial liabilities.....................74

        i.  Immigration fee waiver............................................75

        j.  High school diploma.................................................76

        k.  English proficiency...................................................77

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

iv

l.   Federalism summary impact statement ................... 79

m.  Cost-benefit analysis .................................................. 80

VI.   THE RULE'S CHILLING EFFECTS ON PARTICIPATION IN
FEDERAL AND STATE PUBLIC BENEFITS PROGRAMS .............. 84

A.   Health Care Programs ................................................. 87

1.   Federal health care benefits ................................ 87

2.   State health care benefits .................................... 89

a.   The Plaintiff States' medical assistance programs .... 91

b.   Irreparable harm to medical assistance programs ..... 97

(1)   Plaintiff States' residents will lose medical care
and become uninsured .................................... 99

(2)   Shift of healthcare costs to the Plaintiff
States ............................................................. 101

(3)   Significant public health concerns prompted by
reduced preventive care ............................... 103

(4)   Harm to the Plaintiff States' sovereign interests
in the successful operation of their health care
systems ......................................................... 104

B.   Food Assistance Programs ........................................ 108

1.   Federal Food Assistance Benefits ..................... 108

2.   State food assistance programs .......................... 110

a.   The Plaintiff States' food assistance programs ....... 111

b.   Irreparable harm to food assistance programs ........ 113

(1)   Increased Hunger and Food Insecurity in the
Plaintiff States' Residents ............................. 115

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

v

(2)     Significant public health concerns ............... 116

C.     Housing Assistance Programs ....................................... 117

1.     Federal housing assistance benefits ................................... 117

2.     State housing assistance programs ..................................... 120

a.     The Plaintiff States' housing assistance programs .. 121

b.     Irreparable harms to the Plaintiff States' housing assistance programs ................................................ 124

(1)     Homelessness and other public health consequences ................................................ 125

(2)     Poorer health, educational, and other outcomes ....................................................... 127

D.     Cash Assistance Programs ........................................... 128

1.     Federal cash assistance benefits ....................................... 128

2.     State cash assistance programs ......................................... 131

a.     The Plaintiff States' cash assistance programs ....... 131

b.     Irreparable harm to the Plaintiff States' cash assistance programs ................................................ 135

E.     Other State Benefits Programs ..................................... 136

1.     Long term services and supports for elderly and disabled residents ......................................................... 137

2.     Job and employment training programs ............................ 139

3.     Irreparable harm to the Plaintiff States' support services for crime victims ....................................................... 143

VII.   THE RULE'S OTHER ADVERSE IMPACTS ..................................... 145

A.     Family Reunification Impacts ..................................... 146

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

vi

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

B.      Workforce Impacts........................................................................148

C.      Other Macroeconomic Impacts....................................................149

D.      Disparate Impacts.........................................................................150

VIII.   CAUSES OF ACTION ............................................................................153

IX.     PRAYER FOR RELIEF .........................................................................163

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

vii

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1     Plaintiffs State of Washington, Commonwealth of Virginia, State of

2     Colorado, State of Delaware, State of Illinois, State of Maryland, Commonwealth

3     of Massachusetts, Attorney General Dana Nessel on behalf of the People of

4     Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of

5     New Mexico, and State of Rhode Island (together, the Plaintiff States) bring this

6     lawsuit against the United States Department of Homeland Security (the

7     Department or DHS); its Acting Secretary Kevin K. McAleenan, in his official

8     capacity; its sub-agency United States Citizenship and Immigration Services

9     (USCIS); and USCIS's Acting Director Kenneth T. Cuccinelli, in his official

10    capacity.

## I.    INTRODUCTION

12    1.     The Department's Final Rule, *Inadmissibility on Public Charge*

13    *Grounds*, 84 Fed. Reg. 41,292[1] (August 14, 2019) (the Public Charge Rule or the

14    Rule), effects a radical overhaul of federal immigration law transforming a

15    system that promotes economic mobility among immigrants into one that

16    advantages immigrants with wealth. It does so by penalizing legally present

17    immigrant families who access federally-funded health, nutrition, and housing

18    programs, even briefly. The Rule achieves this sweeping change unlawfully: it

19    expansively redefines the term "public charge"—a previously rare designation

---

21    [1] Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292

22    (Aug. 14, 2019) (to be codified at 8 C.F.R. § 212.20).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

1

1    that triggers exclusion from the United States—in a manner that is contrary to

2    congressional intent and agency interpretation that has prevailed for nearly 70

3    years, and contrary to two 1996 federal statutes.

4         2.    Since the late 19th century, federal immigration law has permitted

5    the government to deny entry to any noncitizen "likely to become a public

6    charge." From colonial times to the present day, "public charge" was used

7    consistently in American law to mean a pauper—that is, someone permanently

8    and primarily dependent on the government for subsistence. Until the current

9    Administration, the Department itself, its predecessor agency the Immigration

10   and Naturalization Service, the U.S. Department of Justice, and the U.S. State

11   Department have all adhered to the established definition of public charge.

12        3.    The Rule departs from this original meaning by redefining a public

13   charge as a noncitizen who receives common forms of federal and state public

14   assistance, even in small amounts and for a short period of time. Never before

15   has the Department considered in a public charge determination an immigrant's

16   receipt of non-cash public benefits for which they are legally eligible such as

17   Medicaid, Supplemental Nutrition Assistance Program benefits, public housing

18   subsidies under the 1937 U.S. Housing Act, or Section 8 housing assistance.

19   Under the Rule, however, participation in those benefits—which are commonly

20   used by working families—would constitute a negative "heavily weighted factor"

21   triggering a public charge determination.

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

2

4.      People who receive those benefits are neither paupers nor primarily dependent on the government for subsistence. Over half of all non-elderly adults receiving Medicaid are employed, and almost 80% are from a home where at least one household member works. Indeed, more than 20% of the U.S. population participates in such benefits programs on average each month. Yet, under the Rule, legally present immigrants' participation in those programs would block their path to citizenship under the public charge exclusion.

5.      The Public Charge Rule is contrary to law and arbitrary and capricious in violation of the Administrative Procedure Act for numerous reasons including:

6.      *First*, the Department's new definition of "public charge" is contrary to its longstanding meaning in the Immigration and Nationality Act. Since its origin in colonial residency requirements and through its reception into state and then federal immigration laws, a "public charge" has been applied to mean a person primarily dependent on the government for subsistence. The Department's Rule is not a clarification of a well-established rule, but marks the rejection of the core principle underlying the long established unambiguous definition.

7.      *Second*, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 allows many lawful immigrants to apply for public benefits if they have been in the country for at least five years. The Rule

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

3

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    eviscerates   Congress's   intent   by   imposing   an   effective   "bait   and

2    switch"—punishing immigrants for using public benefits for which Congress

3    itself made them eligible. The Rule is contrary to this statute, as well as several

4    others.

5        8.    *Third*, the Rule is arbitrary, capricious, and an abuse of discretion

6    because—among other reasons—it reverses a decades-old, consistent policy

7    without reasoned analysis, offers an explanation for the Rule that runs counter to

8    the overwhelming weight of evidence before the Department, and disingenuously

9    promotes as its purpose self-sufficiency in the immigrant population when, as

10   abundantly shown by the administrative record, its effect is precisely the

11   opposite.

12       9.    The radical expansion of the public charge standard will cause

13   irreparable harm to the working families and children who live in the Plaintiffs

14   States, as well as the states themselves. The Rule will deter hundreds of thousands

15   of noncitizens from utilizing essential public assistance programs for which they

16   are legally eligible, so as not to jeopardize their hopes of becoming Americans.

17   Those "chilling effects" are of two types.

18       10.   First, the Rule will deter lawfully present, legally eligible

19   immigrants or their family members from participating in the enumerated "public

20   benefit" programs. Many of these individuals will be forced into state emergency

21

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

4

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1   programs—for example, many will be forced to obtain routine medical care in

2   the far more expensive setting of state-funded emergency rooms.

3        11.    Second, the Rule's true impact sweeps more broadly by chilling

4   immigrant families' participation in state and local assistance programs that the

5   Rule does not classify as public benefits in the public charge test. Out of both fear

6   of the Trump Administration's anti-immigrant agenda and confusion over the

7   byzantine regulatory scheme that the Rule would create, many immigrant

8   families will disenroll or forbear enrollment in all public benefit programs to

9   avoid triggering the Department's expansive and punitive public charge test.

10        12.    Those chilling effects will lead to individuals and families forfeiting

11   health insurance, medical care, nutrition assistance, and shelter not only for

12   themselves but also for their entire households—including U.S. citizen adults and

13   children. In Washington State alone, the state Medicaid agency projects that up

14   to 140,000 families will lose health insurance, and State residents will forgo up

15   to $198 million annually in medical care and up to $55 million annually in food

16   and cash assistance. State and private hospitals will be forced to absorb the vastly

17   more expensive uncompensated care, to the detriment of the State treasury.

18        13.    The resulting loss of economic activity will impose uncompensable

19   social and economic costs on the Plaintiff States that the Department entirely fails

20   to confront. Disenrollment and non-enrollment in health, nutrition, and other

21   state-run assistance programs will make many working class immigrant families

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

5

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

less healthy, less productive, more reliant on state-covered emergency medical care, and more likely to experience economic dislocation and homelessness, which will result in increased strain on state agencies and programs. The broader chilling effects among all state-run assistance programs will undermine those programs' administration and effectiveness. And direct costs to the States will result from immigrants who shift from federal programs to state programs that do not qualify as "public benefits" under the Rule.

14.    In Washington State, for example, economic analysis points to the Rule reducing total economic output by up to $97.5 million annually, cutting wages by up to $36.7 million annually, and eliminating up to 782 jobs. Franklin County, less than five miles from where this Court sits and where, according to Census Bureau data, over half the population is Hispanic and over 15% legal noncitizen, will face particularly harsh increases in public costs and decreases in economic output as a result of the Rule. These consequences will be replicated across the Plaintiff States.

15.    The Department's expansive new public charge test applies to two groups of lawfully present non-citizens: immigrants such as visa-holders seeking to adjust to permanent resident status, and nonimmigrant visitors seeking to extend their visa or change their visa category. It would apply, for example, to:

• An immigrant mother with a U.S. citizen spouse and U.S. citizen children who applies for lawful permanent residency. Even if she

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

6

and her spouse both work full-time, she could be classified as a public charge simply because the family received food stamps for one year in a three-year period.

- A lawful permanent resident who travels abroad to care for his ailing mother and, after her passing, to help with funeral preparations and settle her estate. If previously he had received Section 8 housing assistance vouchers for 12 months in any amount, upon his return to the United States six months later, he could be denied admission under the new public charge test, which applies to lawful permanent residents after a foreign trip longer than 180 days. Although a federal statute entitles this green card holder to receive federal, state, and local public benefits, the Rule would exclude him from the United States for taking advantage of his statutory right.

- And an immigrant granted entry for urgent humanitarian reasons (a "humanitarian parolee"), who has two U.S. citizen children and files for permanent residency. If for just four months in the past three years she received Medicaid coverage, food stamps, and Section 8 housing assistance in any amounts, it could trigger a public charge determination and denial of her green card application because each separate benefit would count as an extra month towards the Rule's 12-month threshold.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

7

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

16.    The Administration, unable to implement its restrictive immigration agenda through legislation, now attempts to implement its agenda through an administrative overhaul of immigration policy that cannot be squared with the terms of statutes duly enacted by Congress or with the United States Constitution. To avert irreparable injury to the Plaintiff States and their residents, the Plaintiff States bring this suit to vacate and set aside the Public Charge Rule.[2]

## II.    JURISDICTION AND VENUE

17.    This Court has personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 1391(e) because Defendants are agencies and officers of the United States.

18.    This Court has jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. § 1331 because this action arises under federal law.

19.    Defendants' publication of the Final Rule in the Federal Register on August 14, 2019, constitutes a final agency action and is therefore judicially reviewable within the meaning of the APA, 5 U.S.C. §§ 704, 706.

20.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because this is a judicial district in which Plaintiff State of Washington resides, the Rule will adversely affect the health and welfare of residents in this district,

---

[2] This Complaint uses the terms "immigrant" and "noncitizen" interchangeably to refer to a foreign national living in the United States, while the Rule generally refers to these individuals as "aliens."

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

8

1    and the finances of the State, and this action seeks relief against federal agencies

2    and officials acting in their official capacities.

3    ### III.    PARTIES

4    21.    The States of Washington, Colorado, Delaware, Illinois, Maryland,

5    Minnesota, Nevada, New Jersey, New Mexico, Rhode Island, and Attorney

6    General Dana Nessel on behalf of the People of Michigan, and the

7    Commonwealths of Virginia and Massachusetts, represented by and through their

8    respective Attorneys General, are sovereign states of the United States of

9    America.

10    22.    Bob Ferguson is the chief legal adviser to the State of Washington.

11    His powers and duties include acting in federal court on behalf of the State on

12    matters of public concern.

13    23.    Mark Herring is the chief legal adviser to the Commonwealth of

14    Virginia. His powers and duties include acting in federal court on behalf of the

15    State on matters of public concern.

16    24.    Phil Weiser is the chief legal adviser to the State of Colorado. His

17    powers and duties include acting in federal court on behalf of the State on matters

18    of public concern.

19    25.    Kathleen Jennings is the chief legal adviser to the State of Delaware.

20    Her powers and duties include acting in federal court on behalf of the State on

21    matters of public concern.

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

9

1    26.    Kwame Raoul is the chief legal adviser to the State of Illinois. His

2    powers and duties include acting in federal court on behalf of the State on matters

3    of public concern.

4    27.    Plaintiff State of Maryland is a sovereign state of the United States

5    of America. Maryland is represented by and through its chief legal officer,

6    Attorney General Brian Frosh. Under the Constitution of Maryland, and as

7    directed by the Maryland General Assembly, the Attorney General has the

8    authority to file suit to challenge action by the federal government that threatens

9    the public interest and welfare of Maryland residents.

10   28.    Maura Healey is the chief legal adviser to the Commonwealth of

11   Massachusetts. Her powers and duties include acting in federal court on behalf

12   of the State on matters of public concern.

13   29.    Dana Nessel is Michigan's chief law enforcement officer. Her

14   powers and duties include acting in federal court on behalf of the people of the

15   State of Michigan on matters of public concern.

16   30.    Keith Ellison is the chief legal adviser to the State of Minnesota. His

17   powers and duties include acting in federal court on behalf of the State on matters

18   of public concern.

19   31.    Aaron D. Ford is the chief legal adviser to the State of Nevada. His

20   powers and duties include acting in federal court on behalf of the State on matters

21   of public concern.

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

10

32.     Gurbir Singh Grewal is the chief legal adviser to the State of New Jersey. His powers and duties include acting in federal court on behalf of the State on matters of public concern.

33.     Hector Balderas is the chief legal adviser to the State of New Mexico. His powers and duties include acting in federal court on behalf of the State on matters of public concern.

34.     Peter F. Neronha is the chief legal adviser to the State of Rhode Island. His powers and duties include acting in federal court on behalf of the State on matters of public concern.

35.     The Plaintiff States bring this action to redress harms to their sovereign, proprietary, and quasi-sovereign interests and their interests as *parens patriae* in protecting the health and well-being of their residents. The Plaintiff States are affected by the Public Charge Rule, are directly injured by it, and the relief requested will redress their injuries.[3]

36.     The power to create and enforce a legal code is a uniquely sovereign interest. The Plaintiff States have adopted health care programs as parts of their legal codes that operate to improve and protect the health of their residents. These include cooperative federal-state programs such as Medicaid, which Congress has given them substantial financial incentives to establish and administer. The success and effectiveness of the Plaintiff States' legislative health care programs

_____

[3] A copy of the Final Rule is attached as Exhibit A.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

11

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1   will be significantly undercut by the Rule. The Plaintiff States' sovereign

2   interests in enforcing their statutory codes and achieving their purposes are

3   harmed by Defendants' challenged action.

4       37.   As a proprietor, a state is likely to have the same interests as other

5   similarly situated proprietors. The Plaintiff States have created and operate

6   programs and institutions to promote and ensure the health, housing stability,

7   nutrition and well-being of their residents. The success and effectiveness of these

8   facilities will be harmed by the Rule. The Plaintiff States' proprietary and

9   financial interests in programs and institutions they paid for with state taxpayer

10   funds, and which are managed by their employees and subcontractors are injured

11   by the Rule.

12       38.   A state has a quasi-sovereign interest in the health and

13   well-being—both physical and economic—of its residents in general. The

14   Plaintiff States' have a quasi-sovereign interest in protecting the health, safety,

15   and well-being of their residents. The Final Rule dissuades state residents from

16   utilizing the benefits of the Plaintiff States' benefits programs. It therefore

17   jeopardizes the health, housing, nutrition, and well-being of their residents,

18   citizen and noncitizen alike.

19       39.   The Plaintiff States and their residents will suffer significant and

20   irreparable harm if the Final Rule goes into effect.

21

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

12

1    40.    Defendant DHS is an executive agency with responsibility for

2    administering federal immigration laws.

3    41.    Defendant Kevin K. McAleenan is the Acting Secretary of DHS. He

4    is sued in his official capacity.

5    42.    Defendant USCIS is a component agency of DHS. Since

6    March 1, 2003, USCIS has had primary responsibility for the immigration

7    service functions of the federal government, including the administration of

8    applications by foreign nationals in the United States for adjustment of status to

9    lawful permanent residency, immigrant and nonimmigrant visas, change of status

10    to a different visa category, or extension of stay.

11    43.    Kenneth T. Cuccinelli II is the Acting Director of USCIS. He is sued

12    in his official capacity.[4]

13    **IV.    HISTORY OF THE PUBLIC CHARGE EXCLUSION**

14    44.    The term "public charge" has an established meaning in American

15    law that dates back to the 17th century. Since its origin in colonial residency

16    _____

17    [4] Challenges have been raised to the propriety of Cuccinelli's appointment

18    to this position. Joel Rose, *Trump Administration Taps Hard-Liner Cuccinelli*

19    *For Top Immigration Job*, Nat'l Pub. Radio Jun. 10, 2019 ("Legal experts say

20    that [allowing] Cuccinelli to serve as acting director . . . would violate the spirit

21    of the [Federal Vacancies Reform Act], according to Anne Joseph O'Connell, an

22    expert on administrative law at Stanford Law School.").

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

13

requirements and through its reception into state and then federal immigration laws, a "public charge" has consistently meant a person primarily dependent on the government for subsistence. The Department's Final Rule disregards that unambiguous, centuries-old definition.

## A. Origins of Public Charge Exclusion in Colonial, State, and Federal Statutes

45.    As early as the 1650s, the American colonies adopted "poor" laws requiring each town to recognize its permanent residents' claims for relief if they became destitute.[5] Based on English models, colonial poor laws made the local governments responsible for supporting its poor residents, for whom the towns cared generously.[6] At the same time, however, such laws permitted towns to expel transient beggars or vagrants as "public charges."[7]

---

[5] Historians' Cmt. at 2, DHS Notice of Proposed Rule "Inadmissibility on Public Charge Grounds," FR 2018-21106 (Oct. 5, 2018) (Historians' Cmt.); Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833, 1846 (1993).

[6] Minor Myers III, *A Redistributive Role for Local Government*, 36 Urb. Law. 753, 773 (2004).

[7] Historians' Cmt. at 2; *Shapiro v. Thompson*, 394 U.S. 618, 628 (1969), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

14

46.    After the American Revolution, state governments came to play a greater role in administration of relief for the poor. When a person without a town "settlement" (or recognized residency right) fell into extreme need, he became a charge of the state or a "state pauper," as distinguished from a "town pauper."[8] In each case, in its original public meaning, "public charge" was synonymous with "pauper."

47.    State measures against immigration of "foreign paupers" developed alongside the state poor laws of the early Republic. As European migration to the United States grew in the early 19th century, states enacted or expanded laws to "prevent the introduction of [p]aupers" at ports of entry as "liable to become chargeable," *i.e.*, public charges.[9] For example, a New York statute prohibited landing of "any lunatic, idiot, deaf and dumb, blind or infirm persons . . . likely to become *permanently* a public charge."[10] Under that law and similar ones in

_____

(1974) ("Newcomers to a city, town, or county who might become public charges were 'warned out' or 'passed on' to the next locality.").

    [8] Kunal M. Parker, *State, Citizenship, and Territory: The Legal Construction of Immigrants in Antebellum Massachusetts*, 19 L. & Hist. Rev. 583, 591 (2001).

    [9] Act of Feb. 25, 1820, ch. 290, 1820 Mass. Laws 428.

    [10] Annual Reps. of the Comm'rs of Emigration of the State of New York, May 5, 1847, to 1860, 1851 Ch. 105, at 339. (Boston: Dutton and Wentworth,

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

15

1  other states, vessel captains were required to post bond or pay a fee to indemnify

2  the state in the event foreign passengers were to become public charges.[11] Again,

3  these state immigration statutes used the terms "paupers" and "public charges"

4  interchangeably and in the "legal, technical sense" as persons "unable to maintain

5  themselves," and not "merely" those who temporarily had "no visible means of

6  support."[12] "Public charge" thus referred to people unlikely to ever become

7  self-sufficient.

8         48.    Eventually, the U.S. Supreme Court struck down such state statutes

9  under the Commerce Clause, ushering in the end of the era of state immigration

10  _____

11  1951) (emphasis added); Act of Mar. 20, 1850, ch. 105, § 1, 1850 Mass. Acts &

12  Resolves 338, 339 ("a pauper, lunatic, or idiot, or maimed, aged, infirm or

13  destitute, or incompetent to take care of himself or herself without becoming

14  a public charge as a pauper").

15       [11] Historians' Cmt. at 2; Gerald L. Neuman, *The Lost Century of American*

16  *Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833, 1849–51, 1901 & n.151

17  (1993); State, Citizenship, and Territory: The Legal Construction of Immigrants

18  in Antebellum Massachusetts, 19 Law & Hist. Rev. 583, 624 (2001); Act of

19  June 1847, 1847 R.I. Acts 27; R.I. Rev. Stat. ch. 51, §§ 5-8 (1857); Act of

20  June 27, 1820, ch. 26, 1820 Me. Laws 35; Act of Mar. 22, 1838, ch. 339, 1838

21  Me. Pub. Acts 497.

22       [12] *City of Boston v. Capen*, 61 Mass. 116, 121–22 (1851).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

16

1    laws.[13] In their place, Congress enacted the Immigration Act of 1882, which

2    borrowed from state laws in erecting a public charge ground of inadmissibility.[14]

3    The Act prohibited the landing of "any convict, lunatic, idiot, or any other person

4    unable to take care of himself . . . without becoming a public charge."[15]

5    Consistent with the plain text and historical context, the legislative history

6    confirms that "public charges" were those living in "poor-houses and

7    alms-houses."[16] Indeed, in 1891, Congress amended the exclusion to preclude

8    admission of "idiots, insane persons, *paupers or persons likely to become a public*

9    *charge.*"[17]

10   **B.    Early Administrative and Judicial Precedent on Public Charge**

11        49.    Judicial and administrative decisions applying the federal public

12   charge ground of inadmissibility interpreted the statute consistently with the

13   original public meaning of the term "public charge," namely, as a person

14   primarily and permanently dependent on the state for subsistence.

15

16   _____

17        [13] *See, e.g.*, *Passenger Cases*, 48 U.S. (7 How.) 283 (1849); *Henderson v.*

18   *Mayor of New York*, 92 U.S. 259, 274 (1875).

19        [14] 22 Stat. 214 (1882).

20        [15] *Id.*

21        [16] 13 Cong. Rec. 5109 (statement of Sen. Voorhis).

22        [17] 26 Stat. 1084, 1084 (1891) (emphasis added).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

17

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

50.     For example, in *Gegiow v. Uhl*, the U.S. Supreme Court read "public charge" consistent with the surrounding statutory categories of exclusions, including "paupers and professional beggars, . . . idiots," and "persons dangerously diseased [or suffering from] . . . a physical defect of a nature to affect their ability to earn a living."[18] In a decision by Justice Holmes, the Court thus held that a public charge is excludable only "on the ground of *permanent* personal objections accompanying them."[19] Likewise, an early Second Circuit case held that the public charge category only "exclude[s] persons who were likely to become occupants of almshouses."[20] Following those precedents, federal courts in the first half of the 20th century consistently interpreted "public charge" as "generically similar to 'paupers,' . . . 'professional beggars,' [and] . . . 'occupants of almshouses.' "[21] In the context of the public charge deportability provision, one court defined "public charge" even more narrowly to mean "a person committed to the custody of a department of the government by due course of

---

[18] 239 U.S. 3, 9–10 (1915).

[19] *Gegiow*, 239 U.S. at 10 (emphasis added).

[20] *Howe v. United States ex rel. Savitsky*, 247 F. 292, 294 (2d Cir. 1917).

[21] *Ex parte Mitchell*, 256 F. 229, 233 (N.D.N.Y. 1919); *see also United States v. Williams*, 175 F. 274, 275 (S.D.N.Y. 1910) (L. Hand, J.) (noting that "the primary meaning of the words, ['likely to become a public charge']" was probably "likelihood of . . . becoming a pauper").

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF                    18                ATTORNEY GENERAL OF WASHINGTON
                                                      8127 W. Klamath Court, Suite A
                                                      Kennewick, WA 99336
                                                      (509) 734-7285

law."[22] These cases reaffirmed the understanding of "public charge" as a person permanently and primarily dependent on government for survival.

51.    Federal agencies charged with enforcing immigration laws also interpreted the public charge ground of inadmissibility in accordance with the settled meaning of the term. For example, in 1917, the Bureau of Immigration ruled that "moral perverts" were not "public charges" under the immigration laws, absent tangible proof of pauper status.[23]

## C.    Modern Regulatory Framework

52.    It was against the foregoing legal backdrop that Congress enacted the Immigration and Nationality Act of 1952 (INA),[24] which codified the current public charge ground of inadmissibility. In reenacting the federal public charge exclusion—which itself borrowed from earlier state laws—Congress adopted the settled understanding of public charge and ratified the judicial precedents

---

[22] *Ex parte Tsunetaro Machida*, 277 F. 239, 241 (W.D. Wash. 1921).

