# Exhibit A

# DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 212, 213, 214, 245 and 248**

[CIS No. 2637–19; DHS Docket No. USCIS–2010–0012]

RIN 1615–AA22

## Inadmissibility on Public Charge Grounds

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends DHS regulations by prescribing how DHS will determine whether an alien applying for admission or adjustment of status is inadmissible to the United States under section 212(a)(4) of the Immigration and Nationality Act (INA or the Act), because he or she is likely at any time to become a public charge. The final rule includes definitions of certain terms critical to the public charge determination, such as "public charge" and "public benefit," which are not defined in the statute, and explains the factors DHS will consider in the totality of the circumstances when making a public charge inadmissibility determination. The final rule also addresses USCIS' authority to issue public charge bonds under section 213 of the Act in the context of applications for adjustment of status. Finally, this rule includes a requirement that aliens seeking an extension of stay or change of status demonstrate that they have not, since obtaining the nonimmigrant status they seek to extend or change, received public benefits over the designated threshold, as defined in this rule.

This rule does not create any penalty or disincentive for past, current, or future receipt of public benefits by U.S. citizens or aliens whom Congress has exempted from the public charge ground of inadmissibility. This rule does not apply to U.S. citizens, even if the U.S. citizen is related to an alien subject to the public charge ground of inadmissibility. The rule also does not apply to aliens whom Congress exempted from the public charge ground of inadmissibility (such as asylees, refugees, or other vulnerable populations listed as exempt in this final rule). Nor does this rule apply to aliens for whom DHS has statutory discretion to waive this ground of inadmissibility, if DHS has exercised such discretion.

In addition, this includes special provisions for how DHS will consider the receipt of public benefits, as defined in this rule, by certain members of the U.S. Armed Forces and their families; certain international adoptees; and receipt of Medicaid in certain contexts, especially by aliens under the age of 21, pregnant women (and women for up to 60 days after giving birth), and for certain services funded by Medicaid under the Individuals with Disabilities Education Act (IDEA) or in a school setting. Aliens who might qualify for these exemptions should study the rule carefully to understand how the exemptions work.

This final rule also clarifies that DHS will only consider public benefits received directly by the alien for the alien's own benefit, or where the alien is a listed beneficiary of the public benefit. DHS will not consider public benefits received on behalf of another. DHS also will not attribute receipt of a public benefit by one or more members of the alien's household to the alien unless the alien is also a listed beneficiary of the public benefit.

This final rule supersedes the 1999 Interim Field Guidance on Deportability and Inadmissibility on Public Charge Grounds.

**DATES:** This final rule is effective at 12:00 a.m. Eastern Time on October 15, 2019. DHS will apply this rule only to applications and petitions postmarked (or, if applicable, submitted electronically) on or after the effective date. Applications and petitions already pending with USCIS on the effective date of the rule (*i.e.*, were postmarked before the effective date of the rule and were accepted by USCIS) will not be subject to the rule.

**FOR FURTHER INFORMATION CONTACT:** Mark Phillips, Residence and Naturalization Division Chief, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts NW, Washington, DC 20529–2140; telephone 202–272–8377.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Legal Authority
  C. Summary of the Proposed Rule
  D. Summary of Changes in the Final Rule
  1. Definitions
  2. Public Benefits
  3. Applicability to Nonimmigrants
  4. Totality of the Circumstances Determination
  5. Public Charge Bond for Adjustment of Status Applicants
  6. Other Changes
  E. Summary of Costs and Benefits
II. Background
  A. Public Charge Inadmissibility and Public Charge Bonds
  B. Current Public Charge Standards
  C. Final Rule
III. Public Comments on the Proposed Rule
  A. Summary of Public Comments
  B. Requests To Extend Comment Period
  C. Comments Expressing General Support for the NPRM
  D. Comments Expressing General Opposition to the NPRM
  1. Purpose of the Rule and Self Sufficiency
  2. Requests for Reconsideration and Withdrawal of NPRM
  3. Alternatives to the Public Charge Rule
  4. Discrimination and Disparate Impact
  5. Potential Disenrollment Impacts
  • Choice Between Public Benefits and Immigration Status
  • General Assertions as to Effects
  • Housing Benefit-Related Effects
  • Food and Nutrition Benefit-Related Effects
  • Health Benefit-Related Effects
  • Effects on Vulnerable Populations
  • Effects on U.S. Citizens
  • Increased Costs to Health Care Providers, States, and Localities
  6. Inconsistent With American Values and Historic Commitment to Immigrants
  7. Contributions to American Society and Consideration of Self-Sufficiency
  8. Adjudication and Processing
  9. Privacy Concerns
  E. General Comments Regarding Legal Authority and Statutory Provisions
  1. Lack of Statutory Authority/Inconsistent With Congressional Intent
  2. Additional Legal Arguments
  a. Allegations That the Rule Is Arbitrary and Capricious
  b. Alternatives
  c. Retroactivity
  d. Due Process/Vagueness and Equal Protection
  e. Coordination With Other Federal Agencies
  f. International Law and Related Issues
  g. Contract Law
  F. Applicability of the Public Charge Ground of Inadmissibility, and the Public Benefit Condition to Extension of Stay and Change of Status
  1. Applicability of the Public Charge Ground of Inadmissibility Generally
  2. Applicability and Content of the Public Benefits Condition
  a. Nonimmigrant Students and Exchange Visitors
  b. Workers
  c. Compact of Free Association Migrants
  3. Exemptions and Waivers With Respect to the Rule Generally
  a. General Comments
  b. Special Immigrant Juvenile
  c. Certain Employment Based Preference Categories, or National Interest Waiver
  d. Violence Against Women Act, T, and U
  4. Summary of Applicability, Exemptions, and Waivers
  G. Definitions
  1. Public Charge
  a. Threshold Standard
  "Primarily dependent" Based on Cash Public Benefit Receipt or Long-Term Institutionalization at Government Expense
  b. Standards for Monetizable and Non-Monetizable Benefits

**Exhibit A**

**Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations    **41293**

Numerical Percentage Threshold

Valuation

Alternatives to the Duration Standard

Combination Standard

2. Public Benefits

a. Specific Groups and Public Benefits

Individuals With Disabilities

Vulnerable Populations

Receipt of Public Benefits by Children

b. Supplemental Security Income

c. Temporary Assistance for Needy Families

d. State, Local and Tribal Cash Assistance

e. Supplemental Nutrition Assistance Program

CalFresh

f. Housing

g. Institutionalization

h. Medicaid

Individuals With Disabilities Education Act

Emergency Services Exclusion

Vaccinations

Substance Abuse

i. Medicare, Medicare Part D Low Income Subsidy

j. Additional Considerations

Exhaustive List

Additional Programs

Dependents

Tax Credits

Special Supplemental Nutrition Program for Women, Infants, and Children

School Breakfast/Lunch Programs

State and Local Benefits

Head Start

Healthy Start, The Emergency Food Assistance Program, and Similar Programs

Pell Grants

Children's Health Insurance Program

Disaster Supplemental Nutrition Assistance

Social Security Disability Insurance

3. Likely at Any Time To Become a Public Charge

4. Household

H. Public Charge Inadmissibility Determination Based on Totality of Circumstances

I. Age

1. Standard

2. Age Discrimination

J. Health

1. Standard

2. Health and Disability Discrimination

K. Family Status

L. Assets, Resources, and Financial Status

1. Income Standard

2. Evidence of Assets and Resources

3. Public Benefits

4. Fee Waivers for Immigration Benefits

5. Credit Report and Score

6. Financial Means To Pay for Medical Costs

M. Education and Skills

1. Education

2. Language Proficiency

3. Skills

4. Employment

N. Affidavit of Support

O. Additional Factors To Consider

P. Heavily Weighted Factors General Comments

Q. Heavily Weighted Negative Factors

1. Lack of Employability

2. Current Receipt of One of More Public Benefit

3. Receipt of Public Benefits Within 36 Months Before Filing

4. Financial Means To Pay for Medical Costs

5. Alien Previously Found Inadmissible or Deportable Based on Public Charge

R. Heavily Weighted Positive Factors

1. Proposed Standard

2. Additional Positive Heavily Weighted Factors

a. Affidavit of Support

b. Family Relationships

c. English Ability

d. Education

e. Private Health Insurance

f. Work History

g. Receipt of Grants, Contracts, and Licensures

h. Caregivers

i. Ability To Work in the Future

S. Public Charge Bonds for Adjustment of Status Applicants

1. Standard

2. Bond Amount

3. Public Charge Bond Cancellation

4. Breach of Public Charge Bond

T. Effective Date(s)

Benefits Received Before Effective Date and Previously Excluded Benefits

U. Other Comments

V. Public Comments and Responses to the NPRM's Statutory and Regulatory Requirements Section

1. Comments on Costs and Benefits

a. Population Seeking Extension of Stay or Change of Status

b. Other Comments on Affected Population

c. Determination of Inadmissibility Based on Public Charge Grounds

d. Other Comments on Baseline Estimates

e. Costs to Applicants To Adjust Status

f. Lack of Clarity

g. Other Comments on Costs to Applicants

h. Costs Related to Public Charge Bond

i. Costs Related to Program Changes and Public Inquiries

j. Costs Related to States and Local Governments, and Public Benefit-Granting Agencies

k. Regulatory Familiarization Costs

l. Costs to the Federal Government

m. Costs to Non-Citizens and Their Communities

n. Healthcare-Related Costs

o. Housing and Homelessness-Related Costs

p. Economic Costs

r. Economic Impact and Job Loss

s. Economic Impact on Healthcare System

t. Impact on U.S. Workforce

u. Economic Impacts Related to Nutrition Programs

v. Other Economic Impacts

w. DHS Estimates of Discounted Direct Costs and Reduced Transfer Payments

x. Benefits of Proposed Regulatory Changes

y. Cost Benefit Analysis Issues

2. Federalism Comments

3. Family Assessment Comments

4. Paperwork Reduction Act Comments

IV. Statutory and Regulatory Requirements

A. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs)

1. Summary

B. Regulatory Flexibility Act

1. Final Regulatory Flexibility Analysis

a. A Statement of the Need for, and Objectives of, the Rule

b. A statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments.

c. The response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments.

d. A description of an and estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available.

e. A description of the projected reporting, recordkeeping, and other compliance requirements of the rule, including an estimate of the classes of small entities that will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.

f. Description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

C. Congressional Review Act

D. Unfunded Mandates Reform Act

E. Executive Order 13132 (Federalism)

F. Executive Order 12988 (Civil Justice Reform)

G. Executive Order 13175 Consultation and Coordination With Indian Tribal Governments

H. Family Assessment

I. National Environmental Policy Act (NEPA)

J. Paperwork Reduction Act

V. List of Subjects and Regulatory Amendments

## Table of Abbreviations

AAO—Administrative Appeals Office

ACA—Affordable Care Act

ACTC—Additional Child Tax Credit

AFM—Adjudicator's Field Manual

ASEC—Annual Social and Economic Supplement of the Current Population Survey

BIA—Board of Immigration Appeals

BLS—U.S. Bureau of Labor Statistics

CDC—Centers for Disease Control and Prevention

CBP—U.S. Customs and Border Protection

**Exhibit A**

CFR—Code of Federal Regulations
CHIP—Children's Health Insurance Program
CNMI—Commonwealth of the Northern Mariana Islands
DACA—Deferred Action for Childhood Arrivals
DD Act—The Developmental Disabilities Assistance and Bill of Rights Act of 2000
DHS—U.S. Department of Homeland Security
DOJ—U.S. Department of Justice
DOS—U.S. Department of State
EITC—Earned Income Tax Credit
E.O.—Executive Order
EOIR—Executive Office for Immigration Review
FAM—Foreign Affairs Manual FCRA—Fair Credit Reporting Act
FPG—Federal Poverty Guidelines
FPL—Federal Poverty Level
Form DS–2054—Medical Examination for Immigrant or Refugee Applicant
Form I–129—Petition for a Nonimmigrant Worker
Form I–129CW—Petition for a CNMI-Only Nonimmigrant Transitional Worker
Form I–130—Petition for Alien Relative
Form I–140—Immigrant Petition for Alien Workers
Form I–290B—Notice of Appeal or Motion
Form I–356—Request for Cancellation of Public Charge Bond
Form I–407—Record of Abandonment of Lawful Permanent Resident Status
Form I–485—Application to Register Permanent Residence or Adjust Status
Form I–539—Application to Extend/Change Nonimmigrant Status
Form I–539A—Supplemental Information for Application to Extend/Change Nonimmigrant Status
Form I–600—Petition to Classify Orphan as an Immediate Relative
Form I–601—Application for Waiver of Grounds of Inadmissibility
Form I–693—Report of Medical Examination and Vaccination Record Form
I–800—Petition to Classify Convention Adoptee as an Immediate Relative
Form I–864—Affidavit of Support Under Section 213A of the INA
Form I–864A—Contract Between Sponsor and Household Member
Form I–864EZ—Affidavit of Support Under Section 213A of the Act
Form I–864P—HHS Poverty Guidelines for Affidavit of Support
Form I–864W—Request for Exemption for Intending Immigrant's Affidavit of Support
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
Form I–944—Declaration of Self-Sufficiency
Form I–945—Public Charge Bond
Form N–600—Application for Certificate of Citizenship
Form N–600K—Application for Citizenship and Issuance of Certificate Under Section 322
GA—General Assistance
GAO—U.S. Government Accountability Office
HHS—U.S. Department of Health and Human Services
HOPWA—Housing Opportunities for Persons with AIDS
HCV—Housing Choice Voucher

ICE—U.S. Immigration and Customs Enforcement
IEFA—Immigration Examinations Fee Account
IIRIRA—Illegal Immigration Reform and Immigrant Responsibility Act of 1996
INA—Immigration and Nationality Act
INS—Immigration and Naturalization Service
IRCA—Immigration Reform and Control Act of 1986
IRS—Internal Revenue Service
LIHEAP—Low Income Home Energy Assistance Program
LIS—Medicare Part D Low Income Subsidy
LPR—Lawful Permanent Resident
NEPA—National Environmental Policy Act of 1969
NHE—National Health Expenditure
NOID—Notice of Intent to Deny
NPRM—Notice of Proposed Rulemaking
PRA—Paperwork Reduction Act
PTC—Premium Tax Credit
PRWORA—Personal Responsibility and Work Opportunity Reconciliation Act of 1996
RFE—Request for Evidence
RFRA—Religious Freedom Restoration Act
SAVE—Systematic Alien Verification for Entitlements Secretary—Secretary of Homeland Security
SIPP—Survey of Income and Program Participation
SNAP—Supplemental Nutrition Assistance Program
SORN—System of Records Notice
SSA—Social Security Administration
SSI—Supplemental Security Income
TANF—Temporary Assistance for Needy Families
TPS—Temporary Protected Status
USDA—U.S. Department of Agriculture
U.S.C.—United States Code
USCIS—U.S. Citizenship and Immigration Services
VAWA—Violence Against Women Act
VAWA 2013—Violence Against Women Reauthorization Act of 2013
WAP—Weatherization Assistance Program
WIC—Special Supplemental Nutrition Program for Women, Infants, and Children

## I. Executive Summary

### A. Purpose of the Regulatory Action

This rule changes how the Department of Homeland Security (DHS) interprets and implements the public charge ground of inadmissibility.[1] The Immigration and Nationality Act (INA or the Act) renders inadmissible and therefore (1) ineligible for a visa, (2) ineligible for admission and (3) ineligible for adjustment of status, any alien[2] who, in the opinion of the DHS (or the Departments of State (DOS) or Justice (DOJ), as applicable),[3]

---

[1] See INA section 212(a)(4), 8 U.S.C. 1182(a)(4).
[2] Congress has by statute exempted certain categories of aliens, such as asylees and refugees, from the public charge ground of inadmissibility. See, e.g., INA sections 207(c)(3) and 209(c), 8 U.S.C. 1157(c)(3), 1159(c). A full list of exemptions is included in this rule.
[3] Three different agencies are responsible for applying the public charge ground of

is likely at any time to become a public charge.[4] The statute does not define the term "public charge," but in a related statute, Congress has articulated a national policy that (1) "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations," and (2) "the availability of public benefits not constitute an incentive for immigration to the United States."[5] In addition, the public charge statute provides that in making the inadmissibility determination, administering agencies must "at a minimum consider the alien's age; health; family status; assets, resources, and financial status; and education and skills."[6] The agencies may also consider any affidavit of support under section 213A of the Act, 8 U.S.C. 1183a, i.e., Form I–864, Affidavit of Support Under Section 213A of the INA, submitted on the alien's behalf.[7]

Since 1999, the prevailing approach to public charge inadmissibility has been dictated primarily by the May 26, 1999, *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds* (1999 Interim Field Guidance), issued by the former Immigration and Naturalization Service (INS).[8] Under

---

inadmissibility, each in a different context or contexts. DHS primarily applies the public charge ground of inadmissibility at ports of entry and when adjudicating certain applications for adjustment of status. This rule amends the standards applicable to those contexts, and also sets forth evidentiary requirements applicable to the adjustment of status context.

DOS Consular officers are responsible for applying the public charge ground of inadmissibility as part of the visa application process and for determining whether a visa applicant is ineligible for a visa on public charge grounds. This rule does not directly revise DOS standards or processes. DHS is working with DOS to ensure that the Foreign Affairs Manual appropriately reflects the standards in this rule.

DOJ is responsible for applying the public charge ground of inadmissibility in immigration court, where DHS may bring and prosecute the charge against certain inadmissible aliens. Immigration judges adjudicate matters in removal proceedings, and the Board of Immigration Appeals and in some cases the Attorney General adjudicate appeals arising from such proceedings. This rule does not directly revise DOJ standards or processes. DHS understands that the DOJ plans to conduct rulemaking to ensure that the standards applied in immigration court are consistent with the standards in this rule.

[4] See INA section 212(a)(4)(A), 8 U.S.C. 1182(a)(4)(A).
[5] See 8 U.S.C. 1601(2).
[6] See INA section 212(a)(4)(B)(i), 8 U.S.C. 1182(a)(4)(B)(i).
[7] See INA section 212(a)(4)(B)(ii), 8 U.S.C. 1182(a)(4)(B)(ii).
[8] See Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 FR 28689 (May 26, 1999). Due to a printing error, the **Federal Register** version of the field guidance

**Exhibit A**

that approach, "public charge" has been interpreted to mean a person who is "primarily dependent on the Government for subsistence, as demonstrated by either the receipt of public cash assistance for income maintenance or institutionalization for long-term care at Government expense." [9] As a consequence, an alien's reliance on or receipt of non-cash benefits such as the Supplemental Nutrition Assistance Program (SNAP), or food stamps; Medicaid; and housing vouchers and other housing subsidies are not currently considered by DHS in determining whether an alien is deemed likely at any time to become a public charge.

DHS is revising its interpretation of "public charge" to incorporate consideration of such benefits, and to better ensure that aliens subject to the public charge inadmissibility ground are self-sufficient, *i.e.*, do not depend on public resources to meet their needs, but rather rely on their own capabilities, as well as the resources of family members, sponsors, and private organizations.[10] This rule redefines the term "public charge" to mean an alien who receives one or more designated public benefits for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months). This rule defines the term "public benefit" to include cash benefits for income maintenance, SNAP, most forms of Medicaid, Section 8 Housing Assistance under the Housing Choice Voucher (HCV) Program, Section 8 Project-Based Rental Assistance, and certain other forms of subsidized housing. DHS has tailored the rule to limit its effects in certain ways, such as for active duty military members and their families, and children in certain contexts.

This rule also explains how DHS will interpret the minimum statutory factors for determining whether "in the opinion of" [11] the officer, the alien is likely at any time to become a public charge. Specifically, the rule contains a list of negative and positive factors that DHS will consider as part of this determination, and directs officers to consider these factors in the totality of the alien's circumstances. For instance,

with respect to the statutory factor for the alien's age, DHS would generally consider it to be a negative factor if the alien is younger than 18 or older than 61, and a positive factor if the alien is between the ages of 18 and 61. These positive or negative factors operate as guidelines to help the officer determine whether the alien is likely at any time to become a public charge, *i.e.*, is more likely than not at any time in the future to receive one or more designated public benefits for more than 12 months in the aggregate within any 36-month period. The rule also contains lists of heavily weighted negative factors and heavily weighted positive factors. For example, the rule includes a heavily weighted negative factor for an alien who is not a full-time student and is authorized to work, but is unable to demonstrate current employment, recent employment history, or a reasonable prospect of future employment. DHS believes that these circumstances should be accorded heavy negative weight in a public charge inadmissibility determination because, as discussed in the preamble to the NPRM and in the preamble to this final rule, the presence of these circumstances suggests a greater likelihood that the alien will become a public charge than other negative factors suggest. The presence of a single positive or negative factor, or heavily weighted negative or positive factor, will never, on its own, create a presumption that an applicant is inadmissible as likely to become a public charge or determine the outcome of the public charge inadmissibility determination. Rather, a public charge inadmissibility determination must be based on the totality of the circumstances presented in an applicant's case.

With respect to applications for adjustment of status in particular, this rule also provides a more comprehensive evidentiary framework under which U.S. Citizenship and Immigration Services (USCIS) will consider public charge inadmissibility. Under this rule, applicants for adjustment of status who are subject to the public charge ground of inadmissibility must file a Declaration of Self-Sufficiency (Form I–944) with their Application to Register Permanent Residence or Adjust Status (Form I–485) to demonstrate they are not likely to become a public charge. The Form I–944 only applies to adjustment applicants and not applicants for admission at a port of entry.

In addition, applicants required to submit Form I–864, Affidavit of Support Under Section 213A of the INA, in

accordance with section 212(a)(4)(C) or (D), must generally submit Form I–944 with the Form I–485. Failure to submit each form, where required, may result in a rejection or a denial of the Form I–485 without a prior issuance of a Request for Evidence or Notice of Intent to Deny.[12]

This rule also revises DHS regulations governing the discretion of the Secretary of Homeland Security (Secretary) to accept a public charge bond under section 213 of the Act, 8 U.S.C. 1183, for those seeking adjustment of status. Additionally, this rule contains additional provisions that will render certain nonimmigrants ineligible for extension of stay or change of status if she or he received one or more public benefits for more than 12 months in the aggregate within any 36-month period since obtaining the status he or she wishes to extend or change.

Finally, DHS notes that the INA also contains a separate public charge ground of deportability.[13] This rule does not interpret or change DHS's implementation of the public charge ground of deportability.

### B. Legal Authority

DHS's authority for making public charge inadmissibility determinations and related decisions is found in several statutory provisions. Section 102 of the Homeland Security Act of 2002,[14] 6 U.S.C. 112, and section 103 of the Act, 8 U.S.C. 1103, charge the Secretary with the administration and enforcement of the immigration and naturalization laws of the United States. In addition to establishing the Secretary's general authority for the administration and enforcement of immigration laws, section 103 of the Act, 8 U.S.C. 1103, enumerates various related authorities, including the Secretary's authority to establish regulations and prescribe such forms of bond as are necessary for carrying out such authority. Section 212 of the Act, 8 U.S.C. 1182, establishes classes of aliens that are ineligible for visas, admission, or adjustment of status; paragraph (a)(4) of that section establishes the public charge ground of inadmissibility, including the minimum factors the Secretary must consider in making a determination that an alien is likely to become a public charge. Section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), also establishes the enforceable affidavit of support requirement, as applicable, to certain family-based and employment-based

---

appears to be dated "March 26, 1999" even though the guidance was actually signed May 20, 1999, became effective May 21, 1999 and was published in the **Federal Register** on May 26, 1999.

[9] *See* Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 FR 28689, 28692 (May 26, 1999).

[10] *See* 8 U.S.C. 1601(1), (2)(A).

[11] *See* INA section 212(a)(4)(A), 8 U.S.C. 1182(a)(4)(A).

[12] *See* 8 CFR 103.2(a)(7), (b)(8)(ii).

[13] *See* INA section 237(a)(5), 8 U.S.C. 1227(a)(5).

[14] Public Law 107–296, 116 Stat. 2135, 2142–44 (Nov. 25, 2002).

**Exhibit A**

immigrants, and exempts certain aliens from both the public charge ground of inadmissibility and the affidavit of support requirement. Section 213 of the Act, 8 U.S.C. 1183, provides the Secretary with discretion to admit into the United States an alien who is determined to be inadmissible as a public charge under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), but is otherwise admissible, upon the giving of a proper and suitable bond. That section authorizes the Secretary to establish the amount and conditions of such bond. Section 213A of the Act, 8 U.S.C. 1183a, sets out requirements for the sponsor's affidavit of support, including reimbursement of government expenses where the sponsored alien received means-tested public benefits. Section 214 of the Act, 8 U.S.C. 1184, addresses requirements for the admission of nonimmigrants, including authorizing the Secretary to prescribe the conditions of such admission through regulations and when necessary, establish a bond to ensure that those admitted as nonimmigrants or who change their nonimmigrant status under section 248 of the Act, 8 U.S.C. 1258, depart if they violate their nonimmigrant status or after such status expires. Section 245 of the Act, 8 U.S.C. 1255, generally establishes eligibility criteria for adjustment of status to lawful permanent residence. Section 248 of the Act, 8 U.S.C. 1258, authorizes the Secretary to prescribe conditions under which an alien may change his or her status from one nonimmigrant classification to another. The Secretary promulgates the changes in this rule under all of these authorities.

*C. Summary of the Proposed Rule*

On October 10, 2018, DHS published a Notice of Proposed Rulemaking (NPRM) entitled Inadmissibility on Public Charge Grounds.[15] The NPRM identified the groups of individuals generally subject to, or exempt from, the public charge inadmissibility ground. Further, DHS proposed definitions for the terms "public charge," "likely at any time to become a public charge," "public benefit," and "alien's household."

As part of the definition of public benefit, DHS proposed to designate an exhaustive list of public benefits that would be considered for purposes of a public charge inadmissibility determination, as well as for purposes of extension of stay and change of nonimmigrant status applications. DHS recognized that the universe of public

benefits is quite large, and that some benefits are more commonly used, at greater taxpayer expense, than others. In seeking to provide clear notice of the effects of the rule, and to limit certain indirect costs that may be associated with the rule, DHS elected to limit the number and types of non-cash public benefits that it would designate. DHS therefore proposed to designate just a few means-tested non-cash benefits related to food and nutrition, housing, and healthcare, which bear directly on the recipient's self-sufficiency and together account for significant federal expenditures on low-income individuals. DHS's proposed list of public benefits included cash benefits for income maintenance, institutionalization for long-term care at government expense, SNAP, most forms of Medicaid, Premium and Cost Sharing Subsidies for Medicare Part D (Medicare Part D LIS), Section 8 Housing Assistance under the HCV Program, Section 8 Project-Based Rental Assistance, and certain other forms of subsidized housing. DHS also sought comment on the potential inclusion of other public benefits programs. As noted below, this final rule designates each of the above-referenced public benefits, except for institutionalization for long-term care at government expense and Medicare Part D LIS. DHS is not designating any additional programs.

DHS proposed to limit its consideration of an alien's receipt of these designated public benefits in two main ways, each of which DHS incorporated into the definition of public benefit. First, DHS proposed to establish "thresholds" for the amount or duration of public benefits that the alien must receive, before DHS will consider the alien to have received a public benefit. In other words, DHS proposed that it would not consider an alien's receipt of a given public benefit at all, unless the alien received the benefit in an amount, or for a duration, that met an applicable threshold. Specifically, DHS proposed the following thresholds:

• For public benefits that are "monetizable" (such as cash benefits, SNAP, and housing vouchers and rental assistance), DHS proposed a threshold of 15 percent of the Federal Poverty Guidelines (FPG) for a household of one within a period of 12 consecutive months.

• For public benefits that cannot be monetized (such as Medicaid, Medicare Part D LIS, subsidized housing, and institutionalization for long-term care at government expense), DHS proposed a threshold of receipt during more than 12

months in the aggregate within a 36-month period.

• DHS also proposed a threshold to address circumstances where an alien receives a combination of monetizable benefits equal to or below the 15 percent threshold, together with one or more benefits that cannot be monetized. In such cases, DHS proposed that the threshold for duration of receipt of the non-monetizable benefits would be more than 9 months in the aggregate within a 36-month period.

DHS expressly sought comment on these proposed thresholds, including whether DHS should consider an alien's receipt of benefits below any given threshold, as part of DHS's totality of the circumstances determination. As noted below, this final rule adopts a single threshold for all designated public benefits (including those that were considered "monetizable" under the proposed rule): More than 12 months in the aggregate within a 36-month period. And this final rule authorizes officers to consider receipt of benefits below that threshold, to the extent relevant in the totality of the circumstances.

Second, DHS proposed to tailor its rule to limit its effects in certain ways, for a range of reasons. For instance, DHS proposed to not consider the receipt of public benefits by certain aliens who, at the time of receipt, filing, or adjudication, are enlisted in the U.S. Armed Forces, serving in active duty or in the Ready Reserve, or if received by such an individual's spouse or children. DHS also proposed to not consider emergency Medicaid or Medicaid received for services provided under the Individuals with Disabilities Education Act (IDEA), and to not consider any school-based benefits provided to individuals who are at or below the maximum eligible age for secondary education, as determined under State law. Lastly, DHS proposed to exempt from consideration Medicaid benefits received by children of U.S. citizens whose lawful admission for permanent residence and subsequent residence in the custody of U.S. citizen parents will result automatically in the child's acquisition of citizenship, or upon finalization of adoption in the United States by the U.S. citizen parents (or upon meeting eligibility criteria) or children entering the United States for the prime purpose of attending a citizenship interview under the Child Citizenship Act of 2000.[16] As noted below, this final rule revises these

---

[15] Inadmissibility on Public Charge Grounds, 83 FR 51114 (proposed Oct. 10, 2018).

[16] *See* Public Law 106–395, 114 Stat. 1631, 1631–33 (Oct. 30, 2000) (codified at INA 320(a)–(b), 8 U.S.C. 1431(a)–(b)).

**Exhibit A**

provisions in certain ways, and also includes an additional provision exempting Medicaid receipt by aliens under the age of 21 and pregnant women (including women for 60 days after the last day of pregnancy).

In addition to proposing new definitions, DHS proposed a regulatory framework for analyzing the aforementioned statutory factors that must be considered for purposes of the public charge inadmissibility determination. DHS also proposed to amend its existing regulations addressing public charge bonds. In addition, DHS proposed to require applicants seeking an extension of stay or change of nonimmigrant status to demonstrate that they have not received and are not currently receiving, nor are they likely to receive public benefits, as defined in the regulation, for the duration of their stay. Again, as noted below, this final rule revises these provisions in certain ways.

DHS received 266,077 comments on the proposed rule, the vast majority of which opposed the rule. The preamble to this final rule includes summaries of the significant issues raised by the comments, and includes responsive explanations, and policy changes.

*D. Summary of Changes in the Final Rule*

Following careful consideration of public comments received and relevant data provided by stakeholders, DHS has made several changes to the regulatory text proposed in the NPRM.[17] As discussed in detail elsewhere in this preamble, the changes in this final rule include the following:

1. Definitions

• *Definitions of "Public Charge" and "Public Benefit."* DHS has revised the definition of "public charge" and "public benefit" to clarify the threshold of public benefit receipt that renders an alien a public charge. As noted above, the proposed rule defined a public charge as an alien who receives one or more public benefits as defined in the proposed rule. The proposed rule incorporated the threshold concept into the definition of public benefit, and proposed different thresholds for "monetizable" and "non-monetizable" benefits. Following receipt of public comments regarding a variety of issues, including the complexity of the proposed standard for monetizing certain public benefits, DHS has revised the definitions for public charge and public benefits, and will now evaluate

all benefits with a single duration-based standard (*i.e.,* the proposed standard for non-monetizable benefits). DHS has also incorporated the single duration standard into the definition of "public charge," rather than the definition of "public benefit." Consequently, under this simplified duration standard, a public charge is an alien who receives one or more public benefit for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two public benefits in one month counts as two months).

• *Consideration of Receipt of Public Benefits below the Threshold, in the Totality of the Circumstances.* Under the proposed rule, DHS would not have considered the receipt of benefits below the applicable threshold in the totality of the circumstances. As a consequence, USCIS would have been unable to consider an alien's past receipt of public benefits below the threshold *at all,* even if such receipt was indicative, to some degree, of the alien's likelihood of becoming a public charge at any time in the future. Under this final rule, adjudicators will consider and give appropriate weight to past receipt of public benefits below the single durational threshold described above in the totality of the circumstances.[18]

• *Receipt of Public Benefits.* DHS has added a definition of "receipt" of public benefits, consistent with the explanation in the proposed rule preamble. The new definition clarifies that an application or certification for benefits does not constitute receipt, although it may serve as evidence of the alien's likelihood of receiving public benefits in the future. It also clarifies that when an alien receives, applies for, or obtains a certification for public benefits solely on behalf of another person, DHS does not consider the alien to have received the benefit.

• *Likely at Any Time to Become a Public Charge.* DHS has amended the definition of "likely at any time to become a public charge" to clarify that an alien is likely at any time to become a public charge if the alien is more likely than not at any time in the future to become a public charge, as determined based on the totality of the alien's circumstances.

• *Primary Caregiver.* DHS has included a new definition of "primary caregiver" to account for a new consideration in the totality of the circumstances for aliens who may not

be currently employed or have employment history but are nonetheless contributing to their households by caring for others. DHS defines primary caregiver as an alien who is 18 years of age or older and has significant responsibility for actively caring for and managing the well-being of a child or an elderly, ill, or disabled person in the alien's household.

2. Public Benefits

• *Medicaid Received by Aliens Under Age 21 and Pregnant Women.* Following receipt of public comments addressing the nature of the Medicaid benefit for children and pregnant women. DHS has revised provisions under which DHS would have considered an alien's receipt of Medicaid, regardless of the alien's age. For purposes of this final rule, DHS has excluded consideration of the receipt of Medicaid by aliens under the age of 21 and pregnant women during pregnancy and during the 60-day period after pregnancy.

• *Medicare Part D Low-Income Subsidy.* The NPRM's definition for public benefit included Medicare Part D LIS. Following receipt of public comment regarding the nature of the Medicare Part D LIS, which is part of an overall benefit scheme that contains extensive work requirements, DHS has decided to exclude an alien's receipt of such subsidies from the public benefit definition for purposes of the public charge inadmissibility determination.

• *Benefits Received by Military Servicemembers and their Spouses and Children.* The NPRM's definition for public benefit excluded the consideration of public benefits received by an alien who at the time of receipt of the public benefit, filing, or adjudication, is enlisted in the U.S. Armed Forces, serving in the active duty or in the Ready Reserve component of the U.S. Armed Forces, or is the spouse or child of such servicemember. The NPRM did not make clear what immigration benefit types this provision applies to. DHS has revised the public benefit definition to clarify that this provision applies with respect to applications for admission, adjustment of status, and extension of stay or change of status.

• *Benefits Received while in a Status that is Exempt from the Public Charge Ground of Inadmissibility.* DHS has revised the public benefit definition to clarify that DHS will not consider any public benefits received by an alien during periods in which the alien was present in the United States in a classification that is exempt from the public charge ground of inadmissibility or for which the alien received a waiver

---

[17] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114 (proposed Oct. 10, 2018).

[18] As stated in the Benefits Received Before Effective Date and Previously Excluded Benefits section of this rule, DHS will not apply this rule to benefits received before the effective date of the rule, except for those benefits that would have been considered under the 1999 Interim Field Guidance.

**Exhibit A**

of the public charge inadmissibility ground.

• *Public Benefits Received by Children Eligible for Acquisition of Citizenship.* DHS has revised the proposed definition of public benefit that excluded from consideration Medicaid received by children of U.S. citizens whose lawful admission for permanent residence and subsequent residence in the legal and physical custody of their U.S. citizen parent will result automatically in the child's acquisition of citizenship, or whose lawful admission for permanent residence will result automatically in the child's acquisition of citizenship upon finalization of adoption in the United States by the U.S. citizen parent(s) or, upon meeting other eligibility criteria as required.[19] DHS has changed this provision to clarify that public benefits, as defined in the rule, do not include any public benefits that were or will be received by such children.

• *Benefits Provided for Institutionalization.* The NPRM's definition of public benefit included benefits for long-term institutionalization at government expense. Following receipt of public comment regarding specific benefits considered to provide for institutionalization, DHS has removed the reference to long-term institutionalization within the definition of public benefit, as the long-term institutionalization benefits that DHS has in the past considered, and intends to consider under this rule, are already part of the public benefit definition, *i.e.,* Temporary Assistance for Needy Families (TANF), Supplemental Security Income (SSI), and Medicaid.

3. Applicability to Nonimmigrants

• *"Likely to Receive" Public Benefits and "Currently Receiving" Public Benefits Condition.* Following receipt of public comments addressing the public benefit condition for nonimmigrants seeking extension of stay or change of status, DHS has revised this provision. Under the proposal, DHS would have considered whether such an alien has received, is currently receiving, or is likely to receive public benefits in excess of the designated thresholds since obtaining the nonimmigrant status the alien seeks to attend or from which the alien seeks to change. DHS has modified the provision by removing the

future-looking requirement. DHS will only consider whether the alien has received designated benefits for more than 12 months in the aggregate within a 36-month period since obtaining the nonimmigrant status they wish to extend or change, up until the time of adjudication of the extension of stay or change of status request.

• *Victim of Severe Form of Trafficking in Persons (T) Nonimmigrants Exemption.* DHS has revised several regulatory provisions relating to individuals who have a pending application setting forth a prima facie case for eligibility for T nonimmigrant status, or who are present in the United States in valid T nonimmigrant status. In the proposed rule, DHS provided that T nonimmigrants applying for adjustment of status were subject to the public charge inadmissibility ground and could request a waiver of inadmissibility. DHS has modified the provisions with respect to T nonimmigrants to accurately reflect changes codified by Congress in the Violence Against Women Reauthorization Act of 2013 (VAWA 2013).[20] DHS has revised the public charge inadmissibility exemption provision proposed in the NPRM and created new provisions to align these regulations with the changes to the law made by VAWA 2013. T nonimmigrants applying for adjustment of status will no longer need to submit a waiver of inadmissibility for public charge purposes.

• *Victims of Criminal Activity (U) Nonimmigrants Exemption.* DHS has revised the regulatory provisions relating to the exemption from public charge inadmissibility for individuals who have a pending application for U nonimmigrant status, or who are granted U nonimmigrant status, to align these regulations with the changes to the law made by VAWA 2013. In the proposed rule, U nonimmigrant petitioners or those granted U nonimmigrant status were exempted from the public charge inadmissibility ground for purposes of U nonimmigrant status or for purposes of adjustment of status under section 245(m) of the Act, 8 U.S.C. 1255(m). DHS has clarified that, in general, U visa petitioners and those granted U nonimmigrant status are exempt from a public charge inadmissibility determination in any future immigration benefit request that requires a finding of admissibility, not only adjustment of status under section 245(m) of the Act, 8 U.S.C. 1255(m).

• *VAWA 2013 Public Charge Exemptions and the Affidavit of Support Requirement for Certain Employment-Based Petitions.* DHS has revised several regulatory provisions relating to T nonimmigrants, U nonimmigrants, VAWA self-petitioners, and qualified aliens as described in 8 U.S.C. 1641(c). The proposed rule was silent on the applicability of section 212(a)(4)(D) of the INA, 8 U.S.C. 1182(a)(4)(D), which requires an affidavit of support as described in section 213A of the INA, 8 U.S.C. 1183a, for certain employment-based immigrant petitions. DHS has modified the exemption provisions at 8 CFR 212.23(a) with respect to T nonimmigrants, U nonimmigrants, VAWA self-petitions, and certain qualified aliens to accurately reflect changes codified by Congress in VAWA 2013.[21] An alien who falls under one of the VAWA 2013 exemptions from public charge inadmissibility would not need to demonstrate that he or she is not likely at any time to become a public charge, but would need to submit a sufficient affidavit of support described in 213A of the INA, 8 U.S.C. 1183a, if adjusting under an employment-based category that requires one by statute.

4. Totality of the Circumstances Determination

• *The Alien is a Primary Caregiver for Household Member as a Consideration in the Education and Skills Factor:* DHS has added a provision that would take into consideration whether an alien is a primary caregiver of another in the alien's household, for example a child or elderly relative. This factor is intended to take into consideration difficult-to-monetize contributions by aliens who may lack current employment or an employment history due to their full time, unpaid care of household members.

• *Heavily Weighted Negative Factor for Receipt of Public Benefits above the Threshold.* Under the proposed rule, in conducting the public charge inadmissibility determination, there were two separate heavily weighted factors related to the receipt of public benefits: (1) The alien is currently receiving or is currently certified or approved to receive one or more public benefits and (2) an alien has received one or more public benefits above the applicable threshold within the 36-months immediately preceding the alien's application for a visa, admission or adjustment of status. DHS has consolidated these factors within one

---

[19] *See* Child Citizenship Act of 2000, Public Law 106–395, 114 Stat. 1631, 1631–33 (Oct. 30, 2000) (codified at section 320(a)–(b) of the Act, 8 U.S.C. 1431(a)–(b)), in accordance with 8 CFR part 320.

[20] *See* Public Law 113–4, 127 Stat. 54 (Mar. 7, 2013).

[21] *See* Public Law 113–4, 127 Stat. 54 (Mar. 7, 2013).

**Exhibit A**

heavily weighted negative factor. The factor will apply in cases where the alien has received or has been certified or approved to receive one or more public benefits for more than 12 months within any 36-month period, beginning no earlier than 36 months prior to the alien's application for admission or adjustment of status.

• *Heavily Weighted Positive Factor for Private Health Insurance.* In this final rule DHS added a new heavily weighted positive factor for when the alien has private health insurance appropriate for the expected period of admission, and for which the alien does not receive subsidies in the form of premium tax credits (including advance premium tax credits) under the ACA. This heavily weighted positive factor is in addition to the positive factor that would apply in circumstances where an alien has sufficient household assets and resources (including health insurance not considered to be a public benefit under 8 CFR 212.22(b)) to cover reasonably foreseeable medical costs, including costs related to a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide care for himself or herself, to attend school, or to work.

• *Evidence of the Alien's Health.* In response to concerns regarding the qualifications of USCIS adjudicators to evaluate the alien's health, DHS has revised the rule to clarify that, if the alien is required to undergo an immigration medical examination from a civil surgeon or panel physician, DHS will generally defer to the immigration medical examination report when assessing whether the alien is more likely than not at any time in the future to become a public charge on account of a diagnosed medical condition unless there is evidence that the report is incomplete. DHS, however, continues to permit the use of other documentation regarding the alien's medical conditions, as proposed in the NPRM, to assess whether the alien's health makes the alien more likely than not to become a public charge at any time in the future.

• *Household Assets.* DHS has revised the rule to clarify that DHS considers an alien's ownership of significant assets similar to the standards in the affidavit of support regulations under 8 CFR 213a.2(c)(2)(iii)(B).

• *Household Income and Servicemembers of the Armed Forces.* DHS has revised the rule to clarify that if the applicant is on active duty, other than training, in the Armed Forces of the United States, the applicant's gross household income may be 100 percent

of the most recent FPG for the alien's household size, and not 125 percent of the FPG for the alien's household size, as proposed in the NPRM, in order to serve as a positive factor in the public charge inadmissibility determination.

• *Household Income and Public Benefits.* DHS has revised the rule to clarify that the applicant's gross household income does not include any household income from public benefits, as defined in this rule.

• *Household Income from Illegal Activities.* DHS has revised the rule to clarify that household income from illegal activity or sources will not be considered as part of the income, assets, or resources factor in the public charge inadmissibility determination. DHS has also consolidated the consideration of income from sources other than household members into a single provision.

• *Household Income and Evidentiary Considerations.* DHS amended the rule to clarify that when assessing the alien's annual gross household income, DHS considers the most recent federal tax-year transcripts from the United States Internal Revenue Service (IRS) for each household member whose income will be considered. Additionally, DHS also clarified that if the most recent tax-year transcripts from the IRS are unavailable, DHS will consider other credible and probative evidence of the household member's income, including an explanation why the evidence is not available.

• *Fee Waivers and Categories Excluded from Public Charge.* DHS has revised the rule to state that a fee waiver request or receipt would not be considered for purposes of determining public charge inadmissibility if the fee waiver was applied for, or granted, as part of an application for which a public charge inadmissibility determination was not required.

• *Public Benefit Disenrollment and Eligibility.* DHS has clarified in the rule how USCIS will consider past public benefits receipt, in the totality of the circumstances. USCIS will consider whether an alien has disenrolled or requested to be disenrolled from the public benefit(s). USCIS will also consider, as part of the totality of the circumstances, any evidence that the alien submits from a Federal, State, local, or tribal agency administering a public benefit, that the alien has specifically identified as showing that the alien does not qualify or would not qualify for such public benefit by virtue of, for instance, the alien's annual gross household income or prospective immigration status, or length of stay. While an alien's prospective

ineligibility for a given benefit would not be outcome-determinative, USCIS will consider the information in the totality of the circumstances.

• *Education and Skills.* To clarify additional types of documentation that establish a steady employment history, DHS has revised the evidentiary considerations for the education and skills factor, to require that applicants submit, with their adjustment of status applications, federal tax return transcripts for the previous three years or, if such transcripts are unavailable, other credible and probative evidence, including an explanation of the unavailability of such transcripts.

5. Public Charge Bond for Adjustment of Status Applicants

• *Breach of Bonds and Threshold of Public Benefit Receipt.* In the NPRM, DHS proposed that a public charge bond is considered breached if the bonded alien had used public benefits in the amount or for the duration established as the threshold in the proposed public benefits definition. In this final rule, DHS has modified the threshold to a single duration-based threshold and has moved that threshold from the proposed public benefits definition into the public charge definition. To ensure that the bond breach conditions remain the same in this final rule, DHS has revised the rule, and incorporated the single duration threshold "for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months)" in the bond breach determination.

• *Substitution.* DHS has revised proposed 8 CFR 213.1 to indicate that DHS will only offer public charge bonds of unlimited duration. Correspondingly, DHS has removed text that references bonds of limited durations or provisions that addressed the substitution of a bond of limited duration. DHS has retained, however, the general bond substitution provision.

• *Cancellation on the basis of Permanent Departure from the United States.* DHS has clarified that an alien is only considered to have voluntarily lost lawful permanent resident status for the purposes of bond cancellation based on a permanent departure when the alien has submitted a record of abandonment of lawful permanent resident status on the form prescribed by DHS and in accordance with the form's instructions, while the alien is outside of the United States.

• *Discretionary Cancellation.* DHS has added language to this final rule to clarify that DHS retains discretion to cancel a public charge bond,

**Exhibit A**

notwithstanding an absence of a written request from the obligor or alien, if DHS determines that an alien otherwise meets the applicable eligibility requirements.

• *Bond Amount.* In response to public comment, DHS has revised proposed 8 CFR 213.1 to reduce the minimum amount in which a public charge bond may be offered to $8,100, annually adjusted for inflation based on the Consumer Price Index for All Urban Consumers (CPI–U), and rounded up to the nearest dollar.

• *Bond Breach and Public Benefits Received while in a Status that is Exempt from the Public Charge Ground of Inadmissibility.* DHS has revised this rule to clarify that DHS will not consider, as part of a public charge bond breach determination, any public benefits received by an alien during periods for which the alien received a waiver of the public charge inadmissibility ground. In the NPRM, DHS had already proposed that public benefits received while in a public charge exempt status following the initial grant of status as a lawful permanent resident, and any public benefits received after the alien obtained U.S. citizenship, would not be counted towards the bond breach determination. These exemptions remain unchanged in this final rule.

6. Other Changes

• *Prospective Application of the Rule.* DHS clarified in 8 CFR 212.20, 214.1, and 248.1 that this final rule applies prospectively to applications and petitions postmarked (or, if applicable, submitted electronically) on or after the effective date. (DHS retained and further refined provisions addressing how it will consider receipt of public benefits before the effective date of this rule.)

• *Technical Changes.* DHS has also made miscellaneous technical edits to reduce redundancy and improve readability and clarity.

• *Changes to Form I–539A.* DHS has made non-substantive changes to Supplemental Information for Application to Extend/Change Nonimmigrant Status (Form I–539A), which collects biographical information about derivative beneficiaries named on an applicant's Application to Extend/Change Nonimmigrant Status (Form I–539). Form I–539A was published as a new form on March 8, 2019, to replace Supplement A of Form I–539. In light of the creation of Form I–539A, DHS has moved the information collection regarding public benefits received by the derivative beneficiaries from Form I–539 to Form I–539A. Each derivative beneficiary of a Form I–539 will need to

complete a separate Form I–539A, and provide information regarding the derivative beneficiary's applications for, or receipt of, public benefits, except where the nonimmigrant classification that the derivative beneficiary seeks to extend, or to which the alien seeks to change, is exempted from the public charge ground of inadmissibility.

*E. Summary of Costs and Benefits*

This rule will impose new costs on the population applying to adjust status using Form I–485 that are subject to the public charge ground of inadmissibility. DHS will now require any adjustment applicants subject to the public charge ground of inadmissibility and who are applying for adjustment of status on or after the effective date of this final rule to submit a Form I–944 with their Form I–485 to demonstrate they are not likely to become a public charge. Failure to submit the form, where required, may result in a rejection or a denial of the Form I–485 without a prior issuance of a Request for Evidence or Notice of Intent to Deny.[22] Additionally, the associated time burden estimate for completing Form I–485 will increase.

The rule will also impose additional costs for those seeking extension of stay or change of status by filing a Petition for a Nonimmigrant Worker (Form I–129); Petition for a CNMI-Only Nonimmigrant Transitional Worker (Form I–129CW); or Form I–539 and Form I–539A, as applicable. The associated time burden estimate for completing these forms will increase because these applicants will be required to demonstrate that they have not received, since obtaining the nonimmigrant status that they seek to extend or from which they seek to change, and through the adjudication, public benefits as described in final 8 CFR 212.21(b) for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months). Moreover, the rule will impose new costs associated with the new public charge bond process, including new costs for completing and filing a Public Charge Bond (Form I–945), and Request for Cancellation of Public Charge Bond (Form I–356).

DHS estimates that the additional total cost of the rule will be approximately $35,202,698 annually. This cost includes the population applying to adjust status who are also required to file Form I–944, the opportunity costs of time associated with such filings, as well the increased time burden estimates for completing

Forms I–485, I–129, I–129CW, and I–539, and for requesting or cancelling a public charge bond using Form I–945 and Form I–356, respectively.

Over the first 10 years of implementation, DHS estimates the total quantified new direct costs of the final rule will be about $352,026,980 (undiscounted). In addition, DHS estimates that the 10-year discounted total direct costs of this final rule will be about $300,286,154 at a 3 percent discount rate and about $247,249,020 at a 7 percent discount rate.

Simultaneously, DHS is eliminating the use and consideration of the Request for Exemption for Intending Immigrant's Affidavit of Support (Form I–864W), currently applicable to certain classes of aliens. In lieu of Form I–864W, the alien will indicate eligibility for the exemption of the affidavit of support requirement on Form I–485.

The final rule will also potentially impose new costs on obligors (individuals or companies) if an alien has been determined to be likely at any time in the future to become a public charge and will be permitted to submit a public charge bond, for which USCIS will use the new Form I–945. DHS estimates the total cost to file Form I–945 will be, at minimum, about $34,166 annually.[23]

Moreover, the final rule will potentially impose new costs on aliens or obligors who submit Form I–356 as part of a request to cancel the public charge bond. DHS estimates the total cost to file Form I–356 would be approximately $824 annually.[24]

The final rule will also result in a reduction in transfer payments from the Federal Government to individuals who may choose to disenroll from or forego enrollment in a public benefits program. Individuals who might choose to disenroll from or forego future enrollment in a public benefits program include foreign-born non-citizens, as well as U.S. citizens who are members of mixed-status households,[25] who may otherwise be eligible for public benefits. DHS estimates that the total reduction in transfer payments from the Federal and State governments will be

---

[22] *See* 8 CFR 103.2(a)(7), (b)(8)(ii).

[23] Calculation: $35.59 (cost per obligor to file Form I–945) * 960 (estimated annual population who would file Form I–945) = $34,166.40 = $34,166 (rounded) annual total cost to file Form I–945.

[24] Calculation: $33.00 (cost per obligor to file Form I–356) * 25 (estimated annual population who would file Form I–356) = $825.00 annual total cost to file Form I–356.

[25] DHS uses the term "foreign-born non-citizen" since it is the term the Census Bureau uses. DHS generally interprets this term to mean alien in this analysis. In addition, DHS notes that the Census Bureau publishes much of the data used in this analysis.

**Exhibit A**

approximately $2.47 billion annually due to disenrollment or foregone enrollment in public benefits programs by foreign-born non-citizens who may be receiving public benefits. DHS estimates that the 10-year discounted federal and state transfer payments reduction of this final rule will be approximately $21.0 billion at a 3 percent discount rate and about $17.3 billion at a 7 percent discount rate. However, DHS notes there may be additional reductions in transfer payments that we are unable to quantify.

There also may be additional reductions in transfer payments from states to individuals who may choose to disenroll from or forego enrollment in public benefits program. For example, the Federal Government funds all SNAP food expenses, but only 50 percent of allowable administrative costs for regular operating expenses.[26] Similarly, Federal Medical Assistance Percentages (FMAP) in some U.S. Department of Health and Human Services (HHS) programs, like Medicaid, can vary from between 50 percent to an enhanced rate of 100 percent in some cases.[27] Since the state share of federal financial participation (FFP) varies from state to state, DHS uses the average FMAP across all states and U.S. territories of 59 percent to estimate the amount of state transfer payments. Therefore, the 10-year undiscounted amount of state transfer payments of the provisions of this final rule is about $1.01 billion annually. The 10-year discounted amount of state transfer payments of the provisions of this final rule would be approximately $8.63 billion at a 3 percent discount rate, and about $7.12 billion at a 7 percent discount rate. Finally, DHS recognizes that reductions in federal and state transfers under federal benefit programs may have impacts on state and local economies, large and small businesses, and individuals. For example, the rule might

result in reduced revenues for healthcare providers participating in Medicaid, companies that manufacture medical supplies or pharmaceuticals, grocery retailers participating in SNAP, agricultural producers who grow foods that are eligible for purchase using SNAP benefits, or landlords participating in federally funded housing programs.

Additionally, the final rule will have new direct and indirect impacts on various entities and individuals associated with regulatory familiarization with the provisions of the rule. Familiarization costs involve the time spent reading the details of a rule to understand its changes. A foreign-born non-citizen (such as those contemplating disenrollment or foregoing enrollment in a public benefits program) might review the rule to determine whether he or she is subject to the provisions of the final rule and may incur familiarization costs. To the extent that an individual or entity directly regulated by the rule incurs familiarization costs, those familiarization costs are a direct cost of the rule. In addition to those individuals or entities the rule directly regulates, a wide variety of other entities would likely choose to read and understand the rule and, therefore, would incur familiarization costs. For example, immigration lawyers, immigration advocacy groups, health care providers of all types, non-profit organizations, non-governmental organizations, and religious organizations, among others, may need or want to become familiar with the provisions of this final rule. DHS believes such non-profit organizations and other advocacy groups might choose to read the rule to provide information to those foreign-born non-citizens that might be affected by a reduction in federal and state transfer payments. Familiarization costs incurred by those not directly regulated are indirect costs.

DHS estimates the time that would be necessary to read this final rule would be approximately 16 to 20 hours per person depending on an individual's average reading speed and level of review, resulting in opportunity costs of time. An entity, such as a non-profit or advocacy group, may have more than one person that reads the rule. Using the average total rate of compensation as $36.47 per hour for all occupations, DHS estimates that the opportunity cost of time will range from about $583.52 to

$729.40 per individual who must read and review the final rule.

The final rule will produce some quantified benefits due to the regulatory changes DHS is making. The final rule will produce some benefits for T nonimmigrants applying for adjustment of status based on their T nonimmigrant status, as this population will no longer need to submit Application for Waiver of Grounds of Inadmissibility (Form I–601) seeking a waiver of the public charge ground of inadmissibility. DHS estimates the total benefit for this population is $15,176 annually.[28]

The primary benefit of the final rule would be to better ensure that aliens who are admitted to the United States, seek extension of stay or change of status, or apply for adjustment of status will be self-sufficient, *i.e.,* will rely on their own financial resources, as well as the financial resources of the family, sponsors, and private organizations.[29] DHS also anticipates that the final rule will produce some benefits from the elimination of Form I–864W. The elimination of this form will potentially reduce the number of forms USCIS would have to process. DHS estimates the amount of cost savings that will accrue from eliminating Form I–864W would be about $36.47 per petitioner.[30] However, DHS is unable to estimate the annual number of filings of Form I–864W and, therefore, currently is unable to estimate the total annual cost savings of this change. Additionally, a public charge bond process will also provide benefits to applicants as they potentially will be given the opportunity for adjustment if otherwise admissible, at the discretion of DHS, after a determination that he or she is likely to become a public charge.

Table 1 provides a more detailed summary of the final provisions and their impacts.

---

[26] Per section 16(a) of the Food and Nutrition Act of 2008, Public Law 110–234, tit. IV, 122 Stat. 923, 1092 (May 22, 2008) (codified as amended at 7 U.S.C. 2025). *See also* USDA, *FNS Handbook 901,* at p. 41 (2017). Available at: *https://fns-prod.azureedge.net/sites/default/files/apd/FNS_HB901_v2.2_internet_Ready_Format.pdf,* (last visited July 26, 2019).

[27] *See* Dep't of Health and Human Servs. Notice, Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for October 1, 2016 through September 30, 2017, 80 FR 73779 (Nov. 25, 2015).

[28] Calculation: $14,880 (Filing fees for Form I–601) + $296.48 (Opportunity cost of time for Form I–601) = $15,176.48 = $15,176 (rounded) total current estimated annual cost for filing T nonimmigrants filing Form I–601 seeking a waiver of grounds of inadmissibility. Therefore, the estimated total benefits of the final rule for T nonimmigrants applying for adjustment of status using Form I–601 seeking a waiver on grounds of inadmissibility will equal the current cost to file Form I–601 for this population.

[29] *See* 8 U.S.C. 1601(1), (2)(A).

[30] Calculation of savings from opportunity cost of time for no longer having to complete and submit Form I–864W: ($36.47 per hour * 1.0 hours) = $36.47.

**Exhibit A**

**41302**    **Federal Register**/Vol. 84, No. 157/Wednesday, August 14, 2019/Rules and Regulations

TABLE 1—SUMMARY OF MAJOR PROVISIONS AND ECONOMIC IMPACTS OF THE FINAL RULE

| Provision | Purpose | Expected impact of final rule |
|---|---|---|
| Revising 8 CFR 212.18. Application for Waivers of Inadmissibility in connection with an application for adjustment of status by T nonimmigrant status holders.<br>Revising 8 CFR 245.23. Adjustment of aliens in T nonimmigrant classification. | To clarify that T nonimmigrants seeking adjustment of status are not subject to public charge ground of inadmissibility. | **Quantitative:**<br>*Benefits:*<br>• Benefits of $15,176 annually to T nonimmigrants applying for adjustment of status who will no longer need to submit Form I–601 seeking a waiver on public charge grounds of inadmissibility.<br>*Costs:*<br>• None. |
| Adding 8 CFR 212.20. Purpose and applicability of public charge inadmissibility.<br>Adding 8 CFR 212.21. Definitions ............<br>Adding 8 CFR 212.22. Public charge determination.<br><br><br><br><br><br><br><br>Adding 8 CFR 212.23. Exemptions and waivers for public charge ground of inadmissibility. | To define the categories of aliens that are subject to the public charge determination.<br>To establish key definitions, including ''public charge,'' ''public benefit,'' ''likely to become a public charge,'' ''household,'' and ''receipt of public benefits.''<br>Clarifies that evaluating public charge is a prospective determination based on the totality of the circumstances.<br>Outlines minimum and additional factors considered when evaluating whether an alien immigrant is inadmissible based on the public charge ground. Positive and negative factors are weighed to determine an individual's likelihood of becoming a public charge at any time in the future.<br>Outlines exemptions and waivers for inadmissibility based on the public charge ground. | **Quantitative:**<br>*Benefits:*<br>• Benefits of $36.47 per applicant from no longer having to complete and file Form I–864W.<br>*Costs:*<br>• DHS anticipates a likely increase in the number of denials for adjustment of status applicants based on public charge inadmissibility determinations due to formalizing and standardizing the criteria and process for inadmissibility determinations.<br>**Quantitative:**<br>*Benefits:*<br>• Better ensure that aliens who are seeking admission to the United States or apply for adjustment of status are self-sufficient through an improved review process of the mandatory statutory factors. |
| Adding 8 CFR 214.1(a)(3)(iv) and amending 8 CFR 214.1(c)(4)(iv). Nonimmigrant general requirements.<br>Amending 8 CFR 248.1(a) and adding 8 CFR 248.1(c)(4). Change of nonimmigrant classification eligibility. | To provide, with limited exceptions, that an application for extension of stay or change of nonimmigrant status will be denied unless the applicant demonstrates that he or she has not received public benefits since obtaining the nonimmigrant status that he or she is seeking to extend or change, as defined in final 8 CFR 212.21(b), for 12 months, in the aggregate, within a 36 month period. | **Quantitative:**<br>*Costs:*<br>• $6.1 million annually for an increased time burden for completing and filing Form I–129.<br>• $0.12 million annually for an increased time burden for completing and filing Form I–129CW.<br>• $2.4 million annually for an increased time burden for completing and filing Form I–539.<br>**Quantitative:**<br>*Benefits:*<br>• Better ensures that aliens who are seeking to extend or change to a status that is not exempt from the section 212(a)(4) inadmissibility ground who apply for extension of stay or change of status continue to be self-sufficient during the duration of their nonimmigrant stay. |
| Amending 8 CFR 245. Adjustment of status to that of person admitted for lawful permanent residence. | To outline requirements that aliens submit a declaration of self-sufficiency on the form designated by DHS and any other evidence requested by DHS in the public charge inadmissibility determination. | **Quantitative:**<br>*Direct Costs:*<br>• Total annual direct costs of the final rule will range from about $45.5 to $131.2 million, including:<br>  • $25.8 million to applicants who must file Form I–944;<br>  • $0.69 million to applicants applying to adjust status using Form I–485 with an increased time burden;<br>  • $0.34 million to public charge bond obligors for filing Form I–945; and<br>  • $823.50 to filers for filing Form I–356.<br>• Total costs over a 10-year period will range from:<br>  • $352.0 million for undiscounted costs;<br>  • $300.1 million at a 3 percent discount rate; and<br>  • $247.2 million at a 7 percent discount rate.<br>*Transfer Payments*<br>• Total annual transfer payments of the final rule would be about $2.47 billion from foreign-born non-citizens and their households who disenroll from or forego enrollment in public benefits programs. The federal-level share of annual transfer payments will be about $1.46 billion and the state-level share of annual transfer payments will be about $1.01 billion. |

**Exhibit A**

TABLE 1—SUMMARY OF MAJOR PROVISIONS AND ECONOMIC IMPACTS OF THE FINAL RULE—Continued

| Provision | Purpose | Expected impact of final rule |
|---|---|---|
| | | • Total transfer payments over a 10-year period, including the combined federal- and state-level shares, will be:<br>  • $24.7 billion for undiscounted costs;<br>  • $21.0 billion at a 3 percent discount rate; and<br>  • $17.3 billion at a 7 percent discount rate.<br>**Quantitative:**<br>*Benefits:*<br>• Potential to make USCIS' in the review of public charge inadmissibility more effective.<br>*Costs:*<br>• DHS anticipates a likely increase in the number of denials for adjustment of status applicants based on public charge inadmissibility determinations due to formalizing and standardizing the criteria and process for public charge determination.<br>• Costs to various entities and individuals associated with regulatory familiarization with the provisions of the final rule. Costs will include the opportunity cost of time to read the final rule and subsequently determine applicability of the final rule's provisions. DHS estimates that the time to read this final rule in its entirety would be 16 to 20 hours per individual. DHS estimates that the opportunity cost of time will range from about $583.52 to $729.40 per individual who must read and review the final rule. However, DHS cannot determine the number of individuals who will read the final rule. |
| | Public Charge Bond Provisions | |
| Amending 8 CFR 103.6. Public charge bonds. | To set forth the Secretary's discretion to approve bonds, cancellation, bond schedules, and breach of bond, and to move principles governing public charge bonds to final 8 CFR 213.1. | **Quantitative:**<br>*Costs:*<br>• $34,166 annually to obligors for submitting Public Charge Bond (Form I–945); and<br>• $823.50 annually to filers for submitting Request for Cancellation of Public Charge Bond (Form I–356). |
| Amending 8 CFR 103.7. Fees ................. | To add fees for new Form I–945, Public Charge Bond, and Form I–356, Request for Cancellation of Public Charge Bond. | • Fees paid to bond companies to secure public charge bonds. Fees could range from 1–15 percent of the public charge bond amount based on an individual's credit score. |
| Amending 8 CFR 213.1. Admission or adjustment of status of aliens on giving of a public charge bond. | In 8 CFR 213.1, to add specifics to the public charge bond provision for aliens who are seeking adjustment of status, including the discretionary availability and the minimum amount required for a public charge bond. | **Quantitative:**<br>*Benefits:*<br>• Potentially enable an alien who was found inadmissible only on the public charge ground to adjust his or her status by posting a public charge bond with DHS. |

Source: USCIS analysis.

DHS has prepared a full analysis of this rule according to Executive Orders (E.O.) 12866 and 13563. This analysis can be found in the docket for this rulemaking or by searching for RIN 1615—AA22 on *www.regulations.gov.*

## II. Background

### A. Public Charge Inadmissibility and Public Charge Bonds

Under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), an alien who is an applicant for a visa, admission, or adjustment of status is inadmissible if he or she is likely at any time to become a public charge. The public charge ground of inadmissibility, therefore, applies to any alien applying for a visa to come to the United States temporarily or permanently, for admission, or for adjustment of status to that of a lawful permanent resident.[31] Section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) does not directly apply to nonimmigrants seeking extension of stay or change of status,[32] because extension of stay and change of status applications are not applications for a visa, admission, or adjustment of status.

The INA does not define "public charge." It does specify that when determining if an alien is likely at any time to become a public charge, consular officers and immigration officers must consider the alien's age; health; family status; assets, resources, and financial status; and education and skills, at a minimum.[33] Some immigrant and nonimmigrant categories are exempt from the public charge inadmissibility ground and other applicants may apply for a waiver of the public charge inadmissibility ground.[34]

Additionally, section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), permits the consular officer, immigration officer, or an immigration judge to consider any affidavit of support submitted under section 213A of the Act, 8 U.S.C. 1183a, on the applicant's behalf when determining whether the applicant may become a public charge.[35] In fact, with

---

[31] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[32] *See* INA section 214 and 248, 8 U.S.C. 1184 and 1258.

[33] *See* INA section 212(a)(4)(B)(i), 8 U.S.C. 1182(a)(4)(B)(i).

[34] *See* proposed 8 CFR 212.23.

[35] *See* INA section 212(a)(4)(B)(ii), 8 U.S.C. 1182(a)(4)(B)(ii). When required, the applicant must
Continued

**Exhibit A**

very limited exceptions, aliens seeking family-based immigrant visas and adjustment of status, and a limited number of employment-based immigrant visas and adjustment of status, must have a sufficient affidavit of support or will be found inadmissible as likely to become a public charge.[36]

In general, if DHS has determined that an alien is inadmissible based on public charge, but is otherwise admissible, DHS may admit the alien at DHS's discretion upon the alien posting a suitable and proper bond as determined by DHS.[37] The purpose of issuing a public charge bond is to ensure that the alien will not become a public charge in the future.[38]

### B. Current Public Charge Standards

As discussed in the NPRM,[39] DHS currently makes public charge determinations in accordance with the 1999 Interim Field Guidance.[40] This guidance explains how the agency determines if a person is likely at any time to become a public charge under section 212(a)(4) of the Act, 8 U.S.C. 1182(a), for admission and adjustment of status purposes, and whether a person has become a public charge within five years of entry from causes not affirmatively shown to have arisen since entry, and therefore deportable under section 237(a)(5) of the Act, 8 U.S.C. 1227(a)(5).[41] On May 26, 1999, INS issued a proposed rule that would have codified these policies in regulation. Ultimately, however, INS did not publish a final rule conclusively addressing these issues.[42] DOS also issued a cable to its consular officers at that time, implementing similar guidance for visa adjudications, and its Foreign Affairs Manual (FAM) was

similarly updated.[43] USCIS has continued to follow the 1999 Interim Field Guidance in its adjudications, and DOS has continued following the public charge guidance set forth in the FAM.[44]

In the 1999 Interim Field Guidance, public charge is defined to mean an alien who is likely to become primarily dependent [45] on the government for subsistence, as demonstrated by either:

• Receipt of public cash assistance for income maintenance; or

• Institutionalization for long-term care at government expense.

Under the 1999 Interim Field Guidance, DHS did not consider receipt of non-cash, supplemental and certain limited cash, and special purpose benefits. Similarly, DHS did not consider institutionalization for short periods of rehabilitation because it does not constitute primary dependence.[46] As discussed in the NPRM, the use of public charge bonds has decreased since the introduction of enforceable affidavits of support in section 213A of the Act, 8 U.S.C. 1183a.[47]

### C. Final Rule

Following careful consideration of public comments received, DHS has made modifications to the regulatory text proposed in the NPRM, as described above. The rationale for the proposed rule and the reasoning provided in the background section of that rule remain valid, except as described in this regulatory preamble. Section III of this preamble includes a detailed summary and analysis of the public comments. Comments may be reviewed at the Federal Docket Management System (FDMS) at *http://www.regulations.gov*, docket number USCIS–2010–0012.

## III. Public Comments on the Proposed Rule

### A. Summary of Public Comments

On October 10, 2018, DHS, USCIS published a proposed rule in docket USCIS–2010–0012. The comment period associated with the proposed rule closed at the end of December 10, 2018. DHS received a total of 266,077 public comment submissions in Docket USCIS–2010–0012 in response to the proposed rule. The majority of comment submissions were from individual or anonymous commenters. Other commenters included healthcare providers; research institutes and universities; law firms and individual attorneys; federal, state, local, and tribal elected officials; State and local government agencies; religious and community organizations; advocacy groups; unions; Federal Government officials; and trade and business organizations. While some commenters provided support for the rule, the vast majority of commenters opposed the rule.

### B. Requests To Extend Comment Period

*Comment:* Some commenters requested that DHS extend the comment period. An individual commenter said the 60-day comment period is not enough time for such a drastic policy and asserted it would be unfair to American people to proceed with the proposed changes. Another individual commenter asked USCIS to extend the notice and comment period for an additional 90 days. A commenter wrote that the 60-day comment period provided inadequate time for its members to meaningfully comment on the proposed rule, and requested a further 60-day extension. Another commenter urged that DHS consider extending the notice and comment period for the docket until all interested individuals have the opportunity to provide input. The commenter said it is standard practice for an agency to extend a notice and comment period when circumstance suggest that additional input may be beneficial.

*Response:* DHS believes that the 60-day comment period provided an adequate opportunity for public input, and declines to extend the comment period. The Administrative Procedure Act (APA) is silent regarding the duration of the public comment period, and does not establish a minimum duration.[48] However, the 60-day comment period is in line with E.O. 12866, which encourages agencies to provide at least 60 days for the public

---

submit an Affidavit of Support Under Section 213A of the INA (Form I–864).

[36] *See* INA section 212(a)(4)(C), (D), 8 U.S.C. 1182(a)(4)(C), (D). A sufficient affidavit of support is one in which the sponsor has demonstrated that he or she has enough income and/or assets to maintain the sponsored alien and the rest of the sponsor's household at 125% of the FPG for that household size (or at 100 percent of the FPG if the sponsor is active duty in the U.S. Armed Forces or U.S. Coast Guard).

[37] *See* INA section 213, 8 U.S.C. 1183; *see also* 8 CFR 103.6; 8 CFR 213.1.

[38] *Matter of Viado,* 19 I&N Dec. 252, 253 (BIA 1985).

[39] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51133 (proposed Oct. 10, 2018).

[40] *See* 64 FR 28689 (May 26, 1999).

[41] *See* 64 FR 28689 (May 26, 1999). In addition to the 1999 Interim Field Guidance, INS proposed promulgating these policies through rulemaking, which was never concluded. *See* Inadmissibility and Deportability on Public Charge Grounds, 64 FR 28676 (proposed May 26, 1999).

[42] *See* Inadmissibility and Deportability on Public Charge Grounds, 64 FR 28676 (proposed May 26, 1999).

[43] *See* Inadmissibility and Deportability on Public Charge Grounds, 64 FR 28676, 28680 (proposed May 26, 1999).

[44] *See* Children's Health Insurance Program Reauthorization Act of 2009, Public Law 111–3, sec. 214, 123 Stat. 8, 56 (Feb. 4, 2009); 9 FAM 302.8–2(B)(2), Determining "Totality of Circumstances," (g) Public Charge Bonds, *https://fam.state.gov/fam/09fam/09fam030208.html* (last visited July 26, 2019). Note, on July 10, 2018, DOS amended 9 FAM 302.8.

[45] Former INS defined "primarily dependent" as "the majority" or "more than 50 percent."

[46] Similar to DHS, DOS has been making public charge inadmissibility determinations using the same legal framework, as reflected in the FAM. *See* 9 FAM 302.8, Public Charge—INA 212(a)(4), *https://fam.state.gov/FAM/09FAM/09FAM030208.html* (last visited July 26, 2019).

[47] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51219 (proposed Oct. 10, 2018).

[48] *See* 5 U.S.C. 553(c).

**Exhibit A**

to comment on economically significant rules. The sufficiency of the 60-day comment period provided in this rule is supported by the over 266,000 public comments received. The public, including attorneys; federal, state, local, and tribal elected officials; and advocacy organizations provided a great number of detailed and informative comments. In addition, DHS notes that the proposed rule had been listed in the publicly available Unified Agenda of Federal Regulatory and Deregulatory Actions since the Fall 2017 publication. Given the quantity and quality of comments received in response to the proposed rule, and other publicly available information regarding the rule, DHS believes that the 60-day comment period has been sufficient.

## C. Comments Expressing General Support for the NPRM

*Comment:* Many commenters stated that immigrants should be self-sufficient. Many commenters stated that aliens should not be permitted to accept government benefits or depend on U.S. taxpayer money to support themselves if they want to obtain green cards. Commenters stated that immigrants should be productive members of society to gain admission to the United States and should not be a burden on the state. One commenter said that migrants should not be able to obtain welfare unless they have a minimum working record in the United States. Another commenter supported the rule and said that illegal immigration needs to stop. One commenter said that this country does not need more poor people. A commenter said that immigrants who cannot support themselves should not come to the United States. Other commenters said that the United States should not be responsible for taking care of people from other countries. One commenter noted that this rule will address the problem of public assistance use by unauthorized aliens seeking to legalize their status, DACA recipients, and any other immigrants who want to legalize their status but who are unable to support themselves or their families. Another commenter indicated that the rule will encourage immigrants to work hard and become self-sufficient.

*Response:* DHS agrees that applicants for admission and adjustment of status who are subject to the public charge ground of inadmissibility should be self-sufficient and should not depend on the government to meet their needs, and this rule seeks to better ensure self-sufficiency. DHS firmly believes that this was Congress' intent in enacting section 212(a)(4) of the Act, 8 U.S.C.

1182(a)(4), including the changes to this ground made in 1996.[49] DHS, however, disagrees with comments suggesting that this rule addresses, or should address, eligibility for government benefits programs. DHS also disagrees that the rule addresses eligibility for public benefits by certain specified groups, such as aliens unlawfully present, or DACA recipients. Neither the public charge ground of inadmissibility nor this final rule govern eligibility for public benefits; they govern which aliens are inadmissible or ineligible for admission or adjustment of status. This final rule does not address the government's responsibility to care for foreign nationals and does not address which aliens are, or should be, eligible to receive public benefits.

DHS also disagrees with suggestions that this rule is aimed at making sure poor people are not able to enter the United States. As noted previously, the rule aims to ensure that aliens subject to the public charge ground of inadmissibility are self-sufficient. An alien's assets, resources, and financial status is one factor that is considered in the totality of the circumstances when making a public charge inadmissibility determination and is not outcome determinative.

*Comment:* Some commenters stated that the rule will have a positive impact on the U.S. economy and job creation, and will protect the social safety net. Numerous commenters mentioned that public assistance should be reserved for U.S. citizens who need help and not immigrants who arrive unable to contribute to the nation's well-being.

Other commenters stated that as more immigrants look to come to the United States, the proposed public charge rule is needed to preserve the "American Dream" for future generations and to prevent the current generation from having to shoulder the financial burden of paying for foreign nationals who cannot provide for themselves.

*Response:* This rule does not aim to address the U.S. economy, job creation, protection of the social safety net or the "American dream," curtail spending on public assistance, or ensure that public assistance will be reserved for U.S. citizens. This rule also does not attempt to curtail efforts to address broader economic and health problems, including with respect to people outside

the United States. Rather, the purpose of this rule is to implement the public charge ground of inadmissibility consistent with the principles of self-sufficiency set forth by Congress, and to minimize the incentive of aliens to attempt to immigrate to, or to adjust status in, the United States due to the availability of public benefits.[50] While the rule may result in reductions in overall alien enrollment in certain public benefit programs, improve the ability of U.S. citizens to obtain public benefits for which they are eligible, or otherwise benefit the U.S. economy, this rule does not directly regulate these matters.

*Comment:* Some commenters stated that there should be more stringent immigration standards generally and reductions in the number of immigrants in the United States. Some commenters stated that immigrants are "abusing" the U.S. welfare system. Other commenters offered general support for the NPRM without further explanation.

*Response:* DHS does not intend this rule to reduce overall immigration levels to the United States. Instead, this rule is an exercise of DHS's authority to interpret the public charge ground of inadmissibility. Fraud or abuse in alien enrollment in public benefits programs is of course problematic, but the public charge ground of inadmissibility applies to an alien who is likely at any time to become a public charge, regardless of whether such alien is likely to fraudulently obtain public benefits or abuse the public benefits system. With respect to comments about an alien receiving public benefits for which he or she was not eligible, DHS notes that to the extent that an alien obtains such a benefit by falsely claiming to be a U.S. citizen, the alien may be inadmissible for falsely claiming U.S. citizenship (section 212(a)(6)(C)(ii) of the Act, 8 U.S.C. 1182(a)(6)(C)(ii)), depending on the circumstances by which he or she received the benefits improperly. Additionally, to the extent that an applicant who has obtained public benefits through fraud or misrepresentation subsequently applies for an immigration benefit for which a favorable exercise of discretion is required, the fraud or misrepresentation can be considered in deciding whether to favorably exercise that discretion. However, public benefits that an alien obtains unlawfully are outside of the scope of this rulemaking, which only addresses inadmissibility based on the public charge ground of inadmissibility.

---

[49] *See* IIRIRA, Public Law 104–208, div. C, sec. 531, 110 Stat. 3009–546, 3009–674 (Sept. 30, 1996) (amending INA section 212(a)(4), 8 U.S.C. 1182(a)(4)); H.R. Rep. No. 104–828 at 240–41 (1996) (Conf. Rep.) ("This section amends INA section 212(a)(4) to expand the public charge ground of inadmissibility. . . . Self-reliance is one of the most fundamental principles of immigration law.").

[50] *See* 8 U.S.C. 1601.

**Exhibit A**

## D. Comments Expressing General Opposition to the NPRM

### 1. Purpose of the Rule and Self Sufficiency

*Comment:* Commenters stated that the proposed rule represented an ineffective solution to a non-existent problem—a lack of self-sufficiency among immigrants. A commenter indicated that the proposed rule emphasized that the self-sufficiency of immigrants is a long-standing congressional policy, yet did not provide sufficient data that dependency on the government and/or government benefits is a problem within immigrant communities, especially in light of data showing that immigrants have been shown generally to make very strong economic contributions to the country. The commenter stated that, for example, in 2014 immigrant-led households in Massachusetts paid nearly $10 billion dollars in federal, state, and local taxes, and represented nearly $28 billion dollars in spending power.

Additionally, commenters expressed concern that the text of the rule suggests that it is the main responsibility of our nation's immigration system—and the agencies which run it—to cultivate or maintain a national ethos of "self-sufficiency." A commenter indicated that immigration policies and systems are meant to achieve a number of different goals, such as family unity, diversity, humanitarian assistance, and ensuring sufficient labor. Commenters stated that safeguarding our nation from individuals that may at some point need government support is not the singular or even primary purpose of our system of immigration.

*Response:* DHS disagrees with the commenters that ensuring the self-sufficiency of immigrants is unnecessary, or that a lack of self-sufficiency is a non-existent problem. As outlined in the NPRM, Congress clearly declared, in its policy statement in PRWORA, that self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes and that it should continue to be a governing principle in the United States.[51] Congress also has maintained the public charge ground of inadmissibility in law since 1882. DHS believes that applicants for admission and adjustment of status who are subject to the public charge ground of inadmissibility should be self-sufficient and should not depend on the government to meet their needs, and DHS firmly believes that this was Congress' intent in enacting section

212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), including as recently as 1996.[52] DHS agrees with the commenter that immigration laws and policies serve many purposes, including goals such as family unity, diversity, humanitarian assistance. However, U.S. immigration laws balance competing values. For example, the criminal grounds of inadmissibility[53] are designed to protect the United States and its citizens from harm and threats to public safety,[54] while health-related grounds of inadmissibility are intended to protect the health of the United States population.[55] These grounds of inadmissibility are valid exercises of congressional authority, notwithstanding that such grounds of inadmissibility may sometimes impede family unity, and notwithstanding that in many individual aliens' cases, such grounds of inadmissibility may not be implicated. Similarly, here, Congress, though legislation, addressed various policy considerations when determining whether a foreign national should be admitted to the United States, including whether an individual who is likely at any time in the future to become a public charge should be admitted to the United States. Therefore, while self-sufficiency may not be the primary purpose of U.S. immigration laws, it is one consideration put into place by Congress.

DHS is under no obligation to demonstrate that all or most aliens in the United States are not self-sufficient. To the extent that an alien is self-sufficient, the alien is unlikely to be affected by this rule. In the NPRM, DHS did provide extensive data on the lack of self-sufficiency among certain aliens, and showed how the minimum statutory factors identified by Congress relate to the self-sufficiency of individuals and their receipt of public benefits.[56] DHS acknowledges that immigrants provide significant contribution to the United States as a whole and within their communities, as demonstrated by data and information provided by many commenters. However, the focus of the inquiry for public charge purposes is whether an

individual alien, who is seeking to be admitted to the United States or who is applying for adjustment of status, is likely to become a public charge at any time in the future. This determination is made following consideration of the totality of the alien's individual circumstances and is a predictive assessment.

*Comment:* A commenter stated that section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) neither mentioned or discussed self-sufficiency nor identified self-sufficiency as a criteria in the determination and therefore disagreed with primary purpose of the rule outlined in the NPRM. Given the close proximity in time when PRWORA and Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) passed, the commenter considered it significant that Congress restricted an immigrant's eligibility for public benefits with PRWORA, yet IIRIRA codified the minimum mandatory factors without PRWORA's articulated self-sufficiency principles as relied on by DHS in the NPRM. The commenter indicated that both PRWORA and IIRIRA, were considered in the 1999 Interim Field Guidance because PRWORA and IIRIRA had created widespread confusion about permissible public benefit receipt in relation to public charge inadmissibility. The commenter stated that the current rule failed to identify post-1999 laws, data, or experience, such as congressional authorities or other information not already taken into account by INS in developing the 1999 Interim Field Guidance that informed DHS's development of the proposed rule. The commenter therefore requested that DHS in its final rule identify and describe legal authorities or information other than the authorities which predated the 1999 Interim Field Guidance and that were relied on by INS, which DHS considered in developing this proposed definition of public charge. The commenter stated that if Congress had wanted to achieve the self-sufficiency or cost-savings goals identified by the NPRM it could alter the eligibility rules for the enumerated programs, but has not changed the public benefit eligibility requirements, and expanded eligibility for some programs following the enactment of PRWORA and IIRIRA in 1996, such as in 2002, when Congress restored SNAP eligibility for all qualified immigrant children.

*Response:* Although DHS agrees with the commenter that self-sufficiency is not mentioned in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), DHS maintains, as outlined in the NPRM,

[51] *See* 8 U.S.C. 1601.

[52] *See* IIRIRA, Public Law 104–208, div. C, sec. 531, 110 Stat. 3009–546, 3009–674 (Sept. 30, 1996) (amending INA section 212(a)(4), 8 U.S.C. 1182(a)(4)); H.R. Rep. No. 104–828 at 240–41 (1996) (Conf. Rep.) ("This section amends INA section 212(a)(4) to expand the public charge ground of inadmissibility. . . . Self-reliance is one of the most fundamental principles of immigration law.").

[53] *See* INA section 212(a)(2), 8 U.S.C. 1182(a)(2).

[54] *See* INA section 212(a)(2), 8 U.S.C. 1182(a)(2).

[55] *See* INA section 212(a)(1), 8 U.S.C. 1182(a)(1).

[56] *See* throughout the NPRM, Inadmissibility on Public Charge Grounds, 83 FR 51114 (proposed October 10, 2018).

**Exhibit A**

that this principle, a congressional' policy objective, informs and has informed public charge determinations. Based on the administrative and legislative context discussed in the NPRM,[57] including congressional records relating to debates addressing self-sufficiency prior to Congress' passing of IIRIRA,[58] DHS's view of self-sufficiency and its role in the public charge determination remains unchanged. In fact, DHS considers the proximity of the passage of both PRWORA and IIRIRA as an indication that Congress associated public charge closely with the principles governing PRWORA, and that Congress must have recognized that it made certain public benefits available to some aliens who are also subject to the public charge grounds of inadmissibility, even though receipt of such benefits could render the alien inadmissible as likely to become a public charge. Additionally, as outlined in the NPRM, DHS does not believe that the plain text of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), INS's discussion of PRWORA and IIRIRA, and the case law cited by INS or DHS requires the adoption of the legacy INS interpretations for purposes of public charge. As discussed in detail throughout the NPRM and below, the term public charge is ambiguous, and neither the statute nor case law prescribe the degree to which an alien must be receiving public benefits to be considered a public charge. DHS remains convinced that its interpretation is permissible and reasonable.

DHS disagrees with the commenter that the NPRM failed to identify post-1999 laws, data, or experience, such as congressional authorities or other information not already taken into account by INS in developing current public charge policy that informed DHS's development of the proposed rule. Post-PRWORA, Congress did restore some public benefit eligibility for aliens. DHS acknowledged these developments in the NPRM preamble.[59] For example, DHS incorporated the discussion that in 2002, the Farm Security and Rural Investment Act of

2002, Public Law 107–17, (May 13, 2002), Section 4401, restored SSI benefits for any person who was lawfully residing in the United States on August 22, 1996; restored SNAP for all children under 18; and provided that ''qualified aliens''[60] were eligible for SNAP after five years of entry into the United States. In 2007, Section 525 of the Consolidated Appropriations Act for Fiscal Year (FY) 2008[61] provided for Iraqi and Afghan foreign nationals to obtain benefits.

These provision and others restoring or providing public benefit access to immigrants are incorporated in the statutory provisions governing PRWORA, 8 U.S.C. 1611. Therefore, this rule is informed by all the documentation and data presented before the 1999 Interim Field Guidance, as well as relevant subsequent legislation, and relevant case law. DHS would note that precedential decisions and other materials cited by DHS do not lose persuasive value for purposes of DHS's interpretation simply because they were also addressed in the 1999 proposed rule and 1999 Interim Guidance.[62] Further, although subsequent legislation, such as Congress's expansion of SNAP, expanded eligibility of public benefits to certain aliens, Congress has not subsequently changed the section 212(a)(4) of the Act, 8 U.S.C. 1182, which governs the public charge inadmissibility determination.[63]

*Comment:* A commenter stated that Congress, not DHS, may change statutory eligibility requirements for federally-administered public benefits programs, including the ones listed in the NPRM. The commenter stated that DHS's regulatory framework was designed to achieve the same effects as changing eligibility requirements—decreased and foregone enrollment in public benefit programs by certain populations—and therefore, usurped Congress' role.

*Response:* DHS strongly disagrees with the comment that that DHS's regulatory framework was designed to achieve the same effects as changing eligibility requirements—decreased and foregone enrollment in public benefit programs by certain populations—and therefore, usurped Congress' role. Although DHS acknowledges that the rule, once effective, may lead individuals to disenroll or choose to forego enrollment from public benefits, the rule does not change eligibility requirements for public benefits. The rule only provides for whether an alien is admissible into the United States, which is a matter of immigration law for the Federal Government and delegated to DHS.

2. Requests for Reconsideration and Withdrawal of NPRM

*Comment:* Several commenters asked that DHS reconsider the rule and withdraw it, stating that the rule is unnecessary and would place an undue burden on DHS and immigrants. One commenter stated the proposed rule's preamble does not establish a sufficient justification for the proposed revisions. Another commenter stated that the NPRM was too long and discouraged the public from commenting on the proposed rule. Some commenters expressed concern that the rule conflicts with local, state, and federal initiatives, including undermining community-based, non-profit efforts, and making the immigration system inefficient. Several commenters stated that DHS should focus on promoting a rule that strengthens, rather than undermines, immigrants' ability to support themselves. Some commenters requested that the rule be withdrawn in its entirety, and that the 1999 Interim Field Guidance remain in effect.

*Response:* DHS will not retract the proposed rule and is concluding the public charge inadmissibility rulemaking through the publication of this final rule. DHS is committed to implementing section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), consistent with the principles of self-sufficiency set forth by Congress. As required by the statute and reflected in this rule, DHS's public charge inadmissibility determinations will involve an assessment of the mandatory factors as they relate to the likelihood of an applicant becoming a public charge at any time in the future.

*Comment:* Multiple commenters said the rule should be withdrawn, the 1999 Interim Field Guidance should remain in place, and that the proposed rule is a drastic change from the 1999 Interim Field Guidance. Many said that the 1999

---

[57] See 83 FR 51114 (Oct. 10, 2018).

[58] See 142 Cong. Rec. S4609 (May 2, 1996) (statement of Sen. Byrd) (''[S]elf-sufficiency will be the watchword for those coming to the United States. By making noncitizens ineligible for Federal means-tested programs, and by 'deeming' a sponsor's income attributable to an immigrant, the American taxpayer will no longer be financially responsible for new arrivals.''), *available at https:// www.congress.gov/crec/1996/05/02/CREC-1996-05-02-pt1-PgS4592.pdf.* (last visited July 26. 2019).

[59] See Inadmissibility on Public Charge Grounds, 83 FR 51114, 51126–51133 (proposed October 10, 2018).

[60] ''Qualified aliens'' generally includes lawful permanent resident aliens, refugees/asylees, and other non-temporary legal residents (such as Cuban/ Haitian entrants).

[61] Public Law 110–161 (Dec. 26, 2007).

[62] For example, precedent decisions issued by the Executive Office for Immigration Review (EOIR) and the Attorney General are binding on DHS until overruled. *See* 8 CFR 103.3(c), 103.10(b), 1003.1(g); *see, e.g., Matter of E–L–H–,* 23 I&N Dec. 814, 817 (BIA 2005) (finding that a published Board decision has precedential effect unless and until modified or overruled by the Attorney General, the Board, Congress, or a Federal court.)

[63] *Cf. Cyan, Inc.* v. *Beaver Cty. Emp. Ret. Fund,* 138 S. Ct. 1061, 1070 (2018) (explaining that, if Congress had wanted to deprive state courts of jurisdiction over certain class actions, it could have easily done so by inserting a provision).

**Exhibit A**

Interim Field Guidance is consistent with congressional intent and case law and should not be abandoned. One commenter noted that the 1999 Interim Field Guidance's exclusion of certain public health, nutrition, and in-kind community service programs was consistent with the intent of Congress as expressed in its 1996 Conference Report regarding PRWORA and that rule was a departure from this intent.

*Response:* DHS disagrees that the 1999 Interim Field Guidance should remain in place. DHS has chosen to define public charge more broadly than in the 1999 NPRM and 1999 Interim Field Guidance. DHS believes this broader definition is consistent with Congress' intention that aliens should be self-sufficient. Self-sufficiency is, and has long been, a basic principle of immigration law in this country.[64] DHS believes that this rule aligns DHS regulations with that principle.[65]

*Comment:* A commenter urged DHS to either withdraw the proposed rule or if moving to finalize it, to provide a full and complete analysis of all public comments received on the proposed rule, including the total number of comments, (and the number of those signing individual comments), composition of, relative numbers of commenters supporting and opposing the overall proposal, the volume and nature of comments regarding specific provisions, and the rationale for specific choices made by DHS in light of comments. The commenter stated that doing so would provide transparency regarding the extent to which DHS considered public input in accordance with the APA.

*Response:* DHS declines to withdraw the NPRM and will conclude rulemaking with the publication of this final rule. DHS has responded to public comments that raise substantive issues or offer significant alternatives.[66] In this final rule, DHS is providing both an overview of public comments and commenters, and a complete analysis of public comments including those addressing specific aspects of the proposed rule. DHS has fully considered the public input on this rule in accordance with the APA.

*Comment:* Commenters stated that DHS's position is inconsistent with the 1999 NPRM.

*Response:* DHS agrees that this rule takes a different approach to interpreting the public charge ground of inadmissibility than the 1999 NPRM, and withdrew the 1999 NPRM as part of the 2018 NPRM.[67] The 2018 NPRM explained DHS's proposed change of position. DHS is not bound by a twenty-year-old proposed rule, and believes that this rule represents a permissible implementation of the public charge inadmissibility standard that Congress provided when it enacted section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). This public charge inadmissibility rule provides long-absent guidance on how to interpret key statutory terms, which have never been fully defined by Congress, and which the agency has the authority and responsibility to define.

### 3. Alternatives to the Public Charge Rule

*Comment:* An individual commenter proposed creating a "self-sufficiency program" in place of the proposed rule, modeled after the Office of Refugee Resettlement's (ORR) Voluntary Agencies Matching Grant Program that provides intensive case management, English language and vocational training, and a variety employment services, which would serve as an alternative to public benefits receipt by immigrants and nonimmigrants. A commenter suggested that rather than creating this rule to disincentivize receipt of public assistance by revoking or denying citizenship status based on receipt of public assistance, DHS should instead create classes or provide resources to aliens to help them understand the importance of self-sufficiency.

*Response:* DHS notes that this rule does not address eligibility for citizenship and neither the statute nor this final rule permit revocation or denial of citizenship status based on the public charge inadmissibility ground. This rule establishes guidelines for determining whether aliens who are applicants for admission or adjustment of status, and who are subject to section 212(a)(4) of the Act, are inadmissible as likely to become a public charge at any time in the future.[68] DHS further notes that it will not create programs in lieu of this rule that will help aliens attain self-sufficiency, as DHS believes, consistent with Congress's intent set forth in PRWORA, that aliens should be self-sufficient before they seek admission or adjustment of status.

*Comment:* A commenter requested a national stakeholder workgroup be convened to accomplish the Administration's goals rather than proceeding with the public charge rule, which the commenter asserted will have a negative impact on the health and financial security of aliens.

*Response:* DHS disagrees that a stakeholder working group is an alternative to this rulemaking. As indicated elsewhere in this rule, DHS is exercising its authority to interpret the INA consistent with its congressional mandate. This final rule provides necessary guidance for purposes of implementing section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), including, by defining statutory terms that have never been defined by Congress in the over 100 years since the public charge inadmissibility ground first appeared in the immigration laws.

The rulemaking process allowed for ample public participation. DHS notes that it received over 266,000 public comments. DHS also participated in over 20 OMB E.O. 12866 meetings with public stakeholders related to the proposed rule. Therefore, DHS does not believe that national stakeholder group would work as substitute for this rulemaking.

In addition, DHS notes that USCIS has a robust stakeholder communication and engagement program that covers all aspects of the agency's operations. This program will engage stakeholders when this rule becomes final to help ensure that applicants for immigration benefits and their representatives fully understand the new rule.

### 4. Discrimination and Disparate Impact

*Comment:* Several commenters stated that this rule discriminates against both aliens and citizens and unduly affects certain individuals. Commenters stated that the rule discriminates against immigrants based on age, gender, income, race, health, and social status. Some commenters expressed concerns that the proposed changes to the definition of public charge are inhumane and discriminatory to immigrants, particularly minors, the elderly, the poor, those will chronic medical conditions and disabilities, immigrants with limited English proficiency, Latinos, Black families, and other communities of color, and goes against core American values. A number of commenters stated this rule would discriminate against individuals with chronic health conditions, such as heart disease. Some commenters stated that the new definition of "likely at any time in the future to become a public charge" in 8 CFR 212.21(c) would be discriminatory towards blind individuals who rely on public

---

[64] *See* 8 U.S.C. 1601(1).

[65] *See Southern S.S. Co.* v. *N.L.R.B.,* 316 U.S. 31, 47 (1942) ("Frequently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another. . . .").

[66] *Reytblatt* v. *U.S. Nuclear Regulatory Comm'n,* 105 F.3d 715, 722 (D.C. Cir. 1997); *Northside Sanitary Landfill, Inc.* v. *Thomas,* 849 F.2d 1516 (D.C. Cir 1988).

[67] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114 (proposed Oct. 10, 2018).

[68] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

**Exhibit A**

assistance to make ends meet, due to the 70 percent unemployment rate for blind individuals. The commenters stated that the proposed definition exhibits a clear and inherent bias against the blind and other individuals with a disability and urged DHS to abandon the rule.

Commenters generally stated the rule creates an ageist system that favors wealthy, healthy, and highly educated individuals. One commenter said that this rule creates a ''merit-based'' system that punishes immigrants and discriminates against them based on their race, religion, and ethnicity. A commenter stated that the rule's consideration of an applicant's English proficiency amounts to discrimination.

Several commenters observed that U.S. born children often qualify for and receive assistance, because their immigrant parents are struggling. The commenters stated that DHS should not penalize the parents or the children for accepting public benefits that were legally available to them. One commenter questioned the legality of the rule and stated that the Supreme Court in *Plyler* v. *Doe* [69] held that states cannot discriminate against children on the basis of undocumented status. The commenter said numerous other cases have held that children cannot be penalized for their parentage (*e.g., Levy* v. *Louisiana,* 391 U.S. 68 (1968) and *Clark* v. *Jeter,* 486 U.S. 456 (1988)).

*Response:* To the extent that this rule, as applied, may result in negative outcomes for certain groups, DHS notes that it did not codify this final rule to discriminate against aliens based on age, race, gender, income, health, and social status, or to create an ''ageist'' system that selectively favors wealthy, healthy, and highly educated individuals. Rather, this rule is intended to better ensure that aliens subject to this rule are self-sufficient. To the extent that this rule specifically or disproportionately affects those of a particular age or those with lower incomes, less education, limited English proficiency, or poor health, DHS notes that Congress requires DHS to consider, among other factors, an applicant's age, assets, resources, financial status, education, and skills as part of the public charge inadmissibility determination.

Additionally, this rule does not create a merit-based system more broadly or apply a wealth or poverty litmus test to make public charge inadmissibility determinations. Instead, DHS has established a systematic approach to implement Congress' totality of the circumstances standard and has given the mandatory statutory factors

meaning, value, and weight strictly in relationship to determining whether or not an alien who is otherwise admissible of eligible for adjustment of status in the context of the existing system is likely at any time in the future to become a public charge. DHS acknowledges that one likely outcome of this change is that some individuals who would may have been able to immigrate under the 1999 Interim Field Guidance will now be deemed inadmissible as likely public charges.

Section 212(a)(4) of the INA, 8 U.S.C. 1182(a)(4), sets forth the public charge ground of inadmissibility that makes aliens ineligible for visas, admission, and adjustment of status. Section 212(a)(4) of the INA, 8 U.S.C. 1182(a)(4), also requires DHS to consider minimum factors in the public charge inadmissibility analysis. The Federal Government is responsible for ''regulating the relationship between the United States and our alien visitors,'' which includes regulating the manner and conditions of entry, as well as the residence of aliens.[70] DHS is the federal agency with the authority to establish regulations regarding the public charge inadmissibility determination.[71] As required by statute, DHS must consider how an alien's age, health, family status, assets and resources, financial status, education, and skills impact the alien's likelihood at any time of becoming a public charge. Under the statute, DHS may also consider an applicant's affidavit of support, if applicable. The statute does not direct DHS to consider an alien's race, gender, or social status. Consequently, DHS will not consider an alien's race, gender, or social status when making a public charge inadmissibility determination. Other than an absent or insufficient affidavit of support, where required, DHS will not find an alien inadmissible based on any single factor without consideration of all of the other factors and the totality of their effect on an applicant's likelihood of becoming a public charge at any time in the future.

In addition, rational basis scrutiny generally applies to immigration regulations applicable to aliens.[72] As set

forth in NPRM,[73] DHS's public charge rule is rationally related to the government's interest to minimize the incentive of aliens to immigrate to the United States because of the availability of public benefits and to promote the self-sufficiency of aliens within the United States.[74]

Equally important, the public charge inadmissibility rule does not discriminate against or penalize U.S. citizens, including children. The public charge inadmissibility rule does not directly regulate the conduct of U.S. citizens because the grounds of inadmissibility do not apply to U.S. citizens. Moreover, this rule does not regulate eligibility for, or access to, public benefits. Neither the NPRM nor this final rule take into consideration receipt of public benefits by U.S. citizens who are part of the alien's household, including benefits received by U.S. citizen children. The receipt of public benefits by household members is not considered as part of an alien's application, although such receipt is excluded from the alien's household income, assets, and resources.

Furthermore, DHS disagrees that this rule is inconsistent with *Plyler* v. *Doe* and the other cited cases. *Plyler* does not apply to this rule. As courts have recognized, *Plyler* relates to distinctions made by states rather than the Federal Government.[75] Similarly, neither *Levy* v. *Louisiana* nor *Clark* v. *Jeter* is applicable here. These cases did not address the immigration status of children or Federal regulations. Instead, both cases

---

[69] 457 U.S. 202 (1982).

[70] *Mathews* v. *Diaz,* 426 U.S. 67, 81–82 (1976).

[71] *See* Homeland Security Act of 2002, Public Law 107–296, sec. 102, 116 Stat. 2135, 2142–44 (Nov. 25, 2002) (codified at 6 U.S.C. 112); INA section 103, 8 U.S.C. 1103.

[72] *See Korab* v. *Fink,* 797 F.3d 572, 577–79 (9th Cir. 2014) (''[F]ederal statutes regulating alien classifications are subject to the easier-to-satisfy rational-basis review . . . Although aliens are protected by the Due Process and Equal Protection Clauses, this protection does not prevent Congress from creating legitimate distinctions either between citizens and aliens or among categories of aliens and allocating benefits on that basis . . . The

difference between state and federal distinctions based on alienage is the difference between the limits that the Fourteenth Amendment places on discrimination by states and the power the Constitution grants to the federal government over immigration.'') (citation omitted); *Lewis* v. *Thompson,* 252 F.3d 567, 570 (2d Cir. 2001), citing *Lake* v. *Reno,* 226 F.3d 141, 148 (2d Cir. 2000) (''We have recently recognized that a 'highly deferential' standard is appropriate in matters of immigration . . . .''). Generally, laws and regulations that neither involve fundamental rights nor include suspect classifications are reviewed under rational basis scrutiny, under which the person challenging the law must show that the government has no legitimate interest in the law or policy or that there is no rational link between the interest and the challenge law or regulation. *See also Heller* v. *Doe by Doe,* 509 U.S. 312, 319 (1993).

[73] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51122–23 (proposed Oct. 10, 2018).

[74] *See* 8 U.S.C. 1601.

[75] *See, e.g., Aleman* v. *Glickman,* 217 F.3d 1191, 1198 (9th Cir. 2000) (''*Plyler* [is] inapposite, however, because [it] involve[s] *state* classifications of aliens.'' (emphasis in the original)); *Rodriguez ex rel. Rodriguez* v. *U.S.,* 169 F.3d 1342, 1350 (11th Cir. 1999) (''*Plyler* is inapposite because it deals with a Fourteenth Amendment challenge to a *state's* classification of aliens.'' (emphasis in the original).

**Exhibit A**

dealt with impacts of state laws on illegitimate children.[76]

5. Potential Disenrollment Impacts

Numerous commenters raised concerns about the rule's asserted ''chilling effect.'' Commenters indicated that the rule would cause aliens and citizens to either disenroll from public benefit programs or forego enrollment in public benefit programs, which would negatively impact the nation, states, local communities, families, vulnerable populations, and health care providers. Because most of these comments reflect the same theme, the discussion below provides a detailed breakdown of public comments separated by topic, followed by a consolidated DHS response.

Choice Between Public Benefits and Immigration Status

Commenters stated that the rule puts the country at risk by forcing choices no family should have to make. Commenters noted that alien parents will limit or forego their U.S. citizen children's receipt of public benefits to avoid adverse immigration consequences. Commenters stated that the rule would force eligible immigrants to withdraw their families from assistance programs for fear of adverse immigration consequences, which would undermine access to essential health, nutrition, and other critical benefits and services. Several commenters, expressing the view that no person in the United States should be denied federal assistance programs or public benefits, said that immigrants should not have to make impossible choices between their health or providing for their family's immediate needs and risking their immigration status or keeping their family together. Some commenters said that the proposed rule would cause patients diagnosed with cancer or HIV to choose between accessing needed health services or suffering adverse consequences with respect to their immigration status. A commenter stated that their state had the highest rate of insurance coverage in the nation, and that it is vital that patients and families continue to access care without fear of adverse immigration consequences. A number of commenters expressed concerns that families must choose between public housing or citizenship as a result of this rule.

Many commenters provided studies or data related to the current or potential number of individuals who will forego and/or disenroll from public benefit programs, including specific groups of individuals, such as children. Commenters involved in social services reported that they were already seeing immigrants refraining from accessing services in clinics, food banks, childcare centers, emergency shelters, and local school districts, including immigrants who are exempt from public charge inadmissibility. Several commenters said that the chilling effect would not be limited to immigrants subject to the proposed rule and would discourage many legal residents from utilizing services to which they are legally entitled, leading to negative health and economic outcomes. For example, a commenter said that refugees, who are automatically enrolled in Medicaid upon arrival in its state, may believe they will be deported if they re-enroll in Medicaid after their initial resettlement period. Some commenters said the rule may provide an incentive for U.S. citizens and lawful permanent residents to terminate their subsidized health care in order to remain eligible to petition for their family members living abroad.

General Assertions as to Effects

Commenters said that the rule's disenrollment effect would have lasting impacts on the health and safety of our communities and that immigrant families are experiencing significant levels of fear and uncertainty that has a direct impact on the health and well-being of children. Citing studies and research, many commenters asserted that the chilling effect will increase hunger, food insecurity, homelessness and poverty. They added that the chilling effect will also decrease educational attainment and undermine workers' ability to acquire new skills for in-demand occupations. Many commenters stated that negative public health, social, and economic outcomes (*e.g.*, hunger, food insecurity, decreased nutrition, unmet physical and mental health needs, unimmunized individuals, disease, decreased school attendance and performance, lack of education, poverty, homelessness) collectively damage the prosperity and health of our communities, schools, and country. Several commenters said that the rule would drive up uncompensated care costs, increase use of medical emergency departments, increase healthcare costs, endanger maternal and infant health and heighten the risk of infectious disease epidemics. One commenter indicated that the rule would make child poverty worse and harm communities as well as infrastructure that serves all of us.

Housing Benefit-Related Effects

Many commenters said some individuals will leave public housing as a result of this rule and become homeless or face housing instability. Commenter stated that the rule will cause disenrollment from subsidized housing programs, which will create additional costs for local governments. Commenters stated that the chilling effect on using HCVs will cause the loss of ''wraparound services'' for residents, including case management, mental healthcare, peer support, and child care. Commenters raised concerns about the effects of housing insecurity in specific cities, including health problems and downstream economic impacts. One commenter stated that while the proposed public charge rule does not directly count benefits received by the U.S. citizen children of immigrant parents, it would still interfere with the ability of U.S. citizens to receive housing assistance, because many citizens live in mixed-status households with individuals who are subject to the public charge ground of inadmissibility.

Food and Nutrition Benefit-Related Effects

Commenters noted that disenrollment from programs like SNAP would worsen food insecurity in the United States. Some commenters provided estimates of the number of children in certain states or cities currently accessing SNAP benefits who could be affected by the rule. Several commenters stated that the proposed rule would force millions of children and families to disenroll from the SNAP program. For example, one commenter cited a study that found that 2.9 million U.S. citizen children would forego SNAP benefits as a result of the proposed public charge rule. Another commenter stated that research shows that immigrants' loss of eligibility reduced participation in the ''Food Stamp Program'' among U.S.-born children of immigrants by 50 percent and reduced the average benefits they received by 36 percent. Some commenters stated that including SNAP in the public charge determination would worsen food insecurity primarily among families with older adults, children, and people with disabilities. Many commenters opined that the inability of individuals in need to access food assistance programs like SNAP would impact health outcomes and those health outcomes would impact healthcare utilization rates and costs. A few commenters emphasized that disenrollment from programs such as SNAP and Special Supplemental Nutrition Program for Women, Infants,

---

[76] *Levy* v. *Louisiana*, 391 U.S. 68 (1968); *Clark* v. *Jeter*, 486 U.S. 456 (1988).

**Exhibit A**

and Children, (WIC) would specifically put children at risk for learning difficulties, increased emergency room visits, chronic asthma, and other diseases and would cause a steep decline in the health and well-being of pregnant women and infants.

Several commenters noted that the rule would increase the number of individuals seeking help from state and local non-profit feeding programs, which would burden local government facilities, volunteer-lead organizations and food pantries and compromise the amount and quality of nutritious food provided. Some commenters added that restricting access to nutrition benefits could make things harder in communities with high volumes of homeless residents.

Some commenters said decreased participation in SNAP or Medicaid will likely have a profound impact on WIC's ability to serve all eligible participants by introducing new barriers to access and heaping additional costs on WIC agencies. A few commenters stated that disenrollment from WIC could be as high as 20 percent. A commenter stated that enrollment in WIC dropped from 7.4 million to 6.8 million from January to May 2018, and the commenter stated that families feel forced to decide between their safety as immigrants and the food and services that their children need.

Health Benefit-Related Effects

A commenter opposed the rule, stating that DHS failed to present anything in the proposed rule that would discredit, or justify ignoring, the evidence in the 1999 Interim Field Guidance that aliens' reluctance to receive benefits for which they are eligible will have a negative impact on public health and general welfare. Commenters expressed concern that the rule would undo historic gains in health coverage and associated positive health outcomes over the past few years. Some commenters stated that the proposed rule would result in immigrants staying away from social service agencies and will negatively impact health in many ways. Another commenter noted that the rule will cause people to get sick or go hungry and indicated that ''penalizing'' immigrants who utilize benefits to support their family only worsens racial, gender, and economic inequality.

A number of commenters cited the Kaiser Family Foundation study, which provided estimates on Medicaid/ Children's Health Insurance Program (CHIP) disenrollment. The Kaiser Family Foundation estimated that if the proposed rule leads to Medicaid

disenrollment rates ranging from 15 percent to 35 percent, then between 2.1 million and 4.9 million Medicaid/CHIP enrollees living in a family with at least one noncitizen would disenroll. Many commenters said that DHS vastly underestimates the numbers of people who will disenroll from Medicaid and warned that DHS was underestimating the ''negative consequences'' in the proposed rule. Collectively, these commenters described the positive health and economic benefits associated with health coverage through programs like Medicaid. They also highlighted research findings about the dangers associated with being uninsured. They warned that decreased participation in Medicaid would lead to decreased utilization of preventative services, worse health outcomes and financial standing for families and children, increased health spending on preventable conditions, and heightened strain on the healthcare system.

Other commenters said the inclusion of Medicare Part D in the rule will cause affected individuals to disenroll or otherwise be restricted from Medicare access, resulting in negative health outcomes for individuals and communities (*e.g.,* increased uninsured rated, decreased access to prescriptions). Another commenter said that seniors who use Medicare Part D will be deterred from filling prescriptions, which could increase acute care and overall healthcare costs. Several commenters stated that the sanctions associated with the use of Medicaid and Medicare Part D benefits would result in reduced access to medical care and medications for vulnerable populations, including pregnant women, children, people with disabilities, and the elderly. A couple of commenters said the inclusion of Medicare Part D would punish immigrants for accessing healthcare services. Another commenter said the proposed rule would dissuade thousands of low-income residents in its state from seeking health coverage.

Effects on Vulnerable Populations

Many commenters said that reduced enrollment in federal assistance programs would most negatively affect vulnerable populations, including people with disabilities, the elderly, children, survivors of sexual and domestic abuse, and pregnant women. Some of these commenters suggested that the chilling effect associated with the proposed rule would cause vulnerable individuals and families to avoid accessing services, even if they are legally residing in the United States and not subject to the proposed rule.

Several commenters said the proposed rule would adversely affect immigrant women, because they will be more likely to forego healthcare and suffer worsening health outcomes. A comment described the detrimental impact of reduced Medicaid enrollment on maternal and infant health. Multiple commenters said the proposed rule would lead to negative health outcomes in general, but especially for pregnant and breastfeeding women, infants, and children. Another commenter indicated that refugees and victims of trafficking, who are exempt from public charge, would also disenroll because of fear and gave the example that in 1996 the use of TANF fell 78 percent among the refugee population despite the fact that refugees were not subject to the public charge test.

Several commenters said the health of children is inextricably linked to the health of their parents, asserting that parents who are enrolled in health insurance are more likely to have children who are insured. Some of these commenters went on to say that disenrollment from health insurance by parents will result in a loss of coverage and access to preventive healthcare for their children. A couple of commenters said that they were already seeing these consequences due to confusion over the proposed rule, including parents choosing to avoid needed health services for their children. A couple of commenters said every child in America should have access to quality, affordable healthcare.

Many commenters, citing studies and research, stressed the chilling effect of this rule will negatively affect the health and well-being of children. Other commenters cited a study that predicted the numbers of children who would disenroll from Medicaid and included figures on the numbers of children with various medical conditions in need of medical attention. Healthcare providers said uninsured children would be less likely to receive preventative care and necessary treatment, and generally would be less healthy compared to children with health insurance. Several commenters said that fewer children with disabilities would receive home and community based services, because Medicaid covers these services. Another commenter said that many children receive critical dental services through Medicaid and that a lack of access to these services can cause oral diseases that impact diet, emotional well-being, sleep, and the ability to work and study.

Several commenters voiced concern about the adverse impact on Medicaid-funded health services in schools. A few commenters provided data on the

**Exhibit A**

funding school districts receive from Medicaid for school-based health services and the numbers of students who benefit from these programs. The commenters pointed out that this funding is tied to the number of Medicaid-eligible students enrolled. Many commenters said the proposed rule's exemption of school-based health services was insufficient given the larger repercussions of the chilling effect and the likelihood that many children would be disenrolled. Commenters said that schools would need to provide healthcare and special education to children regardless of whether the school could request payment from Medicaid for such services. These commenters further stated that the school would need to use local funds to cover the cost of services that Medicaid would ordinary cover because parents would be unwilling to give consent to the school to enroll the children in Medicaid. Some commenters said special education administrators routinely engaged with families around issues related to health, wellness and school attendance, and said the proposed rule would diminish many students' chances for academic success. A commenter said that it was important for schools to create safe, supportive and inclusive communities, and that the proposed rule could undermine efforts to accomplish this goal. One commenter said Medicaid covers behavioral treatments for children and that providers often partner with schools who are not equipped to provide these targeted services. Two commenters said that the language of the proposed rule was concerning for children who receive services through the Early and Periodic Screening, Diagnostic and Treatment (EPSDT) program, which is a federally mandated benefit that provides children with the routine and preventive care services they need to grow into healthy adults.

Effects on U.S. Citizens

Several commenters said that rule would cause the greatest harm to U.S. citizen children of immigrant parents. Many commenters said that U.S. citizen children need SNAP, CHIP, Medicaid, food stamps, and other public benefits to survive if their immigrant parents cannot afford such services, and U.S. citizen children have a right to these benefits. A commenter said research demonstrates that barriers to participation in public programs like Medicaid that affect immigrants also have harmful spillover effects on U.S. citizens, because many U.S. citizens live in mixed-status households. The commenter stated that in these cases,

research shows that U.S. citizens in the household are less likely to obtain needed services such as health insurance through Medicaid due to concerns about the immigration status of other family members. A number of commenters said the rule would discourage U.S. citizens who live in mixed-status households from accessing assistance programs for which they are eligible, including Medicaid and CHIP, or deprive them of the benefits of those programs entirely.

Increased Costs to Health Care Providers, States, and Localities

Many commenters particularly emphasized that disenrollment or foregoing enrollment would be detrimental to the financial stability and economy of communities, States, local organizations, hospitals, safety net providers, foundations, and healthcare centers. Commenters offering estimates on the number of people who would disenroll from Medicaid under the proposed rule warned that the costs associated with the resultant rise in uncompensated care would be borne by health systems, hospitals, and insured patients. A commenter said that this situation presents an ethical dilemma for physicians counseling patients on treatment options, who are "already beginning to field questions from patients and are having to explain the immigration risks of using healthcare services." A commenter citing research that found a high percentage of emergency room visits could be managed in physicians' offices warned that the proposed rule would increase costly emergency room usage.

A couple of commenters said that Medicaid was the largest source of funding for community health centers and provided estimates of financial losses due to reduced Medicaid reimbursement. A commenter said that Medicaid and CHIP were the underpinning for reimbursement for pediatric subspecialists. Commenters stated that the proposed rule would impact their reimbursements and would force them to cut patient services. One of these commenters cited a study on the anticipated reductions in services, which included an estimated $17 billion reduction in hospital payments. Other commenters said that Medicaid enables many individuals to access needed behavioral health services and that a rise in uncompensated care will diminish providers' ability to render these services. A commenter said reductions in federal funding for Medicaid and Medicare resulting from decreased enrollment would force States to increase funding levels, a challenge

that could potentially lead to increased wait list times, rolling enrollment freezes, and other program cuts that would impact the broader health system.

*Response:* With respect to the rule's potential "chilling effects" or disenrollment impacts, DHS notes that (1) the rule's overriding consideration, *i.e.,* the Government's interest as set forth in PRWORA, is a sufficient basis to move forward; (2) it is difficult to predict the rule's disenrollment impacts with respect to the regulated population, although DHS has attempted to do so in the accompanying Final Regulatory Impact Analysis; and (3) it is also difficult to predict the rule's disenrollment impacts with respect to people who are not regulated by this rule, although, again, DHS has attempted to do so in the accompanying Final Regulatory Impact Analysis.

First, as discussed above, this rule is rationally related to the Government's interest, as set forth in PRWORA, to: (1) Minimize the incentive of aliens who attempt to immigrate to, or adjust status in the United States due to the availability of public benefits; and (2) Promote the self-sufficiency of aliens within the United States.[77] DHS has defined public benefits by focusing on cash assistance programs for income maintenance, and an exhaustive list of non-cash food, housing, and healthcare, designed to meet basic living needs. This definition does not include benefits related exclusively to emergency response, immunization, education, or social services, nor does it include exclusively state and local non-cash aid programs. DHS acknowledges that individuals subject to this rule may decline to enroll in, or may choose to disenroll from, public benefits for which they may be eligible under PRWORA, in order to avoid negative consequences as a result of this final rule. However, DHS has authority to take past, current, and likely future receipt of public benefits into account, even where it may ultimately result in discouraging aliens from receiving public benefits.

Although individuals may reconsider their receipt of public benefits as defined by this rule in light of future immigration consequences, this rule does not prohibit an alien from obtaining a public benefit for which he or she is eligible. DHS expects that aliens seeking lawful permanent resident status or nonimmigrant status in the United States will make purposeful and well-informed decisions commensurate with the immigration status they are seeking. But regardless,

---

[77] *See* 8 U.S.C. 1601.

**Exhibit A**

DHS declines to limit the effect of the rulemaking to avoid the possibility that individuals subject to this rule may disenroll or choose not to enroll, as self-sufficiency is the rule's ultimate aim.

Second, DHS finds it difficult to predict how this rule will affect aliens subject to the public charge ground of inadmissibility, because data limitations provide neither a precise count nor reasonable estimate of the number of aliens who are both subject to the public charge ground of inadmissibility and are eligible for public benefits in the United States. This difficulty is compounded by the fact that most applicants subject to the public charge ground of inadmissibility and therefore this rule are generally unlikely to suffer negative consequences resulting from past receipt of public benefits because they will have been residing outside of the United States and therefore, ineligible to have ever received public benefits. For example, most nonimmigrants and most immediate relative, family-sponsored, and diversity visa immigrants seek admission to the United States after issuance of a nonimmigrant or immigrant visa, as appropriate.[78] The majority of these individuals are likely to have been ineligible for public assistance in the United States, because they generally have resided abroad and are not physically present in the United States.

Aliens who are unlawfully present and nonimmigrants physically present in the United States also are generally barred from receiving federal public benefits other than emergency assistance.[79] For example, applicants for admission and adjustment of status—are

generally ineligible for SNAP benefits and therefore, would not need to disenroll from SNAP to avoid negative consequences.[80] Once admitted, lawful permanent residents are generally prohibited from receiving SNAP benefits for a period of five years.[81] Notwithstanding the inclusion of SNAP as a designated public benefit, DHS will not consider for purposes of a public charge inadmissibility determination whether applicants for admission or adjustment of status are receiving food assistance through other programs, such as exclusively state-funded programs, food banks, and emergency services, nor will DHS discourage individuals from seeking such assistance.

DHS recognizes a plausible connection between the NPRM and reduction in alien enrollment in WIC to the extent that aliens who are subject to public charge inadmissibility are also eligible to receive WIC benefits. While DHS did not list WIC as a designated public benefit under proposed 8 CFR 212.21(b), DHS also did not expressly exclude WIC from consideration as a public benefit. Indeed, DHS sought public comments on whether an alien's receipt of benefits other than those proposed to be included in this rule as public benefits should nonetheless be considered in the totality of circumstances, which understandably could have given the impression that DHS was contemplating the inclusion of WIC among other public benefits. This final rule makes clear that WIC will not be an enumerated public benefit under 8 CFR 212.21(b).

DHS also acknowledges that under the NPRM, certain lawfully present children and pregnant women[82] in certain states and the District of Columbia might have chosen to disenroll from or forego enrollment in Medicaid if they are otherwise eligible to maintain or pursue an immigration benefit and are subject to public charge inadmissibility. As noted above, however, this final rule exempts receipt of Medicaid by such persons.

Third, DHS finds it difficult to predict the rule's disenrollment impacts with respect to people who are not regulated by this rule, such as people who erroneously believe themselves to be affected. This rule does not apply to U.S. citizens and aliens exempt from

public charge inadmissibility. In the proposed rule, DHS provided an exhaustive list of immigration classifications that are exempt from the public charge ground of inadmissibility, and this final rule retains those exemptions. DHS is including in the Applicability section of this final rule Tables 3 and 4 that are similar to those included in the NPRM, which also reflect additional clarifications made in this final rule with respect to T, U, and VAWA aliens. This rule does not prohibit or otherwise discourage individuals who are not subject to the public charge inadmissibility from receiving any public benefits for which they are eligible.

Because DHS will not consider the receipt of public benefits by U.S. citizens and aliens not subject to public charge inadmissibility, the receipt of public benefits by these individuals will not be counted against or made attributable to immigrant family members who are subject to this rule. Accordingly, DHS believes that it would be unwarranted for U.S. citizens and aliens exempt from public charge inadmissibility to disenroll from a public benefit program or forego enrollment in response to this rule when such individuals are not subject to this rule. DHS will not alter this rule to account for such unwarranted choices.

DHS appreciates the potential effects of confusion regarding the rule's scope and effect, as well as the potential nexus between public benefit enrollment reduction and food insecurity, housing scarcity, public health and vaccinations, education health-based services, reimbursement to health providers, and increased costs to states and localities. In response to comments, DHS will also issue clear guidance that identifies the groups of individuals who are not subject to this rule, including, but not limited to, U.S. citizens, lawful permanent residents returning from a trip abroad who are not considered applicants for admission, and refugees.

In addition, as explained in greater detail elsewhere in this rule, DHS has made a number of changes in the final rule that may mitigate some of the concerns raised by the public regarding disenrollment impacts. For example, DHS has excluded the Medicare Part D LIS from the definition of public benefit because DHS has determined that Medicare Part D benefits, including LIS, are earned by working or being credited with 40 qualifying quarters of work and establishing eligibility for Medicare. While children are not exempt from public charge inadmissibility, DHS has decided against the inclusion of CHIP in the definition of public benefit. DHS has

---

[78] The United States admitted over 541 million nonimmigrants between Fiscal Years 2015 and 2017. See DHS, Yearbook of Immigration Statistics 2017, Table 25. Nonimmigrant Admissions by Class of Admission: Fiscal Years 2015 to 2017, available at *https://www.dhs.gov/immigration-statistics/yearbook/2017/table25*. Among immediate relative, family sponsored, and diversity visa immigrants who acquired lawful permanent resident status between Fiscal Years 2015 and 2017, sixty-seven percent were admitted to the United States and thirty-three percent adjusted their status in the United States. See DHS, Yearbook of Immigration Statistics 2017, Table 6, Persons Obtaining Lawful Permanent Resident Status by Type and Major Class of Admission: Fiscal Years 2015 to 2017, available at *https://www.dhs.gov/immigration-statistics/yearbook/2017/table6*. The 2017 Yearbook of Immigration Statistics is a compendium of tables that provide data on foreign nationals who are granted lawful permanent residence (*i.e.*, immigrants who receive a "green card"), admitted as temporary nonimmigrants, granted asylum or refugee status, or are naturalized.

[79] DHS understands that certain aliens may be eligible for state-funded cash benefits. As there are multiple state, local, and tribal programs that may provide cash benefits, DHS does not have a specific list of programs or data on the number of aliens that may be affected by the rule by virtue of their enrollment in such programs.

[80] *See* 8 U.S.C. 1611(a); 8 U.S.C 1612(a)(2)(D)(ii).
[81] *See* 8 U.S.C. 1613(a).
[82] U.S. Department of Health and Human Services, Centers for Medicaid and Medicare Services, Medicaid and CHIP Coverage of "Lawfully Residing" Children and Pregnant Women (July 1, 2010), *https://www.medicaid.gov/Federal-Policy-Guidance/downloads/SHO10006.pdf* (last visited May 7, 2019).

**Exhibit A**

excluded from the public benefits definition, public benefits received by children eligible for acquisition of citizenship, and Medicaid benefits received by aliens under the age of 21 and pregnant women during pregnancy and 60 days following the last day of pregnancy.

In sum, DHS does not believe that it is sound policy to ignore the longstanding self-sufficiency goals set forth by Congress or to admit or grant adjustment of status applications of aliens who are likely to receive public benefits designated in this rule to meet their basic living needs in an the hope that doing so might alleviate food and housing insecurity, improve public health, decrease costs to states and localities, or better guarantee health care provider reimbursements. DHS does not believe that Congress intended for DHS to administer section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), in a manner that fails to account for aliens' receipt of food, medical, and housing benefits so as to help aliens *become* self-sufficient. DHS believes that it will ultimately strengthen public safety, health, and nutrition through this rule by denying admission or adjustment of status to aliens who are not likely to be self-sufficient.

## 6. Inconsistent With American Values and Historic Commitment to Immigrants

*Comment:* Several commenters said the rule puts immigration and/or obtaining "green cards" out of reach for working class or poor immigrant families and re-shapes, penalizes, or impedes legal immigration. Many commenters said the rule goes against fundamental American values and morality, including religious values and principles of faith, upon which this nation was built. Many commenters stated the importance of diversity and immigration to United States' history and strength, and expressed that the rule would fundamentally change our nation's historic commitment to welcoming immigrants where the United States would no longer be the country that serves as a beacon for the world's dreamers and strivers. Many commenters pointed out that many immigrants here today would not have been able to enter the country under the proposed rule. Several commenters said that the United States should be receptive to those seeking a better life in the United States and should not seek to penalize them, especially to those fleeing violence. One commenter stated that the rule will force more people to live in the shadows. Two commenters expressed that the rule is scapegoating, is the result of Congress' failure to

compromise on immigration policy, and is not a solution to immigration reform. Two other commenters said that the rule is motivated by fear and greed.

*Response:* While immigration and diversity have strengthened the United States, DHS strongly disagrees that this rule is motivated by fear or greed, or is un-American or immoral. DHS does not seek to frustrate the United States' long-standing commitment to family unity, humanitarian relief, and religious liberty through this rule. DHS also disagrees that this rule re-shapes, penalizes, or impedes the overall flow of legal immigration, and disagrees that the rule puts lawful permanent resident status beyond the reach of working-class and poor immigrant families. DHS reiterates that this rule does not and cannot alter the process of obtaining immediate relative, family-sponsored, employment-based, diversity, or nonimmigrant visas, as required and permitted by law. Rather, this rule clarifies the standard by which DHS will assess whether an alien subject to section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), is inadmissible as likely to become a public charge at any time in the future. Through this final rule, DHS seeks to better ensure that applicants are self-sufficient. Even if an applicant has a low income, or belongs to a low-income family, that is only one consideration in the totality of the circumstances. Even if an applicant has household income that falls below 125 percent of FPG, DHS must consider the applicant's age, health, family status, education, and skills in determining whether the applicant is more likely than not to become a public charge at any time in the future. DHS also notes that the public charge inadmissibility ground does not apply to all applicants who are seeking a visa, admission, or adjustment of status. Congress specifically exempted certain groups, *e.g.,* refugees and asylees at the time of admission and adjustment of status, pursuant to sections 207(c)(3) and 209(c) of the Act, 8 U.S.C. 1157(c)(3), 1159(c).

## 7. Contributions to American Society and Consideration of Self-Sufficiency

*Comment:* Commenters stated that immigrants already significantly contribute to the economy, citing IRS data showing how much income tax the IRS received from immigrants and undocumented workers. Many commenters said that DHS should evaluate immigrants based on their contributions to communities in the United States and not based on their income level or financial status. Many commenters stated that the rule would

negatively affect immigrants who contribute to the American economy, including satisfying this country's need for younger workers. Several commenters stated that immigrants take jobs that Americans are not willing to perform (*e.g.,* landscaping, construction, caregivers, manufacturing) and that immigrants are hardworking and contributing members that increase the diversity of our culture and communities.

Several commenters stated that use of public benefits in a manner commensurate with their purpose should not be "punishable." They emphasized that immigrants want to work and be self-sufficient, but that immigrants access public assistance programs to help them through periods of temporary hardship on the path to self-sufficiency and successfully contributes to society just as U.S. citizens do, if not less so. They added that immigrants often need public assistance due to insecure jobs, inadequate wages, lack of employer-sponsored health insurance, the high cost of medical care and housing, inaccessibility of health insurance, and other societal barriers. Multiple commenters provided anecdotes about how they or their family member's receipt of federal assistance helped them or their children go on to thrive and become productive members of American society. Similarly, some commenters told personal anecdotes about their interactions with hardworking immigrants who rely on temporary public assistance to survive and contribute to society. A few commenters added that a large portion of U.S. born citizens would not meet the public charge standards proposed by DHS.[83]

*Response:* DHS believes that immigrants, in general, make significant contributions to American society and enhance the culture of American life and communities. DHS also recognizes that public assistance programs provide food and nutrition, housing, and healthcare, and other benefits that meet individual needs, serve the public interest, and help people to become productive members of society. The relevant inquiry that this rule aims to address, however, is whether an applicant who is subject to the public charge ground of inadmissibility is likely to become a public charge at any time in the future. DHS believes that an alien who uses certain types of public benefits for the more than 12 months

---

[83] USCIS–2010–0012–0151; USCIS–2010–0012–0264; USCIS–2010–0012–1689; USCIS–2010–0012–13212 (Form Letter Master).

**Exhibit A**

within a 36 month period of time can reasonably be said to lack self-sufficiency because her or she cannot meet his or her basic living needs. DHS has limited the type of public benefits to generally means-tested benefits that provide cash for income maintenance or meet the basic living needs of food and nutrition, housing, and healthcare. DHS believes that receipt of these public benefits alone for more than 12 months in the aggregate within any 36-month period suggests a lack of self-sufficiency, as such receipt exceeds what could reasonably be defined as a nominal or temporary need.

8. Adjudication and Processing

*Comment:* Multiple commenters stated that the rule would exacerbate USCIS and immigration court processing backlogs. Other commenters stated that the proposed rule outlined a process that was confusing at best, and would increase the number of appeals and deepen nationwide immigration processing delays. Similarly, several commenters said the rule, while not binding on the immigration courts, would further exacerbate an already record high case volume in the immigration courts. They further expressed concerns that increased evidentiary requirements, heightened scrutiny, and uncertainty as to what standard to apply, will delay adjudications, add to the backlog and result in inconsistent outcomes. One commenter said that this rule will further delay visa processing. Some commenters asserted that the proposed changes would greatly complicate the adjudication process by placing a greater burden on individuals who will be required to provide more evidence and paperwork to establish that they are not likely at any time to become a public charge and will require adjudicators to spend more time sifting through and verifying information. Several commenters stated that the rule's heightened evidentiary requirements and totality of the circumstances standard would exacerbate backlogs and cause uncertainty in adjudications.

Several commenters provided data on current processing times and estimated processing times under the proposed rule. Commenters stated that families would suffer the consequences of case processing delays such as job loss and food insecurity. Several commenters cited studies and stated that the increased processing times would hinder immigrants' ability to become or remain self-sufficient because the delays could financially impair immigrants

during the time they could not legally work.

A commenter wrote that the backlog for adjustment of status reviews was already significant, and new requirements in the proposed rules would simply exacerbate those conditions. A commenter stated that immigration officers and consular officers will have a limited amount of time to properly review documents and employment letters, and will not undertake an effective, case-by-case appraisal of applications. Similarly, supervising officers will not have enough time to review each denial thoroughly.

*Response:* As noted by commenters, this rule is not binding on the immigration courts or the Board of Immigration Appeals (BIA). It is DHS's understanding that DOJ is developing a public charge proposed rule, which would address DOJ's standard for assessing public charge inadmissibility and deportability. DHS will work with DOJ to ensure consistent application of the public charge ground of inadmissibility. DHS reiterates, however, that this final rule pertains only to public charge inadmissibility determinations made by DHS for applicants seeking admission or adjustment of status, public charge bonds, as well the conditions DHS has set for nonimmigrants applying for an extension of stay or change of status with USCIS. DHS believes that concerns about DOJ's adjudication of cases pending before immigration courts, including immigration court backlogs, are more appropriately addressed by DOJ in the context of their public charge rulemaking.

With respect to commenters' concerns that the DHS final rule would result in inconsistent outcomes, DHS disagrees with the assertion that the rule will lead to inconsistent determinations, or that it creates confusion, in a way that is at all inconsistent with congressional intent. Given the wording of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), which states that the public charge inadmissibility determination is ''in the opinion of'' the Attorney General and based on consideration of a range of circumstances particular to the alien, DHS believes that the determination is inherently subjective in nature.[84]

Because each case will be determined on its own merits, and applicants' individual circumstances will vary, it is reasonable to expect that public charge inadmissibility determinations will vary.

Additionally, while the rule may increase USCIS processing times, such is the burden of robust enforcement of the law. USCIS is committed to timely, accurate, and lawful adjudications, and plans to increase resources for affected applications as appropriate. USCIS, as a fee funded agency, may set fees to support the additional workload associated with adjudication of cases subject to section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). USCIS officers will receive training on the new standards set forth in this final rule, which will include training on how to treat public benefits received before the effective date of this rule. Any increases to adjudication time will not affect an applicant's ability to apply for an employment authorization document if otherwise eligible.[85]

Finally, with respect to comments regarding visa processing time for consular officers, DHS believes that such matters are more appropriately addressed by DOS. This rule only addresses DHS's public charge inadmissibility determinations in applications for admission or adjustment of status. However, it is DHS's understanding that DOS will update its FAM to ensure consistency with the DHS rule.

*Comment:* Many commenters addressed concerns about the adjudication of extension of stay and change of status applications, adjudication delays, and the uncertainty of being able to obtain a future status when seeking an extension of stay or change of status. Some commenters stated that the proposed rule failed to identify the potential Request for Evidence (RFE) and denial rate for applicants. Similarly, commenters stated that the proposed rule's RFE provision would cause significant uncertainty for employers, create obstacles to effective business planning, and increase costs for employers because of potential processing delays and backlogs. Many commenters raised concerns about adjudication delays for workers and other nonimmigrant categories, such as H–2A nonimmigrant workers and their employers, and other categories.

---

[84] *See Matter of Harutunian,* 14 I&N Dec. 583, 588 (Reg'l Cmm'r 1974) (''[T]he determination of whether an alien falls into that category [as likely to become a public charge] rests within the discretion of the consular officers or the Commissioner . . . Congress inserted the words 'in the opinion of' (the consul or the Attorney General) with the manifest intention of putting borderline adverse determinations beyond the reach of judicial

review.'' (citation omitted)); *Matter of Martinez-Lopez,* 10 I&N Dec. 409, 421 (Att'y Gen. 1962) (''[U]nder the statutory language the question for visa purposes seems to depend entirely on the consular officer's subjective opinion.'').

[85] 8 CFR 274a.12(c)(9).

**Exhibit A**

*Response:* DHS does not anticipate any significant processing delays in the adjudication of extension of stay and change of status requests filed by or on behalf of nonimmigrants based on the new conditions imposed in the rule relating to the past and current receipt of public benefits. This is especially so in light of that fact that DHS is removing the requirement that an officer assess the alien's likelihood of receiving public benefits in the future and that USCIS will no longer seek to request that the alien submit Form I–944. Overall, DHS is committed to ensuring that USCIS has the necessary resources to provide for the timely adjudication of immigration benefits. Additionally, USCIS believes that the number of RFEs actually issued relating to these rule changes will be relatively small as long as the employers and petitioners/beneficiaries submit properly documented petition.

### 9. Privacy Concerns

*Comment:* A commenter expressed concern about the lack of clarity on how DHS plans to use, store, access and protect the health data it receives. The commenter stated that copies of medical records provided by applicants may contain highly sensitive information unrelated to the immigration application or the likelihood of the person becoming a public charge. A few commenters expressed concern that the proposed rule's use of health insurance information and data raises data and privacy concerns, stating USCIS would accumulate an overbroad body of data, and this could violate the Health Insurance Portability and Accountability Act (HIPAA).

*Response:* DHS rejects the comment that the rule raises data and privacy concerns that could violate HIPAA. Congress mandated that DHS consider an applicant's health as part of every public charge inadmissibility determination.[86] In order to assess an alien's health in the totality of the circumstances, DHS will generally rely on medical information provided by civil surgeons on the Report of Medical Examination and Vaccination Record (Form I–693), or report of a panel physician, to assess whether the alien has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization, or that will interfere with the alien's ability to provide and care for himself or herself, to attend school, or to work, upon admission or adjustment of status. DHS will also consider whether the alien has

resources to pay for reasonably foreseeable medical costs.

In other words, DHS will be relying on existing medical reports and information submitted with the alien's applications; such information, once submitted by the alien, will become a part of the alien's administrative record. Such data is collected and maintained consistent with the Privacy Act of 1974[87] (Privacy Act) and the System of Records Notice (SORN), which identifies the purpose for which Personally Identifiable Information (PII) is collected, from whom and what type of PII is collected, how the PII is shared externally (routine uses), and how to access and correct any PII maintained by DHS.[88]

Additionally, while USCIS is generally not a covered entity bound by HIPAA,[89] USCIS complies with the Privacy Act in safeguarding information in the applicable systems of records. Such information is generally confidential and is used primarily for immigration purposes.[90] The data is collected and kept in an alien's administrative record consistent with the Privacy Act,[91] which applies to information that is maintained in a "system of records" from which information is retrieved by the name of an individual or by some identifying number, symbol, or other identifying particular assigned to the individual.

### E. General Comments Regarding Legal Authority and Statutory Provisions

#### 1. Lack of Statutory Authority/Inconsistent With Congressional Intent

*Comment:* Several commenters said DHS lacks statutory authority to promulgate the NPRM. Multiple commenters stated the rule is an over-reach, requires congressional consideration, involvement, or approval, and that only Congress can enact such specific policy changes. One commenter stated that the rule's attempt to change public charge policy in a regulation rather than in legislation is inconsistent with the Administration's stated goal to reduce the power of administrative agencies.

*Response:* The public charge inadmissibility rule is within DHS's authority and does not require congressional action. The Secretary has the authority to enforce and administer the immigration laws of the United States.[92] The Secretary is also authorized to prescribe regulations, forms, and instructions necessary to carry out the authority provided in section 103(a)(1) of the Act, 8 U.S.C. 1103(a)(1).[93] Additionally, the Secretary is charged with administering the public charge ground of inadmissibility. Therefore, this rule does not exceed or overreach the Secretary's authority, and further, does not require congressional involvement, consideration, or approval.

This public charge inadmissibility rule is a permissible implementation of the public charge inadmissibility statute enacted by Congress.[94] The public charge inadmissibility rule provides important guidance for purposes of implementing the statute, including by defining statutory terms that have never been defined by Congress in the over 100 years since the public charge inadmissibility ground first appeared in the immigration laws.

DHS believes the terms set forth in the public charge inadmissibility ground need clarification so that DHS can consistently adjudicate applications subject to public charge inadmissibility determinations in a manner that better ensures aliens are self-sufficient and not reliant on the government (*i.e.,* public benefits) for assistance to meet their basic needs.[95]

Finally, DHS disagrees that the public charge rule is inconsistent with the Administration's goals to reduce the role of executive agencies. The rule's

---

[86] *See* INA 212(a)(4), 8 U.S.C. 1182(a)(4).

[87] *See* 5 U.S.C. 552.

[88] *See generally* Notice of Modified Privacy Act System of Records, 82 FR 43556, 43564 (Sept. 18, 2017) ("DHS/USCIS safeguards records in this system according to applicable rules and policies, including all applicable DHS automated systems security and access policies. USCIS has imposed strict controls to minimize the risk of compromising the information that is being stored.").

[89] *See* 45 CFR 160.103.

[90] *See also* E.O. No. 13768, Enhancing Public Safety in the Interior of the United States 82 FR 8799, 8802 (Jan. 30, 2017). Section 14 of E.O. 13768 limits the rights and protections of the Privacy Act, subject to applicable law, to U.S. citizens and lawful permanent residents. *See also* DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Personally Identifiable Information (Apr. 25, 2017), *https://www.dhs.gov/sites/default/files/publications/PPGM%202017-01%20Signed_0.pdf* (last visited May 8, 2019). The latter memorandum sets out DHS policy requiring that decisions regarding the collection, maintenance, use, disclosure, retention, and disposal of information being held by DHS must be consistent with and take into consideration the Fair Information Practice Principles: Transparency, Individual Participation, Purpose Specification, Data Minimization, Use Limitation, Data Quality and Integrity, Security, and Accountability and Auditing.

[91] *See* 5 U.S.C. 552.

[92] INA section 103(a)(1), 8 U.S.C. 1103(a)(1).

[93] INA section 103(a)(3), 8 U.S.C. 1103(a)(3).

[94] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[95] *See* 8 U.S.C. 1601.

**Exhibit A**

aims are consistent with the Administration's goal of rigorously enforcing all grounds of inadmissibility.[96]

*Comment:* A number of commenters stated that the rule is generally inconsistent with Congress' intent and past policies. Commenters said the proposed rule is a significant, unjustified change from the current public charge policy. One commenter said that DHS should not re-interpret a term that Congress had left undefined, and said that if future administrations similarly revised policy based on their understanding of congressional intent, such policy would "change wildly with every administration," and would result in "vast inconsistencies in the law." A commenter specifically stated that the rule is an "unlawful attempt to rewrite Congress's rules" and that DHS cannot "exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law" and needs to comply with Congress's intent in creating the public charge inadmissibility ground. One commenter said the proposed rule would effectively overturn decades of congressional and State decision-making regarding alien access to public benefits with one unilateral executive action. Multiple commenters said the rule is contrary to, or inconsistent with, current law, congressional intent, and the traditional interpretation of public charge, as well as inconsistent with the history of how public charge has been understood. One commenter noted that DHS's contention that "Congress 'must have recognized that it made certain public benefits available to some aliens who are also subject to the public charge ground of inadmissibility, even though

receipt of such benefits could render the alien inadmissible as likely to become a public charge' . . . strains credulity and is simply not a reasonable interpretation of the statutes, as required by *Chevron, U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.,* 467 U.S. 837 (1984)."

*Response:* This rule is not inconsistent with Congress's intent in enacting the public charge ground of inadmissibility in IIRIRA, or in enacting PRWORA. DHS believes that the policy goals articulated in PRWORA and underlying the creation of the mandatory factors for public charge inadmissibility determinations in IIRIRA inform DHS's administrative implementation of the public charge ground of inadmissibility. When passing IIRIRA, Congress added factors to consider in public charge inadmissibility determinations in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4)), but left it to DHS and DOJ to specify how and which public benefits should be considered in a public charge inadmissibility determination.[97] In the same year, Congress passed PRWORA with the clear intent to promote self-sufficiency of those entering the United States and to ensure that public benefits do not provide an incentive for immigration to the United States.[98] This public charge inadmissibility rule, in accordance with PRWORA, disincentivizes immigrants from coming to the United States in reliance on public benefits.[99] As explained in the NPRM and this final rule, DHS agrees that this rule takes a different approach to interpreting the public charge ground of inadmissibility than the 1999 Interim Field Guidance. In the NPRM, DHS acknowledged that it was making a change and provided a detailed explanation and justification for that change. Therefore, DHS disagrees that these changes are unjustified.

With respect to commenter statements that the rule departs from the historical and traditional understanding of what it means to be a public charge, DHS disagrees. As an initial matter, this is the first time that DHS is defining in regulation an ambiguous terms that Congress itself left undefined. As

discussed in greater detail in the section addressing the regulatory definition of public charge, DHS believes that its definition is consistent with what it means to be a public charge—a lack of self-sufficiency and a need to rely on the government for support. DHS believes that its rigorous and fair regulatory framework will ensure that aliens coming to or opting to stay in the United States permanently are self-sufficient. DHS explains the basis for its interpretation of the term "public charge" more fully below.

DHS also disagrees with commenters that this rule changes federal and state decision-making regarding aliens' access to public benefits. The rule itself does not prohibit any eligible alien or citizen from accessing public benefits for which they qualify. As explained above, DHS has the legal authority to promulgate the rule and believes the rule provides needed guidance to determine whether an alien is inadmissible as likely to become a public charge.

*Comment:* One commenter stated that "[c]ontrary to DHS's interpretation, the enactment of PRWORA and section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), close in time suggests that Congress assumed that receipt of these public benefits would *not* be counted against a person in determining whether the individual is likely to become a public charge." A commenter stated that the rule is "an intentional attempt at using the specific language within PRWORA as justification for a new, more restrictive rule which would override portions of PRWORA." Other commenters stated that the proposed rule is unnecessary in light of PRWORA's restrictions on access to benefits to certain immigrants and their families. One commenter noted that in advancing the Administration's goals, the rule undercuts Congress' original intent in creating nutrition, health, and human services programs.

*Response:* The public charge inadmissibility rule is not inconsistent with PRWORA, nor does it contravene PRWORA's requirements. When passing IIRIRA in 1996, Congress added the mandatory factors to be considered in public charge inadmissibility determinations to section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), but left discretion to the relevant agencies, including DHS, to interpret those factors, including how to incorporate a consideration of public benefit receipt into the public charge inadmissibility determination. As discussed in the NPRM, consideration of receipt of public benefits was part of the public charge determination before Congress

---

[96] *See, e.g.,* Memorandum from the President to the Secretary of State, the Attorney General, and the Secretary of Homeland Security, Implementing Immediate Heightened Screening and Vetting of Applications for Visas and Other Immigration Benefits, Ensuring Enforcement of All Laws for Entry Into the United States, and Increasing Transparency Among Departments and Agencies of the Federal Government and for the American People, 82 FR 16279, 16280 (Apr. 3, 2017) ("I direct the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the heads of all other relevant executive departments and agencies (as identified by the Secretary of Homeland Security) to rigorously enforce *all existing grounds of inadmissibility* and to ensure subsequent compliance with related laws after admission. The heads of all relevant executive departments and agencies shall issue new rules, regulations, or guidance (collectively, rules), as appropriate, to enforce laws relating to such grounds of inadmissibility and subsequent compliance. To the extent that the Secretary of Homeland Security issues such new rules, the heads of all other relevant executive departments and agencies shall, as necessary and appropriate, issue new rules that conform to them." (emphasis added)).

[97] *See* Public Law 104–208, div. C, sec. 531, 110 Stat. 3009–546, 3009–674 (Sept. 30, 1996) (amending INA section 212(a)(4), 8 U.S.C. 1182(a)(4)).

[98] *See* Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601).

[99] *See Lewis* v. *Thompson,* 252 F.3d 567, 583–84 (2d Cir. 2001) ("it is reasonable for Congress to believe that some aliens would be less likely to hazard the trip to this country if they understood that they would not receive government benefits upon arrival . . . .")

**Exhibit A**

passed IIRIRA and PRWORA.[100] At the same time that Congress added mandatory factors to be considered in the public charge inadmissibility analysis, Congress passed PRWORA, establishing eligibility restrictions for aliens receiving public benefits with the clear intent to promote the self-sufficiency of those entering the United States and to ensure that public benefits do not provide an incentive for immigrants to come to the United States.[101] Congress did nothing, however, to constrain DHS (then INS) from considering the receipt of public benefits in a public charge inadmissibility determination as INS had done previously. In light of this history, DHS's proposed public charge rule is consistent with the principles of PRWORA and aligns this regulation to those principles. As such, this public charge rule is rationally related to Congress' intent to create a disincentive for immigrants to rely on public benefits if they are seeking admission to the United States,[102] and a permissible interpretation of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4).

*Comment:* One commenter stated that the rule is inconsistent with congressional intent set forth in the IIRIRA Conference Report, because that report noted that certain benefits, such as public health, nutrition, and in-kind community service programs, should not be included in the prohibition on aliens receiving public benefits.[103] Other commenters stated that when Congress expanded the definition of "public charge" in 1996, it rejected a definition of "public charge" that would have included food and healthcare assistance; thus, expanding the definition of "public charge" to include such assistance would ignore Congress' legislative intent.

*Response:* It is not clear what the commenters are referencing when referring to Congress' rejection of a definition of public charge that included food and healthcare assistance. It may be a reference to the proposed ground of

*deportability* in the version that passed the U.S. Senate that included Medicaid and food stamps (now SNAP), among other programs, in the list of public benefits that were considered one of the grounds of deportability for public charge.[104] DHS notes that the Senate-passed bill would not have amended the public charge ground of inadmissibility.[105] Additionally, the administration of the public charge inadmissibility ground under this rule is significantly different from the public charge deportability provisions considered by the Senate. The proposed ground of deportability, for instance, made aliens automatically deportable (with certain exceptions) if they received certain public benefits, including Medicaid and food stamps, for 12 months within five years of admission. This rule, by contrast, focuses on future receipt of public benefits for more than 12 months in the aggregate in a 36-month period. The prospective nature of the determination under this rule renders the definition significantly different. With respect to past receipt, this rule requires DHS to evaluate such receipt as one of several factors to be considered in the totality of circumstances. This rule therefore does not impose the provision included in the Senate-passed bill that Congress had rejected.[106]

DHS notes that the quotation from IIRIRA Conference Report[107] does not relate to public charge inadmissibility, but to PRWORA and exceptions to the prohibition on aliens accepting certain public benefits. While language in a Conference Report, especially when discussing a separate piece of legislation, is not binding, the rule is not inconsistent with the language in the report because the public benefits covered by the rule do not include those excepted under PRWORA.

*Comment:* Commenters stated that reversing the policies set forth in the 1999 Interim Field Guidance, which have allowed immigrants to rely on the

previously excluded benefits for decades, is contrary to congressional intent. One commenter stated that the rule is inconsistent with congressional intent, which "recognizes the importance of access to preventive care and nutrition benefits for all people, including immigrants."

*Response:* DHS acknowledges that this rule is a departure from the 1999 Interim Field Guidance. DHS also acknowledges that some aliens subject to this rule will need to make decisions with respect to the receipt of public benefits for which they are eligible. Ultimately, however, DHS does not believe that its inclusion of previously-excluded benefits is contrary to congressional intent, particularly with respect to access to preventive care and nutrition benefits. In fact, DHS believes it would be contrary to congressional intent to promulgate regulations that encourage individuals subject to this rule to rely on any of the designated public benefits, or to ignore their receipt of such benefits, as this would be contrary to Congress's intent in ensuring that aliens within the United States are self-sufficient and rely on their own resources and capabilities, and those of their family, sponsors, and private organizations.[108]

To the extent that commenters are concerned with the consequences of receipt of previously-excluded public benefits, DHS notes that it is not considering an alien's receipt of previously excluded public benefits in the public charge inadmissibility determination, if such receipt occurred before the effective date of this final rule and receipt of such benefits was not considered under the 1999 Interim Field Guidance.[109] However, DHS is considering an alien's receipt of public benefits that were included in the 1999 Interim Field Guidance and received prior to the effective date of the rule as a negative factor in the totality of the circumstances analysis. DHS also is not considering past receipt of public benefits by an alien if such receipt occurred while the alien was in a classification or status that was exempt from public charge inadmissibility or for which a waiver of public charge inadmissibility was received.

*Comment:* Some commenters stated that DHS only has the authority to administer individual reviews of an applicant's likelihood of becoming dependent on the government in the future, and cannot consider government expenditures on means-tested programs. One of these commenters suggested that

[100] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51158 (proposed Oct. 10, 2018) ("In *Matter of Martinez-Lopez,* the Attorney General indicated that public support or the burden of supporting the alien being cast on the public was a fundamental consideration in public charge inadmissibility determinations"); *Matter of Martinez-Lopez,* 10 I&N Dec. 409, 421 (Att'y Gen. 1964).

[101] *See* 8 U.S.C. 1601.

[102] *See Lewis* v. *Thompson,* 252 F.3d 567, 583–84 (2d Cir. 2001) ("it is reasonable for Congress to believe that some aliens would be less likely to hazard the trip to this country if they understood that they would not receive government benefits upon arrival . . . .").

[103] *See* H.R. Rep. No. 104–828, at 238 (1996) (Conf. Rep.).

[104] H.R. 2202, 104th Cong. sec. 202 (as amended and passed by Senate, May 2, 1996).

[105] *See* H.R. 2202, 104th Cong. sec. 202 (as amended and passed by Senate, May 2, 1996).

[106] *See Hamdan* v. *Rumsfeld,* 548 U.S. 557, 579–80 (2006) ("Congress' rejection of the very language that would have achieved the result the Government urges here weighs heavily against the Government's interpretation."); *see also Competitive Enterprise Inst.* v. *U.S. Dep't of Transp.,* 863 F.3d 911, 917 (DC Cir. 2017) ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." (citations and internal quotations omitted)).

[107] *See* H.R. Rep. No. 104–828, at 238 (1996) (Conf. Rep.).

[108] *See* 8 U.S.C. 1601(2)(A).

[109] *See* 8 CFR 212.22(d).

**Exhibit A**

to the extent DHS is considering aggregate costs of public benefits, it also should consider aggregate benefits. This commenter suggested that DHS abandon its effort to use public charge reform as a back door means of realizing the political goals of reducing government expenditures on means-tested programs authorized by Congress. Another commenter stated that whether or not there is a large government expenditure on a particular program is irrelevant to the assessment of whether a particular individual may become a public charge.

*Response:* DHS believes that these commenters misunderstood DHS's proposal. DHS is not taking expenditures on public benefit programs into account for purposes of any single public charge inadmissibility determination. Rather, DHS has taken into consideration expenditures on public benefit programs in order to appropriately circumscribe, for the purpose of administrative efficiency, the list of public benefits that will be considered in public charge inadmissibility determinations. Therefore, under this rule, DHS will take into consideration all of the mandatory factors in the totality of the alien's circumstances, including whether the alien received public benefits as defined in 212.21(b).

2. Additional Legal Arguments

a. Allegations That the Rule Is Arbitrary and Capricious

*Comment:* Many commenters stated that the proposed rule is arbitrary and capricious. Commenters said that the rule would be struck down under the APA. Commenters stated that DHS failed to provide a reasoned or adequate explanation for the rule, including one based on facts and data. Other commenters asserted that the public charge rule, as proposed, is unnecessary, has no legal justification, and is overbroad. Other commenters stated that the rule "address[es] a problem that doesn't even exist." One commenter stated that "DHS has not cited any evidence that the current statute is ineffective in promoting self-sufficiency or that there is some need for increasing the pool of inadmissibility. Without substantiating the need for this change, DHS is simply proposing unnecessary and harsh restrictions against immigrants." One commenter stated that current immigration policy provides sufficient protection for the nation's interests, including through existing eligibility limits for public benefits.

A few commenters stated that "DHS offered inadequate reasoning for

rejecting the 1999 Interim Field Guidance and making a massive change in the agency's interpretation of federal law." The commenter stated that DHS failed to provide an explanation as to why the interpretation used for the last 20 years is inappropriate, or to justify the particular articulation of resource and health factors contained in the rule. Many commenters stated that the rule failed to provide a reasonable or rational nexus between the data cited and the policy decisions made. One commenter claimed that the proposed rule did not offer adequate justification that access to public benefits create an incentive to migrate to the United States. The commenter also asserted that the proposal is based on inaccurate and misleading data concerning low-wage work, and thus fails to account for the societal benefit of low-wage workers who depend on benefits to supplement their income.

*Response:* DHS believes that it has provided adequate justification for the rule. DHS has interpreted its authorizing statute to clarify the criteria for when an alien would be found inadmissible as likely at any time to become a public charge, based on the consideration of statutory factors. DHS provided an explanation for why and how the proposed rule furthers congressional intent behind both the public charge inadmissibility statute and PRWORA in ensuring that aliens being admitted into and intending to settle permanently in the United States be self-sufficient and not reliant on public resources. DHS also explained the deficiencies of the current standard established by the 1999 Interim Field Guidance, including that the guidance assumed an overly permissible definition of dependence on public benefits by only including consideration of certain cash benefits, rather than a broader set of benefits, whether cash or non-cash, that similarly denote reliance on the government rather than the alien's own resources and capabilities, or the resources and capabilities of the alien's family, sponsors, and private organizations. In expanding the list of benefits to be considered, DHS explained why a broader list should be considered, and provided data to support the specific list proposed in the proposed rule. For instance, DHS referenced Federal Government data for the rates of participation in such benefit programs by non-citizens across factors related to the public charge inadmissibility determination, such as income. DHS disagrees that the data provided to support these conclusions was either inaccurate or misleading, and notes that

DHS followed accepted practices for making inferences at a 95 percent confidence level.

DHS also explained that the 1999 Interim Field Guidance failed to offer meaningful guidance for purposes of considering the mandatory factors and was therefore ineffective in guiding adjudicators in making a totality of the circumstances public charge inadmissibility determinations. In response to this deficiency, DHS proposed to establish definitive legal standards and evidentiary criteria for each of the mandatory factors as relevant to the determination of whether an alien will be more likely than not to become a public charge at any time in the future.

DHS agrees with commenters that the public charge inadmissibility rule constitutes a change in interpretation from the 1999 Interim Field Guidance. Courts have long established that agencies are not bound forever to maintain the same statutory interpretation.[110] To change its prior interpretation, an agency need not prove that the new interpretation is the best interpretation, but should acknowledge that it is making a change, provide a reasoned explanation for the change, and indicate that it believes the new interpretation to be better.[111] DHS has laid out the proposed changes from the 1999 Interim Field Guidance in great detail and provided a justification for each. DHS also explained why it believes the new rule to be a superior interpretation of the statute to the 1999 Interim Field Guidance and explained why such interpretation is desirable from a public policy perspective. Moreover, as explained above, DHS is clearly authorized to promulgate regulations interpreting the public charge inadmissibility ground. DHS carefully considered the public comments on this rule and made

---

[110] *See, e.g., Rust* v. *Sullivan,* 500 U.S. 173, 186–87 (1991) (acknowledging that changed circumstances and policy revision may serve as a valid basis for changes in agency interpretations of statutes); *Chevron, U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 863–64 (1984) ("The fact that the agency has from time to time changed its interpretation of the term 'source' does not, as respondents argue, lead us to conclude that no deference should be accorded the agency's interpretation of the statute. An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis."); *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983) (agencies "must be given ample latitude to 'adapt their rules and policies to the demands of changing circumstances' " (quoting *Permian Basin Area Rate Cases,* 390 U.S. 747, 784 (1968))).

[111] *See generally FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502 (2009).

**Exhibit A**

**41320** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

adjustments based on the input it received. Accordingly, DHS believes this rule has been issued in compliance with the APA.

DHS acknowledges that its broader definitions for public benefits and public charge may result in additional applicants being determined to inadmissible and therefore ineligible for admission or adjustment of status because they are likely at any time to become a public charge. However, as noted elsewhere in this rule, DHS believes that expanding the definitions of public benefits and public charge and any resulting denials of applications based on section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) are reasonable and are consistent with Congress' intent and will better ensure that aliens seeking to come to the United States temporarily or permanently are self-sufficient.[112]

DHS also notes that as stated previously, available data neither provides a precise count nor reasonable estimates of the number of aliens who are both subject to the public charge ground of inadmissibility and are eligible for public benefits in the United States.

b. Alternatives

*Comment:* Commenters stated that, under E.O. 13563 and other applicable authority, DHS should have considered other feasible regulatory alternatives to its proposed rule. One commenter asserted that the proposed rule failed to consider a less restrictive alternative, specifically, enforcing affidavits of support. This commenter stated that this failure makes the rule arbitrary and capricious.

*Response:* DHS disagrees with commenters who argued that the proposed rule failed to consider other alternatives to this rule, or that the proposed rule was unnecessary because DHS can simply increase enforcement of Form I–864. Under E.O. 13563, the agency must identify available alternatives. In this case, DHS did just that and explained the alternatives considered in the proposed rule, including a "no-action" alternative—continuing to administer this ground of inadmissibility under the 1999 Interim Field Guidance.[113] DHS also considered

a more expansive definition of "public benefit," that would have potentially included a range of non-cash benefit programs falling in specific categories (such as programs that provide assistance for basic needs such food and nutrition, housing, and healthcare). DHS rejected these alternatives for the reasons discussed in the proposed rule.[114]

With respect to enforcing Form I–864 as an alternative to this rule, DHS notes that this proposal is neither an adequate nor available alternative to this rule. As explained in the proposed rule, DHS's objective in promulgating this rule is to better ensure that aliens seeking admission or adjustment of status do not rely on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations. While Form I–864 serves a crucial function where required to be submitted by section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), it is not an alternative to consideration of the mandatory factors established by Congress in determining whether an alien is likely at any time to become a public charge. As discussed elsewhere in this rule, Form I–864 ensures that the sponsor is available to support the sponsored alien in the event the sponsored alien is unable or unwilling to support himself or herself and is also intended to provide a reimbursement mechanism for the government to recover from the sponsor the amount of public benefits distributed to the sponsored alien. In fact, the plain language of the statute permits sponsored aliens to sue to enforce the support obligation, if necessary.[115] In addition, Form I–864 *may* also be taken into consideration in the totality of the circumstances public charge inadmissibility determination.[116] Had Congress intended enforcement of Form I–864 to be the sole mechanism by which DHS could ensure that an alien does not become a public charge after admission or adjustment of status, Congress would have included it as the sole mandatory factor to be considered when making public charge inadmissibility determinations. Instead, Congress required DHS to consider the mandatory factors to assess whether the alien is likely at any time to become a public charge based on his or her present circumstances and relevant past

actions (*e.g.,* any past receipt of public benefits, employment history, etc.), even if a sufficient Form I–864 is submitted on behalf of an alien.[117]

In addition, if the sponsor does not provide financial support to the sponsored alien, the sponsored alien may bring a suit in the court of law.[118] In the event a sponsored alien receives public benefits, seeking reimbursement pursuant to the agreement made in Form I–864 requires deployment of relevant resources by the agency that granted the benefit and/or use of judicial resources.

Simply put, the affidavit of support is not a substitute for the assessment of the mandatory factors. For these reasons, DHS determined that simply enforcing the affidavit of support under section 213A of the Act was not an adequate legal or practical alternative to ensuring that DHS appropriately applies mandatory factors established by Congress to assess whether the alien is likely at any time in the future to become a public charge. Furthermore, considering a sufficient affidavit of support under section 213A of the Act does not, alone, achieve Congress' goal to limit the incentive to immigrate to the United States for the purpose of obtaining public benefits.

c. Retroactivity

*Comment:* A commenter stated that, despite the apparent attempt to draft the proposed rule appropriately, its plain language would allow it to be applied retroactively. The commenter stated that because not all sections specifically exempt benefits received prior to the rule's effective date, DHS could apply the rule retroactively. For example, under 8 CFR 212.22(c), an alien's receipt of SNAP within 36 months preceding application for adjustment of status would weigh heavily in favor of a finding of public charge inadmissibility, but that paragraph does not specifically limit DHS's consideration of SNAP receipt to benefits received on or after the effective date of the rule. This commenter also stated that the proposed rule violated reasonable reliance law and violates the APA.

*Response:* DHS disagrees that the rule will be applied retroactively to aliens subject to the public charge ground of inadmissibility. As stated in the **DATES** section of this final rule, this rule will become effective 60 days after it is

---

[112] *See Nat'l Cable & Telecommunications Ass'n* v. *Brand X internet Servs.,* 545 U.S. 967, 1001 (2005) ("the Commission is free within the limits of reasoned interpretation to change course if it adequately justifies the change."); *Competitive Enter. Inst.* v. *United States Dep't of Transportation,* 863 F.3d 911, 918 (D.C. Cir. 2017) ("The benefits of the regulation are also modest, but the Department reasonably concluded that they justify the costs.")

[113] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51276 (proposed Oct. 10, 2018).

[114] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51276 (proposed Oct. 10, 2018).

[115] *See* INA section 213A(a)(1)(B), 8 U.S.C. 1183a(a)(1)(B); 71 FR 35732, 35743 (Jun. 21, 2006).

[116] *See* INA section 212(a)(4)(B)(ii), 8 U.S.C. 1182(a)(4)(B)(ii).

[117] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[118] *See, e.g., Wenfang Lieu* v. *Mund,* 686 F.3d 418 (7th Cir. 2012) (the sponsored immigrant is a third party beneficiary whose rights exist apart from whatever rights she might or might not have under Wisconsin divorce law, and she has no legal obligation to mitigate damages).

**Exhibit A**

published in the **Federal Register**, and the rule will be applied to applications and petitions postmarked (or if applicable, electronically submitted) on or after that date. Thus, for instance, the public charge inadmissibility determination factors and criteria will apply only to applications that are postmarked (or if applicable, electronically submitted) on or after that date; applications that were postmarked before the effective date and accepted by USCIS pursuant to 8 CFR 103.2(a)(1) and (a)(2), and are pending on the effective date will be adjudicated under the criteria set forth in the 1999 Interim Field Guidance. For the purposes of determining whether a case was postmarked before the effective date of the rule, DHS will consider the postmark date for the application or petition currently before USCIS, not the postmark date for any previously-filed application or petition that USCIS rejected pursuant to 8 CFR 103.2(a)(7)(ii).

Similarly, the condition related to public benefit receipt in the context of extensions of stay and change of status will only apply to petitions and applications postmarked (or if applicable, submitted electronically) on or after the effective date of this rule.

In addition, and as stated in this final rule, DHS will not apply the new expanded definition of public benefit to benefits received before the effective date of this final rule. Therefore, any benefits received before that date will only be considered to the extent they would have been covered by the 1999 Interim Field Guidance. In the commenter's example, SNAP benefits received by an alien prior to the effective date of the final rule would not be considered as part of the alien's public charge inadmissibility determination, because SNAP was not considered in public charge inadmissibility determinations under the 1999 Interim Field Guidance. By contrast, as explained in more detail later in this preamble, for applications postmarked (or if applicable, electronically submitted) on or after the effective date of this final rule, an applicant's receipt of cash assistance for income maintenance prior to the effective date of this rule will be treated as a negative factor in the totality of the circumstances. However, regardless of the length of time such benefits were received before the effective date of this rule, for the purposes of public charge inadmissibility determinations made for applications postmarked (or if applicable, submitted electronically) on or after the effective date, DHS will not

treat the receipt of these benefits as a heavily weighted negative factor.

*Comment:* One commenter noted that the rule punishes noncitizens for past conduct and therefore violates the *ex post facto* clause and is unconstitutionally retroactive.''

*Response:* DHS rejects the comment that the public charge inadmissibility rule violates that *ex post facto* clause of the U.S. Constitution. The *ex post facto* clause prohibits changes to the legal consequences (or status) of actions that were committed before the enactment of the law.[119] The *ex post facto* clause would generally only apply to laws that impose criminal penalties.[120] Although inadmissibility determinations are not criminal penalties, and so are generally not subject to the *ex post facto* clause,[121] this rule, in any event, is not impermissibly retroactive in application, as noted in the immediately preceding response.

d. Due Process/Vagueness and Equal Protection

*Comment:* Commenters stated that the public charge inadmissibility determination called for by the proposed rule is too open-ended and unpredictable. Some commenters pointed to likely confusion about which benefits will be included or excluded for purposes of a public charge determination. These commenters further stated that failing to define the term ''likely,'' as that term is used in the phrase ''likely to become a public charge,'' would grant too much discretion to adjudicators in an complex weighing system that would lead to arbitrary outcomes. Another commenter recommended that the determination system be scored. Another commenter stated that that the vagueness of the proposed framework would lead to inconsistent and unfair determinations.

*Response:* DHS disagrees that the rule is vague or unpredictable. Some commenters who alleged that the rule is

vague did not provide specific details to identify which provisions of the rule they were referring and DHS is therefore unable to specifically address those claims other than stating general disagreement. In the NPRM, DHS provided specific examples of various concepts and laid out in great detail the applicability of the rule to different classes of aliens, and clearly identified the classes of aliens that would be exempt from the rule. DHS also provided an exhaustive list of the additional non-cash public benefits that would be considered, including receipt thresholds for all designated benefits. DHS explained that it would make public charge inadmissibility determinations in the totality of the circumstances, and following consideration of the minimum statutory factors. The ''vagueness'' associated with a totality of the circumstances determination is to a significant extent a byproduct of the statute's requirement that DHS consider a range of minimum factors as part of the public charge inadmissibility determination. DHS recognizes that the statutory multi-factor framework will likely result in more inadmissibility determinations when combined with the standard in this rule (as compared to the 1999 Interim Field Guidance), but fundamentally, as it relates to vagueness, the commenters' quarrel is with Congress, not with DHS.

In any case, in response to public comments, the list of public benefits has been revised in this final rule, and the threshold has been simplified such that there is only a single, objective duration-based threshold applicable to the receipt of all included public benefits. And DHS has determined, consistent with public commenter suggestions, that it will not consider the receipt of any benefits not listed in the rule, therefore removing potential uncertainty. In addition, DHS remains committed to providing clear guidance to ensure that there is adequate knowledge and understanding among the regulated public regarding which benefits will be considered and when, as well as to ensure that aliens understand whether they are or are not subject to the public charge ground of inadmissibility.

DHS has also further defined ''likely'' as more likely than not. While DHS agrees with commenters that the regulation must be sufficiently clear so that the regulated public can comply with it, DHS notes that some adjudicator discretion must exist where determinations are based on a totality of the circumstances examination that is highly fact-specific. Congress specifically called for a fact-specific,

---

[119] U .S. Const. art. I, sec. 9, cl. 3; *see Calder* v. *Bull,* 3 Dall. 386, 390–391, 1 L.Ed. 648 (1798) (opinion of Chase, J.).

[120] *See, e.g., Rhines* v. *Young,* 899 F.3d 482, 495 (8th Cir. 2018) (''A criminal or penal law has a prohibited *ex post facto* effect if it is ''retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it.'') (citations omitted); *cert. denied,* No. 18–8030, 2019 WL 826426 (U.S. Apr. 15, 2019); *Bremer* v. *Johnson,* 834 F.3d 925, 932 (8th Cir. 2016);

[121] *Galvan* v. *Press,* 347 U.S. 522, 531 (1954) (Frankfurter, J.) (''[W]hatever might have been said at an earlier date for applying the *ex post facto* Clause, it has been the unbroken rule of this Court that it has no application to deportation.''); *Alvarado–Fonseca* v. *Holder,* 631 F.3d 385, 391–92 (7th Cir. 2011); *Montenegro* v. *Ashcroft,* 355 F.3d 1035, 1037 (7th Cir. 2004).

**Exhibit A**

discretionary determination in the public charge context.[122] As is the case with most regulations, over the course of adjudications, new fact patterns arise that may require additional guidance to adjudicators; however this does not make the regulation impermissibly vague.[123]

DHS does not believe that a scoring system would be appropriate for this analysis, namely because of the wide variations between individual circumstances of aliens. Both the proposed rule and this final rule adequately explain how the criteria are to be applied and what evidence should be considered. USCIS will provide training to its adjudicators and will engage with the regulated public to the extent necessary to foster a better understanding and compliance with the regulation.

*Comment:* One commenter stated that although the Federal Government has great leeway to enact immigration laws, its actions are still subject to review for constitutionality. The commenter stated that proposed rule restricts the rights of non-citizens to access crucial healthcare benefits, housing vouchers, and other government benefits by using "heavily weighted factors," such as English proficiency, and "exorbitant" bond measures, and that the proposed rule would disproportionately impact women and people of color. The commenter stated that the Supreme Court has struck down state laws that restricted public benefits based on alienage and noted that in one such case, the Court reviewed the law under intermediate scrutiny. The commenter suggested that this rule could similarly be subject to intermediate scrutiny. The commenter stated that even if a heightened scrutiny argument loses, the rule would fail rational basis scrutiny because it is not rationally related to a legitimate public interest since "there is no legitimate government interest furthered by the proposed rule, as 212(a)(4) [of the Act, 8 U.S.C. 1182(a)(4)] is already in place and effective." The commenter stated that the proposed measures will disparately impact female immigrants and immigrants of color and is not rationally related to a legitimate public interest. The commenter indicated that the "legitimate public interest (which in and of itself is contestable) is already served by the current provision." Another commenter similarly stated that the rule would have a disparate impact on immigrants of color and women. The commenter cited to a Manatt, Phelps & Phillips independent analysis of the U.S. Census Bureau's (Census Bureau) American Community Survey Data 5-year 2012–2016 data. The commenter stated that the application of the public charge rule would be unequally distributed along racial lines. According to the commenter, the effects of the proposed rule are expected to have a disparate impact on communities of color, affecting as many as 18.3 million members (or one-third) of the Hispanic and Latino community in the United States. The commenter stated that the DHS's proposed "250-percent-FPG threshold" would have disproportionate effects based on national origin and ethnicity, blocking 71 percent of applicants from Mexico and Central America, 69 percent from Africa, and 52 percent from Asia—but only 36 percent from Europe, Canada and Oceania. The commenter stated that "because the proposed rule facially implicates national origin, strict scrutiny applies."

*Response:* DHS disagrees that this rule would fail any level of scrutiny (*i.e.,* strict, intermediate, or rational basis scrutiny).[124] As discussed previously, DHS is not changing rules governing which aliens may apply for or receive public benefits, nor is this rule altering any eligibility criteria for such benefits. Instead, DHS is exercising its authority to administer the public charge ground of inadmissibility in a way that better ensures that aliens being admitted into the United States, or seeking to remain here permanently, are self-sufficient and not reliant on the government for support. While this rule may influence an alien's decision to apply for, or disenroll from, public benefits, it does not constitute a restriction on accessing such benefits. However, even if the rule did place additional restrictions on aliens, the Supreme Court, even prior to PRWORA, determined that the equal protection analysis of Federal action that differentiates between citizens and aliens in the immigration context is different from the equal protection analysis of State actions that differentiate between citizens of another state and citizens of another country. In *Mathews* v. *Diaz,* the Court specifically distinguished between state statutes that deny welfare benefits to resident aliens, or aliens not meeting duration residence requirements, from similar actions taken by the political branches of the Federal Government that are specifically empowered to regulate the conditions of entry and residence of aliens. 426 U.S. 67, 85–86 (1976). In that case, the court found that the enforcement of a 5-year residency requirement against aliens applying for a supplemental medical insurance program did not deprive the aliens of life, liberty or property without due process of law under the Due Process Clause of the Fifth Amendment.[125]

DHS agrees that if this rule were regulating eligibility for public benefits outside of the immigration context, heightened scrutiny might apply.[126] As explained above, however, the rule places no obstacles to aliens' eligibility for public benefits. Furthermore, the rule is not facially discriminatory and DHS does not intend a discriminatory effect based on race, gender, or any other protected ground.

Finally, the commenter misstated the proposed rule's income threshold as 250 percent of the FPG. While USCIS will generally consider 250 percent of the FPG to be a heavily weighted positive factor in the totality of the

---

[122] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4) ("Any alien, who *in the opinion* of the consular officer at the time of application for a visa, or *in the opinion* of the Attorney General at the time of the application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible.") (emphasis added).

[123] *Cf., e.g., Freeman United Coal Mining Co.* v. *Fed. Mine Safety & Health Review Comm'n,* 108 F.3d 358, 362 (D.C. Cir. 1997) ("Regulations generally satisfy due process so long as they are sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require.").

[124] *See Korab* v. *Fink,* 797 F.3d 572, 577–79 (9th Cir. 2014) ("[F]ederal statutes regulating alien classifications are subject to the easier-to-satisfy rational-basis review . . . Although aliens are protected by the Due Process and Equal Protection Clauses, this protection does not prevent Congress from creating legitimate distinctions either between citizens and aliens or among categories of aliens and allocating benefits on that basis.") (citation omitted); *Lewis* v. *Thompson,* 252 F.3d 567, 570 (2d Cir. 2001) (describing the level of scrutiny owed under the constitution to federal regulation of immigration and naturalization as "highly deferential") (citing *Lake* v. *Reno,* 226 F.3d 141, 148 (2d Cir. 2000).) Generally, laws and regulations that neither involve fundamental rights nor include suspect classifications are reviewed under rational basis scrutiny, under which the person challenging the law must show that the government has no legitimate interest in the law or policy or that there is no rational link between the interest and the challenge law or regulation. *Heller* v. *Doe by Doe,* 509 U.S. 312, 319 (1993).

[125] "The fact that all persons, aliens and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship . . ." 426 U.S. at 79–80.

[126] *See, e.g., Personal Administrator of Mass* v. *Feeney,* 442 U.S. 256, 272 (1996) (Classifying persons according to their race is more likely to reflect racial prejudice than legitimate public concerns.), *McLaughlin* v. *Florida,* 379 U.S. 184, 196 (1964) ("Such classifications are subject to the most exacting scrutiny; to pass constitutional muster, they must be justified by a compelling governmental interest and must be 'necessary . . . to the accomplishment' of their legitimate purpose.'"); *United States* v. *Virginia,* 518 U.S. 515 (1996) (ruling that the Virginia Military Institute's gender-based admission policy violated the Equal Protection Clause).

**Exhibit A**

circumstances, the minimum income threshold to be considered a positive factor in the totality of the circumstances is generally 125 percent of the FPG. More specifically, if the alien has income below that level, it will generally be a heavily weighed negative factor in the totality of the circumstances.

As set forth in NPRM,[127] DHS's public charge rule is rationally related to the government's interest in ensuring that aliens entering the United States or seeking to settle here permanently are not likely to become public charges, consistent with the requirements of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). The regulation minimizes the incentive of aliens to immigrate to the United States because of the availability of public benefits and promotes the self-sufficiency of aliens within the United States.[128] Finally, DHS does not understand commenters' statements about the "unequal application" of the public charge inadmissibility rule and disagrees that the public charge inadmissibility rule would be unequally applied to different groups of aliens along the lines of race or gender.

*Comment:* Several commenters objected that the rule violates due process and equal protection rights. One commenter said that aliens seeking adjustment of status should be granted due process rights closer to those of United States citizens, and this rule should be subject to stricter standards for judicial review to "ensure that more immigrants are protected from the detrimental effects of this proposal." The commenter stated that such a review "would require that Congress ha[ve] a dual review process." Another commenter stated that the DHS rule could be challenged on the grounds that it affords nonimmigrants inside the United States less due process rights than they should be afforded. The commenter stated that USCIS should construct an appeals process that satisfies due process and gives applicants the opportunity to present evidence of admissibility. The commenter also stated that a person should not have "their status as a resident revoked" prior to a full review of the case.

*Response:* DHS disagrees with comments asserting that this rule violates aliens' due process or equal protection rights. Although aliens present in the United States are protected by the due process and equal

protections clauses, federal immigration laws and their implementing regulations generally enjoy a highly deferential standard of review, even where the federal laws and regulations treat aliens differently from citizens and create distinctions between different classes of aliens (*i.e.,* lawful permanent residents vs. nonpermanent residents).[129] DHS's public charge inadmissibility rule falls within the agency's broad authority, granted by Congress, to regulate immigration matters, and therefore, if challenged on equal protection grounds as discriminating based on alienage, would be subject to rational basis scrutiny.[130] The public charge inadmissibility rule is indeed rationally related to the government's interest, as set forth in IIRIRA and PRWORA, to determine which aliens are inadmissible on public charge grounds in accordance with section 212(a)(4) of the INA, 8 U.S.C. 1182(a)(4), minimize the incentive of aliens to immigrate to the United States due to the availability of public benefits, and promote the self-sufficiency of aliens within the United States.[131] This is true even if this rule results in a disincentive for aliens to avail themselves of public benefits for which they are eligible under PRWORA.[132] Moreover, although the rule could impact an alien's decision to access public benefits for which he or she is eligible under PRWORA and state and local laws, it does not directly regulate the right to apply for or receive public benefits, and the Due Process Clause would not be implicated by whether, due to the rule, an alien chooses not to access benefits for which he or she qualifies.[133] The Due Process

Clause of the Fifth Amendment "has never been supposed to have any bearing upon, or to inhibit laws that indirectly work harm and loss to individuals."[134] Similarly, and as discussed in greater detail above, any potential chilling impacts of the rule would not violate the equal protection guarantee of the Fifth Amendment's Due Process Clause[135] because this rule is not facially discriminatory nor does DHS intend a discriminatory effect.[136]

The standards of judicial review are established by statute and judicial interpretation[137] and are therefore beyond the scope of this rulemaking. The proposal to institute a review by Congress is also beyond the scope of this rulemaking because only the legislative branch can create a role for itself.[138] DHS rejects the proposal to create an appellate process to allow applicants to present evidence of their admissibility since there is an existing process to present such evidence. Although not specific to this rule, USCIS will notify applicants of deficiencies in their applications with respect to any ineligibility including public charge in accordance with the principles outlined in 8 CFR 103.2 and USCIS policy in regard to notices, RFEs, or notices of intent to deny (NOIDs), and denials.[139] Likewise, DHS will not accept the proposal to decline to revoke a lawful permanent resident's status pending any appeals of a public charge

---

[127] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51122–23 (proposed Oct. 10, 2018).

[128] *See* 8 U.S.C. 1601.

[129] *See Korab* v. *Fink,* 797 F.3d 572, 579 (9th Cir. 2014); *Lewis* v. *Thompson,* 252 F.3d 567, 570 (2d Cir. 2001) (citing *Lake* v. *Reno,* 226 F.3d 141, 148 (2d Cir. 2000)); *Brooks* v. *Ashcroft,* 283 F.3d 1268, 1274 (11th Cir. 2002) ("Classifications that distinguish among groups of aliens are subject to rational basis review, and will be found valid if not arbitrary or unreasonable").

[130] *See Mathews* v. *Diaz,* 426 U.S. 67, 81 n.17 (1976).

[131] *See* 8 U.S.C. 1601.

[132] *See Lewis* v. *Thompson,* 252 F.3d 567, 583–84 (2d Cir. 2001) ("[I]t is reasonable for Congress to believe that some aliens would be less likely to hazard the trip to this country if they understood that they would not receive government benefits upon arrival . . . Although it seems likely that many alien women will illegally immigrate to obtain the benefit of citizenship for their children, undeterred by ineligibility for prenatal care in the event of pregnancy, Congress is entitled to suppose that the denial of care will deter some of them. In the realm of immigration, where congressional discretion is extremely broad, this supposition, even if dubious, satisfies rational basis review.") (citations omitted).

[133] *In O'Bannon* v. *Town Court Nursing Ctr.,* 447 U.S. 773, 789 (1980), the Supreme Court concluded, consistent with long-standing precedent that "the due process provision of the Fifth Amendment does

not apply to the indirect adverse effects of governmental action."

[134] *O'Bannon* v. *Town Court Nursing Ctr.,* 447 U.S. 773, 789 (1980) (quoting *The Legal Tender Cases,* 79 U.S. 457, 551 (1870)).

[135] Although the Equal Protection Clause of the Fourteenth Amendment does not apply to the Federal government, the Supreme Court in *Bolling* v. *Sharpe,* 347 U.S.497, 500 (1954), held that while "'equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law,' . . . discrimination may be so unjustifiable as to be violative of due process." In the case of racial discrimination in DC public schools, the Court found that no lesser Constitutional protections apply to the Federal government through the application of the Due Process Clause in the Fifth Amendment than by application of the Equal Protection Clause of the Fourteenth Amendment.

[136] *See Pers. Adm'r* v. *Feeney,* 442 U.S. 256, 272 (1979).

[137] *See, e.g.,* INA section 242(b)(4), 8 U.S.C. 1252(b)(4) (providing the scope and standard of judicial review of removal orders); *McNary* v. *Haitian Refugee Center, Inc.,* 498 U.S. 479, 493 (1991) (discussing the appropriate standard of review for challenges to the Special Agricultural Worker program).

[138] *See generally Trans Ohio Sav. Bank* v. *Director, Office of Thrift Supervision,* 967 F.2d 598, 620 (DC Cir. 1992) (agency promise to bind Congress would be *ultra vires* and unenforceable).

[139] DHS notes that the failure to submit a completed Form I–944 and Form I–864 with the Form I–485, when required, may result in a rejection or a denial of the Form I–485 without a prior RFE or NOID. *See* 8 CFR 103.2(a)(7), (b)(8)(ii).

**Exhibit A**

finding. Revocation of existing status is generally distinct from the process of adjudicating applications for immigration benefits. For example, a person maintaining a valid nonimmigrant status whose adjustment of status application is denied because he or she is inadmissible on public charge grounds would not lose his or her nonimmigrant status based on the denial of adjustment.[140] To the degree the commenter's concerns relate to the loss of lawful permanent resident status, such status generally terminates upon the entry of a final order of removal [141] unless the alien voluntarily abandons lawful permanent resident status.

e. Coordination With Other Federal Agencies

*Comment:* Several commenters said the proposed definition of public charge conflicts with the definition of public charge used by DOS, which focuses on an alien's primary dependence on public benefits. Other commenters noted that the inconsistency with DOS's definition of public charge would lead to delays and denials of Application for Provisional Unlawful Presence Waiver (Form I–601A).

*Response:* DHS is working and will continue to work with DOS to ensure consistent application of the public charge ground of inadmissibility. As noted in the NPRM, DHS expects that DOS will make any necessary amendments to the FAM in order to harmonize its approach to public charge inadmissibility determinations with the approach taken in this final rule.[142] As previously, indicated, DHS does not believe that the rule would unduly increase the delays or denials of provisional unlawful presence waivers filed on Form I–601A, as such waivers are unrelated to the public charge ground of inadmissibility.[143]

*Comment:* Several commenters stated that in the absence of DOJ regulations on public charge inadmissibility, U.S. Immigration and Customs Enforcement (ICE) attorneys will be compelled to

argue in removal proceedings that DHS's public charge inadmissibility standard should be applied. And because there would not be binding precedent on DHS's interpretation of public charge inadmissibility, some immigration judges would adopt DHS's rule while others would not. This would result in inconsistent determinations and burden the immigration court system.

*Response:* DOJ has acknowledged ongoing work on a proposed public charge rule, which would propose to change how adjudicators within the Executive Office for Immigration Review (EOIR) determine whether an alien is inadmissible to the United States as a public charge consistent with section 212(a)(4) of the INA.[144] According to DOJ, the rule is intended to make certain revisions to more closely conform EOIR's regulations with the DHS public charge inadmissibility rule. DHS will work with DOJ to ensure consistent application of the public charge ground of inadmissibility. DHS reiterates, however, that this final rule pertains only to public charge inadmissibility determinations made by DHS for applicants seeking admission or adjustment of status, public charge bonds, as well the conditions DHS has set for applicants applying for an extension of stay or change of status before DHS.

If USCIS denies an adjustment of status application after determining that the applicant is likely at any time to become a public charge at any time, and the alien is not lawfully present in the United States, USCIS will generally issue a Notice to Appear (NTA),[145] which may charge the alien as inadmissible under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), if the alien is an alien is an arriving alien or an alien present in the United States without having been admitted or paroled. Under section 240(c)(2)(A) of the Act, 8 U.S.C. 1229a(c)(2)(A), an applicant for admission in removal proceedings has the burden of establishing that he or she is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 212 of the Act, 8 U.S.C. 1182. The alien may renew the adjustment of status application before an immigration judge unless the immigration judge does not

have jurisdiction over the adjustment application.[146]

Additionally, when encountering an alien, who is an arriving alien or an alien present in the United State without admission or parole, ICE will use the criteria set forth in this rule with respect to determining whether to charge such an alien under section 212(a)(4), 8 U.S.C. 1182(a)(4).

DHS notes that it has no general authority over the EOIR inadmissibility determinations in removal proceedings and believes such matters are more appropriately addressed by DOJ in the context of its public charge rulemaking.

f. International Law and Related Issues

*Comment:* One commenter suggested, but did not explicitly state, that the rule would violate international refugee law. Another commenter suggested that the rule would discriminate against individuals waiting for their asylum applications to be adjudicated. Other commenters noted that the rule would be a violation of, or is inconsistent with, various international agreements such as the Universal Declaration of Human Rights (UDHR), the 1959 Declaration of the Rights of the Child, the International Convention on the Elimination of All Forms of Racial Discrimination (CERD), and the International Covenant on Civil and Political Rights (ICCPR). A commenter stated that treaties that have been ratified ''should be considered as being Constitutional Amendments under the Supremacy Clause.''

*Response:* DHS rejects the comment that this rule would violate the United States' international treaty obligations relating to refugees or that the rule discriminates against individuals in the United States who have asylum applications pending on the effective date of this rule. As noted in the NPRM, this rule does not apply to asylum applicants, those granted asylum (asylees), and those seeking to adjust their status to that of a lawful permanent resident based on their asylee or refugee status. Applicants for asylum are not required to demonstrate admissibility as part of demonstrating their eligibility for asylum.[147] Additionally, while asylees who travel outside of the United States are examined for admissibility upon returning to the United States with a refugee travel document and are admitted as such if admissible, asylees are not subject to the public charge inadmissibility ground when seeking readmission as an asylee.[148] Similarly,

---

[140] It is possible that the basis for the denial could also make the alien deportable under the different requirements for deportability at section 237(a)(5) of the Act, 8 U.S.C. 1227(a)(5). Aliens placed in removal will be afforded al due process rights accorded to aliens in removal proceedings. *See* INA section 240(b)(4), 8 U.S.C. 1229a(b)(4).

[141] *See* 8 CFR 1.2, definition of ''lawfully admitted for permanent residence.''

[142] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51135 (proposed Oct. 10, 2018).

[143] Form I–601A is filed by aliens inside the United States to request a provisional waiver of the unlawful presence grounds of inadmissibility section 212 (a)(9)(B) of the Act, 8 U.S.C. 1182(a)(9)(B), before departing the United States to appear at a U.S. Embassy or Consulate for an immigrant visa interview.

[144] *See* Unified Agenda of Regulatory and Deregulatory Actions, DOJ, Inadmissibility on Public Charge Grounds, RIN 1125 AA74 (Spring 2019), *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201904&RIN=1125–AA84* (last visited June 11, 2019).

[145] INA sections 103(a) and 239, 8 U.S.C. 1103(a) and 1229; 8 CFR 2.1 and 239.1.

[146] 8 CFR 245.2(a)(5)(ii) and 1245.2(a)(1).

[147] *See* INA section 208, 8 U.S.C. 1158.

[148] *See* 8 CFR 223.3(d)(2).

**Exhibit A**

asylees and refugees who are applying for adjustment of status are not subject to the public charge inadmissibility ground under section 209(c) of the Act, 8 U.S.C. 1159(c).[149] Because the rule does not apply to or otherwise impact asylum applicants, asylees, and applicants for asylee or refugee adjustment, the rule does not violate international treaty obligations relating to refugees, to the extent those obligations are applicable.[150]

DHS also disagrees that the rule would violate international treaties such as the CERD[151] and the ICCPR[152] or that it would be inconsistent with non-binding instruments such as the UDHR[153] and the 1959 Declaration of the Rights of the Child.[154] First, the rule is not inconsistent with those treaties and instruments. As discussed above, the rule does not prevent anyone subject to the public charge ground of inadmissibility from applying for and receiving any benefits for which they are eligible, including benefits related to food and nutrition, housing, and healthcare, and basic social services. Additionally, to the extent that this rule does have a negative effect on those from particular groups, it is not DHS's intent, in issuing this final rule, to target aliens from certain countries or of a particular race. Instead, DHS's intent in codifying the public charge inadmissibility rule is to better ensure the self-sufficiency of aliens who seek to come to or remain in the United States.

Second, the two referenced declarations do not bind DHS as a matter of U.S. domestic law. As the Supreme Court has held, the UDHR "does not of its own force impose obligations as a matter of international law." [155] The Declaration of the Rights of the Child, like the UDHR is a U.N. Declaration rather than a binding treaty. Moreover, the CERD and the ICCPR, were both ratified on the express understanding that they are not self-executing and therefore not create

judicially enforceable obligations.[156] DHS disagrees with the comment that ratified treaties should be considered as constitutional amendments as this is legally inaccurate.[157]

g. Contract Law

*Comment:* A commenter said that it would contradict principles of contract law to hold a child responsible for the public benefits they receive before the age of majority.

*Response:* DHS rejects the suggestion that DHS would be precluded, under contract law principles, from considering the receipt of public benefits in a public charge inadmissibility determination by an alien under the age of 18. With the exception of the affidavit of support statute, section 213A of the Act, 8 U.S.C. 1183a, which requires a sponsor to be at least 18 years of age, decisions as to the admissibility of aliens subject to section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), are questions regarding the burden the alien will place on the government in the future, and does not implicate contract law. While individuals under the age of 18 generally lack the capacity under most States' laws to enter into a contract, such considerations are inapposite to this rulemaking. Aliens under the age of 18 are subject to the provisions of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), except where Congress has specifically provided an exemption of public charge inadmissibility, or otherwise provided the possibility of a waiver of the public charge inadmissibility ground. By its

very nature, the public charge ground of inadmissibility frequently affects people who lack the capacity or competence to enter into contracts. Contract law does not limit DHS's ability to enforce the public charge ground of inadmissibility.

However, as noted elsewhere in this rule, DHS has decided, as a matter of policy, to exclude consideration of the receipt of Medicaid by aliens under the age of 21, as well as services or benefits funded by Medicaid but provided under the IDEA or school-based benefits provided to children who are at or below the oldest age of children eligible for secondary education as determined under State law. DHS also has excluded consideration of the receipt of all public benefits received by children of U.S. citizens whose lawful admission for permanent residence and subsequent residence in the legal and physical custody of their U.S. citizen parent(s) will result automatically in the child's acquisition of citizenship; or whose lawful admission for permanent residence will result automatically in the child's acquisition of citizenship as described in the rule.

*F. Applicability of the Public Charge Ground of Inadmissibility, and the Public Benefit Condition to Extension of Stay and Change of Status*

1. Applicability of the Public Charge Ground of Inadmissibility Generally

*Comment:* A commenter opposed the application of the rule to applicants for admission because, according to the commenter, it is impossible for DHS to make a prediction about future circumstances based upon the totality of the alien's circumstances at the time of the application for admission; the commenter said that life circumstances cannot be predicted. Many commenters said the proposed rule would directly affect a large number of individuals (some commenters cited 1.1 million individuals seeking to obtain lawful permanent resident status), half of whom already reside in the United States and would be subject to a public charge inadmissibility determination. Another commenter stated that the proposed rule would dramatically alter which immigrants are permitted to enter and stay in the United States. This commenter stated that quantitative and qualitative data, including the DHS Yearbook of Immigration Statistics, show that increases in restrictions to the legal means to immigration over the last hundred years are responsible for increases in unauthorized border crossings, visa overstays, and increases in an international network of private and public profiteers. Another

---

[149] "The provisions of paragraphs (4), (5), and (7)(A) of section 212(a) shall not be applicable to any alien seeking adjustment of status under this section . . . ."

[150] Asylum is a discretionary benefit implementing Article 34 of the 1951 Convention Relating to the Status of Refugees (as incorporated in the 1967 Protocol Relating to the Status of Refugees), which is "precatory," *INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 441 (1987), and the 1967 Protocol is not self-executing, *e.g., Cazun* v. *U.S. Att'y Gen.,* 856 F.3d 249, 257 n.16 (3d Cir. 2017).

[151] 660 U.N.T.S. 195, U.N. Doc. A/6014 (1965).

[152] Dec. 16, 1966, 999 U.N.T.S. 171.

[153] G.A. Res. 217A (III), U.N. Doc. A/810 (1948).

[154] G.A. Res. 1386 (XIV), U.N. Doc. A/4354 (1959).

[155] *Sosa* v. *Alvarez-Machain,* 542 U.S. 692, 734–35 (2004).

[156] U.S. Reservations, Declarations, and Understandings, International Convention on the Elimination of All Forms of Racial Discrimination, 140 Cong. Rec. S7634–02 (1994) ("[T]he United States declares that the provisions of the Convention are not self-executing."); U.S. Reservations, Declarations and Understandings, International Covenant on Civil and Political Rights, 138 Cong. Rec. 8071 (1992) ("[T]he United States declares that the provisions of Articles 1 through 27 of the Covenant are not self-executing."); *see also Reid* v. *Covert,* 542 U.S. at 735 ("[T]he United States ratified the Covenant [on Civil and Political Rights] on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts."); *Johnson* v. *Quander,* 370 F. Supp. 2d 79, 101 (D.D.C. 2005) (same—CERD), *aff'd,* 440 F.3d 489 (D.C. Cir. 2006).

[157] *See Reid* v. *Covert,* 354 U.S. 1, 18 (1957) ("This Court has also repeatedly taken the position that an Act of Congress, which must comply with the Constitution, is on a full parity with a treaty, and that when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null."); *La Abra Silver Min. Co.* v. *United States,* 175 U.S. 423, 460 (1899) ("Congress by legislation, and so far as the people and authorities of the United States are concerned, could abrogate a treaty made between this country and another country which had been negotiated by the President and approved by the Senate." (citation omitted)).

**Exhibit A**

commenter indicated that the new regulation would adversely affect immigrants and nonimmigrants alike and discourage people from lawfully entering the United States through visas offered by the DOS.

*Response:* DHS disagrees that the rule cannot apply to applicants for admission because it is impossible to make a prediction about future circumstances based upon the totality of the alien's circumstances at the time of the application for admission. As mandated by Congress under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), any alien applying for admission to the United States is inadmissible if he or she is likely at any time to become a public charge. DHS must make a public charge inadmissibility determination unless the applicant for admission is within one of the exempted categories. Only those categories of aliens designated by Congress are exempt from the public charge ground of inadmissibility.[158] Additionally, although it will impact all aliens subject to the public charge ground of inadmissibility under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), the goal of this rule is to implement the public charge inadmissibility ground as established by Congress. DHS rejects the notion that there is a relationship between the implementation of the congressionally-mandated ground of inadmissibility through this rulemaking and any increase in the number of illegal border crossings or other illegal behavior.

*Comment:* Multiple commenters stated that the proposed rule would negatively affect those seeking a "green card" (lawful permanent residence) and would notably affect family-based immigration.

*Response:* Although this rule will impact those seeking lawful permanent resident status based on an approved family-based petition, only aliens who are subject to the public charge ground of inadmissibility will be required to demonstrate that they are not likely to become a public charge at any time in the future, as prescribed in the rule.

*Comment:* Another commenter indicated that current green card holders and other aliens lawfully present in the United States, like recipients of Deferred Action for Childhood Arrivals (DACA), could see their status jeopardized, as they may not meet the income standard in the proposed rule.

*Response:* DHS notes that a person who is already a lawful permanent resident has already undergone a public

charge inadmissibility determination, unless she or he was exempt from such a determination at the time of application for such status. Such a person would not undergo another public charge inadmissibility determination unless U.S. Customs and Border Protection (CBP) determines, upon the alien's return from a trip abroad, that the returning lawful permanent resident is an applicant for admission based on one of the criteria set forth in section 101(a)(13)(C) of the Act, 8 U.S.C. 1101(a)(13)(C), such as the alien has been absent from the United States for more than 180 days. Aliens who are lawfully present in the United States as nonimmigrants have also undergone a public charge inadmissibility determination, where applicable, and this rule does not impact their status unless they are seeking an immigration benefit for which admissibility is required or if they are seeking an extension of stay or change of status.

With respect to DACA recipients, DHS notes that an alien is not required to demonstrate that he or she is not inadmissible on the public charge ground when requesting DACA. A DACA recipient would only be subject to this rule when applying for a benefit for which admissibility is required.

*Comment:* A commenter indicated that the NPRM excludes too many applicants for admission from public charge review. The commenter stated that the category of "applicants for admission" is clearly defined in section 235(a) of the Act, 8 U.S.C. 1225(a) as "aliens present in the United States who have not been admitted"[159] and "all aliens" who have not been "inspected by immigration officers." The commenter indicated that although most of these categories of aliens are barred from most of the public benefits designated under the proposed rule, the commenter's research indicates that the very high use of welfare programs by noncitizens cannot be explained unless at least half of the non-citizens surveyed in the Survey of Income and Program Participation (SIPP) data are in the country illegally. The commenter further stated that the NPRM fails to provide any guidance on how this population will be assessed for public charge inadmissibility.

*Response:* DHS disagrees that the rule excludes too many aliens from the public charge inadmissibility determination and disagrees that DHS failed to provide adequate guidance with respect to how DHS would apply

the public charge inadmissibility determination with respect to the population identified by the commenter. Congress identified which aliens are subject to the public charge ground of inadmissibility and specified which aliens are exempt from, or can obtain a waiver of, public charge inadmissibility. DHS does not have the authority to add additional categories of aliens that must establish admissibility based on public charge. This rule only applies to those categories of aliens that Congress has designated as subject to the public charge ground of inadmissibility.[160]

In addition, although the commenter indicated that DHS fails to specify how to determine that aliens illegally present in the United States are inadmissible on the public charge ground, this determination is only made when aliens subject to this ground of inadmissibility apply for an immigration benefit for which admissibility is required, such as adjustment of status, or when determining what charges to lodge on an NTA when initiating removal proceedings under section 240 of the Act, 8 U.S.C. 1229a.[161] DHS notes that the SIPP data on receipt of public benefits by noncitizens includes asylees and refugees and lawful permanent residents who are lawfully present in the United States.

*Comment:* Some commenters stated that the regulation would be arbitrary and capricious because DHS would apply it to lawful permanent residents who were abroad for a trip exceeding 180 days, but DHS did not estimate the size of this population in the proposed rule. These commenters further stated that if the returning lawful permanent resident is placed in removal proceedings, the burden of proof of inadmissibility should remain on the government to establish by "clear and convincing evidence"[162] that he or she is lawfully present in the United States pursuant to a prior admission. This burden, per the commenters, should not be transferred to the lawful permanent

[158] *See* 8 CFR 212.23.

[159] *See* INA section 235(a) and (b), 8 U.S.C. 1225(a) and (b).

[160] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4) (Any alien who, . . . in the opinion of the Attorney general at the time of application for admission . . . is likely to become a public charge, is inadmissible). *See* 8 CFR 212.20.

[161] For example, to be eligible for adjustment of status under INA section 245(a) and (c), 8 U.S.C. 1255(a) and (c), an applicant must generally have been, among other requirements, inspected and admitted or paroled, and in legal immigration status. Therefore, in most cases, the applicant must have been legally entered the United States and be legally present in the United States. In contrast, under INA section 244(a), 8 U.S.C. 1154a, an alien cannot be denied Temporary Protected Status on account of his or her immigration status or lack thereof.

[162] *See* INA section 240(a)(3), 8 U.S.C. 1229a(a)(3).

**Exhibit A**

resident through completion of the Form I–944 or similar forms that CBP may request. The commenter stated that doing so, would violate the lawful permanent resident's due process rights as a permanent resident by shifting the burden of proof to returning lawful permanent residents, contrary to *Woodby* v. *INS,* 385 U.S. 276 (1966), *Landon* v. *Plasencia,* 459 U.S. 21 (1982), and *Matter of Rivens,* 25 I&N Dec. 623 (BIA 2011).

*Response:* DHS does not believe such a quantitative estimate is necessary. DHS further disagrees that the rule impermissibly shifts the government's burden of proof onto the returning lawful permanent residents, that the applicability of inadmissibility grounds to returning lawful permanent residents is unlawful, or that it would violate an alien's due process rights. Congress specified when lawful permanent residents returning from a trip abroad will be treated as applicants for admission, and also specified who bears the burden of proof in removal proceedings when such an alien is placed in proceedings. In general, the grounds of inadmissibility set forth in section 212(a) of the Act, 8 U.S.C. 1182(a), including public charge inadmissibility, do not apply to lawful permanent residents returning from a trip abroad.[163] Congress set forth the circumstances under which lawful permanent residents returning from a trip abroad are considered applicants for admission, and therefore, are subject to admissibility determinations, including an assessment of whether the alien is inadmissible as likely at any time to become a public charge.[164] If CBP

determines that the returning lawful permanent resident is an applicant for admission based on one of the criteria set forth in section 101(a)(13)(C) of the Act, 8 U.S.C. 1101(a)(13)(C), including that the alien has been absent for more than 180 days, and that the alien is inadmissible under one of the grounds set forth in section 212(a) of the Act, 8 U.S.C. 1182(a), the law requires that the alien be placed into removal proceedings.[165] In such removal proceedings, DHS bears the burden of proof to demonstrate by clear and convincing evidence that the lawful permanent resident is properly considered an applicant for admission based on being outside of the United States for more than 180 days, or any of the grounds set forth in 101(a)(13)(C) of the Act, 8 U.S.C. 1101(a)(13)(C).[166] And, if the lawful permanent resident is not an applicant for admission, but is removable from the United States for any reason, DHS may charge the alien under section 237 of the INA, 8 U.S.C. 1227.

For these reasons, DHS disagrees that the rule impermissibly places the burden on returning lawful permanent residents in violation of their rights under *Woodby* v. *INS,*[167] *Landon* v. *Plasencia,*[168] and *Matter of Rivens* as alleged by the commenters.[169] Specifically, in *Woodby* and *Landon,* which predate IIRIRA, the Court addressed the government's burden in deportation proceedings against a lawful permanent resident and indicated that the government would bear the burden to demonstrate that the alien is a returning resident seeking admission. Subsequently, with IIRIRA, Congress specified the circumstances under which a lawful permanent resident will be treated as an applicant for admission, and provided that when an alien is an applicant for admission that the alien has the burden to establish that he or she is clearly and beyond doubt entitled

to be admitted and is not inadmissible; however, Congress remained silent with respect to the burden and standard of proof required to determine whether an alien is an applicant for admission.[170] The BIA in *Matter of Rivens,*[171] did not deviate from longstanding case law on this question[172] and affirmed that DHS continues to bear the burden of proving by clear and convincing evidence that a returning lawful permanent resident should be treated as an applicant for admission.[173] This rule does not alter DHS's burden of proof with respect to the treatment of returning lawful permanent residents as applicants for admission in any way, *i.e.,* the only burden DHS bears is establishing that the returning lawful permanent resident should be treated as an applicant for admission.[174] The BIA, in *Matter of Rivens,* did not reach the issue of who then bears the burden of showing admissibility, or a lack of inadmissibility, once it has been determined that an alien is an applicant for admission.[175]

DHS notes, as was pointed out by the commenters, that under section 291 of the Act, 8 U.S.C. 1361, an applicant for admission always bears the burden of proof to establish that he or she is not inadmissible to the United States under any provision of the Act; similarly, under section 240(c)(2)(A) of the Act, 8 U.S.C. 1229a(c)(2)(A), an applicant for admission in removal proceedings has the burden of establishing that he or she is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 212(a) of the Act, 8 U.S.C. 1182(a). Therefore, the burden still lies with the returning resident to establish that he or she is not inadmissible based on public charge.

*Comment:* One commenter asks whether the public charge regulation would apply to applicants seeking naturalization.

---

[163] Although Congress did not subject those admitted as lawful permanent residents to grounds of inadmissibility under INA section 212(a), 8 U.S.C. 1182(a), it did codify that an alien's certain conduct or conditions will lead to the alien's removal from the United States, including inadmissibility on public charge. *See* INA section 237, 8 U.S.C. 1227, generally, and INA section 237(a)(5), 8 U.S.C. 1227(a)(5). One basis of removal is an alien's inadmissibility at the time of admission or adjustment of status, including being inadmissible for public charge under INA section 212(a)(4), 8 U.S.C. 1182(a)(4). *See* INA section 237(a)(1)(A), 8 U.S.C. 1227(a)(1)(A). If the alien is charged as a deportable alien, the burden of proof is on the government to show by clear and convincing evidence that the alien, who has been admitted, is not deportable. *See* INA section 240(c)(3), 8 U.S.C. 1229a(c)(3).

[164] *See* INA section 101(a)(13)(C), 8 U.S.C. 1101(a)(13)(C). According to this provision, lawful permanent residents are regarded as an applicant for admission when they: (1) Have abandoned or relinquished that status; (2) have been outside the United States for a continuous period in excess of 180 days; (3) have engaged in illegal activity after departing the United States; (4) have departed the United States while under legal process seeking removal of the alien from the United States, including removal proceedings and extradition

proceedings; (5) have committed an offense identified in INA section 212(a)(2), 8 U.S.C. 1182(a)(2), unless granted a waiver of inadmissibility for such offense or cancellation of removal; and (6) are attempting to enter at a time or place other than as designated by immigration officers or who have not been admitted to the United States after inspection and authorization by an immigration officer.

[165] As explained above, lawful permanent resident s are not subject to grounds of inadmissibility after being properly admitted to the United States as an lawful permanent resident within the meaning of INA section 101(a)(20), 8 U.S.C. 1101(a)(20). *See* INA sections 235(b)(2)(A) and 240, 8 U.S.C. 1225(b)(2)(A) and 1229a.

[166] *See Matter of Rivens,* 25 I&N Dec. 623 (BIA 2011).

[167] *See Woodby* v. *INS,* 385 U.S. 276 (1966).

[168] *See Landon* v. *Plascencia,* 459 U.S. 21 (1982).

[169] *Matter of Rivens,* 25 I&N Dec. 623 (BIA 2011).

[170] *See* INA sections 235 and 240, 8 U.S.C. 1225 and 1229a; *see Matter of Rivens,* 25 I&N Dec. 623, 625 (BIA 2011). *See* INA sections 101(a)(13)(C), 240(c)(2), and 291, 8 U.S.C. 1101(a)(13)(C), 1229a(c)(2), and 1361.

[171] 25 I&N Dec. 623, 626 (BIA 2011).

[172] *See Matter of Rivens,* 25 I&N Dec. 623, 625 (BIA 2011) (citing *Matter of Huang,* 19 I&N Dec. 749 (BIA 1988); *Woodby* v. *INS,* 385 U.S. 276 (1966); and *Landon* v. *Plasencia,* 459 U.S. 21 (1982)).

[173] *See Matter of Rivens,* 25 I&N Dec. 623, 625 (BIA 2011).

[174] *See Matter of Rivens,* 25 I&N Dec. 623, 626 (BIA 2011).

[175] *See Matter of Rivens,* 25 I&N Dec. 623, 626 (BIA 2011) (not reaching the issue because it was unnecessary to address the "open question of who then bears the burden of showing admissibility, or a lack of inadmissibility, once it has been determined that an alien is an applicant for admission.").

**Exhibit A**

**41328**    **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

*Response:* The laws governing naturalization can be found in Title III of the INA. The public charge ground of inadmissibility does not apply in naturalization proceedings. DHS notes, however, that USCIS assesses as part of the naturalization whether the applicant was properly admitted as a lawful permanent resident and therefore was eligible for adjustment based upon the public charge ground of inadmissibility at the time of the adjustment of status.[176]

*Comment:* Multiple commenters indicated that the proposed rule makes the path to citizenship more difficult and would give the Government the ability to deny a ''broad swath'' of applicants for green cards, especially children who are likely to be self-sufficient as adults, teenagers and students completing their education, infant caregivers, the elderly, immigrants from certain countries, and an immigrant previously deemed admissible who becomes disabled.

Many commenters stated that the rule should not apply to children, and that doing so would destabilize families, make children unhealthy or more likely than not to become a public charge as adults, and may cause some children to be excluded while the parent is admitted. Some commenters provided data on the number of children who would be impacted by the rule. A commenter proposed an exemption from public charge for all children up to age 18, because such children are subject to child labor laws and in most cases still engaged in mandatory education. The commenter also proposed a three-year grace period beyond age 18, until age 21. Finally, the commenter recommended further extending the commenter's proposed exemption for those aliens who are currently engaged in full-time college or vocational education, and for a three-year grace period after graduation or certification. The commenter stated that this will be a strong incentive for young immigrants toward self-sufficiency and positive GDP contribution. A few commenters added that children born in the United States to immigrant parents are United States citizens and therefore are eligible for public benefits under the same eligibility standards as all other United States citizens.

A commenter requested that asylum seekers and entrepreneurs, crime victims, victims and survivors of domestic violence, and T nonimmigrants seeking adjustment of status should be excluded from the rule and public charge ground of inadmissibility. Similarly, commenters stated that victims of domestic violence, human trafficking, and sexual assault would be harmed as a consequence since family members sponsored by victims would be impacted by the proposed rule.

*Response:* Generally, the public charge ground of inadmissibility applies to all aliens who are applicants for a visa, admission, or adjustment of status. However, as noted previously, Congress—not DHS—has the authority to specify which aliens are exempt from public charge inadmissibility determinations, as well as those who may obtain a waiver of public charge inadmissibility. Therefore, the public charge inadmissibility provisions set forth in this final rule will apply to all aliens seeking admission or adjustment of status, or any other immigration benefit for which admissibility is required, unless otherwise exempted by Congress, irrespective of the alien's age, medical condition, economic status, place of origin, or nationality. With respect to comments suggesting that DHS specifically exclude children, teenagers, caregivers of infants, the elderly, and entrepreneurs, and other categories of individuals from the public charge inadmissibility provisions, section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), applies to such aliens applying for a visa, admission, or adjustment of status, unless otherwise specified by Congress. DHS has tailored the effects of this rule somewhat for certain populations. On the whole, however, DHS lacks the authority to create wholesale exemptions or provide a grace period for broad categories of aliens, as suggested by the commenters.

DHS notes that does have the authority to define public charge as it has in this rule and in doing so, decide which public benefits are considered for the purposes of this rule. As discussed in greater detail below, DHS has made some changes to the public benefits that DHS will consider, particularly as it relates to receipt of Medicaid benefits by aliens under the age of 21 and pregnant women, including women for the 60 days following pregnancy, and for receipt of Medicare Part D LIS. DHS has also clarified the role that age and other factors play in the public charge inadmissibility determination. DHS believes that these changes may at least partially address some of the

commenters' concerns, and that such changes are more in line with the statute.

With respect to the commenter's suggestions that asylees, crime victims, victims of domestic violence, and T nonimmigrants be exempt from this rule, DHS notes that such individuals are generally exempted by statute from public charge inadmissibility determinations, and that such exemptions are also set forth in 8 CFR 212.23.[177] As explained in the NPRM,[178] and addressed further below, DHS codified in the regulation those classifications of nonimmigrants and immigrants that Congress exempted from public charge grounds of inadmissibility. DHS will not, and cannot, exempt other classes of aliens unless these exemptions are created by Congress.[179]

### 2. Applicability and Content of the Public Benefits Condition

*Comment:* Citing to the statutory policy statement set forth in PRWORA, a commenter indicated that nonimmigrant applications or petitions for extension of stay or change in status should be subject to inadmissibility on public charge grounds in order to ensure their self-sufficiency. By contrast, some commenters stated that DHS lacked the authority to condition of eligibility for extension of stay or change of status on past, current, or future receipt of public benefits because the public charge inadmissibility ground does not apply to extension of stay or change of status; commenters stated that this provision was therefore not supported by the plain language of the statute and is unlawful. A commenter stated in regards to extension of stay and change of status that DHS's bald assertion that it generally has discretion to apply the test to new categories cannot overcome clear and unambiguous language from Congress to the contrary.

Some of these commenters also indicated that nobody would be eligible for extension of stay or change of status because the proposed regulation asks applicants to prove a negative. Another commenter disagreed with the proposed rule because no one can determine whether an applicant seeking an extension of stay or change of status will receive public benefits at any time in the future.

---

[176] *See* INA section 318, 8 U.S.C. 1429. Additionally, an individual may become removable on account of public charge while in lawful permanent resident status, which is a consideration which may be assessed at the time of naturalization. *See* INA section 237(a)(5), 8 U.S.C. 1227(a)(5). However, the assessment of removability for public charge is different from the assessment of public charge inadmissibility and is not a part of this rule.

[177] However, DHS notes that T nonimmigrants are not excluded from public charge inadmissibility when applying for employment-based adjustment of status. *See* INA section 212(a)(4)(E), 8 U.S.C. 1182(a)(4)(E).

[178] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51156–57 (proposed Oct. 10, 2018).

[179] *See* 8 CFR 212.23.

**Exhibit A**

One commenter stated that because employment-based nonimmigrant categories require the employer to demonstrate the ability to financially support the nonimmigrant, and further, because other nonimmigrants classifications such as F and M nonimmigrant students must demonstrate sufficient financial support during the duration of the nonimmigrant stay, that there are sufficient financial safeguards in place for these nonimmigrants such that this rule poses an unnecessary administrative burden. A commenter indicated that the expansion of the public charge rule to include additional classifications of nonimmigrants will reduce immigration or admission rates.

*Response:* Neither the NPRM nor this final rule is intended to apply the public charge ground of inadmissibility to extension of stay or change of status applicants. Instead, DHS is exercising its statutory authority to set a new condition for approval of extension of stay and change of status applications—that the applicant establish that the alien has not received since obtaining the nonimmigrant status he or she seeks to extend or from which he or she seeks to change, and through adjudication, one or more public benefits for more than 12 months in the aggregate within any 36-month period.[180] This condition will apply to any extension of stay or change of status application or petition postmarked (or if applicable, submitted electronically) on or after the effective date of the rule.

If the nonimmigrant status the individual seeks to extend or to which the applicant seeks to change is statutorily exempt from the public charge ground of inadmissibility,[181] then the public benefits condition will not apply.

After considering the comments, DHS agrees with the commenters that an assessment of whether the nonimmigrant is "likely to receive public benefits" for the expected period of stay, which included the option for USCIS to request submission of a Form I–944 as part of an RFE, might have been similar to a public charge inadmissibility assessment. In addition, applying a prospective element to the public benefits condition would likely be redundant and unnecessary given the finite nature of nonimmigrant status and stay. To the extent DHS grants an extension of stay to a nonimmigrant subject to the public benefit condition

after determining that the alien had not received public benefits, and a nonimmigrant subsequently wishes to apply for another, the condition would apply again. The same would apply to a change of status. If, however, an alien leaves the United States after holding nonimmigrant status, and seeks a new nonimmigrant or immigrant visa based on a classification that is subject to INA 212(a)(4), 8 U.S.C. 1182(a)(4), then the public charge ground of inadmissibility will apply. Similar to aliens who are not required to obtain a visa but are subject to INA 212(a)(4), 8 U.S.C. 1182(a)(4)—DHS would apply the public charge ground of inadmissibility at the port of entry.[182] Finally, with respect to an alien in the United States who is eligible to adjust status from a nonimmigrant classification to that of a lawful permanent resident, and the alien is subject to INA 212(a)(4), 8 U.S.C. 1182(a)(4), DHS will at the time of adjudication of an adjustment of status application make a public charge inadmissibility determination consistent with the requirements of INA 212(a)(4), 8 U.S.C. 1182(a)(4), and regulations promulgated through this rulemaking. Therefore, DHS removed the future-looking aspect of this condition and will not request applicants for an extension of stay or change of status to submit a Form I–944. Additionally, DHS made a technical edit to remove "currently receiving public benefits," as the reference to the alien having "received" public benefits is sufficiently inclusive of receipt up to the date of adjudication. According to preexisting DHS regulations, an applicant must meet an eligibility requirement or a condition not only at the time of filing but also at the time of adjudication,[183] which renders superfluous the proposed text regarding "currently receiving public benefits." Finally, because DHS has moved the public benefits receipt threshold from the public benefits definition to the public charge definition, DHS added the "for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months)" threshold to the public benefits condition in the extension of stay and change of status provisions as well because the threshold applies to the receipt of public benefits in these provisions, as well.

Under this final rule, nonimmigrants who are seeking an extension of stay or a change of status must only demonstrate that they have not received, since obtaining the nonimmigrant status they seek to extend or from which they seek to change, *up to the time of the adjudication of the application,*[184] one or more public benefits for more than 12 months in the aggregate within any 36-month period.[185] This condition will apply to any extension of stay or change of status application or petition postmarked (or if applicable, electronically submitted) on or after the effective date of the rule. DHS will not consider any receipt of public benefits prior to the rule's effective date, for purposes of the public benefits condition for extension of stay or change of status.

Imposing conditions on extension of stay and change of status applications is within DHS's authority, as Congress granted DHS the authority, in sections 214 and 248 of the Act, 8 U.S.C. 1184 and 1258, to regulate conditions and periods of admission of nonimmigrants and conditions for change of status, respectively. As explained in the NPRM, however, the government's interest in a nonimmigrant's ability to maintain self-sufficiency does not end with his or her initial admission as a nonimmigrant.[186] Therefore, given DHS's authority to set conditions[187] and Congress' policy statement "that aliens *within* the Nation's borders not depend on public resources to meet their needs,"[188] it is reasonable for DHS to require, as a condition of obtaining an extension of stay or change of status, evidence that nonimmigrants inside the United States have remained self-sufficient during their nonimmigrant stay.

DHS will continue to require that the alien meets his or her burden of proof that he or she is eligible for the status requested, including whether the alien has the financial means, if required by the laws governing the particular nonimmigrant classification. The two aspects of the adjudication (eligibility for the status requested and the public benefit condition) are not duplicative. DHS notes that although eligibility for a

---

[180] *See, e.g.,* INA sections 103(a)(3), 214(a)(1), 248(a).

[181] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51135–36 (proposed Oct. 10, 2018).

[182] *See, e.g.,* 8 CFR 217.4(a)(1) (Visa Waiver Program participants must not be "inadmissible to the United States under one or more of the grounds of inadmissibility listed in section 212 of the Act (other than for lack of a visa).").

[183] *See* 8 CFR 103.2(b).

[184] *See* 8 CFR 103.2(b) (*Demonstrating eligibility.* An applicant or petitioner must establish that he or she is eligible for the requested benefit at the time of filing the benefit request and must continue to be eligible through adjudication.).

[185] *See* 8 CFR 214.1(a)(3)(iv) and (c)(4)(iv); *see* 8 CFR 248.1(a) and (c)(4).

[186] *See* PRWORA's policy statement at 8 U.S.C. 1601, reiterating that self-sufficiency of all aliens coming to the United States continues to be national policy.

[187] *See* INA sections 214 and 248, 8 U.S.C. 1184, 1258.

[188] *See* 8 U.S.C. 1601(2)(A).

**Exhibit A**

**41330** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

nonimmigrant status might require some indication of future self-support, it would generally not require an assessment of public benefits received since the alien obtained the nonimmigrant status he or she seeks to extend or from which he or she seeks to change.

*Comment:* One commenter said that, according to *Mathews* v. *Eldridge,* 424 U.S. 319 (1976), it would be improper to implement the public benefits condition for change of status applicants with no available appeal process. To comply with due process rights as prescribed by *Goldberg* v. *Kelly,* 397 U.S. 254 (1970), the commenter suggested that DHS give applicants a chance to respond with evidence that supports their admissibility, and that DHS should not revoke the status until the decision had been fully appealed through all stages of review.

*Response:* DHS disagrees that imposing the public benefits condition on extension of stay and change of status applications is improper because it violates due process. DHS notes that to the extent that USCIS obtains derogatory information unknown to the applicant relevant to the extension of stay or change of status application, consistent with 8 CFR 103.2(b)(16)(i), USCIS will provide notice of the derogatory information and give the applicant an opportunity to respond. Moreover, applicants for extension of stay and change of status will receive notice of deficiencies as appropriate and consistent with 8 CFR 103.2(b)(8) and consistent with USCIS' policy on the issuance of certain requests for evidence and notices of intent to deny,[189] before denying an application for an extension of stay or change of status. In general, under DHS regulations, a denial of an extension of stay or change of status application cannot be appealed.[190] Upon denial of an extension of stay or a change of status application, if the alien is removable, DHS can issue an NTA and place the alien in removal proceedings.[191] In removal proceedings, the alien can challenge the basis for removal, and appeal the immigration

judge's decision, if desired.[192] These proceedings provide due process to the extent required by law.[193]

*Comment:* Many commenters noted that consular officers already conduct public charge inadmissibility assessments and CBP would conduct an admissibility determination at the port of entry. Others indicated that the proposed changes extension of stay and change of status applications create duplicative work for applicants and USCIS.

*Response:* As explained in the proposed rule,[194] DHS believes that the Government interest in ensuring an alien's self-sufficiency does not end once a nonimmigrant is admitted to the United States. The Government has an interest in ensuring that aliens present in the United States are self-sufficient. This interest does not end once the alien is admitted; aliens should remain self-sufficient for the entire period of their stay, including any extension of stay or additional period of stay due to a change of status. Indeed, as set forth by Congress in PRWORA, "aliens *within* the Nation's borders [should] not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." [195] The fact that DHS already considers the applicant's financial status in adjudicating some extension of stay and change of status applications further supports this policy. Moreover, although the extension of stay or change of status provisions in the INA and the regulations do not specifically reference an alien's self-sufficiency, consideration of an alien's self-sufficiency in these applications is consistent with the self-sufficiency principles of PRWORA and aligns the INA to those principles.[196]

DHS therefore does not believe that considering an extension of stay or change of status applicant's past and current receipt of public benefits over the designated threshold in the United States is duplicative of the consular officer's public charge inadmissibility assessment at the nonimmigrant visa stage, given that a certain amount of time has passed between an alien's consular interview or the alien's admission to the United States in

nonimmigrant status, and the alien's request for an extension of stay or change of nonimmigrant status.[197] The alien's financial situation may have changed since the visa was issued or the alien was admitted to the United States.

### a. Nonimmigrant Students and Exchange Visitors

*Comment:* A commenter pointed out that the new public charge rule would apply to students and exchange visitors who would seek to change or extend their status. The commenter indicated that the new rule, therefore, would impose new standards and barriers for students. The commenter added that drops in international enrollment would have broader ripple effects for United States higher education institutions.

*Response:* To the extent that the rule may impose barriers to those seeking to extend their stay or change their status, as explained previously, given DHS's authority [198] and Congress' policy statement with respect to self-sufficiency,[199] it is reasonable for DHS to impose, as a condition of obtaining an extension of stay or change of status, the requirement that the alien demonstrate that he or she has not received public benefits as defined in 8 CFR 212.21(b).[200] As discussed previously, DHS has removed the forward-looking aspect of the public benefits condition. This may ameliorate the consequences of the public benefits condition for certain nonimmigrants.

*Comment:* Another commenter stated that subjecting extension of stay and change of status applications and petitions to the public charge test produces multiple legal contradictions: The commenter provided the example of international students in F–1 status who are not eligible to work more than 20 hours off campus or in federally-subsidized work study positions, asserting that these restrictions greatly reduced the amount of income students can earn and thus, reduces their self-sufficiency. The commenter stated that the determinations on self-sufficiency in one status bear no significance on an individual's ability to be self-sufficient within the legal confines of a different classification.

*Response:* As noted above, DHS disagrees that the rule would require

---

[189] *See* USCIS Policy Memorandum Issuance of Certain RFEs and NOIDs; Revisions to *Adjudicator's Field Manual* (*AFM*) Chapter 10.5(a), Chapter 10.5(b) PM–602–0163 (Jul. 13, 2018) (*https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/AFM_10_Standards_for_RFEs_and_NOIDs_FINAL2.pdf* (last visited June 21, 2019).

[190] *See* 8 CFR 214.1(c)(5) and 8 CFR 248.3(g).

[191] *See* USCIS Policy Memorandum, Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens (June 28, 2018), *https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2018/2018-06-28-PM-602-0050.1-Guidance-for-Referral-of-Cases-and-Issuance-of-NTA.pdf* (last visited May 8, 2019).

[192] *See* INA sections 240 and 242, 8 U.S.C. 1229a and 1252.

[193] *E.g., Zadvydas* v. *Davis,* 533 U.S. 678, 693 (2001).

[194] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51135–36 (proposed Oct. 10, 2018).

[195] *See* 8 U.S.C. 1601(2)(A).

[196] *See Southern S.S. Co.* v. *N.L.R.B.,* 316 U.S. 31, 47 (1942) (requiring "careful accommodation of one statutory scheme to another. . . .").

[197] DHS's authority to specify the conditions, as a matter of discretion, under which an alien is eligible for either a change of status or extension of stay can be found in INA section 214(a)(1) and INA section 248(a); 8 U.S.C. 1184(a)(1) and 1258(a); and 8 CFR 214.1 and 8 CFR 248.1.

[198] *See* INA section 214 and 248, 8 U.S.C. 1184 and 1258.

[199] *See* 8 U.S.C. 1601.

[200] *See* 8 CFR 214.1(a)(3)(iv) and (c)(4)(iv), and 8 CFR 248.1(c)(4).

**Exhibit A**

individuals seeking extension of stay or change of status to show they are not inadmissible under section 212(a)(4), 8 U.S.C. 1182(a)(4). At the time of the application for a nonimmigrant visa, the alien must demonstrate to DOS that he or she is not likely at any time in the future to become a public charge. Similarly, at the time a nonimmigrant applies for admission, he or she must demonstrate to CBP that he or she is not likely at any time in the future to become a public charge.

However, when seeking an extension of stay or change of status as a nonimmigrant student [201] or nonimmigrant exchange visitor,[202] the alien will not need to establish that he or she is not likely at any time in the future to become a public charge because those seeking extension of stay or change of status are not subject to the public charge ground of inadmissibility. However, the alien will need to demonstrate that he or she has sufficient funds to pay tuition and related costs as part of the application for extension of stay or change of status to a nonimmigrant. Further, the alien must demonstrate that he or she has not received, since obtaining the nonimmigrant status he or she seeks to extend or change and through the time of filing and adjudication, one or more public benefits as defined in the rule, for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months).

DHS disagrees that subjecting extension of stay and change of status applicants to this new condition is legally contradictory because a student's restriction on employment in the United States reduces an alien's self-

sufficiency. As explained above, a student is required, as part of the eligibility for the nonimmigrant classification, to establish that he or she has sufficient funds to study in the United States; students are thus admitted with the expectation of self-sufficiency. The public benefits condition created by this rule would not be inconsistent with such expectation.

b. Workers

*Comment:* A commenter pointed out that the new public charge rule applies to specialty workers and their dependents who would seek admission or those who seek to change or extend their status. A commenter indicated that the new rule would impose new standards and barriers not only on foreign workers, but also on employers because of the unpredictability of the public charge determination and because wages alone would not be the determining factor. Citing to research and data on the population size and impact that the rule would have on H–2A nonimmigrant workers, several other commenters stated that H–2A nonimmigrant workers would be affected and that the rule would isolate H–2A nonimmigrant workers. One commenter, for example, also stated that the rule's criteria for factors to be considered in the totality of the circumstances test disadvantages farmworkers who seek to either apply to adjust to lawful permanent resident status or apply for or extend their nonimmigrant status. The commenter indicated that many farmworkers, domestic, and H–2A workers would find themselves determined to be a public charge due to factors beyond their control, such as low wages, poverty-level income, and lack of health insurance. Commenters stated that H–2A nonimmigrant workers undergo a public charge assessment at the consular office, and once in the United States, they are not eligible for the vast majority of public benefits but are provided housing by their employer. A commenter also stated that H–2A nonimmigrant workers are already reluctant to seek services due to fear of employer retaliation, and that this rule's chilling effect could further isolate them from the communities where they work and live. Thus, H–2A nonimmigrant workers would face delays and uncertainty in the extension of their visa status, and may become more vulnerable to recruitment fees and agent costs which, while prohibited, are a common abuse. The commenters urged DHS to withdraw the rule in its entirety.

*Response:* For aliens seeking to extend their stay or change their status

to that of an H–2A nonimmigrant, absent any indication of an alien's receipt of the designated public benefits for more than 12 months in the aggregate in a 36-month period since obtaining the nonimmigrant status from which they seek to change, USCIS will approve the application if the alien meets the eligibility requirement for the nonimmigrant classification. Additionally, as commenters pointed out, nonimmigrants are generally ineligible for public benefits that would be considered in connection with this rule. DHS understands the concerns addressed by the commenter regarding the practices of nonimmigrant workers and potential abuses of the programs, and therefore encourages the reporting of any such abuse through the channels provided by DHS or the Department of Labor (DOL).[203]

As previously indicated, given Congress's policy statement with respect to self-sufficiency, and DHS's authority to promulgate a rule addressing public charge inadmissibility, it is reasonable for DHS to impose, as a condition of obtaining an extension of stay or change of status, the requirement that the alien demonstrate that he or she has not received public benefits as defined in the rule. DHS notes that it has removed the forward-looking aspect of the public benefits condition. This may ameliorate the consequences of the public benefits condition for certain nonimmigrants.

*Comment:* One commenter stated that the proposed rule would be detrimental to South Asian organizations that sponsor nonimmigrant religious workers and the rule would deem most of them inadmissible to the United States as public charges. The commenter stated that as part of a petition from a sponsoring institution, usually a non-profit entity supported through volunteer contributions, it would provide free housing, all meals, and health insurance to the religious worker as part of the employment package and may offer a small stipend to cover incidental expenses in lieu of a salary. The commenter indicated that such an employment offer, with its mix of monetary and non-monetary compensation, might be insufficient to overcome the public charge grounds based on the totality of the

---

[201] See 8 CFR 214.1(f)(1)(B) (requiring that the student presents documentary evidence of financial support in the amount indicated on the SEVIS Form I–20 (or the Form I–20A–B/I–20ID)); 8 CFR 214.1(m)(1)(B) (requiring that student documents financial support (in the amount indicated on the SEVIS Form I–20 (or the Form I–20M–N/I–20ID)); *see also* 22 CFR 41.61(b)(1)(ii) (requiring that F and M nonimmigrants possess sufficient funds to cover expenses while in the United States or can satisfy the consular officer that other arrangements have been made to meet those expenses).

[202] See 8 CFR 214.2(j)(1) (admission upon presentation of SEVIS Form DS–2019, issued by DOS); 22 CFR 41.62(b)(2) (requiring that J nonimmigrants possess sufficient funds to cover expenses or have made other arrangements to provide for expenses before DOS can approve DS–2019 and the visa). *See also* AFM Chapter 30.3(c)(2)(C) (applicant to change status to exchange visitor must show approved DS–2019 (formerly known as IAP–66)).

*see also* 22 CFR 30.3(c)(2)(C) (applicants to change status to a nonimmigrant student must demonstrate that they have the financial resources to pay for coursework and living expenses in the United States);

[203] USCIS has web pages and email addresses dedicated to combating suspected H–1B and H–2B fraud or abuse. Anyone, including both U.S. and foreign workers who suspect they or others may be the victim of fraud or abuse, can email USCIS to submit tips, alleged violations, and other relevant information. *See* USCIS, Report Labor Abuses, *https://www.uscis.gov/working-united-states/information-employers-employees/report-labor-abuses* (last visited May 8, 2019).

**Exhibit A**

**41332**    **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

circumstances test proposed in the NPRM.

*Response:* For aliens seeking to extend their stay or change their status to that of religious workers, absent any indication of an alien's receipt of the designated public benefits for more than 12 months in the aggregate in a 36-month period, USCIS will approve the application if the alien meets the eligibility requirement for the nonimmigrant classification. Additionally, as commenters pointed out, nonimmigrants are generally ineligible for public benefits that would be considered in connection with this rule.

As previously indicated, given Congress' policy statement with respect to self-sufficiency, and DHS's authority to promulgate a rule addressing public charge inadmissibility, it is reasonable for DHS to impose, as a condition of obtaining an extension of stay or change of status, the requirement that the alien demonstrate that he or she has not received public benefits as defined in the rule. DHS notes that it has removed the forward-looking aspect of the public benefits condition. This may ameliorate the consequences of the public benefits condition for certain nonimmigrants.

DHS acknowledges that, once the rule is effective, certain religious workers seeking admission to the United States as nonimmigrants could be impacted by this rule. As part of the determination of whether any alien is likely at any time in the future to become a public charge, DHS will consider whether the alien has sufficient assets and resources for the purpose of his or her stay in the United States upon admission.[204] DHS believes that this regulation, and other provisions of the INA and implementing regulations, can be administered consistently with the Religious Freedom Restoration Act of 1993 (RFRA).[205] As DHS has noted previously, "[a]n organization or individual who believes that the RFRA may require specific relief from any provision of this regulation may assert such a claim at the time they petition for benefits."[206] Similarly, DHS acknowledges that any individual or organization who identifies a substantial burden on his, her, or an organization's exercise of religion such that the RFRA may require specific relief may assert such a claim.[207] Note, the RFRA does not

create a wholesale "exemption" to a generally applicable regulation; rather, it permits an applicant to seek specific relief which may or may not be complied with. Whether the RFRA applies to a given applicant is a case-by-case determination.[208] Therefore, for extension of stay and change of status purposes, DHS would still apply the public benefit condition to religious workers and review each case and each request individually.

With respect to admission and adjustment of status, the fact that the alien has an employment offer to work in the United States as well as monetary and non-monetary compensation are positive factors that generally indicate that the alien has sufficient assets and resources to be self-sufficient while present in the United States.[209] As previously noted, the public charge determination is an assessment considering all statutory mandated factors in the totality of the circumstances and that one factor alone is not outcome determinative. Separately, if an individual is required to obtain a visa from the DOS to facilitate entry into the United States, the inadmissibility determination with respect to whether to issue a visa is in the jurisdiction of DOS.

### d. Compact of Free Association Migrants

*Comment:* Several commenters addressed Compact of Free Association (COFA) migrants from the Republic of the Marshall Islands, Federated States of Micronesia and the Republic of Palau, who are able to reside in the United States as nonimmigrants under treaty obligations. Commenters stated that while COFA migrants are not eligible for many federal public benefits, some do participate in state and local programs, especially health insurance, and COFA

migrant children and pregnant women are eligible for Medicaid. Commenters stated that workers may either disenroll from these types of programs because of the applicability to nonimmigrants seeking admission or be blocked from entering the United States. One commenter stated that "[t]his rule could be used to deny COFA entry and ability to live in the [United States] thereby abandoning our Nation's commitment to our Pacific allies, including the more than 61,000 COFA persons currently residing in the United States."

*Response:* DHS appreciates the comments on the impact of the rule on COFA migrants and appreciates the continued relationship between COFA nations and the United States. Under the agreements and resulting regulations, citizens of the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau may enter into the United States as nonimmigrants, lawfully engage in employment, and establish residence in the United States without regard to certain grounds of inadmissibility.[210] Certain COFA citizens are subject to a modified version of the public charge ground of deportability, which is not directly affected by this rule.[211] But Congress did not exempt foreign nationals entering the United States under COFA from the public charge ground of inadmissibility, or otherwise modify the applicability of such ground of inadmissibility with respect to COFA migrants. And Congress expressly reiterated DHS's authority under section 214(a)(1) of the INA, 8 U.S.C. 1184(a)(1), "to provide that admission as a nonimmigrant shall be for such time and under such conditions as the Government of the United States may by regulations prescribe."[212] DHS acknowledges that COFA migrants may be affected by this rulemaking when applying for admission at a port of entry

---

[204] *See* 8 CFR 214.2(r)(11).

[205] Public Law 103–141, sec. 3, 107 Stat. 1488, 1488 (Nov. 16, 1993).

[206] *Special Immigrant and Nonimmigrant Religious Workers,* 73 FR 72276, 72283 (2008) codified at 8 CFR pts. 204, 214, 299.

[207] Note that individuals "located outside sovereign United States territory at the time their

alleged RFRA claim arose" are not "person[s]" within the meaning of RFRA. *Rasul* v. *Myers,* 512 F.3d 644, 672 (D.C. Cir.), *cert. granted, judgment vacated on other grounds,* 555 U.S. 1083 (2008).

[208] See generally *Federal Law Protections for Religious Liberty,* 82 FR 49668, 49669 (Oct. 26, 2017) from DOJ.

[209] Regulations that permit certain religious workers to self-support, 8 CFR 214.2(r)(11)(ii), require submission of "verifiable evidence acceptable to USCIS" that document "the sources of self-support." These sources of self-support are a positive factor in the public charge determination. Additionally, as noted above, any individual or organization who identifies a substantial burden on his, her, or an organization's exercise of religion such that the RFRA may require specific relief from any provision of this rule may assert such a claim. Separately, as noted in the preamble of a different rule, "self-supporting religious workers who are not eligible for admission to the United States as R–1 nonimmigrant religious workers may pursue admission in the B–1 classification." *Special Immigrant and Nonimmigrant Religious Workers,* 73 FR 72282 (2008) codified at 8 CFR pts. 204, 214, 299.

[210] Under these compacts, foreign nationals falling under COFA are able to enter without regard to inadmissibility under INA section 212(a)(5) and (7)(B)(i)(II), 8 U.S.C. 1182(a)(5) and (7)(B)(i)(II). *See* Compact of Free Association Amendment Act of 2003, Public Law 108–188, 117 Stat. 2720 (Dec. 17, 2003); *see also* Compact Free Association Approval Act, Public Law 99–658, 100 Stat. 3672 (Nov. 14, 1986) (regarding the Republic of Palau); *see also* 8 CFR 212.1(d).

[211] *See* Public Law 108–188, 117 Stat. 2720, 2762, 2800 (Dec. 17, 2003) (providing that with respect to citizens of the Federated States of Micronesia and the Republic of the Marshall Islands, "section 237(a)(5) of [the INA] shall be construed and applied as if it reads as follows: 'any alien who has been admitted under the Compact, or the Compact, as amended, who cannot show that he or she has sufficient means of support in the United States, is deportable'"); 8 CFR 214.7(e)(1).

[212] *See* Public Law 108–188, 117 Stat. 2720, 2762, 2800 (Dec. 17, 2003).

**Exhibit A**

or when applying for adjustment of status before USCIS, but respectfully submits that Congress never exempted COFA nonimmigrants from the public charge ground of inadmissibility.

DHS notes, however, that because COFA migrants are not required to obtain an extension of their nonimmigrant stay to remain in the United States pursuant to COFA, such nonimmigrants are unlikely to be affected by public benefits condition applicable to extension of stay applications. In addition, as noted elsewhere in this rule, to the extent that COFA migrant children under 21 and pregnant women receive Medicaid, such receipt would not be considered under this rule.

### 3. Exemptions and Waivers With Respect to the Rule Generally

#### a. General Comments

*Comment:* Many commenters supported the exemptions proposed in the NPRM, but a few of the commenters suggested that exemptions be clearly communicated. Some commenters requested that the discussion of exemptions should be moved earlier in the regulation or included in the executive summary of the preamble, to avoid any confusion. Other commenters expressed their support for the exemptions and waivers but indicated that DHS should ensure that immigrant communities and service providers be made aware of these exemptions.

Many commenters expressed concern about the rule's impact on the vulnerable populations specifically excluded from public charge requirements, such as refugees, asylum seekers, victims of trafficking, and VAWA petitioners, who may avoid applying for or accepting any public benefits for which they qualify, to avoid any negative impact on the adjudication of their benefit requests and for fear of future repercussions. One commenter indicated that the exemptions for asylees and refugees appear to be based on their status at the time of admission or grant of status but do not apply to those whose application for asylum or refugee status is pending and who may be eligible for public benefits during that period.

Multiple commenters stated that while the proposed rule exempts VAWA petitioners and U nonimmigrant status, the exemptions will not protect a large number of victims from the detrimental effects of the public charge rule since there are many victims of domestic violence and sexual assaults that seek status in other immigration categories. While a commenter agreed with the

proposed rule's intention to streamline all abused-spouse applications under the VAWA umbrella, the commenter said USCIS and DHS must ensure there is no negative impact to survivors who choose to seek adjustment of status. A few commenters specifically stated that human trafficking survivors would be negatively impacted by the significant delays and increased adjudication expenses. Other commenters expressed concerns about permitting refugees and asylees to continue to receive healthcare while excluding foreign nationals who have immigrated here with the proper documentation (*i.e.,* legally) and are going through the process to obtain permanent residency here in the United States. These commenters said that this is logical fallacy, at best, and at worst, it is unjustified discrimination.

*Response:* DHS believes that the current organization of the regulations and exemptions clearly communicates who is exempt from the public charge ground of inadmissibility and who may be eligible for a waiver of the inadmissibility ground. DHS has also added the summary table in subsection III.F.4 below. DHS declines to implement the suggestions for reorganizing the final rule because the current organization sufficiently addresses visibility.

DHS does not agree that the rule should be more limited in scope and not consider public benefits as part of the public charge inadmissibility determination. The purpose of this rule is to implement the public charge ground of inadmissibility consistent with the principles of self-sufficiency set forth by Congress, and to minimize the incentive of aliens to attempt to immigrate to, or to adjust status in, the United States due to the availability of public benefits.[213]

DHS disagrees with the commenters who indicated that this rule would negatively impact refugees, asylum seekers, victims of trafficking, and VAWA self-petitioners and that the exemptions should be broader. As noted in the NPRM and previous sections in this final rule, the public charge ground of inadmissibility does not generally apply to these populations. Congress expressly exempted refugees, asylees, and applicants for adjustment based on refugee or asylee status from the public charge inadmissibility ground.[214] Therefore, if an individual has a pending application for asylum, the individual will not be assessed for public charge for purposes of the

asylum application and obtaining asylee status. Refugees who are seeking admission to the United States are not subject to public charge grounds of inadmissibility and DHS will not determine whether they may be likely to become a public charge in the United States as part of the refugee admission. Similarly, refugees or asylees seeking adjustment based on their refugee or asylee status, are not subject to the public charge inadmissibility ground, and therefore, the use of public benefits is not considered. Therefore, DHS believes that the commenters' concerns regarding the rule's impact on asylees and refugees are sufficiently addressed.

Similarly, applicants for T nonimmigrant visas are also generally exempt from the public charge inadmissibility ground,[215] and, as established below, DHS also agrees with the commenters that T nonimmigrants applying for adjustment of status should generally be exempt from public charge.[216] Additionally, Congress generally exempted VAWA self-petitioners from the public charge ground of inadmissibility.[217] Also, in response to comments and for reasons explained in the section addressing public benefits, DHS has amended 8 CFR 212.21(b) by providing that public benefits received by those who are in a status exempted from public charge will not be considered in a subsequent adjudication of a benefit that does subject the alien to the public charge ground of inadmissibility. This step should further alleviate concerns that a person in one of the listed categories would be subject to the public charge ground.

DHS also disagrees that this rule discriminates against aliens who are not asylees or refugees. Congress, in PRWORA, made the decision as to which noncitizens are eligible to apply for and receive certain public benefits. Congress decided that asylees and refugees should be eligible to apply for public benefits, and DHS does not have the authority to include or exclude any groups from the receipt of public benefits.

*Comment:* A commenter stated the rule should exempt people with disabilities and their families, stating many of these families come to the United States in order to receive adequate medical care. Commenters opposed including immigrants with

---

[213] *See* 8 U.S.C. 1601.
[214] *See* INA sections 207, 208, and 209; 8 U.S.C. 1157, 1158, and 1159.

[215] *See* INA sections 101(a)(15)(T) and 212(d)(13)(A), 8 U.S.C. 1101(a)(15)(T) and 1182(d)(13)(A).
[216] *See* INA sections 101(a)(15)(T) and 245(l)(2), 8 U.S.C. 1101(a)(15)(T) and 1255(l)(2).
[217] *See* INA section 212(a)(4)(E)(i), 8 U.S.C. 1182(a)(4)(E)(i).

**Exhibit A**

disabilities in the proposed rule because disability is one of the strongest known factors that affect a household's food security and housing instability. Some commenters said DHS should make an exception for pregnant women. Another commenter asked that DHS provide more exemptions and waivers, suggesting that the rule should be narrowed to only apply to those seeking entry into the United States initially or to provide extra protection to those in the United States to lessen the fears of the proposed rule's negative effects.

*Response:* Congress generally specifies, in legislation, to whom grounds of inadmissibility apply and which classes of aliens are exempt from public charge. DHS understands that individuals with disabilities and pregnant women may be affected by this rule. However, Congress did not provide an exemption for individuals with disabilities or pregnant women in the statute.[218]

Additionally, DHS cannot limit the application of the ground of inadmissibility in a matter so that it only applies to those seeking entry into the United States or so that DHS provides extra protections because Congress, in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) specified that the ground of inadmissibility applies to those seeking a visa, admission to the United States, or adjustment of status in the United States. Classes of aliens exempt from the public charge ground of inadmissibility are listed in 8 CFR 212.23. Certain aspects of this rule limit some of the rule's effects, such as by relying on an exhaustive list of non-cash benefits, and excluding consideration of certain benefits for certain populations or circumstances. DHS believes that this is sufficient.

*Comment:* A commenter recommended adding exemptions from the public charge ground of inadmissibility for those who have been certified for benefits under the authorization of another person, such as the head of household or guardian. The commenter reasoned that the dependents may not have been aware that this occurred or even that they receive a benefit.

*Response:* DHS disagrees that it should exempt from the public charge ground of inadmissibility those who have been certified for benefits under the authorization of another, such as the head of household or guardian, if the beneficiary is an alien subject to the public charge ground of inadmissibility. In general, Congress has the authority to legislate which classes of aliens should

be subject to public charge ground of inadmissibility and which are exempt. Congress did not provide an exemption from the public charge ground of inadmissibility for aliens seeking a visa, admission, or adjustment of status and who may have been certified for benefits under the authorization of another, such as the head of household or the guardian who applied on the alien's behalf. DHS acknowledges that those dependents who are certified for or receiving public benefits under the authorization of another, such as the head of the household or the guardian, may be unaware of the receipt of public benefits but will, once the rulemaking is effective, may be impacted by such receipt of public benefits, if they are subject to the public charge ground of inadmissibility.

After having reviewed the comments, however, DHS has decided to provide additional clarification regarding such matters. As explained in detail in the public benefits section in this preamble, DHS has added a new definition of "receipt of public benefits" to section 212.21(e) to clarify that DHS will only consider the alien to have received a public benefit if the alien is a named beneficiary of the benefit. An alien does not receive a benefit merely by virtue of having applied or been certified for such benefit, and has not received a public benefit if the alien acted not on his or her own behalf but on behalf of another person. Therefore, if an alien is the person receiving benefits on behalf of another (for instance as a parent, legal guardian) the alien will not be considered to have received, been certified for, or applied for such public benefit.

### b. Special Immigrant Juvenile

*Comment:* A commenter stated that the proposed rule would conflict with the purpose of Special Immigrant Juvenile (SIJ) status, asserting that the purpose of the status is to allow children to thrive in the United States and that children are not responsible for their circumstances. Although SIJ recipients are statutorily exempt from inadmissibility on public charge grounds, this rule would still affect SIJ youth indirectly because of its scope, secondary effects on families, and potential for confusion. Many of these youth live in homes with U.S. citizen or permanent resident adults or siblings who would be entitled to benefits but may be deterred from accessing them because of a fear of how it will affect the SIJ youth or other family members.

*Response:* DHS disagrees that this rule conflicts with the SIJ program. As stated in the proposed rule, aliens applying for

adjustment of status based on an SIJ determination are exempt from the public charge inadmissibility ground. If aliens who are not subject to the public charge ground of inadmissibility choose to disenroll from or forego public benefit receipt based on this rule, then the decision to disenroll from or forego enrollment is unwarranted. The NPRM provided an exhaustive list of individuals who are exempt from the public charge ground of inadmissibility, and this final rule retains that list of exemptions. DHS will not consider receipt of public benefits by aliens exempt from the public charge ground inadmissibility, even if the exempted alien has an alien family member who is not exempt. DHS notes that this rule also categorically exempts receipt of Medicaid by children under the age of 21, which should reduce the potential for confusion.

### c. Certain Employment Based Preference Categories, or National Interest Waiver

*Comment:* One commenter requested that individuals applying for lawful permanent resident status via approved EB–1A (extraordinary ability alien), EB–1B (outstanding researcher or scientist), or National Interest Waiver (NIW) petitions be added to the list of those exempted from the rule. The commenter stated that the vast majority of these individuals may need to resort to using the designated benefits, and it would be completely contrary to the intent of Congress in passing the EB–1A, EB–1B and NIW statutes to deny scientific researchers green cards who would otherwise be benefiting the lives of literally millions of U.S. citizens.

*Response:* DHS disagrees that this rule is contrary to congressional intent in passing the EB–1A, EB–1B and NIW statutes. Congress did not exempt employment based EB–1A or EB–1B categories, or those seeking an NIW, from the public charge ground of inadmissibility.[219] DHS neither has the

---

[218] *See* INA sections 212(a)(4), 8 U.S.C. 1182(a)(4).

[219] *See* INA section 203(b)(1)(A), 8 U.S.C. 1153(b)(1)(A) (aliens with extraordinary ability) or INA section 203(b)(1)(B), 8 U.S.C. 1153(b)(1)(B) (outstanding professors and researchers). *See* INA section 203(b)(2), 8 U.S.C. 1153(b)(2) (aliens who are members of the professions holding advance degrees or aliens of exceptional ability who are seeking a waiver of the job over in the national interest); *see also* comment USCIS 2010–0012–31111. The commenter explained that the work these individuals perform is of great importance to the United States and have a profound impact on the U.S. economies. However, the commenter indicated, a vast majority of these individuals who are conducting scientific research earn low salaries below the 250% threshold and may need to resort to using these types of benefits the proposed regulation is seeking to prohibit, especially for their U.S. citizen children. The commenter indicated that it would be contrary to congressional intent to apply public charge to these workers.

**Exhibit A**

authority to exempt an applicant or a group of applicants for admission or adjustment of status from the public charge ground of inadmissibility where Congress has not already done so,[220] nor has the authority to ignore the congressionally-mandated exemptions to the public charge ground of inadmissibility. Because Congress has expressly exempted asylees and refugees from the public charge inadmissibility ground, DHS cannot remove this exemption. Further, because Congress did not specifically exempt EB–1A or EB–1B workers, or those with NIWs, from the public charge ground of inadmissibility, DHS may not create an exemption for them in this rule.[221]

d. Violence Against Women Act, T, and U

*Comment:* A commenter provided the statutory amendment history of 8 U.S.C. Section 1641, and stated that VAWA, T, and U visa victims and all other immigrants covered by 8 U.S.C. 1641(c) cannot be subject to public charge under federal statutes. Another commenter indicated that the NPRM incorrectly applies the public charge ground of inadmissibility to applications for adjustment of status and extension of stay filed by T nonimmigrants. The commenter noted that both T nonimmigrant status seekers and T nonimmigrant status holders are exempt from the public charge ground of inadmissibility. The commenter also indicated that proposed 8 CFR 212.23(a)(17) should be amended to conform to section 804 of VAWA 2013,[222] exempting T nonimmigrants seeking to adjust status to lawful permanent residence or to extend status from the public charge ground of inadmissibility. The commenter indicated that section 804 of VAWA 2013, granted the same exemptions from the public charge ground of

inadmissibility to all foreign national victims who are "qualified aliens" under section 431(c) of PRWORA, 8 U.S.C. 1641(c), including T nonimmigrant status holders.[223]

*Response:* DHS agrees that qualified aliens under 8 U.S.C. 1641(c) (certain battered aliens as qualified aliens) are generally not subject to the public charge inadmissibility ground. Section 212(a)(4)(E)(iii) of the INA, 8 U.S.C. 1182(a)(4)(E)(iii), specifically excludes such individuals from the public charge ground.[224] VAWA 2013, which added section 212(a)(4)(E)(iii) of the INA, 8 U.S.C. 1182(a)(4)(E)(iii), specifically excludes individuals such as qualified aliens described in 8 U.S.C. 1641(c) (including T nonimmigrants and certain battered spouses and children of U.S. citizens), VAWA self-petitioners, and U nonimmigrants from sections 212(a)(4)(A), (B), and (C) of the INA, 8 U.S.C. 1182(a)(4)(A), (B), and (C).

Congress, however, did not include paragraph (D) among the exemptions in section 212(a)(4)(E) of the INA, 8 U.S.C. 1182(a)(4)(E). We must presume that Congress acted intentionally in requiring all aliens described in paragraph (D) to file the requisite affidavit of support, even if they are described in paragraph (E). The law does not permit DHS to add language to the statute. *See, e.g., Lamie* v. *U.S. Tr.,* 540 U.S. 526, 538 (2004) (counseling against interpretative methodologies that yield "not . . . a construction of [a] statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope"); *Yith* v. *Nielsen,* 881 F.3d 1155, 1164 (9th Cir. 2018) ("It is never our job to rewrite a constitutionally valid statutory text. Indeed it is quite mistaken to assume that whatever might appear to further the statute's primary objective must be the law." (citations, quotation marks, and alterations omitted)). Accordingly, in the unlikely event that an alien described in paragraph (E) is seeking admission or adjustment of status based on an immigrant visa issued under section 203(b) of the INA, 8 U.S.C. 1153(b), that individual must comply with the affidavit of support requirement in section 213A of the INA,

8 U.S.C. 1183a. Such individuals, however, would not need to demonstrate, as set forth in paragraphs 212(a)(4)(A) and (B), 8 U.S.C. 1182(A) and (B), that he or she is not likely at any time to become a public charge. Those applicants would not need to submit Form I–944. As such, such applicants would only have to submit a sufficient affidavit of support described in section 213A of the INA, 8 U.S.C. 1183a.

For the reasons stated above, DHS is amending proposed 8 CFR 212.23(a)(18), (19), (20), (21), and 8 CFR 212.23(b) in this final rule to clarify that aliens exempt under section 212(a)(4)(E) of the INA, 8 U.S.C. 1182(a)(4)(E), that are adjusting status based on an employment-based petition subject to section 212(a)(4)(D) of the INA, 8 U.S.C. 1182(a)(4)(D), that requires the execution of an affidavit of support as described in section 213A of the Act, 8 U.S.C. 1183a, are not exempt from the entirety of section 212(a)(4) of the INA, 1182(a)(4), as they are still subject to section 212(a)(4)(D) of the INA, 8 U.S.C. 1182(a)(4)(D).

Applicants seeking T nonimmigrant status, T nonimmigrants applying for adjustment of status, and T nonimmigrants seeking another immigration benefit that requires admissibility, are generally exempt from the public charge ground of inadmissibility under section 212(a)(4)(E) of the Act, 8 U.S.C. 1182(a)(4)(E). In accordance with section 804 of the VAWA 2013,[225] which added new section 212(a)(4)(E) of the Act, 8 U.S.C. 1182(a)(4)(E), individuals who have been granted T nonimmigrant status or have a pending application that sets forth a prima facie case for eligibility for T nonimmigrant status are generally exempt from the public charge inadmissibility determination.

Notwithstanding these changes, VAWA 2013 did not amend section 245(l)(2) of the Act, 8 U.S.C. 1255(l)(2),[226] which provides that DHS may waive the application of the public charge ground of inadmissibility if it is in the national interest to do so for a T nonimmigrant seeking to adjust status to lawful permanent residence under section 245(l) of the Act, 8 U.S.C. 1255(l). DHS concludes, however, that the VAWA 2013 amendments, which postdated the enactment of section 245(l)(2) of the Act, 8 U.S.C. 1255(l)(2),

---

[220] As explained in the NPRM, DHS derives its statutory authority for this rule and its authority to promulgate regulation based on section 102 of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, 2142–44 (Nov. 25, 2002) (codified at 6 U.S.C. 112) and INA section 103, 8 U.S.C. 1103, as well as INA section 212(a)(4), 8 U.S.C. 1182 and the relevant statutory provisions governing immigration benefits. *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51124 (proposed Oct. 10, 2018).

[221] Providing for an exemption where Congress does not expressly authorize one, as it does for other immigration benefits applicants under the INA, would be beyond the scope of DHS's authority. *See Andrus* v. *Glover Const. Co.,* 446 U.S. 608, 616–17 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of a contrary legislative intent.").

[222] *See* Public Law 113–4 (March 7, 2013).

[223] The commenter indicated that DHS correctly recognized the full extent of exceptions that the same provisions made for VAWA-self petitioners, U visa applicants, and U visa holders for purposes of lawful permanent residency.

[224] While INA section 212(a)(4)(E)(iii), 8 U.S.C. 1182(a)(4)(E)(iii), excludes qualified aliens under 8 U.S.C. 1641(c) from public charge, that exclusion does not apply to the separate category of "qualified aliens" described in 8 U.S.C. 1641(b) who are subject to public charge unless otherwise subject to an exception.

[225] *See* Public Law 113–4, 127 Stat 54 (Mar. 7, 2013).

[226] *See* INA section 245(l), 8 U.S.C. 1255(l), which was created by the Victims of Trafficking and Violence Protection Act of 2000, Public Law 106–386, 114 Stat. 1464 (Oct. 8, 2000).

**Exhibit A**

are controlling. That is, DHS has determined that T nonimmigrants seeking to adjust status under section 245(a) of the Act, 8 U.S.C. 1255(a) (with a limited exception) and section 245(l) of the Act, 8 U.S.C. 1255(l) are not subject to the public charge ground of inadmissibility for purposes of establishing eligibility for adjustment of status. However, for this exemption from public charge to apply, the T nonimmigrant must hold and be in valid T nonimmigrant status at the time the Form I–485 is properly filed in compliance with 8 CFR 103.2(a)(7) and throughout the pendency of an application.[227] For the reasons stated above, DHS is amending proposed 8 CFR 212.23(a)(17) in this final rule to clarify that T nonimmigrants seeking any immigration benefit subject to section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4)—except those described in section 212(a)(4)(D) of the Act, 8 U.S.C. 1182(a)(4)(D), who must file an affidavit of support—are exempt from the public charge ground of inadmissibility, provided that the T nonimmigrant seeking the immigration benefit is in valid T nonimmigrant status at the benefit request is properly filed with USCIS and at the time the benefit request is adjudicated.[228] As section 212(a)(4)(E) of the Act, 8 U.S.C. 1182(a)(4)(E), is an additional authority for exempting T nonimmigrants, DHS has revised the authority for the

exemption to refer to sections 212(a)(4)(E) and 212(d)(13)(A) of the Act, 8 U.S.C. 1182(a)(4)(E), (d)(13)(A).[229] Additionally, based on the same rationale provided above, DHS is also modifying current 8 CFR 212.18(b)(2) and 8 CFR 245.23(c)(3) to accurately reflect changes codified by Congress in 2013 in relation to those having a pending prima facie case for status under section 101(a)(15)(T) of the Act, 8 U.S.C. 1101(a)(15)(T), or is in valid T nonimmigrant status at the time of filing for an immigration benefit, and to clarify that these individuals—with the limited exception described in INA 212(a)(4)(D), 8 U.S.C. 1182(a)(4)(D)—are not subject to the public charge ground of inadmissibility. As discussed further under the PRA section of this final rule, DHS is also making conforming changes to the Form I–601 instructions.

Individuals seeking U nonimmigrant status and U nonimmigrants seeking adjustment of status on account of their U nonimmigrant status are generally exempt from the public charge ground.[230] In accordance with section 804 of the VAWA 2013,[231] which added new section 212(a)(4)(E) of the Act, 8 U.S.C. 1182(a)(4)(E), an individual who is an applicant for, or is granted U nonimmigrant status is exempt from the public charge ground of inadmissibility.[232] However, for this exemption from public charge to apply, the U nonimmigrant must hold and be

in valid U nonimmigrant status at the time the Form I–485 is properly filed in compliance with 8 CFR 103.2(a)(7) and throughout the pendency of an application.[233] Therefore, DHS clarified in this final rule that these individuals are not subject to the public charge ground of inadmissibility when seeking an immigration benefit,[234] to accurately reflect changes enacted by Congress in VAWA 2013. Additionally, VAWA self-petitioners are generally exempt from the public charge ground of inadmissibility.[235] Similar to T nonimmigrants (and as described above), U nonimmigrants and VAWA self-petitioners who are adjusting status under an employment-based category that is required to execute an affidavit of support described in section 213A, 8 U.S.C. 1183a, under 212(a)(4)(D) of the INA, 8 U.S.C. 1182(a)(4)(D), must still execute that affidavit of support to overcome the public charge ground of inadmissibility.

4. Summary of Applicability, Exemptions, and Waivers

The following tables provide a summary of all nonimmigrant and immigrant classification and whether they are subject to the public charge inadmissibility determination and submit an I–944 or are subject to the public benefit condition for extension of stay and change of status nonimmigrants.

TABLE 2—SUMMARY OF NONIMMIGRANT CATEGORIES SUBJECT TO PUBLIC BENEFITS CONDITION

| Category | Eligible to apply for extension of stay (i.e., may file Form I–129 or Form I–539) * | Eligible to apply for change of status (i.e., may file Form I–129 or I–Form 539) * | Subject to public benefit condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
|---|---|---|---|
| A–1—Ambassador, Public Minister, Career Diplomat or Consular Officer, or Immediate Family; A–2—Other Foreign Government Official or Employee, or Immediate Family; INA 101(a)(15)(A), 22 CFR 41.21. | No. Not applicable as admitted for Duration of Status, 8 CFR 214.1(c)(3)(v). | Yes. Files I–539, 8 CFR 248.1(a). | No. INA 102; 22 CFR 41.21(d). |
| A–3—Attendant, Servant, or Personal Employee of A–1 or A–2, or Immediate Family; INA 101(a)(15)(A), 22 CFR 41.21. | Yes. Files Form I–539, 8 CFR 214.1(c)(2). | Yes. Files Form I–539, 8 CFR 248.1(a). | Yes. INA 102; 22 CFR 41.21(d)(3). |
| B–1—Temporary Visitor for Business; B–2—Temporary Visitor for Pleasure; * not admitted under Visa Waiver Program; INA 101(a)(15)(B). | Yes. Files Form I–539, 8 CFR 214.1(c)(2), 8 CFR 214.2(b)(1). | Yes. Files Form I–539, 8 CFR 248.1(a). | Yes. |

---

[227] See 8 CFR 103.2(b)(1) (an applicant or petitioner must establish that he or she is eligible for the requested benefits at the time of filing and the benefit request and must continue to be eligible through adjudication); see also Matter of Alarcon, 20 I&N Dec. 557, 562 (BIA 1992) (''an application for admission to the United States is a continuing application, and admissibility is determined on the basis of the facts and the law at the time the application is finally considered'').

[228] See 8 CFR 212.23(a)(17) and (18).

[229] See also INA section 212(s), 8 U.S.C. 1182(s) (excluding from the public charge determination consideration of benefits received by those eligible to receive benefits under 8 U.S.C. 1641(c)).

[230] See 8 CFR 212.23(a)(18).

[231] See Public Law 113–4, 127 Stat 54 (Mar. 7, 2013).

[232] See INA sections 212(a)(4)(E)(ii), 8 U.S.C. 1182(a)(4)(E)(ii), which exclude from public charge determinations an applicants for, or individuals granted, nonimmigrant status under section 1101(a)(15)(U).

[233] See 8 CFR 103.2(b)(1) (An applicant or petitioner must establish that he or she is eligible for the requested benefits at the time of filing and the benefit request and must continue to be eligible through adjudication). See also Matter of Alarcon, 20 I&N Dec. 557, 562 (BIA 1992) (''an application for admission to the United States is a continuing application, and admissibility is determined on the basis of the facts and the law at the time the application is finally considered.'').

[234] See 8 CFR 212.23(a)(19).

[235] See 8 CFR 212.23(a)(21).

**Exhibit A**

**Federal Register**/Vol. 84, No. 157/Wednesday, August 14, 2019/Rules and Regulations    **41337**

TABLE 2—SUMMARY OF NONIMMIGRANT CATEGORIES SUBJECT TO PUBLIC BENEFITS CONDITION—Continued

| Category | Eligible to apply for extension of stay (i.e., may file Form I–129 or Form I–539) * | Eligible to apply for change of status (i.e., may file Form I–129 or I–Form 539) * | Subject to public benefit condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
|---|---|---|---|
| C–1—Alien in Transit; C–1/D—Combined Transit and Crewmember Visa; INA 101(a)(15)(C) and (D), INA 212(d)(8). | No. 8 CFR 214.1(c)(3)(ii) .......... | No. 8 CFR 248.2(a)(2), except for change to T and U, 8 CFR 248.2(b) using Form I–914 or I–918. | Not Applicable as not eligible for extension of stay or change of status. |
| C–2—Alien in Transit to United Nations Headquarters District Under Section 11.(3), (4), or (5) of the Headquarters Agreement; INA 101(a)(15)(C) and (D), INA 212(d)(8). | No. Not applicable as admitted for Duration of Status. 8 CFR 214.1(c)(3)(ii). | No, 8 CFR 248.2(a)(2), except for change to T and U, 8 CFR 248.2(b) using Form I–914 or I–918. | No. 22 CFR 41.21(d). |
| C–3—Foreign Government Official, Immediate Family, Attendant, Servant or Personal Employee, in Transit; INA 101(a)(15)(C) and (D), INA 212(d)(8). | No. 8 CFR 214.1(c)(3)(ii) .......... | No, 8 CFR 248.2(a)(2), except for change to T and U, 8 CFR 248.2(b) using Form I–914 or I–918. | No. 22 CFR 41.21(d). |
| CW–1—Commonwealth of Northern Mariana Islands Transitional Worker Section 6(d) of Public Law 94–241, as added by Section 702(a) of Public Law 110–229. 8 CFR 214.2(w). | Yes. Files Form I–129CW, 8 CFR 214.1(c)(2) and 8 CFR 214.2(w)(17). | Yes. Files Form I–129CW, 8 CFR 214.1(a); 8 CFR 214.2(w)(18). | Yes. |
| CW–2—Spouse or Child of CW–1 ............ | Yes. Files Form I–539, 8 CFR 214.1(c)(2) and 8 CFR 214.2(w)(17)(v). | Yes. Files Form I–539, 8 CFR 248.1(a); 8 CFR 214.2(w)(18). | Yes. |
| D—Crewmember (Sea or Air); D–2—Crewmember departing from a different vessel than one of arrival; INA 101(a)(15)(D). | No. 8 CFR 214.1(c)(3)(iii) ......... | No, 8 CFR 248.2(a)(2), except for change to T and U, 248.2(b) using Form I–914 or Form I–918. | Yes. |
| E–1, E–2—Treaty Trader (Principal); INA 101(a)(15)(E). | Yes. Files Form I–129, 8 CFR 214.1(c)(1); 8 CFR 214.2(e)(20). | Yes. Files Form I–129, 8 CFR 248.1(a), 8 CFR 214.2(e)(21)(i). | Yes. |
| E–1, E–2—Treaty Trader, Spouse or Child; INA 101(a)(15)(E). | Yes. Files Form I–539, 8 CFR 214.1(c)(2). | Yes. Files Form I–539, 8 CFR 214.2(e)(21)(ii),. | Yes. |
| E–2–CNMI—Commonwealth of Northern Mariana Islands Investor (Principal) Section 6(c) of Public Law 94–241, as added by Section 702(a) of Public Law 110–229.8 CFR 214.2(e)(23). | Yes. Files Form I–129, 8 CFR 214.2(e)(23)(xii). | Yes. Files Form I–129, 8 CFR 248.1(a), 8 CFR 214.2(e)(23)(xiii). | Yes. |
| E–2–CNMI—Commonwealth of Northern Mariana Islands Investor, Spouse or Child Section 6(c) of Public Law 94–241, as added by Section 702(a) of Public Law 110–229. 8 CFR 214.2(e)(23)(x). | Yes. Files Form I–539, 8 CFR 214.1(c)(2). | Yes. Files Form I–539, 8 CFR 248.1(a). | Yes. |
| E–3—Australian Treaty Alien coming to the United States Solely to Perform Services in a Specialty Occupation. | Yes. Files Form I–129, 8 CFR 214.1(c)(1) and (2). | Yes. Files Form I–129, 8 CFR 248.1(a). | Yes. |
| E–3D—Spouse or Child of E–3; E–3R—Returning E–3; INA 101(a)(15)(E)(iii). | Yes. Files I–539, 8 CFR 214.1(c)(1) and (2). | Yes. Files I–539, 8 CFR 248.1(a). | Yes. |
| F–1—Student in an academic or language training program (principal); INA 101(a)(15)(F). | Yes, only if the F–1 requesting reinstatement to F–1 status or if the F–1 received a date-specific admission to attend high school and is now seeking an extension to D/S to attend college. 8 CFR 214.1(c)(3)(v); 8 CFR 214.2(f)(7); 8 CFR 214.2(f)(16). | Yes. Files Form I–539, 8 CFR 248.1(a),. | Yes. |
| F–2—Spouse or Child of F–1; INA 101(a)(15)(F). | No, not applicable as admitted for Duration of Status. 8 CFR 214.1(c)(3)(v); 8 CFR 214.2(f)(3). | Yes. Files Form I–539, 8 CFR 214.2(f)(3). | Yes. |

**Exhibit A**

TABLE 2—SUMMARY OF NONIMMIGRANT CATEGORIES SUBJECT TO PUBLIC BENEFITS CONDITION—Continued

| Category | Eligible to apply for extension of stay (i.e., may file Form I–129 or Form I–539) * | Eligible to apply for change of status (i.e., may file Form I–129 or I–Form 539) * | Subject to public benefit condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
|---|---|---|---|
| G–1—Principal Resident Representative of Recognized Foreign Government to International Organization, Staff, or Immediate Family; G–2—Other Representative of Recognized Foreign Member Government to International Organization, or Immediate Family; G–3—Representative of Nonrecognized or Nonmember Foreign Government to International Organization, or Immediate Family; G–4—International Organization Officer or Employee, or Immediate Family; INA 101(a)(15)(G). | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v). | Yes. Files Form I–539, 8 CFR 248.1(a). | No. 22 CFR 41.21(d). |
| G–5—Attendant, Servant, or Personal Employee of G–1 through G–4, or Immediate Family. | Yes. Files Form I–539, 8 CFR 214.1(c)(2). | Yes. Files Form I–539, 8 CFR 248.1(a). | Yes. |
| H–1B—Alien in a Specialty Occupation, Fashion Models of Distinguished Merit and Ability, and workers performing services of exceptional merit and ability relating to a Department of Defense (DOD) cooperative research and development project; INA 101(a)(15)(H)(i)(b); Section 222 of Pub. L. 101–649. | Yes. Files Form I–129, 8 CFR 214.1(c)(1). | Yes. Files Form I–129.8 CFR 248.1(a). | Yes. |
| H–1B1—Chilean or Singaporean National to Work in a Specialty Occupation; INA 101(a)(15)(H)(i)(b1). | Yes. Files Form I–129, 8 CFR 214.1(c)(1). | Yes. Files Form I–129. 8 CFR 248.1(a). | Yes. |
| H–1C [236]—Nurse in health professional shortage area; INA 101(a)(15)(H)(i)(c). | Yes. Filed Form I–129, 8 CFR 212.2(h)(4)(v)(E). | Yes. Filed Form I–129, 8 CFR 212.2(h)(4)(v)(E). | Yes. |
| H–2A—Temporary Worker Performing Agricultural Services Unavailable in the United States; INA 101(a)(15)(H)(ii)(a). | Yes. Files Form I–129, 8 CFR 214.1(c)(1). | Yes. Files Form I–129 .............. | Yes. |
| H–2B—Temporary Worker Performing Other Services Unavailable in the United States; INA 101(a)(15)(H)(ii)(b). | Yes. Files Form I–129, 8 CFR 214.1(c)(1). | Yes. Files Form I–129 .............. | Yes. |
| H–3—Trainee; INA 101(a)(15)(H)(iii) ........ | Yes. Files Form I–129, 8 CFR 214.1(c)(1). | Yes. Files Form I–539 .............. | Yes. |
| H–4—Spouse or Child of Alien Classified H1B/B1/C, H2A/B, or H–3; INA 101(a)(15)(H)(iv). | Yes. Files Form I–539, 8 CFR 214.1(c)(2). | Yes. Files Form I–539. 8 CFR 248.1(a). | Yes. |
| I—Representative of Foreign Information Media, Spouse and Child; INA 101(a)(15)(I). | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v). | Yes. Files Form I–539 .............. | Yes. |
| J–1—Exchange Visitor; J–2—Spouse or Child of J1; INA 101(a)(15)(J). | No, not applicable, as generally admitted for Duration of Status [237] 8 CFR 214.1(c)(3)(v). | Yes, subject to receiving a waiver of the foreign residence requirement, if necessary, Files I–539. 8 CFR 248.2(a)(4); may apply for change to T and U, using Form I–914 or I–918, 8 CFR 248.2(b). | Yes. |
| K–1—Fiance(e) of United States Citizen; K–2—Child of Fiance(e) of U.S. Citizen; INA 101(a)(15)(K). | No. 8 CFR 214.1(c)(3)(iv) ........ | No. 8 CFR 248.2(a)(2) except for change to T and U, 248.2(b) using Form I–914 or I–918. | Not Applicable. |
| K–3—Spouse of U.S. Citizen awaiting availability of immigrant visa; K–4—Child of K–3; INA 101(a)(15)(K). | Yes. Files Form I–539, 8 CFR 214.1(c)(2) and 8 CFR 214.2(k)(10). | No. 8 CFR 248.2(2) except for change to T and U, 248.2(b) using Form I–914 or I–918. | Yes. |
| L–1—Intracompany Transferee (Executive, Managerial, and Specialized Knowledge Personnel Continuing Employment with International Firm or Corporation); INA 101(a)(15)(L). | Yes. Files Form I–129, 8 CFR 214.1(c)(1). | Yes. Files Form I–129, 8 CFR 248.1(a). | Yes. |
| L–2—Spouse or Child of Intracompany Transferee. | Yes. Files I–539 8 CFR 214.1(c)(1) and (2). | Yes. Files Form I–539, 8 CFR 248.1(a). | Yes. |
| M–1—Vocational Student or Other Nonacademic Student; INA 101(a)(15)(M). | Yes. Files Form I–539, 8 CFR 214.1(c)(2). | Yes. Files Form I–539. Not eligible if requesting F–1, 8 CFR 248.1(c)(1). | Yes. |

**Exhibit A**

*Federal Register*/Vol. 84, No. 157/Wednesday, August 14, 2019/Rules and Regulations **41339**

TABLE 2—SUMMARY OF NONIMMIGRANT CATEGORIES SUBJECT TO PUBLIC BENEFITS CONDITION—Continued

| Category | Eligible to apply for extension of stay (*i.e.*, may file Form I–129 or Form I–539) * | Eligible to apply for change of status (*i.e.*, may file Form I–129 or I–Form 539) * | Subject to public benefit condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
|---|---|---|---|
| M–2—Spouse or Child of M–1; INA 101(a)(15)(M). | Yes. Files Form I–539, 8 CFR 214.1(c)(2). | Yes. Files Form I–539 .............. | Yes. |
| N–8—Parent of an Alien Classified SK3 (Unmarried Child Employee of International Organization) or SN–3; N–9—Child of N–8 or of SK–1 (Retired Employee International Organization), SK–2 (Spouse), SK–4 (surviving spouse), SN–1 (certain retired NATO 6 civilian employee), SN–2 (spouse) or SN–4 (surviving spouse); INA 101(a)(15)(N). | Yes. Files Form I–539, 8 CFR 214.1(c)(2). | Yes. Files Form I–539, 8 CFR 248.1(e). | Yes. |
| NATO–1—Principal Permanent Representative of Member State to NATO (including any of its Subsidiary Bodies) Resident in the U.S. and Resident Members of Official Staff; Secretary General, Assistant Secretaries General, and Executive Secretary of NATO; Other Permanent NATO Officials of Similar Rank, or Immediate Family Art. 12, 5 UST 1094; Art. 20, 5 UST 1098. | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v). | Yes. Files Form I–539, 8 CFR 248.1(a). | No. INA 102; 22 CFR 41.21(d). |
| NATO–2—Other Representative of member state to NATO (including any of its Subsidiary Bodies) including Representatives, Advisers, and Technical Experts of Delegations, or Immediate Family; Dependents of Member of a Force Entering in Accordance with the Provisions of the NATO Status-of-Forces Agreement or in Accordance with the provisions of the ''Protocol on the Status of International Military Headquarters''; Members of Such a Force if Issued Visas Art. 13, 5 UST 1094; Art. 1, 4 UST 1794; Art. 3, 4 UST 1796. | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v). | Yes. Files Form I–539, 8 CFR 248.1(a). | No. INA 102; 22 CFR 41.21(d). |
| NATO–3—Official Clerical Staff Accompanying Representative of Member State to NATO (including any of its Subsidiary Bodies), or Immediate Family Art. 14, 5 UST 1096. | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v). | Yes. Files Form I–539, 8 CFR 248.1(a). | No. INA 102; 22 CFR 41.21(d). |
| NATO–4—Official of NATO (Other Than Those Classifiable as NATO1), or Immediate Family Art. 18, 5 UST 1098. | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v). | Yes. Files Form I–539, 8 CFR 248.1(a). | No. INA 102; 22 CFR 41.21(d). |
| NATO–5—Experts, Other Than NATO Officials Classifiable Under NATO 4, Employed in Missions on Behalf of NATO, and their Dependents Art. 21, 5 UST 1100. | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v). | Yes. Files Form I–539, 8 CFR 248.1(a). | No. INA 102; 22 CFR 41.21(d). |
| NATO–6—Member of a Civilian Component Accompanying a Force Entering in Accordance with the Provisions of the NATO Status-of-Forces Agreement; Member of a Civilian Component Attached to or Employed by an Allied Headquarters Under the ''Protocol on the Status of International Military Headquarters'' Set Up Pursuant to the North Atlantic Treaty; and their Dependents Art. 1, 4 UST 1794; Art. 3, 5 UST 877. | No, not applicable as admitted for Duration of Status 8 CFR 214.1(c)(3)(v). | Yes. Files Form I–539, 8 CFR 248.1(a). | No. INA 102; 22 CFR 41.21(d). |
| NATO 7—Attendant, Servant, or Personal Employee of NATO 1, NATO 2, NATO 3, NATO 4, NATO 5, and NATO 6 Classes, or Immediate Family Arts. 12–20, 5 UST 1094–1098. | Yes. Files Form I–539, 8 CFR 214.2(s)(1)(ii).. | Yes. Files Form I–539, 8 CFR 248.1(a). | No. INA 102; 22 CFR 41.21(d). |

**Exhibit A**

**41340** **Federal Register**/Vol. 84, No. 157/Wednesday, August 14, 2019/Rules and Regulations

TABLE 2—SUMMARY OF NONIMMIGRANT CATEGORIES SUBJECT TO PUBLIC BENEFITS CONDITION—Continued

| Category | Eligible to apply for extension of stay (*i.e.*, may file Form I–129 or Form I–539) * | Eligible to apply for change of status (*i.e.*, may file Form I–129 or I–Form 539) * | Subject to public benefit condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
|---|---|---|---|
| O–1—Alien with Extraordinary Ability in Sciences, Arts, Education, Business or Athletics or Extraordinary Achievement in the Motion Picture or Television Industry; O–2—Essential Support Workers Accompanying and Assisting in the Artistic or Athletic Performance by O–1 INA 101(a)(15)(O). | Yes. Files Form I–129, 8 CFR 214.1(c)(1). | Yes. Files Form I–129, 8 CFR 248.1(a). | Yes. |
| O–3—Spouse or Child of O–1 or O–2 INA 101(a)(15)(O). | Yes. Files Form I–539, 8 CFR 214.1(c)(1) and (2). | Yes. Files Form I–539, 8 CFR 248.1(a). | Yes. |
| P–1—Internationally Recognized Athlete or Member of Internationally Recognized Entertainment Group; P–2—Artist or Entertainer in a Reciprocal Exchange Program; P–3—Artist or Entertainer in a Culturally Unique Program INA 101(a)(15)(P); P–1S/P–2S/P–3S—Essential Support Workers 8 CFR 214.2(p). | Yes. Files Form I–129, 8 CFR 213.1(c)(3)(i). | Yes. Files Form I–129, 8 CFR 248.1(a). | Yes. |
| P–4—Spouse or Child of P–1, P–2, or P–3; INA 101(a)(15)(P). | Yes. Files Form I–539, 8 CFR 214.1(c) (1) and (2). | Yes. Files Form I–539, 8 CFR 248.1(a). | Yes. |
| Q–1—Participant in an International Cultural Exchange Program; INA 101(a)(15)(Q)(i). | Yes. Files Form I–129, 8 CFR 213.1(c)(3)(i). | Yes. Files Form I–129, 8 CFR 248.1(a). | Yes. |
| R–1—Alien in a Religious Occupation; INA 101(a)(15)(R). | Yes. Files Form I–129, 8 CFR 213.1(c)(3)(i). | Yes. Files Form I–129, 8 CFR 248.1(a). | Yes. |
| R–2—Spouse or Child of R–1; INA 101(a)(15)(R). | Yes. Files Form I–539, 8 CFR 214.1(c)(1) and (2). | Yes. Files Form I–539, 8 CFR 248.1(a). | Yes. |
| S–5—Certain Aliens Supplying Critical Information Relating to a Criminal Organization or Enterprise; S–6—Certain Aliens Supplying Critical Information Relating to Terrorism; S–7—Qualified Family Member of S–5 or S–6 INA 101(a)(15)(S). | No. 8 CFR 213.1(c)(3)(vi) ......... | No. 8 CFR 248.2(2) except for change to T and U, 248.2(b) using Form I–914 or I–918. | Yes. |
| T–1—Victim of a severe form of trafficking in persons; INA 101(a)(15)(T). | Yes. Files Form I–539. INA § 214(o)(7)(B); 8 CFR 214.11(l)(1) and (2); 8 CFR 214.1(c)(2). | Yes. Files Form I–539, 8 CFR 248.1(a). | No. |
| T–2—Spouse of T–1; T–3—Child of T–1; T–4—Parent of T–1 under 21 years of age; T–5—Unmarried Sibling under age 18 of T–1; T–6—Adult or Minor Child of a Derivative Beneficiary of a T–1; INA 101(a)(15)(T). | Yes. Files Form I–539. INA 214(o)(7)(B); 8 CFR 214.1(c)(2). | Yes. Files Form Files I–539, 8 CFR 248.1(a). | No. |
| TN—NAFTA Professional; INA 214(e)(2) .. | Yes. Files Form I–129, 8 CFR 214.1(c)(1). | Yes. Files Form Files I–129, 8 CFR 248.1(a). | Yes. |
| TD—Spouse or Child of NAFTA Professional; INA 214(e)(2). | Yes. Files Form I–539, 8 CFR 214.1(c)(2). | Yes. Files Form I–539, 8 CFR 248.1(a). | Yes. |
| U–1—Victim of criminal activity; U–2—Spouse of U–1; U–3—Child of U–1; U–4—Parent of U–1 under 21 years of age; U–5—Unmarried Sibling under age 18 of U–1 under 21 years of age; INA 101(a)(15)(U). | Yes. Files Form I–539, 8 CFR 214.1(c)(2); 8 CFR 214.14(g)(2). | Yes. Files Form I–539, 8 CFR 248.1(a). | No. |
| V–1—Spouse of a Lawful Permanent Resident Alien Awaiting Availability of Immigrant Visa; V–2—Child of a Lawful Permanent Resident Alien Awaiting Availability of Immigrant Visa; V–3—Child of a V–1 or V–2 INA 101(a)(15)(V)(i) or INA 101(a)(15)(V)(ii); INA 203(d). | Yes. Files Form I–539, 8 CFR 214.1(c)(2); 8 CFR 214.15(g)(3). | Yes. Files Form I–539, 8 CFR 248.1(a); 214.15(g)(3). | Yes. |

**Exhibit A**

TABLE 2—SUMMARY OF NONIMMIGRANT CATEGORIES SUBJECT TO PUBLIC BENEFITS CONDITION—Continued

| Category | Eligible to apply for extension of stay (i.e., may file Form I–129 or Form I–539) * | Eligible to apply for change of status (i.e., may file Form I–129 or I–Form 539) * | Subject to public benefit condition under proposed 8 CFR 214.1(a)(3)(iv), 214.1(a)(4)(iv); 248.1(c)(4) |
|---|---|---|---|
| W–B—Visa Waiver for visitor for business; W–T—visitor for pleasure, Visa Waiver Program; INA 217. | No. 8 CFR 214.1(c)(3)(i) and 214.1(c)(3)(viii). | No, except for change to T and U, using Form I–914 or I–918; INA 248.2(b). | Not Applicable. |

* Includes questions on Form I–129 and Form I–539 about receipt of public benefits since the nonimmigrant status was approved. Whether the alien must file and I–129 or an I–539 depends on the status the alien is applying to change to or extend. If more than one person is applying using the I–539 application, the Form I–539A, Supplemental Information for Application to extend/Change Nonimmigrant Status, is submitted to provide all of the requested information for each additional applicant listed.

TABLE 3—APPLICABILITY OF INA 212(a)(4) TO FAMILY-BASED ADJUSTMENT OF STATUS APPLICATIONS [238]

| Category | Subject to INA 212(a)(4) and must file Form I–944, Declaration of Self-Sufficiency? * | INA 213A and Form I–864, affidavit of support under section 213A of the INA, required or exempt? |
|---|---|---|
| Immediate Relatives of U.S. citizens including spouses, children and parents [239]. | Yes. INA 212(a)(4) ...................... | Required. INA 212(a)(4)(C). |
| Family-Based First Preference: Unmarried sons/daughters of U.S. citizens and their children [240]. | Yes. INA 212(a)(4) ...................... | Required. INA 212(a)(4)(C). |
| Family-Preference Second: Spouses, children, and unmarried sons/daughters of alien residents [241]. | Yes. INA 212(a)(4) ...................... | Required. INA 212(a)(4)(C). |
| Family Preference Third: Married sons/daughters of U.S. citizens and their spouses and children [242]. | Yes. INA 212(a)(4) ...................... | Required. INA 212(a)(4)(C). |
| Family Preference Fourth: Brothers/sisters of U.S. citizens (at least 21 years of age) and their spouses and children [243]. | Yes. INA 212(a)(4) ...................... | Required. INA 212(a)(4)(C). |
| Fiancé, * admitted as nonimmigrant K–1/K2 [244] | Yes. INA 212(a)(4) ...................... | Required. INA 212(a)(4)(C). |
| Amerasians based on preference category-born between December 31, 1950 and before October 22, 1982 [245]. | Yes. INA 212(a)(4) ...................... | Exempt. Amerasian Act, Public Law 97–359 (Oct. 22, 1982). |

[236] This classification can no longer be sought as of December 20, 2009. See the Nursing Relief for Disadvantaged Areas Reauthorization Act of 2005, Public Law 109–423.

[237] J nonimmigrant who are admitted for a specific time period are not eligible for an extension of stay.

[238] Applicants who filed a Form I–485 prior to December 19, 1997 are exempt from the Affidavit of Support requirement. See Public Law 104–208, div. C., section 531(b), 110 Stat. 3009–546, 3009–675 (Sept. 30, 1996); 8 CFR 213a.2(a)(2)(i) (adjustment applicants) and 213a.2(a)(2)(ii)(B) (applicants for admission). Aliens who acquired citizenship under section 320 of the Act upon admission to the United States are exempt from submitting an affidavit of support. See 8 CFR 213a.2(a)(2)(ii)(E); Child Citizenship Act, Public Law 106–395, section 101, 114 Stat. 1631, 1631 (Oct. 30, 2000) (amending INA section 320). In addition, the surviving spouses, children, and parents of a deceased member of the military who obtain citizenship posthumously are exempt from a public charge determination. See National Defense Authorization Act For Fiscal Year 2004, Public Law 108–136, section 1703(e), 117 Stat. 1392, 1695 (Nov. 24, 2003). An alien who meets the conditions of new 8 CFR 212.23(a)(18), (19), (20), or (21) (e.g., certain T nonimmigrants, U nonimmigrants, and VAWA self-petitioners) are exempt from the public charge inadmissibility ground and the affidavit of support requirement, and therefore do not need to File Form I–944 or Form I–864 regardless of what category the alien adjusts under.

[239] Including the following categories: IR–6 Spouses; IR–7 Children; CR–7 Children,

conditional; IH–8 Children adopted abroad under the Hague Adoption Convention; IH–9 Children coming to the United States to be adopted under the Hague Adoption Convention; IR–8 Orphans adopted abroad; IR–9 Orphans coming to the United States to be adopted; IR–0 Parents of adult U.S. citizens. Note children adopted abroad generally do not apply for adjustment of status.

[240] Including the following categories: A–16 Unmarried Amerasian sons/daughters of U.S. citizens; F–16 Unmarried sons/daughters of U.S. citizens; A–17 Children of A–11 or A–16; F–17 Children of F–11 or F–16; B–17 Children of B–11 or B–16.

[241] Including the following categories: F–26 Spouses of alien residents, subject to country limits; C–26 Spouses of alien residents, subject to country limits, conditional; FX–6 Spouses of alien residents, exempt from country limits; CX–6 Spouses of alien residents, exempt from country limits, conditional; F–27 Children of alien residents, subject to country limits; C–28 Children of C–26, or C–27, subject to country limits, conditional; B–28 Children of B–26, or B–27, subject to country limits; F–28 Children of F–26, or F–27, subject to country limits; C–20 Children of C–29, subject to country limits, conditional; B–20 Children of B–29, subject to country limits; F–20 Children of F–29, subject to country limits; C–27 Children of alien residents, subject to country limits, conditional; FX–7 Children of alien residents, exempt from country limits; CX–8 Children of CX–7, exempt from country limits, conditional; FX–8 Children of FX–7, or FX–8, exempt from country limits; CX–7 Children of alien residents, exempt from country limits, conditional; F–29 Unmarried sons/daughters

of alien residents, subject to country limits; C–29 Unmarried children of alien residents, subject to country limits, conditional.

[242] Including the following categories: A–36 Married Amerasian sons/daughters of U.S. citizens; F–36 Married sons/daughters of U.S. citizens; C–36 Married sons/daughters of U.S. citizens, conditional; A–37 Spouses of A–31 or A–36; F–37 Spouses of married sons/daughters of U.S. citizens; C–37 Spouses of married sons/daughters of U.S. citizens, conditional; B–37 Spouses of B–31 or B–36; A–38 Children of A–31 or A–36, subject to country limits; F–38 Children of married sons/ daughters of U.S. citizens; C–38 Children of C–31 or C–36, subject to country limits, conditional; B–38 Children of B–31 or B–36, subject to country limits.

[243] Includes the following categories: F–46 Brothers/sisters of U.S. citizens, adjustments; F–47 Spouses of brothers/sisters of U.S. citizens, adjustments; F–48 Children of brothers/sisters of U.S. citizens, adjustments.

[244] Includes the following categories: CF–1 Spouses, entered as fiance(e), adjustments conditional; IF–1 Spouses, entered as fiance(e), adjustments.

[245] Includes the following categories: Immediate Relative AR–6 Children, Amerasian, First Preference: A–16 Unmarried Amerasian sons/ daughters of U.S. citizens; Third Preference A–36 Married Amerasian sons/daughters of U.S. citizens; See INA 204(f). Note that this program does not have a specific sunset date and technically applicants could apply but should have already applied.

TABLE 3—APPLICABILITY OF INA 212(a)(4) TO FAMILY-BASED ADJUSTMENT OF STATUS APPLICATIONS [238]—Continued

| Category | Subject to INA 212(a)(4) and must file Form I–944, Declaration of Self-Sufficiency? * | INA 213A and Form I–864, affidavit of support under section 213A of the INA, required or exempt? |
|---|---|---|
| Amerasians, born in Vietnam between 1/1/62–1/1/76. Immediate Relative: AM–6, AR–6 Children; Amerasians under Amerasian Homecoming Act, Public Law 100–202 (Dec. 22, 1987) [246]—born between 1/1/1962–1/1/1976. | No. (I–360 and adjustment) Section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988, Public Law 100–202. | Exempt. Section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988, Public Law 100–202. |
| IW–6 Spouses, widows or widowers ............ | Yes. INA 212(a)(4) ............ | Exempt. 8 CFR 204.2 and 71 FR 35732. |
| Immediate Relative VAWA applicant, including spouses and children [247]. | No. INA 212(a)(4)(E) ............ | Exempt. INA 212(a)(4)(E). |
| First Preference VAWA, B–16 Unmarried sons/daughters of U.S. citizens, self-petitioning; B–17 Children of B–16. | No. INA 212(a)(4)(C)(i) ............ | Exempt. INA 212(a)(4)(C)(i). |
| Second Preference VAWA applicant, including spouses and children [248]. | No. INA 212(a)(4)(C)(i) ............ | Exempt. INA 212(a)(4)(C)(i). |
| Third Preference VAWA. Married son/daughters of U.S. citizen, including spouses and children [249]. | No. INA 212(a)(4)(C)(i) ............ | Exempt. INA 212(a)(4)(C)(i). |

*If found inadmissible based on the public charge ground, USCIS, at its discretion, may permit the alien to post a public charge bond (Form I–945). A public charge bond may be cancelled (Form I–356) upon the death, naturalization (or otherwise obtaining U.S. citizenship), permanent departure of the alien, or otherwise as outlined in proposed 8 CFR 213.1(g), if the alien did not receive any public benefits as defined in the proposed rule.

TABLE 4—APPLICABILITY OF INA 212(a)(4) TO EMPLOYMENT-BASED ADJUSTMENT OF STATUS APPLICATIONS [250]

| Category | Subject to INA 212(a)(4) and must file Form I–944, Declaration of Self-Sufficiency? * | INA 213A, and Form I–864, Affidavit of Support under section 213A of the INA, required or exempt? |
|---|---|---|
| First Preference: Priority workers [251] ............ | Yes, in general. [252] INA 212(a)(4) ............ | Exempt, unless qualifying relative or entity in which such relative has a significant ownership interest (5% or more) [253] in filed Form I–140. INA 212(a)(4)(D), 8 CFR 213a. |
| Second Preference: Professionals with advanced degrees or aliens of exceptional ability [254]. | Yes in general. [255] INA 212(a)(4) ............ | Exempt, unless qualifying relative or entity in which such relative has a significant ownership interest (5% or more) in filed Form I–140. INA 212(a)(4)(D), 8 CFR 213a. |

[246] Includes the following categories: AM–1 principal (born between 1/1/1962–1/1/1976); AM–2 Spouse, AM–3 child; AR–1 child of U.S. citizen born Cambodia, Korea, Laos, Thailand, Vietnam. Note that this program does not have a specific sunset date and technically applicants could apply but should have already applied.

[247] Includes the following categories: IB–6 Spouses, self-petitioning; IB–7 Children, self-petitioning; IB–8 Children of IB–1 or IB–6; IB–0 Parents battered or abused, of U.S. citizens, self-petitioning.

[248] Includes the following categories: B–26 Spouses of alien residents, subject to country limits, self-petitioning; BX–6 Spouses of alien residents, exempt from country limits, self-petitioning; B–27 Children of alien residents, subject to country limits, self-petitioning; BX–7 Children of alien residents, exempt from country limits, self-petitioning; BX–8 Children of BX–6, or BX–7, exempt from country limits; B–29 Unmarried sons/daughters of alien residents, subject to country limits, self-petitioning.

[249] Includes the following categories: B–36 Married sons/daughters of U.S. citizens, self-petitioning B–37 Spouses of B–36, adjustments; B–38 Children of B–36, subject to country limits; Third Preference VAWA; B–36 Married sons/

daughters of U.S. citizens, self-petitioning; B–37 Spouses of B–36, adjustments B–38 Children of B–36, subject to country limits; Third Preference VAWA; B–37 Spouses of B–36, adjustments; B–38 Children of B–36, subject to country limits.

[250] An alien who meets the conditions of new 8 CFR 212.23(a)(18), (19), (20), or (21) (e.g., certain T nonimmigrants, U nonimmigrants, and VAWA self-petitioners) are exempt from the public charge inadmissibility ground and the affidavit of support requirement, and therefore do not need to File Form I–944 or Form I–864 regardless of what category the alien adjusts under.

[251] Includes the following categories: E–16 Aliens with extraordinary ability; E–17 Outstanding professors or researchers; E–18 Certain Multinational executives or managers; E–19 Spouses of E–11, E–12, E–13, E–16, E–17, or E–18; E–10 Children of E–11, E–12, E–13, E–16, E–17, or E–18.

[252] If the alien is adjusting based on an employment-based petition where the petition is filed by either a qualifying relative, or an entity in which such relative has a significant ownership interest (5% or more), and the alien, at both the time of filing and adjudication of the Form I–485, also falls under a category exempted under INA section 212(a)(4)(E), 8 U.S.C. 1182(a)(4)(E), (e.g., T

nonimmigrants, U nonimmigrants, and VAWA self-petitioners) the alien does not need to file Form I–944 (but is still required to file Form I–864).

[253] Relative means a husband, wife, father, mother, child, adult son, adult daughter, brother, or sister. Significant ownership interest means an ownership interest of five percent or more in a for-profit entity that filed an immigrant visa petition to accord a prospective employee an immigrant status under section 203(b) of the Act. See 8 CFR.213a.1.

[254] Includes the following categories: E–26 Professionals holding advanced degrees; ES–6 Soviet scientists E–27 Spouses of E–21 or E–26; E–28 Children of E–21 or E–26.

[255] If the alien is adjusting based on an employment-based petition where the petition is filed by either a qualifying relative, or an entity in which such relative has a significant ownership interest (five percent or more), and the alien, at both the time of filing and adjudication of the Form I–485, also falls under a category exempted under INA section 212(a)(4)(E), 8 U.S.C. 1182(a)(4)(E), (e.g., T nonimmigrants, U nonimmigrants, and VAWA self-petitioners) the alien does not need to file Form I–944 (but is still required to file Form I–864).

**Exhibit A**

Federal Register / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations    41343

TABLE 4—APPLICABILITY OF INA 212(a)(4) TO EMPLOYMENT-BASED ADJUSTMENT OF STATUS APPLICATIONS [250]—Continued

| Category | Subject to INA 212(a)(4) and must file Form I–944, Declaration of Self-Sufficiency? * | INA 213A, and Form I–864, Affidavit of Support under section 213A of the INA, required or exempt? |
|---|---|---|
| Third: Skilled workers, professionals, and other workers [256] .................................. | Yes in general.[257] INA 212(a)(4) ........... | Exempt, unless qualifying relative or entity in which such relative has a significant ownership interest (5% or more) in filed Form I–140. INA 212(a)(4)(D), 8 CFR 213a. |
| Fifth: I–526 Immigrant Petition by Alien Entrepreneur (EB–5) INA 203(b)(5), 8 CFR 204.6 [258]. | Yes. INA 212(a)(4) ................................. | Not Applicable.[259] |

* If found inadmissible based on the public charge ground, USCIS, at its discretion, may permit the alien to post a public charge bond (Form I–945). A public charge bond may be cancelled (Form I–356) upon the death, naturalization (or otherwise obtaining U.S. citizenship), permanent departure of the alien, or upon the fifth year of the alien's anniversary of the adjustment of status, or, if the alien, following the initial grant of lawful permanent resident status, obtains a status that is exempt from the public charge ground of inadmissibility, and provided that the alien did not receive any public benefits as defined in the proposed rule.

TABLE 5—APPLICABILITY OF INA 212(a)(4) TO SPECIAL IMMIGRANT ADJUSTMENT OF STATUS APPLICATION

| Category | Subject to INA 212(a)(4) and must file Form I–944, Declaration of Self-Sufficiency? * | INA 213A, and Form I–864, Affidavit of Support under section 213A of the INA, required or exempt? |
|---|---|---|
| Special Immigrant (EB–4)—Religious Workers. 8 CFR 204.5(m); INA 101(a)(27)(C) [260]. | Yes. INA 212(a)(4) ........................ | Not Applicable.[261] |
| Special Immigrant (EB–4)—International employees of U.S. government abroad. INA 101(a)(27)(D), 22 CFR 42.32(d)(2) [262]. | Yes. INA 212(a)(4) ........................ | Not Applicable.[263] |
| Special Immigrant (EB–4)—Employees of Panama Canal. 22 CFR 42.32(d)(3); INA 101(a)(27)(E), INA 101(a)(27)(F), and INA 101(a)(27)(G) [264]. | Yes. INA 212(a)(4) ........................ | Not Applicable.[265] |
| Special Immigrant (EB–4)—Foreign Medical School Graduates. INA 101(a)(27)(H), INA 203(b)(4) [266]. | Yes. INA 212(a)(4) ........................ | Not Applicable.[267] |

[256] Includes the following categories: EX–6 Schedule—A worker; EX–7 Spouses of EX–6; EX–8 Children of EX–6; E–36 Skilled workers; E–37 Professionals with baccalaureate degrees; E–39 Spouses of E–36, or E–37; E–30 Children of E–36, or E–37; EW–8 Other workers; EW–0 Children of EW–8; EW–9 Spouses of EW–8; EC–6 Chinese Student Protection Act (CSPA) principals; EC–7 Spouses of EC–6; EC–8 Children of EC–6.

[257] If the alien is adjusting based on an employment-based petition where the petition is filed by either a qualifying relative, or an entity in which such relative has a significant ownership interest (5% or more), and the alien, at both the time of filing and adjudication of the Form I–485, also falls under a category exempted under INA section 212(a)(4)(E), 8 U.S.C. 1182(a)(4)(E), (e.g., T nonimmigrants, U nonimmigrants, and VAWA self-petitioners) the alien does not need to file Form I–944 (but is still required to file Form I–864).

[258] Includes the following categories: C–56 Employment creation, not in targeted area, adjustments, conditional E–56 Employment creation; I–56 Employment creation, targeted area, pilot program, adjustments, conditional; T–56 Employment creation, targeted area, conditional; R–56 Investor pilot program, not targeted, conditional; C–57 Spouses of C–51 or C–56, conditional; E–57 Spouses of E–51 or E–56; I–57 Spouses of I–51 or I–56, conditional; T–57 Spouses of T–51 or T–56, conditional; R–57 Spouses of R–51 or R–56, conditional; C–58 Children of C–51 or C–56, conditional; E–58 Children of E–51 or E–56; I–58 Children of I–51 or I–56, conditional; T–58

Children of T–51 or T–56, conditional; R–58 Children of R–51 or R–56, conditional.

[259] EB–5 applicants are Form I–526, Immigrant Petition by Alien Entrepreneur, self-petitioners. The regulation at 8 CFR 213a.1 relates to a person having ownership interest in an entity filing for a prospective employee and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[260] Includes the following categories: SD–6 Ministers; SD–7 Spouses of SD–6; SD–8 Children of SD–6; SR–6 Religious workers; SR–7 Spouses of SR–6; SR–8 Children of SR–6.

[261] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers (for example, a religious institution), would generally not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[262] Includes the following categories: SE–6 Employees of U.S. government abroad, adjustments; SE–7 Spouses of SE–6; SE–8 Children of SE–6. Note that this program does not have a specific sunset date and technically applicants could apply but should have already applied.

[263] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers (for example, the U.S. armed forces), would generally not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[264] Includes the following categories: SF–6 Former employees of the Panama Canal Company

or Canal Zone Government; SF–7 Spouses or children of SF–6; SG–6 Former U.S. government employees in the Panama Canal Zone; SG–7 Spouses or children of SG–6; SH–6 Former employees of the Panama Canal Company or Canal Zone government, employed on April 1, 1979; SH–7 Spouses or children of SH–6. Note that this program does not have a specific sunset date and technically applicants could apply but should have already applied.

[265] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers generally would not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[266] Includes the following categories: SJ–6 Foreign medical school graduate who was licensed to practice in the United States on Jan. 9, 1978; SJ–7 Spouses or children of SJ–6; Note that this program does not have a specific sunset date and technically applicants could apply but should have already applied.

[267] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers would generally not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

**Exhibit A**

TABLE 5—APPLICABILITY OF INA 212(a)(4) TO SPECIAL IMMIGRANT ADJUSTMENT OF STATUS APPLICATION—Continued

| Category | Subject to INA 212(a)(4) and must file Form I–944, Declaration of Self-Sufficiency? * | INA 213A, and Form I–864, Affidavit of Support under section 213A of the INA, required or exempt? |
|---|---|---|
| Special Immigrant (EB–4)—Retired employees of International Organizations including G–4 International Organization Officer. International Organizations (G–4s international organization officer/Retired G–4 Employee) INA 101(a)(27)(I) and INA 101(a)(27)(L); 8 CFR 101.5; 22 CFR 42.32(d)(5); 22 CFR 41.24; 22 CFR 41.25 [268 269]. | Yes. INA 212(a)(4) ...................... | Not Applicable.[270] |
| Special Immigrant (EB–4)—SIJ–6 Juvenile court dependents, adjustments. | No. SIJ are exempt under 245(h) | Not Applicable. INA 245(h). |
| Special Immigrant (EB–4)—U.S. Armed Forces Personnel. INA 101(a)(27)(K) [271]. | Yes. INA 212(a)(4) ...................... | Not Applicable.[272] |
| Special Immigrant—International Broadcasters. INA 101(a)(27)(M); 8 CFR 204.13 [273]. | Yes. INA 212(a)(4) ...................... | Not Applicable.[274] |
| Special Immigrant (EB–4)—Special immigrant interpreters who are nationals of Iraq or Afghanistan [275]. | No. Section 1059(a)(2) of the National Defense Authorization Act for Fiscal Year 2006, as amended; Public Law 109–163—Jan. 6, 2006, Section 1244(a)(3) of the National Defense Authorization Act for Fiscal Year 2008, as amended; Public Law 110–181 (Jan. 28, 2008) Section 602(b) of the Afghan Allies Protection Act of 2009, as amended section (a)(2)(C), Public Law 111–8 (Mar. 11, 2009). | Exempt. Section 602(b)(9) of the Afghan Allies Protection Act of 2009, Title VI of Public Law 111–8, 123 Stat. 807, 809 (March 11, 2009) which states that INA 245(c)(2), INA 245(c)(7), and INA 245(c)(8) do not apply to special immigrant Iraq and Afghan nationals who were employed by or on behalf of the U.S. government (for Section 602(b) and 1244 adjustment applicants who were either paroled into the United States or admitted as nonimmigrants). See Section 1(c) of Public Law 110–36, 121 Stat. 227, 227 (June 15, 2007), which amended Section 1059(d) of the National Defense Authorization Act for Fiscal Year 2006, Public Law 109–163, 119 Stat. 3136, 3444 (January 6, 2006) to state that INA 245(c)(2), INA 245(c)(7), and INA 245(c)(8) do not apply to Iraq or Afghan translator adjustment applicants. |

*If found inadmissible based on the public charge ground, USCIS, at its discretion, may permit the alien to post a public charge bond (Form I–945). A public charge bond may be cancelled (Form I–356) upon the death, naturalization (or otherwise obtaining U.S. citizenship), or permanent departure of the alien, if the alien did not receive any public benefits as defined in the proposed rule.

---

[268] Includes the following categories: SK–6 Retired employees of international organizations; SK–7 Spouses of SK–1 or SK–6; SK–8; Certain unmarried children of SK–6; SK–9 Certain surviving spouses of deceased international organization employees.

[269] Includes SN–6 Retired NATO–6 civilian employees; SN–7 Spouses of SN–6; SN–9; Certain surviving spouses of deceased NATO–6 civilian employees; SN–8 Certain unmarried sons/daughters of SN–6.

[270] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers would generally not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[271] Includes the following categories: SM–6 U.S. Armed Forces personnel, service (12 years) after 10/1/91 SM–9 U.S. Armed Forces personnel, service (12 years) by 10/91; SM–7 Spouses of SM–1 or SM–6; SM–0 Spouses or children of SM–4 or SM–9; SM–8 Children of SM–1 or SM–6.

[272] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers would generally not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[273] Includes the following categories: BC–6 Broadcast (IBCG of BBG) employees; BC–7 Spouses of BC–1 or BC–6; BC–8 Children of BC–6.

[274] For this category, although the applicants are subject to public charge under INA section 212(a)(4), the employers would generally not be a relative of the alien or a for-profit entity and therefore the requirements for an affidavit of support under INA section 212(a)(4)(D) is inapplicable.

[275] Includes the following categories: SI–6 Special immigrant interpreters who are nationals of Iraq or Afghanistan; SI–6, SI–7, SI–8—spouse and child of SI–6; SQ–6 Certain Iraqis and Afghans employed by U.S. Government SQ–6, SQ–7, SQ–8 Spouses and children of SQ–6; SI–6 Special immigrant interpreters who are nationals of Iraq or Afghanistan; SI–7 Spouses of SI–1 or SI–6; SI–8 Children of SI–1 or SI–6.

**Exhibit A**

TABLE 6—APPLICABILITY OF INA 212(a)(4) TO REFUGEE, ASYLEE, AND PAROLEE ADJUSTMENT OF STATUS APPLICATIONS

| Category | Subject to INA 212(a)(4) and must file Form I–944, Declaration of Self-Sufficiency? * | INA 213A, and Form I–864, Affidavit of Support under section 213A of the INA, required or exempt? |
|---|---|---|
| Asylees [276] | No. INA 209(c) | Exempt. INA 209(c). |
| Indochinese Parolees from Vietnam, Cambodia, and Laos. IC–6 Indochinese refugees (Public Law 95–145 of 1977). IC–7 Spouses or children of Indochinese refugees not qualified as refugees on their own. | No. Section 586, Public Law 106–429 (Nov. 6, 2000). | Exempt. Section 586, Public Law 106–429 (Nov. 6, 2000). |
| Polish and Hungarian Parolees (Poland or Hungary who were paroled into the United States from November 1, 1989 to December 31, 1991) [277]. | No. Title VI, Subtitle D, Section 646(b), Public Law 104–208; 8 CFR 245.12. | Exempt. Title VI, Subtitle D, Section 646(b), Public Law 104–208; 8 CFR 245.12. |
| Refugees [278] | No. INA 207(c)(3); INA 209(c) | Exempt. INA 207; INA 209(c). |
| Cuban-Haitian Entrant under IRCA—CH–6, CH–7 [279] | No. Section 202, Public Law 99–603, 100 Stat. 3359 (1986) (as amended), 8 U.S.C. 1255a. | Exempt. Section 202, Public Law 99–603, 100 Stat. 3359 (1986) (as amended), 8 U.S.C. 1255a. |
| HRIFA—Principal HRIFA Applicant who applied for asylum before December 31, 1995 [280]. | No. Section 902 Public Law 105–277, 112 Stat. 2681 (Oct. 21, 1998), 8 U.S.C. 1255. | Exempt. Section 902 Public Law 105–277, 112 Stat. 2681 (Oct. 21, 1998), 8 U.S.C. 1255. |

*If found inadmissible based on the public charge ground, USCIS, at its discretion, may permit the alien to post a public charge bond (Form I–945). A public charge bond may be cancelled (Form I–356) upon the death, naturalization (or otherwise obtaining U.S. citizenship), or permanent departure of the alien, if the alien did not receive any public benefits as defined in the proposed rule.

TABLE 7—APPLICABILITY OF INA 212(a)(4) TO OTHER APPLICANTS WHO MUST BE ADMISSIBLE

| Category | Subject to INA 212(a)(4) and must file Form I–944, Declaration of Self-Sufficiency? * | INA 213A, and Form I–864, Affidavit of Support under section 213A of the INA, required or exempt? |
|---|---|---|
| Diplomats Section 13 | Yes. Section 13 of Public Law 85–316 (September 11, 1957), as amended by Public Law 97–116 (December 29, 1981); 8 CFR 245.3. | Exempt, by statute, as they are not listed in INA 212(a)(4) as a category that requires Form I–864. |
| Individuals Born in the U.S. under Diplomatic Status (NA–3) 8 CFR 101.3. | Yes. INA 212(a)(4) | Exempt. 8 CFR 101.3. |
| Diversity, DV–1 diversity immigrant, spouse and child | Yes. INA 212(a)(4) | Exempt, by statute, as they are not listed in INA 212(a)(4) as a category that requires Form I–864. Diversity visas are issued under INA 203(c) which do not fall under INA 212(a)(4)(C) or (D). |
| W–16 Entered without inspection before 1/1/82; W–26 Entered as nonimmigrant and overstayed visa before 1/1/82. Certain Entrants before January 1, 1982. | Yes. INA 212(a)(4) (except for certain aged, blind or disabled individuals as defined in 1614(a)(1) of the Social Security Act). INA 245A(b)(1)(C)(i) and (a)(4)(a))—application for adjustment 42 U.S.C. 1382c(a)(1). Special Rule for determination of public charge—See INA 245A(d)(2)(B)(iii). | Exempt, by statute as they are not listed in INA 212(a)(4) as a category that requires an Form I–864. |

---

[276] Including the following categories: AS–6 Asylees; AS–7 Spouses of AS–6; AS–8 Children of AS–6; SY–8 Children of SY–6; GA–6 Iraqi asylees; GA–7 Spouses of GA–6; GA–8 Children of GA–6.

[277] Note that this program does not have a specific sunset date and technically applicants could apply but should have already applied.

[278] Includes the following categories: RE–6 Other refugees (Refugee Act of 1980, Public Law 96–212, 94 Stat. 102 (Mar. 17, 1980)); RE–7 Spouses of RE–6; RE–8 Children of RE–6; RE–9 Other relatives.

[279] Note that this program has a sunset date of two years after enactment, however, some cases may still be pending.

[280] Includes the following categories: 1995—HA–6 Principal HRIFA Applicant; Spouse of HA–6, HA–7 and Child of HA–6, HA–8; Unmarried Son or Daughter 21 Years of Age or Older of HA–6, HA–9 Principal HRIFA Applicant paroled into the United States before December 31, 1995- HB–6; Spouse of HB–6, HB–7; Child of HB–6, HB–8; Unmarried Son or Daughter 21 Years of Age or Older of HB–6 HB–9; Principal HRIFA Applicant who arrived as a child without parents in the United States HC–6; Spouse of HC–6, HC–7; Child of HC–6, HC–8; Unmarried Son or Daughter 21 Years of Age or Older of HC–6, HC–9; Principal HRIFA Applicant child who was orphaned

subsequent to arrival in the United States HD–6, Spouse of HD–6, HD–7; Child of HD–6, HD–8; Unmarried Son or Daughter 21 Years of Age or Older of HD–6, HD–9 Principal HRIFA Applicant child who was abandoned subsequent to arrival and prior to April 1, 1998—HE–6; Spouse of HE–6, HE–7; Child of HE–6, HE–8; Unmarried Son or Daughter 21 Years of Age or Older of HE–6, HE–9. Note that this program has a sunset date of March 31, 2000; however, dependents may still file for adjustment of status.

**Exhibit A**

TABLE 7—APPLICABILITY OF INA 212(a)(4) TO OTHER APPLICANTS WHO MUST BE ADMISSIBLE—Continued

| Category | Subject to INA 212(a)(4) and must file Form I–944, Declaration of Self-Sufficiency? * | INA 213A, and Form I–864, Affidavit of Support under section 213A of the INA, required or exempt? |
|---|---|---|
| T, T–1 victim, spouse, child, parent, sibling; INA 101(a)(15)(T), INA 212(d)(13)(A). | No. INA 212(a)(4)(E). | Exempt, by statute as they are not listed in INA 212(a)(4) as a category that requires Form I–864. Adjustment of status based on T nonimmigrant status is under INA 245(l) which does not fall under INA 212(a)(4)(C) or (D). |
| American Indians—INA 289 | No. INA 289 | Exempt. INA 289. |
| Texas Band of Kickapoo Indians of the Kickapoo Tribe of Oklahoma, Public Law 97–429 (Jan. 8, 1983); KIC—Kickapoo Indian Citizen; KIP—Kickapoo Indian Pass. | No. Public Law 97–429 (Jan. 8, 1983). | Exempt. Public Law 97–429 (Jan. 8, 1983). |
| S (Alien witness or informant) | Yes, but there is a waiver available—INA 245(j); INA 101(a)(15)(S); 8 CFR 214.2(t)(2); 8 CFR 1245.11 (Waiver filed on Form I–854, Inter-Agency Alien Witness and Informant Record). | Exempt. INA 245(j); INA 101(a)(15)(S); 8 CFR 214.2(t)(2); 8 CFR 1245.11 (Waiver filed on Form I–854, Inter-Agency Alien Witness and Informant Record). |
| Private Immigration Bill providing for alien's adjustment of status | Dependent on the text of the Private Bill. | Dependent on the text of the Private Bill. |
| NACARA (202); Principal NC–6, (NC 7–9) spouse and children [281] | No. Section 202(a), Public Law 105–100, 111 Stat. 2193 (1997) (as amended), 8 U.S.C. 1255.. | Exempt. Section 202(a), Public Law 105–100, 111 Stat. 2193 (1997) (as amended), 8 U.S.C. 1255. |
| NACARA 203; Cancellation of removal (Z–13) Battered spouses or children (Z–14) Salvadoran, Guatemalan and former Soviet bloc country nationals (Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA)). | No. Section 203, Public Law 105–100, 111 Stat. 2193 (1997) (as amended), 8 U.S.C. 1255. | Exempt. Section 203, Public Law 105–100, 111 Stat. 2193 (1997) (as amended), 8 U.S.C. 1255. |
| Lautenberg, LA–6 [282] | No. Section 599E, Public Law 101–167, 103 Stat. 1195 (Nov. 21, 1989), 8 U.S.C.A. 1255. | Exempt. Section 599E, Public Law 101–167, 103 Stat. 1195 (Nov. 21, 1989), 8 U.S.C.A. 1255. |
| Registry, Z–66—Aliens who entered the United States prior to January 1, 1972 and who meet the other conditions. | No. INA 249 of the Act and 8 CFR part 249. | Exempt. INA 249 of the Act and 8 CFR part 249. |
| U, U–1 Crime Victim, spouse, children and parents, and siblings under INA 245(m). | No. INA 212(a)(4)(E). | Exempt. INA 212(a)(4)(E). |
| Temporary Protected Status (TPS) | No. 8 CFR 244.3(a).[283] | Exempt. 8 CFR 244.3(a).[284] |

*If found inadmissible based on the public charge ground, USCIS, at its discretion, may permit the alien to post a public charge bond (Form I–945). A public charge bond may be cancelled (Form I–356) upon the death, naturalization (or otherwise obtaining U.S. citizenship), or permanent departure of the alien, if the alien did not receive any public benefits as defined in the proposed rule.

### G. Definitions

#### 1. Public Charge

*Comment:* A commenter stated that the lack of a public charge definition is an issue that must be resolved because immigration is an important feature of America's culture and public policy, heightening the importance of having a consistent definition.

*Response:* DHS agrees that it is important to define public charge in the rulemaking—public charge is a term

---

[281] Note that this program has a sunset date of April 1, 2000; however, some cases may still be pending.

[282] Note that this program sunset date of September 30, 2014, only applies to parole. Eligible applicants may still apply for adjustment of status.

[283] INA section 244(c)(2)(ii), 8 U.S.C. 1254a(c)(2)(ii), authorizes USCIS to waive any section 212(a) ground, except for those that Congress specifically noted could not be waived.

[284] *See* INA section 244(c)(2)(ii), 8 U.S.C. 1254a(c)(2)(ii).

that has appeared in U.S. Federal immigration law since at least 1882, but has never been defined by Congress or in regulation. The rule provides a definition for public charge and DHS believes that prior to this rule there has been insufficient guidance on how to determine if an alien who is applying for admission or adjustment of status is likely to become a public charge at any time in the future.

*Comment:* Commenters stated that the proposed definition of public charge is "without precedent and contrary to the discretion provided to DHS under statute." A commenter stated that the proposed public charge definition relies on outdated case law, and that the 1999 Interim Field Guidance is preferable to the proposed rule, for three reasons. First, the commenter argued that the proposed rule undermined DHS's stated objectives, because it could stop an alien from accessing government

services that would make the alien more self-sufficient. Second, the commenter argued that the proposed rule could have adverse effects on aliens whose presence in the United States is a net benefit to the U.S. Government as a consequence of their productivity, associated tax revenues, etc. And third, the commenter argued that the proposed rule would bind adjudicators to a bright-line definition of "public charge" that could result in harsh consequences in some cases. By contrast, in the commenter's view, the "primarily dependent" standard under the 1999 Interim Field Guidance provided adjudicators with more discretion. Another commenter stated that the proposed rule does not comport with the law because it is contrary to the long-established common-law definition of public charge. A commenter stated that the use of non-monetizable benefits

**Exhibit A**

for one third of the time period does not reflect "primary dependence."

*Response:* DHS disagrees that the public charge definition is contrary to the discretion provided to DHS under the INA, relies on outdated case law or is without precedent, or undermines the agency's objectives. As noted in the NPRM, DHS's authority to make public charge inadmissibility determinations and related decisions is found in several statutory provisions, including section 102 of the Homeland Security Act of 2002 (Pub. L. 107–296, 116 Stat 2135), 6 U.S.C. 112, section 103 of the Act, 8 U.S.C. 1103, as well as section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). DHS may issue regulations implementing its authority under these statutes without further congressional authorization. Additionally, as noted in the NPRM, there is a scarcity of case law specifically defining public charge.[285] The cases cited in the NPRM and in this final rule include the most recent and relevant case law discussing the term public charge and the public charge ground of inadmissibility.[286]

With respect to the argument that the public charge rule may make it more difficult for some aliens to become self-sufficient, DHS has addressed this argument at length elsewhere in this preamble. In short, and as relevant here, the fact that an alien might rely on public benefits to *become* self-sufficient in the future has no bearing on whether such alien currently is self-sufficient or currently is or is not a public charge. DHS rejects the notion that it must interpret the term "public charge" in such a way as to allow aliens to rely on public benefits until such time as they are self-sufficient. DHS notes that its position on this aspect of the *definition* of public charge should not be taken as a rejection of the commenters' general point that an alien's past receipt of public benefits can result in greater self-sufficiency. If an alien received public benefits in the past and such benefits helped the alien become self-sufficient, DHS agrees that the alien's current self-sufficiency is relevant to the prospective public charge inadmissibility determination, but the alien's past receipt of public benefits is relevant to assessing the likelihood of future receipt of public benefits.

With respect to the argument regarding aliens who receive the designated public benefits, but may nonetheless be a net benefit to the U.S. Government or society, neither the Act

nor the case law requires DHS to weigh an alien's net impacts on government resources, such as by evaluating the potential tax receipts generated by the alien, as compared to the alien's receipt of public benefits. In addition, a definition that requires consideration of the alien's overall contributions to tax revenues, economic productivity, or society at large would be unjustifiably challenging to administer. For instance, as explained in the proposed rule, fully monetized thresholds (which would be required to make a dollars-to-dollars comparison) would not be administrable because some benefits, such as Medicaid, lack clearly monetizable value. In addition, DHS notes that taxes serve a variety of functions, and benefit the taxpayer regardless of whether she or he receives an individual, means-tested public benefit. A comparison of the alien's "contributions" (in the form of taxes) to the alien's "withdrawals" (in the form of public benefits) would therefore be incomplete, because it would not consider the other government programs and services, including national defense, infrastructure, law enforcement and emergency services, from which the alien benefits. Further, under this rule, DHS will not consider receipt of any public benefits for which the alien has paid into directly. Each of the designated benefits involves significant government subsidization. In this context, DHS does not believe that value of an alien's current or future tax contributions should ultimately have a bearing on whether the alien is a public charge.

With respect to the firmness of the definition, part of the rule's purpose is to provide a clearer definition; DHS will not institute a vague standard in order to avoid harsh consequences for some people.

Finally, as to the comment stating that the rule does not comport with the law because it is contrary to the long-standing common law definition of public charge, the commenter failed to identify any common law definition of public charge that DHS should have considered, or as the commenter stated, that DHS violated. As noted in the NPRM, DHS's definition for public charge is derived from a review of the minimal legislative history of the public charge ground of inadmissibility and the ordinary meaning of the public charge. DHS's definition also relies on the limited case law addressing the definition of public charge, in which courts, in the absence of statutory definition for public charge, generally tied the definition of public charge to receipt of public benefits, without

quantifying the level of public support or the type of public support required to determine that the alien is likely to become a public charge at any time in the future.

DHS notes that even if there were a clear definition for public charge grounded in case law, which there does not appear to be, agencies responsible for administering federal law generally have the authority to interpret an ambiguous statute in a different manner than the manner in which a court interpreted the statute.[287] Therefore, DHS would be within its authority to create a different definition of "public charge."[288]

*Comment:* Commenters provided a historical overview of public charge, and asserted that expanding the definition would represent a "radical departure" from over 100 years of U.S. immigration policy. The commenters discussed the laws governing public charge inadmissibility and deportability, and observed that, in the past, public charge inadmissibility and associated guidance have sometimes operated to the detriment of certain vulnerable populations, including Jews, women, and people from India. The commenters stated that the change in policy—from a focus on dependence on the government by cash support for subsistence or long-term institutionalization, to a focus on a broader range of benefits—would lead to a "general erosion" of benefits that legal immigrants may access.

*Response:* While this rule expands the list of public benefits covered in the INS 1999 Interim Field Guidance and the 1999 proposed rule, DHS does not believe that the rule is inconsistent with historical practice. DHS notes that this rule is not facially discriminatory, and that DHS does not intend the rule to have a discriminatory effect based on

---

[285] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157–58 (proposed Oct. 10, 2018).

[286] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157–58 (proposed Oct. 10, 2018).

[287] *Nat'l Cable & Telecomms. Ass'n* v. *Brand X internet Servs.,* 545 U.S. 967, 983–84 (2005) (*Brand X*) ("Since *Chevron* teaches that a court's opinion as to the best reading of an ambiguous statute an agency is charged with administering is not authoritative, the agency's decision to construe that statute differently from a court does not say that the court's holding was legally wrong. Instead, the agency may, consistent with the court's holding, choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of such statutes. In all other respects, the court's prior ruling remains binding law (for example, as to agency interpretations to which *Chevron* is inapplicable). The precedent has not been 'reversed' by the agency, any more than a federal court's interpretation of a State's law can be said to have been 'reversed' by a state court that adopts a conflicting (yet authoritative) interpretation of state law.").

[288] *Brand X,* 545 U.S. at 1001 ("The Commission is free within the limits of reasoned interpretation to change course if it adequately justifies the change").

**Exhibit A**

race, gender, religion, or any other protected ground. Rather, the rule is consistent with existing precedents that have developed in the years since the earliest public charge laws, as well as Congress' codified policy statement that "[s]elf-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration laws." [289] As noted in the NPRM,[290] courts have consistently tied the concept of public charge to an alien's receipt of public benefits, without quantifying the level of public support or requiring a certain type of public support, and the alien's ability to be self-sufficient. DHS acknowledges that individuals may disenroll from public benefits to avoid the consequences of this rule. As previously noted, the rule aims to align the principles of self-sufficiency set forth in PRWORA[291] with the public charge inadmissibility ground.

DHS does not believe that the history of the public charge ground of inadmissibility—which Congress has consistently chosen to retain as part of our immigration laws—precludes DHS from implementing a rigorous and fair regulatory framework for public charge inadmissibility determinations. DHS notes that our immigration laws have evolved to provide greater protections to vulnerable populations. For instance, refugees and asylees are exempt from the public charge ground of inadmissibility.

*Comment:* One commenter stated that the proposed rule greatly expands the definition of public charge, is a departure from existing policy and creates an unworkable, overly broad definition that will be impossible to implement fairly. The commenter also asserted that experts estimated that, under the new definition, 94% of all noncitizens who entered the United States without lawful permanent resident status have at least one characteristic that DHS could potentially weigh negatively in a public charge determination under the proposed rule. Another commenter stated that taking advantage of any federal, state, or local government program should have no impact on a pathway to residency or citizenship. The commenter suggested that instead, DHS evaluate each applicant based on whether the alien is employed or is caring for a family, has a violent felony conviction, and has a sponsor (such as

a family member or corporate sponsor providing support).

*Response:* DHS agrees that the definition of public charge in this rule is broader than the existing definition and policy. However, as noted previously, DHS believes that this expanded definition for public charge is reasonable and consistent with Congress' intent and will better ensure that aliens seeking to come to the United States temporarily or permanently are self-sufficient.[292] DHS acknowledges that the implementation of the public charge ground of inadmissibility will be a complex adjudication, but USCIS is committed to taking necessary steps to ensure consistent implementation and fair adjudication, including through the issuance of adjudicative guidance and training. As noted elsewhere in this rule, DHS believes consideration of receipt of public benefits is appropriate in determining whether an alien is likely to become a public charge in the future.

*Comment:* Some commenters stated that the proposed rule would exceed DHS's authority because the proposed definition is over-inclusive, encompassing a wide range of people who are substantially self-supporting and not primarily dependent upon the government to meet their basic needs. Commenters also indicated the proposal did not provide a reasoned analysis for changing the long-standing definition of public charge from being primarily dependent on the government to a determination in which a person could become a public charge based on receipt of a smaller amount of public benefits, including non-cash benefits. Commenters also stated that the NPRM would foreclose the opportunity for a hard-working, self-sufficient individual who experiences a fleeting financial hardship to become a long-term resident of the United States.

Similarly, another commenter stated that "[t]he broader scheme of the [Immigration Act of] 1882 . . . confirms that Congress intended the term 'public charge' to refer to primary dependence on the government, not mere receipt of some public aid." The commenter suggested that because the Immigration Act of 1882 (1882 Act) authorized a fund "to defray the expense of regulating immigration . . . , for the care of immigrants arriving in the United States, [and] for the relief of such

as are in distress," [293] Congress must have anticipated that some immigrants would be in need of short-term support, without becoming a public charge.

The commenter also cited a floor statement by a member of Congress in the months preceding enactment of the 1882 Act. According to the commenter, the floor statement supported the conclusion that Congress intended for the term "public charge" to mean a person "primarily if not wholly dependent on the government." Specifically, the member of Congress incorporated into his floor statement an 1879 resolution passed by the New York Board of Charities, which concluded that many cities and towns in Europe sent "to this country blind, crippled, lunatic, and other infirm paupers, who ultimately become life-long dependents on our public charities"; and that many such persons "become permanent inmates of the charitable institutions supported by the State of New York." [294] The resolution called on Congress to exclude such individuals from the United States and to appropriate funds for returning such individuals to their home countries. The commenter suggested that because the resolution referred to "life-long dependents" and "permanent inmates," it is clear that Congress intended for the term "public charge" to refer to primary dependence on the Government for support.

*Response:* DHS rejects the notion that the public charge definition violates the law or is over-inclusive. DHS acknowledges that this is a change that likely will increase the number of individuals who will be deemed inadmissible or ineligible for adjustment of status based on the public charge ground. DHS disagrees, however, with the assertion that it did not provide a reasoned explanation why the prior standard is insufficient, why the change is necessary, and why non-cash benefits are included in the new public charge determinations. Longstanding agency practice and policy,[295] while generally accorded some weight, is not controlling or unalterable.[296] DHS provided

---

[289] 8 U.S.C. 1601(1).

[290] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51158 (proposed Oct. 10, 2018).

[291] *See* 8 U.S.C. 1601.

[292] *Brand X,* 545 U.S. at 1001 ("the Commission is free within the limits of reasoned interpretation to change course if it adequately justifies the change").

[293] Immigration Act of 1882, 22 Stat. 214 (Aug. 3, 1882).

[294] *See* 13 Cong. Rec. 5109–10 (June 19, 1882) (Statement of Rep. John Van Voorhis).

[295] As of the date of the effective rule, the agency practice had not been codified in agency regulations as the NPRM published in May 1999 was never finalized. As explained in the NPRM, the agency also issued interim Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, in which it detailed its policy. *See* 64 FR 28689 (May 26, 1999). *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51133 (proposed Oct. 10, 2018).

[296] *See, e.g., Judulang* v. *Holder,* 565 U.S. 42, 62 (2011) (indicating that longevity is "a slender reed

**Exhibit A**

detailed reasoning why the changes are necessary in the NPRM. As explained in the NPRM, although the primarily dependence (more-than-50-percent dependence) on public assistance standard creates a bright line rule, it is possible and likely probable that many individuals whose receipt of public benefits falls below that standard lack self-sufficiency.[297] Because of the nature of the benefits that would be considered under this rule—*i.e.,* cash benefits for income maintenance and non-cash benefits for basic living needs such as food and nutrition, housing, and healthcare, that account for significant public expenditures on non-cash benefits [298]—DHS believes that receipt of such benefits for more than 12 months within any 36-month period is sufficient to render a person a public charge.[299] This is because an individual with limited means to satisfy basic living needs who uses government assistance to fulfill such needs for that duration of time relies on such assistance to such an extent that the person is not self-sufficient.[300] Given that neither the wording of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), nor case law examining public charge inadmissibility, mandates the "primarily dependent" standard, and in light of Congress' unequivocal policy goal articulated in PRWORA, DHS has concluded that the "primarily dependent" standard is not the only permissible interpretation of what it means to be a public charge, and is in fact suboptimal when considered in relation to the goals of the INA and PRWORA.[301]

With respect to the commenter's arguments about the Immigration Act of 1882, the conclusions that the commenter draws from the funding mechanism in that Act appear to be largely unsupported. The commenter assumes, without articulating any basis for the assumption, that under the Immigration Act of 1882 aliens who received assistance through the fund could not also be public charges. DHS has no reason to believe that assumption is correct. But even if the Immigration Act of 1882 could be read as suggesting that an alien can rely on public funds for support without becoming a public charge, DHS is unaware of any binding case law requiring DHS to interpret the term "public charge" in this manner. And regardless, Congress has since amended the public charge ground of inadmissibility multiple times over the course of more than a century.

With respect to the New York State Board of Charities resolution referenced by the commenter, DHS notes that the resolution does not use the term "public charge" or implicitly define such term. DHS does not find the resolution or the surrounding floor statement particularly instructive for purposes of this rulemaking; they originate in a different historical context that preceded multiple modifications to and re-enactments of the public charge ground of inadmissibility in the 140 years since the passage of the 1879 resolution.[302]

*Comment:* A commenter stated that DHS's rationale for why the public charge definition is consistent with more than 40 years of case law—and specifically, DHS's citation of *Matter of Vindman* and *Matter of Harutunian* [303]—did not withstand scrutiny because these cases involved the receipt of cash benefits by the elderly, unemployed and unsponsored applicants, and therefore bears no relevance to the broad population affected by this rule. One commenter asserted that the cases cited do not support the proposed definition, and stated that the citation to these cases indicates that this rule is haphazardly put together and poorly researched.

*Response:* DHS rejects the notion that the case law cited does not support DHS's public charge definition. In particular, DHS disagrees that the case law cited in support of the public charge definition, and particularly *Vindman* and *Harutunian*,[304] bears no relevance to the population affected by this rule because the facts of *Vindman* and *Harutunian* were limited to cash assistance and elderly, unemployed, or unsponsored applicants. DHS cited these decisions to establish that its proposed regulation is consistent with case law. Absent a clear statutory or regulatory definition, some courts and administrative authorities have tied public charge to the receipt of public benefits.[305] DHS does not believe that *Vindman* or *Harutunian* specifically limited the general understanding of public charge to only those who are "elderly, unemployed or unsponsored" aliens. Both decisions were based on the understanding that Congress intended to exclude those who were unable to support themselves and who received public benefits.[306] Additionally, Congress later amended the law to specifically require sponsorship (by requiring an affidavit of support for some immigrants or considering an affidavit of support for others) as part of the public charge determination, and also codified statutory minimum factors to consider (including age, financial status, and education and skills). Therefore, DHS finds the commenters' assertion that DHS's reasoning does not withstand scrutiny for those non-elderly, employed, and sponsored aliens unpersuasive.

*Comment:* One commenter stated that the proposed public charge definition is nonsensical because DHS has asserted that legislative history and case law support the definition but has also noted that legislative history and case law on the subject are scarce.

*Response:* DHS does not believe that the public charge definition is nonsensical. While the case law and legislative history regarding the meaning of public charge is minimal, it is not non-existent. As outlined in the NPRM, DHS carefully analyzed the available legislative history and case law as part of this rulemaking.

*Comment:* A commenter indicated that DHS ignored Second Circuit case

---

to support a significant government policy"); *see Chevron, USA, Inc* v. *Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 863 (1984) (indicating that to engage in informed rulemaking, the agency must consider varying interpretations and the wisdom of its policy on a continuing basis and establish a reasonable choice); *United States* v. *Nat'l Ass'n of Sec. Dealers, Inc.,* 422 U.S. 694, 719 (1975) (longstanding interpretations by an agency are entitled to considerable weight but are not controlling).

[297] *See* Inadmissibility on Public Charge Grounds, 53 FR 51114, 51164 (proposed Oct. 10, 2018).

[298] *See* Inadmissibility on Public Charge Grounds, 53 FR 51114, 51164 (proposed Oct. 10, 2018).

[299] *See* Inadmissibility on Public Charge Grounds, 53 FR 51114, 51164 (proposed Oct. 10, 2018).

[300] *See* Inadmissibility on Public Charge Grounds, 53 FR 51114, 51164 (proposed Oct. 10, 2018).

[301] *See United States* v. *Mead Corp.,* 533 U.S. 218, 227 (2001) (well-reasoned views of the agency implementing a statute enjoys considerable weight); *see also Chevron, U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 866 (1984) (judges have a duty to respect legitimate policy justices and resolving the struggle between competing views of the public interest are not judicial responsibilities—they are vested in the political branches).

[302] *NLRB* v. *SW General, Inc.,* 137 S. Ct. 929, 943 (2017) ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history.").

[303] *See Matter of Vindman,* 16 I&N Dec. 131 (Reg'l Comm'r 1977); *Matter of Harutunian,* 14 I&N Dec. 583 (Reg'l Comm'r 1974).

[304] The commenter also suggested the age of the decisions. DHS notes that the age of a precedent decision does not invalidate the precedential effect of the decision. Indeed, the Supreme Court has cited the age of a precedent as a reason to maintain it. *See Montejo* v. *Louisiana,* 556 U.S. 778, 792–93 (2009) (citing "the antiquity of the precedent" as a factor against overturning a decision).

[305] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157(proposed Oct. 10, 2018).

[306] *See Matter of Harutunian,* 14 I&N Dec. 583, 586 (Reg'l Comm'r 1974) ("The words 'public charge' had their ordinary meaning, that is to say, a money charge upon or an expense to the public for support and care, the alien being destitute"); *Matter of Vindman,* 16 I&N Dec. at 132 (Congress intends that an applicant be excluded who is without sufficient funds to support himself, who has no one under any obligation to support him, and whose changes of becoming self-supporting decreases as time passes).

**Exhibit A**

law such as *Howe* v. *United States ex rel. Savitsky,* 247 F. 292, 294 (2d Cir. 1917), and *Ex Parte Hosaye Sakaguchi,* 277 F. 913, 916 (9th Cir. 1922), which rejected a broad definition of the term public charge, tying it instead to a person's likelihood of becoming an occupant of almshouses for want of means of support. This commenter indicated that DHS's historical argument—that the late 19th century history and meaning are irrelevant because the wide array of limited-purpose public benefits now available did not exist at the time—was historically inaccurate. The commenter noted that contemporaneous sources and historical studies reveal that throughout the 19th century's governments, including the Federal Government, provided limited public assistance short of institutionalization. Additionally, the commenter indicated that even if limited-purpose public benefits had not been available, the argument is immaterial because such an expansion would not change the meaning of the term set out in the 1882 Act. In fact, according to the commenter, Congress has declined to change its original meaning of the term.[307]

*Response:* DHS is aware of the decisions in *Howe* and *Sakaguchi,* but DHS does not believe that these cases are inconsistent with the public charge definition set forth in this rule or with the suggested link between public charge and the receipt of public benefits. In fact, the cases support DHS's belief that courts generally have neither quantified the level of public support nor the type of public support required for purposes of a public charge inadmissibility finding. In *Howe,* the court reviewed whether the immigration inspector rightly attempted to classify the alien as a public charge because the immigration inspector believed the applicant to have engaged in a criminal matter but lacked the requisite evidence to charge the alien.[308] The court rejected such a broad use of the public charge provision, which would have rendered several other inadmissibility grounds

[307] In support of the commenter's arguments, the commenter cited *Forest Grove Sch. Dist.* v. *T.A.,* 557 U.S. 230, 239–40 (2009); *Feltner* v. *Columbia Pictures Television, Inc.,* 523 U.S. 340, 358 (1998) (Scalia, J., concurring).

[308] *See Howe* v. *United States ex rel. Savitsky,* 247 F. 292, 294 (2d Cir. 1917). In *Howe,* the alien had been engaged in a contractual dispute in his home country on account of writing a bad check, which the immigration inspector regarded as a dishonest practice. Because the immigration inspector lacked the requisite proof to exclude the applicant on criminal grounds, however, the inspector attempted to deny entry on public charge grounds of inadmissibility under section 2 of the Immigration Act of 1907 (36 Stat 264).

unnecessary.[309] Instead, the court emphasized that, in the context of public charge provision and its position within the statute, as it appeared at that time, Congress meant to exclude individuals who are likely to become occupants of government-run almshouses from the United States[310] for want of means to support themselves in the future.[311] The court did note that

[309] *Howe,* 247 F. at 294 ("Indeed, with such latitudinarian construction of the provision 'likely to become a public charge,' most of the other specific grounds of exclusion could have been dispensed with . . . We are convinced that Congress meant the act to exclude persons who were likely to become occupants of almshouses for want of means with which to support themselves in the future. If the words covered jails, hospitals, and insane asylums, several of the other categories of exclusion would seem to be unnecessary.")

[310] DHS reviewed a variety of sources to identify a clear definition of the term "almshouse," as it might relate to an interpretation of the term public charge. The Second Circuit, in *Howe,* did not further elaborate on the meaning of the term almshouse or the threshold level of support for purposes of determining whether an alien was likely to become a public charge. Almshouses have also been discussed in contexts other than public charge. For example, for purposes of claiming tax exemption, New York State courts emphasized that an almshouse only qualified for tax exemptions if it offered services free of charge; almshouses which offered services at a reduced charge, for example, did not qualify as almshouses for tax purposes. *See, e.g., In re Vanderbilt's Estate,* 10 N.Y.S. 239, 242 (Sur. 1890) ("The New York Protestant Episcopal City Mission Society claims exemption as an almshouse. It maintains a home and reading-rooms, etc., and provides lodgings and meals free. It also maintains a day nursery, for which it makes a small charge. This takes it out of the domain of pure charity,—a house wholly appropriated to the poor. I have already decided in several cases that a society, to be exempt from this tax as an almshouse, must be absolutely free,—all benefits given gratuitously.") In *City of Taunton* v. *Talbot,* an almshouse attempted to recover the cost from one of its inmates. 186 Mass 341 (1904). The court denied relief because there were no records to tie the expenses specifically to the inmate, in particular because the agreement between the inmate and the almshouse included support in exchange for the inmate's work. *See id.* at 343. DHS is aware that INS used references to the term "almshouse" in its 1999 proposed regulation and in the 1999 Interim Field Guidance to explain, among other things, its primarily dependent model for purposes of public charge. *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51163 (proposed Oct. 10, 2018); *see also* Inadmissibility and Deportability on Public Charge Grounds, 64 FR 28676 (proposed May 26, 1999) and Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 FR 28689 (May 26, 1999). As explained in the NPRM, however, neither INS's reasoning nor any evidence provided, forecloses the agency adopting a different definition consistent with statutory authority. *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51133 (proposed Oct. 10, 2018).

[311] *Howe,* 247 F. at 294 (interpreting the public charge provision under Act of 1907); *see also Ex parte Mitchell,* 256 F. 229, 230 (N.D.N.Y. 1919) (explaining, in addressing the public charge provision of 1917, that "I am unable to see that this change of location of these words in the act changes the meaning that is to be given them. A 'person likely to become a public charge' is one who for some cause or reason appears to be about to become a charge on the public, one who is to be supported

"[i]f the words covered jails, hospitals, and insane asylums, several of the other categories of exclusion would seem to be unnecessary.'' [312] But other courts have ruled differently,[313] the surrounding grounds of inadmissibility have been amended many times since, and the fact that two INA provisions that may cover the same conduct does not make either unnecessary.[314] Likewise, DHS does not believe that the current public charge inadmissibility provision is limited to almshouses and its modern equivalents. Later decisions have considered other benefits such as old age assistance.[315]

*Skaguchi,*[316] a case in which the court based its holding in part on *Howe,*[317] is

at public expense, by reason of poverty, insanity and poverty, disease and poverty, idiocy and poverty, or, it might be, by reason of having committed a crime which, on conviction, would be followed by imprisonment. It would seem there should be something indicating the person is liable to become, or shows probability of her becoming, a public charge."

[312] *See Howe,* 247 F. at 294.

[313] *See generally* Leo M. Alpert, *The Alien and the Public Charge Clauses,* 49 Yale L.J. 18, 20–22 (1939) (discussing disagreements with part of the of the *Howe* decision). To be clear, DHS is not taking the position that some of the cases cited in the Alpert article did that someone who is incarcerated is likely to become a public charge based on penal incarnation.

[314] *See Kawashima* v. *Holder,* 565 U.S. 478, (2012) (holding that the aggravated felony provision for fraud or deceit includes tax offenses even though there is a separate aggravated felony provision concerns tax crimes).

[315] *See, e.g., Matter of Harutunian,* 14 I&N Dec. 583 (Reg'l Comm'r 1974).

[316] *See Ex parte Hosaye Sakaguchi,* 277 F. 913 (9th Cir. 1922).

[317] The court in *Howe* cited to *Gegiow* v. *Uhl,* 239 U.S. 3 (1915), and *Ex Parte Mitchell,* 256 F. 229 (N.D. NY 1919), both cases that confirmed that a finding of public charge must be based on a defect of a nature that affects an individual's ability to earn a living and cannot be predicated on some external reason such as an overstocked labor market, *see Gegiow,* 239 U.S. at 10, and other speculative and remote conjectures that are unrelated to an alien's defect or other fact that shows or tends to show that the alien is unlikely to earn a living and therefore likely to become a public charge. In *Gegiow,* the Secretary of Labor deemed a group of illiterate aliens who lacked English language proficiency inadmissible as likely to become a public charge, because they had little money on hand, had no sponsor, and intended to travel to a city with a weak labor market. The Court wrote that on the record before it, "the only ground for the order was the state of the labor market at Portland at that time; the amount of money possessed and ignorance of our language being thrown in only as makeweights." *Gegiow,* 239 U.S. at 9. The Court then interpreted the term public charge as similar in kind to the surrounding terms in the governing statute (which included terms such as pauper and beggar). The Court reasoned that because such surrounded terms related to permanent personal characteristics of the alien rather than the alien's destination, the Secretary of Labor could not consider conditions in the aliens' destination city as part of the public charge determination. The Court's characterization of the role of the aliens' assets and resources, as well as language proficiency, is *dicta* and has in any case

**Exhibit A**

not inconsistent with DHS's proposed definition of public charge. As was the case in *Howe*, the court in *Skaguchi* rejected the use of the public charge ground of inadmissibility as a "catch-all" form of inadmissibility.[318] The court reiterated that to sustain a public charge inadmissibility finding, there must be evidence of a fact that tends to show that the burden of supporting the alien is likely to be cast upon the public.[319] Therefore, DHS rejects the commenter's suggestion that these cases mandate a result other than the DHS's public charge definition and the level of dependency assigned to it in the NPRM.

DHS agrees that it is immaterial to this rulemaking whether limited-purpose means-tested benefit programs expanded over the course of the last century-plus. DHS simply recited, without endorsing, INS reasoning for the primarily dependent standard in the NPRM, in an effort to explain the primarily dependent standard's limitations and why DHS proposed a different standard in this rule.[320] DHS's reasoning for changing the public charge definition is not based on this statement.

*Comment:* Some commenters indicated that the proposed rule was at odds with the recommendations of the very agencies that administer the federal programs included in the rule. The commenters also pointed out that, as indicated by DHS in the NPRM, INS had consulted with HHS, the Social Security Administration (SSA), and the Department of Agriculture (USDA) when developing the 1999 Interim Guidance and that these agencies had told INS unequivocally "that the best evidence of whether an individual is relying primarily on the government for subsistence is either the receipt of public cash benefits for income maintenance purposes or institutionalization for long-term care at government expense" and that "neither the receipt of food stamps nor nutrition assistance provided under [SNAP] should be considered in making a public charge determination." Commenters indicated that in the NPRM, DHS "dismissed all of this expertise, stating *ipse dixit* that such input from the federal agencies that actually administer these programs

'd[oes] not foreclose [the Department] adopting a different definition consistent with statutory authority.' " The commenter believed that this response was legally insufficient because it confused DHS's ability to take action under a statute with its independent obligation to adopt an approach based on sound reasoning. The commenter stated that merely asserting that DHS has the ability to reject other agencies' reasoned analyses (whether or not correct) does nothing to justify its choice to do so. The commenter concluded, therefore that DHS's response—like DHS's overall decision—failed to satisfy the APA's requirements.

*Response:* As explained in the NPRM,[321] DHS is aware that former INS consulted with various agencies that administer the federal programs. The letters were issued in the context of the approach taken in the 1999 proposed rule and 1999 Interim Field Guidance, and specifically opined on the reasonableness of that INS interpretation, that is, the primarily dependent on the government for subsistence definition. As noted in the NPRM, DHS does not believe that these letters supporting the interpretation set forth in the 1999 Interim Field Guidance foreclose this different interpretation, particularly where DHS's reasoning for the approach in this final rule is grounded in a different basis.

*Comment:* Some commenters objected to what they describe as the "per se" nature of the rule. Specifically, commenters expressed concerns that immigrants receiving any amount of public benefits would be deemed a public charge. An individual commenter said the rule would implicitly classify more than a fifth of Americans as a public charge.

*Response:* DHS disagrees with the commenters' characterization that the definition of public charge creates an inappropriate per se rule. DHS believes that the nexus between likelihood of becoming public charge at any time in the future, the receipt of public benefits, and self-sufficiency, as described and explained in the NPRM,[322] is consistent with Congress' intent [323] in enacting the

public charge inadmissibility ground. DHS also believes it is consistent with the premise underlying much of the public charge case law analyzing the public charge inadmissibility ground [324] that aliens who enter this country should be self-sufficient and not reliant on the government. As explained in the NPRM and detailed above, despite the lack of a definition in the statute and minimal case law defining public charge, there has always been a link between the receipt of public benefits and the public charge determination.[325] Absent a clear statutory definition, courts and administrative authorities have generally tied the concept of public charge to the receipt of public benefits without quantifying the level, type or duration of the public benefits received.[326] To create an administrable way to implement the statute, DHS's NPRM provided a list of specific benefits and a threshold amount that DHS believed reasonably balances an alien's lack of self-sufficiency against temporary welfare assistance that does not amount to a lack of self-sufficiency.[327] Additionally, by proposing to codify the totality of the circumstances approach to the prospective inadmissibility determination, DHS clarified that an alien's past receipt of public benefits

---

[318] *See Ex parte Hosaye Skaguchi,* 277 F. 913 (9th Cir. 1922).

[319] *See Ex parte Hosaye Skaguchi,* 277 F. 913, 916 (9th Cir. 1922).

[320] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51163 (proposed Oct. 10, 2018).

[321] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51133 (proposed Oct. 10, 2018).

[322] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157–58 (proposed Oct. 10, 2018).

[323] As outlined in the NPRM, legislative history suggests the link between public charge and the receipt of public benefits. For example, in the 1950 Senate Judiciary Committee report, preceding the passage of the 1952 Act, concerns were raised about aliens receiving old age assistance. *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157 (proposed Oct. 10, 2018). Debates on public charge prior to Congress' passage of IIRIRA

in 1996 also highlighted that an immigrant should be relying on his or her own resources, rather than becoming a burden on the taxpayers. *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157 (proposed Oct. 10, 2018). With the passage of PRWORA, Congress explicitly emphasized that self-sufficiency is a fundamental principle of the United States immigration law and connected receipt of public benefits with a lack of self-sufficiency, further stating that aliens within the Nation's borders should not depend on public resources to meet their needs. *See* 8 U.S.C. 1601(1) and (2). Courts likewise have connected public charge determinations to the receipt or the need for public resources *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157–58 (Oct. 10, 2018).

[324] *See, for example, Matter of Vindman,* 16 I&N Dec. 131 (Reg'l Comm'r, 1977) (concluding that Congress intends that an applicant for a visa be excluded who is without sufficient funds to support himself or herself, or who has no one under any obligation to support him, and whose chances of becoming self-supporting decreases as time passes, and that the respondents' receipt of assistance for approximately three years clearly put them into the confines of the public charge inadmissibility ground); *see also Matter of Harutunian,* 14 I&N Dec. 583 (Reg'l Comm'r 1974) (The words "public charge" had their ordinary meaning, that is to say, a money charge upon or an expense to the public for support and care, the alien being destitute); *see* generally cases cited in Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157–58 (proposed Oct. 10, 2018).

[325] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157–51158 (proposed Oct. 10, 2018).

[326] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51157–51158 (proposed Oct. 10, 2018).

[327] *See* 8 CFR 212.21(b).

**Exhibit A**

alone, without consideration of the other factors, would not establish future likelihood of becoming a public charge. DHS further agrees with the commenters that under this new framework, the number of aliens being found inadmissible based on the public charge ground will likely increase.

*Comment:* Commenters objected to the proposed rule because it equates receipt of benefits with the lack of self-sufficiency. Others stated that the receipt of public benefits is not an indicator of a person's incapacity for self-sufficiency, but helps individuals to become self-sufficient. Many commenters expressed concern with the expansion of the public charge definition to include not just those primarily depending on cash benefits, but also individuals who use basic needs programs to supplement their earnings or need short-term help. Some commenters stated that immigrant women already face a heightened risk of economic insecurity, discrimination, and disproportionate responsibility for caregiving, and that participating in benefit programs is important to their ability to support themselves and their children. A commenter stated that many open jobs require specific training that can be provided through community colleges, and in order to obtain the education to become a contributing member of society, some immigrants draw on public benefits for a short period of time to enable them to complete their studies.

*Response:* DHS understands that individuals, including immigrant women and their families, as well as students, may supplement their income with public benefits, such as basic needs programs, because they may require short-term help, and that the goal of these benefits assists them to become self-sufficient in the short- and, eventually long-term. DHS also acknowledges that certain individuals who are depending on public benefits may choose to disenroll because of this rulemaking. However, the goals of public benefits programs and the public charge ground of inadmissibility are not the same. The public charge inadmissibility provision is not intended to ensure that aliens *can become* self-sufficient; in fact, Congress specifically articulated policy goals in PRWORA that provided that government welfare programs should not be an incentive for aliens to immigrate to the United States and that aliens inside the United States are expected to *be* self-sufficient. Correspondingly, DHS's assessment of whether an alien is likely at any time to become a public charge is not the same

as an assessment whether, at some separate point in the future, an alien who is likely to become a public charge will later become self-sufficient. With this rulemaking, DHS is implementing the public charge ground of inadmissibility and seeking to better ensure that those who are seeking admission to the United States and adjustment of status, as well as those seeking extension of stay or change of status, are self-sufficient, so that they do not need public benefits to become self-sufficient.

*Comment:* Some commenters provided input on the temporary nature of public benefits as they relate to future self-sufficiency. Commenters expressed a belief the rule's core assumption was that people dependent on the Government for subsistence will remain that way indefinitely.

*Response:* DHS disagrees that the rule inherently assumes that people who rely in the government for assistance rather than relying on their own capabilities and the resources of their families, sponsors, and private organizations will remain that way indefinitely. As noted above, neither section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), nor this final rule, assess whether an alien subject to the public charge ground of inadmissibility will remain a public charge indefinitely. Rather, the statute and the rule assess whether an alien is likely at any time in the future to become a public charge. An alien may be likely in the future to become a public charge in the future without remaining a public charge indefinitely. For example, a person could receive Medicaid for a number of years and then obtain employment that provides health insurance, avoiding the further need for Medicaid.

*Comment:* A commenter stated that changing the standard from "primarily dependent" upon cash assistance to "likely at any time in the future to receive one or more public benefits" will cause an individual to risk his or her immigration status when enrolling in specific programs. The commenter stated that this is problematic in part because aliens enroll in such programs consistent with government policy, and sometimes with the Government's encouragement. Another commenter stated that the INA includes the phrase "likely to become a public charge" but the proposed rule "defines 'public' and 'charge' as separate words, disconnected from each other or from the fact that the phrase also requires a likelihood that the person 'become' a public charge, as opposed to a likelihood that he or she will engage in a specific act." The commenter indicated that the proposed

approach to "likely at any time to become a public charge" departs from the plain meaning of the phrase, "likely to become a public charge" in the INA, unnecessarily discarding long-standing and well-developed fairness; relies on an inaccurate measure to predict whether an individual is likely to become a public charge; will eviscerate the totality of circumstances standard; is inefficient; not cost effective; and negatively impacts applicants, the agency, and the economy.[328] The commenter also questioned the focus on public benefits, indicating the case law was based on being "dependent on support" rather than focused on the likelihood of receiving a benefit that costs the government some amount of money. The commenter said changing the standard will deter immigrants from pursuing expensive adjustment of status applications if they fear they will be denied, thus forfeiting the corresponding employment authorization that permits access to better-paying jobs unavailable to unauthorized workers. The commenter concluded that such a result thwarts the purported self-sufficiency goals of the proposed rule.

*Response:* DHS disagrees with the commenters' assessment. As outlined in the NPRM, the approach suggested by INS in the 1999 NPRM and the 1999 Interim Field Guidance does not preclude DHS from suggesting a different approach. As DHS laid out in the NPRM, DHS's interpretation is consistent with the statutory wording which requires a public charge assessment that is prospective in nature, and made at the time of the application for a visa, admission, or adjustment of status." [329] DHS understands that certain individuals present in the United States may be impacted by this rule, and therefore hesitant to apply for adjustment of status. However, given the limited number of aliens present in the United States eligible for public benefits under PRWORA, DHS does not believe that the impact is as extensive as alleged by the commenters. Finally, as explained in the NPRM, the receipt of public benefits does not automatically render an alien inadmissible based on public charge; the determination is always based on the totality of the alien's circumstances.

---

[328] The commenter also indicates that the approach is inefficient, not cost effective, and negatively impact applicants, the agency and the economy.

[329] DHS notes the statutory wording includes the wording "at any time"—the commenter omitted the language when asserting that the interpretation is not consistent with the plain wording of the statute.

**Exhibit A**

*Comment:* Several commenters provided feedback on the comparison between public benefits used by non-citizens and native-born residents. A commenter stated that a study concluded that non-citizen households have much higher use of food programs, Medicaid and cash programs compared to households headed by native-born citizens and therefore, a reform of the public charge doctrine is needed. Other commenters stated, providing statistics in support, that immigrants access benefits for which they are eligible at a far lower rate than native-born residents, suggesting that access to public benefits does not make immigrants more of a public charge than native-born residents.

A commenter stated that if the public charge rule were applied to native born citizens, it would exclude one in three U.S. born citizens, whereas the current rule would exclude one in twenty. Similarly, another commenter indicated that the definition would mean that most native-born, working-class U.S. citizens are or have been public charges and that substantial numbers of middle-class Americans are or have been public charges. A commenter stated that according to the MPI's recent analysis, about 69 percent of recent lawful permanent residents have at least one factor that would count against them under the new rule, as opposed to just three percent of noncitizens who make use of cash benefits under the existing standard.

*Response:* The proposed rule's analysis of public benefits receipt among citizens and noncitizens was meant to inform public understanding of the proposal. DHS need not resolve competing claims regarding the rates of public benefits use by various populations, because the primary basis for the NPRM is a revised interpretation of the term public charge, as informed by the statement of congressional policy in PRWORA. The proposal did not rest on a specific level of public benefits use by particular categories of individuals or households.

DHS notes, however, that the analysis in the NPRM included only a limited number of programs, and did not assume that eligibility for public benefits necessarily meant enrollment. Furthermore, the analysis concerned use by individuals and not households.

Additionally, this rulemaking does not apply to U.S. citizens. Even though some U.S. citizens would fall under the receipt threshold in the public charge definition, this fact is not relevant for the purposes of this rule, as the public charge ground of inadmissibility applies to aliens who are seeking a visa,

admission, or adjustment of status, not U.S. citizens. The purpose of this rule is to better ensure that aliens who enter the United States or remain in the United States are self-sufficient.

Statistics on the use of public benefits by non-citizens compared to the use of citizens are not indicative of an individual alien's self-sufficiency. Even though the use of public benefits by noncitizens may be lower than the native-born population for a given benefit, an alien may still qualify and receive public benefits in the future based on his or her particular circumstances and therefore may be likely to become a public charge. Similarly, it is immaterial whether the definition of "public charge" in the rule would affect one in twenty U.S. citizens or one in three. The relevant question is whether the rule's definition of public charge is consistent with the statute. DHS believes that it is consistent with the statute.

*Comment:* Commenters stated that immigrants use public benefits to escape the poverty cycle, using benefits as a ladder to prevent them from becoming public charges. Other commenters stated that the rule is self-defeating, because although DHS prefers self-sufficient families and individuals, the proposed rule dissuades individuals from using public benefits in order to become self-sufficient and thus enhances financial barriers. Many commenters said that those eligible for benefits are entitled to avail themselves of government benefits and should be able to do so without shame or guilt. Commenters stated that when eligible individuals receive such benefits, the outcomes are frequently better for the United States and the economy. Several commenters stated that the United States has always been open to those who needed assistance, and given that this country was founded on a nation of immigrants, a commenter indicated that it was the Government's responsibility to create policies that reflect the values of equal opportunity and humanitarian support. Another commenter indicated that even under existing policy, the United States has always integrated immigrants sufficiently, such that they become self-sufficient and contributing members of U.S. society.

*Response:* With this public charge inadmissibility rule, DHS neither seeks to stigmatize receipt of public benefits nor seeks to preclude an individual from seeking public benefits. DHS appreciates the input on the effect of public benefits payments and the role these benefits play in becoming self-sufficient, and on the economy as a

whole. DHS does not dispute these positive impacts of public benefits on an individual's long-term self-sufficiency, or the importance of these programs and their goals, including the integration of immigrants. DHS also does not dispute that benefits programs may produce more equal opportunities and provide humanitarian support, and does not intend to in any way diminish these opportunities. DHS, however, is implementing the congressional mandate to assess a prospective immigrant's likelihood of becoming a public charge in the future based on the criteria that Congress put into place. As previously indicated, the INA does not aim to achieve the same goals as public assistance programs; in fact, Congress specifically articulated policy goals in PRWORA that provided that government welfare programs should not be an incentive for immigrants and that immigrants are expected to be self-sufficient. Correspondingly, DHS's assessment of whether an alien is likely to become a public charge is not the same as an assessment of whether an alien is currently a public charge or whether, at some separate point in the future, an alien who is likely to become a public charge will later become self-sufficient.

*Comment:* Some commenters emphasized not just the self-sufficiency of the immigrants that use public benefits or programs, but their contributions to society as a whole. A few commenters stated that providing support to families is a necessary facet of our economic system and recipients provide more to communities than the aid they receive. A commenter stated that a study in Arizona found that immigrants generate $2.4 billion in tax revenue, which is more than the $1.4 billion in benefits they used. A few commenters stated that broadening the definition of public charge ignores the work, taxes, and other contributions immigrants are making to their communities, and makes a "false, negative comparison between immigrants' drain on public resources compared to other Americans' use." A few commenters said a "public charge" is not a person who uses government services that are funded via taxes which immigrants are expected to pay throughout their lifetime. Commenters also indicated that tying public benefits to the public charge definition is not appropriate as the foreign national is working, paying taxes, and contributing to the welfare of the United States and is entitled to public benefits.

*Response:* DHS appreciates the commenters' input. DHS did not, however, make any changes to the

public charge definition based on these comments. DHS recognizes the contributions foreign nationals have made to American society as a whole and to their communities. However, with this rulemaking, DHS seeks to better enforce the grounds of inadmissibility to ensure that those seeking admission to the United States are self-sufficient, *i.e.,* rely on their own capabilities and the resources of their family, sponsors, and private organizations.

Finally, DHS disagrees with the commenters who stated that tying public benefits to the public charge definition is not appropriate for aliens who are working, paying taxes, and contributing to the welfare of the United States and entitled to public benefits. Simply because an alien is working, paying taxes and contributing to the welfare of the United States does not guarantee an alien's self-sufficiency now or in the future.

Again, an individual may provide significant benefits to their communities, including to the tax base, but nonetheless be a public charge. With this rulemaking, DHS seeks to ensure that those coming to the United States are self-sufficient and not dependent on the government for subsistence now or in the future, even if they are currently contributing to the tax base. Furthermore, the public charge assessment is an assessment based on the individual's facts and circumstances; the greater the taxable income and other resources, the more likely an individual is self-sufficient, and the less likely he or she is to become a public charge. DHS encourages all applicants to bring forward any factors and circumstances they believe are relevant to their adjudication of public charge.

*Comment:* A commenter suggested that DHS more clearly separate the definition of public charge from the predictive process by moving any predictive language, along with any thresholds based on predictive value, from the definitions in 8 CFR 212 and 214 to a separate section listing factors to be considered as part of the public charge inadmissibility determination. The commenter stated that this would provide a clear separation between the question of what is a public charge, and whether a person is likely to become a public charge.

*Response:* With respect to the commenter's suggestion to more clearly distinguish between the definition of "public charge" and the prospective public charge inadmissibility determination, DHS notes that as proposed, and as codified in this final

rule, DHS has a separate definition for public charge and public benefits. In this final rule, DHS has also provided a more detailed definition for "likely at any time to become a public charge." [330] DHS believes that the framework and separate definitions provided with this final rule sufficiently permit its officers to make sound and reasonable public charge inadmissibility determinations, as intended by Congress.

*Comment:* A commenter stated that DHS's statutory interpretation of "public charge" is flawed. The commenter noted that in the proposed rule DHS stated that its proposed definition of public charge was consistent with various dictionary definitions of public charge, including the current edition of the Merriam-Webster Dictionary, which defines public charge simply as "one that is supported at public expense." [331] The commenter stated that DHS's interpretation is flawed, because DHS failed to define the term "support." The commenter stated that "looking to the Merriam-Webster Dictionary, which is the dictionary favored by the Supreme Court, 'support' is defined as 'pay[ing] the cost of' or 'provid[ing] a basis for the existence or subsistence of.'" [332] The commenter further stated that, in turn, "one who is 'supported at the public expense' must be having needs met entirely or at least nearly entirely by the government." Therefore, the commenter concluded, DHS failed to provide a justification for how DHS's proposal with its low thresholds for benefit use comports with that definition. Another commenter cited to various dictionary definitions of "charge" to support the proposition that the term "public charge" means a person with a very high level of dependence on the government. For instance, the commenter cited the 1828 edition of Webster's Dictionary, which defined "charge" as "The person or thing committed to another's [sic] custody, care or management; a trust." [333]

A commenter also stated that DHS's proposed statutory interpretation is at odds with how DHS justified the proposed thresholds for public benefits use. The commenter explained in defining "public charge," DHS wrote that an individual "who receives public

benefits for a substantial component of their support and care can be reasonably viewed as being a public charge." [334] But in justifying the thresholds, DHS wrote that it "believes that receipt of such benefits, even in a relatively small amount or for a relatively short duration would in many cases be sufficient to render a person a public charge." [335] Another commenter stated that some households may be self-sufficient and capable of meeting their basic needs without public benefits, but nonetheless enroll in such benefits to supplement available resources.

*Response:* DHS disagrees with the commenter that Merriam-Webster's definition of "support" compels DHS to abandon the policy proposed in the NPRM. [336] The commenter is correct that some of Merriam-Webster's definitions of "support" reference paying the costs of another, or providing a basis for the existence or subsistence of another. Other definitions of "support" in the same dictionary do not specify a degree of assistance (for instance, Merriam-Webster's also defines support as "assist, help"). [337]

But, the public benefits designated under this rule are specifically designed for the Government to pay the costs of the beneficiary with respect to basic necessities, *i.e.,* to provide a basis for the beneficiary's subsistence. This is the case with respect to cash benefits for income maintenance, Medicaid, SNAP, and all other designated benefits. DHS believes that its rule is consistent with all of the aforementioned definitions of "support" and especially with the definition of "public charge" as "one that is supported at public expense." [338] And for substantially the same reasons, DHS believes that its rule is broadly consistent with the 1828 Webster's Dictionary definition of the term "charge," as well. For instance, the definition cited by the commenter provides an example of appropriate usage: "Thus the people of a parish are

---

[330] *See generally* 8 CFR 212.21.

[331] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51158 (proposed Oct. 10, 2018).

[332] Merriam-Webster, definition of "support," available at *https://www.merriam-webster.com/dictionary/supported* (last visited July 26, 2019).

[333] Webster's Dictionary 1828 Online Edition, definition of "charge," available at *http://webstersdictionary1828.com/Dictionary/charge* (last visited July 26, 2019).

[334] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51158 (proposed Oct. 10, 2018).

[335] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51164 (proposed Oct. 10, 2018).

[336] In particular, DHS also disagrees with the commenter who indicated that DHS's citing to the 1990 edition of Black's Law Dictionary inappropriate because PRWORA redefined the term public charge. As explained throughout the NPRM and this final rule, PRWORA restricted access for aliens to certain benefits but did not define public benefits.

[337] *See* Merriam-Webster Online Dictionary, Definition of Support, *https://www.merriam-webster.com/dictionary/support* (last visited July 26, 2019).

[338] Merriam-Webster Online Dictionary, Definition of Public Charge, *https://www.merriamwebster.com/dictionary/public%20charge* (last visited July 8, 2019).

**Exhibit A**

called the ministers [sic] charge.'' Just as a parishioner can be a ''charge'' of minister without being entrusted entirely to their care, a person can be a ''charge'' of the public if he or she relies on public benefits to meet basic needs.

Regardless, DHS does not believe that isolated definitions of ''support'' or the word ''charge'' standing alone conclusively determine the possible range of definitions for the term, public charge; neither term standing alone is used in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and neither term, standing alone, is used in the definition of ''public charge'' or ''public benefit'' in this rule. DHS disagrees with the comment that the reference to ''substantial component''[339] makes the statutory interpretation in the NPRM inconsistent with the justification which references a ''relatively small amount.''[340] The reference to ''substantial component'' was part of a summary of dictionary definitions and not the basis for the definition of public charge.[341] Nonetheless, as discussed elsewhere in this rule, DHS has revised 8 CFR 212.22 to limit public charge determinations to benefits received for 12 months in a 36-month period and is not considering the value of the amount of benefits received. Finally, DHS rejects the contention that an alien is not a public charge if the alien does not ''need'' the designated benefits that he or she or receives. DHS's view is that an alien, who receives designated benefits under this rule for the specific duration, is a public charge, whether he or she needs those benefits or not.

*Comment:* A commenter stated that DHS should not have cited to the 1990 Black's Law Dictionary's definition of ''public charge,'' because the edition is out of date and was written pre-PRWORA.

*Response:* In its NPRM, DHS was attempting to provide a historical review of the term public charge as defined in various reference materials. The 1990 edition would have preceded the IIRIRA amendments by only six years.

*Comment:* A commenter stated that DHS's recognition that active-duty U.S. servicemembers would qualify as ''public charges'' under the plain terms of the proposed rule is proof positive that the proposal is bad policy. The commenter stated that the exclusion of public benefits received by servicemembers and their families

confirms that the DHS has set the threshold for ''self-sufficiency''—or ''public charge''—in an unreasonable way and too high. The commenter stated that in setting the salary levels for members of the U.S. military, Congress has determined that the salary levels are sufficient to render our servicemembers ''self-sufficient,'' and therefore the rule conflicts with this determination. The commenter further stated that employment as an active-duty member of the U.S. military has long been viewed as an honorable, stable job that provides a gateway for all individuals in this country—regardless of race, economic background, social class, or other forms of difference—to succeed in life. The commenter stated that the answer is not to exempt active-duty servicemembers from the ''public charge'' regulation, but to embrace a reasonable definition of ''public charge'' so that active-duty servicemembers are not rendered ''public charges.''

*Response:* Contrary to the commenter's arguments, to the best of DHS's knowledge there is no indication that Congress considered the public charge ground of inadmissibility when it created the military compensation structure, or that the levels of pay afforded to active duty servicemembers are always adequate to ensure that servicemembers and their families will be self-sufficient for purposes of our immigration laws. In the NPRM, DHS recognized that as a consequence of the unique compensation and tax structure afforded by Congress to aliens enlisting for military service, some active duty alien servicemembers, as well as their spouses and children, as defined in section 101(b) of the Act, 8 U.S.C. 1101(b), may rely on SNAP and other listed public benefits.[342] DHS included a provision for these individuals, as reflected in the proposed rule and as discussed later in this preamble.

a. Threshold Standard

''*Primarily dependent*'' *Based on Cash Public Benefit Receipt or Long-Term Institutionalization at Government Expense*''

*Comment:* Commenters indicated that DHS, through regulation, cannot institute a definition that Congress had already squarely rejected. The commenters noted that Congress, as part of IIRIRA debates, had rejected a proposal that would have defined a public charge as a person who receives means-tested public benefits. The commenters indicated that Congress'

rejection of the proposed definitions of public charge and means-tested public benefit meant that Congress retained the longstanding meaning of public charge as being primarily dependent on the government for subsistence.[343]

A commenter questioned DHS's assertion that the proposed definition of public charge reflects Congress's intent to have aliens be self-sufficient and not reliant on the government for assistance. The commenter indicated that the INA does not mention self-sufficiency and does not list it as a criterion for avoiding a finding of inadmissibility under public charge. Several commenters stated that the rule would drastically increase the scope of who would be considered a public charge to include people who use a much wider range of benefits and not just those who are primarily dependent on the government for subsistence. A few commenters stated that the proposed rule's definition of public charge would equate occasional or temporary use of benefits and services with primary reliance on benefits. A commenter agreed with the current standard, in that it does not penalize individuals from accepting all of the forms of support encompassed within this rule. A commenter, in considering only primary dependence on public benefits as the degree of dependency required to sustain a public charge finding, stated that the standard provides clear and effective guidelines for adjudicators and applicants without endangering the lives of immigrant families and children in this country.

*Response:* As noted above, although the INA does not mention self-sufficiency in the context of section

339 Inadmissibility on Public Charge Grounds, 83 FR 51114, 51158 (proposed Oct. 10, 2018).

340 Inadmissibility on Public Charge Grounds, 83 FR 51114, 51164 (proposed Oct. 10, 2018).

341 Inadmissibility on Public Charge Grounds, 83 FR 51114, 51158 (proposed Oct. 10, 2018).

343 The commenter indicated that during the debates leading up to IIRIRA, Congress stripped the bill of a provision defining public charge as a noncitizen who uses ''means-tested, public benefits,'' meaning ''any public benefit (including cash, medical, housing, food, and social services) . . . in which eligibility of an individual, household, or family eligibility unit for such benefit or the amount of such benefit, or both are determined on the basis of income, resources, or financial need of the individual household, or unit.'' *See* H.R. Rep. No. 104–208, at 144 (Sept. 24, 1996) (sec. 551 of H.R. 2202, proposing 8 U.S.C. 1183a(e)(defining ''means-tested public benefit''); *see* id. at 138 (sec. 532 of H.R. 2202, proposing 8 U.S.C. 1251(a)(5)(C)(99), (D) (defining term ''public charge'' [to] include[] any alien who receives . . . means-tested public benefits'); H.R. Rep. No. 104–863, at 564, 690–91 (Sept. 28, 1996) (absence of sec. 532 from prior H.R. 2202); *see* 142 Cong. Rec. 25868 (Sept. 28, 1996) (noting that sec 532 was stricken and that proposed subsection (e) to INA section 213A definition ''Federal means-tested public benefit'' was also stricken). Instead, the commenter stated, IIRIRA retained the term's longstanding meaning of primary dependence on the government for subsistence. The commenter further stated that Congress' rejection of the proposed provision was an express political choice to ensure that IIRIRA's passage, and not a clerical change.

**Exhibit A**

212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), DHS believes that there is a strong connection between the self-sufficiency policy statements elsewhere in Title 8 of the United States Code (even if not codified in the INA itself) at 8 U.S.C. 1601 and the public charge inadmissibility language in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), which were enacted within a month of each other.[344] Of particular significance and just prior to the passage of the revised public charge inadmissibility ground in IIRIRA, conference managers noted that the implementing section "amends INA section 212(a)(4) to expand the public charge ground of inadmissibility. Aliens have been excludable if likely to become public charges since 1882. Self-reliance is one of the most fundamental principles of immigration law."[345] Previous House and Senate Judiciary Committee reports included similar statements addressing self-sufficiency and receipt of public benefits in the context of public charge.[346]

Furthermore, DHS disagrees that either congressional actions leading up to IIRIRA or years of precedent mandate the adoption of the primarily dependent standard. As explained in the NPRM, the statute does not expressly prescribe a single method to define the level, type, or duration of public benefit receipt necessary to determine whether an alien is a public charge or is likely at any time to become a public charge.[347] DHS does not interpret the fact that Congress did not define public charge as "any alien who receives [means-tested public] benefits for an aggregate period of at least 12 months" prior to enactment of IIRIRA [348] as meaning DHS is precluded

from adopting a similar definition now.[349] Rather, DHS views Congress' failure to define "public charge" by statute as an affirmation of what the Senate Judiciary Committee acknowledged over 50 years ago, *i.e.,* that the meaning of public charge has been left to the judgment and interpretation of administrative officials and the courts. More specifically, that committee found that the determination whether the alien is a public charge or is likely to become a public charge should rest within the discretion of immigration officers, because the elements constituting public charge are so varied.[350] If Congress had wanted to conclusively define the term public charge as "primarily dependent," it could have done so.[351] DHS also notes that courts that have examined public charge have generally explained public charge in the context of dependence or reliance on the public for support without elaborating on the degree of dependence or reliance required to be a public charge.[352]

As discussed in the NPRM,[353] DHS believes that the primary dependence definition constitutes one permissible, but non-exclusive way of establishing a bright line for considering public benefit receipt relative to a public charge determination. Because Congress already identified certain classes of aliens, including those who are particularly vulnerable, and has exempted or authorized DHS to exempt them from the public charge ground of inadmissibility, DHS believes that with respect to other aliens not similarly protected, the current approach of excluding receipt of non-cash benefits and only finding to be inadmissible individuals who are likely to become

*primarily* dependent on the government, as a policy matter, does not go far enough in enforcing this ground of inadmissibility.

Given that the statute and case law do not prescribe the type or extent of public benefit receipt that makes an alien a public charge, DHS believes that benefits designated in this rule are directly relevant to public charge inadmissibility determinations. These enumerated public benefits are directed toward meeting the basic necessities of life through the provision of food and nutrition, housing, and healthcare.[354] This basic fact is underscored by the many comments identifying significant consequences for individuals who decide to disenroll from these benefits. Ultimately, the public charge ground of inadmissibility is targeted to individuals who, in the absence of government assistance, would lack the basic necessities of life. DHS acknowledges that this rule constitutes a change that will have a practical impact on aliens covered by this rule; however, it views the current policy as unduly restrictive in terms of which benefits are considered for public charge inadmissibility. Therefore, expanding the list of public benefits to include a broader list of public benefits that satisfy basic living needs as a policy matter better enforces this ground of inadmissibility.

Equally important, given that the statute and case law do not prescribe the *degree* or *duration* of public benefit receipt that make an alien a public charge, DHS has determined that it is permissible to adopt a threshold other than the primarily dependent standard. In its annual reports to Congress on welfare indicators and risk factors, HHS explains that defining welfare dependence and developing consensus around a single measure of welfare dependence are difficult and adopting any definition of welfare dependence has its limitations and represents a choice of demarcation beyond which someone is or will be considered dependent.[355] In HHS's efforts to examine the range of dependence from complete long-term dependence to total self-sufficiency, HHS acknowledges that

[344] *See* Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (enacting 8 U.S.C. 1601) and Public Law 104–208, div. C, sec. 531, 110 Stat. 3009–546, 3009–674 (Sept. 30, 1996) (amending INA section 212(a)(4), 8 U.S.C. 1182(a)(4)).

[345] *See* United States. Cong. House. Committee on the Conference. *Illegal Immigration Reform and Immigrant Responsibility Act of 1996.* 104th Cong. 2nd Sess. H. Rpt. 828, at 240–241 (1996). *https://www.congress.gov/104/crpt/hrpt828/CRPT-104hrpt828.pdf* (last visited 5/9/2019).

[346] *See* United States. Cong. House. Committee on the Judiciary. *Immigration in the National Interest Act of 1995.* 104th Cong. 2nd Sess. H. Rpt. 469, pt 1, at 109 (1996). *https://www.congress.gov/104/crpt/hrpt469/CRPT-104hrpt469-pt1.pdf* (last visited 5/9/2019). *See also* United States. Cong. Senate. Committee on the Judiciary. *Immigration Control and Financial Responsibility Act of 1996.* 104th Cong. 2nd Sess. S. Rpt. 249, at 5–7 (1996). *https://www.congress.gov/104/crpt/srpt249/CRPT-104srpt249.pdf* (last visited 5/9/2019.).

[347] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51163–51164 (proposed Oct. 10, 2018).

[348] United States. Cong. House. Committee on the Conference. *Illegal Immigration Reform and Immigrant Responsibility Act of 1996.* 104th Cong. 2nd Sess. H. Rpt. 828, at 138 (1996). *https://*

*www.congress.gov/104/crpt/hrpt828/CRPT-104hrpt828.pdf* (last visited 5/9/2019).

[349] *See Competitive Enterprise Inst.* v. *U.S. Dep't of Transp.,* 863 F.3d 917 (D.C. Cir. 2017) ("But 'Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change.' " (citing *Consumer Elecs. Ass'n* v. *FCC,* 347 F.3d 291, 299 n.4 (DC Cir. 2003) (quoting *Pension Benefit Guar. Corp.* v. *LTV Corp.,* 4966 U.S. 633, 650 (1990))).

[350] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51123 n.21 (proposed Oct. 10, 2018). *See also* The 1950 Omnibus Report of the Senate Judiciary Committee, S. Rep. No. 81–1515, at 349 (1950).

[351] *See, e.g., Cyan, Inc.* v. *Beaver Cty. Emp. Ret. Fund,* 138 S. Ct. 1061, 1070 (2018) (explaining that, if Congress had wanted to deprive state courts of jurisdiction over certain class actions, it could have easily done so by inserting a provision.).

[352] *See* Inadmissibility on Public Charge Grounds, 83 FR 51158 (proposed Oct. 10, 2018).

[353] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51163–51164 (proposed Oct. 10, 2018).

[354] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51159 (proposed Oct. 10, 2018).

[355] *See* U.S. Dep't of Health & Human Servs., Indicators of Welfare Dependence: Annual Report to Congress, at Foreword and Chapter II (1997), *available at https://aspe.hhs.gov/report/indicators-welfare-dependence-annual-report-congress-1997* (last visited July 26, 2019). *See also* U.S. Dep't of Health & Human Servs., Welfare Indicators and Risk Factors, at I–2 (2015), *available at https://aspe.hhs.gov/report/welfare-indicators-and-risk-factors-fourteenth-report-congress* (last visited July 26, 2019).

**Exhibit A**

mere public benefit receipt is not a good measure of dependence [356] but that: ''Welfare dependence, like poverty, is a continuum, with variations in degree and in duration.'' [357] As HHS explains, an individual may be more or less dependent based the share of total resources derived from public benefits or the amount of time over which the individual depends on the public benefit. As HHS further elaborates, ''A summary measure of dependence . . . as an indicator for policy purposes must have some fixed parameters that allow one to determine [who] should be counted as dependent, just as the poverty line defines who is poor under the official standard.'' [358] In this context, DHS has determined that it is permissible to adopt a uniform duration threshold so long as the threshold has fixed parameters to allow DHS to determine who is considered a public charge. Accordingly, as explained further below, DHS has defined ''public charge'' in this final rule to mean a person who receives the designated benefits for more than 12 months in the aggregate in any 36-month period. This fixed standard will assist DHS to determine which aliens are inadmissible as likely to become a public charge at any time in the future based on the totality of the alien's circumstances.

b. Standards for Monetizable and Non-Monetizable Benefits

Numerical Percentage Threshold

*Comment:* One commenter supported the explanation in the NPRM that the 15 percent threshold is an acceptable proxy for benefits use, and indicated that the 15 percent threshold is ''widely used and thus arguably more transparent than other alternatives.''

In contrast, many commenters voiced general opposition to the 15 percent threshold, believing that the standards will likely reverse public health strides communities have made relating to vaccinations, communicable diseases and nutrition; that benefits amount received at that threshold level or any level, did not represent an individual's inability to achieve self-sufficiency; or that the 15 percent threshold was unfair and unnecessary in scope because the minimal financial support provided by federally funded benefits did not promote dependency, but were a safety net for vulnerable families and therefore should not be linked to threats of deportation.

Commenters stated that DHS had offered no basis for its use of 15 percent as the relevant benchmark for who is a public charge. Commenters also indicated that DHS's own conclusory assumption that receipt of this level of funding represents a lack of self-sufficiency is rebutted by the ample research showing that immigrants pay more into the United States healthcare system than they take out and that most immigrants pay taxes. This commenter also indicated that DHS provided little to no guidance as to how DHS officials would go about predicting a person's future likelihood of receiving the requisite amount of benefits and that the use of a specific dollar benchmark belies the Department's assurances that it will not consider prior receipt of benefits to be the dispositive factor in public charge determinations. Another commenter indicated that DHS does not provide an explanation as to why the quantifiable amount of dependency was set at 15 percent rather than 50 percent, which would reflect primary dependency, or even 30 or 40 percent. Citing to *United States* v. *Dierckman,* 201 F.3d 915, 926 (7th Cir. 2000) and *Allied-Signal, Inc.* v. *Nuclear Reg. Comm'n,* 988 F.2d 146, 152 (D.C. Cir. 1993), the commenters indicated that DHS failed to provide the essential facts upon which the administrative decision is based. The commenter also stated that DHS's attempt to justify its public charge definition with existing case law that, according to DHS, failed to stipulate quantifying levels of public support required, may have explained DHS's proposal to quantify the amount, but failed to explain why that quantifiable amount should be 15 percent of FPG, and not a higher percentage like 30 or 40 percent, or another amount that is less than 51 percent.

Other commenters stated DHS did not provide adequate data to support using the 15 percent threshold in public charge determinations, that the threshold was contrary to the spirit of public charge and did not prove an immigrant is ''primarily dependent'' on government assistance; and that the standard ignored the economic realities of low-wage work.

Multiple commenters stated that the 15 percent threshold is too low or restrictive, and arbitrary. A commenter also equated the threshold with having no threshold at all and stated that noncitizens will be too afraid to apply for benefits. Similarly, commenters stated that the 15 percent threshold is particularly low for immigrants living in areas with a high cost of living, for those receiving cash assistance, or for those receiving housing assistance, especially in cities or states where the cost of housing exceeds those detailed in the rule. Some commenters asserted that the standard should be 50 percent of the FPG, while other stated that DHS should conduct a sensitivity analysis comparing the economic impacts of using a 15 percent of the FPG cutoff versus a 50 percent of the FPG cutoff for benefits before determining the threshold. A commenter stated that the FPG have long been criticized for being inadequate and low—failing to take into account, for example, of geographical variances in cost of living, as well as expenses that are necessary to hold a job and to earn income (*e.g.,* child care and transportation costs). The commenter wrote that given these well-documented and critical flaws with the FPG, DHS's proposed thresholds are particularly egregious.

Many commenters provided examples of individuals who would be found to be public charges under the proposed benefit thresholds, despite being largely self-sufficient. Several commenters also stated that a noncitizen receiving slightly less than $5 per day, or roughly $1,800 per year, in benefits would be enough to trigger a public charge finding. Other commenters stated that a noncitizen family of four making 250 percent of the federal poverty line could be deemed public charges if they received $2.50 per person per day, although such a family would be about 95 percent self-sufficient. A commenter stated that therefore, DHS's standard to measure self-sufficiency had no rational connection with actual self-sufficiency. Many commenters cited studies finding that those who are widely self-sufficient, upwards of 90 percent, but who receive or previously received ten percent of their income in benefits could be found inadmissible under the proposed threshold, especially in light of the fact that past receipt counts as a heavily-weighted factor. Another commenter cited a study indicating that the rule could effectively ban a family of four making 175 percent of FPG, but which received $2.50 per day per person in government aid, even though this family is only receiving 8.6 percent of their income from the government and is 91.4 percent self-sufficient. A

---

[356] *See* U.S. Dep't of Health & Human Servs., Indicators of Welfare Dependence: Annual Report to Congress, at Chapter II (1997), *available at https://aspe.hhs.gov/report/indicators-welfare-dependence-annual-report-congress-1997* (last visited July 26. 2019).

[357] *See* U.S. Dep't of Health & Human Servs., Welfare Indicators and Risk Factors, at I–2 (2015), *available at https://aspe.hhs.gov/report/welfare-indicators-and-risk-factors-fourteenth-report-congress* (last visited July 26. 2019).

[358] *See* U.S. Dep't of Health & Human Servs., Welfare Indicators and Risk Factors, at I–2 (2015), *available at https://aspe.hhs.gov/report/welfare-indicators-and-risk-factors-fourteenth-report-congress* (last visited July 26. 2019).

**Exhibit A**

commenter also stated that the proposed threshold could have the perverse effect of discouraging immigrants from accessing benefits they need to eventually become self-sufficient. One commenter stated that it would be unreasonable to use the receipt of public benefits in excess of 15 percent against an individual if the individual received the aid after an accident or emergency, as such use would not be evidence indicating that it will happen again. A commenter stated that the proposed threshold was so low that it would be more of an indicator that the alien is subject to the inherent uncertainties and exigencies of life, *e.g.,* if a sponsoring company goes out of business or with the occurrence of a heart attack or a child developing a disability, that it would be an indicator of the alien's ongoing dependence on public benefits. Another commenter stated that a higher threshold would better keep with the prudence dictated by the precautionary principle. The commenter wrote that significantly tightening the public benefits threshold from the old primary dependence paradigm will entail unanticipated consequences and ought to be conducted slowly.

Many commenters stated that the 15 percent threshold is overly complicated and would lead to widespread confusion. A commenter said that because of the low threshold, it would be difficult or impossible for families to understand how to utilize public safety nets without becoming a public charge, or to know at the time of an application if a specific benefit program would meet the 15 percent threshold. A commenter stated that the proposed cutoff of 15 percent would not serve to improve clarity when making public charge determinations, but would instead reduce the number of immigrants whose applications will be approved.

*Response:* After considering all of the public comments on the proposed thresholds for the receipt of public benefits, DHS decided against finalizing separate thresholds for monetizable and non-monetizable benefits, including the combination threshold. DHS has determined that a better approach from a policy and operational perspective, and one indicative of a lack of self-sufficiency is a single duration-based threshold, which this rule incorporates directly into the definition of public charge,[359] and the determination of likely to become a public charge.[360]

Therefore, under this final rule, DHS will consider an alien likely to become

a public charge at any time in the future if the alien is more likely than not to receive public benefits for longer than 12 months in the aggregate in any 36-month period. As with the proposed rule, current receipt or past receipt of more than 12 months of public benefits, in the aggregate, in any 36-month period will not necessarily be dispositive in the inadmissibility determination; *i.e.,* in determining whether the alien is likely to become a public charge at any time in the future, but will be considered a heavily weighted negative factor in the totality of the alien's circumstances.

By moving the threshold standard into the ''public charge'' definition, DHS intends to alleviate confusion about the threshold for being a public charge. As part of the inadmissibility determination, an officer will review the likelihood of whether an alien will receive public benefits over the durational threshold. The ''public benefit'' definition will only list the specific programs considered and the list of exclusions. Separating concepts of ''public charge'' and ''public benefits'' also clarifies that DHS will consider in the totality whether an alien has applied for, received, or been certified or approved to receive any public benefits, as defined in 8 CFR 212.21(b), in assessing whether he or she is likely to become a public charge as part of the totality of the circumstances.

DHS believes that this approach is particularly responsive to public comments that communicated concerns about the complexity of the bifurcated standard and lack of certainty. As revised, this determination includes the consideration of public benefit application, certification, or receipt over any period of time. However, as indicated above, the alien's application for, certification, or receipt of public benefits will only be weighted heavily in certain circumstances, namely where such application, certification, or receipt of public benefits exceeded 12 months in the aggregate within any 36-month period, beginning no earlier than 36 months prior to the alien's application for admission or adjustment of status on or after the effective date. Similarly, DHS has revised the public benefit condition that applies in the context of an extension of stay or change of status application or petition, to include this new standard as well.

Valuation

*Comment:* DHS also received comments on the valuation of monetizable benefits. A commenter acknowledged that the proposed rule including provisions for pro rata

attribution of monetizable benefits (such that benefits granted to a multi-person household would not all be attributed to a single person), but stated that the proposed rule was confusing, and that families are highly likely to avoid seeking social services entirely, rather than rely on the valuation formulas.

Some commenters suggested that it would be unreasonable to refer to FPG for a household of one, when evaluating an alien who is part of a large household. One commenter wrote that the correlation between household receipts of public benefits in absolute dollar terms and the likelihood that one member of that household will become a public charge can be assumed to be stronger, the smaller the size of the household. For a given level of receipt, a larger household is more likely to be self-sufficient. The commenter suggested that DHS set the threshold for monetary receipt based on actual household size. The commenter did not address the fact that the proposed valuation methodology called for prorating the benefit valuation based on household size.

*Response:* DHS appreciates these comments. Because DHS is eliminating the percentage-based threshold for monetizable benefits, as well as the combination threshold, DHS is not making any adjustments to the application of the FPG to the valuation of monetizable benefits because the entire valuation concept is being eliminated from the rule. Similarly, because DHS will not be monetizing public benefits, the household size applicable to the FPG (*i.e.,* the household size of one) is no longer relevant. That said, DHS does not believe that public benefits received by a member of the alien's household would serve as a reliable measure of the likelihood of an alien becoming a public charge at any time in the future because the receipt of benefits by a household member does not indicate that the applicant is likely to receive public benefits as well. Therefore, if someone in the household other than the applicant is receiving the public benefit, DHS will not consider receipt of the public benefit. Similarly if the recipient is a member of the alien's household, any income derived from such public benefit will be excluded from the calculation of household income. However, because DHS is eliminating the percentage-based threshold for monetizable benefits and instead establishing a single, duration-based threshold, the length of time an alien receives any public benefit, as defined in 8 CFR 212.21(b), will be considered in the totality of the circumstances,

---

[359] *See* 8 CFR 212.21(a).
[360] *See* 8 CFR 212.22(a).

**Exhibit A**

regardless of whether the alien is the only person in the household receiving the benefit, or is one of the people receiving the same benefit. This differs from the approach in the proposed rule where valuation of certain benefits that are based on the household size (*e.g.,* SNAP) would have been proportionally attributed to the alien.[361]

*Comment:* DHS also received comments on the non-monetizable benefits standards. One commenter stated that the 12- and 9-month minimum use thresholds are acceptable proxies for being a public charge, but the NPRM provides almost no explanation of how or why DHS determined that the 12- and 9-month threshold for non-monetizable benefits was indicative that an alien is a public charge. The commenter said a more detailed analysis of the non-monetizable benefits threshold in a final rule would go a long way to legitimizing this rulemaking. Many commenters either voiced general opposition to the 12-month standard for non-monetizable benefits or indicated that the standard was unreasonable in the context of specific non-monetizable benefits, such as Medicaid (which according to the commenters is designed for continuous enrollment) and public housing (which frequently requires a year-long lease agreement. A commenter stated that the threshold would not be well understood by the public, or provide sufficient assurance that a brief period of enrollment would be worthwhile. For instance, with respect to Medicaid, if the alien learned about the thresholds at all, she or he might still be concerned about signing up for a brief period of coverage, fearing that they might experience more acute healthcare needs later and should refrain from using Medicaid until or unless that occurred. The alien might also know that Medicaid eligibility periods typically last a year and may be unclear about how that period can be shortened. Another commenter stated that the 12-month standard is arbitrary and would produce "absurd results" when applied in a real-world context. For example, someone with cancer might use Medicaid to help cover their expenses, and the 12-month standard could cause them to discontinue care too early, leading to devastating consequences. Commenters stated that using duration to determine dependency is particularly problematic in the context of Medicaid,

where the threshold does not allow DHS to determine the extent to which the benefit was used. A commenter suggested this threshold would be prohibitive for all households participating in federal housing programs, regardless of immigration status. The commenter also stated that durational receipt measures are meaningless in the context of health coverage since duration does not represent the extent of benefits actually used. Commenters stated that DHS's public charge assumption rests on arbitrary time periods for receiving benefits. Without citing to the source of information, one commenter stated that the average length a person is on SNAP is 8–10 months, Medicaid assistance for children is provided on average for 28 months, and the average length of receipt for public housing for families is no more than 4 years. Similarly without attributing the source of information, a commenter said a 20-year analysis makes clear that seemingly dependent immigrants will become self-sufficient and productive in the long-term. One commenter stated strong opposition to the double counting of months where more than one benefit is received.

*Response:* DHS has decided to adopt a uniform duration standard for the following reasons. First, the new standard is simpler and more administrable than the proposed approach for monetizable and non-monetizable benefits. It eliminates the need for complicated calculations and projections related to the 15 percent of FPG threshold. By eliminating the 15 percent of FPG threshold for monetizable benefits, DHS is also able to eliminate the complicated assessment for the combination of monetizable and non-monetizable benefits and the provision for the valuation of monetizable benefits, including the need to prorate such benefits.

Second, the standard is consistent with DHS's interpretation of the term "public charge." DHS believes that public benefit receipt for more than 12 cumulative months over a 36-month period is indicative of a lack of self-sufficiency. The threshold is intended to address DHS's concerns about an alien's lack of self-sufficiency and inability to rely on his or her own capabilities as well as the resources of family, sponsors, and private organizations to meet basic living needs. DHS believes that an alien who receives the designated public benefits for more than 12 months in the aggregate during a 36-month period is not self-sufficient. Receipt of public benefits for such a duration exceeds what DHS believes is a level of support that temporarily or

nominally supplements an alien's independent ability to meet his or basic living needs. Although an alien who receives the designated public benefits for more than 12 months in the aggregate may soon disenroll, the fact that she or he received such support for such a substantial period of time establishes that they are a public charge until such disenrollment occurs. DHS would consider the alien's request to disenroll in the totality of the circumstances review.

Ample basis exists for using a duration-based standard even if, as commenters noted, neither the 1999 Interim Field Guidance nor any other source provides an authoritative basis for a specific duration-based standard. As indicated in the NPRM, under the 1999 Interim Field Guidance, the duration of receipt is a relevant factor with respect to covered benefits and is specifically accounted for in the guidance's inclusion of long-term institutionalization at government's expense.[362] But the 1999 Interim Field Guidance did not create a standard by which an alien's long-term reliance on public benefits would indicate a lack of self-sufficiency. In addition, HHS has repeatedly cited and measured the duration of time individuals receive means-tested assistance as an indicator

---

[361] In the NPRM, DHS had proposed calculating the value of the benefit attributable to the alien in proportion to the total number of people covered by the benefit in determining the cumulative value of one or more monetizable benefits. *See* proposed 8 CFR 212.24, Valuation of Monetizable Benefits.

[362] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51165 (proposed Oct. 10, 2018). In assessing the probative value of past receipt of public benefits, "the length of time . . . is a significant factor." 64 FR 28689, 28690 (May 26, 1999) (internal quotation marks and citation omitted). The NPRM also noted that in the context of both state welfare reform efforts and the 1990s Federal welfare reform, Federal Government and state governments imposed various limits on the duration of benefit receipt as an effort to foster self-sufficiency among recipients and prevent long-term or indefinite dependence. States have developed widely varying approaches to time limits. Currently, 40 states have time limits that can result in the termination of families' welfare benefits; 17 of those states have limits of fewer than 60 months. *See, e.g.,* MDRC, formerly Manpower Demonstration Research Corporation, Welfare Time Limits State Policies, Implementation, and Effects on Families. *https://www.mdrc.org/sites/default/files/full_607.pdf* (last visited July 26, 2017). Similarly, on the Federal level, PRWORA established a 60-month time limit on the receipt of TANF. *See* Temporary Assistance for Needy Families Program (TANF), Final Rule; 64 FR 17720, 17723 (Apr. 12, 1999) ("The [Welfare to Work (WtW)] provisions in this rule include the amendments to the TANF provisions at sections 5001(d) and 5001(g)(1) of Public Law 105–33. Section 5001(d) allows a State to provide WtW assistance to a family that has received 60 months of federally funded TANF assistance . . ."). These time limits establish the outer limits of how long benefits are even *available* to a beneficiary as a matter of eligibility for the public benefit, and therefore how long an individual can receive those benefits. But DHS cannot use these time limits to establish a specific standard to determine how long an individual can receive such benefits while remaining self-sufficient for purposes of the public charge inadmissibility determination.

**Exhibit A**

of welfare dependence in its annual reports on welfare dependence, indicators, and risk factors.[363] HHS states, ''The amount of time over which [an individual] depends on welfare might also be considered in assessing [the individual's] degree of dependence.'' [364]

This rule aims to create such a standard, in order to provide aliens and adjudicators with a bright-line rule upon which they can rely. The proposed rule cited longitudinal studies of welfare receipt, such as the Census Bureau's Dynamics of Economic Well-Being study,[365] and the welfare leaver study.[366] Both studies offer insight into the length of time that recipients of public benefits tend to remain on those benefits, and lend support to the notion that this rule's standard provides meaningful flexibility to aliens who may require one or more of the public benefits for relatively short periods of time, without allowing an alien who is not self-sufficient to avoid facing public charge consequences.[367]

For example, according to the Census Bureau, the largest share of participants (43.0 percent) who benefited from one or more means-tested assistance programs in the 48 months from January 2009 to December 2012, stayed in the program(s) between 37 and 48 months. By contrast, 31.2 percent of participants in such benefits stayed in the program(s) for between one and 12 months, and the remaining 25.8% of participants stayed in the program for between 13 and 36-

months.[368] The study thus showed that a significant portion of the benefits-receiving population ended their participation within a year. In fact, the study compared participants' months of program participation across various income and age ranges, racial groups, family types, levels of educational attainment, and types of employment status, and found that nearly across the board, there was a relatively large group of people who participated for between one and 12 months, followed by relatively smaller groups who participated for between 13 and 24 months and between 25 and 36 months, respectively, followed by a relatively large group of people who participated for between 37 and 48 months. Similarly, an earlier study showed that across a 24-month period of study, those who were enrolled in one or more assistance programs (approximately 25.2 percent of the overall population studied) were most likely to be enrolled for the entire 24-month period (10.2 percent).[369] But a substantial portion of the population enrolled in such programs only participated between one and 11 months (8.5 percent) or 12 to 23 months (6.5 percent).[370] All of this suggests that a 12-month standard is not absurd, as indicated by commenters, but in fact accommodates a significant proportion of short-term benefits use, while also providing a simple and accessible touchstone (more than a year) and an easily administrable cutoff that is a midpoint between the cutoffs established in the studies (36 months).

The ''welfare leaver'' study referenced above also provides support for a 12-month standard. Although most people who leave welfare programs work after they leave those programs, people may come back to receive additional public benefits.[371] In the welfare leaver study,

researchers found that on average, ''cyclers'' received 27 months of cash assistance within the study's four-year observation period, compared with an average of 12 months for short-term recipients and 40 months for long-term recipients.[372]

DHS acknowledges that the duration standard is imperfect, because it is an exercise in line-drawing, it does not monetize public benefit receipt, and it is applied prospectively based on the totality of the alien's circumstances instead of an algorithm or formula. In some cases, DHS may find an alien admissible, even though the alien may receive thousands of dollars, if not tens of thousands of dollars, in public benefits without exceeding the duration threshold at any time in the future. DHS recognizes this scenario is plausible based on estimates of Medicaid costs and receipt of Medicaid only. For example, the Office of the Actuary in the Centers for Medicare and Medicaid Services estimated that annual Medicaid spending per enrollee ranged from approximately $3,000-$5,000 for children and adults to approximately $15,000-$20,000 for the aged and persons with disabilities in Fiscal Year 2014.[373] DHS's analysis of SIPP data shows that among individuals receiving SSI, TANF, GA, SNAP, Section 8 Housing Vouchers, Section 8 Rent Subsidy, or Medicaid in 2013, over 32 percent were receiving Medicaid only on average each month.[374]

In other cases, DHS may find an alien inadmissible under the standard, even though the alien who exceeds the duration threshold may receive only hundreds of dollars, or less, in public

---

[363] See, e.g., U.S. Dep't of Health & Human Servs., Welfare Indicators and Risk Factors (2014–2015) and U.S. Dep't of Health & Human Servs., Indicators of Welfare Dependence (1997–1998, 2000–2013), available at https://aspe.hhs.gov/indicators-welfare-dependence-annual-report-congress (last visited July 26, 2019).

[364] See U.S. Dep't of Health & Human Servs., Welfare Indicators and Risk Factors, at I–2 (2015), available at https://aspe.hhs.gov/system/files/pdf/76851/rpt_indicators.pdf (last visited July 26, 2019).

[365] See Shelley K. Irving & Tracy A. Loveless, U.S. Census Bureau, Dynamics of Economic Well-Being: Participation in Government Programs, 2009–2012: Who Gets Assistance? 10 (May 2015), available at https://www.census.gov/content/dam/Census/library/publications/2015/demo/p70–141.pdf (last visited July 26, 2019).

[366] See Lashawn Richburg-Hayes & Stephen Freedman, A Profile of Families Cycling On and Off Welfare 4 (Apr. 2004), available at https://aspe.hhs.gov/system/files/pdf/73451/report.pdf (last visited July 26, 2019).

[367] See Shelley K. Irving & Tracy A. Loveless, U.S. Census Bureau, Dynamics of Economic Well-Being: Participation in Government Programs, 2009–2012: Who Gets Assistance? 10 (May 2015), available at https://www.census.gov/content/dam/Census/library/publications/2015/demo/p70–141.pdf (last visited July 26, 2019). See also Lashawn Richburg-Hayes & Stephen Freedman, A Profile of Families Cycling On and Off Welfare 4 (Apr. 2004), available at https://aspe.hhs.gov/system/files/pdf/73451/report.pdf (last visited July 26, 2019).

[368] See Shelley K. Irving & Tracy A. Loveless, U.S. Census Bureau, Household Economic Studies, Dynamics of Economic Well-Being: Participation in Government Programs, 2009–2012: Who Gets Assistance? 4 (May 2015), available at https://www.census.gov/content/dam/Census/library/publications/2015/demo/p70-141.pdf (last visited July 26, 2019). This report includes TANF, General Assistance (GA), SSI, SNAP, Medicaid, and housing assistance as major means-tested benefits.

[369] The programs included in the study were TANF, GA, SNAP, SSI, and Housing Assistance, all of which are covered to at least some degree by this rule.

[370] See Jeongsoo Kim, Shelley K. Irving, & Tracy A. Loveless, U.S. Census Bureau, Dynamics of Economic Well-Being: Participation in Government Programs, 2004 to 2007 and 2009—Who Gets Assistance? 4 (July 2012), available at https://www2.census.gov/library/publications/2012/demo/p70–130.pdf (last visited July 26, 2019).

[371] See Lashawn Richburg-Hayes & Stephen Freedman, A Profile of Families Cycling On and Off Welfare ES–1 (Apr. 2004), available at https://aspe.hhs.gov/system/files/pdf/73451/report.pdf (last visited July 26, 2019).

[372] For most analyses in the report, the report divides the samples into three key outcome groups, based on each sample member's pattern of welfare receipt: Cyclers, short-term recipients, and long-term recipients. The report states that this grouping reflects definitions used in the literature, combined with an examination of the full sample. The report defines a cycler as someone who had 3 or more spells of welfare receipt during the 4-year observation period. The report defines a short-term recipient as someone who had 1 or 2 spells and a total of up to 24 months of welfare receipt during the observation period. The report defines long-term recipients as sample members with 1 or 2 spells and a total of 25 to 48 months of welfare receipt during the observation period. See Lashawn Richburg-Hayes & Stephen Freedman, A Profile of Families Cycling On and Off Welfare 22 (Apr. 2004), available at https://aspe.hhs.gov/system/files/pdf/73451/report.pdf (last visited July 26, 2019).

[373] See United States Department of Health and Human Services, Centers for Medicare and Medicaid Services, the Office of the Actuary, 2017 Actuarial Report of Financial Outlook for Medicaid, Table 21, page 61, at https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/ActuarialStudies/Downloads/MedicaidReport2017.pdf (last visited July 26, 2019).

[374] DHS analysis of Wave 1 of the 2014 Panel of the Survey of Income and Program Participation.

**Exhibit A**

benefits annually. A DHS analysis of SIPP data related to public benefit receipt and amounts indicates that among the 25 percent of SNAP recipients in 2013 who only received SNAP (rather than SNAP and some other benefit), eight percent lived in households receiving between $11 and $50 per month, compared to 80 percent of recipients who lived in households receiving over $150 per month. Among the 3 percent of TANF recipients who only received TANF in 2013, nearly eight percent of recipients lived in households receiving between $11 and $50 per month compared to 60 percent of recipients who lived in households receiving over $150 per month. And among the 26 percent of TANF, SNAP, GA, and SSI recipients who only received one of those public benefits, six percent of recipients lived in households receiving between $11 and $50 per month compared to 80 percent of recipients who lived in households receiving over $150 per month. Among TANF, SNAP, GA, and SSI recipients receiving any of those public benefits, four percent lived in households receiving between $11 and $50 per month cumulatively across all such benefits received, compared to 87 percent of recipients who lived in households receiving over $150 per month.[375]

These potential incongruities are to some extent a consequence of having a bright-line rule that (1) provides meaningful guidance to aliens and adjudicators, (2) accommodates meaningful short-term and intermittent access to public benefits, and (3) does not excuse continuous or consistent public benefit receipt that denotes a lack of self-sufficiency during a 36-month

period.[376] At bottom, DHS believes that this standard appropriately balances the relevant considerations, and that even an alien who receives a small dollar value in benefits over an extended period of time can reasonably be deemed a public charge, because of the nature of the benefits designated by this rule.

DHS also notes the operational difficulties associated with a monetary threshold particularly given that several of the benefits under consideration are benefits received by a family unit and the public charge determination is, by statute, an individual determination. For example, in the case of SNAP or a housing voucher it would be difficult to meaningfully assign proportions of the group benefit to individuals in the family, who may benefit in different amounts or account for less or more than a pro rata share of the benefit, from the benefits-granting agency's perspective. At its core, the prospective determination seeks to determine, based on the totality of the circumstances, the likelihood of an individual to use the public benefits enumerated in this rule to support themselves at any point in the future. This is a determination more aptly made by examining a pattern of behavior than by a monetary threshold which could represent a lump sum payment due to a one-time need. DHS believes that short-term benefits use may not be as reliable an indicator of an alien's lack of self-sufficiency, and believes that longer-term benefits use serves as a better indicator.

Of course, if an alien who receives a small dollar value in public benefits over an extended period of time disenrolls from a benefit and later applies for admission or adjustment of status, she or he will not necessarily be

inadmissible or ineligible for adjustment of status by virtue of such past receipt. This is because, as noted throughout this preamble, the public charge inadmissibility determination is prospective in nature, and depends on DHS's evaluation of the totality of the circumstances. Moreover, the amount of past benefit receipt may be considered in the totality of the circumstances. For instance, all else being equal, an alien who previously received $15 in monthly SNAP benefits for a lengthy period of time, but has since disenrolled, is less likely to require such benefits in the future, as compared to an alien who only recently disenrolled from a $100 SNAP benefit monthly, or who recently left public housing after a lengthy stay.

Finally, DHS believes that it is appropriate to aggregate the 12 months, inasmuch as the aggregation ensures that aliens who receive more than one public benefit (which may be more indicative of a lack of self-sufficiency, with respect to the fulfillment of multiple types of basic needs) reach the 12-month limit faster. Namely, DHS believes that receipt of multiple public benefits in a single month is more indicative of a lack of self-sufficiency than receipt of a single public benefit in a single month because receipt of multiple public benefits indicates the alien is unable to meet two or more basic necessities of life. This is not an uncommon occurrence. For example, DHS's analysis of SIPP data reveals that among individuals who received the enumerated public benefits in 2013, at least nearly 35 percent of individuals received two or more public benefits on average per month. Table 7 provides additional context with respect to the concurrent receipt of multiple benefits.

TABLE 7—PUBLIC BENEFIT RECEIPT COMBINATIONS AMONG INDIVIDUALS RECEIVING ONE OR MORE ENUMERATED PUBLIC BENEFITS (AVERAGE PER MONTH), 2013

| Program | Percent of individuals with combination | DHS view |
|---|---|---|
| Individuals Receiving Public Benefits ........................................ | 100.0 | |
| Medicaid only ........................................................................... | 32.5 | Meeting healthcare needs. |
| Medicaid and Supplemental Nutrition Assistance Program (SNAP). | 22.8 | Meeting healthcare and food/nutrition needs. |
| SNAP Only ............................................................................... | 13.1 | Meeting food/nutrition needs. |
| Section 8 Rental Assistance Only ........................................... | 3.6 | Meeting housing needs. |
| Medicaid, SNAP, and Supplemental Security Income (SSI) ..... | 3.2 | Meeting healthcare, food/nutrition, and cash assistance needs. |
| Medicaid, SNAP, and Section 8 Rental Assistance ................... | 3.0 | Meeting healthcare, food/nutrition, and housing needs. |
| Medicaid and SSI .................................................................... | 2.9 | Meeting healthcare and cash assistance needs. |

[375] DHS analysis of Wave 1 of the 2014 Panel of the Survey of Income and Program Participation.

[376] Cf., e.g., Harris v. FCC, 776 F.3d 21, 28–29 (D.C. Cir. 2015) ("An agency does not abuse its

discretion by applying a bright-line rule consistently in order both to preserve incentives for compliance and to realize the benefits of easy administration that the rule was designed to achieve."); Turro v. FCC, 859 F.2d 1498, 1500 (D.C.

Cir. 1988) ("Strict adherence to a general rule may be justified by the gain in certainty and administrative ease, even if it appears to result in some hardship in individual cases.").

**Exhibit A**

**41362**    **Federal Register**/Vol. 84, No. 157/Wednesday, August 14, 2019/Rules and Regulations

TABLE 7—PUBLIC BENEFIT RECEIPT COMBINATIONS AMONG INDIVIDUALS RECEIVING ONE OR MORE ENUMERATED PUBLIC BENEFITS (AVERAGE PER MONTH), 2013—Continued

| Program | Percent of individuals with combination | DHS view |
|---|---|---|
| Medicaid, SNAP, Section 8 Housing Vouchers, and Section 8 Rental Assistance. | 2.8 | Meeting healthcare, food/nutrition, and housing needs. |
| SSI Only | 2.1 | Meeting cash assistance needs. |
| All other combinations | 13.3 | |

Note: Because of rounding, percentages may not sum to 100.0.
Source: This table was derived from DHS analysis of Wave 1 of the 2014 Panel of the Survey of Income and Program Participation.

DHS does not believe that the threshold should operate in a way that effectively ignores receipt of multiple benefits in a single month and results in differential treatment for an alien who receives one designated benefit in one month and another in the next month, as compared to an alien who receives each of those designated benefits in the same month. DHS appreciates the references one commenter makes to average durations of receipt for certain benefits but notes that the commenter's statements could not be evaluated without a reference to a study or sources data.

DHS strongly disagrees with commenters' assertion that the duration standard is problematic in the context of Medicaid because the standard does not take into account the extent to which Medicaid is used. As DHS explained in the NPRM, Medicaid serves as a last-resort form of health insurance for people of limited means. Medicaid expenditures are significant across multiple enrollee groups, and are particularly pronounced among persons with disabilities and the aged. The Office of the Actuary in the Centers for Medicare and Medicaid Services, HHS, most recently reported that Medicaid spending per enrollee in FY 2016 was $3,555 for children, $5,159 for adults, $19,754 for persons with disabilities, and $14,700 for the aged.[377] Even if a Medicaid enrollee claims that he or she did not or will not use Medicaid benefits (i.e., by going to the doctor or hospital) within a given time period, the value of Medicaid is not merely the value of claims paid out. Like any insurance plan, Medicaid protects against future potential expenses and ensures that enrollees can receive the services they need. Medicaid coverage constitutes a significant benefit received by enrollees regardless of direct expenditures, even if states require enrollees to pay subsidized premiums and pay for cost-sharing services.[378] According to the Centers for Medicare and Medicaid Services, Office of the Actuary, "beneficiary cost sharing, such as deductibles or copayments, and beneficiary premiums are very limited in Medicaid and do not represent a significant share of the total cost of healthcare goods and services for Medicaid enrollees." [379] Ninety-five percent of total outlays in 2016 were for medical assistance payments, such as acute care benefits, long-term care benefits, capitation payments and premiums, and disproportionate share hospital (DSH) payments. Capitation payments and other premiums, which include premiums paid to Medicaid managed care plans, pre-paid health plans, other health plan premiums, and premiums for Medicare Part A and Part B, represented 49 percent of Medicaid benefit expenditures in 2016.[380] Accordingly, the duration of an alien's receipt of non-monetizable benefits like Medicaid is a reasonable proxy for assessing an alien's reliance on public benefits. DHS also believes that benefits received, including Medicaid, over that timeframe likely exceeds a nominal level of support that merely supplements an alien's independent ability to meet his or her basic living needs.[381]

DHS also disagrees that the standard is arbitrary. As discussed in the NPRM and this final rule, researchers have shown that welfare recipients experienced future employment instability, and continued to move in and out of welfare benefit programs such as Medicaid and SNAP.[382] Based on this research, DHS considers any past receipt of public benefits a negative factor in the public charge determination, although the weight accorded to such receipt would vary according to the circumstances. Similarly, application for or certification to receive a public benefit, or current receipt of public benefits for longer periods of time or moving in and out of benefit programs for an aggregate period of more than 12 of the most recent 36 months preceding the filing of the application for admission or application for adjustment of status is considered a heavily-weighted negative factor.

The duration standard should provide a more predictable threshold that will better permit applicants to adjust their behavior as they deem necessary and appropriate. An applicant should be readily aware whether he or she has received public benefits for more than 12 cumulative months within a 36-month period. Note that this rule clarifies that DHS will take into consideration evidence that an alien made requested to be disenrolled from public benefits and has made clarifying edits in 8 CFR 212.22(b)(4)(ii)(E) to make such consideration explicit.

Finally, DHS notes that the change to a duration-only standard is responsive to comments indicating that the 15 percent of FPG threshold would be too low or unreasonable for those living in cities and areas with high costs of living. For example, under the NPRM,

---

[377] See United States Department of Health and Human Services, Centers for Medicare and Medicaid Services, the Office of the Actuary, 2017 Actuarial Report of Financial Outlook for Medicaid, Table 21, page 61, at https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/ActuarialStudies/Downloads/MedicaidReport2017.pdf (last visited April 25, 2019).

[378] Premium means any enrollment fee, premium, or other similar charge. Cost sharing means any copayment, coinsurance, deductible, or other similar charge. See 42 CFR 447.51 for definitions.

[379] See U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services, the Office of the Actuary, 2017 Actuarial Report of Financial Outlook for Medicaid, page 3, available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/ActuarialStudies/Downloads/MedicaidReport2017.pdf (last visited June 6, 2019).

[380] See United States Department of Health and Human Services, Centers for Medicare and Medicaid Services, the Office of the Actuary, 2017 Actuarial Report of Financial Outlook for Medicaid, pages 5–6, available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/ActuarialStudies/Downloads/MedicaidReport2017.pdf (last visited June 6, 2019).

[381] See Inadmissibility on Public Charge Grounds, 83 FR 51114, 51165 (proposed Oct. 10, 2018).

[382] See Inadmissibility on Public Charge Grounds, 83 FR 51114, 51165 (proposed Oct. 10, 2018).

**Exhibit A**

DHS would have considered an alien receiving a Section 8 Housing Voucher in an area where the eligibility requirement amounted to income more than 250 percent of the FPG in the same manner as another alien living area where the income eligibility was 50 percent of the FPG. Under the new standard, the effect of cost living is minimized.

DHS understands that certain applicants may be hesitant to receive certain benefits in light of the public charge assessment. DHS reiterates that this rule does not prevent individuals who are eligible for public benefits from receiving these benefits. And as explained below, in its public charge inadmissibility determination DHS will not consider receipt of Emergency Medicaid, the Medicare Part D LIS, Medicaid received by alien under age 21 or pregnant women, and a wide range of other benefits, such as emergency or disaster relief. This rule also explains the criteria under which DHS will determine whether an alien subject to section 212(a)(4), 8 U.S.C. 1182(a)(4), has established that he or she is not inadmissible on that ground. As explained, DHS will assess all factors and circumstances applicable to the public charge determination, including the past receipt of public benefits listed in 8 CFR 212.21(b). No one factor alone will render an applicant inadmissible on account of public charge; DHS will assess whether the alien is likely to become a public charge, *i.e.,* to receive the designated benefits above the threshold, in the totality of the circumstances.

DHS also acknowledges that the regulation may result in fewer numbers of nonimmigrants and immigrants being admitted to the United States or granted adjustment of status to that of a lawful permanent resident. DHS notes that the ground of inadmissibility under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) applies to aliens seeking admission to the United States, or adjustment of status to that of a lawful permanent resident. The public charge ground of inadmissibility does not apply to nonimmigrants present in the United States seeking an extension of stay [383] or change of nonimmigrant status.[384] As indicated in the NPRM, however, when adjudicating an alien's application for extension of stay or change of status, DHS will assess whether the alien has demonstrated that he or she has not received, since obtaining the nonimmigrant status and through the time of filing and adjudication, any public benefit, as defined in 8 CFR 212.21(b), for 12 months, in the aggregate, within a 36-month period.[385]

Finally, DHS understands that certain individuals may become self-sufficient in the long-term after a certain duration of benefits use and that individuals may use benefits for shorter or longer periods of time. But similar to the explanation above, the fact that a person may ultimately become self-sufficient is not the material question. The material questions is whether the person is likely to become a public charge at some point in the future. Therefore, DHS will not limit its definition of ''public charge'' based on the potential that an alien who is currently public charge may not remain so indefinitely. The appropriate way to address that nuance is through the totality of the circumstances prospective determination, rather than the definition of public charge. Accordingly, DHS properly considers the receipt of public benefits for more than 12 months in the aggregate within a 36-month period a heavily weighted negative factor in public charge inadmissibility determinations.

Alternatives to the Duration Standard

*Comment:* Some commenters recommended a ''grace period'' for foreign nationals coming to the United States to use public benefits and reach self-sufficiency, including an 18-month period to become a fully acclimated and productive person or to recover from emergencies or severe medical issues.

*Response:* As previously discussed, the purpose of this rule is to implement the public charge ground of inadmissibility consistent with the principles of self-sufficiency set forth by Congress, and to minimize the incentive of aliens to attempt to immigrate to, or to adjust status in, the United States due to the availability of public benefits.[386] In particular, Congress indicated that the immigration policy continues to be that ''aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations.'' [387] When Congress enacted section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), it did not provide a grace period or a time period in which aliens could use public benefits after entering the United States. Therefore, DHS does not believe it is appropriate to add a grace period for the receipt of public benefits. For purposes of this rule, there will be a period between the publication of this rule, and the rule's effective date, which would serve as a ''grace period'' of sorts. DHS has also specified how it will consider receipt of public benefits prior to the rule's effective date. Ultimately, however, all aliens who apply for admission or adjustment of status on or after the rule's effective date will be subject to a prospective public charge inadmissibility determination.

DHS notes that as part of the totality of the circumstances determination, DHS will consider evidence that is relevant to its determination whether an alien is likely to become a public charge at any time in the future. For example, if an alien received public benefits in excess of the threshold pattern but has evidence that his or her circumstances have changes or that the alien has requested to be disenrolled from such benefits, DHS will take such evidence into consideration in the totality of the circumstances.

*Comment:* A commenter stated that the 12-month period ought to be lengthened to approximately 36 months, because according to a report, 45 percent of people who received government assistance for less than 36 months stop receiving assistance sometime after the first 12 months. According to the commenter, the 45 percent are people who are on their way out of poverty due to public benefit programs. By contrast, approximately 43 percent of welfare recipients stay dependent for at least 3 years. According to the commenter, these are the people who truly lack self-sufficiency, as they have failed to exit the welfare system.

*Response:* DHS disagrees with this recommendation. As discussed in the NPRM and above, while some recipients may disenroll from public benefits after 12 months, this only addresses short-term welfare recipients.[388] For example, as indicated in the NPRM, ''the proportion of [Medicaid and food stamp participation] leavers who receive these benefits at some point in the year after exit is much higher than the proportion who receives them in any given quarter, suggesting a fair amount of cycling into and out of these programs.'' [389] HHS also funds various research projects on welfare. Across fifteen state and county

[383] *See* 8 CFR 214.1.

[384] *See* INA section 248, 8 U.S.C. 1258; *see* 8 CFR 248.

[385] *See* 8 CFR 214.1(a)(3)(iv) and 8 CFR 248.1.

[386] *See* 8 U.S.C. 1601.

[387] *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601(2)).

[388] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51199 (proposed Oct. 10, 2018).

[389] *See* Lashawn Richburg-Hayes & Stephen Freedman, *A Profile of Families Cycling On and Off Welfare* 4 (Apr. 2004), *available at https:// aspe.hhs.gov/system/files/pdf/73451/report.pdf* (last visited July 26, 2019).

**Exhibit A**

welfare studies funded by HHS, it was found that the number of leavers who received food stamps within one year of exit was between 41 and 88 percent. Furthermore, TANF leavers returned to the program at a rate ranging between 17 and 38 percent within one year of exit. Twelve of these studies included household surveys, with some conducting interviews less than a year post-exit, and some as much as 34 months after exit. A review of these surveys found that among those who left Medicaid, the rate of re-enrollment at the time of interview was between 33 and 81 percent among adults, and between 51 and 85 percent among children. Employment rates at the time of interview ranged between 57 and 71 percent.'' [390] For these reasons, DHS does not believe that it should lengthen the 12-month period to 36 months.

*Comment:* Commenters also stated that receipt of benefits after an event such as a natural disaster ought not render an alien a public charge, but that sometimes the effects of a natural disaster can last longer than 12 months. The commenter disagreed with DHS's statement in the proposed rule that ''an individual who receives monetizable public benefits for more than 12 cumulative months during a 36-month period is neither self-sufficient nor on the road to achieving self-sufficiency.'' [391] The commenter stated that it can take much longer than 12 months to recover from a natural disaster, and noted that following a tornado in the commenter's community in 2013, some families were still recovering in 2018, and required the designated benefits.

*Response:* As indicated in the NPRM, DHS will not consider public benefits beyond those covered under 8 CFR 212.21(b), but even within that category, DHS will not consider all cash assistance as cash assistance for income maintenance under the rule. For instance, DHS would not consider Stafford Act disaster assistance, including financial assistance provided to individuals and households under Individual Assistance under the Federal Emergency Management Agency's Individuals and Households Program (42 U.S.C. 5174) as cash assistance for income maintenance. The same would hold true for comparable disaster assistance provided by State, local, or tribal governments. Other categories of

cash assistance that are not intended to maintain a person at a minimum level of income would similarly not fall within the definition. In addition, DHS will not consider medical assistance for emergency medical condition (42 U.S. C. 1396(v)(3)) or short-term, non-cash, in-kind emergency disaster relief. [392] Finally as discussed above, DHS will also take into consideration evidence that an alien has disenrolled or requested to disenroll from public benefits in the totality of the circumstances when determining whether an alien is likely at any time in the future to become a public charge.

Combination Standard

*Comment:* DHS received comments on the proposed rule's provision for combining monetizable and non-monetizable benefits. Commenters generally opposed the proposed standard for combination of monetizable benefits under 15 percent of FPG and one or more non-monetizable benefits. Under this proposal, if an alien received a combination of monetizable benefits equal to or below the 15 percent threshold together with one or more benefits that cannot be monetized, the threshold for duration of receipt of the non-monetizable benefits would be 9 months in the aggregate (rather than 12 months) within a 36-month period (*e.g.,* receipt of two different non-monetizable benefits in one month counts as two months, as would receipt of one non-monetizable benefit for one month in January 2018, and another such benefit for one month in June 2018). [393]

Some commenters stated that the proposed combination standard lacked clarity in its explanation and some explained that they opposed this combination standard as it would have a similar effect to having no threshold at all, resulting in immigrants being too afraid to apply for and receive benefits. Commenters stated that DHS did not provide a rationale for the combination of monetizable benefits under 15 percent of the FPG and one or more non-monetizable benefits. One commenter suggested deleting this provision, because it would render a person a public charge based on any amount of SNAP or housing benefits, combined with 9 months of Medicaid coverage. The commenter indicated that this outcome was too severe.

*Response:* DHS disagrees with commenters that the combination standard lacked clarity or justification.

However, as indicated above, DHS has eliminated the threshold standard and is applying a single duration-based threshold standard to all covered public benefits. DHS believes that this approach is responsive to public comments that raised concerns about the complexity of the proposed standards as well as the need for certainty and predictability in public charge determinations.

2. Public Benefits

*Comment:* A majority of commenters recommended that public benefits encompassed by the definition of that term in the proposed rule (both monetizable and non-monetizable), such as SSI, SNAP, Medicaid, TANF, and housing not be included in the public charge determination and described the negative outcomes that would arise if immigrants' access to the benefits were reduced due to this rule. A commenter stated that public charge determinations never considered non-cash benefits in the past, and including them now is inhumane, and will cost the local, State, and Federal governments in the long-run. One commenter requested that the listed programs be removed, and that no additional programs be added to the determination. One commenter said that expanding the public benefits definition would result in sweeping negative consequences and cause detrimental effects to public access to benefits by discouraging vulnerable populations from seeking the services they need. A commenter asserted that this rule affects more than just immigration status determinations, as it would impede access to supplemental services that raise the standard of living for the individual and their family.

Another commenter indicated that lawfully present noncitizens who have jobs within needed sectors simply might not earn enough to provide quality healthcare, nutritious food, and safe, stable housing to their families. The commenter further indicated that programs like SNAP, CHIP, and Medicaid are designed to help individuals meet their families' basic needs to keep them healthy and safe, and to penalize hardworking families for using the program designed for them is morally bankrupt. A couple of commenters said the policy penalizes the use of public benefits, and indicated that safety-net programs are correlated with the positive health and education outcomes that help low-income families escape poverty. Commenters stated that access to non-cash programs and other public benefits offers dignity and comfort as individuals work to build a new and better life, acquiring the skills

[390] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51199 (proposed Oct. 10, 2018) (quoting Lashawn Richburg-Hayes & Stephen Freedman, *A Profile of Families Cycling On and Off Welfare* 4 (Apr. 2004) (citation omitted)).

[391] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51165 (proposed Oct. 10, 2018).

[392] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51128, 51159 (proposed Oct. 10, 2018).

[393] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51166 (proposed Oct. 10, 2018).

**Exhibit A**

and training to qualify for better-paying jobs. Several commenters that opposed the proposed rule stated that the inclusion of the public benefits included in the NPRM, including SNAP, in the public charge determination would reverse longstanding national policy.

Many commenters provided information and data on the general benefits of these public benefits programs; the number of people, children, and businesses affected; and the assistance that these public benefits provide to needy individuals and families. Comments referenced, for instance, the importance of TANF assistance for child care, Medicaid's role in helping families and communities manage healthcare costs, and SNAP's role in fighting food insecurity for children and families. Commenters stated that the proposed rule would exacerbate problems that the designated benefit programs are designed to address. Other commenters provided data suggesting that the designated public benefits help reduce homelessness and improve health outcomes. Commenters stated that these benefits are crucial for the health and development of children and individuals. Commenters also cited research that emphasized the important role public benefits and access to those benefits, including SNAP, plays for pregnant women and the elderly, including that the benefits make elderly individuals less likely to be admitted to nursing homes and hospitals; patients with medical problems, because public benefits reduce financial stress; and college and university students who are struggling with food insecurity.

Many commenters described adverse impacts of homelessness, including childhood depression and the positive impacts of affordable housing, including increased health benefits and chronic disease management and lowering the cost of healthcare. Another commenter cited studies where more students may experience homelessness under this rule, and described the negative impacts on rural subsidized housing and the agriculture economic market.

A commenter stated that receipt of public benefits, including SNAP, support work and improve a family's immediate and long-term prospects, decreasing the odds that the individuals will become primarily dependent on government benefits to support themselves. Similarly, another commenter stated that nutritional, healthcare, and housing assistance are all critical programs that support work, which the commenter identified as the ultimate path to self-sufficiency. A

commenter stated that SNAP supports employment by increasing access to nutritious foods that enable workers to stay healthy and productive, and by enabling families to spend more of their income on work-related expenses like transportation, childcare, and laundry. Many commenters stated the benefits of Medicaid for different people and groups, including better health outcomes for pregnant women and children throughout adulthood. Some commenters described how access to affordable health insurance like Medicaid enables workers to find and retain jobs, and how a lack of affordable insurance contributes to worse health outcomes, unmet physical, behavioral and mental health needs, and eventual joblessness. Commenters stated that access to affordable insurance leads to better performance on the job, an easier time staying employed or seeking employment, and less unpaid bills and other debt; and important economic benefits, such as increased tax contributions, decreased reliance on other public assistance programs, and more disposable income to spend in the local economy. Commenters stated that states that expanded Medicaid experienced savings in costs associated with uncompensated care and state-funded health programs, as well as growth in jobs and general fund revenue. A commenter stated that reimbursement for services rendered to Medicaid patients was especially important for hospitals, and cited research documenting positive effects on hospitals' financial performance in States which decided to expand Medicaid.

Other commenters discussed a study in which the use of certain housing vouchers and access to public housing reduced the chance of families living in crowded conditions, shelters, or on the street, help ease the burden of rent in high-cost cities, prevent or alleviate homelessness, allow the flexibility for families to pay for other necessities, and promote self-sufficiency. Commenters also said this rule will deter landlords from participating in the housing voucher program, affecting the private housing market. Some commenters discussed the difficulty of immigrants obtaining affordable housing.

Other commenters cited research on children's health outcomes, asserting that access to public housing creates long-term improvements in educational attainment, income, self-sufficiency, and children's health outcomes; child development; greater attendance and prospects at school. Commenters also noted that access to affordable housing has positive effects on family stability

and the economy overall, and that access to such housing frees up income for other living necessities. Others cited to research showing that public benefits, such as subsidized housing, positively impacts the health of children, people with disabilities, families, domestic violence victims, pregnant women and people of color; reduces poverty and homelessness, and promotes economic stability; helps low-earning immigrants increase their economic opportunities; facilitates upwards economic mobility; builds safe and affordable housing communities and decreases foreclosures; and benefits of immigrants to the housing market during economic downturns. Other commenters cited research showing that housing instability is associated with a broad range of health impacts, including worsening HIV side effects, heart disease, asthma, and cancer.

Several commenters stated that immigrants in high rent areas need public housing, specifically where income has not kept pace with rent prices. Some of these commenters cited research and figures on the rent prices in areas across the United States. Other commenters stated that only one in four families who need affordable housing receive it, arguing that even fewer families who need affordable housing receive it factoring in immigration status and family size. Multiple commenters stated that housing instability and unaffordability are strongly correlated with involuntary job loss and other economic barriers that undermine self-sufficiency, citing statistics. Several commenters stated that the rule undermines the mission of public housing. A commenter cited research indicating that including affordable housing in the rule may increase the poverty rate and disability rates.

In contrast, a few commenters supported the inclusion of the public benefits as part of the public charge determination. Some stated that only citizens should be eligible for the benefits. A commenter stated that the public charge rule should cover benefits that are provided for long periods of time, such as TANF.

*Response:* DHS appreciates the comments and recognizes that the public benefits listed in the rule provide assistance to needy individuals, and that rigorous application of the public charge ground of inadmissibility will inevitably have negative consequence for some individuals. DHS is aware that individuals may reconsider their receipt of public benefits in light of future immigration consequences. However, the rule does not prevent individuals from receiving any public benefits for

**Exhibit A**

which they are eligible. Additionally, as noted in the NPRM, the rule, particularly the inclusion of the designated benefits into the public benefits definition, is consistent with congressional statements in 8 U.S.C. 1601 concerning self-sufficiency of foreign nationals. In particular, Congress indicated that the immigration policy continues to be that ''aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations.'' [394] DHS will therefore continue to consider the public benefits proposed in the NPRM in public charge inadmissibility determinations with certain exceptions described below.

As discussed in the NPRM, the benefits that will be considered in this rule account for some of the largest federal expenditures on low-income individuals and bear directly on self-sufficiency.[395] The benefits listed are directed toward food and nutrition, housing, and healthcare, and are directly relevant to the public charge inadmissibility determination, because a person who needs the public's assistance to provide for these basic necessities of life and receives such benefits for longer periods of time is more likely to receive such benefits in the future.[396] DHS also notes, as updated in the regulatory text, that receipt of a public benefit occurs when a public benefit-granting agency provides such benefit, whether in the form of cash, voucher, services, or insurance coverage. Certification for future receipt of a public benefit does not constitute receipt, although it may suggest a likelihood of future receipt. With respect to Medicaid in particular, DHS would consider receipt to have occurred when coverage commences, regardless of whether the alien accesses services using such coverage.

*Comment:* A commenter said data refutes the notion that immigrant families rely disproportionately on all forms of public assistance, citing to a study from the National Academies of Sciences, Engineering, and Medicine indicating that just 4.2 percent of immigrant households with children utilize housing assistance as compared to 5.3 percent of U.S.-born households. A commenter stated that only 6.5

percent of people using public benefits are noncitizens and this rule will reach beyond that population. One commenter stated that immigrants use public benefits at a lower rate than U.S. born citizens, while other commenters stated that DHS did not consider whether the temporary benefits immigrants might receive would result in a net positive impact to the budget or society.

*Response:* DHS appreciates the comments and references to data. DHS does not assume, and has not based the rule on the assumption, that immigrant families rely disproportionately on public benefits. The statistical analysis provided in the preamble of the NPRM did not reach that conclusion. The NPRM provided data regarding both citizens and noncitizens in the discussion of the factors that may lead a person to receive public benefits. However, only aliens seeking admission to the United States or adjustment of status are subject to the public charge ground of inadmissibility. Therefore, whether citizens' receipt of public benefits is higher than that of aliens is immaterial. DHS notes that with respect to the comment that the temporary receipt of public benefits would result in a positive impact on the economy, such considerations are not the aim of this rule. This rule is intended to better ensure that aliens seeking to come to and remain in the United States are self-sufficient, and rely on their resources and those of their families, sponsors, and private organizations.

*Comment:* One commenter stated that including Medicaid, SNAP and housing assistance programs as public benefits ''would undermine decades of the federal government's work to address poverty and build a clearer path to the middle class for millions of families,'' because individuals may decide to forego WIC, which is connected to SNAP or other similar benefits. A commenter stated that the inclusion of Medicaid/CHIP, SNAP and housing assistance in public charge review would undermine decades of the federal government's work to address poverty and build a clearer path to the middle class for millions of families.

*Response:* DHS understands that many public benefits may be interconnected, such that when a person enrolls in one benefit, the benefit-granting agency will automatically qualify that person in another benefit. In those circumstances, an alien's decision to forego enrollment in a designated public benefit could result in the alien not being automatically qualified in a non-designated benefit. Similar outcomes could occur if a state conditions eligibility for the second

benefit on enrollment in the first. That said, DHS disagrees that the rule would materially undermine decades of work to address poverty. The population affected by this rule is limited to those applicants seeking admission to the United States and adjustment of status, who are subject to public charge. The data and information provided by the commenter involves a much broader population that may not be affected by the rule.

*Comment:* A commenter stated that Congress had already made clear its intent on immigrants' eligibility for SNAP and Medicaid. The commenter went on to state that IIRIRA established criteria to be weighted by immigration authorities using a ''totality of circumstances'' test, and stated that the criteria specifically did not include receipt of public benefits. The commenter also stated that PRWORA established a set of eligibility rules for certain lawful immigrants to receive Medicaid, SNAP, and other means-tested programs, and Congress later modified these rules to allow Medicaid coverage for pregnant women without the typical five-year waiting period.

*Response:* Through PRWORA, Congress declared that aliens generally should not depend on public resources and that these resources should not constitute an incentive for immigration to the United States.[397] With IIRIRA, Congress codified minimum factors that must be considered when making public charge determinations:[398] Age; health; family status; assets, resources, and financial status; education and skills.[399]

As explained in the NPRM,[400] policy goals articulated in PRWORA and IIRIRA inform DHS's implementation of the public charge ground of inadmissibility. DHS does not believe there is tension between the availability of public benefits to some aliens as set forth in PRWORA and Congress' intent to deny admission, and adjustment of status to aliens who are likely to become a public charge. Indeed, DHS believes that Congress, in enacting PRWORA and IIRIRA very close in time, must have recognized that it made certain public benefits available to some aliens who are also subject to the public charge ground of inadmissibility, even though receipt of such benefits could render the

---

[394] *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601(2)).

[395] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51166 (proposed Oct. 10, 2018).

[396] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51159 (proposed Oct. 10, 2018).

[397] *See* Public Law 104–193, sec. 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601).

[398] Public Law 104–208, div. C, sec. 531, 110 Stat. 3009–546, 3009–674 (Sept. 30, 1996) (amending INA section 212(a)(4), 8 U.S.C. 1182(a)(4)).

[399] *See* INA section 212(a)(4)(B), 8 U.S.C. 1182(a)(4)(B).

[400] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51132 (proposed Oct. 10, 2018).

**Exhibit A**

alien inadmissible as likely to become a public charge. Under the scheme envisioned by Congress, aliens generally would not be issued visas, admitted to the United States, or permitted to adjust status if they are likely to become public charges. This prohibition may deter aliens from making their way to the United States or remaining in the United States permanently for the purpose of availing themselves of public benefits.[401] DHS believes that Congress must have understood, however, that certain aliens who were unlikely to become public charges when seeking admission or adjustment of status might thereafter reasonably find themselves in need of public benefits. Consequently, in PRWORA, Congress made limited allowances for that possibility. Nevertheless, if an alien subsequent to receiving public benefits wishes to adjust status in order to remain in the United States permanently or leaves the United States and later wishes to return, the public charge inadmissibility consideration (including consideration of receipt of public benefits) would again come into play. In other words, although an alien may obtain public benefits for which he or she is eligible, the receipt of those benefits may be considered, consistent with IIRIRA and PRWORA, for future public charge inadmissibility determination purposes. DHS recognizes that Congress through CHIPRA expanded the Medicaid coverage for children and pregnant women who are lawfully residing in the United States, including those within their first five years of having certain legal status. In this final rule, DHS has exempted from consideration receipt of Medicaid by children under 21 and pregnant women during pregnancy and 60 days following pregnancy by amending the definition of public benefit in 8 CFR 212.21(b).

*Comment:* Some commenters stated that immigrants' eligibility for some of the public benefits is already restricted, including SSI, TANF, and housing programs. Another commenter said the inclusion of Medicaid in the proposed rule was unnecessary, since existing law already requires that lawful permanent residents wait five years before becoming eligible for Medicaid or Medicare.

*Response:* DHS recognizes that most aliens are ineligible for the public benefits listed in the rule. However, the public charge inadmissibility determination reviews the likelihood of a person receiving a public benefit at any time in the future, including points in time when an alien may become eligible for the public benefits. In addition, some aliens are eligible for public benefits, as noted in Table 3 of the NPRM.[402]

*Comment:* A commenter indicated that immigrants contribute far more to America (*i.e.,* taxes, premiums, economic and military contributions) than they use in assistance. Other commenters indicated that immigrants contribute by paying taxes and the rule penalizes immigrants who file taxes and utilize programs to which they are legally entitled. Several commenters stated that immigrants make significant contributions to the economy, and the proposed rule would prevent immigrants from partaking in programs that their tax dollars support. Other commenters said that individuals covered by Medicaid or CHIP paid more in taxes and collected less in Earned Income Tax Credit (EITC) payments. According to a commenter, one study reviewing Medicaid expansion during the 1980s and 1990s estimated that, based on children's future earnings and tax contributions alone, the government would recoup 56 cents of each dollar spent on childhood Medicaid by the time the children turned 60.

*Response:* Paying taxes owed and filing tax returns is legally required for all individuals making a sufficient income in the United States.[403] The rule does not penalize those people who fulfill their legal responsibilities to do so. In addition, people are entitled to use benefits for which they qualify, and this rule does not prohibit anyone from using a benefit for which they qualify. However, DHS believes the use of certain benefits is appropriate to consider in determining public charge inadmissibility. Congress mandated the public charge assessment.[404] But Congress did not stipulate in legislation that public benefits received by eligible individuals should not be considered for public charge purposes; instead, Congress clearly stated the policy that those coming to the United States must be self-sufficient and not rely on public resources. Therefore, to implement Congress' requirement to consider public charge inadmissibility, DHS must consider the receipt of benefits by eligible individuals, as indeed the 1999 Interim Field Guidance did. DHS believes that the public charge rule strikes an appropriate balance with the benefits that are considered.

## a. Specific Groups and Public Benefits

### Individuals With Disabilities

*Comment:* Commenters stated that the inclusion of non-monetizable benefits in the proposed rule would disproportionately harm people with disabilities.[405] One commenter stated that ''[p]eople with disabilities would be uniquely affected by the inclusion of Medicaid-funded services in the public charge calculus, including Medicaid-funded community-based services that are efficiently delivered in homes and communities (the current public charge rule only requires consideration of Medicaid-funded institutional long-term care).'' Commenters said that because non-emergency benefits were included, the proposal would make it nearly impossible for immigrants with disabilities to become citizens unless they are independently wealthy. Many commenters indicated that the federal resources individuals with disabilities and their families depend on, such as Medicaid, SNAP, and housing vouchers, would be included in the determination of public charge under the rule. A commenter also noted that ''[p]eople with disabilities would be disproportionally impacted by the inclusion of housing and food assistance in the public charge test.'' One commenter stated that ''[b]y deeming immigrants who use such programs a 'public charge,' the regulations will disparately harm individuals with disabilities and impede their ability to maintain the very self-sufficiency that the Department purports to promote and which the Rehabilitation Act sought to ensure.''

Several commenters stated that individuals with disabilities rely on non-cash benefits disproportionately, often due to their disability, in order to continue working, stay healthy, and remain independent and productive members of the community. Some commenters stated that Medicaid is often the only program available to and appropriate for people with disabilities as many of the services covered by Medicaid, including housing services and community-based services, are often not covered by private insurance. Many commenters cited the statistic that about one-third of adults under age 65 enrolled in Medicaid have a disability, compared with about 12 percent of adults in the general population. Other commenters cited the statistic that more than one-quarter of individuals who use SNAP are also disabled. Several commenters stated that individuals with disabilities disproportionately experience poverty.

---

[401] H.R. Rep. No. 104–469(I), at 144–45 (1996).

[402] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51128–30 (proposed Oct. 10, 2018).

[403] *See* 26 U.S.C. 1 and 6012(a)(1).

[404] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

**Exhibit A**

A commenter stated that the rule would require immigrants with disabilities to meet economic standards that do not take into account the barriers to employment and wealth accumulation issues that individuals with disabilities face. Another commenter added that food insecurity rates in households that include at least one disabled working-age adult are substantially higher, even where the disabled person is working, and that such food insecurity leads to chronic illnesses. Many commenters stated that the rule would cause many individuals with disabilities or families with individuals with disabilities to disenroll from public benefit programs. A commenter cited research indicating that the rate of disability drastically increases as poverty increases, and that by creating fear around participating in public anti-poverty programs, the proposed public charge rule will lead to an increase in disability and negative health impacts for an already vulnerable community of people.

*Response:* DHS understands that individuals with disabilities receive public benefits that are listed in the rule. However, Congress did not specifically provide for a public charge exemption for individuals with disabilities and in fact included health as a mandatory factor in the public charge inadmissibility consideration.[406] Therefore, DHS will retain the designation of Medicaid and SNAP as public benefits, notwithstanding the potentially outsized impact of such designation on individuals with disabilities. With respect to DHS's consideration of the alien's disability as such, DHS would consider disability as part of the health factor, to the extent such disability makes the alien more likely than not to become a public charge. This consideration is not new and has been part of public charge determinations historically.[407] Those

[406] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[407] *See, e.g., Ex parte Mitchell,* 256 F. 229 (N.D.N.Y. 1919) (referencing disease and disability as relevant to the public charge determination); *Ex parte Sakaguchi,* 277 F. 913, 916 (9th Cir. 1922) (taking into consideration that the alien was an able-bodied woman, among other factors, and finding that there wasn't evidence that she was likely to become a public charge); *Barlin* v. *Rodgers,* 191 F. 970, 974–977 (3d Cir. 1911) (sustaining the exclusion of three impoverished immigrants, the first because he had a "rudimentary" right hand affecting his ability to earn a living, the second because of poor appearance and "stammering" such that made the alien scarcely able to make himself understood, and the third because he was very small for his age); *United States ex rel. Canfora* v. *Williams,* 186 F. 354 (S.D.N.Y. 1911) (ruling that an amputated leg was sufficient to justify the exclusion of a sixty year old man even though the man had adult children who were able and willing to support him).

determinations include consideration of whether, in the context of the alien's individual circumstances, the alien has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide and care for himself or herself, such as by working or attending school. As noted in the proposed rule, as an evidentiary matter, USCIS would rely on medical determinations made by a medical professional. This would entail consideration of the potential effects of the disability on the alien's ability to work, attend school, or otherwise support himself or herself.

However, it is not the intent, nor is it the effect of this rule to find a person a public charge solely based on his or her disability. The public charge inadmissibility determination evaluates the alien's particular circumstances. Under the totality of the circumstances framework, the disability itself would not be the sole basis for an inadmissibility finding. DHS would look at each of the mandatory factors, and the affidavit of support, if required, as well as all other factors in the totality of the circumstances. For example, if an individual has a disability but there is no indication that such disability makes the alien more likely to become a public charge, the alien's disability will not be considered an adverse factor in the inadmissibility determination. This could occur if the individual is not currently enrolled in the designated benefits, has not previously been enrolled in any designated public benefit, and is employed or otherwise has sufficient income, assets and resources to provide for himself or herself, or has family willing and able to provide for reasonable medical costs, or the person has private health insurance or would soon be able to obtain private health insurance upon adjustment of status.

Vulnerable Populations

*Comment:* Some commenters identified specific groups of individuals who would be impacted by the inclusion of public benefits in the public charge determination. Several commenters stated that cash assistance provides crucial support for survivors of domestic violence and sexual assault, and would undermine Federal and State policies to support victims of domestic violence and assault by discouraging them to access critical services. A commenter stated that for many survivors, cash assistance, such as TANF or state-funded cash benefits, provides the crucial support they need

to begin the journey of stabilizing their lives and achieving self-sufficiency. The commenter provided a data from a survey in 2017, where 85 percent of respondents said that TANF was a critical resource for domestic violence and sexual assault survivors, and that two-thirds of respondents said that most domestic violence survivors rely on TANF to help address their basic needs and to establish safety and stability, and 45 percent of respondents said the same is true of most sexual assault survivors. The commenter indicated that financial instability poses limited options for escaping or recovering from abuse and that access to cash assistance is an important factor in survivors' decision-making about whether and how they can afford to leave a dangerous situation, and in planning how to keep themselves and their children healthy, fed, and housed. The commenter indicated that the rule may risk significant physical, emotional, and mental harm to these populations. Commenters described a survey that found that nearly 80 percent of service providers included in the survey reported that most domestic violence survivors rely on SNAP to establish their safety and stability. Another commenter stated that being able to meet basic food and nutritional needs provides a means for survivors of domestic violence and sexual assault to take care of themselves and their children while working to address their trauma and take steps toward independence.

Other commenters stated that nearly half a million Asian American and Pacific Islander (AAPI) noncitizens rely on the SNAP program to feed their families, and the rule will lead to less food assistance within family units. A commenter stated that almost 48 percent of noncitizen recipients of SNAP benefits were women in 2017, compared to 40 percent who were men, and 12 percent who were children. Another commenter stated that 80 percent of most domestic violence victims and 55 percent of most sexual assault victims use the program to restore safety and stability in their lives would be heavily affected by limiting access to SNAP.

One commenter stated that the proposed rule would disproportionately affect communities of color who use public benefits and social services to make ends meet and work towards self-sufficiency. A commenter stated that the proposed rule would likely disproportionality cause Latinos to lose access to SNAP and Medicaid benefits, exacerbating existing health inequities, increasing instances of hunger and poverty among this population. Similarly, another commenter described

**Exhibit A**

the benefits of access to SNAP for the Latino community and commented that a loss of SNAP benefits would cause more Latinos, including children, to experience poverty and suffer from hunger and malnutrition. Another commenter stated that including SNAP will harm college students, as SNAP is a critical resource for the many college students who struggle with food insecurity.

Other commenters provided information on individuals with specific medical conditions that need Medicaid, including treating thalassemia (a group of blood disorders) and cardiovascular disease. A commenter cited studies showing that people with opioid addiction who lacked Medicaid were half as likely to receive treatment as those covered by some form of insurance. A commenter said that parental mental health and substance abuse was a strong indicator of child mistreatment, and the services Medicaid provides to combat these issues help keep children safe.

Many commenters noted the negative impact of including the receipt of housing assistance in the public charge determination on a variety of groups, including infants and toddlers, women and single mothers, large and low-income families, Latinos, domestic violence survivors, agricultural workers, low-income communities, people of color, the Lesbian, Gay, Bisexual, Transgender Immigrants (LGBTQ) community, AAPI, elderly, minority groups, and disabled persons. Multiple commenters cited studies and addressed the specific costs of the rule for domestic violence survivors, arguing that a survivor's greatest unmet need is housing when recovering from abuse. Other commenters commented that the rule would make it more difficult for families with multiple children to obtain housing due to the prorated system.

*Response:* DHS appreciates the comments. DHS recognizes that some people currently in the United States do in fact depend on the government to meet their needs, and that this rule is likely to result in negative consequences for some of those people, and people like them. Such negative consequences are, to some extent, an inevitable consequence of more rigorous application of a statutory ground of inadmissibility that is targeted towards people who receive public benefits to meet their basic needs. DHS declines to modify the scope of the rule to accommodate all possible Federal and State policies supporting public benefits use by specific vulnerable populations. DHS notes that if an alien relied on

public benefits for a limited period time to escape a dangerous situation, but no longer relies on such benefits, the alien should make that clear to DHS, so that DHS can incorporate into its totality of the circumstances assessment the fact of the alien's changed circumstances.

DHS recognizes that it is possible that the inclusion of benefits such as SNAP and Medicaid may impact in greater numbers communities of color, including Latinos and AAPI, as well as those with particular medical conditions that require public benefits for treatment, and therefore may impact the overall composition of immigration with respect to these groups. DHS also recognizes that consideration of the receipt of public benefits while the alien was a child may also deter some parents from applying for these benefits on behalf of their children. But this is not DHS's intention in promulgating this rule. Instead, with this rule, DHS seeks to better ensure that applicants for admission to the United States and applicants for adjustment of status who are subject to the public charge ground of inadmissibility are self-sufficient.[408]

As provided by Congress, health is a mandatory factor in the public charge inadmissibility determination.[409] However, DHS will not find an alien inadmissible on public charge grounds based solely on an alien's medical condition or disability.

DHS's public charge inadmissibility determination evaluates the totality of an alien's individual circumstances. This totality of the circumstances approach weighs all the positive and negative evidence related to an alien's age; health; family status; assets, resources, and financial status; education and skills; required affidavit of support; and any other factor or circumstance that may warrant consideration in the public charge inadmissibility determination.[410] If the factors establish, in the balance, that an alien is likely at any time in the future to become a public charge, he or she will be deemed inadmissible. As noted in precedent administrative decisions, determining the likelihood of an alien becoming a public charge involves "consideration of all the factors bearing on the alien's ability or potential ability to be self-supporting"[411] in the totality of the circumstances.[412]

DHS's view of self-sufficiency is that aliens subject to the public charge ground of inadmissibility must rely on their own capabilities and secure financial support, including from family members and sponsors, rather than seek and receive public benefits to meet their basic needs. Cash aid and non-cash benefits directed toward food and nutrition, housing, and healthcare account for significant Federal expenditure on low-income individuals and bear directly on self-sufficiency. Because of the nature of the public benefits that would be considered under this rule—which are generally means-tested and provide cash for income maintenance and for basic living needs such as food and nutrition, housing, and healthcare—DHS believes that receipt of such benefits may render a person a person with limited means to provide for his or her own basic living needs and who receives public benefits is not self-sufficient because his or her reliance.

DHS notes that this rule would not adversely impact certain victims of domestic and sexual abuse, as VAWA, T, and U applicants are generally not subject to the public charge inadmissibility determination, as set forth in 8 CFR 212.23.

*Comment:* Several commenters said that over 1.1 million noncitizens age 62 and older live in low- or moderate-income households. Other commenters stated that nearly seven million seniors age 65 and older are enrolled in both Medicare and Medicaid, and one in five Medicare beneficiaries relies on Medicaid to help them pay for Medicare premiums and cost-sharing. Several commenters said having health insurance is especially important for older adults because they have greater healthcare needs. This makes Medicare a lifeline for most seniors, providing coverage for hospital, doctors' visits, and prescription drugs, but many immigrant seniors are not eligible for Medicare.

A commenter stated this age standard would result in mistreatment of elders when trying to enter or stay in the United States and would undermine immigrants' access to essential healthcare, nutrition, and housing programs. A commenter stated low-income seniors also greatly benefit from programs such as HCV Program (Section 8) rental assistance and SNAP to meet their basic needs and if immigrant families are afraid to access nutrition assistance programs, older adults will be food insecure and at risk of unhealthy eating, which can cause or exacerbate other health conditions and

[408] *See* 8 U.S.C. 1601(2).

[409] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[410] *See* 8 CFR 212.22.

[411] *Matter of Vindman,* 16 I&N Dec. 131, 132 (Reg'l Comm'r 1977).

[412] *See, e.g., Matter of Vindman,* 16 I&N Dec. 131 (Reg'l Comm'r 1977); *Matter of Harutunian,* 14 I&N Dec. 583 (Reg'l Comm'r 1974).

**Exhibit A**

unnecessarily burden the healthcare system.

*Response:* DHS recognizes that eligibility for certain public benefits depends not only on a person's financial need but also on a person's age. However, Congress did not specifically exclude aliens of certain ages from the public charge inadmissibility determination and in fact included age as a mandatory factor in section 212(a)(4) of the Act, 8 U.S.C. 1184(a)(4).[413] Accordingly, DHS proposes to consider the alien's age primarily in relation to employment or employability and secondarily to other factors as relevant to determining whether someone is likely to become a public charge. DHS notes that the public charge inadmissibility determination evaluates the alien's particular circumstances. DHS's totality of the circumstances standard involves weighing all the positive and negative considerations related to an alien's age; health; family status; assets, resources, and financial status; education and skills; required affidavit of support; and any other factor or circumstance that may warrant consideration in the public charge inadmissibility determination.[414] If the negative factors outweigh the positive factors, then the alien would be found to be inadmissible as likely to become a public charge; if the positive factors outweigh the negative factors, then the alien would not be found inadmissible as likely to become a public charge.

DHS also notes that receipt of Medicaid, even if received in conjunction with receipt of Medicare, would still be considered a public benefit in the totality of the circumstances for public charge inadmissibility.

*Comment:* One commenter indicated that the rule could allow a young adult to be deemed inadmissible as a public charge if at any point within the last year the person or a member of the household or certain members of the family received a few of these benefits for only a period of time. The commenter indicated that household definition leaves a very wide array of potential individuals who may receive a public benefit through no volition or interaction of the immigrant applicant but would, as a result, have an impact on the determination of admissibility for the immigrant's application including a child or a young family member. The commenter indicated that despite the applicant providing sufficient support

and having no need for public benefits, that family member or the primary caregiver for the family member may facilitate the application for and receipt of public benefits for that child or in relation to the care for that child.

*Response:* The public charge inadmissibility determination evaluates an alien's particular circumstances. DHS is not considering public benefits received by other household members as part of an alien's public charge inadmissibility determination. DHS has further clarified this inclusions of a definition for receipt of public benefits which indicates that an alien's receipt, application for or certification for public benefits solely on behalf of another individual does not constitute receipt of, application for or certification for such alien. But if the alien is a listed beneficiary, the alien is considered to have received the public benefit.

DHS's totality of the circumstances standard weighs all the positive and negative considerations related to an alien's age; health; family status; assets, resources, and financial status; education and skills; required affidavit of support; and any other factor or circumstance that may warrant consideration in the public charge inadmissibility determination.[415] In the definition of household,[416] DHS accounts for both (1) the persons whom the alien is supporting and (2) those persons who are contributing to the household, and thus the alien's assets and resources. DHS believes that an alien's ability to support a household is relevant to DHS's consideration of the alien's assets, resources, financial status, and family status. DHS believes this is an appropriate definition in the limited immigration context of public charge inadmissibility determinations. Public benefits received by household members do not count towards the alien's financial assets and income for purposes of the public charge inadmissibility determination.[417]

*Comment:* A commenter stated that the rule would deprive U.S. citizens who live in mixed-status households of their access to assistance programs for which they are eligible.

*Response:* DHS disagrees that the rule would deprive U.S. citizens of access to assistance programs for which they are eligible. This rule does not include consideration of public benefits

received by U.S. citizens in the public charge inadmissibility determination. The valuation of the public benefits is an individual determination and receipt of public benefits by other members of a household including U.S. citizens will not be considered in an applicant's public charge inadmissibility determination. In addition, DHS notes that this rule does not restrict an alien's access to public benefits for which the alien is eligible. Rather, this rule explains the criteria that DHS will use to determine whether an alien subject to section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), has met his or her burden of demonstrating eligibility for the immigration benefit sought.

Receipt of Public Benefits by Children

*Comment:* Several commenters said a child's use of benefits should not impact their public charge inadmissibility determination, as public benefits are often vital to the development of children and for them to become productive members of society. Commenters also indicated that a child's use of benefits should not impact their immigration application once they come of age. These commenters cited research demonstrating that the use of these programs in childhood helps children complete their education and have higher incomes as adults, be healthy, have better educational opportunities, and become more likely to be economically secure and contribute to their communities as adults. Another commenter indicated that public benefits serve as crucial levers that reduce the intergenerational transmission of poverty. Commenters also noted that "[b]ecause children do not decide whether or not to apply for benefits and because their financial situation as children is not necessarily indicative of their financial situation for life, children's receipt of benefits should not be counted in any public charge determination." Some commenters stated that considering an immigrant's past use of public benefits as a child in the public charge inadmissibility determination would deter immigrant parents from obtaining food and healthcare assistance for their children, and argued that this would result in adverse outcomes for the children themselves and impose significant costs on society. A commenter stated that low-income children with immigrant parents, including U.S. citizen children, are already less likely to receive Medicaid than those with U.S. born parents.

Many commenters cited to research indicating that the use of programs, such as SNAP, Medicaid, and CHIP, and

---

[413] *See* INA section 212(a)(4)(B), 8 U.S.C. 1182(a)(4)(B).

[414] *See* 8 CFR 212.22.

[415] *See* 8 CFR 212.22.

[416] *See* 8 CFR 212.21(d).

[417] *See* 8 CFR 212.22(b)(4)(ii), which provides that USCIS' considerations when assessing the alien's assets, resources, and financial status excludes any public benefits received by the alien as well as any public benefits received by another person of the household.

**Exhibit A**

housing assistance in childhood, helps children complete their education and have higher incomes as adults, live in stable housing, receive needed health services and consume adequate and nutritious food, and fosters their future success in education and the workforce. A commenter noted the impact of this rule on their work to facilitate healthy brain development among children. A few commenters stated that multiple studies confirm early childhood or prenatal access to Medicaid and SNAP improves health and reduces reliance on cash assistance. The commenters stated that children with access to Medicaid have fewer absences from school, are more likely to graduate from high school and college, and are more likely to have higher paying jobs as adults. Another commenter stated that children with health insurance are more likely to have routine healthcare, improved health outcomes, and improved success in education. One commenter said that lack of access to affordable housing remains one of the main barriers to economic stability for many families and the proposed rule would further limit access to housing assistance for families with children. The commenter cited research that shows rental assistance for households with children results in significant positive effects for future child outcomes and family economic security. A few commenters stated this proposal could undermine the access to healthcare for children of immigrants or their aging family members.

*Response:* DHS recognizes that many of the public benefits programs aim to better future economic and health outcomes for minor recipients, and that parents may decide to disenroll their children from public benefits programs to avoid negative immigration consequences. However, this rule is aimed at better ensuring that aliens who are subject to the public charge ground of inadmissibility are self-sufficient.

DHS also recognizes that children who receive public benefits are not making the decisions to apply for such benefits. However, DHS notes that Congress did not exclude children from the public charge ground of inadmissibility unless the child is seeking a status that Congress expressly exempted from public charge inadmissibility and, moreover, specifically required that DHS consider an applicant's age in the public charge inadmissibility determination. Nonetheless, as explained more fully in the discussion of Medicaid, DHS will not consider the receipt of Medicaid by children under the age of 21.

Military/First Responders

*Comment:* Some commenters supported the NPRM's proposal to exclude from the public charge determination any public benefits received by active duty service members and their families. Some commenters also discussed the impact of the rule on military families, including increasing food security for active military families and allowing them to focus on protecting the United States rather than on whether they will be able to feed their family. Commenters stated that too many military families and veterans depend on SNAP to make ends meet because their military pay is not enough to meet their basic needs. One commenter, citing to data from FY 2013, stated that current and former military members and their families redeemed approximately $104 million in SNAP benefits at commissaries—a 300 percent increase since 2007. The commenter further stated that for military families who do not have base-housing and live in high-cost areas, like those in California, accessing SNAP can be complicated and this has led military families across the country to turn out of desperation to food pantries and food banks—many operating on base or nearby military installations—for emergency food assistance. The commenter further stated that in recent years the Department of Defense (DOD) and the Department of Veterans Affairs (VA) have issued policies to address high rates of hunger among low-income military and veteran families, because military leaders understand that soldiers are less prepared to serve their country if they are hungry or worried about their families going hungry. They also know that when veterans are largely living in poverty with unmet basic needs, it is more difficult to convince young people who live in their communities to sign up.

A commenter also cited to 2013 USDA data, and reported that in that year, $103.6 million of groceries were purchased with SNAP benefits at military commissaries, and that between 2,000 and 22,000 military households received SNAP benefits. The commenter stated that a Department of Defense Education Activity (DoDEA) showed that in September 2015, 24 percent of 23,000 children in DoDEA schools were eligible for free meals, while 21 percent were eligible for reduced-price meals.

Commenters, citing the 2.4 million children from military families who were enrolled in Medicaid or CHIP, noted that many families with family members enlisted in the military benefitted from enrollment in Medicaid

or CHIP, indicated that Medicaid enrollment leads to positive health outcomes.

*Response:* DHS acknowledges that military service members and their families who are applying for an immigration benefit for which admissibility is required and that is subject to section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), will be required to demonstrate that they are not likely at any time in the future to become a public charge. However, consistent with the NPRM, DHS's public charge analysis will exclude consideration of the receipt of any public benefits by active duty servicemembers, including those in the Ready Reserve of the U.S. Armed Forces, and their spouses and children. As noted in the NPRM, the U.S. Government is profoundly grateful for the unparalleled sacrifices of the members of our armed services and their families. Servicemembers who, during their service, receive public benefits, in no way burden the public; indeed, their sacrifices are vital to the public's safety and security. The DOD has advised DHS that many of the aliens who enlist in the military are early in their careers, and therefore, consistent with statutory pay authorities, earn relatively low salaries that are supplemented by certain allowances and tax advantages.[418] Although data limitations exist, evidence suggests that as a consequence of the unique compensation and tax structure afforded by Congress to aliens enlisting for military service, some active duty alien servicemembers, as well as their spouses and children, as defined in section 101(b) of the Act, may rely on SNAP[419] and other listed public

---

[418] *See, e.g.,* 37 U.S.C. 201–212, 401–439 (Basic Pay and Allowances Other than Travel and Transportation Allowances, respectively); Lawrence Kapp, Cong. Research Serv., Defense Primer: Regular Military Compensation 2 tbl.1 (Dec. 17, 2018), available at *https://fas.org/sgp/crs/natsec/IF10532.pdf* (reporting average regular military compensation of $41,384 at the E–1 level in 2018, comprised of $19,660 in average annual basic pay, plus allowances and tax advantage) (last visited July 26, 2019); Lawrence Kapp et al., Cong. Research Serv., RL33446, Military Pay: Key Questions and Answers 6–9 (2019), available at *https://fas.org/sgp/crs/natsec/RL33446.pdf* (describing types of military compensation and federal tax advantages) (last visited July 26, 2019).

[419] *See* U.S. Gov't Accountability Office, GAO–16–561, Military Personnel: DOD Needs More Complete Data on Active-Duty Servicemembers' Use of Food Assistance Programs (July 2016), available at *https://www.gao.gov/assets/680/678474.pdf* (reporting estimates ranging from 2,000 active duty servicemembers receiving SNAP to 22,000 such servicemembers receiving SNAP) (last visited July 26, 2019). Effective FY16, Congress implemented a recommendation by the Military Compensation and Retirement Modernization Commission to sunset DOD's Family Subsistence

Continued

**Exhibit A**

benefits. As a result, the general standard included in the proposed rule could result in a finding of inadmissibility under section 212(a)(4) when such aliens apply for adjustment of status.

As noted in the NPRM, following consultation with DOD, DHS has concluded that such an outcome may give rise to concerns about servicemembers' immigration status or the immigration status of servicemembers' spouses and children as defined in section 101(b) of the Act, 8 U.S.C. 1101(b), which would reduce troop readiness and interfere significantly with U.S. Armed Forces recruitment efforts. This exclusion is consistent with DHS's longstanding policy of ensuring support for our military personnel who serve and sacrifice for our nation, and their families, as well as supporting military readiness and recruitment.

Accordingly, DHS has excluded the consideration of the receipt of all benefits listed in 8 CFR 212.21(b) from the public charge inadmissibility determination, when received by active duty servicemembers, including those in the Ready Reserve, and their spouses and children. If a service member has since retired or otherwise been discharged from military service, receipt of public benefits while in the service will not be counted in the public charge consideration. Only public benefits receipted after discharge from the military would be considered. Applicants that fall under this exclusion must submit proof that the servicemember is serving in active duty or the Ready Reserve. DHS believes this should minimize any impact to military readiness.

*Comment:* Some commenters suggested that the exemption that applies to individuals serving in the Armed Forces should apply to other individuals, such as veterans and stated that failure to include military veterans within this carve-out is arbitrary and capricious. The commenter stated that once an individual leaves active or reserve duty, upon the completion of his or her enlistment, is honorably discharged, and takes up a private job at

the very same salary, the public benefit exemption would no longer apply and thus be ineligible for admissibility and adjustment of status. The commenter stated military service members should be not be subject to public charge the moment they depart the military. A commenter said the rule would have an unintended negative impact on veterans of the U.S. military who do not have permanent status because they have access to the public benefits outlined in the rule. The commenter stated that their need for access to benefits may be directly tied to injuries resulting from their service.

A commenter stated that while applying the proposed rule to servicemembers would have negative policy consequences, the DHS lacks legal authority to exempt the "public charge" analysis from a whole segment of the population. The commenter stated that the relevant statute regarding "public charge" applies to "[a]ny alien," and DHS stated no basis on which it can exclude certain individuals from the generally applicable proposed definition of "public charge." The commenter stated that the rule would almost certainly apply to servicemembers like the rest of the population and therefore DHS should abandon the rule.

*Response:* DHS appreciates the comments and certainly appreciates the sacrifices that veterans have made for the United States. Among other factors, current servicemembers have a unique pay structure implemented by Congress that may involve the use of public benefits, and DHS has accordingly excluded the public benefits as listed in the rule for active duty service members in order to limit a possible impact on military readiness. DHS does not believe the same considerations are presented for veterans, as they do not currently serve, are not directly affected by the military compensation structure, and have access to a specific benefits scheme that Congress has designed for them (and that is not designated in this rule). Further, in light of that unique salary and benefit scheme created by Congress for active service members and their families, DHS disagrees with the commenter that it lacks authority to exempt use of the designated public benefits for such individuals and families from the definition of public charge. Rather, DHS has determined that it would be unreasonable, and contrary to congressional intent, to include use of public benefits by such individuals within the definition, where doing so could undermine the careful salary and benefits structure established by Congress and negatively affect recruitment and readiness.

*Comment:* Some commenters suggested that the exemption that applies to individuals serving in the Armed Forces should apply to other individuals, such as members of the public who have jobs of comparable importance to national security. The commenter stated as an example that there is no exemption for non-uniform support members working for or on behalf of the U.S. military, those working for State or local law enforcement, those working for prisons, or working as firefighters or as emergency medical technicians. The commenter stated that there is no doubt the U.S. "Government is profoundly grateful for the unparalleled sacrifices" of police officers, firefighters, and emergency medical technicians, but the rule does not exclude the public benefits received from these individuals. Other commenters indicated that the failure to exempt first responders and veterans or other groups was irrational, because military service members are not the only ones serving in roles important to national security.

*Response:* DHS refers the commenters to the explanations above regarding this rule's treatment of active duty servicemembers, including those in the Ready Reserve, and their spouses and children. DHS recognizes that many professionals, including first responders, also provide important services for the public, and make sacrifices that are critical and worthy of our gratitude. However, DHS believes that Armed Forces members and their spouses and children are uniquely positioned in this context, and that DHS should not extend similar treatment to other categories of applicants based on their employment or public service.

b. Supplemental Security Income

*Comment:* Multiple commenters opposed the inclusion of SSI and stated that SSI supports children with disabilities, and that a child who begins receiving SSI is less likely to fall below the poverty line. The commenters stated that the inclusion of SSI in the public charge rule threatens the health, safety, and well-being of the children and families that receive it. One commenter stated that SSI benefits represented 1.4 percent of the Federal Budget in FY 2012, and there is no reason to believe that the complete data recited in the "one analysis" relied on by the DHS for 2017 would be any different. The commenter stated that SSI was 0.33 percent of GDP in the years 2011 to 2012, and expected to decline to 0.23 percent in 2037. Further, the commenter said 86 percent of SSI benefits are paid to the disabled, concluding that it is

Supplemental Allowance Program within the United States, Puerto Rico, the U.S. Virgin Islands, and Guam; SNAP reliance may have increased somewhat following termination of the program. *See* Public Law 114–92, div. A, section 602, 129 Stat. 726, 836 (Nov. 25, 2015); Military Comp. & Ret. Modernization Comm'n, Final Report 187 (Jan. 2015) ("The [Family Subsistence Supplemental Allowance Program] should be sunset in the United States, Puerto Rico, Guam, and other U.S. territories where SNAP or similar programs exist, thereby reducing the administrative costs of a duplicative program.").

**Exhibit A**

irrational to exclude individuals with disabilities by claiming that they are likely to become a public charge. In contrast, other commenters asserted that only U.S. citizens should receive SSI.

*Response:* DHS appreciates the comments, however, DHS has determined that it will consider SSI as described in the rule. DHS notes that this decision is consistent with the 1999 Interim Field Guidance, and that, as discussed in the NPRM, SSI represents one of the largest Federal expenditures for low-income people.[420] As provided in the NPRM, SSI was included as public benefit because it provides monthly income payments for people with limited resources, is financed through general revenues, and has high expenditures.[421] DHS has determined that considering SSI in the rule, consistent with the 1999 Interim Field Guidance, is important in ensuring that aliens are self-sufficient and rely on their own capabilities and the resources of their families, their sponsors, and private organizations.

c. Temporary Assistance for Needy Families

*Comment:* Several commenters opposed the inclusion of TANF in the rule. One commenter stated that TANF helps families achieve self-sufficiency through support that allows parents to send their children to high-quality child care programs, and that including consideration of TANF could therefore harm families. Some commenters stated that TANF is the only source of Federal cash assistance for families with children, and that research shows that children make up about 77 percent of recipients. The commenters went on to state that families use cash assistance to aid in achieving economic security and working towards upward mobility, and that the inclusion of TANF in the proposed rule will be detrimental to children during their developmental years. The commenters stated that families who disenroll from TANF would lose their eligibility to receive free school meals, which would result in hungry children, homeless and precariously housed families, sicker adults and children, and reduced access to behavioral health services. Another commenter indicated that while the majority of TANF recipients are children, there is a current decrease in children receiving cash assistance

(under 25 percent of all poor families with children) and the rule would further restrict access. The commenter also indicated that the rule fails to recognize that States are increasingly choosing to provide TANF to working families who earn too much to qualify for the basic cash assistance programs and that research has shown that such policies, which "make work pay," improve employment outcomes because they serve as an effective incentive for families to find and keep jobs.

*Response:* DHS appreciates the comments; however, DHS has determined that considering TANF in the rule, consistent with the 1999 Interim Field Guidance, is important in ensuring that aliens are self-sufficient and rely on their own capabilities and the resources of their families, their sponsors, and private organizations. As provided in the NPRM, TANF was included as public benefit because it provides monthly income payments for low-income families and is intended to foster self-sufficiency, economic stability for families with children and has high expenditures.[422]

*Comment:* Some commenters added that TANF helps families enroll their children in childcare, which is a lifeline for working families. A commenter explained that, while the Child Care and Development Fund (CCDF) is the primary source of public funding for child care, a state may transfer up to 30 percent of its TANF funds to CCDF, or directly allocate its TANF funds, to provide child care subsidies to families in need. The commenter went on to provide statistics on the number of children in child-care and discussed the child-care support that TANF provides for working families. The commenter also provided data on the number of children in childcare and that one in six children eligible for CCDF services gain access to quality care.

*Response:* States may transfer TANF funding to other benefits including childcare, but this is not considered cash TANF.[423] As only the "cash assistance for income maintenance" portion of TANF is considered in the public charge inadmissibility determination, direct TANF spending on child care and transfers to CCDF are excluded from the

definition of public benefit for purposes of this rule.

*Comment:* One commenter stated that TANF "child-only" grants should be exempted from the proposed rule as they support the needs of children raised by extended relatives without parents. The commenter indicated that unlike TANF family grants, "child-only" grants are based solely on the income of the child and are only to meet their needs whether outside or inside the foster care system. The commenter stated that many children living with relatives in foster care are only offered TANF child-only support, since many states do not routinely license relatives and the children are consequently ineligible for foster care maintenance payments.

*Response:* DHS appreciates the comments, but notes the "child-only grants" are based solely on the needs of the child (*i.e.,* does not take the adults' needs into account when calculating the assistance benefit)" as opposed to the income of the child.[424] TANF cash assistance provided to a child is considered a public benefit under this rule. States may fund a variety of child welfare activities using TANF funds, including services for family reunification, parenting education, in-home family services, and crisis intervention.[425] TANF is only considered in the public charge inadmissibility determination if it is in the form of cash assistance for income maintenance. Again, non-cash TANF funded services are not included in the rule. States may transfer TANF funding to other benefits including childcare, which is not being considered in the rule. However, as previously discussed, there is no public charge exemption for children, therefore, any cash benefit receipt, including TANF, by a child generally would still be considered as a public benefit in public charge inadmissibility determination.

d. State, Local and Tribal Cash Assistance

*Comment:* A commenter provided information on various Washington State programs designed to provide individuals and families with the resources and support. The commenter

[420] *See* Gene Falk et al., Cong. Research Serv., R45097, *Federal Spending on Benefits and Services for People with Low Income: In Brief* (2018), *available at https://fas.org/sgp/crs/misc/R45097.pdf* (last visited July 26, 2019).

[421] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51166 (proposed Oct. 10, 2018).

[422] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51166 (proposed Oct. 10, 2018).

[423] *See* PRWORA, Public Law 104–193 (Aug. 22, 1996). *See* HHS, Office of Family Assistance, 2014 Child Care Reauthorization and Opportunities for TANF and CCDF (Feb. 19, 2016), available at *https://www.acf.hhs.gov/ofa/resource/tanf-acf-im-2016-02-2014-child-care-reauthorization-and-opportunities-for-tanf-and-ccdf* (last visited July 26, 2019).

[424] See U.S. Department of Health and Human Services, Temporary Assistance For Needy Families, 12th Report to Congress Fiscal Years 2014 and 2015, available at *https://www.acf.hhs.gov/sites/default/files/ofa/12th_annual_tanf_report_to_congress_final.pdf* (last visited July 23, 2019).

[425] HHS, Child Welfare Information Gateway, Temporary assistance for Needy Families (TANF), available at *https://www.childwelfare.gov/topics/management/funding/program-areas/prevention/federal/nondedicated/tanf* (last visited July 26, 2019).

**Exhibit A**

stated that in the FY 2017, approximately one in four Washington residents needed cash, food, child support, child care, and other services and that each day, more than two million individuals receive the support and resources they need from the state to transform their lives. The commenter stated that Washington invests general state funds to assist individuals and families who are ineligible for Federal programs to include lawfully present non-citizens who fail to meet federal eligibility qualifications established in the PRWORA. The commenter described the following programs: State Family Assistance; Food Assistance Program for Legal Immigrants; Aged, Blind, or Disabled Cash Assistance; Pregnant Women Assistance; Consolidated Emergency Assistance Program; Refugee Cash Assistance; Housing and Essential Needs Referral; Diversion Cash Assistance; and State Supplemental Payment. The commenter indicated that the rule would undermine the success of these programs that involve cash or non-monetized benefits and eligible applicants may refuse to receive these benefits.

*Response:* DHS appreciates the comments; however, DHS has determined that considering state cash assistance in the rule, consistent with the 1999 Interim Field Guidance, is important in ensuring that aliens are self-sufficient and rely on their own capabilities and the resources of their families, their sponsors, and private organizations. The programs listed by the commenter that provide cash assistance would be considered public benefits in the public charge inadmissibility determination even if the funding is provided by the state unless they are provided to individuals not subject to public charge such as Refugee Cash Assistance or are not for general income maintenance (*e.g.,* if they are not means-tested or if they are provided for some specific purpose that is not for food and nutrition, housing, or healthcare). For example, LIHEAP (Low Income Home Energy Assistance Program) and emergency disaster relief would not be considered as a public benefit in the public charge inadmissibility determination even though they may be considered as a cash or cash equivalent benefits.

e. Supplemental Nutrition Assistance Program

*Comment:* Many commenters stated that the rule's inclusion of public benefits such as SNAP affects other public benefits including children's ability to access other needed benefits,

particularly at school. The commenters explained that some benefits received at school (*e.g.,* free school meals) are linked to enrollment in SNAP benefits and could be impacted. A commenter stated that the proposed rule is inhumane, affecting families' ability to access SNAP to get the adequate food and nutrition they need. The commenter stated that hunger and malnutrition affects a person's ability to focus, function, and fight off disease and that hunger is already a serious problem in the United States. The commenter stated that aiding the hunger epidemic through the consideration of SNAP is against the public interest and the progression of our society. A commenter said the onerous restrictions initially placed on immigrant participation in SNAP during the 1996 reforms were reversed at the next available opportunity—the 2002 Farm Bill—which illuminates the sound public policy of ensuring that every family living in the United States has access to the resources necessary to feed their children.[426] A commenter stated that only 40 percent of eligible citizen children living in households with immigrants received SNAP benefits after changes to immigration and welfare law in the 1990s.

*Response:* DHS appreciates the comments and recognizes the importance of SNAP. DHS also acknowledges that some people may choose to disenroll from SNAP. However, this rule does not change the eligibility requirements of SNAP and does not prohibit individuals from receiving SNAP. In addition, this rule does not include school lunch or breakfast programs in the definition of public benefit. Further, the expansion of SNAP provisions for children under 18 established by the 2002 Farm Bill,[427] is only applicable to the five-year waiting period; therefore children who become lawful permeant residents do not need to wait five years before being eligible for SNAP.[428] However, DHS will consider SNAP as part of the public charge inadmissibility determination. DHS has determined that considering SNAP is important in ensuring that aliens are self-sufficient and rely on their own capabilities and the resources of their families, their sponsors, and private organizations. DHS believes that even though children and schools may no longer benefit from direct certification for school nutrition programs, a child's disenrollment from SNAP due to this rule would likely have no effect on the child's eligibility for

school nutrition programs, and would not stop the child and school from accessing these programs through existing enrollment processes other than direct certification. This rule would not prevent a child from applying for or receiving any school related nutrition program.

*Comment:* A couple of commenters said the rule would violate the prohibition in Section 8(b) of the Food and Nutrition Act from considering SNAP benefits as income or resources. For example, commenters stated that the inclusion of SNAP is inconsistent with the SNAP statute that states that ''the value of benefits that may be provided under this chapter shall not be considered income or resources for any purpose under any Federal, State, or local laws.'' Commenters also stated that the inclusion of SNAP is inconsistent with congressional intent to expand SNAP eligibility to immigrant children. Similarly, a commenter stated that SNAP should be excluded from the public charge definition because the legislative history of SNAP indicates that SNAP was intended to be supplemental in nature. The commenter suggested that it would be unreasonable to consider receipt of a supplemental benefit to be sufficient to render a person a public charge. Discussing the legislative history surrounding the past four Farm Bills, a commenter stated that SNAP enjoys bipartisan support and Congress has rejected efforts to reduce its reach. The commenter stated that the proposed rule would reduce benefits for low-income children of immigrant parents and that this was inconsistent with congressional intent. A commenter said the onerous restrictions initially placed on immigrant participation in SNAP during the 1996 reforms were reversed at the next available opportunity—the Farm Security and Rural Investment Act of 2002 (the 2002 Farm Bill)—which illuminates the sound public policy of ensuring that every family living in the United States has access to the resources necessary to feed their children.

*Response:* DHS disagrees that the rule is contrary to congressional intent. The fact that Congress has expanded which aliens can receive certain public benefits does not indicate a congressional intent that those benefits should not be considered in determining public charge. The rule abides by the statutory requirement as provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and is consistent with congressional policy statements relating to self-sufficiency in 8 U.S.C. 1601. In these policy statements, Congress confirmed that the

[427] *See* Public Law 107–171, section 4401, 116 Stat. 134, 333 (May 13, 2002).
[428] *See* 8 U.S.C. 1612(a)(2)(J).

**Exhibit A**

immigration policy continues to be that, "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." [429]

Further, DHS disagrees that the inclusion of SNAP as one of the designated public benefits violates the Food and Nutrition Act of 2008. While Federal law allows certain qualified alien children under 18 to receive SNAP benefits, [430] this rule does not prohibit anyone from receiving a benefit for which they qualify. However, Congress did not prohibit the consideration of public benefits as part of any of the factors to be considered in the public charge inadmissibility determination. DHS believes the use of certain benefits is appropriate to consider in determining public charge inadmissibility. To implement Congress' requirement to administer the public charge ground of inadmissibility, DHS inevitably must consider benefits which individuals are eligible to receive, as did the 1999 Interim Field Guidance. DHS believes the rule strikes an appropriate balance as to which benefits are considered.

Further, DHS disagrees that the rule violates the restrictions in section 8(b) of the Food and Nutrition Act, 7 U.S.C. 2017(b). That section provides that the value of SNAP benefits "shall not be considered income or resources for any purpose under any Federal, State, or local laws." [431] The rule does not consider SNAP as income or resources. The rule explicitly excludes the value of public benefits including SNAP from the evidence of income to be considered. [432] Likewise, the consideration of the assets is limited to cash assets and resources and other assets and resources that can be converted into cash within 12 months. [433] Assets and resources do not include SNAP benefits, which are not cash, and selling SNAP benefits is illegal. [434]

*Comment:* Several commenters said that this rule conflicts with USDA's 1999 input as part of the 1999 proposed rule, [435] which advised that special nutrition programs should not be considered in the public charge analysis. A commenter cited to the 1999 Interim Field Guidance, and stated that historically, the receipt of SNAP benefits (or the typical use of Medicaid) does not indicate that an immigrant is or is likely to become primarily dependent on the Government for subsistence. The commenter stated that to qualify for benefits, a SNAP household's income generally must be at or below 130 percent of FPG, the household's net monthly income (after deductions for expenses like housing and childcare) must be less than or equal to 100 percent of the FPG, and its assets must fall below limits identified in Federal regulations. The commenter further stated that the average monthly benefit per household is $253, and the average monthly benefit per person is $125 per month, or $1.40 per meal.

*Response:* As indicated in the proposed rule, DHS determined that receipt of SNAP is relevant to the determination of whether or not the alien is self-sufficient, and therefore not likely to become a public charge. The 1999 proposed rule, and the associated letters, related to a proposed definition of public charge that this rule would change. Furthermore, while INS consulted with the relevant public benefit granting agencies in 1999, DHS was not bound by those agencies' recommendations, but adopted them based on its interpretation of the term public charge, as well as certain public policy objectives articulated in that rule. DHS believes including the program is consistent with Congress' intention that aliens should be self-sufficient. [436] DHS recognizes that some public benefits have higher income thresholds than the income thresholds that this rule identifies as most relevant to the totality of the circumstances determination. However, the general income threshold of 125 percent of the FPG in the public charge totality of the circumstances determination is just one factor; DHS will not exclude consideration of any benefit that does not match that threshold.

*Comment:* One commenter noted that the rule is inconsistent with SNAP eligibility. Commenters stated that the proposed rule undermines congressional intent and the

longstanding Federal commitment to helping those who struggle to have enough healthy food. Commenters stated that the proposed rule is inconsistent with clear congressional intent regarding eligibility for means-tested programs because it undermines those very rules set by Congress in law. One commenter stated that "Congress has made explicit choices to expand eligibility (or permit states to do so)," and increase immigrant access to programs like SNAP, CHIP and Medicaid, and therefore, "[t]he administration must defer to [c]ongressional intent on this issue."

*Response:* DHS does not agree that the inclusion of SNAP as a public benefit considered in the public charge inadmissibility determination is inconsistent with congressional intent. The rule intends to abide by the statutory requirement as provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and consistent with congressional statements relating to self-sufficiency in 8 U.S.C. 1601: Specifically, that, "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." [437] As discussed in the NPRM, benefits directed toward food and nutrition, housing, and healthcare are directly relevant to public charge inadmissibility determinations, because a person who needs the public's assistance to provide for these basic necessities is not self-sufficient. [438] In addition, these benefits account for significant Federal expenditure on low-income individuals and bear directly on self-sufficiency, as discussed in the NPRM. [439]

*Comment:* A commenter stated that the proposed rule's characterization of individuals receiving SNAP benefits even for modest periods of time as a public charge is inconsistent with extensive research showing that SNAP provides supplemental assistance to a large number of workers, both while they are employed in low-paying jobs and during brief periods of unemployment. The commenter stated that most non-disabled adults who participate in SNAP, including eligible immigrants, work in a typical month or within a year of that month. Specifically, the commenter asserted that over half of the individuals who

---

[429] *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601(2)).

[430] *See* 8 U.S.C. 1612(a)(2)(J).

[431] Congress has also exempted children under 18 from sponsor deeming requirements for purposes of SNAP receipt, 7 U.S.C. 2014(i)(2)(E), but this provision does not affect the core reimbursement obligation. In the latter respect, this provision is materially different than the CHIPRA provision regarding Medicaid for children under 21 and pregnant women, discussed above.

[432] *See* 8 CFR 212.22(b)(4)(ii)(A) & (C) ("excluding any income from public benefits").

[433] *See* 8 CFR 212.22(b)(4)(ii)(D) & (E).

[434] *See* 7 U.S.C. 2024(b).

[435] *See* Inadmissibility and Deportability on Public Charge Grounds, 64 FR 28,676, 28,688 (proposed May 26, 1999).

[436] *See* 8 U.S.C. 1601(1).

[437] *See* Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601(2)).

[438] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51159 (proposed Oct. 10, 2018).

[439] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51166 (proposed Oct. 10, 2018).

**Exhibit A**

were participating in SNAP in a typical month in mid-2012 were working in that month, and 74 percent worked in the year before or after that month. Similarly, many other commenters stated that the large majority of SNAP recipients who can work do work.

*Response:* DHS recognizes that people who are working may also lack self-sufficiency. The person's employment does not negate that the person is receiving the public benefit and the employment is not reimbursing the public benefit-granting agency for the cost of the public benefit. Under this rule, DHS would not treat past receipt of SNAP—or any other benefit—as outcome-dispositive. Instead, will assess such past receipt in the totality of the circumstances, to determine whether the alien is likely to become a public charge in the future.

CalFresh

*Comment:* A commenter stated that one in ten Californians receive nutrition assistance through CalFresh, which is California's SNAP program. The commenter stated that CalFresh is California's food stamp program and increases the food buying power in low income households. The commenter stated that if this proposed rule is enacted, school districts will see more children coming to school hungry because noncitizen families, regardless of whether the rule would affect their situation, will be afraid to apply for food stamps, either by deciding not to enroll, or by disenrolling current recipients.

*Response:* As CalFresh is the Federally-funded SNAP program under the State of California, it would be considered as a public benefit under this rule. As discussed with respect to SNAP generally, CalFresh is relevant to the determination of whether or not the alien is self-sufficient, and therefore not likely to become a public charge. DHS understands that some people may disenroll from SNAP/CalFresh and other SNAP funded State benefits. However, this rule does not change the eligibility requirements for these benefits and DHS believes that the inclusion of State SNAP benefits is consistent with congressional statements relating to self-sufficiency in 8 U.S.C. 1601.

f. Housing

*Comment:* Commenters opposed including project-based Section 8 housing in the definition of public charge, because the vouchers can help ease the burden of rent in high-cost cities, help alleviate homelessness, promote economic stability, allow the flexibility for families to pay for other necessities, and promote self-sufficiency. Commenters also provided information and data on the benefit of the programs. Many of these commenters stated that housing is a basic necessity and is or should be a human right. Several commenters discussed the administrative burden and costs the potential rule will have on housing providers, including local rule makers, housing agencies, and private landlords who administer public vouchers, such as the dissemination of information to tenants and providing them with evidentiary information. Other commenters raised concerns that DHS did not sufficiently address the potential costs to the housing market, including the inundation of homeless shelters, and the loss of Government funds going to the private market. A commenter raised concerns that the rule will divert funds from direct housing and resident services to help U.S. Department of Housing and Urban Development (HUD) residents understand the new rule.

*Response:* DHS appreciates the comments and recognizes the importance of housing programs. DHS has determined that considering housing programs, such as Section 8 Vouchers, Section 8 Rental Assistance and public housing, in the rule is important in ensuring that aliens are self-sufficient and rely on their own capabilities and the resources of their families, their sponsors, and private organizations. These programs have high expenditure and relate to the basic living need of housing, and therefore the receipt of such housing related public benefit suggests a lack of self-sufficiency.[440] DHS will therefore consider the housing programs listed in the rule in the public charge inadmissibility determination. The rule intends to abide by the statutory requirement as provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and be consistent with congressional statements relating to self-sufficiency in 8 U.S.C. 1601. As Congress indicated, the immigration policies continue to be that, "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." [441] However, housing programs that provide mortgage assistance or credits will not be considered in the public charge inadmissibility determination.

*Comment:* A commenter stated that receipt of a housing subsidy does not on its own accurately measure self-sufficiency, citing that 34 percent of assisted households are working and contributing to their housing costs. The commenter also stated that housing programs do not constitute an incentive for immigration. The average number of months a household spends on an agency waiting list before being admitted to the public housing or housing choice voucher program is 18 and 32, respectively. A commenter also stated that rental assistance is best understood as a supplemental benefit that reduces housing costs for low-income households but does not provide support for all of an individual's basic needs, instead recipients are generally required to provide housing costs up to 30 percent of their income. A commenter stated that a small share of individuals and households eligible for housing assistance actually receive it because of local housing conditions, wait list sizes, and preferences, DHS will not be able to predict that someone seeking status adjustment or lawful entry is likely to receive housing benefits.

*Response:* DHS understands that there are many conditions that may affect whether a person ultimately receives public housing. As previously indicated, DHS has determined that considering housing programs, such as Section 8 Vouchers, Section 8 Rental Assistance, and public housing, in the rule is important in ensuring that aliens are self-sufficient and rely on their own capabilities and the resources of their families, their sponsors, and private organizations. As previously indicated, the past receipt of one public benefit will not on its own make a person inadmissible based on public charge grounds. Instead, DHS would review all the factors in the totality of the circumstances.

*Comment:* Some commenters stated that, by including housing programs, the rule directly contradicts the mission of public housing as public housing programs are meant to serve families and provide for housing.

*Response:* DHS appreciates that the mission of public housing is to provide low-income affordable housing to families. DHS also has a mission to abide by congressional mandates to review the inadmissibility of all aliens including based on public charge and congressional statements relating to self-sufficiency in 8 U.S.C. 1601.

*Comment:* A commenter stated that the rule would waste affordable housing

---

[440] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51167 (proposed Oct. 10, 2018).

[441] *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601(2)).

**Exhibit A**

resources, including subsidized rental housing programs such as Low-Income Housing Tax Credit (LIHTC) housing, Section 515 rural housing, and Section 514/516 farm labor housing, leading to especially severe, negative impacts in rural California, and the commenter stated that the rule would further destabilize the farmworker population in our agricultural regions. The commenter indicated that from 1964 to 2004, Section 514 and 516 housing programs managed by USDA financed nearly 35,000 homes for farmworkers and rehabilitated thousands more and that that in the period that followed, farmworker housing development continued to be backed by annual Federal appropriations in the tens of millions of dollars. The commenter stated that housing programs have had varying eligibility requirements that have allowed individuals with a variety of immigration statuses and mixed-status families to secure stable, affordable housing; and the rule would therefore lead to significant dislocation of immigrant families, away from housing that was built precisely for their use.

*Response:* This rule does not include LIHTC housing, Section 515 rural housing, and Section 514/516 farm labor housing as public benefits. Further, although the rule may affect whether individuals apply for housing, the rules does not change the eligibility requirements for any public benefit. DHS also notes that under 20 CFR 655.122(d)(1), the employer must provide housing at no cost to the H–2A workers (temporary workers performing agricultural services), and those workers in corresponding employment who are not reasonably able to return to their residence within the same day. Further, under 20 CFR 655.122(d)(4), if public housing provided for migrant agricultural workers under the auspices of a local, county, or State government is secured by the employer, the employer must pay any charges normally required for use of the public housing units directly to the housing's management. DHS would not consider such housing under the definition of public benefit as the employer is required by regulation to pay for any associated costs.

*Comment:* A commenter said data refuted the notion that immigrant families rely disproportionately on all forms of public assistance, citing a study indicating that just 4.2 percent of immigrant households with children utilize housing assistance as compared to 5.3 percent of U.S.-born households. A couple of commenters cited research showing that most able-bodied adults receiving rental assistance are employed, arguing that they are therefore self-sufficient.

*Response:* DHS appreciates the comment and recognizes that the availability of public benefits for aliens is limited. The purpose of the public charge rule is, however, to ensure that those seeking admission to or adjustment of status in the United States do not become public charges by using the public benefits in the future. The public charge inadmissibility determination is correspondingly one of an alien's likelihood of becoming a public charge through receipt of benefits in the future even if the person is employed. Further, as previously indicated, DHS recognizes that people receiving public benefit may nonetheless be working, but as they are receiving public benefits, such aliens are not self-sufficient. Therefore, DHS will continue to consider the public benefits as listed in the rule.

*Comment:* A commenter stated that DHS should specify in its rule that individuals in mixed-status families who are not recipients of Federal financial housing assistance do not receive a public benefit for public charge determination purposes.

*Response:* DHS will not consider a person who lives in any one of the listed housing programs as receiving public benefits unless the public benefit-granting agency actually designated the benefit for the applicant as a beneficiary, such as in a contract, lease, or other documentation.

*Comment:* A commenter stated that including housing to the public charge determination will cause recipients of public housing to be treated differently due to their immigration status, in contradiction to the Fair Housing Act [442] of 1968's prohibition against discrimination.

*Response:* DHS does not believe that the rule is contrary to the antidiscrimination provisions of the Fair Housing Act.[443] The antidiscrimination provisions prohibit discrimination on grounds covered by the Fair Housing Act by lenders, property sellers, and others covered by that law. In contrast, this rule is applicable in the immigration context where an alien must establish that he or she is admissible and is not inadmissible as likely at any time in the future to become a public charge under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4).

*Comment:* A few commenters asked whether homeownership programs are included under the rule.

*Response:* The rule does not consider homeownership programs, such as the Housing Choice Voucher Homeownership program,[444] in the public charge inadmissibility determination. DHS will only consider public housing benefits as listed in the rule.

*Comment:* A commenter requested that DHS add benefits received pursuant to Project Rental Assistance Contracts (PRAC), USDA rental assistance projects, or all HUD benefits to the public benefits definition.

*Response:* DHS appreciates the comment, however, DHS will not include additional housing programs. The programs listed by the commenters have low expenditures.[445]

In addition, DHS has removed references to 42 U.S.C. 1437u, the Family Self-sufficiency program, and 24 CFR part 402 Section 8 Project-Based Contract Renewal, which is a program associated with housing but is not itself a housing program.

*Comment:* A commenter associated with the City of Los Angeles reported that the beneficiaries of many city housing programs and policies will be directly negatively impacted by the proposed public charge rule. The

---

[442] *See* 42 U.S.C. 3604.

[443] *See* Title VIII (Fair Housing Act, as amended) of the Civil Rights Act of 1968, Public Law 90–284, 82 Stat. 73 (April 11, 1968) (codified in 42 U.S.C. 3601–19).

[444] *See* 24 CFR part 982, subpart M, 24 CFR 982.625–982.643. *See* also *HUD.gov,* Homeownership Vouchers, available at *https:// www.hud.gov/program_offices/public_indian_ housing/programs/hcv/homeownership* (last visited April 19, 2019).

[445] For example, Supportive Housing for the Elderly, the 2019 Request for Outlays is $659,000,000, *see* HUD, Housing, Housing For The Elderly (Section 202), 2019 Summary Statement and Initiatives, available at *https://www.hud.gov/ sites/dfiles/CFO/documents/25%20- %20FY19CJ%20-%20HSNG%20-%20Housing% 20for%20the%20Elderly%20%28Section% 20202%29%20-%20Updated.pdf* (last visited May 31, 2019); for Supportive Housing for Persons with Disabilities, the 2019 Request for Outlays is $188,000,000, Housing, Housing For Persons With Disabilities (Section 811), 2019 Summary Statement and Initiatives, available at *https://www.hud.gov/ sites/dfiles/CFO/documents/26%20-% 20FY19CJ%20-%20HSNG%20-%20Housing% 20for%20Persons%20with% 20Disabilities%20%28Section%20811%29%20- %20Updated.pdf* (last visited May 31, 2019); for Housing for Persons With AIDS (HOPWA), the 2019 Request for Outlays is $353,448,000, *see* Community Planning And Development Housing Opportunities For Persons With Aids 2019 Summary Statement And Initiatives, available at *https://www.hud.gov/sites/dfiles/CFO/documents/ 17%20-%20FY19CJ%20-%20CPD%20-% 20Housing%20Opportunities%20for %20Persons%20with% 20AIDS%20%28HOPWA%29.pdf* (last visited May 31, 2019); and for USDA Multi-Family Housing Rental Assistance, the 2019 appropriated funds is $1,331,400,000, *see* FY 2019 Appropriated Funds, available at *https://www.rd.usda.gov/newsroom/ fy2019-appropriated-funding* (last visited May 31, 2019).

**Exhibit A**

commenter cited programs such as permanent support housing, including Section 8 Vouchers; Housing Opportunities for Persons With HIV/AIDS; Domestic Violence Shelter Operations; and Family Source Center services. The commenter indicated that the rule will either dissuade immigrants who legally qualify for public assistance from seeking the necessary services or lead to high level of disenrollment. The commenter indicated that some program officials could not confidently offer aliens clear guidance on the immigration consequences of accessing certain services. The commenter stated that the rulemaking would exacerbate homelessness and has already led to a "chilling effect." The commenter also stated that the proposed rule was inconsistent with the commenter's commitment to ensure fair housing for its residents, and threatens its ability to enforce housing rights for local residents. The commenter stated that such commitment includes a requirement by HUD to certify that it would affirmatively further fair housing.

*Response:* The public charge rule does not prevent aliens from obtaining benefits they are legally entitled to under PRWORA. Given Congress' strong interest in an immigrant's self-sufficiency [446] and based on the fact that Congress did not exempt the receipt of such benefits from consideration for purposes of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4),[447] DHS will consider public benefits as listed in the rule. DHS notes that other housing programs not listed in the rule, such as Section 202 Supportive Housing for the Elderly, Section 811 Supporting Housing for Person with Disabilities, Housing Opportunities for Persons With AIDS (HOPWA), USDA Multi-Family Housing Rentals, and home loan and grant programs, will not be considered in the public charge inadmissibility determination.

*Comment:* A commenter asked whether the following benefits received as part of a lead paint abatement program would be considered public benefits for purposes of public charge; any stipend received as part of the program, including stipends or gift cards that are offered to encourage families to get their children tested for lead; the use of a city-operated lead safe house to which families may move during renovation of their home to remove lead; or receipt of HUD grant funds used to pay a landlord of a rental unit to rehabilitate a unit that has been found to have poisoned a child. The

commenter indicated that many of the funds used for lead abatement programs are HUD grant dollars, and to the extent that these payments are made available based upon the income of the renter, they could have an impact on the renter from a public charge standpoint.

*Response:* DHS will not consider any subsidies or grants provided to test for lead paint or to ameliorate homes with lead paint issues in the public charge determination. DHS will only consider those public housing programs enumerated in 8 CFR 212.21(b). HUD's Lead-Based Paint and Lead Hazard Reduction Demonstration Grant Programs are regulated under 24 CFR part 35, and do not fall under the list of enumerated benefits. Therefore, subsidies or grants for lead abatement programs are not considered a public benefit for purpose of the public charge inadmissibility determination.

g. Institutionalization

*Comment:* A commenter asked that institutionalization for long-term care be removed as a consideration in the public charge determination because the country has made progress with deinstitutionalization over the past several administrations. The commenter also stated that there is no evidence that people with significant disabilities are taking advantage of the Medicaid system. The commenter stated that the rule's potential effects on individuals with disabilities created an implication that individuals with disabilities were not welcomed citizens of the United States, and stated that this was an "appalling message." A commenter stated that despite deinstitutionalized supports and services becoming more and more prevalent, most people with disabilities receiving any Medicaid supports must first prove that they are at risk of institutionalization. The commenter stated that the requirement to prove risk of institutionalization applies to virtually every individual with an intellectual and/or developmental disability in the United States regardless of immigration status. The commenter stated that inclusion of institutionalization in the public charge rule would thus automatically cast a mark against a person with a disability under the proposed rule.

*Response:* DHS appreciates the comments. DHS does not believe that all individuals with an intellectual or developmental disability will necessarily be institutionalized, be likely to be institutionalized, or be inadmissible based on public charge

grounds. As explained in the NPRM,[448] the U.S. Government subsidizes health insurance, which pays for expenses associated with the institutionalization. The receipt of these benefits to provide for the cost of institutionalization indicates a lack of self-sufficiency in satisfying basic living needs of food and nutrition, housing, and healthcare. Additionally, institutions are residential facilities that assume the total care of individuals who are admitted, including room and board. However, DHS understands that the language in the NPRM could be interpreted as inclusive of other public benefits not listed in the rule, such as Social Security retirement benefits or Medicare. Therefore, DHS has removed the reference to long-term institutionalization within the definition of public benefit, as the long-term institutionalization benefits that DHS has in the past considered, and intends to consider under this rule, are already part of the public benefit definition, *i.e.,* TANF, SSI, and Medicaid.

Further, DHS disagrees that continuing to consider institutionalization for long-term care at government expense indicates that the United States does not welcome people with disabilities. DHS reiterates that a child or a person who is severely disabled or who has a severe medical condition and who lives in a long-term care facility at government expense would not be found inadmissible on the public charge ground solely on account of the past institutionalization. Instead, DHS will, in the totality of the circumstances, take into account whether there are sufficient assets and resources to provide for his or her future care in a privately-financed setting, including resources provided by guardians or relatives who may have the ability to support the alien and provide for the alien's future care.

*Comment:* One commenter stated that most of the population would eventually require long-term care in nursing homes. A commenter stated that including benefits provided for institutionalization is a virtually blanket conclusion that all immigrants are "likely" to become public charges, because a huge percentage of aging individuals in the United States will ultimately require some form of institutional care. The commenter cited to data that, according to the commenter, indicated nursing homes alone will ultimately care for 35 percent of the population. The commenter said

---

[446] As expressed in 8 U.S.C. 1601.

[447] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[448] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51171–72 (proposed Oct. 10, 2018).

**Exhibit A**

considering these services as public benefits would render all immigrants inadmissible. A commenter stated that institutionalization cannot be predicted and asked what would happen if an alien previously deemed admissible later became disabled, but documented that they will not need benefits at any time in the future.

*Response:* DHS understands that people may need long-term care with age; however, DHS does not believe that everyone will need to be supported by the Government. For example, an alien or his or her family may have sufficient assets or resources to ensure that the alien has the necessary care, even in a circumstance where the alien cannot work or must be institutionalized. Or the alien could have adequate insurance to support institutionalization for long-term care, whether through a private insurer or through Medicare.

The public charge inadmissibility determination calls for a determination that it is more likely than not, in the totality of the circumstances, that the alien will become a public charge. For this reason, DHS would consider it unreasonable to assume, for purposes of the public charge determination, that all individuals will eventually live in nursing homes subsidized by the government. USCIS will not deny a person based on public charge solely because of a remote possibility that a person will need such care in advanced age. DHS also clarifies that the public charge inadmissibility determination does not necessarily involve a review of whether the person has actually received a public benefit after DHS has made its determination. DHS further understands that the language in the regulation may indicate that other public benefits not otherwise listed that may be used to fund institutionalization, including State benefits, Social Security retirement benefits, SSDI, or Medicare. When referring to public benefits used for long-term care at government expense, the 1999 Interim Guidance listed SSI, TANF, and Medicaid as examples of public benefits for long-term institutionalization at government expense that would be considered in the public charge inadmissibility determination.[449] Likewise, under this rule, DHS would consider such benefits as part of long-term institutionalization at Government expense and did not intend to consider other benefits may be used such as Social Security retirement benefits, SSDI, Medicare or veteran's

benefits. Social Security retirement benefits, SSDI, Medicare and veteran's benefits are considered earned benefits in that individuals pay into the programs as part of their employment and must work for a certain period of time before being eligible. Therefore, DHS is removing the provision for public benefits for long-term care at government expense as a separate provision in the definition of public benefits. Because the benefits considered for institutionalization under the rule are already within the rest of the list in the public benefit definition, DHS does not believe the additional provision is necessary and its deletion avoids confusion with other benefits that are not considered in the rule. Further, when a person is institutionalized and the person or a relative is paying for any cost associated with the institutionalization without the use of public benefits, DHS would not consider the institutionalization as a public benefit being received. DHS notes that institutionalization would otherwise be generally be considered as part of the health factor as described in the rule.

### h. Medicaid

*Comment:* Many commenters stated that Medicaid should not be considered in public charge determinations. Commenters stated that the rule contradicts one of PRWORA's main policies, which extends Medicaid benefits to immigrants, as well as other laws that allow certain children and pregnant women to access Medicaid without a waiting period. One commenter stated that DHS should exempt up to two years of Medicaid when the individual has shown past ability and earning potential. The commenter did not provide a reason for the proposed two-year period, but stated that when a person applies for health insurance on the Affordable Care Act (ACA) marketplace, and is eligible for Medicaid, ''the marketplace automatically forwards an application on their behalf to Medicaid, even if they never intended to apply for Medicaid, leaving them with no choice in the matter at all!'' The commenter did not provide evidence to support his statement regarding how the ACA marketplace works. Some commenters supported the inclusion of Medicaid in the rule.

*Response:* DHS will continue to consider Medicaid. DHS agrees that Medicaid is beneficial to those who receive it. DHS, however, seeks to better ensure that applicants for admission to the United States and applicants for adjustment to lawful permanent

resident status, who are subject to the public charge ground of inadmissibility or are nonimmigrants applying for an extension of stay or change of status, are self-sufficient and do not rely on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, sponsors, and private organizations.[450] Further as previously discussed, the public charge inadmissibility rule is not inconsistent with PRWORA, nor does it contravene or overrule PRWORA.[451]

As indicated in Table 10 of the NPRM,[452] the total Federal expenditure for the Medicaid program overall is by far larger than any other program for low-income people.[453] In addition, the focus of this public charge rule is to ensure self-sufficiency that covers the basic necessities of life, such as food and nutrition, housing, and healthcare.[454] Medicaid is a federal benefits program that provides for a person's health insurance to cover the costs of healthcare, which, is a basic necessity of life that is directly relevant to public charge.

However, DHS credits the many comments that DHS received regarding the receipt of Medicaid and CHIP by children and pregnant women, as well as the states that have expanded their Medicaid programs to allow access to such groups without a waiting period. DHS has decided to exclude consideration of Medicaid received by all aliens under the age of 21. The age limit of 21 for exempting Medicaid receipt from consideration reflects Congressional intent to allow states to extend coverage to this population (along with pregnant women as discussed below) without requiring them to wait five years as required by PRWORA, and without triggering a reimbursement requirement for the alien's sponsor under an affidavit of

---

[449] *See* Inadmissibility and Deportability on Public Charge Grounds, 64 FR 28689 (May 26, 1999).

[450] *See* 8 U.S.C. 1601(2).

[451] *See* Part III, Section D, Comments Regarding Legal Authority/Inconsistency with Congressional Intent.

[452] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51160 (Oct. 10, 2018).

[453] *See* Table 26–1 Policy, Net Budget Authority by Function, Category, and Program, available at *https://www.whitehouse.gov/wp-content/uploads/2018/02/26-1-fy2019.pdf* (last visited July 26, 2019). Expenditure amounts are not outlays unless otherwise noted. *See also* Gene Falk et al., Cong. Research Serv., R45097, Federal Spending on Benefits and Services for People with Low Income: In Brief (2018), *available at https://fas.org/sgp/crs/misc/R45097.pdf* (last visited July 26, 2019). Note however that neither HHS nor DHS are able to disaggregate emergency and non-emergency Medicaid expenditures. Therefore, this rule considers overall Medicaid expenditures.

[454] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51159 (proposed Oct. 10, 2018).

**Exhibit A**

**41380** Federal Register / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

support.[455] The age limit also aligns with the limit most states offer free public education to children, and provides appropriate certainty to educators, parents, and children with respect to use of health care programs by children.[456]

DHS recognizes Congress did not exclude children from the public charge determination. But as noted in the proposed rule, the fact that an alien received public benefits as a child is a relevant consideration when determining the likelihood that the alien will receive public benefits in the future. As alien children approach or reach adulthood, they may age out of eligibility for certain benefits, choose to disenroll from such benefits (for which their parents may have enrolled them), or increase their chances of becoming self-sufficient depending upon whether they acquire education and skills, secure employment, and accumulate assets and resources. As a consequence, past receipt of public benefits as a child may be less indicative of future receipt, as compared to past receipt as an adult.

DHS recognizes that Medicaid and CHIP benefits for children also provide for other services or funding for in-school health services and serve as an important way to ensure that children receive the vaccines needed to protect public health and welfare. In addition, children may be enrolled in Medicaid through the school system or other programs which are required by law to provide services which may affect school budgets.

In sum, while children are not exempt from public charge inadmissibility, there are strong legal and policy reasons to assume that Congress did not intend DHS to treat receipt of Medicaid by alien children under the age of 21 in the same way as receipt of Medicaid by adult aliens. Congress expressly authorized states to expand Medicaid eligibility for aliens under the age of 21 without a waiting period, and expressly provided that receipt of such Medicaid would not trigger a reimbursement application under an affidavit of

support. Finally, Medicaid also funds the delivery of certain services through the educational system, which DHS intends to exempt. Therefore, DHS believes that it is appropriate to exclude Medicaid for individuals under the age of 21 from the public benefit definition.

In addition, and consistent with the foregoing, DHS has decided to exempt Medicaid received by pregnant aliens during pregnancy and during the 60-day period beginning on the last day of the pregnancy. This exemption aligns the rule with the exclusion of CHIP from consideration, as CHIP also provides coverage to pregnant women and children, and ensures parity under this rule for this population across two Federal benefits (Medicaid and CHIP). It also aligns the rule with the special treatment that Congress afforded children under 21 and pregnant women in under 42 U.S.C. 1396b(v)(4). Again, that authority allows states to extend coverage to pregnant women, and children under the age of 21, without regard to the 5-year limit under PRWORA, and without imposing reimbursement obligations on an alien's sponsor through an affidavit of support (as discussed above). DHS believes that Medicaid received by pregnant aliens, while providing a short-term benefit for the alien herself, in many cases ultimately benefits the U.S. citizen child(ren) who is born to such alien.

DHS appreciates the suggestion to incorporate a two-year "exemption period" for Medicaid. However, DHS will not include a two-year period in the rule. Although DHS agrees that through the health insurance marketplace, an eligible person may be *referred* for Medicaid eligibility, DHS understands that generally the referral must still be approved by the State and accepted by the potential beneficiary.[457] The person has a choice in accepting Medicaid through the health insurance marketplace. In addition, all individuals may voluntarily disenroll from Medicaid at any time.[458] As DHS will only consider Medicaid received after the effective date of the rule, and requires the alien to be likely to receive Medicaid (or other designated public

benefits) above the threshold in order for the alien to be likely to become a public charge, DHS does not believe that a two-year "exemption period" is necessary.

*Comment:* Some commenters said the durational limits on the use of Medicaid did not align with how Medicaid recipients use the program, and said that health insurance should be treated differently than other welfare programs. A commenter stated that the proposed 12-month threshold for Medicaid would produce absurd results when applied to a real-world context. The commenter stated that some treatments and services are intensive and span months, if not years. For example, a Medicaid enrollee with cancer could have a debilitating year-long treatment regimen. The proposed rule would force such an individual into an impossible situation where continued treatment would count against them for immigration purposes. Some commenters said insurance through programs like Medicaid reduces the likelihood that an individual will become bankrupt, and that the proposed rule may cause previously self-sufficient individuals to become reliant on government assistance. One commenter stated that individuals may be enrolled in Medicaid by hospitals without their knowledge if they are in an accident or presented to the ER with a serious health condition. The commenter said that at times, the patients do not even know that they are being enrolled in Medicaid and just think they are being enrolled into a sliding scale program. The commenter stated that looking at past receipt of Medicaid is too complicated and unhelpful in determining if a person may become a public charge, and recommended that if DHS insists on including Medicaid then the period of time should be reduced to a look back of maximum 12 months.

*Response:* DHS disagrees that Medicaid as health insurance should be treated differently. Medicaid has a large federal expenditure impact, similar to other public benefit programs included in the rule.[459] DHS believes the benefit programs considered in the public charge determination are appropriate as they directly relate to self-sufficiency, since they are providing basic necessities of life such as food and nutrition, housing, and healthcare. Because of the nature of the public benefits that would be considered under this rule—which are generally means-tested and provide cash for income maintenance and for basic living needs such as food and nutrition, housing, and

---

[455] Children's Health Insurance Program Reauthorization Act of 2009, Pub. L. 111–3, section 214, 123 Stat. 8, 56 (Feb. 4, 2009) (Permitting States to Ensure Coverage Without a 5-Year Delay of Certain Children and Pregnant Women Under the Medicaid Program and CHIP) (codified as amended at 42 U.S.C. 1396B(v)(4)).

[456] State laws generally provide a maximum age limit for free public education. The limit ranges between 17 (Alabama) and 26 (Texas). As of 2017, 25 states allow for free public education until age 21. Department of Education, National Center for Education Statistics, Table 5.1 Compulsory school attendance laws, minimum and maximum age limits for required free education, by state: 2017 *https://nces.ed.gov/programs/statereform/tab5_1.asp* (last visited July 17, 2019)

[457] *See* Kalman Rupp and Gerald F. Riley, State Medicaid Eligibility and Enrollment Policies and Rates of Medicaid Participation among Disabled Supplemental Security Income Recipients, Social Security Bulletin, Vol. No. 76 No. 3, 2016, available at *https://www.ssa.gov/policy/docs/ssb/v76n3/v76n3p17.html* (last visited June 14, 2019).

[458] *See* CMS, Medicare-Medicaid Plan Enrollment and Disenrollment Guidance (June 14, 2013), available at *https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/Downloads/MMPFinalEnrollGuidance.pdf* (last visited July 26, 2019).

[459] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51160 (proposed Oct. 10, 2018).

**Exhibit A**

healthcare—DHS believes that receipt of such benefits is an important factor to consider, in the totality of the circumstances, when making a public charge determination. This is because a person with limited means to satisfy basic living needs who uses government assistance to fulfill these needs frequently will be dependent on such assistance to such an extent that the person is not self-sufficient. Medicaid, as a government subsidized health-insurance program, provides means to ensure sufficient healthcare. Regarding the concern that individuals may be enrolled in Medicaid without their knowledge when receiving emergency room services, DHS notes that the rule excludes consideration of emergency Medicaid. Additionally, individuals who are enrolled in Medicaid receive documentation informing them of their enrollment and may at any time disenroll from the public benefit.

DHS acknowledges the positive outcomes associated with public benefits programs, but the goals of programs such as Medicaid are different from the objectives of immigration in admission of aliens into the United States. The rule, therefore, abides by the statutory requirement as provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and is consistent with congressional statements relating to self-sufficiency in 8 U.S.C. 1601. As Congress indicated, the immigration policy continues to be that, ''aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations.''[460] Therefore, the public charge inadmissibility ground and this rule serve to ensure that those coming to the United States will be self-sufficient.

*Comment:* One commenter opposed including Medicaid in the definition of public benefit and stated that such inclusion will harm the ability of disabled individuals to access reasonable accommodations. The commenter stated that such inclusion will result in individuals disenrolling from Medicaid and may adversely affect individuals' ability to obtain proof of disability from a doctor that is necessary to secure reasonable accommodations in housing. The commenter noted that such an individual, potentially with the assistance of social service or other organizations serving the individual, would have to find an alternative means

of proving the disability. The commenter stated that costs and delays associated with obtaining such proof ''would lead to fewer tenants being allowed to bring forward the defenses to which they are legally entitled, and would lead to further evictions in the greater Boston area.''

*Response:* DHS recognizes that an individual who disenrolls from Medicaid (or foregoes initial enrollment) as a consequence of this rule may face additional challenges in providing proof of disability for purposes of reasonable accommodation. As noted by the commenter, however, Medicaid is not a precondition to obtaining such proof of disability. An alien who relies on Medicaid for healthcare (including potential documentation of disabilities) for the period of time that meets the requisite threshold (more than 12 months in the aggregate during any 36-month period) may be found to be a public charge, notwithstanding that such outcome may have negative downstream effects for such alien or others.

*Comment:* A couple of commenters said there was no reason to distinguish between private and public health insurance in making a determination about self-sufficiency, and that private insurance for working-class people is often subsidized by the government through such mechanisms as special tax treatment for employer-provided insurance and refundable tax credits for private health insurance plans under the ACA.

*Response:* DHS appreciates the comments but disagrees. Medicaid can impose substantial costs on multiple levels of government and generally indicates a lack of ability to be self-sufficient in satisfying a basic living need, *i.e.,* healthcare. As noted in the NPRM, by at least one measure, this program entails some of the largest overall Federal expenditure for low-income people, by far. Although DHS agrees that government subsidies for private health insurance plans may also be amenable to consideration for public charge purposes, DHS believes it is a reasonable approach to only designate Medicaid at this time.

*Comment:* Several commenters remarked that states have implemented programs, such as Medicaid Buy-In programs, to allow individuals with disabilities to retain the necessary Medicaid coverage while participating in the labor force. A commenter stated that Medicaid is one of many government programs that provide targeted assistance to individuals with disabilities. The commenter provided the example of New York, which

created a Medicaid Buy-In Program for Working People with Disabilities specifically to allow working people with disabilities to earn more income without risk of losing their health insurance. The commenter stated that many people qualify for Medicaid because an injury or disability has made them unable to work. Medicaid often covers services that are unavailable through private insurance, such as medical equipment, long-term care, and certain specialist care services. The commenter stated that the NPRM undermines the goals of these programs by broadly including ''health'' as a factor in the public charge determination and by heavily weighting receipt of health-related benefits as a negative factor in public charge determinations without distinguishing Medicaid recipients with disabilities.

*Response:* DHS appreciates that some people may be eligible for Medicaid based on other eligibility criteria or a higher income threshold, however, such Medicaid programs would also be included within the definition of public benefit for the purposes of the public charge inadmissibility determination. DHS does not intend to undermine the goals of Medicaid or Medicaid Buy-In programs in this rule. However, Congress provided for the mandatory factors, including health.[461] The interpretation of the public charge provision has long included consideration of the alien's receipt of government-funded healthcare programs.[462] Medicaid Buy-In programs are optional state Medicaid programs for workers with disabilities who have earnings in excess of traditional Medicaid rules.[463] These programs are still using the same source of government funding; the main difference is that they contain different eligibility requirements, such as a higher income threshold. Further, DHS, as previously discussed, understands that people may be employed and still receive public benefits and are therefore not self-sufficient. Aliens should be

[460] *See Personal Responsibility and Work Opportunity Reconciliation Act of 1996*, Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601(2)).

[461] *See* INA section 212(a)(4)(B), 8 U.S.C. 1182(a)(4)(B).

[462] *See, e.g., Ex parte Nunez*, 93 F.2d 41 (9th Cir. 1937).

[463] *See* Medicaid.gov, Medicaid Employment Initiatives, available at *https://www.medicaid.gov/medicaid/ltss/employment/index.html* (last visited June 24, 2019). *See also* for example, New York State, Medicaid Buy-in Program for Working People with Disabilities, available at *https://www.health.ny.gov/health_care/medicaid/program/buy_in/index.htm* (last visited June 24, 2019). In order to qualify under the New York State program, a person must have a disability as defined by SSA, be engaged in paid work, and have a gross income that may be as high as about $63,492 for an individuals and $86,575 for a couple, among other requirements.

**Exhibit A**

obtaining private health insurance other than Medicaid in order to establish self-sufficiency.

*Comment:* A commenter indicated that the rule is unclear on the meaning of Medicaid and unclear whether programs that are funded only by the state and provided under the auspices of Medi-Cal would be considered Medicaid for the purposes of a public charge analysis.

Another commenter stated that Medicaid is a Federal-State program; it is funded jointly by the Federal Government and the States, and each state operates its own program within broad Federal guidelines. The commenter indicated that States have numerous options as to the people and benefits they cover and a great deal of flexibility in designing and administering their programs. The commenter stated that consequently, Medicaid eligibility and benefits vary widely from state to state. For example, the commenter stated that Wisconsin is the only non-expansion state to cover childless adults at any income level. The commenter further stated that immigration authorities would have no way of predicting which states individuals would likely live in throughout their lives and therefore would not know which income thresholds would be relevant to consider when making a public charge determination, potentially leading them to assume that most people could end up using Medicaid at some point.

*Response:* Medicaid is a Federal-State partnership under which the Federal Government provides matching funds to states for certain expenditures at varying percentages (depending on the state). The form of Medicaid covered by this rule is any Medicaid program operated under the authority of Title XIX of the Social Security Act Amendments of 1965 (Pub. L. 89–97), for which the state seeks reimbursement from the Federal Government. In other words, any Medicaid benefit for which a state seeks reimbursement from the Federal Government will be considered in the public charge determination regardless of which state administers the program. Medi-Cal is how the State of California delivers Medicaid to its residents.[464] Any Medi-Cal receipt will therefore be considered in the totality of the circumstances in the public charge inadmissibility determination, unless the Medi-Cal is provided to the alien under a state-only authority at no expense to the Federal Government.

Medicaid administered by other states will also be considered in the public charge inadmissibility determination to the same extent as described above, regardless of the name used for Medicaid in such state. A state medical insurance program, funded exclusively by the state, is not included in the definition of public benefit under 8 CFR 212.21(b), and will not be considered as a public benefit in the public charge inadmissibility determination. To the extent that States give the same name to their Federal Medicaid program and the state-only funded health insurance program, aliens will not be required to report the receipt of the state-only funded health insurance. USCIS would assume that any Medicaid identified on the Form I–944 is Federal Medicaid.

*Comment:* A commenter agreed with the exception for school-based services, but said it underscores the need for clarification stating that public benefit programs and services provided to school children by public school systems will not be considered in immigration status determinations for a family member or member of the household. Moreover, the commenter said further clarification is needed that any application, documentation, or verification information collected by a public school for program eligibility, allocation, or qualification purposes would not be requested or subject to disclosure by the local education agencies or the student and their parents or guardians for DHS public charge consideration.

*Response:* DHS reiterates that only the public benefits listed in 8 CFR 212.21(b) are considered public benefits for purposes of the public charge inadmissibility determination. DHS also reiterates that under this rule, Medicaid-funded school-based benefits provided to children who are at or below the oldest age of children eligible for secondary education as determined under State law are not considered public benefits for purposes of the public charge determination, as are Medicaid-funded IDEA programs and Medicaid for children under the age of 21 are not included the are definition of public benefit. Additionally, public benefits received by household members are not considered in an alien's public charge inadmissibility determination.[465] Confidentiality or non-disclosure provisions relating to applications for or receipt of certain public benefits programs are generally

governed by laws relating to the specific public benefits program and are not within the scope of this regulation. Further, as part of the public charge inadmissibility determination, DHS does not intend to request information from schools that was collected by such school for program eligibility, allocation, or qualification purposes. Instead the students, or students' parents or guardians would provide documentation related to any Medicaid or SNAP, or other public benefit, application, documentation, or verification information collected by a public school for program eligibility, allocation, or qualification purposes.

Individuals With Disabilities Education Act

*Comment:* Multiple commenters stated that children with special healthcare needs (disabilities) depend on Medicaid, and that while the proposed rule includes exceptions for services funded by Medicaid but provided through IDEA, no plan has been put forward that would enable this carve-out to work in practice.

Many commenters discussed the positive effects of children being enrolled in Medicaid and the "chilling effect" or disenrollment associated with the proposed rule, and warned that decreased participation in Medicaid would lead to decreased utilization of preventative services, worse health outcomes for families and children, and significant economic costs. Many commenters said the proposed rule's exemption of school-based health services was insufficient given the larger repercussions of the "chilling effect" and the likelihood that many children would be disenrolled. Some commenters indicated that under IDEA, schools serve as a health care provider reimbursed by Medicaid but are not eligible for reimbursement if a family chooses not to enroll their child. A commenter provided data on the funding school districts receive from Medicaid for school-based health services, and the numbers of students who benefit from these programs. The commenters pointed out that this funding is tied to the number of Medicaid-eligible students enrolled. Schools said they already struggle to receive consent for school-based, Medicaid-reimbursable services, and warned that the proposed rule would exacerbate this problem. A commenter expressed concern that, even though medically necessary special education services provided to eligible children at school would be excluded under the rule, the fear of being labelled a public charge would cause some immigrant

---

[464] *Ca.gov*, Medi-Cal, available at *https://www.dhcs.ca.gov/services/Medi-cal/pages/default.aspx* (last visited Mar. 29, 2019).

[465] If a household member is obtaining public benefits, however, that amount will not be counted toward the household's annual gross income determinations. *See* 8 CFR 212.22(b)(4)(ii)(A).

**Exhibit A**

parents to refrain from securing these services for children. A few commenters were concerned that the proposed rule would worsen health outcomes, increase food insecurity, and reduce educational attainment.

A commenter supported the exclusion of benefits under IDEA, but stated that it remained concerned about these services being used against parents who refuse to sign a specific consent form. Multiple commenters stated that children with special healthcare needs, including children with disabilities, depend on Medicaid. These commenters indicated that children with special needs cannot and do not receive Medicaid for educational services alone and the exclusion of Medicaid-funded IDEA services will likely do little to encourage families who are fearful of participating in Medicaid to maintain their enrollment. A commenter stated that IDEA funding is often insufficient and requires states to rely on Medicaid to fill funding gaps. The commenter added that if schools lost Medicaid funding, it could result in special education and even general education services being withheld and the loss of school nurses, whose salaries are subsidized by Medicaid. (Special education assistance programs, such as the New Jersey Special Education Medicaid Initiative addressed by one of the commenters, are school-based Medicaid reimbursement programs that allow school districts to obtain federal reimbursement of actual costs of Medicaid covered services under the IDEA).[466] One commenter who generally supported the rule stated opposition to the Medicaid exclusion under IDEA and recommended that all disabilities should be individually assessed.

*Response:* DHS recognizes the public benefits listed in the rule may be associated with other programs and that eligibility for other programs or reimbursements to organizations may be dependent or automatically provided based on the receipt of one of the enumerated public benefits. DHS also understands that it is possible that a parent would not be aware of which services in an Individualized Education Plan or any other education plan set up by a school for a child with disabilities are reimbursed by Medicaid or a different funding source. Parents may not receive notification that Medicaid was billed for services provided at school. In addition, DHS recognizes that Medicaid's assistance programs go beyond mere special education assistance under IDEA for Medicaid

covered benefits and that school-based programs also include services such as dental and vision services, (for example under the Early Periodic Screening Diagnostic and Treatment (EPSDT)) benefit or other preventative services.[467] DHS believes that by excluding any Medicaid received by an alien under the age of 21 (as well as any and all CHIP benefits), and retaining the exemptions for (1) services or benefits funded by Medicaid but provided under the IDEA and for (2) school-based benefits provided to children who are at or below the oldest age of children eligible for secondary education, DHS has effectively addressed many of the objections that commenters raised related to the potential indirect effects of this rule on school funding. With these changes, DHS believes that it has created a workable framework for purposes of the public charge assessment and the benefits these programs provide for school-age children.

*Comment:* A commenter stated that DHS's reasoning for excluding a program like IDEA should apply to the other benefits DHS proposes adding to the public charge determination. For example, according to the commenter, the proposed rule stated or implied that DHS proposed to exclude IDEA to avoid discriminating against people with disabilities. The commenter stated that DHS should consider other ways the proposed rule discriminates against vulnerable populations. Some commenters specifically requested that public benefits received by individuals with disabilities be excluded or that DHS exclude Medicaid and SNAP. Several commenters reasoned that individuals with disabilities rely on non-cash benefits disproportionately, often due to their disability, in order to continue working, stay healthy, and remain independent and productive members of the community.

*Response:* As indicated in the NPRM, DHS excluded services provided under IDEA that are partially funded in whole or in part by Medicaid to ensure that schools continue to receive financial resources to cover the cost of special education and related services which they would be legally required to provide at no cost regardless of the outcomes of the rulemaking.[468] But DHS also recognizes that Congress did not exclude applicants with disabilities or other medical conditions in the public

charge inadmissibility statute.[469] DHS considers any disability or other medical condition in the public charge inadmissibility determination to the extent the alien's health makes the alien more likely than not to become a public charge at any time in the future. USCIS' consideration of health-related issues will be largely limited to those conditions that are identified on the Form I–693 and affect an applicant's ability to work, attend school, or otherwise care for himself or herself. As noted in the proposed rule, after assessing Federal statutes and regulations protecting individuals with disabilities from discrimination, DHS believes that this rule's treatment of disability in the public charge context is not inconsistent with such statutes and regulations.[470]

*Comment:* A commenter stated that many of its members are childcare providers and child-care center teachers who raised questions about whether or not certain child-specific services through Medicaid and CHIP would be excluded. The commenter stated that children received essential services through these programs, including the EPSDT benefit, which is a federally mandated benefit, and ensures coverage for developmental assessments for infants and young children with the routine and preventive care services they need to grow into healthy adults.

*Response:* The EPSDT benefit is not a separately funded Medicaid program, but an integral part of the Medicaid benefit for children, as described in section 1905(r) of the Social Security Act. As EPSDT is a Medicaid program, and DHS determined that any services provided to aliens under the age of 21 based on Medicaid and CHIP will not be considered as part of the public charge determination, any benefits under EPSDT would also not be considered in the public charge inadmissibility determination.

Emergency Services Exclusion

*Comment:* A commenter opposed the exclusion of emergency services, stating that the failure to provide financially for the receipt of emergency services was a strong indicator of a lack of self-reliance. Another commenter stated that emergency Medicaid's applicability to births creates an immigration incentive by advertising a service, which will ultimately assist aliens' immigration process (by providing them with a new U.S. citizen as a family member). The commenter further stated that DHS

---

[466] *See* 20 U.S.C. 1400 *et seq.*

[467] Medicaid payments for necessary health services are covered under section 1905R of the Social Security Act, 42 U.S.C. part 441, Subpart B.

[468] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51170 (proposed Oct. 10, 2018). These services are typically not income-based.

[469] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[470] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51184 (proposed Oct. 10, 2018).

**Exhibit A**

**41384** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

misconstrued 8 U.S.C. 1611(b), and did not consistently recognize the distinction in legislative intent to provide benefits to aliens that may nevertheless be considered as negative factors in a public charge determination. In contrast, some commenters supported the exclusion of emergency Medicaid. Some commenters indicated that immigrants would still be reluctant to access emergency services because many will not be aware that emergency services are excluded, or may not know if someone in their household was experiencing a true medical emergency.

*Response:* DHS appreciates and understands the commenters' concerns. However, DHS will exclude emergency Medicaid benefits in the rule, consistent with the policy underlying the PRWORA exclusion for care and services that are necessary for the treatment of an emergency medical condition. In 8 U.S.C. 1611(b), Congress specifically excluded this category of benefit from the definition of public benefits and as a result from allows non-qualified aliens to receive such emergency public benefits. DHS did not propose to designate any public benefits that are not defined as public benefits in PRWORA, because those exclusions may reflect a congressional judgment regarding the importance of ensuring that those benefits remain available to otherwise eligible aliens. DHS prefers to avoid any appearance of interfering with aliens' willingness or ability to access such public benefits. Accordingly, DHS excludes receipt of Medicaid under these provisions if the State determines that the relevant treatment falls under "emergency medical conditions." [471]

*Comment:* A commenter stated that hospitals are compelled to provide emergency services due to their mission and laws like the Emergency Medical Treatment and Active Labor Act (EMTALA), but those services will go uncompensated if patients are disenrolled from Medicaid due to the chilling effect. A commenter stated that the emergency services exemption would not be uniformly applied across states, resulting in hospitals bearing the unpaid costs of medical care. One commenter said different states will make different determinations about what constitutes an emergency, and this uncertainty will cause individuals with chronic, involuntary medical conditions to be denied admission or avoid treatment out of fear.

*Response:* DHS understands that the states determine whether a medical condition would be determined to be an emergency for purposes of Medicaid and that determination may be inconsistent throughout states. However, DHS does not have the authority to determine whether a medical condition is an emergency or whether a state must provide Medicaid for a particular medical condition. Congress enacted the EMTALA to ensure public access to emergency services regardless of ability to pay.[472] Medicare-participating hospitals that offer emergency services must provide a medical screening examination and provide stabilizing treatment regardless of an individual's ability to pay.[473] DHS acknowledges that increased use of emergency rooms and emergent care as a method of primary healthcare due to delayed treatment is possible and there is a potential for increases in uncompensated care in which a treatment or service is not paid for by an insurer or patient. However, DHS does not have specific estimates on the increase cost for such services.

Vaccinations

*Comment:* Commenters indicated that the public charge rule would make immigrant families afraid to seek health-care, including vaccinations against communicable diseases, and therefore, endanger the U.S. population. The commenters stated that mass disenrollment from Medicaid would greatly restrict access to vaccines, which would result in adverse effects for the immigrant and general population, and would harm the public and the national security of the United States. For example, a commenter stated that in the event of a novel influenza outbreak, a critical first step would be to get individuals access to healthcare, which requires trust in governmental public health authorities. The commenter indicated that engaging with the public health system was critical to ensuring robust immunization to protect the population overall; if a subset of the community were fearful to access government healthcare services, regardless of whether a specific type of service qualified for a narrow exception, it would have a significant impact on the country's ability to protect and promote the public health. Another commenter indicated that its health department anticipated that promulgation of the rule, as written in the NPRM, will result in decreased utilization of children's healthcare, including vaccinations, which will increase the risk for vaccine preventable diseases. According to the commenter, these effects will pose an immediate risk to the health of individual immigrants and is also likely result in increased transmission of tuberculosis or other infectious diseases, increasing the likelihood of an outbreak.

Some commenters stated that since many immigrants live in communities alongside people of the same national origin, reduced vaccinations could result in unvaccinated or under-vaccinated clusters of individuals. Commenters warned that research shows that uninsured individuals are much less likely to be vaccinated. One commenter stated that a recent study found that even a five percent reduction in vaccine coverage could trigger a significant measles outbreak. A commenter stated that many immigrant families were already cancelling appointments for flu vaccinations, and referred to a Centers for Disease Control and Prevention (CDC) estimate of the number of flu-related deaths in 2018 to underscore the severity of this issue. A commenter indicated that the proposal will cause worse health outcomes, increased use of emergency departments, and increases in communicable diseases due to less vaccination. Another commenter stated that the rule would increase the incidence of childhood diseases like chickenpox, measles, mumps and rubella and deter parents from vaccinating their children.

*Response:* With this rulemaking, DHS does not intend to restrict the access of vaccines for children or adults or intend to discourage individuals from obtaining the necessary vaccines to prevent vaccine-preventable diseases. The purpose of this rulemaking is to ensure that those seeking admission to the United States are self-sufficient and rely on themselves or family and friends for support instead of relying on the government for subsistence. As noted above, this final rule does not consider receipt of Medicaid by a child under age 21, or during a person's pregnancy, to constitute receipt of public benefits. This should address a substantial portion, though not all, of the vaccinations issue.

Vaccinations obtained through public benefits programs are not considered public benefits under 8 CFR 212.21(b), although if an alien enrolls in Medicaid for the purpose of obtaining vaccines, the Medicaid itself qualifies as a public

---

[471] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51169 (proposed Oct. 10, 2018).

[472] *See CMS.gov,* Emergency Medical Treatment & Labor Act (EMTALA), available at *https://www.cms.gov/Regulations-and-Guidance/Legislation/EMTALA/index.html* (last visited May 31, 2019).

[473] *See CMS.gov,* Emergency Medical Treatment & Labor Act (EMTALA), available at *https://www.cms.gov/Regulations-and-Guidance/Legislation/EMTALA/index.html* (last visited May 31, 2019).

**Exhibit A**

**Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations **41385**

benefit. DHS also notes that free or low cost vaccines are available to children who are not insured or underinsured through the Vaccines for Children (VFC) Program.[474] In addition, local health centers and state health departments provide preventive services that include vaccines that may be offered on a sliding scale fee based on income.[475] Therefore, DHS believes that vaccines would still be available for children and adults even if they disenroll from Medicaid.

Substance Abuse

*Comment:* Several commenters stated that the proposed rule would also discourage people from utilizing substance abuse disorder treatment services for which Medicaid is the largest insurer.

*Response:* DHS does not intend to discourage people from utilizing substance abuse disorder treatment services. DHS acknowledges however that, once this rule is effective, individuals may choose to disenroll from public benefits or not seek to receive such public benefits. DHS would like to note that local health centers and state health departments may provide certain health services addressing substance abuse and mental disorders.[476] Additionally, state-funded rehabilitation centers may offer affordable options, even if an individual disenrolls from Medicaid.[477] Benefits from local and state health departments or state-funded rehabilitation centers are generally not considered public benefits under this rule, unless they are obtained through Medicaid. Therefore, DHS believes that substance abuse disorder treatment will continue to be available to individuals even if they disenroll from Medicaid.

i. Medicare, Medicare Part D Low Income Subsidy

*Comment:* Commenters opposed DHS's proposal to include the Medicare Part D Low Income Subsidy (Medicare Part D LIS) in the definition of public

benefit. Commenters stated that inclusion of the Medicare Part D LIS may result in greater poverty and sickness, lack of access for seniors to prescription drugs, health services, worse health outcomes for Medicare enrollees and higher costs for Medicare non-drug spending. Commenters stated that Medicare Part D LIS helps seniors with chronic conditions, including breast cancer. Commenters also stated the rule, by including Medicare Part D LIS, targets disabled people, who use the program at higher rates than the general population. Commenters stated that the rule would force "millions" of seniors to disenroll from Medicare Part D, making it harder to afford necessary prescriptions. A commenter indicated that low- and moderate-income seniors who have been paying into Social Security like all other taxpayers would not be able access Medicare Part D subsidies. Commenters stated that prescription medication is very expensive and seniors who cannot afford having their prescriptions filled will end up in emergency rooms which will only cost their communities even more.

A commenter indicated that the Medicare Part D LIS program has higher financial eligibility thresholds than cash welfare programs and is available to more than the indigent, making it a bad indicator of dependence on the government. Citing a Kaiser Family Foundation report,[478] the commenter stated that individuals with income up to 150 percent of the FPL, and countable assets of $14,100 for an individual or $28,150 for a couple, qualify for Medicare Part D LIS in 2018. The commenter further stated that the scope of Medicare Part D LIS is limited to assistance in the cost of drugs which does not indicate dependence on government subsistence.

Commenters indicated that most non-citizen Medicare enrollees are lawful permanent residents, but that individuals who are "lawfully present" (*e.g.,* immigrants with TPS) and have a ten-year work history or have end-stage renal disease (ESRD) may also be eligible. A commenter indicated that individuals over the age of 65 and young individuals with disabilities who meet the income and employment guidelines are eligible for Medicare Part D LIS. A commenter stated that it is difficult to see any purpose to a rule that would deny admission to long term

elderly residents who have worked and paid taxes for 10 or more years for using a benefit as modest as the Medicare Part D LIS.

A commenter stated that the effect of the proposed rule may to increase the costs, which according to the commenter was not considered in the NPRM, paid for under Medicare Part A and B or C because the increased medication use and adherence achieved through expanded drug coverage for seniors have been associated with decreased spending for nondrug medical care and reduced hospitalization rates among Medicare enrollees. The commenter stated that the rule would adversely affect Massachusetts where 74 percent of Medicare enrollees in Massachusetts were enrolled in Part D plans, and 35 percent of Medicare Part D recipients also receive the LIS.

Several commenters stated that immigrants contribute more into the Medicare system than they take out of it, and pay more out of pocket for care than citizens, thus subsidizing the system. Commenters stated that the Medicare Part D LIS may be more heavily supported by general revenues, but funding for the entire Medicare Part D program comes mostly from general revenues, with premiums covering about one-quarter of all costs. The commenter provided data intended to show that for 2019, Medicare's actuaries estimate that Medicare Part D plans will receive direct subsidy payments averaging $296 per enrollee overall and $2,337 for enrollees receiving the LIS; employers are expected to receive, on average, $553 for retirees in employer-subsidy plans. The commenter stated that the average Medicare Part D LIS beneficiary is receiving added government assisted benefits of only $1,784 per year compared to retirees in employer plans, which would be less than the 15 percent of FPG threshold that would have applied under the proposed rule had the Medicare Part D LIS been considered a "monetized" benefit. Commenters stated that almost one in three Medicare beneficiaries enrolled in Medicare Part D prescription drug coverage get "extra help" with their premiums, out-of-pocket prescription costs, copays or percentage of the drug's costs through LIS. The commenter further stated that one in five people with Medicare (11.7 million) rely on Medicaid to afford their monthly Medicare Part B premiums or cost-sharing. Nearly 12 million older adults and people with disabilities are enrolled in both Medicare and Medicaid. A commenter stated that "Extra Help" is estimated to be worth approximately

---

[474] *See* CDC, Vaccines For Children (VFC), available at *https://www.cdc.gov/vaccines/programs/vfc/index.html* (last visited May 15, 2019). *See also* CDC, VFC Detailed Questions and Answers for Parents, available at *https://www.cdc.gov/vaccines/programs/vfc/parents/qa-detailed.html#eligibility* (last visited May 15, 2019).

[475] *See* HHS, vaccines.gov, How to Pay, available at *https://www.vaccines.gov/getting/pay* (last visited May 15, 2019).

[476] *See* Substance Abuse and Mental Health Services Administration (SAMHSA) *https://www.samhsa.gov/find-treatment* (last visited July 22, 2019).

[477] *See* SAMHSA, Directory of Single State Agencies for Substance Abuse Services (Dec. 16, 2016), *https://www.samhsa.gov/sites/default/files/ssadirectory.pdf* (last visited June 4, 2019).

[478] *See* Kaiser Family Foundation, Medicare Part D: An Overview of the Medicare Part D Prescription Drug Benefit (Oct. 12, 2018), *https://www.kff.org/medicare/fact-sheet/an-overview-of-the-medicare-part-d-prescription-drug-benefit/* (last visited July 26, 2019).

**Exhibit A**

$4,000 per year per individual which is a substantial support for medications that are often necessary to prevent disease or manage a chronic illness. The commenter stated that to forego needed medications due to cost will not only be a harm to an elderly person or someone living with a permanent disability, but to our overall healthcare system that will be burdened with more costly hospital-based and emergency care.

However, another commenter agreed with DHS's assertion that utilization of Medicare Part D LIS was an indicator of a lack of ability to remain self-sufficient in covering medical costs.

*Response:* DHS appreciates the comments and recognizes the importance of Medicare and the Medicare Part D LIS, as well as the heightened eligibility threshold for those programs. Someone who is not entitled to Medicare Part A and/or Part B is not eligible for Medicare Part D or the LIS.[479] In general, to be eligible for premium-free Medicare Part A, a person must be age 65 or older and worked (or the spouse worked) and paid Medicare taxes for at least 10 years.[480] A person must be a U.S. resident and either a citizen or an alien lawfully admitted for lawful permanent residence who has resided in the United States continuously for the five-year period immediately preceding the month the application is filed in order to qualify for Medicare Part B and, therefore, the associated Medicare Part D. An individual who is not a United States citizen or is not lawfully present in the United States is not eligible for Medicare Part D and may not enroll in a Medicare Part D plan.[481]

In addition, the Medicare Part D LIS lowers the premium and cost-sharing amounts owed by Medicare Part D plan enrollees; as such, individuals not enrolled in a Medicare Part D plan are not able to access the benefits of the subsidy. While included in the NPRM because of the large Federal expenditure,[482] Medicare Part D prescription drug coverage only provides medical prescription coverage, and not health insurance as a whole. Since 2006, it has been available to all Medicare recipients regardless of income, health status, or prescription drug usage.[483] DHS agrees with the commenters and removed Medicare Part D subsidies from consideration in the public charge inadmissibility determination. DHS also notes that it has not designated any other aspect of Medicare for consideration in the public charge inadmissibility determination. However, any receive of Medicaid as a subsidy for Medicare would be considered receipt of a public benefit in the public charge inadmissibility determination.

*Comment:* A commenter stated that in order to mitigate the negative public health consequences associated with deterring use of public health insurance benefits, Medicaid and Medicare Part D LIS should comprise a separate set of programs that may only be given "minimal negative weight" in the totality of the circumstances, whether they are currently received at the time of application or were received at some point in the 36 months prior to application and for whatever factor in the totality of circumstances their receipt is being considered. The commenter stated that this would mean that a person could not be determined to be a public charge when receiving or having received those benefits in the 36 months prior to applying without also having a heavily weighted negative factor present in his or her case. The commenter stated that with this modification in place, noncitizens applying for visas, lawful permanent resident status, or other status could expect to financially "rehabilitate" themselves without fear that receipt of public benefits in the remote past might weigh negatively against them. Additionally, the commenter indicated that with this change, the rule would effectively make receiving public health insurance benefits the "lightest" negative factor to be considered and provide noncitizens with assurance that seeking coverage will have only a small impact on their admissibility which would mitigate the deterrent effect of considering receipt of these benefits.

*Response:* As provided in the previous response, DHS is not including Medicare Part D LIS in the definition of public benefit and therefore, there is no need to address the weight given to Medicare Part D LIS. With respect to Medicaid, DHS refers the commenter to the specific discussion above regarding the basis for considering Medicaid receipt. If an alien reports past Medicaid receipt as part of an adjustment of status application, the alien can also show that the alien is no longer receiving Medicaid and explain why the alien's past receipt of Medicaid does not make it more likely than not that the alien will receive any public benefit in the future.

j. Additional Considerations

Exhaustive List

*Comment:* An individual commenter stated that the agency should emphasize, in light of future congressional action, that the list outlined in the proposed rule is not exhaustive and any definition of public benefit would be best left to agency discretion, or be defined in a separate rule. A commenter stated that the list in the rule is hardly exhaustive when it comes to potential programs. The commenter stated that by one count, there are a total of 89 separate means-tested welfare programs spread across 14 departments and agencies, paid for by the Federal Government. The commenter provided examples including that more than $30 billion is spent annually by the Federal Government on Refundable Premium Assistance and cost-sharing tax credits to assist low-income people with buying health insurance and named other public benefits. The commenter stated that States also spend some $6 billion annually on their own as part of their Medicaid General Assistance programs and another $34 billion on other programs to help low-income people receive care, particularly at hospitals. The commenter stated that the vast number of overlapping and linked welfare programs means that recipients seldom use just one program.

In contrast, a commenter stated that the inclusion of a "catch-all" provision could leave the rule open to constitutional challenges. Additionally, other commenters stated that DHS should not allow public benefits that are not explicitly enumerated in the rule to be weighted negatively in the totality of the circumstances review. Commenters opposed to a "catch-all" provision suggested that its inclusion would remove the certainty an exhaustive list provides and would introduce a great potential for confusion as well as call into question whether the members of the regulated public have had sufficient notice that a certain benefit may be considered negatively in a public charge determination analysis, thus triggering due process concerns. Several commenters said they opposed the future inclusion of any "unenumerated

---

[479] The Centers For Medicare And Medicaid Services, Guidance To States On The Low-Income Subsidy (February 2009), available at *https://www.cms.gov/Medicare/Eligibility-and-Enrollment/LowIncSubMedicarePresCov/Downloads/StateLISGuidance021009.pdf* (last visited July 26, 2019).

[480] *See* HHS, Who is eligible for Medicare?, available at *https://www.hhs.gov/answers/medicare-and-medicaid/who-is-elibible-for-medicare/index.html#main-content* (last visited June 25, 2019).

[481] *See* 42 CFR 423.30.

[482] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51172 (proposed Oct. 10, 2018).

[483] *See* Medicare.gov, How to get drug coverage, available at *https://www.medicare.gov/drug-coverage-part-d/how-to-get-drug-coverage* (last visited June 14, 2019).

**Exhibit A**

benefits'' into the scope of the proposed rule since the proposed rule already improperly considers non-cash benefits and because the addition of any more programs would increase harm to individuals, families, and communities. A commenter stated that DHS's request for public comment to expand the list of other benefits in the totality of circumstances was a "catch-all provision" that would allow the agency to consider all benefits an alien receives, regardless of whether they are listed in the regulation or not. Other commenters wrote that it is highly likely that individuals using the benefits outlined in the proposed rule are also using additional benefits not included in the rule.

*Response:* For clarity and consistency, DHS has specifically listed the public benefits that will be considered. The list of designated benefits is exhaustive, avoiding the Constitutional concerns raised by the commenters that may arguably come with a non-exhaustive list. Indicating that the list is non-exhaustive would add vagueness and confusion as to what public benefits would be considered. This does not preclude DHS from updating the list of benefits through future regulatory action. DHS believes that the rule is adequately protective as drafted.

Additional Programs

*Comment:* Many commenters opposed the inclusion of any additional programs in the rule. Commenters stated that the inclusion of additional programs would lead to further negative health impacts on families and children.

*Response:* DHS appreciates the comments. DHS has not designated additional public benefits for consideration under this final rule.

*Comment:* A commenter asked that public benefits provided by State and local governments to non-qualified aliens under authority of PRWORA be specifically included in the codified list. The commenter said these benefits are provided from "appropriated funds" and with few exceptions are accessed on an individualized basis using means-tested criteria. A commenter said its state had created a program called Alien Emergency Medical Program, which was designed to offer coverage to newly arrived immigrants, or those who had resided in-state for less than five years. The commenter said the proposed rule would target those who qualify for the program.

*Response:* A state medical insurance program that is not included in the rule's definition of public benefit will not be considered as a public benefit in the public charge inadmissibility

determination. DHS understands that the Washington State Alien Emergency Medical Program [484] is separate from Medicaid and is funded by Washington State, and is not a program listed in the public benefit definition in the rule. Further, emergency Medicaid is also not considered a public benefit for purposes of the public charge inadmissibility determination. Therefore, the Washington State Alien Emergency Medical Program would not be considered a public benefit for purposes of the public charge inadmissibility determination.

Dependents

*Comment:* A commenter indicated the new regulations should include welfare use by dependents. The commenter indicated that the very idea of self-sufficiency means that people can provide for themselves and their children and spouses without assistance from taxpayers. The commenter indicated that excluding the children's benefits including Medicaid, WIC, and free school lunch, from not being considered for public charge is like having an income tax that excludes all income from second jobs, investments, and rental properties. The commenter analyzed the 2014 public-use SIPP data and indicated that in 39 percent of immigrant-headed households (legal and illegal) receiving TANF, only the children receive the payments. The commenter indicated that much of the immigrant welfare use of this program would be missed if dependents are not considered. Another commenter stated that any receipt of means-tested anti-poverty benefits by immigrants or their dependents should count toward the public charge determination. Other commenters stated that DHS should never attribute to an alien applicant the receipt of benefits by the alien's dependents, including U.S. citizen children. The commenters stated that considering receipt of benefits by an alien's U.S. citizen children could give rise to constitutional issues.

*Response:* DHS appreciates the comments. DHS believes that the rule addresses self-sufficiency adequately without introducing consideration of a third party's receipt of public benefits, potentially to include U.S. citizen third parties such as non-custodial children. In consideration of these issues, as well as the many comments regarding the potential effects of the rule on U.S. citizen children, DHS respectfully

declines to expand the rule in this manner. DHS notes that although an inadmissibility determination is made for each person individually, the alien's income is reviewed in terms of the household, and the alien's family status is considered as well, as the statute requires. The ultimate question under this rule, however, is whether the alien (rather than his or her dependents) is likely to receive public benefits in the future above the applicable threshold.

Tax Credits

*Comment:* Some commenters stated that non-citizens should be unable to benefit from the EITC or the Additional Child Tax Credit (ACTC). Similarly, a few commenters said the exclusion of the refundable tax credits is problematic since the refundable portion of EITC and ACTC cost over $80 billion combined in 2016. The commenters asserted that these tax credits meet the definition of a means-tested anti-poverty benefit.

In contrast, another commenter stated that the receipt of EITC and Child Tax Credit (CTC) credits, which are funded through TANF and are actually employment incentives, should be explicitly exempted from the rule in order to eliminate possible misconceptions and prevent immigrants from failing to file their income tax returns out of fear of being disqualified from future citizenship. Another commenter said inclusion of EITC would punish hardworking immigrants.

*Response:* DHS appreciates the comments regarding the EITC, ACTC, and CTC. Only public benefits as defined in 8 CFR 212.21(b) will be considered in the public charge inadmissibility determination. Although EITC and ACTC benefits provide what may be considered cash assistance, DHS did not propose to include EITC or ACTC as public benefits in the public charge inadmissibility determination. DHS is not including tax credits because many people with moderate incomes and high incomes are eligible for these tax credits, and the tax system is structured in such a way as to encourage taxpayers to claim and maximize all tax credits for which they are eligible. In addition, DHS is unable to determine how much of the taxpayer's refund is attributable to any one tax credit, as compared to other aspects of the tax return (such as non-designated credits or deductions) or to any one person, as opposed to a spouse filing jointly. Finally, these tax credits may be combined with other tax credits between spouses. One spouse may be a U.S. citizen and the tax return may be filed jointly. Therefore, DHS would not

---

[484] *See* Washington State Department of Social and Health Services, Alien Emergency Medical Program, available at *https://www.dshs.wa.gov/esa/community-services-offices/alien-emergency-medical-programs* (last visited July 22, 2019).

**Exhibit A**

be able to determine whether the alien or the U.S. citizen received the tax credit. DHS has revised the regulatory text to make clear that "cash assistance for income maintenance" does not include any tax credit programs.

*Comment:* One commenter stated that DHS should exempt up to two years of the ACA premium subsidy, also known as the Premium Tax Credit (PTC), usage when the individual has shown past ability and earning potential. In addition, the commenter indicated that the ACA premium subsidies are applied based on income levels without the individual choosing to apply for the subsidies. Another commenter suggested that DHS should not consider PTC for purchasing individual market coverage in a public charge determination at all. One commenter stated that, in addition to continuing to exclude exchange programs such as ACTC under the ACA [485] from public charge consideration, DHS should clarify the interaction between applications for exchange programs and other potentially impacted benefits. The commenter explained that marketplaces are required by law to feature a uniform application process for Medicaid and non-Medicaid health programs and stated that this could cause confusion because an individual attempting to apply for exchange insurance and programs could inadvertently be seen as a "Medicaid applicant."

In contrast, some commenters suggested that DHS should reconsider whether immigrants wishing to reside in the United States will have the ability to support themselves, and any subsequently born children, without using benefits like subsidies under the ACA. Another commenter indicated that serious consideration should be given to adding subsidies that underwrite more than 50 percent of premium costs to the list in 8 CFR 212.21(b). The commenter stated that these benefits are provided from appropriated funds and, with few exceptions, are accessed on an individualized basis using means-tested criteria.

*Response:* DHS has decided not to consider ACA subsidies or health insurance received through the health insurance marketplace outside of Medicaid as public benefits in the public charge inadmissibility determination, due to the complexity of assessing the value of the benefit and the higher income eligibility thresholds associated with the benefit, as compared to the eligibility thresholds for other

benefits. As discussed in section III.R of this preamble, DHS has added a heavily weighted positive factor for private health insurance appropriate to the expected period of admission. This heavily weighted positive factor would not apply in the case of a plan for which the alien receives subsidies in the form of premium tax credits.

## Special Supplemental Nutrition Program for Women, Infants, and Children

*Comment:* Many comments opposed the potential inclusion of WIC, stating that consideration of benefits such as WIC would have a negative impact on the health and nutrition of families and individuals. Some commenters indicated that families and individuals should not have to choose between benefits such as WIC and an immigration status. Other commenters stated that programs like WIC help provide essential nutrition to children, pregnant women, and mothers, and result in improved health outcomes. Commenters provided anecdotes about how they or their family members' access to WIC helped them or their children thrive and become productive members of American society. Several commenters provided rationale, research, or data relating to important public health goals and the benefits of WIC enrollment, including the reduction or prevention of preterm birth and infant mortality, iron deficiency anemia, malnourishment, as well as increases in breastfeeding rates and hemoglobin levels of enrolled children. Other commenters provided that the WIC food package with its nutritional value increased public health, specifically for Hispanics who have lived in the United States for less than five years. Sourcing research articles and studies, some commenters described that WIC's 2009 food package changes lead to a modest decline in severe childhood obesity among young children, and that children who received SNAP or Medicaid were more likely to finish high school and grow up to be successful adults.

A commenter stated that the reduction in programs like WIC will end up costing taxpayers much more than they might save in the short term, as healthcare costs will increase. Commenters stated that a decrease in WIC participation will have short and long-term economic implications. The commenters stated that for every dollar spent on WIC there is an associated savings in Medicaid costs during the first 60 days after birth from $1.77 to $3.13 for newborns and mothers, and $2.84 to $3.90 for newborns alone.

Additionally, the commenters provided further examples of Medicaid cost-savings associated with WIC.

Another commenter cited to data and stated that 74.9 percent of WIC participants are adjunctively eligible for SNAP and Medicaid, thereby reducing initial certification requirements and paperwork. Commenters added that the decreased participation in Medicaid or SNAP among WIC families would have a significant impact on WIC's certification process because income certification through adjunctive eligibility was more efficient than income screening involving pay stubs and other financial documents. The commenters, citing data and multiple studies, provided a state's estimate that income screening with financial documents costs $12.50 per participant, whereas the income screening with adjunctive eligibility is $3.75 per participant. The commenters stated that the increased costs would place a strain on WIC's state budgets, which would undercut WIC's efforts to improve efficiency, streamline certification processes, and focus WIC services on its core public health mission.

Other commenters said Congress has never sought to inhibit WIC's ability to serve immigrant populations due to the overriding public interest in promoting access to health services and nutrition assistance. A commenter noted that participating clients can only spend a maximum of five years on this program and receive limited benefits (only supplemental foods) not qualifying them a public charge. Some commenters said the rule would impact their ability to serve eligible WIC participants.

In contrast, some commenters suggested that USCIS reconsider whether immigrants wishing to reside in the United States will have the ability to support themselves, and any subsequently born children, without using benefits like WIC. The commenter said these benefits are provided from "appropriated funds" and with few exceptions are accessed on an individualized basis using means-tested criteria.

*Response:* WIC was not included in the public benefits designated for consideration in public charge inadmissibility determinations. Only public benefits as defined in 8 CFR 212.21(b) will be considered in a public charge inadmissibility determination. DHS understands that aliens subject to the public charge inadmissibility ground may choose to disenroll from public benefits, even if the benefit is not listed in 8 CFR 212.21(b). However, this rule does not, and cannot, preclude individuals from requesting or receiving

---

[485] Patient Protection and Affordable Care Act, Public Law 111–148, Section 1401(a), 124 Stat. 119, 213 (2010) (codified at 26 U.S.C. 36B).

**Exhibit A**

any public benefits for which they qualify. As discussed in the NPRM, benefits directed toward food and nutrition, housing, and healthcare are directly relevant to public charge inadmissibility determinations, because a person who needs the public's assistance to provide for these basic necessities is not self-sufficient.[486] WIC [487] provides federal grants to States for supplemental foods, healthcare referrals, and nutrition education for low-income pregnant, breastfeeding, and non-breastfeeding postpartum women, and to infants and children up to age five who are found to be at nutritional risk.[488] But overall expenditures for WIC are low, and WIC is authorized under the Child Nutrition Act of 1966,[489] which is excluded under the limitations for qualified aliens from federal means-tested public benefits. Therefore, DHS believes WIC is appropriately excluded.

Additionally, as discussed later in DHS's responses to comments related to the economic analysis and in the economic analysis itself, DHS agrees that some entities, such as State and local governments or other businesses and organizations would incur costs related to the changes commenters identify. However, these costs are considered to be indirect costs of the rule since this rule does not directly regulate these entities and does not require them to make changes to their business processes or programs. Therefore, DHS considers these indirect costs as qualitative, unquantified effects of the final rule since it is unclear how many entities will choose to make administrative changes to their business processes and the cost of making such changes. DHS agrees that there could be WIC applicants who are not adjunctively eligible due to disenrollment from Medicaid or SNAP although an individual who is a member

of a family in which a pregnant woman or infant is certified as eligible to receive Medicaid may be deemed adjunctively eligible for WIC. DHS notes that households receiving WIC would be adjunctively eligible only through noncitizen participation in SNAP or Medicaid for those age 21 and over (or receiving Medicaid while pregnant) which would only apply to a very small percentage of households receiving WIC. Any costs associated with changes in adjunctive eligibility would be a consequence of DHS's decision to designate SNAP, which DHS has explained earlier in this preamble.

School Breakfast/Lunch Programs

*Comment:* A few commenters recommended that DHS include the National School Lunch Program (NSLP) and School Breakfast Program (SBP) for purposes of a public charge determination. The commenters stated that receiving public benefits indicates a person is not self-sufficient. Some commenters suggested that USCIS reconsider whether immigrants wishing to reside in the United States will have the ability to support themselves, and any subsequently born children, without using benefits from the NSLP. The commenter said these benefits are provided from ''appropriated funds'' and with few exceptions are accessed on an individualized basis using means-tested criteria. A commenter stated that in their local school district, hundreds of families had not reapplied for free/reduced meal program, which resulted in tens of thousands of dollars in lost revenue to its food service program, a negative impact to the farming community, and children who are hungry at school who cannot perform well. The commenter indicated that families were fearful of government assistance and the risk of being separated from their families or deported. A commenter stated that Federal nutrition assistance programs play a vital role in improving the nutritional well-being and food security of targeted segments of the United States population. The commenter stated that the California Department of Education Nutrition Services Division administers the NSLP, SBP, Seamless Summer Option, Afterschool Meal Supplement, Special Milk Program, Child and Adult Care Food Program, Summer Food Service Program, and the Fresh Fruit and Vegetable Program, which provide nutrition for low-income children. The commenter provided the number of children receiving benefits under the programs and indicated that the rule could create confusion and a chilling effect on families' perception that

participating in any health and nutrition program will jeopardize their immigration status. A commenter stated that children who qualify for SNAP, or live with a child who receives SNAP, are automatically qualified for free meals under the NSLP ''direct certification'' under 42 U.S.C. 1758(b)(12) and that when a family disenrolls a child from the SNAP benefits, the school district may be unable to ''directly certify'' that child or his/her siblings for free meal status.

*Response:* Although school lunch programs provide for nutrition similar to SNAP, these benefits account for a relatively low overall expenditure, are specific to children in a school setting, and are administered by schools. In addition, assistance or benefits under the National School Lunch Act, (NSLP and the SBP) [490] and the Child Nutrition Act of 1966 are excluded under the limitations for qualified aliens from federal means-tested public benefits.[491] Under 8 U.S.C. 1613, qualified aliens are generally not eligible for ''means-tested public benefits'' until after five years of entry. However, the child nutrition programs, including the NSLP, are excluded from this ineligibility. In addition, the law prescribes that a person who receives free public education benefits under State or local law shall not be ineligible to receive benefits provided under the school lunch program under the Richard B. Russell National School Lunch Act [492] or the SBP under section 4 of the Child Nutrition Act of 1966 [493] on the basis of citizenship, alienage, or immigration status.[494] Therefore, DHS believes the NSLP is appropriately excluded. In addition, the other school related nutrition programs mentioned by the commenter, including Seamless Summer Option, Afterschool Meal Supplement, Special Milk Program, Child and Adult Care Food Program, Summer Food Service Program, and the Fresh Fruit and Vegetable Program, would not be considered public benefits under the public charge inadmissibility determination.

Further, DHS understands that a child may no longer automatically enroll in the school lunch programs or be automatically certified for the school programs. However, the child would

[486] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51159 (proposed Oct. 10, 2018).

[487] *See Lewis v. Thompson,* 252 F.3d 567, 583 (2d Cir 2001). Although WIC may provide benefits to a pregnant woman's whose unborn child would otherwise be eligible for public benefits after birth based on U.S. citizenship, at least one circuit has determined that the denial of prenatal care to an unqualified alien pregnant woman had a rational basis and therefore did not violate equal protection. The court indicated that there were ''three rationales for the denial of prenatal care to unqualified alien pregnant mothers: deterrence of illegal immigration, self-sufficiency, and cost savings. The first alone suffices for rational basis review.''

[488] *See* USDA, Food and Nutrition Service, Special Supplemental Nutrition Program for Women, Infants, and Children, available at *https://www.fns.usda.gov/wic/women-infants-and-children-wic* (last visited June 14, 2019).

[489] *See* Public Law 104–193, section 423, 110 Stat. 2105, 2271–2247 (Aug. 22, 1996).

[490] *See* USDA, The School Breakfast Program, available at *https://fns-prod.azureedge.net/sites/default/files/sbp/SBPfactsheet.pdf* (last visited July 26, 2019).

[491] *See* Public Law 104–193, Section 403, 110 Stat. 2105, 2266 (Aug. 22, 1996) (codified at 8 U.S.C. 1613(c)(2)(D)).

[492] *See* 42 U.S.C. 1751 *et seq.*

[493] *See* 42 U.S.C. 1773.

[494] *See* 8 U.S.C. 1615.

**Exhibit A**

still qualify for the programs based on the eligibility criteria and this rule does not change the programs' eligibility criteria or restrict who may apply for the programs.

State and Local Benefits

*Comment:* Referring to the PRWORA definition of public benefits,[495] a commenter asked that public benefits include State and local governments' public benefits provided to non-qualified aliens under the authority of PRWORA. This commenter also referenced federal and state retirement, health, disability, postsecondary education, and unemployment benefits, indicating that the eligibility for these benefits is generally determined using individualized adjudications of need, typically means-based. The commenter advised that in order to avoid APA challenges to the codification or arbitrary exclusions, DHS should include all of the statutory benefits that can be accessed individually by needy persons. In contrast, other commenters stated that benefits funded by states should not be included in public charge determinations.

*Response:* While the proposed rule included state and local and tribal cash benefits for income maintenance, DHS excluded state, local, and tribal non-cash benefits from consideration in the public charge inadmissibility determination because of the number of public benefits that exist and the administrative burden such a rule would have imposed on DHS and the state and local public benefit granting agencies. In addition, including all state and local benefits would add vagueness and confusion as to what public benefits would be considered. Consistent with the proposed rule, DHS will continue to exclude state, local, and tribal benefits that are not cash-benefits for these reasons. Further, DHS would not consider federal and state retirement, Social Security retirement benefits, Social Security Disability, postsecondary education, or unemployment benefits as public benefits under the public charge inadmissibility determination as these are considered to be earned benefits through the person's employment and specific tax deductions.

Head Start

*Comment:* A few commenters asked that DHS include Head Start, because this program also qualifies as a means-tested federal program and goes toward

a person's self-sufficiency. In contrast, a commenter objected to the proposed rule based on the commenter's assessment that programs such as Head Start and WIC will be impacted by the proposed changes and their "chilling effect." Commenters indicated that participation in Head Start programs has been shown to result in better educational and health outcomes as well as lower rates of incarceration, ultimately saving local, state, and federal tax dollars. A commenter stated that in Michigan farmworker families one or both parents work and receive low wages enough to for their children to qualify for Head Start.

*Response:* DHS appreciates the comments and understands other programs also provide for nutrition and healthcare. DHS believes that the focus of the rule is best served in considering certain general benefits directed toward food and nutrition, housing, and healthcare that have high expenditures. DHS has decided to continue to exclude Head Start. DHS notes that when Congress reauthorized the Improving Head Start for School Readiness Act,[496] in 2007, it focused, in part, on ways to make Head Start services more accessible to migrant and seasonal farmworker families. Because both parents typically work in the fields, Migrant and Seasonal Head Start (MSHS) programs offer 12 weeks to year-round, full-day services to accommodate local agricultural industries and harvest season workers. To be eligible for MSHS services, a family's income must come primarily from agricultural work and the family must be eligible otherwise for Head Start services (*i.e.,* poverty, homelessness, or foster care).[497] Head Start also has a low expenditure in comparison to other benefits. Therefore, DHS believes that Head Start is appropriately excluded.

Healthy Start, The Emergency Food Assistance Program, and Similar Programs

*Comment:* A few commenters asked that DHS include Healthy Start. The commenters stated that this program also qualify as a means-tested federal program and illustrates a person's lack of self-sufficiency. Some commenters asked that DHS include The Emergency

Food Assistance Program (TEFAP), as this program also qualifies as a means-tested federal program and illustrates a person's lack of self-sufficiency. Commenters made similar points with respect to additional programs, such as programs that provide grants to localities or organizations to alleviate homelessness, programs that provide supplemental nutrition assistance to specific populations, and programs that provide low-income energy assistance or weatherization assistance.[498] Some commenters recommended that DHS exclude these and similar programs to avoid a range of costs that might be incurred by individuals, communities, and government agencies, if DHS included some or all of these programs.

*Response:* As stated earlier in this section, DHS believes that the focus of the rule is best served in considering certain general benefits directed toward food and nutrition, housing, and healthcare, which have high expenditures, and generally excluding emergency services or support. None of these programs have overall expenditures approaching the levels of the other listed benefits, and some provide emergency services or support, or involve providing funding to organizations, without an individual enrollment mechanism. In the interest of administrability, DHS will not consider these benefits at this time.

Pell Grants

*Comment:* Although several commenters were generally pleased that the proposed rule did not include public education benefits such as Pell Grants or other financial aid, one commenter stated that fear and confusion generated by the rule could deter greater numbers of immigrant youth or children of immigrants eligible for federal and state-funded aid programs from applying to college. A commenter indicated that the proposed rule could effect changes in the U.S. talent pipeline that would ultimately undermine our nation's global competitiveness and regional growth, and indicated that a highly educated workforce spurs economic growth and strengthens state and local economies. The commenter stated that the rule would discourage and may decrease the number of U.S.-citizen youth with non-U.S. citizen parents, lawful permanent residents, and undocumented immigrant youth who are long-term residents of the United States from completing college degrees and pursuing areas of national need

---

[495] Includes public benefits "provided by appropriated funds of the United States" or "a state or local government." 8 U.S.C. 1611(c)(1), 1621(c)(1).

[496] *See* Public Law 110–134, 121 Stat. 1363 (Dec. 12, 2007).

[497] *See* Office of Head Start Administration for Children and Families U.S. Department of Health and Human Services, Migrant And Seasonal Head Start Report To Congress (no date), available at *https://eclkc.ohs.acf.hhs.gov/sites/default/files/pdf/migrant-seasonal-congress-report-2009-2011.pdf* (last visited July 26, 2019).

[498] Such as LIHEAP and Weatherization Assistance Program (WAP).

**Exhibit A**

particularly true in the fields of science, technology, engineering, and mathematics (STEM). Another commenter requested that DHS explicitly exclude Title IV federal student aid programs from the list of those considered for a public charge determination.

*Response:* Pell grants and student aid programs will not be considered in the public charge inadmissibility determination. As previously discussed, DHS's list of public benefits included in the regulation is an exhaustive list and only those benefits listed will be considered in a public charge inadmissibility determination. The focus of the rule is public benefits programs that provide cash assistance for income maintenance or support food nutrition, housing and healthcare with a relatively high overall expenditure. Pell grants and student aid programs are education-based and DHS is not considering them in the public charge inadmissibility determination. DHS decided to not include a list of those benefits that are not considered for public charge purposes because they are too numerous and benefits programs may change over time.

Children's Health Insurance Program

*Comment:* A commenter asked that USCIS consider the inclusion of additional welfare programs such as CHIP. Some commenters noted that CHIP ought to be part of a public benefit determination because it is still part of determining an applicant's overall self-sufficiency. Another commenter stated that CHIP should be included in the public charge determination for consistency purposes, because CHIP is a form of government support and applying consistent standards ensures the Government's goal of promoting self-sufficiency.

In contrast, numerous commenters requested that CHIP be explicitly exempt from public charge; these commenters cited to studies and indicated that millions of children and thousands of pregnant women rely on the program for health coverage. Others also discussed the importance and benefits of CHIP for children, such as providing vaccinations; keeping children healthy; reducing the rate of uninsured children across the United States; and improving children's health, education, and outcomes later in life; as well as long-term economic benefits into adulthood such as job attainment and paying more in taxes. Several commenters stated that CHIP provided a critical link for children who have experienced abuse or who are in homes where domestic violence is present to

overcome trauma and address physical injuries inflicted by their abusers. Many commenters generally warned that CHIP should not be included in public charge assessments because doing so would cause significant harm, including serious health consequences, costly long-term expenses for health care providers and patients, and food insecurity in children, which is especially detrimental to the health, educational performance, development, and well-being of children. A commenter stated that including CHIP would lead to parents having to choose between their child's health, and the public charge determination and immigration status. Numerous commenters said including CHIP in public charge assessments would be contrary to Congress' explicit intent in expanding coverage to lawfully present children and pregnant women for public health, economic, and social benefits. A commenter stated that the higher income thresholds for Medicaid and the Children's Health Insurance Program Reauthorization Act of 2009 (CHIPRA) state option represents a clear intent by Congress to ensure that pregnant immigrant women have access to the medical services necessary to ensure a healthy pregnancy and positive birth outcomes. Other commenters stated that including CHIP, a benefit explicitly created for working families, in public charge assessments would be contrary to the historical meaning of public charge as a person who depends on the government rather than working. Many commenters stated that Congress and states have historically demonstrated a high level of commitment to promoting health for lower-income children through CHIP, with 49 states now electing to cover children though CHIPRA and the Legal Immigrant Children's Health Improvement Act (ICHIA).

Commenters stated that penalizing the use of CHIP undercuts the sound public policies many states have put in place to ensure basic healthcare services are available to immigrants to protect their health and to promote healthy communities. Another commenter cited a study indicating that the inclusion of CHIP in the final rule would have significant public health and economic ramifications, including lower rates of healthcare utilization and poorer health among immigrants and their dependents as well as higher uncompensated care costs to federally qualified health centers and public hospitals. Many commenters stated that including CHIP in a public charge determination would lead to many parents of eligible children foregoing CHIP benefits and some

commenters cited data on the number of people who would disenroll from CHIP. Many commenters suggested that those foregoing CHIP coverage due to the rule, may visit emergency departments for care that could have otherwise been obtained in a primary care setting and would cause a rise in the number of uninsured people and charity care, thereby transferring the financial burden to hospitals, and forcing hospitals to reduce the healthcare services that they are able to provide to communities.

Several commenters stated that by including CHIP, USCIS would be able to specifically target families with children who may be eligible for CHIP even if the family surpasses the 125 percent of the FPL standard laid out in the proposal. Numerous commenters stated that CHIP addresses a critical coverage gap, targeting working families that earn too much to be eligible for Medicaid but cannot afford traditional private insurance. Commenters stated that making the receipt of CHIP coverage a negative factor in the public charge test, or including it in the definition of "public charge," would place coverage for children out of reach. Other commenters stated that including CHIP in the final rule will create additional financial pressures on working families, and would penalize those who are moving toward self-sufficiency, as they do not qualify for Medicaid due to their increased income. A few commenters stated that past use of CHIP is not a predictor of future dependence on the Government for subsistence as an adult.

Many commenters stated that DHS's reasons for not including CHIP in the proposed rule have nothing to do with a public charge determination because CHIP does not involve the same level of expenditures as other programs; commenters stated that government expenditures are irrelevant to the assessment of whether an individual may become a public charge. Some stated that DHS's reasons for not including CHIP indicates that DHS recognizes that immigrants do not over-utilize the CHIP program and, thus, including CHIP in the final rule would only serve the purpose of denying immigrant children a benefit that supports their basic health needs. Other commenters stated that Federal CHIP funding is capped and, thus, reduced spending in states with larger immigrant populations will not reduce overall Federal spending, but will disadvantage those states relative to states with a smaller immigrant population. Another commenter stated that while the proposal exempts CHIP, it was unclear what would happen to beneficiaries in states that have opted to implement

**Exhibit A**

**41392** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

CHIP as part of a Medicaid expansion rather than a separate program.

*Response:* DHS appreciates the comments and recognizes the importance of CHIP. DHS determined that it will not include CHIP in the public charge inadmissibility determination. States can use CHIP funding to cover children at higher incomes under CHIP.[499] CHIP enrollees have a higher income and states have greater flexibility in the benefit package provided.[500] An individual must be ineligible for Medicaid to quality for CHIP. CHIP primarily covers children, including lawfully residing children, and in a handful of states and covers pregnant women.[501] Eligible families have higher incomes (between 133–400 percent FPL).[502] In addition, states (and in turn the Federal Government) tend to spend less per person on CHIP than on Medicaid because the families have a higher income and thus fewer healthcare needs, and because children are less expensive to cover. Overall expenditures are also lower than Medicaid.[503] Finally, exclusion of CHIP is consistent with this rule's changes with respect to Medicaid received by a child under the age of 21 and receipt during an alien's pregnancy. Therefore, DHS believes it is appropriate to exclude CHIP from the public benefit definition in the public charge inadmissibility determination.

Disaster Supplemental Nutrition Assistance

*Comment:* A commenter recommended that Disaster Supplemental Nutrition Assistance (D–

SNAP) should be excluded from the public charge determination to allow families or persons who have experienced a catastrophic disaster, such as a fire or a hurricane, to receive D–SNAP benefits without fear of being subject to a public charge inadmissibility determination.

*Response:* D–SNAP and other emergency disaster relief assistance programs are not included in the rule. DHS also notes that, as provided in the NPRM, not all cash assistance would qualify as cash assistance for income maintenance under the proposed rule. For instance, DHS would not consider Stafford Act disaster assistance, including financial assistance provided to individuals and households under the Federal Emergency Management Agency's Individuals and Households Program, 42 U.S.C. 5174, as cash assistance for income maintenance. The same would hold true for comparable disaster assistance provided by State, local, or tribal governments.

Social Security Disability Insurance

*Comment:* A commenter stated that the rule should not consider Social Security Disability Insurance (SSDI) as part of the public charge inadmissibility determination because SSDI is an earned benefit which may be a parent of a child.

*Response:* DHS will only consider those public benefits as listed in the rule. SSDI is not one of the benefits listed under the definition of public benefits for purposes of public charge inadmissibility and therefore will not be considered as part of the rule.

## 3. Likely at Any Time To Become a Public Charge

*Comment:* A commenter stated that DHS interprets "likely at any time to become a public charge" to mean "likely at any time in the future to receive one or more public benefits. . . based on the totality of the circumstances," and DHS does not propose to establish a per se policy whereby an alien is likely to become a public charge if the alien is receiving benefits at the time of the application. The commenters stated that DHS's reasoning is "less than transparent" and conflicts with both pre-1999 practice and statutory interpretation. A commenter stated that Congress could have added the phrase "in the future" but has repeatedly declined to do so.

*Response:* DHS disagrees with the commenter that the interpretation of "likely at any time in the future" conflicts with the statutory wording and pre-1999 practice. As explained in the

NPRM,[504] the language of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), requires a predictive assessment. Terms such as "become" and "likely at any time" indicate that the assessment should be based on factors that tend to reasonably show that the burden of supporting the alien is likely to be cast on the public.[505] As established in the NPRM, case law supports this view and is therefore consistent with the pre-1999 approach to public charge and the definition of "likely at any time in the future to become a public charge" as added to 8 CFR 212.21(c).[506] While Congress could have added "in the future," Congress' wording of the public charge provision clearly indicates prospective determination; DHS added the words to clarify that any time is prospective and forward looking.[507]

*Comment:* Commenters stated that the proposed rule is impermissibly vague by failing to define "likely" as the term is used in "likely to become a public charge." One commenter indicated that DHS failed to define "likely" although it used the term throughout the entire rule. The commenter indicated that DHS used a specific dollar amount for purposes of the public charge determination, yet, DHS failed to provide a threshold amount for adjudicators to use to assess the likeliness of becoming a public charge in the future. Additionally, the commenter also indicated that although DHS provided numerous statistics on benefits use rates, DHS never clarified what likelihood is high enough to justify a denial.[508] Therefore, the commenter suggested defining the term "likely" as a "probability of becoming a public charge equal to or greater than 75 percent."

*Response:* DHS appreciates the comment and agrees that the meaning of likely at any time in the future to become a public charge needs clarification. However, DHS will not

---

[499] CHIP-funded Medicaid coverage generally can be used for children whose income is above the Medicaid income standard in effect in the state in 1997, when the CHIP program was first established.

[500] Medicaid.gov, CHIP Eligibility, available at *https://www.medicaid.gov/chip/eligibility-standards/index.html* (last visited June 13, 2019).

[501] *See* Medicaid.gov, Medicaid and CHIP Coverage of Lawfully Residing Children and Pregnant Women, available at *https://www.medicaid.gov/medicaid/outreach-and-enrollment/lawfully-residing/index.html* (last visited June 13, 2019).

[502] *See* Medicaid.gov, Medicaid, Children's Health Insurance Program, & Basic Health Program Eligibility Levels, available at *https://www.medicaid.gov/medicaid/program-information/medicaid-and-chip-eligibility-levels/index.html* (last visited July 27, 2019).

[503] *See* U.S. Dep't of Health and Human Servs. (HHS), Centers for Medicare & Medicaid (CMS), Expenditure Reports from MBES/CBES. Available at *https://www.medicaid.gov/medicaid/finance/state-expenditure-reporting/expenditure-reports/index.html* (last visited July 27, 2019). For a list of federal expenditures by program, *see* FY 2016 data from table 2 of Gene Falk et al., Cong. Research Serv., R45097, Federal Spending on Benefits and Services for People with Low Income: In Brief (2018), available at *https://fas.org/sgp/crs/misc/R45097.pdf* (last visited July 27, 2019).

[504] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51174–75, 51178–79 (proposed Oct. 10, 2018).

[505] *See, e.g., Matter of Martinez-Lopez,* 10 I&N Dec. 421 (Att'y Gen. 1964).

[506] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51174–75, 51178–79 (proposed Oct. 10, 2018).

[507] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51174–75, 51178–79 (proposed Oct. 10, 2018).

[508] The commenter referred to a 1999 Central Intelligence Agency study in which was concluded that NATO military officers did not interpret the words "likely" or "unlikely" in a consistent manner showing a wide variation. *See* Richard J. Heuer, Jr., Psychology of Intelligence Analysis, Central Intelligence Agency (1999), p. 155, *https://www.cia.gov/library/center-for-the-study-of-intelligence/csi-publications/books-and-monographs/psychology-of-intelligence-analysis/PsychofIntelNew.pdf* (last visited July 26, 2019).

**Exhibit A**

accept the suggestion that likely at any time to become a public charge means a 75 percent likelihood that the alien would become a public charge at any time in the future. As with other key terms in the statute, Congress did not define or otherwise describe what it meant by likely at any time to become a public charge. DHS believes likely in the context of likely at any time to become a public charge is best considered as probable, *i.e.,* more likely than not. Although, as the commenter noted, the term "likely" has been inconsistently defined in some contexts,[509] equating likely at any time to more likely than not is nonetheless consistent with the approach many courts have taken in the determining the meaning of likely.[510] DHS believes that defining likely at any time to mean "more likely than not" is consistent with how the DHS regulations implementing withholding of removal and deferral of removal under the Convention Against Torture have used "more likely than not" interchangeably with "likely to."[511]

Therefore, DHS has amended the definition of likely to become a public

charge at 212.21(c) to clarify that a person is likely to become a public charge if it is "more likely than not" that the individual at any time in the future will receive one or more public benefits, as defined in 8 CFR 212.21(b), based on the totality of the alien's circumstances.[512]

4. Household

*Comment:* Several commenters expressed concern with the new definition of "household." A commenter stated that this new definition is designed to apply to as many people as possible and would be the most expansive definition of "household" within the Executive Branch. A few commenters asserted that the proposed rule rejects both the HHS and the IRS definitions of "dependent" and "household" in favor of arbitrary standards set by DHS. Another commenter indicated that different agencies have their own definition of a "household," which leads to variance and an uneven application of the law.

*Response:* DHS disagrees that the definition of household would be the most expansive in the Executive Branch or that it acts as a penalty. As discussed in the NPRM,[513] the poverty guidelines do not define who should be considered part of the household, and different agencies and programs have different standards for determining household size.[514] For example, and as explained in the NPRM,[515] SNAP uses the term "household" and includes everyone who lives together and purchases and prepares meals together, which is more expansive than the definition that DHS is adopting. DHS further disagrees that the standard is arbitrary. However, DHS does agree that different agencies have

their own definition of household as discussed in the NPRM.

Furthermore, as discussed in the NPRM, DHS is not fully adopting the IRS definition of "dependent."[516] That definition would generally require some type of relationship to the person filing (including step and foster children and their children) whether or not the dependent is living with the person filing and the amount of support being provided by the person filing (over 50 percent).[517] For tax purposes, dependents may include U.S. citizens, U.S. resident aliens, U.S. nationals, and residents of Canada or Mexico.[518] DHS's definition would adopt the IRS consideration of the amount of support being provided to the individuals (50 percent) as the threshold for considering an individual as part of the household in the public charge determination, rather than consider any support being provided.[519] As discussed in the NPRM, DHS believes that the "at least 50 percent of financial support" threshold as used by the IRS is reasonable to apply to the determination of who belongs in an alien's household, without regard to whether these individuals physically reside in the alien's home. This would include those individuals the alien may not have a legal responsibility to support but may nonetheless be supporting. DHS believes that an alien's ability to support a household is relevant to DHS's consideration of the alien's assets, resources, financial status, and family status.

*Comment:* Several commenters expressed concern with the definition classifying people as household members if the alien contributes 50 percent or more to their financial support. A commenter said that this requirement is vague and too expansive, asserting that many families live in

[509] For example, a review of state laws on determining when sex offenders are "likely" to reoffend found that "states vary greatly on how they define likely" with some states define it as greater than 50 percent or substantially probable while others have expressly rejected standard based on percentages. Jefferson C. Knighton, Daniel C. Murrie, Marcus T. Boccaccini, & Darrel B. Turner, *How Likely is 'Likely to Reoffend' in Civil Sex Offender Commitment Trials*, 38 Law & Hum, Behav. 293, 294–96 (2014). N.B. DHS is referencing sex offender statutes to show the lack of clarity in defining the word likely; DHS is not implying, in any way, any similarity between those who commit sexual crimes to those who are subject to public charge.

[510] *See, e.g., Southwest Sunsites, Inc.* v. *F.T.C.,* 785 F.2d 1431 (9th Cir.) ("First, the FTC must show probable, not possible, deception ('*likely* to mislead,' not '*tendency and capacity* to mislead')." (emphasis in the original)), *cert. denied,* 479 U.S. 828 (1986); *Fermin* v. *Pfizer Inc.,* 215 F. Supp. 3d 209, 211 (E.D.N.Y. 2016) ("The term 'likely' indicates that deception must be probable, not just possible."); *Siderca, S.A.I.C.* v. *United States,* 28 C.I.T. 1782, 350 F. Supp.2d 1223, 1226 (Ct. Int'l Trade 2004) ("The common meaning of 'likely' is 'probable,' or, to put it another way, 'more likely than not.'"); *In re G.H.,* 781 NW2d 438, 445 (Neb. 2010) (holding that "'probable,' in other words, more likely than not" satisfies the "likely to engage in repeat acts of sexual violence" standard under Nebraska law.).

[511] *Compare* 8 CFR 208.16(c)(4) ("If the immigration judge determines that the alien is *more likely than not* to be tortured in the country of removal, the alien is entitled to protection under the Convention Against Torture.") *with* 8 CFR 208.17(b)(2) ("The immigration judge shall also inform the alien that removal has been deferred only to the country in which it has been determined that the alien is *likely* to be tortured, and that the alien may be removed at any time to another country where he or she is not likely to be tortured.") (emphasis added). *See generally Matter of Chawathe,* 25 I&N Dec. 369, 376 (2010) (discussing the more likely than not standard).

[512] This change clarifies the definition of likely to become a public charge, but it does not alter the burden that adjustment applicants bear in demonstrating that they are admissible. As with any other ground of inadmissibility, an applicant for adjustment of status still has the burden of demonstrating that he or she is clearly and beyond doubt entitled to be admitted to the United States and is not inadmissible. *See Matter of Bett,* 26 I&N Dec. 437, 440 (BIA 2014). Adjustment applicants have the burden to show that they clearly and beyond doubt satisfy the standard of not being more likely than not to become a public charge in the future. *See generally House* v. *Bell,* 547 U.S. 518, 538 (2006) (discussing habeas petitioner's burden of showing "more likely than not" with the standard of "no reasonable juror would find him guilty beyond a reasonable doubt.")

[513] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51176 (proposed Oct. 10, 2018).

[514] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51176 (proposed Oct. 10, 2018), discussing Annual Update of the HHS Poverty Guidelines, 83 FR 2642 (Jan. 18, 2018). *See also* HHS Annual Update of the HHS Poverty Guidelines, 84 FR 1167 (Feb. 1, 2019).

[515] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51176 (proposed Oct. 10, 2018).

[516] *See* 26 U.S.C. 152; *see also* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51176 (proposed Oct. 10, 2018), discussing IRS Publication 501 (Jan 2, 2018), *available at https://www.irs.gov/pub/irs-pdf/p501.pdf* (last visited May 8, 2019).

[517] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51176 (proposed Oct. 10, 2018), discussing IRS Publication 501 (Jan 2, 2018), *available at https://www.irs.gov/pub/irs-pdf/p501.pdf.*

[518] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51176 (proposed Oct. 10, 2018), discussing IRS Publication 501 (Jan 2, 2018), *available at https://www.irs.gov/pub/irs-pdf/p501.pdf.*

[519] *See* Internal Revenue Serv., *Dependency Exemptions, available at https://apps.irs.gov/app/vita/content/globalmedia/4491_dependency_exemptions.pdf* (last visited July 26, 2017); *see also* Internal Revenue Serv., *Table 2: Dependency Exemption for Qualifying Relative, available at https://apps.irs.gov/app/vita/content/globalmedia/table_2_dependency_exemption_relative_4012.pdf* (last visited July 26, 2018).

**Exhibit A**

extended family and close friend housing that share the cost of utilities, transportation, food, etc., which can lead to difficult miscalculations of this 50 percent threshold. Similarly, one commenter stated that household size is not predictive of a person's propensity to become a public charge, but is instead the natural consequence of working people pooling together their resources to support each other. Other commenters provided the example that many immigrants provide financial support to family members who remain in their countries of origin and in some countries, as little as $100 a month can constitute more than 50 percent of an individual's financial support, which would mean that the person should be counted as part of the immigrant's household size, which would drive up the earnings they would need to meet the threshold by much higher amounts. Multiple commenters asserted that immigrants could be penalized for providing family support to a sibling with disability or parents to whom they have no legal obligation. A commenter said the definition could cause harm to larger households who must show larger incomes or resources to support the larger numbers being counted, regardless of the reality of the financial benefits that households may be providing to society. This commenter also stated that it could be especially harmful to immigrant families who often care for extended family members in cases of emergencies without being legally required to do so.

*Response:* As explained in the NPRM,[520] DHS considers an alien's household size not only as part of the alien's asset, resources, and financial status but also for purposes of the family status. As is the case with all of the factors and consideration, DHS will consider the impact of the household size as part of the totality of the circumstances.[521] Therefore, having support from other household members may be a positive consideration while having assets below the 125 percent threshold for the household size may be a negative consideration because it indicates that an alien may be likely to become a public charge. For these reasons, DHS considers the household size a relevant consideration in the public charge assessment and predictive of the likelihood, within the totality of the circumstances, that an alien will become a public charge. DHS recognizes that multiple individuals in the household may be working to support the household.

With the definition of household, DHS aims to account for both the persons whom the alien is supporting and those who are contributing to the household to support the alien, and thus to the alien's assets and resources.[522] DHS will consider any of the family members supported, including those who are supported outside the United States and listed on Form I–944. DHS clearly outlined in the regulatory provision who is included in the definition of household and therefore DHS does not agree that the definition is vague or too expansive, but agrees that it may be, depending on the specific circumstances of the household, either over-or under-inclusive.

*Comment:* Commenters stated that, although the receipt of benefits by U.S. citizen children would not be a negative factor to their noncitizen parent's application, the mere fact that the children are in the household would be a downward factor for determining overall household income. Another commenter stated that children should not be included in the household calculation because most support agreements or orders do not contain information to determine whether a potential amount is 50 percent of the financial support of a child. A commenter stated that verifying which individuals provide to the applicant at least 50 percent of their financial support requires a fact-intensive review of not only cash support, but non-cash support such as room and board or payment of utilities that may only be partly attributable to the noncitizen. The commenters said this overly complicates the household size assessment, particularly as compared to the relatively straightforward determination used for the current Form I–864.

*Response:* As indicated in the NPRM, as part of the description of the definition of household and family status [523] research and data have shown that the number of household members may affect the likelihood of receipt of public benefits. However, the number of household members may also positively affect the financial status and household, depending on the alien's and household's circumstances, include other member's employment and financial contributions to the household. Therefore, DHS disagrees

with the commenters that children would be considered a downward factor for determining overall household income. DHS's definition of household member adopts the IRS consideration of the amount of support being provided to individuals (50 percent) as the threshold for considering an individual as part of the household. Therefore, DHS will retain the standard as proposed.

*Comment:* Several commenters remarked that this assessment would have a disproportionally negative impact on immigrant women, asserting that immigrant women are more likely than immigrant men to have one or more children living in the same household, and, therefore, more likely to have a large household. Some commenters stated this requirement directly imposes on an immigrant woman's bodily autonomy and agency, particularly if or when to have children, by counting having a large family against them as part of the public charge determination. A commenter discussed the definition's impact on domestic and sexual violence survivors, asserting that this population could be penalized for providing continuing support to former partners or family members if they were involuntarily coerced into providing such support or have ceased living with them due to abuse. The commenter added that the rule could penalize victims who often seek the help of family members to alleviate housing and childcare expenses and strengthen their ties to the United States.

*Response:* DHS is implementing a statutory ground of inadmissibility provided by Congress; the goal of the rule is not to penalize but to ensure that those coming to the United States are self-sufficient and not likely depend on public resources. DHS also incorporated exceptions provided by Congress, including those applicable to battered spouses and children.[524] Therefore, DHS disagrees that the rule penalizes domestic and sexual violence survivors. As it is the case for all, the public charge assessment will be made in the totality of the circumstance to determine whether an applicant is likely, at any time in the future, to become a public charge.

*Comment:* A commenter said the definition does not allow for the exclusion of the alien's household members who are not intending to immigrate within six months of the immigrant's application, which holds the applicant fiscally responsible for an individual that they will not be living with for at least 6 months after immigrating to the United States.

---

[520] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51175 (proposed Oct. 10, 2018).

[521] *See* 8 CFR 212.22(a).

[522] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51177 (proposed Oct. 10, 2018).

[523] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51176–51178, 51184 (proposed Oct. 10, 2018).

[524] *See* 8 CFR 212.23.

**Exhibit A**

*Response:* As explained in the NPRM, for purposes of the household definition, DHS will take into consideration both individuals living in the alien's home and individuals not living in the alien's home, including aliens living outside the United States, for whom the alien, and or the alien's parents or legal guardians are providing, or are required to provide, at least 50 percent of financial support.[525] DHS therefore does not focus on the location of the financially supported person, but on the fact that the person is receiving more than 50 percent of financial support from the applicant, rendering those funds unavailable to the applicant for his or her own support and self-sufficiency.

*Comment:* A commenter expressed their opposition to the NPRM assertion that ''the receipt of non-cash benefits generally increased as family size increased.'' This commenter referenced Table 17 in the NPRM, which the commenter stated indicated that non-cash benefit usage is higher among families of three (22.3 percent) than families of four (20.7 percent). The same commenter cited information claiming that among noncitizens in ''nonfamily households'' (*i.e.,* individuals), 2.7 percent received cash assistance and that number steadily decreased in larger households with only 1.8 percent of noncitizens in families of five or more receiving any cash benefit.

*Response:* DHS appreciates the comment. DHS acknowledges that certain data were not statistically significant, which in some cases was a consequence of small sample sizes. The statistics cited regarding non-cash benefit use among families of sizes three and four were not statistically significantly different from each other, so DHS would not conclude that one is higher or lower. Among noncitizens, the results that were statistically significant showed a lower rate of non-cash benefit use among nonfamily households, and a higher rate of non-cash benefit use among those with a family size bigger than five, compared with those having family sizes of two, three, and four. Among citizens, those having family sizes of two were shown to have a lower rate of non-cash benefit use than those with larger families. These findings suggest a generally higher rate of non-cash benefit use as family size increases. Regarding the rates of cash benefit use, the estimates cited for nonfamily households and those with families of size five or more were not statistically significantly different. The estimates of

cash benefit use among noncitizens in Table 17 in the NPRM had high variance, indicating only that the rates were about one to three percent across family size groups. Therefore, DHS believes that the data properly reflects that receipt of noncash benefits generally increases with an increase in family size.

*Comment:* A commenter stated that the rule ''contravenes PRWORA and IIRIRA by drastically limiting how a sponsor's income is considered as part of the public charge analysis—even though the sponsor's commitment is legally enforceable.'' The commenter stated that only considering the sponsor's income if (i) the sponsor physically lives with the noncitizen, or (ii) ''the sponsor is already contributing 50 percent or more of the alien's financial support,'' has no basis in either PRWORA or IIRIRA and ''would run contrary to the basic logic undergirding the sponsor affidavit provisions of both laws'' because under PRWORA and IIRIRA, a sponsor must have an income of at least 125 percent of the FPL, and both the sponsored noncitizen and benefit-granting agencies may legally enforce the affidavit of support as the sponsor's promise to maintain a noncitizen above 125 percent of the FPL. In addition, the commenter noted that PRWORA requires benefit-granting agencies to include a sponsor's income when determining whether a sponsored noncitizen is income-eligible for means-tested benefits. The commenter asserted that discounting the value of an affidavit of support in the public charge determination unless the sponsor is closely related to or lives with the noncitizen, would ignore the legally enforceable nature of the sponsor's promise and that the sponsor's income is deemed that of the noncitizen.

*Response:* DHS disagrees that the rule contravenes PRWORA and IIRIRA with respect to the manner in which DHS will consider a sponsor's income. DHS neither proposed any changes to how the sponsor's income is considered with respect to the enforceable affidavit of support, nor changed any applicable deeming rules. In addition, the INA requires a distinct public charge assessment for admission and adjustment of status even where an alien has an affidavit of support. Under this rule, the affidavit of support, where required, will still have to comply with the requirements of section 213A of the Act, 8 U.S.C. 1183a, and 8 CFR part 213a.

As noted previously, Congress set forth the mandatory factors that DHS must consider in the public charge

inadmissibility determination—these factors include the alien's assets, resources, and financial status. While the affidavit of support is required for most family-based applications and some employment-based applications, it is set apart from those factors, and *may* be considered in a public charge inadmissibility determination as a separate consideration.[526] This indicates that Congress intended for the affidavit of support and the public charge determination to serve similar, but not identical functions.

As discussed in the NPRM, DHS chose a definition of household that takes into account the definitions used by benefit-granting agencies and that captures individuals who are financially interdependent with the alien. In considering gross household income, USCIS will also consider any monthly or annual income from individuals who are not included in the alien's household, where the support to the household has been provided to the household on a continuing monthly or yearly basis during the most recent calendar year.[527] Accordingly, if the sponsor is already providing 50 percent or more of financial support or is otherwise providing income on a monthly or annual basis to the alien that the alien will rely on to meet the income threshold, the sponsor's income or payments would be included in the consideration of the alien's assets, resources, and financial status.[528] DHS

[525] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51176 (proposed Oct. 10, 2018).

[526] *See* INA section 212(a)(4)(B)(i) & (ii), 8 U.S.C. 1182(a)(4)(B)(i) & (ii).

[527] *See* 8 CFR 212.22(b)(4)(i)(B).

[528] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51177 (proposed Oct. 10, 2018). (''For example, when a child, as defined in INA section 101(b), 8 U.S.C. 1101(b)(1), is filing for adjustment of status as the child of a U.S. citizen or lawful permanent resident, the affidavit of support sponsor would also be the parent. Because the parent is part of the household, the parent's income would be included as part of the household income. The parent's income would be reviewed as part of the assets, resources, and financial status factor based on the total household size. However, for example, if there is a cosponsor, who is the alien's cousin and who is not physically residing with the alien, then the cousin would not be counted as part of the household and his or her income would not be included as part of the assets, resources or financial status unless the sponsor is already contributing 50 percent or more of the alien's financial support. In addition, if the sponsor is a member of the alien's household and included in the calculation of the 125 percent of the FPG, DHS would only count the sponsor's income once for purposes of determining the alien's total household assets and resources. A sponsor's income as reported on the affidavit of support would be added to the income of the other members of the alien's household. The sponsor's income that is added to the alien's total household assets and resources would not be increased because the sponsor also submitted an affidavit of support promising to support the alien at least 125 percent of the FPG for the sponsor's household size. For example, assuming the alien and sponsor's
Continued

declines to otherwise deem the sponsor's income to the alien in the public charge context, as this kind of automatic deeming would essentially render meaningless the public charge determination for any alien with an affidavit of support. DHS does not believe Congress would have retained the public charge ground of inadmissibility, had it intended such a result.

### H. Public Charge Inadmissibility Determination Based on Totality of Circumstances

*Comment:* Many commenters expressed general concern about the discretion that government workers would be given when making public charge determinations, which would result in inconsistent and unfair public charge inadmissibility determinations. One commenter noted that the rule change gives too much discretion to officers in making inadmissibility determinations. Another commenter noted that because the rule relies on officer discretion, there will be inconsistent adjudications and the rule is thus arbitrary and capricious. The commenter further stated that this proposed standard is also arbitrary and capricious because the required officer evaluation would be burdensome and inefficient. A commenter provided an estimate on the number of people adversely affected by the rule based on the factors.

Several commenters stated that the "totality of circumstances" test would require adjudicators to weigh a potentially unlimited number of "factors," and expressed confusion regarding the difference between "factors" and "considerations" under the proposed rule. A commenter noted that "[a]s a result, there could be an infinite number of factors that adjudicators could possibly assess, resulting in public charge determinations [that] will inevitably vary from adjudicator to adjudicator even when faced with very similarly situated cases." Two commenters stated that the proposed rule is not quantitative and the "totality of circumstances" test to determine public charge admissibility is vague and ambiguous. An individual commenter suggested that DHS remove the totality of circumstances language to ensure the

household sizes are the same, if the sponsor's total income reported on the affidavit of support is 250 percent of the FPG for the household size, that income would be added to the alien's assets and resources; the alien's total household income would then be at least 250 percent of the FPG, which constitutes a heavily weighted positive factor.").

rule will operate as intended and will not lead to inconsistent results.

An individual commenter stated that the existing statutory framework directs an adjudicator to consider an immigrant's personal and financial circumstances to determine the likelihood that they will become dependent on the government in the future, which is easily demonstrated by their employment prospects and the existence of support systems. However, the commenter stated that the proposed positive and negative weighted factor system was unworkable and provided no guidance on how these factors would be weighted. The commenter also stated that DHS should allow immigrants to prove themselves sufficient after immigrating. A commenter suggested DHS provide written documentation of the public charge determination and reasoning to the applicant and his/her legal representative. A few commenters described the proposed rule as extremely vague and open-ended regarding the issues that will be considered. The commenters also stated that DHS fails to state how it will measure the weighted factors. A commenter stated the alien must show by a preponderance of the evidence that he or she is eligible for the benefit sought but that the rule requires too high a standard of proof with respect to the applicant demonstrating he or she will not become a public charge.

Some commenters stated that the proposed rule contained vague standards, required adjudicators to consider a broad range of factors, and afforded such adjudicators significant discretion. The commenters stated that as a consequence, outcomes will be dependent on the particular adjudicator making the decision. Commenters indicated that they were especially concerned that this lack of predictability will make it nearly impossible for attorneys to adequately advise their clients. Commenters stated that such unpredictability would lead to a chilling effect with respect to aliens' use of public benefits.

Commenters stated that granting USCIS officers the discretion to evaluate the totality of circumstances would be inefficient, as they would require new training to evaluate criteria, such as credit reports, and that other agencies, such as DOL, already have education and skills criteria for work visas.

*Response:* DHS disagrees with the assertion that the rule provides too much discretion to adjudicators as a result of the totality of the circumstances approach and that the framework will lead to unfair and inconsistent determinations. DHS

acknowledges the complexity of this rule. This final rule is intended to provide greater clarification in response to comments. As with any new regulation, the regulated public may need to read and become familiar with the regulation to understand how it applies. DHS will also issue guidance, and may further revise such guidance as necessary after it has gained experience with the new regulatory regime.

As explained in the NPRM, section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), provides that an alien who, "in the opinion of" the Secretary is likely to become a public charge is inadmissible.[529] The Government has long interpreted the phrase "in the opinion of" as describing an assessment that is subjective and discretionary in nature.[530] While authorizing this subjective, discretionary assessment, however, Congress also mandated that the public charge determination consider, at a minimum, the alien's age, health, family status, assets, resources, financial status, education, and skills. Consideration of these mandatory factors requires a case-by-case determination based on the totality of the alien's circumstances. This final rule will result in officers conducting a full analysis of the factors set forth in the statute and in this rule, and weighing all evidence submitted in the totality of the circumstances. Both the proposed rule and this final rule adequately explain how the criteria are to be applied and what evidence should be considered.

Unlike the 1999 Interim Field Guidance, which failed to interpret the statutory factors and provided no direction to adjudicators on how to consider them, this final rule is clear about the legal standard and evidentiary burden aliens must meet to demonstrate that they are not likely at any time in the future to become a public charge. In addition, USCIS will be conducting training for adjudicators and, as necessary, issuing sub-regulatory guidance to ensure consistency in adjudications. However, to the extent that each alien's individual circumstances constitute a unique fact

[529] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).
[530] *See Matter of Harutunian,* 14 I&N Dec. 583, 588 (Reg'l Comm'r 1974) ("[T]he determination of whether an alien falls into that category [as likely to become a public charge] rests within the discretion of the consular officers or the Commissioner . . . Congress inserted the words 'in the opinion of' (the consul or the Attorney General) with the manifest intention of putting borderline adverse determinations beyond the reach of judicial review." (citation omitted)); *Matter of Martinez-Lopez,* 10 I&N Dec. 409, 421 (Att'y Gen. 1962) ("[U]nder the statutory language the question for visa purposes seems to depend entirely on the consular officer's subjective opinion.").

**Exhibit A**

pattern, outcomes in public charge determinations will appropriately vary. In addition, DHS disagrees that public charge determinations will be burdensome and inefficient. USCIS will take care to effectively examine the evidence presented to determine whether the alien is likely to become a public charge at any time in the future, consistent with the statute.

DHS also disagrees that the standard used to determine public charge inadmissibility is too high. While the commenter is correct that, in general, an applicant applying for an immigration benefit must demonstrate eligibility by a preponderance of the evidence,[531] DHS has not changed that standard of proof with respect to applications subject to a public charge inadmissibility determination. Those applicants will still, unless otherwise specified, be required to show by a preponderance of the evidence that they are not likely at any time to become a public charge. DHS has defined likely at any time to become a public charge in this final rule as more likely than not at any time in the future to become a public charge. Therefore, applicants subject to a public charge inadmissibility determination will need to demonstrate by a preponderance of the evidence that they are not more likely than not at any time in the future to become a public charge.

Additionally, the public charge inadmissibility analysis is a prospective determination, as evidenced by the words ''likely at any time to become'' a public charge. Moreover, aliens subject to the public charge ground of inadmissibility must demonstrate that they are not likely at any time to become a public charge at the time of their application or a visa, admission, or adjustment of status. Therefore, DHS will not adopt the commenter's suggestion that an alien subject to the public charge ground of inadmissibility should be allowed to wait until after immigrating to the United States to demonstrate that he or she is likely at any time to become a public charge and thereby avoid becoming inadmissible on public charge grounds at the time of admission as an immigrant.

DHS also believes that the rule provides a clear framework for considering the mandatory factors in a public charge inadmissibility determination in the totality of the circumstances. DHS acknowledges,

however, that the adjudication of public charge inadmissibility is complex and that the determination of the likelihood at any time in the future to become a public charge is not governed by clear data regarding whether any given alien subject to this determination is more likely than not to receive public benefits for more than 12 months in the aggregate in a 36-month period at any time in the future, and therefore would be inadmissible when weighing all factors in the totality of the alien's circumstances.

To address these concerns, USCIS plans to take several steps. For one, to provide its officers with a solid foundation and knowledge on public charge inadmissibility determinations, USCIS plans to issue policy guidance in its USCIS Policy Manual (*https://www.uscis.gov/policy-manual*), which will include information from the NPRM and this final rule and can be accessed by potential applicants. In its policy guidance, USCIS will direct officers to determine:

• Whether the alien is more likely than not to receive one or more public benefits, as defined in 8 CFR 212.21(b), at any time in the future; and

• Whether the alien's likely receipt of one or more of the enumerated public benefits is more likely than not to exceed 12 months in the aggregate within any 36 month period (such that, for instance, receipt of two benefits in one month counts as two months) at any time in the future.

In making this determination, there is no bright-line test that USCIS officers will administer. For instance, past or current receipt of public benefits may make an alien a public charge at present, but past or current receipt of public benefits, alone, is insufficient to sustain a finding that an alien is likely to become a public charge at any point in the future.

Instead, there must be a nexus between the alien's circumstances and the alien's future likelihood of becoming a public charge. The mere presence of any one enumerated circumstance, alone, is not outcome determinative.[532] USCIS, therefore, will evaluate all of the alien's facts, circumstances, and evidence to determine whether factors in the analysis are *positive* or *negative*. Any factor that *decreases* the alien's future likelihood of receiving one or more public benefits above the 12 months in the aggregate in a 36-month period threshold is *positive*. Any factor

that *increases* the alien's future likelihood of an alien receiving one or more public benefits above the 12 aggregate months in a 36-month period threshold is *negative*.

USCIS will then weigh all factors individually and cumulatively. USCIS will assess the *weighted degree* to which each factor is *negative* or *positive*—the extent to which the factor affects the likelihood that the alien *will* or *will not* receive one or more public benefits above the threshold. Certain enumerated factors will weigh heavily in favor of finding that an alien is not likely to become a public charge or finding that an alien is likely to become a public charge. But, for example, depending on the alien's specific circumstances, a heavily weighted negative factor can be outweighed by a heavily weighted positive factor or some combination of positive factors in the totality of the circumstances. Otherwise, the weight given to an individual factor not designated a heavily weighted factor depends on the particular facts and circumstances of each case and the relationship of the individual factor to other factors in the analysis. Multiple factors operating together will carry more weight to the extent those factors in tandem show that the alien is more or less likely than not to become a public charge.

USCIS' totality of circumstances assessment will focus on, for instance, the following considerations:

• *Ability to Earn a Living*—The ability of the alien to earn sufficient income to pay for basic living needs (*i.e.,* food and nutrition, housing, and healthcare), as evidenced or impacted by, for example, the alien's age, health, work history, current employment status, future employment prospects, education, and skills;

• *Sufficiency of Income, Assets, and Resources*—The sufficiency of the alien's household's income, assets, and resources to meet basic living needs (*i.e.,* food and nutrition, housing and healthcare);

• *Sufficiency and Obligation of Sponsorship*—The legal sufficiency of the affidavit of support, if required, and the likelihood that a sponsor would actually provide the statutorily-required amount of financial support to the alien, and other related considerations;

• *Ability to Overcome Receipt of Public Benefits or Certification or Approval to Receive Public Benefits Above the Designated Threshold*—The ability of the alien to overcome receipt of, or certification or approval to receive, one or more public benefits for more than 12 months in the aggregate in any 36 month period beginning no

---

[531] *See Matter of Chawathe,* 25 I&N Dec. 369, 375 (2010) (''Except where a different standard is specified by law, a petitioner or applicant in administrative immigration proceedings must prove by a preponderance of evidence that he or she is eligible for the benefit sought.'') (citations omitted).

[532] Except that the absence of a sufficient affidavit of support, where required, will lead to an inadmissibility finding. *See* INA section 212(a)(4)(C), (D), 8 U.S.C. 1182(a)(4)(C), (D).

**Exhibit A**

earlier than 36 months before the application for admission or adjustment of status.

Assessing an alien's ability to overcome the heavily weighted negative factor for recent receipt of, or certification or approval to receive, one or more public benefits above the designated threshold, in particular, will depend on the totality of the alien's circumstances and the existence of positive factors that alone or in combination could outweigh this heavily weighted negative factor such that the alien would not be likely to become a public charge at any time in the future. For example, the alien's assets and resources being at or above 250 percent of the FPG, the alien being healthy and between the ages of 18 and 61, the alien being currently employed, and evidence that the alien has disenrolled or requested to disenroll from public benefits could play a significant role in outweighing recent receipt of, or certification or approval to receive, public benefits above the designated threshold. Where a factor includes more than one consideration, including evidence related to such considerations, DHS will consider all evidence presented by the alien in the totality of the circumstances. For example, DHS will consider income above 125 percent and a good credit score and report as positive considerations in the totality of the circumstances.

If USCIS finds that the alien's positive factors outweigh the alien's negative factors, such that the alien is not likely to receive one or more public benefits above the designated threshold at any time in the future, then USCIS will conclude that the alien is not inadmissible as likely to become a public charge. On the other hand, if USCIS finds that the alien's negative factors outweigh the alien's positive factors, such that the alien is more likely than not to receive one or more public benefits above the designated threshold at any time in the future, then USCIS will find that the alien is inadmissible as likely to become a public charge.

USCIS, as with other applications, will notify applicants of deficiencies in their applications with respect to public charge inadmissibility in accordance with the principles outlined in 8 CFR 103.2 and USCIS policy in regard to notices, RFEs or NOIDs, and denials.[533]

If USCIS denies an alien's application for adjustment of status on public charge grounds under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), USCIS will explain why the negative factors outweigh the positive factors based on the alien's individual circumstances in making the alien more likely than not to receive one or more public benefits above the designated threshold at any time in the future.

Furthermore, to ensure consistency and quality control, USCIS will provide training to officers and continue to monitor adjudications. As is the case for any adjudication at USCIS, USCIS will apply its general quality control processes for adjudications involving public charge assessments. USCIS continues its ongoing data collection efforts on its adjudications as well as other information relevant to the adjudication, to continually assess and improve the adjudication processes, procedures and training.

However, DHS notes that officer discretion is not a new concept in USCIS immigration benefits adjudications. Several benefits provided under the Act are discretionary in nature, and involve an assessment and weighting of positive and negative factors. For example, an alien's adjustment of status application to that of lawful permanent resident under section 245 of the Act, 8 U.S.C. 1255, requires the officer to weigh all positive and negative factors in the alien's case to ultimately determine whether lawful permanent resident status should be granted as a matter of discretion.[534] DHS disagrees with commenters' characterization that the rule overall, the proposed framework for the public charge determination, and individual factors, as published in the NPRM, lack required specificity or are impermissibly vague. When creating implementing regulations under the APA, an agency must provide notice that, among other things, articulates the terms or substance of the proposed rule, or a description of the subjects and issues involved. A notice of proposed rulemaking must contain sufficient factual details and rationale to permit interested parties to comment meaningfully. An agency is accorded broad deference in selecting the level of

generality at which it may articulate regulations but a regulation is not deemed vague simply because it may contain a factor that is difficult to prove; it may be deemed vague or lacking in specificity if it is unclear as to what fact must be proven.[535] The NPRM and this rule both make abundantly clear what an alien must prove. DHS not only ensured that the public had a meaningful opportunity to comment by clearly articulating which factors USCIS will consider as part of the totality of the circumstances standard, but also by illustrating the application of the public charge determination framework and its factors in the preamble and in Table 33 of the NPRM.[536]

DHS also disagrees that the rule requires a high standard of proof. Congress established the mandatory factors that must be considered as part of the public charge determination and DHS is providing guidance on how to assess these factors.[537] Additionally, Congress established clear burdens and standards of proof relating to grounds of inadmissibility in immigration proceedings. The alien always has the burden to show that he or she is eligible for an immigration benefit and that he or she is not inadmissible.[538] In general, an alien must show by a preponderance of the evidence that he or she is eligible for the benefit sought.[539]

Finally, DHS understands that commenters believe that the submission of Form I–864 provides a method for objective public charge inadmissibility analysis and that the totality of the circumstances approach is inefficient because of training needs and because other agencies, such as the DOL, already evaluate education and skills criteria. It is true that the practical focus of DHS

[533] See USCIS Policy Memorandum Issuance of Certain RFEs and NOIDs; Revisions to *Adjudicator's Field Manual (AFM)* Chapter 10.5(a), Chapter 10.5(b), PM–602–0163 (Jul. 13, 2018) (*https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/AFM_10_Standards_for_RFEs_and_NOIDs_FINAL2.pdf* (last visited June 21, 2019).

DHS notes that the failure to submit a completed Form I–944, Declaration of Self-Sufficiency or Form I–864, Affidavit of Support with the Form I–485, Application to Register or Adjust Status, when required, may result in a rejection or a denial of the Form I–485 without a prior RFE or NOID. See 8 CFR 103.2(a)(7), (b)(8)(ii).

[534] See INA section 245, 8 U.S.C. 1255; see also USCIS Policy Manual Guidance on Adjustment of Status under INA section 245, Volume 7, Part B, 245(a) Adjustment.

[535] See F.C.C. v. *Fox Television Stations, Inc.,* 567 U.S. 239, 253 (2012); see also Connally v. *General Constr. Co.,* 269 U.S. 385, 391 (1926).

[536] See Inadmissibility on Public Charge Grounds, 83 FR 51114, 51211 (proposed Oct. 10, 2018).

[537] See INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[538] See INA section 291, 8 U.S.C. 1361; 8 CFR 103.2(b)(1) ("An applicant or petitioner must establish that he or she is eligible for the requested benefit."); *Matter of Brantigan,* 11 I&N Dec. 493 (BIA 1966).

[539] See *Matter of Bett,* 26 I&N Dec. 437, 440 (BIA 2014) ("To be eligible for adjustment of status, an applicant has the burden to show that he is clearly and beyond doubt entitled to be admitted to the United States and is not inadmissible under section 212(a) of the Act."); *Matter of Chawathe,* 25 I&N Dec. 369, 375 (2010) ("Except where a different standard is specified by law, a petitioner or applicant in administrative immigration proceedings must prove by a preponderance of evidence that he or she is eligible for the benefit sought.") (citations omitted). See also *Kirong* v. *Mukasey,* 529 F.3d 800, 803–804 (8th Cir. 2008) (concluding that as an applicant for adjustment of status, the alien is put into the position of an alien seeking admission and must prove that he or she is clearly and beyond doubt admissible).

**Exhibit A**

in a public charge inadmissibility determination previously had been primarily on the sufficiency of an affidavit of support submitted on the alien's behalf. DHS, however, clarified the relationship between the Form I–864 and a public charge inadmissibility determination in the NPRM.[540] As explained in the NPRM, given that the statute [541] differentiates between the affidavit of support requirement and the mandatory factors of the public charge assessment, DHS considers it inconsistent with the statutory language to solely use the affidavit of support as a means to determine public charge inadmissibility. Similarly, while certain employment-based immigrant categories are required to obtain labor certifications from the DOL and to submit evidence of job qualifications, these requirements focus on an alien's ability to meet qualifications of the job offered and the employer's ability to pay the proffered wages [542] rather than an alien's likelihood of becoming a public charge because of age, health, financial status, education, skills, etc. Therefore, DOL's assessments and certifications obtained by DOL are not redundant to or a suitable substitute for public charge determinations.

*Comment:* Several commenters stated that, although the proposed rule acknowledges that the public charge determination is intended to be prospective, the proposed criteria are actually retrospective and offered without any evidence that they are relevant to the determination of whether an immigrant will become dependent on the Government for support in the future. Some commenters stated that the proposed rule completely ignores an individual's ability to learn, work, develop skills, and support himself or herself and his or her family. Several commenters recommended that DHS conduct research about the probability that an individual would be self-sufficient or not based on the weighted factors included in the public charge determination.

One commenter agreed with the use of data in Table 33 on the Totality of Circumstances Framework for Public Charge Determinations in the NPRM,[543] but this commenter and many others stated that positive and negative weighted factors are not treated the same, as there is an extensive list of negative factors and a short list of

positive factors. Therefore, these commenters believed that it would appear more likely an applicant could be disqualified based on weighted negative factors even if their application contains both positive and negative factors. Several commenters cited the MPI's analysis of American Community Survey (ACS) data from 2012–2016, that identified immigrants that are lawful permanent residents with fewer than five years of residency in the United States. The study showed that a significant number of these lawful permanent residents would have one or more negative factors counted against them, indicating substantial reduction in the number of potential green cards issued if the proposed rule was finalized.

Multiple commenters stated that, in order to improve one's education and skills and to be self-sufficient, it is often necessary to draw on short-term supportive services, but drawing on such means-tested public benefits would be a negative consideration in the totality of the circumstances test. Thus, the rule sets up a contradictory situation in which individuals attempting to strengthen their positive factors may instead add to the negative factors for their case. A commenter stated that the weighted factors used in the "totality of circumstances" test to determine inadmissibility is the "only interpretation that would be consistent with the governing statutory language and established methods of statutory construction."

*Response:* DHS disagrees that it is at all problematic for DHS to consider events in the alien's past as part of a prospective inadmissibility determination. As explained in the NPRM, DHS's proposed totality of the circumstances standard involves the weighing of positive and negative considerations in relation to the alien's age, health, financial assets, education and skills as well as the required affidavit of support and any other factor that warrants consideration in the alien's case. The totality of the circumstances approach, including consideration of events and circumstances in the alien's past, is consistent with the approach taken by the former INS, the BIA, and Article III case law.[544] Thus, although these factors may require some retrospective evaluation at the time of adjustment of status, Congress and courts deemed the alien's past as relevant to the alien's likelihood of becoming a public

charge.[545] DHS also discussed, in detail, the relevance of each factor in the public charge determination and supported its finding with relevant data. DHS, therefore, disagrees that it failed to provide a reasonable explanation why the factors are relevant.

Finally, although section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), lists required factors that must be considered, it does not preclude USCIS from considering other considerations relevant in an applicant's case. DHS agrees that officers will encounter various circumstances not specifically accounted for in the regulation, but plans to give officers the necessary tools through guidance and training to fairly adjudicate such cases, and believes that officers are able to exercise their judgment appropriately. As noted above, Congress specifically provided for the agency's discretion to account for all aspects in an individual's case.[546] DHS disagrees with the commenters that indicated that positive and negative factors are not treated equally because DHS in its regulations listed more negative factors than positive ones. Although having more negative factors may be a basis for finding a person inadmissible based on public charge, the number of negative factors does not by itself lead to a conclusion that a person is likely to become a public charge. USCIS will consider and weigh each factor presented in an alien's case in the totality of the circumstances.[547] DHS notes that it has added an additional heavily weighted positive factor in section III.R. of this preamble.

*Comment:* Some commenters also indicated that it appeared more likely that applicants would be disqualified based on heavily weighted negative factors even though their application contains both positive and negative factors.

*Response:* DHS agrees that some applicants may be found in the totality of circumstances likely to become a

---

[540] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51197 (proposed Oct. 10, 2018).

[541] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[542] *See* 20 CFR part 656.

[543] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51211 (proposed Oct. 10, 2018).

[544] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51179 (proposed Oct. 10, 2018).

[545] *See Matter of Vindman,* 16 I&N Dec. 131 (Reg'l Comm's 1977) (consideration of past public benefits in determining the likelihood of becoming a public charge in the future); *Matter of Martinez-Lopez,* 10 I&N Dec. 409, 421–22 (BIA 1962; Att'y Gen. 1964) (in determining whether a person is likely to become a public charge, factors to consider include age, health, and physical condition, physical or mental defects which might affect earning capacity, vocation, past record of employment, current employment, offer of employment, number of dependents, existing conditions in the United States, sufficient funds or assurances of support by relatives or friends in the United States, bond or undertaking, or any specific circumstances reasonably tending to show that the burden of supporting he alien is likely to be cast on the public.)

[546] *See* INA section 212(a)(4), 8 U.S.C. 1184(a)(4).

[547] *See* 8 CFR 212.22(a).

**Exhibit A**

**41400** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

public charge even if they present positive factors. If negative factors in the alien's case (factors that increases an alien's likelihood of becoming a public charge) outweigh positive factors (factors that decrease the alien's likelihood of becoming a public charge), DHS would conclude, in the totality of the circumstances, that the applicant is inadmissible for likely becoming a public charge. Therefore, it may be that an alien is found inadmissible in light of a heavily weighted negative factor even if he or she may be able to present positive factors.

*Comment:* One commenter recommended that DHS provide guidance on how the "totality of circumstances" and likelihood determination should be reached using evidence-based methods, namely using a base rate as a prior probability which can be updated based on the evidence about a given alien. The commenter stated that starting from the "inside view" of the evidence about a given alien rather than the "outside view" of base rates about the reference class of all aliens would likely lead DHS to significantly more false positive determinations. The commenter stated that DHS should estimate a base rate—both before the rule takes effect and again after a sufficiently long interval to account for disenrollment—for the proportion of aliens non-exempt from public charge inadmissibility who would be considered public charges. This base rate should then be considered the prior probability that an alien is likely to become a public charge. The commenter also stated that DHS should also estimate average levels of receipt, duration, and other kinds of evidence in the totality of the circumstances so that officials may compare any given alien's evidence to average levels and make appropriate updates in the right direction. Another commenter suggested weighing factors using valid statistical methods, using administrative survey data to create a factor model to precisely calculate the probability of future use, and making the factor model available online for applicants to utilize before applying.

*Response:* The factors contained in this rule are based, in significant part, on data regarding the relationship between the minimum statutory factors and a person's likelihood of receiving public benefits. In the preamble to the proposed rule, for each positive and negative factor, DHS included supportive reasoning that related to either inferences regarding self-sufficiency or empirical data regarding the relationship between the factor and the likelihood that a person would

receive public benefits. DHS relied on such data for all heavily weighted factors. For instance, in proposing the heavily weighted negative factor for lack of employability, DHS relied not only on the reasonable premise that "[s]elf-sufficiency generally involves people being capable and willing to work and being able to maintain gainful employment," but also on Census Bureau data showing that individuals with full-time work were less likely to receive means-tested benefits during the year (ranging from 4.5 percent to 5.1 percent) than those with either part-time work (ranging from 12.6 percent to 14.2 percent) or those who were unemployed (ranging from 24.8 percent to 31.2 percent).[548]

That said, DHS cannot satisfy the commenter's request that DHS "estimate . . . base rates—both before the rule takes effect and again after a sufficiently long interval to account for disenrollment—for the proportion of aliens non-exempt from public charge inadmissibility." This is because as DHS acknowledged in the proposed rule, DHS lacks access to data regarding the specific categories of aliens that are subject to the public charge ground of inadmissibility, let alone data regarding such aliens' public benefits use as it relates to the statutory factors. For instance, the proposed rule explained that much of the data that DHS relied upon came from the 2014 Panel of the SIPP. The SIPP Panel includes respondent-provided data on nativity, citizenship status, and initial immigration status, but does not provide data on current immigration classification. Additionally, the categories represented in the SIPP immigration status item do not align precisely with the populations covered by this rule—for instance, the results include refugees, asylees, and other populations that may access public benefits but are not subject to the public charge ground of inadmissibility. Finally, the SIPP data and DHS's analysis of this data do not examine whether the receipt of public benefits was authorized, and DHS did not

examine program payment rate error information for this purpose. DHS sought comment on its use of the SIPP data, and whether alternative reliable data sources are available.[549] The commenter did not identify an alternative reliable data source that controls for whether an alien is subject to the public charge ground of inadmissibility.

Even if the commenter had identified such data, however, adjudicators would not have been able to rely heavily on such data, because the public charge assessment requires a prediction based on an assessment of the alien's particular circumstances within the framework of multiple statutory factors, and any other relevant considerations. A data set tailored to such particular individuals' circumstances may not be available, and in any event was not identified by the commenter.

DHS acknowledges that the predictive analysis it will be conducting based on an individual's particular circumstances leaves some room for error, however, so would any predictive algorithm or data-based "outside view" analysis, particularly given the data limitations DHS encountered and the likelihood that even if comprehensive data sets existed that could be utilized in the fashion the commenter suggests, they would not be detailed enough or sufficiently timely to account for changes in trends. For example, a dataset from the 2008–2010 timeframe may predict an appreciably higher rate of benefit receipt based on certain individual circumstances than a dataset from 2015–2017. Therefore, in the absence of adequate tools that would allow DHS to use a comprehensive quantitative framework for individual public charge inadmissibility determinations, USCIS officers will rely on their training and USCIS guidance to assess the relationship between factors and the likelihood to receive public benefits above the designated threshold at any time in the future. This analysis will include an assessment of all evidence provided by the alien in support of his or her application, including any credible and probative data that is relevant to the assessment. Furthermore, to the extent USCIS is able to identify credible and probative data sources that would provide context for

---

[548] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51198 (proposed Oct. 10, 2018) (citing Jeongsoo Kim, Shelley K. Irving, & Tracy A. Loveless, U.S. Census Bureau, *Dynamics of Economic Well-Being: Participation in Government Programs, 2004 to 2007 and 2009—Who Gets Assistance?* 12 (July 2012), available at *https:// www2.census.gov/library/publications/2012/demo/ p70–130.pdf* (last visited July 26, 2019); Shelley K. Irving & Tracy A. Loveless, U.S. Census Bureau, Dynamics of Economic Well-Being: Participation in Government Programs, 2009–2012: Who Gets Assistance? 10 (May 2015), available at *https:// www.census.gov/content/dam/Census/library/ publications/2015/demo/p70–141.pdf*) (last visited July 26, 2019).

[549] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51160–61 (proposed Oct. 10, 2018). The commenter also suggested that DHS generate such data. But, it does not seem possible to estimate the probability of becoming a public charge by following up with aliens who were subject to the determination. For instance, many of those who were denied a benefit may not reside in the United States at a later date.

**Exhibit A**

adjudicators in evaluating one or more mandatory factors, USCIS may provide such data sources to adjudicators and ensure consistent application through guidance and training.

*Comment:* A few commenters provided feedback on the review process. One commenter stated that immigration officers will have a limited amount of time to properly review documents and employment letters, and will not undertake an effective, case-by-case appraisal of applications. Similarly, commenters indicated that supervising officers will not have enough time to review each denial thoroughly.

*Response:* DHS understands the concerns that the public charge determination could increase the adjudication time of immigration benefits and that individuals, including attorneys, may have additional questions. DHS and USCIS are committed to putting the necessary resources into place, including additional adjudicators, to minimize any impact on current immigration benefits adjudications and to provide for thorough consideration of each case and appropriate supervisory review.

*Comment:* Many commenters voiced concern about the disproportionate negative impact of the application of the mandatory factors on marginalized communities. This included negative effects on immigrants belonging to the LGBTQ community, HIV positive immigrants, immigrants with chronic health conditions and disabilities, immigrants of color, Latino immigrants, AAPI immigrants, immigrants from countries that are poor and largely people of color, senior citizens, women, and victims of domestic violence and sexual abuse.

*Response:* Regardless of whether this rule will impact the groups specified in these comments, DHS is not promulgating this rule for a discriminatory purpose. Rather, this rule will better ensure that aliens seeking to enter or remain in the United States either temporarily or permanently are self-sufficient, and rely on their own capabilities and the resources of their family, sponsors, and private organizations, rather than the government.[550] DHS will determine an individual's inadmissibility on public charge grounds of inadmissibility in the totality of the circumstances, based on the statutorily mandated factors.[551] Additionally, Congress did not make applicable the public charge ground of inadmissibility to certain classes of aliens, including certain victims of

domestic violence, trafficking and other crimes. DHS therefore included these exemptions in this rulemaking.[552]

*Comment:* A few commenters cited the MPI study, which stated that of the over 2 million individuals granted lawful permanent residence status in the past five years (between 2012 and 2016), 69 percent of recent lawful permanent residents who are not refugees or other humanitarian admissions would have had at least one negative factor under the proposed new definition, 43 percent at least two negative factors, and 17 percent had at least three negative factors.[553] The same analysis reported that 39 percent of recent lawful permanent residents did not speak English well or not at all, 33 percent had household incomes below 125 percent of the FPG, 25 percent did not have a high school diploma, and 12 percent were under age 18 or over age 61. The analysis also estimated that 39 percent of recent lawful permanent residents had incomes at or above 250 percent of the FPG.

*Response:* DHS thanks commenters for citing the findings of the MPI study, which also highlighted that ''the rule does not specify how many negative versus positive factors someone must have for their application to be denied.''[554] While an alien may have one, two, three, or more negative factors, the mere fact that the alien's negative factors outnumber the alien's positive factors is not a sufficient basis to find the alien inadmissible. DHS must find that the alien's negative factors outweigh the alien's positive factors based on the totality of circumstances analysis, such that the alien is more likely than not at any time in the future to receive one or more public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within any 36-month period.

Once effective, DHS is aware that this rule will likely result in more findings of public charge inadmissibility and may result in fewer overall admissions and approved adjustment of status applications to the United States, as DHS seeks to better enforce the public charge ground of inadmissibility and to ensure that aliens are self-sufficient

when coming to the United States or seeking to adjust status. Notwithstanding, DHS will be bound by its own regulations in making public charge inadmissibility determinations based on the totality of the alien's circumstances, which includes considering and weighing all relevant factors that are favorable to the alien.

*Comment:* Commenters indicated that it is impossible to predict future self-sufficient behavior based on current resources of individuals who are, by definition, in transition (or trying to be) from living in another country to finding and creating opportunity in the United States.

*Response:* DHS disagrees that it is impossible to predict whether an individual is likely to become a public charge in the future based on the factors outlined in INA section 212(a)(4) of the Act, 8 U.S.C 1182(a)(4). The commenters' quarrel is with Congress, not DHS. While DHS acknowledges that the public charge determination is a complex assessment, DHS described at length in the NPRM how it would evaluate an alien's individual circumstances, including the minimum statutory factors, as part of the public charge determination. In Table 33 of the NPRM, DHS also outlined in detail the totality of the circumstances assessment and when the evidence in the totality of the circumstances may be indicative of the individual becoming a public charge. In this final rule, as explained below, DHS has further clarified and expanded on its approach.

*Comment:* Commenters pointed out that many who would be subject to the public charge rule are already barred from receiving public benefits for at least 5 years due to past welfare reform efforts.

*Response:* The commenters correctly pointed out that under PRWORA and other laws, most immigrants and nonimmigrants are not eligible for certain public benefits for a duration of at least five years. The public charge ground of inadmissibility, however, does not have any temporal limits in this regard and is prospective in nature; Congress directed the administering agencies to determine, for admissibility purposes, whether the alien is likely, ''at any time'' to become a public charge.

*I. Age*

1. Standard

*Comment:* A commenter expressed support for the proposed designation of the age range 18–61 as a positive factor and stated that there is a strong correlation between this prime working age range and a much lower rate of use

---

[550] 8 U.S.C. 1601(2)(A).
[551] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[552] *See* 8 CFR 212.23.
[553] MPI, Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration (Nov. 2018), *https://www.migrationpolicy.org/research/impact-dhs-public-charge-rule-immigration* (last visited July 25, 2019).
[554] *See* Capps, Randy et al, ''Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration,'' Migration Policy Institute. (November 2018). Available at: *https://www.migrationpolicy.org/research/impact-dhs-public-charge-rule-immigration* (last visited July 26, 2019).

**Exhibit A**

42 827 82 3 4

!

**Federal Register**/Vol. 84, No. 157/Wednesday, August 14, 2019/Rules and Regulations    **41403**

inadmissibility based on public charge solely based on the age of a child. Instead, USCIS would also review the support provided by a parent or other source in the totality of the circumstances.

*Comment:* Commenters stated DHS based the proposed age standard on the minimum age at which one can start to claim retirement benefits under social security; however, this was never meant to be used to say that people are unable or even unlikely to work after that age. Several commenters explained that if DHS finalized the rule as proposed, many U.S. citizens would no longer be able to welcome their own parents into the country because it would be difficult for older adults to pass the "public charge" test under the new criteria. A commenter stated that applications for parents account for almost 30 percent of all family-based applications. Some commenters stated that many seniors immigrate to the United States in order to help care for children and other family members. Commenters stated this rule fails to recognize the value of intergenerational families who support each other and the proposed rule "callously" labels parents and grandparents as a burden because of their age or health needs and ignores the critical roles many grandparents play in caring for their grandchildren and other family members, often enabling others to work.

A few commenters stated that the proposed rule fails to accord appropriate dignity and respect to community elders seeking immigration relief by treating them as economically disposable, and would have the effect of straining and fracturing families who seek to maintain seniors within the familial unit.

A commenter said having older adults at home can eliminate the cost of childcare, which is one of the highest budget items for many families and can approach 20 percent of household income for low-income families. Citing studies, a commenter stated that limiting the age of workers has been shown to have a negative economic impact on society. Another commenter remarked that the proposed rule could prevent many American citizens from maintaining the dignity of their families due to "exclusionary factors" assigned to advanced age or receipt of life-saving medical savings under Medicare Part D. The commenter also stated that this illustrates a critical flaw in the proposed rule: it undervalues the important role a parent or grandparent contributes to a family. A few commenters stated that if U.S. citizens are unable to bring their parents to the United States, they would

have to send money abroad for their care in their home country, which may require expensive residential care, financially hampering citizens and sending those dollars outside of the U.S. economy.

One commenter stated there is a priceless emotional benefit to U.S. citizens having their parents nearby for love, support, and for their families to be whole and enriched through the joyful and sorrowful life events of the birth of grandchildren and the passing of family elders. A commenter stated that some U.S. citizens bring their elderly parents to the United States because caring for them here will ease the burden of worrying about their care in countries that are many thousands of miles away. The commenter added that the ability to care for loved ones at the end stages of life is an important marker for all communities and nationalities, which would be nearly impossible if DHS finalized the rule as proposed.

*Response:* DHS disagrees that the age standard is arbitrary. As provided in the NPRM,[564] there is a correlation between the prime working age range and lower rates of public benefit use. As indicated in the NPRM,[565] the 18 through 61 age range is based on the ages at which people are generally able to work full-time before being able to retire with some social security retirement benefits under Federal law.[566] The age of 18 is based on the general age to be able to start working full-time;[567] the age of 61 is the year before the minimum "early retirement age" for social security purposes[568] (62 as of 2017). DHS will still consider the alien's age in relation to whether it makes the alien more or less likely to become a public charge, such as by impacting the alien's ability to work. DHS is not establishing the age range as a statement that people outside that range are unable to work. DHS acknowledges that people under the age of 18 and over the age of 61 may be working or have other adequate means of support, such as from family members. DHS would recognize such means as positive factors. In other words, a senior who establishes to DHS's satisfaction that she or he is not likely to become a public charge would

not be deemed inadmissible on public charge grounds.

DHS recognizes the tangible and intangible value to individuals and communities of strong family bonds and support across generations. DHS notes that where an alien can establish that he or she is not likely to become a public charge in light of all the relevant factors—including, for example, the support of one or more family members—the alien would not be found inadmissible as a public charge. Accordingly, DHS does not believe that this rulemaking will necessarily render it impossible for individuals to care for family members. Rather, the rule seeks to ensure that aliens rely on themselves and on private sources, including their families, to meet their needs, rather than relying on public benefits. DHS does acknowledge that the rule could affect a family member's admissibility or eligibility to adjust status in some cases, but notes that such effect would be a consequence of the statutory scheme, under which the family member is subject to the public charge ground of inadmissibility.

*Comment:* A commenter asserted the statistics DHS used to establish the 18–61 age standard do not distinguish between those who are refugees and asylees and those who obtained legal status through a family or employment-based petition. The commenter added that lawful permanent residents who immigrate or adjust through other means are barred for their first five years from accessing SSI, and they are subject to sponsor-to-alien deeming of income thereafter. The commenter stated that it is inappropriate to lump this latter group of lawful permanent residents in with refugees and asylees, who are in fact encouraged to participate in Federal benefit programs, and it is disingenuous to use it as a basis to make age above 61 years a negative factor.

*Response:* As discussed in the NPRM, DHS recognizes that the statistics provided do not distinguish the immigrant status of the alien, and "the results include refugees, asylees, and other populations that may access public benefits but are not subject to the public charge ground of inadmissibility."[569] The SIPP data and DHS's analysis of this data do not examine whether the receipt of public benefits was authorized, and DHS did not examine program payment rate error information for this purpose. Notwithstanding these limitations, DHS believes the SIPP data on noncitizen participation is instructive with respect

---

[564] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51180 (proposed Oct. 10, 2018).

[565] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51180 (proposed Oct. 10, 2018).

[566] *See* 29 U.S.C. 213(c), 42 U.S.C. 416(*l*)(2).

[567] *See* 29 U.S.C. 213(c); 29 CFR part 570; *see also* Dep't of Labor, *Table of Employment/Age Certification Issuance Practice Under State Child Labor Laws, available at* https://www.dol.gov/whd/state/certification.htm (last visited July 26, 2019).

[568] *See* 42 U.S.C. 416(*l*)(2).

[569] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51160 (proposed Oct. 10, 2018).

**Exhibit A**

to the receipt of non-cash benefits by the noncitizen population overall.

*Comment:* A few commenters stated this proposal could undermine access to healthcare, nutrition, and housing programs for children of immigrants and their aging family members. One commenter said the proposed consideration of age could contribute to family separations. The commenter added that by weighing age negatively in the totality of circumstances, immigrant children younger than 18 years of age are likely to see their green card or visa applications denied, which could lead to members of the same family obtaining differing immigration statuses, with some members unable to remain in the United States. A few commenters said the rule could increase family separation, which can cause emotional stress and trauma in children that leads to negative health outcomes. Another commenter cited an MPI analysis, which found that 45 percent of children who recently received green cards had two or more negative factors. The commenter added that depriving children, including U.S. citizens, of access to public benefits that would otherwise increase their families' ability to thrive will lead to deep stress, which studies show then in turn leads to reduced outcomes throughout life. A commenter indicated that being a child should not weigh against an individual in a public charge determination. The commenter stated that because children generally are not allowed to work, it is unlikely they could have an income or assets on their own equal to 125% or more of the FPG.

*Response:* DHS understands that individuals, including children, will be impacted by this rulemaking, once effective. When codifying section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), Congress did not generally exempt children from the public charge inadmissibility ground and an alien's age is a mandatory, statutory factor that DHS must be considered when determining whether an alien is likely at any time in the future to become a public charge.[570] Accordingly, DHS will consider whether the alien's age makes the alien more likely than not to become a public charge, such as if the alien's age affects an alien's ability to work. DHS understands that children are in a unique position in some respects, especially as it relates to employability. The commenter referred to the MPI's study, which attempted to measure the general impact of the proposed rule by examining the situations of recent green

card recipients. The MPI study estimated that among recent green card recipients, about 45 percent of the children would have had two or more negative factors if the proposed rule had been applied to them.[571] DHS appreciates the input on the potential impact. As indicated in the NPRM, however, DHS is not able to quantify the number of aliens, including children, who would possibly be denied admission based on a public charge determination under this rule. Again, DHS is qualitatively acknowledging this potential impact.

DHS would like to clarify, however, the following aspects of the inadmissibility determination in relation to children under the age of 18: DHS understands that children may continue their education and obtain employment in the future. As indicated throughout this preamble, DHS would not make a public charge inadmissibility determination solely based on the age of a child. Instead, USCIS will review the support provided by a parent or the parents, and any other evidence addressing the resources and assets available to the child in the totality of the circumstances when determining whether the child is more likely than not at any time in the future to become a public charge. DHS has also made a number of changes and clarifications in this final rule that are relevant to the rule's effects on children, including (1) excluding receipt of Medicaid by children under age 21, and (2) clarifying that receipt of benefits by another beneficiary's behalf is not attributed to the person who received it (such as a parent or legal guardian, for example). DHS does not anticipate outcomes that would require family members to live in different countries, so long as any family members who have applied for an immigration benefit for which admissibility is required can demonstrate that they are not inadmissible.

Overall, DHS notes that the public charge inadmissibility determination requires DHS to evaluate the alien child's particular circumstances. DHS's totality of the circumstances standard involves weighing all the positive and negative considerations related to an alien's age; health; family status; assets, resources, and financial status; education and skills; required affidavit of support; and any other factor or

circumstance that may warrant consideration in the public charge inadmissibility determination.[572] If the negative factors outweigh the positive factors, then the alien would be found inadmissible as likely to become a public charge; if the positive factors outweigh the negative factors, then the alien would not be found inadmissible as likely to become a public charge.

2. Age Discrimination

*Comment:* Some commenters stated that rule discriminates against people of certain ages. Commenters stated that the age standard is not only discriminatory towards children, but is also logically inconsistent as children have a lifetime of productive years ahead of them. Commenters stated that adding age and disability discrimination into our immigration regulations would unjustly deny U.S. citizens the ability to reunite with, receive support from, and if necessary, provide support to their family members.

*Response:* DHS does not agree that this rule adds discrimination based on age or disability. An alien's age is a mandatory factor that must be considered when determining whether an alien is likely to become a public charge in the future.[573] Therefore, the rule includes this factor. As DHS noted in the NPRM, a person's age may impact his or her ability to legally or physically work and is therefore relevant to being self-sufficient, and the likelihood of becoming a public charge. An alien's likelihood of becoming a public charge is prospective and based on the totality of the alien's circumstances. If an alien's positive factors outweigh the negative factors, then the alien would not be found inadmissible as likely to become a public charge. No one factor, apart from the failure to submit a sufficient affidavit of support where required, is outcome determinative.

Additionally, to the extent that this rule may result in the denial of some applications filed by relatives of U.S. citizens, DHS disagrees that this rule would deny U.S. citizens the ability to reunite with, and support, their families. DHS acknowledges that the rule could affect a family member's admissibility or eligibility for adjustment of status, but such effect would be a consequence of the statutory scheme, under which the family member is subject to the public charge ground of inadmissibility. This rule does not change the criteria applicable to a U.S. citizen filing Petition for Alien

---

[570] *See* section INA section 212(a)(4)(B), 8 U.S.C. 1182(a)(4)(B).

[571] *See* Capps, Randy et al, "Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration," Migration Policy Institute. (November 2018). Available at: *https://www.migrationpolicy.org/research/impact-dhs-public-charge-rule-immigration* (last visited July 26, 2019).

[572] *See* 8 CFR 212.22.

[573] *See* INA section 212(a)(4)(B), 8 U.S.C. 1182(a)(4)(B).

**Exhibit A**

Relative (Form I–130), which does not require the beneficiary's admissibility. This rule addresses the criteria for establishing eligibility for admission or adjustment of status and for demonstrating that the applicant is not inadmissible as likely to become a public charge. In other words, even if an alien may be eligible statutorily to be granted adjustment of status based upon the approval of a Form I–130 filed by a U.S. citizen relative, the alien is not entitled to be admitted to the United States or granted adjustment,[574] and the U.S. citizen is not entitled to be reunified with the applicant.

*J. Health*

1. Standard

*Comment:* Several commenters stated that the rule perpetuates the "false assumption" that a medical diagnosis is solely determinative of an individual's current abilities and future prospects, with some asserting that chronic illness is not an accurate indicator of future self-sufficiency and full-time employment capabilities. One commenter stated that this policy assumes that the presence of a physical or mental condition is a financial risk to the state and fails to recognize the significant contributions that people with chronic health and other conditions can and do make as professionals and community members. One commenter stated the that consideration of disability in the health factor was a per se rule that is inconsistent with the fact that "health status is far from necessarily predictive of a person's ability to engage productively in work and other aspects of community life." Another commenter stated that DHS failed to consider that with access to health insurance (*e.g.*, Medicaid), preventive medical treatment, and health care professionals, individuals with chronic medical conditions can exhibit drastic improvements in their health and productivity. A different commenter stated that counting conditions that require extensive medical treatment and/or hospitalization as negative factors ignores the reality that a Class A or B medical condition, especially a curable one, is not an accurate indicator

of future self-sufficiency and full-time employment capabilities. Commenters noted that advances in medical technology could make certain conditions, such as HIV/AIDS more manageable in the future, with one noting that Type 1 Diabetes was a disabling condition in the 1950s but now adults and children with Type 1 Diabetes lead full, productive, and independent lives.

Conversely, one commenter agreed that the proposed health factor approach is appropriate for public charge purposes, so long as the inquiry is limited to whether aliens are likely to be able to pay for health-related expenses for themselves and any household dependents without the use of public resources.

*Response:* DHS recognizes that an individual with medical conditions may provide significant contributions to society. As established by Congress, an alien's health is a factor that must be considered when determining whether an alien is likely to become a public charge at any time in the future.[575] As indicated in the NPRM, the mere presence of a medical condition would not render an alien inadmissible.[576] Instead, DHS would consider the existence of a medical condition in light of the effect that such medical condition is likely to have on the alien's ability to provide and care for himself or herself; DHS will weigh such evidence in the totality of the circumstances. DHS officers will not be making medical determinations or determining the effects of the conditions. Instead, officers will review any required Form I–693 or applicable DOS medical examination form[577] submitted in support of the application for the diagnosis of medical conditions according to the procedures established by HHS;[578] or any other evidence of a medical condition that is likely to require extensive medical treatment or institutionalization after arrival, or that will interfere with the alien's ability to care for himself or herself, to attend school, or to work. The HHS regulations direct physicians conducting the immigration medical examinations for either Class A or Class B conditions to explain on the medical report "the

nature and extent of the abnormality; the degree to which the alien is incapable of normal physical activity; and the extent to which the condition is remediable . . . [as well as] the likelihood, that because of the condition, the applicant will require extensive medical care or institutionalization." [579] In addition, the CDC Technical Instructions for Medical Examinations of Aliens, directs physicians to provide information about Class B conditions, which, although do not "constitute a specific excludable condition, represents a departure from normal health or well-being that is significant enough to possibly interfere with the person's ability to care for himself or herself, to attend school or work, or that may require extensive medical treatment or institutionalization in the future." [580] Such an assessment would necessarily account for any recent advancements in treating the medical condition, and goes directly to the prospect of the alien being able to care for himself or herself and being able to attend school or go to work. And, of course, the alien could provide further information with the application.

*Comment:* One commenter stated that, while health has always been a factor in the public charge test, the proposed rule codifies and unduly weighs the specific standard for evaluating an individual's health. Similarly, another commenter stated that the proposed rule essentially counts the same health status as two negative factors and also as a heavily weighted negative factor: Once as a negative health factor; again as a negative assets, resources and financial status factor; and then again as a heavily weighted negative factor if the non-citizen is uninsured. A different commenter said the combination of penalizing someone's medical condition

---

[574] *See Mudric* v. *Att'y Gen. of U.S.*, 469 F.3d 94, 98 (3d Cir. 2006) ("While an alien may be eligible for a grant of . . . adjustment of status under the immigration laws, he is not entitled to such benefits as a constitutional matter."); *see also*, Matter of Ho, 19 I&N Dec. 582, 589 (BIA 1988) (holding that "[a]pproval of a visa petition is but a preliminary step in the visa or adjustment of status application process, and the beneficiary is not, by mere approval of the petition, entitled to an immigrant visa or to adjustment of status.")

[575] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[576] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51181–84 (proposed Oct. 10, 2018).

[577] This is currently the Immigrant or Refugee Application (Form DS–2054).

[578] The medical examination documentation indicates whether the applicant has either a Class A or a Class B medical condition. In addition, the alien must provide a vaccination record as part of the medical examination. Class A and Class B medical conditions are defined in the HHS regulations. *See* 42 CFR 34.2.

[579] 42 CFR 34.4(b)(2) (Class A); 42 CFR 34.4(c)(2) (Class B).

[580] *See* Ctrs. for Disease Control & Prevention, *Required Evaluations—Other Physical or Mental Abnormality, Disease, or Disability, Technical Instructions For Medical Examination Of Aliens, available at https://www.cdc.gov/immigrant refugeehealth/exams/ti/panel/technical-instructions/panel-physicians/other-physical-mental.html* (last updated Nov. 23, 2016) (last visited July 26, 2019); Ctrs. for Disease Control & Prevention, *Required Evaluation Components Other Physical or Mental Abnormality, Disease or Disability, Technical Instructions for the Medical Examination of Aliens in the United States, available at https://www.cdc.gov/immigrant refugeehealth/exams/ti/civil/technical-instructions/civil-surgeons/required-evaluation-components/other-disease-disability.html* (last updated Aug. 3, 2010) (last visited July 26, 2019). The HHS regulations require physicians conducting medical examinations for an alien to comply with the CDC's Technical Instructions for Medical Examinations of Aliens. 42 CFR 34.3(i).

**Exhibit A**

and negatively weighting use of benefits and services that help to treat that medical condition will create an insurmountable bar for many older adults and people living with chronic illnesses or disabilities. Another commenter said health and disability are factors that are improperly considered twice under the rubric of the proposed rule.

*Response:* DHS disagrees that the review of the health factor in the public charge inadmissibility determination is an insurmountable bar for people with chronic illness or disabilities. The mere presence of a medical condition would not render an alien inadmissible. Instead, DHS would consider the existence of a medical condition in light of the effect that such medical condition is likely to have on the alien's ability to attend school or work, and weigh such evidence in the totality of the circumstances. As part of the assets, resources and financial status factor, DHS would also consider whether the alien has the resources to pay for associated medical costs.

As stated in the NPRM, an alien is at high risk of becoming a public charge if he or she does not have the resources to pay for reasonably foreseeable medical costs, including costs related to a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide care for himself or herself, to attend school, or to work.[581]

The mere presence, however, of any one enumerated circumstance, would not alone be determinative. A heavily weighted factor could be outweighed by countervailing evidence in the totality of the circumstances. DHS also disagrees that it is impermissibly counting factors twice. DHS acknowledges that multiple factors may coincide or relate to each other and emphasizes that the public charge determination reviews all factors in the totality of the circumstances. Therefore, the fact that a person has a medical condition that prevents him or her from working or going to school and lacks private health insurance is considered in the totality of the circumstances without assigning a point system or value to various factors. Finally, as discussed in section III. R. of this preamble, DHS has added a heavily weighted positive factor for private health insurance appropriate to intended the duration of the alien's stay.

*Comment:* Some commenters expressed concern that this aspect of the

rule contained vague wording. One commenter stated that considering "any physical or mental condition" as part of the individual's health is overly broad and open to interpretation. Another commenter stated that the rule would stretch the INA's public charge language beyond recognition by adding vague references to "extensive medical treatment" and "interference" with an individual's ability to work, attend school, or otherwise be self-sufficient. The commenter stated that the manner in which DHS proposed to consider the health of an immigrant in making a forward-looking public charge determination leaves so much room for discretion that it renders the health factor consideration meaningless. A different commenter objected to using the standard of whether a health condition "interferes with work or school" as too broad, vague, and biased against people of color who will be prejudiced by this generic standard. The commenter stated that social determinants of health are one of the main inequalities between whites and persons of color. A commenter said that the proposed rule's consideration of medical conditions "likely" to require extensive medical treatment in the future was highly speculative, and that medical predictions about the future are notoriously inaccurate.

One commenter stated that, although the rule claims to use a physician's medical examination/report with two classes of medical conditions, it is vague, provides the physician with great latitude, and does not provide a clear definition of which medical conditions would be considered as a negative factor. This commenter stated that this suggests that any pre-existing condition may be counted against a green card applicant regardless of whether it will seriously undermine an individual's self-sufficiency.

Some commenters provided input on the role of DHS adjudicators as it relates to the health factor. Several commenters questioned the ability of an adjudicator to determine if someone living with a chronic condition will be a public charge in the future. One commenter said authorizing DHS personnel to make projections about whether a person's health condition could, in the future, affect their ability to work, study or care for themselves or require expensive treatment invites unbridled speculation and discrimination against persons with disabilities or other observable physical conditions. Another commenter stated that USCIS lays out no standards for determining whether a disability or other serious health condition will lead the agency to decide whether an

applicant has a "reasonable prospect of future employment." A different commenter said the rule would authorize non-medically trained personnel to overrule a medical professional's determination about whether a person's health should be a barrier to admission. Another commenter said immigration officials lacking any specialized medical knowledge would rely on hastily composed medical reports (frequently from medical providers who would have no established medical relationship with an individual) to exclude a noncitizen from the immigration benefit solely because of the presence of a particular illness or disability that may appear "grave" or "costly" based on preconceived and often erroneous assumptions. Some commenters said the proposed rule discounts future advancements in medical science and social norms by allowing DHS officials to make present-day judgements about an individual's future capabilities. A couple of commenters stated that the rule does not provide meaningful guidance on permissible and impermissible considerations when factoring in a person's disability during a public charge inadmissibility finding, which leaves immigration officials with seemingly open-ended interpretation.

*Response:* DHS disagrees that the wording regarding the health factor is vague and does not provide guidance on the consideration of disability. DHS's language mirrors the language as provided by HHS regulations and CDC guidance. In identifying a Class A medical condition, the HHS regulations direct physicians conducting the immigration medical examinations to explain on the medical report "the nature and extent of the abnormality; the degree to which the alien is incapable of normal physical activity; and the extent to which the condition is remediable . . . [as well as] the likelihood, that because of the condition, the applicant will require extensive medical care or institutionalization."[582]

A Class B medical condition is defined as a physical or mental condition, disease, or disability serious in degree or permanent in nature.[583] Currently, the CDC Technical Instructions for Medical Examinations of Aliens, which direct physicians to provide information about Class B conditions, describe a Class B condition as one that, although it does not "constitute a specific excludable

---

[581] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51182 (proposed Oct. 10, 2018).

[582] 42 CFR 34.4(b)(2).
[583] *See* 42 CFR 34.2(b)(2).

**Exhibit A**

condition, represents a departure from normal health or well-being that is significant enough to possibly interfere with the person's ability to care for himself or herself, to attend school or work, or that may require extensive medical treatment or institutionalization in the future.''[584]

As discussed in the NPRM,[585] as part of the immigration medical examination, when identifying a Class B medical condition, civil surgeons and panel physicians are required to report on certain disabilities, including the nature and severity of the disability, its impact on the alien's ability to work, attend school, or otherwise support himself or herself, and whether the disability will require hospitalization or institutionalization. DHS would only consider disability as part of the health factor to the extent that such disability, in the context of the alien's individual circumstances, impacts the likelihood of the alien becoming a public charge; *i.e.*, the rule calls for a consideration of the potential effects on the alien's ability to work, attend school or otherwise support himself or herself. Further, if an immigration medical examination by a civil surgeon or panel physician is required, officers will generally defer to the report when assessing whether an individual's medical condition will affect a person's ability to care for himself or herself, work, or go to school. DHS would generally defer to such report, unless there is evidence that the report is incomplete. DHS has amended the regulatory text consistent with this approach. Consistent with the NPRM, however, DHS will also permit the alien to submit other documentation regarding the alien's medical conditions to assess whether the alien's health makes the alien more likely than not to become a public charge at any time in the future. This should provide ample

opportunity for the alien to provide the full context surrounding his or her health.

*Comment:* Another commenter stated that the Form I–693 medical exam could not be expected to detect ailments or conditions not indicated on Form I–693, and therefore, DHS may never be made aware of many health conditions among future applicants and petitioners. The commenter further indicated that an individual could delay seeking treatment for a condition, and could delay application for Medicaid or Medicare until after naturalizing. Another commenter expressed concern that the list of medical conditions included in the Form I–693 medical exam may be subject to additions after finalization of the proposed rule threatening the hard-won progress towards ending many epidemics in the United States.

*Response:* DHS's general reference for review of the health factor is the Form I–693. Civil surgeons test for Class A and Class B conditions and report the findings on the Form I–693, as directed by the CDC Technical Instructions; an officer would review the civil surgeon's findings in the totality of the circumstances. However, DHS would also take into consideration any additional medical records or related information provided by the alien to clarify any medical condition included on the medical form or other information that may outweigh any negative factors. Such documentation may include, for instance, a licensed doctor's attestation of prognosis and treatment of a medical condition. DHS would consider the evidence in the totality of the circumstances. DHS acknowledges that this approach is imperfect, but believes that it appropriately implements the statute in the context of adjudicators' limited expertise.

*Comment:* A commenter said the rule's inclusion of Class B medical conditions as impacting admissibility is an impermissible use of regulatory power. Specifically, the commenter said the proposed rule seeks to create a new ground of inadmissibility by finding those who are not inadmissible under section 212(a)(1) of the Act, inadmissible under section 212(a)(4) of the Act and is attempting to substitute medical determinations by congressionally enabled civil surgeons and panel physicians with its own determination about medical inadmissibility.

*Response:* DHS disagrees with the commenter that considering Class B medical conditions as part of the public charge determination is an

impermissible use of regulatory authority. As part of the public charge determination, Congress directed agencies to consider, among other factors, the health of the alien.[586] As explained in the NPRM,[587] prior to Congress establishing health as a factor for the public charge determination, the courts, the BIA and INS had also held that a person's physical and mental condition was of major significance to the public charge determination, generally in relation to the ability to earn a living.[588] Accordingly, DHS proposed that when considering an alien's health, DHS will consider whether the alien has any physical or mental condition that, although not considered a condition or disorder that would render the alien inadmissible under the health-related ground of inadmissibility,[589] is significant enough to interfere with the person's ability to care for himself or herself or to attend school or work, or that is likely to require extensive medical treatment or institutionalization in the future. USCIS-designated civil surgeons and DOS-designated panel physicians examine whether an alien has a condition that renders the alien inadmissible on medical grounds (a Class A medical condition according HHS regulation)[590] or whether the alien has a medical condition that is significant enough to interfere with the person's ability to take care of himself or herself, to attend school or to work and would likely receive extensive medical treatment (a Class B condition).[591] If the alien is required to

[584] See Ctrs. for Disease Control & Prevention, *Required Evaluations—Other Physical or Mental Abnormality, Disease, or Disability, Technical Instructions For Medical Examination Of Aliens, available to civil surgeons*, available at https://www.cdc.gov/immigrant refugeehealth/exams/ti/panel/technical-instructions/panel-physicians/other-physical-mental.html (last updated Nov. 23, 2016) (last visited July 26, 2019); Ctrs. for Disease Control & Prevention, *Required Evaluation Components Other Physical or Mental Abnormality, Disease or Disability, Technical Instructions for the Medical Examination of Aliens in the United States*, available at https://www.cdc.gov/immigrant refugeehealth/exams/ti/civil/technical-instructions/civil-surgeons/required-evaluation-components/other-disease-disability.html (last updated Aug. 3, 2010) (last visited July 26, 2019). The HHS regulations require physicians conducting medical examinations for an alien to comply with the CDC's Technical Instructions for Medical Examinations of Aliens. See 42 CFR 34.3(i).

[585] See Inadmissibility on Public Charge Grounds, 83 FR 51114, 51181–84 (proposed Oct. 10, 2018).

[586] See INA section 212(a)(4), 8 U.S.C. 1182.

[587] See Inadmissibility on Public Charge Grounds, 83 FR 51114, 51181–84 (proposed Oct. 10, 2018).

[588] See, e.g., Matter of Martinez-Lopez, 10 I&N Dec. 409, 421–23 (Att'y Gen. 1964); see also Matter of A-, 19 I&N Dec. 867, 869 (Comm'r 1988) (citing Matter of Harutunian, 14 I&N Dec. 583 (Reg'l Comm'r 1974); Matter of Vindman, 16 I&N Dec. 131 (Reg'l Comm'r 1977)).

[589] See INA section 212(a)(1), 8 U.S.C. 1182(a)(1).

[590] See INA section 212(a)(1), 8 U.S.C. 1182(a)(1).

[591] A Class B condition is defined as a physical or mental condition disease or disability serious in degree or permanent in nature. See 42 CFR 34.2(b)(2). The Technical Instructions for the Medical Examination of Aliens directs physicians to provide information about Class B conditions in the medical forms submitted as part of the immigration benefits application. See Ctrs. for Disease Control & Prevention, *Required Evaluations—Other Physical or Mental Abnormality, Disease, or Disability, Technical Instructions For Medical Examination Of Aliens*, available at https://www.cdc.gov/immigrant refugeehealth/exams/ti/panel/technical-instructions/panel-physicians/other-physical-mental.html (last updated Nov. 23, 2016) (last visited July 26, 2019); Ctrs. for Disease Control & Prevention, *Required Evaluation Components Other Physical or Mental Abnormality, Disease or Disability, Technical Instructions for the Medical*

Continued

**Exhibit A**

undergo an immigration medical examination, USCIS will generally defer to the findings from the civil surgeon or panel physician made in the immigration medical examination report (unless the report appears incomplete) in regard to the determination of the medical condition and its impact on the person's ability to take care of himself or herself, to attend school or to work, or whether the condition requires medical treatment. USCIS may also use other evidence of medical conditions in the alien's file.[592]

## 2. Health and Disability Discrimination

*Comment:* A commenter said the inclusion of "interfere[nce] with the alien's ability to provide and care for him- or herself" at 8 CFR 212.22(b)(2)(i) in the NPRM also raises concerns under *Olmstead* v. *L.C.,* 527 U.S. 581 (1999), which recognized that the Americans with Disabilities Act (ADA) mandate provides people with disabilities a life in the most integrated setting appropriate to their needs. Relatedly, a commenter stated that the proposed rule codifies discriminatory standards for evaluating a noncitizen's health and may be in violation of the ADA. The commenter also indicated that individuals with disabilities who would have been institutionalized before *Olmstead* live at home with their families, go to school, and hold jobs even though they cannot solely care for themselves. Therefore, the commenter indicated that the "ability to care for oneself" factor excludes many people who are not public charges and is likely to generate the kind of discrimination that *Olmstead* seeks to prevent.

*Response:* DHS disagrees with the commenter's assertion that the rule, as proposed, would generate the kind of discrimination that *Olmstead* sought to prevent. In *Olmstead,* the Court held that, in accordance with Title II of the ADA, and under the implementing regulations, states are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the

resources available to the State and the needs of others with mental disabilities.[593] At issue was whether the state interpreted the reasonable accommodation provision properly or incorrectly continued to institutionalize the plaintiff because community placement would have been costly.[594]

Title II of the ADA does not govern DHS's actions in this context. In addition, unlike in the ADA provision and the regulatory provision discussed in *Olmstead,* Congress did not single out disability in section 212(a)(4) of the Act. As explained in the NPRM,[595] DHS has carefully considered the interaction between various federal laws and regulations with respect to discrimination and determined that considering, as part of the health factor, an applicant's disability diagnosis, in the context of the alien's individual circumstances and how it affects his or her ability to work, attend school, or otherwise care for himself or herself, is not inconsistent with these laws. The alien's disability is treated just like any other medical condition that affects an alien's likelihood, in the totality of the circumstances, of becoming a public charge—it is neither singled out nor treated differently and, within the totality of the circumstances, is also not the sole basis for an inadmissibility finding.[596] Similarly, DHS does not single out or treat differently any one health-related or medical condition over another but has continuously emphasized that all factors will have to be considered in the totality of the alien's circumstances and that no one factor is determinative.

*Comment:* Several commenters expressed concern that the proposed changes would be discriminatory against or penalize immigrants based on their health status, particularly those with chronic health conditions and disabilities and the elderly. One commenter noted that "[w]hile it is illegal to discriminate against someone on the basis of disability, the proposed rule encourages this form of discrimination, and furthers the idea that some people are more worthy than others." A commenter expressed that individuals with the misfortune of suffering serious health issues or living with a disability will be at risk of a high rate of application denials under this proposed rule. One commenter stated

this rule would discriminate against individuals with chronic health conditions such as heart disease, which tend to disproportionally impact communities of color. One commenter noted that the very definition of disability, a condition that "'interferes' with a person's ability to do such things as go to school or work," means that "virtually every person with a health condition affecting her or his life could be deemed a public charge, no matter how well the person has coped with the condition." A couple of commenters warned that the discrimination against individuals with disabilities would have the unintended consequence of splitting up families, even in an asylum seeking application, or penalizing family members providing support for individuals with disabilities.

Several commenters stated that the rule penalizes and discriminates against individuals with serious medical conditions, such as cancer, cystic fibrosis, multiple sclerosis, heart, lung disease. Commenters also stated that, under this proposed policy, an individual cancer survivor would be penalized, regardless of the individual's type of cancer, period of survivorship, or long-term health outcome, which is discriminatory. An individual commenter said the classification of arthritis and heart disease as serious health conditions seems overly exaggerated and extreme, since almost 50 percent of individuals over 65 have doctor reported arthritis and healthy lifestyle can help reduce the negative consequences of heart disease.

Multiple commenters said the proposal would equate any person with a serious health condition as effectively having a "pre-existing condition" that disqualifies them for immigration, asserting that this would have a profound impact on racial and ethnic minorities who, because of many social determinants of health, disproportionately experience a number of chronic conditions (with many citing studies as support). One commenter pointed to studies indicating that social determinants of health are one of the main inequalities between whites and persons of color.

Numerous commenters expressed general concern about the rule's negative effects on aliens with disabilities and their families. Many commenters also expressed concern over the negative assessments that individuals with intellectual and developmental disabilities, psychiatric disabilities, or physical disabilities would receive under the "health" factor in public charge determination. The commenters indicated that the rule

---

*Examination of Aliens in the United States, available at https://www.cdc.gov/immigrant refugeehealth/exams/ti/civil/technical-instructions/ civil-surgeons/required-evaluation-components/ other-disease-disability.html* (last updated Aug. 3, 2010) (last visited July 26, 2019). The HHS regulations require physicians conducting medical examinations for an alien to comply with the CDC's Technical Instructions for Medical Examinations of Aliens. 42 CFR 34.3(i).

[592] *See* 8 CFR 212.22(b)(2)(ii).

[593] *Olmstead* v. *L.C. ex rel. Zimring,* 527 U.S. 581, 607 (1999).

[594] *See Olmstead* v. *L.C. ex rel. Zimring,* 527 U.S. 581, 598 (1999).

[595] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51184 (proposed Oct. 10, 2018).

[596] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51184 (proposed Oct. 10, 2018).

**Exhibit A**

discriminates against immigrants with disabilities because a range of medical conditions that constitute disabilities, as well as the existence of a disability, would be unduly weighted in the determination of whether an immigrant is likely to become a public charge. Multiple commenters remarked that individuals with disabilities often lack private health insurance and are currently using or recently used Medicaid, which are two heavily weighted negative factors. Other commenters expressed concern that the rule's health standard is overbroad, specifically in its inclusion of individuals with chronic health conditions, like heart disease, cancer, trauma, mental disorders, and pulmonary conditions, and potentially individuals who may need Individualized Education Plans to study or reasonable accommodations to work. Some commenters stated that the rule would perpetuate the false notion that a medical diagnosis is solely determinative of an individual's current abilities and future capabilities.

*Response:* DHS neither proposed to exclude from the United States individuals who have specific health conditions, nor sought to disproportionately impact communities of color or people with disabilities. DHS is required by statute to consider in the totality of the circumstances whether *any* health condition an alien may have would make the alien likely to become a public charge. This determination takes into account any health condition in the context of the alien's ability to support himself or herself and like all of the mandatory factors, is highly fact-specific; *i.e.,* dependent on the alien's precise circumstances. For example, an alien may have a health condition that does not impact the alien's ability to work or secure employment or constitute a drain on the alien's financial resources, and therefore such health condition would not make the alien likely to become a public charge. Similarly, an alien may have a health condition that if unmanaged would affect the alien's ability to work but if successfully managed would not impact the alien's ability to work or find employment or constitute a drain on the alien's financial resources. In those cases, USCIS would look at whether the alien has or is likely to obtain private health insurance or any other means to pay for medical treatment. Finally, even if an alien has a health condition that precludes employment, if the alien has the financial means to pay for medical treatment and is able to be self-sufficient

without working, then the alien may not be likely to become a public charge.

*Comment:* A commenter stated the rule should require immigration officials to take the letter and spirit of federal anti-discrimination laws into account when determining public charge. Multiple commenters stated that the rule "disfavor[s] people with disabilities in the public charge analysis," and will deem, inappropriately, people with disabilities, who contribute to the economy, public charges.

Several commenters stated that the rule is contrary to decades of bipartisan congressional lawmaking regarding disability inclusion, including the ADA, Section 1551 of the ACA, Fair Housing Act, and the Rehabilitation Act of 1973 (Rehab Act). A few commenters, in particular, warned that the rule would echo the types of bias and archaic attitudes about disability that the Rehab Act was meant to overcome. One commenter stated that, while the proposed changes to the totality of circumstances would especially affect people with disabilities, excluding them from the United States by claiming they are more likely to need government assistance, the Rehab Act makes it unlawful to discriminate against anyone on the basis of disability, whether or not they are a citizen. Some commenters stated that the proposed rule's broad reading of the statutory health and resources factors for public charge determinations are inconsistent with Section 504's prohibition on disability-based discrimination.

One commenter stated that the rule is inconsistent with the intent of the 1990 amendments to the INA, which ensured that individuals were not deemed inadmissible based on their disability status by deleting the prior grounds of exclusion for, among others, paupers and those with a physical disability. The same commenter stated that the rule is also contradictory to Section 504's bar on disability-based discrimination in DHS's programs and activities.

A couple of commenters stated that the rule would violate the Developmental Disabilities Assistance and Bill of Rights Act. One commenter noted that "that further clarification is needed explaining precisely how DHS will consider certain factors like a disability "to the extent that such disability . . . would entail consideration of the potential effects on the alien's ability to work, attend school or otherwise support himself or herself." Other commenters stated that the rule needs to make accommodations for individuals with disabilities and that

the proposed rule "reflects the types of bias and "archaic attitudes" about disabilities that the Rehab Act was meant to overcome." Other commenters stated that the proposed rule discriminates against individuals with disabilities. An individual commenter stated that, while DHS states that the impact of using health as a factor in determining if they will become a public charge would not violate IDEA or the ADA, it is hard to see how DHS actually thinks that will happen given that a disability is concretely being deemed a negative factor which needs to be "rectified" by ability to work. This and other commenters said DHS's interpretation seems to violate 6 CFR 15.30(b)(1)(i) by denying a benefit on the basis of disability.

*Response:* DHS disagrees with the comments stating that the rule discriminates against individuals with disabilities or those with specific medical conditions. As noted in the NPRM, in enacting section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), Congress required DHS to consider, as part of the public charge inadmissibility determination, an alien's health. Although Congress has, over time, significantly reduced the prohibitions on immigration for persons with mental and physical disabilities and also amended PRWORA to restore the ability of certain aliens with disabilities to receive certain public assistance, such as SSI,[597] Congress has never correspondingly prohibited the application of the public charge inadmissibility ground to aliens with disabilities who receive, or are likely to receive, disability benefits for which they are eligible.[598]

As noted in the NPRM, this rule is not inconsistent with federal statutes and regulations with respect to discrimination against aliens with disabilities, as an alien's disability is

[597] *See generally* Mark C. Weber, *Opening the Golden Door: Disability and the Law of Immigration,* by 8 Journal of Gender, Race, and Justice at pp. 4–5, 8 (Spring 2004) (discussing historical changes in 1986 and 1990 immigration laws that removed various prohibitions on aliens with mental and physical disabilities, unless they represented a threat to themselves or others; describing restoration of SSI disability benefits to aliens who had been receiving them before Aug. 22, 1996). *See also* John F. Stanton, *The Immigration Laws from a Disability Perspective: Where We Were, Where We Are, Where We Should Be,* 10 Geo. Immigr. L. J. 441 (Spring, 1996) (pre-PRWORA analysis).

[598] Congress did permit a waiver of INA section 212(a)(4), 8 U.S.C. 1182(a)(4), for aliens seeking lawful permanent resident status under the legalization provision of the Immigration Reform and Control Act of 1986 (IRCA) if they met the age, blindness, or disability standards for SSI. *See* INA section 245A(d)(2)(B)(ii)(IV), 8 U.S.C. 1255a(d)(2)(B)(ii)(IV).

**Exhibit A**

treated just as any other medical condition that affects an alien's likelihood, in the totality of the circumstances, of becoming a public charge. A diagnosis of a disability is related to an alien's health, and therefore is properly considered as part of the public charge analysis.

An alien's health is not outcome determinative—that is, an alien's health cannot be the sole basis for a finding that an alien is inadmissible as likely to become a public charge. As such, a diagnosis that an alien has a disability, alone, will never result in a public charge inadmissibility finding. As with any other medical condition identified in the alien's application and supporting documentation, the alien's disability will be considered in the totality of the circumstances framework. An alien with a disability will neither be treated differently nor singled out, and the disability itself would not be the sole basis for an inadmissibility finding. In other words, as with any other mandated factor and consideration in the public charge inadmissibility determination, DHS would look at each of the mandatory factors, and the affidavit of support, if required, as well as all other relevant factors in the totality of the circumstances. Therefore, consideration of a disability in the context of the totality of circumstances does not violate the Rehabilitation Act's prohibition on denying a benefit "solely by reason of [an applicant's] disability." [599]

Likewise, DHS does not believe the rule is in violation of or inconsistent with the other cited authorities. For example, the rule is not inconsistent with the regulation that prohibits DHS from denying benefits to a "qualified individual with a disability . . . by reason of his or her disability." [600] Public charge determinations will be made based on the totality of circumstances and not on the basis of a disability, and the regulatory definition of a "qualified individual with a disability" requires a person to "meet the essential eligibility requirements." [601] The essential requirements in the context of admission and adjustment of status require that an applicant not be likely at any time in the future to become a public charge.

DHS does not believe the rule is inconsistent with the 1990 amendments to the INA and its revision of the prior

grounds of exclusion with the grounds of inadmissibility. The rule is not recreating the prior grounds of excludability that, prior to 1990, included persons certified to have a "physical defect, disease, or disability" who is required to work. [602] Rather, the rule is providing guidance to the public charge inadmissibility ground as it has existed since the 1990 amendments to the INA. [603]

As to the comment that the public charge inadmissibility rule violates the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (DD Act) (42 U.S.C. 15001 *et seq.*), [604] the statute was enacted to ensure that individuals with developmental disabilities and their families "participate in the design of and have access to needed community services, individualized supports, and other forms of assistance that promote self-determination, independence, productivity, and integration and inclusion in all facets of community life, through culturally competent programs. . . ." [605] The programs within the DD Act are funded through congressional appropriations for the Administration for Community Living, which are not related to Medicaid or TANF appropriations or other federal benefit programs covered by the proposed public charge rule. The State Councils on Developmental Disabilities, Protection and Advocacy Systems, University Centers of Excellence in Developmental Disabilities, and Projects of National Significance participate in capacity building, systems change, advocacy, protect legal and human rights of people with developmental disabilities, conduct research, provide inter-disciplinary training for students and fellows, leadership training, direct support services training, community based training, and clinical or other training to strengthen the workforce that serves individuals with developmental disabilities.

The DD Act is intended for all individuals with developmental disabilities and their families regardless of immigration status. [606] The DD Act states that: "there is a need to ensure that services, supports, and other assistance are provided in a culturally competent manner that ensures that individuals from racial and ethnic

minority backgrounds are fully included in all activities provided under this title."

Based on the language in the DD Act, DHS believes that services under the DD Act are not public benefits as defined in the rule, because all individuals with developmental disabilities, without regard to income, are eligible for services that the DD Act allows.

DHS further does not believe that the rule violates the DD Act. While the policy of the DD Act is to offer protections and advocacy to individuals with developmental disabilities, and while the services provided pursuant to the DD Act would not make an individual a public charge, DHS does not believe the DD Act would govern DHS's public charge determination regarding other benefits. The DD Act is silent regarding the issue of whether an individual can be considered a public charge based upon receipt of services that do not fall under the DD Act. Other HHS disability and aging statutes and programs such as the Traumatic Brain Injury Act, Limb Loss Act, Older Americans Act, and the Christopher and Dana Reeves Paralysis Act do not receive Medicaid or Medicare funds and do not have restrictions on immigration or citizenship status.

*Comment:* Some commenters suggested that the USCIS should estimate the extent to which any regulatory changes will impact the number of otherwise eligible applicants with disabilities when compared to the current and historical baselines, and then reconsider other less harmful alternatives.

*Response:* As indicated in the NPRM, DHS would only consider disability as part of the health factor to the extent that such disability, in the context of the alien's individual circumstances, impacts the likelihood of the alien becoming a public charge. [607] Although a study of the correlations between different disabilities and the array of positive and negative factors were not included in the text of the rule, DHS understands that those correlations may exist and may also be affected by the type and severity of the disability. However, DHS would not distinguish between Medicaid recipients who are disabled from those who are not disabled. Instead, DHS would look to the information provided in the medical certification as to whether it would affect the person's ability to work or attend school. DHS provided estimates of benefit use by an array of characteristics in the NPRM, and does

---

[599] 29 U.S.C. 794(a).

[600] 6 CFR 15.30(a). *See also* 6 CFR 15.30(b)(1)(i) (prohibiting denying a benefit "on the basis of a disability").

[601] 6 CFR 15.3(e)(2).

[602] *See* section 212(a)(7) of the Act, 8 U.S.C. 1182(a)(7) (1988).

[603] *See* Immigration Act of 1990, Public Law 101–649, section 601, 110 Stat. 4978, 5072 (Nov. 29, 1990).

[604] Public Law 106–402, 114 Stat. 1677 (Oct. 30, 2000).

[605] Id.

[606] *See* INA section 101(b) and 101(c).

[607] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51183 (proposed Oct. 10, 2018).

**Exhibit A**

not believe additional tables for disability are needed in the justification for the rule.

*Comment:* Numerous commenters cited to the impact on individuals with disabilities and children with disabilities. Many commenters cited the statistic that roughly 2.6 million children in immigrant families have a disability or special healthcare need. Numerous commenters asserted that children with special health and developmental needs require medical, behavioral, and educational services above and beyond typical children, which makes immigrant families vulnerable to economic hardship. Many commenters cited the fact that children with disabilities are more likely to live in low-income households experiencing food insecurity and housing instability. Multiple commenters concluded that access to Medicaid is uniquely critical, as children with disabilities rely on the public health coverage for occupational, physical, or speech therapies and prescription drugs. One commenter stated that, although there is a Medicaid exception for foreign-born children adopted by U.S. citizens, there is not one for special needs children that are foreign-born with immigrant parents. One commenter stated that individuals with disabilities will be uniquely affected by the rule because of the inclusion of Medicaid-funded services, including services in the home and in communities, and will be disproportionately impacted by the inclusion of housing and food assistance programs.

*Response:* DHS appreciates the numerous programs that provide services to individuals with disabilities. As discussed in the NPRM,[608] as part of the immigration medical examination, when identifying a Class B medical condition, civil surgeons and panel physicians are required to report on certain disabilities, including the nature and severity of the disability, its impact on the alien's ability to work, attend school, or otherwise support himself or herself, and whether the disability will require hospitalization or institutionalization. DHS would only consider disability as part of the health factor to the extent that such disability, in the context of the alien's individual circumstances, impacts the likelihood of the alien becoming a public charge; *i.e.,* a consideration of the potential effects on the alien's ability to work, attend school, or otherwise support himself or herself.

As discussed in the NPRM,[609] DHS has determined that considering, as part of the health factor, an applicant's disability diagnosis that, in the context of the alien's individual circumstances, affects his or her ability to work, attend school, or otherwise care for himself or herself, is not inconsistent with federal statutes and regulations with respect to discrimination, as the alien's disability is treated just as any other medical condition that affects an alien's likelihood, in the totality of the circumstances, of becoming a public charge. Under the totality of the circumstances framework, an alien with a disability is not being treated differently, or singled out, and the disability itself would not be the sole basis for an inadmissibility finding. DHS would look at each of the mandatory factors, and the affidavit of support, if required, as well as all other factors in the totality of the circumstances.

Therefore, an applicant's disability could not be the sole basis for a public charge inadmissibility finding. In addition, DHS recognizes that the ADA, the Rehabilitation Act, IDEA, and other laws provide important protections for individuals with disabilities, including with respect to employment opportunities. Furthermore, as it relates to a determination of inadmissibility under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), when the alien is applying for the immigration benefit, DHS does not stand in the position of an employer or school where additional provisions of the ADA and Rehab Act or IDEA would apply.

*Comment:* Numerous commenters expressed concern about the impact this rule would have on individuals living with HIV/AIDS. A commenter said most applicants with HIV will automatically have two heavily weighted negative factors: Having a health condition without private insurance to cover the cost of treatment and receiving a public benefit in the form of Medicaid. Some commenters expressed concern that, because treatment is prohibitively expensive unless subsidized by government programs, these individuals would be subjected to additional constraints regarding the enrollment of health insurance (*i.e.,* they would be forced into buying non-subsidized medical coverage, which does not typically cover anti-retroviral therapy, or buying additional coverage due to lack of adequate coverage from their government-subsidized plan). Multiple commenters said immigrants with HIV

will potentially forego subsidized healthcare treatment due to this rule, resulting in substantial negative health outcomes, not only to affected individuals but also the community at large. Multiple commenters stated that reports are already emerging of individuals who are considering waiting to begin life-saving treatment in the belief that this will ensure their eligibility.

Several commenters stated that the rule sends the signal that individuals with HIV/AIDS and other chronic health conditions are "undesirable." A couple of commenters said the proposal will create a "backdoor means" of excluding those with HIV from the United States by classifying HIV/AIDS as a Class B medical condition that can be used as a negative factor in determining public charge. Some commenters said the inclusion of HIV as a negatively weighted factor undoes congressional intent in removing HIV as a ground of inadmissibility and draws disturbing parallels to the 1987 HIV travel and immigration ban overturned in 2010.[610] A commenter said the rule could operate as a de facto ban on admission of HIV positive immigrants because it would be difficult for an HIV positive noncitizen to withstand the revised public charge analysis. This commenter also said the de facto ban on HIV positive noncitizens runs against the stated goal of the Trump Administration to lead a global effort against HIV/AIDS and undermines U.S. leadership in this area.

Many commenters said the rule ignores the reality that suffering from a chronic illness such as HIV/AIDS is not an accurate indicator of future self-sufficiency and full-time employment capabilities. One commenter stated that a large portion of people living with HIV/AIDS have incomes below the poverty line, which is not due to their inability to work due to health conditions, but rather due to the continued stigma of HIV/AIDS on people's ability to get work.

Another commenter stated that the disproportionate negative impact on people living with HIV/AIDS will also cause a disproportionate negative impact on LGBT immigrants who apply for admission to the United States because they account for a large portion of the HIV diagnoses.

For similar reasons expressed above relating to HIV, some commenters expressed concerns about the rule's impact on individuals with Hepatitis B

[608] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51182–84 (proposed Oct. 10, 2018).

[609] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51182–84 (proposed Oct. 10, 2018).

[610] 74 FR 56547 (Nov. 2, 2009) (removing HIV from the list of communicable diseases of public health significance at 42 CFR 34.2).

**Exhibit A**

and Hepatitis C. One commenter said the proposed rule would undermine its approach, as a State agency, to combating HIV/AIDS and Hepatitis C.

*Response:* As indicated in the NPRM,[611] DHS will consider any medical condition diagnosed in the totality of the circumstances. The fact that an alien has been diagnosed with a medical condition would not serve as the sole factor considered when determining whether an alien is likely at any time in the future to become a public charge.[612] The consideration entails whether, in light of the alien's health, the alien will be able to care for himself or herself, to attend school, or to work.[613] Relatedly, as part of the assets, resources and financial status factor, DHS would consider whether the alien either has sufficient household assets and resources, including but not limited to private health insurance, to cover any reasonably foreseeable medical costs.[614] The rule does not focus on any specific medical condition and people living with certain conditions may still be able to care for themselves, attend school, or go to work,[615] which the medical professional would be able to affirm in the medical certification.

*K. Family Status*

*Comment:* Several commenters requested family size be removed from consideration as a public charge. One commenter indicated that the proposal would be harmful to families, including all members of the nuclear family, and may prohibit nuclear families from immigrating.

A few commenters voiced concerns about the statement that the applicant's household size would be counted in both the family status factor and the assets, resources, and financial status factor, claiming the rule has the potential to double-count negative factors. Another commenter stated that family status should not count as a negative factor if an immigrant has sufficient income and resources.

Conversely, a commenter expressed support for considering the size of an alien's household as the primary element of the family status factor, adding that this factor appropriately involves the assessment of whether an alien has a household to support, or is being supported by another household, when calculating the alien's household size. The commenter also stated that the NPRM correctly notes research showing that receipt of non-cash benefits increases as family size increases.

*Response:* DHS is required by statute to consider an applicant's family status when determining whether the alien is likely at any time in the future to become a public charge.[616] As discussed in the NPRM, DHS will consider whether the alien has a household to support or whether the alien is being supported by another household and whether the alien's household size makes the alien more or less likely to become a public charge.[617] The receipt of non-cash benefits generally increases as family size increases [618] and is relevant to assessing self-sufficiency. Therefore, DHS will retain the household size as a consideration in the public charge inadmissibility determination.

*Comment:* A commenter stated that DHS does not provide sufficient data or explanation for stakeholders to meaningfully comment on the way it will evaluate family status in a public charge determination, so the requirement to provide sufficient notice under the APA has not been met. A few commenters stated that the rule fails to provide any evidence that larger household sizes results in lack of self-sufficiency, pointing to research showing that household size, by itself, is not an indicator of future public benefit use or self-sufficiency. Another commenter said an extended family structure offers many advantages, including stability, coherence, and physical and psychological support, particularly in times of need and should not be counted as a negative factor.

*Response:* DHS disagrees that the NPRM does not provide data or an explanation about family status. The NPRM states that ''Table 16 and Table 17 show that among both U.S. citizens and noncitizens, the receipt of non-cash benefits generally increased as family size increased.'' [619] Based on that data, DHS would consider the number of people in a household as defined in the proposed 8 CFR 212.21(d). As with the other factors, household size, on its own, would never dictate the outcome of a public charge inadmissibility determination. Household size is also not an inherently negative factor under DHS's regulations, as certain commenters indicate. If an alien demonstrates that the alien's household structure and members offer advantages that decrease the alien's likelihood of receiving one or more public benefits at any time in the future above the 12 aggregate months in a 36-month period threshold, then DHS will consider household size a positive factor.

The rule also permits consideration of the alien's family status within the context of assessing the alien's household income, assets, and resources instead of simply the alien's own income, assets, and resources. Therefore, an alien may present evidence of how the alien's household provides advantages relevant to consideration under income, assets, and resources and makes the alien less likely at any time to become a public charge. For instance, an alien who is part of a large family may have more household assets and resources available to use or may have his or her own income or access to additional assets and resources that would assist in supporting the household. DHS would take these family status-related considerations into account when examining the totality of the alien's circumstances.

*Comment:* A commenter expressed concern for how family status could impact families that have a member with chronic conditions because family members would be spending a significantly higher proportion of their income and resources on the family member with that condition, which under the proposed rule would be weighted as a negative factor against those families.

*Response:* DHS recognizes that chronic conditions may impact a person's income availability. However, an applicant's family status is a factor that must be considered when determining whether the alien is likely to become a public charge in the future.[620] As explained in the NPRM, DHS's proposed totality of the circumstances standard would involve weighing all the positive and negative considerations related to an alien's age; health; family status; assets, resources, and financial status; education and skills; required affidavit of support; and any other factor or circumstance that may warrant consideration in the public charge inadmissibility determination.

[611] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51183 (proposed Oct. 10, 2018).

[612] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51183 (proposed Oct. 10, 2018).

[613] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51183 (proposed Oct. 10, 2018).

[614] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51183 (proposed Oct. 10, 2018).

[615] *See* HIV.gov, Aging with HIV available at *https://www.hiv.gov/hiv-basics/living-well-with-hiv/taking-care-of-yourself/aging-with-hiv* (last visited January 17, 2019); and HIV.gov, Working with HIV, available at *https://www.hiv.gov/hiv-basics/living-well-with-hiv/taking-care-of-yourself/employment-and-health* (last visited January 17, 2019).

[616] *See* 8 CFR 212.2; *see also* INA section 212(a)(4)(B)(i)(III), 8 U.S.C. 1182(a)(4)(B)(i)(III).

[617] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51184 (proposed Oct. 10, 2018).

[618] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51184–85 (proposed Oct. 10, 2018).

[619] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51184 (proposed Oct. 10, 2018).

[620] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

**Exhibit A**

However, DHS would not consider the medical conditions of a member of the alien's household. DHS would only consider the household size in relationship to the FPG level for the assets, resources and financial status factor.

Regardless of household size, an alien may present other factors (*e.g.*, assets, resources, financial status, education, and skills) that weigh for or against a finding that the alien is likely to become a public charge. For instance, an alien who is part of a large household may have his or her own income or access to additional assets and resources that would assist in supporting the household which would also be considered in the totality of the circumstances.

*Comment:* One commenter said this rule would punish applicants who have larger families, thus creating another disincentive to have children. Another commenter stated the rule would discriminate against immigrants from countries whose cultural or religious traditions encourage larger and multi-generational families, disregarding whether such interdependence was required or recognized by law. Similarly, a commenter suggested that Asian Americans would be most affected by this rule because they are the most likely to live in multigenerational homes. Another commenter said this aspect of the proposed rule would have the greatest impact on applicants from Mexico and Central America (71 percent), Africa (69 percent), and Asia (52 percent)—regions that typically account for substantial numbers of Muslim immigrants. The commenter stated this aspect would have substantially lower impacts on European or Canadian applicants. One commenter stated that DHS has not adequately analyzed the adverse impact this proposal would have on families seeking lawful permanent residence for a spouse or a child. One commenter asked if DHS would consider it more beneficial to be single and unmarried than to be in a committed relationship with children and/or parents living with the family.

*Response:* DHS appreciates the comments but disagrees that the rule punishes people with larger families. As discussed in the NPRM, DHS will consider whether the alien has a household to support, or whether the alien is being supported by another household and whether the alien's household size makes the alien more or less likely to become a public charge.[621]

As previously indicated Congress established that family status would be a factor in the public charge inadmissibility determination.[622] Having a larger family does not necessarily lead to a conclusion that the person is likely to be a public charge. The household may have multiple sources of income that increase the income, assets, and resources of the household allowing the person and household to be self-sufficient. Alternatively, a single person may or may not have additional income, assets, or resources to be self-sufficient. While the receipt of non-cash benefits generally increases as family size increases as discussed in the NPRM,[623] DHS will never determine that a person is likely to become a public charge based on family size alone. DHS recognizes that family status can also have positive benefits and would take all relevant factors into account when assessing the totality of the circumstances regarding the alien's likelihood to become a public charge.

*L. Assets, Resources, and Financial Status*

1. Income Standard

*Comment:* Multiple commenters expressed general concern that the income assessment would penalize low-income immigrants. One commenter said that the income threshold is arbitrary. Using hypotheticals to illustrate that someone seeking to adjust status might still be found to be likely to become a public charge despite minimal use of benefits and adequate family support, a commenter stated that having a low income and multiple negative or heavily weighted negative factors had no clear correlation to self-sufficiency, and that the rule slanted toward denials. One commenter stated that the assets, resources, and financial status factors are not realistic given the realities of low-wage work. Another commenter said that the proposed assets, resources, and financial status factor ignores the cultural and economic value of immigrants. Several commenters stated that having an income threshold is in conflict with the American ideal of upward mobility. Other commenters stated that the proposed income threshold of 125 percent of the FPG lacked rational basis in that the affidavit of support standard is unconnected with the likelihood of an applicant becoming a public charge and relates to whether the sponsor can

support someone else rather than themselves. An individual commenter said the proposed rule would affect spouses of individuals seeking a "green card" because the proposed rule requires the couple's income to be at $41,000. Therefore, the commenter said that this rule would result in making decisions on whom to marry based on a potential spouse's income, which could increase fraudulent marriages.

In contrast, one commenter voiced general support for the proposed threshold of 125 percent of the FPG, and another commenter suggested that the rule include a provision that requires applicants to show that they make an income high enough that neither they nor their dependents qualify for public benefits.

*Response:* Even though this rule considers an applicant's income in the totality of the circumstances, which may negatively impact low-income aliens, DHS disagrees with comments that this rule is aimed at denying the admission or adjustment of status of low income aliens. Instead, this rule is aimed at better ensuring the self-sufficiency of aliens seeking to reside in the United States.

As noted elsewhere in this final rule, an alien's income is one of many pieces of evidence that DHS will consider in the totality of the circumstances. As provided in the NPRM, DHS will generally consider whether the alien has a gross household income of at least 125 percent of the FPG based on the alien's household size. If the alien's household income is less than 125 percent of the FPG, DHS will generally consider whether the alien has assets and resources that is at least five times the difference between the household income and 125 percent of the FPG based on the household size.[624] DHS also disagrees that the standard is unconnected to becoming a public charge or should be raised to other levels. DHS is adopting the standard established by Congress with the affidavit of support, which has long served as a touchpoint for public charge inadmissibility determinations.[625] An alien subject to section 213A of the Act,

[621] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51184 (proposed Oct. 10, 2018).

[622] *See* INA section 212(a)(4)(B)(i)(III), 8 U.S.C. 1182(a)(4)(B)(i)(III).

[623] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51184–85 (proposed Oct. 10, 2018).

[624] This is consistent with the provisions for assets under the affidavit of support in 8 CFR 213a.2(c)(2)(iii)(B)(3). As explained below, in certain cases, the standard applied may be less than five times under 8 CFR 213a.2(c)(2)(iii)(B)(1) and (2). To be fully consistent with the affidavit of support provisions, DHS also applies the other standards for purposes of the public charge determination and amended the provision accordingly.

[625] *See* INA section 213A(f)(1)(E), 8 U.S.C. 1183a(f)(1)(E); *see* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51187 (proposed Oct. 10, 2018).

**Exhibit A**

8 U.S.C. 1183a, who does not have a sponsor capable of supporting himself or herself, the household, and the alien would currently be found inadmissible based on public charge grounds.

DHS also notes that to the extent that aliens will make marriage decisions based how much income a potential spouse earns in order to avoid any negative consequences that might stem from having household income under 125 percent of the FPG, aliens who enter into marriage for the sole purpose of circumventing the immigration laws have not entered into a valid marriage for immigration purposes and would not be eligible for adjustment of status.[626]

*Comment:* One commenter opposed DHS's proposal that an alien who fails to demonstrate income greater than 125 percent of the FPG may overcome the deficiency by providing evidence of assets totaling at least five times the difference between the household income and 125 percent of the FPG for the household size. This commenter indicated that DHS failed to provide any arguments or evidence as to why this threshold is appropriate or relevant to the public charge determination. A commenter suggested that if the rule must include a ratio of assets to the difference between household income and 125 percent of the FPG, it should be a ratio of two times. The commenter stated that this would enable the individual or household to have a two-year period of financial security during which they may be able to increase their income.

*Response:* DHS disagrees that it failed to outline the appropriateness of the standard and that the standard is arbitrary and capricious. DHS will also not incorporate the commenter's suggestion to change the standard to a ratio of two times. DHS disagrees that two times the FPG is more appropriate because the commenter's reasoning relies on increasing income in the future and as discussed in the NPRM, whether a person may be qualified for public benefits frequently depends on where the person's household income falls with respect to the FPG.[627]

As explained in the NPRM,[628] DHS will consider whether the applicant has

a gross household income[629] of at least 125 percent of the FPG for the household size, and alternatively, whether the applicant has substantial assets as described in the rule and the FPG for the household size, because it has long served as a touchpoint for public charge inadmissibility determination and the enforceable affidavit of support.[630] The suggestion to reduce the standard to a ratio of two times was also a comment in response to the Affidavit of Support Rule promulgated in 2006 and was not incorporated because the purpose of the requirement was "to ensure that a sponsor whose income is not sufficient will nevertheless be able to provide the needed support until the sponsorship obligation ends."[631] Similarly, the significant assets provision in this rule allows an alien whose income is below the applicable income threshold to demonstrate sufficient assets to support himself or herself, thereby reducing the likelihood of becoming a public charge.

The five times the FPG was chosen for the Affidavit of Support because "[i]n most cases, an alien is not eligible for naturalization until he or she has been a permanent resident alien for at least 5 years," [632] to show that the sponsor has the assets to support the beneficiary until they generally qualified for naturalization. In addition to being similar to the support obligation, five times would also be consistent with the reasoning behind the bond cancellation authority under 8 CFR 103.6(c)(1) in 1984. As explained in the NPRM, INS reasoned that if an alien is self-sustaining for a five-year period, it would not be probable that the alien would become deportable as a public charge after five years because an alien is deportable as a public charge only if the reason for the becoming a public charge is based on factors in existence prior to admission as an immigrant.[633]

After further consideration and consistent with the explanation in the proposed rule, however, DHS has decided to adjust the amount to match the affidavit of support provision in

regards to income level used and amended the provision to reflect that those aliens on active duty, other than in training, in the U.S. Armed Forces have to establish household income reflecting 100 percent of the most recent FPG for the alien's household size.

Additionally, to be more consistent with the affidavit of support regulations, DHS also decided to define significant assets for purposes of the assets and resources factor in the public charge inadmissibility determination, using a similar standard, as that outlined in 8 CFR 213a.2(c)(2)(iii)(B), but applying it to the public charge rule and the alien's household. According to 8 CFR 213a.2(c)(2)(iii), if the sponsor is unable to meet the 125 percent of the FPG (100 percent for those on active duty, other than training, in the U.S. Armed Forces) income requirement, he or she can use significant assets to make up the difference between the sponsor's income and the required FPG standard according to a particular formula similarly in 8 CFR 213a.2(c)(iii)(B)(*1*), (*2*), and (*3*), as applicable to the sponsor's household.

In applying this provision for purposes of the public charge determination, the rule provides that an alien may establish ownership of significant assets, such as savings accounts, stocks, bonds, certificates of deposit, real estate or other assets, in which the combined cash value of all the assets (the total value of the assets less any offsetting liabilities) exceeds:

(1) If the intending immigrant is the spouse or child of a United States citizen (and the child has reached his or her 18th birthday), three times the difference between the alien's household income and 125 percent of the FPG (100 percent for those on active duty, other than training, in the U.S. Armed Forces) for the alien's household size;

(2) If the intending immigrant is an orphan who will be adopted in the United States after the alien orphan acquires permanent residence (or in whose case the parents will need to seek a formal recognition of a foreign adoption under the law of the State of the intending immigrant's proposed residence because at least one of the parents did not see the child before or during the adoption), and who will, as a result of the adoption or formal recognition of the foreign adoption, acquire citizenship under section 320 of the Act, 8 U.S.C. 1431, the difference between the alien's household income and 125 percent of the FPG (100 percent for those on active duty, other than training, in the U.S. Armed Forces) for the alien's household size; or

---

[626] *See Matter of Patel,* 19 I&N Dec 774 (BIA 1988).

[627] The poverty guidelines are updated periodically in the **Federal Register** by HHS. The U.S. Census Bureau definition of family and family household can be found in U.S. Census Bureau, *Current Population Survey 2017 Annual Social and Economic Supplement (ASEC)* 9–1 to 9–2, *available at https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar17.pdf* (last visited July 26, 2019).

[628] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51187 (proposed Oct. 10, 2018).

[629] Gross income includes "all income you receive in the form of money, goods, property, and services that isn't exempt from tax. It also includes income from sources outside the United States or from the sale of your main home (even if you can exclude all or part of it)." *See* IRS Publication 17, Your Federal Income Tax, page 5 (2018), available at *https://www.irs.gov/pub/irs-pdf/p17.pdf* (last visited July 26, 2019).

[630] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51187 (proposed Oct. 10, 2018); *see also* INA sections 213A(f)(1)(E) and 213A(f)(6)(A)(ii), 8 U.S.C. 1183a(f)(1)(E) and 1183a(f)(1)(E) and 8 CFR 213a.2.

[631] *See* 71 FR 35731, 35739.

[632] *See* 71 FR 35731, 35739.

[633] *See* 49 FR 24010, 24011.

**Exhibit A**

(3) In all other cases, five times the difference between the alien's household income and 125 percent of the FPG (100 percent for those on active duty, other than training, in the U.S. Armed Forces) for the alien's household size.

*Comment:* Many commenters expressed general concern that the income assessment would penalize low-income immigrants, low-wage workers, members of ''marginalized groups,'' and families and farmworkers. A commenter stated that counting wealth and income as indicators of a person's future contribution amounts to a sea change in U.S. immigration policy. Other commenters stated that the proposed income thresholds are biased against low and middle-income immigrants while unfairly favoring wealthy immigrants; disregard and devalue low wage-workers and their contributions to society; and ignore the ability of immigrants to raise their wages over time. A few commenters said the 125 percent income threshold is too high. Others provided data on starting salaries and on some of the fastest growing occupations that are in fields with low wages. A commenter stated that six of the 20 largest occupational fields in the country have median wages close to or below the poverty threshold for a family of three. According to the commenter, this means that lawfully present non-citizens who have jobs in these sectors through an employment visa may not be able to renew that visa. Another commenter indicated that immigrants increasingly are needed to fill middle-skill level jobs, referring to those jobs that require more than a high school diploma but less than a four-year degree. Therefore, the commenter asserted, businesses that largely employ individuals at low wages would suffer, as legally present non-citizens could become too encumbered to continue their employment, and those who have low wages would be penalized because they use benefits to supplement their wages, which allows them to thrive.

One commenter indicated that the threshold for household income would have a large impact on the eligibility for admission of intending immigrants and make it very difficult for entry level workers and other individuals to seek admission to the United States; this would harm the U.S. economy, educational institutions and businesses, and sends a message that only those with financial resources are welcome although study after study has shown that immigrants are job creators and provide a net benefit to the United States. Another commenter indicated that U.S. employers will find it more

difficult and less predictable to extend the status of highly skilled workers on H–1B nonimmigrant (skilled worker) visas or recruit students, unless the employer offers a salary of more than the newly created 250 percent threshold, or risk that the worker is not able to renew the work visa given the complex and subjective considerations from USCIS adjudicators.

Additionally, some commenters stated that if the proposed income tests are applied to U.S. citizens, many would fail the test and therefore the tests should not be applied. Another commenter further stated that if the proposed public charge test is applied to U.S. born citizens, only five percent would meet the criteria, as compared to 29 percent under current guidance. Another commenter indicated that currently, 21 percent of immigrants nationally fall below the 125 percent threshold and 17 percent of citizens do as well. The commenter asserted that if the current public charge rule was applied to all Kentuckians, just 8 percent would fall into the ''public charge'' category, but under the proposed rule 33 percent of all Kentuckians would.

Some commenters provided data on the number of people in the United States living below 125 percent of the FPL and facts about the affected low-income population. Other commenters stated that the 125 percent income threshold would be incredibly difficult for young adults working in entry-level jobs to overcome. A commenter noted that the 125 percent of FPG standard has been the income threshold to be met by sponsors who are required to submit an affidavit of support, not by the immigrant subject to the public charge inadmissibility determination. The commenter questioned why, if a sponsor is expected to care for his or her own needs and the person he or she is sponsoring based on an income of 125 percent of the FPG, the same standard would apply individually to the intending immigrant.

Several commenters indicated that those working for minimum wage would not be able to meet the proposed threshold even if working full time, and that the minimum wage has not kept pace with changes in the cost of living in the United States. A commenter stated that basing entry into this country and adjustment of status solely on the basis of wealth is not only anathema to longstanding American values of upward mobility, but it also destabilizes financial security of immigrant families already in the United States, particularly in instances of family-based green card petitions.

Some commenters warned that the proposed income threshold would be nearly impossible for immigrants from very poor countries to achieve, and would therefore disproportionately and negatively affect immigrants from poorer regions of the world compared to immigrants from wealthier regions, such as Europe and Canada. A commenter stated that the proposed income thresholds are arbitrary and unreasonable and will be compounded by income inequality and variations in cost of living in the United States.

Some commenters stated that the rule will have a disproportionate effect on low income workers, leading to shortages in industries in which immigrants make up a substantial portion of the workforce.

*Response:* DHS understands that the rule changes the public charge inadmissibility determination as set forth in the 1999 Interim Field Guidance. However, Congress mandates that, as part of the public charge inadmissibility assessment, officers consider the applicant's assets, resources, and financial status, which, as explained in the NPRM, includes consideration of whether the applicant's household income is at or above 125 percent of the FPG income. DHS chose the 125 percent of FPG threshold (100 percent for an alien on active duty, other than training, in the U.S. Armed Forces) standard because Congress imposed it as part of the affidavit of support, which has long been a touchpoint for the public charge ground of inadmissibility.[634] Therefore, DHS disagrees that the threshold is arbitrary.

DHS also disagrees that if a sponsor is expected to demonstrate an income of 125 percent of the FPG, the alien should not be subject to the same standard. As noted elsewhere in this rule, Congress did not add the affidavit of support requirements as a substitute for a public charge inadmissibility determination or to supplant the mandatory factors set forth in section 212(a)(4)(B), 8 U.S.C. 1182(a)(4)(B). Instead, Congress added the affidavit of support as an additional assurance that the alien will not become a public charge at any time in the future. As Congress believed that 125 percent was an appropriate minimum threshold in the affidavit of support context, DHS does not believe the threshold should be lowered. Although Congress believed that 125 percent of the FPG based on the sponsor's household income was a reasonable minimum threshold in the affidavit of support context to support the sponsored alien and the sponsor's household, it does not necessarily

---

[634] Under INA section 213A, 8 U.S.C. 1183a.

**Exhibit A**

**41416** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

follow that Congress believed that half that amount (assuming the sponsor used half the amount to support himself or herself), or any amount lower than 125 percent of the FPG, would be sufficient to demonstrate that the alien is not more likely than not to become a public charge. Rather, Congress' retention of the public charge inadmissibility determination indicates that Congress believed it was necessary to consider the alien's assets, resources, financial status (including, of course, income), and other relevant factors in addition to requiring the affidavit of support. Further, household income below 125 percent of the FPG would be reviewed along with the other factors in the totality of the circumstances such that on its own, such income would not be a basis for a public charge inadmissibility determination.

DHS disagrees that the rule bases entry into this country and adjustment of status solely on wealth. DHS notes that it must consider an applicant's assets, resources, and financial status in making a public charge inadmissibility determination, which includes consideration of the applicant's household income.[635] However, DHS does not intend the rule to penalize or negatively affect any particular group, and being a low-income worker would not necessarily in itself render an applicant inadmissible on public charge grounds. The rule abides by the statutory requirement as provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and is consistent with congressional statements relating to self-sufficiency in 8 U.S.C. 1601, when Congress declared it to be the United States' continued immigration policy that ''aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations.'' Further, the data in the NPRM shows that the percentage of people receiving these public benefits generally goes down as the income percentage increases. Therefore, DHS will maintain the 125 percent of the FPG (100 percent for an alien on active duty, other than training, in the U.S. Armed Forces) standard. After consideration of the comments, DHS also believes it is necessary to clarify that when assessing the alien's annual gross household income, DHS will consider as evidence the most recent tax-year transcripts from the IRS, U.S. Individual Tax Return (Form 1040) from each household member whose income will

be considered.[636] If such a Federal income tax return transcript is unavailable, DHS will consider other credible and probative evidence of the household member's income, including an explanation why the evidence is not available,[637] which may include Form W–2, Wages and Tax Statement, Social Security Statements, or Form SSA–1099, Social Security Benefit Statement.

Concerning nonimmigrants seeking extension of stay or change of status, DHS notes that the rule does not require them to demonstrate that they have income over 125 or 250 percent of the FPG. That threshold is a heavily weighted negative factor in the public charge inadmissibility determination, which is not applied to extension of stay and change of status. Further, as previously indicated, DHS is no longer reviewing whether the alien is likely to receive public benefits in the future in extension of stay and change of status determinations, and therefore, none of the factors in the public charge inadmissibility determination will be considered for nonimmigrants.

*Comment:* A few commenters stated that the heavy positive weight assigned to household income 250 percent above the poverty level discriminates against persons with disabilities because individuals with disabilities and their families are more likely to live in poverty than those without disabilities, and that such individuals will consequently not have the benefit of the heavily-weighted positive factor to offset any negative factors. In the same vein, commenters stated that individuals with disabilities will be disproportionately affected by the negative weight associated with incomes that fall below 125 percent of the poverty level.

*Response:* DHS disagrees that considering household income at or above 250 percent of the FPG a heavily weighted positive factor in the totality of the circumstances discriminates against persons with disabilities. DHS recognizes that any income threshold may affect aliens with low-income. However, DHS did not intend, in adding this income threshold as a heavily weighted positive factor, to discriminate against applicants on the basis of their applicant's race, nationality, medical condition, disability, or membership in any protected class. Even if applicants who have low income are unable to get the benefit of this heavily-weighted positive factor to offset any negative factors, the presence of any other positive factors could, in the totality of

the circumstances, render the alien admissible.

*Comment:* A few commenters stated the proposed threshold could lead to greater family separation and undermine family unity. Another commenter stated that the rule will have an immediate and direct effect on families and their ability to stay united, and could lead to the separation of U.S. citizen children from their immigrant parents. The commenter stated that U.S. citizens will also be directly harmed by the rule, as they will be unable to petition for and sponsor family members. The commenter provided an example of a U.S. citizen mother and wife, who relies on the income of her non-U.S. citizen husband who entered the U.S. on a visa and who would be unable to sponsor her husband under the NPRM because she has no income. The commenter stated that if the U.S. citizen's husband cannot demonstrate sufficient assets or earnings, she would need to find another sponsor for her husband.

Other commenters stated that the proposed income threshold would negatively affect U.S. citizen children, as having children would make meeting the standard more difficult, which is counter-productive to encouraging self-sufficiency because family-based immigration has a positive impact on immigrant success. A couple of commenters said that the proposed income threshold particularly affects multigenerational households, a common practice among Asian American families, and that it would discourage people from supporting family members. An individual commenter suggested that placing an income threshold at 125 percent FPG would decrease the number of immigrant families with a stay-at-home parent, despite the benefits to the family of having a stay-at-home parent.

*Response:* DHS disagrees that the 125 percent income threshold standard would lead to family separation, or otherwise undermines family unity. The rule is not intended to separate families or otherwise undermine the family, but instead ensures that the statutory requirements, as provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) are implemented, which mandate that USCIS must consider an applicant's assets, resources, and financial status in making a public charge inadmissibility determination. This approach is also consistent with congressional policy statements relating to self-sufficiency in 8 U.S.C. 1601, which provides that, ''aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own

---

[635] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[636] *See* 8 CFR 212.2(b)(4)(ii)(A)(*1*).

[637] *See* 8 CFR 212.2(b)(4)(ii)(A)(*2*).

**Exhibit A**

capabilities and the resources of their families, their sponsors, and private organizations.'' [638] As discussed in the NPRM,[639] DHS chose a household income of at least 125 percent of the FPG (100 percent for an alien on active duty, other than training, in the U.S. Armed Forces), which has long served as a touchpoint for public charge inadmissibility determinations.[640] As discussed in the NPRM, DHS also cited data demonstrating that the percentage of people who receive public benefits generally decreases as income increases. In other words, the data established a correlation between having low income and the receipt of public benefits.[641] Therefore, DHS will maintain the 125 percent of the FPG standard. However, as reiterated in other areas, USCIS will not make a public charge determination based on one factor alone; rather, a determinations will be based on the totality of the alien's circumstances. Therefore, in addition to the household income determination, the review of public charge inadmissibility takes into consideration the other factors enumerated in this rule and all other relevant information.

DHS also disagrees that U.S. citizens will be directly harmed by the rule because they will be unable to petition for and sponsor family members. The rule does not directly impact who may file a family based immigration petition, or the sponsorship requirements under section 213A of the INA, 8 U.S.C. 1183a. DHS acknowledges that the rule may result in more family members of U.S. citizens being denied adjustment of status after being found inadmissible on public charge grounds, but believes that Congress intended that aliens be self-sufficient, and DHS has created through this rulemaking a fair and robust standard that is likely to have this this result in more cases than under the current policy.

*Comment:* One commenter stated that the proposed income threshold does not take into account the value of unpaid labor a family member may provide, such as a stay at home parent or grandparent providing childcare. Commenters also stated that the proposed rule could cause a shortage in direct care workers who are unable to remain in the United States, leaving many older and disabled Americans without access to caregivers.

*Response:* DHS understands that some applicants or some families may have household members or family members that provide services within the family, such as caregivers, stay at home parents, and others who will not be readily able to document either their work or income. To account for this, DHS will consider the applicant's household income, which may include the income of other household members who are more able to document their income and who provide the applicant with financial support. Accordingly, an applicant who provides care to a relative without pay may still be able to demonstrate that his or her household income meets the 125 percent FPG threshold. DHS notes that there is no evidence, however, that being a caregiver of others, or living in a household with a caregiver, in and of itself, is indicative of self-sufficiency or lack thereof. Although caregivers may benefit the household by eliminating the need for childcare expenses, each person must establish he or she is not likely to be a public charge based on the totality of the factors based an individual's circumstances. However, as discussed further below, DHS has added a separate provision under the Education and Skills factor that would allow DHS to take into positive consideration that the alien is a primary caregiver of another person within his or her household where there is evidence that the alien is currently unemployed, under employed or lacks an employment history but expects to rejoin the workforce. As discussed in this final rule, DHS has also defined primary caregiver as an alien who is 18 years of age or older and has significant responsibility for actively caring for and managing the well-being of a child or an elderly, ill, or disabled person in the alien's household.

Additionally, as discussed elsewhere in the rule, DHS acknowledges that, once the rule is effective, it will likely result in more adverse determinations. DHS also acknowledges the possibility that this rule, in turn, may impact the admissions of certain types of workers such as direct care workers. Congress did not exempt such workers from the public charge inadmissibility ground. DHS anticipates that the employment of such individuals as direct care workers may diminish the likelihood that they will be considered public charges, but, if the totality of the circumstances establish they, like any other applicant, are likely to become public charges, consistent with this rule, they will be deemed inadmissible. DHS believes a more effective implementation of the congressionally mandated self-sufficiency policy aims as articulated in this rule are paramount.

*Comment:* A few commenters stated this portion of the rule would strongly impact farmworkers and their families. Other commenters cited to a family income below 100 percent FPL and that farm labor's wages are among some of the lowest in the nation. Another commenter indicated that many of their patients, including agriculture workers, live below 150 percent FPL. Many commenters echoed this sentiment and remarked that farmworkers earn an average of around $17,500 per year. With low wages, these workers are highly unlikely to have assets to rule out this negative factor. Another commenter indicated that the proposed rule would particularly affect farmworkers in Michigan, as the work is largely seasonal and farmworkers in the state are not subject to the state minimum wage if they work on small farms. One commenter stated that farmworkers provide valuable and skilled labor that contributes greatly to our nation's agricultural productivity.

*Response:* As previously indicated in the section discussing extension of stay and change of status, and as explained in the notice of proposed rulemaking, DHS will not apply the public charge inadmissibility grounds under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) to nonimmigrants (including farmworkers present in the United States under the temporary worker program for agricultural services (H–2A)), seeking an extension of their stay or a change of status to another nonimmigrant classification. Instead, DHS imposes as one of the terms and conditions of granting an extension of stay or change of status, that the alien establishes that he or she had not received, since obtaining the nonimmigrant status that he or she is seeking to extend or change, any public benefits as defined in 8 CFR 212.21(b), for 12 months in the aggregate within a 36-month period. Based on this information, USCIS would then issue the decision on the application for extension of stay or change of status.

*Comment:* A commenter said that the FPL is a poor guideline due to differences in cost of living throughout the United States. Another commenter stated that differences in costs of living could mean that two people working full time at minimum wage could fall short of affording adequate housing in the district they represent. Another commenter stated that due to the high cost of living in many large cities, reliance on public assistance is not a

---

[638] *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601(2)).

[639] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51187 (proposed Oct. 10, 2018).

[640] *See* INA section 213A(f)(1)(E), 8 U.S.C. 1183a(f)(1)(E).

[641] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51204 (proposed Oct. 10, 2018).

**Exhibit A**

sign of a lack of self-sufficiency, but rather a symptom of a high cost of living. Other commenters stated that the proposed rule would trap immigrants in a cycle of poverty instead of giving them the opportunity to prosper.

*Response:* DHS agrees that the cost of living is different across the United States but disagrees that reliance on public assistance for housing is not a sign of lack of self-sufficiency. Through this rule, DHS has defined public charge as an alien who receives one or more public benefit as defined in the rule for longer than the designated threshold, to include public housing or housing vouchers. HUD programs are based on the cost of living in the area, which denotes that a person is unable to pay for local rent and therefore unable to be self-sufficient and instead must use public benefits in order to afford the rent. Therefore, DHS will consider 125 percent of the FPG threshold in the totality of the circumstances rather than the cost of living.

*Comment:* One commenter stated that the proposed factors institutionalize income bias and discrimination. According to the commenter, this income bias disregards the fact that many full-time workers earning a minimum wage would fall well below the threshold for being accorded positive weight. This commenter noted that such a stringent test creates a policy that is biased against working families, and perpetuates the myth that immigrants are a drain on our society and overly dependent on Government benefits. Some commenters stated that the proposed income threshold of 125 percent FPG would have an outsized and disproportionate impact on members of marginalized groups including children; families; immigrants of color; survivors of domestic violence and sexual assault; people with disabilities; elderly; low-wage workers; AAPI; South Asian Americans; Latino immigrants; those living with HIV and their families; immigrants with disabilities; older adults and families attempting to reunify; LGBTQ immigrants; and women, especially women with other intersecting identities regarding race, ethnicity, and sexuality. Additionally, another commenter remarked that the proposed standards would penalize victims of domestic and sexual violence; and pregnant women.

*Response:* DHS disagrees with the comments that this rule institutionalizes bias and discrimination. The Federal Government is responsible for "regulating the relationship between the United States and our alien visitors," which includes regulating the manner

and conditions of entry, as well as the residence of aliens.[642] DHS is the Federal agency with the authority to establish regulations regarding the public charge inadmissibility determination.[643] Section 212(a) of the INA, 8 U.S.C. 1182(a), sets forth the aliens who are ineligible for visas, admission, or adjustment of status, the public charge ground of inadmissibility and the minimum factors DHS is required to consider in the public charge inadmissibility analysis. DHS must consider an applicant's age, health, family status, assets, resources and financial status, and education and skills. The statute does not include the consideration of race, or any other characteristics and DHS did not propose to consider an alien applicant's race or any other characteristics when making a public charge determination. Similarly, DHS did not propose to take into account an applicant's "social status."

With respect to Immigration regulations applicable to aliens, the rational basis scrutiny applies.[644] DHS's public charge rule is rationally related to the Government's interest, as enacted in PRWORA, to minimize the incentive of aliens to attempt to immigrate to the United States, or to adjust status in this country, due to the availability of public benefits, as well as to promote the self-sufficiency of aliens within the United States.[645]

*Comment:* A commenter said the sum total of past income taxes paid by an individual, and their contribution to the welfare programs, should be balanced against the total value of benefits received by the individual. The

[642] *Mathews* v. *Diaz,* 426 U.S. 67, 81–82, (1976).
[643] *See* Homeland Security Act of 2002 section 102, 6 U.S.C. 112; INA section 103, 8 U.S.C. 1103.
[644] *Korab* v. *Fink,* 797 F.3d 572, 577–79 (9th Cir. 2014) ("[F]ederal statutes regulating alien classifications are subject to the easier-to-satisfy rational-basis review . . . Although aliens are protected by the Due Process and Equal Protection Clauses, this protection does not prevent Congress from creating legitimate distinctions either between citizens and aliens or among categories of aliens and allocating benefits on that basis . . . The difference between state and federal distinctions based on alienage is the difference between the limits that the Fourteenth Amendment places on discrimination by states and the power the Constitution grants to the federal government over immigration.") (citation omitted); *Lewis* v. *Thompson,* 252 F.3d 567, 570 (2d Cir 2001), citing *Lake* v. *Reno,* 226 F.3d 141, 148 (2d Cir.2000) ("We have recently recognized that a 'highly deferential' standard is appropriate in matters of immigration . . . ."). Generally, laws and regulations that neither involve fundamental rights nor include suspect classifications are reviewed under rational basis scrutiny, under which the person challenging the law must show that the government has no legitimate interest in the law or policy or that there is no rational link between the interest and the challenge law or regulation. *Heller* v. *Doe by Doe,* 509 U.S. 312, 319 (1993).
[645] *See* 8 U.S.C. 1601.

commenter stated that taxes paid in the past are indicative of ability and future potential, and surely has a strong correlation with the likelihood of drawing from a benefits program in the future. Another commenter stated that the proposed income threshold would discourage immigrants from entering the country legally. Commenters also indicated that DHS's own conclusory assumption that receipt of this level of funding represents a lack of self-sufficiency was rebutted by the ample research showing that immigrants pay more into the United States healthcare system than they take out and that most immigrant pay taxes.

*Response:* DHS declines to adopt the commenters' suggestion to consider the amount of income taxes paid as an indicator of a likelihood to receive public benefits. The public charge inadmissibility determination looks at a person's individual circumstances to determine whether he or she is likely to become a public charge in the future. Not everyone is required to pay taxes and even if a person pays taxes, he or she may be eligible for public benefits. Given that Congress reiterated that the immigration policy continues to be that, "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations,"[646] DHS believes that the proposed rule has properly and consistently balanced the value of assets and resources of the public charge determination to ensure that those seeking status in the United States do not become a public charge. With this rule, DHS is not seeking to deter immigration but to implement the congressional mandate given in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4).

*Comment:* A commenter stated that employment alone was not sufficient evidence of an immigrant's self-sufficiency and that the criteria should focus on an immigrant's ability to earn wages at least three times the FPL.

*Response:* DHS disagrees with the commenter's suggestions to consider three times the FPL as the threshold. DHS uses the FPG published by the HHS as a threshold in immigration matters. As explained in the NPRM,[647] the 125 percent household income threshold has long served as a touchpoint for public charge inadmissibility determinations as part of

[646] *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601(2)).
[647] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51187 (proposed Oct. 10, 2018).

**Exhibit A**

affidavits of support and public charge. Therefore, DHS will continue to apply the 125 percent of the FPG threshold. DHS agrees, however, with the commenter that employment alone is insufficient evidence of self-sufficiency. The public charge determination reviews all factors in the totality of the circumstances and one factor alone, except for an insufficient affidavit of support when required, will not conclude that an alien is inadmissible based on public charge. An alien's education and skills, which reflect a person's ability to earn wages, are also considered in the totality of the circumstances.

*Comment:* One commenter suggested that community involvement be included when considering evidence of assets and resources.

*Response:* DHS recognizes that community involvement may be an asset to the community as a whole and appreciates the suggestion. However, community involvement does not establish the person's self-sufficiency or evidence of income, assets or financial status.

*Comment:* A commenter stated that the evidence of assets and resources requirement, namely the completion of the declaration of self-sufficiency as proposed in 8 CFR 245.4(b),[648] does not change the fact that someone could become gravely ill and be unable to work and never be self-sufficient. The same commenter stated that the evidentiary requirements encourage people to lie or discourages them from completing the process of seeking adjustment of status altogether.

*Response:* DHS agrees that individuals' future circumstances may be different than the ones that exist at the time of adjudication and the public charge assessment. However, the statute requires DHS to rely on present and past conditions and circumstances as the best available evidence to determine an alien's likelihood of becoming a public charge. Although it is a remote possibility that everyone could become sick and not be able to work, DHS is not assuming that this will happen. DHS would review reasonable possibilities in the future based on the person's current and parent circumstances.

Further, while it is true that some applicants may not provide USCIS with honest answers, DHS expects all applicants and petitions to provide honest and accurate information and requires information to be provided under penalty of perjury. DHS reiterates that not providing truthful information on immigration applications according to the best of an applicant's knowledge and ability may have immigration consequences, including denial of the benefit or ineligibility for benefits in the future.

DHS acknowledges that this rulemaking may discourage certain aliens from seeking adjustment of status that of a lawful permanent resident in the United States. However, with this rulemaking, DHS seeks to better enforce the public charge ground of inadmissibility codified by Congress. Additionally, DHS is also seeking to ensure that those seeking admission in the United States are self-sufficient upon admission and not likely to become a public charge at any time in the future.

*Comment:* Commenters indicated that the proposed rule seeks to set an income standard for income above 125% of the FPG, making it extremely difficult for low income immigrant young adults previously in foster care and earning less than 125 percent of the FPL ($31,375 annually for a family of four), meeting the new income threshold of the public charge test. Given that youth aging out of foster care often need to access public cash and shelter benefits to secure housing or to attend college or training, this could result in denying these young adults lawful permanent resident status. The commenter therefore believed that the proposed rule only serves to heavily favor immigrants with wealth, while punishing low-income immigrants, including immigrant young adults who are working in important, but low-wage jobs to sustain themselves and their families.

*Response:* With this rulemaking, DHS is seeking to better enforce the public charge ground of inadmissibility codified by Congress. DHS, therefore, disagrees with the commenters' statement that this rulemaking only serves to favor wealthy immigrants and to punish those with low-income. The determination whether somebody is likely at any time in the future to become a public charge is based on the totality of the alien's circumstances, and one factor alone, such as the financial status of the alien or the current receipt of public benefits, is not outcome determinative.

DHS acknowledges a possible impact of this rulemaking, once effective, on those in Federal, State, or tribal foster care or those who are aging out of foster care but may continue to obtain certain Federal, State, or tribal public benefits. DHS also acknowledges the possibility that individuals, including those aging out of foster care, may be likely to disenroll from public benefits because of this rulemaking. DHS notes, however, that individuals are typically placed in out-of-home care, such as foster care, because of abuse, neglect or other violence. U.S. law provides certain protections and statuses for aliens who have become victims of violence, such as refugee or asylee status, T nonimmigrant status for certain victims of human trafficking, U nonimmigrant status for victims of certain crimes, VAWA protections for victims of battery or extreme cruelty, and Special Immigrant Juvenile status for victims of child abuse, neglect, abandonment, or a similar basis under State law. Generally, the public charge inadmissibility ground does not apply to these individuals and therefore, the level of income or the receipt of public benefits would be a consideration.

## 2. Evidence of Assets and Resources

*Comment:* Some commenters stated that the proposed rule penalizes immigrants for having a mortgage, despite real estate being a wise investment. Several other commenters said the criteria undervalues homeownership. A commenter stated that home ownership is a gauge of middle class status in the United States and that the longer an immigrant lives in the United States, the more likely they will own a home. Another commenter expressed doubts whether the assets and resources threshold would have the required predictive value for purposes of public charge. Additionally, the same commenter also expressed skepticism that real estate could be easily convertible into cash within 12 months. This commenter reasoned that such assets are typically the residence of the alien or his household, which cannot be readily liquidated without imposing offsetting new housing costs; and, in case of a commercial property, liquidation within twelve months is an unlikely prospect in most U.S. real estate markets. The commenter requested a better justification for the assets and resources threshold of five times the difference between the alien's household gross annual income and the FPG for the alien's household size, and the inclusion of real estate as an asset that could be converted into cash within 12 months; or, preferably, the elimination of these standards from the final rule.

*Response:* DHS disagrees that the rule penalizes immigrants for having mortgages. There is no requirement that

---

[648] The commenter referred to 245.5. 8 CFR 245.5 is the regulatory provision addressing the medical examination of individuals seeking adjustment of status. The NPRM proposed to amend 8 CFR 245.4 by requiring a new documentary requirement for purposes of the public charge determination under INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

**Exhibit A**

an alien have a mortgage-free home; and an alien with a mortgage could use the total value of the home minus the amount of the mortgage to meet the assets threshold. In other words, homeownership could help the alien establish that he or she is meets the income threshold and is not likely to become a public charge where the alien can provide evidence that he or she has available assets through value in a home to overcome any negative factors of the absence of regular income through employment or substantial assets in bank accounts.

The "five times equivalency" test to establish significant assets to cover the difference between the 125 percent standard and the actual income has long been recognized for public charge inadmissibility in the affidavit of support context.[649] DHS disagrees that having assets to cover five times the difference between income below 125 percent of the FPG and the 125 percent amount fails to meet any predictive value, because such assets could be readily converted to cash and substitute for income, thereby helping ensure that the alien does not rely on public benefits to meet his or her basic needs.

DHS disagrees that typically the residence of the alien or his household cannot be readily liquidated without imposing offsetting new housing costs or in case of a commercial property, liquidation within twelve months is an unlikely prospect in most U.S. real estate markets. An alien may be able to liquidate the home and then obtain a new lower cost home or start renting.

Additionally, DHS also disagrees with the commenter about the assessment of the 12-month benchmark; this benchmark is used for affidavit of support purposes [650] which, again, has long been part of the public charge inadmissibility determination. The affidavit of support permits listing of assets that may be liquidated within one year only, and specifically includes the net value of the sponsor's or the sponsored immigrant's home as a permissible asset. Although the affidavit of support does not specifically address commercial property in terms of liquid assets, the commenter provided no

evidence to support the proposition that an alien would be unable to liquidate commercial property within 12 months, and DHS sees no reason to treat commercial property differently from residential property in this context. In addition, 8 CFR 213a.2(c)(2)(iii)(B) does specifically consider real estate in the calculation of significant assets, and it is similarly reasonable to consider commercial property as assets in this context. Therefore, DHS will continue to use the 12-month standard for liquidation of assets.

*Comment:* A commenter stated that the income threshold in the NPRM fails to exclude income from illegal conduct, unlike what the commenter states is the definition of income used by DOS.[651] The commenter reasoned that no alien may work in the United States without authorization, either by operation of law or by specific application.[652] The commenter strongly recommended that income from unauthorized employment should be excluded from the calculation of gross annual household income, in the same manner as unlawful income from drug dealing, gambling, or smuggling. The commenter further suggested that no evidence of irregular income that is not documented on a tax return or equivalent document, such as an IRS Wage and Tax Statement (Form W–2) or Return of Organization Exempt from Income Tax (Form 990), should be accepted; that income earned under a taxpayer identification number rather than a Social Security number should be presumptively unacceptable; and that this approach would streamline the adjudication of public charge determinations, by eliminating consideration of most evidence of income other than recognized IRS documentation.

*Response:* DHS appreciates the comments and would like to clarify that an alien's employment and income derived from employment without an employment authorization card or status which authorizes employment will be considered as part of the assets, resources and financial status factor and the education and skills factor. DHS believes that limiting consideration of employment and income to only that derived from authorized employment goes beyond the narrow purpose of this rule, which is ensuring that aliens are self-sufficient and do not rely on the government to meet their basic living needs. For purposes of a public charge

determination, the alien's household income is relevant to the determination of whether the alien's assets, resources and financial status make the alien more likely than not in the totality of the alien's circumstances to become a public charge. Whether or not the alien engaged in unauthorized employment and any immigration consequences flowing from such unauthorized employment is a separate determination.[653] DHS will therefore consider any past employment and any income derived from such employment in the public charge inadmissibility determination. In addition, as not all income is required to be reported in tax returns, DHS will continue to consider additional income that is not listed on the IRS forms as provided in the I–944 instructions.

However, DHS does agree that income derived from illegal activities or sources should be excluded from the calculation of gross annual household income including, but not limited to, income gained illegally from drug sales, gambling, prostitution, or alien smuggling.

### 3. Public Benefits

*Comment:* Some commenters referenced DHS's request regarding whether use of other benefits should be counted in the totality of circumstances test. Those commenters opposed considering the use of non-listed programs in the totality of circumstances test. Additionally, other commenters stated that DHS should not allow public benefits that are not explicitly enumerated in the rule to be weighted negatively in the totality of the circumstances review. Several commenters said that Federal assistance programs or public benefits should not be a deciding factor in the public charge inadmissibility determination. One commenter cited a study showing that immigrants have a lower unemployment rate than native-born citizens and requested the agency's rationale for focusing on discouraging immigrants from using public benefits, despite their lower unemployment rate as a demographic group.

Some commenters stated that receipt of benefits was not evidence of weak financial status, as benefits are used temporarily to help people get back on

---

[649] *See* 8 CFR 213a.2(c)(2)(iii)(B). *See also* 64 FR 54346, 54348 (October 20, 1997) (explaining the rationale for the significant asset rule as part of the interim affidavit of support rule) and 71 FR 35732, 35739 (June 21, 2006) (explaining the rational for adopting the current affidavit of support rule at 8 CFR 213a, which provides for additional standards for certain aliens). DHS has amended the public charge regulatory provision to reflect that DHS will adopt the three standards used in the significant asset provision for purposes of the public charge determination.

[650] *See* Form I–864, Instructions, Part 7.

[651] The commenter cited to the former FAM section on public charge at 9 FAM 40.41. The public charge FAM section is now located at 9 FAM 302.8.

[652] *See* INA sections 274A(a)(1), (h)(3), 8 U.S.C. 1324a(a)(1), (h)(3).

[653] Furthermore, a general limitation of the type suggested by the commenter could be in tension with USCIS policy. *See* USCIS Policy Memorandum PM–602–0119, *Qualifying U.S. Work Experience for Special Immigrant Religious Workers* (July 5, 2015), *https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2015/2015-0705_Lawful_Status_PM_Effective.pdf*; *Shalom Pentecostal Church v. Acting Secretary DHS,* 783 F.3d 156 (3d Cir. 2015).

**Exhibit A**

their feet. Another commenter stated that many of the public benefits considered under the proposed rule would in fact make someone less likely to be a public charge, especially when the benefits are received by children. A few other commenters expressed concern that using prior receipt of public benefits as evidence of financial status ignores the role public benefits play in promoting self-sufficiency. A commenter indicated that past receipt of benefits is not even mentioned by Congress as a factor that should be given any weight in the public charge determination. Another commenter cited a 1999 letter from HHS stating that it could not imagine any way in which an individual could become primarily dependent on public benefits. Another commenter asserted that the current provisions surrounding public benefits are sufficient to be used in public charge determinations. A few commenters stated that counting benefits as a negative factor when used by children in the public charge assessment is contrary to the purpose of the public charge ground of inadmissibility because benefits providing essential health, nutrition and housing assistance prepare children to be productive, working adults; counting it as a negative factor would unfairly base a child's future potential for self-sufficiency on their use of benefits as a child. A commenter stated that using prior receipt of benefits in public charge determinations is contrary to the totality of circumstances test. One commenter indicated that considering the use of public benefits as evidence of financial status would negatively and disproportionately impact LGBTQ immigrants and immigrants with disabilities. Another commenter stated that, since most applications for public assistance consider a wide range of benefits, immigrants would be kept from applying from all benefits, even those not mentioned in the proposed rule. Some commenters stated that including receipt of benefits as evidence of financial status would lead to a widespread chilling effect among immigrants and citizens alike. One commenter asserted that, unless DHS is willing to compel employers in agriculture and in other industries to provide a living wage and health benefits, it is cruel and unjust to punish hard-working immigrants who rely on public benefits but who also benefit the United States.

*Response:* DHS disagrees with the commenters and maintains that receipt of public benefits indicates weak financial status. DHS also disagrees

rates of public benefits receipt among aliens as a whole would warrant abandoning this rule, which applies the public charge ground of inadmissibility to individual aliens. As provided in the NPRM,[654] and elsewhere in this regulation, current or past applications for, or receipt of, or certification for future receipt of public benefits, as defined in 8 CFR 212.21(b), suggests that the alien's overall financial status is so weak that he or she is or was unable to fully support himself or herself without public benefits, *i.e.,* that the alien will receive such public benefits in the future. Accordingly, as discussed more fully in the discussion on the public benefits threshold section, DHS believes that it is reasonable to consider any application, approval, or certification for, or receipt of, public benefits as a negative factor in the totality of the circumstances, as this is relevant to determining the likelihood of becoming, at any time in the future, a public charge. DHS understands however, that certain individuals may have become self-sufficient over time after having received or having been certified to receive public benefits, and therefore, either have disenrolled, or have requested disenrollment from the public benefits. To account for these positive developments in an alien's life, DHS decided to include as a consideration evidence of the disenrollment, or a request for disenrollment or withdrawal from public benefit receipt.

Overall, however, Congress implicitly recognized that past receipt of public benefits can be considered in determining likelihood of someone becoming a public charge when it prohibited consideration of benefits that were authorized under 8 U.S.C. 1641(c) for "certain battered aliens."[655] Congress' prohibition of consideration of prior receipt of benefits by a specific class of aliens indicates Congress understood and accepted the agency's consideration of past receipt of benefits in other circumstances.

DHS agrees that public benefits play a role in promoting and helping people obtain self-sufficiency; however, the primary reason people seek public benefits is the inability to be self-sufficient. In addition, the 1999 Interim Field Guidance, in which other agencies commented, involved the "primary dependence" standard, which is different from the standard set forth in this final rule. While DHS understands that some people may choose not to

apply for benefits, however, the rule does not intend to disproportionally affect any group of people as previously discussed.

*Comment:* A commenter indicated that the proposed regulation states only that DHS would consider whether a noncitizen has "applied for" or "received" benefits or fee waivers, without defining those terms. The commenter wrote that the proposed rule did not plainly state that DHS will only consider a noncitizen's application for benefits on her own behalf. These omissions, according to the commenter, would allow immigration officers to penalize a noncitizen during a public charge determination when she is the formal applicant for, or payee of, benefits for which her children or others are the true beneficiaries.

Another commenter expressed concern that many affected families will include U.S. citizens. The commenter explained that although the proposed rule stated that DHS did not intend to consider benefits received by a mixed status household where a noncitizen would not be entitled to receive a benefit or was not counted for purposes of calculating household size, the proposed regulatory text did not clearly implement DHS's stated intent. The commenter stated that as a consequence, an immigrant applying for benefits exclusively on behalf of U.S. citizen dependents could still face adverse consequences in a public charge determination for the family's receipt of such benefits, leaving the household with the choice of either not applying for benefits and facing food and housing insecurity, or the applying for the benefits and increasing the likelihood of adverse immigration consequences for some family members.

Similarly, a commenter stated that the proposed regulatory text fails both to clearly explain how DHS will identify "the portion of the benefit that is attributable to the alien" (for example, when the individual lives in a household that receives housing assistance and he or she would not be eligible to receive such assistance). The commenter wrote that the proposed rule did not plainly state that DHS will only consider a noncitizen's application for benefits on her own behalf. Another commenter stated that DHS should commission research on the cash value equivalence when determining the discount factor for housing benefits.

*Response:* DHS agrees with commenters that additional clarification of when DHS will consider application, certification, or receipt of public benefits will weigh negatively in the totality of the circumstances could be

---

[654] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51188 (proposed Oct. 10, 2018).

[655] INA section 212(s), 8 U.S.C. 1182(s).

**Exhibit A**

**41422**    **Federal Register**/Vol. 84, No. 157/Wednesday, August 14, 2019/Rules and Regulations

helpful. Therefore, DHS has added a new definition of ''receipt of public benefits'' to 8 CFR 212.21(e) to clarify that DHS will only consider the alien to have received a public benefit if the alien is a named beneficiary of the benefit but not where an alien is applying, being certified, or receiving a public benefit not on his or her own behalf but on behalf of another person. For example, if a parent is applying for a public benefit on behalf of a U.S. citizen child, such application for public benefits will not be considered negatively against the parent. Similarly, if an alien is the legal guardian or power of attorney of the alien's lawful permanent resident parent and is applying for a benefit on behalf of such parent, such application and/or associated administration of the public benefit on behalf of the alien's parent will not count negatively against the alien. DHS would only count as a public benefit any benefit for which the alien is specifically listed as a beneficiary. The new definition also clarifies that application for a public benefit is not the same as receipt but is indicative of an alien's intent to receive such a benefit. Similarly, certification is not the same as receipt but may impact the likelihood that the alien will in the future receive such public benefit.

*Comment:* Commenters stated, in response to a call for comments in the proposed rule preamble, that DHS should not revise the rule to allow adjudicators to consider an alien's receipt of public benefits below the applicable threshold, as part of DHS's assessment of whether the alien is likely at any time in the future to become a public charge (*i.e.,* to receive benefits above the applicable threshold). A commenter wrote that all individuals, citizen or non-citizen alike, may have emergency situations or unanticipated job losses that could result in a need for benefits on a temporary basis. Another commenter wrote that if any benefit receipt below the threshold were to be considered in the totality of circumstances, the thresholds would become ''entirely meaningless.''

*Response:* No commenters established that receipt of designated public benefits below the applicable threshold has no bearing on whether the alien may, in the future, receive designated public benefits above the applicable threshold. In addition, the proposed rule, as drafted, would have effectively required DHS to be willfully blind to evidence of significant benefits use that fell short of the threshold. For instance, it was unclear whether the proposed rule would allow adjudicators to consider the fact that an alien had

received non-monetized benefits for 11 consecutive months leading up to an application, even though such fact would be directly relevant to whether the alien is likely to exceed the applicable threshold in the future.

Following careful consideration of the issue, DHS has determined that it is reasonable to consider any application, approval, or certification for, or receipt of, public benefits as a negative factor in the totality of the circumstances, regardless of whether the benefits exceed the threshold for becoming a public charge. While DHS does not believe that past receipt of the benefits enumerated in this rule for 12 months or less, on its own, makes the alien likely to become a public charge in the future, such receipt will in some cases suggest that the alien is not self-sufficient, or may soon lack self-sufficiency. Accordingly, under the assets, resources, and financial status factor, DHS will consider it to be a negative factor (though not a heavily weighted negative factor) if the alien has applied for, been approved or certified for, or has received, public benefits for any amount of time.[656] The fact that an alien has in the past applied for, been approved or certified for, or has received public benefits for any amount of time, would never be dispositive on its own, but would be relevant to assessing an alien's likelihood of becoming at any time in the future a public charge. USCIS will consider the duration, amount, and recentness of an alien's past approval or certification for, or receipt of, public benefits, when deciding how much weight to give this past activity as part of the prospective totality of the circumstances determination.

*Comment:* An individual commenter stated that the proposed assets, resources, and financial status factors would treat immigrants who have been living in the country fundamentally different than those arriving at ports of entry and are therefore arbitrary. The commenter indicated that this difference in treatment is wholly inequitable and fundamentally wrong because an individual who has continually received public assistance in a foreign country could potentially be allowed to enter the United States. In contrast, individuals who are applying for adjustment of status within the United States could be denied adjustment of status for a brief, temporary use of a low dollar amount of public assistance.

*Response:* DHS disagrees that the proposal is arbitrary. DHS understands

that public benefits and assistance programs exist in other countries. However, DHS did not propose and will not consider public benefits provided by foreign countries.[657] Public benefits in foreign countries have different standards and objectives. For example, in some countries, healthcare is provided on a national basis irrespective of income or need and is, therefore, not comparable to public benefits or to the public charge standard in the United States. In addition, the inadmissibility determination addresses whether a person is likely to become a public charge in the United States in the future.

Additionally, all applicants for admission and adjustment of status applicants must demonstrate that they are clearly and beyond a doubt not inadmissible to the United States.[658] The ground of inadmissibility under section 212(a) of the Act, 8 U.S.C. 1182, include the public charge grounds of inadmissibility under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). DHS explained in the proposed rule that it provided a more comprehensive framework for determining public charge inadmissibility, including certain and new paper-based applications, as additional evidence related to public charge considerations.[659] DHS also explained that, due to operational differences, this additional evidence would not generally be required at ports of entry.[660] Applicants for admission are inspected by immigration officers at or, when encountered, between ports of entry in a timeframe and setting distinct from the adjudications process. This, however, does not imply that DHS does not screen applicants for admission for grounds of inadmissibility, including public charge grounds of inadmissibility. Therefore, DHS does not fundamentally treat those who seek adjustment of status in the United States differently from those seeking admission to the United States.

*Comment:* One commenter stated that the proposed rule ignores that under PRWORA applicants for admission are and will remain ineligible for public benefits even after admission, and that applicants for adjustment of status are and will remain ineligible for most public benefits until they have green cards for five years. The same commenter stated that the rule's

---

[656] 8 CFR 212.22(b)(4)(ii)(F)(1), (2).

[657] *See* 8 CFR 212.21(b). *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51158–51174 (proposed Oct. 10, 2018).

[658] *See* INA section 235(b)(2)(A), 8 U.S.C. 1225(b)(2)(A).

[659] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51116 (proposed Oct. 10, 2018).

[660] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51116 (proposed Oct. 10, 2018).

**Exhibit A**

"weighing scheme" is impermissibly vague. The commenter pointed to one of the examples in the proposed rule as indicative of the unpredictable nature of the determination, namely that an individual who is in school and employed with an income of 120 percent of the FPG and does not have health insurance but has no other negative factors would not be deemed likely to become a public charge. But the commenter noted that if the individual was not precluded by immigration status from receiving public benefits, the individual would be income-eligible for SNAP, Medi-Cal, and Federal housing assistance. The commenter stated that it is not clear why DHS would not deem the individual likely to become a public charge at any time in the future.

*Response:* DHS disagrees with the commenter that the rule fails to consider the alien's immigration status in determining whether an alien could qualify for public benefits, and has added language in the rule to clarify. DHS also disagrees that the totality of the circumstances determination is impermissibly vague and unpredictable, or that the example the commenter cited illustrates the unpredictability of the determination. In the proposed rule, DHS established as one of the mandatory regulatory factors the consideration of the alien's prospective immigration status and expected period of admission. DHS notes that there are a number of legal and practical limitations on DHS's ability to consider eligibility for public benefits as part of its totality of the circumstances determination. For instance, DHS does not have the expertise to apply the varied and often complex framework of public benefit eligibility criteria, either on a state-by-state basis or according to general Federal standards; cannot reliably predict the alien's likely state of residence at any time in the future; and cannot assume that all aliens who are ineligible for the designated benefits in the near-term will not use them in the long term.[661]

But if an alien provides evidence from a Federal, State, local, or tribal agency specifically identifying that alien does not qualify for one or more public benefits, USCIS can use that information

as part of its totality of the circumstances determination. DHS has therefore revised the regulatory text to make clear that DHS would consider evidence from a Federal, State, local, or tribal agency administering a particular benefit that shows the alien does not qualify for the public benefit, so long as the alien submits the necessary evidence and specifically identifies it as relating to eligibility.

For example, an alien could provide a letter from a benefit-granting agency indicating that the alien is not eligible for a particular benefit based on the alien's immigration status. In the alternative, the alien could provide information from a public benefit-granting agency listing the immigration classifications not eligible for public benefits and evidence of the alien's prospective immigration status that together indicate that the alien is not eligible for the benefit because the alien does not have an immigration classification that the public benefit-granting agency has identified as eligible. Similarly, the alien could provide evidence of his or her gross household income together with information from a public benefit agency's website showing the eligibility income threshold for the state in which the alien resides, or will reside upon becoming a lawful permanent resident, that specifically indicates that the alien's gross household income exceeds the threshold. DHS would consider such evidence in the totality of the circumstances. DHS notes that an assessment that an alien is not currently eligible for any or all designated public benefits may carry some weight in the totality of the circumstances, but will never be outcome determinative. DHS must consider all statutory factors to determine whether the alien is likely *at any time in the future* to become a public charge.

With respect to the specific example cited by the commenter, DHS notes that evidence of alien's income being below 125 percent of the FPG or evidence that the alien's immigration status may not be disqualifying, are not necessarily determinative factors in the totality of the circumstances. In the example commenter discusses (Table 34, example A in the proposed rule), DHS would determine that the alien is not likely to become a public charge notwithstanding the alien's lower income and lack of health insurance because the alien is fundamentally a young and healthy person (age 30) of a working age, with an employment history and education (attending a Bachelor's degree program), and the alien is an employment-based applicant

for adjustment of status. In making this determination, DHS would take into consideration the fact that the alien is working while in school and thus that the nature and hours of employment may be limited by his need to attend classes. DHS would also look at the likelihood that the alien's earning capacity would increase as a result of his education—for example, U.S. Census data shows that a college degree nearly doubles earnings.[662] Similarly, there is no evidence that the alien had previously received, or even attempted to apply for, or been certified to receive public benefits.[663] Therefore, notwithstanding the commenter's observation about potential future eligibility for such benefits, the alien, based on the facts, would not be more likely than not receive public benefits at any time in the future. However, if there were evidence that, the alien was discontinuing his or her education, or had a chronic health condition that would impair the alien's ability to work, or that the alien had attempted to apply for public benefits but had been found ineligible based on his immigration status, such evidence could tip the determination the other way and USCIS may determine that the alien is more likely than not to receive public benefits above the designated threshold at any time in the future. Therefore, DHS appreciates that a real world circumstance is likely to include facts beyond those included in the hypothetical fact pattern that could lead to a different adjudication.

### 4. Fee Waivers for Immigration Benefits

*Comment:* Many commenters said the rule overweighs receipt of one-time immigration fee waivers to predict whether a person will become a public charge by double counting, as use of a fee waiver is a function of income.

---

[661] *See, e.g.,* Medicaid.gov, Medicaid, Children's Health Insurance Program, & Basic Health Program Eligibility Levels, *https://www.medicaid.gov/medicaid/program-information/medicaid-and-chip-eligibility-levels/index.html* (discussing Medicaid eligibility from state to state) (last visited June 5, 2019); State TANF Policies: A Graphical Overview of State TANF Policies as of July 2016, available at *https://www.acf.hhs.gov/sites/default/files/opre/wrd_2016_databook_companion_piece_05_15_18_508.pdf* (last visited June 5, 2019).

[662] *See College Degree Nearly Doubles Annual Earnings: https://www.thoughtco.com/college-degree-nearly-doubles-annual-earnings-3320979* (last visited June 27, 2019); *U.S. Census Bureau Educational Attainment in the United States: 2004: https://www.census.gov/data/tables/2004/demo/educational-attainment/cps-detailed-tables.html* (last visited June 27, 2019); *U.S. Census Bureau Post-Secondary Employment Outcomes (PSEO) (Beta) https://lehd.ces.census.gov/data/pseo_beta.html.*

[663] Even though some studies show that low income earners receive one or more public benefits at higher rates, DHS would not necessarily find this trend to be outcome determinative in the case of an individual enrolled in a Bachelor's degree program. *See, e.g.,* The New York Times, *Working, but Needing Public Assistance Anyway https://www.nytimes.com/2015/04/13/business/economy/working-but-needing-public-assistance-anyway.html* (April 12, 2015) (last visited July 26, 2019); U.C. Berkeley Labor Center: High Public Cost of Low Wages *http://laborcenter.berkeley.edu/the-high-public-cost-of-low-wages/* (last visited June 27, 2019).

**Exhibit A**

Another commenter stated that there is not enough data to determine whether one-time receipt of a fee waiver was related to a person being a public charge. A commenter noted that a separate consideration of the use of a fee waiver means that factors such as income would be unfairly counted twice—once based on their household income and a second time when the fee waiver is granted because of their income.

*Response:* DHS disagrees that the receipt of a fee waiver for an immigration benefit is over-weighted. The fee waivers for immigration benefits is only one evidentiary consideration in the totality of the circumstances and it is not heavily weighted. As indicated in the NPRM,[664] since fee waivers are based on an inability to pay (*i.e.,* receipt of means-tested public benefits or income at the FPG level), a fee waiver for an immigration benefit suggests an inability to be self-sufficient. DHS recognizes that some of the factors required to obtain a fee waiver may be similar to those used as part of the public charge determination. These factors, however, are reviewed differently according to their respective purposes. For purpose of the public charge inadmissibility determination, all the factors and circumstances will be reviewed in the totality of the circumstances without a counting system currently used for fee waiver purposes, in which each factor is individually ranked or scored to assess whether a fee waiver is warranted. As such, DHS will consider the alien's financial liabilities and the request or the receipt of a fee waiver as evidence of financial liabilities and status in the totality of the circumstances. Other evidence may provide the same information and therefore, DHS would consider the evidence as a whole but not individually rank or score the evidence.

*Comment:* One commenter said it is impermissibly retroactive to consider the past receipt of a fee waiver because "it impermissibly penalizes applicants for their financial status on the date of the application for the fee waiver and not on the date of application for admission, adjustment of status, or for a visa." Commenters indicated that often, an individual's economic situation improves after receiving immigration benefits for which applicants receive a fee waiver. A commenter stated that even immigrants who applied for a fee waiver and were rejected for having

high income, would be counted under the proposed rule.

*Response:* DHS disagrees that the consideration of a fee waiver would be impermissibly retroactive. First, fee waivers applied for or received before the effective date will not be considered.[665] Second, any fee waiver received on or after the effective date of the rule, will be considered in the totality of circumstances and, alone, would not result in a finding that a person is likely at any time in the future to become a public charge. In the totality of the circumstances analysis, evidence of a change in circumstances, *e.g.,* steady employment and income, would also be taken into consideration. Third, simply because the regulation bases the consideration of public charge in part on an occurrence of a fee waiver on or after the effective date of the rule, does not make the regulation impermissibly retroactive.[666] Through this regulation, DHS simply specifies considerations as part of implementing the public charge determination, according to the best evidence available at the time of the adjudication, including past occurrences of a fee waiver request or grant as a consideration, in the totality of the alien's circumstances. Finally, and similar to the receipt of public benefits, DHS will, in the totality of the circumstances, consider how long ago the fee waiver was received. If the fee waiver was received recently, it would have more relevance to the public charge determination, whereas if the fee waiver was received some time ago, for example, before the alien obtained new, steady employment, the relevance of the fee waiver in the totality of the circumstances would be diminished.

*Comment:* Some commenters stated that the rule seemed to reduce or potentially eliminate the use of the application fee waivers and stated that the fee waiver program is founded on its own policy rationale, which, according to the commenters, is not the subject of this rule. A commenter stated that fee waivers are typically only available for applications not subject to the public charge ground of inadmissibility and stated that using fee waivers in public charge determinations will only serve to chill overall immigration applications. Another commenter further remarked

that the inclusion of fee waivers in public charge determinations would result in fewer immigrants being willing and able to seek citizenship. A commenter stated that many of their clients were worried about whether using a fee waiver would impact their chances of having their applications approved. A commenter stated that the fee waivers would be limiting the options immigrants have to file for immigration benefits and would harm families, citing a story about a client in the process of applying for citizenship. An individual commenter stated that it is cruel to offer fee waivers and then hold the use of said fee waiver against immigrants in their application. Additionally, another commenter stated that the standards for fee waivers are often more lenient than the finding of inadmissibility under the proposed rule, and therefore should not be used in public charge determinations. A different commenter stated that the use of fee waivers in public charge determination would likely disadvantage naturalized citizens in efforts to reunite their families. A couple commenters stated that receipt of a fee waiver often serves as a step toward self-sufficiency and decreases the likelihood that an immigrant will be dependent on government assistance in the future. Another commenter stated that fee waivers are often used when applying for work authorization, as at that time immigrants have no income, and considering fee waivers would lead to longer unemployment periods and increase use of public benefits. A commenter stated that often immigrants apply for fee waivers when they need to file an application in a timely manner, but do not have the time to save enough money to afford the application fee. Another commenter stated that including a fee waiver in public charge determinations would increase the burden on immigrants.

*Response:* DHS disagrees that the rule eliminates fee waiver requests. Applicants would still be able to request fee waivers in accordance with the applicable regulations and form instructions.[667] The consideration of a fee waiver in the public charge inadmissibility determination is but one factor in the totality of the circumstances. As indicated in the NPRM,[668] requesting or receiving a fee waiver for an immigration benefit suggests a weak financial status. Since fee waivers are based on an inability to pay, seeking or obtaining a fee waiver

---

[664] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51188 (proposed Oct. 10, 2018).

[665] 8 CFR 212.22(b)(4)(ii)(G).

[666] "A regulation has retroactive effect 'when it takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past.'" *See Mejia* v. *Gonzales,* 499 F.3d 991, 995—99 (9th Cir. 2007) (quoting *INS* v. *St. Cyr,* 533 U.S. 289, 321 (2001)).

[667] *See* 8 CFR 103.7(c).

[668] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51188 (proposed Oct. 10, 2018).

**Exhibit A**

for an immigration benefit suggests an inability to be self-sufficient. In addition, the Senate Appropriations Report for the Department of Homeland Security for FY 2017, stated that ''the Committee is concerned about the increased use of fee waivers, as those paying fees are forced to absorb costs for which they receive no benefit. In addition, those unable to pay USCIS fees are less likely to live in the United States independent of government assistance.[669] However, the House Report on Department of Homeland Security Appropriations Bill, 2019, said ''USCIS is expected to continue the use of fee waivers for applicants who can demonstrate an inability to pay the naturalization fee. USCIS is also encouraged to consider whether the current naturalization fee is a barrier to naturalization for those earning between 150 percent and 200 percent of the federal poverty guidelines, who are not currently eligible for a fee waiver.'' Therefore, DHS would not consider the request or receipt of reduced fee for the naturalization application as part of the public charge inadmissibility.

DHS also disagrees that this rule would deter individuals from applying for U.S. citizenship or otherwise imposes additional burdens on applicants. This rule addresses how DHS determines inadmissibility of aliens on account of public charge; and it does not apply to individuals seeking to be naturalized who would apply for a fee waiver request because the public charge ground of inadmissibility does not apply to naturalization proceedings.[670]

For clarification purposes, DHS has amended the regulatory text in 8 CFR 212.21(b) to provide that fee waiver requests submitted or granted as part of immigration benefits that are not subject to the public charge inadmissibility ground under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) will not be considered as part of the public charge determination. *See* 8 CFR 212.22(b)(4)(G).

*Comment:* One commenter stated that considering fee waivers would unfairly and disproportionately impact survivors of human trafficking and domestic violence who are less likely to have the ability to pay for fee-based forms. Another commenter further remarked that the use of fee waivers in public charge determination would disproportionately affect women, survivors of abuse, and people of color.

*Response:* As discussed in the NPRM, an alien who is a VAWA self-petitioner,

a T nonimmigrant at time of admission, and an applicant for, or individual who is granted, U nonimmigrant status are generally exempt from the public charge ground of inadmissibility. For reasons discussed earlier in this preamble, DHS amended this final rule to clarify that T nonimmigrants seeking any immigration benefit subject to section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), are generally exempt from the public charge ground of inadmissibility, as previously discussed. Because these survivors of human trafficking and domestic violence are generally exempt from the public charge inadmissibility ground, they would not be impacted by this rule.

*Comment:* Several commenters stated that the consideration of receipt of a fee waiver would keep immigrants from accessing their right to justice in immigration proceedings.

*Response:* DHS disagrees that the consideration of requests for, and receipt of, fee waivers would prevent individuals in removal proceedings from applying for any benefits for which they are eligible. Although request and receipt of a fee waiver is a consideration in the public charge inadmissibility determination, it is but one factor in the totality of the circumstances, and could not, alone, form the basis of an inadmissibility determination. The consideration of fee waivers within public charge inadmissibility determinations conducted by immigration judges in removal proceeding is more appropriately addressed by DOJ in the context of their public charge rulemaking. DHS's rule only addresses the consideration of fee waivers in the context of matters before DHS.

### 5. Credit Report and Score

*Comment:* Several commenters noted that a credit scores and credit histories are not designed to assess an alien's likelihood of becoming a public charge, were not designed to be used in the immigration context, and do not assess an alien's self-sufficiency. A commenter also noted that credit reports do not address at all whether an alien can financially provide for himself or herself because credit reports do not reflect the subject's payment of rent, utilities, income, savings, or other financial resources. A few commenters stated that a person's credit history should not impact their ability to change immigration status. Many commenters said there is no correlation between a low credit score and the evaluation factor. Many commenters stated that credit reports are highly inaccurate. Further, a commenter remarked that credit reporting scores vary widely

between agencies, and that the score reported to a consumer may not be the same as the score used by lenders. Many commenters asserted that an applicant's credit history could be impacted by factors outside their control from which they may recover. Additionally, a commenter indicated that credit report and income alone does not depict a clear picture of an immigrant's full financial situation or their ability to raise their credit score. A couple of other commenters stated that credit reports and scores do not contain enough information about an individual's earnings or incomes. Another commenter stated that many consumers who are credit invisible or unscoreable will be disadvantaged by the rule and provided data on the population who falls into these groups.

Many commenters stated that credit scores are a poor way to evaluate the past ability to pay bills, since scores do not reflect rent payments, which are often the largest recurring expense a household or individual will incur. Some commenters stated that medical debt is often reflected in credit reports and is not an accurate or reliable measure of an individual's financial status. One commenter stated that credit reports should not be included as a negative factor, but that individuals should be allowed to submit a good credit score as a positive factor if they so choose. An individual commenter stated that there may be additional credit data, which provides for non-traditional credit activity (*i.e.*, short-term payday lending, rent-to-own, auto lending data) that could be used in public charge determinations.

*Response:* A weaker financial status may, in the totality of the circumstances, lead to a public charge determination. As indicated in the NPRM,[671] USCIS would consider an alien's liabilities and information of such liabilities in a U.S. credit report and score as part of the financial status factor in the totality of the circumstances. As provided in the NPRM, a good credit score in the United States is a positive factor that indicates a person is likely to be self-sufficient and support the household. Conversely, a lower credit score or negative credit history in the United States may indicate that a person's financial status is weak and that he or she may not be self-sufficient. Credit reports and credit scores provide information about a person's bill paying history, loans, age of current accounts, current debts, as well as work, residences, lawsuits,

---

[669] *See* S. Rep. No. 114–264, at 125 (2016).
[670] *See* INA section 311–347, 8 U.S.C. 142–1458.

[671] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51189 (proposed Oct. 10, 2018).

**Exhibit A**

arrests, collections, actions, outstanding debts and bankruptcies in the United States.[672] Credit reports generally assist creditors to determine the credit worthiness or risk of a person, and affect the terms of the credit the person is offered.[673] DHS's use of the credit report or scores focuses on the assessment of these debts, liabilities, and related indicators, as one indicator of an alien's strong or weak financial status, so that in the totality of the circumstances and as part of all considerations affecting the alien, the alien is more or less likely to become, in the future, a public charge. DHS believes it is useful information in determining whether aliens are able to support themselves. However, DHS understands that not everyone has a credit history in the United States and would not consider the lack of a credit report or score as a negative factor. DHS also understands that the three main different credit reporting agencies do not provide identical scores. DHS believes that the credit report and score are nonetheless sufficiently reliable to be useful in reviewing a person's financial status in determining whether an applicant is likely to become a public charge.[674] As the Consumer Finance Protection Board has said "A credit report generally is considered s reasonably reliable third-party record . . . for purposes of verifying items customarily found on a credit report, such as the consumer's current debt obligations, monthly debts, and credit history." [675] Further, if the alien has a confirmed error on the report or score, USCIS would not consider the report a negative factor. USCIS will review the latest credit report and score provided by the alien. DHS notes that a credit report or score alone would not lead to an inadmissibility determination based on public charge because the assessment of public charge is made in the totality of the circumstances and no one factor or consideration (with the exception of an insufficient affidavit of support or no affidavit of support, where required) is outcome determinative for being found inadmissible based on public charge.

*Comment:* A commenter expressed concern that inclusion of credit history in public charge determinations would amount to double counting of some of the evidence upon which such reports and scores are based and would already factor into the public charge determination.

*Response:* DHS recognizes that some of the factors enumerated in the public charge rule may be based on similar circumstances; however, some of the considerations may be reviewed differently depending on the factor. However, all the factors and circumstances will be reviewed in the totality of the circumstances without ranking the factors numerically. DHS would consider the alien's financial liabilities and past receipt of public benefits; the credit report and score would simply serve as evidence of financial liabilities and status. Other evidence may provide the same information and therefore DHS would consider the evidence as a whole but not individually rank or score the evidence.

*Comment:* One commenter stated that the guidelines in the proposed rule regarding credit score were broad and ambiguous. A commenter stated that using credit scores in public charge evaluation would lead to "arbitrary, inconsistent, and unfair" public charge determinations. The commenter further stated that the mechanics of going through immigrants' credit reports and scores are impractical.

*Response:* DHS disagrees that the language on credit scores is broad and ambiguous or that it would lead to an arbitrary, inconsistent and unfair public charge determination. As indicated in the NPRM,[676] USCIS would generally consider a credit score characterized as "good" or better to be a positive factor as it demonstrates an applicant may be able to support himself or herself and any dependents assuming all other financial records are sufficient. A "good" credit report is generally near or slightly above the average of U.S. consumers,[677] and therefore the person may be self-sufficient and less likely to become a public charge. A poor credit report is well below the average of U.S. consumers.[678]

*Comment:* Multiple commenters asked whether past poor credit would

be used as a negative factor in a public charge determination.

*Response:* DHS would only consider the information included in the latest credit report and score as provided by the alien at the time of adjudication for public charge inadmissibility purposes. The fact that some had a previous negative or positive score will not be taken into account in the public charge inadmissibility determination.

*Comment:* One commenter questioned how DHS plans to collect, protect, and manage sensitive data surrounding credit report scores. Another commenter noted that USCIS would be required to comply with the storage and disposal requirements for credit information at 15 U.S.C. 1681x.

*Response:* DHS takes seriously its responsibility to properly protect sensitive information in its possession.[679] DHS follows the Privacy Act requirements, which apply to information that is maintained in a "system of records" from which information is retrieved by the name of an individual or by some identifying number, symbol, or other identifying particular assigned to the individual. The materials in alien files (A-files) are considered permanent records and are transferred to the National Archives and Records Administration 100 years after the subject's birth,[680] and therefore not subject to the disposal requirements of the Fair Credit Reporting Act (FCRA). To the extent that credit information subject to the FCRA is maintained in other agency records systems, such records will be destroyed in accordance with applicable General and/or Agency Records Schedules which would be in compliance with the FCRA requirements.[681] As with all forms and private identifiable information, DHS will follow all applicable regulations and procedures to safeguard and protect any sensitive information.

*Comment:* A commenter indicated that if DHS includes credit reports in the public charge determination DHS should not exclude non-U.S. credit reports because credit reporting in the United States is exclusively the province of private-sector corporations, this is not the case in many countries. The commenter cited the World Bank, which stated that at least 30 countries

[672] *See* USA.gov, *Credit Reports and Scores, available at https://www.usa.gov/credit-reports* (last updated July 18, 2019) (last visited July 26, 2019).

[673] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51189 (proposed Oct. 10, 2018).

[674] *See generally Marting Realty, Inc.* v. *Marks,* 1986 WL 4647 (Ohio Ct. App. 9th Dist. 1986) ("Credit reports are held to be highly reliable by the business world and should be admitted where such reliability is not challenged.") (citation omitted).

[675] Official Interpretation 43(c)(3)-3 to 12 CFR 1026.43(c)(3), published as part of Ability-to-Repay and Qualified Mortgage Standards Under the Truth in Lending Act (Regulation Z), 78 FR 6408, 6607 (Jan. 30, 2013).

[676] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51189 (proposed Oct. 10, 2018).

[677] MyFICO, *Understanding FICO Scores* 5, *available at https://www.myfico.com/Downloads/Files/myFICO_UYFS_Booklet.pdf* (last visited July 26, 2019).

[678] MyFICO, *Understanding FICO Scores* 5, *available at https://www.myfico.com/Downloads/Files/myFICO_UYFS_Booklet.pdf* (last visited July 26, 2019).

[679] *See generally* Notice of Modified Privacy Act System of Records, 82 FR 43556, 43564 (Sept. 18, 2017) ("DHS/USCIS safeguards records in this system according to applicable rules and policies, including all applicable DHS automated systems security and access policies. USCIS has imposed strict controls to minimize the risk of compromising the information that is being stored.").

[680] 82 FR 43556, 43564.

[681] *See* 15 U.S.C. 1681w; 16 CFR 682.3.

**Exhibit A**

operate public credit registries, including seven nations in the European Union and 17 in Latin America and the Caribbean.

*Response:* DHS will not include credit reports from other countries in the public charge inadmissibility determination. DHS agrees that credit reporting systems vary significantly throughout the world, including but not limited to how they are established, the information collected, and the rating policy used.[682] As explained in the NPRM, the information obtained through a U.S. credit report may be indicative of a person's financial status and the person's self-sufficiency in the United States.[683] Given that the focus of the public charge determination is the alien's likelihood of becoming a public charge to the United States in the future, DHS believes that the U.S. credit report provides the best means to obtain relevant information regarding assets, resources and financial status. As it is the case with all factors, USCIS will assess the information obtained through a U.S. credit report or score and its impact on the public charge determination in the totality of the circumstances; USCIS will not base the inadmissibility determination solely on the results of the credit report or score.

*Comment:* Another commenter indicated that considering credit scores and reports as a negative factor is directly contrary to case law, citing to *Howe* v. *United States ex rel Savitsky,* 247 F. 292 (2d Cir. 1917). The commenter explained that in this case the immigration inspector found the alien to be a public charge for having drawn a check abroad which ultimately proved bad and that in a dispute arising from contractual matter, the alien had sold the equipment at issue and kept the proceeds.[684] The Second Circuit reversed the decision explaining that Congress meant the public charge provision to exclude persons who are likely to become occupants of almshouses for want of means with which to support themselves in the future.''

*Response:* DHS disagrees that considering credit scores and reports as a negative factor is directly contrary to the case law established in *Howe* v. *United States ex rel Savitsky.*[685] In *Howe,* the court criticized the public charge determination made by the immigration inspector, finding that immigration inspector's ''latitudinarian construction'' of the term public charge would render all other grounds redundant because everybody could be considered a public charge.[686] The court indicated that the public charge determination could not be simple conjecture but that there must be some indication that an otherwise physically fit individual were to become a public charge for want of means to support themselves in the future before he or she could be found inadmissible.[687] The court did not imply or mandate that any aspect of an individual's financial history be excluded from a public charge determination. Additionally, the case was decided based on the 1910 version of Section 2 of the Immigration Act of 1907; the provision at the time did not specifically require immigration officers to consider the alien's ''assets, resources and financial status'' as part of the public charge determination.[688] In contrast, with the 1996 amendments of IIRIRA, Congress specifically required immigration officers to consider these factors as part of the public charge determination.[689] As explained in the NPRM,[690] DHS considers an alien's liabilities and information of such liabilities in the U.S. credit report and score indicative of the state of an alien's assets, resources, and financial status and the person's ability to be self-sufficient.

*Comment:* Many commenters remarked that immigrants are more likely to have no credit history or an insufficient amount of information to generate a reliable score. A commenter stated that in their experience helping enroll immigrant populations in ACA open enrollment, credit scores were often either unavailable or inaccurate. A commenter stated that many immigrants are often victims of financial frauds and financial abuse, which could negatively affect their credit score. The commenter

further stated that the only people to prosper from the proposed rule would be the credit repair industry.

A few commenters stated that credit reports are not available in languages other than English, which can disadvantage immigrants with limited English proficiency from accessing their score and disputing mistakes made to their credit. Adding to this a commenter stated that immigrants often are not aware or are not able to correct errors on their credit score. One commenter stated that not using credit cards can negatively impact one's credit score even though not using credit cards can be a financially responsible choice. Adding to this, a few commenters stated that many people lack credit history because they are frugal which shows a lack of likelihood of becoming a public charge.

*Response:* DHS recognizes that the credit reports and scores may be unavailable or inaccurate. As provided in the NPRM,[691] the absence of an established U.S. credit history would not be a negative factor when evaluating public charge in the totality of the circumstances. Absent a U.S. credit report or score, USCIS may give positive weight to an alien who can show little to no debt and a history of paying bills timely. An alien may provide evidence of regular and timely payment of bills, and limited balances on credit cards and loans. In addition, USCIS would not consider any error on a credit score that has been verified by the credit agency in determining whether an alien is likely to become a public charge in the future.

*Comment:* Several commenters stated that considering credit scores will disparately affect ''marginalized communities.'' Additionally, a few commenters stated that using an immigrant's credit history in public charge determinations would have a disproportionate impact on immigrants of color; women; survivors of sexual and domestic abuse; people with lower levels of education; and local communities where credit scores there are lower than the national average. A commenter stated that the use of credit scores in public charge determinations may have the unintended consequence of trapping immigrants in a cycle of payday loans.

*Response:* DHS disagrees that consideration of credit scores will disparately affect certain groups of aliens. DHS must consider an applicant's assets, resources, and financial status in making a public

---

[682] The commenter cited to Margaret Miller, ''Credit Reporting Systems Around the Globe'' (Washington; World Bank, June 2000), *available at, http://siteresources.worldbank.org/INTRES/Resources/469232–1107449512766/Credit_Reporting_Systems_Around_The_Globe.pdf* (last visited July 24, 2019).

[683] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51189 (proposed Oct. 10, 2018).

[684] *Howe* v. *United States ex rel Savitsky,* 247 F. 292 (2d Cir. 1917) (He had drawn a check for $113 before leaving Canada which proved bad and that in a dispute with one Solomon Cohen arising out of the purchase of a milk route, Cohen charged him with having sold some of the equipment and kept the proceeds.)

[685] *See Howe* v. *United States ex rel Savitsky,* 247 F. 292 (2d Cir. 1917).

[686] *See Howe* v. *United States ex rel Savitsky,* 247 F. 292, 294 (2d Cir. 1917).

[687] *See Howe* v. *United States ex rel Savitsky,* 247 F. 292, 294 (2d Cir. 1917).

[688] *See Howe* v. *United States ex rel Savitsky,* 247 F. 292, 293 (2d Cir. 1917). *See* Comp. St. 1916, Sec. 4244.

[689] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[690] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51188–89 (proposed Oct. 10, 2018).

[691] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51189 (proposed Oct. 10, 2018).

**Exhibit A**

**41428** **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

charge determination.[692] The rule abides by the statutory requirement as provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and is consistent with congressional statements relating to self-sufficiency set forth in 8 U.S.C. 1601. DHS does not believe that the use of credit scores will trap people into a cycle of payday loans since the rule in general, and the use of credit scores in particular, do not require anyone to incur any debts.

*Comment:* A few commenters said that if public charge determinations are made using credit reports or scores, it must be in compliance with user duties under the FCRA. Specifically, the commenters noted that the FCRA applies to USCIS as a Government agency,[693] and that FCRA requires persons to provide the consumer with a written notice if it takes an "adverse action" against that person "based in whole or in part" on a credit report.[694] A USCIS denial would qualify as an "adverse action" since it would be denying a "license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status." [695] USCIS would be required to provide the required written notice required under the FCRA. Some commenters stated that the burden caused by complying with the FCRA would outweigh the benefits from using the credit score.

*Response:* DHS appreciates the comments. DHS agrees that it would be subject to FCRA when it relied on whole or on part on a credit report or credit score obtained from a credit report or other consumer report to deny a benefit. In such cases, USCIS will include the information required by 15 U.S.C. 1681m(a) as part of its communication with applicants. However, DHS disagrees that the burden imposed upon USCIS would outweigh the benefits from using a credit score and will retain the score as part of the rule.

6. Financial Means To Pay for Medical Costs

*Comment:* One commenter supported the proposal to assess whether an immigrant has private medical insurance. Another commenter disagreed with the proposal to include financial means to cover medical costs. A couple commenters stated that the requirement that an immigrant have sufficient assets to cover the costs of medical care is vague and impossible to determine fairly. One commenter said considering lack of private health insurance seems "outlandish" when fewer than half of private employers in the United States provide health insurance to their workers. Similarly, a commenter said that many people who are employed do not have access to affordable healthcare coverage. Another commenter stated that immigrants are more likely than citizens to work in low-income industries that do not provide health insurance or pay enough for employees to afford health insurance. One commenter suggested the agency provide more information on how an immigrant can obtain insurance, since employer insurance is not always an option. Some commenters stated that low-wage workers should not be denied status because they lack health insurance. A couple commenters remarked that the lack of private health insurance in the United States provided the rationale behind the passing of the ACA. An individual commenter stated that the proposed financial means to pay for medical costs factor introduces a conundrum in deciding which will be weighted more heavily: Having private insurance now or previously having used public insurance. Another commenter stated that the proposed standard would be double counting with other factors in the public charge determination.

*Response:* As explained in the NPRM, USCIS will consider whether a person has health insurance or has the household assets and resources to pay for reasonably foreseeable medical costs.[696] In addition, as discussed in section III.R. below, based on DHS's review of the relevant data, DHS has determined to designate a heavily weighted positive factor for having private health insurance, so long as such insurance is appropriate to the expected period of admission, and the alien does not receive premium tax credits under the ACA for such insurance. DHS understands that certain individuals may choose to forego public health insurance, such as Medicaid, because of the impact on public charge. The rule, however, abides by the statutory requirement as provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and is consistent with congressional statements relating to self-sufficiency in 8 U.S.C. 1601. As Congress indicated that the immigration policies continues to be that, "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." [697] Financial means to pay for reasonably foreseeable medical costs is part of being self-sufficient. In evaluating the alien's ability to pay for reasonably foreseeable medical costs, DHS will consider whether the alien has private health insurance (which, on its own, can constitute a heavily weighted positive factor in certain circumstances, as described below) or other household assets and resources. DHS notes that such an evaluation may in some cases require DHS to consider an alien's publicly funded or subsidized health insurance that is not defined as a public benefit under this rule. As previously indicated, DHS will not base the inadmissibility determination on simply one factor but will review all the factors and circumstances in the totality of the circumstances without a rating or numerical standard.

*Comment:* Some commenters stated that the proposed rule, with its statement that "individuals in poor to fair health are more likely to access public benefits to treat their medical condition" erroneously suggests that all immigrants suffer from preexisting conditions and that they will all access federally subsidized health insurance.

*Response:* DHS disagrees that the rule assumes that all immigrants suffer from pre-existing conditions and obtain federally subsidized health insurance. Whether a person has a medical condition is but one factor in the totality of the circumstances. DHS will also consider whether the alien has the resources to pay for reasonably foreseeable medical costs, and DHS will consider it a heavily weighted positive factor if the alien has private health insurance, so long as such insurance is appropriate for the expected period of admission and the alien does not receive premium tax credits under the ACA for such insurance.

*Comment:* Another commenter stated that requiring the financial means to pay for medical costs is in direct conflict with the goals of the ACA.

*Response:* DHS disagrees that requiring financial means to pay for medical costs is in conflict with the ACA. Although the ACA provides for affordable health insurance for a greater number of people, it also limits coverage to categories of immigrants eligible for subsidies and assistance through the

---

[692] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[693] 15 U.S.C. 1681a(b) (including government agencies in the definition of persons).

[694] 15 U.S.C. 1681m(a).

[695] 15 U.S.C. 1681b(a)(3)(D).

[696] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51189 (proposed Oct. 10, 2018).

[697] *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193, section 400, 110 Stat. 2105, 2260 (Aug. 22, 1996) (codified at 8 U.S.C. 1601(2)).

**Exhibit A**

ACA.[698] DHS is also not limiting the ability of people to receive subsidized health insurance, through the ACA or other programs. Insurance obtained from a private health insurance provider through the ACA marketplace would be considered private health insurance under this rule, although, as explained more fully in section III.R below, private health insurance for which the alien receives premium tax credits under the ACA would not qualify as private health insurance for purposes of the heavily weighted positive factor.

*Comment:* A commenter stated that the agency should provide the data used to determine the cost of caring for chronic disease treatment and that the agency should further their analysis to reflect the cost to taxpayers. They further stated that DHS should illustrate how immigrants could access health insurance.

*Response:* The NPRM included a discussion of healthcare costs, and the importance of considering an individual's health when making the determination of public charge. DHS does not believe a more detailed analysis of the costs associated with chronic disease treatment is necessary. DHS does not have current information on all available health insurance plans, however, an applicant can seek information through HHS or through their local government.

*Comment:* Many commenters stated that this factor would negatively and disproportionately affect people with disabilities; people with chronic health conditions; immigrants of color; Asian Americans; victims of human trafficking; farmworkers; and survivors of sexual abuse and violence.

*Response:* DHS does not intend to disproportionately affect such groups. The rule abides by the requirements as provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and is consistent with congressional statements relating to self-sufficiency in 8 U.S.C. 1601. As Congress indicated that the immigration policies continues to be that, "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations."

### M. Education and Skills

#### 1. Education

*Comment:* A commenter said that it should be unlawful to preclude individuals from immigrating to the United States for lack of education and that the new definition of public charge, in general, benefits the wealthy, putting them above hardworking families that actually help the country's economy. Another commenter equated the education requirement to a wealth test with no bearing on an individual's potential. In contrast, a commenter stated that education should be considered in a public charge determination because it is a key indicator of welfare use. The commenter added that, while the majority of immigrants come for work and most are employed, their lack of education results in low average income and heavy use of means-tested benefits programs. The commenter expressed support for an even higher standard and suggested that if an applicant has only a high school education or did not graduate high school, the burden must be on the applicant to show they will not be a public charge. Another commenter stated that, while the proposed evidentiary criteria to support the education requirement are all reasonable to consider as contributing factors, it is critical that they not be treated as separate elements, but as distinct ways to prove education and skills. The commenter concluded that treating each of these elements as separate factors is inconsistent with congressional intent and the general concept of a totality of the circumstances approach.

*Response:* When Congress amended section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), it directed officers to consider the alien's education and skills, and the rule implements Congress's directive on this mandatory statutory factor. Additionally, DHS cited in the NPRM to various studies and data supporting the concept that a person's education and skills, including skills in the English language, are correlated to an individual's self-sufficiency and therefore a positive factor.[699] The goal of this rule is to ensure an alien's self-sufficiency and therefore, the implementation of this factor, as proposed by the NPRM, is consistent with congressional statements relating to self-sufficiency in 8 U.S.C. 1601. DHS will review and consider evidence brought forward by the applicant, including, but not limited to, evidence of the alien's employment history; an alien's degrees; occupational skills, licenses or certifications; and evidence of the alien's and proficiency in English.[700]

*Comment:* A commenter stated that the proposed rule assumes that individuals who have a highly recognized degree or a unique skill are more likely to succeed in the United States, but these individuals often experience downward mobility post-migration because their foreign degrees, credentials, and work experience are not directly transferable to the United States job market. The commenter further stated that recent data shows education is a misguided factor in a public charge determination citing one study that found that even though many first-generation Americans may face issues with lower education levels, subsequent generations dramatically improve their educational profiles. Another commenter stated that being employed or currently enrolled in STEM (science, technology, engineering, and mathematics) or information technology (IT) fields should be listed as a positive factor.

*Response:* As previously indicated, education and skills is a mandatory factor established by Congress.[701] DHS would individually review a person's education and skills to determine whether they are able to maintain or obtain employment to avoid becoming a public charge. As occupations vary in education and skills requirements, DHS is not limiting its review to specific education or occupations. Therefore, DHS does not find it necessary to specify in the rule education and occupations in STEM or other similar fields. It is DHS's intent that officer should examine every consideration, including education and skills, set forth by the alien in the totality of the circumstances when ascertaining whether an alien is likely to become a public charge based upon the applicability of the alien's education and skills to available employment at the time of adjudication.

*Comment:* Commenters stated that the education requirement discriminates against farm workers and other trade workers because they may not have a formal education, but could have been working in the United States for many years. A commenter indicated that, while individuals that lack a high school or equivalent education generally earn less than persons with more formal education, they have many opportunities for gainful employment. The commenter noted that there are numerous jobs with no formal educational requirement, primarily in the agricultural, food processing and preparation, and building trades sectors, which are essential to the economy.

---

[698] *See* Healthcare.gov, Immigration status and the Marketplace, available at *https://www.healthcare.gov/immigrants/immigration-status* (last visited July 24, 2019).

[699] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51189–96 (proposed Oct. 10, 2018).
[700] *See* 8 CFR 212.22(a).

[701] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

**Exhibit A**

Another commenter said consideration of an immigrant's educational level is impermissible under the governing statute, in light of that factor's failure to accurately predict a likelihood of reliance on public benefits. The commenter suggested that studies have shown that low-skilled and low-educated immigrant men demonstrate ''substantially higher rates of employment'' than do comparable native-born men, particularly because of migrant selectivity in deciding where to locate and work. The commenter concluded by saying lack of a formal secondary education does not indicate, among immigrant populations, a likelihood of becoming a public charge and indicates the contrary.

*Response:* As indicated above, education is one of the mandatory factors in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) that DHS must consider in the public charge determination. Employment history will also be considered in the public charge inadmissibility determination to determine whether the alien may obtain or maintain employment. Therefore, while the lack of formal education such as the lack of a high school diploma or other education, are generally a negative consideration, the alien's employment history as well as any occupational skills, certifications or licenses are generally positive considerations. DHS agrees that there are many opportunities for gainful employment, but DHS disagrees that consideration of an immigrant's educational level is impermissible as it is part of Congress' mandatory factors to consider in section 212(a)(4) of the Act, 8 U.S.C. 1182(A)(4). Additionally, the NPRM showed a clear link between increased education and increased employability, employment productivity, as well as earnings, and a reduction in public benefits use.[702]

DHS will consider a range of evidence as to education and skills. To clarify additional types of documentation that establishes a steady employment history, DHS has revised the evidentiary considerations in the rule to indicate that applicants should include federal tax return transcripts for the previous 3 years, if applicable, or, if the alien was not required to file federal income taxes, other probative evidence of the alien's employment history including Form W–2 for the previous 3 years.

*Comment:* Some commenters stated that an education requirement would be more difficult for immigrant women, stating that immigrant women from certain countries, such as Mexico, El Salvador, and China, are less likely to have completed high school, and are therefore, less likely to overcome a negative assessment based on this factor. Similarly, a commenter stated that the negative weight for lack of a high school diploma and lack of employment history would impact a significant portion of women from Asian countries who are adjusting their status.

*Response:* DHS will examine the totality of the individual's circumstances, regardless of the individual's nationality, sex or other characteristic, to assess whether the individual is likely to become a public charge in the future. Among the factors to consider, education and skills is but one factor and is not outcome determinative on its own. When evaluating whether the alien has adequate education or skills to either obtain or maintain employment, USCIS' considerations include, but are not limited to the alien's past employment history; whether the alien has a high school degree or its equivalent, or any higher education; whether the alien has any occupational skills, certifications or licenses; and the alien's proficiency in the English or other languages in addition to English. DHS also encourages the applicant to bring forward any consideration he or she believes are relevant to the determination whether the alien has sufficient education or skills to not become a public charge at any time in the future.

*Comment:* A commenter stated that the level and quality of the education attained by a prospective immigrant can help predict how likely they are to become a public charge and suggested prioritizing higher education in the immigration process. The commenter stated that immigrants with a high school education or less should not qualify for a green card unless the applicant holds a skill(s) that is in high demand and can be expected to earn a high enough salary that they would not need to enroll in any welfare programs. Another commenter said not enough weight is being given to an education standard, noting that while 37 percent of households headed by noncitizens with at least some college use welfare, the rate rises to 81 percent for households headed by noncitizens with only a high school diploma or less.

*Response:* Congress legislates which individuals should be qualified for lawful permanent resident status, and not DHS. Therefore, DHS cannot implement the suggestion that immigrants with a high school education or less should not qualify for lawful permanent resident status unless the applicant holds a skill that is in high demand and for which the market pays a high salaries. Additionally, DHS disagrees that it does not give sufficient weight to the education standard: The public charge assessment considers each factor and circumstance applicable to the alien and each factor is accordingly weighted to determine whether an alien will be self-sufficient while in the United States. The DHS standard recognizes, consistent with the statute, that it is possible that an alien's other positive factors may outweigh the lack of formal education with the result that an alien is not deemed to be likely at any time in the future to become a public charge.

*Comment:* Several commenters expressed concern over the negative assessments that individuals with disabilities may encounter under the education and skills factor in public charge determination. One commenter noted that in order to work and go to school, many individuals with disabilities rely upon Medicaid-funded services that would be considered in the public charge inadmissibility determination's assets, resources and financial status factor, and will also impact the education and skills factor.

A few commenters added that unemployment rates for individuals with disabilities are drastically higher than those for individuals without disabilities. Many commenters addressed how the education requirements might negatively affect immigrants with disabilities, arguing that disparity in education and educational barriers for people with a disability have been ongoing in the United States for generations, resulting in lower rates of high school completion, and great disparities exist when comparing the attainment of higher-level degrees. A couple of commenters said attaining education and employment are areas where many people with disabilities often face significant discrimination based on their disability.

*Response:* DHS appreciates the comments and understands that employment opportunities individuals with disabilities are different. Officers will not find an individual inadmissible solely on account of his or her education, skills, or his or her disability. Rather, officers will assess, based on the totality of the circumstances, whether the individual is likely to be self-sufficient. As indicated in the NPRM,[703]

---

[702] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51189–97 (proposed Oct. 10, 2018).

[703] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51184 (proposed Oct. 10, 2018).

**Exhibit A**

Federal laws [704] and regulations prohibit discrimination against individuals with disabilities. DHS recognizes that individuals with disabilities and other conditions make substantial contributions to the American economy. DHS has analyzed these laws and regulations, and has determined that assessing an alien's education and skills, including work history, is not inconsistent with adhering to non-discrimination requirements with respect to individuals with disabilities.

*Comment:* A commenter expressed concern that adjudicators would apply the education and skills factor inconsistently with respect to the mission and duties of certain religious workers. The commenter stated that qualifying religious workers come from diverse educational backgrounds and perform a diverse range of work duties, depending on the nature and mission of the religious order. The commenter stated that work duties may include duties that do not produce any income at all, such as meditation and prayer, in those orders that pursue a more monastic way of life. Another commenter stated that the proposed education and skills factor could negatively impact those seeking visas as religious workers.

A commenter suggested that DHS exempt special immigrant religious worker category [705] from public charge inadmissibility determinations or clarify that these workers would still be admissible. The commenter stated that the regulations define a religious vocation as a "formal lifetime commitment . . . to a religious way of life" and cover religious workers who have taken a vow of poverty. The commenter indicated that as part of the vow of poverty, many religious workers relinquish personal property and assets, and are not permitted by their religious order to receive compensation. Instead, their religious order or community obligates itself to provide non-salaried support to its vowed member, such as room and board, health insurance, a small allowance, etc. In addition, the commenter stated that a religious order may be obligated to support this member as long as they remain a member. Given that "assets, resources, and financial status" is one of the main factors in the public charge determination, the commenter expressed concern that religious workers would be immediately disadvantaged.

Additionally, the commenter expressed concern about the administrative and economic burden imposed on religious organizations to demonstrate that special immigrant religious workers are not likely to become a public charge. The commenter indicated that sponsors of religious workers may not possess the financial ability of typical U.S. employers. The commenter also stated that the imposition of additional documentary and form requirements to demonstrate that a religious worker is not likely to become a public charge would increase costs to the religious worker sponsor. The commenter indicated that these organization will maximize their resources to serve their mission in the Catholic Church, and that to impose additional economic burdens on U.S. religious organizations seems contrary to American values of religious freedom and liberty.

Finally, the commenter expressed concern about the rule's negative impact on individuals and communities in the United States. The commenter stated that many international religious workers play a vital role in the daily lives of individuals and families in the United States. In addition to the spiritual and ministerial role played, many religious workers also participate in activities and duties supporting the communities directly. Therefore, the commenter requested clarification these special immigrant religious workers continue to qualify for the status or be exempt from public charge.

*Response:* DHS acknowledges that special immigrant religious workers, and immigrants who perform religious work generally, provide valuable contributions to the United States and are in a special position, as acknowledged by Congress in the special immigrant religious worker classification.[706] Congress, however, did not exempt these workers from the public charge ground of inadmissibility and, therefore, DHS will not exempt them in this rule. As noted elsewhere in this final rule, DHS believes that this regulation, and other provisions of the INA and implementing regulations, can be administered consistently with the RFRA. DHS acknowledges that any individual or organization who identifies a substantial burden on his, her, or an organization's exercise of religion such that the RFRA may require specific relief from any provision of this rule may assert such a claim.[707]

Among the requirements for a special immigrant religious worker, the sponsoring religious organization must provide an attestation, attesting, among other things, that the employee will be employed at least 35 hours a week, and that the worker will be provided a complete package of salaried or non-salaried compensation.[708] As part of the petition, the employer provides detailed evidence as to the compensation package being offered to the religious worker, which may include salaried and non-salaried compensation, such as room, board, and other remuneration.[709] Additionally, as part of the attestation, the sponsoring religious organization also has to demonstrate the ability and intention to compensate the alien at a level at which the alien and accompanying family members will not become public charges, and that funds to pay the alien's compensation do not include any monies obtained from the alien, excluding reasonable donations or tithing to the religious organization.[710] To the extent that the sponsoring religious organization complies with these evidentiary requirements with respect to the religious worker's compensation package, DHS does not anticipate, in general, that special immigrant religious workers, including those who have taken a vow of poverty are disadvantaged regarding consideration of their income, assets and resources because the sponsoring religious organization provides compensation to the religious worker such that the religious worker would generally be relying on private rather than on public benefits.

Additionally, DHS does not believe that considering the education and skills of a religious worker applicant may result in inconsistent adjudications or violate due process. As explained above, DHS is required to consider an applicant's education and skills as part of the public charge inadmissibility determination. As provide in the rule, when considering an alien's education and skills, DHS will consider whether the alien has adequate education and skills to either obtain or maintain

---

[704] *See, e.g.,* the Rehabilitation Act of 1973, Pub. L. 93–112, 87 Stat 355 (Sept. 26, 1973) (codified as amended, in pertinent part, at 29 U.S.C. 794), the Americans with Disabilities Act of 1990, Pub. L. 101–336, 104 Stat. 327 (July 26, 1990) (codified as amended at 42 U.S.C. 12101–12213), and the Individuals with Disabilities Education Act (IDEA), Pub. L. 108–446, 118 Stat 2647 (Dec. 3, 2004).

[705] *See* INA section 101(a)(27)(C), 8 U.S.C. 101(a)(27)(C).

[706] For example, special immigrant religious workers under INA section 101(a)(27)(C), 8 U.S.C. 1101(a)(27)(C) qualify for adjustment of status under INA section 245(a), notwithstanding certain bars under INA section 245(c).

[707] Note that that individuals "located outside sovereign United States territory at the time their alleged RFRA claim arose" are not "person[s]" within the meaning of RFRA. *Rasul* v. *Myers,* 512 F.3d 644, 672 (DC Cir.), *cert. granted, judgment vacated on other grounds,* 555 U.S. 1083 (2008).

[708] *See* 8 CFR 204.5(m)(7)(vi), (vii), and (xii).

[709] *See* 8 CFR 204.5(m)(10).

[710] *See* 8 CFR 204.5(m)(7)(xii).

**Exhibit A**

employment in a lawful industry with income that is sufficient to avoid being more likely than not to become a public charge. In the context of a special immigrant religious worker, the relevant question is whether the alien's skills are suitable for the alien's intended occupation. DHS will not assume that the religious worker will be likely to receive a public benefit because of the nature of the employment or lack of income at the indicated threshold. Instead, DHS would consider provisions for housing, food, and medical care provided by the religious institution as available resources.

Further, this rule is not intended to negatively impact special immigrant religious workers or communities in which such workers would reside. Rather, this rule is aimed at better ensuring that those seeking admission to the United States are self-sufficient and rely on their own resources and the resources of their sponsors and private organizations.

2. Language Proficiency

*Comment:* A commenter said that it should be unlawful to preclude individuals from immigrating to the United States because of a language barrier and that the new definition of public charge, in general, benefits the wealthy, putting them above hardworking families that actually help the country's economy. One commenter said the United States has no official language, so there should be no language requirement. Many commenters stated that requiring English proficiency would mark a fundamental change from the nation's historic commitment to welcoming and integrating immigrants. A couple of commenters stated that the rule acknowledges the centrality of English language skills to economic self-sufficiency, but individuals commonly improve their English skills through participation in education programs and rely on Medicaid or other public benefits to enable them to succeed in their English language classes. A commenter indicated that the expanded negative weights for English language proficiency and educational/skills attainment conflict with longstanding policy and principles that support upward mobility and self-sufficiency.

Some commenters indicated that individuals who rely on Medicaid or other public benefits to enable them to succeed in their English language classes could be discouraged from continuing their education and improving their employability by fear of being found a public charge. Some commenters cited research showing a strong connection between better basic skills and higher earnings, which means that as an immigrant improves their reading, math, and spoken English skills, they will be better able to contribute economically to American society. Stating that data demonstrates that the use of cash benefits by immigrant populations that are not English-proficient is so low as to be within the study's margin of error, a commenter reasoned that many immigrants with limited English proficiency (LEP) are taxpaying business owners, or work in white collar or blue-collar jobs. The commenter further noted that although lack of English-speaking skills may be a hindrance to obtaining certain employment, proficiency in a foreign language may bolster an immigrant's ability to obtain other employment. One commenter suggested investing in English language learning programs instead of ''punishing'' immigrants for lack of English language proficiency. Another commenter reasoned that the ability to immigrate lawfully increases opportunities and ability to improve English and by limiting access to legal immigration, the rule would perpetuate an underclass of immigrants who continue to be prohibited from service that could improve their lives, including their English.

*Response:* DHS disagrees with the commenters' suggestions to remove English language proficiency as a consideration in the public charge inadmissibility determination. DHS is not mandating English proficiency for admissibility. DHS recognizes that individuals who lack English proficiency may already participate in the workforce or may be able to obtain employment. However, as discussed in the NPRM,[711] people with the lowest English speaking ability tend to have the lowest employment rate, lowest rate of full-time employment, and lowest median earnings. Further as illustrated in Table 24 in the NPRM, among the noncitizen adults who speak a language other than English at home, the participation rates for both cash and non-cash benefits are higher among those who do not speak English well, or at all, than among those who speak the language well. The margin of error of an estimate, and likewise its standard error, are affected by the number of people surveyed to construct the estimate, which in the case of a percentage or rate will include those who respond that they have the characteristic and those who respond that they do not. A relatively large standard error should not be interpreted to mean that the underlying rate being estimated is low. Findings from the SIPP tables were only discussed in the text of the NPRM if they are significant at the 95 percent confidence level.

DHS understands that aliens may improve their English skills in the future. The Form I–944 does allow a person to identify any courses or certifications in English. Furthermore, DHS is not mandating English proficiency for admissibility. Proficiency in English is one positive aspect for purposes of the education and skills factor to establish an alien's ability to obtain or maintain employment and that the alien, therefore, would be self-sufficient. Lack of English proficiency alone would not establish public charge inadmissibility, but would be one consideration in the totality of the circumstances.

*Comment:* One commenter stated that requiring English language proficiency could extend to all kinds of visas, which could have a negative impact on tourism.

*Response:* DHS reiterates that is not imposing an English proficiency requirement on nonimmigrants or immigrants—it is merely a consideration within the totality of the circumstances when determining for an immigrant applying for adjustment of status whether the alien is more likely than not to become a public charge in the United States. As previously discussed, DHS has removed the forward-looking aspect of the public benefits condition for extension of stay and change of status applications. Therefore, lack of English proficiency will not impact nonimmigrant visitors or the tourism industry. Further, nonimmigrants seeking extension of stay or change of status are not subject to the public charge ground of inadmissibility under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). Nonetheless, B nonimmigrant visitors would have to establish that they have maintained their status and that they have not received, since obtaining the nonimmigrant status that they are seeking to extend or change, any public benefits as defined in 8 CFR 212.21(b), for 12 months in the aggregate within a 36-month period.

*Comment:* A few commenters stated that most people who settle here permanently will develop English proficiency by the time they become citizens. These commenters reasoned that this is why there is no English language test until an individual is being naturalized and that this method provides several years for immigrants to

---

[711] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51195–96 (proposed Oct. 10, 2018).

**Exhibit A**

immerse themselves in the English language. Another commenter stated that Congress made English proficiency a requirement for citizenship and not the initial stage of becoming a legal permanent resident and that imposing an English proficiency requirement in this rule bypasses Congress. A commenter stated that the rule penalizes people for speaking languages other than English, an English proficiency requirement places strain on shared heritage as a source of social support and resiliency, as well as creates redundancy given that our immigration systems requirement of English fluency for citizenship. A commenter asserted that while English has long been a requirement for those seeking to become naturalized citizens of the United States, the rule would create an English language requirement for nonimmigrant visas, family-based, and employment-based visas, even when a language requirement is already a consideration, and even where it is irrelevant. A commenter stated that the proposed English-language proficiency factor would reduce family reunification.

*Response:* DHS is not imposing an English proficiency requirement or as a factor that is outcome determinative in the public charge determination. English proficiency is among the considerations evaluated when assessing education and skills; the alien may submit any evidence relevant to the factor.

DHS understands that certain individual's English will improve over time in the United States and that the ability to read, write and understand the English language is tested as part of naturalization proceedings. However, DHS has established, through data presented in the NPRM, that an individual's inability to speak and understand English may adversely affect an alien's employability, and may increase receipt of public benefits.[712] Therefore, DHS will consider the applicant's proficiency as one of the consideration for purposes of assessing education and skills; DHS will consider any factor applicable to the alien in the totality of the circumstances. DHS would also consider whether the alien is already employed or has education and skills that would allow the alien to obtain or maintain employment and avoid becoming a public charge.

*Comment:* Some commenters suggested that including English proficiency in the factor discriminates against deaf immigrants, individuals with hearing or speech disabilities,

individuals who communicate through assistive devices, and immigrants with intellectual and developmental disabilities.

*Response:* DHS disagrees that the rule discriminates against deaf immigrants or other disabilities. DHS does not mandate English proficiency as a pre-requisite for legal immigration or as a determinative factor within the public charge inadmissibility determination. Adjudicators would not consider it a negative factor for a deaf immigrant to read and write English but not speak it. And in view of ADA requirements applicable to employers, adjudicators would give equal weight to a deaf immigrant's ability to communicate through American Sign Language. An alien's Form I–693 may also establish that a person has a hearing or speech disorder, for which DHS would provide the appropriate accommodation for any interview. Although DHS may consider any medical condition in the totality of the circumstances, the fact that an alien is deaf or hard of hearing or has hearing or speech disabilities, communicates through assistive devices, or that the alien has intellectual and developmental disabilities will not alone lead to a determination of inadmissibility based on the public charge ground.

*Comment:* Some commenters stated that USCIS does not have the authority to impose an official language and that there is no law that allows the Government to prefer those who speak English over those with LEP. Others stated that considering English proficiency in the public charge determination violates constitutional and statutory mandates prohibiting language-based discrimination, which the Supreme Court has interpreted as a form of national origin discrimination. One commenter stated that by discriminating based on English language proficiency the proposed rule violates laws banning national origin discrimination. Several commenters cited several Federal civil rights acts that show LEP persons are protected from discrimination on the basis of English proficiency and those acts included Title VI, the Civil Rights Act, the ACA, and more. Other commenters indicated that the INA, the U.S. Constitution's Equal Protection Clause and other authority demonstrate that individuals cannot be discriminated against on the basis of LEP.

Many commenters stated that consideration of English language proficiency would disproportionally impact women with LEP, citing to studies indicating that women with LEP are less likely to participate in the labor

force than men and more than twice as likely to work in low-wage service occupations as women with English proficiency, and older immigrants with LEP. Another commenter stated that the proposed rule will cause additional harm to trafficking survivors who have yet to gain proficiency in English because they have newly entered the United States or have been intentionally barred from learning English or accessing education by their traffickers. Another commenter said that DHS's analysis fails to account for the fact that many immigrants reside in multigenerational households where the English-speaking capacity of younger generations serves to benefit older generations that do not speak English as readily. The commenter also noted that the vast majority of immigrants to the United States have not been English-speaking and this has not prevented immigrants from becoming contributing members of their communities. Some commenters addressed the adverse impact of the rule on immigrants of Asian descent because nearly three out of four speak languages other than English at home and 35 percent have limited English proficiency. Other commenters stated that this requirement favors immigrants from wealthier, European countries and potentially disfavor immigrants from Latin America, Africa, Asia, the Caribbean, Asia, South America and more.

*Response:* DHS disagrees that the rule imposes a language requirement or impedes LEP individuals from entering the United States. DHS is not imposing an English proficiency requirement for admission to the United States, but solely uses English proficiency as one consideration among others when assessing an alien's education and skills. Additionally, DHS disagrees that considering an alien's proficiency in the English language as a consideration impermissibly discriminates on the basis of national origin or otherwise violates the Equal Protection Clause. Courts have applied rational basis scrutiny to immigration regulations applicable to aliens,[713] and there is a

---

[712] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51190–97 (proposed Oct. 10, 2018).

[713] *Korab v. Fink,* 797 F.3d 572, 577–79 (9th Cir. 2014) ("[F]ederal statutes regulating alien classifications are subject to the easier-to-satisfy rational-basis review . . . Although aliens are protected by the Due Process and Equal Protection Clauses, this protection does not prevent Congress from creating legitimate distinctions either between citizens and aliens or among categories of aliens and allocating benefits on that basis . . . The difference between state and federal distinctions based on alienage is the difference between the limits that the Fourteenth Amendment places on discrimination by states and the power the Constitution grants to the federal government over immigration.") (citation omitted); *Lewis v.*

Continued

**Exhibit A**

rational and non-discriminatory basis for consideration of English proficiency as an element of the education and skills factor. As explained in the NPRM, consideration of English proficiency in determining whether an applicant is likely to become a public charge is based on the fact that an inability to speak and understand English may adversely affect whether an alien can obtain employment,[714] which is consistent with the Census Bureau study cited in the NPRM.[715] During the drafting of this final rule, DHS also considered the Social Security Administration analysis published in that agency's notice of proposed rulemaking that showed high levels of labor market participation among individuals with LEP, and an increase in LEP labor market participants over time.[716] Upon considering this information, DHS believes, however, that while individuals with LEP may be working in the United States, the jobs these individuals may be holding low skilled jobs which are typically available at lower pay. Because the purpose of this rule is to ensure that aliens are self-sufficient, such lower paying jobs may not denote the same

*Thompson,* 252 F.3d 567, 570 (2d Cir 2001) (citing *Lake* v. *Reno,* 226 F.3d 141, 148 (2d Cir. 2000) ("We have recently recognized that a 'highly deferential' standard is appropriate in matters of immigration . . . .")).

[714] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51195 (proposed Oct. 10, 2018).

[715] *See* Jennifer Cheeseman Day and Hyon B. Shin, U.S. Census Bureau, *How Does Ability to Speak English Affect Earnings?* 2 (2005), *available at https://www.census.gov/hhes/socdemo/language/data/acs/PAA_2005_AbilityandEarnings.pdf* (last visited July 26, 2019).

[716] Removing Inability To Communicate in English as an Education Category, Proposed Rule, 84 FR 1006, 1008 (Feb. 1, 2009). ("In absolute numbers, the working age population (ages 25–64) with LEP increased from approximately 5.4 to 17.8 million between 1980 and 2016, while more than doubling, from 5.1% to 10.5%, as a percentage of the population. Within this group, the number of individuals who spoke no English more than quadrupled from approximately 682,000 to 2.8 million (representing growth from 0.6% to 1.7%, as a percentage of the working age population). Between 1980 and 2016, the number of non-English speaking workers in the 25–64 age range grew from approximately 373,000 to 1.7 million. During the same period, the labor force participation rate for working age individuals who speak no English increased from approximately 54.7% to 61.5%.41. Notably, considering the working age population with ''less than high school diploma,'' the 2016 labor force participation rate for those speaking no English (60.5%) surpassed the labor force participation rate of those speaking ''only English'' (48.9%). In 1980, the reverse was true; working age individuals with less than a high school diploma speaking only English had a 60.7% labor force participation rate that exceeded the 54.5% rate for those speaking no English. The increase in labor force participation by individuals who lack English proficiency may be in part due to the increase in low-skilled work in the national economy.'' (internal citations omitted)).

level of self-sufficiency as jobs that may be held by an individual who are able to effectively communicate in English and who may be employed in a higher skilled, higher paying job. Therefore, DHS has retained the consideration of English proficiency.

The consideration of English proficiency is thus based on the factually neutral likelihood of someone obtaining sufficient employment to avoid becoming a public charge and not on a discriminatory motive. The alien is not precluded from bringing forth any other consideration, which will be considered under the circumstances of the particular alien.

*Comment:* A commenter stated the agency should indicate how it would test English language proficiency, as developing a test similar to the citizenship test would be costly in terms of development, training for immigration officers, and the time it takes to conduct the test at each individual interview. A few commenters said the rule has no fair or narrowly tailored process for assessing language ability, which will result in arbitrary decisions and will lead to abuse of discretion and discriminatory conduct. The commenters also stated that the proposed rule does not explain how DHS will make this determination and does not explain what level of English language proficiency is needed, how individuals can demonstrate that ability, or how staff will verify the appropriate level. A few commenters stated that, if English proficiency is to be considered, there needs to be a clear definition for what that means and how it will be determined and not left to the USCIS' opinion or sole determination. Another commenter expressed similar concerns over how the English proficiency requirement would be measured, remarking that the NPRM does not indicate what tests might be employed, whether they would be standardized, what questions might be asked so that a test is administered uniformly, whether an adjudicator would perform the test, whether there would be exceptions or accommodations available, whether the test would be in writing or administered orally, and how an officer would evaluate an applicant's proficiency in other languages.

*Response:* DHS disagrees with some commenters' assessment that the current content of the NPRM and the related documents provided as part of the proposed rulemaking insufficiently outlines the considerations that DHS will be employing to assessing the alien's education and skills. Evidentiary requirements for purposes of the public charge determination are outlined in the

rule and in Form I–944, which includes questions on education and language skills. In general, certifications in a language or other evidence demonstrating an alien's education in the English and any other languages, for example, may demonstrate that the alien has attained some proficiency in the English language or another language. DHS is not requiring an English proficiency written test or provide a reading or writing test. Instead, DHS would review the documentation of English proficiency such as certifications or an alien's transcript for a course of study that was primarily in English (such as a native speaker's secondary school transcript). In addition, USCIS may confirm an alien's speaking and understanding of the English language through the question and answer process of the I–485 form during the adjustment of status interview.

*Comment:* A commenter stated that English proficiency is not required for employment in the United States and cited employment statistics that indicate there is demand for a workforce that is not necessarily proficient in English. Other commenters asserted that the proposed rule fails to consider that immigrants may travel and secure employment in other areas where multiple languages are spoken alongside English. Similarly, other commenters indicated that this rule assumes that non-English speakers cannot perform jobs where English is not required, citing agriculture as an example and claiming the H–2A visa program itself does not require English to work temporarily in agriculture. Many commenters indicated that this rule would improperly reject many people with practical job skills doing essential work in our economy that have limited formal education and English proficiency and highlighted farmworkers as an example.

*Response:* DHS understands that English proficiency is not be required to be employed in the United States. DHS is not requiring or mandating English proficiency as a requisite to immigrating to the United States. English proficiency is a consideration in the assessment whether the alien possesses education and skills sufficient to maintain or obtain employment as to not likely to become a public charge. As explained in the NPRM,[717] data on the relationship between the level of English proficiency and employment as well as public benefits participation highlights that proficiency in the English language is a

[717] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51195 (proposed Oct. 10, 2018).

**Exhibit A**

relevant consideration. DHS will consider all circumstances of the alien's case and all factors in the totality of the circumstances; therefore, no single factor is outcome determinative in this assessment, including the lack or the existence of English proficiency. In individual circumstances, DHS would also consider the alien's employment as a positive factor despite lack of proficiency in English.

*Comment:* Many commenters addressed the 2014 SIPP data about the use of benefits by populations at various levels of English language ability cited by DHS. A commenter asserted that DHS failed to provide any causal linkage between the data cited and its conclusions. A commenter stated that the survey relied upon cross-sectional studies that capture information from a given point in time and that DHS does not cite longitudinal studies that follow the same population and capture relevant information over time. The commenter said DHS cannot predict whether an individual non-citizen is likely to become a public charge in the future based on such studies. One commenter cited information showing that while children of newly-immigrated families speak a non-English language at home, English language learning children are amongst the most successful students at school in the United States, especially once they become fully proficient in English. The commenter stated that this information contradicts studies cited by DHS.

*Response:* DHS discusses English proficiency as an indicator of potential public benefits receipt, which does not rely on an assumption that the relationship is cause-and-effect. The cross-sectional analysis showed that not being proficient in English is an indicator of public benefit receipt in the near term, which is considered in the public charge determination. The DHS analysis shows a relationship between public benefit receipt and English proficiency among adults age 18 and over, and does not describe outcomes for the population of English language learning children, so the results of the studies do not appear contradictory.

*Comment:* Multiple commenters stated that DHS failed to consider alternative reasons that people who are LEP may be more likely to access benefits, adding that that states that have high numbers of LEP populations, such as New York and California, also have high income thresholds for Medicaid. The commenters concluded by stating that three out of the four studies DHS cited used data derived from Europe, while the fourth relies on

Current Population Survey data nearly 30 years old, which is insufficient to support DHS's proposed change.

*Response:* DHS analysis showed that lack of English proficiency was a factor that affected the likelihood of receiving welfare. DHS does not dispute that likelihood of public benefits receipt may also be affected by the state of residency. DHS's findings were not interpreted to suggest that lack of English proficiency necessarily led to welfare receipt, or that there was any causal relationship between the two. As such, complex inter-relationships such as the one mentioned were not investigated. The studies provided by DHS regarding English proficiency included SIPP data representing U.S. noncitizens in 2013,[718] as well as a study using data from the 2000 Census.[719] One report that was referenced was international in its scope, and included a discussion of different European countries, as well as the United States.[720]

*Comment:* A few commenters stated multilingualism should be considered an asset. Another commenter indicated that DHS based its consideration of English proficiency or additional languages on the assumption that English skills are required to enter the U.S. job market. According to the commenter, however, the large number of Spanish speaking workers in the construction industry undermined the premise that English skills are required to enter the U.S. job market. The commenter acknowledged that DHS would consider other languages depending on their market value, but that the rule was silent on considerations guiding this determination, such as the market value assessment for Spanish skills. Therefore, the commenter suggested that the rule

should explicitly indicate that Spanish skills have a high market value, at least in the construction industry.

*Response:* DHS will consider the ability to speak other languages in addition to English as part of the totality of the circumstances when evaluating all of the relevant skills that apply to an alien's employability, education and skills. The ability to speak a language or language proficiency may have differing impacts depending on the nature of the work and the employer, and is best considered individually in the context of each alien's application in the totality of the circumstances. DHS recognizes that certain professions or employment require that an alien speak another language in addition to English. However, the public charge assessment is geared toward becoming a public charge in the United States; the data presented in the NPRM [721] clearly demonstrated a connection between the inability to speak and understand English in relation to employment, public benefit receipt, and financial status. Therefore, DHS retained the English proficiency provision. However, nothing in the regulation precludes an alien from presenting evidence and consideration relating to education or skills other than the considerations mentioned in the regulation; all considerations will be evaluated based on the totality of the circumstances.[722]

### 3. Skills

*Comment:* A commenter indicated that the expanded negative weights for educational/skills attainment conflict with longstanding policy and principles that support upward mobility and self-sufficiency. Another commenter indicated that DHS failed to describe how DHS will consider, among other things, the education and skills requirement. The commenter stated that the rule could prejudice the many foreign-born workers in the construction worker industry, who have little formal education but skills that are in high demand and that these workers earn a good wage. The commenter suggested that DHS should change the requirement that it considers "no high school diploma or other education or skills" as a negative factor in the public charge analysis, and that DHS should instead consider education only as a positive factor. The commenter suggested that in the alternative, the lack of education should only be considered a negative factor when coupled with unemployment. The commenter stated that DHS fails to

---

[718] *See* Table 24, Inadmissibility on Public Charge Grounds, 83 FR 51114, 51196 (proposed Oct. 10, 2018).

[719] *See* Jennifer Cheeseman Day and Hyon B. Shin, U.S. Census Bureau, How Does Ability to Speak English Affect Earnings? 6 (2005), available at *https://www.census.gov/hhes/socdemo/language/data/acs/PAA_2005_AbilityandEarnings.pdf* (last visited July 26, 2019).

[720] Barry R. Chiswick & Paul W. Miller, Immigrant Earnings: Language Skills, Linguistic Concentrations and the Business Cycle, 15 J. Population Econ., 31, 31–57 (2002); Christian Dustmann, Fluency, Writing Fluency, and Earnings of Migrants, 7 J. Population Econ., 133, 133–156 (1994); Ingo E. Isphording, IZA Discussion Paper No. 7360, Disadvantages of Linguistic Origin: Evidence from Immigrant Literacy Scores (2013), available at *http://ftp.iza.org/dp7360.pdf* (last visited July 26, 2019); Org. for Econ. Cooperation & Dev./European Union, Indicators of Immigrant Integration 2015: Settling In (2015), available at *http://www.oecd.org/els/mig/Indicators-of-Immigrant-Integration-2015.pdf* (last visited July 26, 2019).

[721] *See* 83 FR 51114, 51195–97.

[722] *See* 8 CFR 212.22(a) and 8 CFR 212.22(b)(5).

**Exhibit A**

define "skills" and expressed concern that the skills that workers have may be difficult to demonstrate as an evidentiary matter and that this could cause DHS adjudicators to improperly discount skills that often take many years to develop. Along with providing certain data noting that a significant percentage of both foreign-born (over 90 percent) and native-born workers (over 85 percent) in the construction industry do not have a four-year college degree, the commenter pointed out that, for example, a brick layer may be highly skilled but lacks a way of demonstrating a formal certification. The commenter requested that the final rule explicitly indicate that Spanish language skills have a high market value, at least for those in the construction industry. The commenter also suggested that Form I–944 be amended to clarify that DHS will consider experience-based construction skills in the analysis, as the form as currently drafted largely focuses on the certification.

Another commenter suggested that DHS amend its consideration of education and skills as a prerequisite to legal immigration because the legal immigrants that are entering the direct care workforce are entering a career pathway to a successful lifelong career. The commenter stated that although many such immigrants have increasing levels of responsibility, the workforce is not highly skilled. The commenter reasoned that preventing some of the most eligible individuals from entering the United States prevents them from addressing the direct care workforce deficit, which will negatively impact people with disabilities and the elderly in the United States, who rely on this workforce to maintain their well-being and quality of life.

A couple of commenters stated that although agricultural work is considered unskilled labor under some technical definitions, it is in fact a skilled occupation requiring years of experience to gain the necessary knowledge, precision, exercise of judgment, endurance, and speed that many of these workers already have and which contribute to their employer's profitability. The commenters concluded by arguing that that the proposed rule would improperly reject the value of many farmworkers' contributions to our economy and society. Similarly, a commenter expressed their concern that the "skills" component of the education and skills factor is undervalued by the proposed rule. The commenter stated that this narrow view of skilled work will have a particularly harmful impact on immigrants who staff many vital

occupations, such as healthcare support and personal care, for which certification procedures do not exist, but on which many in the United States may depend.

*Response:* Education and skills are mandatory statutory factors as established by Congress under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). DHS disagrees that it did not sufficiently outline the consideration of the factors in the NPRM.[723] DHS appreciates the suggestions from commenters, including the suggestions relating to the construction industry. However, DHS will not remove the lack of a high school diploma or other education or skills provisions from the rule as a negative factor in the public charge analysis. Further, DHS will consider both the positive and negative factors associated with education and skills, as described in the NPRM. As evidenced by the commenters addressing various industries, each industry and area of employment may be different. The DHS proposed rule is flexible enough to account for all factors and circumstances in any particular industry and an individual's case so that each alien may set forth the considerations applicable to him or her demonstrating why the individual is not likely to become a public charge.

As discussed in the NPRM, education has been found to have a significant impact on public benefit usage. As it is possible for an alien to be employed and still be a public charge, the mere fact of employment cannot categorically remove education from an analysis of the totality of the circumstance because education is a statutorily mandated factor. Although education would certainly weigh positively, the exact nature of the education (or lack thereof) and employment would have to be considered. The level and quality of the education attained by a prospective immigrant can help estimate how likely they are to become a public charge. Therefore, while not having high school diploma or other education or skills are generally a negative factor, the lack of a high school diploma, for example, may be overcome by skills or other positive circumstances.

DHS agrees that skills gained as part of employment are positive even when certifications are not available. Regardless of occupation, an alien may demonstrate that he or she has skills through employment that are positive factors. This showing will not be focused on construction, but generally,

be applicable to all job skills. Overall, education and skills will be considered as part of the totality of the circumstances. DHS is not mandating any particular level of education or skill to overcome a public charge inadmissibility determination.

*Comment:* One commenter stated that using both DOL, which already has education and skills criteria for immigrants entering the country to work, and DHS to evaluate labor needs and skills was redundant, unnecessary, and a waste of public funds.

*Response:* DHS disagrees that the rule conflicts with DOL's evaluation of labor needs and skills. Under this rule, DHS will be considering whether an alien possesses education and skills that would contribute to the alien being employable in the United States and thus able to be self-sufficient. This determination does not entail determining whether an alien meets an employer's minimum job requirements for a particular position or qualifies for employment in a particular occupational classification. In addition, even if an alien is found to not possess any education or skills but instead has sufficient financial means to support himself or herself and any dependents, DHS may determine in the totality of the circumstances that the alien is not likely to become a public charge. In contrast, DOL has a statutory mandate to certify before an alien may be admitted in certain employment-based immigrant classifications that there are no able, willing, qualified, and available U.S. workers to perform the job for which an employer seeks to hire the alien, and that the alien's employment will not have an adverse effect on the wages and working conditions of similarly employed U.S. workers. In doing so, DOL examines whether the alien's education, skills, and job qualifications meet the employers' stated minimum job requirements. Therefore, the two departments fulfill two different responsibilities in the immigration process.[724]

*Comment:* A commenter asserted that DHS does not have the ability to adequately evaluate occupational skills, certifications, or licenses, and many occupations do not require them. The commenter stated that this requirement would cause a great burden on employers and agencies who must comply with these new requests.

*Response:* DHS will evaluate all occupational skills, certifications, licenses, and any other evidence that

---

[723] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51189–51196 (proposed Oct. 10, 2018).

[724] *See* INA section 212(a)(5)(A), 8 U.S.C. 1182(a)(5)(A), 20 CFR and 656.1 (DOL's labor certification requirements for immigrant workers).

**Exhibit A**

**Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations    **41437**

establishes a skill in an occupation, as presented by the alien. The alien has the burden to establish that he or she qualifies for the immigration benefit and is not inadmissible.[725] Generally, forms and their instructions outline, in detail, the necessary evidence to apply for a benefit; similarly Form I–944 and its instructions outline possible evidence that an alien can submit to establish that he or she has the requisite education or skills as to be able to maintain or obtain employment. If USCIS believes that the alien has not submitted sufficient evidence to establish that he or she is not likely to become a public charge, where applicable, it may issue a RFE or a NOID to obtain clarification.[726]

### 4. Employment

*Comment:* A commenter indicated that because immigrants who are in the United States without work authorization are not able to work legally, it will be impossible for many immigrants to demonstrate their past employment history. The commenter stated that the proposed rule will therefore place immigrants in an impossible situation: if they comply with the law that prohibits them from working without having first obtained employment authorization, they will forfeit the ability to obtain legal status because they will be unable to show current employment or a recent history of employment. Another commenter stated that DHS cannot accurately assess an individual's likelihood of becoming a public charge if DHS does not first grant work authorization to such an individual.

Other commenters stated that certain visas, such as the K–1 fiancé visa, do not permit a grantee to work. Another commenter stated that the use of an employability factor in a public charge determination would put many immigrants in a catch-22 where their options would be to either work illegally and be denied citizenship or not work and be denied immigration status due to lack of employment. Another commenter suggested that an applicant should be given time to enter the country and work before being subject to the public charge test.

*Response:* As discussed in the NPRM, DHS recognizes that not everyone subject to this rule is authorized to work in the United States. Although an applicant may not be authorized for employment in the United States at the time of filing the adjustment of status application, he or she may have employment history in a foreign

country, or volunteer work experience in the United States, that will be considered as part of the totality of the alien's circumstances.

However, DHS notes that it would consider any employment history outside the United States as part of the public charge inadmissibility determination. Moreover, USCIS would also review the likelihood that the alien will work upon filing for or being granted adjustment of status, *i.e.,* when authorized to work. In addition, USCIS would consider whether the alien may have sufficient assets and resources, including a pension or a household member's assets and resources, which may overcome any negative factor related to lack of employment. The assets and resources would include those of the household, which may include a sponsor when the sponsor is part of the household.

DHS will not, however, include provisions in this rule to provide aliens subject to this rule time to enter the country and work before being subject to the public charge inadmissibility determination. As noted previously, the public charge ground of inadmissibility applies at the time of the alien's application for a visa, admission, or adjustment of status.

*Comment:* Some commenters provided input on how the employment history requirements impacts domestic violence survivors. These commenters indicated that DHS disregards the reality of many crime survivors who are faced with losing their jobs due to intense trauma, reduced productivity, harassment at work by perpetrators, and other reasons stemming from violence. One commenter stated that secure immigration status can help survivors of abuse access employment opportunities, escape violent relationships, and help alleviate the trauma they have suffered. This commenter stated that the proposed rule is actually setting up barriers to employment for survivors, which is also a barrier to self-sufficiency. Other commenters stated that several studies have documented how domestic violence perpetrators deliberately try to sabotage their victims' efforts to obtain and keep paid employment; that domestic violence survivors are forced to become dependent on their abusive partners' incomes; or that some survivors have had their work permits or lawful permanent residence cards taken by their abusers, making it impossible to show that they had legal authorization to work and had to, at times, pay filing fees to get their replacement documents. One commenter stated that half of women who experienced sexual assault

had to quit or were forced to leave their job within the first year and stated that by heavily weighting the lack of employment, the proposed rule doubly penalizes a victim for the economic effects that domestic violence and sexual assault abusers perpetrate.

*Response:* DHS appreciates the commenters' input. As explained in the NPRM, USCIS will assess the alien's education and skills with the focus whether the alien has adequate education and skills to either obtain or maintain employment sufficient to avoid becoming a public charge.[727] As part of the assessment, USCIS will consider the totality of the alien's circumstances, including any and all factors and considerations set forth by the alien. Furthermore, T and U nonimmigrants, VAWA self-petitioners, and others listed in 8 CFR 212.23, are generally exempt from inadmissibility on account of public charge and therefore, they are not likely impacted by this regulation.

*Comment:* One commenter stated requiring employment history would be problematic for many international students attending American universities, arguing that that foreign nationals on student visas are generally not permitted to work while engaging in studies on the F–1 visa. This commenter stated that nearly one-quarter (20 out of 91) of the billion-dollar startup companies had a founder who first came to the United States as an international student, and stated that holding student loan and credit card debt against the students could have a negative impact. The commenter stated that, under the proposed rule, these individuals would be subject to the public charge test even as nonimmigrants when seeking to change status from that of a student to that of an employee on an employment-based visa.

*Response:* DHS does not require that the alien have an employment history as part of the public charge determination. As discussed above, DHS has removed the forward-looking determination for nonimmigrant applicants for extension of stay or change or status. Therefore, DHS would not be reviewing the factors for nonimmigrants applicant for extension of stay or change of status, such as students. Further, the NPRM indicates that for purposes of the assessment of employment and skills, USCIS' considerations include, but are not limited to the alien's employment history.[728] In general, students acquire skills as part of their studies; also, USCIS would not consider it to be a

---

[725] *See* INA section 291, 8 U.S.C. 1361.
[726] *See generally* 8 CFR 103.2.

[727] *See* 8 CFR 212.22(b)(5).
[728] *See* 8 CFR 212.22(b)(5).

**Exhibit A**

heavily weighted negative factor if a student, applying for adjustment of status for a valid basis, is not working because she or he lacks employment authorization. For these reasons, DHS does not believe that students in universities in the United States will be adversely impacted by DHS's consideration of the education and skills factor, as set forth in this rule.

*Comment:* A commenter stated that pregnant women may be forced to leave the work force and stay home to deal with medical complications of a pregnancy or to care for a child during the first months, due to reasons such as the high cost of out-of-home daycare, and that therefore, they will be less likely to show employment history. A few commenters stated that consideration of employment history would unfairly discriminate against women, particularly those who stay home and care for their children. Another commenter stated that often the work of a caregiver, such as a stay-at-home parent or grandparent, is vitally important for the emotional and financial well-being of a family. One commenter remarked that the rule unfairly penalizes individuals who may have additional caregiving responsibilities due to a child's special needs, inability to afford child-care, or even religious beliefs.

*Response:* As indicated throughout this rulemaking, DHS will assess the likelihood of becoming a public charge based on the totality of the circumstances of the individual's case. While there are certain temporary medical conditions or other conditions that may require an individual to interrupt a certain employment activity or have a temporary absence, one can hardly regard such incidents as negating an individual's employment history, or his or her education or skills generally. Additionally, the applicant may bring forward evidence to establish that he or she has adequate education and skills to either obtain or maintain employment to avoid becoming a public charge.

DHS acknowledges that an MPI paper observed that women could encounter difficulty with the totality of circumstances analysis, because women comprised 70 percent of the over 43 percent of recent green card holders who were neither employed nor in school. MPI added that many immigrant women do not work because of child care responsibilities and child care costs.[729] In instances such as this where

a mother is not currently employed and is raising children, DHS would not exclusively focus on the mother's lack of current employment. DHS would also take into full account other factors that could be favorable to the mother and could outweigh her current unemployment: her household's income, assets, and resources; an affidavit of support and relationship to her sponsor, if applicable; and her reasonable prospects to obtain and maintain lawful employment based on her age, education, skills, and any previous work history. This same level of consideration would also apply to other similarly situated parents, guardians, and caregivers who are currently unemployed or who are employed part-time.

Consistent with the above, and following consideration of these and other comments about contributions of caregivers, DHS is adding under the Education and Skills factor an additional positive consideration, namely whether the alien is a primary caregiver of another person in the alien's household. This will be taken into consideration in the totality of the circumstances, and is intended to account for difficult-to-monetize contributions by aliens who may lack current full time employment or recent employment history due to their unpaid engagement in the household. As with all other considerations, the consideration of whether an alien is a primary caregiver would not alone establish that an alien is not likely at any time in the future to become a public charge. Rather, DHS would not consider it a negative factor if an alien of a working age who would normally be employable lacks full time employment, or a recent employment history. This consideration could cover a range of circumstances, including, for example, a parent who stays at home to care for a newborn child, or an adult child who stays at home to care for an elderly parent. DHS has limited this consideration so that only one alien within the household can be considered the primary caregiver of the same person in his or her household. Because some commenters responding to various aspects of the totality of the circumstances analysis raised concerns about "double counting" negative factors, DHS notes that it will only take the primary caregiver role into consideration if relevant, *i.e.,* DHS will not use this consideration to negatively compound the absence of full time

employment or recent employment history if the alien is *not* a primary caregiver. As indicated above, DHS has also added a definition of "primary caregiver" under 8 CFR 212.21(f) to correspond to this provision; primary caregiver means an alien who is 18 years of age or older and has significant responsibility for actively caring for and managing the well-being of a child or an elderly, ill, or disabled person in the alien's household.

*Comment:* Multiple commenters wrote that the rule misunderstands the nature of low-wage work, indicating that there are not simply "people who work" and "people who receive benefits," rather there is an overlap between the two groups.

*Response:* DHS understands that there is an overlap between "people who work" and "people who receive benefits." People who are employed but nonetheless receive public benefits may not be self-sufficient. However, the fact that an alien who is subject to a public charge inadmissibility determination has in the past received public benefits is not outcome determinative. Whether an alien is inadmissible because he or she is likely at any time in the future to become a public charge depends on a review of a range of factors, including work history, in the totality of the circumstances.

### N. Affidavit of Support

*Comment:* Several commenters stated that the affidavit of support is sufficient to satisfy the standard because the sponsor agrees to provide the necessary financial support or to reimburse providing agencies. One commenter stated that the Form I-864 already provides a method for objective public charge analysis. Many commenters stated that Form I-864 creates a legally binding contractual agreement between the petitioner/sponsor and the government that the intending immigrant will not receive public benefits. Some of the commenters indicated that relegating the Form I-864 to a mere factor and proposing to replace it with a bond eliminates the true potential of the Form I-864: to deter new immigrants from applying for government assistance. The commenters stated that in lieu of the Form I-864, the government now proposes to increase the use of public charge bonds and the bond amount to levels that most immigrants will not be able to pay, and involves a third party private bond company. One commenter stated that the proposed heavily weighted factors do not achieve the stated goals of the rule; the commenter indicated that the agency has not stated a sufficient reason

---

[729] *See* Capps, Randy et al, "Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration," Migration Policy Institute. (November 2018). Available at: *https://*

*www.migrationpolicy.org/research/impact-dhs-public-charge-rule-immigration* (last visited July 26, 2019).

**Exhibit A**

why the existence of a binding contract from a financially-capable sponsor, such as the affidavit of support that used to be sufficient for public charge purposes would not satisfy the standard for purposes of public charge, and others stated that this is especially the case, when the question addressed with the affidavit of support is whether an immigrant is likely to become a public charge. Another commenter stated that the affidavit of support, by statutory definition, requires the immigrant to demonstrate financial support to ensure that he or she is not a public charge, but the rulemaking arbitrarily relegates the affidavit of support to a non-substantial factor. The commenter disagreed that the affidavit of support should just be one factor and stated that the proposed rule allows for the possibility of a heavily weighted factor to outweigh the contractual showing of the sponsorship, as outlined by Congress. The commenter also stated that without according the affidavit of support any weight, the NPRM effectively eviscerated the affidavit of support process and goes against congressional intent to establish clear guidelines and a meaningful measure of likelihood of becoming a public charge.

Two commenters stated this proposed regulation diminishes the consideration of a sufficient affidavit of support in the determination of likely to become a public charge, and drastically diminishes the sponsor's role as they exist within the current standards. One commenter said the affidavit of support requirement can be hard to meet for some potential adjustment of status applicants. The commenter said if the petitioner's income and assets are not adequate, it can be difficult to find another person (a ''joint sponsor'') who is willing to hand over their sensitive identification and financial documents and sign a binding contract to ensure the intending immigrant will not depend on public benefits.

A few commenters indicated that the current system already places a high burden on petitioners and immigrants, and that the affidavit of support system has done a good job in making sure that immigrants will not become public charges after entry. One commenter said the demotion of the affidavit of support is another way that the re-framed totality of circumstances would allow only those already with resources to enter or remain in this county. Similarly, commenters stated this rule would make it harder for low-income immigrants to get their green card or visa, and tilt away from family-based immigration to a wealth-based system that would be both deeply unethical and

entirely inconsistent with laws and policies in the United States.

Another commenter stated that the focus should remain on the sponsor and their ability to maintain the intending immigrant at 125 percent of the FPG, asserting that DHS should only consider the other heavily weighted factors in ''unusual cases.'' Another commenter stated that the proposed rule shifts the focus of an applicant's eligibility away from an applicant's sponsor and onto the applicant.

*Response:* DHS rejects the assertion that the rule shifts the emphasis away from the affidavit of support, as the statute does not require or even permit DHS to focus the public charge inadmissibility determination solely on the affidavit of support. In fact, the minimum mandatory factors that must be considered as part of the public charge inadmissibility determination under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), do not include the affidavit of support. Rather, Congress added that any affidavit of support under section 213A of the Act, 8 U.S.C. 1183a, may be considered in the public charge inadmissibility determination.[730] An affidavit of support is required for most family-sponsored immigrant applicants and certain employment-sponsored immigrant applicants, and the absence of a sufficient affidavit of support will result in an inadmissibility finding.[731] Because the lack of a sufficient affidavit of support, when required, automatically results in a finding of public charge inadmissibility, it would be inconsistent with the statute to place an emphasis on the affidavit of support in the public charge determination. Under this rule, DHS will give positive weight to a sufficient affidavit of support, but it would not, and cannot under the statute, be outcome determinative.

*Comment:* Another commenter asserted that the proposed rule does not provide any standards for evaluating factors or the likelihood that the sponsor would actually provide the required financial support to the alien, and that such vagueness invites officers to make decisions on the basis of their personal assumptions and biases, which will almost certainly result in inconsistent application of the standards. Another commenter also stated that DHS's justification for independently considering the sponsor's income and resources, relationship to the applicant and the likelihood of supporting the

applicant, or any other related considerations, is inadequate as it fails to provide a standard for evaluating these standards, and will lead to inconsistent decisions that are also based on officer's assumptions and biases and exceeds the statutory wording in regard to affidavits of support. Additionally, referring to a 1998 DOS cable on the sufficiency of affidavits of support, the commenter indicated that the proposed provision upends, without justification, prior practice that instructed that the intent of the sponsor and the verification of the sources is not a consideration once a sufficient affidavit of support has been presented. The commenter furthermore indicated that DHS justification and evidence—referring to reports that are nine and sixteen years old—does not support the agency's position. Another commenter stated that the proposed rule creates opportunities for arbitrary decision-making when assessing one's family status or financial status, because the rule tasks the adjudicator with assessing the closeness of the sponsor-alien relationship and with the assumption that a close family member ''would be more likely to financially support the alien if necessary.'' The commenter indicated, however, that the closeness of a relationship is a subjective determination and not necessarily based on the existence of a blood relationship but rather on personal connections and history that an outside adjudicator would find difficult to comprehend. Similarly, another commenter provided that evaluating the relationship between a sponsor and an applicant may be particularly prejudicial if the agency fails to account for cultural differences in family dynamics. A commenter stated that, once an affidavit of support is determined to be legally sufficient, DHS should not substitute its agents' judgment for that of Congress by requiring a different income threshold or encouraging them to speculate about a sponsor's relationship to an applicant.

Another commenter said the guidance in the FAM, which explains that a joint sponsor ''can be a friend or a non-relative who does not reside in and is not necessarily financially connected with the sponsor's household'' was consistent with the statutory language at section 213A of the Act, 8 U.S.C. 1183a that defined the requirements of a ''sponsor'' but does not include a requirement that a joint sponsor have a familial relationship to the immigrant.

*Response:* DHS does not believe that the proposed public charge inadmissibility determination, including the consideration relating to

---

[730] *See* INA section 212(a)(4)(B)(ii), 8 U.S.C. 1182(a)(4)(B)(ii).
[731] *See* INA section 212(a)(4)(C) and (D), 8 U.S.C. 1182(a)(4)(C) and (D).

**Exhibit A**

the affidavit of support, is not sufficiently detailed or nebulous. DHS put forth a detailed assessment of the factors and how they are applied in the NPRM. Additionally, DHS provided additional information in the proposed forms and the form's instructions. As provided in the NPRM, a sufficient affidavit of support does not guarantee that the alien will not receive public benefits in the future and, therefore, DHS would only consider the affidavit of support as one factor in the totality of the circumstances.[732] The inability or unwillingness of the sponsor to financially support the alien may be viewed as a negative factor in the totality of the circumstances. DHS expects that a sponsor's sufficient affidavit of support would not be an outcome-determinative factor in most cases; the presence of a sufficient affidavit of support does not eliminate the need to consider all of the mandatory factors in the totality of the circumstances.

USCIS would assess the sponsor's annual income, assets, resources, and financial status, relationship to applicant, the likelihood that the sponsor would actually provide financial support to the alien, and any other related considerations. In order to assess the sponsor's likelihood of meeting his or her obligation to support the alien, DHS would look at how close of a relationship the sponsor has to the alien, as close family members would be more likely to financially support the alien if necessary. DHS would also look at whether the sponsor lives with this alien, as this could be indicative of the sponsor's willingness to support the alien if needed. Additionally, DHS would look at whether the sponsor has submitted an affidavit of support with respect to other individuals, as this may be indicative of the sponsor's willingness or ability to financially support the alien.

DHS furthermore disagrees with the commenters' assessment in regard to the weight provided to a sufficient and properly executed affidavit of support. The statute, under section 213A of the Act, 8 U.S.C. 1183a does not mandate that the affidavit is outcome determinative, nor does it limit DHS's discretion how to weigh the affidavit in the totality of the circumstances: It simply puts forth that "[n]o affidavit of support may be accepted by the Attorney General or by any consular officer to establish that an alien is not excludable as a public charge under section 1182(a)(4) of this title" and provides the requirements for a valid affidavit of support. The guidance of how to assess it is contained in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), which specifically provides that the lack of an affidavit of support, where required, renders an applicant inadmissible on the public charge ground; the statute further states an officer may consider any affidavit of support under section 213A of the Act, 8 U.S.C. 1183a, when assessing the public charge ground of inadmissibility.[733] DHS, therefore, determined that it will consider the affidavit of support as a factor in the totality of the circumstances.[734]

The statute under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) also does not mandate how much weight an affidavit of support must be given. Therefore, it is appropriate for DHS to regulate that the weight should be assessed based on the sponsor's annual income, assets, resources and his or her financial status, as well as the closeness of the relationship which would be indicative of the willingness and ability of the sponsor to financially support the alien.[735] DHS appreciates the reference to DOS' guidance on that issue, but DOS guidance is not binding on DHS.

In sum, the INA does not preclude DHS from establishing a framework for officers to provide the appropriate weight of the affidavit of support within the totality of the circumstances. In cases where the statute requires an alien to submit an affidavit of support and the alien fails to do so, the statute mandates a finding of public charge inadmissibility.[736] As explained in the NPRM,[737] however, the submission of a sufficient affidavit of support does not guarantee that the alien will not receive public benefits in the future. The submission of a sponsor's sufficient affidavit of support also does not eliminate the need to consider all of the mandatory factors in the totality of the circumstances.

*Comment:* A commenter suggested that DHS codify as a ground of exclusion on public charge, that a beneficiary sue the sponsor for reimbursement of listed public funds received, or else be deemed a public charge. The commenter explained beneficiaries have the option, but not the obligation, to initiate a private legal action against a sponsor who fails to fulfill their contract obligations to support the alien financially. The commenter stated that integrating this as a factor or ground would significantly facilitate DHS's goal of ensuring self-sufficiency. The commenter also said the sponsored beneficiary could also meet this obligation if the sponsor was sued for reimbursement by the funding Government agency. Another commenter stated that, if the concern of DHS is to lessen the financial strain Federal public benefit programs create, then a more effective and less harmful to public-health-and-safety alternative would be to enforce the sponsor's affidavit of support, which is a binding contract as signed.

*Response:* DHS does not have the authority to create such a required ground of inadmissibility under authority of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). Additionally, DHS does not believe adding an additional factor to this rule regarding sponsor reimbursement of any amount of public benefits provided by an applicant is consistent with the public charge ground of inadmissibility, or that enforcing the sponsor's affidavit of support obligation is relevant to the public charge inadmissibility determination.

DHS notes that while the existence of a sufficient affidavit of support, where required to be submitted, is considered as a positive factor in any public charge inadmissibility determination, the sponsorship obligation set forth on the affidavit of support does not attach until *after* the application for an immigrant visa or adjustment of status is granted.[738] The subsequent action of enforcing the affidavit of support is distinct from the actual inadmissibility determination. Therefore, DHS will not, in adjudicating an adjustment of status application, consider the sponsor's potential future reimbursement in a public charge inadmissibility determination when there is not yet a reimbursement obligation. Rather, DHS will consider the existence of a sufficient affidavit of support and the likelihood that the sponsor would actually provide the statutorily-required amount of financial support to the alien, and any other related considerations.

Moreover, the statute is forward-looking and requires DHS to determine whether the alien is likely at any time to become a public charge. While past receipt of public benefits is a factor to consider, the fact that the beneficiary or the funding Government agency seeks

---

[732] Inadmissibility on Public Charge Grounds, 83 FR 51114, 51197 (proposed Oct. 10, 2018).

[733] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[734] *See* 8 CFR 212.22(b)(7).

[735] *See* 8 CFR 212.22(b)(7); *see also* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51198 (proposed Oct. 10, 2018).

[736] *See* INA section 212(a)(4)(C) and (D), 8 U.S.C. 1182(a)(4)(C) and (D).

[737] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51198 (proposed Oct. 10, 2018).

[738] *See* INA section 213A, 8 U.S.C. 1183a; 8 CFR 213a.2(d).

**Exhibit A**

reimbursement for such receipt is unrelated to an alien's likelihood of becoming a public charge in the future. Imposing such a requirement would not meaningfully contribute to DHS's goal of ensuring self-sufficiency of those foreign nationals in the United States. For these reasons, DHS will not include reimbursement of the cost of public benefits provided to an alien as part of the factors is an appropriate consideration.

*O. Additional Factors To Consider*

*Comment:* A commenter stated that being a past recipient of public benefits should not be a heavily weighted negative factor and suggested that certain positive factors, or considerations, should offset negative factors such as being a caregiver for a U.S. citizen child, being an elderly person or an individual with disabilities, having a child under the age of five, being recently pregnant, being someone who had a temporary health condition which caused the individual to be unable to work which has since improved, and those receiving Medicaid.

*Response:* Aside from the above-referenced clarification with respect to caregivers, DHS will not add additional factors or considerations to the rule along the lines proposed by the commenter. There is no evidence that these listed factors, such as being a caregiver for a U.S. citizen child, being an elderly person or an individual with disabilities, having a child under the age of five, or being a Medicaid recipient, is indicative of self-sufficiency. Although caregivers may benefit the household by eliminating the need for childcare or eldercare expenses, each person must establish he or she is not likely to be a public charge based on the totality of the factors of an individual's circumstances. However, as noted above, USCIS, on an individual basis, may take into consideration that a person is a caregiver for others in the household as part of the Education and Skills factor or that a sponsor provides sufficient support for the alien. When considering whether the alien is likely to become a public charge, DHS will consider the totality of the alien's circumstances. The alien is not precluded from advancing any argument or providing evidence that would indicate that, in the totality of the circumstances, the alien is not likely to become a public charge.

*Comment:* One commenter suggested that DHS should take reimbursement (or the possibility of reimbursement) of public benefits into account when determining whether an individual is likely to become a public charge. The commenter, while noting that benefits such as costly long-term institutional care were unlikely to be reimbursed, stated that there was no reason to think that very modest amounts of Medicaid or SNAP benefits would not be reimbursed if the public entity providing the benefits sought reimbursement. This commenter noted that the Government has the authority to obtain reimbursement from a sponsor under an affidavit of support. The commenter noted that the current SNAP, Medicaid, SSI, and TANF programs permit reimbursement. This commenter stated that lower thresholds for public charge determinations increase the likelihood of receiving reimbursements of benefits that would push the amount of benefits received below the public charge threshold as set by DHS. And finally, the commenter requested that consideration of reimbursement, and how it will be determined, as part of the regulatory action on public charge, should be done with notice and comment because it is such a major aspect of the rule.

*Response:* Although an adjustment of status applicant who is required to submit a sufficient affidavit of support must submit Form I–864 with his or her application, the sponsor's obligations with respect to the applicant do not become effective until the adjustment of status application is granted. Therefore, at the time the applicant files an application for adjustment of status, there would not be anyone responsible for reimbursing a public benefit-granting agency. The reimbursement of public benefits may be more applicable in the deportability context and out of scope of this rule.

*P. Heavily Weighted Factors General Comments*

*Comment:* A commenter opposed proposed establishment of heavily weighted positive and negative factors in a public charge inadmissibility determination. The commenter indicated the proposed system of heavily weighted negative and positive factors effectively limits an adjudicator's ability to consider the totality of circumstances. Many commenters stated that the proposed rule would yield inconsistent outcomes as there is no clear guidelines to what extent heavily weighted positive or negative factors should inform a final decision. Another commenter stated that the proposed weighting scheme unreasonably under-weighs the most important factors (ability to work in the future and having potential family support) and overweighs several other marginal factors in public charge determinations. The commenter also indicated that the general considerations are turned into a complex, variable-factor test that always involves more than five factors, and that it will massively increase the error rate for public charge decisions. The commenter indicated that the example in Table 35 in the NPRM and rule specify quantitative weights to the factors. The commenter indicated that the factor labeled ''not applicable'' has a presumed weight of zero and is not included in the numerator or denominator of any quantitative or qualitative final ''score'' of the proposed test; and that ''heavily weighted factors'' have a much greater weight than all other factors. The commenter further assumed that the agency intends each of the applicable factors to have a weight equal to one, and heavily weighted factors have a weight equal to two. The commenter concluded that that while this would be the most straightforward reading of the factors and the tables included in the NPRM, the commenter stated it is actually unclear what the rule requires.

*Response:* DHS disagrees that the standard of identifying heavily weighted factors limits an officer's ability to consider the totality of the circumstances.[739] The heavily weighted factors provide guidance as to how to weigh all the factors present in an alien's case. Each case has different circumstances that will be reviewed in the totality of the circumstances. DHS believes that while the heavily weighted factors are more indicative of an alien's likelihood to become a public charge, these factors, under the totality of the circumstances framework, are still evaluated in conjunction with the other relevant positive and negative factors, and accorded the weight they are due in an alien's individual circumstances. Further, one factor alone, even those that are heavily weighted, will not determine whether an alien is likely at any time to become a public charge.

The totality of the circumstances approach is consistent with the statutory requirement that DHS consider certain minimum factors, as well as a body of administrative case law that has developed over the past 50 years, which generally directs the agency to ''consider all the factors bearing on the alien's ability or potential ability to be self-supporting.''[740] Additionally, as discussed in the NPRM, DHS has determined that certain factual

---

[739] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51178 (proposed Oct. 10, 2018).

[740] *See Matter of Vindman* 16 I&N Dec. 131, 132 (Reg'l Comm'r 1977).

**Exhibit A**

**41442**    **Federal Register**/Vol. 84, No. 157/Wednesday, August 14, 2019/Rules and Regulations

circumstances would weigh heavily because DHS considered them to be particularly indicative of an alien being more of less likely to become a public charge.[741] In the sections that follow, DHS addresses public comments regarding specific heavily weighted factors.

Again, the inclusion of heavily weighted factors does not change that the public charge inadmissibility determination is one that is made based on the totality of the alien's individual facts and circumstances. Therefore, DHS disagrees with the commenter's assessment on the quantitative weight assessment of the factors. DHS does not review the factors quantitatively, so there is not a factor that has a weight equal to zero, one, or two. The use of the term "neutral" in the "Weight of Factor" column in Table 35 of the NPRM refers to the fact that the factor is not heavily weighted. The factors would still be positive or negative unless designated as heavily weighted factor.

*Comment:* A commenter stated that the heavily weighted negative factors are highly correlated and "puts a thumb on the scales" against low-income immigrants. A couple of commenters stated that the heavily weighted factors ignore the positive contributions of immigrants to society. A commenter stated that the heavily weighted factors in the proposed rule are not realistic given the realities of the current job market in the United States. A commenter stated that negatively weighted factors in the proposed rule, such as family size or being under the age of 18, are misaligned with efforts to grow the U.S. economy. Another commenter expressed concern that the negative weighted factors ignore the positive impacts receiving public benefits have on future self-sufficiency.

*Response:* As explained in the NPRM, the mere presence of any of the factual circumstances listed in the rule would not, alone, be outcome determinative. A circumstance that the rule designates as warranting heavy weight might be outweighed by countervailing evidence in the totality of the circumstances.[742] Other evidence may also be probative of an alien's likelihood to become a public charge in the context of an alien's individual circumstances.[743] Therefore, the public charge inadmissibility determination, as proposed in the NPRM and as set forth in this final rule,

is neither a formulaic scheme nor will it ignore important considerations in an alien's case, such as the alien's ability to work or the family support that she or he receives, or any other positive contributions by the alien that demonstrate self-sufficiency.

DHS also disagrees that the heavily weighted factors are not realistic given the realities of the current job market in the United States and that these factors are misaligned with efforts to grow the U.S. economy. This rule is designed to better ensure that those seeking to come to and remain in the United States either temporarily or permanently are self-sufficient, as directed by Congress.[744] However, DHS notes that as addressed elsewhere in this rule, this rule does not aim to address the U.S. economy or the U.S. job market.

*Comment:* Several commenters stated that four in ten noncitizens who entered the United States without a green card would have characteristics that would be considered heavily weighted negative factors. Many commenters stated that the heavily weighted factors would disproportionately affect immigrant women; survivors of domestic and sexual abuse; immigrants with disabilities; immigrants with HIV and other chronic health conditions; LGBTQ immigrants; children and families; seniors; multigenerational families; racial and ethnic minorities; and AAPI immigrants. For example, several commenters stated that the employability factor would negatively and disproportionately impact survivors of sexual and domestic violence. A commenter stated that women are more likely to be victims of harassment at work, and are more likely to face negative consequences if they speak out. Another commenter stated that the employability factor and receipt within the previous 36 months of one or more public benefits above the threshold would unfairly affect individuals with disabilities. Some commenters stated that survivors of domestic and sexual abuse would be disproportionately affected by heavily weighting recent receipt of one or more public benefits. A commenter stated that the proposed rule's lookback period will negatively impact pregnant women as well as women and families with children because they are eligible to receive benefits for a longer period of time. Another commenter stated that using recent receipt of public benefits as a heavily weighted negative factor would have disastrous effects on those receiving Medicaid. Several commenters stated that the heavily weighted

negative factor for lacking financial means to pay for reasonably foreseeable medical costs would disproportionately harm immigrants with disabilities, and those living with chronic medical conditions. Several commenters stated that this proposed factor would disproportionately affect survivors of domestic and sexual abuse, and certain subpopulations of Asian Americans.

*Response:* DHS understands that the rule may result in more public charge inadmissibility findings, which may have specific effects on certain groups. For example, the rule will affect some aliens who have low incomes; however, income is relevant to the alien's assets, resources, and financial status, which DHS is required to consider in determining whether an alien is likely at any time to become a public charge in the totality of the circumstances. Similarly, DHS understands that the rule will affect aliens who do not work, but employability has obvious relevance to whether a person is likely at any time to become a public charge. Again, an officer evaluates all of the factors in the totality of the circumstances and an alien may have positive factors that outweigh lack of past, current, or future employment. Finally, an alien's recent receipt of public benefits (or an alien's continuing enrollment in public benefits such as Medicaid) is also relevant to the alien's assets, resources, and financial status, which DHS is also required to consider in determining whether an alien is likely at any time to become a public charge. However, as noted previously, this is one relevant factor in the totality of the circumstances, and an alien could always show evidence of disenrollment, or evidence that the alien obtained private health insurance or other means of support to offset this heavily weighted negative factor.

As noted elsewhere in this rule, Congress has generally exempted certain vulnerable populations from the public charge ground of inadmissibility, such as VAWA, T, and U applicants, and DHS included these exemptions in the regulatory text in this final rule. DHS, however, will not adjust the statutory factors to otherwise accommodate specific groups whom Congress has made subject to the public charge ground of inadmissibility.

### Q. Heavily Weighted Negative Factors

#### 1. Lack of Employability

*Comment:* One commenter supported lack of employability as a heavily weighted negative factor, and stated that lack of employability should be the only disqualifying factor. Another commenter stated that employment

---

[741] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51198–206 (proposed Oct. 10, 2018).

[742] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51198 (proposed Oct. 10, 2018).

[743] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51198 (proposed Oct. 10, 2018).

[744] *See* 8 U.S.C. 1601.

**Exhibit A**

alone does not guarantee an immigrant's economic self-sufficiency, because much of the work done by immigrants is low-wage and does not fully cover the cost of living in the United States.

*Response:* DHS agrees that employment alone does not guarantee that a person will be self-sufficient. DHS disagrees, however, with the comment suggesting that the lack of employability should be disqualifying in the public charge inadmissibility determination. All the factors as listed in the statute and this final rule, including the heavily weighted negative factors, are reviewed in the totality of the circumstances. The fact that an alien is not a full-time student and is authorized to work but cannot demonstrate employment history or a reasonable prospect of future employment will not be the sole factor that would lead to a determination that the applicant is inadmissible as likely at any time to become a public charge.[745] Even where an alien has this heavily weighted negative factor, that factor, in and of itself, will not render an applicant likely at any time to become a public charge in the totality of the circumstances analysis.

DHS will not implement the suggestion that the lack of employability be the only disqualifying factor. As noted above, none of the heavily weighted negative factors is disqualifying and further, DHS has determined that there are other factual circumstances (*e.g.,* income, assets, resources at or above 250 percent) apart from employability that are also particularly indicative of an alien being more of less likely to become a public charge and therefore, are heavily weighted negative factors.

*Comment:* A commenter stated that the factor is misleadingly characterized in the preamble as a ''Lack of Employability.'' The commenter indicated that it is not clear how recently a person needs to have worked, or how they would demonstrate the prospect of future work, or even the type of work that would avoid the application of this heavily weighted negative factor. Some commenters stated that the employability heavily weighted negative factor was vague and poorly defined.

*Response:* DHS does not believe that the heading for this factor is misleading. The factor relates to whether an alien who is not a full-time student and is authorized to work, is able to demonstrate current employment, recent employment history, or a reasonable prospect of future

employment. Because this factor assesses whether an alien who has work authorization has worked or can demonstrate the ability to work in the future, it goes directly to whether the alien is employable, which DHS believes is particularly indicative of whether an alien is more likely to become a public charge.

With respect to the commenter's objections regarding vagueness, DHS believes it is reasonable and consistent with a totality of the circumstances approach to not limit the review of employability to specific time periods or specific types of employment. Form I–485 requests information on the last 5 years of employment. An applicant may be able to demonstrate prospects of future employment through their employment history and education and skills.

## 2. Current Receipt of One of More Public Benefit

*Comment:* A few commenters stated that considering current receipt of one or more public benefits is not in keeping with the totality of circumstances test. In addition to this, one commenter stated that including receipt of one or more public benefits to the public charge determination was a drastic change in the scope of the test. One commenter stated that including public benefits as a heavily weighted negative factor ignores the contributions of low-wage workers to society and the economy. A few commenters stated there was not sufficient evidence to state that receipt of one or more public benefits is indicative of someone becoming a public charge. Other commenters said that some people who are self-sufficient will access benefits, and that this has been supported by congressional intent.

*Response:* DHS disagrees that considering prior or current receipt of public benefits is inconsistent with the totality of the circumstances test. As discussed in the NPRM, DHS believes that receipt of benefits is a key gauge to determining the likelihood of future use of public benefits and becoming a public charge. All else being equal, a person who is currently receiving public benefits is more likely to receive public benefits in the future than a person who is not currently receiving such benefits. The 1999 Interim Field Guidance recognizes this by directing officers to consider current and past receipt of covered benefits.[746] DHS appreciates that low-wage workers contribute to

society and the economy but believes that including public benefits as a heavily weighted negative factor is an appropriate consideration in determining who is likely to become a public charge.

*Comment:* One commenter stated that the heavily weighted factors would impair rather than advance the financial stability of immigrants. A commenter stated the negative factors in the rule ignore the role public benefits and family support play in advancing self-sufficiency. Another commenter stated that using receipt of one or more public benefits as a heavily weighted factor would hurt the ability of public benefit-granting agencies to combine multiple benefits that work in concert to improve self-sufficiency of the recipients.

*Response:* DHS agrees that public benefits can assist in advancing self-sufficiency but believes the rule is a proper interpretation of the congressional mandate regarding the public charge provisions.[747] Further, the rule does not prevent public benefit-granting agencies from working to improve the self-sufficiency of recipients, although it does create consequences for an alien's receipt of certain public benefits.

*Comment:* One commenter said this factor was appropriately weighted but indicated that an alien's reliance on a foreign government assistance program should not be considered as a negative factor, as in many cases, the dependence on such programs is customary, or the program is designed to be one where the immigrant would not have had to opt into.

*Response:* DHS appreciates the comment and agrees that the factor is appropriately weighted. DHS did not propose and will not consider public benefits provided by foreign countries.[748] Public benefits in foreign country have different standards and objectives. For example, in some countries, such as Canada, healthcare is provided on a national basis and is not based on income eligibility and not aligned to a need-based standard. In addition, the inadmissibility determination is whether a person is likely to become a public charge in the United States.

## 3. Receipt of Public Benefits Within 36 Months Before Filing

*Comment:* Some commenters stated that a retrospective test is inconsistent with the prospective nature of the

---

[745] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51178 (proposed Oct. 10, 2018).

[746] *See* Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 FR 28689, 28690 (May 26, 1999).

[747] *See* 8 U.S.C. 1601.

[748] *See* 8 CFR 212.21(b). *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51158–74 (proposed Oct. 10, 2018).

**Exhibit A**

public charge inadmissibility determination. Other commenters asserted that weighing receipt of public benefits within the previous 36 months is inconsistent with the totality of circumstances test, and represented a significant and troubling departure from current federal policy. A commenter commented that the ''studies provide zero evidence that previous receipt of the newly added benefits is an indicator of future use.'' A few commenters commented that receipt of public benefits is a clear benchmark that an immigrant was deemed eligible for a benefit by another Federal agency and it is therefore inappropriate to consider previous receipt of public benefits. Several commenters stated that if the specific circumstances that led to the use of public benefits no longer apply, the previous use of benefits is irrelevant. One commenter added to this and said that they opposed the proposed addition of receipt of public benefits within last 36 months of filing application as there are many cases where someone needs help only temporarily. Another commenter stated that many individuals would just disenroll from benefits for 3 years and re-enroll once they receive adjustment of status, but in the meantime could suffer. Many commenters stated that a lookback period disregards the positive effects of public benefits, including future self-sufficiency. Several commenters stated that the 36-month rule is retrospective and has no place in a rule that is meant to be forward looking, and commented that prior receipt of public benefits has no bearing on whether an individual will be dependent on the Government in the future. A commenter indicated that the past receipt of public benefits should receive no weight. One commenter expressed concern that by using a lookback period, even individuals who were able to increase their earnings to a point where assistance is no longer needed will be penalized. Adding to this, a commenter that the proposed lookback period will disproportionately hurt those who are gainfully employed and may therefore be eligible to access benefits for longer than those who are not employed.

*Response:* DHS understands that a person may no longer need public benefits in the future if the circumstances that led to the use of public benefits no longer apply, and DHS would take that into consideration. DHS would take into consideration that the public benefit was used temporarily and that the person may not be likely to receive public benefits in the future. No longer receiving public benefits because

of stable employment or income would be a consideration in the totality of the circumstances. However, DHS believes, as discussed in the NPRM, that past receipt of public benefits for more than 12 months in the aggregate within 36 months is an indicator that an alien will continue to receive (or again receive) public benefits, and therefore is likely to become a public charge.

*Comment:* A commenter indicated that the 36-month standard is unreasonable because the study conducted by HHS in 2001 is outdated and does not appear to provide a reasonable basis for the 36-month period that DHS has included in this proposed rule. A couple of commenters stated there was not adequate rationale to support negatively weighting receipt of public benefit within the prior 36 months. Another commenter stated that it was unclear how prior benefit use would be weighted. A couple of commenters stated that the 36-month rule is unfair because no one could have predicted this rule or can predict their circumstances, and would cause great fear and confusion.

*Response:* As discussed in the NPRM, some studies suggest that although most people who leave welfare programs are working after they leave those programs, people may come back to receive additional public benefits.[749] As explained in the NPRM, DHS would view past receipt of public benefits within 36 months as an indicator that an alien will continue to receive (or again receive) public benefits, and therefore is likely to become a public charge. With respect to the statement that the study is outdated or insufficient, DHS notes that although there are limitations to the data, this study was particularly of interest in that it examined repeated return to public benefit programs.

As explained elsewhere in this rule, DHS has also clarified as part of the definition of receipt of public benefits, that although an application or certification for public benefits is not considered receipt, DHS believes that the application for, or being certified to receive in the future to receive public benefits may suggest a likelihood of future receipt. Correspondingly, DHS also amended the heavily weighted factor to state an alien's receipt, being

certified to receive, or approval to receive one or more public benefits, as defined, for more than 12 months within any 36 month period, beginning from 36 months prior to the alien's application for admission or adjustment of status, will be considered a heavily-weighted negative factor in the totality of the circumstances assessment.

The NPRM explains that the weight given to public benefits will depend on whether the alien received multiple benefits, how long ago the benefits were received, and the amounts received.[750] For example, the receipt of a public benefit five years ago may be a negative factor; however, a public benefit received six months before the adjustment of status application would be considered a heavily weighted negative factor. DHS will consider receipt of (or application or certification for) public benefits after the effective date of the rule. DHS will also consider those benefits that were previously considered under the 1999 Interim Field Guidance including SSI, TANF, State and local cash assistance programs that provide benefits for income maintenance (often called ''General Assistance'' programs), and those benefits received (including Medicaid) to support the alien's institutionalization for long-term care. The publication of the rule and effective date provides sufficient notice for people to cancel current receipt of public benefits.

*Comment:* One commenter requested an explanation of the necessity of the 36-month lookback period as most immigrants who would qualify for public benefits are either exempt from public charge determinations or have already adjusted status.

*Response:* As explained previously, the 36-month component of the public charge threshold is an appropriate timeframe to determine whether an alien is more likely than not to become a public charge at any time in the future. That said, DHS will not make a public charge inadmissibility determination with respect to aliens who are exempt from public charge inadmissibility or who have already adjusted status to that of a lawful permanent resident, and would not otherwise be considered applicants for admission. Therefore, DHS will not consider whether such aliens have received public benefits. With respect to other aliens, as discussed in this final rule, DHS has added the consideration of credible and probative evidence presented by the

---

[749] *See* Lashawn Richburg-Hayes & Stephen Freedman, *A Profile of Families Cycling On and Off Welfare* 4 (Apr. 2004), *available at https://aspe.hhs.gov/system/files/pdf/73451/report.pdf* (last visited July 26, 2019). *See* also U.S. Dep't of Health & Human Servs., Office of the Assistant Sec'y for Planning & Evaluation, *Status Report on Research on the Outcomes of Welfare Reform* app. B (Aug. 2001), *available at https://aspe.hhs.gov/report/status-report-research-outcomes-welfare-reform-2001* (last visited July 26, 2019).

[750] This proposed policy is generally consistent with longstanding policy affording less weight to benefits that were received longer ago in the past.

**Exhibit A**

alien from a Federal, state, or local government agency that demonstrates the alien is not eligible for one or more public benefits. This information will be taken into consideration in the totality of the circumstances.

4. Financial Means To Pay for Medical Costs

*Comment:* Some commenters stated that many people do not have the ability to afford their own healthcare due to low wages and the high cost of healthcare, making this factor unfair to low-wage workers and immigrants. Another commenter expanded on this and remarked that this factor will simply exclude individuals without substantial resources and who do not understand the complicated healthcare system in the United States. One commenter expressed concern that the rule asserts that a sign of self-sufficiency is having enough cash on-hand to deal with serious illness, asserting that most Americans born in this country could not pass this test. Another commenter stated that it is impossible to predict an individual's future healthcare costs.

*Response:* The basis for including Medicaid in the rule is discussed earlier in this preamble. Even if the alien does not have health insurance, he or she should have sufficient funds to provide for any reasonably foreseeable medical costs, which is only one consideration in the totality of the circumstances. Further, DHS will not consider assistance for an "emergency medical condition" as provided under section 1903(v) of Title XIX of the Social Security Act, 42 U.S.C. 1396b(v), and in implementing regulations at 42 CFR 440.255(c) as part of the public charge inadmissibility determination. Having health insurance or being able to pay for medical expenses is only one factor in the totality of the circumstances. This factor does not call for the alien to be able to pay for medical costs that are not reasonably foreseeable.

*Comment:* Commenters suggested that DHS eliminate the proposed heavily weighted negative factor for an alien who (1) has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide for himself or herself, attend school, or work, and who (2) is uninsured and has neither the prospect of obtaining private health insurance, nor the financial resources to pay for reasonably foreseeable medical costs related to a medical condition. A commenter stated that the factor is applicable even if the applicant has not used public benefits and would keep most people with

disabilities from entering or remaining in the United States. The commenter further stated that assigning the factor a heavy weight would codify discriminatory assumptions regarding people with disabilities. The commenter stated that disability should remain a factor to be measured on a case-by-case basis free of an automatically assigned heavy negative weight.

*Response:* DHS will retain the heavily weighted negative factor based on the applicant's lack of financial means to pay for reasonably foreseeable medical costs if the alien does not have private health insurance. As established in the NPRM, certain chronic medical conditions can be costly to treat and certain conditions may adversely affect an applicant's ability to obtain and retain gainful employment, or to otherwise support himself or herself. Evidence outlined in the NPRM also indicated that individuals in poor to fair health are more likely to access public benefits to treat their medical condition. DHS agrees with the commenter that this factor may be applicable even if the applicant has not received any public benefits, but disagrees that this factor would keep most people with disabilities from entering or remaining in the United States. Since the public charge inadmissibility determination is made on a case-by-case basis and in the totality of the alien's individual circumstances, an applicant could overcome this heavily weighted negative factor through presentation of other evidence.

Additionally, DHS notes that the fact that an applicant has a disability does not mean that the applicant has this heavily weighted negative factor, and disagrees that the rule codifies discriminatory assumptions. As is the case with any other applicant, individuals with disability may establish their self-sufficiency notwithstanding their medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide for himself or herself, attend school, or work. Such applicants may do so by providing proof of income, employment, education and skills, private health insurance, and private resources.

*Comment:* One commenter expressed concern that this factor would allow DHS personnel to overrule the opinions of medical professionals in a move that would invite "unbridled speculation and discrimination."

*Response:* DHS disagrees that this heavily weighted negative factor would permit DHS to overrule the opinions of medical professionals. In reviewing the

Form I–693 or DOS medical examination form, USCIS will be relying on the diagnoses set forth by the civil surgeon or designated panel physician on such forms submitted in support of the application for the diagnosis of any medical conditions; USCIS will also rely on evidence, as provided by the applicant, of a medical condition that is likely to require extensive medical treatment or institutionalization after arrival, or that will interfere with the alien's ability to care for himself or herself, to attend school, or to work. DHS will not speculate as to the cost of medical conditions or the ability of a person to provide for himself or herself or go to school or work.

*Comment:* Multiple commenters stated that farmworkers often lack health insurance, even if offered by their employer, because they cannot afford it, and stated this factor is unfair to these workers.

*Response:* For nonimmigrants' admission, DHS will also consider the proposed length of stay of the nonimmigrant and the assets, resources and financial status of the applicant. Some employers may provide for medical assistance for the duration of the alien's stay. Whether a person has the ability to pay for reasonably foreseeable medical costs is but one factor in the totality of the circumstances. As previously indicated for extension of stay and change of status purposes, DHS removed the forward looking determination and will only consider whether the nonimmigrant received public benefits during the stay.

5. Alien Previously Found Inadmissible or Deportable Based on Public Charge

*Comment:* Some commenters asserted that by using whether a person was previously found inadmissible or deportable as a public charge as a heavily weighted factor, DHS would be ignoring the prospective nature of the public charge assessment. One commenter stated that since the prior finding of *not* being a public charge is not accorded comparable weight in the proposed rule this factor would be arbitrary and unfair. The commenter stated that in addition, because the only heavily weighted positive factor that could counterbalance this one is income or assets above 250 percent of the FPG, reliance on such a factor would arbitrarily impose a more difficult evidentiary hurdle for immigrants below that level than for immigrants above it without rational justification, as well as disproportionately harm immigrants of color, who are less likely to earn above that level, as described infra in our

**Exhibit A**

comments on the 250 percent criteria. Another commenter warned that this factor would be an arbitrary addition and would serve no purpose other than to deter individuals from applying for adjustment of status out of fear it would ruin their future attempts to gain lawful permanent residence status.

*Response:* DHS disagrees that considering a prior inadmissibility determination as a heavily weighted negative factor would be arbitrary and unfair or that considering an alien's prior admissibility under the public charge ground would merit comparable favorable treatment. A previous finding of inadmissibility on public charge grounds would likely be documented. By contrast, there would not necessarily be a statement of the Government's reasons for admitting the alien or approving his or her application for adjustment of status.

DHS acknowledges that an alien's circumstances may have changed since a previous application for admission or determination of inadmissibility or deportability based on the public charge ground. DHS would take those new circumstances into account in the totality of the circumstances when making a new public charge inadmissibility determination. There is no requirement to specifically ''balance out'' a heavily weighted negative factor with a heavily weighted positive one. Rather adjudicators will consider the alien's specific circumstances within the totality of the circumstances framework when assessing the alien's likelihood of becoming a public charge, and will afford specific facts the weight they are due in the context of this rule's adjudicative framework.

*R. Heavily Weighted Positive Factors*

1. Proposed Standard

*Comment:* Several commenters stated that having the 250 percent threshold as the sole heavily weighted positive factor in the public charge test would represent a fundamental change to immigration policy and the immigrant population. A commenter stated a bright-line positive or negative income threshold subverts the totality of circumstances consideration. Some commenters stated that the 250 percent threshold was another example of double counting in public charge inadmissibility determinations under the proposed rule. Another commenter stated the 250 percent threshold was there to prevent immigration through administrative means. Another commenter stated that those falling between 125 percent and 250 percent of the FPG would have their cases

improperly adjudicated. One commenter stated the 250 percent threshold does not go far enough to help qualified individuals overcome the public charge test. Other commenters stated that the proposed heavily weighted positive factor ignores the positive contributions of immigrants. One commenter stated that using 250 percent as the sole positive factor undermines and minimizes the value of other key economic and wealth building milestones. Additionally, some commenters stated that the proposed heavily weighted positive factors undervalue those who contribute to society in nonmonetary ways, such as stay at home parents. Another commenter stated that the 250 percent threshold functions as a ''wealth-test.'' Another commenter said that most legally present noncitizens would not meet the 250 percent FPG threshold. Similarly, other commenters stated that much of the U.S. population would not qualify for a heavily weighted positive factor. Many commenters said the threshold for a family of four is higher than the 2017 median household income for the United States ($63,000 vs. $61,372). One commenter stated that in some regions of the United States those earning above 250 percent FPG would be among the wealthiest in their communities. One commenter stated that the proposed 250 percent FPG threshold would do little to improve the systemic issues of income inequality in the United States.

*Response:* DHS disagrees that the rule provides a wealth test. The 250 percent FPG standard is a heavily weighted positive factor and not a requirement that aliens need to meet in order to overcome a public charge inadmissibility finding. As previously stated, income is one factor in the totality of the circumstances, and any income above 125 percent of the FPG is a positive factor.

*Comment:* Several commenters cited research showing there was not a statistically significant difference in receipt of benefits between immigrants above and below the 250 percent threshold. Some commenters stated that the 250 percent FPG threshold would have a perverse effect of discouraging people from supporting family members out of fear it would change their public charge determination.

*Response:* DHS acknowledges that certain tests involving estimates of noncitizens yielded results in Table 28 of the NPRM that were not statistically significant, which in some cases was a consequence of small sample sizes due to forming estimates on only noncitizens instead of foreign-born more

generally. DHS chose to study noncitizens specifically despite the inherent issues in making inferences from small sample sizes, since the population of noncitizens more closely corresponded to the individuals who would be subject to the public charge rule than foreign-born generally, which includes naturalized citizens. In Table 27 of the NPRM, DHS showed that there is lower public benefit program participation rates among those in higher income categories for the population of citizens in the tables listed in the NPRM. Lower participation rates may also be shown in the overall population by averaging across both citizens and noncitizens (*i.e.,* Tables 27 and 28 of the NPRM). Table 28 of the NPRM is not inconsistent with such a relationship. The justification still holds for using income as a percentage of FPG in the public charge determination, and persons with an income at a higher percentage of the FPG are less likely to the receive public benefits than those at a low percentage. Further, DHS disagrees that the 250 percent threshold would discourage people from supporting their families as 125 percent is the threshold for positive consideration in the totality the circumstances and the 250 percent threshold a heavily weighted positive factor but not a requirement. DHS acknowledges that the income threshold may be harder to meet if the alien has a larger household size, however, DHS would also take into account any income, assets, or resources the other household members also provide. Nevertheless, family status is still a mandatory factor as established by Congress.[751]

*Comment:* One commenter stated that heavily weighing household income at or above 250 percent FPG would confuse the threshold for the affidavit of support.

*Response:* The affidavit of support is a different requirement and has a specific form associated with it. The affidavit of support threshold is 125 percent of the FPG of the sponsor's income and that threshold is not being changed with this rule. The income threshold for the alien's household is part of this rule's totality of the circumstances public charge assessment is 250 percent of the FPG. Income at this level is considered a heavily weighted positive factor (as opposed to income at the 125 percent of the FPG (100 percent for member of the U.S. Armed forces in active duty), which is a positive consideration).

[751] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

**Exhibit A**

**Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations **41447**

*Comment:* Another commenter stated there may not be enough time for migrants under certain visa classifications to seek, obtain, and begin a job with the income necessary to meet the 250 percent of FPG level.

*Response:* The burden is upon the alien to establish that he or she is eligible to be admitted into the United States. Further, certain nonimmigrant and immigrant classifications require the employment to be established before the nonimmigrant visa is issued. That said, DHS notes that there is no requirement that an applicant subject to the public charge ground of inadmissibility demonstrate that he or she has income at or above 250 percent of the FPG in order to gain admission or adjustment of status. Rather, the fact that an applicant who has income at or above 250 percent of the FPG will weigh heavily in favor of finding the applicant is admissible in the totality of the circumstances, but is not outcome determinative. Therefore, an applicant who has household income below 250 percent of the FPG will not, based on that fact alone, be denied admission or adjustment of status.

*Comment:* Several commenters stated the proposed 250 percent heavily weighted positive threshold would disproportionately affect members of marginalized communities; hard-working low- and middle-income families; immigrants of color; South Asian immigrants; Latino immigrants; Muslim immigrants; immigrants with disabilities; those with pre-existing health conditions; women and single mothers; victims of domestic and sexual abuse; families with children who have special healthcare needs; and the health and well-being of children of immigrant parents.

A few commenters stated that the proposed heavily weighted positive factor would increase family separations and would have a negative impact on family-based immigration. Many commenters stated that the proposed heavily weighted positive factor would effectively bar lower income immigrants; disregards the efforts and contributions of low-wage workers; and that the majority of legally present noncitizens would fail to meet the 250 percent FPG threshold.

*Response:* DHS understands that the rule may affect certain groups who may have low incomes; however, income is but one factor in the totality of the circumstances and will not serve as the sole reason to find an alien inadmissible based on public charge grounds. As previously indicated, if an applicant has household income at or above 250 percent of the FPG it will be treated as

a heavily weighted positive factor because it is particularly indicative of an alien being less likely to become a public charge. An applicant subject to the public charge ground of inadmissibility is not required to demonstrate that he or she has income at or above 250 percent of the FPG in order to establish admissibility, and an alien's failure to demonstrate such income does not receive "negative" weight in the totality of the circumstances unless that income is below 125 percent of the FPG. The standard only serves to assist individuals in establishing self-sufficiency.

*Comment:* A commenter stated that many couples seeking adjustment of status would be affected by the 250 percent threshold, as many of these visas prohibit immigrants from working. The commenter stated that according to one analysis, about 31 percent of foreign-born spouses were unemployed when they applied for a marriage-based green card, as many were prohibited from working on their nonimmigrant visas, such as the F–1 or F–2 student visas, or B–2 visitor visas. For those who did work, about 22 percent of them held jobs that would unlikely meet the 250 percent income threshold, and even if DHS were to allow both spouses to pool their income to meet the new threshold, 36 percent of couples could still find themselves unable to qualify for a marriage green card. The commenter stated that it is basic common sense that a student who is prohibited from working would likely have some student loans, potentially credit card loans, and would not have significant savings, and that the rule would allow primarily the independently wealthy to be eligible for marriage-based adjustment of status.

One commenter said the proposed heavily weighted positive factor creates a "Catch-22" for nonimmigrants on student visas who are married to U.S. citizens because they are not allowed to work. Some commenters cited a study that many H–1B visa holders make less than the amount necessary to support a family of five and qualify for the proposed income threshold of 250 percent of FPG. Another commenter stated that the proposed rule would negatively impact skilled workers who are supporting families and are making prevailing, middle-class wages. One commenter mentioned that the vast majority of scientific researchers applying for permanent resident status based upon an approved EB–1A, EB–1B or NIW petition do not meet this 250 percent income requirement. Another commenter also stated that some highly

skilled employees such as post-doctoral research fellows may not make enough money to qualify for the heavily weighted positive factor. Some commenters remarked that many skilled workers are compensated with stock options as part of their regular income, and it is unclear if this will be considered under the heavily weighted positive factor. One commenter expressed concern that the 250 percent threshold does not take into account that many workers will increase their income the longer they work. A few commenters stated that the 250 percent threshold would pose a unique challenge for California, where it would make it more difficult to extend the status of H–1B visa holders and create a labor shortage for California's agriculture industry, which heavily relies on the H–2A visa program.

*Response:* DHS understands that not everyone is authorized to work or needs to work in order to be self-sufficient. As previously indicated the 250 percent of the FPG standard is not a requirement to establish admissibility and is one consideration in the totality of the circumstances. Further, when adjudicating a nonimmigrant's application for extension of stay or change of status, USCIS will review whether the alien has established that he or she has not received, since obtaining the nonimmigrant status he or she is seeking to extend or change, any public benefit as defined in 8 CFR 212.21(b), for more than 12 months, in the aggregate, within a 36 months period. The heavily weighted factors do not apply in that context.

## 2. Additional Positive Heavily Weighted Factors

*Comment:* One commenter said that the 250 percent of the FPG standard should be downgraded from "highly positive" to just considered. Some commenters stated that earning 125 percent of the FPG should be a heavily weighted positive factor.

*Response:* DHS declines to adopt the commenter's suggested changes in this final rule. The rule already provides for 125 percent of the FPG as a positive factor in the totality of the circumstances. Making 250 percent of the FPG a general positive factor instead of a heavily weighted positive factor would further limit an alien's ability to establish admissibility. An alien would not need to establish income at or above 250 percent of the FPG in other to be admitted into the United States. Any income between 125 percent and 250 percent of the FPG is still a positive factor in the totality of the circumstances. The 125 percent income

**Exhibit A**

threshold is based on the income threshold set by Congress for sponsors for a Form I–864, which is required for most family-based AOS applications and some employment-based AOS applications. In order to maintain consistency with the income threshold set forth in the Form I–864 context, DHS believes that the 125 percent threshold is appropriate for use in the public charge rule and will not lower the threshold. Any household income between 125 percent and 250 percent of the FPG is considered a positive factor in the totality of the circumstances.

a. Affidavit of Support

*Comment:* A commenter stated that the proposed rule mandates denial for anyone who cannot provide an affidavit of support, yet the presence of one is not a heavily weighted positive factor under the proposed rule. Several commenters stated the filing of a legally enforceable affidavit of support by a sponsor should be a heavily weighted positive factor and it should be sufficient to overcome any heavily weighted negative factors.

*Response:* DHS appreciates the comments but declines to establish the affidavit of support as a heavily weighted positive factor. The submission of an affidavit of support under section 213A of the Act, 8 U.S.C. 1183a is a requirement for certain categories of immigrants. See section 212(a)(4)(C) and (D) of the Act, 8 U.S.C. 1182(a)(4)(C) and (D). Not all aliens are required to submit the affidavit of support. According to section 212(a)(4) of the Act, 8 U.S.C. 1182 (a)(4), the lack of a sufficient affidavit of support, where required, renders an alien inadmissible on the public charge ground. Congress mandated the presence of an affidavit of support in certain cases as a separate requirement, but did not establish submission of the affidavit of support as a mandatory factor in all public charge inadmissibility determinations.

There is no indication that Congress believed that a sufficient affidavit of support would warrant a finding that the alien is not likely becoming a public charge. Had Congress believed that to be true, Congress would have specified such a provision in the statute. Instead, Congress listed the other factors as the minimum mandatory factors in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), which do not include the affidavit of support. For these reasons, and consistent with congressional intent, DHS will retain the affidavit of support as a factor considered in the totality of the circumstances, but will not make it a heavily weighted positive factor.

b. Family Relationships

*Comment:* Commenters suggested that the rule add close family relationship to the U.S. citizen or lawful permanent resident, or having a relative in the United Stated providing support, as a heavily weighted positive factor because it is strongly associated with self-sufficiency. The commenter notes that immigrants overwhelmingly come to the United States to work and advance their own and their families' financial prospects. The commenter cited their own report that estimates that 2.25 million undocumented persons and 212,000 nonimmigrants have a qualifying family relationship to a U.S. citizen or lawful permanent resident living in their household that makes them potentially eligible for an immigrant visa or adjustment to lawful permanent resident status. The report further indicated that out of this population, 982,000 live in families that earn at least 250 percent of the FPG.

*Response:* DHS will not add a close family relationship to the U.S. citizen or lawful permanent resident as a heavily weighted positive factor. There is insufficient evidence that the fact that an applicant's household includes a U.S. citizen or lawful permanent resident is indicative of self-sufficiency, or that having family members in the United States is in and of itself indicative of self-sufficiency. As with every mandatory factor, an applicant's family status will not serve as the sole basis of a finding of inadmissibility, as this factor must be considered in the totality of the circumstances.

c. English Ability

*Comment:* One commenter suggested that the ability to speak English well or very well should be a heavily weighted positive factor. The commenter indicated that the totality of the circumstances test affords insufficient weight to factors strongly associated with self-sufficiency and requested additional heavily weighted positive factors. The commenter's study found that 1.32 million of the 2.25 million that would be directly affected by the proposed rule speak English well or very well.

*Response:* DHS will consider whether the alien is proficient in English or proficient in other languages in addition to English as part of the public charge inadmissibility determination. The ''speaking English well or very well'' language comes from the SIPP survey analysis in which people assessed their own speaking abilities. As provided in the NPRM, the better the person spoke English, the higher the income he or she

obtained. People who spoke a language other than English at home were less likely to be employed, and less likely to find full-time work when employed.[752] The SIPP data provided in the NPRM indicates that the rate of coverage of non-cash benefits among those who spoke English either well or very well (about 15 to 20 percent) was significantly lower than the rate among those who either spoke English poorly or not at all (about 25 to 30 percent). Further, DHS understands that not all employment requires English proficiency. DHS believes that while it is appropriate to consider English proficiency in the consideration of likelihood to become a public charge in the future, it is inappropriate to include English proficiency as a heavily weighted positive factor in light of the fact that many jobs do not require it.

d. Education

*Comment:* One commenter suggested that a high school education or beyond should be a heavily weighted factor. The commenter stated that the totality of the circumstances test affords insufficient weight to factors strongly associated with self-sufficiency and requesting additional heavily weighted positive factors.

*Response:* The rule provides that DHS would consider whether the alien has a high school degree or higher education as positive factors. However, a person's education may or may not assist him or her in becoming self-sufficient, depending on other factors specific to the alien's circumstances, such as the job market where the alien lives, outstanding liabilities and support obligations, or other personal or family circumstances. Therefore, DHS will not include education as a heavily weighted positive factor.

e. Private Health Insurance

*Comment:* One commenter suggested that private health insurance coverage should be considered as a heavily weighted positive factor, as it is strongly associated with self-sufficiency. The commenter explained that 1.1 million individuals have health insurance (out of the 2.25 million that would be directly affected by this rule based on a study conducted by the commenter, a non-profit think-tank and educational institute focused on international migration) and argued that the rule's totality of the circumstances test affords

---

[752] *See* Jennifer Cheeseman Day and Hyon B. Shin, U.S. Census Bureau, *How Does Ability to Speak English Affect Earnings?* 6 (2005), *available at https://www.census.gov/hhes/socdemo/language/data/acs/PAA_2005_AbilityandEarnings.pdf* (last visited July 26, 2019).

**Exhibit A**

insufficient weight to factors strongly associated with self-sufficiency.

*Response:* DHS agrees that having private health insurance is a strong indicator of self-sufficiency. DHS analyzed the SIPP data and found that individuals who have private health insurance are significantly less likely to be receiving one or more enumerated public benefits in this rule than those individuals who do not have private health insurance. The rate of receipt of public benefits among those covered by private health insurance was 4 percent for citizens and 6 percent for noncitizens, while the rate of receipt for those not covered by private health insurance was 40 percent for citizens and 30 percent for noncitizens. DHS has therefore revised the rule to include a heavily weighted positive factor for an alien who has private health insurance, subject to two provisos. First, the health insurance must be appropriate for the expected period of admission.[753] Second, the health insurance may not be subsidized via premium tax credits (including advance premium tax credits) authorized under the ACA. Although individuals receiving such benefits have significantly lower odds of concurrently receiving the public benefits designated in this rule, they receive government subsidies to fulfill a basic living need, and qualify on a means-tested basis.[754] DHS does not

[753] *See* USCIS analysis of private health insurance in Wave 1 of the 2014 Survey of Income and Program Participation (SIPP). Private health insurance includes coverage through another person in the household and Medigap, and does not include Medicaid, Medicare parts B or D, or military- or government-provided insurance.

[754] USCIS was unable to identify a variable in the SIPP data for private health insurance paid for using a premium tax credit. USCIS also analyzed the SIPP data on private health insurance and receipt of public benefits, while controlling for income levels. The data support the proposition that having private health insurance, regardless of income level, is a significant determinant of whether the individual receives the designated public benefits. For example, 13.2 percent of individuals *with* private health insurance at an income level between 125 percent and 250 percent of FPG receive the designated public benefits. By contrast, 54.8 percent of individuals *without* private health insurance, at that same income level, receive the designated public benefits. Similarly, 10.3 percent of individuals *with* private health insurance at an income level between 250 percent and 400 percent of FPG receive the designated public benefits. By contrast, 47.5 percent of individuals *without* private health insurance, at those same income levels, receive the designated public benefits. *See* USCIS analysis of private health insurance and income level in Wave 1 of the 2014 Survey of Income and Program Participation (SIPP).

In addition, the data also appear to show a relationship between income level and receipt of public benefits, within the population of individuals who have private health insurance. For example, 15.3 percent of individuals *with* private health insurance below 125 percent of the FPG receive the designated public benefits. Receipt

believe it is appropriate to include a heavily weighted positive factor for this type of health insurance, although this type of health insurance would generally be considered positively as part of the consideration of the totality of the alien's circumstances, such as with respect to the alien's ability to pay for reasonably foreseeable health care costs. Private health insurance purchased through an ACA Marketplace without such credits will count for purposes of this heavily weighted positive factor.

### f. Work History

*Comment:* One commenter stated that work history, without regard to wage history, should be a heavily weighted positive factor. This commenter stated that the essence of a ''public charge'' is where an individual is not willing or able to work and the rule should not focus on workers that earn low wages. This commenter explained that farm workers toil in extremely difficult conditions, performing work few others are willing to do, and at a low compensation rate that cannot possibly sustain a family, through no fault of their own. Another commenter stated that entrepreneurship should be considered a heavily weighted factor, as it is strongly associated with self-sufficiency.

*Response:* The rule provides for employment history to be considered as a positive factor. However, every factor must be considered in the totality of the circumstances. There might be instances where a person has long-term employment, but is not able to be self-sufficient and must receive public benefits and conversely, there might be instances that a person does not have long-term employment and would otherwise be self-sufficient. DHS believes that income is a proper consideration in the totality of circumstances and as a heavily weighted positive factor since it is indicative of self-sufficiency. DHS also recognizes that different types of employment may provide additional income, however, DHS does not believe it is appropriate to specify just one form of employment as a heavily weighted positive factor. Therefore, DHS will not include entrepreneurship as a heavily weighted positive factor.

levels decline as income rises (13.2 percent for individuals with income levels between 125 percent and 250 percent of FPG; 10.3 percent for individuals with income levels between 250 percent and 400 percent of FPG; and 3.2 percent for individuals with income levels above 400 percent of FPG). *See* USCIS analysis of private health insurance and income level in Wave 1 of the 2014 Survey of Income and Program Participation (SIPP).

### g. Receipt of Grants, Contracts, and Licensures

*Comment:* A commenter suggested that receipt of grants, contracts, and licensures should be a heavily weighted positive factor. The commenter stated that excluding grants, contracts, and licensures from consideration was not appropriate and that an individual's receipt of a grant, contract, or license is likely demonstrative of their ability to support themselves without recourse to public benefits, as such receipt is indicative of ongoing work, skills/ proficiencies, and qualifications recognized by the relevant government entity. The commenter further indicated that grants, contracts, and licensures may have a direct bearing on the future likelihood of an individual becoming a public charge and thus should be recognized as a positive factor.

*Response:* DHS is not excluding grants, contracts, and licensures from the public charge inadmissibility determination. DHS agrees that grants, contracts, and licensures are indicative of an alien's likely self-sufficiency. As with other signs of likely self-sufficiency, these would be positive considerations in the totality of the circumstances. However, DHS does not agree that these specifically should be included as heavily weighted positive factors.

### h. Caregivers

*Comment:* A commenter suggested that being a caregiver should be a heavily weighted positive factor. This commenter shared an anecdote regarding a single father petitioning on behalf of his elderly mother so she could enter the United States to provide care to his children while he worked full time and pointed out that some contributions may not be monetary or employment-based but will instead have a ''trickle down'' effect that benefits others.

*Response:* DHS declines to adopt this recommendation. As previously discussed, although caregivers may provide assistance to the overall household, the public charge inadmissibility determination is based on the totality of the alien's individual circumstances and being a caregiver does not establish self-sufficiency or strongly suggest that the person is not likely to receive the designated public benefits above the designated threshold. Although caregivers may benefit the household by eliminating the need for childcare or eldercare expenses, DHS does not believe that a person's status as a caregiver warrants a heavily weighted positive factor. DHS, as previously

**Exhibit A**

**41450    Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

discussed, did include a provision regarding caregivers within the Education and Skills factor.

i. Ability To Work in the Future

*Comment:* A commenter indicated that the ability to work in the future should be a heavily weighted positive factor and stated that it, along with having potential family support, had been one of the two heavily weighted factors for over a century under Federal law. The commenter questioned why work ability and having legally enforceable family support should be weighted less heavily than past receipt of Medicaid or SNAP. The commenter indicated that this kind of disparate treatment might be justifiable if Congress had drafted the public charge test in a way that explicitly directed the agency to give heavier weight to past receipt of benefits than to future employability and family support, which Congress did not. The commenter provided a list of twenty occupations that the commenter stated would have the most job growth over the next decade. The commenter stated that in nine of the 20 occupations, a full-time worker in a household of one who earns the median salary for such occupation would not meet the 250 percent of the FPG standard. The commenter also stated that in 14 of 20 occupations, a full-time worker in a household of two who earns the median salary for such occupation would not meet the 250 percent of the FPG standard. The commenter indicated that the agency provides no reason or evidence for a standard that effectively classifies millions of full-time, year-round workers in high-demand occupations as public charges, or as not self-sufficient.

*Response:* DHS disagrees that it is classifying millions of full-time, year-round workers in high-demand occupations as public charges. Under the education and skills factor, DHS would consider whether the alien has adequate education and skills to either obtain or maintain employment sufficient to avoid becoming a public charge if authorized for employment. The evidence DHS will consider includes the alien's employment and income derived from such employment. As noted above, the fact that the alien does not qualify for a heavily weighted positive factor does not render the alien likely to become a public charge. In fact, many of the median wages identified by the commenter would generally result in a positive consideration, because they exceed 125 percent of the FPG.

*S. Public Charge Bonds for Adjustment of Status Applicants*

1. Standard

*Comment:* Several commenters supported the requirement that all new immigrants post a bond when they apply for entry into the United States. A commenter requested that DHS allow "any alien determined inadmissible" on public charge grounds to apply for a public charge bond.[755] One commenter stated that the public charge bond would be most useful in the category of immigrants that have an income between 125 percent and 250 percent of FPG.

*Response:* DHS appreciates these comments regarding the applicability of the public charge bond. However, DHS will not require all aliens seeking admission as immigrants to post a public charge bond. Section 213 of the Act, 8 U.S.C. 1183, neither requires all such aliens to post a public charge bond, nor authorizes DHS to require one from every intending immigrant. Instead, consistent with its statutory authority, USCIS will offer the public charge bond to certain applicants for adjustment of status, who are inadmissible only due to the likelihood of becoming a public charge and when a favorable exercise of discretion is warranted, based upon the totality of the alien's facts and circumstances.

*Comment:* One commenter noted that the public charge bond process might lead to pressure on DHS officials to make inadmissibility findings and offer public charge bonds.

*Response:* USCIS will not find an applicant is likely at any time in the future to become a public charge for the sole purpose of collecting a public charge bond. Although Congress has created certain exceptions and waivers to inadmissibility, the determination that an alien is inadmissible is mandatory where the alien meets any of the grounds described in section 212 of the Act, 8 U.S.C. 1182. USCIS is required to find an alien inadmissible if the alien is likely to become a public charge. As noted in the NPRM, a public charge bond in the adjustment of status context would generally only be offered in limited circumstances in which the alien has no heavily weighted negative factors and when offering the option of a public charge bond to an alien is warranted based upon the totality of the alien's facts and circumstances.

*Comment:* A number of commenters noted the standard DHS will use to determine when to offer a public charge bond. One commenter stated that the public charge bond must be offered only in rare cases. A few commenters further

stated that the NPRM does not provide a clear standard defining who should qualify for a public charge bond and that the proposed public charge bond system is vulnerable to an abuse of discretion. A commenter suggested that DHS codify a criteria for exercising discretion regarding whether or not to offer the bond in this rule, noting that there should be uniformity and predictability of enforcement on the part of DHS, and that the manner in which this discretion is utilized should be clear and objective. One commenter asked for the justification for warranting a public charge bond in certain circumstances and asked that DHS almost always allow for an individual to post a bond. Another commenter requested that DHS clarify when a public charge bond would be used and also provided recommendations, including that public charge bonds should be available only if the applicant has obtained private medical insurance, and the applicant is part of an existing family unit whose only reason for separation would be an adverse public charge inadmissibility determination. The commenter further stated that DHS should only offer a public charge bond to applicants who can demonstrate hardship such as extreme hardship or exceptional and extremely unusual hardship.

*Response:* DHS disagrees that the rule is unclear in describing how DHS will exercise its discretion to offer a public charge bond. Public charge bonds will be offered only in limited circumstances to those inadmissible aliens USCIS has determined warrant a favorable exercise of discretion, in the totality of the alien's facts and circumstances, and by weighing all positive and negative factors available. As noted in the NPRM, offering a public charge bond in the adjustment of status context, generally, will only be warranted if an alien has no heavily weighted negative factors, such as those that are particularly indicative of the likelihood that an alien would become a public charge. However, and as noted in the NPRM, the presence of heavily weighted negative factors will not automatically preclude USCIS from offering a public charge bond. Rather, as with any discretionary determination, USCIS could also find that the heavily weighted negative factor(s) are outweighed by certain positive factors like those that benefit national security, or would be justified for exceptional humanitarian reasons.

DHS thanks the commenters for the suggestion to codify a more "predictable" criteria for determining whether to offer an alien an opportunity to post a public charge bond, but

declines to do so. The criteria outlined in the rule balances the need for certainty and predictability with that for flexibility USCIS adjudicators need to account for a wide array of facts and circumstances. For similar reasons, DHS also declines to limit its discretion to only permit submission of a public charge bond by aliens who have obtained and will maintain private health insurance, or to aliens who are members of an existing family unit whose only reason for separation would be an adverse public charge inadmissibility determination. DHS believes that limited approach would not account for the variety of factual scenarios USCIS may encounter. Furthermore, DHS believes that limiting the opportunity to post a public charge bond to only a particular narrow range of circumstances would unreasonably exclude from the possibility of a bond applicants who might otherwise merit a positive exercise of discretion.[756] Given that a bond is offered to applicants as a matter of discretion on a case-by-case basis, USCIS reserves the right to determine, based on the particular facts of the case, when the alien's individual circumstances warrant a favorable exercise of discretion.

USCIS also disagrees that it should only offer public charge bonds to applicants who have demonstrated hardship. As is the case with any discretionary determination, USCIS may consider any of a range of positive and negative factors applicable to the alien's case when determining whether the alien should be offered the option to post a public charge bond and be admitted to the United States on bond. USCIS respectfully declines to limit its consideration in this regard.

*Comment:* A commenter stated that DHS should not offer a public charge bond to any applicant with a heavily weighted negative factor. Other commenters were concerned that an applicant with a heavily weighted negative factor, such as use of Medicaid to pay for services associated with his or her disability that are not covered by private medical insurance, will not be considered for a public charge bond. One commenter added that individuals with one or more heavily weighted factors will not have access to sufficient resources to be able to submit a public charge bond. Another commenter asked if USCIS would provide guidance, such as via the USCIS Policy Manual, with guidelines for officers to follow and that will be available for public review.

*Response:* DHS appreciates the comments and will retain the provision

that if an alien has one or more heavily weighted negative factors, as defined in 8 CFR 212.22, present in his or her case, USCIS generally will not favorably exercise discretion to allow the alien to submit a public charge bond. USCIS notes that a disability that affects an applicant's ability to care for himself or herself, to attend school, or to work is not in itself a heavily weighted negative factor, but rather, one factor USCIS will consider in the totality of the circumstances. Accordingly, a disability alone could not be the sole basis for a determination that the alien is likely at any time in the future to become a public charge.

Similarly, an alien's disability, alone, will not serve as the sole basis for USCIS deciding not to exercise its discretion to permit an alien to submit a public charge bond.[757] In determining whether to offer the alien a public charge bond, USCIS will consider all of the positive and negative factors applicable to the alien's case. The NPRM provides examples where a bond may be offered, including instances where allowing the alien to become a lawful permanent resident would offer benefits to national security, or would be justified for exceptional humanitarian reasons. As provided in the NPRM, DHS believes that offering a public charge bond in the adjustment of status context will generally only be warranted in limited circumstances in which the alien has no heavily weighted negative factors, but the presence of any such factors will not automatically preclude USCIS from offering the alien the opportunity to submit a public charge bond.

As this rule is implemented, USCIS will provide training and guidance in the USCIS Policy Manual to all officers in making these discretionary determinations to allow an alien to submit a bond.

*Comment:* A commenter asked for clarification on "permitting an alien who is found inadmissible as a public charge but is otherwise admissible to submit a public charge bond is within DHS's discretion."

*Response:* An alien who is found to be inadmissible only on the public charge ground may be permitted to submit a public charge bond. In other words, under section 213 of the Act, 8 U.S.C. 1183, the alien cannot be inadmissible under any other ground but the public charge ground in order for USCIS to consider exercising its discretion to permit the alien to submit a public charge bond. The decision whether to issue a public charge bond is at the sole

discretion of USCIS; there is no right or entitlement to a public charge bond. Generally, USCIS will not favorably exercise its discretion in situations where the alien has one or more heavily weighted negative factors. In addition, USCIS is formulating training and policy guidance related to the exercise of this discretion to ensure that discretionary decisions on whether or not to offer a public charge bond are fair and consistent.

*Comment:* A commenter asked that DHS eliminate public charge bonds. A few commenters stated that the NPRM bond section lacks justification for changing current and longstanding procedure.

*Response:* DHS disagrees that the public charge bond should be eliminated. The public charge bond provision was established by Congress in the Immigration Act of 1952, in section 213 of the Act, 8 U.S.C. 1183,[758] and, as discussed in the NPRM,[759] has existed without essential variation since 1907.[760] Public charge bonds allow an alien who would otherwise be inadmissible because of the likelihood of becoming a public charge to nonetheless be admitted to the United States. Since the changes to immigration law implemented by IIRIRA, DHS has lacked a formal mechanism for the issuance of public charge bonds.[761] This rule creates a formal public charge bond procedure that conforms with both the statutory language and past practices.

*Comment:* Other commenters suggested that public charge bonds should be eliminated based on the history of monetary bonds in the criminal pre-trial context, which have been discredited as inefficient and unfair.

*Response:* DHS reiterates that public charge bonds are authorized under the Act,[762] and the Act provides a mechanism whereby DHS can nonetheless admit aliens who are inadmissible only under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). DHS cannot ignore this authority and must consider whether to exercise its discretion on a case-by-case basis to allow such aliens to submit a public charge bond.

DHS disagrees that a public charge bond is directly comparable to a pre-trial appearance bond. The Act states that the purpose of the public charge is

---

[756] *See* INA section 213, 8 U.S.C. 1183.

[757] *See* INA section 213, 8 U.S.C. 1183.

[758] *See* INA of 1952, section 213, 66 Stat. 163, 188.

[759] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51134 (proposed Oct. 10, 2018).

[760] *See* Act of February 20, 1907, ch. 1134, section 26, 34 Stat. 898, 907.

[761] *See* Public Law 104–208 (Sept. 30, 1996).

[762] *See* INA section 213, 8 U.S.C. 1183.

**Exhibit A**

to hold the United States, and all states, territories, counties, towns and municipalities and districts harmless against bonded aliens becoming public charges.[763] USCIS will provide officers with guidance and training to ensure that discretion is exercised in a fair, efficient, and consistent manner.

*Comment:* A commenter opposed the implementation of a public charge bond and stated that while DHS created a distinction between the affidavit of support and the public charge bond in this rule, it did not provide support for the idea that the affidavit of support is an insufficient safeguard. A commenter stated that affidavits of support already give the Government sufficient assurances that an individual will not become overly reliant on the social safety net, without forcing immigrants to freeze significant assets in Government-held bonds.

*Response:* DHS disagrees that the affidavit of support sufficiently safeguards against an alien becoming a public charge after admission. Had Congress intended a sufficient affidavit of support to be the sole basis to safeguard against an alien becoming a public charge after admission, Congress would not have added the mandatory factors in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), to determine an applicant's likelihood of becoming a public charge. Congress would have simply required all applicants subject to public charge inadmissibility to submit a sufficient affidavit of support without requiring an assessment of the applicant's age, health, family status, assets, resources and financial status, and education and skills.

Additionally, had Congress considered the affidavit of support alone to be the best way to safeguard against an alien becoming a public charge, Congress would have eliminated the public charge bond provision altogether, and certainly would not have provided in section 213 of the Act, 8 U.S.C. 1183, for DHS to exercise its discretion to offer a public charge bond to aliens who may also be subject to the affidavit of support requirement at section 213A of the Act, 8 U.S.C. 1183a.[764] That Congress created

the mandatory factors for consideration in a public charge determination at the same time it created the enforceable affidavit of support as a non-mandatory factor for consideration, while also retaining the public charge bond provision in section 213 of the Act, 8 U.S.C. 1183, suggests that Congress did not believe the enforceable affidavit of support, on its own, sufficiently safeguarded against an alien becoming a public charge after admission.

*Comment:* A few commenters stated that a public charge bond system is "redundant and nonsensical," stating that the Government has not provided sufficient reasoning for adding the public charge bond system to the immigration process while the affidavit of support already exists and allows the Government to recoup the cost of public benefits received by immigrants.

*Response:* DHS disagrees with the comments that the public charge bond provisions are redundant and nonsensical in light of the affidavit of support requirement. Although the public charge bond provision pre-dates the creation of the affidavit of support requirements in IIRIRA, Congress expressly amended the public charge bond provision in IIRIRA by amending section 213 of the Act, 8 U.S.C. 1183, to reference the affidavit of support and require it as a condition for admission in some cases in addition to the posting of a public charge bond.[765] This means that Congress was aware at the time it created the enforceable affidavit of support and amended the public charge bond provision that a public charge bond could still be offered to certain aliens at the agency's discretion, in addition to the alien's submission of a sufficient affidavit of support. DHS's inclusion of public charge bonds in this rule is consistent with Congress' intent in maintaining public charge bonds after IIRIRA created the enforceable affidavit of support.

*Comment:* Commenters stated that the bonds would have a disproportionately negative impact on minorities, communities of color, and their families, citing studies on custodial bonds. Another commenter said that the changes to public charge bonds will not prevent individuals from bypassing new regulations and will affect average immigrants by restricting access to services. A few commenters stated that

DHS should not expand the use of bonds because studies have shown that bonds have been proven to be highly discriminatory and increase financial instability. Many commenters provided research on the effects of custodial bonds and stated that bonds cause long-term hardship and increase the likelihood of financial instability. Many commenters said the use of public charge bonds would place an impossible burden on immigrant families, and there is no evidence that public charge bonds will prevent them from becoming dependent on government assistance in the future. Multiple commenters stated that families will face years of annual fees, non-refundable premiums and liens on the homes and cars put up as collateral charged by for-profit surety companies and their agents. A commenter stated that the bond system would result in a loss of money and adverse immigration consequences if the immigrant suffers an unexpected issue and is forced to forfeit their bond.

*Response:* As indicated above, DHS does not believe that the rule itself disproportionately negatively impacts certain groups, and does not believe the public charge bond provisions disproportionately impact particular groups. Although commenters cited studies on the effects of custodial bonds on particular communities, DHS does not believe the public charge bond is directly comparable to custodial bonds, and thus does not believe that such studies are directly applicable. Rather, public charge bonds offer an opportunity for an alien who is inadmissible, based only upon the likelihood of becoming a public charge, to be admitted to the United States. Breach of a public charge bond may result in loss of money and adverse immigration consequences. This is a result of the alien's action, and the longstanding statutory scheme. As noted above, USCIS will provide officers with guidance and training to ensure that USCIS' discretion to offer this opportunity is exercised in a fair and consistent manner.

*Comment:* A commenter stated that the public charge bond process would further complicate and increase inefficiency in the adjustment of status process. Specifically, the commenter said the creation of two new forms, and the accompanying processes and training, as well as the collection of any information therein, will be a waste of Government and applicant resources given the existence and ongoing adjudication of Form I–864. The commenter further stated that the public charge bond is unjust because it removes the intending immigrant as a

---

[763] *See* INA section 213, 8 U.S.C. 1183. While there is currently no statutory mechanism for DHS to directly reimburse benefit-granting agencies, the breached bond amounts will be deposited into an account designated by the U.S. Treasury for collecting breached immigration-related bond amounts.

[764] INA section 213, 8 U.S.C. 1183 reads, in part: "An alien inadmissible under paragraph (4) of section 1182(a) of this title may, if otherwise admissible, be admitted in the discretion of the Attorney General (*subject to the affidavit of support requirement and attribution of sponsor's income and resources under section 1183a of this title*)

upon the giving of a suitable and proper bond or undertaking approved by the Attorney General, in such amount and containing such conditions as he may prescribe, to the United States (. . .).  [*Emphasis added*].

[765] *See* IIRIRA, Public Law 104–208, div. C, section 534(f), 110 Stat. 3009–546, 3009–684 (Sept. 30, 1996).

**Exhibit A**

party to the agreement, such that he or she neither has power to act against the obligor, nor has the ability to reply to the Government's decisions.

*Response:* DHS disagrees that the bond process would increase inefficiency or that the process and training would be a waste of Government and applicant resources. DHS also disagrees that the existence of the Form I–864 obviates the need for new forms to facilitate the public charge bond process. The public charge bond is authorized by statute (separately from, and in addition to, the affidavit of support).[766] USCIS may choose to exercise its discretion to allow an alien to submit a bond in a particular case, allowing for aliens who are inadmissible to the United States based only upon the likelihood of becoming a public charge to nonetheless be admitted to the United States. DHS cannot decide to never exercise this public charge bond authority. USCIS will review its resources and personnel to ensure that it will be able to efficiently carry out its discretionary public charge bond authority. DHS does not believe the public charge bond would be a waste of Government resources or creates an undue burden on aliens. DHS also disagrees that the public charge bond is unjust in that it removes the intending immigrant as a party to the agreement. Although the commenter states that this leaves the alien unable to defend himself or herself against a breach of contract action, a breach of contract action against the alien in the case of an alien with a surety bond could only be asserted by the obligor, with whom the alien would be in contractual privity. With regard to appealing a USCIS breach determination or a denial of a request to cancel a surety bond, the process will be similar to the existing process for seeking review of such determinations in the custodial immigration bond context: *i.e.,* the obligor may challenge the determination before the Administrative Appeals Office (AAO) pursuant to 8 CFR part 103, subpart A. Like the appeals process in the long-established custodial bond context, an alien with a surety bond lacks standing to seek review in public charge bond context and is not "removed" from the process. In the case of an alien with a cash or cash equivalent bond, the alien would be the obligor and thus have standing to appeal a denial of a cancellation request or a breach determination. DHS disagrees that this longstanding process is unjust.

*Comment:* A few commenters stated that the NPRM creates a new market

segment for commercial bond companies, but imposes an unfunded mandate on state and local insurance and financial services regulators. Similarly, these commenters and others said many non-citizens may accept the "exceptionally harsh" procedures and penalties and "crippling surety bond terms" to avoid family separation. The commenters stated that, in many cases, the non-citizen would have to pay the bond company up to 15 percent up-front, which could prove destabilizing for low and moderate-income families and stifle their ability to become self-sufficient. A commenter also stated that any new investment of USCIS resources to assess nonimmigrants on public charge would be an unnecessary administrative burden. Another commenter stated that broad and vague conditions governing breach of bonds heighten the risk of exploitation by for-profit companies managing public charge bonds.

*Response:* DHS understands the concerns about exploitation concerning public charge bond terms and conditions, and about the potential challenges that bond terms and conditions may pose to aliens with limited resources. However, Congress has determined that the public charge ground of inadmissibility is necessary. DHS has congressional authority to consider whether to allow an alien, inadmissible only on the public charge ground, to submit a public charge bond, (including a surety bond), on a case-by case basis in the exercise of its discretion. DHS has decided to exercise its authority in cases involving applicants for adjustment of status who are inadmissible only under section 212(a)(4), 8 U.S.C. 1182(a)(4). As provided in the NPRM, DHS will accept surety bonds only from sureties certified by the Department of Treasury and listed in the Treasury Department Circular 570.[767] Department of Treasury-certified sureties have agents throughout the United States from whom aliens could seek assistance in procuring an appropriate bond.[768] The Department of the Treasury certifies companies only after having evaluated a surety company's qualifications to underwrite Federal bonds, including whether those sureties meet the specified corporate and financial standards. Under 31 U.S.C. 9305(b)(3), a surety (or the obligor) must be able to carry out its contracts and must comply with statutory requirements, including

prompt payment of demands arising from an administratively final determination that the bond has been breached. DHS believes these safeguards reduce the risk that aliens will be exploited. DHS also notes that whether the availability of public charge bonds imposes an unnecessary administrative burden on USCIS is a question for Congress, not DHS.

DHS also disagrees that it imposes an unfunded mandate on state and local insurance and financial services regulators through this rulemaking. As part of the NPRM,[769] DHS analyzed any impact on State, local, and tribal governments in accordance with the Title II of the Unfunded Mandates Reform Act of 1995 (UMRA)[770] and with E.O. 13132 (Federalism). The obligation to regulate various aspects of the financial and securities markets within states is already a function of the Federal Government; DHS does not further impose any new unpaid mandate on State, local or tribal governments by implementing a public charge bond procedure in accordance with section 213 of the Act, 8 U.S.C. 1183. It is up to financial institutions, authorized to conduct business according to the provisions implemented by states, to offer public charge bond products. This rule does not impose any new obligations on states.

### 2. Bond Amount

*Comment:* One commenter said DHS should reduce the proposed bond amount. Commenters stated that a $10,000 bond was excessive and would create an opportunity for private bond companies to exploit immigrant families, the elderly, and minorities. Similarly, a few commenters stated that even the minimum amount may be beyond the means of most families. A couple of commenters stated that increasing the minimum amount of the bond by one thousand percent was grossly unfair. Many commenters added that the cost was prohibitive for applicants who earn low incomes. Many commenters stated that a family's self-sufficiency would be destabilized and provided example scenarios where families would be required to pay up to 15 percent of $10,000.

A commenter stated that DHS provided no guidance on how evaluation of public charge bond sizes will be made. Another commenter asked that the value of the public charge bond

---

[766] *See* INA section 213, 8 U.S.C. 1183.

[767] *See* 8 CFR 103.6(b); *see also* proposed 8 CFR 103.6, as published in 83 FR 25951 (June 5, 2018).

[768] *See* Dep't of Treasury Circular 570, *Listing of Approved Sureties* (July 1, 2018).

[769] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51276 (proposed Oct. 10, 2018).

[770] *See* Pub. L. 104–4, 109 Stat. 48 (Mar. 22, 1995).

**Exhibit A**

be based on the value provided for monetizable benefits under 8 CFR 212.21, which is 15 percent of the per-month Federal Poverty Guidelines for a single person. A few individual commenters asked that the minimum public charge bond be set to specific amounts, such as $1,000 or $8,100.

In contrast, another commenter asked that DHS increase the minimum bond amount to $25,000 for the least educated or individuals with the most dependents. Similarly, a commenter stated that the $10,000 bond does not cover the potential cost of supporting individuals who need food, shelter, or medical treatment.

*Response:* DHS agrees with the commenter that for consistency with prior agency practice, a minimum bond amount of $8,100, adjusted annually for inflation, is appropriate, as this is equal to the prior bond minimum adjusted for inflation. The amount of the bond represents liquidated damages to compensate the Government for all harms caused by a bonded individual who violates the terms, not simply the value of the benefits used. Furthermore, some public benefits do not have an easily quantifiable dollar value. Operational challenges make separate determinations for public benefits that are distributed in quantifiable and non-quantifiable values unfeasible. Making liquidated damages in an amount similar to historical precedent is a reasonable remedy.

Under this rule, public charge bonds permit DHS to admit, in its discretion, an adjustment of status applicant who is inadmissible based only on the public charge ground. Should DHS not exercise its public charge bond authority in a particular case based on a review of the individual facts and circumstances of that case, DHS will deny the adjustment of status application. DHS acknowledges that an individual offered a bond has already been found likely to become a public charge and that bond expenses may further destabilize an applicant's self-sufficiency. However, the additional assurance provided by the bond is necessary to overcome the finding of inadmissibility due to likelihood of becoming a public charge. Each applicant offered the opportunity to post a public charge bond will have to evaluate whether accepting the obligations of the public charge bond is the right decision given his or her circumstances.

As part of the implementation of the public charge bond process, USCIS will provide training and guidance to all officers in making these discretionary determinations to allow an alien to submit a public charge bond, and the amount of any such bond.

3. Public Charge Bond Cancellation

*Comment:* A commenter stated that the terms of cancellation of the public charge bond are unreasonable. The commenter stated that since DHS only predicts less than three percent of immigrants would be able to cancel their bond, surety companies would set costly parameters and payment schedules. The commenter further stated that the process of cancelling the public charge bond is difficult because an obligor must apply to have the bond cancelled, the application must be approved by DHS, and bonds are not automatically released after completion.

*Response:* DHS disagrees that the bond cancellation terms are unreasonable. Consistent with the statute, public charge bonds may be cancelled where an alien is no longer likely to become a public charge, either because the alien naturalized, died, or permanently departed the United States. Additionally, an alien may apply for cancellation of the bond if the alien obtains a different immigration status that is exempt from the public charge inadmissibility provisions, or if the alien has reached his or her five-year anniversary since becoming a lawful permanent resident. Cancellation is not automatic and does not limit the duration of the bond, which remains in effect until canceled.

DHS also disagrees that the cancellation process is unreasonable. An application for cancellation must be made so that DHS can verify that the alien or surety have met their burden of demonstrating that one of the public charge bond cancellation conditions has been met, including that the bond was not breached, before the public charge bond can be cancelled and the funds released. DHS carefully considered the suggestion that public charge bonds be automatically released upon completion of the terms of the bond, but determined that no viable mechanism would ensure that the necessary conditions have been met in each case.

4. Breach of Public Charge Bond

*Comment:* A few commenters stated that the NPRM prioritizes the revenue streams of private bond companies over family unity because in the event of a breach of public charge bond, the principal would have to reimburse the bond company the full amount of the breach penalty. Several commenters stated that DHS should not be entitled to recoup the entire bond amount in the event of a breach by receipt of a public benefit. The commenter also stated that DHS should allow use of Medicaid as an exception to the breach of the full bond.

*Response:* DHS disagrees that the rule prioritizes the revenue of bond companies over family unity. The public charge bond allows aliens who are inadmissible to nonetheless seek admission to the United States upon posting of a public charge bond, which facilitates family unity. Additionally, the fees and collateral submitted to the bond company are compensation for the risk a bond company takes in guaranteeing the alien's conduct under the bond. This rule is not aimed at enriching private bond companies, but rather at ensuring that aliens subject to the public charge ground of inadmissibility are self-sufficient and are relying on their resources and those of their family, friends, and sponsors.

As explained above, DHS will collect the full amount of the public charge bond, as liquidated damages, because DHS considers it difficult, if not impossible, to calculate the alien's public benefit receipt as well as the government's costs. DHS will not exempt Medicaid from the benefits listed that count towards the breach of a public charge bond. A public charge bond is issued on the condition that the alien does not become a public charge by not using the public benefits, as defined in 8 CFR 212.21(b) for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months). As is generally the case for the benefits listed in 8 CFR 212.21(b), Medicaid is one of the public benefits that constitute a major expenditure for the United States and the use of it generally indicates to DHS that the person may not be self-sufficient. Correspondingly, a public charge bond is issued under the condition that the alien does not use the benefits listed in 8 CFR 212.21(b), including Medicaid, and DHS declines to exempt its use from being a breach condition.

*Comment:* A commenter presented research and stated that monetary bonds would not be efficient or effective. Other commenters stated that the minimum bond amount bears no real relationship to the value of the public benefit that is received. Several commenters stated that breach of public charge bond would lead to economic destabilization for families.

*Response:* The face value of the public charge bond constitutes liquidated damages for a breach of the conditions of that bond. As explained in the NPRM, liquidated damages are an appropriate remedy in situations such as the public charge bond, where the total damages to

**Exhibit A**

the Government are difficult, if not impossible to calculate.[771] Additionally, these damages go beyond the simple amount of the benefits received (which are not always calculable), but also the overhead of the benefit agency in administering the benefit. DHS disagrees that monetary bonds are ineffective. The purpose of a bond is to provide some reimbursement for harms incurred should the alien violate the terms of the bond. As stated above, the $8,100 minimum amount of the public charge bond is consistent with the historical public charge bond minimum, that has been found reasonable and enforceable, adjusted for inflation.

*Comment:* A commenter said the rule's requirements around breach of the public charge bond are unfair, put immigrants in economic jeopardy, and are a huge departure from previous policy. The commenter also stated that the rule removes the phrase "substantial violation" from the conditions for breaching bond, meaning that any breach of the terms of the bond, which are not fully outlined in the rule, would render the obligor liable for the full amount of the bond. The commenter stated that this creates a punitive policy against intending immigrants instead of fulfilling the purported purpose of recouping losses from public benefits use. The commenter also stated that this unnecessarily puts immigrants at great financial risk.

*Response:* DHS disagrees with these comments. The conditions that constitute breach of a public charge bond are listed in 8 CFR 213.1(h)(1) and (2), and state that a public charge bond is breached if the alien received public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months) after the alien's adjustment of status to that of a lawful permanent resident or if any other condition of the public charge bond is violated, with limited exceptions. In particular, public benefits that are exempt from being considered, as outlined in 8 CFR 212.21(b), including while present in a status exempt from public charge, do not count towards the breach determination as explained in the NPRM. To make the bond provisions consistent with the amended public benefits definition of 8 CFR 212.21(b), DHS has also amended the regulatory bond provision to clarify that public benefits received after having been granted a waiver of inadmissibility from

public charge will not be considered as part of the breach determination.[772] As detailed in 8 CFR 213.1(h)(3), DHS will determine whether the conditions of the bond have been breached, and 8 CFR 213.1(h) provides that an administratively final determination that a bond has been breached creates a claim in favor of the United States. Such a breach determination is administratively final when the time to file an appeal with the AAO pursuant to 8 CFR part 103, subpart A, has expired or when the appeal is dismissed or rejected.

As explained in the NPRM,[773] under the breach of bond provisions at 8 CFR 103.6(e), an immigration bond is considered breached if there has been a substantial violation of the stipulated condition. The term "substantial violation" is generally interpreted according to contractual principles.[774] However, in the NPRM, DHS proposed to incorporate the substantial violation standard via incorporating principles that govern the public charge and public benefits definitions.[775] As explained in the statute, the public charge bond is intended to hold the United States, and all states, territories, counties, towns and municipalities and districts harmless against aliens becoming a public charge.[776] Whether the public charge bond is unnecessary or punitive is a question for Congress, not DHS.[777]

*Comment:* Some commenters stated that the Government receiving full bond payment in those circumstances when the public benefits paid out are less than the full amount of the bond is unfair, unjust, and unlawful. A commenter further stated that the proposed regulations imposed an unlawful and strict standard for accidental, or inadvertent violations of bond conditions. Another commenter said the NPRM does not offer a coherent explanation for why recovery of the entire amount is appropriate, asserting that it makes little sense to forfeit the entire bond since DHS itself asserts that the purpose of the bond is to "recoup [the] cost of public benefits received." A commenter stated that in the case of a breach of public charge bond, the individual should only be responsible for the specific amount of benefits

received rather than "arbitrary liquidated damages award."

A commenter indicated that the proposal to require forfeiture of the entire amount of the bond upon a showing that an alien has obtained any public benefit whatsoever is arbitrary, capricious and, as the commenter stated that DHS acknowledges, contrary to past practice, under which only the amount of the benefit would be forfeited. The commenter also indicated that this makes little sense particularly since many immigrants may be unclear as to the precise conditions that would result in forfeiture. The commenter stated that total forfeiture should be limited to the rare instances in which DHS can prove by a preponderance of the evidence that the alien intentionally sought public benefits with the knowledge that such benefits would result in bond forfeiture; in other instances, the commenter suggested, forfeiture should be limited to the amount of benefits received plus a surcharge for the administrative costs of collection.

*Response:* DHS disagrees. As explained in the NPRM, liquidated damages are an appropriate remedy in situations such as the public charge bond, where the total damages to the Government are difficult, if not impossible to calculate and the amount of the damages is reasonable.[778] Additionally, these damages go beyond the simple amount of the benefits received, encompassing not only the monetary value of the benefits received (which frequently are not calculable) but also the overhead of the benefit agency in administering the benefit.

As stated in the NPRM,[779] the minimum amount of the public charge bond is consistent with historical public charge bond amounts, adjusted for inflation, that have been found reasonable and enforceable. Historically, public charge bonds have been forfeited in their entirety upon breach.[780] The conditions that constitute breach of a public charge bond are delineated fully in 8 CFR 213.1(h)(1) and (2), and any alien offered a bond has ample opportunity to review the conditions and terms before agreeing to these terms. Additionally, as explained in the

---

[771] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51226 (proposed Oct. 10, 2018).

[772] *See* 8 CFR 213.1(h)(4).

[773] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51125 (proposed Oct. 10, 2018).

[774] *See, e.g., Aguilar* v. *United States,* 124 Fed. CL 9, 16 (2015) (discussing substantial violation under 8 CFR 103.6(a) in relation to a delivery immigration bond).

[775] *See* 8 CFR 212.21(a) and (b).

[776] *See* INA section 213, 8 U.S.C. 1183.

[777] *See* INA section 213, 8 U.S.C. 1183.

[778] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51226 (proposed Oct. 10, 2018).

[779] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51221 (proposed Oct. 10, 2018).

[780] *See, for example, United States* v. *Goldberg,* 40 F.2d 406 (2d Cir. 1930); *see Matta* v. *Tillinghast,* 33 F.2d 64 (1st Cir. 1929); *Ill. Surety Co.* v *United States,* 229 F. 527 (2d Cir. 1916); *United States* v. *Rubin,* 227 F. 938 (E.D. Pa 1915); *Matter of B–,* 1 I&N Dec. 121 (BIA 1941).

**Exhibit A**

NPRM,[781] under the current breach of bond provisions of 8 CFR 103.6(e), an immigration bond is considered breached if there has been a substantial violation of the stipulated condition. The term "substantial violation" is generally interpreted according to contractual principles.

*Comment:* A commenter stated that the NPRM's proposals for the appeal of public charge bond decisions are unfair because the obligor must pay a $675 fee to have the same officer who issued the initial denial review that decision, and because throughout the process, the alien must rely on the obligor to complete the steps, as the alien is not a party to the bond contract. A commenter further stated that the proposed rule would hinder the ability of noncitizens to meaningfully challenge harsh or arbitrary breach determinations.

*Response:* DHS disagrees. The public charge bond appeal process as described in the NPRM is a long established and accepted method of disputing initial USCIS determinations. It is possible for obligors to appeal errors in either law or fact through well-established administrative remedies via the AAO without having to resort to bringing suit in a Federal court. Although the alien is not a party to the surety bond contract with DHS, the rule does not impair his or her ability to pursue or defend against traditional contract actions with regard to the obligor, with whom he or she is in contractual privity. Similarly, if the alien is the obligor in that the alien submits a cash equivalent bond, the alien would be able to defend against a breach determination. Requiring USCIS to set up a separate and distinct review process for bond appeals would be unnecessarily burdensome and redundant.

*Comment:* An individual commenter said the NPRM would add further fees and expenses to an already costly process. Some commenters provided a discussion of the costs associated with filing a public charge bond application and filing an appeal. The commenters said immigrants would be inflicted with expensive fees and fines.

*Response:* USCIS is primarily funded by fees. Congress mandated that DHS may set IEFA fees in a manner commensurate with the expense of adjudicating the benefits in question.[782] The cost of filing a public charge bond may be assessed in the USCIS fee rule, as are other USCIS fees.

*Comment:* A commenter stated that the bond requirement should not be limited to surety bonds but should instead allow for cash, cashier's check, or money order. Another commenter stated that USCIS should accept only surety bonds, not cash or equivalents, until the effectiveness of the bonding process can be assessed in practice. This commenter recommended that only limited-duration bonds be accepted, at least initially. The commenter indicated that a periodic bond renewal process would provide valuable private sector monitoring of the alien's compliance, especially where the time period between bond acceptance and eligibility for cancellation extends over multiple years.

*Response:* DHS agrees that bonds should not be limited to surety, and plans to accept cash equivalents once the proper accounts and procedures can be established. DHS disagrees that it is necessary to wait until the effectiveness can be established before accepting cash bonds. The nature of cash bonds makes it unlikely that any situation would arise where DHS would have more difficulty collecting for a breached cash bond than for a breached surety bond. DHS also disagrees that only limited duration bonds be accepted initially. As a commenter has noted, public charge bonds of limited duration place an additional burden in both time and money on both the bonded alien and DHS, as they must be periodically renewed and these renewals must be reviewed by DHS. For this reason, DHS will only accept public charge bonds of unlimited duration.

*Comment:* One commenter stated that if immigrants can afford to pay the high cost of a guide to cross the border illegally, they can probably afford a bond to guarantee their stay in the United States.

*Response:* DHS appreciates concerns raised about illegal entry but stresses that the public charge inadmissibility rule assesses an applicant's likelihood of becoming a public charge at any time in the future. Whether an alien paid a guide to enter the United States without permission, in and of itself, is not relevant to the public charge inadmissibility determination, or to whether DHS should exercise its discretion and allow an alien inadmissible only on the public charge ground to submit a public charge bond.

*Comment:* A commenter stated that the government receiving full bond payment in those circumstances when the public benefits paid out are less than the full amount of the bond is unfair, unjust, and unlawful.

*Response:* DHS disagrees that forfeiture of the full bond amount in the event of breach is unfair, unjust, or unlawful. The amount is based on a review of the amount originally provided by 8 CFR 213.1 in 1964,[783] adjusted for inflation, to represent present dollar values.[784] Further, the face value of the bond constitutes liquidated damages for a breach of the conditions of that bond. As explained in the NPRM,[785] liquidated damages are an appropriate remedy in situations such as the public charge bond, where the total damages to the government are difficult, if not impossible to calculate. Additionally, these damages go beyond the simple amount of the benefits received, encompassing not only the monetary value of the benefits received but also the overhead of the benefit agency in administering the benefit.

The public charge bond is offered to aliens who are otherwise inadmissible due to a likelihood of becoming a public charge an opportunity to overcome that finding of inadmissibility. The conditions that constitute breach of a bond are delineated fully in 8 CFR 213.1(h)(1) and (2), and any alien offered a bond has ample opportunity to review them before agreeing to these terms. Additionally, as explained in the NPRM,[786] under the current breach of bond provisions of 8 CFR 103.6 an immigration bond is considered breached if there has been a substantial violation of the stipulated condition. The term "substantial violation" is generally interpreted according to contractual principles.[787] However, in the NPRM, DHS proposed to incorporate the substantial violation standard via incorporating principles that govern the public charge and public charge benefits definitions.[788] Whether the public charge bond is punitive is a matter for Congress; however, per the Act, the public charge bond's purpose is to hold the United States, and all states, territories, counties, towns and municipalities and districts harmless

[781] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51125 (proposed Oct. 10, 2018).

[782] *See* INA section 286(m), 8 U.S.C. 1356(m).

[783] Miscellaneous Amendments to Chapter, 29 FR 10579 (July 30, 1964).

[784] DHS uses the semi-annual average for the first half of 2018 and the annual average from 1964 from the historical CPI–U for U.S. City Average, All Items. *See https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-201806.pdf* (last visited July 26, 2019).

Calculation: Annual average for 1st half of 2018 (250.089)/annual average for 1964 (31) = 8.1; CPI–U adjusted present dollar amount = $1,000 * 8.1 = $8,100.

[785] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51226 (proposed Oct. 10, 2018).

[786] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51125 (proposed Oct. 10, 2018).

[787] *See, e.g., Aguilar* v. *United States*, 124 Fed. CL 9, 16 (2015) (discussing substantial violation under 8 CFR 103.6(a) in relation to a delivery immigration bond.)

[788] *See* 8 CFR 212.21(a) and (b).

**Exhibit A**

against bonded aliens becoming public charges.[789]

*Comment:* A commenter indicated that sponsors of religious workers may not possess the financial ability of typical U.S. employers, and may not be able to afford a bond.

*Response:* DHS acknowledges that special immigrant religious workers, and immigrants who perform religious work generally, provide valuable contributions to the United States and are in a special position, as acknowledged by Congress in the special immigrant religious worker classification.[790] Congress, however, did not exempt these workers from the public charge ground of inadmissibility and therefore, DHS will not exempt them in this rule. The public charge bond provides a way for individuals who would otherwise be inadmissible due to likelihood of becoming a public charge to overcome that finding. While DHS will take into account the totality of the circumstances regarding all applicants, and will adjudicate the applications of religious workers in light of the unique conditions under which many of them live and work, in those instances where a bond is offered it is already an extraordinary exercise of discretion to allow the alien to adjust status in the United States even when found inadmissible as likely to become a public charge. It is up to the applicant to determine whether it is in his or her best interests to accept the offered opportunity to post a public charge bond, and this rule does not require that the sponsor post the bond, rather this obligation is on the alien and the bond maybe posted by any entity or individual that can serve as an obligor under section 8 CFR 103.6 and 213.1. DHS declines to further modify this exercise of discretion based upon either the nature of the applicant's employment or the immigration classification in which the alien seeks to adjust status.

*T. Effective Date(s)*

*Comment:* Many commenters asked that the proposed rule be delayed as long as possible. One commenter noted that the verification requirements related to the Form I–944 would create new challenges and impose great burdens on State and local agencies. Another commenter requested that the rule be delayed as long as possible not only because of the impact on agencies

but also because of the impact on the legal services community and ethnic community-based organizations who would bear the brunt of dealing with immigrants fearful about how the new requirements will affect them and their families. Another commenter said DHS should time the publication of the final rule so that the effective date falls within an ACA marketplace open enrollment period, so that those who are currently using Medicaid or CHIP and who may be affected by this rule, may discontinue that benefit and switch to an ACA marketplace plan without an interruption in health insurance coverage. A couple of commenters stated that the 60-day effective date may be insufficient and reasoned that DHS should delay the effective date of any final regulation until at least January 1, 2020, or one year after the publication of the final rule, which would minimize disruption to the markets, decrease consumer confusion of mid-year changes, and allow affected entities to adjust their outreach, messaging, and technology to accommodate the changes. A commenter asked that the proposed rule be delayed a minimum of three years to allow states to implement a comprehensive education program. Another commenter stated that if any changes are implemented public agencies will need far longer than 60 days to prepare, noting that contracts will need to be obtained with vendors in order to reprogram computer systems, all materials pertaining to immigrant eligibility will need to be reviewed, workers will need to be trained, and funding will need to be appropriated in order to do these things through a state's budget cycle. The commenter cited to the Medicaid expansion which, though passed in 2010, was not set to be implemented until January 2014; computer systems and other processes were not ready nearly 4 years later, causing adverse impacts on Californians. Another commenter detailed other impacts or administrative burdens the rule would place on benefit-granting agencies. These impacts include needing to provide aliens with documentation regarding benefit receipt, responding to inquiries from the public, updating communication materials, and increased caseload.

*Response:* DHS is retaining the 60-day effective date. Relatedly, DHS is also clarifying that DHS will apply the public charge final rule only to applications and petitions (in the context of extensions of stay or changes of status) postmarked (or if applicable, electronically submitted) on or after the effective date of the final rule.

Applications and petitions pending with USCIS on the effective date of the rule, *i.e.* were postmarked before the effective date of the rule and were accepted by USCIS pursuant to 8 CFR 103.2(a)(1) and (a)(2)) will not be subject to the rule. For the purposes of determining whether a case was postmarked before the effective date of the rule, DHS will consider the postmark date for the application or petition currently before USCIS, not the postmark date for any previously-filed application or petition that USCIS rejected pursuant to 8 CFR 103.2(a)(7)(ii).

In addition, DHS will not consider the receipt of public benefits excluded under the 1999 Interim Field Guidance unless such benefits are received on or after the effective date of the final rule.

As DHS stated elsewhere in this rule, DHS is not imposing any requirements on benefit-granting agencies through this final rule or a requirement that these agencies specifically verify the information provided on the Form I–944. While the Form I–944 includes a Federal Agency Disclosure and Authorization, that part of the form will only become relevant after DHS enters into information sharing agreements with specific agencies to obtain verification of the information supplied by applicants. DHS expects that this process will take time and will likely be in effect at some point in the future after the final rule becomes effective. In addition, any such information sharing will depend on the ability of the relevant agencies to share such information with DHS. Because this aspect of the rule's implementation will necessarily involve inter-agency collaboration, DHS does not believe that delaying the effective date of the final rule beyond 60 days will be necessary to address the agencies' concerns related to the verification of information on Form I–944.

DHS is also not altering an alien's eligibility for public benefits, and therefore does not believe that agencies would have to change their guidance in that regard. The rule specifies what public benefits will be considered in the public charge inadmissibility determination. DHS encourages agencies to update their web pages and guidance to direct recipients of public benefits to DHS guidance related to this final rule rather than repeat or explain what receipt of public benefits may make a person a public charge. While aliens may choose to disenroll from benefits to ensure the public benefit threshold is not triggered, DHS is moving to a duration-only threshold, aliens will have more time to adjust

---

[789] *See* INA section 213, 8 U.S.C. 1183.

[790] For example, special immigrant religious workers under section 101(a)(27)(C), 8 U.S.C. 1101(a)(27)(C) qualify for adjustment of status under INA section 245(a), notwithstanding certain bars under INA section 245(c).

**Exhibit A**

**41458**    **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

their conduct in response to this rule. Therefore any potential increase in agencies' caseloads will likely be spread over a longer period of time which would eliminate the need to further extend the effective date of the final rule.

Finally, DHS is also not requiring that benefit-granting agencies develop new documentation of benefits provided, but will accept documentation already provided in the normal course of benefit administration. Such documentation should be adequate given that DHS is simplifying the threshold standard to focus exclusively on the duration of receipt and not the amount. DHS notes that examples of implementation of the Medicaid expansion program are not apt for comparison to the implementation of this rule for the reasons explained above, namely, that this rule imposes no direct obligations on benefit-granting/ administering agencies, and it does not modify eligibility criteria for the benefits covered by this rule.

With respect to comments requesting time so aliens can move from Medicaid to obtaining private health insurance through the ACA marketplaces, DHS notes that it believes aliens will have sufficient time to obtain private health insurance through the ACA marketplaces. Additionally, Medicaid benefits included in the definition of public benefit will only be a heavily weighted negative factor in the totality of the circumstances if the alien receives Medicaid for more than 12 months in the aggregate, beginning 36 months before the alien filed for adjustment of status. The open enrollment period for 2020 will run from November 1, 2019 to December 15, 2019.[791] Because USCIS will only consider benefits covered under this final rule if received on or after the effective date of the final rule, and given that this rule published on August 14, 2019, aliens will have sufficient time to disenroll from Medicaid and enroll in private health insurance through the ACA marketplaces without incurring a heavily weighted negative factor for purposes of the public charge inadmissibility determination. Therefore, DHS will implement the rule within 60 days from the date of publication.

*Comment:* A commenter stated that DHS does not provide sufficient notice to noncitizen benefit recipients of TANF, SSI, or general assistance about the impact of benefits received prior to the effective date of the rule. The commenter requested that DHS use the

''primarily dependent'' standard for TANF, SSI, and general assistance benefits received prior to the effective date of the rule.

*Response:* DHS disagrees that it has given recipients of public benefits inadequate time to make decisions about receiving public benefits before the effective date of this rule. Through the NPRM, DHS provided advance notice to the public that DHS was changing which public benefits would be considered in public charge inadmissibility determinations. The NPRM's provisions, coupled with the 60-day effective date of the final rule, provided adequate notice to the regulated public with respect to the possible consequences associated with the receipt of public benefits.[792]

DHS notes that in this final rule, DHS will not consider public benefits listed in 8 CFR 212.21(b) that were previously excluded under the 1999 Interim Field Guidance if received before the effective date of this final rule. DHS will continue to consider benefits listed in 8 CFR 212.21(b) that were previously considered under the 1999 Interim Field Guidance if received before the effective date of the final rule.[793] The receipt of such benefits would not be considered as a heavily weighted negative factor. In addition, DHS is clarifying that this final rule will not apply to any applications or petitions postmarked before the effective date and accepted by USCIS pursuant to 8 CFR 103.2(a)(7)(ii),

and are pending on the effective date of the final rule, but only to applications or petitions postmarked (or if applicable, electronically submitted) on or after the effective date of the final rule.

*Comment:* A commenter stated that the proposed rule should be applied to applications filed on or after the effective date. Pending applications would be affected by the new rule and would place a strain on DHS to re-interview and re-adjudicate applications that are already pending. In contrast, one commenter stated the rule, if implemented, needs to apply retroactively at some point in order to remove green cards from individuals who may have already received them and who could be deemed public charges under the proposed rule.

*Response:* DHS agrees that the rule will not be applied to applications pending on the effective date of the rule, *i.e.* were postmarked (or if applicable, electronically submitted) and were accepted by USCIS pursuant to 8 CFR 103.2(a)(1) and (a)(2) the effective date of the rule and were accepted by USCIS pursuant to 8 CFR 103.2(a)(1) and (a)(2). As discussed above, DHS will continue to review such cases under the 1999 Interim Field Guidance. For the purposes of determining whether a case was postmarked before the effective date of the rule, DHS will consider the postmark date for the application or petition currently before USCIS, not the postmark date for any previously-filed application or petition that USCIS rejected pursuant to 8 CFR 103.2(a)(7)(ii).

DHS will only apply this final rule to applications for admission or applications or petitions for immigration benefits postmarked (or if applicable, electronically submitted) on or after the effective date of the rule. DHS does not anticipate a strain on USCIS resources due to the effective date of this final rule. By applying the public charge rule to applications postmarked on or after the effective date, DHS ensures a smooth implementation and ample notice to applicants and petitioners.

Benefits Received Before Effective Date and Previously Excluded Benefits

*Comment:* Several commenters generally opposed the consideration of benefits received before the effective date of the rule, and that the 1999 Interim Field Guidance should be applied to any receipt of benefits prior to the effective date of the final rule. Some commenters disagreed with this portion of the rule, stating it runs counter to the original purpose of the

---

[791] *https://www.healthcare.gov/quick-guide/dates-and-deadlines/* (last visited May 1, 2019).

[792] *See, e.g., Alcaraz* v. *Block,* 746 F.2d 593, 611 (9th Cir. 1984) ("In addition to the pre-promulgation procedures, 5 U.S.C. 553(d) provides for a 30-day lag time between the rule's publication and its effective date. This post-adoption delay in effectiveness affords parties affected by the regulations reasonable time in which to adjust their conduct or take other measures.") (citations omitted).

[793] Under the 1999 Interim Field Guidance, DHS would consider the current receipt of cash benefits for income maintenance or long-term institutionalization at government expense in the totality of the circumstances. *See* Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 FR 28689, 28690 (May 26, 1999) ("If at the time of application for admission or adjustment an alien is receiving a cash public assistance for income maintenance or is institutionalized for long-term care (as discussed in section 6, below), that benefit should be taken into account under the totality of the circumstances test, along with the other statutory factors under section 212(a)(4)(B)(i) and any [adjustment of status]."). DHS would also consider past receipt of cash benefits for income maintenance or long-term institutionalization at government expense in the totality of the circumstances. *See* Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 FR 28689, 28690 (May 26, 1999) ("[P]ast receipt of cash income-maintenance benefits does not automatically make an alien inadmissible as likely to become a public charge, nor does past institutionalization for long-term care at government expense. Rather this history would be one of many factors to be considered in applying the totality of the circumstances test.").

**Exhibit A**

public charge test and the 1999 Interim Field Guidance standard by which individuals are becoming a public charge. A commenter expressed disapproval of this section of the rule because it would impact family members who rely on cash benefits.

Another commenter stated that the proposed rule could be retroactively applied so that immigrants' receipt of benefits prior to the effective date of the rule would be considered in a public charge determination. The commenter provided readings of the proposed regulatory text against the 1999 Interim Field Guidance, arguing that SNAP, specifically, could ''fall through the cracks.'' Other commenters stated that this part of the rule lacked clear guidance and proved difficult to implement, providing examples and saying this section will be unfair and unworkable. A commenter requested that DHS use the ''primarily dependent'' standard for TANF, SSI, and general assistance benefits received prior to the effective date of the rule. A commenter said this portion of the rule is in contrast with what many social workers have advised their clients on in the past.

*Response:* DHS acknowledges that the public charge inadmissibility standard in this final rule is a departure from the 1999 Interim Field Guidance. However, this final rule as it pertains to public charge inadmissibility will only apply to applications for admission or adjustment of status postmarked (or if applicable, electronically submitted) on or after the effective date of the rule. For any application for admission or adjustment of status postmarked (or if applicable, electronically submitted) and pending before the effective date of the rule, USCIS will apply the 1999 Interim Field Guidance. For the purposes of determining whether a case was postmarked before the effective date of the rule, DHS will consider the postmark date for the application or petition currently before USCIS, not the postmark date for any previously-filed application or petition that USCIS rejected pursuant to 8 CFR 103.2(a)(7)(ii).

Additionally, for any application for admission or adjustment of status postmarked (or if applicable, electronically submitted) on or after the effective date of the rule, if the alien received any included public benefit listed in the 1999 Interim Field Guidance (cash assistance for income maintenance, including SSI, TANF, and general assistance) before the effective date of the rule, DHS will consider those benefits as they would have been considered under the 1999 Interim Field Guidance. In other words, for

adjustment of status applications filed on or after the effective date of the rule, an applicant's receipt of any of the benefits listed in the 1999 Interim Field Guidance prior to the effective date of the rule will be treated as a negative factor in the totality of the circumstances, as they were in the 1999 Interim Field Guidance. Public benefits that were not considered in the 1999 Interim Field Guidance, such as SNAP, would not be considered at all in the public charge inadmissibility determination; they would only be considered if received on or after the effective date of the rule. However, regardless of the length of time such benefits were received before the effective date of this rule, or the monetary amount of such benefits, DHS will not treat the receipt of these benefits as a heavily weighted negative factor, as set forth in 8 CFR 212.22(d).

DHS believes that it has minimized any adverse effects on applicants as a result of having received benefits that were listed in the 1999 Interim Field Guidance before the effective date of this rule. DHS believes that recipients of public benefits listed in the 1999 Interim Field Guidance are being given adequate time to make decisions about receiving public benefits on or after the effective date of this rule. The NPRM's discussion of how DHS would treat past receipt of benefits listed in the 1999 Interim Field Guidance, this rule's explanation of how such benefits will be treated, and the proposed 60-day effective date of the final rule, provide aliens an opportunity to discontinue the receipt of any public benefits before filing an application for admission or adjustment of status and provides an opportunity for public benefit-granting agencies to communicate the consequences of receiving public benefits, to the extent such agencies deem appropriate.

With respect to the public benefit condition for extension of stay and change of status, DHS will not consider any receipt of public benefits that occurred before the effective date of this final rule.

*Comment:* A commenter proposed that a 3-year grace period be applied for the consideration of previously excluded benefits. The commenter indicated that, in some cases, the receipt of benefits for up to 3 years prior to the proposed rule's enactment could count against immigrants, and that such an outcome would be absurd in light of the standard 3-year cycle process for benefits. The commenter indicated that people should not be punished for following the standard 3-year cycle process for receiving benefits which are

currently excluded from the public charge determination, or for not being able to obtain a termination letter quickly enough.

*Response:* DHS appreciates the suggestion but declines to incorporate a 3-year grace period for previously received benefits. As previously indicated, the rule will only consider all benefits as listed in 8 CFR 212.21(b) if the application was filed on or after the effective date. For benefits received before the effective date and were also considered under the 1999 Interim Field Guidance, USCIS will only consider the benefits as they would have been considered under the 1999 Interim Field Guidance. The rule will become effective within 60 days, which DHS believes is sufficient time for aliens to terminate any currently received public benefits that may be reviewed in the public charge inadmissibility determination.

*Comment:* Commenters stated that such a rule should not be applied to immigrants already in the United States who are on a pathway to ''legalization'' (who are ''in line'').

*Response:* DHS disagrees with the comment that the rule will be applied to applicants with applications pending on the day the rule goes into effect. This rule only applies to applications for admission or adjustment of status postmarked (or if applicable, electronically submitted) on or after the effective date of the rule. Individuals who have applications pending with DHS on the effective date of the rule will not be subject to this rule; USCIS will adjudicate such applications under the terms of the 1999 Interim Field Guidance.

*Comment:* A commenter argued that past acceptance of legally-obtained Federal assistance programs or public benefits should not count against immigrants already in the country, as it is often U.S. born children who have qualified for and are receiving assistance because their immigrant parents are struggling. Neither the parents nor the children should be penalized for accepting public benefits that were legally available for assistance.

*Response:* As noted elsewhere in this preamble, benefits received by or on behalf of a U.S. citizen child are not considered in the public charge inadmissibility determination.

*Comment:* A commenter requested that DHS use the ''primarily dependent'' standard for TANF, SSI, and general assistance benefits received prior to the effective date of the rule.

*Response:* As noted, under this rule, USCIS will continue to apply the

**Exhibit A**

criteria set forth in the 1999 Interim Field Guidance to applications postmarked (or if applicable, electronically submitted) before, and pending on, the effective date of this rule, and therefore, the receipt of previously-included benefits in those applications will be considered pursuant to the "primary dependence" standard. However, for applications postmarked (or if applicable, electronically submitted) on or after the effective date of this rule in which the applicant received previously-included benefits before the effective date of the rule, DHS will consider the receipt of those benefits as a negative factor in the totality of the circumstances, but such receipt will not be considered a heavily weighted negative factor.

*U. Other Comments*

*Comment:* A commenter indicated that DHS did not affirmatively address whether it consulted with Federal benefit-granting agencies such as HHS, USDA, and HUD in developing its proposed definition of "public charge" as "an alien who receives one or more public benefit[s]" and abandoning the current "primarily reliant" standard. Although the commenter acknowledged that the NPRM indicated that DHS consulted these benefit-granting agencies on other, tangential issues such as methodologies for considering and quantifying an immigrant's receipt of non-cash, non-monetizable benefits, the commenter was requesting that DHS address, in the next public action, whether or not it formally consulted Federal benefit-granting agencies such as HHS, USDA, and HUD in developing its proposed definition of "public charge," and if so, that DHS publicly disclose copies of any written feedback it received from these agencies.

*Response:* Interagency discussions are a part of the internal deliberative process associated with the rulemaking.

*Comment:* Another commenter indicated that the rule would arbitrarily prevent immigrants from obtaining or maintaining lawful immigration status, which data shows improves immigrants' hourly wages.

*Response:* DHS disagrees that the rule will impermissibly prevent immigrants from obtaining or maintaining lawful immigration status. This rule only addresses one ground of inadmissibility and does not otherwise affect eligibility for public benefits. As discussed elsewhere in this rule, DHS's objective in promulgating this rule is to better ensure that aliens seeking admission, adjustment of status, extension of stay, and change of status, rely on their own resources and capabilities and the not

government to meet their needs. DHS also intends that this rule provide a clear regulatory framework for assessing the factors Congress established as mandatory considerations with respect to the public charge ground of inadmissibility.

*Comment:* An individual commenter proposed creating a "self-sufficiency program" in place of the proposed rule. The commenter suggested the program be modeled after the ORR's Voluntary Agencies Matching Grant Program that provides intensive case management, English language and vocational training, and a variety employment services. A commenter suggested creating classes or having resources available to aliens to help them understand the importance of self-sufficiency and methods to obtain that ideal goal. The commenter indicated that those kinds of programs would provide more incentive to the aliens to avoid public assistance than revoking or denying their citizenship status just because they needed some help or might need it in the future.

*Response:* DHS appreciates the suggestion. However, this rule establishes guidelines for the inadmissibility of aliens based on the public charge ground of inadmissibility as established by Congress. The rule provides for the initial determination of admissibility; other immigration related benefits or activities fall beyond the scope of the rule. The programs offered to refugees are designated to assist people who are not subject to the public charge inadmissibility ground. Further, neither the statute nor this final rule permit revocation or denial of citizenship status based on inadmissibility on public charge grounds.

*Comment:* A commenter asked that a public information campaign be implemented that is targeted towards the general public to explain the rule changes.

*Response:* DHS will provide additional information and communication materials on the rule and its provisions as part of the implementation of the final rule.

*Comment:* Some commenters provided general comments and recommendations on and other aspects of the immigration system. Multiple commenters opposed the separation of families at the southwest border. Several commenters stated that asylum seekers and refugees are unfairly treated. Several commenters stated their support for suspension of all immigration via section 212(f) of the Act, 8 U.S.C. 1182(f). Commenters expressed concern regarding the lack of support provided

to Iraqi translators in the search for asylum.

*Response:* DHS appreciates the comments. However, these comments are outside of the scope of DHS's rulemaking. Through this rulemaking, DHS is exercising its authority to regulations implementing the public charge ground of inadmissibility and the public charge bond framework. DHS is also setting a public benefit condition related to extension of stay and change of status.

*Comment:* Some commenters stated that all individuals should be treated with dignity, compassion, and kindness.

*Response:* DHS believes that this rule implements the public charge ground of inadmissibility consistent with those values, as well as other values prioritized by Congress.

*Comment:* One commenter suggested that DHS should issue work authorization cards to all aliens subject to the public charge ground of inadmissibility and that USCIS should amend the rule to include a work authorization category for all pending applications. Another commenter suggested that USCIS amend the rule to include a work authorization category for all pending applications.

*Response:* These comments are outside of the scope of DHS's rulemaking. DHS will not offer employment authorization to all aliens subject to the public charge ground of admissibility. DHS notes that aliens with pending adjustment of status application may apply for employment authorization under 8 CFR 274a.12(c)(9).

*Comment:* One commenter requested that DHS affirmatively review and incorporate into the administrative record for this rulemaking the supporting evidence and authority cited in the approximately 300 footnotes contained in the commenter's submission. The commenter also submitted to the docket 22 additional documents, which included some but not all of the commenter's supporting evidence and authority.

*Response:* DHS has fulfilled its obligation to meaningfully consider and respond to the public comments. With respect to the commenter's additional request regarding the administrative record, the APA does not require DHS to conduct the exercise requested by the commenter, and DHS respectfully declines to do so.

*Comment:* A commenter recommended that the proposed rule include the "protective effect of secure immigration status against abuse and exploitation, as well as the bolstering effects on family stability." The

commenter indicated that as recognized under VAWA, admission to the United States or adjustment of status can help victims access employment and increase their ability to escape the violence or overcome the trauma they've suffered. The commenter further stated that a stable immigration status helps individuals obtain secure better paying jobs, reducing the stress associated with exploitative working conditions, leading to better short-term and long-term outcomes for their families. The commenter provided information on research conducted among immigrant victims across the United States that indicated 65 percent of immigrant victims reported that their violent partner had used some form of a threat of deportation after arrival in the United States as a form of abuse. The commenter suggested that DHS should consider the supportive and protective effects of stable immigration status to victims. The commenter indicated that such a consideration would support the purpose and guidance of the important protections that Congress has afforded for victims in various Federal laws, even if they are not seeking admission under an exempt victim-specific category.

*Response:* DHS understands the concerns and emphasizes that VAWA, T and U applicant categories are generally not subject to the public charge inadmissibility determinations. Further DHS has provided that if a person receives a public benefit during a status exempt from public charge inadmissibility, and later applies for an immigration benefit under a different status where admissibility is required, such public benefit receipt would not be considered in the public charge inadmissibility determination.

*Comment:* A commenter expressed concern about restricting the possibility of filing Request for Fee Waiver (Form I–912), stating that many applicants have an income below the Federal Tax Filling Requirement Threshold, do not file tax returns, and will lack the evidence to submit this request. The commenter went on to say that forcing applicants to submit evidence through IRS tax filing will increase the amount of tax return moneys that low-income tax payers are eligible to obtain, thus canceling out any additional income received by DHS if these applicants are unable to qualify for the fee waiver.

*Response:* This rule not change the eligibility or evidentiary requirements of Form I–912. This comment seems misdirected as it appears to relate to a routine revision of Form I–912 and not this rule. Therefore, this comment is out of scope of this rule.

*Comment:* Some commenters provided general comments and recommendations on public benefits and the welfare system in the United States. For example, multiple commenters stated that immigrants are putting a burden on public services and U.S. taxpayers. One commenter summarized potential methods for saving money within the public welfare system in the United States, as an alternative to changing how the Government implements the public charge ground of inadmissibility. An individual commenter in support of the rule provided information and views regarding fraud and abuse in the U.S. public welfare system, along with brief recommendations on how to address such issues.

*Response:* DHS appreciates these comments. However, DHS's public charge inadmissibility rule is not intended to address public benefit fraud and abuse specifically. Rather, this rule is intended to align the self-sufficiency goals set forth by Congress with the public charge ground of inadmissibility.

*Comment:* One commenter requested that USCIS ensure employers are paying living wages to immigrants. The commenter stated that SNAP participants are either employed or seeking jobs, or are children or elderly. Similarly, another commenter asserted that, unless DHS is willing to compel employers in agriculture and in other industries to provide a living wage and health benefits, it is cruel and unjust to punish hard-working immigrants who rely on public benefits but who also benefit the United States.

*Response:* The vast majority of workers who enter the United States on employment-based nonimmigrant and immigrant visas, including temporary agricultural workers, enter based on the terms and the conditions that have been certified by DOL.[794] For a temporary agricultural worker (H–2A nonimmigrant),[795] the employer must offer the appropriate wage rate[796] and comply with other requirements as set by law and regulations.[797] As such, DOL deemed the financial aspect and conditions of the employment itself

sufficient for purpose of the alien's status.

With this rulemaking, DHS prevent individuals from receiving public benefits for which they are eligible. DHS understands that individuals may be hesitant to apply for or receive public benefits in light of this rulemaking. DHS, however, is implementing the congressional mandate provided in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4) to assess, as part of an alien's application for admission or adjustment of status, whether the alien is likely at any time to become a public charge.

*Comment:* Commenters referenced DOS's January 2018, changes to public charge in the FAM. One commenter stated that if DOS adopted a standard similar to the proposed rule, it would result in significant increases of visa denials.

*Response:* This rule only pertains to aliens who seek admission into the United States as a nonimmigrant, or as an immigrant, or seek an adjustment of status or a change of status or extension of stay. Although the standards set forth in the rule pertain to DHS's determinations as a whole, the rule's cost analysis focuses on the impact to USCIS adjudications, as the rule most directly impacts USCIS adjudication of applications for adjustment of status, as well as applications for extension of stay and change of status. DHS did not include an analysis of the costs and benefits associated with public charge inadmissibility determinations made by the DOS in the immigrant and nonimmigrant visa context. DHS defers to DOS on any information related to the application of the public charge inadmissibility determination as part of the immigrant and nonimmigrant visa process.

*Comment:* A commenter urged DHS to defer to the DOS's public charge determination. Another commenter stated that DOS could further modify its own public charge guidance in response to the proposed rule from DHS. The commenters stated that this would cause more than one million individuals that seek visas from DOS annually to be subjected to arbitrary standards and potentially shut out of the country.

*Response:* DHS is collaborating with other departments and agencies with regard to the regulatory changes promulgated by this final rules. DHS is working, and will continue to work, with DOS to ensure consistent application of the public charge ground of inadmissibility. As noted in the NPRM, DHS expects that DOS will make any necessary amendments to the FAM in order to harmonize its approach to public charge inadmissibility

---

[794] *See* 20 CFR parts 655 and 656.

[795] *See* INA section 101(a)(15)(H)(ii)(a), 218, 8 U.S.C. 1101(a)(15)(H)(ii)(a), 1188.

[796] *See* 20 CFR 655.120(l). Employers must pay H–2A workers and workers in corresponding employment, unless otherwise excepted by the regulations, at least the highest of the Adverse Effect Wage Rate (AEWR), the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective bargaining wage (if applicable), or the Federal or State minimum wage in effect at the time the work is performed.

[797] *See* 20 CFR 655.100–185.

**Exhibit A**

determinations with the approach taken in this final rule.[798]

*Comment:* A commenter discussed the rule's impact on consular processing. A commenter stated that DOS is likely to adopt public charge rules consistent with DHS's rules, thus exasperating and extending costs to applicants to many types of visa programs. Multiple commenters stated the rule would result in increased administrative burdens to other organizations such as DOS, as the proposed rule would require every adjudicator to be trained to apply the proposed rule, which is already subjective and unclear.

*Response:* This rule provides a standard for determining whether an alien who seeks admission into the United States as a nonimmigrant or as an immigrant, or seeks adjustment of status, is likely at any time in the future to become a public charge under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). DHS defers to DOS as to the procedure and timing for adopting changes consistent with the policy articulated in this final rule, as well as on the impact of any changes to visa processing times and costs incurred as a result of any such changes.

*Comment:* A commenter stated that DHS should consider the implications of defining the inadmissibility ground at section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), on the public charge deportability ground at section 237(a)(5) of the Act, 8 U.S.C. 1227(a)(5). The commenter stated that DHS should consider the impact and reasonableness of the proposed NPRM definition in the deportability context and how the definition "might further heighten fear and anxiety related to deportation among lawful permanent residents and others." The commenter that the Administration "will likely act quickly to adopt it for deportation purposes."

*Response:* DHS does not believe it is essential to consider the impact on the public charge deportability ground. The rule is limited to the ground of inadmissibility. Additionally, as explained in the NPRM, standards applicable to DOJ continue to govern the standard regarding the public charge deportability ground.[799] While the forward-looking inadmissibility ground and the past-looking deportability grounds both use the phrase "become a public charge," the two provisions are significantly different. Most notably, the deportability ground requires a two-step

determination absent in the inadmissibility ground. Specifically, the public charge ground of deportability applies to an alien who (1) within five years after the date of entry, has become a public charge (2) from causes not affirmatively shown to have arisen since entry.[800] Whereas, the public ground charge of inadmissibility is prospective and requires an analysis to determine whether there is a likelihood that an alien will become a public charge at any time in the future. In the event there are any regulatory changes to the interpretation of the public charge deportability ground, such changes will necessarily comply with the APA and other statutory and regulatory requirements.

*Comment:* A commenter discussed the rule's impact on immigration courts. The commenter indicated that although immigration judges are not bound by DHS rules, DOJ is in the process of creating a public charge rule that is likely to parallel the DHS proposed rule. However, until a DOJ rule is finalized, the DHS proposed rule is likely to be used as persuasive authority by immigration judges tasked with making public charge assessments. The commenter pointed out that this will occur in at least three scenarios: (1) Individuals without lawful status seeking to adjust status in removal proceedings; (2) returning lawful permanent residents who are treated as applicants for admission under section 101(a)(13)(C) of the Act, 8 U.S.C. 1101(a)(13)(C); and (3) lawful permanent residents placed in removal proceedings who are seeking to re-adjust status with a waiver under section 212(h) of the Act, 8 U.S.C. 1182(h). Additionally, the commenter stated that the adjudication of adjustment of status applications in immigration courts will likely increase due to a 2018 policy change at USCIS, under which NTAs are issued in any case in which USCIS issues a denial, leaving the applicant with no legal status upon denial of the adjustment application. This, according to the commenter, will result in an increase of adjustment of status applications in front of an immigration judge, increasing the frequency of cases requiring a public charge adjudication. Until a DOJ rule is promulgated, ICE trial attorneys, who are bound by DHS regulations, will likely argue that immigration judges should apply the proposed rule's heightened standards. Lacking any binding precedent on the interpretation of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), some immigration judges will agree and will

rely on the proposed rule as a guide, while other immigration judges will not. The commenter stated that this will create inconsistencies in adjudication, and increase administrative inefficiencies through additional appeals and motions; will take significantly more court time for those cases already in front of the judge due to the heightened evidentiary requirements; and need additional and more detailed testimony. These heightened evidentiary requirements will also impact ICE attorneys, who will be required to review that evidence and prepare a response, as well as the respondent and his or her counsel, if represented. With an immigration court backlog that is already above 750,000 cases, the public charge rule would further exacerbate an already record high case volume. Additionally, increased evidentiary requirements, heightened scrutiny, and uncertainty as to what standard to apply will delay adjudications, add to the backlog, and result in inconsistent court adjudications.

*Response:* Comments regarding the manner in which EOIR will assess public charge inadmissibility are beyond the scope of DHS's rule. DHS's rule pertains to DHS's public charge inadmissibility determinations for applicants seeking admission to the United States and for applicants seeking adjustment of status. If DHS denies an adjustment of status application and places the applicant into removal proceedings, the alien may renew the adjustment of status application before an immigration judge unless the immigration judge does not have jurisdiction over the adjustment application.[801] DHS has no authority over EOIR's inadmissibility determinations.

DHS notes that all inadmissibility determinations are made on a case-by-case basis and depend on the facts and circumstances, as well as the available evidence, in each case. As such, it is impossible to anticipate the arguments that might be made or the evidence that might be submitted in support of a charge of inadmissibility. However, as noted above, under section 291 of the Act, 8 U.S.C. 1361, the burden of proof is on an applicant for admission to establish that he or she is not inadmissible to the United States under any provision of the Act. Similarly, under section 240(c)(2)(A) of the Act, 8 U.S.C. 1229a(c)(2)(A), an applicant for admission in removal proceedings has the burden of establishing that he or she is clearly and beyond doubt entitled to

---

[798] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51135 (proposed Oct. 10, 2018).

[799] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51134 (proposed Oct. 10, 2018).

[800] *See* INA section 237(a)(5), 8 U.S.C. 1227(a)(5).

[801] 8 CFR 245.2(a)(5)(ii) and 8 CFR 1245.2(a)(1).

**Exhibit A**

be admitted and is not inadmissible under section 212 of the Act, 8 U.S.C. 1182. As noted above, DHS believes that concerns about DOJ's adjudication of cases pending before immigration courts, including immigration court backlogs, are more appropriately addressed by DOJ in the context of their public charge rulemaking.

## V. Public Comments and Responses to the NPRM's Statutory and Regulatory Requirements Section

### 1. Comments on Costs and Benefits

#### a. Population Seeking Extension of Stay or Change of Status

*Comment:* Commenters stated the rule will have a disproportionate impact on South Asian immigrants seeking an extension of stay or change of status, stating that more than 550,000 from South Asian countries lawfully reside in the United States. Particularly, a commenter states that the rule will have a detrimental impact because it requires applicants for an extension or a change of status completing the Form I–129 or Form I–539 to complete an additional Form I–944.

*Response:* DHS appreciates the commenters' concerns regarding the impact this rule will have specifically on South Asian immigrants. DHS does not believe that the rule would impact all of the 550,000 aliens from South Asian countries that the commenter references, as it is unclear that all aliens from these countries would apply for an extension of stay or change of status. In addition, after reviewing the comments, DHS removed the requirement that individuals must establish that they are not likely to receive public benefits by submitting Form I–944. Under the revised standard, aliens seeking to change or extend their nonimmigrant status will have to demonstrate that they have not received any public benefit since obtaining the nonimmigrant status the alien is seeking to extend or change, as defined in 8 CFR 212.21, for more than 12 months, in the aggregate, within a 36-month period.

However, to the extent that South Asians may seek extension of stay or change of status in large numbers given their percentage of total foreign nationals present in the United States, the public benefit condition does not have a disparate impact that is "unexplainable on grounds other than" national origin.[802] Rather, under this rule, all applicants for extension of stay and change of status, regardless of national origin, will be required to demonstrate that they have not received, since obtaining the nonimmigrant status they are seeking to extend or change, any public benefit, as defined in 8 CFR 212.21(b), for more than 12 months, in the aggregate, within a 36-month period. Although this rule may impact aliens from South Asian countries to a larger extent solely because they account for a larger percentage of foreign nationals who may apply for an extension of stay or change of status, DHS did not add the public benefits condition to extension of stay and change of status applications in order to specifically target aliens from South Asian countries or for any other discriminatory purpose. Instead, in including the public benefits condition, DHS is seeking to ensure that aliens present in the United States do not depend on public benefits to meet their needs.

#### b. Other Comments on Affected Population

*Comment:* Multiple commenters stated that if the rule is finalized it could negatively impact between 24 and 26 million immigrants and their family members. Commenters stated that this estimate was based on a study that determined the number of aliens and their family members with incomes below 250 percent of FPG. Another commenter stated that between 22.2 and 41.1 million noncitizens and their family members could be impacted by the rule, and that out of this population, an estimated 4.9 million legal immigrants would lose healthcare coverage. Other commenters estimated that nearly 40 percent of individuals who sought adjustment of status last year (380,000 of 1.1 million, according to the commenters) would be subject to a public charge determination.

A few commenters stated that the rule could increase the number of immigrants that would be considered a public charge from the current three percent to 47 percent. Other commenters argued the rule could reduce naturalization overall because immigrants would be deterred from adjusting status. Another commenter stated that DHS has not indicated an estimate of the number of noncitizens that will be denied admissibility under the rule.

*Response:* DHS appreciates the comments regarding the potential negative effects of the rule and the number of individuals who may be affected. The study the commenters cited estimated that 24 million to 26 million aliens and their family members would be affected by the rule's potential chilling effect, *i.e.*, a circumstance under which the rule results in fear and confusion among aliens, who therefore voluntarily disenroll from or forgo enrollment in public benefits.[803] However, the study notes that most of the individuals who may experience a chilling effect are those who will not be subject to a public charge inadmissibility determination. DHS acknowledges that some individuals may disenroll or forego enrollment in public benefits programs even though they are not directly regulated by this rule. DHS has provided an estimate of the number of individuals that may choose to disenroll or forego enrollment due to the final rule, but it is unclear how long such individuals would remain disenrolled or forego enrollment.

As shown in the economic analysis of this rule, DHS estimates that the total population seeking to adjust status that will be subject to a public charge review for inadmissibility is about 382,264 annually. Further, DHS estimates that about 324,438 individuals who are members of households with foreign-born non-citizens and about 9,632 households with at least one foreign-born non-citizen will choose to disenroll from or forego enrollment in a public benefits program, based on a 2.5 percent rate of disenrollment or foregone enrollment.

Moreover, DHS notes that this rule does not force individuals who are eligible for public benefits to disenroll or forego enrollment in such benefits programs and acknowledges that those who choose to disenroll may need to rely on other means of support within their family or community. Nonetheless, through this rule, DHS seeks to better ensure that applicants for admission to the United States and applicants for adjustment of status who are subject to the public charge ground of inadmissibility are self-sufficient, *i.e.*, do not depend on public resources to meet their needs, but rely on their own capabilities and the resources of their family, sponsor, and private organizations.

*Comment:* Numerous commenters focused on the rule's impact on children, with some providing estimates of the number of impacted children. These include estimates that one in four children have at least one foreign-born parent, between nine and 10 million children who are U.S. citizens born of immigrant parents would be impacted by the rule, and that approximately 18.4 million children live in immigrant families and approximately 16 million

---

[802] *Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

[803] *See* Fiscal Policy Institute, "How a Trump Rule's Chilling Effect Will Harm the U.S." Oct. 10, 2018. Available at *http://fiscalpolicy.org/wp-content/uploads/2018/10/US-Impact-of-Public-Charge.pdf*, (last visited May 21, 2019).

**Exhibit A**

of those children were born in the United States. Other commenters noted estimates that approximately 90 percent of the children of foreign-born parents in the United States are citizens of the United States. Many commenters estimated that 45 percent of children who recently became permanent residents of the United States could have multiple negative factors that could prevent adjustment of status. Some commenters noted that approximately 14 million children enrolled in CHIP live in a household with at least one immigrant parent. Many commenters noted the support that public benefits programs, including Medicaid and other health services as well as nutrition assistance, provide for individuals and families, often pointing to the support these programs provide to children. Some commenters stated the rule would have negative consequences on families and "grand families," including family separation.

*Response:* DHS refers the reader to DHS's response regarding Potential Disenrollment Impacts in section III.D.5 of this preamble. With respect to comments that specifically referenced DHS's initial regulatory impact analysis, DHS notes that in consideration of the comments, it has revised the analysis for this final rule to include a range of potential disenrollment impacts.

*Comment:* Many commenters stated the rule would have a negative effect on low-wage workers with some stating it would reduce economic mobility and reduce the ability to support families. Commenters noted workers in specific industries, such as healthcare, construction, hospitality, agriculture, and recreation, would be negatively affected by the rule, as would those who benefit from these industries.

*Response:* DHS reiterates that the goal of this regulation is to ensure that aliens who are admitted to the United States, adjust status, or obtain extension of stay or change of status, are self-sufficient and do not depend on public benefits. This rule does not aim to reduce economic mobility or the ability to support families, but rather aims to do the opposite, by ensuring that those families who enter or remain in the United States are self-sufficient.

*Comment:* A commenter states the projected annual average of adjustment applicants subject to public charge review is underestimated. The commenter suggested using the publicly available USCIS datasets titled "Data Set: All USCIS Application and Petition Form Types," "All USCIS Application and Petition Form Types," and "Number of Service-wide Forms by Fiscal Year To-Date, Quarter, and Form

Status," rather than using internal data or data from approvals.

*Response:* DHS does not have historical data to serve as a basis of how many applicants currently are subject to a negative public charge determination or how many are ultimately denied admission due to negative factors. Additionally, DHS notes that we use data from internal and external sources as appropriate, and ensures that all data are current, valid, reliable, and accurate. For this economic analysis, DHS used publicly available data in various years of DHS statistical reports, "Yearbook of Immigration Statistics," which are thoroughly vetted through the agency.[804] DHS used these data not only because of their quality, but because they provide the detailed classifications of those adjusting status to determine those who are exempt from inadmissibility based on the public charge ground and those who are not. Additionally, the USCIS data that the commenter cites does not provide enough detail to show the visa classifications of applicants for admission and adjustment of status. The information is necessary for DHS to tailor the analysis to those who are subject to the inadmissibility based on the public charge ground. The data cited only provide aggregate receipt totals whereby it is not possible to remove individuals from the population count who are exempt from a public charge review of inadmissibility. As the data used for the analysis considers all applicants who obtained lawful permanent resident status, the estimated number of individuals who disenroll or forego enrollment due to the rule is likely overestimated.

DHS notes that in the data cited by the commenter, there were approximately 567,640 applications for adjustment of status annually and about 532,887 approvals annually, based on the 5-year average number of application received during the period fiscal year 2012 to 2016.[805] The data the commenter cites only presents data in the broad categories of adjustments, including family-based, employment-based, asylum, and refugee, among others. In general, applicants in family-based and employment-based classifications will be subject to a public charge review of inadmissibility, while

applicants in asylum, refugee, and other classifications that are exempt from a public charge review. After removing the categories that are exempt from the data the commenter cited, there were approximately 417,390 applications for adjustment of status annually and about 388,724 approvals annually.

By contrast, the total population in the dataset DHS uses in its economic analysis (including those who are exempt from public charge) is about 544,246 lawful permanent resident approvals annually. After removing the classifications that are exempt from a public charge review of inadmissibility, DHS estimates approximately 382,264 law approvals annually. Thus, the difference between the data cited by the commenter that uses receipts with general categories of applicants that are exempt from a public charge review of inadmissibility and the approvals data DHS used in its analysis is approximately 35,126 applicants annually.

*Comment:* A commenter indicated that the NPRM fails to provide data regarding the specific impact it might have on the individual, beyond the opportunity cost of time taken to familiarize oneself with the changes in policies and the time taken to accurately fill out new forms.

*Response:* DHS provides the direct costs of this rule for individuals, which include the familiarization costs of the rule and the costs associated with filling out forms as well as any new or adjusted form fees. The commenter did not provide DHS with any specific data or additional costs for consideration. Additionally, the economic analysis of this final rule discusses several indirect impacts that are likely to occur because of the final regulatory changes in order to provide a more thorough overview of the costs of this rule. However, indirect costs are less certain and more variable, therefore making it more difficult to reliably estimate what those costs may be. The long term impacts are not known at this time.

c. Determination of Inadmissibility Based on Public Charge Grounds

*Comment:* A commenter noted that the cost estimates of filing Form I–485, Form I–693, and Form I–912 should not be considered as new and additional costs.

*Response:* DHS presents these forms and costs to establish the baseline for this analysis. The Office of Management and Budget (OMB) Circular A–4 directs agencies to include differences from the baseline as costs, benefits, or transfers in the analysis of the rule. DHS also provides estimates of the additional

---

[804] *See* Dept. of Homeland Security. *Yearbook of Immigration Statistics.* Available at: *https:// www.dhs.gov/immigration-statistics/yearbook* (last visited July 26, 2019).

[805] DHS notes that using the 5-year average over the period fiscal year 2012 to 2016 is consistent with the economic analysis that accompanies this rule, which can be found in the rule docket at *www.regulations.gov.*

**Exhibit A**

costs associated with the rule's changes to some of these forms.

### d. Other Comments on Baseline Estimates

*Comment:* A commenter stated that the rule incorrectly implies there is rampant abuse of public benefits by immigrants. The commenter cites the PRWORA and a Cato Institute working paper to note which immigrants have access to Federal public benefit programs, those who are not eligible for these programs, and who is likely to use certain public benefit programs compared to native born or naturalized citizens.

*Response:* DHS did not intentionally use language that would imply abuse of public benefits. DHS acknowledges the provisions in PRWORA that limit public assistance to eligible classes of aliens and confirms that this regulation is consistent with PRWORA. The Cato Institute working paper, which is based on Census data (and the Medical Expenditure Panel Survey), concludes that low-income non-citizen immigrants are less likely to receive public benefits than low-income native-born citizens and that the value of benefits received per recipient is less for immigrant groups.[806] These findings are not inconsistent with this final rule.

### e. Costs to Applicants To Adjust Status

*Comment:* Many commenters remarked the impact the rule would have on applicants who may apply to adjust status. One individual commenter stated that, given the overall objectives of this rule, the estimated increased cost to immigrants seeking to adjust their status and economic loss which might represent a significant barrier to filing the application. The commenter stated that such a barrier might in fact suit the agency's goals and therefore represent a benefit. The commenter stated that greater concern are the costs borne by existing resident aliens, with some existing status, who are not the target of the rule and yet stand to be affected by it significantly. The commenter suggested a careful review should be conducted to ensure that this impact on a non-target group of people is warranted, or weigh whether this group should be forced to file all or some of the new forms.

*Response:* DHS agrees that there are benefits to this rule that justify the new costs it will impose. DHS does not

consider the estimated opportunity cost of time for filling out the Form I–944 to be a ''benefit'' of the rule. DHS estimated the costs of this rule on those seeking to adjust status, or pursuing extension of stay or change of status. DHS also notes that costs and/or benefits of a rule are generally estimated from the perspective of what the societal costs and/or benefits of the rule will be. We have reviewed the data provided by commenters and where possible quantified the indirect impacts of the rule. Where quantification was not possible, the economic analysis provides a qualitative discussion of indirect impacts that might result due to this rule. To be clear, aliens who are already lawful permanent residents of the United States are not applying for adjustment of status, extension of stay, or change of status, and therefore generally, will not be directly affected by the rule. Elsewhere in this preamble, DHS addresses the suggestion that DHS apply the rule differently to those who are already in the United States, as compared to those who seek admission from abroad. The Form I–944 is intended to apply to all aliens who are subject to the public charge ground of inadmissibility and who apply for adjustment of status before USCIS.

*Comment:* One commenter stated that the rule changes are intended to prevent legal immigrants from applying to adjust status to lawful permanent resident as the fee increases are enormous and the bureaucratic hurdles outrageous.

*Response:* DHS disagrees the rule is intended to prevent eligible individuals from adjusting status to that of a lawful permanent resident. Rather, the rule is intended to better ensure that individuals seeking admission or adjustment of status are able to demonstrate that they are self-sufficient. DHS believes that the benefits to this rule justify the new costs it will impose. Where possible, DHS quantified the cost of completing the new forms.

### f. Lack of Clarity

*Comment:* Multiple commenters noted costs related to a lack of clarity and certainty around strongly positive and negative factors. One commenter noted this lack of clarity would make estimating compliance costs difficult. Another commenter wrote that the form is highly confusing, because it conflates negative consideration of non-monetary benefits if received for more than two months in the aggregate within a 36-month period, and lacks questions seeking to elicit factors that would provide a basis for a positive finding.

*Response:* DHS agrees that it is unable to quantify the full compliance costs of

this rule at this time. The Form I–944 is meant for the alien to provide information about the factors, which an immigration officer would then review to determine whether the alien is likely to become a public charge at any time in the future. The form has been updated for clarity.

*Comment:* Several commenters noted that applicants may incur additional costs as a result of having to pay for a credit report, an appraisal for a home, and retaining an attorney or accredited representative, and that applicants will need to expend time and effort to gather all documentation and estimate debts and assets from a variety of sources.

*Response:* DHS notes that applicants may incur additional costs associated with fulfilling the requirements of completing Form I–944 such as obtaining a credit report or appraisal for a home and includes theses costs in the economic analysis, where possible. The economic analysis that accompanies this rule can be found in the rule docket at *www.regulations.gov.* Completion of Form I–944, which includes gathering all necessary evidence, does entail time and cost burdens. DHS reported estimated time and cost burdens in the NPRM and in this final rule in compliance with the PRA.

*Comment:* A commenter stated that employers will likely not be able to prepare Form I–944 on their employees' behalf like more general immigration forms due to sensitive financial data requested.

*Response:* DHS has revised the public benefit condition for extension of stay and change of status, such that officer will not issue an RFE for the Form I–944 in that context. No employers will be required to complete the Form I–944.

*Comment:* One commenter stated the rule may discourage nonimmigrants from coming to or remaining in the United States, regardless of their financial status, and that the rule will reinforce the view that the United States has become an undesirable destination, damaging the nation's status as a welcoming country, and could deprive the U.S. economy of a substantial amount of tourism.

*Response:* The commenter did not provide evidence or sources to support the claim that the rule will discourage nonimmigrants from visiting, studying, or working in the United States. As stated above, this rule is intended to better ensure that aliens inside the United States ''do not depend on public resources to meet their needs, but rather rely on their own capabilities and the

---

[806] The Use of Public Assistance Benefits by Citizens and Non-Citizen Immigrants in the United States, Cato Institute Working Paper; Leighton Ku and Brian Bruen, February 19, 2013. *https://object.cato.org/sites/cato.org/files/pubs/pdf/workingpaper-13__1.pdf* (last visited July 26, 2019).

**Exhibit A**

resources of their families, their sponsors, and private organizations.''[807]

*Comment:* A commenter stated that an immigration service provider would need to develop expertise in all public benefit programs applicants may have used in any state where the applicant resided, that it will be virtually impossible for people to obtain proof that they did not trigger a negative factor for public charge test, and that their group will likely invest $500,000 to $1 million in trainings to assist the legal and service provider sector to understand this change, although the commenter stated that it still would not be able to advise with any certainty.

*Response:* The commenter did not explain how it developed the estimated training costs of $500,000 to $1 million. As discussed above, DHS will train and provide internal guidance to USCIS officials processing these forms so they can accurately adjudicate cases. DHS also notes that it considered the costs presented by commenters and provided estimates for additional indirect costs that might result from this rule in the RIA.

*Comment:* One commenter indicated there was no justification for imposing compliance costs on every alien seeking to adjust status, or on substantial numbers of nonimmigrants seeking routine extensions of status, even where nothing in that person's background or circumstances suggests the prospect that the public charge ground of inadmissibility might be an issue.

*Response:* DHS believes that the questions posed in the I–944 are relevant and necessary for the public charge inadmissibility determination and allows the alien an opportunity to provide all information regarding the factors as discussed in the rule. DHS reiterates that the public charge inadmissibility ground does not apply to those seeking a change of status or extension of stay. Additionally, DHS has decided against asking nonimmigrants seeking to extend or change such status to submit Form I–944. DHS notes that those categories of aliens exempt from the public charge inadmissibility ground by statute face no additional compliance costs as a result of this rule.

g. Other Comments on Costs to Applicants

*Comment:* One commenter stated that the agency acknowledges that most individuals this rule applies to would be making close to the Federal minimum wage of $7.25 an hour. The commenter stated that the agency's decision to base its estimates of

opportunity cost of time on the mean average for all occupations ($24.35 per hour) instead of the mean national minimum wage ($10.66 per hour) suggests ''a desire to minimize the negative impact of the proposed rule by offsetting the negative impact with what appears to be a net positive, despite the analyzed wage applying to only a small segment of the population that this proposed rule seeks to reach.'' Another commenter stated that USCIS should consider using a more varied rate for calculated opportunity costs. The commenter further stated that the RIA uses $10.66 an hour, but many individuals affected by the rule may have a higher hourly rate.

*Response:* DHS does not understand the commenter's arguments regarding minimizing the negative impact of the proposed rule. Where appropriate and based on the population of focus, DHS uses various wage rates to estimate opportunity costs of time. DHS uses the average hourly wage for all occupations ($24.34 per hour plus benefits) to estimate the opportunity cost of time for some, not all, populations in the economic analysis. Populations for which this hourly wage is applicable include those submitting an affidavit of support for an immigrant seeking to adjust status and those requesting extension of stay or change of status. For these populations, DHS assumes that individuals are dispersed throughout the various occupational groups and industry sectors of the U.S. economy. Therefore, DHS calculates the average total rate of compensation as $35.78 per hour, where the mean hourly wage is $24.34 per hour worked and average benefits are $11.46 per hour.[808][809] As noted in the economic analysis of the rule, DHS generally uses $10.66 per hour ($7.25 Federal minimum wage base plus $3.41 weighted average benefits) as a reasonable proxy of time valuation to estimate the opportunity costs of time for individuals who are applying for adjustment of status and must be reviewed for determination of inadmissibility based on public charge grounds.[810] DHS also uses $10.66 per

hour to estimate the opportunity cost of time for individuals who cannot, or choose not to, participate in the labor market as these individuals incur opportunity costs and/or assign valuation in deciding how to allocate their time. Moreover, this analysis uses the Federal minimum wage rate since approximately 80 percent of the total number of individuals who obtained lawful permanent resident status were in a class of admission under family-sponsored preferences and other non-employment-based classifications such as diversity, refugees and asylees, and parolees.[811] Moreover, approximately 70 percent of the total number of individuals who obtained lawful permanent resident status were in a class of admission that were also subject to the public charge inadmissibility determination. Therefore, DHS assumes many of these applicants hold positions in occupations that are likely to pay around the Federal minimum wage.

*Comment:* There were a number of other general comments on costs and potential burdens to applicants:

• One commenter stated that the costs and fees imposed on applicants could burden non-citizens and require them to turn to public assistance programs as a result.

• Another commenter stated that USCIS did not consider ''departure costs'' such as plane tickets or broken leases/contracts for individuals that will need to leave the country due to the NPRM's provisions.

• A commenter stated that the NPRM places a significant burden on community organizations, requiring them to become experts on requirements to explain them to the community.

• Another commenter stated that NPRM would lead to a substantial increase in general legal costs related to applications citing a figure of $40 million for every 100,000 adjustments of status or immigrant visa applications.

*Response:* DHS appreciates comments regarding costs to applicants and the potential burdens that this rule may impose on those seeking immigration benefits. DHS notes that the purpose of this rule is to better ensure that aliens subject to the public charge inadmissibility ground are self-sufficient, *i.e.,* do not depend on public resources to meet their needs, and rely on their own capabilities, as well as the resources of family members, sponsors,

---

[807] 8 U.S.C. 1601(2)(A).

[808] The national mean hourly wage across all occupations is reported to be $24.34. *See* Occupational Employment and Wage Estimates United States. May 2017. Department of Labor, BLS, Occupational Employment Statistics program; *available at https://www.bls.gov/oes/2017/may/oes_nat.htm* (last visited July 26, 2019).

[809] The calculation of the weighted mean hourly wage for applicants: $24.34 per hour * 1.47 = $35.779 = $35.78 (rounded) per hour.

[810] *See* 29 U.S.C. 206. *See also* U.S. Department of Labor, Wage and Hour Division. The minimum wage in effect as of May 24, 2018. Available at *https://www.dol.gov/general/topic/wages/minimumwage* (last visited July 26, 2019).

[811] *See* United States Department of Homeland Security. Yearbook of Immigration Statistics: 2016, Table 7. Washington, DC, U.S. Department of Homeland Security, Office of Immigration Statistics, 2017. Available at *https://www.dhs.gov/immigration-statistics/yearbook/2016* (last visited July 26, 2019).

**Exhibit A**

and private organizations.[812] Moreover, DHS sets the fees associated with requesting immigration benefits as necessary to recover the full operating costs associated with administering the nation's lawful immigration system, safeguarding its integrity, and efficiently and fairly adjudicating immigration benefit requests.

DHS appreciates receiving comments regarding the additional burden this rule imposes on community organizations, requiring them to become experts on the requirements in the rule to explain them to the community. DHS acknowledges that the final rule will add new direct and indirect impacts on various entities and individuals associated with regulatory familiarization with the provisions of the rule. Familiarization costs involve the time spent reading the details of a rule to understand its changes. To the extent that an individual or entity directly regulated by the rule incurs familiarization costs, those familiarization costs are a direct cost of the rule. In addition to those individuals or entities the rule directly regulates, a wide variety of other entities would likely choose to read and understand the rule and, therefore, would incur familiarization costs. For example, immigration lawyers, immigration advocacy groups, health care providers of all types, non-profit organizations, non-governmental organizations, and religious organizations, among others, may need or want to become familiar with the provisions of this final rule. DHS believes such non-profit organizations and other advocacy groups might choose to read the rule in order to provide information to those foreign-born non-citizens that might be affected by a reduction in Federal and state transfer payments. Familiarization costs incurred by those not directly regulated are indirect costs such as those listed. DHS estimates the time that would be necessary to read this final rule would be approximately 16 to 20 hours per person, resulting in opportunity costs of time. Additionally, an entity, such as a non-profit or advocacy group, may have more than one person that reads the rule.

With regard to USCIS' consideration of "departure costs" for individuals who must leave the United States as a consequence of a public charge inadmissibility determination, DHS agrees that some people may be required to depart the United States due to the requirements of this rule. However, DHS is unable to quantify the departure costs listed by the commenter as we do not

have enough information on the number of immigrants who would incur departure costs nor the amount that each immigrant would incur.

DHS appreciates comments asserting that the rule would lead to a substantial increase in general legal costs related to applications of around $40 million per 100,000 adjustment of status or immigrant visa applications. DHS notes that the estimated costs of this rule are based on the estimated populations for relevant forms and the requirements for filing those forms, including any applicable filing fees, opportunity costs of time, travel costs for fulfilling a filing requirement such as submitting biometrics information, among other requirements. DHS has updated the economic analysis to account for additional legal costs as some applicants may retain a lawyer for help in filling out and filing the forms.

With respect to the comment that this rule will also impact legal costs associated with filing applications for immigrant visas, as noted above, DHS has estimated the costs for the populations that are directly regulated by this rule—applicants for adjustment of status, and those seeking change of status or extension of stay. DHS is unable to estimate costs and benefits associated with applicants for immigrant visas filed with DOS.

*Comment:* An individual commenter wrote that if USCIS took on credit score reporting costs from the beginning of the process it would lower the cost burden for applicants.

*Response:* It appears that this commenter misunderstands the credit report and score requirement in this rule and believes that DHS will reimburse the cost of obtaining a credit score and/or report associated with the public charge inadmissibility determination. However, under this rule, DHS will not reimburse applicants for costs incurred as a result of obtaining a credit score and/or report to individuals. Aliens seeking immigration benefits who are subject to public charge inadmissibility will bear the cost of obtaining a credit score and/or report solely, as described in the final rule and economic analysis. DHS notes that an applicant may obtain a credit report for free, but in its estimates DHS assumed that applicants would pay for the report.

### h. Costs Related to Public Charge Bond

*Comment:* One commenter noted that the public charge bond provision in the NPRM would increase the overall costs for applicants, and that USCIS has not provided sufficient evidence that public charge bonds will achieve the

administration's objective of ensuring immigrants remain self-sufficient.

The commenter indicated that USCIS has failed to adequately document and justify the costs related to how many people will secure public charge bonds; costs of bond for those using them to overcome the public charge definition; costs imposed on families; cost imposed on families that fall on hard times with a public charge bond; upfront and ongoing fees, bond cancellation fees, and fees related to ending a bond; benefits to bond surety companies; and costs to state and localities related to bonds.

A commenter wrote that the bond-related fees will never compensate for the additional administrative costs incurred by operation of the program, and these fees themselves will make the program cost prohibitive for many applicants and their families. Similarly, a commenter wrote that USCIS anticipates that the $25 filing fee for Forms I–945 and I–356 would cover the necessary administrative costs, but then later in the analysis suggests the fee would not fully recover intake costs. Another commenter wrote that the public bond cost should be subtracted from gross costs of the rule as it does not qualify as a marginal benefit.

*Response:* Although DHS agrees that there may be a cost associated a bond an alien choose to submit (if eligible), as described in the economic analysis, DHS disagrees that the amount of the bond was not properly justified. DHS had generally based the amount on the original regulatory amount adjusted for inflation. However, in order to more precisely match the effect of prior regulations, DHS has decided to have the minimum amount of the bond to be the exact amount as adjusted for inflation. The current *8 CFR 213.1* refers to a bond amount of at least $1,000. *8 CFR 213.1* was promulgated in July of 1964. This provision has not been updated and inflation has never been accounted to represent present dollar values. Simply adjusting the amount for inflation using CPI–U would bring the bond floor in June 2018 to about $8,100.[813]

Once the alien has been determined to likely to become a public charge, and provided the opportunity to submit a bond, the bond acts a deterrent and penalty if the bond is breach. Whether the public charge bonds will achieve the administration's objective of ensuring immigrants remain self-sufficient is not

---

[812] *See* 8 U.S.C. 1601(1), (2)(A).

[813] Calculation: Annual average for 1st half of 2018 (250.089)/annual average for 1964 (31) = 8.1; CPI–U adjusted present dollar amount = $1,000 * 8.1 = $8,100.

**Exhibit A**

a necessary consideration as DHS would have already determine that the alien is likely to become a public charge and would be giving the alien the opportunity to be admitted with the condition that he or she not receive public benefits. Further, the bond provides was establish by Congress and therefore a requirement for DHS to consider affording the alien an opportunity to provide a bond even though he or she may be likely to become a public charge.[814]

When posting a surety bond, an individual generally would pay between 1 to 15 percent of the bond amount for a surety company to post a bond.[815] The percentage that an individual must pay may be dependent on the individual's credit score where those with higher credit scores would be required to pay a lower percentage of the bond to be posted. DHS notes that an individual may be allowed to submit cash or cash equivalent, such as a cashier's check or money order as another possible option for securing a public charge bond.

DHS will charge a filing fee of $25.00 to submit a public charge bond using Form I–945 and $25.00 to request cancellation of a public charge bond fee using Form I–356, which would cover the estimated administrative costs of processing these forms. Where possible, DHS sets fees at levels sufficient to cover the full cost of the corresponding services associated with fairly and efficiently adjudicating immigration benefit requests.[816] Congress has

814 *See* INA section 213, 8 U.S.C. 1183.

815 *See also* Surety Bond Authority, Frequently Asked Questions about Surety Bonds, *https:// suretybondauthority.com/frequently-asked-questions/* (last visited May 8, 2019) and Surety Bond Authority, Learn More, *https:// suretybondauthority.com/learn-more/* (last visited May 8, 2019). DHS notes that the company cited is for informational purposes only.

816 *See* INA section 286(m), 8 U.S.C. 1356(m), provides broader fee-setting authority and is an exception from the stricter costs-for-services-rendered requirements of the Independent Offices Appropriations Act, 1952, 31 U.S.C. 9701(c) (IOAA). *See Seafarers Int'l Union of N. Am.* v. *U.S. Coast Guard,* 81 F.3d 179 (DC Cir. 1996) (IOAA provides that expenses incurred by agency to serve some independent public interest cannot be included in cost basis for a user fee, although agency is not prohibited from charging applicant full cost of services rendered to applicant which also results in some incidental public benefits). Congress initially enacted immigration fee authority under the IOAA. *See Ayuda, Inc.* v. *Attorney General,* 848 F.2d 1297 (DC Cir. 1988). Congress thereafter amended the relevant provision of law to require deposit of the receipts into the separate Immigration Examinations Fee Account of the Treasury as offsetting receipts to fund operations, and broadened the fee-setting authority. Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1991, Public Law 101–515, section 210(d), 104 Stat. 2101, 2111 (Nov. 5, 1990). Additional values are considered in setting Immigration Examinations

provided that USCIS may set fees for providing adjudication and naturalization services at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants.[817] Moreover, USCIS conducts biennial reviews of the fee amounts charged for each immigration and naturalization benefit request. Fees are collected from individuals and entities filing immigration benefit requests and are deposited into IEFA. Those funds then are used to cost of adjudicating immigration benefit requests, including those provided without charge to refugee, asylum, and certain other applicants. The primary objective of the fee review is to determine whether current immigration and naturalization benefit fees will generate sufficient revenue to fund the anticipated operating costs associated with administering the nation's legal immigration system. Therefore, if the results of this review indicate that current fee levels are insufficient to recover the full cost of operations, DHS may propose to adjust USCIS fees. For the forms used in the newly established public charge bond process, should DHS determine that the fees set for these forms are not sufficient to cover the full cost of the associated services adjudicating these immigration benefit requests, the agency will propose to adjust these form fees.

A legal requirement to provide a monetized total cost estimate for this rule does not exist. The public charge bond process is newly established and, therefore, historical data is not available. DHS explained in the NPRM the many factors that were not within the control of DHS that would influence total costs. To the extent possible DHS quantified the costs of the bond provision, for example DHS estimates that approximately 960 aliens will be eligible to file for a public charge bond annually using Form I–945 and approximately 25 aliens will request to cancel a public charge bond annually using Form I–356. DHS does not have enough information to estimate the costs imposed on families that fall on hard times with a public charge bond, upfront and ongoing fees, benefits to bond surety companies, and costs to state and localities related to bonds.

With regard to the comment that the public bond cost should be subtracted from gross costs of the rule as it does not

Fee Account fees that would not be considered in setting fees under the IOAA. *See* 72 FR at 29866–7.

817 *See* INA section 286(m), 8 U.S.C. 1356(m).

qualify as a marginal benefit, DHS notes that the public charge bond process is being newly established and, therefore, any costs associated with the bond process are considered to be new costs to the public. Additionally, should DHS determine that the fees set for the relevant forms related to the public charge review process, including those for the bond process, are not sufficient to cover the full cost of the associated services adjudicating immigration benefit requests, the agency will propose to adjust these form fees in a subsequent fee rule. DHS sets the fees associated with requesting immigration benefits as necessary to recover the full operating costs associated with administering the nation's lawful immigration system, safeguarding its integrity, and efficiently and fairly adjudicating immigration benefit requests. DHS also notes that the new costs estimated for the public charge bond process are considered costs, not benefits. As shown in the economic analysis, which can be found in the Public Charge final rule docket at *www.regulations.gov,* DHS estimates the baseline cost of the rule and then estimates the costs and benefits of the policy changes that the final rule will implement. The difference between the estimated current baseline costs and benefits and the estimated costs and benefits of the policy changes are considered to be, and presented as, the new costs and benefits of the final rule.

### j. Costs to U.S. Employers

*Comment:* Many commenters stated that the rule would impose significant compliance costs and administrative burdens on employers that would interfere with hiring and staff retention. Commenters also stated that costs would increase for employers by reducing the supply of low-wage workers and skilled workers. The commenter indicated that the supply of skilled workers could be reduced as non-citizen residents reduce investments in human capital and skilled non-citizens are denied entry or discouraged from seeking entry into the United States. A commenter stated that the analysis does not include the effect on legal immigration to the United States, including how many applicants would be issued RFEs or estimating a potential denial rate. Several commenters stated that the RFE provision could cause potential delays and backlogs causing increased costs to employers. Many commenters stated that the rule change would make it harder for employers to extend H–1B visas or change students from F–1 to H–1B visas. A commenter stated the rule

**Exhibit A**

could lead employers to make their own public charge determinations. Multiple commenters wrote that a broad list of industries would experience a reduction in immigrant labor force or face challenges meeting their labor demand as a result of the rule.

*Response:* DHS disagrees with these commenters concerning the impact on the supply of labor to employers. This rule is not intended to change the composition of the labor market. Employers will still be permitted to seek extensions of stay and change of status for eligible nonimmigrants. Additionally, this rule is not intended to discourage nonimmigrants from seeking to extend their nonimmigrant stays or changing to another nonimmigrant status. Employers will still be permitted to file immigrant visa petitions for potential alien employees, who would still be able to file for adjustment of status. Instead, this rule as it pertains to extension of stay and change of status sets additional conditions, which are intended to better ensure that aliens present in the United States continue to remain self-sufficient for the duration of their nonimmigrant stay. DHS notes that aliens seeking extension of stay and change of status are not subject to the public charge ground of inadmissibility. Instead they are subject only to the condition that the applicant has not received public benefits since obtaining the nonimmigrant status from which he or she seeks to change, as described in 8 CFR 212.21(b) for more than 12 months, in the aggregate, within a 36-month period.

i. Costs Related to Program Changes and Public Inquiries

*Comment:* Several commenters noted that states, localities, universities, and healthcare providers will face the enormous task of reprogramming computer software, redesigning application forms and processes, and other aspects pertaining to benefit programs processes. As an example, a commenter stated that online application portals for public benefits often highlight disclaimers that applying for assistance will not affect immigration status. One commenter stated that in some states like Pennsylvania, individuals can submit an application for healthcare coverage and simultaneously be eligible for Medicaid, CHIP, or SNAP; however the rule will require local authorities to provide new systems to shield applicants from public charge risk. In addition, multiple commenters stated that ''churn'' is associated with higher administrative costs, increased clinic time spent on paperwork and

certification process, and worsened healthcare outcomes.

*Response:* DHS appreciates receiving comments regarding administrative changes that will be needed in response to the rule regarding, for example, reprogramming computer software and redesigning application forms and processing. DHS agrees that some entities may incur costs related to the changes commenters identified and describes these costs in the economic analysis based on the data provided by commenters. However, DHS is unable to determine the entities that will choose to make administrative changes to their business processes.

*Comment:* Many organizations said that states, localities, and healthcare providers will incur increased costs in many unprecedented ways, including handling general inquiries related to the rule, creating public awareness campaigns, providing notice to current participants, retraining and educating staff, hiring additional response staff, and providing aid to partner programs.

Other commenters said that states, localities, healthcare providers, and housing providers will be bombarded with requests from current and former program participants for official documentation verifying that they have not received public benefits during a specific time frame, requiring significant resources in gathering this historical data and responding to these requests while also obeying privacy restrictions and other technical constraints. According to a commenter, many agencies will not have older documentation available in their records, or records will be incomplete or inaccessible. According to a commenter, state and local officials will likely see a significant volume of communication related to questions about eligibility for certain programs and the impact on immigration status.

*Response:* DHS acknowledges that the final rule will add new direct and indirect impacts on various entities and individuals associated with the provisions of the rule. However, in response to the commenters' concerns about the availability of older documentation related to receipt of public benefits, DHS does not agree that the new requirements associated with public charge inadmissibility determinations would pose an unnecessary administrative burden, as DHS has determined that it is necessary to establish a public charge inadmissibility rule. While age and availability of record of public benefits receipts may vary among Federal and State agencies, it is the responsibility of the individual seeking immigration

benefits to provide the required documents and information. Beyond the indirect costs and other economic effects described in the economic analysis of this rule, it is unclear the effect that this rule will have on the entities mentioned by the commenters.

j. Costs Related to States and Local Governments, and Public Benefit-Granting Agencies

*Comment:* A commenter stated that most states have already established their budgets based on expected enrollment in programs such as SNAP and Medicaid. Another commenter wrote that resources for programs such as the USDA Community Eligibility Provision program are allocated based on direct certification data, which is based on SNAP enrollment, and that non-citizens in the program who disenroll based on public charge provisions will cause additional administrative work for the localities to adjust and compensate. Another commenter stated that local governments have already adjusted and planned services based on the location and living situations of immigrant communities that this rule could greatly affect. A commenter wrote that their state's housing investments could be destabilized by the rule.

*Response:* DHS appreciates the comments regarding the effects of the rule on State and local budgets. As discussed above, DHS agrees that some entities, such as State and local governments or other businesses and organizations, would incur costs related to the changes commenters identified. DHS considers these costs qualitatively in the final rule since it is unclear how many entities will choose to make administrative changes to their business processes and what the cost of making such changes will be. DHS notes that, in the economic analysis accompanying this rule, which can be found in the rule docket at *www.regulations.gov*, we estimate the reduction in transfer payments from federal and state governments to certain individuals who receive public benefits and discusses certain indirect impacts that are likely to occur because of the final regulatory changes. These indirect impacts are borne by entities that are not specifically regulated by this final rule, but may incur costs due to changes in behavior caused by this final rule. The primary sources of the reduction in transfer payments from the federal government are the disenrollment or foregone enrollment of individuals in public benefits programs. The primary sources of the consequences and indirect impacts of the final rule are

**Exhibit A**

costs to various entities that the final rule does not directly regulate, such as hospital systems, state agencies, and other organizations that provide public assistance to aliens and their households. Indirect costs associated with this rule include familiarization with the rule for those entities that are not directly regulated but still want to understand the final rule.

The commenter's statement that the rule could destabilize the state's housing investments is unclear. This rule does not directly regulate the availability of Federal housing benefits and how states choose to allocate those funds. Rather, the rule directly regulates only aliens who, at the time of application for admission or adjustment of status, are subject to the public charge inadmissibility ground, as well as aliens seeking extension of stay or change of status who are subject to the public benefits condition on eligibility. DHS is prescribing how it will determine whether an alien is inadmissible because he or she is likely at any time in the future to become a public charge and identifying the types of public benefits that will be considered in the public charge determinations. An alien applying for admission or adjustment of status generally must establish that he or she is not likely at any time in the future to become a public charge.

k. Regulatory Familiarization Costs

*Comment:* Many commenters expressed concerns that NPRM was very complex and therefore would cause confusion, stress, and fear among those directly and indirectly affected by it, including the immigrant community, lawyers, government agencies, educational and social service providers, and community and charitable organizations. Other commenters noted that familiarization costs would be particularly burdensome for applicants with multiple jobs or limited English proficiency, small and medium sized businesses, as well as large complex healthcare providers, groups assisting applicants including advocacy groups and state and local agencies. Some commenters argue that the complexity of the rule would result in almost all applicants needing legal assistance. Other commenters noted that the complexity of the rule, and the resulting confusion, could lead immigrants to face discrimination, receive incorrect legal advice, or forego public benefits even if they are not affected by this rule. Many commenters believe that substantial training and administrative work would be needed in order to provide accurate guidance to immigrant applicants and their families,

specifically mentioned were issues related to education and employment. A commenter stated that state and local officials will incur costs related to not just familiarizing officials with the rule, but also in understanding recommendations, policies, and procedures with the general public. Some commenters said the rule would discourage workforce professionals, such as healthcare professionals and social workers, from providing advice to clients because of the risk of increased liability caused by providing advice beyond these workforce professionals' expertise. Some commenters wrote that USCIS would incur familiarization costs associated with the rule as well as understanding State laws and procedures associated with programs such as Medicaid eligibility. Research organizations suggested that the familiarization costs of eight to 10 hours is an underestimate and should be increased because of time spent on translation, public outreach, training, research, legal consultation, fielding questions, and dealing with the "chilling effect."

*Response:* DHS increased the expected familiarization burden to range between 16 to 20 hours after reviewing the time estimates in response to comments we received. DHS does not quantify the potential population that may incur familiarization costs associated with the rule due to the uncertainty surrounding the estimated number of people that will familiarize themselves with this rule. The net effect this rule will have on the population seeking an adjustment of status in terms of additional assistance sought is not known. However, to the extent possible DHS has incorporated the costs provided by commenters into the economic analysis.

As discussed above, USCIS has a robust stakeholder communication and engagement program that covers all aspects of the agency's operations. This program will engage stakeholders when this rule becomes final to help ensure that applicants for immigration benefits and their representatives fully understand the new rule. With respect to comments about healthcare professionals and social workers being concerned about liability and not providing advice, DHS notes that these professionals can provide information and disseminate that guidance that USCIS will issue to assist individuals understand and comply with this rule, but should not be providing legal advice without being licensed to practice law in the state.

l. Costs to the Federal Government

*Comment:* Several commenters discussed the costs of the rule to the Federal Government. Many commenters said the rule will add new adjudication costs to the Government while increasing the already overstretched and delayed processing and regulatory burden. Many commenters stated that the rule would impose an immense administrative burden on USCIS and require USCIS to conduct individualized public charge determinations and adjudications of Form I–944 for hundreds of thousands of applicants with increased evidentiary requirements, heightened scrutiny, and uncertainty as to what standards will apply. Multiple commenters highlighted the increased administrative burdens to USCIS and other organizations such as DOS, as the rule will require every adjudicator to be trained to apply rules which are already subjective and unclear.

According to a commenter, the increased complexity of applying the public charge definition would lead to increased work for USCIS related to adjudicating appeals. An individual commenter suggested USCIS would face additional costs related to removal proceedings as a result of the rule by requiring it to issue more NTAs. A couple of commenters said public charge assessments of individuals making requests to extend or change nonimmigrant status creates additional and unnecessary administrative burden on USCIS.

*Response:* DHS believes that the burdens associated with improved administration of the public charge ground of inadmissibility, including the expanded information collection, are justified. Adjudicators will be appropriately trained on Form I–944 and will make their determinations in as timely a manner as possible. In addition, DHS does not agree that the new requirements associated with public charge inadmissibility determinations would waste resources and be an unnecessary administrative burden, as DHS has determined that it is necessary to establish a public charge inadmissibility rule. Should DHS determine that the fees set for the relevant forms related to the public charge review process are not sufficient to cover the full cost of the associated services adjudicating immigration benefit requests, the agency will propose to adjust these form fees in a subsequent fee rule. DHS sets the fees associated with requesting immigration benefits as necessary to recover the full operating costs associated with

**Exhibit A**

administering the nation's lawful immigration system, safeguarding its integrity, and efficiently and fairly adjudicating immigration benefit requests. DHS does not believe the costs of additional NTAs will be significant. As discussed above, while the rule may increase USCIS processing times, such is the burden of robust enforcement of the law.

m. Costs to Non-Citizens and Their Communities

*Comment:* A number of commenters highlighted the impact the proposed rule would have on non-citizens and their communities. Commenters stated that the rule holds non-citizen workers responsible for the low wages offered by employers utilizing visa programs, when instead the costs of the public charge determination should be placed on employers.

*Response:* DHS appreciates the comments concerning the impact on noncitizens and their communities. DHS does not agree that this rule holds noncitizen workers responsible for low wages offered by employers using visa programs. DHS also does not agree that employers should incur the costs of the public charge determination. As the alien has the burden of proof of establishing admissibility into the United States, the cost burden is appropriately on the individual seeking the immigration benefit in the United States.

n. Healthcare-Related Costs

*Comment:* A commenter wrote that the rule would increase costs related to general administrative burdens having to manage disenrollment, reenrollment, and inquiries related to the rule. A commenter stated that Medicaid coverage is heavily linked to the economic health of hospitals and, as a result, hospitals could realize significant costs due to the rule. Similarly, a commenter wrote that the rule could see administrative costs and uncompensated care significantly increase. Finally, another commenter wrote about concerns regarding costs related to the privacy of patient data and security as the rule may require USCIS to seize health records.

*Response:* As discussed elsewhere, this rule furthers the Government's interest, as set forth in PRWORA, to minimize the incentive of aliens to attempt to immigrate to the United States due to the availability of public benefits, as well as promote the self-sufficiency of aliens within the United States.[818] DHS addresses the rule's

potential ''chilling effect,'' as well as the eligibility of affected aliens for the designated benefits, elsewhere in the preamble.

DHS appreciates concerns expressed about increasing healthcare costs, worse health outcomes, increased use of emergency rooms, and the economic health of hospitals. As explained in greater detail elsewhere in this rule, DHS has made a number of changes in the final rule itself. DHS has excluded the Medicare Part D LIS, receipt of public benefits by children eligible for acquisition of citizenship, and Medicaid receipt by aliens under the age of 18 from the definition of public benefit in the public charge determination. In addition, DHS is not including CHIP in the public benefit definition. DHS also adopted a simplified, uniform duration standard for public charge determinations for assessing the use of public benefits.

Finally, DHS does not agree that USCIS will ''seize'' health records of patients. Most adjustment of status applicants are already required to undergo an immigration medical examination and submit Form I–693 with their adjustment application. As noted previously, DHS will rely on the medical information provided by civil surgeons on the Form I–693, or report of a panel physician, to assess whether the alien has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization, or that will interfere with the alien's ability to provide and care for himself or herself, to attend school, or to work upon admission or adjustment of status. The data collected on Form I–693 is collected and kept in an alien's administrative record consistent with the Privacy Act and SORN. DHS must comply with the Privacy Act in safeguarding information in the applicable systems of records. As noted on the instructions to Form I–693, consistent with the Privacy Act, DHS may share the information an alien and the civil surgeon provide on Form I–693 with Federal, State, local, and foreign government agencies, and authorized organizations for law enforcement purposes, or in the interest of national security. The civil surgeon may share the results of the immigration medical examination with public health authorities.

o. Housing and Homelessness-Related Costs

*Comment:* Some commenters cited various studies regarding the costs of housing, homelessness, and healthcare. Another commenter referenced research showing that providing access to public

housing to those with serious mental illness would reduce healthcare costs by 24 percent, arguing that housing is pivotal to healthcare. Low-income households with children that pay more than half of their monthly income on rent spend considerably less on other basic necessities—they spend $200 less per month on food, nearly $100 less on transportation, and about $80 less on healthcare. An individual commenter stated that a homeless person on the street may cost more to public service providers and healthcare facilities, such as ambulances, city street clean-up, law enforcement, etc., than the annual cost of providing them housing. The commenter stated that housing is a basic need that provides stability for all things needed to be contributing members of society and that without quality affordable housing, families are forced to pay for unsafe and unsanitary living conditions, which results in negative consequences for society.

A commenter cited studies where more students may experience homelessness under this rule. Commenters stated there is an affordable housing and homelessness crisis across the country that would be exacerbated by this rule, including overcrowding, long wait lists and inundated housing authorities, and make public housing more necessary for immigrants and citizens. A commenter stated that the Government failed to consider a potential increased cost of homelessness to local governments and cited a cost benefit analysis. Commenters stated that they use HCV as additional funding to cover costs and support permanent public housing, arguing that this rule would add to their overall costs. Another commenter stated that even with access to food assistance, 57 percent of households that face food-insecurity are forced to choose between buying enough food and paying for housing. The commenter further stated that due in large part to California's booming economy, there is a significant need for affordable housing in the state. Renters struggle to find affordable housing, particularly in California cities, where the cost of living is higher than the national average (nearly one-third of renter households in California spend at least half of their income on rent). The commenter stated that of the approximately 491,000 low-income households in California that use Federal housing rental assistance, 90 percent include children, the elderly, or the disabled who would be disproportionately impacted by the rule.

*Response:* DHS appreciates the comments regarding the potential effects and costs the rule may have regarding

---

[818] *See* 8 U.S.C. 1601.

**Exhibit A**

housing, homelessness, and healthcare and the citation to various studies that address and estimate these issues. However, in most cases, the studies that commenters reference are not the focus of the NPRM and its economic analysis, but instead look at different populations of interest (*e.g.,* specific metropolitan areas or very low-income individuals/ households), and/or are not generalizable. For example, the commenter who referenced research showing that providing access to public housing to those with serious mental illness would reduce healthcare costs by 24 percent cited a case study that examines the Mercy Maricopa Integrated Care contract for the Phoenix, Arizona area, which is highly localized and not generalizable to the wider U.S. population.

Regarding the effect of this rule on homelessness, this rule does not directly regulate eligibility for Federal housing benefits or other public benefits that individuals who are homeless, or at risk of being homeless, may rely upon. Rather, the rule directly regulates only aliens who, at the time of application for admission or adjustment of status, are subject to the public charge inadmissibility ground, as well as aliens seeking extension of stay or change of status who are subject to the public benefits condition on eligibility.[819] Moreover, this rule does not eliminate funding for public benefits programs. As a result, DHS only estimated the potential effect on individuals who choose to disenroll or forego enrollment in a public benefits program. DHS provides estimates of the amount of the reduction in transfer payments from the Federal and State governments to certain individuals who receive public benefits in the RIA, which can be found in the public docket of this final rule.

*Comment:* A commenter stated that any disenrollment or return of housing assistance will not result in any cost savings to public housing authorities (PHA) or federal programs because the demand for such assistance far outstrips the available assistance. The commenter stated that PHAs will be faced with increased administrative costs given the anticipated disenrollment/new enrollment turnover. As a result, PHAs will have to proceed with processing the next individual on the waiting list, as well as closing out the family that is exiting the program.

Another commenter stated that the DHS estimates of reduce housing assistance payments by $71 million per year is highly problematic. That commenter takes issue with the

assertion of federal savings in housing programs, because HUD rental assistance programs are discretionary programs, not entitlements, and are provided with a fixed amount of funding that falls very far below what is needed to serve all eligible households. The commenter stated that therefore, net transfer payments for housing assistance would remain roughly the same as a result of the proposed rule and would yield no net savings for the Federal Government.

*Response:* DHS appreciates the comment regarding the effect the rule may have on PHAs. The commenter mischaracterizes "cost savings" in their comment to DHS. As DHS shows in the economic analysis of the rule, the effect of disenrollment or foregone enrollment by individuals in public benefits programs are likely to result in a reduction in transfer payments from Federal and State governments to certain individuals who receive public benefits, not a cost savings. Transfer payments are monetary payments from one group to another that do not affect total resources available to society. The reduction in transfer payments are quantified in the transfer payments section of the economic analysis of this rule in accordance with OMB's Circular A–4. However, DHS notes that there is great uncertainty regarding the effects that changes in transfer payments will have on the broader economy and estimating those effects are beyond the scope of this rule.

Additionally, with regard to administrative costs that PHAs may incur due to the rule, DHS agrees that some entities may incur costs, but these costs are considered to be indirect costs of the rule since this rule does not directly regulate these entities and does not require them to make changes to their business processes. DHS considers these indirect costs as qualitative, unquantified effects of the final rule since it is unclear how many entities will choose to make administrative changes to their business processes and the cost of making such changes.

p. Economic Costs

*Comment:* A number of commenters had broad concerns about costs the rule would have on the economy as well as innovation and growth. Commenters wrote that the rule is essentially an unfunded mandate to businesses, nonprofits, and educational organizations with substantial compliance costs. A commenter wrote that the rule would stifle economic risk taking and the entrepreneurial spirit in immigrants, thus costing the American economy over the long term. One

commenter stated that the rule would reduce immigration and hurt the country's economic future given the need for immigrant workers to replenish an increasingly aging population. Similarly, a commenter stated that demographic shifts mean that immigrant communities represented the future of their state, and the rule would significantly harm those communities. A commenter wrote that approximately 20 percent of their local businesses are run by foreign-born individuals and, therefore, the rule would hurt not just non-citizen families, but also local communities.

*Response:* DHS appreciates the comments regarding the potential effect of the rule on the economy, innovation, and growth. Beyond the indirect costs and other economic effects described in the economic analysis of this rule, DHS is unable to determine the effect this rule will have on every economic entity mentioned or all aspects of future economic growth. DHS agrees that there may be effects on the U.S. economy and on individuals seeking immigration benefits. DHS describes the potential economic effects in the economic analysis of this rule, which can be found in the rule docket at *www.regulations.gov.*

However, this rule does not directly regulate businesses, nonprofits, or educational organizations. DHS notes that this rule directly regulates only aliens who, at the time of application for admission, or adjustment of status, are deemed likely at any time in the future to become a public charge or who are seeking extension of stay or change of status.[820] DHS is prescribing how it will determine whether an alien is inadmissible because he or she is likely at any time to become a public charge and identify the types of public benefits that will be considered in the public charge determination or the public benefit condition.

*Comment:* Commenters stated that the number of noncitizens who will be forced to avoid benefits will have a significant impact on the U.S. economy. Commenters quoted cost estimates associated with the rule, including some estimates as high as $164.4 billion. Several commenters quoted an economic impact of $33.8 billion and a loss of 230,000 jobs. Similarly, one commenter stated that the annual income of workers potentially impacted by the rule is $96 billion, and losing these workers would have a $68 billion impact on the economy with $168 billion in damages total. A commenter wrote that the rule would have national

---

[819] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[820] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

**Exhibit A**

effects across a number of sectors and industries in the economy. A commenter wrote that effects of the rule could total between $453 million and $1.3 billion due to various effects of increased poverty, reduced productivity, etc. Another commenter wrote that the rule would result in an increase in healthcare costs for their city of at least $45 million annually.

*Response:* DHS appreciates the comments regarding the impact of the rule on the U.S. economy. DHS does not agree that noncitizens will be forced to avoid benefits. Although individuals may choose to disenroll from or forego enrollment in public benefits programs for which they are eligible, this rule does not, and cannot, require individuals to do so and does not change the eligibility requirements for public benefits. Under the rule, DHS will conduct a public charge inadmissibility determination when an alien seeks an adjustment of status, by evaluating an alien's particular circumstances, including an alien's age; health; family status; assets, resources, and financial status; education and skills; required affidavit of support; and any other factor or circumstance that may warrant consideration in the public charge inadmissibility determination.[821] In addition, DHS will only consider the applicant's own receipt of public benefits.

DHS also appreciates the comments that included cost estimates and the potential effects of the rule on the U.S. economy. DHS agrees that there may be some effects on the U.S. economy and on individuals seeking immigration benefits from the United States. In the economic analysis of this rule, which can be found in the rule docket at *www.regulations.gov,* DHS estimates the direct and indirect costs according to the methodology presented using the best available data; DHS also estimates the amount of the reduction in transfer payments from the Federal Government to individuals who may choose to disenroll from or forego enrollment in a public benefits program.

In response to the commenter stating that the rule will cost as much as $164.4 billion dollars, DHS notes that this estimate is not comparable to the estimates DHS presents in the economic analysis that accompanies this rule, which can be found in the rule docket at *www.regulations.gov.* The $164.4 billion estimated cost of the rule the commenter cites comes from an analysis from New American Economy and is comprised of the total annual income of workers who could be affected by this

rule.[822] In addition, the analysis estimates that there would be about $68 billion in indirect economic effects as part of the estimated $164.4 billion total cost. However, the validity and reliability of the analysis cited by the commenter is unclear as the calculations of the analysis are not presented, which makes it difficult to assess comparability with DHS's economic analysis.

The final rule, under section 3(f)(1) of E.O. 12866, is designated a ''significant regulatory action'' that is economically significant since it is estimated that the final rule would have an annual effect on the economy of $100 million or more (annualized costs are estimated to range from about $89.8 million to $144.4 million). In addition, DHS estimates approximately $2.47 billion for a reduction in transfer payments from the Federal Government and State governments to public benefits recipients who are members of households that include foreign-born non-citizens, which includes the estimated federal- and state-level shares of transfer payments to foreign-born non-citizens. While the commenters mentioned above provided estimates of the costs of the rule, DHS will maintain the cost and transfer payments estimates we presented in the economic analysis of the rule, which can be found in the rule docket at *www.regulations.gov.* Where possible, DHS discusses the costs presented by commenters and provides a range of additional costs that states, cities, businesses and people could incur because of this rule. However, DHS was unable to determine the number of entities and people that would be affected.

*Comment:* Some commenters noted the economic costs the rule would impose on aliens who have low income. One commenter stated that the most significant costs of the rule will be concentrated on the poorest communities in cities with large numbers of immigrants. A commenter wrote that if the Federal Government reduces transfer payments, the costs will be passed onto other entities such as food banks, pantries, religious organizations, etc. According to another commenter, the rule will incur costs to housing providers who will need to be prepared to answer inquiries from tenants and others related to the rule,

and possibly provide materials on request.

*Response:* DHS does not intend the rule to disproportionately affect poor communities. As described elsewhere, the purpose of the rule is to ensure the self-sufficiency of aliens who are subject to the public charge ground of inadmissibility. As described in the economic analysis accompanying this rule, which can be found in the rule docket at *www.regulations.gov,* some may incur indirect costs of the rule. Additionally, the final rule does not force individuals who are eligible for public benefits to disenroll or forego enrolling in public benefits programs and acknowledges that those who choose to disenroll may need to rely on other means of support within their family or community. Individuals may choose to disenroll from or forego enrollment in public benefits programs for which they are eligible, but this rule does not, and cannot, require individuals to do so and does not change the eligibility requirements for public benefits. As such, the Federal Government is not intentionally reducing transfer payments for public benefits programs through this rule, but DHS estimates there is likely to be a reduction in transfer payments from individuals to federal and state governments because a number of individuals may choose to disenroll from or forego enrollment in public benefits program for which they are eligible.

*Comment:* A number of commenters provided input on the cost analysis of the rule provided by USCIS. A commenter wrote that the rule does not attempt to engage with strategies for avoiding the costs imposed by the rule's changes to the public charge inadmissibility determination. A commenter wrote that USCIS did not accurately estimate of the number of people who will disenroll from or forego enrollment in public benefits programs as a result of the rule. The commenter also noted that DHS did not did not monetize the costs of this disenrollment and foregone enrollment; did not account for the costs to the U.S. economy of deeming a greater number of foreign-born noncitizens inadmissible to the country; did not account for the non-financial costs of adverse public charge determinations for affected foreign-born noncitizens; and did not provide any evidence for its low estimate of the rule's familiarization costs. One commenter wrote that the rule acknowledges effects of changes on communities that could be harmful, but it fails to quantify this effect.

---

[821] *See* 8 CFR 212.22.

[822] *See* New American Economy Research Fund, ''*How Proposed Rule Change Could Impact Immigrants and U.S. Economy.*'' Oct. 31, 2018. Available at: *https://research.newamericaneconomy.org/report/economic-impact-of-proposed-rule-change-inadmissibility-on-public-charge-grounds/* (last visited July 26, 2019).

**Exhibit A**

*Response:* DHS appreciates receiving comments regarding aspects of the cost-benefit analysis of this rule. The purpose of the economic analysis is not to provide suggestions for avoiding costs that regulated entities may impose. Instead, the purpose of the economic analysis is to estimate the costs and benefits of policy changes the agency is implementing through a regulation compared to current practices. Elsewhere in this preamble, DHS addresses specific alternatives and cost-saving recommendations submitted by commenters.

The final rule will affect individuals who are present in the United States and are seeking an adjustment of status to that of a lawful permanent resident and who are not expressly exempted, and individuals seeking extension of stay or change of status. DHS estimated the effect of the rule on foreign-born non-citizens as accurately as possible given the requirements that are being implemented for aliens to submit to a review for a public charge determination. However, due to serious data limitations, DHS is not able to estimate the effect of being deemed inadmissible as a public charge.

*Comment:* Commenters wrote that the inability to submit forms related to the rule electronically increases costs.

*Response:* DHS does not agree that not having the option to submit forms related to the rule electronically increases costs. Submitting forms via mail to USCIS is current practice, which is not changing with this final rule, and therefore estimated costs are expected to remain the same. However, USCIS is taking steps towards implementing a system for electronic filing of all immigration forms in the future, including the forms affected by this rule, which is expected to reduce costs to the agency and ultimately those who file forms with USCIS to request immigration benefits.

*Comment:* One commenter stated that DHS has disregarded the costs associated with the proposed age standard.

*Response:* DHS is unable to estimate the specific cost to individuals, society, or the Government, that a single factor considered as part of public charge reviews for inadmissibility may have because the public charge inadmissibility determination will be conducted based on an individual's "totality of the circumstances."

r. Economic Impact and Job Loss

*Comment:* Commenters cited studies pointing to the substantial impact on local economies and healthcare systems due to a significant drop in enrollment from public benefit programs, such as Medicaid and SNAP. Several commenters stated that this rule would pose substantial costs to New York City, which is home to a large number of immigrants and children with foreign-born parents. Other commenters provided data detailing the rule's economic impact to Los Angeles County, CA; Austin, TX; Minneapolis, MN; San Jose, CA; Philadelphia, PA; St. Paul, MN; Boston, MA; and Dallas, TX.

One commenter stated that the rule will undermine our nation's global competitiveness because a highly-educated workforce spurs economic growth and strengthens state and local economies. Similarly, a commenter noted that the rule will undermine our competitive advantage and allow other countries permitting natural immigration flows to take the United States' place on the global economic stage. The same commenter continued by writing that innovation carried out by immigrants has the potential to increase the productivity of native-born Americans, likely raising economic growth per capita. This commenter also cited a report finding that immigration has positive effects, with little to no negative effects, on wages and employment for native-born Americans.

Additionally, at the state level, several commenters noted that in California (the 5th largest economy in the world if it were a country), studies project a $718 million to $1.67 billion reduction in public benefits would lead to 7,600 to 17,700 lost jobs, $1.2 to 2.8 billion in lost economic output, and $65 to $151 million in lost State and local tax revenue. Several commenters cited a study concluding that reduced participation in California's Medicaid program, Medi-Cal, and California's SNAP program, CalFresh, could result in tens of thousands of jobs lost in California, as well as billions of dollars in lost federal funding and more than $150 million in lost tax revenue in California. Some commenters provided data relating to the rule's economic impact on specific states, such as Michigan, Oregon, New York, Washington, Pennsylvania, Rhode Island, Colorado, Florida, Ohio, Kentucky, Massachusetts, Illinois, Pennsylvania, Wisconsin, Maine, Georgia, Maryland, and North Carolina.

*Response:* DHS appreciates the comments concerning immigration and U.S. economic competitiveness. The final rule does not limit the number of individuals who may seek immigration benefits or restrict the existing categories of immigrants and nonimmigrants. Additionally, DHS does not agree that this final rule will have a negative effect on U.S. competitiveness or economic growth. Rather, through this final rule DHS seeks to better ensure that applicants for admission to the United States and applicants for adjustment of status who are subject to the public charge ground of inadmissibility, as well as applicants for extension of stay and change of status, are self-sufficient, *i.e.,* do not depend on public resources to meet their needs, but rely on their own capabilities and the resources of their family, sponsor, and private organizations.[823]

*Comment:* Several commenters stated that DHS's assessment of the downstream economic impacts of the rule is insufficient. A commenter said DHS provides no basis for its assertion that the state share of the total transfer impact of the rule would be 50 percent of the federal share, concluding that evaluation of the rule's impact on states should be part of any sound justification for the rule. A commenter similarly referenced DHS's statement that half of the savings will be from lower transfers from State and local governments and stated that, should DHS accept the commenter's recommendations to end various additional exemptions from the list of public charge-related benefits, these transfer payment savings would increase significantly. This commenter also stated that the cost-benefit ratio as proposed would thus be very favorable, between $14 to $37 in taxpayer saving for every dollar expended by the agency and the applicant to prepare and review documentation for a public charge determination.

*Response:* DHS appreciates the comments regarding downstream economic effects of the rule as well as DHS's estimate for the amount of transfer payments at the state-level. DHS notes there is not a legal requirement to provide a monetized total cost estimate for this rule. DHS explained in the proposed rule the many factors that were not within the control of DHS that would influence total costs. As previously explained, DHS described and monetized, where possible, the types of costs that would result from this rule and has added many additional costs that were provided by the commenters. For those costs and benefits that DHS was not able to quantify and monetize to calculate a total cost, the economic analysis includes a description of those costs and benefits and a reasoned discussion about why they could not be quantified or monetized.

---

[823] *See* 8 U.S.C. 1601(2).

**Exhibit A**

DHS addressed its assumption that the state-level share of transfer payments is 59 percent of the estimated amount of Federal transfer payments. Because state participation in these programs may vary depending on the type of benefit provided, DHS is only able to estimate the impact of state transfers. For example, the Federal Government funds all SNAP food expenses, but only 59 percent of allowable administrative costs for regular operating expenses.[824] Similarly, Federal Medical Assistance Percentages (FMAP) in some HHS programs, like Medicaid, can vary from between 50 percent to an enhanced rate of 100 percent in some cases.[825] However, upon consideration of the commenter's point and further review of the published FMAPs for each state and territory of the United States, DHS has revised its estimates of the state share of transfer payments from 50 percent to 59 percent, which is the national average FMAP.

*Comment:* Commenters said the strength of America's economic future is dependent on the well-being and success of children, who are our future workforce and tax base, and the rule could jeopardize our country's economic future by causing tax-paying individuals who are legally eligible for support to forego it.

*Response:* DHS appreciates the comments regarding children and the economic future of the United States. DHS agrees that children are part of what will continue to make the U.S. economy strong into the future. However, DHS does not agree that this rule will jeopardize the economic future of the United States. While DHS acknowledges the potential disenrollment (or foregone enrollment) from public benefits by aliens based on the final rule, the final rule does not force individuals who are legally eligible for public benefits to disenroll or forego enrolling in such benefits programs. Instead, through this final rule DHS seeks to better ensure that applicants for admission to the United States and applicants for adjustment to

lawful permanent resident status who are subject to the public charge ground of inadmissibility, as well as aliens seeking extension of stay or change of status, are self-sufficient, *i.e.,* do not depend on public resources to meet their needs, but rely on their own capabilities and the resources of their family, sponsor, and private organizations.[826]

s. Economic Impact on Healthcare System

*Comment:* Some commenters stated that the rule will result in decreased tax revenue and lower productivity for individuals who delay primary care.

*Response:* DHS appreciates the comment regarding decreased tax revenue and lower productivity for individuals who delay primary care. DHS agrees that working age individuals who fall ill would have lower productivity at their jobs and possibly cause decreased tax revenue if such individuals are forced to take unpaid sick leave or must quit working altogether. However, DHS does not agree that this rule would be the cause of such unfortunate events. DHS reiterates that the main purpose of the rule is to provide guidance on the public charge inadmissibility ground statutory provision for those seeking admission or adjusting status in establishing that the person is not likely at any time in the future to become a public charge.

*Comment:* Multiple commenters stated that the rule would cause reductions in reimbursement, patient use, and collectability, which would have substantial negative financial impacts on hospitals and health centers, with many citing supporting data on potentially lost revenue. Some commenters pointed to a study showing that enrollees affected by the rule account for $68 billion in Medicaid and CHIP healthcare services. One commenter calculated the amount of hospital Medicaid payments at risk for 13 million beneficiaries who are likely to experience a chilling effect from this rule, finding that hospitals could lose up to $17 billion annually in payments from these programs.

Many commenters stated that the rule would negatively impact the healthcare workforce, particularly direct care workers. Commenters cited data indicating that the rule will impact health and long-term care agencies' ability to hire and retain their health care workers, as approximately 25 percent of healthcare support workers, such as nursing and home health aides,

are immigrants, many of whom are paid low wages and rely on public assistance who would either leave the profession or forego health coverage and put their health at risk. Some commenters emphasized that this obstacle to expanding the workforce would be particularly impactful at a time when the need for home care workers is growing rapidly due to an aging U.S. population. Commenters state that an exacerbated direct care workforce shortage would particularly impact people with disabilities since many direct care workers are immigrants who often rely on publicly-funded programs due to low wages. Some commenters stated that if home health care workers are unable to continue working, vulnerable populations may be forced to leave their homes and receive more expensive care in nursing homes. Commenters stated that this would not only put these vulnerable populations at risk, but also would destroy decades of federal and state efforts, including millions of federal dollars spent, to reduce the number of individuals residing in nursing homes. Some commenters said the costs to hospitals and the public health system would amount to more than any cost-savings from lower enrollment in public programs.

*Response:* DHS agrees that some entities such as hospitals would incur costs related to the rule such as rule familiarization costs and various administrative costs. DHS considers these costs as qualitative, unquantified effects of the final rule since it is unclear how many entities will choose to make administrative changes to their business processes and the cost of making such changes.

Additionally, in response to commenters' concern that this rule will cause a direct care worker shortage, DHS is unable to quantify or confirm these effects because DHS does not know how aliens will change their behavior in response to this rule. DHS reiterates that the intent of this rule is not to prevent individuals such as these from working, but to provide guidance on determining whether an alien seeking admission or adjustment of status is likely at any time in the future to become a public charge.

*Comment:* One commenter stated that, without the contributions made by immigrants to the healthcare system, health insurance premiums could be expected to rise for Americans who rely on that coverage, concluding that the rule neither mentions nor considers these costs to U.S. citizens in its economic analysis. This commenter also said DHS should take into account that

---

[824] Per section 16(a) of the Food and Nutrition Act of 2008. *See also* USDA, FNS Handbook 901, p. 41 available at: *https://fns-prod.azureedge.net/sites/default/files/apd/FNS_HB901_v2.2_internet Ready_Format.pdf* (last visited July 26, 2019).

[825] *See* Dept. of Health and Human Services, "Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for October 1, 2016 through September 30, 2017." ASPE FMAP 2017 Report. Dec. 29, 2015. Available at *https://aspe.hhs.gov/basic-report/fy2017-federal-medical-assistance-percentages* (last visited July 26, 2019).

[826] *See* 8 U.S.C. 1601(2).

**Exhibit A**

the rule would actually increase Federal Medicaid expenditures for HHS. The commenters points to three factors that were included in the proposed rule, or could be included in the final rule, that would exacerbate their concern. The commenters recommended not including them as part of the final rule. The concerns were: (1) Including Medicaid or Medicare Part D LIS as negative factors in public charge determinations; (2) including the Children's Health Insurance Program (CHIP) in public charge determinations; and (3) considering premium tax credits for purchasing individual market coverage in a public charge determination.

*Response:* The commenter states that health insurance premiums could rise and Federal Medicaid expenditures will increase as an effect of the rule. DHS notes that the Public Charge final rule no longer includes Medicare Part D LIS as a public benefits program considered in public charge determinations, nor does it include CHIP or Medicaid for aliens under the age of 21 or pregnant women. In addition, the final rule does not consider premium tax credits in public charge determinations. Therefore, these changes to the final rule is responsive to a number of the commenters' concerns.

*Comment:* Several commenters stated that, in the long-run, some of the uncompensated care incurred by hospitals will be reimbursed by the Federal Government in the form of Medicare and Medicaid disproportionate share hospital payments, which is another instance of unaccounted for cost shifting that the rule will cause. One commenter requested that USCIS systematically research the increased costs that this rule will cost our healthcare system. An individual commenter cited DHS's reference to the decrease in particular healthcare providers' revenues, but asserted that there is no reference to findings showing either an increased or a decreased percentage of uncompensated care. To determine if including both non-monetary and monetary public benefits is a positive, the commenter said there must be some information on the amount of uncompensated care that healthcare providers provide to non-citizen aliens.

*Response:* DHS acknowledges in the economic analysis accompanying this rule that various entities may incur indirect costs associated with the rule. Additionally, in the economic analysis that accompanies this rule, which can be found in the rule docket at *www.regulations.gov,* DHS notes there are a number of consequences that

could occur because of follow-on effects of the reduction in transfer payments identified in the final rule. DHS is provides a list of the primary non-monetized potential consequences of the final rule where disenrollment or foregoing enrollment in public benefits programs by aliens who are otherwise eligible could lead to issues such as increases in uncompensated care in which a treatment or service is not paid for by an insurer or patient. However, DHS notes that it is not able to estimate such costs at this time.

t. Impact on U.S. Workforce

*Comment:* Some commenters pointed to a study indicating that over 91 percent of all adults active in the labor force who would be affected by the public charge rule are employed in critical industries, such as farming, construction, mining, hospitality, manufacturing, and professional and business services. A commenter provided data indicating the rule's destabilizing impact on multiple sectors of the California workforce that are comprised of a large number of low-wage immigrants, including agriculture, construction, child care and early education, and students. Some commenters provided data regarding the rule's impact on the workforce in Massachusetts, particularly in the construction field. A commenter wrote about the rule's potential impact on the immigrants in the construction industry who have been helping to rebuild Houston after Hurricane Harvey and who contribute billions each year in state and local taxes. The commenter notes that this rule would prevent immigrants from partaking in benefits that their tax dollars help support and will cause confusion in the immigrant community for using benefits that lead to a better life. Another commenter stated that Maine faces extraordinary demands to replace an aging and retiring workforce.

Two commenters described the rule's impact on the workforce in areas such as agriculture, ranching, hotels, and restaurants. Two other individual commenters provided input on the rule's impact on the horse industry, stating that putting immigrants in situations where they are working in physically demanding jobs with no access to healthcare could be "disastrous" for all involved. Another individual commenter stated that, because the disenrollment and foregone enrollment figures are unclear or uncalculated, it is impossible to know what the immediate economic impact will be in agriculture, healthcare, retail, and rental markets.

After asserting that the rule will cause job losses and economic decline, a commenter said restricting the number of immigrants to the United States could leave the nation at a vulnerable position given the current national employment boom.

*Response:* DHS appreciates the comments regarding the impact on the U.S. workforce, particularly the effect that the rule will have on specific industries. DHS does not anticipate that this rule will have a strong or extensive effect on the U.S. workforce overall or across specific industries as discussed in the economic analysis that accompanies this rule, which can be found in the rule docket at *www.regulations.gov,* and the Final Regulatory Flexibility Analysis. DHS estimates the potential impacts to businesses, states and small entities using the data provided by commenters. Small entities that could be impacted by this final rule are those who file Form I–129 or Form I–129CW as petitioners on behalf of beneficiaries requesting an extension of stay or change of status as well as obligors that would request a cancellation of a public charge bond.

u. Economic Impacts Related to Nutrition Programs

*Comment:* Some commenters said a significant drop in use of food stamps and other food programs will negatively affect farmers, local growers, and grocery sales at retailers and farmers markets. A commenter said reduced enrollment in SNAP will shift the burden to local communities and food banks that are already stretched to meet demand. A commenter stated that in 2017 more than $22.4 million in SNAP benefits were spent at farmers markets. The commenter also asserted that many small farmers, farm workers, and their families are beneficiaries of SNAP, which the commenter concluded meant that they would be hit doubly hard by the proposed rule. Similarly, an academic commenter stated that limiting the ability of immigrants to use SNAP would hurt the American farming community and destabilize the American food system, reasoning that the revenues of farmers would be reduced and some farmworkers would lose access to SNAP benefits.

A commenter said the rule would withdraw nearly $200 million in Federal SNAP funding, amounting to approximately $358 million in lost economic activity when taking the economic multiplier into account. A couple of commenters stated that SNAP is an economic driver in local economies, especially rural communities. Commenters stated that

**Exhibit A**

lower participation in SNAP means less federal funding to support local economies and lower worker productivity. Other commenters provided estimates for the amount of economic activity that would be lost in certain states as a result of immigrants foregoing critical nutritional benefits.

*Response:* DHS appreciates the comments regarding the economic effects of disenrollment or foregone enrollment in the SNAP benefits program. As noted in the NPRM, DHS recognizes that reductions in federal and state transfers under Federal benefit programs may have downstream impacts on state and local economies, large and small businesses, and individuals. However, DHS is generally not able to quantify these impacts due to uncertainty and availability of data. DHS estimated these impacts or discussed them qualitatively to the extent possible in the economic analysis for this final rule. For example, the rule might result in reduced revenues for grocery retailers participating in SNAP, agricultural producers who grow foods that are eligible for purchase using SNAP benefits, or landlords participating in federally funded housing programs. DHS notes that the economic impact will result in a reduction in transfer payments from the Federal Government and State governments to individuals who may choose to disenroll from or forego enrollment in a public benefits program. However, the same amount of funding for public benefits programs, such as SNAP, will be available for qualified individuals. This final rule does not appropriate or disappropriate funding for public benefits programs, but ensures that applicants for admission to the United States and applicants for adjustment of status to lawful permanent resident who are subject to the public charge ground of inadmissibility, as well as aliens seeking extension or change of status, are self-sufficient, *i.e.,* do not depend on public resources to meet their needs, but rely on their own capabilities and the resources of their family, sponsor, and private organizations.[827]

*Comment:* A commenter stated that a reduction in SNAP enrollment could also reduce school reimbursement for free and reduced lunches in states that have extended SNAP benefits above 130 percent of FPL. A commenter indicated an expectation to see a decline in families willing to complete the forms in the Child and Adult Care Food Program center-based child care programs, which would result in less federal nutrition funding to support healthy meals for children, the local retail and agriculture food economy, and revenue for child care businesses.

*Response:* DHS appreciates the comment regarding the effect of the final rule on enrollment in reduced and free school lunches. DHS does not believe the rule will reduce school reimbursement for reduced and free lunches beyond the effect of individuals who may choose to disenroll from or forego enrollment in a public benefits program. Again, the final rule only regulates applicants for admission to the United States and applicants for adjustment of status to lawful permanent resident who are subject to the public charge ground of inadmissibility, as well as aliens seeking change of status or extension of stay.[828]

### v. Other Economic Impacts

*Comment:* A commenter stated the rule will adversely impact colleges and universities, as even a slight decrease in international student enrollment has drastic impacts on higher education institutions because international students often receive little or no financial aid and pay higher out-of-state tuition at public universities. Similarly, a school said colleges across the country could see significant decrease in enrollment and increased burden on student health centers.

*Response:* DHS appreciates the comments regarding the effect of the rule on colleges and universities, including student health centers, as it relates to international student enrollment. However, this rule does not regulate international student enrollment in colleges and universities nor the amount of financial aid awards or the rate of tuition that colleges and universities charge. The final rule also does not regulate student health centers located at colleges and universities. Rather, the rule directly regulates aliens who, at the time of application for admission or adjustment of status, are deemed likely at any time in the future to become a public charge, as well as aliens seeking extension of stay or change of status.[829] DHS is prescribing how it will determine whether an alien is inadmissible because he or she is likely at any time in the future to become a public charge and identify the types of public benefits that will be considered in the public charge determinations. An alien applying for admission or adjustment of status generally must establish that he or she is not likely at any time in the future to become a public charge.

As explained in the preamble of the rule,[830] DHS believes that the government interest in ensuring the self-sufficiency and non-reliance on public benefits of aliens, including nonimmigrants, as articulated by Congress in PRWORA,[831] applies to all aliens within the United States, including to those whose stays are temporary. Moreover, although the extension of stay or change of status provisions in the INA and the regulations do not specifically reference an alien's self-sufficiency, consideration of an alien's self-sufficiency in these applications is consistent with the principles of PRWORA and aligns DHS's administration of the INA to those principles.[832]

### w. DHS Estimates of Discounted Direct Costs and Reduced Transfer Payments

*Comment:* A commenter stated that USCIS characterization of reduced transfer payments as the primary benefit of the rule ignores long-standing principles of regulatory cost-benefit analysis distinguishing between benefits and transfers. This commenter suggests that the cost-benefit analysis should estimate the net effect that the reduced transfer payments would have on the larger economy. A commenter stated the exactness of the values used in our range of estimates leave little room for error as well as suggesting a more enhanced analysis given the broadness of the estimated range.

Another commenter questioned USCIS' approach in estimating costs and benefits of the rule stating that the reduction in transfer payments to non-citizens is itself a cost to those individuals per the guidelines of OMB Circular A–4 and should be defined as such in the regulatory impact analysis (RIA). A commenter also stated that cost savings of $2.27 billion will not be realized due to the effect on temporary visa applications and the potential that DOS starts applying public charge standards to applicants abroad. Another commenter said that the cost benefit analysis did not have sufficient documentation, and the rule's cost savings of $2.2 billion was chosen for its "wow" factor.

Finally, a commenter stated that USCIS highlights $23 billion in savings related to Medicaid, but fails to account for the beneficial impacts of the program

---

[827] *See id.*

[828] *See id.*

[829] *See* INA section 212(a)(4), 8 U.S.C. 1182(a)(4).

[830] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51135–36 (proposed Oct. 10, 2018).

[831] *See* 8 U.S.C. 1601.

[832] *See Southern S.S. Co.* v. *N.L.R.B.,* 316 U.S. 31, 47 (1942) (requiring "careful accommodation of one statutory scheme to another. . . .").

**Exhibit A**

and the effects of losing Medicaid coverage.

*Response:* DHS appreciates the comments regarding transfer payments. DHS notes that the $2.27 billion in cost savings that a commenter refers to are actually the estimated transfer payments of the rule as shown in the economic analysis, which can be found in the rule docket at *www.regulations.gov.* The method and calculation of the estimated transfer payments is shown as clearly as possible in the economic analysis of the rule. As previously discussed, DHS estimates the reduction in transfer payments from the Federal and State governments to certain individuals who receive public benefits and discusses certain indirect impacts that are likely to occur because of the final regulatory changes. The primary sources of the reduction in transfer payments from the Federal and State governments of this final rule are the disenrollment or foregone enrollment of individuals in public benefits programs. DHS notes there is not a legal requirement to provide a monetized total cost estimate for this rule. As previously explained, DHS described and monetized where possible the types of costs that would result from this rule and has added many additional costs provided by the commenters. For those costs and benefits that DHS was not able to quantify and monetize to calculate a total cost, the economic analysis includes a description of those costs and benefits and a reasoned discussion about why they could not be quantified or monetized. DHS does not agree that it is not adhering to long-standing principles of regulatory cost-benefit analysis. The economic analysis for this final rule was conducted based on the guidelines set forth in OMB's Circular A–4, which provides guidance to agencies for conducting cost-benefit analyses and, in this case, a discussion on the distinction between cost and/or benefits and transfer payments.[833] As noted in OMB Circular A–4 (p. 38), "[b]enefit and cost estimates should reflect real resource use. Transfer payments are monetary payments from one group to another that do not affect total resources available to society." The reduction in transfer payments are quantified in the transfer payments section of the economic analysis of this rule, in accordance with OMB's Circular A–4. A reduction in transfer payments is not quantified in the benefits section of this rule. There is great uncertainty

regarding the effects that changes in transfer payments will have on the broader economy and DHS is unable to estimate those effects.

x. Benefits of Proposed Regulatory Changes

*Comment:* A few commenters provided input on the benefits of the rule. A benefit noted by commenters is that the rule enforces the requirement that immigrants should be self-sufficient. One commenter provided scenarios and personal experiences as examples of fraudulent claims and behavior of immigrants. An educational institution said the rule ensures participation of immigrant families in federal or state-funded public benefit programs are monitored and limited. Two individual commenters provided comments, data, or studies relating to immigrants' dependence on public assistance programs causing continued decay on American culture. One commenter stated that the rule would save American taxpayers money. Another commenter noted the rule is non-discriminatory by creating a uniform process, and that the additional forms will allow better collection of information.

*Response:* DHS appreciates these comments. DHS's public charge inadmissibility rule is neither intended to address public benefit fraud and abuse nor ensure that alien access to public benefit programs is monitored and limited. As stated throughout this preamble, this rule is intended to align the self-sufficiency goals set forth in the PRWORA with the public charge ground of inadmissibility.

y. Cost Benefit Analysis Issues

*Comment:* Some commenters stated that DOS's January changes to public charge has led to improper denials, and that the rule may exacerbate that problem and lead to administrative inconsistency. Another commenter argued that DHS failed to adequately consider the costs of the rule on CBP application of the rule, citing studies.

*Response:* Although the standards set forth in the rule pertain both to whether an alien who seeks admission as a nonimmigrant or immigrant or seeks adjustment of status is inadmissible, the rule's economic analysis, which can be found in the rule docket at *www.regulations.gov,* focuses on the impact to USCIS adjudications, as the rule primarily impacts USCIS' adjudication of applications for adjustment of status, as well as applications for extension of stay and change of status. DHS is working closely with the Department of State to ensure

that they are aware of the requirements of this rule and to prevent any administrative inconsistency. In addition, DHS did not include an analysis of costs and benefits associated with public charge inadmissibility determinations made by CBP in the admission context. This rule would potentially limit entries into the United States in that CBP officers would deny admission to aliens at the ports of entry on public charge grounds, but CBP is already responsible for administering the public charge ground of inadmissibility and we do not anticipate a meaningful change in the amount of time the determination would take.

*Comment:* A commenter remarked on USCIS' approach to estimating costs and benefits of the rule noting that USCIS states the rule will have no effect on wages or growth, but this is unlikely given the rule will cause a fundamental change in future working populations. The commenter cited research with data and suggested using it as a model for this rule's economic analysis.[834]

*Response:* DHS does not expect this rule to have a direct effect on wages or economic growth as this rule does not regulate hiring practices of employers in the United States. This final rule requires an individual seeking admission or adjusting status to establish that he or she is not likely at any time in the future to become a public charge, and that aliens seeking change of status or extension of stay meet the public benefits condition. Moreover, DHS notes that the research the commenter cites is not relevant to a discussion of wages or economic growth that may result from this rule.[835] The research cited primarily discusses the effects on applicants when they are reviewed for public charge based on the factors that will be considered in the "totality of the circumstances."

*Comment:* Several commenters provided suggestions on how the analysis could have been done differently overall. One commenter said that USCIS should consider a general equilibrium analysis to better analyze the holistic impacts of the rule throughout the entire economy. Another commenter said in order to develop an

---

[833] OMB Circular A–4 is *available at https:// www.whitehouse.gov/sites/whitehouse.gov/files/ omb/circulars/A4/a-4.pdf* (last accessed July 26, 2019).

[834] *See* MPI, Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration (Nov. 2019), available at *https:// www.migrationpolicy.org/sites/default/files/ publications/MPI-PublicChargeImmigrationImpact_ FinalWeb.pdf* (last visited April, 18, 2019).

[835] *See* Capps, et al. (2018). Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration. Washington, DC: Migration Policy Institute, available at *https:// www.migrationpolicy.org/sites/default/files/ publications/MPI-PublicChargeImmigrationImpact_ FinalWeb.pdf* (last visited April, 18, 2019).

**Exhibit A**

accurate portrayal of the rule's cost and benefits, USCIS must use actual benefit receipt information to determine the affected population rather than DHS summary statistics.

*Response:* DHS appreciates the commenters' suggestions. DHS did not consider a general equilibrium analysis to be appropriate here. We do not have enough data to build a general equilibrium model that would be able to estimate the impact of this rule. In addition, due to the complexity of potential benefits, issues of confidentiality, and data limitations, it was not possible to use actual benefit receipt information for the analysis.

*Comment:* A commenter stated that USCIS has not made any attempt to detail costs related to processing delays and noted that public charge determinations will inevitably slow down federal agency processing times, for which DHS did not estimate the opportunity cost of such delays.

*Response:* DHS appreciates the comment. DHS was unable to quantify such costs at this time. DHS notes that delays in processing various forms may occur, but that every effort is taken to avoid such delays whenever possible. DHS does not agree that the new requirements associated with public charge inadmissibility determinations would waste resources and be an unnecessary administrative burden, as DHS has determined that it is necessary to establish a public charge inadmissibility rule. Should DHS determine that the fees set for the relevant forms related to the public charge review process are not sufficient to cover the full cost of the associated services adjudicating immigration benefit requests, the agency will propose to adjust these form fees in a subsequent fee rule. DHS sets the fees associated with requesting immigration benefits as necessary to recover the full operating costs associated with administering the nation's lawful immigration system, safeguarding its integrity, and efficiently and fairly adjudicating immigration benefit requests. As discussed above, while the rule may increase USCIS processing times, such is the burden of robust enforcement of the law.

*Comment:* A commenter stated that USCIS fails to properly estimate the impact of effects such as immigrants foregoing noncash benefits and other reductions in transfer payments. Another commenter stated that the impact that a loss of public benefits would have on immigrant communities should be calculated in a more robust way by using actuarial models or models used in personal injury

litigation that accurately capture the pain and suffering these individuals would undergo.

*Response:* DHS conducted its economic analysis to the best of its ability given the complexity of the analysis and the availability of data. DHS does not agree that the economic analysis should employ "actuarial models or models used in personal injury litigation" to estimate the economic effects of this rule. Actuarial models assess risk and probabilities utilizing a given set of parameters. Unfortunately, DHS does not have enough data on the usage of various subsidies nor the rate of disenrollment needed to create an accurate model. More specifically, in the case of actuarial models used in personal injury litigation, each person's situation is unique and DHS would need to know the specific impacts for each person in order to utilize that type of model. DHS reiterates that the main purpose of the rule is to provide guidance on the public charge inadmissibility ground statutory provision for those seeking admission or adjusting status in establishing that the person is not likely at any time in the future to become a public charge.

*Comment:* A commenter stated that the cost benefit analysis fails to consider the upward mobility of immigrant communities, the impact of lower levels of immigration on the economy, and other costs such as separation of families, businesses losing workers, and families going without needed assistance.

*Response:* Where possible, DHS has tried to quantify the indirect impacts of this rule, but DHS is unable to fully quantify the impact of lower immigration on the economy and other costs that could indirectly result from this rule.

*Comment:* A commenter stated that the cost benefit analysis details an increase in the number of denials for adjustment of status applications, but it does not provide a monetization of these impacts. A commenter stated that the proposed rule requires additional sensitivity analysis. Another commenter stated that USCIS fails to consider key impacts centered around increased denials for admission, change of status, or re-entry, and USCIS should complete a further literature review around these issues.

*Response:* DHS was able to detail an increase in the number of denials for adjustment of status applications, but did not have enough detailed information on specific aliens to monetize the impacts such denials may have on the economy. DHS disagrees

that the rule requires additional sensitivity analysis.

*Comment:* A commenter stated that USCIS significantly overestimated the average cost of housing assistance per person in calculating costs and benefits.

*Response:* DHS used the publicly available HUD Federal Rental Assistance and HUD HCV programs report data on the household level in order to estimate the number of households that may be receiving housing benefits. The average annual benefit of $8,121.16 is the estimate DHS calculated per household. DHS recognizes that actual average annual benefits may be less due to the size and location of a particular household.

*Comment:* A commenter stated that USCIS failed to estimate the number of applicants who will be deemed inadmissible, and the associated effects.

*Response:* DHS is unable to estimate the number of applicants who will be deemed inadmissible due to this rule. The review for public charge inadmissibility will be based on the totality of the circumstances that considers many positive and negative factors that are specific to each applicant. Therefore, DHS is unable to estimate the number of individuals who may be deemed inadmissible based on public charge. However, DHS estimated the annual population that will be subject to a public charge review for inadmissibility in the economic analysis for this rule, which can be found in the rule docket at *www.regulations.gov*.

*Comment:* A commenter stated that USCIS should monetize the costs of reduced participation in public benefits programs.

*Response:* DHS appreciates the comment regarding monetizing the costs of reduced participation in public benefits programs. DHS monetized the effect of disenrollment in public benefits programs to the extent possible based on the best available data. While DHS provides estimates of the direct costs of the final rule in the economic analysis, we also provide estimates and detailed methodology of the reduction in transfer payments from the Federal and State governments to certain individuals who receive public benefits such as those individuals who choose to disenroll or forego future enrollment in public benefits programs due to fear or confusion. As noted in OMB Circular A–4 (p. 38), "[b]enefit and cost estimates should reflect real resource use. Transfer payments are monetary payments from one group to another that do not affect total resources available to society." The reduction in transfer payments are quantified in the transfer section of the economic analysis

**Exhibit A**

**41480** **Federal Register**/Vol. 84, No. 157/Wednesday, August 14, 2019/Rules and Regulations

of this rule, in accordance with OMB's Circular A–4. However, a reduction in transfer payments are not quantified in the benefits section of this rule. DHS notes that there is great uncertainty regarding the effects changes in transfer payments will have on the broader economy, and estimating those effects are beyond the scope of this rule.

*Comment:* A commenter stated that USCIS includes the removal of Form I–864W as a benefit, but does not present a primary, minimum, or maximum estimate of the benefits.

*Response:* As noted in the economic analysis, which can be found in the rule docket at *www.regulations.gov*, DHS is eliminating Form I–864W and instead individuals will be required to provide the information previously requested on the Form I–864W using Form I–485. Based on the information provided in the Form I–485, an adjudication officer can verify whether an immigrant is statutorily required to file an affidavit of support. DHS estimated the cost per petitioner for filing Form I–864W, but was unable to determine the number filings of Form I–864W and was unable to estimate the total annual cost savings of eliminating this form.

*Comment:* A commenter stated that the lack of a sufficient economic model showing the potential impact this could have on families and the economy should be grounds to reject the proposed rule.

*Response:* DHS does not agree that DHS did not conduct a sufficient economic analysis for this final rule. E.O. 12866 directs agencies subordinate to the President to assess costs and benefits of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages, distributive impacts, and equity). In implementing E.O. 12866, OMB has provided further internal guidance to agencies through OMB Circular A–4 (Sept. 17, 2003), found at *https://www.whitehouse.gov/ sites/whitehouse.gov/files/omb/ circulars/A4/a-4.pdf.* OMB Circular A–4 states that it ''is designed to assist analysts in the regulatory agencies by defining good regulatory analysis . . . and standardizing the way benefits and costs of Federal regulatory actions are measured and reported.'' OMB Circular A–4, at 3.

As previously explained, DHS described and monetized where possible the types of costs that would result from this rule and has added many additional costs provided by the commenters. For those costs and benefits that DHS was not able to quantify and monetize to calculate a total cost, the economic analysis includes a description of those costs and benefits and a reasoned discussion about why they could not be quantified or monetized.

*Comment:* One commenter submitted a detailed comment on the cost-benefit analysis accompanying the proposed rule stating that over half of foreign-born spouses eligible for green cards would be impacted by USCIS' rule.[836] The commenter also stated that USCIS has not provided sufficient analysis to determine how many temporary visitors to the United States would be impacted, that the number of individuals likely to be impacted by the proposed rule's Form I–944 requirement on an annual basis is 436,029 as opposed to 382,264, and that the opportunity costs model used by USCIS is flawed largely due to the use of a weighted minimum wage rather than the average prevailing wage. The commenter stated that the number of individuals impacted by the proposed rule who receive minimum wage is likely significantly lower than 28.5%, and the minimum wage is often higher in a number of states than the national average. The commenter stated that the cost of attorney fees to applicants will be significantly higher than DHS recognizes. When correcting for these effects, the proposed rule would incur total costs of $2,260,448,302, or about 17 times greater than USCIS' estimate. A commenter stated that the cost savings related to healthcare provisions were unworkable given the disjointed nature of exempting some health services such as immunizations but punishing use of Medicaid and CHIP. A commenter stated that the proposed rule would lead to significant increase in administrative costs to deal with public charge provisions.

*Response:* DHS appreciates these comments. The analysis used the Federal minimum wage rate since approximately 80 percent of the total number of individuals who obtained lawful permanent resident status were in a class of admission under family-sponsored preferences and other non-employment-based classifications such as diversity, refugees and asylees, and parolees.[837] Further, the benefits-to-

wage multiplier raised the Federal minimum wage to $10.59, which could account for wages above $7.25 that do not receive non-wage benefits.[838] The cost savings presented in the analysis were based on the provisions of the proposed rule and have been updated in the final rule. Administrative costs were not calculated.

The analysis does not quantify potential effects on admissibility, as opposed to adjustment of status. Instead, the purpose of the rule is to determine whether an alien is inadmissible to the United States under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), because an alien is likely at any time in the future to become a public charge. Aliens who seek adjustment of status or a visa, or who are applicants for admission, must establish that they are not likely at any time to become a public charge, unless Congress has expressly exempted them from this ground of inadmissibility or has otherwise permitted them to seek a waiver of inadmissibility. Moreover, DHS will require all aliens seeking an extension of stay or change of status to demonstrate that they have not, since obtaining the nonimmigrant status they wish to extend or change, received public benefits, as defined in this rule, for more than 12 months in the aggregate within any 36-month period unless the nonimmigrant classification that they seek to extend, or to which they seek to change, is exempt from the public charge ground of inadmissibility.

In addition, DHS acknowledges the commenter's estimate of the population that would be affected by this rule's requirement to submit the new Form I–944. However, DHS notes that we use data from internal and external sources as appropriate, and ensures that all data are current, valid, reliable, and accurate. DHS declines use the commenter's population estimate in favor of the estimates we present in the economic analysis that accompanies this rule, which can be found in the rule docket at *www.regulations.gov.* The data DHS used for its estimates are necessary since it provides detailed information showing the classes of applicants for admission, adjustment of status, or registry according to statute or regulation that are exempt from

836 *See* Looming Immigration Directive Could Separate Nearly 200,000 Married Couples Each Year, Boundless Immigration Inc. (Sept. 24, 2018),*https://www.boundless.com/blog/looming-immigration-directive-separate-nearly-200000-married-couples.* (last visited July 26, 2019).

837 *See* United States Department of Homeland Security. Yearbook of Immigration Statistics: 2016, Table 7. Washington, DC, U.S. Department of Homeland Security, Office of Immigration

Statistics, 2017. Available at *https://www.dhs.gov/ immigration-statistics/yearbook/2016.* (last visited July 26, 2019).

838 Note that the benefits-to-wage multiplier of 1.47 used in the proposed rule has been updated to 1.46 for the final rule based on an annual data update released by the Bureau of Labor Statistics. Therefore, DHS updated its wage estimate using the Federal minimum wage plus benefits from $10.66 per hour to $10.59 per hour.

**Exhibit A**

inadmissibility based on the public charge ground. Other data that are available are informative, but only provide aggregate receipt totals whereby it is not possible to remove individuals from the population count who are exempt from a public charge review of inadmissibility.

Finally, based on comments received, DHS amended its economic analysis, where possible, to account for individuals who choose to hire an attorney for legal representation on their behalf.

*Comment:* A commenter noted that though the rule impacts only a small number of immigrants, its chilling effect impacts will outweigh its intentional impacts. This, the commenter and others commenters asserted, is an abdication of DHS's APA duties to consider costs and benefits. Further, a commenter stated that DHS failed to satisfactorily justify the prospective harm of the chilling effect of this rule. Another commenter stated that DHS's cost analysis is arbitrary, stating that its estimates appear in some cases to reflect a range based on simply moving decimal places rather than evidence. Elsewhere, the commenters say estimates are inconsistent, such as the Form I–944 cost estimates in the PRA analysis versus elsewhere in the proposed rule. A few commenters noted that the public charge definition is not supported by or tied to any benefit to ''health, well-being, businesses, economies, or communities.'' One commenter stated that the rule ''does not point to any expected benefits for individual or public health, for national, state or local economies, for businesses, for healthcare systems, or for our communities.''

*Response:* DHS disagrees with these comments. E.O. 13563 directs agencies to propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs; the regulation is tailored to impose the least burden on society, consistent with achieving the regulatory objectives; and in choosing among alternative regulatory approaches, the agency has selected those approaches that maximize net benefits. E.O. 13563 recognizes that some benefits are difficult to quantify and provides that, where appropriate and permitted by law, agencies may consider and discuss qualitatively values that are difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts.

## 2. Federalism Comments

*Comment:* A commenter stated that DHS did not conduct an adequate

analysis of the NPRM's federalism implications. The commenter further stated that because of the serious impact the NPRM will have on the States, it is improper for DHS to forego the federalism summary impact statement. The commenter also stated that E.O. 13132 requires DHS to produce a federalism summary impact statement. One commenter stated that DHS did not engage in adequate consultation with governors pursuant to E.O. 13132, and requested that DHS engage in a meaningful and formal way before taking further action on the public charge rule. The commenter noted that the rule would likely impose significant financial and administrative burdens on states, including costly and labor-intensive changes in how states implement their shared eligibility systems among human services and health programs.

*Response:* This final rule does not have federalism implications because it does not have substantial direct effects on the States, on the relationship between the Federal Government and the States, or on the distribution of power and responsibilities among the various levels of government. Although this rule defines public benefit to include certain cash and non-cash benefits, some of which may be fully or partially administered by states or local governments, DHS is not purporting to regulate which aliens may receive such benefits or how states and local governments administer such programs. DHS does not expect that this final rule will impose substantial direct compliance costs on State and local governments, or preempt State law. Accordingly, in accordance with section 6 of E.O. 13132, this rule requires no further agency action or analysis.

*Comment:* A commenter stated that this rule impinges on a state's right to provide healthcare services and increases federal intrusion into local issues.

*Response:* DHS disagrees that this rule impinges on state's rights to provide healthcare services and increases federal intrusion into local issues. This rule enforces a law that has been in place, in one form or another, since the late 19th century. The review of public charge inadmissibility, which is an immigration matter, is a matter of Federal jurisdiction alone, as indicated by the Supreme Court.[839]

*Comment:* A commenter indicated that as a matter of law and effective

policy, USCIS must consult with States and localities about the impact of the public charge rule on state and local choice and policy. The need for this consultation was apparent because the formulation of the guidance document this regulation proposes to replace considered state and local public health concerns.

*Response:* DHS has considered the relevant public comments and engaged in many meetings with state and local entities as part of the E.O. 12866 process. Aliens entitled to public benefits under State or local law may elect to receive such benefits and this rule does not, and cannot, change that fact. However, DHS believes that the consideration of an alien's receipt of designated public benefits is consistent with congressional intent, as set forth in PRWORA, that the receipt of public benefits should not be an incentive to come to the United States, and aligns DHS's administration of the INA to those principles.[840]

*Comment:* Some commenters stated that the rule violates state's rights to provide benefits to children and immigrants experiencing short-term crises. Some commenters said this rule impinges on a state's right to provide healthcare services and increases federal intrusion into local issues. Commenters stated that some state statutes and constitutions, as well as DHS's own 1999 Interim Field Guidance, make it a state interest to provide certain benefits to non-citizens.

Several commenters stated that the proposed rule impermissibly overrides state authority. Others stated that the proposed rule would bar their states' from providing state-funded aid to their own residents, regardless of immigration status. A commenter stated that the proposed rule violates the 10th Amendment of the U.S. Constitution because it commandeers state resources by compelling agencies to implement the rule, especially in providing notice and information to applicants. Another commenter stated that the rule violates a federalism principle by imposing an unfunded mandate. One commenter stated that the proposed rule will impose substantial costs on State and local governments such that federalism concerns are implicated. Other commenters stated that the proposed rule would harm their states. A commenter stated that the proposed rule would undermine a state statute that was passed with bipartisan support in order to extend CHIP.

---

[839] *See, e.g., Hines* v. *Davidowitz,* 312 U.S. 52 (1941); *see also Arizona* v. *United States,* 567 U.S. 387, 394 (2012) (''The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens.'').

[840] *See Southern S.S. Co.* v. *N.L.R.B.,* 316 U.S. 31, 47 (1942) (requiring ''careful accommodation of one statutory scheme to another.'').

**Exhibit A**

Another commenter asserted that, even if the proposed rule were passed in the form of a statute, it would violate Article I of the Spending Clause for coercively restricting state use of Federal grant money.

*Response:* DHS did not propose in the NPRM to, in any way, regulate or circumscribe the ability of states to offer public benefits to children and immigrants, or to require states to implement the DHS rule. Similarly, this final rule neither prohibits states from providing benefits to children and immigrants nor prohibits any category of immigrants from receiving any state or local benefits for which they are eligible. Furthermore, the rule's definition of public benefit does not include emergency aid, emergency medical assistance, or disaster relief. Likewise, the rule does not impact the Spending Clause since it does not restrict a state's ability to use Federal funds.

3. Family Assessment Comments

*Comment:* One commenter said that the rule violated Section 654 of the Treasury General Appropriations Act, 1999, Public Law 105–277, which requires agencies to assess their policies' impact on family stability, families' ability to function, and other indicators of family well-being. Another commenter stated that DHS's Family Policymaking Assessment failed to fully and meaningfully evaluate the rulemaking's effects on family well-being under section 654(c)(1) and did not address 654(c)(2)–(7) at all. Other commenters generally agreed that the family assessment in the proposed rule is insufficient.

Several commenters stated this rule will unnecessarily harm family unity, such as by making it difficult for some spouses of U.S. citizens to enter the United States or adjust status. A commenter generally stated that the proposed rule's definition of "household," along with the asset and income standards, would pressure families to separate. The commenter also stated that the proposal to subject residents to public charge determinations upon reentering the United States would discourage immigrants from preserving contact with family outside of the United States. A commenter added that it would make it especially difficult for immigrants to let their parents join them in the United States. Another commenter cited an article noting that there are 9,000,000 mixed status families in the United States, and many would be faced with the threat of coerced separation.

Another commenter stated that this rule could result in the separation of at least 200,000 married couples annually. Another commenter provided data on the impact of the study on marriage-based permanent residency applications, saying the proposed rule would undermine family unity and stability. A commenter stated that the proposed rule would chill access to their state's Department of Children and Families and Juvenile Court, leading to children remaining dependent on state child welfare programs.

Many commenters said this rule would dramatically hurt and jeopardize families, as well as place undue burden on all family members. A commenter stated that the proposed rule fails to analyze the rule's effect on the well-being of families, especially its impact to family stability, and on the disposable income of families and children. Some commenters provided studies showing how children could be severely and irreversibly harmed, including children's health, by separation as part of a strategy to prevent immigrants from legalizing their status.

A commenter stated that the rule contravenes international and domestic policies that support children's best interests, citing the U.N. Convention on the Rights of the Child.

*Response:* Section 654 of the Treasury and General Government Appropriations Act, 1999 [841] requires Federal agencies to issue a Family Policymaking Assessment for any rule that may affect family well-being. Agencies must assess whether: (1) The action strengthens or erodes the stability or safety of the family and, particularly, the marital commitment; (2) the action strengthens or erodes the authority and rights of parents in the education, nurture, and supervision of their children; (3) the action helps the family perform its functions, or substitutes governmental activity for the function; (4) the action increases or decreases disposable income or poverty of families and children; (5) the proposed benefits of the action justify the financial impact on the family; (6) the action may be carried out by State or local government or by the family; and whether (7) the action establishes an implicit or explicit policy concerning the relationship between the behavior and personal responsibility of youth, and the norms of society.

As discussed in the NPRM,[842] DHS has determined that the rule may decrease disposable income and increase the poverty of certain families and children, including U.S. citizen children. And as discussed previously, DHS has modified some provisions in ways that will mitigate the impact on families, such as by exempting receipt of Medicaid by aliens under 21 and pregnant women. Ultimately, however, DHS continues to believe that the financial impact on the family is justified.

Additionally, because the final rule considers receipt of public benefits that were not considered under the 1999 Interim Field Guidance, DHS determined that the aliens found inadmissible under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), will likely increase. However, given the compelling legal and policy reasons associated with this rulemaking, including but not limited to, better ensuring self-sufficiency, DHS determined that this rulemaking's impact is justified and no further actions are required. DHS also determined that this final rule will not have any impact on the autonomy or integrity of the family as an institution.

Furthermore, with this rulemaking, DHS does not intend to separate families. DHS's intent is to implement Congress' mandate to assess whether an alien has met his or her burden to demonstrate that he or she is not likely at any time to become a public charge under section 212(a)(4)(A) of the Act, 8 U.S.C. 1182(a)(4), given the congressional policy to ensure that those coming to the United States should be self-sufficient and not rely on the government for assistance to meet their needs.[843]

DHS agrees that family unity is a significant tenet of the family-based immigration system. As indicated above, the rule does not alter eligibility criteria for a family-based immigrant petition, although it could have some impact on the ultimate outcome of such petitions. DHS has taken certain steps that mitigate the potential effects of this rule on families. For instance, DHS will not attribute U.S. citizen children's receipt of public benefits to their parents who are subject to the public charge inadmissibility ground. Like all other applicants for admission or adjustment of status who are subject to the public charge or any other ground of inadmissibility, aliens are not guaranteed admission or adjustment of status merely by virtue of their

---

[841] Public Law 105–277, 112 Stat. 2681 (Oct. 21, 1998).

[842] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51277 (proposed Oct. 10, 2018).
[843] *See* 8 U.S.C. 1601(1) and (2).

**Exhibit A**

relationship to a U.S. citizen or lawful permanent resident.[844]

4. Paperwork Reduction Act Comments

*Comment:* A commenter stated that the newly proposed Form I–944 is duplicative and unnecessary in light of the Form I–864. Another commenter stated that DHS has not shown that there are not less burdensome ways of gaining the information from I–944 than the form requires.

*Response:* DHS disagrees that the Form I–944 duplicates information collected on Form I–864 and is therefore duplicative. However, DHS has updated the forms to remove the questions about employment that are also on the I–485. In addition, DHS added language to the forms, indicating to the applicant that if tax forms were submitted as part of Form I–485, Form I–864 or Form I–944, the same tax returns do not need to be submitted with the I–864. Any document that is submitted as part of another form related to the immigrant benefit does not need to be submitted multiple times. Form I–864 is an affidavit of support submitted by an intending immigrant's sponsor, as required for certain categories of aliens subject to the affidavit of support requirements under section 213A of the Act, 8 U.S.C. 1183a. Form I–864 is a contract between the sponsor and the U.S. Government in which the sponsor agrees to use his or her income, assets, and resources to support the intending immigrants named in Form I–864, if it becomes necessary. The sponsor completing and signing Form I–864 must show that he or she has enough income and/or assets to maintain the intending immigrants listed on the affidavit and the rest of the sponsor's household at 125 percent of the FPG. The sponsor, therefore, is largely submitting information regarding his or her financial situation.

However, Form I–944 is completed by the intending immigrant, *i.e.,* applicant for adjustment of status, and requests information on the relevant factors as established by section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and the final rule, which are distinct from the requirements of the affidavit of support.

*Comment:* A commenter suggested a simplification of the declaration of self-sufficiency that targets aliens that might trigger public charge concerns, rather than, for example, all aliens who seek to adjust status. Another commenter stated that Form I–944 imposes undue burdens

and that DHS has failed to justify requiring it.

*Response:* DHS disagrees that the Form I–944 needs to be simplified and more carefully targeted or is overly burdensome. Form I–944 requests information about all the relevant factors as established by section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), and the rule to determine whether the alien is inadmissible based on public charge ground.

The Form I–944 instructions state that only applicants filing Form I–485 who are subject to the public charge ground of inadmissibility must file Form I–944. The Form I–944 instructions also explain that an alien who is exempt from the public charge ground of inadmissibility does not need to file Form I–944, and subsequently lists all categories of aliens that are exempt from the public charge ground of inadmissibility. Therefore, DHS believes the declaration of self-sufficiency is appropriately targeted to the aliens that might trigger public charge concerns.

*Comment:* A commenter noted that there was no way to specify the receipt of public benefits was for an emergency on the Form I–944, nor did the form indicate that such services were excluded.

*Response:* DHS appreciates the comment and has updated the form to include questions regarding the exemptions and updated the description of the designated public benefits to clarify the information being sought.

*Comment:* A commenter opposed requiring that employees provide employers with certain information, whether through Form I–129, Form I–539, or Form I–944. The commenter stated that requiring a nonimmigrant to provide such personal information to his or her employer or prospective employer to overcome the presumption that he or she is or could become a public charge, such as medical payments, tax return transcripts, W–2s, or documents for temporary housing needs, is an unfair and unreasonable imposition on any employee. The commenter stated the employer should not know such personal information, and that the requirement could potentially expose an employer to liability. The commenter stated further that it is unclear who would be responsible to pay for the Form I–944, especially in the context of H–1B-based change or extension of status petitions, where the employer is generally required to pay the fees associated with the filing.

*Response:* Employees seeking employment-based nonimmigrant visas and those seeking to extend of change

to an employment-based nonimmigrant category, must provide certain biographical information to employers as part of the application process. Form I–129 and Form I–539/Form I–539A already provide for some information from both employers and employees when the benefit is related to employment-based immigration. As noted on the instructions for USCIS forms, the failure to provide requested information, or any other requested evidence, may delay adjudication or result in a denial of the benefit requested.

*Comment:* A commenter stated that DHS appears to be acting on the basis of either conflicting information or no information at all. For example, in the context of its PRA analysis, DHS estimates that 382,264 individuals will be required to fill out Form I–944, that the hour burden per response will be 4 hours, and that the monetary burden is $59,931,350. Those figures seem to directly conflict with DHS's earlier estimates that Form I–944 would take 4.5 hours to fill out and that the annual cost would be $25,963,371.[845] The commenter notes that the number of applicants is similarly in conflict. DHS also appears to assume that only applicants for adjustment will fill out Form I–944.[846] DHS overtly states, however, that at least some nonimmigrant visa applicants would have to fill out that form as well, and it provides statistics showing annual averages of those applicants over 200,000.[847] The commenter concludes from this information that DHS does not know how many people will have to fill out the form, how long it will take them, or how much it will cost on an annualized basis.

*Response:* DHS has corrected an error in the estimated time burden for Form I–944 from 4 hours to 4.5 hours. DHS uses historical data to estimate the populations and burdens reported. In some instances, DHS does not have historical data on a population and may need to derive these populations using statistical methods. For example, the 5-year average of those filing Form I–485 who are not exempt from the public charge inadmissibility determination is estimated at 382,264. DHS used this population for the Form I–944 estimate. Additionally, as part of the calculation of the 5-year average estimated population, DHS used the FY 2016 population of those who are not exempt

[844] *See Agyeman* v. *INS,* 296 F.3d 871, 879 (9th Cir. 2002) ("[A]pproval of the I–130 petition does not automatically entitle the alien to adjustment of status as an immediate relative of a United States citizen.").

[845] 83 FR 51284–85, at 51254.

[846] 83 FR 51284–85, at 51240 (calculating that 382,769 adjustment applicants would be subject to public charge review).

[847] 83 FR 51284–85, at 51243–44.

**Exhibit A**

from public charge review (382,769 filers), which is very close to the 5-year average estimate. In sum, the economic analysis used the 5-year average of those filing Form I–485 of 382,264 and the FY 2016 population of those not exempt from public charge review, to estimate the population that will be subject to public charge inadmissibility determination and, therefore, will have to submit Form I–944.

Finally, DHS is required to estimate cost burden in multiple ways: (1) The PRA requires estimating cost burden based on the average hourly wage of the respondent; (2) the PRA also requires estimating the annual cost burden based on expenses incurred to complete the information collection including but not limited to attorney's fees, shipping and handling, etc., and (3) E.O. 12866 requires estimating the benefits and costs of the regulation, including the opportunity cost of time, among other costs.

*Comment:* A commenter stated that the proposed rule would also impose unreasonable burdens and financial costs on immigration benefit applicants and petitioners, specifically mentioning Form I–944. The comment indicated that though DHS projects an average Form I–944 preparation time of 4 hours and 30 minutes, the evidentiary requirements associated with the form and the public charge assessment overall suggest that DHS has seriously underestimated the time commitment. For example, using a method of assessing "household size" that differs significantly from the long-accepted definition used to evaluate Form I–864, the proposed rule and Form I–944 instructions require individuals to submit extensive supporting documentation of the financial status of the applicant's household, including all sources of household income and all cash and non-cash assets that can be converted into cash within 12 months. For every such asset, an applicant must provide a description of the asset, along with the value, basis of the claim for the value, and proof of ownership. The net value of a home may be included as an asset, but only if accompanied by documentation of ownership, evidence of all secured loans or liens, and a recent appraisal completed by a licensed appraiser (estimated to cost an average of $300 to $400 for a single family home). The commenter indicated that these requirements alone could consume significant amounts of time beyond the DHS estimate. In addition, multiple commenters stated that the documentation and information applicants would be required to collect and present is extensive (the commenter

stated that the Form I–944 would require the alien to list the name of every household member, amount of current assets and resources, recent Federal tax return history for the applicant and household members, credit score, proof of debts and liabilities, complete list of all public benefits applied for or received, and education and employment history), and that accurately completing the form and providing all required information with documentation would be a significant effort for non-citizens and their families.

*Response:* DHS acknowledges that the time that it would take each individual to complete Form I–944 could be more or less time than the reported estimated average time burden, depending on the applicant's individual facts and circumstances. For example, some applicants would be children who do not have extensive education, assets, and liabilities to report on the Form I–944. In contrast, an older applicant could have extensive education, assets, and liabilities to report on the Form I–944. Moreover, in estimating the time burden, DHS does not include the time burden already accounted for by other information collections subject to the PRA nor inactive time to obtain the necessary evidence required. DHS also notes that an alien does not always have to provide information about the net value of a home and the related evidence. In general, the alien would need to provide information regarding the home and its net value if aliens using the home as evidence of his or her assets or resources. DHS will maintain the estimated time burden at 4.5 hours.

*Comment:* One commenter detailed several issues with Form I–944 and its requirements, saying that it will disproportionately harm low-income applicants and their families, place an unreasonable burden on families especially those who apply with their minor children, impose costly administrative burdens on Federal, State, and local government agencies, generate a huge workload for social services agencies, and undermine privacy rights of applicants. The commenter also noted that the rule will likely make it more difficult for low-income and vulnerable immigrants to remain on the path to U.S. citizenship, will dissuade many potential applicants from pursuing adjustment due to the costs of the application process, create financial hardship for people, and result in processing delays and lengthy wait times. One commenter said that the Form I–944 requirement would require states and counties to develop new work processes, require system updates, and

would likely result in hiring and specially training additional personnel. The commenter further indicated that counties will need to work with their respective states to develop standardized processes for receiving requests and providing information across the state that safeguards personal data. The commenter stated that this is not only a significant workload but also would include potentially major automation costs, given the level of detail required.

*Response:* The purpose of Form I–944 is to demonstrate that an adjustment of status applicant subject to the public charge ground of inadmissibility is not likely at any time in the future to become a public charge, as required by Congress in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4). Form I–944 collects information relevant to the mandatory factors, such as age, family status, assets, resources, financial status, education, and skills. DHS is required to assess an applicant's assets and resources as part of the public charge inadmissibility determination, which entails a review of the alien's income. These factors are mandated by Congress in section 212(a)(4) of the Act, and DHS does not have the authority to disregard these factors. Additionally, the estimated burden on any alien submitting Form I–944 was provided in the NPRM.

DHS acknowledges in the economic analysis accompanying this rule that various government agencies may incur indirect costs associated with the rule such as, for example, the potential need to update administrative processes and provide additional training. However, Form I–944 imposes no requirements on Federal, State, or local government agencies. Instead, applicants required to submit Form I–944 must submit certain evidence from Federal, State, and local government agencies such as Federal income tax returns and documentation of receipt of public benefits. DHS has reviewed the data provided by commenters and updated the cost estimates to account for the indirect effects of this rule, where possible.

## IV. Statutory and Regulatory Requirements

*A. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs)*

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is

**Exhibit A**

necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. Executive Order 13771 directs agencies to reduce regulation and control regulatory costs.

The Office of Information and Regulatory Affairs has designated this final rule as a "significant regulatory action" that is economically significant since it is estimated that the final rule would have an annual effect on the economy of $100 million or more, under section 3(f)(1) of E.O. 12866. Accordingly, OMB has reviewed this final regulation.

This rule is a regulatory action under E.O. 13771.

1. Summary

As discussed above, DHS is modifying its regulations to add new regulatory provisions for inadmissibility determinations based on the public charge ground under the INA. DHS is prescribing how it will determine whether an alien is inadmissible because he or she is likely at any time in the future to become a public charge and is identifying the types of public benefits that will be considered in the public charge determinations. An alien applying for admission at the port of entry, or adjustment of status generally must establish that he or she is not likely at any time in the future to become a public charge. DHS will weigh certain factors positively or negatively, depending on how the factor impacts the immigrant's likelihood to become a public charge. DHS is also revising existing regulations to require all aliens seeking an extension of stay or change of status to demonstrate that they have not received public benefits, as defined in this rule unless the nonimmigrant classification that they seek to extend or to which they seek to change is exempt from the public charge ground of inadmissibility. Finally, DHS is revising its regulations governing the Secretary's discretion to accept a public charge bond or similar undertaking under section 213 of the Act, 8 U.S.C. 1183. Similar to a waiver, a public charge bond permits an alien deemed inadmissible on the public charge ground to obtain adjustment of status, if otherwise admissible.[848]

This final rule will impose new costs on the population applying to adjust status using Form I-485 that are subject to the public charge ground of inadmissibility who will now be required to file the new Form I-944 as part of the public charge inadmissibility determination. DHS will require any adjustment applicants subject to the public charge inadmissibility ground to submit Form I-944 with their Form I-485 to demonstrate they are not likely at any time in the future to become a public charge. The final rule will also impose additional costs for completing Forms I-485, I-129, I-129CW, and I-539 as the associated time burden estimate for completing each of these forms will increase. Moreover, the final rule will impose new costs associated with the new public charge bond process, including new costs for completing and filing Forms I-945 and I-356. DHS estimates that the additional total cost of the final rule will be approximately $35,202,698 annually to the population applying to adjust status who is also required to file Form I-944, for the opportunity cost of time associated with the increased time burden estimates for Forms I-485, I-129, I-129CW, and I-539, and for requesting or cancelling a public charge bond using Form I-945 and Form I-356, respectively.

Over the first 10 years of implementation, DHS estimates the total quantified new direct costs of the final rule will be about $352,026,980 (undiscounted). In addition, DHS estimates that the 10-year discounted total direct costs of this final rule will be about $300,286,154 at a 3 percent discount rate and about $247,249,020 at a 7 percent discount rate.

The final rule will also potentially impose new costs on obligors (individuals or companies) if an alien has been determined to be likely at any time in the future to become a public charge and will be permitted to submit a public charge bond, for which USCIS will use the new Form I-945. DHS estimates the total cost to file Form I-945 will be, at minimum, about $34,166 annually.[849]

Moreover, the final rule will potentially impose new costs on aliens or obligors who submit Form I-356 as part of a request to cancel the public charge bond. DHS estimates the total

cost to file Form I-356 would be approximately $824 annually.[850]

The final rule will also result in a reduction in transfer payments from the Federal Government to individuals who may choose to disenroll from or forego enrollment in a public benefits program. Individuals who might choose to disenroll from or forego future enrollment in a public benefits program include foreign-born non-citizens as well as U.S. citizens who are members of mixed-status households,[851] who otherwise may be eligible for the public benefits. DHS estimates that the total reduction in transfer payments from the Federal and State governments will be approximately $2.47 billion annually due to disenrollment or foregone enrollment in public benefits programs by foreign-born non-citizens who may be receiving public benefits. DHS estimates that the 10-year discounted federal and state transfer payments reduction of this final rule will be approximately $21.0 billion at a 3 percent discount rate and about $17.3 billion at a 7 percent discount rate. However, DHS notes there may be additional reductions in transfer payments, or categories of transfers such as increases in uncompensated health care or greater reliance on food banks or other charities, that we are unable to quantify.

There also may be additional reductions in transfer payments from states to individuals who may choose to disenroll from or forego enrollment in a public benefits program. For example, the Federal Government funds all SNAP food expenses, but only 50 percent of allowable administrative costs for regular operating expenses.[852] Similarly, FMAP in some HHS programs, like Medicaid, can vary from between 50 percent to an enhanced rate of 100 percent in some cases.[853] Since the state

[848] There is no mention of "waiver" or "waive" in INA section 213, 8 U.S.C. 1183. However, the BIA has viewed that provision as functioning as a

waiver of the public charge ground of inadmissibility. *See Matter of Ulloa*, 22 I&N Dec. 725, 726 (BIA 1999).

[849] Calculation: $35.59 (cost per obligor to file Form I-945) * 960 (estimated annual population who would file Form I-945) = $34,166.40 = $34,166 (rounded) annual total cost to file Form I-945.

[850] Calculation: $33.00 (cost per obligor to file Form I-356) * 25 (estimated annual population who would file Form I-356) = $825.00 annual total cost to file Form I-356.

[851] DHS uses the term "foreign-born non-citizen" since it is the term the U.S. Census Bureau uses. DHS generally interprets this term to mean alien in this analysis. In addition, DHS notes that the Census Bureau publishes much of the data used in this analysis.

[852] Per section 16(a) of the Food and Nutrition Act of 2008, Pub. L. 110–234, tit. IV, 122 Stat. 923, 1092 (May 22, 2008) (codified as amended at 7 U.S.C. 2025). *See also* USDA, FNS Handbook 901, at p. 41 (2017). Available at: *https://fns-prod.azureedge.net/sites/default/files/apd/FNS_HB901_v2.2_Internet_Ready_Format.pdf*, (last visited May 7, 2019).

[853] *See* Dept. of Health and Human Servs. Notice, Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons

Continued

**Exhibit A**

share of FFP varies from state to state, DHS uses the average FMAP across all states and U.S. territories of 59 percent to estimate the amount of state transfer payments. Therefore, the estimated 10-year undiscounted amount of state transfer payments that could occur as a result of the provisions of this final rule is about $1.01 billion annually. The estimated 10-year discounted amount of state transfer payments of the provisions of this final rule would be approximately $8.63 billion at a 3 percent discount rate and about $7.12 billion at a 7 percent discount rate. Finally, DHS recognizes that reductions in federal and state transfers under Federal benefit programs may have downstream impacts on state and local economies, large and small businesses, and individuals. For example, the rule might result in reduced revenues for healthcare providers participating in Medicaid, companies that manufacture medical supplies or pharmaceuticals, grocery retailers participating in SNAP, agricultural producers who grow foods that are eligible for purchase using SNAP benefits, or landlords participating in federally funded housing programs.

Additionally, the final rule will have new direct and indirect impacts on various entities and individuals associated with regulatory familiarization with the provisions of the rule. Familiarization costs involve the time spent reading the details of a rule to understand its changes. A foreign-born non-citizen (such as those contemplating disenrollment or foregoing enrollment in a public benefits program) might review the rule to determine whether she or he is subject to its provisions and may incur familiarization costs. To the extent that an individual or entity directly regulated by the rule incurs familiarization costs, those familiarization costs are a direct cost of the rule. In addition to those individuals or entities the rule directly regulates, a wide variety of other entities would likely choose to read and understand the rule and, therefore, would incur familiarization costs. For example, immigration lawyers, immigration advocacy groups, health care providers of all types, non-profit organizations, non-governmental organizations, and religious organizations, among others, may need or want to become familiar with the provisions of this final rule. DHS believes such non-profit organizations and other advocacy groups might choose to read the rule in order to provide information to those foreign-born non-citizens that might be affected by a reduction in federal and state transfer payments. Familiarization costs incurred by those not directly regulated are indirect costs.

DHS estimates the time that would be necessary to read this final rule would be approximately 16 to 20 hours per person depending on an individual's average reading speed and level of review, resulting in opportunity costs of time. An entity, such as a non-profit or advocacy group, may have more than one person that reads the rule. Using the average total rate of compensation as $36.47 per hour for all occupations, DHS estimates that the opportunity cost of time will range from about $583.52 to $729.40 per individual who must read and review the final rule.

The final rule will produce some quantified benefits due to the regulatory changes DHS is making. The final rule will produce some benefits for T nonimmigrants applying for adjustment of status based on their T nonimmigrant status, as this population will no longer need to submit Form I–601 seeking a waiver on the public charge ground of inadmissibility. DHS estimates the total benefits for this population is $15,176 annually.[854]

The primary benefit of the final rule would be to better ensure that aliens who are admitted to the United States, seek extension of stay or change of status, or apply for adjustment of status are not likely to receive public benefits and will be self-sufficient, *i.e.*, individuals will rely on their own financial resources, as well as the financial resources of the family, sponsors, and private organizations.[855] DHS also anticipates that the final rule will produce some benefits from the elimination of Form I–864W. The elimination of this form will potentially reduce the number of forms USCIS would have to process. DHS estimates the amount of cost savings that will accrue from eliminating Form I–864W will be about $36.47 per petitioner.[856] However, DHS is unable to determine the annual number of filings of Form I–864W and, therefore, currently is unable to estimate the total annual cost savings of this change. Additionally, a public charge bond process will also provide benefits to applicants as they potentially will be given the opportunity for adjustment if otherwise admissible, at the discretion of DHS, after a determination that he or she is likely to become a public charge.

Table 2 provides a more detailed summary of the final provisions and their impacts.

#### TABLE 2—SUMMARY OF MAJOR PROVISIONS AND ECONOMIC IMPACTS OF THE FINAL RULE

| Provision | Purpose | Expected impact of final rule |
|---|---|---|
| Revising 8 CFR 212.18. Application for Waivers of Inadmissibility in connection with an application for adjustment of status by T nonimmigrant status holders.<br>Revising 8 CFR 245.23. Adjustment of aliens in T nonimmigrant classification. | To clarify that T nonimmigrants seeking adjustment of status are not subject to public charge ground of inadmissibility. | **Quantitative:**<br>*Benefits:*<br>• Benefits of $15,176 annually to T nonimmigrants applying for adjustment of status who will no longer need to submit Form I–601 seeking a waiver on public charge grounds of inadmissibility.<br>*Costs:*<br>• None. |

for October 1, 2016 through September 30, 2017, 80 FR 73779 (Nov. 25, 2015).

[854] Calculation: $14,880 (Filing fees for Form I–601) + $296.48 (Opportunity cost of time for Form I–601) = $15,176.48 = $15,176 (rounded) total current estimated annual cost for filing T nonimmigrants filing Form I–601 seeking a waiver of grounds of inadmissibility. Therefore, the estimated total benefits of the final rule for T nonimmigrants applying for adjustment of status using Form I–601 seeking a waiver on grounds of inadmissibility will equal the current cost to file Form I–601 for this population.

[855] 8 U.S.C. 1601(2).

[856] Calculation of savings from opportunity cost of time for no longer having to complete and submit Form I–864W: ($36.47 per hour * 1.0 hours) = $36.47.

**Exhibit A**

TABLE 2—SUMMARY OF MAJOR PROVISIONS AND ECONOMIC IMPACTS OF THE FINAL RULE—Continued

| Provision | Purpose | Expected impact of final rule |
|---|---|---|
| Adding 8 CFR 212.20. Purpose and applicability of public charge inadmissibility.<br>Adding 8 CFR 212.21. Definitions ............<br>Adding 8 CFR 212.22. Public charge determination.<br><br><br><br><br><br><br><br>Adding 8 CFR 212.23. Exemptions and waivers for public charge ground of inadmissibility. | To define the categories of aliens that are subject to the public charge determination.<br>To establish key definitions, including "public charge," "public benefit," "likely to become a public charge," "household," and "receipt of public benefits."<br>Clarifies that evaluating public charge is a prospective determination based on the totality of the circumstances.<br>Outlines minimum and additional factors considered when evaluating whether an alien immigrant is inadmissible based on the public charge ground. Positive and negative factors are weighed to determine an individual's likelihood of becoming a public charge at any time in the future.<br>Outlines exemptions and waivers for inadmissibility based on the public charge ground. | **Quantitative:**<br>*Benefits:*<br>• Benefits of $36.47 per applicant from no longer having to complete and file Form I–864W.<br>*Costs:*<br>• DHS anticipates a likely increase in the number of denials for adjustment of status applicants based on public charge inadmissibility determinations due to formalizing and standardizing the criteria and process for inadmissibility determinations.<br>**Quantitative:**<br>*Benefits:*<br>• Better ensure that aliens who are seeking admission to the United States or apply for adjustment of status are self-sufficient through an improved review process of the mandatory statutory factors. |
| Adding 8 CFR 214.1(a)(3)(iv) and amending 8 CFR 214.1(c)(4)(iv). Nonimmigrant general requirements.<br>Amending 8 CFR 248.1(a) and adding 8 CFR 248.1(c)(4). Change of nonimmigrant classification eligibility. | To provide, with limited exceptions, that an application for extension of stay or change of nonimmigrant status will be denied unless the applicant demonstrates that he or she has not received public benefits since obtaining the nonimmigrant status that he or she is seeking to extend or change, as defined in final 8 CFR 212.21(b), for 12 months, in the aggregate, within a 36 month period. | **Quantitative:**<br>*Costs:*<br>• $6.1 million annually for an increased time burden for completing and filing Form I–129;<br>• $0.12 million annually for an increased time burden for completing and filing Form I–129CW;<br>• $2.4 million annually for an increased time burden for completing and filing Form I–539.<br>**Quantitative:**<br>*Benefits:*<br>• Better ensures that aliens who are seeking to extend or change to a status that is not exempt from the section 212(a)(4) inadmissibility ground who apply for extension of stay or change of status continue to be self-sufficient during the duration of their nonimmigrant stay. |
| Amending 8 CFR 245. Adjustment of status to that of person admitted for lawful permanent residence. | To outline requirements that aliens submit a declaration of self-sufficiency on the form designated by DHS and any other evidence requested by DHS in the public charge inadmissibility determination. | **Quantitative:**<br>*Direct Costs:*<br>• Total annual direct costs of the final rule will range from about $45.5 to $131.2 million, including:<br>  • $25.8 million to applicants who must file Form I–944;<br>  • $0.69 million to applicants applying to adjust status using Form I–485 with an increased time burden;<br>  • $0.34 million to public charge bond obligors for filing Form I–945; and<br>  • $823.50 to filers for filing Form I–356.<br>• Total costs over a 10-year period will range from:<br>  • $352.0 million for undiscounted costs;<br>  • $300.1 million at a 3 percent discount rate; and<br>  • $247.2 million at a 7 percent discount rate.<br>*Transfer Payments*<br>• Total annual transfer payments of the final rule would be about $2.47 billion from foreign-born non-citizens and their households who disenroll from or forego enrollment in public benefits programs. The federal-level share of annual transfer payments will be about $1.46 billion and the state-level share of annual transfer payments will be about $1.01 billion.<br>• Total transfer payments over a 10-year period, including the combined federal- and state-level shares, will be:<br>  • $24.7 billion for undiscounted costs;<br>  • $21.0 billion at a 3 percent discount rate; and<br>  • $17.3 billion at a 7 percent discount rate.<br>**Quantitative:**<br>*Benefits:*<br>• Potential to make USCIS' in the review of public charge inadmissibility more effective.<br>*Costs:* |

**Exhibit A**

TABLE 2—SUMMARY OF MAJOR PROVISIONS AND ECONOMIC IMPACTS OF THE FINAL RULE—Continued

| Provision | Purpose | Expected impact of final rule |
|---|---|---|
| | | • DHS anticipates a likely increase in the number of denials for adjustment of status applicants based on public charge inadmissibility determinations due to formalizing and standardizing the criteria and process for public charge determination.<br>• Costs to various entities and individuals associated with regulatory familiarization with the provisions of the final rule. Costs will include the opportunity cost of time to read the final rule and subsequently determine applicability of the final rule's provisions. DHS estimates that the time to read this final rule in its entirety would be 16 to 20 hours per individual. DHS estimates that the opportunity cost of time will range from about $583.52 to $729.40 per individual who must read and review the final rule. However, DHS cannot determine the number of individuals who will read the final rule. |
| | Public Charge Bond Provisions | |
| Amending 8 CFR 103.6. Public charge bonds. | To set forth the Secretary's discretion to approve bonds, cancellation, bond schedules, and breach of bond, and to move principles governing public charge bonds to final 8 CFR 213.1. | **Quantitative:**<br>*Costs:*<br>• $34,166 annually to obligors for submitting Public Charge Bond (Form I–945); and<br>• $823.50 annually to filers for submitting Request for Cancellation of Public Charge Bond (Form I–356). |
| Amending 8 CFR 103.7. Fees ................. | To add fees for new Form I–945, Public Charge Bond, and Form I–356, Request for Cancellation of Public Charge Bond. | • Fees paid to bond companies to secure public charge bonds. Fees could range from 1–15 percent of the public charge bond amount based on an individual's credit score. |
| Amending 8 CFR 213.1. Admission or adjustment of status of aliens on giving of a public charge bond. | In 8 CFR 213.1, to add specifics to the public charge bond provision for aliens who are seeking adjustment of status, including the discretionary availability and the minimum amount required for a public charge bond. | **Quantitative:**<br>*Benefits:*<br>• Potentially enable an alien who was found inadmissible only on the public charge ground to adjust his or her status by posting a public charge bond with DHS. |

Source: USCIS analysis.

DHS has prepared a full analysis according to E.O.s 12866 and 13563, and can be found in the docket for this rulemaking or by searching for RIN 1615–AA22 on *www.regulations.gov*. In addition to the impacts summarized above and as required by OMB Circular A–4, Table 8 presents the prepared accounting statement showing the costs associated with this final regulation.[857]

TABLE 8—OMB A–4 ACCOUNTING STATEMENT

[$, 2018]

| Category | Primary estimate | Minimum estimate | Maximum estimate | Source citation |
|---|---|---|---|---|
| | | BENEFITS: | | |
| Monetized Benefits .............. | The final rule will produce some benefits for T nonimmigrants applying for adjustment of status based on their T nonimmigrant status, as this population will no longer need to submit Form I–601 seeking a waiver on grounds of inadmissibility. DHS estimates the total benefits for this population is $15,176 annually.<br>Form I–485 applicants will no longer have to file Form I–864W. Benefits to applicants will be approximately $36.47 per petition based on the opportunity cost of time. | | | RIA. |
| Annualized quantified, but un-monetized, benefits. | ............................................. | ............................................. | ............................................. | RIA. |
| Unquantified Benefits .......... | The primary benefit of the final rule is to ensure that aliens who are admitted to the United States or apply for adjustment of status will not use or receive one or more public benefits for which they are entitled to receive, and instead, will rely on their financial resources, and those of family members, sponsors, and private organizations. | | | RIA. |

[857] OMB Circular A–4 is *available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf.*

**Exhibit A**

TABLE 8—OMB A–4 ACCOUNTING STATEMENT—Continued

[$, 2018]

| Category | Primary estimate | Minimum estimate | Maximum estimate | Source citation |
|---|---|---|---|---|
| | Potential to improve the efficiency for USCIS in the review process for public charge inadmissibility. | | | |
| **COSTS:** | | | | |
| Annualized monetized costs (discount rate in parenthesis). | (3%) $35,202,698<br>(7%) $35,202,698 | N/A<br>N/A | N/A<br>N/A | RIA. |
| Annualized quantified, but un-monetized, costs.<br>Qualitative (unquantified) costs. | N/A.<br><br>DHS anticipates a likely increase in the number of denials for adjustment of status applicants based on public charge inadmissibility determinations due to formalizing and standardizing the criteria and process for public charge determination.<br>Costs to various entities and individuals associated with regulatory familiarization with the provisions of the rule. Costs will include the opportunity cost of time to read the final rule and subsequently determine applicability of the final rule's provisions. DHS estimates that the time to read this final rule in its entirety would be 16 to 20 hours per individual. DHS estimates that the opportunity cost of time will range from about $583.52 to $729.40 per individual who must read and review the final rule. However, DHS cannot determine the number of individuals who will read the final rule.<br>Fees paid by aliens to obligors to secure public charge bond.<br>Other qualitative, unquantified effects of the final rule could include:<br>• Potential lost productivity,<br>• Adverse health effects,<br>• Additional medical expenses due to delayed health care treatment, and<br>• Increased disability insurance claims<br>• Administrative changes to business processes such as reprogramming computer software and redesigning application forms and processing. | | | RIA. |
| **TRANSFERS:** | | | | |
| Annualized monetized transfers: "on budget". | ($1,455,724,086) | N/A | N/A | RIA. |
| From whom to whom? ........ | Reduction in transfer payments from the federal government to public benefits recipients who are members of households that include foreign-born non-citizens. This amount includes the estimated federal-level shares of transfer payments to members of households that include foreign-born non-citizens. | | | RIA. |
| Annualized monetized transfers: "off-budget". | ($1,011,604,874) | N/A | N/A | RIA. |
| From whom to whom? | Reduction in transfer payments from state governments to public benefits recipients who are members of households that include foreign-born non-citizens. This amount includes the estimated state-level shares of transfer payments to members of households that include foreign-born non-citizens. DHS estimates that the state-level share of transfer payments is 59 percent of the estimated amount of federal transfer payments. DHS estimates the annual federal-level share would be about $1.46 billion and the annual state-level share of transfer payments would be about $1.01 billion. | | | |
| Miscellaneous analyses/category | Effects | | | Source citation |
| Effects on state, local, and/ or tribal governments. | DHS believes that the rule may have indirect effects on state, local, and/or tribal government, but DHS does not know the full extent of the effect on state, local, and/or tribal governments. There may be costs to various entities associated with familiarization of and compliance with the provisions of the rule, including salaries and opportunity costs of time to monitor and understand regulation requirements, disseminate information, and develop or modify information technology (IT) systems as needed. It may be necessary for many government agencies to update guidance documents, forms, and webpages. It may be necessary to prepare training materials and retrain staff at each level of government, which will require additional staff time and will generate associated costs. | | | RIA. |
| Effects on small businesses | DHS believes there may be some impacts to those small entities that file Form I–129 or Form I–129CW for beneficiaries that extend stay or change status. These petitioners will have an increase in time burden for completing and filing Form I–129 or Form I–129CW and possibly have labor turnover costs if the Form I–129 or Form I–129CW EOS/COS request is denied and the beneficiary has to leave the United States or the Commonwealth of the Northern Mariana Islands (CNMI), respectively. DHS also believes that some surety companies that are small entities may be impacted by filing Form I–356. DHS estimates the total annual cost to file Form I–356 will be about $823.50. | | | RIA. |

**Exhibit A**

**41490**    **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

| Miscellaneous analyses/category | Effects | Source citation |
|---|---|---|
| Effects on wages ............... | None ...................................................................................................................................... | None. |
| Effects on growth ............... | None ...................................................................................................................................... | None. |

*B. Regulatory Flexibility Act*

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121 (March 29, 1996), imposes certain requirements on Federal agency rules that are subject to the notice and comment requirements of the APA, 5 U.S.C. 553(b), and are likely to have a significant economic impact on a substantial number of small entities. The RFA requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, or governmental jurisdictions with populations of less than 50,000.[858] This final rule requires an individual seeking admission at the port of entry or adjusting status to establish that he or she is not likely at any time in the future to become a public charge. Most of this rule's regulatory changes do not fall under the RFA because they directly regulate individuals who are not, for purposes of the RFA, within the definition of small entities established by 5 U.S.C. 601(6). However, DHS recognizes that there may be some provisions of this final rule that would directly regulate small entities, and, therefore, DHS has examined the impact of this final rule on small entities.

This final rule would increase the time burden by an additional 30 minutes for petitioners who file Form I–129 or Form I–129CW on behalf of a beneficiary requesting an extension of stay or change of status, which would impose direct costs on these petitioners. Additionally, the provisions to establish a public charge bond process included in this final rule would allow for either an alien or an obligor (individual or an entity) to request a cancellation of a public bond. As a result, this final rule could have direct impacts on small entities that are obligors. DHS also recognizes that a Form I–129 or Form I–

129CW beneficiary, for whom a Form I–129 or Form I–129CW petitioner (*i.e.,* the employer) sought either an extension of stay or a change of status, may have to leave the United States if the employer's request was denied. In these cases, the petitioner may lose the beneficiary as an employee and may incur labor turnover costs. DHS presents this Final Regulatory Flexibility Analysis (FRFA) to examine these impacts.

1. Final Regulatory Flexibility Analysis

The small entities that could be impacted by this final rule are those who file Form I–129 or Form I–129CW as petitioners on behalf of beneficiaries requesting an extension of stay or change of status as well as obligors that would request a cancellation of a public charge bond.

a. A Statement of the Need for, and Objectives of, the Rule

DHS seeks to better ensure that applicants for admission to the United States and applicants for adjustment of status to lawful permanent resident who are subject to the public charge ground of inadmissibility are self-sufficient, *i.e.,* they will rely on their own financial resources as well as the financial resources of their family, sponsors, and private organizations as necessary.[859] Under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), an alien is inadmissible if, at the time of an application for admission or adjustment of status, he or she is likely at any time to become a public charge. The statute requires DHS to consider the following minimum factors that reflect the likelihood that an alien will become a public charge: The alien's age; health; family status; assets, resources, and financial status; and education and skills. In addition, DHS may consider any affidavit of support submitted by the alien's sponsor and any other factors relevant to the likelihood of the alien becoming a public charge.

Separate from these requirements, as a condition for permitting extension of stay or change of status for certain nonimmigrant aliens, this rule requires such aliens (or their petitioning employer) to establish that they have not received certain public benefits above a particular threshold since

obtaining the nonimmigrant status that they wish to extend or change. This "public benefit condition" serves the same policy goals as the rule generally.

b. A statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments.

*Comment:* Some commenters stated that the rule will negatively impact small businesses. An individual commenter stated that the rule would undercut small and mid-sized businesses' ability to manage their talent pipelines. The commenter stated that nearly 48 percent of private-sector workers in the United States are employed in these small and mid-sized businesses, and that small businesses rely on strategic partnerships and related tools to ensure a strong talent pipeline of workers who are equipped with the skills they need. The commenter stated that the rule would penalize individuals who often draw upon public benefits to support themselves or their families during their training period or even when they first begin work. The commenter stated that in view of currently low unemployment, employers need access to labor that is able to attend training while still relying on public benefits programs to provide for their families' basic needs.

A commenter stated that the RFA mandates that DHS consider more impacts than it has such as labor turnover costs, or reduced productivity and educational attainment.

*Response:* DHS appreciates the comments regarding the effect of the rule on small entities, including small business, and DHS's RFA analysis. The RFA analysis discusses and estimates the potential direct costs that small businesses could incur and explains the limitations for providing a more thorough quantification of the potential costs to small businesses. Additionally, the economic analysis that accompanies this rule, which can be found in the rule docket at *www.regulations.gov,* discusses the direct and indirect effects of the rule, including on small businesses. Most of this rule's regulatory effects, such as the effects described in the comment summary above, do not fall under the RFA because they directly

---

[858] A small business is defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act, 15 U.S.C. 632.

[859] *See* 8 U.S.C. 1601(2).

**Exhibit A**

regulate individuals who are not, for purposes of the RFA, within the definition of small entities established by 5 U.S.C. 601(6). However, DHS recognizes that there may be some provisions of this final rule that would directly regulate small entities, and, therefore, DHS has examined the impact of this final rule on small entities.

The primary effect on small entities is that this rule will increase the time burden for petitioners who file Form I–129 or Form I–129CW on behalf of a beneficiary requesting an extension of stay or change of status, which would impose direct costs on these petitioners via opportunity costs of time. DHS also recognizes that a Form I–129 or Form I–129CW beneficiary, for whom a Form I–129 or Form I–129CW petitioner (*i.e.*, the employer) sought either an extension of stay or a change of status, may have to leave the United States if the employer's request was denied. In these cases, the petitioner may lose the beneficiary as an employee and may incur labor turnover costs. Additionally, this rule could have direct impacts on small entities as the provisions establish a public charge bond process included in this final rule would allow for either an alien or an obligor (individual or an entity) to request a cancellation of a public bond.

DHS believes it has considered all impacts that the RFA requires. The courts have held that the RFA requires an agency to perform a regulatory flexibility analysis of small entity impacts only when a rule directly regulates them.[860] However, DHS notes that we have also considered other, indirect impacts in the economic analysis that accompanies this rule.

c. The response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments.

No comments were filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA).

d. A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available.

This final rule will increase the time burden by an additional 30 minutes for petitioners who file Form I–129 or Form

I–129CW on behalf of a beneficiary requesting an extension of stay or change of status, which would impose direct costs on these petitioners and entities.[861] As previously discussed in the E.O. 12866 section of this final rule, DHS estimates an annual population of 336,335 beneficiaries seeking extension of stay or change of status through a petitioning employer using Form I–129. In addition, DHS estimates an annual population of 6,307 beneficiaries seeking extension of stay or change of status through a petitioning employer using Form I–129CW. DHS estimates that the 30-minute increase in the estimated time burden for these populations would increase the opportunity cost of time for completing and filing Form I–129 and Form I–129CW and would result in about $6.1 million and about $115,040 million in costs, respectively.

The provisions regarding the bond process included in this final rule will allow a surety company to become an obligor on a public charge bond (Form I–945) and, later, to request a cancellation of such a bond (Form I–356). Therefore, this final rule could have some impacts to surety companies, some of which are small entities. A request for cancellation of a public bond using Form I–356 includes a time burden of 15 minutes per request and a fee to DHS of $25.00. The number of surety bond companies that might complete and file Forms I–945 and I–356 is not known due to a lack of historical data and uncertainty in the number individuals that may be granted the opportunity to post a public charge bond. However, DHS estimates that the filing volume for Form I–945 might be about 960 and the filing volume for Form I–356 might be approximately 25. While DHS cannot predict the exact number of surety companies that might be impacted by this final rule, nine out of 273 Treasury-certified surety companies in fiscal year 2015 posted new immigration bonds with ICE.[862] DHS found that of the nine surety companies, four entities were considered ''small'' based on the number of employees or revenue being less than their respective SBA size standard.[863] Assuming these nine surety

companies post public charge bonds with USCIS, we can assume that four surety companies may be considered as small entities. However, USCIS cannot predict the exact impact to these small entities at this time. We expect that obligors would be able to pass along the costs of this rulemaking to the aliens.

e. A description of the projected reporting, recordkeeping, and other compliance requirements of the rule, including an estimate of the classes of small entities that will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.

In addition to burden costs discussed in Section 4 of this FRFA, DHS recognizes that a Form I–129 or Form I–129CW beneficiary, for whom a Form I–129 or Form I–129CW petitioner (*i.e.*, the employer) sought either an extension of stay or a change of status, may have to leave the United States if the employer's request is denied. In these cases, the petitioner may lose the beneficiary as an employee and may incur labor turnover costs. A 2012 report published by the Center for American Progress surveyed several dozen studies that considered both direct and indirect costs and determined that turnover costs per employee ranged from 10 to 30 percent of the salary for most salaried workers.[864] An employer paid an average of about 20 percent of the worker's salary in total labor turnover costs. Specifically, for workers earning $50,000 or less, and for workers earning $75,000 or less, the average turnover cost was about 20 percent for both earning levels. According to the study, these earning levels corresponded to the 75th and 90th percentiles of typical earnings, respectively. Assuming Form I–129 and Form I–129CW beneficiaries are employed, DHS believes it is reasonable to assume an annual mean wage of $50,620 across all occupations.[865] Assuming an average labor turnover cost of 20 percent of $50,620, on average, an employer could incur costs of approximately $10,124 per beneficiary

---

[860] *See* U.S. Small Business Administration, Office of Advocacy. *The RFA in a Nutshell: A Condensed Guide to the Regulatory Flexibility Act.* Oct. 2010. Available at: *https://www.sba.gov/advocacy/rfa-nutshell-condensed-guide-regulatory-flexibility-act* (Last visited July 25, 2019).

[861] In the context of Form I–129, a petitioner is typically an employer or the representative of an employer who files on behalf of a nonimmigrant worker (or beneficiary) to come to the United States temporarily to perform services or labor, or to receive training. See *https://www.uscis.gov/i-129*.

[862] *See* DHS, Procedures and Standards for Declining Surety Immigration Bonds and Administrative Appeal Requirement for Breaches NPRM, 83 FR 25951, 25962–25965 (June 5, 2018).

[863] U.S. Small Business Administration, Table of Small Business Size Standards Matched to North

American Industry Classification System (NAICS) Codes, October 1, 2017. *https://www.sba.gov/sites/default/files/files/Size_Standards_Table_2017.pdf* (Last visited July 26, 2019).

[864] *See* ''There Are Significant Business Costs to Replacing Employees,'' by Heather Boushey and Sarah Jane Glynn (2012), Center for American Progress, *available: https://www.americanprogress.org/issues/economy/reports/2012/11/16/44464/there-are-significant-business-costs-to-replacing-employees/* (last visited July 26, 2019).

[865] Bureau of Labor Statistics, May 2017 National Occupational Employment and Wage Estimates, All Occupations *https://www.bls.gov/oes/2017/may/oes_nat.htm* (last visited July 26, 2019).

**Exhibit A**

that would be separated from employment as a result of a denied request for an extension of stay or change of status. However, DHS does not know the number of small entities within this population of petitioners that might incur labor turnover costs.

Additionally, DHS also recognizes that a Form I–129 or Form I–129CW beneficiary, for whom a Form I–129 or Form I–129CW petitioner (*i.e.,* the employer) sought either an extension of stay or a change of status and the request was denied, may still be able to get a visa and return to the U.S., including pursuant to other means.

DHS does not believe it would be necessary for Form I–129 or Form I–129CW petitioners, or for surety bond companies (obligors) to acquire additional types of professional skills as a result of this final rule. These petitioners and obligors should already possess the expertise to fill out the associated forms for this final rule. Additionally, these petitioners and obligors would be familiar with the final rule and such familiarization costs are accounted for in the E.O. 12866 sections.

f. Description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

DHS considered a range of potential alternatives to the final rule. First, under a "no action" alternative, DHS would continue administering the public charge ground of inadmissibility under the 1999 Interim Field Guidance, and would not impose a public benefit condition for extension of stay and change of status. For reasons explained more fully elsewhere in the preamble to the final rule, DHS determined that this alternative would not adequately ensure the self-sufficiency of aliens subject to the public charge ground of inadmissibility. Second, DHS considered including a more expansive definition of "public benefit," potentially to include a range of non-cash benefit programs falling in specific categories (such as other programs that provide assistance for basic food and nutrition, housing, and healthcare). For reasons explained more fully elsewhere in the preamble to the final rule, DHS chose the approach contained in this final rule—a more limited list of cash

benefits for income maintenance and high-expenditure non-cash benefits. DHS expects that, as compared to the broader alternative, the approach DHS decided to pursue may reduce the overall effect of the rule on transfers, but enhance its administrability and predictability. Employers filing Forms I–129 and I–129CW, and surety companies will have a better understanding of the types of non-cash benefits that may be covered under this final rule than they would under the broader alternative, and may realize cost savings as a result. In addition, certain indirect effects of the rule may be different as a result of the decision to reject this alternative.

DHS has revised the final rule to eliminate the future-looking aspect of the public benefit condition, which will reduce burden on small entities.

*C. Congressional Review Act*

DHS has sent this final rule to the Congress and to the Comptroller General under the Congressional Review Act, 5 U.S.C. 801 *et seq.* The Administrator of the Office of Information and Regulatory Affairs has determined that this rule is a "major rule" within the meaning of the Congressional Review Act. The rule therefore requires at least a 60-day delayed effective date.

*D. Unfunded Mandates Reform Act*

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may directly result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector. The inflation-adjusted value of $100 million in 1995 is approximately $165 million in 2018 based on the Consumer Price Index for All Urban Consumers (CPI–U).[866]

This final rule does not contain such a mandate as it does not include any Federal mandate that may result in increased expenditures by State, local, or tribal governments; nor does it increase private sector expenditures by more than $165 million annually (inflation adjusted); nor does it

---

[866] U.S. Bureau of Labor Statistics, *Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. City Average, All Items, available at https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-201902.pdf* (last visited April 25, 2019).

significantly or uniquely affect small governments. Accordingly, the UMRA requires no further agency action or analysis.

*E. Executive Order 13132 (Federalism)*

This final rule does not have federalism implications because it does not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Accordingly, E.O. 13132, Federalism, requires no further agency action or analysis.

*F. Executive Order 12988 (Civil Justice Reform)*

This final rule was drafted and reviewed in accordance with E.O. 12988, Civil Justice Reform. This final rule was written to provide a clear legal standard for affected conduct and was carefully reviewed to eliminate drafting errors and ambiguities, so as to minimize litigation and undue burden on the Federal court system. DHS has determined that this final rule meets the applicable standards provided in section 3 of E.O. 12988.

*G. Executive Order 13175 Consultation and Coordination With Indian Tribal Governments*

This final rule does not have "tribal implications" because it does not have substantial direct effects on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes. Accordingly, E.O. 13175, Consultation and Coordination with Indian Tribal Governments, requires no further agency action or analysis.

*H. Family Assessment*

Section 654 of the Treasury and General Government Appropriations Act, 1999 (Pub. L. 105–277) requires Federal agencies to issue a Family Policymaking Assessment for any rule that may affect family well-being. Agencies must assess whether the regulatory action: (1) Impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) if the regulatory action financially impacts families, are justified; (6) may be carried out by State or local government or by the family; and (7) establishes a policy

**Exhibit A**

concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the determination is affirmative, then the Agency must prepare an impact assessment to address criteria specified in the law. As discussed in the NPRM,[867] DHS has determined that the rule may decrease disposable income and increase the poverty of certain families and children, including U.S. citizen children. DHS continues to be of the opinion that the benefits of the action justify the financial impact on the family. Additionally, because the final rule considers public benefits for purposes of the inadmissibility determination that were not considered under the 1999 Interim Field Guidance, DHS determined that the aliens found inadmissible under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), will likely increase. However, given the compelling need for this rulemaking, including but not limited to ensuring self-sufficiency and minimizing the incentive to immigrate based on the U.S. social safety net, DHS determined that this rulemaking's impact is justified and no further actions are required. DHS also determined that this final rule will not have any impact on the autonomy or integrity of the family as an institution.

*I. National Environmental Policy Act (NEPA)*

DHS analyzes actions to determine whether NEPA applies to them and if so what degree of analysis is required. DHS Directive (Dir) 023–01 Rev. 01 and Instruction Manual (Inst.) 023–01–001 Rev. 01 establish the procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500 through 1508. The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions (''categorical exclusions'') which experience has shown do not individually or cumulatively have a

significant effect on the human environment and, therefore, do not require an Environmental Assessment (EA) or Environmental Impact Statement (EIS). 40 CFR 1507.3(b)(1)(iii), 1508.4. DHS Instruction 023–01–001 Rev. 01 establishes such Categorical Exclusions that DHS has found to have no such effect. Inst. 023–01–001 Rev. 01 Appendix A Table 1. For an action to be categorically excluded, DHS Inst. 023–01–001 Rev. 01 requires the action to satisfy each of the following three conditions:

(1) The entire action clearly fits within one or more of the Categorical Exclusions;

(2) the action is not a piece of a larger action; and

(3) no extraordinary circumstances exist that create the potential for a significant environmental effect. Inst. 023–01–001 Rev. 01 section V.B(1)–(3).

DHS has analyzed this action and has concluded that NEPA does not apply due to the excessively speculative nature of any effort to conduct an impact analysis. This final rule fits within the Categorical Exclusion found in DHS Inst. 023–01–001 Rev. 01, Appendix A, Table 1, number A3(d): ''Promulgation of rules . . . that interpret or amend an existing regulation without changing its environmental effect.'' This final rule is not part of a larger action. This final rule presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this final rule is categorically excluded from further NEPA review.

This final rule applies to applicants for admission or adjustment of status, as long as the individual is applying for an immigration status that is subject to the public charge ground of inadmissibility. In addition, this final rule would potentially affect individuals applying for an extension of stay or change of status because these individuals would have to demonstrate that they have not received, since obtaining the nonimmigrant status they are seeking to

extend or change, public benefits for a duration of more than 12 months in the aggregate within a 36-month period. As discussed in detail above, this final rule establishes a definition of public charge and expands the types of public benefits that DHS would consider as part of its public charge inadmissibility determinations. The final rule also proposes to establish a regulatory framework based on the statutory factors that must be considered in public charge determinations, including enhanced evidentiary requirements for public charge inadmissibility determinations by USCIS. Finally, the final rule revises the public charge bond process. Overall, the final rule requires an in-depth adjudication that may result in additional findings of inadmissibility, ineligibility for adjustment of status on public charge grounds, or denials of requests for extension of stay or change of status based on the public benefit condition.

DHS cannot estimate with any degree of certainty the extent to which any potentially increased findings of inadmissibility on public charge grounds would result in fewer individuals being admitted to the United States. DHS is similarly unable to estimate the extent to which there would be an increased denial of applications for extension of stay or change of status. Even if DHS could estimate any of these numerical effects, any assessment of derivative environmental effect at the national level would be unduly speculative. This final rule is not part of a larger action. This final rule presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this final rule is categorically excluded from further NEPA review.

*J. Paperwork Reduction Act*

Under the PRA, all Departments are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule. *See* Public Law 104–13, 109 Stat. 163 (May 22, 1995). Table 9 below is a listing of all forms impacted by this rule.

---

[867] *See* Inadmissibility on Public Charge Grounds, 83 FR 51114, 51277 (proposed Oct. 10, 2018).

**41494**    **Federal Register** / Vol. 84, No. 157 / Wednesday, August 14, 2019 / Rules and Regulations

TABLE 9—SUMMARY OF FORMS

| Form | Form name | New or updated forms | General purpose of form | General categories filing | Applicability to public charge rule |
|------|-----------|----------------------|-------------------------|---------------------------|-------------------------------------|
| I–944 ........ | Declaration of Self-Sufficiency. | New ........................ | This form is used to demonstrate that an alien is not likely to become a public charge. | Anyone who is subject to a public charge inadmissibility determination. See Tables 2–7 for a full list. | This form is the primary basis for determining whether an applicant is inadmissible on public charge grounds, as it asks questions about the factors considered. |
| I–356 ........ | Request for Cancellation of a Public Charge Bond. | Update—Previously discontinued. | This form is used to request cancellation of the bond that was submitted on Form I–945, Public Charge Bond, on behalf of an alien. | An obligor who posted Form I–945 on the alien's behalf or an alien who posted Form I–945 posted on his or her own behalf, and who seeks to cancel Form I–945 because the alien has permanently departed the United States, naturalized, or died; the obligor or the alien seeks cancellation of the bond following the alien's fifth anniversary of admission to the United States as a lawful permanent resident; or the alien, following the initial grant of lawful permanent resident status, obtains an immigration status that is exempt from the public charge ground of inadmissibility. | This form is used to seek cancellation of the Form I–945 the criteria as provided in the rule. |
| I–945 ........ | Public Charge Bond | New ........................ | This form is the bond contract between USCIS and the obligor. | For aliens inadmissible only based on public charge and who are permitted to post bond. The form is completed by the obligor, who posts the bond on the alien's behalf. | If an alien seeking adjustment of status has been found inadmissible he or she may be admitted to the United States upon the posting of a suitable and proper a bond at the discretion of DHS. |
| I–485 ........ | Application to Register Permanent Residence or Adjust Status. | Update—adds questions and instructions to clarify what categories need to file Form I–944 and Form I–864. | This form is used by aliens present in the United States to obtain lawful permanent resident status.. | For aliens applying for adjustment of status including: Immediate relatives (spouses, children, and parents of U.S. citizens) Family-based immigrants (principal beneficiaries and their dependents) Employment-based immigrants (principal beneficiaries and their dependents) Those who entered as Ks (Fiance(e)s or certain spouses of U.S. citizens, and their children) who are seeking lawful permanent resident status based on the primary beneficiary's marriage to the U.S. citizen petitioner. | Adjustment of status applicants generally must be admissible, including with regard to the public charge inadmissibility ground. |
| I–864 ........ | Affidavit of Support Under Section 213A of the INA. | Update—reference to Form I–864W, which is being discontinued. | Statement/contract provided by a sponsor to show that the sponsor has adequate financial resources to support the alien. | Most family-based immigrants and some employment-based immigrants must have a sponsor submit this form. See additional Tables 2–7 for a full list. | The affidavit of support, when required, is part of the public charge inadmissibility determination. |

**Exhibit A**

TABLE 9—SUMMARY OF FORMS—Continued

| Form | Form name | New or updated forms | General purpose of form | General categories filing | Applicability to public charge rule |
|------|-----------|---------------------|------------------------|--------------------------|-----------------------------------|
| I–864EZ ... | Affidavit of Support Under Section 213A of the Act. | Update—reference to Form I–864W, which is being discontinued. | Statement/contract provided by sponsor to show that the sponsor has adequate financial resources to support the alien. This is a simpler version of Form I–864. | The sponsor is the person who filed or is filing Form I–130, Petition for Alien Relative, for a relative being sponsored; the relative the sponsor is sponsoring is the only person listed on Form I–130; and the income the sponsor is using to qualify is based entirely on the sponsor's salary or pension and is shown on one or more Internal Revenue Service (IRS) Form W–2s provided by the sponsor's employers or former employers. | The affidavit of support, when required, is part of the public charge inadmissibility determination. |
| I–864W .... | Request for Exemption for Intending Immigrant's Affidavit of Support. | Discontinued—information incorporated into Form I–485. | Certain classes of immigrants are exempt from the affidavit of support, Form I–864, requirement and therefore must file Form I–864W instead. | Aliens who have earned 40 quarters of SSA coverage. Children who will become U.S. citizens upon entry or adjustment into the United States under INA 320. Self-Petitioning Widow(er) Form I–360, Petition for Amerasian, Widow(er) or Special Immigrant; Self-Petitioning bettered spouse or child. | Although some people may be exempt from the affidavit of support requirement, the person may still be subject to public charge. |
| I–129 ....... | Petition for Nonimmigrant Worker. | Update—adds questions and instructions about receipt of public benefits. | This form issued by an employer to petition USCIS for an alien beneficiary to come temporarily to the United States as a nonimmigrant to perform services or labor, or to receive training. This form is also used by certain nonimmigrants to apply for EOS or COS. | • E–2 CNMI—treaty investor exclusively in the Commonwealth of the Northern Mariana Islands (CNMI).<br>• H–1B—specialty occupation worker; an alien coming to perform services of an exceptional nature that relate to a U.S. Department of Defense-administered project; or a fashion model of distinguished merit and ability.<br>• H–2A—temporary agricultural worker<br>• H–2B—temporary nonagricultural worker.<br>• H–3—trainee<br>• L–1—intracompany transferee<br>• O–1—alien of extraordinary ability in arts, science, education, business, or athletics.<br>• O–2—accompanying alien who is coming to the United States to assist in the artistic or athletic performance of an O–1 artist or athlete.<br>• P–1—major league sports<br>• P–1—internationally recognized athlete/entertainment group.<br>• P–1S—essential support personnel for a P–1.<br>• P–2—artist/entertainer in reciprocal exchange program.<br>• P–2S—essential support personnel for a P–2.<br>• P–3—artist/entertainer coming to the United States to perform, teach, or coach under a program that is culturally unique.<br>• P–3S—essential support personnel for a P–3.<br>• Q–1—alien coming temporarily to participate in an international cultural exchange program. Extension of Status.<br>• E–1—treaty trader<br>• E–2—treaty investor (not including E–2 CNMI treaty investors).<br>• E–3—Free Trade Agreement professionals from Australia. Free Trade Nonimmigrants—H–1B1 specialty occupation workers from Chile or Singapore and TN professionals from Canada or Mexico.<br>• R–1—religious worker | As a condition of granting extension of stay and change of status, the applicant must show that he or she has not received, since obtaining the nonimmigrant status he or she is seeking to extend or change public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate, within a 36-month period. |

**Exhibit A**

TABLE 9—SUMMARY OF FORMS—Continued

| Form | Form name | New or updated forms | General purpose of form | General categories filing | Applicability to public charge rule |
|---|---|---|---|---|---|
| I–129CW | Petition for a CNMI-Only Non-immigrant Transitional Worker. | Update—adds questions and instructions about receipt of public benefits. | ............................... | This form is used by an employer to request an extension of stay or change of status for a Commonwealth of the Northern Mariana Islands (CNMI) temporarily to perform services or labor as a CW–1, CNMI-Only Transitional Worker. | As a condition of granting extension of stay and change of status, the applicant must show that he or she has not received, since obtaining the nonimmigrant status he or she is seeking to extend or change public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within a 36-month period. |
| I–539 ....... | Application to Extend/Change Nonimmigrant Status. | Update—adds questions and instructions about receipt of public benefits for principal aliens. | This form is used by certain nonimmigrants (principal filers) to apply for an extension of stay or change of status. In certain circumstances, this form may be used as an initial nonimmigrant status, or reinstatement of F–1 or M–1 status (students). | CNMI residents applying for an initial grant of status; Student (F) and vocational students (M) applying for reinstatement; and Persons seeking V nonimmigrant status or an extension of stay as a V nonimmigrant (spouse or child of a lawful permanent resident who filed a petition on or before December 21, 2000). | As a condition of granting extension of stay and change of status, the applicant must show that he or she has not received since obtaining the nonimmigrant status he or she is seeking to extend or from which he or she is seeking to change public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within a 36-month period. |
| I–539A ..... | ........................... | Update—adds questions and instructions about receipt of public benefits by co-applicants of I–539 applicants. | This form is used by certain nonimmigrants (co-applicants of the primary I–539 applicants) to apply for an extension of stay or change of status. | Co-Applicants of I–539 principal filers .... | As a condition of granting extension of stay and change of status, the co-applicant must show that he or she has not received, since obtaining the nonimmigrant status he or she is seeking to extend or from which he or she is seeking to change, public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within a 36-month period. |

**Exhibit A**

TABLE 9—SUMMARY OF FORMS—Continued

| Form | Form name | New or updated forms | General purpose of form | General categories filing | Applicability to public charge rule |
|------|-----------|---------------------|------------------------|--------------------------|-------------------------------------|
| I–912 ........ | Request for Fee Waiver. | Update—provides a notice that a request for a fee waiver may be a factor in the public charge determination. | This form may be filed with certain USCIS applications, petitions, and requests in order to request a fee waiver. | Certain Form I–485 applicants, generally those who are not subject to the public charge ground of inadmissibility and those applying under certain humanitarian programs, may request a fee waiver on Form I–912. Applicants for E–2 CNMI investor nonimmigrant status under 8 CFR 214.2(e)(23) filing Form I–129 or Form I–539 may request a fee waiver.. | A request of a fee waiver is a factor in the determination of Public Charge. |
| I–407 ........ | Record of Abandonment of Lawful Permanent Resident Status. | No changes ............ | This form is used to record an alien's abandonment of status as a lawful permanent resident in the United States. | An alien who wants to record the voluntary abandonment of his or her lawful permanent resident status. | If a public charge bond has been posted on the alien's behalf, the obligor or the alien may request that the bond be cancelled because the alien permanently departed the United States. The alien shows that he or she voluntarily abandoned his or her status by submitting proof that he or she executed Form I–407 and that he or she physically departed the United States. |
| I–693 ........ | Report of Medical Examination and Vaccination Record. | No changes ............ | This form is used to report results of an immigration medical examination performed by a civil surgeon to USCIS.. | Generally, adjustment of status applicants are required to submit Form I–693. Nonimmigrants seeking a change or extension of status are generally not required to submit Form I–693, except for nonimmigrants seeking a change of status to spouse of legal permanent resident (V) status. See table in *https://www.uscis.gov/policymanual/HTML/PolicyManual-Volume8-PartB-Chapter3.html.* | Form I–693 is used as part of the health factor to identify medical conditions that will affect an applicant's ability to provide and care for himself or herself, to attend school or to work. |

To conform with the requirements set forth by the PRA, on October 10, 2018, at 83 FR 51114, USCIS requested comments on the following information collection. USCIS did receive comments on some of these information collections after publishing that notice. USCIS responded to these comments above in Section III. At this time, the following forms are not open for comment.

USCIS Form I–944

(1) *Type of Information Collection Request:* New Collection.

(2) *Title of the Form/Collection:* Declaration of Self-Sufficiency.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–944; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. USCIS will require an individual applying to adjust status to lawful permanent residence (Form I–485) and who is subject to the public charge ground of inadmissibility to file Form I–944. The data collected on these forms will be used by USCIS to determine the likelihood of a declarant becoming a public charge based on the factors regarding age; health; family status; assets, resources, and financial status; and education and skills. The information collection serves the purpose of standardizing public charge evaluation metrics and ensures that declarants provide all essential information required for USCIS to assess self-sufficiency and adjudicate the declaration. If USCIS determines that a declarant is likely to become a public charge, the declarant may need to provide additional evidence to overcome this determination.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–944 is 382,264 and the estimated hour burden per response is 4.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,720,188 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $177,943,892.

**Exhibit A**

**USCIS Form I–356**

(1) *Type of Information Collection Request:* New Collection.

(2) *Title of the Form/Collection:* Request for Cancellation of Public Charge Bond.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–356; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or household, business or other for profits. The alien (on whose behalf a public charge bond has been posted) or the obligor (surety) (who is the obligor who posted a bond on the alien's behalf). The form is used to request cancellation of the public charge bond because of the alien's naturalization, permanent departure, or death. The form is also used by the alien or the obligor to request cancellation of the public charge bond upon the fifth anniversary of the alien's admission to the United States as a lawful permanent resident.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–356 is 25 and the estimated hour burden per response is 0.75 hour.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 19 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $6,250.

**USCIS Form I–945**

(1) *Type of Information Collection Request:* New Collection.

(2) *Title of the Form/Collection:* Public Charge Bond.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–945; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households, business or other for profit. In certain instances, a surety bond, or cash or any cash equivalent and contract to secure the bond, can be posted on behalf of the alien to guarantee a set of conditions set by the Government concerning an alien, *i.e.,* that the alien will not become a public charge as defined in 8 CFR 212.21 because he or she will not receive public benefits, as defined in the rule, after the alien's

adjustment of status to that of a lawful permanent resident. An acceptable surety is generally any company listed on the Department of the Treasury's Listing of Approved Sureties (Department Circular 570) in effect on the date the bond is requested or an individual or an entity that deposits cash or a cash equivalent, such as a cashier's check or money order for the full value of the bond.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–945 is 960 and the estimated hour burden per response is one hour.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 960 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $0.

**USCIS Form I–485**

(1) *Type of Information Collection Request:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application to Register Permanent Residence or Adjust Status.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–485; Supplement A; and Supplement J; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. The information collected is used to determine eligibility to adjust status under section 245 of the INA.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–485 is 382,264 and the estimated hour burden per response is 6.42 hours. The estimated total number of respondents for the information collection Supplement A is 36,000 and the estimated hour burden per response is 1.25 hours. The estimated total number of respondents for the information collection Supplement J is 28,309 and the estimated hour burden per response is one hour. The estimated total number of respondents for the information collection of Biometrics is 305,811 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 2,885,243 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $131,116,552.

**USCIS Forms I–864; I–864A; I–864EZ**

(1) *Type of Information Collection Request:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Affidavit of Support Under Section 213A of the INA; Contract Between Sponsor and Household Member; Affidavit of Support under Section 213 of the Act.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–864; Form I–864A; and Form I–864EZ; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. Form I–864: USCIS uses the data collected on Form I–864 to determine whether the sponsor has the ability to support the sponsored alien under section 213A of the INA. This form standardizes evaluation of a sponsor's ability to support the sponsored alien and ensures that basic information required to assess eligibility is provided by petitioners. The information collection required on Form I–864A is necessary for public benefit agencies to enforce the affidavit of support in the event the sponsor used income of his or her household members to reach the required income level and the public benefit agencies are requesting reimbursement from the sponsor. Form I–864A: Form I–864A is a contract between the sponsor and the sponsor's household members. It is only required if the sponsor used income of his or her household members to reach the required 125 percent of the FPG. The contract holds these household members jointly and severally liable for the support of the sponsored immigrant. The information collection required on Form I–864A is necessary for public benefit agencies to enforce the affidavit of support in the event the sponsor used income of his or her household members to reach the required income level and the public benefit agencies are requesting reimbursement from the sponsor. Form I–864EZ: USCIS uses Form I–864EZ in exactly the same way as Form I–864; however, USCIS collects less information from the sponsors as

**Exhibit A**

less information is needed from those who qualify in order to make an adjudication.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–864 is 453,345 and the estimated hour burden per response is 6 hours. The estimated total number of respondents for the information collection I–864A is 215,800 and the estimated hour burden per response is 1.75 hours. The estimated total number of respondents for the information collection I–864EZ is 100,000 and the estimated hour burden per response is 2.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 3,347,720 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $135,569,525.

USCIS Form I–129

(1) *Type of Information Collection Request:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Petition for Nonimmigrant Worker.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–129; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Business or other for-profit. USCIS uses the data collected on this form to determine eligibility for the requested nonimmigrant petition and/or requests to extend or change nonimmigrant status. An employer (or agent, where applicable) uses this form to petition USCIS for an alien to temporarily enter as a nonimmigrant. An employer (or agent, where applicable) also uses this form to request an extension of stay or change of status on behalf of the alien worker. The form serves the purpose of standardizing requests for nonimmigrant workers, and ensuring that basic information required for assessing eligibility is provided by the petitioner while requesting that beneficiaries be classified under certain nonimmigrant employment categories. It also assists USCIS in compiling information required by Congress annually to assess effectiveness and utilization of certain nonimmigrant classifications.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–129 is 552,000 and the estimated hour burden per response is 2.84 hours. The estimated total number of respondents for the information collection I–129, E–1/E–2 Classification Supplement is 4,760 and the estimated hour burden per response is 0.67 hours. The estimated total number of respondents for the information collection I–129, Trade Agreement Supplement is 3,057 and the estimated hour burden per response is 0.67 hours. The estimated total number of respondents for the information collection I–129, H Classification Supplement is 255,872 and the estimated hour burden per response is two hours. The estimated total number of respondents for the information collection I–129, H–1B and H–1B1 Data Collection and Filing Fee Exemption Supplement is 243,965 and the estimated hour burden per response is one hour. The estimated total number of respondents for the information collection I–129, L Classification Supplement is 37,831 and the estimated hour burden per response is 1.34 hours. The estimated total number of respondents for the information collection I–129, O and P Classifications Supplement is 22,710 and the estimated hour burden per response is one hour. The estimated total number of respondents for the information collection I–129, Q–1 Classification Supplement is 155 and the estimated hour burden per response is 0.34 hours. The estimated total number of respondents for the information collection I–129, R–1 Classification is 6,635 and the estimated hour burden per response is 2.34 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 2,417,609 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $132,368,220.

USCIS Form I–129CW

(1) *Type of Information Collection Request:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Petition for a CNMI-Only Nonimmigrant Transitional Worker.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–129CW; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Business or other for profit. USCIS uses the data collected on this form to determine eligibility for the requested immigration benefits. An employer uses this form to petition USCIS for an alien to temporarily enter as a nonimmigrant from the CNMI to perform services or labor as a CNMI-Only Transitional Worker (CW–1). An employer also uses this form to request an extension of stay or change of status on behalf of the alien worker. The form serves the purpose of standardizing requests for these benefits, and ensuring that the basic information required to determine eligibility, is provided by the petitioners. USCIS collects biometrics from aliens present in the CNMI at the time of requesting initial grant of CW–1 status. The information is used to verify the alien's identity, background information and ultimately adjudicate their request for CW–1 status.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–129CW is 3,749 and the estimated hour burden per response is 3.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 13,122 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $459,253.

USCIS Form I–539 and Form I–539A

(1) *Type of Information Collection Request:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application to Extend/Change Nonimmigrant Status.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–539; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. This form will be used for nonimmigrants to apply for an extension of stay, for a change to another nonimmigrant classification, or for obtaining V nonimmigrant classification.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to*

**Exhibit A**

*respond:* The estimated total number of respondents for the information collection Form I–539 paper filers is 174,289 and the estimated hour burden per response is two hours. The estimated total number of respondents for the information collection Form I–539 e-filers is 74,696 and the estimated hour burden per response is 1.08 hours. The estimated total number of respondents for the information collection I–539A is 54,375 and the estimated hour burden per response is 0.5 hour. The estimated total number of respondents for the information collection of Biometrics is 248,985 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 747,974 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $56,121,219.

USCIS Form I–912

Under the PRA DHS is required to submit to OMB, for review and approval, covered reporting requirements inherent in a rule. This rule will require non-substantive edits to USCIS Form I–912, Request for Fee Waiver. These edits make clear to those who request fee waivers that an approved fee waiver can negatively impact eligibility for an immigration benefit that is subject to the public charge inadmissibility determination. Accordingly, USCIS has submitted a PRA Change Worksheet, Form OMB 83–C, and amended information collection instrument to OMB for review and approval in accordance with the PRA.

USCIS Form I–407

Under the PRA, DHS is required to submit to OMB, for review and approval, covered reporting requirements inherent in a rule. This rule requires the use of USCIS Form I–407 but does not require any changes to the form or instructions and does not impact the number of respondents, time or cost burden. This form is currently approved by OMB under the PRA. The OMB control number for this information collection is 1615–0130.

USCIS Form I–693

Under the PRA, DHS is required to submit to OMB, for review and approval, covered reporting requirements inherent in a rule. This rule requires the use of USCIS Form I–693 but does not require any changes to the form or instructions and does not impact the number of respondents, time or cost burden. This form is currently approved by OMB under the PRA. The OMB control number for this information collection is 1615–0033.

**V. List of Subjects and Regulatory Amendments**

List of Subjects

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of information, Immigration, Privacy, Reporting and recordkeeping requirements, Surety bonds.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 213*

Immigration, Surety bonds.

*8 CFR Part 214*

Administrative practice and procedure, Aliens, Cultural exchange programs, Employment, Foreign officials, Health professions, Reporting and recordkeeping requirements, Students.

*8 CFR Part 245*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 248*

Aliens, Reporting and recordkeeping requirements.

Accordingly, DHS amends chapter I of title 8 of the Code of Federal Regulations as follows:

**PART 103—IMMIGRATION BENEFITS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS**

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356, 1365b; 31 U.S.C. 9701; Public Law 107–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*); E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p.166; 8 CFR part 2; Pub. L. 112–54.

■ 2. Section 103.6 is amended by:
a. Revising paragraphs (a)(1), (a)(2)(i), and (c)(1);
■ b. Adding paragraph (d)(3); and
■ c. Revising paragraph (e) The revisions and additions read as follows:

**§ 103.6 Surety bonds.**

(a) * * *

(1) *Extension agreements; consent of surety; collateral security.* All surety bonds posted in immigration cases must be executed on the forms designated by DHS, a copy of which, and any rider attached thereto, must be furnished to the obligor. DHS is authorized to approve a bond, a formal agreement for the extension of liability of surety, a request for delivery of collateral security to a duly appointed and undischarged administrator or executor of the estate of a deceased depositor, and a power of attorney executed on the form designated by DHS, if any. All other matters relating to bonds, including a power of attorney not executed on the form designated by DHS and a request for delivery of collateral security to other than the depositor or his or her approved attorney in fact, will be forwarded to the appropriate office for approval.

(2) *Bond riders*—(i) *General.* A bond rider must be prepared on the form(s) designated by DHS, and attached to the bond. If a condition to be included in a bond is not on the original bond, a rider containing the condition must be executed.

* * * * *

(c) * * *

(1) *Public charge bonds.* Special rules for the cancellation of public charge bonds are described in 8 CFR 213.1.

* * * * *

(d) * * *

(3) *Public charge bonds.* The threshold bond amount for public charge bonds is set forth in 8 CFR 213.1.

(e) *Breach of bond.* Breach of public charge bonds is governed by 8 CFR 213.1. For other immigration bonds, a bond is breached when there has been a substantial violation of the stipulated conditions. A final determination that a bond has been breached creates a claim in favor of the United States which may not be released by the officer. DHS will determine whether a bond has been breached. If DHS determines that a bond has been breached, it will notify the obligor of the decision, the reasons therefor, and inform the obligor of the right to appeal the decision in accordance with the provisions of this part.

■ 3. Section 103.7 is amended by adding paragraphs (b)(1)(i)(LLL) and (MMM) to read as follows:

**§ 103.7 Fees.**

* * * * *

(b) * * *
(1) * * *
(i) * * *
(LLL) Public Charge Bond, Form I–945. $25.
(MMM) Request for Cancellation of Public Charge Bond, Form I–356. $25.

**Exhibit A**

## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 4. The authority citation for part 212 continues to read as follows:

**Authority:** 6 U.S.C. 111, 202(4) and 271; 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1185 note (section 7209 of Pub. L. 108–458), 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 CFR part 2.

■ 5. Amend § 212.18 by revising paragraph (b)(2) and (3) to read as follows:

### § 212.18  Application for Waivers of inadmissibility in connection with an application for adjustment of status by T nonimmigrant status holders

\*    \*    \*    \*    \*

(b) \* \* \*

(2) If an applicant is inadmissible under section 212(a)(1) of the Act, USCIS may waive such inadmissibility if it determines that granting a waiver is in the national interest.

(3) If any other applicable provision of section 212(a) renders the applicant inadmissible, USCIS may grant a waiver of inadmissibility if the activities rendering the alien inadmissible were caused by or were incident to the victimization and USCIS determines that it is in the national interest to waive the applicable ground or grounds of inadmissibility.

■ 6. Add §§ 212.20 through 212.23 to read as follows:

Sec.

\*    \*    \*    \*    \*

212.20    Applicability of public charge inadmissibility.
212.21    Definitions.
212.22    Public charge inadmissibility determination.
212.23    Exemptions and waivers for public charge ground of inadmissibility.

### § 212.20  Applicability of public charge inadmissibility.

8 CFR 212.20 through 212.23 address the public charge ground of inadmissibility under section 212(a)(4) of the Act. Unless the alien requesting the immigration benefit or classification has been exempted from section 212(a)(4) of the Act as listed in 8 CFR 212.23(a), the provisions of §§ 212.20 through 212.23 of this part apply to an applicant for admission or adjustment of status to lawful permanent resident, if the application is postmarked (or, if applicable, submitted electronically) on or after October 15, 2019.

### § 212.21  Definitions.

For the purposes of 8 CFR 212.20 through 212.23, the following definitions apply:

(a) *Public Charge.* Public charge means an alien who receives one or more public benefits, as defined in paragraph (b) of this section, for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months).

(b) *Public benefit.* Public benefit means:

(1) Any Federal, State, local, or tribal cash assistance for income maintenance (other than tax credits), including:

(i) Supplemental Security Income (SSI), 42 U.S.C. 1381 *et seq.;*

(ii) Temporary Assistance for Needy Families (TANF), 42 U.S.C. 601 *et seq.;* or

(iii) Federal, State or local cash benefit programs for income maintenance (often called "General Assistance" in the State context, but which also exist under other names); and

(2) Supplemental Nutrition Assistance Program (SNAP), 7 U.S.C. 2011 to 2036c;

(3) Section 8 Housing Assistance under the Housing Choice Voucher Program, as administered by HUD under 42 U.S.C. 1437f;

(4) Section 8 Project-Based Rental Assistance (including Moderate Rehabilitation) under Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f); and

(5) Medicaid under 42 U.S.C. 1396 *et seq.,* except for:

(i) Benefits received for an emergency medical condition as described in 42 U.S.C. 1396b(v)(2)–(3), 42 CFR 440.255(c);

(ii) Services or benefits funded by Medicaid but provided under the Individuals with Disabilities Education Act (IDEA) 20 U.S.C. 1400 *et seq.;*

(iii) School-based services or benefits provided to individuals who are at or below the oldest age eligible for secondary education as determined under State or local law;

(iv) Benefits received by an alien under 21 years of age, or a woman during pregnancy (and during the 60-day period beginning on the last day of the pregnancy).

(6) Public Housing under section 9 of the U.S. Housing Act of 1937.

(7) Public benefits, as defined in paragraphs (b)(1) through (b)(6) of this section, do not include any public benefits received by an alien who at the time of receipt of the public benefit, or at the time of filing or adjudication of the application for admission or adjustment of status, or application or request for extension of stay or change of status is—

(i) Enlisted in the U.S. Armed Forces under the authority of 10 U.S.C. 504(b)(1)(B) or 10 U.S.C. 504(b)(2), or

(ii) Serving in active duty or in the Ready Reserve component of the U.S. Armed Forces, or

(iii) Is the spouse or child, as defined in section 101(b) of the Act, of an alien described in paragraphs (b)(7)(i) or (ii) of this section.

(8) In a subsequent adjudication for a benefit for which the public charge ground of inadmissibility applies, public benefits, as defined in this section, do not include any public benefits received by an alien during periods in which the alien was present in the United States in an immigration category that is exempt from the public charge ground of inadmissibility, as set forth in 8 CFR 212.23(a), or for which the alien received a waiver of public charge inadmissibility, as set forth in 8 CFR 212.23(b).

(9) Public benefits, as defined in this section, do not include any public benefits that were or will be received by—

(i) Children of U.S. citizens whose lawful admission for permanent residence and subsequent residence in the legal and physical custody of their U.S. citizen parent will result automatically in the child's acquisition of citizenship, upon meeting the eligibility criteria of section 320(a)–(b) of the Act, in accordance with 8 CFR part 320; or

(ii) Children of U.S. citizens whose lawful admission for permanent residence will result automatically in the child's acquisition of citizenship upon finalization of adoption (if the child satisfies the requirements applicable to adopted children under INA 101(b)(1)), in the United States by the U.S. citizen parent(s), upon meeting the eligibility criteria of section 320(a)–(b) of the Act, in accordance with 8 CFR part 320; or

(iii) Children of U.S. citizens who are entering the United States for the purpose of attending an interview under section 322 of the Act in accordance with 8 CFR part 322.

(c) *Likely at any time to become a public charge.* Likely at any time to become a public charge means more likely than not at any time in the future to become a public charge, as defined in 212.21(a), based on the totality of the alien's circumstances.

(d) *Alien's household.* For purposes of public charge inadmissibility determinations under section 212(a)(4) of the Act:

(1) If the alien is 21 years of age or older, or under the age of 21 and married, the alien's household includes:

**Exhibit A**

(i) The alien;

(ii) The alien's spouse, if physically residing with the alien;

(iii) The alien's children, as defined in 101(b)(1) of the Act, physically residing with the alien;

(iv) The alien's other children, as defined in section 101(b)(1) of the Act, not physically residing with the alien for whom the alien provides or is required to provide at least 50 percent of the children's financial support, as evidenced by a child support order or agreement a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided by the alien;

(v) Any other individuals (including a spouse not physically residing with the alien) to whom the alien provides, or is required to provide, at least 50 percent of the individual's financial support or who are listed as dependents on the alien's federal income tax return; and

(vi) Any individual who provides to the alien at least 50 percent of the alien's financial support, or who lists the alien as a dependent on his or her federal income tax return.

(2) If the alien is a child as defined in section 101(b)(1) of the Act, the alien's household includes the following individuals:

(i) The alien;

(ii) The alien's children as defined in section 101(b)(1) of the Act physically residing with the alien;

(iii) The alien's other children as defined in section 101(b)(1) of the Act not physically residing with the alien for whom the alien provides or is required to provide at least 50 percent of the children's financial support, as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided by the alien;

(iv) The alien's parents, legal guardians, or any other individual providing or required to provide at least 50 percent of the alien's financial support to the alien as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided to the alien;

(v) The parents' or legal guardians' other children as defined in section 101(b)(1) of the Act physically residing with the alien;

(vi) The alien's parents' or legal guardians' other children as defined in section 101(b)(1) of the Act, not physically residing with the alien for whom the parent or legal guardian provides or is required to provide at

least 50 percent of the other children's financial support, as evidenced by a child support order or agreement, a custody order or agreement, or any other order or agreement specifying the amount of financial support to be provided by the parents or legal guardians; and

(vii) Any other individual(s) to whom the alien's parents or legal guardians provide, or are required to provide at least 50 percent of such individual's financial support or who is listed as a dependent on the parent's or legal guardian's federal income tax return.

(e) *Receipt of public benefits.* Receipt of public benefits occurs when a public benefit-granting agency provides a public benefit, as defined in paragraph (b) of this section, to an alien as a beneficiary, whether in the form of cash, voucher, services, or insurance coverage. Applying for a public benefit does not constitute receipt of public benefits although it may suggest a likelihood of future receipt. Certification for future receipt of a public benefit does not constitute receipt of public benefits, although it may suggest a likelihood of future receipt. An alien's receipt of, application for, or certification for public benefits solely on behalf of another individual does not constitute receipt of, application for, or certification for such alien.

(f) Primary caregiver means an alien who is 18 years of age or older and has significant responsibility for actively caring for and managing the well-being of a child or an elderly, ill, or disabled person in the alien's household.

### § 212.22  Public charge inadmissibility determination.

This section relates to the public charge ground of inadmissibility under section 212(a)(4) of the Act.

(a) *Prospective determination based on the totality of circumstances.* The determination of an alien's likelihood of becoming a public charge at any time in the future must be based on the totality of the alien's circumstances by weighing all factors that are relevant to whether the alien is more likely than not at any time in the future to receive one or more public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within any 36-month period. Except as necessary to fully evaluate evidence provided in paragraph (b)(4)(ii)(E)(*3*) of this section, DHS will not specifically assess whether an alien qualifies or would qualify for any public benefit, as defined in 8 CFR 212.21(b).

(b) *Minimum factors to consider.* A public charge inadmissibility determination must at least entail

consideration of the alien's age; health; family status; education and skills; and assets, resources, and financial status, as follows:

(1) *The alien's age*—(i) *Standard.* When considering an alien's age, DHS will consider whether the alien's age makes the alien more likely than not to become a public charge at any time in the future, such as by impacting the alien's ability to work, including whether the alien is between the age of 18 and the minimum "early retirement age" for Social Security set forth in 42 U.S.C. 416(*l*)(2).

(ii) [Reserved]

(2) *The alien's health*—(i) *Standard.* DHS will consider whether the alien's health makes the alien more likely than not to become a public charge at any time in the future, including whether the alien has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide and care for himself or herself, to attend school, or to work upon admission or adjustment of status.

(ii) *Evidence.* USCIS' consideration includes but is not limited to the following:

(A) A report of an immigration medical examination performed by a civil surgeon or panel physician where such examination is required (to which USCIS will generally defer absent evidence that such report is incomplete); or

(B) Evidence of a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide and care for himself or herself, to attend school, or to work upon admission or adjustment of status.

(3) *The alien's family status*—(i) *Standard.* When considering an alien's family status, DHS will consider the alien's household size, as defined in 8 CFR 212.21(d), and whether the alien's household size makes the alien more likely than not to become a public charge at any time in the future.

(ii) [Reserved]

(4) *The alien's assets, resources, and financial status*—(i) *Standard.* When considering an alien's assets, resources, and financial status, DHS will consider whether such assets, resources, and financial status excluding any income from illegal activities or sources (*e.g.,* proceeds from illegal gambling or drug sales, and income from public benefits listed in 8 CFR 212.21(b)), make the alien more likely than not to become a public charge at any time in the future, including whether:

**Exhibit A**

(A) The alien's household's annual gross income is at least 125 percent of the most recent Federal Poverty Guideline (100 percent for an alien on active duty, other than training, in the U.S. Armed Forces) based on the alien's household size as defined by section 212.21(d);

(B) If the alien's household's annual gross income is less than 125 percent of the most recent Federal Poverty Guideline (100 percent for an alien on active duty, other than training, in the U.S. Armed Forces), the alien may submit evidence of ownership of significant assets. For purposes of this paragraph, an alien may establish ownership of significant assets, such as savings accounts, stocks, bonds, certificates of deposit, real estate or other assets, in which the combined cash value of all the assets (the total value of the assets less any offsetting liabilities) exceeds:

(1) If the intending immigrant is the spouse or child of a United States citizen (and the child has reached his or her 18th birthday), three times the difference between the alien's household income and 125 percent of the FPG (100 percent for those on active duty, other than training, in the U.S. Armed Forces) for the alien's household size;

(2) If the intending immigrant is an orphan who will be adopted in the United States after the alien orphan acquires permanent residence (or in whose case the parents will need to seek a formal recognition of a foreign adoption under the law of the State of the intending immigrant's proposed residence because at least one of the parents did not see the child before or during the adoption), and who will, as a result of the adoption or formal recognition of the foreign adoption, acquire citizenship under section 320 of the Act, the difference between the alien's household income and 125 percent of the FPG (100 percent for those on active duty, other than training, in the U.S. Armed Forces) for the alien's household size; or

(3) In all other cases, five times the difference between the alien's household income and 125 percent of the FPG (100 percent for those on active duty, other than training, in the U.S. Armed Forces) for the alien's household size.

(C) The alien has sufficient household assets and resources to cover any reasonably foreseeable medical costs, including as related to a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide care

for himself or herself, to attend school, or to work;

(D) The alien has any financial liabilities; and whether

(E) The alien has applied for, been certified to receive, or received public benefits, as defined in 8 CFR 212.21(b), on or after October 15, 2019.

(ii) *Evidence.* USCIS' consideration includes, but is not limited to the following:

(A) The alien's annual gross household income including, but not limited to:

(1) For each member of the household whose income will be considered, the most recent tax-year transcript from the U.S. Internal Revenue Service (IRS) of such household member's IRS Form 1040, U.S. Individual Income Tax Return; or

(2) If the evidence in paragraph (b)(4)(ii)(A)(1) of this section is unavailable for a household member, other credible and probative evidence of such household member's income, including an explanation of why such transcript is not available, such as if the household member is not subject to taxation in the United States.

(B) Any additional income from individuals not included in the alien's household provided to the alien's household on a continuing monthly or yearly basis for the most recent calendar year and on which the alien relies or will rely to meet the standard at 8 CFR 212.22(b)(4)(i);

(C) The household's cash assets and resources. Evidence of such cash assets and resources may include checking and savings account statements covering 12 months prior to filing the application;

(D) The household's non-cash assets and resources, that can be converted into cash within 12 months, such as net cash value of real estate holdings minus the sum of all loans secured by a mortgage, trust deed, or other lien on the home; annuities; securities; retirement and educational accounts; and any other assets that can easily be converted into cash;

(E) Evidence that the alien has:

(1) Applied for or received any public benefit, as defined in 8 CFR 212.21(b), on or after October 15, 2019 or disenrolled or requested to be disenrolled from such benefit(s); or

(2) Been certified or approved to receive any public benefit, as defined in 8 CFR 212.21(b), on or after October 15, 2019 or withdrew his or her application or disenrolled or requested to be to disenrolled from such benefit(s);

(3) Submitted evidence from a Federal, State, local, or tribal agency administering a public benefit, as

defined in 212.21(b), that the alien has specifically identified as showing that the alien does not qualify or would not qualify for such public benefit by virtue of, for instance, the alien's annual gross household income or prospective immigration status or length of stay;

(F) Whether the alien has applied for or has received a USCIS fee waiver for an immigration benefit request on or after October 15, 2019, unless the fee waiver was applied for or granted as part of an application for which a public charge inadmissibility determination under section 212(a)(4) of the Act was not required.

(G) The alien's credit history and credit score in the United States, and other evidence of the alien's liabilities not reflected in the credit history and credit score (*e.g.,* any mortgages, car loans, unpaid child or spousal support, unpaid taxes, and credit card debt); and

(H) Whether the alien has sufficient household assets and resources (including, for instance, health insurance not designated as a public benefit under 8 CFR 212.21(b)) to pay for reasonably foreseeable medical costs, such as costs related to a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide care for himself or herself, to attend school, or to work;

(5) *The alien's education and skills.* (i) *Standard.* When considering an alien's education and skills, DHS will consider whether the alien has adequate education and skills to either obtain or maintain lawful employment with an income sufficient to avoid being more likely than not to become a public charge.

(ii) *Evidence.* USCIS' consideration includes but is not limited to the following: (A) The alien's history of employment, excluding employment involving illegal activities, *e.g.,* illegal gambling or drug sales. The alien must provide the following:

(1) The last 3 years of the alien's tax transcripts from the U.S. Internal Revenue Service (IRS) of the alien's IRS Form 1040, U.S. Individual Income Tax Return; or

(2) If the evidence in paragraph (b)(5)(ii)(A)(1) of this section is unavailable, other credible and probative evidence of the alien's history of employment for the last 3 years, including an explanation of why such transcripts are not available, such as if the alien is not subject to taxation in the United States;

(B) Whether the alien has a high school diploma (or its equivalent) or has a higher education degree;

**Exhibit A**

(C) Whether the alien has any occupational skills, certifications, or licenses; and

(D) Whether the alien is proficient in English or proficient in other languages in addition to English.

(E) Whether the alien is a primary caregiver as defined in 8 CFR 212.21(f), such that the alien lacks an employment history, is not currently employed, or is not employed full time. Only one alien within a household can be considered a primary caregiver of the same individual within the household. USCIS' consideration with respect to this paragraph includes but is not limited to evidence that an individual in the alien's household is caring for resides in the alien's household, evidence of the individual's age, and evidence of the individual's medical condition, including disability, if any.

(6) *The alien's prospective immigration status and expected period of admission.*

(i) *Standard.* DHS will consider the immigration status that the alien seeks and the expected period of admission as it relates to the alien's ability to financially support for himself or herself during the duration of the alien's stay, including:

(A) Whether the alien is applying for adjustment of status or admission in a nonimmigrant or immigrant classification; and

(B) If the alien is seeking admission as a nonimmigrant, the nonimmigrant classification and the anticipated period of temporary stay.

(ii) [Reserved]

(7) *An affidavit of support under section 213A of the Act, when required under section 212(a)(4) of the Act, that meets the requirements of section 213A of the Act and 8 CFR 213a*—(i) *Standard.* If the alien is required under sections 212(a)(4)(C) or (D) to submit an affidavit of support under section 213A of the Act and 8 CFR part 213a, and submits such a sufficient affidavit of support, DHS will consider the likelihood that the sponsor would actually provide the statutorily-required amount of financial support to the alien, and any other related considerations.

(A) *Evidence.* USCIS consideration includes but is not limited to the following:

(*1*) The sponsor's annual income, assets, and resources;

(*2*) The sponsor's relationship to the applicant, including but not limited to whether the sponsor lives with the alien; and

(*3*) Whether the sponsor has submitted an affidavit of support with respect to other individuals.

(c) *Heavily weighted factors.* The factors below will weigh heavily in a public charge inadmissibility determination. The mere presence of any one heavily weighted factor does not, alone, make the alien more or less likely than not to become a public charge.

(1) *Heavily weighted negative factors.* The following factors will weigh heavily in favor of a finding that an alien is likely at any time in the future to become a public charge:

(i) The alien is not a full-time student and is authorized to work, but is unable to demonstrate current employment, recent employment history, or a reasonable prospect of future employment;

(ii) The alien has received or has been certified or approved to receive one or more public benefits, as defined in § 212.21(b), for more than 12 months in the aggregate within any 36-month period, beginning no earlier than 36 months prior to the alien's application for admission or adjustment of status on or after October 15, 2019;

(iii)(A) The alien has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide for himself or herself, attend school, or work; and

(B) The alien is uninsured and has neither the prospect of obtaining private health insurance, nor the financial resources to pay for reasonably foreseeable medical costs related to such medical condition; or

(iv) The alien was previously found inadmissible or deportable on public charge grounds by an Immigration Judge or the Board of Immigration Appeals.

(2) *Heavily weighted positive factors.* The following factors will weigh heavily in favor of a finding that an alien is not likely to become a public charge:

(i) The alien's household has income, assets, or resources, and support (excluding any income from illegal activities, *e.g.,* proceeds from illegal gambling or drug sales, and any income from public benefits as defined in § 212.21(b)) of at least 250 percent of the Federal Poverty Guidelines for the alien's household size;

(ii) The alien is authorized to work and is currently employed in a legal industry with an annual income, excluding any income from illegal activities such as proceeds from illegal gambling or drug sales, of at least 250 percent of the Federal Poverty Guidelines for the alien's household size; or

(iii) The alien has private health insurance, except that for purposes of this paragraph (c)(2)(iii), private health insurance must be appropriate for the expected period of admission, and does not include health insurance for which the alien receives subsidies in the form of premium tax credits under the Patient Protection and Affordable Care Act, as amended.

(d) *Treatment of benefits received before October 15, 2019.* For purposes of this regulation, DHS will consider, as a negative factor, but not as a heavily weighted negative factor as described in paragraph (c)(1) of this section, any amount of cash assistance for income maintenance, including Supplemental Security Income (SSI), Temporary Assistance for Needy Families (TANF), State and local cash assistance programs that provide benefits for income maintenance (often called "General Assistance" programs), and programs (including Medicaid) supporting aliens who are institutionalized for long-term care, received, or certified for receipt, before October 15, 2019, as provided under the 1999 Interim Field Guidance, also known as the 1999 Field Guidance on Deportability and Inadmissibility on Public Charge Grounds. DHS will not consider as a negative factor any other public benefits received, or certified for receipt, before October 15, 2019.

### § 212.23  Exemptions and waivers for public charge ground of inadmissibility.

(a) *Exemptions.* The public charge ground of inadmissibility under section 212(a)(4) of the Act does not apply, based on statutory or regulatory authority, to the following categories of aliens:

(1) Refugees at the time of admission under section 207 of the Act and at the time of adjustment of status to lawful permanent resident under section 209 of the Act;

(2) Asylees at the time of grant under section 208 of the Act and at the time of adjustment of status to lawful permanent resident under section 209 of the Act;

(3) Amerasian immigrants at the time of application for admission as described in sections 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988, Public Law 100–202, 101 Stat. 1329–183, section 101(e) (Dec. 22, 1987), as amended, 8 U.S.C. 1101 note;

(4) Afghan and Iraqi Interpreter, or Afghan or Iraqi national employed by or on behalf of the U.S. Government as described in section 1059(a)(2) of the National Defense Authorization Act for Fiscal Year 2006 Public Law 109–163 (Jan. 6, 2006), as amended, and section 602(b) of the Afghan Allies Protection Act of 2009, Public Law 111–8, title VI

**Exhibit A**

(Mar. 11, 2009), as amended, 8 U.S.C. 1101 note, and section 1244(g) of the National Defense Authorization Act for Fiscal Year 2008, as amended Public Law 110–181 (Jan. 28, 2008);

(5) Cuban and Haitian entrants applying for adjustment of status under section 202 of the Immigration Reform and Control Act of 1986 (IRCA), Public Law 99–603, 100 Stat. 3359 (Nov. 6, 1986), as amended, 8 U.S.C. 1255a note;

(6) Aliens applying for adjustment of status under the Cuban Adjustment Act, Public Law 89–732 (Nov. 2, 1966), as amended, 8 U.S.C. 1255 note;

(7) Nicaraguans and other Central Americans applying for adjustment of status under sections 202(a) and section 203 of the Nicaraguan Adjustment and Central American Relief Act (NACARA), Public Law 105–100, 111 Stat. 2193 (Nov. 19, 1997), as amended, 8 U.S.C. 1255 note;

(8) Haitians applying for adjustment of status under section 902 of the Haitian Refugee Immigration Fairness Act of 1998, Public Law 105–277, 112 Stat. 2681 (Oct. 21, 1998), as amended, 8 U.S.C. 1255 note;

(9) Lautenberg parolees as described in section 599E of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1990, Public Law 101–167, 103 Stat. 1195, title V (Nov. 21, 1989), as amended, 8 U.S.C. 1255 note;

(10) Special immigrant juveniles as described in section 245(h) of the Act;

(11) Aliens who entered the United States prior to January 1, 1972, and who meet the other conditions for being granted lawful permanent residence under section 249 of the Act and 8 CFR part 249 (Registry);

(12) Aliens applying for or re-registering for Temporary Protected Status as described in section 244 of the Act in accordance with section 244(c)(2)(A)(ii) of the Act and 8 CFR 244.3(a);

(13) A nonimmigrant described in section 101(a)(15)(A)(i) and (A)(ii) of the Act (Ambassador, Public Minister, Career Diplomat or Consular Officer, or Immediate Family or Other Foreign Government Official or Employee, or Immediate Family), in accordance with section 102 of the Act and 22 CFR 41.21(d);

(14) A nonimmigrant classifiable as C–2 (alien in transit to U.N. Headquarters) or C–3 (foreign government official), 22 CFR 41.21(d);

(15) A nonimmigrant described in section 101(a)(15)(G)(i), (G)(ii), (G)(iii), and (G)(iv), of the Act (Principal Resident Representative of Recognized Foreign Government to International Organization, and related categories), in

accordance with section 102 of the Act and 22 CFR 41.21(d);

(16) A nonimmigrant classifiable as NATO–1, NATO–2, NATO–3, NATO–4 (NATO representatives), and NATO–6 in accordance with 22 CFR 41.21(d);

(17) An applicant for nonimmigrant status under section 101(a)(15)(T) of the Act, in accordance with 8 CFR 212.16(b);

(18) Except as provided in section 212.23(b), an individual who is seeking an immigration benefit for which admissibility is required, including but not limited to adjustment of status under section 245(a) of the Act and section 245(l) of the Act and who:

(i) Has a pending application that sets forth a prima facie case for eligibility for nonimmigrant status under section 101(a)(15)(T) of the Act, or

(ii) Has been granted nonimmigrant status under section 101(a)(15)(T) of the Act, provided that the individual is in valid T nonimmigrant status at the time the benefit request is properly filed with USCIS and at the time the benefit request is adjudicated;

(19) Except as provided in § 212.23(b), (i) A petitioner for nonimmigrant status under section 101(a)(15)(U) of the Act, in accordance with section 212(a)(4)(E)(ii) of the Act; or

(ii) An individual who is granted nonimmigrant status under section 101(a)(15)(U) of the Act in accordance with section 212(a)(4)(E)(ii) of the Act, who is seeking an immigration benefit for which admissibility is required, including, but not limited to, adjustment of status under section 245(a) of the Act, provided that the individual is in valid U nonimmigrant status at the time the benefit request is properly filed with USCIS and at the time the benefit request is adjudicated;

(20) Except as provided in section 212.23(b), any alien who is a VAWA self-petitioner under section 212(a)(4)(E)(i) of the Act;

(21) Except as provided in section 212.23(b), a qualified alien described in section 431(c) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 8 U.S.C. 1641(c), under section 212(a)(4)(E)(iii) of the Act;

(22) Applicants adjusting status who qualify for a benefit under section 1703 of the National Defense Authorization Act, Public Law 108–136, 117 Stat. 1392 (Nov. 24, 2003), 8 U.S.C. 1151 note (posthumous benefits to surviving spouses, children, and parents);

(23) American Indians born in Canada determined to fall under section 289 of the Act;

(24) Texas Band of Kickapoo Indians of the Kickapoo Tribe of Oklahoma, Public Law 97–429 (Jan. 8, 1983);

(25) Nationals of Vietnam, Cambodia, and Laos applying for adjustment of status under section 586 of Public Law 106–429 under 8 CFR 245.21;

(26) Polish and Hungarian Parolees who were paroled into the United States from November 1, 1989 to December 31, 1991 under section 646(b) of the IIRIRA, Public Law 104–208, Div. C, Title VI, Subtitle D (Sept. 30, 1996), 8 U.S.C. 1255 note; and

(27) Any other categories of aliens exempt under any other law from the public charge ground of inadmissibility provisions under section 212(a)(4) of the Act.

(b) *Limited Exemption.* Aliens described in §§ 212.23(a)(18) through (21) must submit an affidavit of support as described in section 213A of the Act if they are applying for adjustment of status based on an employment-based petition that requires such an affidavit of support as described in section 212(a)(4)(D) of the Act.

(c) *Waivers.* A waiver for the public charge ground of inadmissibility may be authorized based on statutory or regulatory authority, for the following categories of aliens:

(1) Applicants for admission as nonimmigrants under 101(a)(15)(S) of the Act;

(2) Nonimmigrants admitted under section 101(a)(15)(S) of the Act applying for adjustment of status under section 245(j) of the Act (witnesses or informants); and

(3) Any other waiver of the public charge ground of inadmissibility that is authorized by law or regulation.

## PART 213—PUBLIC CHARGE BONDS

■ 7. The authority citation for part 213 is revised to read as follows:

**Authority:** 8 U.S.C. 1103; 1183; 8 CFR part 2.

■ 8. Revise the part heading to read as set forth above.

■ 9. Revise § 213.1 to read as follows:

**§ 213.1 Adjustment of status of aliens on submission of a public charge bond.**

(a) *Inadmissible aliens.* In accordance with section 213 of the Act, after an alien seeking adjustment of status has been found inadmissible as likely at any time in the future to become a public charge under section 212(a)(4) of the Act, DHS may allow the alien to submit a public charge bond, if the alien is otherwise admissible, in accordance with the requirements of 8 CFR 103.6 and this section. The public charge

**Exhibit A**

bond must meet the conditions set forth in 8 CFR 103.6 and this section.

(b) *Discretion.* The decision to allow an alien inadmissible under section 212(a)(4) of the Act to submit a public charge bond is in DHS's discretion. If an alien has one or more heavily weighted negative factors as defined in 8 CFR 212.22 in his or her case, DHS generally will not favorably exercise discretion to allow submission of a public charge bond.

(c) *Public Charge Bonds.* (1) *Types.* DHS may require an alien to submit a surety bond, as listed in 8 CFR 103.6, or cash or any cash equivalents specified by DHS. DHS will notify the alien of the type of bond that may be submitted. All surety, cash, or cash equivalent bonds must be executed on a form designated by DHS and in accordance with form instructions. When a surety bond is accepted, the bond must comply with requirements applicable to surety bonds in 8 CFR 103.6 and this section. If cash or a cash equivalent, is being provided to secure a bond, DHS must issue a receipt on a form designated by DHS.

(2) *Amount.* Any public charge bond must be in an amount decided by DHS, not less than $8,100, annually adjusted for inflation based on the Consumer Price Index for All Urban Consumers (CPI–U), and rounded up to the nearest dollar. The bond amount decided by DHS may not be appealed by the alien or the bond obligor.

(d) *Conditions of the bond.* A public charge bond must remain in effect until USCIS grants a request to cancel the bond in accordance with paragraph (g) of this section, whereby the alien naturalizes or otherwise obtains U.S. citizenship, permanently departs the United States, dies, the alien has reached his or her 5-year anniversary since becoming a lawful permanent resident, or the alien changes immigration status to one not subject to public charge ground of inadmissibility. An alien on whose behalf a public charge bond has been submitted may not receive any public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within any 364month period (such that, for instance, receipt of two benefits in one month counts as two months, after the alien's adjustment of status to that of a lawful permanent resident, until the bond is cancelled in accordance with paragraph (g) of this section. An alien must also comply with any other conditions imposed as part of the bond.

(e) *Submission.* A public charge bond may be submitted on the alien's behalf only after DHS notifies the alien and the alien's representative, if any, that a bond may be submitted. The bond must be submitted to DHS in accordance with the instructions of the form designated by DHS for this purpose, with the fee prescribed in 8 CFR 103.7(b), and any procedures contained in the DHS notification to the alien. DHS will specify the bond amount and any other conditions, as appropriate for the alien and the immigration benefit being sought. USCIS will notify the alien and the alien's representative, if any, that the bond has been accepted, and will provide a copy to the alien and the alien's representative, if any, of any communication between the obligor and the U.S. government. An obligor must notify DHS within 30 days of any change in the obligor's or the alien's physical and mailing address.

(f) *Substitution.* (1) *Substitution Process.* Either the obligor of the bond previously submitted to DHS or a new obligor may submit a substitute bond on the alien's behalf. The substitute bond must specify an effective date. The substitute bond must meet all of the requirements applicable to the initial bond as required by this section and 8 CFR 103.6, and if the obligor is different from the original obligor, the new obligor must assume all liabilities of the initial obligor. The substitute bond must also cover any breach of the bond conditions which occurred before DHS accepted the substitute bond, in the event DHS did not learn of the breach until after DHS accepted the substitute bond.

(2) *Acceptance.* Upon submission of the substitute bond, DHS will review the substitute bond for sufficiency as set forth in this section. If the substitute bond is sufficient DHS will cancel the bond previously submitted to DHS, and replace it with the substitute bond. If the substitute bond is insufficient, DHS will notify the obligor of the substitute bond to correct the deficiency within the timeframe specified in the notice. If the deficiency is not corrected within the timeframe specified, the previously submitted bond will remain in effect.

(g) *Cancellation of the Public Charge Bond.* (1) An alien or obligor may request that DHS cancel a public charge bond if the alien:

(i) Naturalized or otherwise obtained United States citizenship;

(ii) Permanently departed the United States;

(iii) Died;

(iv) Reached his or her 5-year anniversary since becoming a lawful permanent resident; or

(v) Obtained a different immigration status not subject to public charge inadmissibility, as listed in 8 CFR 212.23, following the grant of lawful permanent resident status associated with the public charge bond.

(2) *Permanent Departure Defined.* For purposes of this section, permanent departure means that the alien lost or abandoned his or her lawful permanent resident status, whether by operation of law or voluntarily, and physically departed the United States. An alien is only deemed to have voluntarily lost lawful permanent resident status when the alien has submitted a record of abandonment of lawful permanent resident status, on the form prescribed by DHS, from outside the United States, and in accordance with the form's instructions.

(3) *Cancellation Request.* A request to cancel a public charge bond must be made by submitting a form designated by DHS, in accordance with that form's instructions and the fee prescribed in 8 CFR 103.7(b). If a request for cancellation of a public charge bond is not filed, the bond shall remain in effect until the form is filed, reviewed, and a decision is rendered. DHS may in its discretion cancel a public charge bond if it determines that an alien otherwise meets the eligibility requirements of paragraphs (g)(1) of this section.

(4) *Adjudication and Burden of Proof.* The alien and the obligor have the burden to establish, by a preponderance of the evidence, that one of the conditions for cancellation of the public charge bond listed in paragraph (g)(1) of this section has been met. If DHS determines that the information included in the cancellation request is insufficient to determine whether cancellation is appropriate, DHS may request additional information as outlined in 8 CFR 103.2(b)(8). DHS must cancel a public charge bond if DHS determines that the conditions of the bond have been met, and that the bond was not breached, in accordance with paragraph (h) of this section. For cancellations under paragraph (g)(1)(iv) of this section, the alien or the obligor must establish that the public charge bond has not been breached during the 5-year period preceding the alien's fifth anniversary of becoming a lawful permanent resident.

(5) *Decision.* DHS will notify the obligor, the alien, and the alien's representative, if any, of its decision regarding the request to cancel the public charge bond. When the public charge bond is cancelled, the obligor is released from liability. If the public charge bond has been secured by a cash deposit or a cash equivalent, DHS will refund the cash deposit and any interest earned to the obligor consistent with 8 U.S.C. 1363 and 8 CFR 293.1. If DHS denies the request to cancel the bond,

**Exhibit A**

DHS will notify the obligor and the alien, and the alien's representative, if any, of the reasons why, and of the right of the obligor to appeal in accordance with the requirements of 8 CFR part 103, subpart A. An obligor may file a motion pursuant to 8 CFR 103.5 after an unfavorable decision on appeal.

(h) *Breach.* (1) *Breach and Claim in Favor of the United States.* An administratively final determination that a bond has been breached creates a claim in favor of the United States. Such claim may not be released or discharged by an immigration officer. A breach determination is administratively final when the time to file an appeal with the Administrative Appeals Office (AAO) pursuant to 8 CFR part 103, subpart A, has expired or when the appeal is dismissed or rejected.

(2) *Breach of Bond Conditions.* (i) The conditions of the bond are breached if the alien has received public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months), after the alien's adjustment of status to that of a lawful permanent resident and before the bond is cancelled under paragraph (g) of this section. DHS will not consider any public benefits, as defined in 8 CFR 212.21(b), received by the alien during periods while an alien was present in the United States in a category that is exempt from the public charge ground of inadmissibility or for which the alien received a waiver of public charge inadmissibility, as set forth in 8 CFR 212.21(b) and 8 CFR 212.23, and public benefits received after the alien obtained U.S. citizenship, when determining whether the conditions of the bond have been breached. DHS will not consider any public benefits, as defined in 8 CFR 212.21 (b)(1) through (b)(3), received by an alien who, at the time of receipt filing, adjudication or bond breach or cancellation determination, is enlisted in the U.S. Armed Forces under the authority of 10 U.S.C. 504(b)(1)(B) or 10 U.S.C. 504(b)(2), serving in active duty or in the Ready Reserve component of the U.S. Armed Forces, or if received by such an individual's spouse or child as defined in section 101(b) of the Act; or

(ii) The conditions of the bond otherwise imposed by DHS as part of the public charge bond are breached.

(3) *Adjudication.* DHS will determine whether the conditions of the bond have been breached. If DHS determines that it has insufficient information from the benefit-granting agency to determine whether a breach occurred, DHS may request additional information from the benefit-granting agency. If DHS determines that it has insufficient information from the alien or the obligor, it may request additional information as outlined in 8 CFR part 103 before making a breach determination. If DHS intends to declare a bond breached based on information that is not otherwise protected from disclosure to the obligor, DHS will disclose such information to the obligor to the extent permitted by law, and provide the obligor with an opportunity to respond and submit rebuttal evidence, including specifying a deadline for a response. DHS will send a copy of this notification to the alien and the alien's representative, if any. After the obligor's response, or after the specified deadline has passed, DHS will make a breach determination.

(4) *Decision.* DHS will notify the obligor and the alien, and the alien's representative, if any, of the breach determination. If DHS determines that a bond has been breached, DHS will inform the obligor of the right to appeal in accordance with the requirements of 8 CFR part 103, subpart A. With respect to a breach determination for a surety bond, the alien or the alien's representative, if any, may not appeal the breach determination or file a motion.

(5) *Demand for Payment.* Demands for amounts due under the terms of the bond will be sent to the obligor and any agent/co-obligor after a declaration of breach becomes administratively final.

(6) *Amount of Bond Breach and Effect on Bond.* The bond must be considered breached in the full amount of the bond.

(i) *Exhaustion of administrative remedies.* Unless an administrative appeal is precluded by regulation, a party has not exhausted the administrative remedies available with respect to a public charge bond under this section until the party has obtained a final decision in an administrative appeal under 8 CFR part 103, subpart A.

(ii) [Reserved]

## PART 214—NONIMMIGRANT CLASSES

■ 10. The authority citation for part 214 continues to read as follows:

**Authority:** 6 U.S.C. 202, 236; 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305 and 1372; sec. 643, Pub. L. 104–208, 110 Stat. 3009–708; Public Law 106–386, 114 Stat. 1477–1480; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note, and 1931 note, respectively; 48 U.S.C. 1806; 8 CFR part 2.

■ 11. Section 214.1 is amended by:
■ a. Adding paragraph (a)(3)(iv),

■ b. Removing the term, "and" in paragraph (c)(4)(iii);
The additions read as follows:

### § 214.1  Requirements for admission, extension, and maintenance of status.

(a) * * *
(3) * * *
(iv) Except where the nonimmigrant classification for which the alien seeks to extend is exempt from section 212(a)(4) of the Act or section has been waived, as a condition for approval of extension of status, the alien must demonstrate that he or she has not received since obtaining the nonimmigrant status he or she seeks to extend one or more public benefits as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months). For the purposes of this determination, DHS will only consider public benefits received on or after October 15, 2019 for petitions or applications postmarked (or, if applicable, submitted electronically) on or after that date.

*     *     *     *     *

## PART 245—ADJUSTMENT OF STATUS TO THAT OF A PERSON ADMITTED FOR PERMANENT RESIDENCE

■ 12. The authority citation for part 245 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1255; Pub. L. 105–100, section 202, 111 Stat. 2160, 2193; Pub. L. 105–277, section 902, 112 Stat. 2681; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

■ 13. Amend § 245.4 by redesignating the undesignated text as paragraph (a) and adding paragraph (b) to read as follows:

### § 245.4  Documentary requirements.

*     *     *     *     *

(b) For purposes of public charge determinations under section 212(a)(4) of the Act and 8 CFR 212.22, an alien who is seeking adjustment of status under this part must submit a declaration of self-sufficiency on a form designated by DHS, in accordance with form instructions.

■ 14. In § 245.23, revise paragraph (c)(3) to read as follows:

### § 245.23  Adjustment of aliens in T nonimmigrant classification.

*     *     *     *     *

(c) * * *
(3) The alien is inadmissible under any applicable provisions of section 212(a) of the Act and has not obtained a waiver of inadmissibility in accordance with 8 CFR 212.18 or

**Exhibit A**

214.11(j). Where the alien establishes that the victimization was a central reason for the applicant's unlawful presence in the United States, section 212(a)(9)(B)(iii) of the Act is not applicable, and the applicant need not obtain a waiver of that ground of inadmissibility. The alien, however, must submit with the Form I–485 evidence sufficient to demonstrate that the victimization suffered was a central reason for the unlawful presence in the United States. To qualify for this exception, the victimization need not be the sole reason for the unlawful presence but the nexus between the victimization and the unlawful presence must be more than tangential, incidental, or superficial.

## PART 248—CHANGE OF NONIMMIGRANT CLASSIFICATION

■ 15. The authority citation for part 248 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1184, 1258; 8 CFR part 2.

■ 16. Section 248.1 is amended by:

■ a. Revising paragraph (a);

■ b. Redesignating paragraphs (b) through (e) as paragraphs (c) through (f), respectively; and

■ c. Adding a new paragraph (b); and

■ d. Revising newly redesignated paragraph (c)(4).

The revisions and additions read as follows:

## § 248.1   Eligibility.

(a) *General.* Except for those classes enumerated in § 248.2 of this part, any alien lawfully admitted to the United States as a nonimmigrant, including an alien who acquired such status in accordance with section 247 of the Act who is continuing to maintain his or her nonimmigrant status, may apply to have his or her nonimmigrant classification changed to any nonimmigrant classification other than that of a spouse or fiance(e), or the child of such alien, under section 101(a)(15)(K) of the Act or as an alien in transit under section 101(a)(15)(C) of the Act. Except where the nonimmigrant classification to which the alien seeks to change is exempted by law or regulation from section 212(a)(4) of the Act, as a condition for approval of a change of nonimmigrant status, the alien must demonstrate that he or she has not received since obtaining the nonimmigrant status from which he or she seeks to change, public benefits, as described in 8 CFR 212.21(b), for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months). DHS will only consider public benefits received on or after October 15, 2019 for petitions or applications postmarked (or, if applicable, submitted electronically) on or after that date . An alien defined by section 101(a)(15)(V) or 101(a)(15)(U) of the Act may be accorded nonimmigrant status in the United States by following the procedures set forth in 8 CFR 214.15(f) and 214.14, respectively.

(b) *Decision in change of status proceedings.* Where an applicant or petitioner demonstrates eligibility for a requested change of status, it may be granted at the discretion of DHS. There is no appeal from the denial of an application for change of status.

(c) * * *

(4) As a condition for approval, an alien seeking to change nonimmigrant classification must demonstrate that he or she has not received, since obtaining the nonimmigrant status from which he or she seeks to change, one or more public benefits, as defined in 8 CFR 212.21(b), for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months). For purposes of this determination, DHS will only consider public benefits received on or after October 15, 2019 for petitions or applications postmarked (or, if applicable, submitted electronically) on or after that date. This provision does not apply to classes of nonimmigrants who are explicitly exempt by law or regulation from section 212(a)(4) of the Act.

*    *    *    *    *

Kevin K. McAleenan,

*Acting Secretary of Homeland Security.*

[FR Doc. 2019–17142 Filed 8–12–19; 8:45 am]

BILLING CODE 9111–97–P

**Exhibit A**