1   ROBERT W. FERGUSON
    *Attorney General*

2

3   RENE D. TOMISSER, WSBA #17509
    *Senior Counsel*
    JEFFREY T. SPRUNG, WSBA #23607

4   ZACHARY P. JONES, WSBA #44557
    JOSHUA WEISSMAN, WSBA #42648

5   PAUL M. CRISALLI, WSBA #40681
    NATHAN K. BAYS, WSBA #43025

6   BRYAN M.S. OVENS, WSBA #32901*
        *Admission pending*

7   *Assistant Attorneys General*
    8127 W. Klamath Court, Suite A

8   Kennewick, WA 99336
    (509) 734-7285

9
    [Additional counsel on signature page]

10

11   **UNITED STATES DISTRICT COURT**
     **EASTERN DISTRICT OF WASHINGTON**
     **AT SPOKANE**

12

13   STATE OF WASHINGTON, et al.,          NO. 4:19-cv-05210-RMP

14                    Plaintiffs,          PLAINTIFF STATES' MOTION
                                           FOR § 705 STAY PENDING
                                           JUDICIAL REVIEW OR FOR
15       v.                                PRELIMINARY INJUNCTION

16   UNITED STATES DEPARTMENT
     OF HOMELAND SECURITY, et al.,         NOTED FOR: OCTOBER 3, 2019
                                           With Oral Argument at 10:00 a.m.

17                    Defendants.

18

19

20

21

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

1

## TABLE OF CONTENTS

2   I.    INTRODUCTION ..................................................................................... 1

3   II.   BACKGROUND ...................................................................................... 3

4         A.  Overview of Public Charge Ground of Inadmissibility ............... 3

5         B.  History of the Public Charge Exclusion ...................................... 4

6         C.  DHS's Public Charge Rule .......................................................... 5

7               1.   New definition of "public charge" ...................................... 6

8               2.   Consideration of non-cash benefits ..................................... 7

9               3.   "Heavily weighted factors" and other wealth-related
                     criteria ................................................................................ 8

10

11              4.   Changes in bond requirements ............................................ 9

                5.   Failure to address costs to states ....................................... 10
12

13        D.  The Plaintiff States Will Suffer Immediate and Irreparable
              Harm ........................................................................................... 10

14              1.   The Rule will chill State residents from participating
                     in state and federal benefit programs ................................. 10
15

16              2.   Anticipated disenrollment will cause concrete irreparable
                     harm to the Plaintiff States ............................................... 12

17                    a.   Health care ................................................................ 12

18                    b.   Food assistance ......................................................... 14

19                    c.   Housing assistance .................................................... 16

20  III.  ARGUMENT............................................................................................ 18

21        A.  Legal Standards ........................................................................... 18

22              1.   Administrative Procedure Act § 705 stay standards............. 18

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

i

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

2.    Preliminary injunction standards ..........................................20

B.    The Plaintiff States Are Likely to Succeed on Their APA
      Claims....................................................................................20

      1.    DHS's new definition of "public charge" is inconsistent
            with the term's plain meaning and is contrary to law ..........21

            a.    *Chevron* framework...........................................22

            b.    Public charge means a person primarily dependent
                  upon the government for subsistence..............................22

            c.    The history of the public charge exclusion confirms
                  that Congress adopted the term's common law
                  meaning ........................................................24

                  i.     Colonial and early state law sources.....................24

                  ii.    The Immigration Act of 1882 ..............................26

                  iii.   Immigration and Naturalization Act of 1952
                         and subsequent enactments ....................................27

                  iv.    Welfare Reform and Immigration Reform Acts...27

                  v.     Congress repeatedly rejected the definition of
                         "public charge" DHS now adopts .........................29

            d.    The context of the public charge exclusion confirms
                  that Congress intended the term "public charge" to
                  retain its common law meaning .....................................30

                  i.     Early judicial and agency interpretations..............31

                  ii.    Modern agency interpretations .............................31

                  iii.   Post-1996 Agency Field Guidance confirms
                         the settled interpretation of "public charge".........32

      2.    The Rule adopts an interpretation expressly rejected by
            Congress..............................................................................34

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

ii

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

3. The Rule's weighted criteria are contrary to law ................. 35

   a. The weighted criteria are contrary to the INA and
      Immigration Reform Act ................................................. 35

   b. The weighted criteria are contrary to the
      Welfare Reform Act ....................................................... 39

   c. The weighted criteria are contrary to Section 504
      of the Rehabilitation Act ................................................ 39

4. The Rule is arbitrary or capricious ...................................... 40

   a. DHS failed to justify or meaningfully address the
      Rule's many devastating harms ..................................... 42

      i. DHS disregarded evidence the Rule will cause
         public health crises ................................................ 42

      ii. DHS disregarded evidence of the Rule's
          harmful effects on children ................................... 44

      iii. DHS disregarded the Rule's harmful and
           discriminatory effects on the elderly and
           individuals with disabilities ................................. 45

   b. DHS ignored evidence showing the factors in the
      public charge analysis are arbitrary and capricious ....... 47

      i. Income thresholds ................................................. 47

      ii. English proficiency ............................................... 49

      iii. Credit scores ........................................................ 50

C. Absent a Stay or Injunctive Relief, the Plaintiff States
   Will Suffer Immediate and Irreparable Harm ........................... 51

   1. Categories of irreparable harm to be considered by the
      Court ................................................................................. 51

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

iii

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

2.  Disenrollment from federal and state programs will
    result in irreparable harm to health care, nutrition, and
    housing ................................................................................... 52

D.  The Balance of Equities and Public Interest Both Favor a
    Preliminary Injunction ............................................................... 55

IV.  CONCLUSION .................................................................................. 57

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

iv

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1

# TABLE OF AUTHORITIES

2

## <u>Cases</u>

3

*Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife*
   273 F.3d 1229 (9th Cir. 2001)............................................................................50

4

*Assoc. Sec. Corp. v. SEC*
   283 F.2d 773 (10th Cir. 1960)..........................................................................19

5

6

*Bakersfield City Sch. Dist. of Kern Cty. v. Boyer*
   610 F.2d 621 (9th Cir. 1979)............................................................................18

7

*Bauer v. DeVos*
   325 F. Supp. 3d 74 (D.D.C. 2018) ...................................................................18

8

9

*Beltran v. Myers*
   677 F.2d 1317 (9th Cir. 1982)..........................................................................52

10

*Bunker v. Ficke*
   6 Ohio Dec. Reprint 978, 1880 WL 5770 (Ohio Dist. 1880) ..........................25

11

12

*Cal. Cosmetology Coal. v. Riley*
   110 F.3d 1454 (9th Cir. 1997)..........................................................................38

13

*California v. Azar*
   911 F.3d 558....................................................................................................52

14

15

*California v. Health & Human Servs.*
   281 F. Supp. 3d 806 (N.D. Cal. 2017), *aff'd in pertinent part sub nom.*
   *California v. Azar*, 911 F.3d 558 (9th Cir. 2018) ...........................................52

16

17

*California v. Health and Human Servs.*
   351 F. Supp. 3d 1267 (N.D. Cal. 2019) ...........................................................52

18

*Chevron, U.S.A. v. Nat. Res. Def. Council, Inc.*
   467 U.S. 837 (1984) .............................................................................21, 22, 30

19

20

*City & County of San Francisco v. Trump*
   897 F.3d 1225 (9th Cir. 2018)........................................................................2, 34

21

*City of Boston v. Capen*
   61 Mass. 116 (1851)........................................................................................25

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

v

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

*Colorado Coal. for Homeless v. Gen Servs. Admin.*
  No. 18-CV-1008-WJM-KLM, 2018 WL 3109087 (D. Colo. 2018) ..............20

*County of Santa Clara v. Trump*
  250 F. Supp. 3d 497 (N.D. Cal. 2017) ...........................................................52

*Cronin v. U.S. Dep't of Agric.*
  919 F.2d 439 (7th Cir. 1990)........................................................................19

*D.F. ex rel. L.M.P. v. Leon Cty. Sch. Bd.*
  No. 4:13CV3-RH/CAS, 2014 WL 28798 (N.D. Fla. Jan. 2, 2014)...............40

*Davis Cty. Solid Waste Mgmt. v. U.S. EPA*
  108 F.3d 1454 (D.C. Cir. 1997) ....................................................................35

*Davis v. Pension Benefit Guar. Corp.*
  571 F.3d 1288 (D.C. Cir. 2009) ....................................................................20

*Diaz v. Brewer*
  656 F.3d 1008 (9th Cir. 2011).......................................................................56

*Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*
  512 U.S. 267 (1994) ......................................................................................23

*Disney Enters., Inc. v. VidAngel, Inc.*
  869 F.3d 848 (9th Cir. 2017).........................................................................20

*Drakes Bay Oyster Co. v. Jewell*
  747 F.3d 1073 (9th Cir. 2014).......................................................................55

*E. Bay Sanctuary Covenant v. Trump*
  354 F. Supp. 3d 1094 (N.D. Cal. 2018) ...................................................20, 52

*E. Bay Sanctuary Covenant v. Trump*
  932 F.3d 742 (9th Cir. 2018).........................................................................56

*Empire Health Found. for Valley Hosp. Med. Ctr. v. Price*
  334 F. Supp. 3d 1134 (E.D. Wash. 2018)......................................................22

*FCC v. Fox Television Stations, Inc.*
  556 U.S. 502 (2009) ......................................................................................41

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

vi

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

*FDA v. Brown & Williamson Tobacco Corp.*
    529 U.S. 120 (2000) ...................................................................22, 30, 32, 34

*Fischer v. Meader*
    111 A. 503 (N.J. 1920)..............................................................................25

*Franco-Gonzalez v. Holder*
    No. CV 10-02211 DMG (DTBx), 2013 WL 3674492
    (C.D. Cal. Apr. 23, 2013)..........................................................................40

*Henderson v. Mayor of City of New York*
    92 U.S. 259 (1875)....................................................................................26

*Hernandez v. Sessions*
    872 F.3d 976 (9th Cir. 2017)...............................................................20, 55

*Howe v. United States ex rel. Savitsky*
    247 F. 292 (2d Cir. 1917).........................................................................31

*Humane Soc'y of United States v. Gutierrez*
    558 F.3d 896 (9th Cir. 2009).....................................................................19

*Idaho v. Coeur d'Alene Tribe*
    794 F.3d 1039 (9th Cir. 2015)...................................................................52

*In re Day*
    27 F. 678 (C.C.S.D.N.Y. 1886)................................................................26

*In re O'Sullivan*
    31 F. 447 (C.C.S.D.N.Y.).........................................................................25

*INS v. Cardoza-Fonseca*
    480 U.S. 421 (1987)..................................................................................29

*Iwata v. Intel Corp.*
    349 F. Supp. 2d 135 (D. Mass. 2004) .......................................................39

*League of Women Voters of United States v. Newby*
    838 F.3d 1 (D.C. Cir. 2016) ...............................................................52, 56

*Louisiana Real Estate Appraisers Bd. v. United States Fed. Trade Comm'n*
    No. 19-CV-214-BAJ-RLB, 2019 WL 3412162 (M.D. La. July 29, 2019) ....18

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

vii

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

*Lovell v. Chandler*
  303 F.3d 1039 (9th Cir. 2002)..........................................................................40

*M.R. v. Dreyfus*
  697 F.3d 706 (9th Cir. 2012)............................................................................52

*Martinez-Farias v. Holder*
  338 F. App'x 729 (9th Cir. 2009) ....................................................................36

*Matter of Martinez-Lopez*
  10 I. & N. Dec. 409 (A.G. 1962) .....................................................................31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*
  463 U.S. 29 (1983)....................................................................................41, 47

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*
  551 U.S. 644 (2007) .........................................................................................30

*Nat'l Parks Conservation Ass'n v. EPA*
  788 F.3d 1134 (9th Cir. 2015)..........................................................................49

*North Carolina v. EPA*
  531 F.3d 896, *on reh'g in part*, 550 F.3d 1176 (D.C. Cir. 2008) ..................35

*Pennsylvania v. Trump*
  351 F. Supp. 3d 791 (E.D. Pa. 2019),
  *aff'd sub nom. Pennsylvania v. President United States*,
  930 F.3d 543 (3d Cir. 2019), as amended (July 18, 2019) ..............................35

*Pine Twp. Overseers v. Franklin Twp. Overseers*
  4 Pa. D. 715, 1894 WL 3774 (Pa. Quar. Sess. 1894).......................................25

*Ramirez v. United States Immigration and Customs Enf't*
  310 F. Supp. 3d 7 (D.D.C. 2018) .....................................................................55

*Ranchers-Cattlemen Action Legal Fund v. United States Dep't of Agric.*
  No. 2:17-CV-223-RMP, 2018 WL 2708747 (E.D. Wash. June 5, 2018).......22

*Rotenberry v. Comm'r Internal Rev.*
  847 F.2d 229 (5th Cir. 1988)............................................................................39

*Schwartz v. Covington*
  341 F.2d 537 (9th Cir. 1965).............................................................................19

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

viii

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

*Shannon v. United States*
    512 U.S. 573 (1994) ........................................................................24

*State v. Bureau of Land Mgmt.*
    286 F. Supp. 3d 1054 (N.D. Cal. 2018) .........................................52

*Tennessee Valley Auth. v. Hill*
    437 U.S. 153 (1978) ........................................................................38

*Texas v. EPA*
    829 F.3d 405 (5th Cir. 2016) .....................................................18, 19

*Trump v. Int'l Refugee Assistance Project*
    137 S. Ct. 2080 (2017) ....................................................................55

*United States Telecom Ass'n v. Fed. Commc'ns Comm'n*
    855 F.3d 381 (D.C. Cir. 2017) ........................................................35

*Valle Del Sol v. Whiting*
    723 F.3d 1006 (9th Cir. 2013) ........................................................52

*Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*
    259 F.2d 921 (D.C. Cir. 1958) ........................................................19

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ...........................................................20, 51, 55, 56

### Statutes

5 U.S.C. § 705                                                              18, 19

8 U.S.C. §§ 1101(a)(13)(c)                                                        3

8 U.S.C. §§ 1157(c)(3)                                                            3

8 U.S.C. § 1158(b)(2)                                                             3

8 U.S.C. § 1159(c)                                                                3

8 U.S.C. § 1182(a)                                                                3

8 U.S.C. § 1182(a)(1)(A)                                                         37

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

ix

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    8 U.S.C. § 1182(a)(4)                                  3, 28

