1  ROBERT W. FERGUSON
   *Attorney General*

2

3  RENE D. TOMISSER, WSBA #17509
   *Senior Counsel*
   JEFFREY T. SPRUNG, WSBA #23607

4  ZACHARY P. JONES, WSBA #44557
   JOSHUA WEISSMAN, WSBA #42648

5  PAUL M. CRISALLI, WSBA #40681
   NATHAN K. BAYS, WSBA #43025

6  BRYAN M.S. OVENS, WSBA #32901
   *Assistant Attorneys General*

7  8127 W. Klamath Court, Suite A
   Kennewick, WA 99336

8  (509) 734-7285

9          **UNITED STATES DISTRICT COURT**
          **EASTERN DISTRICT OF WASHINGTON**
10                    **AT RICHLAND**

11 STATE OF WASHINGTON, et al.,          NO. 4:19-cv-05210-RMP

12            Plaintiffs,                DECLARATION OF SARAH K.
                                         PETERSON IN SUPPORT OF
13    v.                                 PLAINTIFF STATES' MOTION
                                         FOR § 705 STAY PENDING
14 UNITED STATES DEPARTMENT              JUDICIAL REVIEW OR FOR
   OF HOMELAND SECURITY, a               PRELIMINARY INJUNCTION
15 federal agency, et al.
                                         NOTED FOR: October 3, 2019
16            Defendants.                With Oral Argument at 10:00 a.m.

17
   I, Sarah K. Peterson, declare as follows:
18
        1.    I am over the age of 18, competent to testify as to the matters herein
19
   and make this declaration based on my personal knowledge.
20
        2.    I am the Washington State Refugee Coordinator and the Chief of
21
   Washington's Office of Refugee and Immigrant Assistance (ORIA) within the
22

DECLARATION OF SARAH K.              1       ATTORNEY GENERAL OF WASHINGTON
PETERSON                                          8127 W. Klamath Court, Suite A
NO. 4:19-cv-05210-RMP                                   Kennewick, WA 99336
                                                          (509) 734-7285

1    Community Services Division of the Economic Services Administration (ESA)

2    at the Washington Department of Social and Health Services. Prior to joining

3    ORIA in 2014, I worked for 14 years in nonprofit organizations that served

4    immigrant and refugee communities in Philadelphia, Pennsylvania. In 2003, I

5    earned my Master's Degree in Social Work from the University of Pennsylvania.

6    I worked for HIAS Pennsylvania (Hebrew Immigrant Aid Society) for eight years

7    helping to support their work in Philadelphia providing immigration legal

8    services and refugee resettlement.  It is at this organization that I gained direct

9    experience helping people navigate federal immigration processes as well as

10    access to public benefits programs. Part of my role was to help people in the

11    community understand the public charge policy and how it might impact

12    someone's immigration status when they applied for lawful permanent residency.

13        3.    In my role as the Washington State Refugee Coordinator, I work

14    directly with eight refugee resettlement agencies and other stakeholders in the

15    local communities to ensure that services are available to help successfully

16    resettle refugees in these local communities. In addition, I manage Washington's

17    Office of Refugee and Immigrant Assistance, which invests over $25 million

18    annually of state and federal resources to provide low-income refugees and

19    immigrants with the services and assistance they need to achieve economic

20    stability and integration into our local communities. ORIA accomplishes this by

21    partnering with more than 60 different organizations across the state to provide

22    direct services. These organizations include refugee resettlement agencies,

DECLARATION OF SARAH K.
PETERSON
NO. 4:19-cv-05210-RMP

2

1    nonprofit organizations, ethnic community-based organizations, state colleges,

2    public health departments, federally qualified health centers, and other state

3    agencies. ORIA values our community partners, and my team of professional

4    staff and I engage with these community stakeholders on a monthly and quarterly

5    basis to understand how the programs that we oversee are impacting the lives of

6    the more than 10,000 refugees and immigrants each year.   This regular

7    community engagement enables ORIA to learn and receive feedback about how

8    state and federal policies impact people in the community.

9         4.    ORIA is housed within the Community Services Division (CSD),

10   which is a Division within the Economic Service Administration (ESA), which

11   is one of six administrations of the Washington Department of Social and Health

12   Services (DSHS). My position reports directly to Babs Roberts, the Director of

13   the Community Service Division, who reports to David Stillman, the Assistant

14   Secretary of the Economic Services Administration. ESA's core services focus

15   on poverty reduction and safety net programs, child support services, and

16   disability determinations.   In 2018, roughly one in four Washington residents

17   turned to ESA for assistance with cash, food, child support, child care, disability

18   determinations, support for transitioning to employment, and other services.

