1  Christopher B. Durbin (WSBA No. 41159)
   1700 Seventh Ave., Suite 1900
2  Seattle, WA 98101-1355
   Telephone: (206) 452-8700
3  Fax: (206) 452-8800
   Email: cdurbin@cooley.com
4
   *Attorneys for proposed amici curiae* AMERICAN
5  ACADEMY OF PEDIATRICS, AMERICAN MEDICAL
   ASSOCIATION, AMERICAN COLLEGE OF PHYSICIANS,
6  WASHINGTON CHAPTER OF AMERICAN ACADEMY OF
   PEDIATRICS, and WASHINGTON STATE MEDICAL
7  ASSOCIATION

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Sep 19, 2019

SEAN F. McAVOY, CLERK

8
9              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF WASHINGTON
10

11  STATE OF WASHINGTON, *et al.*,          Case No. 4:19-cv-5210-RMP

12              Plaintiff,                   **BRIEF OF *AMICI CURIAE***
                                            **AMERICAN ACADEMY OF**
13      v.                                  **PEDIATRICS, AMERICAN MEDICAL**
                                            **ASSOCIATION, AMERICAN**
14  UNITED STATES DEPARTMENT                **COLLEGE OF PHYSICIANS,**
    OF HOMELAND SECURITY, *et al.*,         **WASHINGTON CHAPTER OF THE**
15                                          **AMERICAN ACADEMY OF**
                Defendant.                  **PEDIATRICS, AND WASHINGTON**
16                                          **STATE MEDICAL ASSOCIATION IN**
                                            **SUPPORT OF PLAINTIFFS' MOTION**
17                                          **FOR PRELIMINARY INJUNCTION**

18                                          NOTING DATE:  October 15, 2019

19                                          Without Oral Argument
20
21
22
23
24
25
26
27
28

*AMICI CURIAE* BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION
CASE NO. 4:19-cv-5210-RMP

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

# TABLE OF CONTENTS

PAGE

STATEMENT OF INTEREST ................................................................ 1

BACKGROUND AND SUMMARY OF ARGUMENT .............................. 2

ARGUMENT .................................................................................... 4

I.    THE PUBLIC CHARGE REGULATION TARGETS KEY HEALTH AND NUTRITION PROGRAMS AND ALLOWS FOR DISCRIMINATORY DECISION MAKING .................................................................................... 4

    A.    Utilization of Essential Health and Nutrition Programs Are Targeted by the Regulation ................................................ 5

    B.    The Totality of the Circumstances Test Is so Vague It Will Result In Discriminatory Decision Making ........................... 6

II.   BOTH CITIZEN AND NON-CITIZEN CHILDREN WILL BE HARMED BY THE PUBLIC CHARGE REGULATION ........................................... 8

    A.    The Totality of Circumstances Test Will Disproportionally Impact Non-Citizen Children ................................................ 8

    B.    Children's Health Will Be Harmed by the Public Charge Regulation ............................................................... 9

III.  THE PUBLIC CHARGE REGULATION WILL ACT AS A BARRIER TO HEALTH CARE FOR PREGNANT AND POSTPARTUM WOMEN .............................. 14

    A.    The Totality of Circumstances Test Will Disproportionally Impact Pregnant and Postpartum Women ................................ 15

    B.    Pregnant and Postpartum Women Will Be Directly Harmed by the Public Charge Regulation .......................................... 15

IV.   THE PUBLIC CHARGE REGULATION WILL ALSO PARTICULARLY HARM INDIVIDUALS WITH DISABILITIES AND CHRONIC HEALTH CONDITIONS ........... 19

    A.    The Totality of Circumstances Test Will Disproportionally Impact Individuals with Disabilities ....................................... 19

    B.    Individuals with Disabilities Will Suffer Negative Consequences to Their Health and Well-Being ........................ 19

CONCLUSION ............................................................................... 21

*AMICI CURIAE* BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION
CASE NO. 4:19-cv-5210-RMP

i

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

# TABLE OF AUTHORITIES

**PAGE(S)**

**STATUTES**

8 U.S.C. § 1182(a)(4)(A) ...................................................................... 3

Immigration and Nationality Act, Section 212(a)(4) ............................. 3

§212.22(c)(1)(iii) ................................................................................... 9

**OTHER AUTHORITIES**

8 C.F.R.
    § 212.21 ........................................................................................ 4
    § 212.21(a) .................................................................................... 3
    § 212.21(a)(5)(iv) ......................................................................... 9
    § 212.21(b) .................................................................................... 5
    § 212.21(d)(2) ............................................................................... 8
    § 212.22(a) .................................................................................... 6
    § 212.22(a), (b) ............................................................................. 3
    § 212.22(b)(1) ............................................................................... 8
    § 212.22(b)(2) .......................................................................... 9, 135
    § 212.22(b)(2)(i) ........................................................................... 6
    § 212.22(b)(2)(ii) .......................................................................... 7
    § 212.22(b)(3) ............................................................................... 8
    § 212.22(b)(5) ............................................................................... 8
    § 212.22(b), (c) ............................................................................. 6
    § 212.22(c) .................................................................................... 3
    § 212.22(c)(1) ............................................................................. 15
    § 212.22(c)(1)(iii)(B) ................................................................. 15
    § 213.1(b) ................................................................................... 15

42 C.F.R. §34 *et seq* ........................................................................... 7

64 Fed. Reg. 28689-01 (May 26, 1999) ............................................... 3

84 Fed. Reg. 41292-01 (Aug. 14, 2019) .......................................*passim*

*AMICI CURIAE* **BRIEF I/S/O PLTF.'S**
**MOTION FOR PRELIM. INJUNCTION**
CASE NO. 4:19-cv-5210-RMP

ii

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

### STATEMENT OF INTEREST

The American Academy of Pediatrics ("AAP"), the American Medical Association ("AMA"), the American College of Physicians ("ACP"), the Washington Chapter of the American Academy of Pediatrics (WCAAP), and the Washington State Medical Association (WSMA) (collectively, "*Amici*") respectfully submit this brief as *amici curiae* in support of Plaintiffs' Motion for Preliminary Injunction. *Amici* are leading medical organizations in the United States whose members collectively provide medical care to the most vulnerable groups of people in society, including children, pregnant women, and persons who are disabled or those who suffer from chronic illnesses.