[23] *See* Parthenios Colones, Bureau of Immigr., U.S. Dep't of Labor, INS File No. 54134/62, Accession 60A600, Box 869, Records of the INS, *cited in* William N. Eskridge, Jr., *Law and the Construction of the Closet: American Regulation of Same-Sex Intimacy, 1880-1946*, 82 Iowa L. Rev. 1007, 1134 (1997).

[24] Pub L. 82–414, 66 Stat. 163.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

19

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1   interpreting the term.[25] In the 70 years since the INA's enactment, numerous

2   statutes and administrative decisions have comported with and confirmed the

3   settled meaning of public charge as a person permanently and primarily

4   dependent on government for survival.

5        **1.**    **Immigration and Nationality Act of 1952**

6        53.    The INA overhauled federal immigration law, unifying previously

7   scattered sections and adding new provisions in a statutory framework that exists

8   to this day.[26] Overriding President Truman's veto, Congress declared its power

9   to "provide for the elimination of undesirable aliens" and set forth numerous new

10   categories of inadmissibility, including "anarchists," "Communist[s]," or

11   "affiliated with . . . any . . . totalitarian party."[27]

12        54.    The INA also reenacted the public charge exclusion that had been

13   part of federal immigration law since 1882. Section 212(a) excluded from

14   admission into the United States "[a]liens who, in the opinion of the consular

15   officer at the time of application for a visa, or in the opinion of the Attorney

16

17

18

---

19      [25] *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998); *Lorillard v. Pons*,

20   434 U.S. 575, 580 (1978).

21      [26] Act of June 27, 1952, 66 Stat. 163, *codified as amended at* Title 8 U.S.C.

22      [27] 66 Stat. 184, § 212(a)(28).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

20

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

General at the time of application for admission, are likely at any time to become public charges."[28]

55.   In applying the modern public charge exclusion, federal immigration authorities considered the "totality of the alien's circumstances,"[29] including "economic factors" and "the alien's physical and mental condition, as it affects ability to earn a living."[30] The Board of Immigration Appeals (BIA) held specifically that "[t]he fact that an alien has been on welfare does not, by itself, establish that he or she is likely to become a public charge."[31] And in the government's appeal from a BIA decision overturning a public charge determination, Attorney General Robert F. Kennedy affirmed, noting that the

---

[28] 66 Stat. 183, § 212(a)(15).

[29] *In re Perez*, 15 I. & N. Dec. 136, 137 (BIA 1974) (citing Foreign Affairs Manual, Part III, Vol. 9, Note 1 to 22 CFR 42.91(a)(15)).

[30] *In re Harutunian*, 14 I. & N. Dec. 583, 588 (BIA 1974); *see also* Adjustment of Status for Certain Aliens, 53 Fed. Reg. 43986-01, 43996 (1988) ("In determining whether an alien is 'likely to become a public charge' financial responsibility of the alien is to be established by examining the totality of the alien's circumstances at the time of his or her application for legalization."), *codified at* 8 C.F.R. § 245a.3(g)(4)(i).

[31] *In re Perez*, 15 I. & N. Dec. at 137.

21

INA "requires more than a showing of a possibility that the alien will require public support."[32]

56.    In 1989, DOJ issued a final rule establishing guidelines for public charge determinations in various contexts, including adjustment to lawful permanent resident status.[33] In such determinations, the "financial responsibility of the alien is to be established by examining the totality of the alien's circumstances at the time of his or her application," and the "existence or absence of a particular factor should never be the sole criteria for determining if an alien is likely to become a public charge."[34] The determination "should be a prospective evaluation based on the alien's age, health, income, and vocation."[35] And even where an immigrant's "income may be below the poverty level," he is "not excludable" as a public charge if he "has a consistent employment history which shows the ability to support himself."[36] Though a noncitizen's past acceptance of "public cash assistance" may "enter into this decision," the 1989

---

[32] *In re Martinez-Lopez*, 10 I. & N. Dec. 409, 421 (A.G. 1962).

[33] U.S. Dep't of Justice, Final Rule: Adjustment of Status for Certain Aliens, 54 FR 29442-01 (July 12, 1989), codified in relevant part at 8 C.F.R. §§ 245a.2(k)(4), 245a.3(g)(4)(iii), 245a.4(b)(1)(iv)(C)

[34] 8 C.F.R. § 245a.3(g)(4)(i).

[35] *Id.*

[36] *Id.* § 245a.3(g)(4)(iii).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

22

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    DOJ rule does not provide for consideration of non-cash public benefits.[37] This

2    rule reaffirmed the understanding of a public charge as a person permanently and

3    primarily dependent on government for survival: a person unlikely to ever

4    become self-sufficient.

5        **2.    Current public charge legal framework**

6        57.    Congress amended the INA in 1990 to drop the "paupers,

7    professional beggars, or vagrants" exclusions, but retained the public-charge

8    inadmissibility ground.[38] The ranking member of the House Judiciary

9    Committee, Representative Hamilton Fish IV (R-NY), explained that in

10    eliminating the "paupers, professional beggars, or vagrants" inadmissibility

11    ground, Congress was replacing an "antiquated" exclusion with "one generic

12    standard which exclude[s] aliens who are 'likely to become a public charge.' "[39]

13        58.    That provision, INA Section 212(a)(4), is one of two public charge

14    provisions in the INA. In its current form, Section 212(a)(4) provides that "[a]ny

15    alien who, . . . in the opinion of the [Secretary of DHS] at the time of application

16    for admission or adjustment of status, is likely at any time to become a public

17

18    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

19       [37] *Id.*

20       [38] *See* Immigration Act of 1990, Pub. L. No. 101-649, § 601(a)(4), 104

21    Stat. 4978, 5072 (codified as amended at 8 U.S.C. § 1182).

22       [39] 136 Cong. Rec. 36,844 (1990).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

23

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

charge is inadmissible."[40] Under the INA, an application for "adjustment of status" means an application for lawful permanent residency (*i.e.*, a green card).[41] USCIS is the agency within DHS that processes applications from foreign nationals in the United States—including those with immigrant visas and those with temporary nonimmigrant visas (such as for business or tourism)—for adjustment of status to lawful permanent residency.[42]

59.    The same INA provision also provides that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa . . . is likely at any time to become a public charge is inadmissible."[43] This public charge exclusion is administered by U.S. embassies and consulates abroad, which

---

[40] Immigration and Nationality Act of 1952, Pub L. 82–414, 66 Stat. 163., § 212(a)(4), *codified as amended at* 8 U.S.C. §1182(a)(4). The text of Section 212(a)(4) refers to the "Attorney General," but pursuant to Congress's transfer of adjudicatory functions of the former Immigration and Naturalization Service (INS) to DHS, *see* 6 U.S.C. § 271(b)(5), the reference is "deemed to refer to the Secretary" of Homeland Security.

[41] *See, e.g.*, 8 U.S.C. §§ 1255(a), 1101(a)(20).

[42] *See* 6 U.S.C.A. § 271 (establishing USCIS under former name).

[43] Immigration and Nationality Act of 1952, Pub L. 82–414, 66 Stat. 163., § 212(a)(4), *codified as amended at* 8 U.S.C. §1182(a)(4).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

24

1    process visa applications by foreign nationals outside the Untied States.[44]

2    Although the Secretary of State may "direct a consular officer to refuse a visa,"[45]

3    the Homeland Security Act of 2002 vests the DHS Secretary "exclusively with

4    all authorities to issue regulations . . . relating to the functions of consular

5    officers . . . in connection with the granting or refusal of visas."[46]

6         60.    A separate section of the INA, Section 237(a)(5), provides that

7    "[a]ny alien who, within five years after the date of entry, has become a public

8    charge from causes not affirmatively shown to have arisen since entry is

9    deportable."[47] DOJ enforces this public charge provision under its authority to

10   adjudicate immigration cases, including removal proceedings.[48] DOJ is currently

11   preparing a proposed public charge rule to "more closely conform [its]

12   regulations with the DHS public charge rule" challenged here.[49] The Plaintiff

13   States do not now challenge DOJ's forthcoming rule.

14   _____

15   [44] *See* 8 U.S.C. § 1201(a) (authorizing consular officers to issue immigrant

16   and nonimmigrant visas); 9 FAM 302.8.

17   [45] 6 U.S.C. § 236(c)(1).

18   [46] *Id.*

19   [47] 8 U.S.C. § 1227(a)(5).

20   [48] *See* 8 U.S.C. § 1103(g).

21   [49] Inadmissibility on Public Charge Grounds, RIN 1125-AA84, Spring

22   2019 Spring Regulatory Agenda, Office of Information and Regulatory Affairs,

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF                    25                    ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

### 3.   Illegal Immigration Reform and Immigrant Responsibility Act of 1996

61.    Section 212(a)(4)'s public charge exclusion has remained largely identical throughout Congress's many reenactments of the INA. The single material revision came in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Immigration Reform Act), when Congress codified the BIA's long-applied totality of circumstances test.[50] Amending the INA, the Immigration Reform Act set forth five factors that must be considered "at minimum" to determine whether an alien is likely to become a public charge: (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills.[51] Congress also authorized consular and immigration officers to consider any "affidavit of support" furnished on behalf of an applicant and provide that certain family-sponsored and employment-based immigrants are inadmissible without such affidavits.[52]

62.    The Immigration Reform Act is also important for what Congress did not do. The version of the law adopted by the House would have redefined

_____

Office of Management and Budget, https://www.reginfo.gov/public/do/eAgenda ViewRule?pubId=201904&RIN=1125-AA84 (last visited Aug. 2, 2019).

[50] Pub. L. 104-208, Div. C, 110 Stat. 3009, Sec. 531(a)(4)(B), *codified as amended at* 8 U.S.C. § 1182.

[51] 8 U.S.C. § 1182(a)(4)(B)(i).

[52] 8 U.S.C. §§ 1182(a)(4)(B)(ii), 1183a.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

"public charge" for deportability purposes in a manner strikingly similar to the Department's new Rule. The unenacted bill defined "public charge" to "include[] any alien who receives [means-tested public] benefits for an aggregate period of at least 12 months."[53] That public charge definition was stricken from the bill adopted by the full Congress and signed by the President.[54]

63.     At no point did Congress ever indicate that it intended to alter the long-settled meaning of the term, "public charge." Other than the codification of the totality of circumstances test, the INA has retained nearly identical language throughout its many amendments (the most recent in 2013).

### 4.     Personal Responsibility and Work Opportunity Act of 1996

64.     The same year it enacted the Immigration Reform Act, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Welfare Reform Act).[55] Before 1996, lawfully present immigrants were generally eligible for public benefits on similar terms as U.S. citizens, provided they met the same means-tested eligibility criteria. The Welfare Reform Act significantly altered that general rule, classifying immigrants into two general categories: "qualified" and "non-qualified."[56] Qualified immigrants include

---

[53] H.R. Rep. No. 104-828, at 138 (1996) (Conf. Rep.).

[54] Pub. L. 104-208, Div. C, 110 Stat. 3009.

[55] Pub. L. 104-193, 110 Stat. 2105.

[56] 8 U.S.C. § 1641(b).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

27

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    lawful permanent residents, refugees, asylees, humanitarian parolees, Cuban and

2    Haitian entrants, noncitizens granted withholding of deportation or conditional

3    entry, and certain victims of battery or extreme cruelty by a spouse or other family

4    member.[57] All other immigrants, regardless of their legal status, are non-qualified

5    under the Welfare Reform Act. With certain exceptions, non-qualified

6    immigrants are ineligible for federal public benefits.[58]

7         65.   Qualified immigrants, however, generally may be eligible for

8    "federal means-tested public benefits" after five years of entry to the United

9    States.[59] Such benefits include Medicaid, TANF, and State Child Health

10    Insurance Program (CHIP) and, with further limitations, food stamp benefits

11    under the Supplemental Nutrition Assistance Program (SNAP) and Supplemental

12    Security Income (SSI).[60] For certain "designated federal programs" (namely,

13    TANF, social services block grants, and Medicaid), a "State is authorized to

14    determine the eligibility of" qualified immigrants.[61]

15

16    ———————————

17        [57] 8 U.S.C. § 1641(b)–(c).

18        [58] 8 U.S.C. § 1611(a).

19        [59] 8 U.S.C. § 1613(a); *Pimentel v. Dreyfus*, 670 F.3d 1096, 1100 (9th Cir.

20    2012) (per curiam).

21        [60] 8 U.S.C. §§ 1611(c), 1612(b)(1).

22        [61] 8 U.S.C. § 1612(b)(1).

COMPLAINT FOR         28      ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND             8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                Kennewick, WA 99336
                                             (509) 734-7285

66.    State and local public benefits are less restricted under the Welfare Reform Act. Not only qualified immigrants, but also temporary, nonimmigrant visitors, are eligible for state and local public benefits.[62] The Welfare Reform Act expressly authorizes each state to determine the eligibility for any state public benefits of any qualified alien or nonimmigrant.[63] In addition, a state may provide by statute that "an alien who is not lawfully present in the United States is eligible for any State or local public benefit."[64]

67.    In the wake of the Welfare Reform and Immigration Reform Acts, "public confusion" emerged concerning the relationship between receipt of federal, state, or local benefits and the public charge provisions of federal immigration law.[65] According to the U.S. Department of State, "such confusion led many persons in the immigrant community to choose not to sign up for important benefits, especially health-related benefits, which they were eligible to

_____

[62] 8 U.S.C. §§ 1621(a), 1622(a).

[63] 8 U.S.C. § 1622(a).

[64] 8 U.S.C. § 1621(d).

[65] *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28689-01, 28,689 (May 26, 1999) (Field Guidance).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

29

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

receive" out of "concern[s] it would affect their or a family member's immigration status."[66]

### 5.    Agency guidance

68.    To alleviate public confusion, the Immigration and Naturalization Service (INS) issued a memorandum (Field Guidance) providing "new guidance on public charge determinations in light of the recent changes in law."[67] The Field Guidance defined a "public charge" as an immigrant who is "primarily dependent

---

[66] U.S. State Department Cable, INA 212(A)(4) Public Charge: Policy Guidance, Ref: 9 FAM 40.41 (hereinafter State Department cable).

[67] 64 Fed. Reg. 28,690. On the same day it issued the Field Guidance, DOJ also published a proposed rule adding further gloss to the public charge definition. *See Inadmissibility and Deportability on Public Charge Grounds*, 64 Fed. Reg. 28,676 (May 26, 1999). That proposed rule observed that the "primary dependence model of public assistance was the backdrop against which the 'public charge' concept in immigration law developed in the late 1800s," and "[h]istorically, individuals who became dependent on the Government were institutionalized in asylums or placed in 'almshouses' . . . long before the array of limited-purpose public benefits now available existed." *Id.* at 28,677. Although DOJ never published a final public charge rule, the Field Guidance's public charge definition and policies were "adopt[ed] . . . immediately" and have guided DOJ—and, later, DHS—policy ever since.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

30

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense."[68]

69.    That definition was not a product of INS's administrative discretion, but rather a direct application of the traditional, established meaning of the term "public charge." As INS explained in a separate regulation it proposed alongside the Field Guidance, it based its definition on "the plain meaning of the word 'charge'" and "the historical context of public dependency when the public charge immigration provisions were first adopted more than a century ago."[69] The ordinary meaning of the word "charge," as used in the INA, is "a person or thing committed or entrusted to the care, custody, management, or support of another"—in the case of a *public* charge, to the government.[70] Because a person who receives only supplemental public assistance is not "committed" to the government's "care" or "custody," INS concluded that the term "public charge" encompasses only instances of "complete, or nearly complete, dependence on the Government rather than the mere receipt of some lesser level of financial

---

[68] 64 Fed. Reg. at 28,689.

[69] *Inadmissibility and Deportability on Public Charge Grounds*, 64 Fed. Reg. 28,676, 28,677 (May 26, 1999).

[70] *Id.* (quoting *Webster's Third New International Dictionary* 337 (1986)).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

31

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

support."[71] Although INS never published a final public charge rule, the Field Guidance's public charge definition and policies were "adopt[ed] . . . immediately" and have guided DOJ—and, later, DHS—policy ever since.[72]

70.    The Field Guidance instructed that consular and immigration "officers should not place any weight on the receipt of non-cash public benefits" other than long-term institutionalization.[73] INS explained that because "non-cash benefits . . . are by their nature supplemental and do not, alone or in combination, provide sufficient resources to support an individual or family," participation in such programs "is not evidence of poverty or dependence."[74] Among the list of benefits that should not be considered for public-charge purposes, the Field Guidance expressly listed "Medicaid and other health insurance and health services," CHIP, "[n]utrition programs," and [h]ousing benefits."[75] Finally, the Field Guidance made clear that it was designed to address "adverse impact . . . on public health and the general welfare" caused by confusion over the public charge standard—namely, that it had "deterred eligible aliens and their families,

---

[71] *Id.*

[72] 64 Fed. Reg. at 28,689.

[73] 64 Fed. Reg. at 28,689.

[74] *Id.* at 26,692–93.

[75] 64 Fed. Reg. at 28,693.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

32

1    including U.S. citizen children, from seeking important health and nutrition

2    benefits that they are legally entitled to receive."[76]

3        71.    In sum, the Field Guidance embraced the traditional understanding

4    of a public charge as a person permanently and primarily dependent on

5    government for subsistence. That definition has guided the government's

6    application of federal immigration law's public charge provisions for 20

7    years—since the end of the Clinton Administration, and through the entire

8    George W. Bush and Obama Administrations, and even through the

9    reorganization of the agencies responsible for enforcing the INA.

10        72.    In 2009, DOJ issued a Public Charge Fact Sheet (DOJ Fact Sheet),

11    which confirmed the Field Guidance's definition of "public charge" to mean "an

12    individual who is likely to become 'primarily dependent on the government for

13    subsistence.' "[77] The DOJ Fact sheet reiterated that "a number of factors must be

14    considered," in the public charge determination, "including age, health, family

15    status, assets, resources, financial status, education, and skills."[78] It also made

16

17    ───────────────

18        [76] 64 Fed. Reg. at 28,692.

19        [77] U.S. Dep't of Justice, Public Charge Fact Sheet, 2009 WL 3453730

20    (Oct. 29, 2011) (quoting "Field Guidance on Deportability and Inadmissibility

21    on Public Charge Grounds," 64 Fed. Reg. 28689 (May 26, 1999)).

22        [78] *Id.*

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

33

1    clear that "[n]o single factor—other than the lack of an affidavit of support, if

2    required—will determine whether an individual is a public charge."[79]

3        73.    The DOJ Fact Sheet echoed the Field Guidance rule that a public

4    charge determination may not be based on "non-cash benefits and

5    special-purpose cash benefits that are not intended for income maintenance."

6    Further reflecting the understanding of a public charge as someone permanently

7    and primarily dependent on government for survival, the DOJ Fact Sheet

8    specifically identified the following public benefit programs as irrelevant to a

9    public charge determination:

10        •    Medicaid and other health insurance and health services other

11    than support for long-term institutional care;

12        •    Nutrition programs, including SNAP, the Special

13    Supplemental Nutrition Program for Women, Infants and Children (WIC),

14    the National School Lunch and School Breakfast Program, and other

15    supplementary and emergency food assistance programs;

16        •    Housing benefits;

17        •    Child care services;

18        •    Job training programs; and

19        •    Non-cash benefits under TANF such as subsidized child care

20    or transit subsidies.

21    _____

22    [79] *Id.*

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

34

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

74.    The DOJ Fact Sheet further provided that while acceptance of "cash assistance for income maintenance"—including SSI, TANF, or local cash general assistance programs—could be considered in the public charge determination, "the mere receipt of these benefits does not automatically make an individual inadmissible" or "ineligible to adjust status to lawful permanent resident." Rather, "each determination is made on a case-by-case basis in the context of the totality of the circumstances."

75.    In 2011, USCIS issued its own Public Charge Fact Sheet (USCIS Fact Sheet) which affirmed that many common public benefits are not considered in making a public charge inadmissibility determination.[80] Those benefits included Medicaid and other health insurance and health services assistance (other than support for long-term care); CHIP; nutrition programs, such as food stamps; housing benefits; child care services; energy assistance; emergency disaster relief; foster care and adoption assistance; educational assistance; job training programs; non-cash benefits under TANF; community-based programs or services; and unemployment compensation.

76.    Although the USCIS Fact Sheet explained certain cash assistance programs could be considered in a public charge determination, receiving such benefits could not, in and of itself, render an immigrant inadmissible on public charge grounds. Rather, every public charge determination, USCIS confirmed,

_____

[80] Public Charge Fact Sheet, USCIS., Apr. 29, 2011.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

35

1    must be made on a case-by-case basis in light of all of the available evidence,

2    considering the totality of the immigrant's circumstances.

3          77.    In sum, from the colonial era through 115 Congresses and 44

4    presidential administrations, American law uniformly interpreted and applied the

5    term "public charge" to mean a "pauper" or a person permanently and "primarily

6    dependent on the government for subsistence." Specifically, federal agencies

7    reached consensus that an immigrant's past receipt of non-cash public

8    benefits—such as health, nutrition, or housing assistance, all of which bolster

9    overall public health and economic growth—should not be considered for

10   purposes of the public charge exclusion. The Department's Public Charge Rule

11   rejects that consensus, defying the original meaning of public charge and

12   substituting its own definition and criteria that cannot be reconciled with statutory

13   text, history, or precedent.

14        **V.    THE DEPARTMENT'S PUBLIC CHARGE RULE**

15         78.    During the 2016 campaign, President Trump ran on a platform to

16   radically transform U.S. immigration policy.

17         79.    Having failed to secure passage of any immigration legislation, the

18   Trump Administration promulgated the Public Charge Rule to circumvent

19   Congress and implement the President's anti-immigration agenda through the

20   regulatory backdoor. In issuing the Rule, the Department ignored hundreds of

21   thousands of public comments warning of its significant costs to working

22

COMPLAINT FOR                          36              ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                                              8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                                              Kennewick, WA 99336
                                                                 (509) 734-7285

1    families, children, patients, health care providers, American businesses, state and

2    local governments, and others, while failing to identify any tangible benefit the

3    Rule may conceivably produce.

4    **A.      The Trump Administration's Anti-Immigration Agenda**

5          80.    As a candidate and in office, President Trump endorsed significant

6    cuts to legal immigration and challenged the centrality of family reunification to

7    federal immigration policy. The official White House website states that "the

8    President supports ending chain migration, eliminating the Visa Lottery, and

9    moving the country to a merit-based entry system."[81]

10         81.    Shortly after President Trump's inauguration in January 2017, the

11   media obtained a draft of an "Executive Order on Protecting Taxpayer Resources

12   by Ensuring Our Immigration Laws Promote Accountability and Responsibility."

13   The draft Executive Order instructed DHS to "rescind any field guidance" and

14   "propose for notice and comment a rule that provides standards for determining

15   which aliens are admissible or deportable on public charge grounds," including

16   if a noncitizen receives or is likely to receive non-cash public benefits. The draft

17   Executive Order was never issued.[82]

18   _____

19         [81]   White House, Immigration, https://www.whitehouse.gov/issues/

20   immigration/ (last visited July 27, 2019).

21         [82] *See* Memorandum from Andrew Bremberg Regarding Executive Order

22   on Protecting Taxpayer Resources by Ensuring Our Immigration Laws Promote

82.    In 2017, two U.S. senators introduced a bill designed to significantly reduce legal immigration by, for example, curbing the government's long-established policy favoring family reunification. The Reforming American Immigration for a Strong Economy (RAISE) Act would have given visa preference only to immediate family and eliminated the diversity visa lottery, which allots a limited number of visas to countries with historically low rates of immigration to the United States.[83] It also proposed a "merit-based immigration system," which gives preference to immigrants between the ages of 26 and 30, with doctoral degrees, high English proficiency, and a job offer with a high salary. The RAISE Act would have precluded parents of adult U.S. citizens from applying for Legal Permanent Resident status and, if they entered as temporary nonimmigrants, barred those parents from receiving federal, state, or local public benefit.[84]

_____

Accountability and Responsibility (Jan. 23, 2017), https://www.nafsa.org/uploadedFiles/NAFSA_Dojo/Professional_Resources/Browse_by_Interest/International_Students_and_Scholars/DraftEOtaxprograms.pdf.

[83] S.B. 354, 115th Cong., 1st sess. (2017).

[84] *Id.* § 4(d)(2)(B).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

38

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

83. President Trump supported the RAISE Act.[85] Explaining his support, President Trump said "The RAISE Act prevents new migrants and new immigrants from collecting welfare . . . . They're not going to come in and just immediately go and collect welfare." The White House also asserted falsely that "[m]ore than 50 percent of all immigrant households receive welfare benefits, compared to only 30 percent of native households in the United States that receive welfare benefits."[86] In fact, immigrants are less likely to consume public assistance benefits than native-born Americans and, when they do, they generally consume a lower dollar value of benefits. Overall, immigrants consume 27% fewer benefits on average than native-born Americans with similar incomes and ages.[87]

84. In June 2017, shortly before announcing his support for the RAISE Act, President Trump received a briefing on immigration from White House senior adviser Stephen Miller. (Miller, an ardent supporter of the Public Charge

---

[85] White House, Fact Sheets, President Donald J. Trump Backs RAISE Act, Aug. 2, 2017, https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-backs-raise-act/

[86] *Id.*

[87] Alex Nowrasteh & Robert Orr, *Immigration and the Welfare State* at 1, 7, Cato Institute, May 10, 2018, https://object.cato.org/sites/cato.org/ files/pubs/ pdf/irpb6.pdf.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

39

Rule, had reportedly once told a former White House communications aide, "I would be happy if not a single refugee foot ever touched American soil."[88]) At the briefing, after learning that 15,000 Haitians had received U.S. visas in 2017, President Trump replied that they "all have AIDS." When President Trump learned that 40,000 Nigerians had received visas, he said that they would never "go back to their huts."[89]

85.    Defendant Cuccinelli has expressed similar sentiments. In a 2012 interview, Cuccinelli compared U.S. immigration policy to local laws governing treatment of rats, stating that a District of Columbia law prohibiting killing of rats or separating rat families is "worse than our immigration policy—you can't break up rat families. Or raccoons or all the rest and you can't even kill them. It's unbelievable."[90]

---

[88] Cliff Sims, *Team of Vipers: My 500 Extraordinary Days in the Trump White House* 191 (2019).

[89] Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times, Dec. 23, 2017, https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html?module=inline.

[90] Latino Voices, *Ken Cuccinelli Protested With Live Rats Over Comments About Immigrants*, Huff. Post. Nov. 5, 2013.