2    8 U.S.C. § 1183                                       9

3    8 U.S.C. § 1185(d)                                    3

4    8 U.S.C. § 1225(a)                                    3

5    8 U.S.C. § 1255(a)                                    3

6    8 U.S.C. § 1361                                        3

7    8 U.S.C. § 1612(a)(2)                                28

8    8 U.S.C. § 1612(b)(1)                                28

9    8 U.S.C. § 1613(a)                                    28

10    8 U.S.C. § 1613(b)(1)–(2)                           28

11    8 U.S.C. §§ 1621(d)                                 28

12    8 U.S.C. § 1622(a)                                   28

13    29 U.S.C. § 794(a)                                  39

14    42 U.S.C. § 1396n(i)                              40

15    26 Stat. 1084 (1891)                              4

16    66 Stat. 163 (1952)                               38

17    Immigration Act of 1882, 47th Cong., ch. 376, 22 Stat. 214 (1882)    4, 23, 26

18    Immigration and Nationality (McCarran-Walter) Act of 1952,
       Pub. L. No. 414, 66 Stat. 163
19    (codified as amended at 8 U.S.C. § 1101, *et seq.*)            *passim*

20    Immigration Act of 1990, Pub. L. No. 101-649,
       104 Stat. 4978                                      4, 38

21

22

PLAINTIFF STATES' MOTION       x       ATTORNEY GENERAL OF WASHINGTON
FOR § 705 STAY PENDING                    8127 W. Klamath Court, Suite A
JUDICIAL REVIEW OR FOR PI                Kennewick, WA 99336
NO. 4:19-CV-05210-RMP                      (509) 734-7285

Personal Responsibility and Work Opportunity Reconciliation Act of 1996
(Welfare Reform Act)
Pub. L. 104-193, 110 Stat. 2105 (1996)                                    27

Pub. L. 82–414, 66 Stat. 163                                             27

Pub. L. 104-208, Div. C, 110 Stat. 3009                              29, 30

**Regulations**

8 C.F.R. § 212.21(a)                                                  6, 7, 21

8 C.F.R. § 212.21(b)                                                     7, 39

8 C.F.R. § 212.22(b)                                                         9

8 C.F.R. § 212.22(b)(2)(ii)(B)                                             37

8 C.F.R. § 212.22(b)(4)                                                36, 40

8 C.F.R. § 212.22(c)                                                       48

8 C.F.R. § 212.22(c)(1)(i)–(iv)                                       8, 37, 39

8 C.F.R. § 212.22(c)(2)(i)-(iii)                                         9, 40

8 C.F.R. § 213.1(c)(2)                                                       9

**Rules**

*Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41,292    *passim*
(August 14, 2019)

U.S. Dep't of Justice, Final Rule: *Adjustment of Status for Certain Aliens*
54 FR 29,442-01 (July 12, 1989)                                         32

**Executive and Administrative Materials**

*Attorney General's Manual on the Administrative Procedure Act* 105 (1947)  18

*Field Guidance on Deportability and Inadmissibility on Public Charge
Grounds*
64 Fed. Reg. at 28,689-01, 28,689 (May 26, 1999)                       33

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

xi

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

Proposed Rule, *Inadmissibility on Public Charge Grounds*,
   83 Fed. Reg. 51,114 (Oct. 18, 2019)   43, 48, 50, 53

Public Charge Fact Sheet
   USCIS, Apr. 29, 2011   34

*Public Charge Provisions of Immigration Law:*
   *A Brief Historical Background*, USCIS   24, 31

Report of the Visa Office, 2000–2018   5

U.S. Dep't of Justice, Public Charge Fact Sheet
   2009 WL 3453730 (Oct. 29, 2011)   34

U.S. State Department Cable, INA 212(A)(4) Public Charge: Policy Guidance,
   Ref: 9 FAM 40.41   33

### Legislative Materials

Border Security, Economic Opportunity, and Immigration Modernization Act
   of 2013, S. 744, 113th Cong. (2013)   30

Immigration Control and Financial Responsibility Act of 1996
   H.R. 2202, 104th Cong. § 202 (1996)   29

S. Rep. No. 1515, 81st Cong., 2d Sess. (1950)   27

### Dictionaries

*Black's Law Dictionary* (6th ed. 1990)   23

*Black's Law Dictionary* (3d ed. 1933)   23

*The Century Dictionary of the English Language* vol. IV (1889–91)   23

Webster, *An American Dictionary of the English Language* (1857)   23

### Other Authorities

Act of Mar. 20, 1850, ch. 105, § 1, 1850 Mass. Acts & Resolves 338   25

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

xii

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

Eileen Sullivan & Michael D. Shear, *Trump Sees an Obstacle to Getting His Way on Immigration: His Own Officials*, N.Y. Times (Apr. 14, 2019)    5, 34

Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833, 1846 (1993)    4

Hidetaki Hirota, *Expelling the Poor: Atlantic Seaboard States and the Nineteenth-Century Origins of American Immigration Policy* (2017)    4

Mass. Gen. Ct., Acts and Resolves 552, § 2 (Mar. 14, 1700)    24

Minor Myers III, *A Redistributive Role for Local Government*, 36 Urb. Law. 753, 773 (2004)    4

Shelley K. Irving & Tracy A. Loveless, *Dynamics of Economic Well-Being*, U.S. Census Bureau at 2–4 (May 2015)    7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

xiii

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

# I.   INTRODUCTION

On August 14, 2019, Defendants (collectively, DHS) issued a Final Rule that will cause hundreds of thousands of families in the Plaintiff States, and millions of eligible children and adults nationwide, to disenroll from federal and state health care, nutrition, and housing benefits programs. This, in turn, will result in State residents losing hundreds of millions of dollars in health care services, decreased vaccinations and increased transmission of communicable diseases, and denied access for people with disabilities to services only available through Medicaid. It will increase hunger, malnutrition, and homelessness among children, all associated with deficits in cognitive development, chronic asthma, substance abuse, depression, and behavioral challenges. As demonstrated by the 51 declarations submitted with this motion, DHS's Rule will undermine the mission of dozens of state programs and impose millions of dollars in costs to the Plaintiff States to address the resulting public health problems, educational burdens, and homelessness.

The Plaintiff States move to stay the Rule pending judicial review under the Administrative Procedure Act, or alternatively for a preliminary injunction prohibiting DHS from implementing the Rule, which is scheduled to take effect on October 15, 2019. Through the Rule, the Administration attempts to remake the "public charge" doctrine, a rarely used statutory ground for exclusion of immigrants, into—in its own words—a "transformative" tool to reshape

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

1

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1   American immigration policy. The Plaintiff States are likely to succeed on the

2   merits of their claims for a host of reasons:

3       First, DHS interprets the term "public charge" in a manner contrary to

4   Congress's intent, as evidenced by statutory text, history, and context.

5       Second, DHS brazenly adopts a legal standard that Congress twice

6   expressly rejected, "coopt[ing] Congress's power to legislate" through executive

7   action. *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir.

8   2018).

9       Third, the Rule separately violates four statutes: (1) the Immigration and

10  Nationality Act of 1952, (2) the Illegal Immigration Reform and Immigrant

11  Responsibility Act of 1996, (3) the Personal Responsibility and Work

12  Opportunity Reconciliation Act of 1996, and (4) the Rehabilitation Act of 1973.

13      Fourth, the Rule is arbitrary and capricious because DHS failed to

14  meaningfully address evidence of the harm the Rule inflicts on vulnerable people,

15  especially children, the elderly, and individuals with disabilities, and DHS

16  ignored its own evidence that the factors it prescribed for the public charge

17  analysis are arbitrary, ill-defined, and give unreasonable discretion to

18  immigration officials.

19      DHS's unlawful efforts to refashion American immigration policy through

20  regulation should not take effect while the Plaintiff States' legal challenge is

21  pending.

22

PLAINTIFF STATES' MOTION                    2                    ATTORNEY GENERAL OF WASHINGTON
FOR § 705 STAY PENDING                                                8127 W. Klamath Court, Suite A
JUDICIAL REVIEW OR FOR PI                                               Kennewick, WA 99336
NO. 4:19-CV-05210-RMP                                                      (509) 734-7285

## II.   BACKGROUND

**A.   Overview of Public Charge Ground of Inadmissibility**

The Immigration and Nationality Act (INA) requires certain immigrants to prove that they are "not inadmissible." 8 U.S.C. § 1361; 8 U.S.C. § 1225(a). A noncitizen who is "likely at any time to become a public charge" is inadmissible. 8 U.S.C. § 1182(a)(4).[1] This "public charge exclusion" is enforced abroad by consular officers (who process visa applications) and domestically by Defendant USCIS. It applies to:

- noncitizens seeking to become lawful permanent residents;
- immigrants entering the United States on a visa;[2]
- noncitizens applying to "adjust" status to lawful permanent residency (*i.e.*, apply for a green card); and
- permanent residents "seeking admission" (including, among other circumstances, when a permanent resident returns to the United States after a trip of more than 180 days).

8 U.S.C. §§ 1101(a)(13)(c), 1182(a), 1225(a), 1255(a), 1361.

---

[1] Certain groups of noncitizens, such as asylum seekers and refugees, are exempt from the public charge ground. *See* 8 U.S.C. §§ 1157(c)(3), 1158(b)(2), 1159(c).

[2] Visa holders undergo an inadmissibility determination by DHS at ports of entry every time they enter and re-enter the United States. 8 U.S.C. § 1185(d).

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

3

1    **B.    History of the Public Charge Exclusion**

2    From colonial "poor laws" through modern times, the term "public charge"

3    has had a clear and established meaning: a person unable to care for himself or

4    herself and primarily dependent on the state for support. *See* Minor Myers III, *A*

5    *Redistributive Role for Local Government*, 36 Urb. Law. 753, 773 (2004)

6    (colonial poor laws permitted towns to expel transient beggars, vagrants, and

7    paupers as "public charges"); Gerald L. Neuman, *The Lost Century of American*

8    *Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833, 1846 (1993); Hidetaki

9    Hirota, *Expelling the Poor: Atlantic Seaboard States and the Nineteenth-Century*

10    *Origins of American Immigration Policy* (2017) (mass European migration in the

11    early 19th century brought "large numbers of exceptionally impoverished and

12    destitute people" who were described, in common parlance and law, as "public

13    charges," "paupers," or both); Immigration Act of 1882, 47th Cong., ch. 376, 22

14    Stat. 214 (1882) (borrowing from state immigration laws, to prohibit the landing

15    in the United States of "any convict, lunatic, idiot, or any other person unable to

16    take care of himself . . . without becoming a public charge"); 26 Stat. 1084, 1084

17    (1891) (adding "paupers" to the list so that the provision precluded admission of

18    "idiots, insane persons, paupers or persons likely to become a public charge").

19    When Congress reorganized immigration law into the present statutory

20    framework, the INA retained the long-established exclusions of "paupers" and

21    those "likely at any time to become a public charge," along with numerous other

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

4

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

grounds of inadmissibility—including for those with "a mental defect," "physical defect," disease," or "disability . . . of such a nature that it may affect the ability of the alien to earn a living." Immigration and Nationality (McCarran-Walter) Act of 1952, Pub. L. No. 414, § 212(a), 66 Stat. 163, 182 (codified as amended at 8 U.S.C. § 1101, *et seq*.).[3]

## C.    DHS's Public Charge Rule

On August 12, 2019, DHS issued a Final Rule designed to "transform"[4] who may immigrate to the United States, by expanding the previously rarely used "public charge" exclusion.[5] Final Rule, *Inadmissibility on Public Charge*

---

[3] The Immigration Act of 1990 eliminated all of the above grounds of inadmissibility, with the exception of the public charge exclusion. Pub. L. No. 101-649, § 601(a)(4), 104 Stat. 4978, 5072 (codified as amended at 8 U.S.C. § 1182).

[4] *See* Eileen Sullivan & Michael D. Shear, *Trump Sees an Obstacle to Getting His Way on Immigration: His Own Officials*, N.Y. Times (Apr. 14, 2019), https://www.nytimes.com/2019/04/14/us/politics/trump-immigration-stephen-miller.html?action=click&module=Top%20Stories&pgtype=Homepage.

[5] Between 2000 and 2016, less than 0.2% of the more than 17 million immigrants admitted as lawful permanent residents were denied visas on public charge grounds. *See* Report of the Visa Office, 2000–2018, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics.html.

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

5

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    *Grounds*, 84 Fed. Reg. at 41,292 (August 14, 2019) (to be codified at 8 C.F.R.

2    pts. 103, 212–14, 245, 248) (the Rule).[6] The Rule becomes effective October 15,

3    2019. 84 Fed. Reg. at 41,292.

4         The Rule unmoors the public charge definition from its historic anchor in

5    primary dependence on the government for subsistence, and it significantly

6    expands the types of benefits considered in the public charge determination and

7    the amount of wealth an immigrant needs to remain in the country. In public

8    comments, many states (including the Plaintiff States) explained the devastating

9    impacts the proposed rule would have on the health care costs and well-being of

10   families of legal immigrants in their states. *See, e.g.*, Bays Decl.[7] Exs. H, I.

11   **1.    New definition of "public charge"**

12        Contrary to the established meaning of "public charge" and Congressional

13   intent, the Rule redefines the term as "an alien who receives one or more public

14   benefits . . . for more than 12 months in the aggregate within any 36-month

15   period." 8 C.F.R. § 212.21(a). Under the 12-month threshold, receipt of two

16

17   _____

18        [6] Unless otherwise noted, all subsequent C.F.R. citations are to provisions

19   of the Rule to be codified and effective October 15, 2019.

20        [7] Plaintiff States refer throughout to declarations submitted with this

21   Motion by the last name of the declarant, followed by the pertinent reference to

22   the paragraph or exhibit number of that declaration.

PLAINTIFF STATES' MOTION          6          ATTORNEY GENERAL OF WASHINGTON
FOR § 705 STAY PENDING                               8127 W. Klamath Court, Suite A
JUDICIAL REVIEW OR FOR PI                               Kennewick, WA 99336
NO. 4:19-CV-05210-RMP                                     (509) 734-7285

1   benefits in a given month counts as two months, three benefits as three months,

2   and so forth—regardless of the amounts received. 8 C.F.R. § 212.21(a).