19   ESA's Community Services Division (CSD) operates the federal and state public

20   assistance programs that help low-income people meet their foundational needs

21   and achieve economic security. Major programs include Temporary Assistance

22   for Needy Families (TANF) and WorkFirst (Washington's welfare to work

DECLARATION OF SARAH K.
PETERSON
NO. 4:19-cv-05210-RMP

3

1    program), Basic Food (food assistance) and Basic Food Employment and

2    Training, Refugee Cash Assistance, and others. ORIA works within CSD to

3    ensure that refugee and immigrant families and individuals receiving public

4    assistance have access to culturally sensitive and linguistically appropriate

5    programs to transform their lives.

6        5.    I understand that the U.S. Department of Homeland Security (DHS)

7    has published a new regulation on the public charge ground of inadmissibility

8    under the Immigration and Nationality Act, and I have reviewed the rule.  As I

9    understand it, the public charge rule [1]would allow the federal government to

10   expand its consideration of a person's past use of public benefits, including

11   specified federal programs as well as state cash assistance for income

12   maintenance, and future need for public assistance, in determining whether

13   someone should be eligible for lawful permanent residency, a new visa, or for an

14   extension of stay or change of stay from an existing visa. As a result of that

15   change, I believe the public charge rule will discourage a large number of legally

16   present noncitizens from accessing health, nutrition, and social services that they

17   need to thrive in Washington communities. Evidence from prior changes in

18   immigration policy strongly suggests that many immigrants who are *not* subject

19   to the public charge test will nevertheless withdraw from a broad array of public

20   _____

21        [1]    https://www.federalregister.gov/documents/2019/08/14/2019-17142/

22   inadmissibility-on-public-charge-grounds

DECLARATION OF SARAH K.        4        ATTORNEY GENERAL OF WASHINGTON
PETERSON                                8127 W. Klamath Court, Suite A
NO. 4:19-cv-05210-RMP                   Kennewick, WA 99336
                                        (509) 734-7285

1    programs and services out of confusion, fear, or an abundance of caution.

2    Following the passage of PRWORA in 1996, thousands of immigrant families

3    withdrew from public benefits programs *for which they were eligible*.[2] It is

4    reasonable to assume that this type of disenrollment will continue, and will

5    include two types of erroneous disenrollment: (i) immigrants who are *not* subject

6    to the public charge test, such as refugees, and (ii) immigrants who are

7    disenrolling even from services that are not included in the public charge

8    determination.

9        According to the Migration Policy Institute, changes in the behavior of

10   immigrant families following the passage of the 1996 welfare law provide the

11   best available evidence of the potential effects of the proposed public-charge

12   rule.[3] A comprehensive review of studies done following the introduction of

13   _____

14       [2] M. Fix & J. Passel, *Trends in Noncitizens' and Citizens' Use of Public*

15   *Benefits Following Welfare Reform* (March 1999), https://www.urban.org/

16   research/publication/trends-noncitizens-and-citizens-use-public-benefits-

17   following-welfare-reform. *See also* L. Ku & A. Freilich, *Caring for Immigrants:*

18   *Health Care Safety Nets in Los Angeles, New York, Miami, and Houston*

19   (Feb. 2001), https://files.eric.ed.gov/fulltext/ED453330.pdf.

20       [3] J. Batalova, M. Fix, M. Greenberg, *Chilling Effects: The Expected Public*

21   *Charge Rule and Its Impact on Legal Immigrant Families' Public Benefit Use*

22   (June 2018).

DECLARATION OF SARAH K.
PETERSON
NO. 4:19-cv-05210-RMP                              5                    ATTORNEY GENERAL OF WASHINGTON
                                                                       8127 W. Klamath Court, Suite A
                                                                       Kennewick, WA 99336
                                                                       (509) 734-7285

1    welfare reform found statistically significant evidence of a withdrawal from

2    benefits among populations whose eligibility was unchanged by the law,

3    including refugees and U.S. citizen children. USDA found that food stamp use

4    fell by 53% among U.S. citizen children in families with a noncitizen parent

5    between 1994 and 1998. Fix and Passel found that it fell 60% among refugees

6    even though the law did not restrict their eligibility for the program, even during

7    their initial years in the country. Comparable figures for drops in Medicaid use

8    were 17% among noncitizens and 39% among refugees; for TANF, 44% and

9    78%.[4] In addition, the Urban Institute discovered in 2018 that one in nine adults

10   (11.7%) in families where all foreign-born family members have green cards or

11   US citizenship reported avoiding at least one routine activity that involves public

12   authorities, such as interacting with teachers, school officials, police officers, or

13   health care providers, driving a car, renewing or applying for a driver's license.[5]

14   Feedback from the community indicates that many refugee families who are

15   guaranteed access to the services provided by the Washington Office of Refugee

16   _____

17        [4] *Id*.