The AAP is a non-profit professional membership organization of 67,000 primary care pediatricians and pediatric medical subspecialists, and pediatric surgical specialists dedicated to the health and well-being of infants, children, adolescents, and young adults. AAP believes that the future prosperity and well-being of the United States depends on the health and vitality of all of its children, without exception. Access to health care, nutrition, and housing assistance programs ensures that children grow up healthy and strong. AAP is uniquely positioned to understand the impact of the Administration's public charge regulation on the health of vulnerable populations, including children.

Amicus curiae the AMA is the largest professional association of physicians, residents and medical students in the United States. Additionally, through state and specialty medical societies and other physician groups seated in its House of Delegates, substantially all U.S. physicians, residents and medical students are represented in the AMA's policy making process. AMA members practice in every state and in every medical specialty. The AMA was founded in 1847 to promote the art and science of medicine and the betterment of public health, and these remain its core purposes. The AMA joins this brief on its own behalf and as a representative of the Litigation Center of the AMA and the State Medical Societies. The Litigation Center is a coalition among

*AMICI CURIAE* BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION
CASE NO. 4:19-cv-5210-RMP

1

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

the AMA and the medical societies of each state and the District of Columbia, whose mission is to advance the interests of the medical profession and their patients in the courts. The AMA is exceptionally well-suited to appreciate the impact of the Regulation on the health of vulnerable populations.

Amicus curiae the ACP is the largest medical specialty organization and the second-largest physician group in the United States. ACP members include 159,000 internal medicine physicians (internists), related subspecialists, and medical students. Internal medicine physicians are specialists who apply scientific knowledge and clinical expertise to the diagnosis, treatment, and compassionate care of adults across the spectrum from health to complex illness.

Amicus curiae WCAAP represents over 1100 pediatric health care providers from across Washington State. WCAAP's mission is to optimize the health and well-being of children and their families while advancing pediatric care. WCAAP frames and leads the public discussion on child health issues, advances public policy to benefit children, and empowers pediatricians to provide quality medical care.

Amicus curiae WSMA represents 11,300 physicians, residents, medical students and physician assistants throughout Washington state. Our mission is to advance strong physician leadership and advocacy to shape the future of medicine and advance quality care for all Washingtonians. Our vision: to make Washington the best place to practice medicine and to receive care.

*Amici* submit this brief in support of Plaintiffs' motion for preliminary injunction to highlight for the Court the immediate and irreparable harm that will impact millions of vulnerable individuals if Plaintiffs' motion is denied.

## BACKGROUND AND SUMMARY OF ARGUMENT

The United States Department of Homeland Security ("DHS") has drastically overhauled decades of precedent and Congressional intent by promulgating *Inadmissiblity on Public Charge Grounds*, 84 Fed. Reg. 41292-01 (Aug. 14, 2019) (the "Regulation"). The Regulation dramatically alters the factors considered by

AMICI CURIAE BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION
CASE NO. 4:19-cv-5210-RMP

2

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

immigration officials in evaluating whether a non-citizen seeking to immigrate or adjust their immigration status will become a "public charge."[1]  Prior to this Regulation, public charge referred to an individual who was likely to become primarily dependent on the government, such as someone who received cash assistance for income maintenance or was institutionalized in a government-funded long-term care facility.[2]  The use of benefits such as health services or nutrition assistance were not considered in the public charge determination.

The Regulation now interprets public charge to be an  immigrant "who receives one or more public benefits,…for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months.)"[3]  The definition of "public benefits" has also been enlarged to now include health, nutrition, and housing programs such as non-emergency Medicaid for non-pregnant adults and Supplemental Nutritional Assistance Program ("SNAP").

Application of the Regulation's totality of the circumstances test and consideration of the minimum factors[4] (age, health, family status, education and skills, and financial status) will have a disparate impact on certain groups including children, pregnant women, and persons suffering from disabilities and chronic health conditions. The receipt of public benefits is deemed to be a "_heavily weighted_" negative factor,[5]

---

[1] Under Section 212(a)(4) of the Immigration and Nationality Act ("INA"), an individual seeking admission to the United States or seeking to adjust status is inadmissible if the individual is likely at any time to become a public charge.  See 8 U.S.C. § 1182(a)(4)(A).

[2] Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28689-01 (May 26, 1999).

[3] 8 C.F.R. § 212.21(a).

[4] 8 C.F.R. § 212.22(a), (b).

[5] 8 C.F.R. § 212.22(c).

_AMICI CURIAE_ BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION
CASE NO. 4:19-cv-5210-RMP

3

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

and by expanding the definition of public benefits to include health and nutrition programs,[6] the impact of the Regulation on vulnerable populations is amplified. Though DHS claims the Regulation is intended to promote self-sufficiency, there is no evidence that chilling the use of health and nutrition benefits will result in an increase in income, employment, or educational status of immigrants.  Amici submit this brief to describe the deleterious impact this Regulation will have on the health of vulnerable populations.  These sweeping and detrimental changes will ultimately result in far greater costs to the public's health than any purported benefit offered by DHS.

## ARGUMENT

### I.  THE PUBLIC CHARGE REGULATION TARGETS KEY HEALTH AND NUTRITION PROGRAMS AND ALLOWS FOR DISCRIMINATORY DECISION MAKING.