1    **B.    Rulemaking History**

2        86.    In December 2017, DHS noted in the Unified Agenda of Federal

3    Regulatory and Deregulatory Actions its intent to publish a Notice for Public

4    Rulemaking regarding the public charge ground of inadmissibility. In early 2018,

5    it was widely reported that the new rule would dramatically expand the types of

6    public assistance programs that could be considered in the public charge test,

7    including non-cash benefits like SNAP and Medicaid.[91] In January 2018, the

8    State Department revised the Foreign Affairs Manual (FAM) to instruct consular

9    officers to consider a wider range of public benefits when determining whether

10   visa applicants who have received or are currently receiving benefits are

11

12   _____

13       [91] *See, e.g.*, Nick Miroff, *Trump proposal would penalize immigrants who*

14   *use tax credits and other benefits*, Wash. Post. Mar. 28, 2018, https://

15   www.washingtonpost.com/world/national-security/trump-proposal-would-pen

16   alize-immigrants-who-use-tax-credits-and-other-benefits/2018/03/28/4c6392e0-

17   2924-11e8-bc72-077aa4dab9ef_story.html?noredirect=on&utm_term=.e291852

18   f1728; Yeganeh Torbati, *Exclusive: Trump administration may target*

19   *immigrants who use food aid, other benefits*, Reuters, Feb. 8, 2018,

20   https://www.reuters.com/article/us-usa-immigration-services-exclusive/

21   exclusive-trump-administration-may-target-immigrants-who-use-food-aid-other

22   -benefits-idUSKBN1FS2ZK.

COMPLAINT FOR                          41            ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                                          8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                                           Kennewick, WA 99336
                                                              (509) 734-7285

1   inadmissible on public charge grounds.[92] As revised, the FAM also allowed State

2   Department officials to consider whether an applicant's family member has

3   received public benefits as part of the public charge test.[93]

4       87.     Also in January 2018, President Trump rejected a bipartisan

5   immigration proposal by members of Congress. In reference to the deal's

6   protections for immigrants from Haiti and Africa, President Trump asked why he

7   should accept immigrants from "shithole countries" rather than from nations like

8   "Norway."[94]

9       88.     A detailed draft of DHS's proposed public charge rule was leaked

10  in March 2018. Under the draft proposed rule, new criteria would be considered

11  as heavily weighted negative factors in public charge determinations, including

16      [92] U.S. Dep't of State, "Public Charge" Update to 9 FAM 302.8

17  (Jan. 4, 2018), https://fam.state.gov/fam/09FAM/09FAM030208.html#M302_8.

18          [93] *Id.* at 302.8-2(B)(2)(f)(2)(b)(i).

19      [94] Julie Hirschfeld Davis, Sheryl Gay Stolberg & Thomas Kaplan, *Trump*

20  *Alarms Lawmakers With Disparaging Words for Haiti and Africa*, N.Y. Times,

21  Jan. 11, 2018, https://www.nytimes.com/2018/01/11/us/politics/trump-shithole-

22  countries.html.

COMPLAINT FOR                               42               ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                                                 8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                                                   Kennewick, WA 99336
                                                                      (509) 734-7285

1   whether an immigrant has received non-cash benefits regardless of the

2   immigrant's legal entitlement to participate in the benefit program.[95]

3       89.    In spring 2018, shortly after the draft rule leaked, DHS informed the

4   Office of Management and Budget (OMB) that it "will propose regulatory

5   provisions guiding the inadmissibility determination on whether an alien is likely

6   at any time to become a public charge."[96] As first provided to OMB, the proposed

7   rule was not classified as a "significant regulatory action"[97] or a "major" rule

8   pursuant to the Congressional Review Act.[98]

9       90.    The same month, President Trump said in a meeting at the White

10   House that the United States has "the dumbest laws on immigration in the world"

11   and exhorted his administration officials to "do much better" in keeping out

12   _____

13       [95] *Read the Trump administration's draft proposal penalizing immigrants*

14   *who accept almost any public benefit*, Wash. Post., http://apps.

15   washingtonpost.com/g/documents/world/read-the-trump-administrations-draft-

16   proposal-penalizing-immigrants-who-accept-almost-any-public-benefit/2841/.

17       [96] Office of Management and Budget (OMB), Office of Information and

18   Regulatory Affairs (OIRA), *Inadmissibility on Public Charge Grounds - Spring*

19   *2018*, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201804&

20   RIN=1615-AA22.

21       [97] Exec. Order 12,866, § 3(f).

22       [98] 5 U.S.C. § 804(2).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

43

1    undesirable immigrants. "You wouldn't believe how bad these people are,"

2    President Trump said. "These aren't people, these are animals . . . ."[99]

3        91.    In June 2018, Miller emailed then-USCIS Director L. Francis Cissna

4    regarding DHS's public charge rule. Miller wrote, "Francis – The timeline on

5    public charge is unacceptable." Miller continued, "I don't care what you need to

6    do to finish it on time." Miller also wrote, "It's an embarrassment that we've been

7    here for 18 months and USCIS hasn't published a single major reg."[100]

8        92.    In the same month, President Trump tweeted that immigrants are

9    "invad[ing]" and "infest[ing]" the United States.[101]  Of other countries, President

10

11

12    _____

13    [99] Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants*

14    *'Animals' in Rant*, N.Y. Times, May 16, 2018, https://www.nytimes.com/

15    2018/05/16/us/politics/trump-undocumented-immigrants-animals.html.

16    [100] Ted Hesson, *Emails show Miller pressed hard to limit green cards*,

17    Politico, Aug. 2, 2019, *available at* https://subscriber.politicopro.com/

18    article/2019/08/emails-show-miller-pressed-hard-to-limit-green-cards-1630406.

19    [101] Donald J. Trump (@realDonaldTrump), Twitter (June 24, 2018,

20    8:02 AM), https://twitter.com/realdonaldtrump/status/1010900865602019329;

21    Donald J. Trump (@realDonaldTrump), Twitter (June 19, 2018, 9:52 AM),

22    https://twitter.com/realDonaldTrump/status/1009071403918864385.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

44

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    Trump said at a rally that same month, "They're not sending their finest. We're

2    sending them the hell back."[102]

3         93.    At a political campaign event in Arizona in October 2018, President

4    Trump referred to Latin American immigrants as "bad hombres."[103]

5    **C.    The Department's Proposed Public Charge Rule**

6         94.    On October 10, 2018, DHS published a notice of proposed

7    rulemaking and proposed rule entitled *Inadmissibility on Public Charge Grounds*

8    (the Proposed Rule).[104] The Proposed Rule sought to significantly expand the

9    authority of the USCIS to designate an immigrant as inadmissible on the ground

10   that he or she is likely to become a "public charge," far beyond the long-settled

11   meaning of the term and its prior application in the history of U.S. immigration

12   law.

13   _____

14        [102] Katie Rogers & Jonathan Martin, *'We're Sending Them the Hell Back,'*

15   *Trump Says of Securing the Country's Borders*, N.Y. Times, June 20, 2018,

16   https://www.nytimes.com/2018/06/20/us/politics/trump-minnesota-rally.html.

17        [103] Christopher Cadelago and Brent D. Griffiths, *Still hopeful of keeping*

18   *House, Trump torches Democrats in the Desert*, Politico (Oct. 20, 2018).

19        [104] U.S. Citizenship and Immigration Servs., U.S. Dep't of Homeland

20   Security, *Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51,114-01,

21   51,198, to be codified at 8 C.F.R. pts. 103, 212, 213, 214, 245, and 248)

22   (Oct. 10, 2018).

COMPLAINT FOR                          45            ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                                         8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                                            Kennewick, WA 99336
                                                              (509) 734-7285

95.     The Proposed Rule redefined the term "public charge" to mean "an alien who receives one or more public benefit[s]."[105] The Proposed Rule defined "public benefit" to include not only a wide range of federal, state, local, or tribal cash benefits but also, in a reversal of decades of past practice and precedent, specific federally-funded non-cash benefits—namely SSI, SNAP, Section 8 housing assistance, and Medicaid.[106]

96.     In fact, the Department's Final Rule allowing consideration of SNAP benefits is directly contrary to existing federal law governing those programs.[107]

97.     The Proposed Rule would have required DHS in making a public charge determination to consider the immigrant's "past receipt of public benefits" above certain thresholds as a "heavily weighed negative factor" favoring exclusion.[108] The Proposed Rule's thresholds differed based on whether the benefit was "monetizable" or "non-monetizable."

98.     For "monetizable" benefits such as SNAP or TANF, the Proposed Rule imposed a dollar-value and durational threshold: it would have weighed

---

[105] 83 Fed. Reg. at 51,157 & 51,289 (to be codified at 8 C.F.R. § 212.21(a)).

[106] 83 Fed. Reg. at 51,289–90 (to be codified at 8 C.F.R. § 212.21(b)).

[107] 7 U.S.C. § 2017(b)

[108] 83 Fed. Reg. at 51,289–90 (to be codified at 8 C.F.R. § 212.22(c)(1)(3)).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

46

1    heavily against an immigrant's application if, within any one-year period, the

2    amount of public benefits received exceeds 15% of the Federal Poverty

3    Guidelines (FPG) for a household of one (the 15% threshold).[109] For

4    non-monetizable benefits such as Medicaid and subsidized housing, the Proposed

5    Rule set a purely durational threshold: the heavily weighed negative factor would

6    apply whenever an immigrant received such benefits for 12 months total in any

7    36-month period, regardless of the actual value of the benefits received (the

8    12-month threshold).[110]

9         99.    Any amount of cash assistance for income maintenance could be

10    considered as a negative factor favoring exclusion (though not "heavily

11    weighed") under the Proposed Rule.[111] However, it would not have permitted the

12    Department to consider at all an immigrant's receipt of non-cash public benefits

13    below the applicable durational or dollar-value thresholds.

14         100.   The Proposed Rule also sought to extend the public charge test into

15    two areas not provided by statute—noncitizens' applications for (1) extension of

16    stay, and (2) change of status. Under the Proposed Rule, as a mandatory

17    "condition of approval," a noncitizen would have had to "demonstrate" that since

18

19    _____

20         [109] 83 Fed. Reg. at 51,289–90 (to be codified at 8 C.F.R. § 211.21(b)(1)).

21         [110] 83 Fed. Reg. at 51,290 (to be codified at 8 C.F.R. § 212.22(b)(2)).

22         [111] 83 Fed. Reg. at 51,292 (to be codified at 8. C.F.R. § 212.22(d)).

COMPLAINT FOR                              47                    ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                                                      8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                                                       Kennewick, WA 99336
                                                                          (509) 734-7285

1    obtaining the nonimmigrant status she seeks to change or extend she has not

2    received, nor "is likely to receive," a public benefit.[112]

3        101.    The Department acknowledged that it had issued the Proposed Rule

4    despite "anticipat[ing] that a number of individuals would be likely to disenroll

5    or forego enrollment in a number of public benefits program as a result of the

6    proposed rule."[113]    The Department acknowledged that it was "unable to

7    determine the exact percentage of individuals who would disenroll or forego

8    enrollment" in public benefit programs.[114] The Department was also unable to

9    "determine whether immigrants are net contributors or net users of government-

10    supported public assistance programs."[115] Finally, the Department was "not able

11    to estimate potential lost productivity, health effects, additional medical expenses

12    due to delayed health care treatment, or increased disability insurance claims as

13    a result of this proposed rule."[116]

14

15    _____

16        [112] 83 Fed. Reg. 51,295 (to be codified at 8 C.F.R. § 214.1(a)(3)(iv)

17    extension of stay); 83 Fed. Reg. at 51,296 (to be codified at 8 C.F.R. § 248.1(a)

18    (change of status).

19        [113] 83 Fed. Reg. at 51,264.

20        [114] 83 Fed. Reg. at 51,274.

21        [115] 83 Fed. Reg. at 51,235.

22        [116] 83 Fed. Reg. at 51,236.

48

1      **D.      Plaintiff States' Opposition to Proposed Rule**

2              **1.      Comments to proposed rule**

3              102.    During the 60-day comment period, the Department received over

4      260,000 comments on the Proposed Rule. The vast majority of those public

5      comments opposed the Proposed Rule. Many comments focused on the

6      significant hardships the Proposed Rule would cause by deterring individuals and

7      families—immigrants, nonimmigrant visitors, and U.S. citizens alike—from

8      accessing public benefits for which they are eligible. Commenters also described

9      the significant administrative and financial burden the Proposed Rule, if

10     finalized, would impose on state and local government agencies, U.S. businesses,

11     families, and individuals.

12             103.    The Attorneys General of New Mexico, Virginia, California, the

13     District of Columbia, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maryland,

14     Massachusetts, Minnesota, New Jersey, New York, Oregon, Pennsylvania,

15     Rhode Island, Vermont, and Washington submitted a joint comment letter

16     opposing the Proposed Rule (the Multistate Comment).[117] The Multistate

17     Comment urged the Department to modify or withdraw the Proposed Rule

18     because it would "burden states with additional healthcare costs," "harm

19     _____

20             [117] Comment of Commonwealth of Virginia *et al.* on Proposed Rule:

21     Inadmissibility on Public Charge Grounds, DHS Dkt. No. USCIS-2010-0012

22     (Oct. 10, 2018), Dec. 10, 2018 (Multistate Cmt.).

families," "discriminate against people with disabilities," and "improperly disfavor non-English speakers."[118] Fear of the new public charge rule "will cause many eligible immigrants—including some who are exempt from the Proposed Rule altogether—to drop their benefits or decline to enroll."[119] The Multistate Comment noted that, following leaks of the draft proposed rule, "individuals and families dropped out in noticeable numbers from support programs that are not included in the Proposed Rule."[120] By leading to a reduction in Medicaid program enrollment, the Proposed Rule would, if finalized, "increase costs to the States and their residents for state-funded public health clinics, school health programs, and uncompensated emergency care."[121]

104.   In addition to joining the Multistate Comment, Plaintiff State of Washington submitted its own comment letter opposing the Proposed Rule (the Washington Comment). Signed by Washington's Governor and Attorney General, as well as the Mayor of Seattle, the Washington Comment urged the Department to withdraw the Proposed Rule because, if adopted, it "will gravely harm Washingtonians, causing children in our State—noncitizens and citizens

---

[118] Multistate Cmt. at 2.

[119] Multistate Cmt. at 5.

[120] Multistate Cmt. at 11.

[121] Multistate Cmt. at 2.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

50

alike—to forfeit meals, health insurance and a roof over their heads."[122] The Washington Comment projected that the Proposed Rule would (1) cause "[o]ver 140,000 Washington residents [to] lose health insurance"; (2) cause Washingtonians to forgo up to $55.3 million in State food and cash benefits and $198.7 million in medical care annually; (3) reduce total state economic output by up to $97.5 million annually; (4) cut wages up to $36.7 million per year; and (5) eliminate up to 782 jobs.[123]

105.   In addition to joining the Multistate Comment, Plaintiff Commonwealth of Massachusetts and several of its agencies submitted comments opposing the proposed rule and detailing harms to its health care, public health, housing, and public welfare systems.

106.   By law, the Department was required to review every public comment received and describe and respond to each "significant" comment in the preamble of any final regulation.[124]

---

[122] Comment of Governor Jay Inslee, Attorney General Bob Ferguson, and Mayor Jenny Durkan re DHS Dkt. No. USCIS-2010-0012, Proposed Rule: *Inadmissibility on Public Charge Grounds*, RIN 1615–AA22 (Oct. 10, 2018), Dec. 10, 2018, at 2 (Wash. Cmt.).

[123] Wash. Cmt. at 1–2.

[124] *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015); Office of Information and Regulatory Affairs, *Regulations and the Rulemaking Process*,

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

51

1  **2.   White House involvement and review**

2  107.   By March 2019, the Department had not yet published a final rule.

3  At a meeting in the White House Situation Room that month, senior adviser

4  Stephen Miller expressed his frustration that the "transformative" public charge

5  rule had not yet been finalized. "You ought to be working on this regulation all

6  day every day," Miller shouted. "It should be the first thought you have when

7  you wake up. And it should be the last thought you have before you go to bed.

8  And sometimes you shouldn't go to bed."[125]

9  108.   Within weeks of the Situation Room meeting, President Trump

10  removed multiple DHS senior officials from their positions, including

11

12

13

14  _____

15  https://www.reginfo.gov/public/jsp/Utilities/faq.myjsp            (last       visited

16  July 28, 2019). A "significant comment" is one that "raise[s] relevant points and

17  which, if adopted, would require a change in the agency's proposed rule." *Am.*

18  *Mining Cong. v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992).

19  [125] Eileen Sullivan & Michael D. Shear, *Trump Sees an Obstacle to Getting*

20  *His Way on Immigration: His Own Officials*, N.Y. Times, Apr. 14, 2019, https://

21  www.nytimes.com/2019/04/14/us/politics/trump-immigration-stephen-

22  miller.html.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

52

1    then-Homeland Security Secretary Kirstjen Nielsen and then-USCIS Director L.

2    Francis Cissna.[126]

3    109.    On July 12, 2019, the Department transmitted the Rule to the White

4    House Office of Management and Budget (OMB) for regulatory review pursuant

5    to Executive Order 12,866 (E.O. 12,866).[127] As required by law, the OMB Office

6    of Information and Regulatory Affairs (OIRA) held E.O. 12,866 meetings with

7    interested parties in the two weeks following its receipt of the Rule. On

8    July 24, 2019, a coalition of 17 states, including the Plaintiff States, requested a

9    meeting with OIRA—both through the OIRA online E.O. 12866 meeting request

10   system and via letter transmitted by e-mail—to further express their "significant

11   concerns about the severe impact that [the public charge] rule would have on our

12   states' residents." Although OIRA held at least four E.O. 12,866 meetings on

13   July 25, 2019, for a full week the Plaintiff States' July 24 meeting request

14   received no response from OIRA.[128]

15   _____

16   [126] *Id*.; Geneva Sands & Priscilla Alvarez, *Trump's Citizenship and*

17   *Immigration Services director out*, CNN, May 24, 2019, https://www.cnn.com

18   /2019/05/24/politics/l-francis-cissna-citizenship-and-immigration-

19   services/index.html.

20   [127] *See* E.O. 12,866 of Sept. 30, 1993.

21   [128] EO 12866 Meetings Search Results, Office of Information and

22   Regulatory  Affairs,  Office  of  Management  and  Budget,  https://

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF                              53                    ATTORNEY GENERAL OF WASHINGTON
                                                                    8127 W. Klamath Court, Suite A
                                                                    Kennewick, WA 99336
                                                                    (509) 734-7285

110.    OIRA completed its review of the Rule on July 31, 2019.[129] That day, OIRA responded to the Plaintiff States declining their E.O. 12,866 meeting request.

**E.    The Final Rule**

111.    On August 12, 2019, the Department announced the issuance of the Final Public Charge Rule and it was posted for public inspection. In a press conference at the White House, Acting USCIS Director Kenneth T. Cuccinelli II stated that in promulgating "President Trump's public charge inadmissibility rule," the Department was "promoting our shared history" and "implement[ing] . . . a law passed by Congress in 1996 that has not been given meaningful effect."[130] Asked about the 1903 plaque on the Statue of Liberty that invites "your tired, your poor, your huddled masses," Cuccinelli said: "I'm certainly not prepared to take anything down off the Statute of Liberty."

_____

www.reginfo.gov/public/do/eom12866SearchResults?pubId=201904&rin=1615 -AA22&viewRule=true (last visited July 28, 2019).

[129] *OIRA Conclusion of EO 12866 Regulatory Review*, Office of Information and Regulatory Affairs, Office of Management and Budget, https:// www.reginfo.gov/public/do/eoDetails?rrid=129323 (last visited Aug. 2, 2019).

[130] *Cuccinelli on "public charge" immigration rule*, CBS News, Aug. 12, 2019,    https://www.cbsnews.com/video/immigration-official-ken-cuccinelli-immigrants-public-charge-rule/.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

54

1      112.   In response to questions about the Rule, Cuccinelli publicly stated

2  that the famous Emma Lazarus Statue of Liberty sonnet inscribed on the Statue

3  of Liberty "was referring back to people coming from Europe where they had

4  class-based societies" not to people coming to the United States from outside

5  Europe. He also reinterpreted it to "[g]ive me your tired and your poor who can

6  stand on their own two feet . . . ."[131] When asked if the Rule changes the

7  definition of the American dream, Cuccinelli said, "[n]o one has a right to

8  become an American who isn't born here as an American" and that "it is a

9  privilege to become an American, not a right for anybody who is not already an

10  American citizen."[132] He also said the Rule was "part of President Trump keeping

11  his promises."[133]

12

13

14

15

16

_____

17      [131] Rebecca Morin, *Immigration official Ken Cuccinelli: Statue of Liberty*

18  *poem refers to immigrants from Europe*, USA Today Aug. 13, 2019.

19      [132] Sasha Ingber and Rachel Martin, *Immigration Chief: 'Give Me Your*

20  *Tired, Your Poor Who Can Stand On Their Own 2 Feet'*, Nat'l Pub. Radio,

21  Aug. 13, 2019.

22      [133] *Id.*

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

55

113.   On August 14, 2019, the Department published the Final Rule in the Federal Register.[134]

### 1.    Summary of the Final Rule

#### a.    Applicability of the Rule

114.   The Public Charge Rule applies to any noncitizen subject to section 212(a)(4) of the INA who, after the October 15, 2019 effective date, applies to the Department for admission to the United States or for adjustment of status to that of lawful permanent resident.[135] The Rule catalogues a list of immigrant groups that are exempted from its provisions, based on preexisting exemptions created by Congress or DHS regulations. These include, for example, refugees and asylees, certain Afghan or Iraqi nationals employed by or on behalf of the U.S. government, and certain Cuban and Haitian entrants. *See* 84 Fed. Reg. at 41,504 (proposed 8 C.F.R. § 212.23).

115.   The Rule also applies to requests for extension of stay and change of status by nonimmigrant visitors to the United States. A nonimmigrant is generally admitted into the United States for a limited period and for a particular purpose. Section 212(a)(4) does not apply to an extension of stay or change of

---

[134] U.S. Citizenship and Immigration Servs., U.S. Dep't of Homeland Security, *Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. at 41,292, to be codified at 8 C.F.R. pts. 103, 212-214, 245, and 248) (August 14, 2019).

[135] 84 Fed. Reg. at 41,501 (proposed 8 C.F.R. § 212.20).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

56

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    status. Nevertheless, the Department asserts authority to apply its expanded

2    public charge provisions to a nonimmigrant's application to extend his or her

3    status or change it from one classification to another.[136]

### b.    Definitions of "public charge" and "public benefit"

5    116.   The Rule defines "public charge" to mean "an alien who receives

6    one or more public benefits . . . for more than 12 months in the aggregate within

7    any 36-month period (such that, for instance, receipt of two benefits in one month

8    counts as two months)."

9    117.   "Public benefit" means any of the following six forms of public

10   assistance: (1) "[a]ny Federal state, local or tribal cash assistance for income

11   maintenance," including SSI, TANF, or state "General Assistance"; (2) SNAP;

12   (3) Section 8 housing assistance vouchers; (4) Section 8 project-based rental

13   assistance; (5) Medicaid (with exceptions for benefits or services (i) for an

14   emergency medical condition, (ii) under the Individuals with Disabilities

15   Education Act, (iii) that are school-based, (iv) to immigrants who are under 21

16   years of age or a woman during pregnancy); and (6) public housing under section

17   9 of the U.S. Housing Act of 1937.[137]

18   118.   In several respects, those core definitions are even more draconian

19   than the corresponding provisions of the Proposed Rule. First, the Department

21   [136] *See* 84 Fed. Reg. at 41,507-08, (proposed 8 C.F.R. §§ 214.1, 248.1).

22   [137] 84 Fed. Reg. at 41,501 (to be codified at 8. C.F.R.§ 212.21(b)).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF                          57                  ATTORNEY GENERAL OF WASHINGTON
                                                              8127 W. Klamath Court, Suite A
                                                              Kennewick, WA 99336
                                                              (509) 734-7285

1    eliminated the Proposed Rule's distinction between monetizable and

2    non-monetizable benefits. While the Proposed Rule would have considered

3    monetizable benefits received only if they exceeded 15% threshold, in the Final

4    Rule the Department applies the 12-month threshold to all public benefits. Thus,

5    any amount of benefits received for a total of 12 months in the aggregate in a

6    36-month period as a factor weighing "heavily" in favor of a public charge

7    determination.[138] An additional benefit counts as an extra month, such that receipt

8    of two benefits triggers the threshold after six months; three benefits, after four

9    months; and four benefits, after just three months.

10        119.   Second, the Final Rule permits the Department to consider as a

11    negative factor favoring a public charge determination any past receipt of

12    non-cash public benefits, even if below the 12-month threshold.[139] The Proposed

13    Rule would have only permitted consideration of cash benefits below the

14    applicable thresholds.

15               **c.**    **Heavily weighted negative factors**

16        120.   The Rule establishes four factors that will "generally weigh heavily

17    in favor of a finding that an alien is likely to become a public charge."

18        121.   First, it is a "heavily weighted negative factor" if the immigrant "is

19    not a full-time student and is authorized to work, but is unable to demonstrate

20

21               [138] 84 Fed. Reg. at 41,504 (to be codified at 8 C.F.R.§ 212.22(c)(1)(ii)).

22               [139] 84 Fed. Reg. at 41,503 (to be codified at 8 C.F.R. § 212.22(b)(4)(E)).

COMPLAINT FOR            58            ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                         8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                         Kennewick, WA 99336
                                                (509) 734-7285

1    current employment, recent employment history or no reasonable prospect of

2    future employment."[140]

3        122.   Second, it is a "heavily weighted negative factor" if the immigrant

4    "has received or has been certified or approved to receive one or more public

5    benefits, as defined in § 212.21(b), for more than 12 months in the aggregate

6    within any 36 month period, beginning no earlier than 36 months immediately

7    preceding the alien's application for admission or adjustment of status.[141] The

8    lookback period can begin no earlier than 36 months before an immigrant's

9    application for admission or adjustment of status on or after October 15, 2019.