3       **2.    Consideration of non-cash benefits**

4       The Rule dismisses the longstanding interpretation of the benefits that

5   trigger a public charge determination and casts a vastly wider net to include

6   common, non-cash federal benefits.[8] A "public benefit" includes: "(1) [a]ny

7   Federal state, local or tribal cash assistance for income maintenance," including

8   SSI, TANF, or state "General Assistance"; (2) Supplemental Nutrition Assistance

9   Program (SNAP); (3) Section 8 housing assistance vouchers; (4) Section 8

10  project-based rental assistance; (5) Medicaid (with exceptions for benefits or

11  services for emergency medical conditions, under the Individuals with

12  Disabilities Education Act, that are school-based, to immigrants who are under

13  21 years of age or a woman during pregnancy); and (6) public housing under

14  Section 9 of the U.S. Housing Act of 1937. 8 C.F.R. § 212.21(b).

15

16  _____

17      [8] Between 2009 and 2012, approximately 52.2 million people in the United

18  States (or 21.3% of the general population) participated in one or more major

19  public assistance programs in a given month—including the programs swept up

20  in the Rule—of whom more than two-thirds participated for at least 12 months.

21  *See* Shelley K. Irving & Tracy A. Loveless, *Dynamics of Economic Well-Being*,

22  U.S. Census Bureau at 2–4 (May 2015).

1        **3.    "Heavily weighted factors" and other wealth-related criteria**

2        The Rule creates new heavily weighted factors in determining whether a

3    noncitizen is a public charge, placing heavily negative weight on poverty. The

4    Rule establishes four factors having heavily negative weight:

5        1.    the immigrant is not a full-time student and is authorized to work,
              but is unable to demonstrate current or recent employment, or no
6             reasonable prospect of future employment;

7        2.    the immigrant has received or has been certified or approved to
              receive one or more public benefits for more than 12 months in the
8             aggregate within any 36-month period;

9        3.    (A) the immigrant has been diagnosed with a medical condition that
              likely will require extensive medical treatment or will interfere with
10            his or her ability to attend work or school; and (B) he or she is
              uninsured and has no prospect of obtaining private health insurance
11            nor the financial resources to pay for reasonably foreseeable medical
              costs;
12
13       4.    the immigrant has been previously found to be inadmissible or
              deportable on public charge grounds.

14   8 C.F.R. § 212.22(c)(1)(i)–(iv).

15       Other wealth-related criteria the Rule introduces include whether the

16   immigrant (1) is under the age of 18 or over the minimum early retirement age

17   for social security; (2) has a medical condition that will require extensive

18   treatment or interfere with the ability to attend school or work; (3) has an annual

19   household gross income under 125% of the Federal poverty guidelines (FPG);

20   (4) has a household size that makes the immigrant likely to become a public

21   charge at any time in the future; (5) lacks significant assets, like savings accounts,

22

1    stocks, bonds, or real estate; (6) lacks sufficient assets and resources to cover

2    reasonably foreseeable medical costs; (7) has any financial liabilities; (8) has

3    applied for, been certified to receive, or received public benefits after October

4    15, 2019; (9) has applied for or has received a USCIS fee waiver for an

5    immigration benefit request; (10) has a lower credit history and credit score;

6    (11) lacks private health insurance or other resources to cover reasonably

7    foreseeable medical costs; (12) lacks a high school diploma (or equivalent) or a

8    higher education degree; or (13) is not proficient in English. 8 C.F.R. § 212.22(b).

9        Heavily weighted positive factors also evaluate wealth and include

10    whether (1) the immigrant's household income, assets, or resources are at least

11    250% of the FPG; (2) the immigrant legally works with an annual income at least

12    250% of the FPG; and (3) the immigrant has private health insurance, except for

13    any health insurance for which there are tax credits under the Affordable Care

14    Act. 8 C.F.R. § 212.22(c)(2)(i)-(iii).

15        **4.    Changes in bond requirements**

16        If DHS determines a noncitizen likely to become a public charge, it

17    nevertheless may allow the person to obtain a visa by submitting a public charge

18    bond. 8 U.S.C. § 1183. The Rule increases the bond amount more than eight-fold,

19    to $8,100. 8 C.F.R. § 213.1(c)(2). The Rule also severely limits the use of bonds,

20    which "generally will not" be allowed if an immigrant "has one or more heavily

21    weighted negative factors." 84 Fed. Reg. at 41,451.

22

PLAINTIFF STATES' MOTION                9
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

### 5.    Failure to address costs to states

Despite the Rule's impact on states' health care plans, housing programs, and supplemental nutrition programs, DHS submitted no federalism summary impact statement and asserted that the Rule "does not have substantial effects on the States." 84 Fed. Reg. at 41,481; *see also id.* at 41,469–70 (dismissing the costs to state and local government as "unclear" and "indirect").

## D.    The Plaintiff States Will Suffer Immediate and Irreparable Harm

### 1.    The Rule will chill State residents from participating in state and federal benefit programs

If the Rule goes into effect, millions of legally present noncitizens nationwide could be subject to public charge determinations. Bays Decl. Ex. A; 84 Fed. Reg. at 41,417 (admitting that more working immigrants with incomes below the 125% threshold will be determined a public charge); *see also* Bays Decl. Ex. B (in 2017, approximately 380,000 individuals adjusted their immigration status in a manner that likely would have subjected them to a public charge determination under the Rule). Currently, over 6.3 million noncitizens nationwide accept public benefits as defined by the Rule making them subject to a public charge determination, including 233,000 individuals in Illinois, 192,000 individuals in Massachusetts, 188,000 individuals in New Jersey, 92,000 individuals in Maryland, 78,000 individuals in Michigan, and 75,000 individuals in Washington. Bays Decl. Ex. G.

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

10

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    DHS concedes that the Rule will have a chilling effect on immigrants'

2    willingness to seek public benefits for which they are entitled. 84 Fed. Reg. at

3    41,312. Immigrants fearing deportation will disenroll from state and federal

4    public benefit programs to avoid the potential classification as a public charge.

5    *See* 84 Fed. Reg. at 41,463 (estimating a 2.5% disenrollment rate from programs

6    included in the new public charge test); *id.* at 51,266–69 (agreeing that the Rule

7    will cause hundreds of thousands of eligible individuals who are members of

8    households with foreign-born noncitizens to disenroll from or forego enrollment

9    in benefits for which they eligible).

10    In reality, the number of noncitizens who will be chilled from using state

11    or federal public benefits is much higher than DHS's estimates and is expected

12    to range between 15% and 35% among noncitizens. Bays Decl. Exs. C, D, E

13    (reflecting up to 60% disenrollment, even for noncitizens who were exempted

14    from restrictions on access to those benefits); Wong Decl. ¶¶ 27–29, 32–34

15    (studies in related areas of immigration show that, when threatened with

16    deportation, statistically significant numbers of immigrants will disenroll or not

17    participate in benefit programs related to health, food, and housing). Nationwide,

18    there are over 10.3 million noncitizens in families receiving at least one cash or

19    noncash benefit whom the Rule may cause to disenroll in the applicable program,

20    including 424,000 individuals in Illinois, 335,000 individuals in New Jersey,

21    255,000 individuals in Massachusetts, 245,000 individuals in Washington,

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

11

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

182,000 individuals in Maryland, 148,000 individuals in Virginia, 116,000 individuals in Michigan, and 114,000 individuals in Nevada. Bays Decl. Ex. G.

### 2. Anticipated disenrollment will cause concrete irreparable harm to the Plaintiff States

Nearly all of the benefits programs identified in the Rule are administered by the Plaintiff States, who provide additional funding to many of these programs. *See, e.g.*, Linke Decl. ¶ 8; Sharfstein Decl. ¶ 10; Emerson Decl. ¶ 10. The Plaintiff States also have adopted their own programs to provide additional health care, nutrition, and housing benefits. The Rule causes three types of irreparable injury to the Plaintiff States in connection with these expenditures: (1) harm to missions of state benefits programs; (2) harm to the health and well-being of state residents; and (3) financial harm to the Plaintiff States.

#### a. Health care

The Plaintiff States combine billions of dollars of federal funds from Medicaid with billions of dollars of state funds to administer health care programs for millions of people in their states. Linke Decl. ¶ 8; Sharfstein Decl. ¶ 10; Emerson Decl. ¶ 10; Neira Decl. ¶ 7. The predicted disenrollment from Medicaid and other state health care programs will undermine the purpose of these programs and frustrate the will of the Plaintiff States' legislatures that enacted them. Linke Decl. ¶¶ 22–25; Sharfstein Decl. ¶¶ 14–16; Betts Decl. ¶ 14; Ezike Decl. ¶ 14; MacEwan Decl. ¶ 7; Persichilli Decl. ¶ 11.

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

12

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    The Plaintiff States expect millions of people receiving Medicaid coverage

2    to disenroll because of the Rule. Linke Decl. ¶¶ 17–18; Boyle Decl. ¶ 29;

3    Kelly Decl. ¶ 15; Eagleson Decl. ¶ 10; Whitley Decl. ¶ 12; *see* Bays Decl. Ex. C.

4    Millions of families will also be impacted where a member of the household falls

5    under the policy. Linke Decl. ¶ 18; Kelly Decl. ¶ 15; Curtatone & Skipper Decl.

6    ¶ 12; Chavez Decl. ¶ 11; Winders Decl. ¶ 12; *see* Bays Decl. Ex. C. Nationwide,

7    over 9.5 million noncitizens are in in families receiving Medicaid or CHIP

8    benefits. Bays Decl. Ex. G. The effects will be particularly harsh on the Plaintiff

9    States' programs for women, infants, and children, for which participation rates

10   have already decreased since the Rule was first made public. Polk Decl. ¶ 19;

11   Sharfstein Decl. ¶ 16; Hanulcik Decl. ¶¶ 7, 11–20; Bohanan Decl. ¶¶ 13, 19, 22;

12   Kelly, Decl. ¶ 13; Zimmerman Decl. ¶ 13; Neira Decl. ¶ 9. The result will be an

13   annual reduction in medical and behavioral care received by residents of the

14   Plaintiff States. Pryor Decl. ¶ 9; Sharfstein Decl., ¶ 15; Boyle Decl. ¶ 30;

15   MacEwan Decl. ¶¶ 10–13; Berge Decl. ¶¶ 14–17; Groff Decl. ¶¶ 16–17; Clark

16   Decl. ¶¶ 8–9; Batayola Decl. ¶ 23; Basta Decl. ¶ 8; Twite Decl. ¶¶ 11–12. The

17   financial value of foregone health care currently received by residents of the

18   Plaintiff States is projected in the hundreds of millions of dollars. Bays Decl.

19   Ex. I at 2. The loss of medical care and health care insurance will seriously impact

20   the health and well-being of residents of the Plaintiff States. Sharfstein Decl.

21   ¶ 23; Hanulcik Decl. ¶ 19; Batayola Decl. ¶ 14; Hotrum-Lopez Decl. ¶ 6 at 8.

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

13

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    It will deter eligible individuals from accessing routine preventative medical care

2    like vaccinations. Polk Decl. ¶ 13; Sharfstein Decl. ¶¶ 17–18; Kelly Decl. ¶ 17;

3    Persichilli Decl. ¶¶ 20–22.

4        As DHS admits, Plaintiff States will suffer higher and more frequent

5    emergency services and uncompensated care costs. 84 Fed. Reg. at 41,384;

6    Sharfstein Decl. ¶ 19; Persichilli Decl. ¶¶ 7–11. Not only will individuals' health

7    suffer, but treatment will be significantly more expensive than if people received

8    care before emergencies materialized; these costs will be borne by the Plaintiff

9    States and private institutions located in the Plaintiff States. Hou Decl. ¶ 22;

10    Sharfstein Decl. ¶¶ 19–22; Fehrenbach Decl. ¶ 36; Emerson Decl. ¶ 16. The Rule

11    thus shifts the costs to the States to pay for the public health problems it creates.

12        **b.    Food assistance**

13        The Plaintiff States and local governments manage and administer food

14    assistance programs using federal funds that will be undermined by the Rule.

15    Peterson Decl. ¶¶ 3, 4, 7, 8; Storen Decl. ¶ 5. While the Rule considers only

16    SNAP-related benefits as "public benefits" under the public charge test, the broad

17    chilling effect will harm state-only food assistance programs, too. Predicted

18    disenrollment of tens of thousands of eligible residents from the state

19    supplemental nutrition programs and SNAP benefits will undermine the purpose

20    of these programs and frustrate the will of the legislatures of the Plaintiff States

21    that enacted these programs. Sharfstein Decl. ¶ 23; Hou Decl. ¶ 27;

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

14

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    Perry Decl. ¶ 17; Peterson Decl. ¶¶ 10, 15; Neira Decl. ¶ 12. The impacts will

2    lead to more vulnerable people experiencing food insecurity and severe public

3    health concerns. Storen Decl. ¶ 9; Fehrenbach Decl. ¶ 33; Curtatone & Skipper

4    Decl. ¶¶ 12–13; Neira Decl. ¶ 18; Sternberg Decl. ¶ 6. The Rule thus not only

5    undermines the Plaintiff States' interest in healthy, stable, and productive

6    residents, but also contradicts the purported goal of the Rule itself to "better

7    ensure" that immigrants "are self-sufficient, i.e., do not depend on public

8    resources to meet their needs." 84 Fed. Reg. at 41,295.

9         The chilling and disenrollment will particularly hurt children, who as a

10   result of malnutrition and hunger are more likely to suffer deficits in cognitive

11   development, behavioral problems, and poor health. Polk Decl. ¶ 19; Medrano

12   Decl. ¶ 13; Oliver Decl. ¶ 22; Bayatola Decl. ¶¶ 13–14; Hawkins Decl. ¶ 34.

13   Children will have more difficulty in school and require greater resources from

14   the Plaintiff States' educational systems. Polk Decl. ¶ 22; Bohanan Decl. ¶14;

15   Tahiliani Decl. ¶ 7. The Plaintiff States will bear the brunt of higher health care

16   and other costs resulting from the unnecessary malnutrition.

17        The Rule will reduce combined food and cash assistance to families by

18   tens of millions of dollars. *E.g.*, Hou Decl. ¶ 21. With reduced assistance, grocers

19   will see lower sales, and farmers may see lower prices with decreased demand.