18        [5] H.Bernstein, D. Gonzalez, M. Karpman, S. Zuckerman.*Adults in*

19   *Immigrant Families Report Avoiding Routine Activities Because of Immigration*

20   *Concerns.* (July 2019). Urban Institute: https://www.urban.org/sites

21   /default/files/publication/100626/2019.07.22_immigrants_avoiding_activities_f

22   inal_v2_2.pdf.

DECLARATION OF SARAH K.
PETERSON
NO. 4:19-cv-05210-RMP

6

1    and Immigrant Assistance may withdraw from or decline these services out of

2    fear. Overall, the public charge rule is likely to have a negative impact on the

3    health and well -being of these families, slow their social integration, create new

4    economic challenges due to a lack of stability, and make it increasingly difficult

5    for them to become fully self-sufficient and integrated into our communities.

6    **A.    Description of Relevant Program**

7            6.    ESA's Community Services Division (CSD) operates 52 different

8    Community Services Offices (CSOs) and the Community Services Call Center

9    that process client applications and determine eligibility for one of Washington's

10    many public assistance programs, including cash and food assistance programs.

11    CSD issues eligible clients the appropriate cash and food assistance, and connects

12    them to required or voluntary employment and training programs. In addition to

13    administering public assistance programs, ORIA provides programs and services

14    for immigrants and refugees through partners in the community. One program

15    that we administer is the Limited English Proficiency (LEP) Pathway Program

16    for people receiving cash assistance who need assistance in looking for and

17    securing employment, learning English, and gaining new skills for employment.

18    The ORIA Basic Food Employment and Training (ORIA BFET) program offers

19    employment and training services for refugees and immigrants receiving

20    federally-funded food stamps.

21            7.    All public assistance programs have a number of eligibility

22    requirements, which include income levels, residency in Washington state, and

DECLARATION OF SARAH K.
PETERSON
NO. 4:19-cv-05210-RMP

7

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    verification of citizenship/immigration status. All federally-funded programs are

2    limited to lawfully present immigrants who are deemed to be qualified under

3    federally-defined eligibility standards.[6] Generally this includes lawful permanent

4    residents who have been in the United States longer than five years. It also

5    includes people resettled as refugees, granted asylum, and those who meet other

6    humanitarian visas. Washington state invests general state funds to assist

7    individuals and families who are ineligible for federal programs to include

8    lawfully present noncitizens who fail to meet federal eligibility qualifications

9    established in the Personal Responsibility and Work Opportunity Act (PROWA)

10    of 1996.[7]

11        8.    ESA provides a variety of public assistance programs that draw from

12    both federal and state resources. ESA's federally funded programs include

13    Temporary Assistance for Needy Families (TANF), which is administered by the

14    U.S. Department of Health and Human Services, and Supplemental Nutrition

15    Assistance Programs (SNAP), which is administered by U.S. Department of

16    Agriculture Food and Nutrition Service. All federally funded programs exclude

17    non-citizens who do not meet federally defined eligibility standards. Washington

18    State invests general state funds to expand state-based eligibility to certain

19    non-citizens who are ineligible for federally-funded programs because of their

20    _____

21    [6] Wash. Admin. Code § 388-424-0001.

22    [7] Wash. Admin. Code §§ 388-400-0050, 388-424-0015, 388-424-0030

DECLARATION OF SARAH K.
PETERSON
NO. 4:19-cv-05210-RMP

8

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    immigration status. These programs include State Family Assistance and the

2    Food Assistance Program for Legal Immigrants. In addition, the state uses state

3    general funds to support cash assistance programs for individuals not otherwise

4    eligible for TANF, such as the Aged, Blind or Disabled Program, Pregnant

5    Women's Assistance, Consolidated Emergency Assistance Program, and State

6    Supplemental Payment.

7         Washington's public assistance programs administered by ESA are funded

8    by a blend of federal and state dollars. The Temporary Assistance for Needy

9    Families (TANF) program,[8] utilizes federal funds from the U.S. Department of

10   Health and Human Services and state funding to provide cash assistance to

11   parents/caregivers with children and pregnant individuals to bolster their ability

12   to meet their families' foundational needs, including a safe home, healthy food,

13   reliable transportation, and school supplies. In State Fiscal Year 2017, the

14   average monthly caseload for TANF recipients was 28,555 cases with a monthly

15   average assistance of $408.20.[9] During the 2017-2019 Biennium, Washington

16   projects to spend $262,495,000 ($244,127,000 federal and $18,368,000 state) in

17   service dollars and $141,385,000 ($69,070,000 federal and $72,315,000 state) in

18   _____

19        [8] 8 U.S.C. §§ 1611(a), (c)(1)(B), 1612(b)(3)(C).