The Regulation upends decades of settled policy with regard to public charge. Historically, an immigrant could be deemed inadmissible if an immigration official concluded that the immigrant was likely to become a public charge—interpreted to mean *primarily dependent on public assistance*.  The Regulation now broadly defines "public charge" to include anyone who has received or is likely to receive a wide range of public benefits.  The programs targeted by the Regulation include medical benefits such as Medicaid, nutrition benefits such as SNAP, and housing assistance—all of which may be integral to keep immigrants and their family members healthy, fed, and sheltered.[7]  The Regulation employs a "totality of the circumstances" test which is so all-encompassing that vulnerable populations such as children, pregnant women and individuals with disabilities are uniquely at risk for discrimination under the test simply because of their age or health status.

---

[6] 8 C.F.R. § 212.21 ((except for non-citizen immigrants under 21 years old or pregnant women or up to 60 days postpartum).

[7] 8 C.F.R. § 212.21.

*AMICI CURIAE* BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION
CASE NO. 4:19-cv-5210-RMP

4

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

### A.    Utilization of Essential Health and Nutrition Programs Are Targeted by the Regulation.

The Regulation expands the definition of "[p]ublic benefit" to include significant non-cash benefit programs including SNAP, Medicaid, and Section 8 housing benefits.[8] These types of non-cash public benefit programs have been key to upward mobility for generations of immigrants.  This expansion of the definition of public benefit will affect many immigrant families, especially those with low to moderate incomes.  For example, the Regulation gives immigration officers broad discretion to make a public charge determination based on whether an immigrant may utilize, at some point in the future, Medicaid, SNAP, or housing benefits.  Certain groups of immigrants, such as parolees or those subject to withholding of removal, would be penalized for utilizing Medicaid if they ever sought to adjust their immigration status through a family member. Immigrants with health conditions that require "extensive treatment" who receive health coverage through state-funded programs would be penalized if they cannot demonstrate an ability to purchase private insurance.

Equally significant, the Regulation's chilling effect will impact many additional families.  The Regulation has already resulted in widespread confusion and fear throughout the immigrant community, causing many to forego such assistance including assistance for which they are legally entitled under federal or state law.  In fact, there was an increase in the child uninsurance rate in 2018 to 5.5% which is largely because of a decline in children's Medicaid and CHIP coverage rates.[9]  Rates of decline

---

[8] 8 C.F.R. § 212.21(b).

[9] https://www.census.gov/library/stories/2019/09/uninsured-rate-for-children-in-2018.html (reporting that Hispanic children were more likely to be uninsured than children from other races and non-Hispanic origin groups. Between 2017 and 2018, the uninsured rate increased 1.0 percentage point for Hispanic children and 0.5 percentage points for non-Hispanic Whites).

AMICI CURIAE BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION
CASE NO. 4:19-cv-5210-RMP

5

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

1    were highest for Hispanic children.  Sadly, this puts parents and children at risk for

2    poorer health outcomes, additional economic hardship, and long-term consequences.

3        **B.    The Totality of the Circumstances Test Is so Vague It Will Result in Discriminatory Decision Making.**

4

5        The Regulation is problematic in that its application by immigration officers is

6    likely to result in inconsistent and discriminatory outcomes.  The Regulation states that

7    the public charge determination "must be based on *the totality of the alien's*

8    *circumstances by weighing all factors* that are relevant to whether the alien is more

9    likely than not…to receive one or more public benefits . . . ."[10]  While on its face, the

10    Regulation describes the determination as based on a totality of the circumstances, it is

11    anything but.  The immigration officer is instructed to consider a set of minimum factors

12    (age, health, family status, education and skills, and financial status), heavily weighted

13    negative factors (e.g., employment status, receipt of public benefits, diagnosis of an

14    extensive medical condition without adequate private insurance), and heavily weighted

15    positive factors (household income of at least 250% of the federal poverty guidelines,

16    employment with an income of at least 250% of federal poverty guidelines, and private

17    health insurance).[11]  There is no guidance provided on how to balance the competing

18    factors, especially when in many cases some factors have more impact than others.

19        Most significantly, the application of each of these factors will have a disparate

20    impact on vulnerable populations. For example, as discussed in more detail below,

21    children will automatically have their age counted against them.  In addition, the

22    inclusion of one factor in particular—"health"—will likely result in discrimination

23    across the board.  The Regulation states:

24        DHS will consider whether the alien's health makes the alien more likely

25        than not to become a public charge at any time in the future, including

26

27    [10] 8 C.F.R. § 212.22(a) (emphasis added).

28    [11] 8 C.F.R. § 212.22(b), (c).

*AMICI CURIAE* BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION
CASE NO. 4:19-cv-5210-RMP

6

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

whether the alien has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide and care for himself or herself, to attend school, or to work upon admission or adjustment of status.[12]

This implicit definition of "medical condition" is so broad as to be unworkable.  There is no guidance provided as to what "extensive medical treatment" consists of, or what type of medical condition would rise to the level of "interfer[ing]" with work or school. This vague standard could include anything from a condition requiring the use of expensive medical equipment such as a power wheelchair to a child's learning disability that requires an Individualized Education Plan.

The Regulation further provides that the immigration official can rely on evidence that includes, *but is not limited to*, (i) an immigration medical examination, or if the immigration officer finds the report to be incomplete (ii) evidence of such a medical condition.[13]  There is no further requirement of the type or quality of such "evidence," including whether the evidence must be documented by a medical professional.  Moreover, the Regulation expressly states that the immigration officer is not limited to these two categories of evidence.  The Regulation provides no restrictions on what the immigration officer can consider when evaluating an immigrant's health. This provision has the potential of allowing an immigration official to act as an unqualified medical expert, with no oversight.[14]

The Regulation expands the definition of public benefit and relies on an

---

[12] 8 C.F.R. § 212.22(b)(2)(i).

[13] 8 C.F.R. § 212.22(b)(2)(ii).