10        123.   Third, it is a "heavily weighted negative factor" if an immigrant both

11    (a) "has been diagnosed with a medical condition that is likely to require

12    extensive medical treatment or institutionalization or that will interfere with the

13    alien's ability to provide for him- or herself, attend school, or work"; and (b) "is

14    uninsured and has neither the prospect of obtaining private health insurance, or

15    the financial resources to pay for reasonably foreseeable medical costs related to

16    a the medical condition."[142]

17

18

19    _____

20        [140] 84 Fed. Reg. at 41,504 (to be codified at 8. C.F.R.§ 212.22(c)(1)(i)).

21        [141] 84 Fed. Reg. at 41,504 (to be codified at 8. C.F.R.§ 212.22(c)(1)(ii)).

22        [142] 84 Fed. Reg. at 41,504 (to be codified at 8. C.F.R.§ 212.22(c)(1)(iii)).

COMPLAINT FOR                              59        ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                                      8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                                         Kennewick, WA 99336
                                                            (509) 734-7285

124.    Fourth, it is a "heavily weighted negative factor" if the "alien had previously been found inadmissible or deportable on public charge grounds by an Immigration Judge or the Board of Immigration Appeals."[143]

### d.    Heavily weighted positive factors

125.    The Rule establishes three factors that "will generally weigh heavily in favor of a finding that an alien is not likely to become a public charge." First, it is a "heavily weighted positive factor" if the noncitizen's "household has income, assets, or resources, and support . . . of at least 250 percent of the Federal Poverty Guidelines for the alien's household size."[144]

126.    Second, it is a "heavily weighted positive factor" if the "alien is authorized to work and is currently employed in a legal industry with an annual income . . . of at least 250 percent of the Federal Poverty Guidelines for the alien's household size."[145]

127.    Third, it is a "heavily weighted positive factor" if the "alien has private health insurance" that is "appropriate for the expected period of admission," except health insurance for which an immigrant receives premium tax credits under the Patient Protection and Affordable Care Act (ACA).[146]

---

[143] 84 Fed. Reg. at 41,504 (to be codified at 8. C.F.R.§ 212.22(c)(1)(iv)).

[144] 84 Fed. Reg. at 41,504 (to be codified at 8. C.F.R.§ 212.22(c)(2)(i)).

[145] 84 Fed. Reg. at 41,504 (to be codified at 8. C.F.R.§ 212.22(c)(2)(ii)).

[146] 84 Fed. Reg. at 41,504 (to be codified at 8. C.F.R.§ 212.22(c)(2)(iii)).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

60

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1                **e.    Other criteria**

2         128.  The Rule requires DHS to consider various other criteria in any

3 public charge determination. Those other criteria that will weigh in favor of a

4 public charge determination include whether the immigrant: (1) is under the age

5 of 18 or over the minimum early retirement age for Social Security (currently age

6 62); (2) has a "medical condition that is likely to require extensive medical

7 treatment or institutionalization" or "interfere with [his] ability to provide and

8 care for himself," to "attend school," or "to work"; (3) has an annual household

9 gross income under 125% of the Federal poverty guideline (FPG) (or 100% for

10 active duty service members); (4) has a household size that makes the immigrant

11 "more likely than not to become a public charge at any time in the future";

12 (5) lacks "significant assets, such as savings accounts, stocks, bonds, certificates

13 of deposit, real estate or other assets"; (6) lacks "sufficient household assets and

14 resources to cover any reasonably foreseeable medical costs related to a medical

15 condition," (7) has "any financial liabilities"; (8) has applied for, "been certified

16 to receive" or received "public benefits" since [October 15, 2019]; (9) has applied

17 for or has received a USCIS fee waiver for an immigration benefit request since

18 [October 15, 2019]; has a lower "credit history and credit score"; (10) lacks

19 private health insurance or other sufficient assets and resources to cover

20

21

22

COMPLAINT FOR            61        ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND              8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                Kennewick, WA 99336
                                (509) 734-7285

1  "reasonably foreseeable medical costs"; (11) lacks a high school diploma (or

2  equivalent) or a "higher education degree"; or (12) is not proficient in English.[147]

3      129.  Under the Rule, the Department must also consider any required

4  affidavit of support meeting the statutory sponsorship and income requirements.

5  But an affidavit of support would not be dispositive, and its weight would depend

6  on the "likelihood that the sponsor would actually provide the statutorily-required

7  amount of financial support" in the judgment of USCIS.[148] Again, this is a major

8  departure from prior agency practice and precedent, which had long treated a

9  compliant affidavit of support as a significant, if not outcome-determinative

10  factor in favor of the applicant.[149]

11          **f.**    **Other provisions**

12      130.  The Rule would apply a more exacting standard to applications for

13  adjustment of status or immigrant visas than to applications for temporary

14  nonimmigrant visas. Specifically, USCIS would consider the "immigration status

15  that the alien seeks and the expected period of admission as it relates to the alien's

16  ability to financially support for [sic] himself or herself during the duration of the

17  alien's stay."[150]

18  _____

19     [147] 84 Fed. Reg. at 41,502-04 (to be codified at 8. C.F.R.§ 212.22(b)).

20     [148] 84 Fed. Reg. at 41,504 (to be codified at 8 C.F.R. § 212(b)(7)).

21     [149] 83 Fed. Reg. at 51,186.

22     [150] 84 Fed. Reg. at 41,504 (to be codified at 8. C.F.R.§ 212.22(b)(6)(i)).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

62

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    131.    The Rule also authorizes the Department to allow a lawful

2    permanent resident applicant determined likely to become a public charge to

3    submit a "public charge bond" as a condition of his or her green card approval.

4    The decision to allow a public charge bond is discretionary, but the Department

5    "generally will not favorably exercise discretion" if at least one heavily weighed

6    negative factors applies. The amount of the bond must be at least $8,100, which

7    is breached in full if the applicant receives any public benefits for more than 12

8    months in the aggregate within any 36-month period after becoming a lawful

9    permanent resident.[151]

10    132.    Like the Proposed Rule, the Final Rule also imposes additional

11    requirements on nonimmigrants applying for a change of status or an extension

12    of stay, though the INA's public charge exclusion applies in neither situation.

13    The Rule provides that such applications will be denied unless the applicant

14    demonstrates that he or she has not received public benefits since obtaining the

15    nonimmigrant status that he is seeking to extend or change for 12 months total

16    within a 36-month period.[152] Unlike the Proposed Rule, the Final Rule does not

17    require or permit consideration of whether a nonimmigrant applicant for change

18    of status or extension of stay is "likely to receive public benefits" in the future.

19    _____

20        [151] 84 Fed. Reg. at 41,505-07 (to be codified at 8 C.F.R. § 213.1).

21        [152] 84 Fed. Reg. at 41,507 (amending 8 C.F.R.§§ 214.1(a) & (c) and

22    248.1(a) & (c).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

63

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

### 2. The Department's failure to provide reasoned analysis, examine relevant data, or address public comments' significant concerns

133.   As mentioned above, the Department received more than 260,000 public comments on the Proposed Rule, the "vast majority" in opposition.[153] The public comments raised significant concerns regarding the legality and impact of the Department's radical proposed transformation of the public charge exclusion. In the preamble to the Final Rule, the Department failed to provide reasoned analysis, examine the relevant data, or adequately address the significant concerns raised in the public comments.

#### a. Definition of public charge

134.   First and foremost, the Department failed to account for its decision to redefine the term public charge in a manner inconsistent with the historical understanding of public charge, Congressional intent, and more than a century of judicial and administrative precedent. In response, the Department asserted that the Rule interprets "ambiguous terms that Congress itself left undefined," offering the ipse dixit that it "believes that its definition with what it means to be a public charge."[154]

_____

[153] 84 Fed. Reg. at 41,297 & 41,304.

[154] 84 Fed. Reg. at 41,317.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

64

1          **b.        The 12-month public benefit threshold**

2          135.   Many commenters criticized the Proposed Rule's thresholds for

3    consideration of public benefits as arbitrary. Under the Proposed Rule,

4    monetizable public benefits would weigh in favor of a public charge

5    determination if they exceeded 15% of FPG in a 12-month period, while

6    non-monetizable benefits would be a negative factor if received for 12 months

7    within a 36-month period. Commenters noted that the Department had provided

8    no data to support its 15% threshold, which would have considered the receipt of

9    just $150 per month (or $5 per day) in benefits as a heavily weighted factor

10   favoring a public charge finding. Commenters also criticized the 12-month

11   standard for non-monetizable benefits as arbitrary and irrational, particularly

12   with respect to specific programs like Medicaid, which is designed for continuous

13   enrollment.

14         136.   Implicitly acknowledging the arbitrariness of the 15% threshold, the

15   Department correctly abandoned it in the Final Rule—but only to adopt the

16   flawed 12-month threshold for monetizable benefits as well. Under the Rule's

17   public charge test, the receipt of any public benefit—monetizable or not—for 12

18   or more months in a 36-month period would constitute a heavily weighted

19   negative factor. Each additional benefit received in the same period would count

20   as an additional month, such that just three months of Medicaid, housing

21   vouchers, food stamps, and income assistance could result in a public charge

22

COMPLAINT FOR                                      65                    ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                                                              8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                                                               Kennewick, WA 99336
                                                                                   (509) 734-7285

finding—no matter how small the actual dollar value of the benefits. The Department acknowledged that by ignoring the value of benefits received, its 12-month threshold could result in a public charge finding based on an immigrant's receipt of "only hundreds of dollars or less in public benefits." The Department did not provide a reasoned explanation to justify the 12-month threshold's "incongruities."[155]

137.   Indeed, the only justification the Department provided for adopting this strict 12-month threshold for all public benefits is that it is "simpler and more administrable" than its 15% of FPG threshold.[156] But just because a regulation is administrable does not make it rational or non-arbitrary. The Department fails to provide data, evidence, or reasoned analysis to explain why it believes an immigrant's past receipt of public assistance for as little as a few months is at all predictive of whether she will become a public charge in the future. The Department cited a Census Bureau study finding that 31.2% of participants in "one or more means-tested assistance programs" ended their participation within a year, ignoring that many of those participants may have received more than one benefit program—rendering the study entirely irrelevant to the Rule's 12-month threshold.[157] As the Department's own analysis reveals, of individuals who

---

[155]84 Fed. Reg. at 41,360-61.

[156] 84 Fed. Reg. at 41,359.

[157] 84 Fed. Reg. at 41,360.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

66

1    receive the enumerated public benefits, "at least nearly 35 percent received two

2    or more public benefits on average per month."[158] The Department's decision to

3    aggregate multiple benefits in the 12-month threshold overlooks its own findings

4    on how beneficiaries utilize temporary public assistance in actual practice.

5                        **c.    Heavily weighted negative factors**

6          138.   The Department received multiple comments criticizing the use of

7    "heavily weighted factors" (or "weighed," in the Proposed Rule's terminology),

8    separate from the enumerated considerations that Congress mandated the

9    Department to consider in the totality of circumstances test codified in the

10   Immigration Reform Act. Attempting to defend its decision to create

11   non-statutory heavily weighted factors, the Department asserts that it "does not

12   change that the public charge inadmissibility determination is one that is made

13   based on the totality of the alien's individual facts and circumstances."[159] Yet the

14   Department fails to account for the fact that the Rule's heavily weighted negative

15   factors—which overlap considerably to the point of double-counting—will often

16   be dispositive in operation, contrary to Congressional intent.

17         139.   In particular, the public benefit factor is likely to be

18   outcome-determinative in most cases. That factor weighs heavily in a public

19   charge determination if an immigrant receives one or more public benefits for 12

20   _____

21         [158] 84 Fed. Reg. at 41,361.

22         [159] 84 Fed. Reg. at 41,442.

COMPLAINT FOR                    67              ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                                      8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                                         Kennewick, WA 99336
                                                            (509) 734-7285

1    months total within a 36-month period. The Department asserts that the factor

2    "will not necessarily be dispositive in the inadmissibility determination,"

3    overlooking that whenever it applies, at least one other enumerated negative

4    factor will always also apply. That is so because the Rule requires consideration

5    of evidence that the immigrant has "applied for," "received," or "been certified

6    or approved to receive" any public benefits.[160] Furthermore, because the

7    enumerated public benefits are all means-tested, the vast majority of recipients

8    will also have an annual income below 125 percent of FPG, which would itself

9    also "generally be a heavily weighed negative factor."[161]

10    140.  So too, is the medical condition negative factor likely to be

11    dispositive. That heavily weighted factor is triggered where an applicant (1) has

12    a medical condition "likely to require extensive medical treatment or

13    institutionalization" and is (2) both uninsured and has neither the prospect of

14    obtaining private health insurance nor the resources to pay for medical costs.[162]

15    That standard is literally duplicative with the ostensibly separate "health" factor,

16    which weighs in favor of a public charge determination when an "alien has been

17    diagnosed with a medical condition that is likely to require extensive medical

18

19    _____

20         [160] 84 Fed. Reg. at 41,503.

21         [161] 84 Fed. Reg. at 41,323.

22         [162] 84 Fed. Reg. at 41,445.

COMPLAINT FOR                          68            ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                                          8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                                              Kennewick, WA 99336
                                                                 (509) 734-7285

1    treatment or institutionalization."[163] And a person who meets that standard is also

2    likely to fail under the "assets, resources, and financial status factor," which

3    considers whether he has "sufficient household assets and resources to cover any

4    reasonably foreseeable medical costs."[164] Here again, the Department stacks the

5    deck to convert the totality of circumstances inquiry into a bright-line test focused

6    myopically on non-statutory considerations (such as the receipt of public

7    assistance and private health insurance coverage) that the Department assigns

8    talismanic significance.

9    141.   These factors thus do not merely "coincide or relate to each other,"

10    as the Department contends, but instead engender obvious double-counting.[165]

11    The Department does not provide a reasoned basis for creating duplicative—and

12    effectively dispositive—"heavily weighted factors" that outweigh the

13    considerations Congress has expressly set forth in the statutory totality of

14    circumstances test.

15    **d.   Private health insurance**

16    142.   Commenters expressed significant concern over the Proposed

17    Rule's consideration of private health insurance as a factor in the public charge

18    test. As numerous commenters pointed out, many immigrants work in industries

19

20    [163] 84 Fed. Reg. at 41,502 (to be codified at 8 C.F.R. § 212.22(b)(2)).

21    [164] 84 Fed. Reg. at 41,502-03 (to be codified at 8 C.F.R. § 212(b)(4)).

22    [165] 84 Fed. Reg. at 41,406.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

69

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    that tend not to provide employer-based health insurance. Many commenters also

2    noted that considering health insurance and related factors, such as having

3    sufficient household assets and resources to cover "reasonably foreseeable

4    medical costs," would disproportionately and negatively affect certain

5    populations, including people with disabilities; people with chronic health

6    conditions; the elderly; and immigrants of color.[166]

7        143.   The Department entirely disregarded those concerns, instead

8    elevating private health insurance coverage to a heavily weighted positive factor

9    in the Final Rule. The Department stated that it will proceed to consider "whether

10   a person has health insurance or has the household assets and resources to pay

11   for reasonably foreseeable medical costs," and that having private insurance will

12   generally be weighed as a heavily positive factor (provided the insurance is not

13   for example offset by tax credits under the ACA).[167] Further, the Department

14   readily conceded that "certain individuals may choose to forego public health

15   insurance, such as Medicaid, because of the impact on public charge."[168] The

16   Department did not explain how such disenrollment from health coverage could

17   possibly advance its purported goal to promote immigrants' self-sufficiency and

18   economic independence.

19   _____

20       [166] 84 Fed. Reg. at 41,442.

21       [167] 84 Fed. Reg. at 41,428.

22       [168] 84 Fed. Reg. at 41,428.

COMPLAINT FOR                    70        ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                            8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                          Kennewick, WA 99336
                                           (509) 734-7285

1   144.   Although the Department notably stated it would not consider

2   programs other than Medicaid as public benefits, its response to these comments

3   clarifies that the "evaluation may in some cases require DHS to consider an

4   alien's publicly funded or subsidized health insurance that is not defined as a

5   public benefit under this rule."[169] Finally, regarding the potentially

6   disproportionate impact on certain populations such as the disabled, the

7   Department responded simply that it "does not intend to disproportionately affect

8   such groups."[170] Such a cursory explanation does not justify the arbitrary and

9   capricious nature of the factor, which double counts certain evidence to

10  disadvantage immigrants who use medical benefits they are entitled to receive.

11          **e.     Nonimmigrant applications for change of status or
                      extension of stay**

12

13  145.   Numerous commenters criticized the Proposed Rule for applying a

    public charge-like test to nonimmigrant applicants for a change of status or

14

15  extension of stay, neither of which is subject to the INA's public charge

    exclusion. Under the Public Charge Rule, extension of stay and change of status

16

17  applicants must establish that they have not received public benefits in an

    aggregate of 12 months in the prior 36-month period. The Department denies that

18

19  it is "intended to "apply the public charge ground of inadmissibility to extension

20  _____

21          [169] 84 Fed. Reg. at 41,428.

22          [170] 84 Fed. Reg. at 41,429.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

71

1   of stay or change of status applicants." Rather, the Department claims that it is

2   simply "exercising its statutory authority to set a new condition for approval of

3   extension of stay and change of status applications."[171]

4   146.   The Department's denial is implausible. Not only does this "new

5   condition of approval" appear in the very regulation called "Inadmissibility on

6   Public Charge Grounds," but it bootstraps into change of status and extension of

7   stay applications the central criterion of the Department's new public charge test

8   (*i.e.*, the receipt of public benefits above the 12-month threshold). The

9   Department fails to explain how expanding that core criterion beyond the public

10   charge exclusion's statutory bounds comports with its authority under the INA.

### f.   Application to lawful permanent residents returning from 180-day trips abroad

11

12   147.   Commenters also criticized the Department for failing to estimate

13   the consequences or costs of applying its expansive new public charge standard

14   to lawful permanent residents returning to the United States after 180 or more

15   days abroad. The Department's only response is that it "does not believe such a

16   quantitative estimate is necessary."[172] That brusque response fails to give due

17   consideration to a significant concern about how the regulation will affect lawful

18   permanent residents on the path to U.S. citizenship.

19

20   _____

21   [171] 84 Fed. Reg. at 41,329.

22   [172] 84 Fed. Reg. at 41,327.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

72

1

### g.    Disparate impact

2    148.    Numerous commenters pointed to the racially and ethnically

3    disparate impact the Department's public charge test would have by

4    disproportionately affecting immigrants of color. For example, one analysis

5    predicted that the public charge test's income thresholds would have

6    "disproportionate effects based on national origin and ethnicity, blocking 71

7    percent of applicants from Mexico and Central America, 69 percent from Africa,

8    and 52 percent from Asia—but only 36 percent from Europe, Canada and

9    Oceania."[173]

10    149.    The Department did not dispute that the Rule would have a disparate

11    impact on immigrants of color. Instead, the Department claimed it did not

12    intentionally "codify this final rule to discriminate"[174] and that it "does not

13    understand commenters' statements about the 'unequal application' of the public

14    charge inadmissibility rule."[175]    Although it provided no evidence, the

15    Department "disagree[d] that the public charge inadmissibility rule would be

16    unequally applied to different groups of aliens along the lines of race."[176] That

17    bald denial fails to meaningfully address an important aspect of the

18    _____

19    [173] 84 Fed. Reg. at 41,322.

20    [174] 84 Fed. Reg. at 41,309.

21    [175] 84 Fed. Reg. at 41,323.

22    [176] 84 Fed. Reg. at 41,323.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

73

1  problem—the Rule's discriminatory effects—and to consider the significant

2  disadvantages and injustice of its decision.

3  **h.    Credit history and financial liabilities**

4  150.  Several commenters expressed concern that the Proposed Rule

5  sought to consider an immigrant's credit history as a factor in the determination

6  of whether the immigrant is likely to become a public charge. As these

7  commenters noted, credit scores and credit histories were not intended to be used

8  in the immigration context; do not assess an immigrant's likelihood of being

9  self-sufficient; have no correlation with the evaluation factor; are often highly

10  inaccurate; and may be affected by factors outside the immigrant's control but

11  from which they may recover. Further, commenters noted that credit reports

12  contain irrelevant data, such as medical debts that do not measure an individual's

13  financial status, while at the same time omitting potentially more relevant data,

14  such as consistency of rent payments. Other commenters noted that considering

15  credit scores would essentially "double count" evidence already factoring into

16  the public charge determination.

17  151.  The Department largely disregarded these concerns, however,

18  instead stating in conclusory fashion that it believes such information is useful

19  "in determining whether aliens are able to support themselves." According to the

20  Department, credit reports "generally assist creditors to determine the credit

21  worthiness or risk of a person," and the Department proposes its use of credit

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

74

1 reports "focuses on the assessment of these debts, liabilities, and related

2 indicators, as one indicator of an alien's strong or weak financial status." The

3 Department's decision is arbitrary and capricious, however, as it elevates private

4 credit reports into a realm they were never intended to occupy—a lawful

5 immigrant's status and admissibility—arbitrarily introducing error, irrelevant

6 factors, and double counting into the analysis.[177]

7      **i. Immigration fee waiver**

8   152. Many commentators criticized the Proposed Rule for taking into

9 consideration whether an immigrant had ever received an immigration fee waiver

10 as a negative factor weighing in favor of a public charge finding. As these

11 commentators noted, there is no evidence to suggest the one-time receipt of an

12 immigration fee waiver correlates to whether an immigrant is likely to become a

13 public charge. For example, commenters noted that an immigrant's financial

14 condition often improves after receiving the immigration benefits for which they

15 received the fee waiver. Further, commenters noted that considering the one-time

16 receipt of a fee waiver leads to double counting income, which unduly punishes

17 immigrants who received fee waivers based on temporarily adverse economic

18 circumstances. Finally, other commentators noted that punishing immigrants for

19 seeking fee waivers is counter-productive, as immigrants often seek such waivers

20 for work authorization (as they have no income at the time they apply) or to

21 

22   [177] 84 Fed. Reg. at 41,426.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

75

1    ensure their immigration documents are timely filed when they have not had

2    sufficient time to save enough money for the application fee (perhaps because

3    they are using the money for other household expenses, thus promoting

4    self-sufficiency).

5        153.    The Department largely brushed these concerns aside, however,

6    essentially arguing that any problems resulting from consideration of fee waivers

7    would be minimal, as they constitute "only one evidentiary consideration in the

8    totality of the circumstances and [are] not heavily weighted."[178] But, injecting an

9    arbitrary and unreliable factor into a totality-of-the-circumstances analysis does

10   not make consideration of the factor any less arbitrary. Here, the Department has

11   failed to proffer any non-arbitrary or capricious basis for considering the

12   one-time receipt of a fee-waiver as a factor.

13                        **j.    High school diploma**

14       154.    Many commenters stated that considering whether an immigrant has

15   a high school diploma or comparable educational background will arbitrarily

16   discriminate against large categories of immigrants, including farm workers and

17   other trade workers who may have been lawfully present and working for many

18   years without obtaining such a degree. Several commenters also noted the factor

19   discriminates in particular against immigrant women, many of whom come from

20   countries where women are discouraged or prevented from attending school.

21   _____

22       [178] 84 Fed. Reg. at 41,424.

COMPLAINT FOR                         76            ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                                        8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                                           Kennewick, WA 99336
                                                              (509) 734-7285

1   Other commenters expressed concerns over the arbitrary and undue burden such

2   a factor would place on disabled immigrants, many of whom often face

3   significant educational and employment-related obstacles and benefit from

4   public assistance programs in their pursuit of these goals. In response, the

5   Department noted merely that it was required to consider an immigrant's

6   educational background in the totality of circumstances review. The Department

7   conceded that "lack of formal education such as the lack of a high school diploma

8   or other education are generally a negative consideration," but noted that

9   employment history and "occupational skills, certifications or licenses" may also

10  be considered.[179] The Department's undue emphasis on a formal diploma—even

11  despite overwhelming evidence and commentary noting that immigrants

12  frequently work and contribute without any such educational

13  background—renders the factor arbitrary and capricious.

### k.   English proficiency

15  155.   Many commenters objected to including an immigrant's proficiency

16  in English as a factor in the public charge determination, noting that "requiring

17  English proficiency would mark a fundamental change from the nation's historic

18  commitment to welcoming and integrating immigrants."[180] Other commenters

19  noted that English language learners often benefit from receipt of Medicaid or

20  _____

21  [179] 84 Fed. Reg. at 41,430.

22  [180] 84 Fed. Reg. at 41,432.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

77

1    other non-cash public benefits in their pursuit of attending language classes and

2    becoming fluent. As numerous commenters noted, the Rule will deter these

3    immigrants from accepting the very benefits that would better enable them to

4    improve their employability. Other commenters argued that evaluating English

5    proficiency will unduly burden immigrant women and deaf immigrants;

6    constitutes discrimination on the basis of national origin; and has no relation to

7    the rule's purported goal, as skilled immigrants may readily obtain employment

8    in fields that do not require English proficiency. According to these commenters,

9    the Rule would "improperly reject many people with practical job skills doing

10    essential work in our economy that have limited formal education and English

11    proficiency highlighted farmworkers as an example."[181] The Department largely

12    shrugged off these concerns, however, noting repeatedly that it was not

13    "mandating English proficiency for admissibility."[182] And, although the

14    Department conceded that individuals who lack English proficiency might

15    already be working or able to obtain employment, it nevertheless argued that

16    "people with the lowest English speaking ability tend to have the lowest

17    employment rate, lowest rate of full-time employment, and lowest median

18    earnings."[183]    The Department's    willful    disregard    of    these    comments

19    _____

20        [181] 84 Fed. Reg. at 41,434.

21        [182] 84 Fed. Reg. at 41,432.

22        [183] 84 Fed. Reg. at 41,432.

COMPLAINT FOR                                    78                    ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                                                        8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                                                      Kennewick, WA 99336
                                                                       (509) 734-7285

1    demonstrates that the English proficiency factor is entirely arbitrary and

2    capricious, and its inclusion as only one factor in a totality of circumstances does

3    not make it any less so.

### l.    Federalism summary impact statement

5    156.   Although Executive Order 13,132 requires the Department to

6    produce a federalism summary impact statement, the Department summarily

7    asserted that the Rule "does not have substantial direct effects on the States" and

8    the Rule "requires no further agency action or analysis."[184]

9    157.   The Department's analysis of its obligations under Executive Order

10   13,132 was insufficient because the Department did not identify the myriad costs

11   and effects of the Rule on the Plaintiff States. As discussed throughout this

12   complaint, the Rule has profound direct effects on state and local governments

13   and will impose substantial costs on state and local governments.