20   Hanulcik Decl. ¶ 13. The Plaintiff States will also bear the public health costs as

21   more individuals suffer from malnutrition and hunger, and ultimately, a less

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

15

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    productive workforce. Hou Decl. ¶ 23; Peterson Decl. ¶ 13; Hundley Decl. ¶ 15;

2    Fitzgerald Decl. ¶ 16.

3            **c.    Housing assistance**

4            The Rule will undermine the efficacy of housing assistance programs. The

5    Rule will undercut the Plaintiff States' programs aimed at housing assistance and

6    homelessness prevention. Ohle Decl. ¶¶ 8, 11; Rubin Decl. ¶¶ 9, 15–19;

7    Curtatone & Skipper Decl. ¶ 10; Baumtrog Decl. ¶¶ 5, 7–8; RI-Doe Decl. ¶¶ 19–

8    21; Carey Decl. ¶ 11; Johnston Decl. ¶ 7; Grossman Decl. ¶ 9; Fitzgerald Decl.

9    ¶ 10; Persichilli Decl. ¶ 30. This will harm the Plaintiff States' abilities to fight

10   homelessness.

11           The Rule will lead to increased homeless individuals and families in the

12   Plaintiff States, and poorer health, educational, and other outcomes for vulnerable

13   children residing in the Plaintiff States and who, because of their or a family

14   member's immigration status, will be deprived of emergency shelter or

15   placement in permanent housing. Fitzgerald Decl. ¶12; Ohle Decl. ¶ 14;

16   Baumtrog Decl. ¶ 12; Carey Decl. ¶ 12; Johnston Decl. ¶¶ 11, 14; Grossman Decl.

17   ¶¶ 15–16; Rubin Decl. ¶¶ 11, 25, 30. In the first few years after moving to the

18   United States, many immigrants benefit from temporary assistance to adjust to

19   rental housing markets. *See* Bays Decl., Ex. S at 20–22 (noting that the Rule

20   "ignores the fact that public programs are often used as work supports which

21   empower future self-sufficiency"); Grossman Decl. ¶¶ 9, 11–12. Without these

22

1   temporary benefits, immigrant workers employed in low wage fields will be

2   unable to afford current market-based rents. Rubin Decl. ¶¶ 28, 31; Baumtrog

3   Decl. ¶ 12; Carey Decl. ¶ 12; Grossman Decl. ¶¶ 9–10, 16. For instance, demand

4   for long term services and support workers, in which the labor force includes a

5   disproportionate number of immigrants, is expected to grow because of an aging

6   population. Moss Decl. ¶¶ 9–16. Children who have lost their homes will suffer

7   worse educational outcomes and access fewer and less profitable work

8   opportunities. Bourque Decl. ¶ 7; Curtatone & Skipper Decl. ¶ 15; Korte Decl.

9   ¶ 23; Rubin Decl. ¶¶ 37–38.

10      This homelessness and housing insecurity will irreparably harm the

11   families, children, and the Plaintiff States, which will ultimately bear

12   responsibility for the increased costs and consequences of the Rule. Ohle Decl.

13   ¶ 13; Bourque Decl. ¶¶ 8–9; Curtatone & Skipper Decl. ¶ 16; Baumtrog Decl.

14   ¶¶ 13–14; RI-Doe Decl. ¶ 43; Carey Decl. ¶ 13; Johnston Decl. ¶¶ 13–15; Rubin

15   Decl. ¶¶ 35–36. The Plaintiff States will bear the economic costs of the resulting

16   homelessness of families, including public health and safety costs. Bourque Decl.

17   ¶ 8; Curtatone & Skipper Decl. ¶¶ 15–16; Baumtrog Decl. ¶¶ 13–15; Johnston

18   Decl. ¶¶ 13–15; Rubin Decl. ¶¶ 12, 42–48; Fitzgerald Decl. ¶ 20.

19

20

21

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

17

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1          III.    ARGUMENT

2    A.    Legal Standards

3          1.    Administrative Procedure Act § 705 stay standards

4          The Administrative Procedure Act (APA) authorizes this Court to stay the

5    effective date of the Rule pending judicial review. 5 U.S.C. § 705 ("On such

6    conditions as may be required and to the extent necessary to prevent irreparable

7    injury, the reviewing court . . . may issue all necessary and appropriate process

8    to postpone the effective date of an agency action or to preserve status or rights

9    pending conclusion of the review proceedings."); *see also Texas v. EPA*, 829 F.3d

10   405, 424, 435 (5th Cir. 2016); *Bakersfield City Sch. Dist. of Kern Cty. v. Boyer*,

11   610 F.2d 621, 624 (9th Cir. 1979); *Louisiana Real Estate Appraisers Bd. v.*

12   *United States Fed. Trade Comm'n*, No. 19-CV-214-BAJ-RLB, 2019 WL

13   3412162, at *2 (M.D. La. July 29, 2019).

14         The purpose of Section 705 is to allow courts "to maintain the status

15   quo . . . . The authority granted is equitable and should be used by both agencies

16   and courts to prevent irreparable injury or afford parties an adequate judicial

17   remedy." *Bauer v. DeVos*, 325 F. Supp. 3d 74, 105 (D.D.C. 2018) (quoting APA,

18   Pub. L. 1944–46, S. Doc. No. 248, at 277 (1946)); *id.* at 106–07; *see also*

19   *Attorney General's Manual on the Administrative Procedure Act* 105 (1947)

20   ("The function of such a power is, as heretofore, to make judicial review

21   effective"), https://ia600406.us.archive.org/30/items/AttorneyGeneralsManual

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

18

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    OnTheAdministrativeProcedureActOf1947/AttorneyGeneralsManualOnTheAd

2    ministrativeProcedureActOf1947.pdf.[9]

3        The same traditional equitable factors governing a motion for a

4    preliminary injunction apply to an application for a Section 705 stay:

5    (1) likelihood of success on the merits; (2) irreparable injury; (3) the balance of

6    equities; and (4) the public interest. *See Texas*, 829 F.3d at 424, 435;

7    *Humane Soc'y of United States v. Gutierrez*, 558 F.3d 896, 896 (9th Cir. 2009);

8    *Schwartz v. Covington*, 341 F.2d 537, 538 (9th Cir. 1965); *Assoc. Sec. Corp. v.*

9    *SEC*, 283 F.2d 773, 774–75 (10th Cir. 1960); *Virginia Petroleum Jobbers Ass'n*

10    *v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam); *see*

11    *also Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 446 (7th Cir. 1990) ("The

12    standard is the same whether a preliminary injunction against agency

13    action . . . or a stay of that action is being sought . . .").

14        Courts sometimes treat preliminary injunctions under Rule 65 and stays

15    under Section 705 as interchangeable. *See Colorado Coal. for Homeless v. Gen*

16    *Servs. Admin.*, No. 18-CV-1008-WJM-KLM, 2018 WL 3109087, at *1 (D. Colo.

17

18        [9] "The Supreme Court accords deference to the interpretations of APA

19    provisions contained in the *Attorney General's Manual*, both because it was

20    issued contemporaneously with the passage of the APA and because of the

21    significant role played by the Justice Department in drafting the APA."

22    *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1012 n.7 (9th Cir. 1987).

PLAINTIFF STATES' MOTION                    19                    ATTORNEY GENERAL OF WASHINGTON
FOR § 705 STAY PENDING                                              8127 W. Klamath Court, Suite A
JUDICIAL REVIEW OR FOR PI                                              Kennewick, WA 99336
NO. 4:19-CV-05210-RMP                                                    (509) 734-7285

1    2018) ("The Coalition explicitly moves for a preliminary injunction under

2    Federal Rule of Civil Procedure 65. Because this case seeks review of agency

3    action under the APA, the proper authority for preliminary relief is 5 U.S.C. §

4    705: the public interest."); *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d

5    1094, 1119 n.20 (N.D. Cal. 2018).

6        **2.    Preliminary injunction standards**

7        "A party can obtain a preliminary injunction by showing that (1) it is likely

8    to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence

9    of preliminary relief, (3) the balance of equities tips in [its] favor, and (4) an

10    injunction is in the public interest." *Disney Enters., Inc. v. VidAngel, Inc.*, 869

11    F.3d 848, 856 (9th Cir. 2017) (quotations and citations omitted); *see also Winter*

12    *v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Under the Ninth Circuit's

13    "sliding scale" approach, these elements are "balanced, so that a stronger

14    showing of one element may offset a weaker showing of another." *Hernandez v.*

15    *Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (quotations and citations omitted).[10]

16    **B.    The Plaintiff States Are Likely to Succeed on Their APA Claims**

17        The Plaintiff States are likely to prevail on three of their core claims. First,

18    the Rule's expansive new definition of "public charge"—on which the entirety

19

---

20        [10] The "sliding scale" approach has been criticized as inconsistent with

21    *Winter*. *See Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C.

22    Cir. 2009) (Kavanaugh, J., concurring).

PLAINTIFF STATES' MOTION        20        ATTORNEY GENERAL OF WASHINGTON
FOR § 705 STAY PENDING                      8127 W. Klamath Court, Suite A
JUDICIAL REVIEW OR FOR PI                    Kennewick, WA 99336
NO. 4:19-CV-05210-RMP                        (509) 734-7285

1    of the Rule is premised—deviates from the plain meaning of the statutory term,

2    and therefore must be invalidated at Step One of the *Chevron* framework.

3    *See Chevron, U.S.A. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).

4    Second, the Rule is contrary to law because it adopts an interpretation of "public

5    charge" that had been expressly rejected by Congress, and its weighted factor test

6    is contrary to the (i) "totality of circumstances" test mandated by INA Section

7    212(a)(4), (ii) Welfare Reform Act, and (iii) Rehabilitation Act. Third, the Rule

8    is arbitrary and capricious because it fails to address evidence of the harm it

9    inflicts on vulnerable people, and it includes factors in its public charge test that

10   are unrelated to—and at times at odds with—its purported purpose.[11]

11           1.     **DHS's new definition of "public charge" is inconsistent with**
                    **the term's plain meaning and is contrary to law**

12         The Rule redefines "public charge" to mean "an alien who receives one or

13   more public benefits" above the 12-month threshold. 8 C.F.R. § 212.21(a).

14   DHS's definition fails *Chevron* Step One because it is irreconcilable with the

15   clear meaning of the term "public charge" as demonstrated by its text, history,

16   and context.

17

18   ───────────────

19         [11] Because the Plaintiff States are entitled to a stay or a preliminary

20   injunction on the APA claims, this motion need not address the Plaintiff States'

21   other claim. *E.g.*, *Versaterm Inc. v. City of Seattle*, No. C16-1217JLR, 2016 WL

22   4793239, at *5 (W.D. Wash. Sept. 13, 2016).

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

21

1       **a.**     *Chevron* **framework**

2        In reviewing an agency's implementation of a statute, courts follow a

3 two-step approach. *Chevron*, 467 U.S. 842–44; *Empire Health Found. for Valley*

4 *Hosp. Med. Ctr. v. Price*, 334 F. Supp. 3d 1134, 1145 (E.D. Wash. 2018). First,

5 using the "traditional tools of statutory construction," the court first determines

6 whether "the intent of Congress is clear." *Id.* at 842 & n.9; *FDA v. Brown &*

7 *Williamson Tobacco Corp.* (*Brown & Williamson*), 529 U.S. 120, 132 (2000)

8 ("traditional tools" include the statute's text, history, structure, "context"—

9 including its place among other statutes enacted previously or "subsequently"—

10 as well as "common sense"); *Empire Health*, 334 F. Supp. 3d at 1145. If

11 Congress's intent is clear, "that is the end of the matter." *Chevron*, 467 U.S. at

12 842–43. If not, and the statute "is silent or ambiguous with respect to the specific

13 issue," the court determines "whether the agency's answer is based on a

14 permissible construction of the statute." *Id.*

15       **b.**     **Public charge means a person primarily dependent upon**

16                     **the government for subsistence**

17        The *Chevron* Step One inquiry into statutory meaning begins with the

18 language of the statute. *Ranchers-Cattlemen Action Legal Fund v. United States*

19 *Dep't of Agric.*, No. 2:17-CV-223-RMP, 2018 WL 2708747, at *7 (E.D. Wash.

20 June 5, 2018). The text of the original 1882 public charge exclusion provided that

21 a "convict, lunatic, idiot, or any person unable to take care of himself or herself

22 without becoming a public charge . . . shall not be permitted to land." Immigration

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

22

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    Act of 1882, ch. 376, § 2, 22 Stat. 214. The most natural reading of "public

2    charge" in the 1882 statute is one who is, as the text says, "unable to take care of

3    himself or herself." *Id.*

4        Because the statute does not define "public charge," it must be presumed

5    that the 47th Congress intended the term to have its "ordinary or natural meaning"

6    in the "year [it] was enacted." *Dir., Office of Workers' Comp. Programs, Dep't*

7    *of Labor v. Greenwich Collieries*, 512 U.S. 267, 272 (1994). The period's most

8    comprehensive American dictionary defined the root word "charge" to mean

9    "[a]nything committed to another's custody, care, concern, or management."

10   *The Century Dictionary of the English Language* vol. IV at 929 (1889–91). This

11   definition is consistent with historical definitions where "public charge" was

12   interchangeable with "pauper." *See id.* vol. XI at 4334 (defining "pauper" as "a

13   very poor person; a person entirely destitute of property or means of support;

14   particularly one who, on account of poverty, becomes *chargeable to the public*")

15   (emphasis added); *accord* Webster, *An American Dictionary of the English*

16   *Language* 595 (1857).

17       This definition endured over time. *See Black's Law Dictionary* 311 (3d ed.

18   1933) (defining "public charge" as "[a] person whom it is necessary to support at

19   public expense by reason of poverty, insanity, and poverty, disease and poverty,

20   or idiocy and poverty" and—as used in the Immigration Act of 1917, Pub. L. 301,

21   39 Stat. 874—to include "paupers"); *Black's Law Dictionary* 233 (6th ed. 1990)

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

23

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    (an "indigent[; a] person whom it is necessary to support at public expense by

2    reason of poverty alone or illness and poverty").

3          **c.**    **The history of the public charge exclusion confirms that Congress adopted the term's common law meaning**

4

5          **i.**    **Colonial and early state law sources**

6        Congress adopted the public charge exclusion against a long backdrop of

colonial and state public charge laws. Because Congress based the Immigration

7    Act of 1882 on those earlier laws, the term "public charge" "must be construed

8    as they were understood at the time in the State[s]." *Shannon v. United States*,

9    512 U.S. 573, 581 (1994) (quoting *Capital Traction Co. v. Hof*, 174 U.S. 1, 36

10   (1899)).