20        [9] DSHS, Econ. Servs. Admin., *Program Briefing Book for State Fiscal*

21   *Year 2017*, TANF/SFA/WorkFirst, https://www.dshs.wa.gov/sites/default/files/

22   ESA/briefing-manual/2017TANF_WorkFirst.pdf.

DECLARATION OF SARAH K.              9          ATTORNEY GENERAL OF WASHINGTON
PETERSON                                              8127 W. Klamath Court, Suite A
NO. 4:19-cv-05210-RMP                                      Kennewick, WA 99336
                                                              (509) 734-7285

1    administrative costs.

2    Washington operates a state-funded program titled State Family Assistance that

3    makes income assistance available to individuals who are ineligible for TANF,

4    including some noncitizens.[10] Some families may contain people with different

5    immigration status that qualify them to receive both TANF and SFA. Out of the

6    monthly average caseload of 28,555, 97.1% of cases were TANF only (meaning

7    that they met the federal eligibility qualifications), 1.7% received a mix of TANF

8    and State Family Assistance (SFA), and 1.3% received SFA only.[11] DSHS

9    estimates that approximately six to seven percent of the combined TANF and

10   SFA caseload have someone who is a noncitizen.

11          Washington provides certain pregnant non-citizens who are ineligible for

12   TANF with assistance through the state-funded Pregnant Women Assistance

13   program.[12] In addition, Washington provides certain non-citizen families and

14   pregnant residents with emergency income assistance through the state-funded

15

16

17   _____

18          [10] Wash. Rev. Code § 74.08A.100.

19          [11] DSHS, Econ. Servs. Admin., *Program Briefing Book for State Fiscal*

20   *Year 2017*, TANF/SFA/WorkFirst, https://www.dshs.wa.gov/sites/default/files

21   /ESA/briefing-manual/2017TANF_WorkFirst.pdf.

22          [12] Wash. Rev. Code § 74.62.030(2).

DECLARATION OF SARAH K.
PETERSON
NO. 4:19-cv-05210-RMP

10

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1  Consolidated Emergency Assistance Program.[13] This funding is used to alleviate

2  emergency conditions by providing cash to assist with food, shelter, clothing,

3  medical care, or other necessary items. Another state funded cash program is the

4  State Supplemental Program with helps certain clients who the Social Security

5  Administration determines are eligible for Supplement Security Income.

6          9.      The benefits and services offered by ESA that fall within the scope

7  of the new public charge rule include cash and food assistance. The Temporary

8  Assistance for Needy Families (TANF) program, which is funded by a blend of

9  federal funds from the U.S. Department of Health and Human Services and state

10  funding, provides cash assistance to parents/caregivers with children and

11  pregnant individuals to bolster their ability to meet their families' foundational

12  needs, including a safe home, healthy food, reliable transportation, and school

13  supplies. State Family Assistance (SFA) makes income assistance available to

14  individuals who are ineligible for TANF, including some non-citizens.[14] Some

15  families may contain people with different immigration status that qualify them

16  to receive both TANF and SFA.

17          Washington's Basic Food program provides assistance for children and

18  adults to purchase and access nutritious foods. The program combines federally

19  _____

20          [13]  Wash. Rev. Code § 74.04.660(3)(a); Wash. Admin. Code

21  § 388-436-0015.

22          [14] Wash. Rev. Code § 74.08A.100

DECLARATION OF SARAH K.
PETERSON
NO. 4:19-cv-05210-RMP

11

1    funded SNAP and the state-funded Food Assistance Program for Legal

2    Immigrants (FAP). FAP is used for individuals who are lawfully present and meet

3    all eligibility requirements for SNAP except citizenship or immigration status.[15]

4    To qualify for Basic Food, a household's earnings must fall below 200%

5    ($41,560 for a family of three) of the federal poverty level.

6         The Supplemental Nutrition Assistance Program (SNAP) was created in

7    1977. SNAP provides food purchasing assistance to low-income individuals and

8    families. *See* 7 U.S.C. § 2013 (2018). SNAP benefits are provided on a

9    "household" basis. In federal law, a SNAP "household" means "an individual

10   who lives alone or who, while living with others, customarily purchases food and

11   prepares meals for home consumption separate and apart from the others; or a

12   group of individuals who live together and customarily purchase food and

13   prepare meals together for home consumption." 7 U.S.C. § 2012(m). SNAP

14   households may use the benefit to purchase food at one of the quarter million

15   retailers authorized by the Food and Nutrition Service to participate in the

16   program.