[14] Not only is it manifestly unjust for an immigration officer, with no medical training, to make a determination about the health status of an immigrant, such a scenario contravenes 42 C.F.R. §34 et seq (setting forth the requirements for medical examinations of aliens).

*Amici Curiae* Brief i/s/o Pltf.'s
Motion for Prelim. Injunction
Case No. 4:19-cv-5210-RMP

7

Cooley LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

ambiguous "totality of circumstances" test to evaluate whether an immigrant is or will become a public charge.  The application of this Regulation will have a negative impact on the health of immigrants and their families and an even more severe effect on the health of vulnerable populations, including children, pregnant women, and disabled individuals.  The impact of this rule on each of these vulnerable populations is set forth in more detail below.

## II. BOTH CITIZEN AND NON-CITIZEN CHILDREN WILL BE HARMED BY THE PUBLIC CHARGE REGULATION.

The Regulation will have a devastating impact on children in this country—increasing the likelihood that immigrant children will be designated a public charge and reducing access to health and nutrition benefits for all children, including U.S. citizens.

### A. The Totality of Circumstances Test Will Disproportionally Impact Non-Citizen Children.

Immigrant children are plainly disadvantaged by the Regulation's "totality of circumstances" public charge test.  At the very least, a child's age will count against him or her as a negative factor.[15]  A child will also be penalized by the "education and skills" factor, as it is unlikely the child could demonstrate "adequate education and skills to either obtain or maintain lawful employment."[16]  Additional negative factors are related to larger family size (implicated if the child has siblings) or if the child resides in a single parent household.[17]  If the child has a medical condition that requires

---

[15] 8 C.F.R. § 212.22(b)(1) ("When considering an alien's age, DHS will consider whether the alien's age makes the alien more likely than not to become a public charge at any time in the future, such as by impacting the alien's ability to work, including whether the alien is between the age of 18 and the minimum 'early retirement age' for Social Security . . . .").

[16] 8 C.F.R. § 212.22(b)(5).

[17] 8 C.F.R. § 212.21(d)(2); 8 C.F.R. § 212.22(b)(3).

AMICI CURIAE BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION          8
CASE NO. 4:19-cv-5210-RMP

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

"extensive medical treatment" or "interfere[s]" with the child's ability to attend school, this will count as a negative factor.[18]   One study reported that 4.8 million children in need of medical attention live in households with at least one noncitizen adult and are insured by Medicaid or CHIP.[19]   This includes a significant number of children with at least one potentially life-threatening condition or illness, including asthma, influenza, diabetes, epilepsy, or cancer.[20]   Children who live with such medical conditions and who reside in households that cannot obtain or afford private health insurance would be penalized with a heavily weighted negative factor under §212.22(c)(1)(iii).

While the Regulation exempts from the public benefits definition the receipt of Medicaid benefits by immigrants under the age of 21,[21] consideration of all the factors in the "totality of circumstances" test will make it uniquely difficult for children, particularly those with health challenges or those in lower income households, to avoid being determined a public charge.

**B.     Children's Health Will Be Harmed by the Public Charge Regulation.**

The impact of the Regulation on the health and well-being of all children in immigrant families cannot be understated.   Many such families rely on government programs for preventive, rehabilitative, habilitative, and emergency health needs as well as supplemental nutrition.   This Regulation will cause, or already has caused, families to disenroll from these programs.

---

[18] 8 C.F.R. § 212.22(b)(2).

[19] "[I]n need of medical attention" was defined in the study to be "children with a current or recent medical diagnosis, disability, and/or need for specific therapy."  Leah Zallman, *Changing Public Charge Immigration Rules: The Potential Impact on Children Who Need Care*, CALIFORNIA HEALTH CARE FOUNDATION, (October 23, 2018), https://www.chcf.org/publication/changing-public-charge-immigration-rules/.

[20] *Id.*

[21] 8 C.F.R. § 212.21(a)(5)(iv).

AMICI CURIAE BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION
CASE NO. 4:19-cv-5210-RMP

9

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

1    The Regulation will have a chilling effect on programs specifically identified,

2    such as SNAP and Medicaid.  The fear and confusion over what is covered by the

3    Regulation will also result in a chilling effect on programs that are not explicitly called

4    out, such as the Children's Health Insurance Program (CHIP), the Special Supplemental

5    Nutrition Program for Women, Infants, and Children (WIC), and state-funded Medicaid

6    programs.

7        This chilling effect is real, measurable, and exacerbated by the final Regulation.

8    When the Regulation was published, before it was even finalized, immigrant families

9    shied away from government healthcare programs and regular doctor's appointments.[22]

10   A study reported that one-seventh of all adults in immigrant families reported avoiding

11   non-cash public benefits over the past year because of fear that their legal immigration

12   status would be harmed.[23]  Low-income members of immigrant families reported even

13   higher rates of avoidance.[24]  Of this group that avoided benefits, 46% avoided nutrition

14   benefits (SNAP), 42% avoided medical benefits (Medicaid and CHIP), and 33%

15   avoided public housing subsidies.[25]  Notably, this chilling effect was measurable before

16   the final Regulation was published, and it is expected that the rates of avoidance will be

17   markedly higher once it is enforced.

18       Children will lose health coverage—whether due to chilling effects or their

19   _____

20   [22] See Lena O'Rourke, *Trump's Public Charge Proposal Is Hurting Immigrant*

21   *Families Now*, PROTECTING IMMIGRANT FAMILIES (Apr. 2019),

22   https://www.chn.org/wp-content/uploads/2019/04/ProtectingImmigrantFamilies.pdf.

23   [23] Hamutal Bernstein et al., *One in Seven Adults in Immigrant Families Reported*

24   *Avoiding Public Benefit Programs in 2018*, URBAN INSTITUTE (May 2019),

25   https://www.urban.org/sites/default/files/publication/100270/one_in_seven_adults_in_

26   immigrant_families_reported_avoiding_publi_2.pdf.