14   158.   The Plaintiff States raised the concern about the Proposed Rule's

15   lack of federalism summary impact statement in their comment letter—as did

16   various other commentators. Had OIRA granted the Plaintiff States an

17   E.O. 12,866 meeting, the Plaintiff States could have discussed this issue with

18   OIRA.

---

22   [184] 84 Fed. Reg. at 41,481.

COMPLAINT FOR
DECLARATORY AND
INJUNCTION RELIEF

79

1             **m.**    **Cost-benefit analysis**

2       159.   DHS generally failed to conduct a true or adequate cost-benefit

3  analysis, instead only aiming to quantify the direct reduction in transfer payments

4  resulting from the Rule. For example, DHS failed to estimate the chilling effects

5  of the Rule because it was "difficult to predict the rule's disenrollment impacts

6  with respect to people who are not regulated by this rule, such as people who

7  erroneously believe themselves to be affected."[185] The preamble also repeatedly

8  diminishes the significance of impacts to those people, businesses, and state

9  governments that are not "directly" regulated by the Rule. In neglecting to

10  conduct deeper quantitative analysis of the costs to states or their economies, the

11  preamble cites, for example, "great uncertainty" to "the broader economy" as a

12  result of diminished transfer payments.[186]

13       160.   With respect to chilling effects, the preamble makes broad,

14  unsupported assumptions. DHS dismisses widespread confusion that currently

15  exists and that will be exacerbated by the Rule, saying only that it would be

16  "unwarranted" for people to disenroll from a benefit if they were not subject to

17  the Rule and that DHS "will not alter the rule to account for such unwarranted

18  choices."[187] This significantly understates the impacts of a drastic change in

19  _____

20      [185] 84 Fed. Reg. at 41,313.

21      [186] 84 Fed. Reg. at 41,472 & 41,478 & 41,480.

22      [187] 84 Fed. Reg. at 41,313.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

80

agency position, particularly when combined with other proposed and final regulatory actions publicized by federal officials.

161.    In purporting to analyze the number of noncitizens who would choose to forego benefits to which they are legally entitled, DHS arbitrarily used a figure of 2.5% of the estimated number of foreign-born noncitizens participating in any particular program. Instead of actually attempting to determine the number of people who were expected to disenroll, DHS apparently selected this figure by using the number of individuals seeking to adjust status within a given time period.[188]

162.    DHS downplays the number of impacted individuals by the Rule in numerous ways. For example, the preamble states that most applicants are "unlikely to suffer negative consequences from past receipt of public benefits because they will have been residing outside the United States. . . ."[189] The preamble then cites statistics showing that only about 33% of the relevant group of immigrants between fiscal years 2015 and 2017 adjusted their status while in the United States. However, because the United States admitted over 541 million

_____

[188] Department of Homeland Security, [CIS No. 2499-10; DHS Docket No. USCIS-2010-0012]; RIN 1615-AA22, Proposed Rule: Inadmissibility on Public Charge Grounds, Economic Analysis Supplemental Information for Analysis of Public Benefits Program, Table 4, n. 1.

[189] 84 Fed. Reg. at 41,313.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

81

nonimmigrants during this time period, this still leaves over 178 million people residing in the United States during the cited time period who could have been affected by the Rule, had it been in place at the time. This is but one example of arbitrary qualitative analysis minimizing the reach of the Rule.

163. DHS does not adequately assess the costs to states. While acknowledging that state and local governments would "incur costs," DHS goes on to dismiss these costs as "unclear" and "indirect," with no substantive analysis.[190]

164. DHS repeatedly cites the Office of Management and Budget's Circular A-4 as excusing quantitative or even qualitative analysis of various impacts. OMB's Circular A-4 assists agencies in conducting a regulatory analysis of economically significant actions consistent with Executive Order 12866. Far from excusing analysis of "chilling effects" on immigrants, costs to state governments, private businesses such as hospitals, or the economy, Circular A-4 expressly states that agencies should include the monetary values of "Private-sector compliance costs and savings" and "Government administrative costs and savings." Circular A-4 also does not excuse analysis where there is uncertainty. Rather, it states that while the precise benefits and costs of regulatory options are not always known, "the probability of their occurrence can often be developed."

---

[190] 84 Fed. Reg. at 41,469-70.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

82

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1      165.   By focusing only on the reduction in direct transfer payments, DHS

2      greatly overstates the benefits of the Rule. In many instances, these "savings"

3      will be offset by even greater costs that are simply shifted to others, including

4      other federal or state programs, or private parties. DHS's treatment of the impacts

5      to the Medicaid program provides a clear example of this deficiency in analysis.

6      DHS estimates a reduction in transfer payments related to Medicaid of over

7      $1 billion.[191] But this estimate fails to take into account increased costs from

8      emergency services that will result from delaying health care until conditions

9      become emergent and they are much more costly to treat. At that time, costs are

10     borne by other federal programs, states, private hospitals and health providers,

11     and individuals receiving care. For example, in Washington, the Alien

12     Emergency Medical Program covers certain emergency care for noncitizens. The

13     program is funded through both state and federal sources. Private medical

14     providers will also suffer costs by providing uncompensated care. By making no

15     effort to analyze these resulting costs, DHS has overstated the actual benefits of

16     the Rule in its cost-benefit analysis.

17

18     ———————————

19        [191] Department of Homeland Security, [CIS No. 2499-10; DHS Docket No.

20     USCIS-2010-0012]; RIN 1615-AA22, Proposed Rule: Inadmissibility on Public

21     Charge Grounds, Economic Analysis Supplemental Information for Analysis of

22     Public Benefits Program, Table 5.

COMPLAINT FOR                                  83              ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                                                  8127 W. Klamath Court, Suite A
                                                                    Kennewick, WA 99336
INJUNCTIVE RELIEF                                                     (509) 734-7285

## VI.   THE RULE'S CHILLING EFFECTS ON PARTICIPATION IN FEDERAL AND STATE PUBLIC BENEFITS PROGRAMS

166.   As the Department itself recognizes, the Rule will cause lawfully present noncitizens whom Congress specifically made eligible to participate in federal benefit programs—and U.S. citizens with participating or eligible family members—to disenroll or forbear enrollment. The Rule does so by making the receipt of benefits (including five non-cash federal benefits—SNAP, Medicaid, Section 8 vouchers, Section 8 rental assistance, and public housing subsidies) a ground for designating a person a public charge. Even harsher, the Rule makes an immigrant beneficiary's exclusion virtually inevitable by making receipt of such benefits a "heavily weighed negative factor" in the determination.

167.   The chilling effects of the Rule began to materialize long before its publication, and were observed quickly following the leaks in January 2017 of the draft Executive Order and in March 2018 of the draft Rule. Due to the ambiguity and complexity of the Rule, many noncitizens and their families have foregone and will forego participation in a wide swath of federal, state, and local benefits. Widespread confusion over which forms of "public benefits" will trigger a public charge determination will exacerbate the Rule's harms to the Plaintiff States and their residents.

168.   As eligible noncitizens and their families disenroll or refrain from seeking federal benefits for fear of jeopardizing their ability to immigrate, many will turn to the Plaintiff States' programs to fill the gap. Others will refrain from

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

84

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1   seeking any government assistance at all—including state-funded non-cash

2   benefits that would not even be subject to the Rule—leading to increased poverty,

3   homelessness, hunger, poor health, and other social costs. These harms to

4   individuals and families will place increased downstream financial strain on the

5   Plaintiff States, including their housing, public health, and education systems.

6       169.  The Department admits that the Rule will deter immigrant

7   participation in public benefits programs, despite Congress's express

8   determination allowing immigrant participation.[192] Indeed, in the Department's

9   view, the chilling effects are not a vice of the Rule but a virtue—regardless of the

10  acknowledged decline in health, income, educational opportunities, housing, and

11  overall quality of life they will cause among millions in our communities.[193] The

12  Department even suggests that state agencies "advise potential beneficiaries of

13  the potential immigration consequences of receiving certain public benefits."[194]

14  The manifest intent of the Rule is to exclude immigrants this Administration

15  deems "undesirable" from the United States and, barring that, to exclude them

16  and their families from the U.S. social safety net, contrary to congressional and

17  state determinations regarding eligibility.

18

19  _____

20       [192] 83 Fed. Reg. at 51,267.

21       [193] 83 Fed. Reg. at 51,270.

22       [194] 83 Fed. Reg. at 51,174.

COMPLAINT FOR                          85

170.   As a result of those chilling effects, implementation of the Rule will also cause severe and irreparable harm to the Plaintiff States. First, States will lose federal dollars from benefits programs that they administer to the benefit of their residents. Additional direct costs to states will result from immigrants who shift from federal programs to state programs that do not qualify as "public benefits" under the Rule. At the same time, disenrollment and non-enrollment in nutrition, health, and other federal and state assistance programs will make many working class immigrant families less healthy, less productive, more reliant on state-covered emergency medical care, more likely to experience economic dislocation and homelessness—all of which will redound to greater strains on state agencies and programs. Further, the broader chilling effects among all state-run assistance programs will undermine those programs' administration and effectiveness. Those affected programs include, but are not limited to, medical and healthcare services, food assistance programs, housing benefits, financial and cash assistance programs, long-term support services for elderly and disabled residents, education systems, job and employment training programs, and programs supporting crime victims.

171.   For any immigrants reviewing this Complaint for guidance on the types of programs that are deemed a "public benefit" for purposes of the Rule, the Plaintiff States strongly urge the immigrant to contact the relevant State

1    agency. As mentioned throughout, many state programs do not qualify as "public

2    benefits" under the Rule.

3    **A.    Health Care Programs**

4         172.   The Plaintiff States manage and administer medical services and

5    benefits programs such as Medicaid. Some of these programs are jointly funded

6    by federal and state funds and others by only state funds. As set forth below, the

7    Rule would imperil the effectiveness of these programs by reducing enrollment,

8    jeopardizing public health, and dramatically increasing costs to the Plaintiff

9    States.

10        **1.    Federal health care benefits**

11        173.   Congress created Medicaid in 1965 to assist states in furnishing

12   medical assistance to individuals and families.[195]

13        174.   Medicaid is jointly funded by the states and the federal government.

14   A state's participation in Medicaid is voluntary, but once a state chooses to

15   participate it must comply with federal statutory and regulatory requirements to

16   receive federal matching funds.[196]

17        175.   Anyone who qualifies under program rules can receive Medicaid.

18

19   _____

20        [195] *See* Pub. L. 89-97, 79 Stat. 286, *codified as amended at* 42 U.S.C.

21   § 1396-1.

22        [196] 42 U.S.C. §§ 1396–1, 1396a, 1396b, 1396c.

COMPLAINT FOR                    87        ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                             8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                              Kennewick, WA 99336
                                                  (509) 734-7285

176.   States administer Medicaid and generally determine financial eligibility criteria for participants.

177.   Federal law requires coverage for certain groups of individuals, including some low-income families, qualified pregnant women and children, and individuals receiving Supplemental Security Income. States may offer coverage for additional groups, such as people receiving home and community-based services and children in foster care who are not otherwise eligible. States may extend Medicaid coverage to all children and pregnant women, including any immigrants lawfully residing in the United States.[197]

178.   The Affordable Care Act established a new methodology for determining Medicaid income eligibility. Some individuals are eligible for Medicaid based on methodology other than income, such as disability. These changes resulted in greater participation in the Medicaid Program. Thirty-six states, and the District of Columbia, participated in the Medicaid expansion.

179.   Over half of all non-elderly adults receiving Medicaid—about 60%—are working. An even greater number of Medicaid recipients—about 79%—are from a home where at least one household member works. Among adult Medicaid enrollees who work, over half (about 51%) work full-time for the entire year.

---

[197] 42 U.S.C. § 1396b(v)(4)(A).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

88

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

180.    Under the Welfare Reform Act, states may extend Medicaid eligibility to lawful permanent residents and all other "qualified" immigrants after a five year waiting period.[198] States may also elect to use state-only funds to cover qualified immigrants during the five-year ban.[199] Many of the Plaintiff States have done so.[200] Although such state-only health benefits do not constitute "public benefits" under the Rule's public charge test, many noncitizens will fear that enrollment in state-funded programs (which often have the same name as the state's Medicaid program) will carry adverse immigration consequences.

## 2.    State health care benefits

181.    The Plaintiff States manage and administer numerous health care services programs, including Medicaid.

182.    Certain classes of citizens and noncitizens are eligible to participate in these state-run medical services programs. If implemented, the Rule would result in many otherwise eligible individuals—including citizens—disenrolling

---

[198] *See* 8 U.S.C. § 1613(a).

[199] 8 U.S.C. § 1622(a).

[200] *See* ASPE Issue Brief: Overview of Immigrants' Eligibility for SNAP, TANF, Medicaid, and CHIP, Office of the Ass't Sec'y for Planning & Eval., U.S. Dep't of Health & Human Servs. (Mar. 2012), https://aspe.hhs.gov/basic-report/overview-immigrants-eligibility-snap-tanf-medicaid-and-chip (HHS Issue Brief).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

89

1    or forbearing enrollment for fear of jeopardizing their own or their family

2    members' immigration status.

3        183.   Individuals who are eligible to enroll in these programs but elect not

4    to participate because of the Rule will likely delay seeking both routine and

5    necessary medical treatment (including vital preventative services such as

6    vaccinations) until they require emergency care. Indeed, the Department

7    essentially concedes this fact, noting that "DHS acknowledges that increased use

8    of emergency rooms and emergent care as a method of primary healthcare due to

9    delayed treatment is possible and there is a potential for increases in

10   uncompensated care in which a treatment or service is not paid for by an insurer

11   or patient."[201] Individuals who resort to emergency care as a method of primary

12   healthcare are more likely to experience severe medical conditions, creating

13   public health concerns and requiring unnecessarily expensive emergency medical

14   treatment, the overwhelming cost of which will be borne by the Plaintiff States

15   and their private hospitals.

16       184.   As set forth below, implementing the Rule will cause irreparable

17   harm to the Plaintiff States by undermining the functions and effectiveness of

18   these health care services programs.

19

20

21   _____

22       [201] 84 Fed. Reg. at 41,384.

COMPLAINT FOR                          90          ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                                         8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                                          Kennewick, WA 99336
                                                              (509) 734-7285

a.     **The Plaintiff States' medical assistance programs**

185.   Each of the Plaintiff States manages and administers a Medicaid program for its residents. In addition, the Plaintiff States administer numerous other health care programs, some with combined federal and state funds and some with state-only funds. With community, state, and national partners, the Plaintiff States provide evidence-based, cost-effective services that support the health and well-being of individuals, families, and communities in their States.

186.   Many of the Plaintiff States' Medicaid programs include coverage groups encompassing citizens and noncitizens, including adults between the ages of 19 and 65; certain parents and caretakers; the elderly; the blind and disabled; those using long-term support services or hospice; and Medicare Savings Program enrollees.

187.   The Washington Health Care Authority (HCA) administers Washington's Medicaid program, as well as other federal and state-funded medical assistance programs. HCA has over 1,300 employees and a biennial budget of over $20 billion.

188.   Washington Apple Health is the name for Washington's medical assistance programs, which include not only the state Medicaid program, which is covered under the Rule, but also other programs that are not expressly covered but are likely to be affected, including because of the Rule's chilling effect on eligible individuals. This chilling effect on programs not expressly covered under

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

91

1    the Rule will extend to CHIP and various health-assistance programs funded

2    solely by the state.

3    189.   Through the Apple Health program, Washington purchases health

4    care for approximately 1.9 million people. In state fiscal year 2019, Washington's

5    HCA is expected to spend $10.1 billion to support Apple Health and its

6    Community Behavioral Health Services program. Of this amount, $6.8 billion

7    will come from federal contributions.

8    190.   Washington's Apple Health currently covers adults with incomes up

9    to 138 percent of the federal poverty level under the Adult Medical Program and

10    provides these individuals with essential health coverage, including preventative

11    care, inpatient hospitalization, prescription drugs, and many other health services.

12    191.   The Massachusetts Executive Office of Health and Human Services

13    (EOHHS) manages Massachusetts's Medicaid program, which is covered by the

14    Rule, as well as other health assistance programs that are not expressly covered

15    but are likely to be affected by the Rule's chilling effect on eligible individuals.

16    EOHHS comprises 12 agencies, has over 22,000 employees, and oversees an

17    annual budget of over $22 billion.

18    192.   Massachusetts's Medicaid program and CHIP are combined into

19    one program, MassHealth, through which Massachusetts provides healthcare

20    benefits to almost 1.8 million adults, children, and people with disabilities. In

21    state fiscal year 2019, Massachusetts's MassHealth spent $16.5 billion to support

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

92

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

MassHealth medical and behavioral programs and services to covered populations. Of this amount, $4.3 billion came from state contributions. Massachusetts's MassHealth provides essential health coverage to adults and children, including inpatient and outpatient services, preventive care, mental health and addiction services, and various other services and benefits.

193.   The Virginia Department of Medical Assistance Services (DMAS) administers Virginia's Medicaid program, which is subject to the Rule, as well as various other programs that the Rule does not expressly cover. Virginia's Medicaid program currently covers adults with incomes up to 138% of the federal poverty level and provides a full range of inpatient and outpatient services, pharmacy, mental health and addiction treatment, long term services and supports. In 2018, 983,000 Virginians received Medicaid benefits. That number is projected to rise to as many as 1,406,000 people in 2019.

194.   The Maryland Department of Health runs the state Medicaid program. Through Maryland's medical assistance programs, the state provides assistance to 1,160,067 enrollees.

195.   In New Mexico, 840,860 people were enrolled in the state Medicaid program in 2018. The program, which is covered by the Rule, is administered by the State's Human Services Department.

196.   In New Jersey, the State's Medicaid and CHIP programs together serve approximately 1.8 million low- and moderate-income residents—or about

1    20% of the State's population. Notably, New Jersey is one of the most diverse

2    states in the country, with 22% of its residents having been born in a foreign

3    country.

4        197.   The Rhode Island Executive Office of Health and Human Services

5    and the Department of Human Services administer the State's Medicaid program,

6    as well as other federal- and State- funded medical assistance programs. Under

7    the State's Medicaid expansion, eligible Rhode Island residents between the ages

8    of 19 and 64 with incomes up to 133% of the federal poverty level are eligible

9    for Medicaid coverage. Rhode Island's health care services cover approximately

10   300,000 Rhode Island residents, including citizens and noncitizens.

11       198.   The Minnesota Department of Human Services administers

12   Minnesota's Medicaid program, known as Medical Assistance, as well as other

13   related federal and state-funded health care assistance programs, collectively

14   known as Minnesota Health Care Programs. Through the State's Medical

15   Assistance program, Minnesota purchases health care for approximately

16   1,031,888 people.

17       199.   The Plaintiff States also provide supplemental health care programs

18   specifically targeted to children. Although the Rule exempts from its public

19   charge test Medicaid benefits received by immigrants under age 21 and pregnant

20   women,[202] it nevertheless will likely undermine these supplemental children's

21   _____

22       [202] 84 Fed. Reg. at 41,297.

COMPLAINT FOR                                    94              ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                                                    8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                                                     Kennewick, WA 99336
                                                                        (509) 734-7285

1    health care programs because of (1) the chilling effect the Rule will have on

2    eligible participants; and (2) the programs' close and intertwined relationship to

3    Medicaid benefits (which are generally considered "public benefits"). For

4    example, Virginia's CHIP program, called Family Access to Medical Insurance

5    Security (FAMIS), provides free health coverage to children in households at or

6    below 205% of the poverty level. In fiscal year 2018, Virginia's CHIP program

7    alone provided medical care services to more than 200,000 children and pregnant

8    women. Virginia relies on the CHIP Program to assist in providing low-income

9    children with health insurance coverage and keeping all children in Virginia

10   healthy. In fiscal year 2017, Virginia received approximately $291.1 million

11   federal allotment under the CHIP program.

12       200.   Washington Apple Health for Kids similarly provides free coverage

13   to children in households at or below 210% of the federal poverty level. For a

14   monthly premium, the program also provides coverage to households at or below

15   312% of the federal poverty level. Washington Apple Health for Kids is partially

16   funded through CHIP, which receives matching federal funds under the Social

17   Security Act[203] and provides low-income children with essential health coverage,

18   including preventive care, inpatient hospitalization, prescription drugs, and many

19   other health services.

20

21   _____

22       [203] *See* 42 U.S.C. § 1397dd.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

95

201. As part of the Washington Apple Health for Kids program, Washington uses federal funds related to CHIP to provide services for low-income children whose families are slightly above the income cutoff for free child health coverage. CHIP dollars also fund other Washington programs and services, such as medical coverage for lawfully present noncitizen children, and prenatal coverage for pregnant women ineligible for Medicaid because of their citizenship status.

202. The Plaintiff States also manage and administer several related health care programs, which are not considered "public benefits" under the Rule but which will likely be affected by its chilling effect on eligible participants. For example, the Washington Family Medical Program provides coverage to adults with countable income at or below the applicable Medicaid standard who have dependent children living in their home under age 18. Similarly, Washington's Pregnancy and Family Planning Program provides coverage to pregnant women at or below 193% of the federal poverty level without regard to citizenship or immigration status.

203. Washington provides a host of other medical services programs that likewise are not directly covered by the Rule but are likely to be harmed by it, including the Community and Behavioral Health Services Program; the Breast and Cervical Cancer Treatment Program for Women; the Refugee Medical Assistance Program; the Alien Emergency Medical Program; the Supplemental

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

96

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    Security Income Program; Healthcare for Workers with Disabilities; the

2    Medically Needy Program; the Medicare Savings Program; and Long-Term

3    Services and Supports and Hospice.

4    204.    Similarly, Virginia state agencies administer a host of additional

5    medical services that are not covered by the Rule but are likely to be affected by

6    it, including community mental health services through Community Service

7    Boards; newcomer refugee health program; breast and cervical cancer prevention

8    and treatment; labor and delivery services, and dialysis services.

9    205.    Massachusetts similarly administers various other medical services

10    programs that, while not covered by the Rule, are likely to be harmed by it. These

11    include programs targeted towards infectious and chronic disease prevention,

12    substance abuse treatment and prevention, cancer screening and diagnosis, and

13    sexual and domestic violence prevention.

14    206.    Many of the Plaintiff States also provide state-only-funded health

15    coverage to qualified immigrants prior to the five-year ban. Those states include

16    Illinois, Massachusetts, Minnesota, New Mexico, Virginia, and Washington.[204]

17    **b.    Irreparable harm to medical assistance programs**

18    207.    The Rule will cause irreparable harm to the Plaintiff States' medical

19    assistance programs. For example, the Rule will result in (1) a loss of medical

20    care and healthcare insurance for the Plaintiff States' residents; (2) higher and

21    _____

22    [204] HHS Issue Brief at 5–6.

COMPLAINT FOR                                    97                    ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                                                      8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                                                    Kennewick, WA 99336
                                                                     (509) 734-7285

more frequent emergency services costs and uncompensated care for the Plaintiff States; (3) severe public health concerns, including by deterring eligible individuals from accessing routine preventative medical care such as vaccinations; and (4) significant harm to the Plaintiff States' sovereign interests in the effective administration of their health services programs.

208.   The Rule will cause a devastating loss of health coverage under government-sponsored health programs in the Plaintiff States. If the Rule is implemented, the Plaintiff States will experience disenrollment rates for noncitizens ranging from 15 to 35%, based on metrics and data analysis from the Kaiser Family Foundation, a non-profit foundation focused on providing the United States public with unbiased research and journalism on major health care issues.[205]

209.   Below are specific examples of the types of harms the Plaintiff States and their residents will experience.

---

[205] *See* S. Artiga, R. Garfield, A. Damico, Estimated Impacts of the Proposed Public Charge Rule of Immigrants and Medicaid (Henry J. Kaiser Family Foundation Oct. 11, 2018), https://www.kff.org/disparities-policy/issue-brief/estimated-impacts-of-the-proposed-public-charge-rule-on-immigrants-and-medicaid/.

**(1)    Plaintiff States' residents will lose medical care and become uninsured**

210.   In Washington, as of October 31, 2017, there were 107,244 noncitizens insured for health coverage under Apple Health. These enrollees will be deterred from using government health insurance and government-funded health services by the Rule.

211.   An additional 140,612 Washington families had a member of a household who might be subject to a public charge determination while another household member is receiving Apple Health coverage. Although the Rule does not expressly consider public benefits accessed by another member of the immigrant's household,[206] members of mixed-status households will fear accessing Apple Health-covered services to which they are legally entitled, resulting in public health concerns and increased costs due to delays in accessing preventative care, vaccinations, prenatal care, and wellness checks.

212.   Based on projected disenrollment rates in Washington the Rule will result in an annual reduction in medical and behavioral care in Washington of between $42.6 million and $99.4 million.

213.   Based on projected disenrollment rates in Washington the Rule will cause approximately 10,000 to 24,000 lawfully present adults to lose medical care annually and become uninsured.

---

[206] 84 Fed. Reg. at 41,370.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

214.    Based on projected disenrollment rates in Washington the Rule will cause approximately 2,600 to 6,000 undocumented adults and children to lose Medicaid annually and become uninsured.

215.    The severe effects of such a loss of coverage could also result in a reduction of health care jobs and supporting services, particularly in rural regions of Washington.

216.    In Massachusetts, as of December 2018, approximately 264,000 MassHealth members were noncitizens, including 52,000 children. Six thousand of these children were enrolled in CHIP.

217.    Based on projected disenrollment rates in Massachusetts the Rule will cause approximately 39,600 to 92,400 lawfully present MassHealth members to lose medical care annually and become uninsured.

218.    Based on projected disenrollment rates in Massachusetts the Rule will cause approximately 7,800 to 18,200 citizen or lawfully present noncitizen children to lose MassHealth medical coverage annually and become uninsured.

219.    The effects of the Rule, however, are not merely limited to deterring individuals who may be subject to a public charge determination from participating in assistance programs specifically defined as "public benefits." The Rule will also likely have a chilling effect on individuals who are not subject to it and on assistance programs that are not considered "public benefits" under the analysis.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

100

220.   For example, for many families in Massachusetts, some household members will be subject to a public charge determination while others will not, and some family members may receive benefits that are part of the public charge analysis while others receive benefits not subject to the rule. The Massachusetts Health Connector estimates that as of December 2018, up to 60,000 enrollees live in households where participation in Massachusetts's health care benefits programs could result in negative immigration consequences under the Final Rule for at least one family member. Because of the complexity of determining these impacts and disenrolling only those family members from only those benefits that could have negative impacts, however, whole families may opt to simply withdraw their participation from the Massachusetts health insurance exchange.