11

12       In the American colonies, "public charges" were persons permanently

incapable of caring for themselves and primarily dependent on the government,

13   similar to a pauper. As Defendant USCIS acknowledges, due to opposition to

14   "the immigration of 'paupers,' . . . several colonies enacted protective measures

15   to prohibit the immigration of individuals who might become public charges."

16   *Public Charge Provisions of Immigration Law: A Brief Historical Background*,

17   USCIS, https://www.uscis.gov/history-and-genealogy/our-history/public-charge

18   -provisions-immigration-law-a-brief-historical-background#_ftnref1    (USCIS

19   *Public Charge Hist. Backgr.*); *see also* Mass. Gen. Ct., Acts and Resolves 552,

20   § 2 (Mar. 14, 1700); ECF No. 31 (First Amended Complaint for Declaratory and

21   Injunctive Relief (FAC)) ¶ 46.

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

24

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1       State laws of the 19th century reflect the same original meaning of "public

2   charge." In response to mass migration of "large numbers of exceptionally

3   impoverished and destitute people" from Europe in the 1800s, states adopted

4   passenger laws limiting immigration of such persons—who were described as

5   "public charges," "paupers," or both. Hirota, *Expelling the Poor* 33; *see, e.g.*, Act

6   of Mar. 20, 1850, ch. 105, § 1, 1850 Mass. Acts & Resolves 338, 339 (excluding

7   without a bond any "pauper, . . . destitute, or incompetent to take care of himself

8   or herself without becoming a public charge as a pauper"); FAC ¶ 48 (citing

9   similar New York, Rhode Island, and Maine laws).

10      Early cases evidence this common law understanding of "public charge,"

11  which required more than simply having "no visible means of support," *City of

12  Boston v. Capen*, 61 Mass. 116, 121–22 (1851), but that persons be "unable to

13  take care of themselves," *In re O'Sullivan*, 31 F. 447, 449 (C.C.S.D.N.Y.)

14  (quoting 22 Stat. 214); *see, e.g.*, *Fischer v. Meader*, 111 A. 503, 504 (N.J. 1920)

15  ("abandoned child" in "legal effect . . . became a public charge, and a ward of the

16  state as parens patriae"); *Pine Twp. Overseers v. Franklin Twp. Overseers*, 4 Pa.

17  D. 715, 716, 1894 WL 3774, at *2 (Pa. Quar. Sess. 1894) ("both mother and

18  child, the present pauper, were public charges for maintenance and support");

19  *Bunker v. Ficke*, 6 Ohio Dec. Reprint 978, 979, 1880 WL 5770 (Ohio Dist. 1880)

20  ("The obvious intention of the framers of the constitution being to regard insane

21

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

25

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1  persons as the wards of the state, to be under the fostering and protecting charge

2  of the state . . .").

3  ### ii.    The Immigration Act of 1882

4  Congress enacted the first federal public charge exclusion in 1882 to fill

5  the void left from the Supreme Court's invalidation of state passenger laws.

6  *See Henderson v. Mayor of City of New York*, 92 U.S. 259, 274 (1875).

7  Borrowing directly from state laws to impose a federal public charge ground of

8  inadmissibility, the 1882 Congress described "public charge" to express its

9  traditional, common law meaning—a person "unable to take care of himself or

10  herself," Immigration Act of 1882, 22 Stat. 214—who primarily depends on the

11  government for support. This understanding is reflected in the legislative history.

12  *See* Complaint ¶ 62, *Make the Road New York, et al. v. Cuccinelli, et al.*,

13  No. 19-cv-07993 (S.D.N.Y. filed Aug. 27, 2019) (*Make the Road* Compl.),

14  Bays Decl. Ex. DDD;[12] *In re Day*, 27 F. 678, 681 (C.C.S.D.N.Y. 1886). Indeed,

15  the 1882 Act created a federal immigration head-tax which was used in part for

16  the "relief" of immigrants in economic "distress"—*i.e.*, those who were poor but

17  not so destitute as to be considered public charges. 22 Stat. 214. Later bills

18  _____

19  [12] The FAC and the *Make the Road* Complaint both contain fuller

20  discussions of the legislative history of the relevant immigration statutes than

21  space limitations permit here, including citations to the congressional record and

22  congressional reports. Plaintiffs incorporate those citations by reference.

PLAINTIFF STATES' MOTION              26              ATTORNEY GENERAL OF WASHINGTON
FOR § 705 STAY PENDING                                        8127 W. Klamath Court, Suite A
JUDICIAL REVIEW OR FOR PI                                        Kennewick, WA 99336
NO. 4:19-CV-05210-RMP                                              (509) 734-7285

changed the wording of the clause to "likely to become a public charge," and this language has remained in the statute to the present. *Make the Road* Compl. ¶ 60 n.12.

### iii.    Immigration and Naturalization Act of 1952 and subsequent enactments

Congress overhauled federal immigration law in the Immigration and Nationality Act of 1952 and reenacted the public charge exclusion. Pub. L. 82–414, 66 Stat. 163. The legislative history of the INA shows that Congress intended to retain the common law meaning of "public charge." *See* S. Rep. No. 1515, 81st Cong., 2d Sess., at 349 (1950) ("The subcommittee recommends that the clause excluding persons likely to become public charges should be retained in the law.").

In 1990, Congress amended the INA to remove the "paupers, professional beggars, or vagrants" exclusions, but it retained the public charge inadmissibility ground. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 601(a)(4), 104 Stat. 4978, 5072 (codified as amended at 8 U.S.C. § 1182).

### iv.    Welfare Reform and Immigration Reform Acts

Congress enacted two major immigration reform statutes in 1996. Neither statute purported to redefine "public charge" or alter the traditional and established understanding of the term.

First, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Welfare Reform Act), Pub. L. 104-193, 110 Stat. 2105 (1996)

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

27

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    (codified as amended at 8 U.S.C. §§ 1601-46), restricted certain noncitizens'

2    eligibility for most federal benefits.[13] At the same time, Congress allowed all

3    "qualified" immigrants—including lawful permanent residents—to receive after

4    five years of entry many forms of federal public benefits included in DHS's Rule.

5    These include Medicaid, TANF, and SNAP. 8 U.S.C. §§ 1612(a)(2)(L), 1613(a).

6    The "five-year ban" does not apply to certain benefits swept up in the Rule,

7    including Section 8 housing vouchers. *Id.* §§ 1612(a)(2)(A) & (a)(2)(C),

8    1613(b)(1)–(2).[14]

9        Second, the Illegal Immigration Reform and Immigrant Responsibility Act

10    of 1996 (Immigration Reform Act)—enacted one month after the Welfare

11    Reform Act—reenacted the existing INA public charge provision and codified

12    the existing standard in case law for determining whether a noncitizen was

13    ―――――――――――――

14        [13] Prior to the Welfare Reform Act, lawfully present immigrants were

15    generally eligible for many public benefits on similar terms as U.S. citizens.

16    *See* H.R. Rpt. 104-725, 104th Cong., 2d Sess., July 30, 1996, at 379.

17        [14] States are authorized to determine the eligibility of qualified immigrants

18    for some federal programs (TANF, social services block grants, and Medicaid).

19    8 U.S.C. § 1612(b)(1). Each state may determine the eligibility for any state

20    public benefits, and a state may statutorily provide that "an alien who is not

21    lawfully present in the United States is eligible for any State or local public

22    benefit." 8 U.S.C. §§ 1621(d), 1622(a).

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

28

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

inadmissible as a public charge. 8 U.S.C. § 1182(a)(4). It provided that a public charge determination should take account of the "totality of circumstances" and codified the five factors long applied by immigration officials: the applicant's (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills. Pub. L. 104-208, Div. C, 110 Stat. 3009, Sec. 531(a)(4)(B) (codified as amended at 8 U.S.C. § 1182(a)(4)(B)(i)). Neither of those 1996 statutes altered the well-established meaning of "public charge" under the INA.

### v.    Congress repeatedly rejected the definition of "public charge" DHS now adopts

Congress's decision to maintain the definition of "public charge" was no oversight. To the contrary, Congress repeatedly considered and rejected proposals to amend the INA public charge provisions to apply to persons who receive (or are considered likely to receive) the benefits DHS now deems off-limits. *See, e.g.*, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.") (internal quotation marks and citation omitted).

In the debate leading up to enactment of the Immigration Reform Act, Congress considered and rejected a proposal to label anyone who received means-tested public benefits a public charge. Immigration Control and Financial

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

29

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1  Responsibility Act of 1996, H.R. 2202, 104th Cong. § 202 (1996); Pub. L.

2  104-208, Div. C, 110 Stat. 3009. The express purpose of this provision was to

3  overturn the settled understanding of "public charge" found in the case law.

4  *See Make the Road* Compl. ¶¶ 81–83.

5      In 2013, Congress repelled another effort to broaden the scope of the public

6  charge exclusion in a manner similar to DHS's new definition. An amendment

7  proposed by then-Senator Jefferson B. Sessions to the Border Security, Economic

8  Opportunity, and Immigration Modernization Act of 2013, S. 744, 113th Cong.

9  (2013), would have altered the definition of public charge to require applicants

10  to show "they were not likely to qualify even for non-cash employment supports

11  such as Medicaid . . . [and] SNAP." S. Rep. No. 113-40, at 42 (2013). Once

12  again, the Senate rejected the amendment. *Id.*

13      By adopting virtually the same definition of "public charge" that Congress

14  rejected in 1996, the Rule contravenes the unambiguous meaning of the statute.

15
16          **d.**    **The context of the public charge exclusion confirms that Congress intended the term "public charge" to retain its common law meaning**

17      In *Chevron* Step One, the court also "must place the provision in context,

18  interpreting the statute to create a symmetrical and coherent regulatory scheme."

19  *Brown & Williamson*, 529 U.S. at 121 (internal quotation marks and citation

20  omitted). That "context" includes parallel statutory provisions, "other Acts," *id.*,

21

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

30

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    and "the statutory backdrop of . . . agency directives," *Nat'l Ass'n of Home*

2    *Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007).

3    ### i.    Early judicial and agency interpretations

4    During the first half of the 20th century, early judicial interpretations of

5    the original public charge provisions confirmed Congress's intent to exclude only

6    those primarily dependent on the government for their care or management. *See,*

7    *e.g.*, *Howe v. United States ex rel. Savitsky*, 247 F. 292, 294 (2d Cir. 1917) ("[w]e

8    are convinced that Congress meant the act to exclude persons who were likely to

9    become occupants of almshouses for want of means with which to support

10   themselves in the future"); FAC ¶ 51 (collecting cases). Federal agencies charged

11   with enforcing those early federal immigration laws also read "public charge" to

12   mean a person incapable of self-support and dependent upon the state for

13   survival. *See* USCIS *Public Charge Hist. Backgr.* ("immigrants who showed they

14   had no physical or mental conditions that could prevent them from working and

15   who demonstrated a willingness to work were admitted"); FAC ¶ 53.

16   ### ii.    Modern agency interpretations

17   Consistent with the original public meaning of "public charge," federal

18   immigration authorities have applied the modern public charge provision only to

19   those dependent on government for survival. *See, e.g.*, *Matter of Martinez-Lopez*,

20   10 I. & N. Dec. 409, 421 (A.G. 1962) (then-Attorney General Robert F. Kennedy

21   detailing the public charge doctrine's "extensive judicial interpretation" and

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

31

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    explaining that the INA "requires more than a showing of a possibility that the

2    alien will require public support"); U.S. Dep't of Justice, Final Rule: *Adjustment*

3    *of Status for Certain Aliens*, 54 FR 29,442-01 (July 12, 1989) (codified in relevant

4    part at 8 C.F.R. §§ 245a.2(k)(4), 245a.3(g)(4)(iii), 245a.4(b)(1)(iv)(C)) (even

5    where an immigrant's "income may be below the poverty level," he is "not

6    excludable" if he "has a consistent employment history which shows the ability

7    to support himself"); *Make the Road* Compl. ¶¶ 70–71. Congress' reenactment

8    of the INA's public charge exclusion "against the backdrop of" these "consistent

9    and repeated statements" by immigration enforcement agencies precludes DHS's

10    novel definition in the Rule. *Brown & Williamson*, 529 U.S. at 144.

### iii.    Post-1996 Agency Field Guidance confirms the settled interpretation of "public charge"

In 1999 Field Guidance, INS confirmed that the Welfare Reform and Immigration Reform Acts did not change the "longstanding" law governing public charge inadmissibility.[15] To the contrary, the meaning of "public charge"

───────────────

[15] Following the Welfare Reform Act, public confusion emerged about the relationship between receipt of federal, state, or local benefits and the public charge provisions of federal immigration law. *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. at 28,689-01, 28,689 (May 26, 1999) (Field Guidance). According to the U.S. Department of State, "such confusion led many persons in the immigrant community to choose

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

32

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    "has been developed in several [INS], BIA, and Attorney General decisions" and

2    codified in INA "section 212(a)(4) itself" in its " 'totality of circumstances' test."

3    Field Guidance on Deportability and Inadmissibility on Public Charge Grounds,

4    64 Fed. Reg. at 28,689; 28,690 (May 26, 1999).

5        Consistent with the common law definition, INS confirmed that "likely to

6    become a public charge" means "likely to become . . . primarily dependent on the

7    Government for subsistence, as demonstrated by either the receipt of public cash

8    assistance for income maintenance or institutionalization for long-term care at

9    Government expense." *Id.* at 28,692. The Field Guidance expressly excluded

10   from the public charge determination noncash benefits such as Medicaid (for

11   those not institutionalized), nutrition programs like SNAP, and housing benefits.

12   INS noted that it had "never been [INS] policy that any receipt of services or

13   benefits paid for in whole or in part from public funds . . . indicates that the alien

14   is likely to become a public charge." *Id.* The Field Guidance governed the

15   agencies responsible for public charge inadmissibility determinations, including

16   _____

17   not to sign up for important benefits, especially health-related benefits, which

18   they were eligible to receive" out of "concern[s] it would affect their or a family

19   member's immigration status." U.S. State Department Cable, INA 212(A)(4)

20   Public Charge: Policy Guidance, Ref: 9 FAM 40.41 (State Department cable).

21   INS issued the Field Guidance for public charge determinations to eliminate the

22   confusion. 64 Fed. Reg. at 28,689-01.