17        Federal law lays out SNAP eligibility rules and benefit amounts. To

18   qualify for benefits, a SNAP household's income generally must be at or below

19   130% of the federal poverty level, the household's net monthly income (after

20   deductions for expenses like housing and child care) must be less than or equal

21   _____

22        [15] Wash. Admin. Code § 388-400-0050.

DECLARATION OF SARAH K.                    12        ATTORNEY GENERAL OF WASHINGTON
PETERSON                                                  8127 W. Klamath Court, Suite A
NO. 4:19-cv-05210-RMP                                        Kennewick, WA 99336
                                                              (509) 734-7285

1    to 100% of the federal poverty level, and its assets must fall below limits

2    identified in federal regulations.[16] The average monthly benefit per household is

3    $253, and the average monthly benefit per person is $125 per month, or $1.40

4    per meal. *Id.*

5        For SNAP, adult immigrants with Lawful Permanent Residency (LPR)

6    status are eligible after five years. Immigrant children with LPR status are eligible

7    without a waiting period.

8        In addition to cash and food assistance, Washington has an associated

9    employment and training programs connected to each program that are likely to

10    be impacted by the new Public Charge Rule. Washington's WorkFirst program

11    is for families receiving TANF or SFA. WorkFirst provides families with

12    opportunities to engage in work activities that support financial stability and

13    resilience. As part of the WorkFirst Program, ORIA offers the Limited English

14    Proficiency (LEP) Pathway Program to offer employment services, job skills

15    training, and English as a Second Language (ESL) services to nearly 5,000 people

16    each year, the majority of whom are refugees and immigrants. DSHS infuses

17    state-funding into this program to be able to serve those non-citizens who may

18    be ineligible for federally-funded services.

19    ———————————

20        [16] *See* A Quick Guide to SNAP Eligibility and Benefits, Ctr. on Budget &

21    Pol'y Priorities, https://www.cbpp.org/research/a-quick-guide-to-snap-eligibility

22    -and-benefits (last updated Sept. 14, 2017).

DECLARATION OF SARAH K. PETERSON
NO. 4:19-cv-05210-RMP

13

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    The Washington State Basic Food Employment and Training (BFET) program

2    provides job search, job search training, self-directed job search, educational

3    services, skills training, and other employment opportunities to Basic Food

4    (SNAP) recipients who are not participating in the Temporary Assistance for

5    Needy Families WorkFirst work program. BFET is an important part of the

6    state's comprehensive workforce development system serving the needs of

7    low-income individuals, displaced workers, and employers by encouraging

8    financial independence from public assistance through skill acquisition, personal

9    responsibility and gainful employment. Washington also dedicates state-funding

10   to support a BFET program designed specifically to provide culturally and

11   linguistically appropriate services to more than 1,000 non-citizens in

12   Washington. This program is only available to people who are qualified for

13   federal benefits. People currently receiving services offered by Washington's

14   WorkFirst Programs or Basic Food Employment and Training, which require

15   enrollment in either TANF/SFA or SNAP for eligibility, will no longer be able

16   to access these important programs if they refuse to participate in the associated

17   federal program.

18        10.    ESA staff serving in the Community Services Office have reported

19   seeing an increase in the number of immigrant families asking to withdraw from

20   food and cash assistance programs. These reports indicate that the reason for

21   exiting the program is not due to income or employment, rather a report of

22   concern and fear related to the public charge ruling. Anecdotal reports from ESA

staff increased in the winter of 2017 when a proposed Executive Order on the public charge rule leaked to the media. It received wide attention in ethnic-specific newspapers and radio. Similarly, ORIA receives frequent reports from community-based providers that people that seek their services are reluctant to access public assistance programs, such as cash and food stamps and also Medicaid, WIC, and even school lunch programs. Even when someone is eligible, staff from community organizations indicate fear being a strong motivator in the community to avoid participating in certain government funded programs.

In addition to anecdotal evidence, ESA has received multiple cases of immigrant families wanting to repay their cash and medical assistance costs. In February 2018, ESA's Division of Finance and Financial Recovery communicated with several immigrant clients who had received public assistance. They indicated that they had been advised to repay the amount they had receive in public assistance to avoid incurring complications with their immigration petitions. This type of interaction was new for ESA, and it is difficult for staff to provide clients with accurate information and assistance around on complex policy that could have a significant impact on their lives and livelihoods.