27   [24] Id.

28   [25] Id.

*AMICI CURIAE* BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION    10
CASE NO. 4:19-cv-5210-RMP

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

households being directly targeted by this Regulation—to potentially disastrous effects.[26]  A study found that disenrollment of children in need of medical care would likely contribute to child deaths and future disability.[27]  Foregoing regular treatment for such children will likely lead to increased health care costs and disastrous outcomes.[28]  For these vulnerable children, the loss of health coverage would be catastrophic.

While the loss of health coverage by parents has a significant negative impact on their children's health coverage, the converse is also true.  When parents gain access to health coverage, their children also gain access to health coverage.[29]  It is well documented that children who access health care early on have long-term improved health and educational outcomes.  For example, increased access to health insurance such as Medicaid in early childhood leads to long-term health improvements such as a decline in prevalence of high blood pressure, reduced adult hospitalizations, reduction in self-reported rates of disability, and reduced mortality in teenage and adult years.[30]

---

[26] Karpman, M. and G. Kenney, *Health Insurance Coverage for Children and Parents: Changes Between 2013 and 2017*, URBAN INSTITUTE, September 7, 2017. http://hrms.urban.org/quicktakes/health-insurance-coveragechildrenparents-march-2017.html.

[27] See Leah Zallman et al., *Implications of Changing Public Charge Immigration Rules for Children Who Need Medical Care*, JAMA PEDIATR., at E4, E5 (July 1, 2019).

[28] *See id.*

[29] Hudson, J. L., & Moriya, A. S. (2017). *Medicaid Expansion For Adults Had Measurable 'Welcome Mat' Effects On Their Children*, HEALTH AFFAIRS, 36(9), 1643-1651. doi:10.1377/hlthaff.2017.0347. https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.2017.0347

[30] Karina Wagnerman et al., *Medicaid Is A Smart Investment in Children*, (March 2017), at 4-5, https://ccf.georgetown.edu/wpcontent/uploads/2017/03/

*AMICI CURIAE* BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION
CASE NO. 4:19-cv-5210-RMP                    11

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

The benefits to providing insurance coverage to children are wide ranging, including improving children's access to health and dental care, improving parental satisfaction, and saving money.[31]  Access to health insurance during childhood also increases the likelihood of graduating from high school and attending college, as well as achieving a higher earning potential.[32]

Furthermore, access to nutritious food is fundamental to the healthy development of all children.  SNAP is the largest federal nutrition program that allows recipients to buy healthy food.  Children in immigrant families that receive SNAP benefits are more likely to be in good or excellent health, be food secure, and reside in stable housing.[33] These families have more resources to afford medical care and prescription medications, compared to families who do not participate in SNAP.[34]  Significantly, an

---

MedicaidSmartInvestment.pdf

[31] Lisa Clemens et al., *How Well Is CHIP Addressing Oral Health Care Needs and Access for Children?*, Academic Pediatrics 15:13 Suppl., (May-June 2015), https://www.sciencedirect.com/science/article/pii/S1876285915000649; Zhou J. Yu et al., *Associations among dental insurance, dental visits, and unmet needs of US children*, THE JOURNAL OF THE AMERICAN DENTAL ASSOCIATION, 148:2 (February 2017); https://www.sciencedirect.com/science/article/abs/pii/S0002817716309047; Glenn Flores et al., *The health and healthcare impact of providing insurance coverage to uninsured children: A prospective observational study*, BMC PUBLIC HEALTH, 17:553 (May 23, 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5463460/

[32] *Id.* at 5, 6.

[33] CHILDREN'S HEALTHWATCH, *Report Card On Food Security & Immigration: Helping Our Youngest First-Generation Americans To Thrive*, (February 2018), http://childrenshealthwatch.org/wp-content/uploads/Report-Card-on-Food-Insecurity-and-Immigration-Helping-Our-Youngest-First-Generation-Americans-to-Thrive.pdf.

[34] *Id.*

AMICI CURIAE BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION
CASE NO. 4:19-cv-5210-RMP

12

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

1  additional year of SNAP eligibility for young children with immigrant parents is
2  associated with significant health benefits in later childhood and adolescence.[35]

3      These results are not surprising: nutrition is one of the greatest environmental
4  influences on the development of babies in the womb and during infancy.[36]  A healthy
5  balance of essential nutrients during a child's formative periods is imperative for normal
6  brain development.[37]  Neuroscientists describe such formative periods as "critical
7  periods" and "sensitive periods" to emphasize the vulnerability of a child's developing
8  brain.[38]  During such periods, nutrient deficiencies can have irreversible long-term
9  consequences such as preventing children from fully developing their potentials in
10 sensori-motor, cognitive-language, and social-emotional functions.[39]  Such failures to
11 optimize brain development early in life have substantial and long-lasting ramifications.
12 Studies have shown that children that do not meet certain developmental milestones are
13 less likely to remain and succeed in school, less likely to earn higher incomes as adults,
14 and less likely to provide adequate nutrition and educational opportunities to their own

15

16 _____

17 [35] Chloe N. East, *The Effect of Food Stamps on Children's Health: Evidence from*
18 *Immigrants' Changing Eligibility*, Working Paper, (August 6, 2017),
19 http://www.chloeneast.com/uploads/8/9/9/7/8997263/east_fskids_r_r.pdf
20 [36] See Peter J. Morgane et al., *Effects of prenatal protein malnutrition on the*
21 *hippocampal formation,* 26 NEUROSCIENCE AND BIOBEHAVIORAL REV. 471, 474
22 (2002).
23 [37] *See* Sarah E. Cusick & Michael K. Georgieff, *The Role of Nutrition in Brain*
24 *Development: The Golden Opportunity of the "First 1000 Days"*, 175 J. PEDIATRICS
25 16 (Aug. 2016).
26 [38] *See id.*
27 [39] *See id.  See also* Susan P. Walker et al., *Child development: risk factors for adverse*
28 *outcomes in developing countries*, 369 LANCET 145 (2007).