### (2)   Shift of healthcare costs to the Plaintiff States

221.   The harms to the Plaintiff States will include an increase in emergency and uncompensated care, which refers to unreimbursed medical services provided by hospitals to patients resulting in charity care or bad debts.

222.   Individuals who lose their health insurance coverage will likely delay seeking medical care until their conditions require emergency treatment. When these individuals present at a hospital emergency room for such treatment, the Plaintiff States will ultimately bear the more expensive cost of their care.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

101

1    Further, because their conditions are more serious, they will require greater

2    resources to treat.

3        223.   Many of the Plaintiff States have made significant gains in reducing

4    their uninsured populations, all of which will be undermined by implementation

5    of the Rule. Between 2013 and 2016, for example, Washington significantly

6    reduced its rate of uninsured residents, from 14% in 2013 to 5.4% in 2016. The

7    State's reduction in its number of uninsured residents is associated with a parallel

8    reduction in uncompensated care for medical services, which dropped from

9    $2.638 billion in 2013 to $932 million in 2016.

10       224.   Similarly, Virginia has reduced its number of uninsured residents

11   with the state's January 1, 2019 expansion of its Medicaid program. As of

12   July 2019, over 300,000 adults in the state have newly enrolled in the program.

13       225.   In Maryland, the uninsured rate likewise fell by more than 64%

14   between 2013 and 2017. The drop in uninsured rates closely aligns with a

15   reduction in uncompensated care: From fiscal year 2013 to 2015, hospital

16   uncompensated care costs in Maryland declined by approximately $311 million.

17       226.   Because of the Public Charge Rule, however, the Plaintiff States

18   stand to lose all these gains. For example, Massachusetts foresees a substantial

19   increase in the provision of uncompensated care across the Commonwealth due

20   to loss of health coverage resulting from the Rule. Safety net providers such as

21   hospitals and community health centers will disproportionately bear the financial

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

102

1   burden of providing uncompensated care, and in turn, the demand on state
2   programs that compensate providers for such care will increase. The state's
3   EOHHS estimates that Massachusetts hospitals are in danger of losing almost
4   $457 million in Medicaid and CHIP funding because of the chilling effect of the
5   Rule on otherwise-eligible individuals.

6   227.   Because the Rule will reduce the number of insured residents and
7   increase the amount of individuals who rely on emergency treatment for their
8   primary source of medical care, uncompensated care in the Plaintiff States will
9   rise. This increase will result in higher medical bills and health care costs charged
10  by hospitals, undermining the Plaintiff States' efforts to reduce their uninsured
11  populations and harming their economies.

12
            **(3)      Significant public health concerns prompted by
                       reduced preventive care**
13
14  228.   By deterring individuals from accessing the government-sponsored
15  healthcare coverage to which they are legally entitled, the Final Rule discourage
    these individuals from engaging in routine medical care such as wellness exams
16
    and vaccinations.
17
18  229.   A general decline in engagement with such routine medical
19  preventive services, including vaccinations, risks increasing the spread of viruses
20  and communicable diseases in the Plaintiff States. As a result, the Rule threatens
21  to cause dangerous public health hazards for the Plaintiff States and their
22  residents.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

103

1    230.  DOJ has previously recognized that discouraging eligible

2    immigrants from accessing these health care benefits may lead to the very same

3    public health concerns cited by the Plaintiff States. As noted above, in 1999 DOJ

4    proposed a rule, 64 Fed. Reg. 28,676, stating: "Immigrants' fears of obtaining

5    these necessary medical and other benefits are not only causing them

6    considerable harm, but are also jeopardizing the general public. For example,

7    infectious diseases may spread as the numbers of immigrants who decline

8    immunization services increase."

9    **(4)  Harm to the Plaintiff States' sovereign interests in
     the successful operation of their health care
10   systems**

11   231.  In addition to the above costs, implementation of the Rule will also

12   harm the Plaintiff States' sovereign interests in administering their health benefits

13   systems.

14   232.  The Plaintiff States have carefully developed state-funded health

15   care programs to fill gaps in Medicaid and to provide coverage to financially or

16   medically vulnerable individuals, including noncitizens. Although the Rule

17   expressly applies only to Medicaid-related health benefits, the Plaintiff States'

18   own programs are often closely intertwined with their Medicaid programs, and

19   the Rule will cause noncitizens and mixed-status families to forgo health

20   coverage to which they are legally entitled—even when such coverage would not

21   be considered a negative factor under the Department's public charge test. This

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

104

1    chilling effect will undermine the comprehensive network of services the Plaintiff

2    States have developed to address their unique public health needs.

3        233.   The Rule would, for example, undermine Massachusetts's ability to

4    achieve its policy of universal health coverage among its residents. As of 2017,

5    97.2% of Massachusetts residents are covered by health insurance, the highest

6    insurance coverage rate in the nation. This is largely due to watershed health

7    reform legislation enacted by the state in 2006, including state subsidy programs

8    for low- and moderate-income individuals and a state-level individual mandate

9    to have health insurance.

10       234.   The Department's highly restrictive, complex, and vague treatment

11   of public benefits, however, threatens to upend the system of incentives and

12   disincentives that informs the choices of individuals and families enrolling in

13   health insurance through Massachusetts's health insurance marketplace.

14       235. Since  2006,  Massachusetts  has  required  that  most  adult

15   Massachusetts residents have health coverage or pay a penalty through their tax

16   returns.  The Rule, however, will interfere with Massachusetts's ability to

17   maintain this requirement, particularly for any residents who would face adverse

18   immigration consequences by virtue of accessing health coverage.

19       236.  About 260,000 Massachusetts residents individually purchase

20   health coverage through the Health Connector, which procures high-quality plans

21   at competitive prices that residents can access. Any disenrollment that will follow

22

COMPLAINT FOR                        105              ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                                            8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                                              Kennewick, WA 99336
                                                                  (509) 734-7285

from the Rule will diminish the collective impact of individuals purchasing health coverage and make Massachusetts's health insurance marketplace less competitive. A less competitive health insurance marketplace will put at risk the progress Massachusetts has made towards universal health coverage for all its residents.

237.    In Massachusetts, individuals and small businesses share the same risk pool, insurance products, and premiums. The Massachusetts Health Connector's data shows that on average, noncitizen enrollees have 25% lower medical claims than their citizen counterparts, which is attributable to the overall lower age of noncitizens and their lower utilization of medical services. A decline in enrollment or retention of coverage for noncitizens as a result of the Rule could impact the overall risk pool in Massachusetts, which could in turn lead to monthly premium increases for citizens and noncitizens alike. Based on the merged structure of the insurance risk pool in Massachusetts, such impacts can flow beyond the Health Connector and cause premiums to increase for not only the small business community but potentially throughout the health insurance market.

238.    Federal regulation requires that state health exchanges use a single streamlined application that collects the information needed to determine an applicant's eligibility for a qualified health plan, health coverage subsidies, Medicaid, CHIP, or a basic health plan.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

106

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

239.   In Massachusetts, all applicants for federally funded and state funded health insurance—including Medicaid, CHIP, and ConnectorCare—use a uniform application portal, and after applying are matched with the appropriate program for which they are determined eligible. The chilling effect of the Rule will likely require Massachusetts to create new forms, policies, and procedures for its various health care programs and services to ensure that benefits applicants are aware of the potential public charge consequences of their application and can choose to apply only for those programs which are not considered as part of the public charge analysis.

240.   Additionally, MassHealth and Health Connector may have to expand its customer service support to answer questions about public charge consequences from potentially affected individuals. MassHealth and the Health Connector would have to absorb the costs and administrative burden for these modifications.

241.   Further, the Plaintiff States will be required to cover expenses associated with adopting new laws, regulations, and administrative practices, policies, and procedures as a result of the Public Charge Rule. Those changes will be necessary to adapt to and mitigate the effects of enrollment decisions by noncitizens and mixed-status families, as well as the public health consequences for their reduced access to health care services.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

107

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

**B.    Food Assistance Programs**

242.   The Plaintiff States manage and administer various state and federally funded food assistance programs for eligible individuals and families, including noncitizens. Implementation of the Public Charge Rule, however, will irreparably harm the Plaintiff States by undermining the effectiveness of these programs, as eligible individuals—including working families and their children—will opt not to participate for fear of jeopardizing their immigration status. This reduction in participation will lead to significant public health concerns, including child hunger and malnourishment.

**1.    Federal Food Assistance Benefits**

243.   In 1977, Congress created the federal Food Stamp Program, known since 2008 as the Supplemental Nutrition Assistance Program (SNAP), which provides food purchasing assistance to low-income individuals and families.[207]

244.   SNAP benefits are provided on a "household" basis. For purposes of SNAP eligibility, a "household" is defined as "an individual who lives alone or who, while living with others, customarily purchases food and prepares meals for home consumption separate and apart from others; or a group of individuals who live together and customarily purchase food and prepare meals together for home consumption."[208]

---

[207] *See* 7 U.S.C. § 2013 (2018).

[208] 7 U.S.C. § 2012(m).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

108

245.   Under federal law, SNAP is available to households with income at or below 130% of the federal poverty level; a net monthly income after deductions for housing, child care and other expenses at less than or equal to 100% of the federal poverty level; and with assets under the amount set in the applicable federal regulations.

246.   The average monthly SNAP benefit per household is $253—or $8.40 per day, per household. SNAP households may purchase food by using the benefit at one of the quarter million retailers authorized by the federal Food and Nutrition Service to participate in the program.

247.   SNAP imposes work requirements on program participants. Federal law requires that able-bodied adult SNAP recipients who are not exempt register to work, accept a job if offered, and not quit a job without good cause. The Welfare Reform Act limits SNAP benefits for able-bodied adults without dependents to 3 months of assistance within a 36 month period unless they are participating in work activities for at least 20 hours per week. States also operate SNAP Employment and Training (E&T) programs, which help participants build job skills, receive training, find work, and increase work experience.

248.   About 14.9 million workers—or about 10% of workers nationwide—are from households that received SNAP benefits over the past year.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

109

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

249.   Under the Welfare Reform Act, adult immigrants with lawful permanent residency status, and other "qualified" immigrants, are eligible for SNAP after five years.[209] The five-year ban does not apply to children, immigrants with 40 qualifying quarters of work, or to members of the military and veterans (or their spouses), all of whom are immediately eligible for SNAP benefits upon adjustment to lawful permanent resident status.[210]

250.   States have the authority to use state-only funds to provide nutrition assistance benefits to non-qualified immigrants and qualified immigrants before the five-year SNAP ban. Plaintiff States Minnesota and Washington have done so. Although such state-only nutrition benefits do not constitute "public benefits" under the Department's public charge test, many noncitizens will fear that enrollment in state-funded programs will carry adverse immigration consequences, and therefore disenroll or forbear enrollment.

251.   As set forth below, implementing the Rule will cause irreparable harm to the Plaintiff States by undermining the functions and effectiveness of these food assistance programs.

**2.    State food assistance programs**

252.   The Plaintiff States manage and administer various food assistance programs, including SNAP. These programs are intended to reduce food

---

[209] 8 U.S.C. § 1612(a)(2)(L).

[210] 8 U.S.C. § 1612(a)(2)(B)–(C) & (J).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

110

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    insecurity and assist in fulfilling the food and nutritional needs of some of the

2    states' most vulnerable populations.

3        253.   Certain classes of citizens and noncitizens are eligible to participate

4    in these state-run food assistance programs. If implemented, the Rule would

5    result in many otherwise eligible individuals—including citizens—disenrolling

6    or refraining from participating for fear of jeopardizing their or their family

7    members' immigration status.

8        254.   As set forth below, implementing the Rule will cause irreparable

9    harm to the Plaintiff States by undermining the functions and effectiveness of

10   their food assistance programs.

11       **a.     The Plaintiff States' food assistance programs**

12       255.   All Plaintiff States manage and administer a SNAP program for their

13   residents. In addition, the Plaintiff States administer numerous other food

14   assistance programs, some using combined federal and state funds and some

15   using state-only funds. While the Rule considers only SNAP-related benefits as

16   "public benefits" under the public charge test, other state-only food assistance

17   programs are likely to be harmed because of the broad chilling effects on eligible

18   individuals.

19       256.   Washington's Basic Food program assists eligible children and

20   adults in purchasing food. The Basic Food program combines federally funded

21   SNAP benefits with the state-funded Food Assistance Program for legal

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

111

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1  immigrants (FAP). FAP is available to individuals who are lawfully present and

2  meet all eligibility requirements for SNAP except for their citizenship or

3  immigration status.

4      257.   Virginia's food assistance program includes SNAP (including debit

5  card technology for accessing SNAP benefits); nutrition education; supplemental

6  nutrition program for women, infants, and children; nutrition program for seniors

7  (Fresh Market Fresh for Seniors), national school lunch program, food banks, and

8  meals on wheels.

9      258.   Massachusetts's Department of Transitional Assistance (MA-DTA)

10  assists and empowers low-income individuals and families to meet their basic

11  needs, improve their quality of life, and achieve long-term economic

12  self-sufficiency through training programs, and cash and food benefits, such as

13  SNAP. Massachusetts also funds a supplement to SNAP through the state budget.

14  In state fiscal year 2019, the SNAP state supplement was $300,000. Another

15  $300,000 for the state supplement has been appropriated for state fiscal year

16  2020.

17      259.   Maryland's Food Supplement Program reached 684,000 Maryland

18  residents in fiscal year 2017, or 11% of the state population. The state

19  supplemented the program with approximately $3.3 million in state funds during

20  state fiscal year 2019, and over $4.1 million in fiscal year 2020.

21

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

112

1    260.   In New Mexico, approximately 25% of the State's residents receive

2    SNAP benefits, with enrollment capped for a family of four at the federal poverty

3    limit of $25,100. In March 2018, for example, there were 456,190 people enrolled

4    in the state's program.

5    261.   New Jersey administers a SNAP program that helps provide food

6    assistance to residents suffering from food insecurity. An estimated 1 in 10 New

7    Jersey residents are food insecure—which translates to more than 900,000

8    residents, including nearly 270,000 children.

9    262.   In Rhode Island, the Department of Human Services administers the

10   SNAP program to low-income families and individuals with income less than

11   185% of the federal poverty level. Rhode Island residents who meet eligibility

12   requirements may receive up to $642 per month in food-assistance based on their

13   family size and income level.

14              **b.     Irreparable harm to food assistance programs**

15   263.   The Plaintiff States' food assistance programs will be irreparably

16   harmed by the Rule, which will result in, among other things, (1) more vulnerable

17   families and individuals in the Plaintiff States experiencing food insecurity; and

18   (2) severe public health concerns, including child hunger and malnutrition.

19   264.   The Rule will cause a devastating loss of food assistance for working

20   families and individuals in the Plaintiff States. This will occur in SNAP-related

21

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

113

1    programs that are "public benefits" under the Rule as well as other state-only

2    food assistance programs that are not "public benefits" under the Rule.

3        265.   For example, using metrics and data analysis from the above-noted

4    Kaiser Family Foundation study, the Washington State Department of Social and

5    Health Services (DSHS) has estimated the effects the Rule will have on food

6    assistance participation in the state.[211] Specifically, DSHS estimates the Rule will

7    lead to disenrollment rates ranging from 15 to 35% among food assistance

8    enrollees in cases involving a noncitizen. DSHS further estimates that full

9    implementation of the Rule will reduce combined food and cash assistance to

10   Washington families by up to $55.3 million.

11       266.   In Massachusetts, each year between 2009 and 2012, SNAP benefits

12   kept 141,000 residents out of poverty, including 57,000 children. It is estimated

13   the Rule will jeopardize approximately $122 million in SNAP benefits, or almost

14   10 percent of Massachusetts's SNAP program.

15       267.   In New Jersey, it is estimated that as many as 50,000 residents who

16   are eligible for and receiving SNAP benefits might be affected by the chilling

17   effect of the Rule.

18       268.   Below are examples of the specific types of harms the Plaintiff

19   States and their residents will experience.

20

21   _____

22       [211] *See* S. Artiga, R. Garfield, A. Damico, supra.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

114

**(1)    Increased Hunger and Food Insecurity in the Plaintiff States' Residents**

269.    The Plaintiff States' food assistance programs are specifically tailored to provide food assistance to low-income individuals who otherwise likely could not afford to purchase sufficient food for themselves and their families.

270.    Individuals who are eligible to participate in the Plaintiff States' food assistance programs but who forgo participation because of the Rule are likely to experience greater food insecurity and will struggle to provide food for themselves and their families.

271.    In Massachusetts, speculation about the impact of the Rule has already spurred a decline in numbers of participants in public nutrition programs such as the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC), even though the program is not a "public benefit" under the Rule. Since February 2018, when Reuters released a draft of the Proposed Rule, which included WIC as a public benefit, there has been a 2,000 person decrease from 2017 levels in WIC participation in Massachusetts.

272.    The number of individuals and households disenrolling from or forgoing participation in the Plaintiff States' SNAP programs, which are considered "public benefits" under the Rule, is likely to be even greater.

273.    This increase in food insecurity and hunger directly undermines the purposes and effectiveness of the Plaintiff States' food assistance programs,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

115

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    which are intended to alleviate hunger and improve nutrition for the States' most

2    vulnerable residents.

3             **(2)**      **Significant public health concerns**

4        274.   The Plaintiff States' food assistance programs are specifically

5    tailored to assist working families who might not otherwise be able to afford

6    sufficient food for their children.

7        275.   The projected reduction in the number of immigrants and

8    mixed-status families participating in these programs because of fears associated

9    with the Rule will undermine the programs and lead to significant public health

10    concerns, including increases in child hunger and malnutrition.

11       276.   Children who experience hunger, food insecurity, and

12    malnourishment are more likely to suffer deficits in cognitive development,

13    behavioral problems, and poor health, along with reduced learning and academic

14    achievement, all of which tends to diminish future earning potential. Children

15    who are hungry will experience more difficulty in school and will require greater

16    resources from the Plaintiff States' educational systems.

17       277.   Further, eligibility for many federal school breakfast and lunch

18    programs—which provide free or reduced price meals to eligible students—are

19    based at least in part on enrollment in SNAP. Thus, although the Rule does not

20    expressly consider receipt of free or reduced price school meals as a "public

21    benefit" under the public charge test, the Rule will undoubtedly have a negative

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

116

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

effect on these programs by limiting enrollment in the underlying programs. In this way, the Rule will negatively affect far more assistance programs than only the limited programs it expressly identifies as public benefits.

278.　The Plaintiff States will ultimately bear the higher healthcare and other costs associated with treating the medical conditions resulting from this unnecessary child malnourishment.

279.　For this reason, the increase in food insecurity resulting from the Rule would undermine not only the Plaintiff States' interests in healthy, stable, productive residents and workforces, but also a purported goal of the Rule itself—to "better ensure" that immigrants "are self-sufficient, i.e., do not depend on public resources to meet their needs."

C.　**Housing Assistance Programs**

280.　The Plaintiff States manage and administer various state and federally funded housing assistance programs for eligible individuals and families, including noncitizens. The Rule, however, will irreparably harm the Plaintiff States by undermining the effectiveness of these programs, as eligible individuals and their families will disenroll or refrain from seeking housing assistance for fear of jeopardizing their ability to immigrate.

1.　**Federal housing assistance benefits**

281.　In general, individuals and families with incomes at or below 50 to 80% of their area median income are eligible for federal housing assistance.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

117

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    Federal housing assistance is not an entitlement program, and for families that

2    make it on the waiting list, the average wait time to receive a housing voucher is

3    2.5 years. Thus, federal housing assistance serves only about 25% of eligible

4    households.

5        282.   The Housing Act of 1937[212] provides for subsidies to be paid from

6    the U.S. government to local public housing agencies to improve living

7    conditions for low-income families (Subsidized Housing Program). There are

8    currently approximately 1 million units in the federal public housing subsidies

9    program. Nearly two-thirds of public housing subsidies households are

10    considered "extremely low income," with incomes below 30% of the Area

11    Median Income and an average annual income of $14,605. Approximately 3.3

12    million children live in such subsidized public housing.[213]

13        283.   The Section 8 Housing Choice Voucher Program (Housing Voucher

14    Program) is the federal government's major program for assisting low-income

15    families, the elderly, and the disabled to afford decent, safe, and sanitary housing

16    in the private market.[214] Housing choice vouchers are administered locally by

17

18    ——————————

19    [212] Pub. L. 75-412, 50 Stat. 888.

20    [213] Public Housing, National Housing Law Project, www.nhlp.org/

21    resource-center/public-housing/ (last visited Aug. 14, 2019).

22    [214] 42 U.S.C. §§ 1437f, 1437u.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

118

1   public housing agencies, which receive federal funds from the U.S. Department

2   of Housing and Urban Development (HUD).

3      284.   The Section 8 Project-Based Rental Assistance (PBRA) program

4   also provides housing assistance to low-income families.[215] This HUD program

5   provides critical affordable housing stock to more than 2 million people—in 1.2

6   million households—across the country. HUD contracts with private owners to

7   rent units in their housing developments, paying a subsidy that helps pay tenants'

8   rent.

9      285.   The Housing Voucher and PBRA programs (together, Section 8

10   programs) and the Subsidized Housing Program help prevent homelessness and

11   other kinds of housing instabilities. To participate in the Section 8 programs,

12   families must demonstrate incomes at or below certain threshold levels; an

13   absence of criminal- or drug-related records and evictions; and proof of

14   citizenship or eligible immigrant status.

15      286.   Under the Welfare Reform Act and the Housing and Community

16   Development Act of 1980, lawful permanent residents and certain other qualified

17   immigrants are eligible for Section 8 programs.[216] The Welfare Reform Act's five

18

19   _____

20      [215] 42 U.S.C. 1437f; 24 CFR parts 5, 402, 880–81, 883–84, and 886.

21      [216] Pub. L. 96-399, 94 Stat. 1614, Sec. 214, *codified as amended at*

22   42 U.S.C. § 1436a(a); 8 U.S.C. § 1611(a) & (c).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

119

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1   year ban applicable to Medicaid, SNAP, and other "federal means-tested public

2   benefits" does not apply to Section 8 programs.[217]

3    287. The Rule treats as "public benefits" (1) Section 8 Housing

4   Assistance under the Housing Choice Voucher program; (2) Section 8

5   Project-Based Rental Assistance; and (3) Public Housing under Section 9 of the

6   Housing Act of 1937. Under the Rule, an immigrant's participation in any of

7   these programs could constitute a heavily weighed negative factor favoring a

8   public charge determination, even though Congress has explicitly authorized

9   eligible noncitizens to participate in those programs.[218]

10     **2. State housing assistance programs**

11    288. The Plaintiff States manage and administer a variety of housing

12   assistance programs, including by using a combination of state, federal, and

13   private funding to provide safe and stable shelter options for eligible individuals

14   and their families. Certain classes of citizens and noncitizens are eligible to

15   participate in these housing assistance programs.

16   ————————————

17    [217] 8 U.S.C. § 1613(a); 8 C.F.R. § 213a.1; *Eligibility Restrictions on*

18   *Noncitizens: Inapplicability of Welfare Reform Act Restrictions on Federal*

19   *Means-Tested Public Benefits*, Dep't of Housing and Urban Devel., 65 Fed. Reg.

20   49994-01, Aug. 16, 2000.

21    [218] 83 Fed. Reg. at 51,289–90 (to be codified at 8 C.F.R.

22   § 212.21(b)(1)(ii)(B) & (b)(2)(iv)).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

120

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

289.   The chilling effect of the Rule, however, will deprive vulnerable individuals of opportunities to obtain such housing assistance, and irreparably harm the functioning of the Plaintiff States' programs.

### a.   The Plaintiff States' housing assistance programs

290.   All Plaintiff States manage and administer housing assistance programs. Working together with community, state, and national partners, the Plaintiff States provide effective programs seeking to prevent and alleviate homelessness and housing instability for their most vulnerable residents. Although the Department does not consider receipt of state-only housing assistance as a "public benefit"—unlike the federal programs described above— these state programs are likely to be harmed by the Rule's broad chilling effects on eligible individuals and families who forgo participation for fear of jeopardizing their ability to immigrate.

291.   For example, the Washington Department of Commerce administers Washington's state and federal housing assistance funding. The Department of Commerce manages the Washington State Housing Trust Fund, a 33-year-old source of capital to develop and preserve affordable housing for low-income and vulnerable Washingtonians. County governments act as lead grantees and are responsible for directing and managing the local homeless response system. These local homeless response systems assist homeless families and individuals who need help obtaining or maintaining permanent housing.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

121

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

292.   Washington's housing assistance programs receive approximately $196 million per year in funding from a variety of sources, including private funders as well as federal, state, and local governments. Using these funds, the programs seek to both (1) stabilize households that are currently in permanent housing but are at risk of homelessness; and (2) provide homeless individuals and families with emergency shelter, temporary housing, or placement into permanent housing.

293.   DSHS administers the Washington Housing and Essential Needs (HEN) Referral Program, which provides access to essential needs items and potential rental assistance for low income individuals and families who are unable to work for at least 90 days due to a physical and/or mental incapacity. DSHS provides this assistance even if the individuals are ineligible to receive federal funds.

294.   The Massachusetts Department of Housing and Community Development (MA-DHCD) similarly administers numerous federal and state housing programs and services to promote safe and affordable housing for residents. In particular, MA-DHCD oversees the operations of approximately 240 local housing authorities as well as programs that provide federal- and state-funded rental vouchers to low-income families; assist families in moving from shelter into housing or in avoiding homelessness altogether; and provide

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

122

1    shelter access for all low-income families that become homeless if they meet

2    certain eligibility criteria.

3          295.  Massachusetts's state budget allocated over $500 million for

4    homelessness and housing safety net programs and services in fiscal year 2019.