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP                    33              ATTORNEY GENERAL OF WASHINGTON
                                                              8127 W. Klamath Court, Suite A
                                                                 Kennewick, WA 99336
                                                                   (509) 734-7285

1    DHS, for more than two decades. *See, e.g.*, U.S. Dep't of Justice, Public Charge

2    Fact Sheet, 2009 WL 3453730 (Oct. 29, 2011); Public Charge Fact Sheet, USCIS,

3    Apr. 29, 2011.

### 2. The Rule adopts an interpretation expressly rejected by Congress

4

5          The Rule also is contrary to law because it adopts a statutory interpretation

6    explicitly disavowed by Congress. Here, Congress has repeatedly rejected the

7    "transformative" immigration policy the Administration now purports to

8    establish.[16] *See supra* at 29–30.

9          The Ninth Circuit has already admonished this administration for seeking

10   to "coopt Congress's power to legislate" through executive actions. *City &*

11   *County of San Francisco*, 897 F.3d at 1234 (Rejecting Executive Order regarding

12   sanctuary cities, reasoning "Congress has frequently considered and thus far

13   rejected legislation accomplishing the goals of the Executive Order . . . . Not only

14   has the Administration claimed for itself Congress's exclusive spending power,

15   it has also attempted to coopt Congress's power to legislate."); *see also Brown &*

16   *Williamson*, 529 U.S. at 147 (holding FDA lacks authority to regulate tobacco

17   products as customarily marketed  and noting that "before enacting the FCLAA

18   in 1965, Congress considered and rejected several proposals to give the FDA the

19

20   _____

21         [16] Sullivan & Shear, *Trump Sees an Obstacle to Getting His Way on*

22   *Immigration: His Own Officials*, *supra* note 4.

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP                    34                  ATTORNEY GENERAL OF WASHINGTON
                                                             8127 W. Klamath Court, Suite A
                                                             Kennewick, WA 99336
                                                             (509) 734-7285

1   authority to regulate tobacco"); *Pennsylvania v. Trump*, 351 F. Supp. 3d 791, 821

2   (E.D. Pa. 2019), *aff'd sub nom. Pennsylvania v. President United States*, 930 F.3d

3   543 (3d Cir. 2019), as amended (July 18, 2019) (rejecting agency interpretation

4   because, in part, "Congress [previously] explicitly rejected an attempt to add to

5   the ACA an exemption similar to that contained in the Final Rules").

6       As Judge Srinivasan on the DC Circuit observed, "[a]n activist President

7   with control over the rulemaking process could use his power to press agencies

8   beyond statutory limits that he was unable to persuade Congress to remove. Such

9   a President would be guilty of unfaithful execution of the laws." *United States*

10  *Telecom Ass'n v. Fed. Commc'ns Comm'n*, 855 F.3d 381, 414 (D.C. Cir. 2017)

11  (quoting Thomas O. McGarity, Presidential Control of Regulatory Agency

12  Decisionmaking, 36 Am. U. L. Rev. 443, 455 (1987)).

13      **3.   The Rule's weighted criteria are contrary to law**

14      DHS's new definition of "public charge," based on its unwarranted focus

15  on poverty, distorts the "totality of circumstances" test. This fundamental error

16  compels invalidation of the rule. *See, e.g.*, *Davis Cty. Solid Waste Mgmt. v. U.S.*

17  *EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997) (per curiam); *North Carolina v. EPA*,

18  531 F.3d 896, 929, *on reh'g in part*, 550 F.3d 1176 (D.C. Cir. 2008) (per curiam).

19      **a.   The weighted criteria are contrary to the INA and**

20          **Immigration Reform Act**

21      The Rule's new public charge test transforms the "totality of

22  circumstances" inquiry mandated by Congress into a categorical test of DHS's

1    own making. Because the four "heavily weighted negative factors" overlap with

2    other enumerated "negative" factors, any one heavily weighted negative factor

3    may trigger a public charge finding under the new Rule. The new test as written

4    treats one main consideration—poverty—as paramount, if not dispositive,

5    elevating it above the required statutory factors set forth in the INA itself.

6        The heavily weighted factor of whether an immigrant "has received or has

7    been certified or approved to receive one or more public benefits" above the

8    12-month threshold is duplicative of several other negative factors: an immigrant

9    who met or exceeded the public benefits threshold will *ipso facto* have "applied

10   for or received any public benefit" in any amount and be virtually certain to have

11   a "gross income [of] less than 125 percent" of the FPG (both of which are

12   nominally separate negative, but not heavily weighted, factors). 8 C.F.R.

13   § 212.22(b)(4)(i)(A), (b)(4)(ii)(E)(1). The past receipt of public benefits above

14   the 12-month threshold appears dispositive, contrary to the INA's mandated

15   totality of circumstances inquiry. *See, e.g.*, *Martinez-Farias v. Holder*, 338 F.

16   App'x 729, 730–31 (9th Cir. 2009) (in making public charge determination, INA

17   Section 212(a)(4)(B) requires decision maker to consider all statutory factors).

18       The Rule likewise makes an immigrant's medical condition virtually

19   dispositive. A medical condition counts as a heavily weighted negative factor if

20   the following two conditions apply: (1) the immigrant "has been diagnosed with

21   a medical condition that is likely to require extensive medical treatment or

22

PLAINTIFF STATES' MOTION                    36              ATTORNEY GENERAL OF WASHINGTON
FOR § 705 STAY PENDING                                              8127 W. Klamath Court, Suite A
JUDICIAL REVIEW OR FOR PI                                              Kennewick, WA 99336
NO. 4:19-CV-05210-RMP                                                     (509) 734-7285

1    institutionalization or that will interfere with [his or her] ability to provide for

2    himself or herself, attend school, or work;" and (2) the immigrant "is uninsured

3    and has neither the prospect of obtaining private health insurance, nor the

4    financial resources to pay for reasonably foreseeable medical costs related to such

5    medical condition." 8 C.F.R. § 212.22(c)(1)(iii). This heavily weighted factor is

6    duplicative of other, ostensibly separate, negative factors. *See, e.g.*, 8 C.F.R.

7    § 212.22(b)(2)(ii)(B) (treating as negative factor if immigrant "has been

8    diagnosed with a medical condition that is likely to require extensive medical

9    treatment or institutionalization or that will interfere with [his or her] ability to

10    provide and care for himself or herself, to attend school, or to work"). Because

11    the medical condition factor is likely to be dispositive under the Rule's weighted

12    test, it is contrary to the totality of circumstances inquiry mandated by the INA.

13        The overlapping medical condition factors are contrary to the INA for

14    another reason: they go well beyond the discrete "health-related grounds" that

15    Congress has expressly set forth as basis of inadmissibility. 8 U.S.C.

16    § 1182(a)(1)(A). Under INA Section 212(a)(1), a noncitizen is inadmissible for

17    health-related reasons only if he or she (1) has a "communicable disease of public

18    health significance"; (2) failed to submit proof of vaccinations; (3) has or had a

19    "physical or mental disorder and a history of behavior associated with the

20    disorder" posing a present "threat to the property, safety, or welfare" of the

21    immigrant or others; or (4) has been determined to be a "drug abuser or addict."

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

37

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    *Id.* The provision of those limited health-based grounds of inadmissibility

2    strongly suggests that Congress did not intend for the Department to create much

3    broader health-based exclusions under the guise of a public charge regulation.

4    *See, e.g.*, *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 188 (1978) (maxim of

5    *expressio unius est exclusio alterius*).

6         The statutory history makes that intent even clearer. The 1952 INA's

7    health-related exclusions were much broader, rendering inadmissible anyone

8    who was "insane," "epilep[tic]," or who had "a physical defect disease, or

9    disability, when determined by the consular or immigration officer to be of such

10   a nature that it may affect the ability of the alien to earn a living." 66 Stat. 163,

11   182, § 212(a). Congress eliminated those grounds of exclusion in the

12   Immigration Act of 1990, 104 Stat. 4978, § 601. Yet the Department has now

13   engrafted that broad health exclusion onto its new public charge test, despite

14   Congress having stripped it from the INA decades ago. In this respect, the Rule

15   is contrary to the text of the statute and the clearly expressed intent of Congress.

16   *See, e.g.*, *Cal. Cosmetology Coal. v. Riley*, 110 F.3d 1454, 1460 (9th Cir. 1997)

17   ("A regulation may not serve to amend a statute, nor add to the statute 'something

18   which is not there.'") (citation omitted) (quoting *United States v. Calamaro,* 354

19   U.S. 351, 359 (1957)).

20

21

22

1

**b.**    **The weighted criteria are contrary to the Welfare Reform Act**

The Rule's focus on immigrants' use of non-cash public benefits to deprive them of the ability to remain in the United States also is inconsistent with the Welfare Reform Act, which expressly allowed qualified immigrants to receive after five years of entry many forms of federal public benefits included in the Rule. *See supra* at 27–29. *Iwata v. Intel Corp.*, 349 F. Supp. 2d 135, 147 (D. Mass. 2004) (rejecting interpretation of statute that would allow for a "bait-and-switch" where a person would be covered by the Americans with Disabilities Act up until the point she needs the act and reasoning that statute "must be interpreted to give effect to the rights [it] has created"); *see also Rotenberry v. Comm'r Internal Rev.*, 847 F.2d 229, 233 (5th Cir. 1988) ("Congress did not intend that the Secretary set a trap for the unwary.").

**c.**    **The weighted criteria are contrary to Section 504 of the Rehabilitation Act**

The Rule also is contrary to the Rehabilitation Act, which prohibits "any program or activity receiving federal financial assistance" or "any program or activity conducted by any Executive agency," from excluding, denying benefits to, or discriminating against persons with disabilities. 29 U.S.C. § 794(a). The Rule violates this provision by requiring officials to consider an applicant's "medical condition"—including a "disability diagnosis"—to weigh in favor of a public charge determination. *See* 8 C.F.R. § 212.22(c)(1)(iii)(A); 84 Fed. Reg. at 41,407–08. Such facially discriminatory treatment will be exacerbated by the

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

39

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1  consideration of other negative factors related to a disability, such as receipt of

2  Medicaid home and community-based services. *See* 8 C.F.R. §§ 212.21(b)(5),

3  212.22(b)(4)(E); 84 Fed. Reg. at 41,367–68; *see also* 42 U.S.C. § 1396n(i).[17]

4  Because the Rule's overlapping criteria operate in such a way that an applicant's

5  disability will often be the "but for" cause of a public charge determination, it

6  violates Section 504. *See, e.g.*, *D.F. ex rel. L.M.P. v. Leon Cty. Sch. Bd.*,

7  No. 4:13CV3-RH/CAS, 2014 WL 28798, at *2 (N.D. Fla. Jan. 2, 2014) (under

8  Rehabilitation Act, plaintiff's disability must be a "but for" cause of the denial of

9  services, but the disability need not be the "sole" cause); *Franco-Gonzalez v.*

10  *Holder*, No. CV 10-02211 DMG (DTBx), 2013 WL 3674492, at *4 (C.D. Cal.

11  Apr. 23, 2013); *Lovell v. Chandler*, 303 F.3d 1039, 1053 (9th Cir. 2002).

12  **4.    The Rule is arbitrary or capricious**

13  A regulation is arbitrary and capricious if the agency "relied on factors

14  which Congress has not intended it to consider, entirely failed to consider an

15  important aspect of the problem, offered an explanation for its decision that runs

16  _____

17  [17] Moreover, receiving Medicaid services will disqualify many disabled

18  applicants from two independent *positive* public charge factors: private health

19  insurance and sufficient household assets to cover reasonably foreseeable

20  medical costs. *See* 8 C.F.R. § 212.22(c)(2)(iii); 84 Fed. Reg. at 41,299 (explaining

21  the first "heavily weighted positive factor" is "in addition to the [second] positive

22  factor").

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

40

1    counter to the evidence before the agency, or is so implausible that it could not

2    be ascribed to a difference in view or the product of agency expertise."

3    *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* (*State Farm*),

4    463 U.S. 29, 43 (1983). When an agency departs from a well-established prior

5    policy that "engendered serious reliance interests"—as DHS has done here—the

6    agency must provide a more "detailed justification" for its actions. *FCC v. Fox*

7    *Television Stations, Inc.*, 556 U.S. 502, 515 (2009). DHS has failed to do so.

8         DHS received over 265,000 comments—the "vast majority" of which

9    opposed the Rule and provided compelling evidence of devastating harms likely

10    to result from its implementation. 84 Fed. Reg. at 41,304; *see, e.g.*, Bays Decl.

11    Exs. H–CCC (examples of comments submitted in opposition to the Rule). DHS

12    largely ignored these concerns and instead chose to finalize—without sufficiently

13    reasoned justification—a Rule that all but promises to inflict the very harms

14    warned of by commenters. Where DHS did address concerns, it largely brushed

15    them aside, stating in conclusory fashion that it did not intend to cause the harms

16    at issue or the purported goal of the Rule merited the trade-off. The Rule is

17    arbitrary and capricious for two primary reasons: (1) DHS failed to address,

18    justify, or even meaningfully evaluate the many significant harms identified by

19    commenters; and (2) the Rule promotes the consideration of factors entirely

20    unrelated to—and at times directly at odds with—its purported purpose.

21

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

41

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

### a.    DHS failed to justify or meaningfully address the Rule's many devastating harms

DHS has failed to address drastic harms the Rule will cause, including to public health generally and to vulnerable populations specifically, such as children, the elderly, and individuals with disabilities.

### i.    DHS disregarded evidence the Rule will cause public health crises

DHS received compelling evidence and comments warning the Rule was likely to cause significant public health crises. *See, e.g.*, Bays Decl. Exs. R at 31–32; T at 107–09. By deterring participation in Medicaid, the Rule would result in decreased vaccinations and a corresponding increase in the transmission of communicable diseases. 84 Fed Reg. at 41,384 (noting comments stating that "uninsured individuals are much less likely to be vaccinated," and that "even a five percent reduction in vaccine coverage could trigger a significant measles outbreak"); Bays Decl. Exs. J at 2–3 ("Discouraged access to preventive services would inevitably have a devastating impact on immunization coverage for immigrant populations."); FF at 3 ("[D]ecreased vaccinations and untreated communicable diseases will place the American public at risk for outbreaks.").

DHS also received comments identifying a host of other public health crises likely to result from the Rule, including malnutrition, unintended pregnancies, substance abuse, obesity, homelessness, untreated chronic illnesses, and mental health disorders. *See, e.g.*, Bays Decl. Exs. O at 1–2, AA at 2, EE at 2–3, GG at 1, HH at 1, II at 2, NN at 3 (warning of harm to individuals suffering

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

42

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    from chronic medical conditions and diseases such as Hepatitis B, HIV,

2    tuberculosis, and blood cancers such as lymphoma and leukemia); Exs. OO at 7,

3    QQ at 2 (warning of reduced early detection and treatment of sexually transmitted

4    diseases); Ex. M at 6 (warning of reduced access to family planning resources).