11. In May 2019, approximately 57,071 adults and children in Washington received federal or state-funded cash assistance (TANF/SFA). Out of this population, 2,070 were non-citizen adults, 1,458 were citizen children with

DECLARATION OF SARAH K.
PETERSON
NO. 4:19-cv-05210-RMP

15

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

non-citizen adult family members, and 2,041 were non-citizen children.[17] Non-citizen recipients of cash assistance (including citizen children with non-citizen adult family members) represent approximately 10% of the total caseload. During the same month, 849,499 adults and children received federal or state-funded food assistance (SNAP/FAP). Out of this population, 48,338 were non-citizen adults, 26,794 were citizen children non-citizen adults, and 11,641 were non-citizen children.[18] Non-citizen recipients of food assistance (including citizen children with non-citizen adult family members) represented approximately 10% of the total monthly caseload. Any of the monthly caseload of non-citizen recipients could be impacted either by the public charge rule directly or by the fear and lack of information related to it.

**B.   Harms to Agency Mission or Broader Harms**

12.   The Department of Justice noted the importance of providing comprehensive social and health services to all residents when it proposed changes to the Inadmissibility and Deportability on Public Charge Grounds rule in 1999, due to fear and confusion surrounding public charge at the time,

> This situation is becoming particularly acute with respect to the provision of emergency and other medical assistance, children' immunizations, and basic nutrition programs, as well as the

---

[17]  DSHS/ESA/Office of the Assistant Secretary/EMAPS Assignment #M4567 using the ACES Data Warehouse, updated July 2019.

[18]  IBD

DECLARATION OF SARAH K. PETERSON
NO. 4:19-cv-05210-RMP

16

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

treatment of communicable diseases. Immigrants' fears of obtaining these necessary medical and other benefits are not only causing them considerable harm, but are also jeopardizing the general public. For example, infectious diseases may spread as the numbers of immigrants who decline immunization services increase. Concern over the public charge issue is further preventing [immigrants] from applying for available supplemental benefits, such as child care and transportation vouchers, that are designed to aid individuals in gaining and maintaining employment. In short . . . [the fear and confusion around Public Charge] is undermining the Government's policies of increasing access to health care and helping people to become self-sufficient.[19]

One of ESA's core missions is to reduce the number of people living in poverty. Federal and state cash and food assistance programs help to keep people from living in deep poverty without food, housing, and basic essentials. Many other ESA programs, such as those administered by the Office of Refugee and Immigrant Assistance provide support services and resources to help people gain skills and employment and eliminate barriers to becoming economically stable in their communities. The proposed public charge rule creates walls that prevent ESA from being able to reach Washingtonians who may be non-citizens. ESA's Office of Refugee and Immigrant Assistance administers a program that helps low-income immigrants and refugees apply for U.S. citizenship. The public

---

[19] 64 Fed. Reg. 28676 (May 26, 1999), www.gpo.gov/fdsys/pkg/FR-1999-05-26/html/99-13188.htm (last visited August 1, 2019)

DECLARATION OF SARAH K. PETERSON
NO. 4:19-cv-05210-RMP

17

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1    charge rule may prevent individuals and families from receiving the resources

2    and supports that they need to thrive and become fully integrated into our local

3    communities through naturalization.

4

5    13.    The Washington Department of Social and Health Services

6    developed estimates of the impact of the proposed rules on the use of food, cash,

7    and medical assistance for the programs identified above. While we developed

8    these estimates in response to the proposed rule, having now reviewed the final

9    rule, there has been no change that would materially change these estimates. For

10    each program, the number of affected families and total expenditures for cases

11    including persons other than a U.S. citizen were identified for the month of

12    August 2018. To forecast program expenditures through CY 2021, for purposes

13    of these calculations, we assumed that caseloads associated with noncitizens

14    would remain constant at August 2018 levels.