*AMICI CURIAE* BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION          13
CASE NO. 4:19-cv-5210-RMP

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

children.[40]

Disincentivizing the use of SNAP or other public food security benefits by immigrant families will result in enduring damage to the collective health and proper development of all children in such families.[41]  Such damage will only be compounded over time as affected children suffer from higher likelihoods of falling short of their full developmental potential, lower achievement in school, and having less satisfaction from their professional careers.[42]  Access to medical care and adequate nutrition allows early identification of any issues before they become more serious or costly to treat.  Given the serious and irreparable health risks to children that will directly result from a lack of access to health and nutrition programs, enforcement of the Regulation should be enjoined.

## III.  THE PUBLIC CHARGE REGULATION WILL ACT AS A BARRIER TO HEALTH CARE FOR PREGNANT AND POSTPARTUM WOMEN.

In addition to children, the Regulation will greatly hamper the ability of pregnant and postpartum women to obtain or maintain legal immigration status. Equally important, the Regulation will have a tragic effect on the health of this population.

---

[40] *See e.g.,* Anthony Lake, *Early childhood development – global action is overdue,* 378 LANCET 1277 (Oct. 8, 2011); Patrice L. Engle et al., *Strategies for reducing inequalities and improving developmental outcomes for young children in low-income and middle-income countries,* 378 LANCET 1339 (Oct. 8, 2011); Susan P. Walker et al., *Inequality in early childhood: risk and protective factors for early child development,* 378 LANCET 1325, 1334 (Oct. 8, 2011).

[41] *See* Leah Zallman et al., *Implications of Changing Public Charge Immigration Rules for Children Who Need Medical Care*, JAMA PEDIATR., at E4-E5 (July 1, 2019).

[42] *Id.* at E5.

AMICI CURIAE BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION
CASE NO. 4:19-cv-5210-RMP

14

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

### A.    The Totality of Circumstances Test Will Disproportionally Impact Pregnant and Postpartum Women.

Under the Regulation's totality of circumstances test, women could be penalized for being pregnant or for having given birth.  As discussed above in Section I.B., the Regulation explicitly mandates that a heavily-weighted negative factor is the immigrant's "health," including diagnosis of a medical condition requiring extensive medical treatment or interfering with care, school, or work."[43]  If the individual does not have private health insurance, this will be considered as an additional heavily weighted negative factor.[44]  If an individual has one or more heavily weighted negative factor, "DHS generally will not favorably exercise discretion to allow submission of a public charge [surety] bond."[45]  A pregnant woman (or one who has recently given birth)—especially a woman who has suffered serious pregnancy-related complications—who is unable to afford private insurance to cover the birth or post-partum care will plainly be penalized.  Moreover, while the Regulation exempts receipt of Medicaid benefits for women who are pregnant and for 60 days post-partum as a factor in the public charge determination, Medicaid-eligible immigrants who utilize the program after the 60-day postpartum period would be given a "heavily weighted negative factor."[46]

### B.    Pregnant and Postpartum Women Will Be Directly Harmed by the Public Charge Regulation.

As with other vulnerable populations, the Regulation will have the effect of reducing the use of social safety net programs by pregnant women and those who recently gave birth.  These barriers to prenatal and postnatal care will have a drastic

---

[43] 8 C.F.R. § 212.22(b)(2).

[44] 8 C.F.R. § 212.22(c)(1)(iii)(B).

[45] 8 C.F.R. § 213.1(b).

[46] 8 C.F.R. § 212.22(c)(1).

*Amici Curiae* Brief i/s/o Pltf.'s
Motion for Prelim. Injunction
Case No. 4:19-cv-5210-RMP

15

Cooley LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

1  impact on the health of these women, their babies, and other family members.  Regular

2  prenatal care is proven to help prevent and detect serious pregnancy complications in

3  the mother, including hypertension, infection, and anemia.[47]  Not surprisingly, lack of

4  adequate prenatal care contributes to higher rates of maternal mortality.[48]  Foregoing

5  postpartum care, which is crucial to the health and well-being of mothers, newborns,

6  and families, could also mean that women endure postpartum depression without proper

7  medical, social, and psychological care, skip doctor's visits that address infant feeding,

8  nutrition, and physical activity, or leave other postpartum health issues unaddressed.[49]

9  _____

10  [47] Swartz JJ et al., *Expanding prenatal care to unauthorized immigrant women and the*

11  *effect on infant health*, OBSTET GYNECOL., 130(5): 938–945 (November 2017) (*citing*

12  Mbuagbaw L, Medley N, Darzi AJ, Richardson M, Habiba Garga K, Ongolo-Zogo P.,

13  *Health system and community level interventions for improving antenatal care*

14  *coverage and health outcomes*, COCHRANE DATABASE SYST REV. 2015; (12)

15  CD010994. doi: 10.1002/14651858.CD010994.pub2.)

16  [48] Jacques Balayla & Haim Arie Abenhaim,  *Inadequate Prenatal Care Utilization*

17  *and Risks of Infant Mortality and Poor Birth Outcome: A Retrospective Analysis of*

18  *28,729,765 U.S. Deliveries over 8 Years,* AMERICAN JOURNAL OF PERINATOLOGY

19  (2012), https://www.researchgate.net/profile/Jacques_Balayla2/publication/

20  230573498_Inadequate_Prenatal_Care_Utilization_and_Risks_of_Infant_Mortality_a

21  nd_Poor_Birth_Outcome_A_Retrospective_Analysis_of_28729765_US_Deliveries_o

22  ver_8_Years/links/0deec526dabeb49c3f000000/Inadequate-Prenatal-Care-Utilization-

23  and-Risks-of-Infant-Mortality-and-Poor-Birth-Outcome-A-Retrospective-Analysis-of-

24  28-729-765-US-Deliveries-over-8-Years.pdf.