5    The Massachusetts Rental Voucher Program (MRVP), which provides both

6    mobile and project-based vouchers, alone received $100 million in state funding,

7    and Massachusetts's Emergency Assistance (MA-EA) program, through which

8    MA-DHCD funds family shelters, received over $175 million.

9          296.  The Virginia Department of Housing and Community Development

10   (VDHCD) and Virginia Housing Development Authority (VHDA), under the

11   oversight of Virginia's Secretary of Commerce and Trade, administer Virginia's

12   housing assistance programs. VDHCD creates safe and affordable housing by

13   regulating building and fire codes while investing more than $100 million each

14   year into affordable housing and community development projects throughout

15   Virginia. VHDA promotes access to home loans, homeowner and homebuyer

16   education to ensure quality, affordable housing for all in Virginia.

17         297.  VDHA also administers the federal Housing Choice Voucher and

18   Housing Credit programs in Virginia, and administers multiple programs that

19   offer state and federal funding to address homelessness. For example, the

20   Virginia Homeless Solutions Programs is a homeless and special needs housing

21   funding source that supports the development and implementation of localized

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

123

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

emergency crisis response systems with housing-focused, coordinated community-based activities. VDHCD also administers the housing opportunities for persons with AIDS program, HUD funding dedicated to the housing needs of low income people living with HIV/AIDS.

### b. Irreparable harms to the Plaintiff States' housing assistance programs

298. The Rule will lead to reduced immigrant participation in federal housing assistance programs for eligible residents of the Plaintiff States.

299. Further, while the Rule does not treat the above state housing assistance programs as "public benefits," because of the complexity of the regulatory regime and widespread public confusion and fear, it will nevertheless deter many immigrants and mixed-status families from participating in state-funded housing assistance programs for which they are eligible.

300. For these reasons, the Rule will cause irreparable harm to the Plaintiff States. Among other harms, the Rule will (1) lead to increased numbers of homeless individuals and families in the Plaintiff States; and (2) result in poorer health, educational, and other outcomes for vulnerable children who reside in the Plaintiff States and who, because of their or their family member's immigration status, will be deprived of opportunities for emergency shelter or placement into permanent housing.

301. Below are examples of the specific types of harms the Plaintiff States and their residents will experience.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

124

1

**(1)   Homelessness and other public health consequences**

2   302.   If the Rule is implemented, it will cause increased numbers of

3   individuals and families to experience homelessness in the Plaintiff States, as

4   individuals who are otherwise eligible for such assistance will forgo seeking it

5   for fear of jeopardizing their or their family member's ability to immigrate.

6   303.   The Rule provides that officials will consider Public Housing and

7   Section 8 participation in making a determination regarding whether someone is

8   likely to become a public charge. This will deter many eligible households from

9   seeking benefits and will delay placement of homeless families into permanent

10   housing.

11   304.   For example, in Washington, over 78,000 low-income households

12   use Public Housing and Section 8 assistance to afford modest rents and make

13   ends meet. Most of these individuals are either working themselves or come from

14   working families that cannot afford fair market rents.

15   305.   In Massachusetts, approximately 175,000 households receive

16   Section 8 or Public Housing assistance. Massachusetts's MRVP supported 5,100

17   households as of January 2013.

18   306.   In Maryland, approximately 84,000 households receive Section 8 or

19   Public Housing assistance. Approximately 48,000 Maryland households receive

20   federal rental assistance through the Section 8 Housing Choice Voucher Program.

21

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

125

307.  Further, many immigrant workers are employed in typically low-wage fields such as agriculture, construction, building and grounds cleaning and maintenance, and food service, which make it difficult for them to afford current market-based rents.

308.  In Massachusetts, large numbers of low-wage immigrant workers are employed in the health care system, serving in positions such as home health aides and nursing assistants. A minimum wage worker in Massachusetts would need to work, on average, at least 104 hours per week to afford a two-bedroom apartment.

309.  Washington currently provides 50,000 families per year with rental assistance, and about 15,000 of these families have children. About 14% of these families who receive rental assistance and have children are immigrant families.

310.  Washington has recently faced increased homelessness, with an estimated 3,285 homeless families with children. About 14% of the State's homeless families with children are immigrant families. Available data suggests the Rule is likely to compel over 10,000 immigrants and their families in Washington to give up the lifeline assistance that prevents them from suffering homelessness. For other eligible families, implementation of the Rule will significantly delay their placement into permanent housing.

311.  The homeless population in Massachusetts increased by 2,500 people, or 14%, in 2018. Massachusetts estimates that about 3,600 families with

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

126

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    children and pregnant individuals are in the MA-EA shelter system on any given

2    night. This number does not include families who are doubled up, living in unsafe

3    conditions, or sleeping in their cars.

4    312.   Further, because many of the placements into permanent housing

5    are related to Public Housing or Section 8 programs (17% of placements in

6    Washington last year), the Rule will hinder the Plaintiff States' ability to

7    successfully transition homeless individuals and their families into permanent

8    housing, significantly harming their residents who are otherwise unable to obtain

9    permanent housing.

10    **(2)    Poorer health, educational, and other outcomes**

11    313.   The Rule will also lead to other harmful related costs for the Plaintiff

12    States and their homeless and housing-insecure populations.

13    314.   Access to good housing is well-recognized as a social determinant

14    of public health, as families and individuals without stable housing are more

15    likely to use emergency services and require hospitalizations.

16    315.   Data shows that children who suffer homelessness and housing

17    insecurity experience dramatically poorer health outcomes, including having

18    twice as many respiratory infections and being three times more likely to be

19    hospitalized for asthma. This creates significant public health concerns for the

20    Plaintiff States.

21

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

127

316. Further, children who experience homelessness and housing insecurity also tend to suffer worse educational outcomes and generally have access to fewer and less profitable work opportunities. This results in harm to the Plaintiff States' economies and job markets.

317. Directly contrary to the supposed purpose of the Rule, needlessly depriving children of access to housing assistance only makes it more likely these children will require additional assistance as they grow older and will carry with them the adverse effects of their childhood homelessness.

318. The many negative effects of increased homelessness in families with children will irreparably harm the families, their children, and the Plaintiff States, which will ultimately bear responsibility for the many increased costs and other consequences associated with childhood homelessness.

## D. Cash Assistance Programs

319. The Plaintiff States manage and administer various state and federally funded cash assistance programs for eligible individuals and families, including noncitizens. Under the Rule, however, eligible individuals and their families will opt not to seek critical financial assistance for fear of jeopardizing their immigration status.

### 1. Federal cash assistance benefits

320. Congress created the Temporary Assistance to Needy Families (TANF) program in 1996 as part of the Welfare Reform Act.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

128

1    321.    TANF provides grant funds to states to provide families with

2    financial assistance and related support services including childcare assistance,

3    job preparation, and work assistance.

4    322.    To qualify for TANF, individuals must either be pregnant or

5    responsible for a child under 19, have a low or very low income, and be

6    unemployed, under-employed, or about to be unemployed.

7    323.    As the first word in the program name suggests, TANF was designed

8    as a temporary benefit to help otherwise self-sufficient, working families get back

9    on their feet while experiencing joblessness, unanticipated adverse life events, or

10    other hard times.

11    324.    Federal law imposes work requirements applicable to TANF

12    participants. It requires states administering TANF to (1) ensure that cash

13    assistance recipients are working within 24 months of receiving assistance, or

14    sooner if the state deems them ready for work, and (2) achieve annual work

15    participation rates. Fifty percent of all TANF families with one work-eligible

16    adult and 90 percent of families with two work-eligible adults must engage in

17    specified work or work-related activities for a minimum number of weekly hours.

18    325.    The Welfare Reform Act allows qualified immigrants, including

19    lawful permanent residents, to participate in TANF after five years in qualified

20    immigrant status. Certain qualified immigrants are exempt from the five year ban,

21    including members of the military and veterans (and their spouses and children).

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

129

326.   States are permitted under the Welfare Reform Act to provide state-funded cash assistance benefits to nonexempt qualified immigrants during the five year TANF ban to replace the loss of federal benefits, as well as to provide state-only-funded assistance to nonqualified immigrants.

327.   The Rule treats TANF as a "public benefit" program in which an immigrant's participation could constitute a heavily weighed negative factor favoring a public charge determination.

328.   The Rule also treats some state-only-funded cash assistance as "public benefits" in which an immigrant's participation could constitute a heavily weighed negative factor favoring a public charge determination. The Rule's definition of public benefit includes "[s]tate or local cash benefit programs for income maintenance (often called 'General Assistance in the State context, but which may exist under other names)."[219] That ambiguous definition does not provide clear notice of the state cash assistance programs in which an immigrant's participation may "heavily" weigh in favor of a public charge determination.

329.   As set forth below, implementing the Rule will cause irreparable harm to the Plaintiff States by undermining the functioning and effectiveness of their cash assistance programs.

---

[219] 84 Fed. Reg. at 41,501 (to be codified at 8 C.F.R. § 212.21(b)(1)(iii)).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

130

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1     **2.**    **State cash assistance programs**

2     330.  All Plaintiff States manage and administer various financial

3 assistance programs intended to provide modest monetary assistance to eligible

4 residents and their families for maintaining financial stability in certain

5 circumstances. Certain classes of citizens and noncitizens are eligible to

6 participate in these programs.

7     331.  The Rule, however, considers as "public benefits" not only federal

8 cash assistance programs such as TANF but also state and local cash benefit

9 programs for income maintenance. As a result, the Rule will deprive vulnerable

10 individuals and their families of opportunities to access these programs and

11 achieve financial stability.

12     **a.**    **The Plaintiff States' cash assistance programs**

13     332.  All Plaintiff States manage and administer cash assistance programs

14 to assist eligible individuals and their families in dealing with financial hardship.

15     333.  For example, the Washington Department of Social and Health

16 Services administers Washington's TANF program as well as several other cash

17 assistance programs for eligible individuals.

18     334.  Washington's TANF program provides cash assistance to certain

19 parents or caregivers and pregnant individuals to bolster their ability to support

20 their families' foundational needs, including a safe home, healthy food, reliable

21 transportation, and school supplies.

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

335. During the 2017 to 2019 biennium, the Washington TANF program cost over $300 million in combined federal and state service and administrative costs, including over $90 million in total state funding.

336. Washington complements TANF with a state-funded program called State Family Assistance (SFA). SFA is available to individuals who meet TANF's income requirements but are ineligible for TANF for other reasons, including certain noncitizens. Washington extends SFA cash assistance to qualified immigrants during the five year TANF ban, as well as to non-qualified immigrants who are residents of Washington and legally present in the United States.[220] Some families receive a mix of TANF and SFA based on the eligibility or immigrant status of each family member. Under the Rule, SFA constitutes a state cash benefit program for income maintenance in which an immigrant's participation could constitute a "heavily weighed negative factor" favoring a public charge determination.

337. The Virginia Department of Social Services administers Virginia's TANF program. Virginia's TANF program provides eligible families with a monthly cash payment to meet their basic needs. Virginia's TANF program emphasizes personal responsibility. Participants may be provided with services such as job skills training, work experience, job readiness training, child care assistance, transportation and other work related expenses. The Virginia TANF

---

[220] WAC 388-400-0010, 388-424-0001, 388-468-0005.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

132

1    program also includes an employment advancement program that is designed to

2    provide proven service approaches and strategies to help current and former

3    TANF clients to prepare to enter, succeed, and advance in the workplace. The

4    expected outcome of this program are improved job placement, improved job

5    retention, higher employment wages upon entry, and increased wage gains from

6    job advancement.

7        338.   In Massachusetts, MA-DTA manages aid programs designed to help

8    low-income individuals and families escape poverty, including the Transitional

9    Aid to Families with Dependent Children (TAFDC), Massachusetts's TANF cash

10   assistance program.

11       339.   Massachusetts's TAFDC program provides cash assistance, child

12   care, and transportation support for job assistance to families with children and

13   pregnant women with little or no assets or income, to meet their emergency and

14   transitional needs.

15       340.   In state fiscal year 2019, Massachusetts's TAFDC program spent

16   $841 million, including $382 million in state funds.

17       341.   The Plaintiff States administer other programs that, due to the Rule's

18   ambiguity, may or may not be considered "public benefits" in which an

19   immigrant's participation would weigh in favor of a public charge determination.

20       342.   For example, Washington's Aged, Blind, or Disabled Cash

21   Assistance Program is a state-funded program that provides financial assistance

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

133

1    to certain eligible, low-income individuals who are age 65 or older, blind, or are

2    determined likely to meet specific Supplemental Security Income disability

3    criteria expected to last at least 12 consecutive months. Washington also

4    administers the state-funded Pregnant Women Assistance Program, which

5    provides financial assistance to certain pregnant noncitizens ineligible for TANF;

6    the Consolidated Emergency Assistance Program, which provides emergency

7    assistance to families and pregnant women; the Diversion Cash Assistance

8    Program, which provides alternative assistance to TANF for families with

9    short-term financial needs; the State Supplemental Program, which assists certain

10   individuals while the Social Security Administration determines their eligibility

11   for Supplemental Security Income; and the Additional Requirements for

12   Emergent Needs Program, which assists individuals in keeping housing or

13   utilities.

14   343.   In Massachusetts, MA-DTA similarly administers Emergency Aid

15   for Elderly, Disabled, and Children (EAEDC), a wholly state-funded cash

16   assistance program for persons who are age 65 or older, disabled adults,

17   caretakers, and children who are not able to get TAFDC.

18   344.   Due to the Rule's ambiguity, it is uncertain whether the Department

19   would treat an immigrant's participation in these state-only cash assistance

20   programs as a "heavily weighed negative factor" favoring a public charge

21   determination. Regardless, the chilling effect of such ambiguity will be

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

134

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

substantial, resulting in many individuals opting not to seek state-funded cash-assistance benefits for which they may be eligible.

**b.     Irreparable harm to the Plaintiff States' cash assistance programs**

345.   The Rule will cause irreparable harm to the Plaintiff States and their cash assistance programs, as eligible individuals and families facing financial hardship will elect not to access the program benefits for fear of jeopardizing their own or a family member's immigration status. Due to the Rule's ambiguity, as well as widespread fear and confusion among immigrant communities, those chilling effects will reduce enrollment both in cash assistance programs in which a noncitizen's participation could trigger a public charge determination and in programs the Department would not consider a state or local cash benefit program for income maintenance.

346.   The Rule will thus irreparably harm the Plaintiff States by increasing the number of their residents whose financial hardships lead to loss of medical coverage or housing.

347.   For   example,   Washington's   DSHS   estimates   that   full implementation of the Rule will reduce combined food and cash assistance to Washington families by approximately $23.7 to $55.3 million as eligible individuals either terminate their benefits or decline to seek assistance.

348.   The Rule will irreparably harm the Plaintiff States by deterring individuals from seeking temporary, hardship-based cash assistance they are

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

135

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    otherwise eligible to receive. Without access to temporary financial assistance,

2    these individuals and their families are less likely to be able to weather

3    unexpected financial hardships, increasing the likelihood they will lose valuable

4    stability in the form of housing, transportation, or medical coverage or care.

5        349.   The resulting economic dislocations will cause significant harm to

6    the Plaintiff States, which will ultimately bear the greater costs associated with

7    noncitizens' or mixed-status families' loss of financial stability, medical

8    coverage, or housing.

9    **E.    Other State Benefits Programs**

10       350.   In addition to irreparably harming the Plaintiff States by

11   undermining the proper functioning and effectiveness of their medical, housing,

12   food, and cash assistance programs, implementation of the Rule will also imperil

13   a host of other critical, state-managed assistance programs.

14       351.   These various state-administered programs include but are not

15   limited to long-term care for elderly and disabled residents, job and employment

16   training programs, support and advocacy services for crime victims and energy

17   assistance.

18       352.   Although the Rule does not expressly consider participation in these

19   programs as a "public benefit" under the public charge test, the programs will

20   nevertheless be harmed by the chilling effect the Rule has on eligible individuals.

21   As set forth below, implementing the Rule will cause irreparable harm to the

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

136

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

Plaintiff States and their residents by undermining the functions and effectiveness of these and similar assistance programs.

1. **Long term services and supports for elderly and disabled residents**

353.   The Plaintiff States manage and administer various programs to provide care for elderly and disabled residents.

354.   Long Term Services and Supports (LTSS) is a specific category of care that includes both paid and unpaid medical and personal care services, which may be provided in a person's home, a community residential setting, or an institution such as a nursing home.

355.   For example, in Washington, the Aging and Long-Term Support Administration (ALTSA) is an agency within DSHS that administers LTSS services to the State's low-income elderly and disabled individuals.

356.   In Virginia, DMAS and the Department of Aging and Rehabilitative Services (DARS) are agencies with the Secretary of Health and Human Resources (HSS) that administer long terms services and supports for low-income elderly people and people with disabilities.

357.   There is rapidly growing demand for workers who provide LTSS (called Direct Care Workers) because of the increasing population of individuals over the age of 65.

358.   According to the U.S. Department of Health and Human Services, demand for Direct Care Workers nationally will grow from 2.3 million in 2015

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

137

1    to 3.4 million in 2030. Without a ready supply of workers, Plaintiff States'

2    programs and elderly and disabled residents will struggle to recruit sufficient

3    staff.

4        359.   According to the U.S. Government Accountability Office,

5    approximately 23% of Direct Care Workers are immigrants.

6        360.   The average annual earnings for these jobs are at or below the

7    federal poverty level. Accordingly, many of these workers rely on public

8    assistance for health care, food, and housing. For example, in Massachusetts over

9    40 percent of direct care workers depend on Medicaid, SNAP, or other benefits.

10    Under the Rule, however, these workers will be discouraged from seeking such

11    benefits, as doing so might jeopardize their immigration status.

12        361.   Other factors for consideration under the Rule, including credit

13    history, education, and language, are all likely to increase the chances many

14    Direct Care Workers will be considered a "public charge."

15        362.   Under the Rule, many immigrants who are currently Direct Care

16    Workers or would become employed in such positions would likely be

17    considered a public charge. A decrease in LTSS labor will increase the risk of

18    injury, institutionalization, and death for the Plaintiff States' many vulnerable

19    elderly and disabled residents, including citizens and noncitizens.

20

21

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

138

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

363.   This will also increase costs for states like Washington to ensure that their elderly and disabled residents are properly cared for, including by increasing costs to Medicaid in the Apple Health program.

364.   The resulting labor shortage will also force more citizens into nursing homes, destroying decades of federal and state efforts to keep aging individuals in their own homes. The Plaintiff States will therefore suffer a diminished ability to administer elderly and disabled support services in a manner approved by the States' residents, legislatures, and governors.

## 2.    Job and employment training programs

365.   The Plaintiff States manage and administer various job and employment training programs. Although these programs are not identified as "public benefits" under the Rule, they are likely to be affected by the chilling effect the rule will have on eligible populations.

366.   For example, in Washington, DSHS administers employment and training programs designed to provide recipients of cash and food benefits with opportunities to gain skills, secure employment, and escape poverty.

367.   In combination with other state agencies and community partners, DSHS develops custom plans to support people in building skills through employment and education training. DSHS tailors these programs to serve particular populations, including programs specifically designed to assist noncitizen families.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

139

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

368.   Washington also has a WorkFirst program for families receiving TANF or SFA benefits. The WorkFirst program provides families with opportunities to engage in work activities that support financial stability and resilience, including a Limited English Proficiency Pathway Program offering employment services, job skills training, and English-as-a-Second-Language services to nearly 5,000 people every year. DSHS infuses state funding into this program to serve noncitizens who are ineligible for federally-funded services.

369.   Further, the Washington State Basic Food Employment and Training program (BFET) provides job search training, self-directed job search, educational services, skills training, and other employment opportunities to Basic Food (SNAP) recipients. This is an example of a program that, although not directly identified as a "public benefit" itself under the Rule, is likely to be severely affected because of its close relation to programs that are considered public benefits, such as SNAP.

370.   BFET is an important part of the State's comprehensive workforce development system, as the program serves the needs of low-income individuals, displaced workers, and employers by encouraging financial independence from public assistance through skill acquisition, personal responsibility, and gainful employment.

371.   Washington dedicates state funding to support a BFET program designed specifically to provide culturally and linguistically appropriate services

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

140

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    to more than 1,000 noncitizens in Washington. This program is available only to

2    those individuals eligible to receive other federal benefits.

3        372.   In Virginia, the Department of Social Services (DSS) administers

4    employment and training programs designed to provide recipients of cash and

5    food benefits with opportunities to gain skills, secure employment, and get out of

6    poverty. The Department for Aging and Rehabilitative Services provides

7    employment and vocational rehabilitation services for low-income elderly people

8    and individuals with disabilities and their families. The Virginia Department for

9    the Blind and Vision Impaired provides employment services for low-income

10   blind and visually impaired individuals and their families. In combination with

11   other state agencies and community partners, DSS supports people in building

12   skills through employment and education training. DSS has specific programs

13   that service particular populations, including programs specifically designed to

14   assist noncitizen families.

15       373.   Virginia provides job skills, work experience, job readiness training,

16   child care assistance, transportation, and other work related expenses to families

17   receiving TANF. Virginia also provides former TANF clients opportunities to

18   prepare to enter, succeed, and advance in the workplace.

19       374.   In Massachusetts, the Commonwealth's Department of Transitional

20   Assistance administers and funds, in cooperation with the federal government, a

21   skills and employment program, Path to Work, for SNAP recipients who need

22

1    help finding work. The program reflects the agency's statutory mandate to

2    connect participating SNAP recipients with "education, employment and training

3    activities." Because of the program's close relationship to SNAP, however, it is

4    likely to be severely affected by implementation of the Rule. Even though the

5    program is not itself identified as a "public benefit" under the Rule, SNAP

6    benefits are considered to be "public benefits" that may result in a public charge

7    determination. Thus, eligible immigrants are likely to forgo participating in either

8    program, particularly where participation in one is contingent on participation in

9    the other.

10       375.  Due to the Rule's ambiguity and because it considers SNAP

11   enrollment in making public charge determinations, eligible immigrants are

12   likely to be uncertain of whether their participation in one of the above

13   employment training programs would be a negative factor weighing in favor of a

14   public charge determination. Immigrants will therefore be strongly discouraged

15   from accessing the above programs, many of which are based on SNAP

16   enrollment. In this way, the Rule affects far more benefits programs than are

17   identified in the text of the rule.

18       376.  Reduced participation in the above training programs will

19   negatively impact the Plaintiff States' residents, employers, economy, and

20   pursuit of their policy priorities.

21

22

COMPLAINT FOR                          142        ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                                        8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                                         Kennewick, WA 99336
                                                            (509) 734-7285

377.   Residents who might otherwise have participated in the programs will be deprived of the opportunity to develop their skills, increase their earning potential, and improve their quality of life. Ironically, the change will leave these residents more vulnerable and more likely, in the long term, to rely on emergency public assistance. Employers will lose access to a more highly trained pool of potential employees. The Plaintiff States' economies will lose the benefits of would-be participants' increased productivity. The Plaintiff States will be unable to achieve their policy goals of providing the greatest possible access to workforce development in order to maximize the public welfare.

378.   Lower participation in job and employment training programs will also have the self-defeating result of making fewer people capable of becoming independent from public benefits, directly contradicting the supposed purpose of the Rule.

379.   In sum, the Rule will harm the Plaintiff States' sovereign interests in administering comprehensive work training programs critical to their continued economic growth and success.

**3.      Irreparable harm to the Plaintiff States' support services for crime victims**

380.   The Plaintiff States manage and administer various services to advocate on behalf of and provide support for crime victims. Although these and similar programs are not considered "public benefits" under the Rule, they are

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

143

1    nevertheless likely to be negatively affected by the chilling effect the Rule will

2    have on individuals who are eligible to access these programs.

3        381.   For example, Washington State has established the Office of Crime

4    Victims Advocacy (OCVA) to serve as an advocate for crime victims in

5    Washington. OCVA's mission is to support, heal, and assist crime victims in

6    reaching their full potential.

7        382.   OCVA supports crime victims in obtaining services and resources,

8    assists communities with planning and implementing the provision of services to

9    crime victims, advises local and state government agencies that assist crime

10   victims, and administers grant funds for community programs that support crime

11   victims.

12       383.   The Virginia General Assembly promulgated the Virginia Victim

13   and Witness of Crime Act to service crime victims, including providing support

14   related to financial assistance and social services in Virginia. The Virginia

15   Victims Fund (VVF) is a state program created to help victims of violent crimes

16   with out of pocket expenses, including medical bills, prescriptions, funeral

17   expenses, lost wages, temporary housing, counseling services, and many other

18   expenses. The Victims Services Team within the Virginia's Department of

19   Criminal Justice Services (DCJS) provides grant funding, training, technical

20   assistance, and written resources to programs and individuals serving crime

21   victims. The DCJS and the VVF are the lead coordinating agencies in Virginia

22

1    for crime victims during critical events and emergencies under emergency

2    management plans.

3        384.   The Rule will deter immigrant crime victims from accessing vital

4    benefits for themselves or their families, including children and elderly relatives

5    trying to escape from or address the trauma of domestic violence, sexual assault,

6    unlawful labor or sex trafficking, and other crimes.

7        385.   The Rule will significantly harm the Plaintiff States' efforts to assist

8    crime victims, as many victims and their families will sacrifice basic needs,

9    safety, and health in the form of food assistance, housing assistance, and medical

10   insurance, all to avoid potentially adverse immigration consequences.

11               **VII.   THE RULE'S OTHER ADVERSE IMPACTS**

12       386.   As set forth in detail above, the Rule's chilling effects will cause

13   far-reaching harms to the Plaintiff States and their residents due to the loss of

14   public benefits and services to which they are legally entitled. In addition to those

15   harms, the Rule will have a vast array of other adverse impacts, including

16   (1) wrongfully denying marriage-based green cards to half of applicants due to

17   the irrationally high income threshold; (2) destabilizing the Plaintiff States'

18   workforces by erecting arbitrary new barriers to immigration and adjustment or

19   change of status; (3) reducing overall economic output and tax revenues in the

20   Plaintiff States; (4) imposing a disparate burden on communities of color,

21

22

1  particularly Latinos; and imposing a disparate burden on individuals with

2  physical or mental disabilities.

3  **A.    Family Reunification Impacts**

4  387.   The INA requires most green card applicants to have a

5  sponsor—typically a U.S. citizen-spouse or other family member—with a high

6  enough income to ensure the immigrant would not become a public charge.[221] By

7  statute, the sponsor must "agree[] to provide support to maintain the sponsored

8  alien at an annual income that is not less than 125 percent of the Federal poverty

9  [guide]line" (FPG) based on household size.[222] When the sponsor is the green

10  card applicant's spouse, the applicant's income may be included "to meet the

11  income requirement" of 125%of FPG.[223] The affidavit of support provision thus

12  reflects a Congressional determination that an income of at least 125% of FPG is

13  sufficient to ensure a lawful permanent resident will not become a public charge.