5        DHS acknowledged the Rule may lead to these public health crises.

6    *See, e.g.*, 83 Fed. Reg. at 51,270 ("[D]isenrollment or forgoing enrollment in

7    public benefits program by [otherwise eligible] aliens" may result in, among

8    other things, increased obesity, malnutrition, and transmission of communicable

9    diseases). Nevertheless, DHS still has not conducted any adequate analysis to

10   measure the public health effects on the American public. *See, e.g.*, Bays Decl.

11   Ex. J at 2 ("[W]e are concerned that [DHS] failed to quantify the human and

12   economic impact from [either] the increased prevalence of communicable

13   diseases [or] the fact that the prevalence could be exacerbated by fewer

14   vaccinated individuals."). DHS instead responded that it would exempt from

15   consideration receipt of Medicaid benefits only for pregnant women and

16   individuals under 21 years of age. *See* 84 Fed. Reg. at 41,384 (asserting, without

17   evidentiary support, that these exemptions "should address a substantial portion,

18   though not all, of the vaccinations issue").

19       DHS's cursory response disregards overwhelming evidence that even a

20   slight decrease in population immunity may give rise to a dangerous outbreak of

21   communicable diseases. Bays Decl. Exs. J at 2–3, T at 107–09. And, DHS's

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

43

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    response—if any—to the other likely public health crises is even more

2    problematic. *See* 84 Fed. Reg. at 41,384 (arguing without analysis that, in lieu of

3    Medicaid, unidentified "local health centers and state health departments may

4    provide certain health services addressing substance abuse and mental

5    disorders"). DHS's failure to appropriately analyze or respond to overwhelming

6    evidence of potentially devastating public health crises underscores that the Rule

7    is arbitrary and capricious.

8          **ii.    DHS disregarded evidence of the Rule's harmful**
                      **effects on children**
9
         DHS received numerous comments and compelling evidence showing the
10
   Rule would inflict dramatic and lasting harms on vulnerable children.
11
   Commenters explained that the Rule will cause at-risk children to suffer
12
   increased hunger, malnutrition, and homelessness. Commenters also provided
13
   evidence showing the trauma resulting from childhood food insecurity and
14
   housing instability is likely to have lifelong effects, severely compromising these
15
   children's physical and mental health, educational outcomes, and employment
16
   prospects. Bays Decl. Exs. S at 32–35; VV at 12–13. The lasting trauma of such
17
   childhood instability results in a broad variety of negative outcomes, including
18
   chronic asthma, higher incidences of unplanned pregnancies, substance abuse,
19
   depression, and behavioral challenges. *Id.*; Bays Decl. Exs. T at 61–62; V at 4.
20
         While detailing the harms the Rule will inflict upon vulnerable children,
21
   commenters also questioned what reasonable basis DHS had for applying such a
22

1  rigid public charge analysis to children in the first place, as they are too young to

2  work and their use of public benefits is not probative of their likelihood of

3  becoming a public charge when older. Bays Decl. Ex. T at 74-78. DHS itself

4  agrees the programs at issue are intended to *help* children become healthy, safe,

5  and successful in their educations, thus improving their employment prospects

6  and moving them toward the Rule's purported goal of self-sufficiency. 84 Fed.

7  Reg. at 41,370–71 (acknowledging "many of the public benefits programs [at

8  issue] aim to better future economic and health outcomes for minor recipients").

9       In response, DHS merely amended the Proposed Rule to exclude from

10  consideration only the receipt of Medicaid benefits by individuals under 21. DHS

11  will still, however, consider a young child's receipt of SNAP or federal housing

12  assistance as evidence the child is likely to become a public charge. DHS's failure

13  to address the overwhelming evidence showing children will suffer severe harms

14  from the Rule's implementation (directly undermining their chances of reaching

15  DHS's purported goal of "self-sufficiency") is arbitrary and capricious,

16  underscoring the Plaintiff States' likelihood of success on the merits.

17       **iii.    DHS disregarded the Rule's harmful and discriminatory effects on the elderly and individuals with disabilities**

18

19       DHS received many comments detailing the discriminatory and harmful

20  effects the Rule will have on the elderly and individuals with disabilities. *See,*

21  *e.g.*, 84 Fed. Reg. at 41,367. For example, commenters noted that counting an

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

45

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    individual's disability as a negative health factor was discriminatory and would

2    overlap with other factors. Bays Decl. Ex. X at 6 ("[T]he proposed formula

3    effectively authorizes blanket determinations that anyone with a significant

4    disability is likely to become a public charge."). Further, many of the services on

5    which people with disabilities rely are available only through Medicaid, meaning

6    the Rule will separate these already-vulnerable individuals from the very services

7    that assist them in reaching DHS's purported goal of "self-sufficiency." Bays

8    Decl. Exs. JJ at 6; L at 9–10 ("Individuals with significant disabilities, including

9    even highly educated professionals and business owners, typically must retain

10   Medicaid coverage because no other public or private program covers the

11   attendant care and equipment they need to get up, get dressed, and go to work.").

12   　　　Similarly, the Rule focuses almost exclusively on the age and economic

13   value of elderly applicants, ignoring the many other contributions they make to

14   family stability, including caring for children and enabling other family members

15   to work. Bays Decl. Ex. S at 80. Preventing these elderly applicants from

16   accessing benefits they have paid for with their taxes would *reduce* their

17   self-sufficiency, severely endanger their health, and make it more difficult for

18   them to live with and contribute to their families. Bays Decl. Ex. KK at 7–9.

19   　　　DHS readily conceded the potentially "outsized impact" the Rule might

20   have on specific vulnerable populations, including individuals with disabilities.

21   84 Fed. Reg. at 41,368. DHS largely dismissed such concerns, however, noting

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

46

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    simply that age and health are statutory factors and "it is not the intent, nor is it

2    the effect of this rule to find a person a public charge *solely* based on his

3    disability." *Id.* (emphasis added). But, as commenters noted, DHS's selection of

4    arbitrary, poorly defined, and overlapping factors will not only inflict severe

5    harm on these already vulnerable populations but will also give immigration

6    officials unfettered discretion to deem them public charges. Bays Decl. Exs. L at

7    12–14; X at 6. DHS's disregard for the evidence it received, as well as its refusal

8    to meaningfully address the discriminatory and lasting harms on these

9    populations, underscores the arbitrary and capricious nature of the Rule.

10              **b.    DHS ignored evidence showing the factors in the public**
                        **charge analysis are arbitrary and capricious**

11

12            DHS's multifactor test is itself arbitrary and capricious. As set forth below,

13    DHS relies on vague, poorly defined factors that are inconsistent with—and often

14    directly at odds with—the Rule's purported purpose, further demonstrating the

15    lack of any "rational connection between the facts found and the choice made."

16    *State Farm*, 463 U.S. at 43; Bays Decl. Ex. R at 40. Below are a few such

17    examples.

18                      **i.    Income thresholds**

19            The Rule imposes arbitrary income thresholds for making public charge

20    determinations, despite DHS's own evidence that such thresholds are unrelated

21    to the Rule's stated purpose. Under the Rule, an income "below [the] level of 125

22    percent of FPG would generally be a heavily weighed negative factor," 84 Fed.

1    Reg. at 41,332, while a household income higher than 250% of the FPG ($64,375

2    annually for a family of four) would be "heavily positive." 84 Fed. Reg. at

3    41,502-04; 8 C.F.R. § 212.22(c). Many commenters, however, noted the arbitrary

4    and capricious nature of these thresholds, as well as the devastating effects they

5    will have on hardworking, law-abiding immigrants. *See, e.g.*, Bays Decl. Ex. R

6    at 47–48 (warning that under the arbitrary income thresholds, "nearly 200,000

7    married couples in the United States would be faced with a wrenching choice:

8    leave the United States, or live apart").

9         DHS's reliance on these income thresholds is irrational based also on

10   DHS's own evidence and data. In the Proposed Rule's preamble, DHS defended

11   the income thresholds on the ground "[t]he percentage of people receiving these

12   public benefits generally goes down as the income percentage increases." 83 Fed.

13   Reg. at 51,204. This assertion rings hollow, though, as eligibility for public

14   benefits is generally means-tested based on an applicant's income. DHS's data

15   shows that even immigrants in the lowest-income group analyzed—those with

16   incomes below 125% of FPG—were in general *unlikely* to receive such public

17   benefits. 83 Fed. Reg. at 51,204 tbl. 28. Medicaid, the most-utilized public benefit

18   received by the group, had a participation rate of 39.2%. Further, such rigid

19   income thresholds may lead to the perverse result that an applicant who works

20   full-time making minimum wage but has never used *any* of the benefits at issue

21   would be assigned a negative factor and branded a public charge. In

22

1    "contradict[ing] the evidence before" DHS, the Rule is "internally inconsistent,"

2    "arbitrary and capricious." *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d

3    1134, 1141 (9th Cir. 2015).

**ii.    English proficiency**

5    DHS treats as a negative factor an immigrant's "lack of English

6    proficiency." 84 Fed. Reg. at 41,435. DHS cites no evidence suggesting that

7    immigrants "lacking English proficiency"—a vague and poorly defined factor—

8    are "more likely than not at any time in the future" to receive the public benefits

9    at issue. 84 Fed. Reg. at 41,501. Instead, DHS starts from its conclusion and

10    works backward, asserting that in a USCIS survey of noncitizens, the rate of

11    enrollment in non-cash benefits programs was lower among "those who spoke

12    English either well or very well (about 15 to 20 percent)" compared to "those

13    who either spoke English poorly or not at all (about 25 to 30 percent)." 84 Fed.

14    Reg. at 41,448. As numerous commenters noted, DHS's reliance on such an

15    arbitrary, undefined factor not only affords undue discretion to immigration

16    officials but also ignores a wealth of evidence demonstrating that an immigrant's

17    language proficiency is not an immutable characteristic making them likely to

18    become a public charge. *See, e.g.*, Bays Decl. Ex. XX at 6–7 ("Although

19    non-citizens who are limited English proficient may face initial challenges in

20    obtaining certain jobs, their ability to speak another language may serve them

21

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

49

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1   well economically in the long run."); *see Arizona Cattle Growers' Ass'n v. U.S.*

2   *Fish & Wildlife*, 273 F.3d 1229, 1251 (9th Cir. 2001) (agency action was

3   "arbitrary and capricious" based on "lack of an articulated, rational connection"

4   between regulatory condition and purpose as well as the "the vagueness of the

5   condition itself"). And, DHS's own data once again undermines its conclusion,

6   as its survey shows immigrants with limited English proficiency were more likely

7   *not* to utilize public benefits. 83 Fed. Reg. at 51,195 tbl. 24.

8                          iii.      **Credit scores**

9        The Rule considers credit reports and credit scores in the public charge

10  analysis. 84 Fed. Reg. at 41,425. DHS's reliance on such evidence is not justified,

11  as there is no evidence credit scores or reports have any relevance in determining

12  whether someone is likely to become a public charge. Bays Decl. Exs. Y at 1–3;

13  Z at 1–3; TT at 1–4; ZZ at 1–3. Consideration of credit reports in this context is

14  arbitrary, as (1) immigrants are likely to have no or thin credit histories and

15  artificially low credit scores; (2) credit reports are not generally available in

16  languages other than English, which could limit immigrants with language

17  barriers from correcting errors (thus double-counting English proficiency in the

18  public charge analysis); and (3) a bad credit score is frequently the result of a

19  temporary circumstance such as illness or job loss and does not reflect whether

20  someone is likely to become a public charge. Further, credit reports suffer from

21  unacceptable rates of inaccuracy, with at least 21% of consumers having verified

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

50

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

errors on their reports. Bays Decl. Exs. Y at 1–3; Z at 2. DHS offers no rationale for introducing such dramatically high error rates into the public charge analysis, and although it promises not to consider "verified errors," the process for consumers to address such errors is extremely burdensome—especially for immigrants—and private credit reporting agencies may still fail to correct them.

*     *     *

For the reasons stated above, the Plaintiff States are likely to prevail on the merits of their claims that the Rule violates the APA because it is contrary to law and arbitrary or capricious.

## C.    Absent a Stay or Injunctive Relief, the Plaintiff States Will Suffer Immediate and Irreparable Harm

Were the Final Rule to take effect, the Plaintiff States are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Because the Final Rule will cause mass disenrollment and forbearance from enrollment by immigrants from federal and state benefits programs, it will result in worsened health, nutrition, and housing outcomes for those individuals. This vitiates the purposes of state programs, results in deterioration in health and well-being for state residents, and exponentially increases the financial burden on the States.

### 1.    Categories of irreparable harm to be considered by the Court

The Rule triggers three forms of irreparable harms. First, "ongoing harms to [the Plaintiff States'] organizational missions." *Valle Del Sol v. Whiting*,

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

51

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    723 F.3d 1006, 1029 (9th Cir. 2013); *League of Women Voters of United States*

2    *v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *E. Bay Sanctuary Covenant*,

3    354 F. Supp. 3d at 1109. Second, negative "consequences for public health" and

4    well-being. *State v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1074 (N.D.

5    Cal. 2018); *see also California v. Health & Human Servs.*, 281 F. Supp. 3d 806,

6    830 (N.D. Cal. 2017), *aff'd in pertinent part sub nom. California v. Azar*,

7    911 F.3d 558 (9th Cir. 2018). Indeed, the Ninth Circuit has held repeatedly that

8    loss of public health benefits constitutes irreparable injury. *See M.R. v. Dreyfus*,

9    697 F.3d 706, 732–33 (9th Cir. 2012); *Beltran v. Myers*, 677 F.2d 1317, 1322

10   (9th Cir. 1982). Third, uncompensable economic harm—which may include

11   "budget uncertainty" experienced by government organizations that cannot

12   "budget, plan for the future, and properly serve their residents," *County of Santa*

13   *Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017). *California v. Azar*,

14   911 F.3d at 581; *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir.

15   2015); *California v. Health and Human Servs.*, 351 F. Supp. 3d 1267, 1298 (N.D.