15    Following the approach taken in national estimates developed by the

16    Kaiser Family Foundation, we estimated that when fully implemented, the

17    proposed rules would lead to disenrollment rates ranging from 15% to 35%

18    among food, cash, and medical assistance enrollees in cases including a

19    noncitizen.[20] These estimates reflect impacts on noncitizens without Legal

20    _____

21    [20] *See* S. Artiga, R. Garfield, A. Damico, *Estimated Impacts of the*

22    *Proposed Public Charge Rule on Immigrants and Medicaid* (Henry J. Kaiser

DECLARATION OF SARAH K.
PETERSON
NO. 4:19-cv-05210-RMP

18

1    Permanent Residence (LPR) status who would withdraw because participation in

2    the program could negatively affect their chances of attaining LPR status, as well

3    as disenrollment resulting from a "chilling effect" among a broader group of

4    enrollees in immigrant families, including effects on their U.S. born children. The

5    assumed disenrollment rate range draws from previous research on the effect of

6    welfare reform era rule changes on enrollment in health coverage among

7    immigrant families.[21]

8         With regard to participation in food or cash assistance programs

9    administered by the DSHS Economic Services Administration, we estimate that

10   at full implementation the Proposed Rules will cause:

11   •    $23.7 to $55.3 million annual reduction in food and cash assistance
          to needy families;

12

13   •    $41.8 to $97.5 million annual reduction in total economic output;

14   _____

15   Family Foundation Oct. 11, 2018), https://www.kff.org/disparities-policy/issue-

16   brief/estimated-impacts-of-the-proposed-public-charge-rule-on-immigrants-and

17   -medicaid/ [last accessed Dec. 1, 2018].

18        [21] *See* N. Kaushal and R. Kaestner, *Welfare Reform and Health Insurance*

19   *of Immigrants*, 40(3) Health Serv. Res. 697-722 (June 2005), https://www.ncbi.

20   nlm.nih.gov/pmc/articles/PMC1361164/ [last accessed Dec. 1, 2018]; M. Fix and

21   J. Passel, *Trends in Noncitizens' and Citizens' Use of Public Benefits Following*

22   *Welfare Reform 1994-97* (The Urban Institute March 1, 1999).

DECLARATION OF SARAH K.
PETERSON
NO. 4:19-cv-05210-RMP                    19            ATTORNEY GENERAL OF WASHINGTON
                                                        8127 W. Klamath Court, Suite A
                                                        Kennewick, WA 99336
                                                        (509) 734-7285

- •    $15.7 to $36.7 million annual reduction in wages, salaries, and benefits for workers; and

- •    the destruction of 334 to 782 jobs.

The Washington economy would be directly impacted due to a reduction in economic activity in industries that include retailers such as grocery stores and other merchants, transportation services, rental housing, and education and child care services. Each of the direct impacts in these economic sectors are estimated in terms of their change in output in their respective sector.

Further, the Washington State Input-Output (I-O) model was used to calculate the indirect economic impacts of the Proposed Rules from multiplier effects flowing from the direct impacts of reduced assistance to needy families. As the direct impact ripples through the State's economy, the I-O model projected the loss of economic activity, labor income, and jobs noted above.[22]

## C.    Pecuniary or Direct Harms to Agency

14.    Any decrease in federal funding for the direct client services provided through ESA will also impact ESA's administrative funding. ESA's administrative cost structure is a "benefitting methodology" that attributes costs to all fund sources, including TANF and SNAP, based on the level of benefit each program counts from ESA's administrative functions. If the federally

_____

[22] Beyers, William; and Lin, Ta-Win; *The 2007 Washington Input-Output Study* *https://www.ofm.wa.gov/washington-data-research/economy-and-labor-force/washington-input-output-model/2007-washington-input-output-model*.

1   funded portion from TANF and SNAP decreases and the state funded portion

2   increases, the balance of state and federal funding changes to align with that shift

3   resulting in increased administrative costs to Washington.

4   **D.   Harms to Individuals Served by Agency**

5          15.    Since the formal release of the proposed changes to the public

6   charge rule in October 2018, I have been working with ESA's Management

7   Accountability and Performance Statistics (EMAPS) team to analyze the monthly

8   caseload data for cash and food assistance programs for July 2015 to the present.

9   The data is disaggregated for citizen and non-citizen children and adults. The data

10  shows an overall percent decline in both the TANF and SNAP average monthly

11  caseloads for both citizens and noncitizens.  However, the pace of decline in the

12  non-citizen caseload is notably faster than the citizen caseload, suggesting that

13  factors above improving economic conditions may be at play.

14         Between 2017 and 2018, a period in which the federal administration made

15  significant changes to refugee resettlement policy and also leaked information on

16  a proposed change to the public charge policy, the non-citizen average monthly

17  caseload for adults receiving TANF declined by 20%, compared to five percent

18  for the citizen adult caseload. During the same period, the non-citizen child

19  TANF caseload declined by 23%, compared to a five percent decline for the

20  citizen child caseload (note that "mixed status" households – children who are

21  citizens living with adult non-citizens – also experienced a larger decline than

22  citizen households, but not as dramatic).