25  [49] *See* The American College of Obstetricians and Gynecologists, *Ob-Gyns Stress the*

26  *Importance of Postpartum Care: The Fourth Trimester* (2016),

27  https://www.acog.org/About-ACOG/News-Room/News-Releases/2016/Ob-Gyns-

28  Stress-the-Importance-of-Postpartum-Care-The-Fourth-Trimester.

AMICI CURIAE BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION
CASE NO. 4:19-cv-5210-RMP

16

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

The lack of prenatal care can have serious implications for children, affecting their birth and early health outcomes.[50]  Prenatal care has been shown to be associated with decreased incidence of low birth weight and newborn death.[51]  For example, researchers studying the expansion of Emergency Medicaid Plus program in Oregon which resulted in expanding access to prenatal care found "a significant decrease in both the probability of extremely low birth weight infants and infant death with access to prenatal care."[52]  The decrease in infant mortality associated with expanded access to prenatal care was so great that it measured "greater than the 30-year reduction in infant mortality from Sudden Infant Death Syndrome (SIDS) associated with the "Back to Sleep" campaign."[53]

Moreover, the United States already has the highest rate of maternal deaths in the developed world and one of the highest rates of infant mortality.[54]  These rates are even higher in low-income communities and among women of color.[55]  The CDC has identified contributing factors to maternal mortality and strategies to prevent future pregnancy-related deaths.  These factors include community factors (e.g., unstable

---

[50] Megan M. Shellinger, et al., *Improved Outcomes for Hispanic Women with Gestational Diabetes Using the Centering Pregnancy Group Prenatal Care Model,* MATERNAL AND CHILD HEALTH JOURNAL (2016), https://link.springer.com/article/10.1007/s10995-016-2114-x.

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] Emily E. Petersen et al., *Vital Signs: Pregnancy-Related Deaths, United States, 2011–2015, and Strategies for Prevention, 13 States, 2013–2017*, CDC, MORB MORTAL WKLY REP (MMWR) 68(18): 423-29 (May 10, 2019) (available at http://dx.doi.org/10.15585/mmwr.mm6818e1).

[55] *Id.*

AMICI CURIAE BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION
CASE NO. 4:19-cv-5210-RMP

17

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

housing, access to clinical care, and limited access to transportation) and system factors (e.g., inadequate receipt of care and case coordination or management).  Strategies to address community factors include "increasing availability and use of group prenatal care, prioritizing pregnant and postpartum women for temporary housing programs, improving availability of transportation services covered by Medicaid, and improving access to healthy foods and promoting healthy eating habits and weight management strategies."  Strategies to address system factors include "extend[ing] expanded Medicaid coverage eligibility for pregnant women to include one year of postpartum care."  Thus even if immigrant women are not penalized for using Medicaid during their pregnancy and immediately after birth, they will be penalized for accessing these types of medical safety-net programs that are demonstrated to reduce maternal mortality.

Moreover, DHS trivializes the immense cost of inadequate prenatal care to society.  Inadequate prenatal care is associated with an increased risk of preterm babies, and the Institute of Medicine estimates that the medical costs for a preterm baby are much greater than for a healthy newborn.[56]  Specifically, the economic burden associated with preterm birth in the United States was at least $26.2 billion annually, or $51,600 per infant born preterm.[57]  To put it in perspective, the average preterm/low birth weight hospitalization cost $15,100 with a 12.9 day length of stay, whereas, an uncomplicated newborn hospitalization cost $600 with a 1.9 day stay.[58]

Unless enjoined, the Regulation is highly likely to cause irreparable damage to the health and well-being of immigrant pregnant and postpartum women, as well as the health and cognitive development of millions of infants and young children.

---

[56] Behrman RE, Butler AS. (Eds) (2007) Preterm Birth. Causes, Consequences and Prevention. Washington, DC National Academies Press.

[57] *Id.*

[58] R. B. Russell et al., *Cost of Hospitalization for Preterm and Low Birth Weight Infants in the United States*, PEDIATRICS 120.1 (2007): E1-E9.

AMICI CURIAE BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION
CASE NO. 4:19-cv-5210-RMP                      18

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

**IV.   THE PUBLIC CHARGE REGULATION WILL ALSO PARTICULARLY HARM INDIVIDUALS WITH DISABILITIES AND CHRONIC HEALTH CONDITIONS.**

The Public Charge Regulation would directly harm the health of immigrants with disabilities and make it harder for them to successfully apply for a visa or permanent legal status.  Of even greater concern, the Regulation creates a strong incentive for these individuals to avoid accessing necessary health and other non-cash benefit programs.

**A.   The Totality of Circumstances Test Will Disproportionally Impact Individuals with Disabilities.**

Receipt of non-cash public benefits including Medicaid, inadequate private insurance, and a diagnosis with a medical condition that "will require extensive medical treatment" or "interfere with the individual's ability to support himself or herself" are all heavily weighted negative factors in the public charge determination.  As a result, this Regulation will have a devastating impact on the ability of immigrants with disabilities and chronic health conditions to obtain, adjust, or maintain legal residency in the United States.

**B.   Individuals with Disabilities Will Suffer Negative Consequences to Their Health and Well-Being.**

The Regulation acts as a significant roadblock for disabled immigrants and their families to become and remain self-sufficient.  Public benefit programs, including Medicaid, are essential to facilitate educational and employment opportunities for people with disabilities and chronic conditions.  Medicaid covers primary care, preventative care, medical treatment, and supportive services for people with disabilities.[59]  For many, Medicaid is the *only* source for critical community living supports (like personal care services, nursing services, respite, intensive mental health services and employment supports).