14  388.   The Rule eviscerates Congress's intent in establishing the 125% of

15  FPG threshold for an affidavit of support. It does so by doubling the income

16  ─────────────────

17  [221] 8 U.S.C. §§ 1182(a)(4)(C), 1183a.

18  [222] 8 U.S.C. § 1183a(a)(1)(A); *see also* 8 C.F.R. § 213a.2 ("In order for the

19  intending immigrant to overcome the public charge ground of inadmissibility, the

20  sponsor must demonstrate the means to maintain the intending immigrant at an

21  annual income of at least 125 percent of the Federal poverty line.").

22  [223] 8 C.F.R. § 213a.2(i)(3).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

146

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

threshold to 250% of FPG at which an immigrant's household income would constitute a "heavily weighed positive factor" in the public charge test.[224] Even with a household income exceeding 250% of FPG, the Department would apparently retain the discretion to deny the sponsored immigrant's green card application based on its other public charge factors.[225] The Department provides no rational reason for disregarding the statutory 125% FPG threshold and adopting the significantly higher 250% threshold instead. In doing so, the Department is attempting to rewrite the INA by regulation.

389.    The Department's new 250% FPG threshold would significantly inhibit the goal of family reunification that has long been a cornerstone of U.S. immigration policy. According to the analysis of one public commenter, 54% of the foreign-born spouses who are currently eligible for green cards would become ineligible under the Rule's higher income threshold.[226] The Rule will force 200,000 U.S. citizens to choose whether to leave the United States or live apart from their spouse, disrupting family cohesion and stability in the Plaintiff States.

---

[224] 84 Fed. Reg. at 41,504 (to be codified at 8 C.F.R. § 212.22(2)(c)(2)(i)).

[225] *See generally*, 84 Fed. Reg. at 41,504 (to be codified at 8 C.F.R. § 212.22).

[226] Boundless Cmt. at 48.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

147

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

**B.    Workforce Impacts**

390.    Non-cash public assistance benefits are essential for workers to remain employed, employable, and productive. For example, access to affordable health insurance helps workers to enter and remain in the workforce.[227] Workers with health insurance miss approximately 75% fewer work days and are more productive at work than their uninsured peers.[228] The Rule will therefore make the workforces in the Plaintiff States less healthy and less productive, reducing overall economic output.

391.    As explained above, the Rule will significantly reduce the labor supply of direct care workers, who provide LTSS to low-income elderly and disabled individuals. The resulting shortage in the direct care worker labor market will increase costs for Plaintiff States to administer LTSS programs, endangering the safety of their elderly and disabled residents.

---

[227] Larisa Antonisse and Rachel Garfield, The Relationship Between Work and Health: Findings from a Literature Review, Kaiser Fam. Found. (Aug. 7, 2018), https://tinyurl.com/KKFRelationship-work-health.

[228] Allan Dizioli and Roberto Pinheiro, Health Insurance as a Productive Factor, 40 Labour Econ. 1-24, (June 2016), https://www.sciencedirect.com/science/article/abs/pii/S0927537116300021.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

148

## C.     Other Macroeconomic Impacts

392.   The mass disenrollment from and forgone participation in public assistance programs by immigrants and their families will have significant adverse impacts on the Plaintiff States' economies. The loss of medical, food, cash, and other benefits will reduce revenue to numerous health care providers, grocers, farmers' markets, and other market participants providing basic goods and services—constraining overall economic output in the Plaintiff States both directly and indirectly.

393.   For example, Washington State estimates that the Rule will directly reduce total economic output by as much as nearly $100 million. Economists with Washington's DSHS used an input-output model to calculate indirect economic impacts from multiplier effects flowing from the reduced assistance to eligible families. Under this model, implementation of the Rule will reduce total economic output in Washington from between $41.8 million and $97.5 million. Under Washington's projections, this will also result in an annual reduction in wages, salaries, and benefits for workers in the amount of $15.7 million to $36.7 million, as well as a loss of approximately 334 to 782 Washington jobs.

394.   State and local governments benefit from the significant tax revenues from immigrant taxpayers. Between 2011 and 2013, tax revenues received from immigrants were $130 billion higher than public money spent on

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

149

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

that same population.[229] On average, an immigrant in the United States pays $900 more per individual in tax revenue than she collects in public expenditures.[230]

395.   Those state and local tax revenues are likely to decrease substantially as a result of the Rule, which will cause eligible immigrants to disenroll from public benefits programs, limit their participation in the workforce, and not fully participate in the economy.

**D.   Disparate Impacts**

396.   The effects of the Rule will have a disparate impact on communities of color, most severely on Latinos. It is well established that income and wealth disparities across racial and ethnic groups are substantial. The Rule, by selecting for wealthy immigrants and punishing the working class—including participation in common social safety net programs—would severely disadvantage non-white

---

[229] Nat'l Academies. Sci., Engineering, Med., The Economic and Fiscal Consequences of Immigration, 522 (2017), https://doi.org/10.17226/23550; Sang V. Nguyen and Alice Zawacki, Health Insurance and Productivity: Evidence from the Manufacturing Sector, Ctr. for Econ. Studies, U.S. Census Bureau, Working Papers (Jan. 2009), https://tinyurl.com/Health-Insur-Productivity.

[230] *Id.* at 524.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

150

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

immigrants.[231] In other words, the Rule would effectively implement the President's policy of preferring white immigrants like those from "Norway."

397. By one estimate, the chilling effects of the Rule would disproportionately fall on people of color, prompting as many as 18.3 million Latino noncitizens or their family members to disenroll or forgo enrollment in public benefit programs—roughly 70% of the total noncitizen families at risk.[232] The Department's arbitrarily high 250% FPG income threshold would have disproportionate effects based on national origin and ethnicity, blocking 71% of applicants from Mexico and Central America, 69% from Africa, and 52% from Asia—compared to only 36% from Europe, Canada, and Oceania.[233]

398. Other factors in the Public Charge Rule will cause a disparate impact on the basis of race, ethnicity, or national origin. Credit scores are lower among blacks and Hispanics than among non-Hispanic whites and Asians.[234]

---

[231] That is, the Rule would effectively enact the President's policy of preferring white immigrants like those from "Norway." *See supra* ¶ X.

[232] Boundless Cmt. at 65; *Public Charge Proposed Rule: Potentially Chilled Population Data*, Manatt, Phelps & Phillips, LLP (Oct. 11, 2018), goo.gl/nWawDr.

[233] Boundless Cmt. at 65–66.

[234] Bd. of Governors of the Fed. Reserve Sys., *Report to the Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit*,

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

151

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

399.   The high school degree factor will also have a disparate impact, since 54% of immigrants from Mexico and 46% of immigrants from Central America have not obtained a high school degree, while only 10% of immigrants from Europe or Canada have not obtained one.[235]

400.   Finally, the English proficiency factor will also exacerbate the Rule's disparate impact on the basis of race, ethnicity, and national origin. Of the seven countries with the highest rates of English proficiency, six are in Europe and none is in Latin America or Africa. Conversely, none of the 24 countries with the lowest rates of English proficiency is in Europe, while all but one are in Latin America, Africa, or the Middle East.[236]

401.   The racial and ethnic animus evident in the President's own statements indicates that the Rule was adopted because of, and not in spite of, its disparate impact.

――――――――――――――

at O-25   (Aug.   2007),   https://www.federalreserve.gov/boarddocs/rptcongress/creditscore/creditscore.pdf.

[235] Jynnah Radford, *Key Findings About U.S. Immigrants*, Pew Research Ctr. (June 17, 2019), https://www.pewresearch.org/fact-tank/2019/06/17/key-findings-about-u-s-immigrants/.

[236] Education First, *EF English Proficiency Index* at 6–7 (2018), https://www.ef.edu/__/~/media/centralefcom/epi/downloads/full-reports/v8/ef-epi-2018-english.pdf.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

152

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    402.    Through Section 504 of the Rehabilitation Act of 1973, Congress

2    statutorily barred discrimination based on disability in any program or activity of

3    any federal executive branch agencies.[237]

4    403.    Despite Section 504's prohibition on disability discrimination, the

5    Public Charge Rule subjects individuals with disabilities to an increased

6    likelihood of a public charge determination. It does so by, for example, requiring

7    immigration officers to consider in the negative any medical condition that may

8    interfere with self-care or restricts the individual's ability to attend school or

9    work, and by targeting non-monetary public benefits, such as Medicaid, which

10   such individuals are likelier to receive to pay for medical costs related to their

11   conditions.

12   404.    DHS knowingly maintained these elements in the Rule despite the

13   disproportionate impact it will have on individuals with disabilities.

### VIII.  CAUSES OF ACTION
#### Count I:
**Violation of the Administrative Procedure Act—Action Not in Accordance with Law**

17   405.    All the foregoing allegations are repeated and realleged as though

fully set forth herein.

---

22   [237] 29 U.S.C. § 794.

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

153

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    406.   The APA requires a reviewing court to "hold unlawful and set aside

2    agency action, findings, and conclusions found to be . . . not in accordance with

3    law."[238]

4    407.   Congress used the term "public charge" in the INA consistent with

5    its original public meaning which includes determining whether an immigrant is

6    likely to become "primarily dependent" on the government for subsistence.[239] By

7    redefining "public charge" as "an alien who receives one or more public

8    benefit[s],"[240] in even modest amounts, the Rule unmoors the term from its

9    original public meaning and departs from the unambiguously expressed intent of

10   Congress in numerous statutes. The Rule's redefinition of public charge and new

11   standards governing public charge determinations are not in accordance with the

12   following statutes:

13           a.      INA Section 212(a)(4);[241]

14           b.      INA Section 202(a)(1);[242]

15

16   _____

17   [238] 5 U.S.C. § 706(2)(C).

18   [239] 64 Fed. Reg. at 28,689.

19   [240] 83 Fed. Reg. at 51,157 & 51,289 (to be codified at 8 C.F.R.

20   § 212.21(a)).

21   [241] 8 U.S.C. § 1182(a)(4).

22   [242] 8 U.S.C. § 1152

1        c.    Personal    Responsibility    and    Work    Opportunity

2    Reconciliation Act of 1996 (Welfare Reform Act),[243] including Sections

3    401–03,[244] 411–12,[245] and 431;[246]

4        d.    Illegal Immigration Reform and Immigrant Responsibility

5    Act of 1996 (Immigration Reform Act),[247] including Sections 531[248] and

6    551;[249]

7        e.    Section 504 of the Rehabilitation Act of 1973, which provides

8    that "[n]o otherwise qualified individual with a disability in the United

9    States . . . shall, solely by reason of her or his disability, be excluded from

10    the participation in, be denied the benefits of, or be subjected to

11    discrimination . . . under any program or activity conducted by any

12    Executive agency."[250]

13

14    ──────────────

15    [243] Pub. L. 104-193, 110 Stat. 2105.

16    [244] 8 U.S.C. §§ 1611–13.

17    [245] 8 U.S.C. §§ 1621–22.

18    [246] 8 U.S.C. § 1641.

19    [247] Pub. L. 104-208, 110 Stat. 3009.

20    [248] 8 U.S.C. § 1182.

21    [249] 8 U.S.C. § 1183a.

22    [250] 29 U.S.C. § 794(a).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

155

408.   The Final Rule's inclusion of SNAP as a negatively weighted consideration for public charge is contrary to federal statutes governing those programs. Specifically, the Final Rule's allowance of consideration of a noncitizen's receipt of SNAP benefits is contrary to the express statutory provision prohibiting consideration of those benefits "[as] income or resources for any purpose under any Federal, State, or local laws." 7 U.S.C. § 2017(b).

## Count II:
## Violation of the Administrative Procedure Act—*Ultra Vires* Conduct

409.   All the foregoing allegations are repeated and realleged as though fully set forth herein.

410.   The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction [or] authority."[251]

411.   The Rule expands the public charge exclusion to reach applicants for extension of stay and change of status. The INA does not permit—either expressly or impliedly—the Department to expand its authority in this regard. As the Department itself acknowledges, the public charge exclusion statute "by its terms only applies to applicants for visas, admission, and adjustment of status,

---

[251] 5 U.S.C. § 706(2)(C).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

156

1   and thus does not, by its terms, render aliens who are likely to become a public

2   charge ineligible for the extension of stay or change of status."[252]

3       412.   Congress has specifically confined the categories of immigration

4   applications to which the "public charge" designation applies. DHS may not

5   expand those statutory limitations by regulation. Its attempt to do so is ultra vires

6   and unlawful.[253]

7                       **Count III**

   **Violation of the Administrative Procedure Act—Arbitrary or Capricious**
8   **Agency Action**

9       413.   All the foregoing allegations are repeated and realleged as though

10   fully set forth herein.

11       414.   The APA requires a reviewing court to "hold unlawful and set aside

12   agency action, findings, and conclusions found to be . . . arbitrary, capricious,

13   [or] an abuse of discretion."[254]

14       415.   In general, a rule is arbitrary and capricious where the agency "relied

15   on factors which Congress has not intended it to consider, entirely failed to

16   consider an important aspect of the problem, offered an explanation for its

17   decision that runs counter to the evidence before the agency, or is so implausible

18   _____

19      [252] 83 Fed. Reg. at 51,135.

20      [253] *MCI Telecommunications Corp. v. American Telephone & Telegraph*

21   *Co.*, 512 U.S. 218, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994).

22      [254] 5 U.S.C. § 706(2)(C).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

157

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

that it could not be ascribed to a difference in view or the product of agency expertise."[255] The agency must consider "the advantages and the disadvantages" of the proposal before taking action.[256]

416.   When an agency reverses position, it must "supply a reasoned analysis for the change,"[257] and may not "depart from a prior policy sub silentio or simply disregard rules that are still on the books."[258] Further, any "serious reliance interests must be taken into account,"[259] particularly where "decades of . . . reliance on the Department's prior policy" demand a fulsome explanation for the reversal.[260]

417.   Under the standards set forth above, the Rule is arbitrary or capricious in its entirety, including in the following particular respects:

    a.   the redefinition of public charge to mean "an alien who receives one or more public benefits";[261]

---

[255] *Motor Vehicle Mfrs. Ass'n  v. State Farm Mut. Auto. Ins. Co.* (*State Farm*), 463 U.S. 29, 43 (1983) (citation and internal quotation marks omitted).

[256] *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015).

[257] *State Farm* at 42.

[258] *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009).

[259] *Id.*

[260] *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016).

[261] 84 Fed. Reg. at 41,501 (to be codified at 8 C.F.R. § 212.21(a)).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

158

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1         b.    the inclusion of non-cash public assistance programs in the

2   definition of "public benefit," reversing a consistent, decades-old policy;

3         c.    the arbitrary selection of 12 months within a 36 month period

4   as the duration of time at which receipt of public benefits constitutes a

5   heavily weighted negative in public charge determinations;

6         d.    the creation of "heavily weighed negative factors" in public

7   charge determinations that are not among the enumerated factors Congress

8   directed the Department to consider;

9         e.    the decision to consider whether a noncitizen is more likely

10   than not to become a public charge "at any time in the future";

11         f.    the decision to weigh in favor of a public charge

12   determination a noncitizen's unfavorable credit history or financial

13   liabilities;

14         g.    the selection of 250% of FPG as the minimum income level

15   disfavoring a public charge determination as a "heavily weighed positive

16   factor";

17         h.    the selection of 125% of FPG as the income level below

18   which a noncitizen's income will weigh in favor of a public charge

19   determination;

20

21

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

159

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1          i.      the decision to weigh in favor of a public charge

2     determination a noncitizen's having applied for or received a fee waiver

3     for an immigration benefit;

4          j.      the decision to weigh in favor of a public charge

5     determination a noncitizen's lack of private health insurance;

6          k.      the decision to weigh in favor of a public charge

7     determination a noncitizen's lack of a high school diploma or equivalent;

8          l.      the decision to weigh in favor of a public charge

9     determination a noncitizen's lack of proficiency in English;

10         m.      the discriminatory animus on the basis of race, ethnicity, or

11    national origin that was a motivating factor in the Rule's adoption;

12         n.      the pretextual nature of the explanations given for the Rule,

13    which do not match the evidence as a whole;

14         o.      the vague and irrational factor-weighing framework;

15         p.      the decision to weigh in favor of a public charge

16    determination a noncitizen's mere application for public benefits;

17         q.      the failure to consider, account for, or respond to the

18    significant public comments regarding the Rule;

19

20

21

22

COMPLAINT FOR                          160              ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                                           8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                                              Kennewick, WA 99336
                                                                (509) 734-7285

1    r.    the failure to consider the impact of the new public charge test

2    on lawful permanent residents returning from a trip abroad of 180 days or

3    more;[262]

4    s.    the failure to accurately assess or acknowledging the

5    substantial costs of the Rule;

6    t.    the failure to engage in proper analysis of the Department's

7    obligations under Executive Order 13,132 and subsequent failure to

8    provide meaningful analysis of the federalism impacts as required by

9    Executive Order 13,132; and

10    u.    the overestimation of the purported benefits of the Rule.

11    **Count IV:**
**Denial of the Constitutional Right to Equal Protection of the Laws**

12    418.   All the foregoing allegations are repeated and realleged as though

13    fully set forth herein.

14    419.   The Due Process Clause of the Fifth Amendment to the U.S.

15    Constitution forbids the federal government from denying equal protection of

16    the laws.[263]   It is an equal protection violation where a "discriminatory purpose"

17

18

19    _____

20    [262] 84 Fed. Reg. at 41,327.

21    [263] *See, e.g.*, *Davis v. Passman*, 442 U.S. 228, 234 (1979); *Bolling v.*

22    *Sharpe*, 347 U.S. 497, 500 (1954).

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

161

1  was a "motivating factor" in a government decision.[264]

2  420.  The Rule was motivated by Administration officials' intent to

3  discriminate on the basis of race, ethnicity, or national origin.

4  421.  That discriminatory intent is evidenced by the Rule's

5  disproportionate adverse impacts on communities of color, including affecting

6  as many as 18.3 million Latinos in the United States.[265] While people of color

7  account for approximately 36% of the total U.S. population, approximately 90%

8  of those chilled from seeking public services would be people of color (70% of

9  whom are Latino). In other words, the Rule will cause Latinos and other people

10  of color to be disproportionately excluded from the United States under the

11  INA's public charge provision.

12  422.  In addition to that anticipated disparate racial and ethnic impact,

13  other circumstantial evidence indicates that discrimination against people of

14  color was a motivating factor behind the Rule. That evidence includes the

15  historical background of the Rule, the specific sequence of events leading up to

16  the Rule, departures from normal rulemaking procedures, the rulemaking

17  _____

18  [264] *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252,

19  265–66 (1977).

20  [265] *See Public Charge Proposed Rule: Potentially Chilled Population*

21  *Data*, Manatt, Phelps & Phillips, LLP (Oct. 11, 2018), https://www.manatt.com

22  /Insights/Articles/2018/Public-Charge-Rule-Potentially-Chilled-Population. *Id.*

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

162

1    history, and remarks by administration officials—including President Trump

2    and Kenneth Cuccinelli—reflecting animus towards non-European immigrants.

3        423.   Because discrimination on the basis of race, ethnicity, or national

4    origin is a motivating factor in the Rule's adoption, it violates the Fifth

5    Amendment's equal protection guarantee.

## IX.    PRAYER FOR RELIEF

7        WHEREFORE, the Plaintiff States request that the Court enter a judgment

8    against Defendants and award the following relief:

9        a.    Declare that the Rule shall be vacated for violation of the

10    APA on any or each of the following grounds:

11        •    the Rule is contrary to enacted legislation and

12    Congressional intent;

13        •    the Rule is arbitrary and capricious, and issued in

14    excess of the Department's authority; and

15        •    the Department failed to undertake legally required

16    analyses.

17        b.    Declare the Rule unconstitutional as violative of the Equal

18    Protection Clause;

19        c.    Preliminarily and permanently enjoin the Rule; and

20        d.    Award Plaintiff States' reasonable costs and attorney fees and

21    such additional relief as the interests of justice may require.

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

163

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1          RESPECTFULLY SUBMITTED this 14th day of August, 2019.

2     ROBERT W. FERGUSON
      Attorney General of Washington

3

4     _____
      RENE D. TOMISSER, WSBA #17509
5     Senior Counsel
      JEFFREY T. SPRUNG, WSBA #23607
6     ZACHARY P. JONES, WSBA #44557
      JOSHUA WEISSMAN, WSBA #42648
7     PAUL M. CRISALLI, WSBA #40681
      NATHAN K. BAYS, WSBA #43025
8     BRYAN M.S. OVENS, WSBA #32901 (admission pending)
      Assistant Attorneys General
9     8127 W. Klamath Court, Suite A
      Kennewick, WA 99336
10    (509) 734-7285
      Rene.Tomisser@atg.wa.gov
11    Jeff.Sprung@atg.wa.gov
      Zach.Jones@atg.wa.gov
12    Joshua.Weissman@atg.wa.gov
      Paul.Crisalli@atg.wa.gov
13    Nathan.Bays@atg.wa.gov
      Bryan.Ovens@atg.wa.gov
14    *Attorneys for Plaintiff State of Washington*

15

      To Appear Pro Hac Vice:
16
      MARK R. HERRING
17    Attorney General of Virginia

18    */s/ Michelle S. Kallen*
      _____
      MICHELLE S. KALLEN (VSB # 93286)
19    Deputy Solicitor General
      Office of the Attorney General
20    202 North Ninth Street
      Richmond, Virginia 23219
21    (804) 786-7240
      SolicitorGeneral@oag.state.va.us
22    *Attorneys for Plaintiff Commonwealth of Virginia*

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

164

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

PHIL WEISER
Attorney General of Colorado

*/s/ Eric R. Olson*
ERIC R. OLSON
Solicitor General
Office of the Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508 6548
Eric.Olson@coag.gov
*Attorneys for Plaintiff the State of Colorado*


KATHLEEN JENNINGS
Attorney General of Delaware
AARON R. GOLDSTEIN
State Solicitor
ILONA KIRSHON
Deputy State Solicitor

*/s/ Monica Horton*
MONICA HORTON
Deputy Attorney General
*Attorneys for Plaintiff the State of Delaware*


KWAME RAOUL
Attorney General State of Illinois

*/s/ Liza Roberson-Young*
LIZA ROBERSON-YOUNG
Public Interest Counsel
Office of the Illinois Attorney General
100 West Randolph Street, 11th Floor
Chicago, IL 60601
(312) 814-5028
ERobersonYoung@atg.state.il.us
*Attorney for Plaintiff State of Illinois*

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

165

1  BRIAN E. FROSH
   Attorney General of Maryland
2
   */s/ Steven M. Sullivan*
3  STEVEN M. SULLIVAN
   Solicitor General
4  JEFFREY P. DUNLAP
   Assistant Attorney General
5  200 St. Paul Place
   Baltimore, MD 21202
6  T: (410) 576-6325
   F: (410) 576-6955
7  *Attorneys for Plaintiff State of Maryland*

8
   MAURA HEALEY
9  Attorney General of Commonwealth of Massachusetts

10 */s/ Abigail B. Taylor*
   ABIGAIL B. TAYLOR
11 Chief, Civil Rights Division
   DAVID UREÑA
12 Special Assistant Attorney General
   ANGELA BROOKS
13 Assistant Attorney General
   Office of the Massachusetts Attorney General
14 One Ashburton Place
   Boston, MA 02108
15 (617) 963-2232
   abigail.taylor@mass.gov
16 *Attorneys for Plaintiff Commonwealth of Massachusetts*

17

18

19

20

21

22

COMPLAINT FOR                    166        ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND                             8127 W. Klamath Court, Suite A
INJUNCTIVE RELIEF                           Kennewick, WA 99336
                                            (509) 734-7285

DANA NESSEL
Attorney General of Michigan

*/s/Toni L. Harris*
FADWA A. HAMMOUD
Solicitor General
TONI L. HARRIS
*First Assistant Attorney General*
Michigan Department of Attorney General
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603 (main)
HarrisT19@michigan.gov
*Attorneys for the People of Michigan*

KEITH ELLISON
Attorney General of Minnesota

*/s/ R.J. Detrick*
R.J. DETRICK
*Assistant Attorney General*
Minnesota Attorney General's Office
Bremer Tower, Suite 100
445 Minnesota Street
St. Paul, MN 55101-2128
(651) 757-1489
(651) 297-7206
Rj.detrick@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

167

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1  AARON D. FORD
   Attorney General of Nevada
2
   _/s/ Heidi Parry Stern_
3  HEIDI PARRY STERN (Bar. No. 8873)
   Solicitor General
4  Office of the Nevada Attorney General
   555 E. Washington Ave., Ste. 3900
5  Las Vegas, NV 89101
   HStern@ag.nv.gov
6  _Attorneys for Plaintiff State of Nevada_

7

   GURBIR SINGH GREWAL
8  Attorney General of New Jersey

9  _/s/ Glenn J. Moramarco_
   GLENN J. MORAMARCO
10 Assistant Attorney General
   Office of the Attorney General
11 Richard J. Hughes Justice Complex
   25 Market Street, 1st Floor, West Wing
12 Trenton, NJ 08625-0080
   (609) 376-3232
13 E-mail: Glenn.Moramarco@law.njoag.gov
   _Attorneys for Plaintiff State of New Jersey_
14

15 HECTOR BALDERAS
   Attorney General of New Mexico
16
   _/s/ Tania Maestas_
17 TANIA MAESTAS
   Chief Deputy Attorney General
18 PO Drawer 1508
   Santa Fe, New Mexico 87504-1508
19 E-mail: tmaestas@nmag.gov
   _Attorneys for Plaintiff State of New Mexico_
20

21

22

COMPLAINT FOR                        168
DECLARATORY AND
INJUNCTIVE RELIEF

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1   PETER F. NERONHA
     Attorney General of Rhode Island

2

     */s/ Lauren Hill*
3   LAUREN HILL
     Special Assistant Attorney General
4   Office of the Attorney General
     150 South Main Street
5   Providence, Rhode Island 02903
     (401) 274-4400 x 2038
6   E-mail:  lhill@riag.ri.gov
     *Attorneys for Plaintiff State of Rhode Island*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

169