16   Cal. 2019).

17         **2.    Disenrollment from federal and state programs will result in
               irreparable harm to health care, nutrition, and housing**

18

19         The direct disenrollment from the listed federal programs, and anticipated

     chilling effects to enrollment in state benefit programs, will result in irreparable
20
     harms to state residents, the mission of state programs, and ultimately to state
21
     treasuries. Proposed Rule, *Inadmissibility on Public Charge* Grounds, 83 Fed.
22

---

PLAINTIFF STATES' MOTION                    52                    ATTORNEY GENERAL OF WASHINGTON
FOR § 705 STAY PENDING                                                   8127 W. Klamath Court, Suite A
JUDICIAL REVIEW OR FOR PI                                                   Kennewick, WA 99336
NO. 4:19-CV-05210-RMP                                                          (509) 734-7285

1    Reg. at 51,114, 51,266–69 (Oct. 18, 2019); 84 Fed. Reg. at 41,312 (conceding

2    that the Rule will result in significant disenrollment by immigrants); *see supra* at

3    10–12.

4        The initial, and potentially most significant, area affected by

5    disenrollments as a result of the Rule is health care. Medicaid is a vital source of

6    preventative care, lessens financial hardship, helps women have healthy

7    pregnancies, and reduces preventable mortality. *See supra* at 12–13. Even under

8    DHS's estimate, were 2.5% of immigrants to choose to forgo health care to

9    protect their immigration status, the results would be immediate, predictable and

10    irreversible. *See supra* at 11. Put simply, "[p]eople will die. The anxiety and fear

11    generated in the immigrant population will lead to people not seeking care for

12    emergent conditions (heart attacks, for example)." Oliver Decl. ¶ 21.

13        Beyond the individual effect, a lack of health care harms entire families

14    because those who disenroll may be deterred from seeking coverage for their

15    dependent children, no matter the minor's immigration status. *See supra*

16    at 13–14. Furthermore, this disenrollment will have community-wide effects,

17    including the prevalence of disease "among members of the U.S. citizen

18    population who are not vaccinated." 83 Fed. Reg. at 51,270; 84 Fed. Reg.

19    at 41,384; *see supra* at 13–14. Finally, forgone health care coverage and

20    preventative care, as DHS admits, will cause higher and more frequent

21    emergency services and uncompensated care costs, as immigrants without

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

53

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    healthcare turn to the emergency room for care. 84 Fed. Reg. at 41,384; *see supra*

2    at 14. These increased costs "shall now fall solely on the [States'] taxpayers,"

3    harming the Plaintiff States' financial health. Pryor Decl. ¶ 10.

4        Second, the Final Rule will also create food insecurity, resulting in

5    increased costs to the Plaintiff States and the frustration of programs which aim

6    to create a well-nourished, productive population. SNAP, and corresponding

7    state programs, will likely suffer reduction in enrollees. *See supra* at 14–15.

8    When immigrants make the heartbreaking decision to forgo food assistance to

9    maintain immigration status, the effects are threefold. First, and most

10   immediately, more families, including those with U.S. citizen children become

11   hungry. *See supra* at 15–16. Second, disenrollment results in losses to economic

12   activity and productive output, thus harming the Plaintiff States' economies. *See*

13   *supra* at 15–16. The State of Illinois, alone, estimates a loss to its economy of

14   $95 to $222 million in economic stimulus because of immigrant withdrawals

15   from SNAP. Hou Decl. ¶ 23. Finally, hungry children use more state resources—

16   educational, social services, and health care. *See supra* at 15–16.

17       Third, immigrant disenrollment in federal and state housing assistance

18   programs will lead to increased homelessness and a cascade of negative

19   outcomes, both for the affected individuals and the States. Especially in markets

20   where immigrants are more often employed in lower-paying jobs, housing,

21   without assistance, will quickly become unsustainable and more people will

22

1    become homeless, thereby increasing the demand on state sheltering resources

2    and finances. *See supra* at 16–18. Increased homelessness has immediate and

3    irreparable consequences for public health and has proven to have deleterious

4    effects on children's lifetime outcomes. *See supra* at 16–17. Indeed, "[t]he

5    longterm social costs of poor health and education far outweigh the cost of

6    providing rental assistance." Carey Decl. ¶ 13.

7          Overall, the Final Rule will lead to a state population which is sicker,

8    hungrier, and less able to contribute to the economic vitality of their communities,

9    all of which imposes significant costs for the Plaintiff States.

10   **D.    The Balance of Equities and Public Interest Both Favor a Preliminary
         Injunction**

11

12         When the government is a party, the final two *Winter* factors merge.

13   *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). "[T]he

     purpose of such interim equitable relief is not to conclusively determine the rights
14
     of the parties, but to balance the equities as the litigation moves forward."
15
     *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). The
16
     principal consideration concerns the extent of the "public consequences"
17
     attendant to the stay of the Rule. *Ramirez v. United States Immigration and*
18
     *Customs Enf't*, 310 F. Supp. 3d 7, 32 (D.D.C. 2018) (quoting *Winter*, 555 U.S. at
19
     24); *see also Hernandez*, 872 F.3d at 996. Here, the balance of the equities and
20
     public interest strongly favor a stay.
21

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

55

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    "There is generally no public interest in the perpetuation of unlawful

2    agency action. To the contrary, there is a substantial public interest in having

3    governmental agencies abide by the federal laws that govern their existence and

4    operations." *League of Women Voters*, 838 F.3d at 12 (citations and internal

5    quotation marks omitted). The Rule violates the APA, and will have significant,

6    and immediate, consequences across the country (including the Plaintiff States

7    and their residents). It is, without doubt, in the public interest to prevent lawfully-

8    present individuals and families with children from abandoning myriad federal

9    and state health, education, and housing benefits to which they are entitled by

10    law because of fear of future repercussions to their immigration status.

11    By contrast, preserving the status quo will not harm the defendants, and

12    refraining from enforcing the Final Rule will cost them nothing. *See Diaz v.*

13    *Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (court may waive Rule 65(c) bond

14    requirement). Indeed, the Plaintiff States merely seek to keep in place regulations

15    which have governed for the past 23 years. *See E. Bay Sanctuary Covenant v.*

16    *Trump*, 932 F.3d 742, 778 (9th Cir. 2018) (denying the government's motions to

17    stay district court's TRO, reasoning, in part, that the TRO merely "restored the

18    law to what it had been for many years prior").

19    Thus, the final two *Winter* factors weigh heavily in favor of the interim

20    equitable relief sought by the Plaintiff States.

21

22

56

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

## IV.   CONCLUSION

For the all the reasons above, the Plaintiff States respectfully request that the Court stay the Rule pending a final adjudication of their claims on the merits or, in the alternative, preliminarily enjoin Defendants from enforcing or implementing the Rule.

RESPECTFULLY SUBMITTED this 6th day of September, 2019.

ROBERT W. FERGUSON
Attorney General of Washington

*/s/ Jeffrey T. Sprung*
JEFFREY T. SPRUNG, WSBA #23607
Assistant Attorney General
RENE D. TOMISSER, WSBA #17509
Senior Counsel
ZACHARY P. JONES, WSBA #44557
JOSHUA WEISSMAN, WSBA #42648
PAUL M. CRISALLI, WSBA #40681
NATHAN K. BAYS, WSBA #43025
BRYAN M.S. OVENS, WSBA #32901
Assistant Attorneys General
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285
Jeff.Sprung@atg.wa.gov
Rene.Tomisser@atg.wa.gov
Zach.Jones@atg.wa.gov
Joshua.Weissman@atg.wa.gov
Paul.Crisalli@atg.wa.gov
Nathan.Bays@atg.wa.gov
Bryan.Ovens@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

57

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    MARK R. HERRING
     Attorney General of Virginia
2
     */s/ Michelle S. Kallen*
3    MICHELLE S. KALLEN, VSB #93286
     Deputy Solicitor General
4    RYAN SPREAGUE HARDY, VSB #78558
     ALICE ANNE LLOYD, VSB #79105
5    MAMOONA H. SIDDIQUI, VSB #46455
     Assistant Attorneys General
6    Office of the Attorney General
     202 North Ninth Street
7    Richmond, Virginia 23219
     (804) 786-7240
8    MKallen@oag.state.va.us
     RHardy@oag.state.va.us
9    ALloyd@oag.state.va.us
     MSiddiqui@oag.state.va.us
10   SolicitorGeneral@oag.state.va.us
     *Attorneys for Plaintiff Commonwealth of Virginia*

11

12   PHIL WEISER
     Attorney General of Colorado
13
     */s/ Eric R. Olson*
14   ERIC R. OLSON, #36414
     Solicitor General
15   Office of the Attorney General
     Colorado Department of Law
16   1300 Broadway, 10th Floor
     Denver, CO 80203
17   (720) 508 6548
     Eric.Olson@coag.gov
18   *Attorneys for Plaintiff the State of Colorado*

19

20

21

22

PLAINTIFF STATES' MOTION          58          ATTORNEY GENERAL OF WASHINGTON
FOR § 705 STAY PENDING                              8127 W. Klamath Court, Suite A
JUDICIAL REVIEW OR FOR PI                              Kennewick, WA 99336
NO. 4:19-CV-05210-RMP                                    (509) 734-7285

1   KATHLEEN JENNINGS
Attorney General of Delaware

2   AARON R. GOLDSTEIN
State Solicitor

3   ILONA KIRSHON
Deputy State Solicitor

4

*/s/ Monica A. Horton*

5   MONICA A. HORTON, #5190
Deputy Attorney General

6   820 North French Street
Wilmington, DE 19801

7   Monica.horton@delaware.gov
*Attorneys for Plaintiff the State of Delaware*

8

9   KWAME RAOUL
Attorney General State of Illinois

10

*/s/ Liza Roberson-Young*

11   LIZA ROBERSON-YOUNG, #6293643
Public Interest Counsel

12   Office of the Illinois Attorney General
100 West Randolph Street, 11th Floor

13   Chicago, IL 60601
(312) 814-5028

14   ERobersonYoung@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

15

16   CLARE E. CONNORS
Attorney General of Hawaiʻi

17

*/s/ Lili A. Young*

18   LILI A. YOUNG, #5886
Deputy Attorney General

19   Department of the Attorney General
425 Queen Street

20   Honolulu, HI 96813
(808) 587-3050

21   Lili.A.Young@hawaii.gov
*Attorneys for Plaintiff State of Hawaiʻi*

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

59

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1

2
BRIAN E. FROSH
Attorney General of Maryland

3
/s/ Jeffrey P. Dunlap
JEFFREY P. DUNLAP

4
D. MD Bar #20846
MD State Bar #1812100004

5
Assistant Attorney General
200 St. Paul Place

6
Baltimore, MD 21202
T: (410) 576-6325

7
F: (410) 576-6955
JDunlap@oag.state.md.us

8
Attorneys for Plaintiff State of Maryland

9

10
MAURA HEALEY
Attorney General of Commonwealth of Massachusetts

11
/s/ Abigail B. Taylor
ABIGAIL B. TAYLOR, #670648

12
Chief, Civil Rights Division
DAVID URENA, #703076

13
Special Assistant Attorney General
ANGELA BROOKS, #663255

14
Assistant Attorney General
Office of the Massachusetts Attorney General

15
One Ashburton Place
Boston, MA 02108

16
(617) 963-2232
abigail.taylor@mass.gov

17
david.urena@mass.gov
angela.brooks@mass.gov

18
Attorneys for Plaintiff Commonwealth of Massachusetts

19

20

21

22

PLAINTIFF STATES' MOTION
FOR § 705 STAY PENDING
JUDICIAL REVIEW OR FOR PI
NO. 4:19-CV-05210-RMP

60

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1   DANA NESSEL
    Attorney General of Michigan
2
    */s/Toni L. Harris*
3   FADWA A. HAMMOUD, #P74185
    Solicitor General
4   TONI L. HARRIS, #P63111
    *First Assistant Attorney General*
5   Michigan Department of Attorney General
    P.O. Box 30758
6   Lansing, MI 48909
    (517) 335-7603 (main)
7   HarrisT19@michigan.gov
    Hammoudf1@michigan.gov
8   *Attorneys for the People of Michigan*

9
    KEITH ELLISON
10  Attorney General of Minnesota

11  */s/ R.J. Detrick*
    R.J. DETRICK, #0395336
12  *Assistant Attorney General*
    Minnesota Attorney General's Office
13  Bremer Tower, Suite 100
    445 Minnesota Street
14  St. Paul, MN 55101-2128
    (651) 757-1489
15  (651) 297-7206
    Rj.detrick@ag.state.mn.us
16  *Attorneys for Plaintiff State of Minnesota*

17

18

19

20

21

22

1   AARON D. FORD
    Attorney General of Nevada
2
    */s/ Heidi Parry Stern*
3   HEIDI PARRY STERN, #8873
    Solicitor General
4   Office of the Nevada Attorney General
    555 E. Washington Ave., Ste. 3900
5   Las Vegas, NV 89101
    HStern@ag.nv.gov
6   *Attorneys for Plaintiff State of Nevada*

7
    GURBIR SINGH GREWAL
8   Attorney General of New Jersey

9   */s/ Glenn J. Moramarco*
    GLENN J. MORAMARCO, #030471987
10  Assistant Attorney General
    Office of the Attorney General
11  Richard J. Hughes Justice Complex
    25 Market Street, 1st Floor, West Wing
12  Trenton, NJ 08625-0080
    (609) 376-3232
13  Glenn.Moramarco@law.njoag.gov
    *Attorneys for Plaintiff State of New Jersey*
14

15  HECTOR BALDERAS
    Attorney General of New Mexico
16
    */s/ Tania Maestas*
17  TANIA MAESTAS, #20345
    Chief Deputy Attorney General
18  P.O. Drawer 1508
    Santa Fe, New Mexico 87504-1508
19  tmaestas@nmag.gov
    *Attorneys for Plaintiff State of New Mexico*
20

21

22

PLAINTIFF STATES' MOTION              62          ATTORNEY GENERAL OF WASHINGTON
FOR § 705 STAY PENDING                               8127 W. Klamath Court, Suite A
JUDICIAL REVIEW OR FOR PI                                 Kennewick, WA 99336
NO. 4:19-CV-05210-RMP                                       (509) 734-7285

1    PETER F. NERONHA
     Attorney General of Rhode Island

2
     */s/ Lauren E. Hill*
3    LAUREN E. HILL, #9830
     Special Assistant Attorney General
4    Office of the Attorney General
     150 South Main Street
5    Providence, Rhode Island 02903
     (401) 274-4400 x 2038
6    E-mail:  lhill@riag.ri.gov
     *Attorneys for Plaintiff State of Rhode Island*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22