DECLARATION OF SARAH K.
PETERSON
NO. 4:19-cv-05210-RMP

21

1    A similar, though less dramatic decline occurred for families in the

2  SNAP/FAP program. Between 2017 and 2018, the decline in the non-citizen

3  adult average monthly caseload (7.4%) was double that of the citizen adult case

4  load (3.7%). The data for the SNAP/FAP program participation for non-citizen

5  children declined at a slower rate than for citizen children.  Citizen children with

6  non-citizen adults, however, declined by 11% compared with 9% for the citizen

7  children.

8    This analysis suggests that the overall federal immigrant and refugee

9  policy climate is likely having a chill effect on participation, even if it is not

10  possible to attribute the declines to any one policy (e.g., public charge). For

11  example, under the current administration there has been an overall decline in

12  refugee resettlement, as well as discussion of public charge, both of which may

13  be contributing to the decline above and beyond the effects of an improving

14  economy.

15

16

17

18

19

20

21

22

DECLARATION OF SARAH K.
PETERSON
NO. 4:19-cv-05210-RMP

22

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

**Chart 1. Percent change in Adults and Child TANF/SFA Caseload, Washington State 2017 to 2018:**



**Chart 2. Percent change in Adults and Child SNAP/FAP Caseload, Washington State 2017 – 2018:**



DECLARATION OF SARAH K.
PETERSON
NO. 4:19-cv-05210-RMP

23

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1      16.    Following the approach taken in national estimates developed by the

2 Kaiser Family Foundation, we estimate that when fully implemented, the final

3 rule could lead to disenrollment rates ranging from 15 to 35% among food, cash,

4 and medical assistance enrollees in cases including a non-citizen.[23] These

5 estimates reflect impacts on non-citizens without LPR status who would

6 withdraw because participation in the program could negatively affect their

7 chances of attaining LPR status, as well as disenrollment resulting from a

8 "chilling effect" among a broader group of enrollees in immigrant families,

9 including effects on their U.S. born children. The assumed disenrollment rate

10 range draws from previous research on the effect of welfare reform era rule

11 changes on enrollment in health coverage among immigrant families.[24]

12 _____

13 [23] *See* S. Artiga, R. Garfield, A. Damico, *Estimated Impacts of the*

14 *Proposed Public Charge Rule on Immigrants and Medicaid* (Henry J. Kaiser

15 Family Foundation Oct. 11, 2018), https://www.kff.org/disparities-policy/issue-

16 brief/estimated-impacts-of-the-proposed-public-charge-rule-on-immigrants-and

17 -medicaid/ [last accessed Dec. 1, 2018].

18 [24] *See* N. Kaushal and R. Kaestner, *Welfare Reform and Health Insurance*

19 *of Immigrants*, 40(3) Health Serv. Res. 697-722 (June 2005),

20 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1361164/ [last accessed

21 Dec. 1, 2018]; M. Fix and J. Passel, *Trends in Noncitizens' and Citizens' Use of*

22 *Public Benefits Following Welfare Reform 1994-97* (The Urban Institute

DECLARATION OF SARAH K. PETERSON
NO. 4:19-cv-05210-RMP

24

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285

1        I declare under penalty of perjury under the laws of the State of

2    Washington and the United States that the foregoing is true and correct.

3        DATED this **5** day of September, 2019, at *Seattle*_____, WA.

4

5    _____
     SARAH K. PETERSON
6    Washington State Refugee Coordinator
     Chief of ORIA
7    Community Services Division of the
     Economic Services Administration,
8    Washington Department of Social and
     Health Services

9

10

11

12

13

14

15

16

17

18

19    _____

20    March 1, 1999), https://www.urban.org/research/publication/trends-noncitizens-

21    and-citizens-use-public-benefits-following-welfare-reform/view/full_report [last

22    accessed Dec. 7, 2018].

DECLARATION OF SARAH K.              25          ATTORNEY GENERAL OF WASHINGTON
PETERSON                                              8127 W. Klamath Court, Suite A
NO. 4:19-cv-05210-RMP                                      Kennewick, WA 99336
                                                             (509) 734-7285

1

## <u>DECLARATION OF SERVICE</u>

2       I hereby declare that on this day I caused the foregoing document to be

3   electronically filed with the Clerk of the Court using the Court's CM/ECF System

4   which will serve a copy of this document upon all counsel of record.

5       DATED this 6th day of September, 2019, at Tumwater, Washington.

6

7               */s/ Sara M. Cearley*
                SARA M. CEARLEY
8               Paralegal

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ATTORNEY GENERAL OF WASHINGTON
8127 W. Klamath Court, Suite A
Kennewick, WA 99336
(509) 734-7285