---

[59] Congressional Research Service, Who Pays For Long-Term Services and Supports? (Aug. 22, 2018), https://fas.org/sgp/crs/misc/IF10343.pdf

*AMICI CURIAE* BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION
CASE NO. 4:19-cv-5210-RMP

19

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

There is a strong link between Medicaid and the ability of individuals with disabilities to live independently, and Medicaid is critical to help ensure that individuals with disabilities disabled individuals can attend school and work.[60]  For example, more than 150,000 individuals with disabilities participate in Medicaid buy-in programs, which provides Medicaid coverage for those who participate in the labor force.[61]  It is well documented that these Medicaid buy-in participants earn more, work more, contribute more in taxes, and rely less on food stamps than people with disabilities who are not enrolled.[62]   For individuals with intellectual or developmental disabilities, Medicaid provides more supportive services to facilitate employment.[63]  The role of

---

[60] The Center on Budget and Policy Priorities, Medicaid Works for People with Disabilities (Aug. 29, 2017), https://www.cbpp.org/research/health/medicaid-works-for-people-with-disabilities.

[61] Brigitte Gavin and Marci McCoy-Roth, *Review of studies regarding the Medicaid Buy-In Program,* BOSTON UNIVERSITY, SARGENT COLLEGE, CENTER FOR PSYCHIATRIC REHABILITATION, (2011), http://www.bu.edu/drrk/research-syntheses/psychiatric-disabilities/medicaid-buy-in/; Social Security Administration, Continued Medicaid Eligibility (Section 1619(B)), https://www.ssa.gov/disabilityresearch/wi/1619b.htm; Medicaid and CHIP Payment and Access Commission, Promoting Continuity of Medicaid Coverage among Adults under Age 65 (Mar. 2014), https://www.macpac.gov/publication/ch-2-promoting-continuity-of-medicaid-coverage-among-adults-under-age-65/.

[62] Brigitte Gavin and Marci McCoy-Roth, *supra.*

[63] Department of Health and Human Services, Centers for Medicare and Medicaid Services, Updates to the §1915 (c) Waiver Instructions and Technical Guide regarding employment and employment related services (Sept. 16, 2011), at https://downloads.cms.gov/cmsgov/archived-downloads/CMCSBulletins/downloads/CIB-9-16-11.pdf (discussing the use of waiver

*AMICI CURIAE* BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION
CASE NO. 4:19-cv-5210-RMP

20

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

Medicaid to support individuals with disabilities so that they can remain productive members of their community cannot be understated.

The number of individuals who will be irreparably harmed by the Regulation is significant. Approximately one-third of working age adults enrolled in Medicaid have a disability.[64] In 2015 people with disabilities made up 26 percent of SNAP participants.[65] Blocking or disincentivizing access to medical and nutrition benefits will result in worse medical outcomes and food insecurity for an already vulnerable population.

## CONCLUSION

The Regulation dramatically increases the likelihood that lawfully present immigrants and their families will forego health and nutrition benefits to avoid negatively impacting their immigration status. The harmful impact of this Regulation will most severely threaten the health and well-being of vulnerable children, pregnant women, and individuals with disabilities. On behalf of their patients, members, and the communities they serve, amici curiae urge this Court to grant Plaintiffs' preliminary injunction and to prevent further harm and damage to the health of these groups.

///

///

---

supports to increase employment opportunities for individuals with disabilities).

[64] *See, e.g.,* Nationwide Adult Medicaid CAHPS, *Health Care Experiences of Adults with Disabilities Enrolled in Medicaid Only: Findings from a 2014-2015 Nationwide Survey of Medicaid Beneficiaries* (2016), https://www.medicaid.gov/medicaid/quality-of-care/downloads/performance-measurement/namcahpsdisabilitybrief.pdf.

[65] Steven Carlson et al., *SNAP Provides Needed Food Assistance to Millions of People with Disabilities*, CENTER FOR BUDGET AND POLICY PRIORITIES (June 14, 2017), https://www.cbpp.org/research/food-assistance/snap-provides-needed-food-assistance-to-millions-of-people-with.

*AMICI CURIAE* BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION
CASE NO. 4:19-cv-5210-RMP

21

COOLEY LLP
1700 Seventh Ave, Ste. 1900
Seattle, WA 98101-1355
(206) 452-8700

1    Respectfully submitted this 13th day of September, 2019.

2                              By:  */s/ Christopher B. Durbin*
                                   Christopher B. Durbin (WSBA No. 41159)
3                                  1700 Seventh Avenue, Suite 1900
                                   Seattle, WA  98101-1355
4                                  Tel.: (206) 452-8700
                                   Fax: (206) 452-8800
5                                  Email: cdurbin@cooley.com

6                                  Susan Krumplitsch (*pro hac vice* pending)
                                   Elizabeth Stameshkin (*pro hac vice* pending)
7                                  Priya Arora (*pro hac vice* pending)
                                   COOLEY LLP
8                                  3175 Hanover Street
                                   Palo Alto, CA  94304-1130
9                                  Tel.: (650) 843-5000
                                   Fax: (650) 849-7400
10                                 Email: skrumplitsch@cooley.com
                                         lstameshkin@cooley.com
11                                       parora@cooley.com

12                                 *Attorneys for amici curiae* AMERICAN
                                   ACADEMY OF PEDIATRICS, AMERICAN MEDICAL
13                                 ASSOCIATION, AMERICAN COLLEGE OF
                                   PHYSICIANS, WASHINGTON CHAPTER OF
14                                 AMERICAN ACADEMY OF PEDIATRICS, and
                                   WASHINGTON STATE MEDICAL ASSOCIATION

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*AMICI CURIAE* BRIEF I/S/O PLTF.'S
MOTION FOR PRELIM. INJUNCTION
CASE NO. 4:19-cv-5210-RMP                    22                    COOLEY LLP
                                                          1700 Seventh Ave, Ste. 1900
                                                          Seattle, WA 98101-1355
                                                          (206) 452-8700