1  JOSEPH H. HUNT
   Assistant Attorney General
2  ALEXANDER K. HAAS
   Branch Director
3  ERIC J. SOSKIN
   Senior Trial Counsel
4  KERI L. BERMAN
   KUNTAL V. CHOLERA
5  JOSHUA M. KOLSKY, DC Bar No. 993430
   Trial Attorneys
6  United States Department of Justice
   Federal Programs Branch
7
8  *Attorneys for Defendants*

9
        **UNITED STATES DISTRICT COURT**
10      **EASTERN DISTRICT OF WASHINGTON**
            **AT RICHLAND**
11

12 STATE OF WASHINGTON, *et al.*,

13              Plaintiffs,              No. 4:19-cv-5210-RMP

14        v.                            DEFENDANTS' OPPOSITION TO
                                        MOTION FOR § 705 STAY
15 UNITED STATES DEPARTMENT OF          PENDING JUDICIAL REVIEW OR
   HOMELAND SECURITY, *et al.*,         FOR PRELIMINARY INJUNCTION
16
              Defendants               Motion Hearing: October 3, 2019 at
17                                      10:00 a.m.

18

19

20

21

22

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................... 1

II.   BACKGROUND .......................................................................................... 3

III.  ARGUMENT................................................................................................ 7

     A.   Plaintiffs Are Unlikely To Succeed On the Merits. ....................... 8

         1.   Plaintiffs Lack Article III Standing And Their Claims Are Unripe............................................................................... 8

         2.   Plaintiffs Are Outside the Zone of Interests Regulated by the Rule. ................................................................. 17

         3.   Plaintiffs' Substantive Claims Lack Merit........................... 18

             a.  The Rule is Consistent With the Plain Meaning of "Public Charge." ................................................ 18

             b.  The Plain Meaning of Public Charge Does Not Require Long-Term Receipt Of Government Benefits Or That Such Benefits Be Paid In Cash. .......................... 28

             c.  The Rule Properly Exercises Interpretive Authority That Congress Delegated, Implicitly and Explicitly, To The Executive Branch. ................................................ 31

             d.  The Rule's Weighted Criteria Are Not Contrary To Law.......................................................................... 33

             e.  The Rule is Not Arbitrary and Capricious. ................. 37

                1.  DHS Adequately Responded to Comments Concerning Potential Harms....................................... 38

                2.  Factors Considered as Part of the Public Charge Test Are Not Arbitrary or Capricious. .......................... 45

             f.  The Rule Does Not Violate the Rehabilitation Act. ................. 50

     B.   Plaintiffs Fail to Establish Irreparable Harm. ............................. 52

     C.   The Remaining Equitable Factors Require Denial of Plaintiffs' Motion. ................................................................. 56

     D.   The Court Should Not Grant a Nationwide Injunction or Stay of the Effective Date. ................................................................. 58

IV.  CONCLUSION................................................................................ 60

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

i

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

# TABLE OF AUTHORITIES

**CASES**

*Addington v. U.S. Airline Pilots Ass'n,*
  606 F.3d 1174 (9th Cir. 2010) .................................................................. 16

*Aguayo v. Jewell,*
  827 F.3d 1213 (9th Cir. 2016) .................................................................. 38

*All. For The Wild Rockies* ["AFWR"] *v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ...................................................... 52, 56, 57

*Am. Sec. & Tr. Co. v. Utley,*
  382 F.2d 451 (D.C. Cir. 1967) .................................................................. 30

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Service,*
  273 F.3d 1229 (9th Cir. 2001) .................................................................. 48

*Ass'n of Private Sector Colls. & Univs. v. Duncan,*
  681 F.3d 427 (D.C. Cir. 2012) .................................................................. 38

*Baker v. Johnston,*
  21 Mich. 319 (Mich. 1870) ...................................................................... 18

*Batalla Vidal v. Duke,*
  295 F. Supp. 3d 127 (E.D.N.Y. 2017) ...................................................... 10

*Bauer v. DeVos,*
  325 F. Supp. 3d 74 (D.D.C. 2018) ............................................................. 8

*Bishop Paiute Tribe v. Inyo Cty.,*
  863 F.3d 1144 (9th Cir. 2017) .................................................................. 14

*Boardman v. Pac. Seafood Grp.,*
  822 F.3d 1011 (9th Cir. 2016) ............................................................ 53, 55

*Boston v. Capen,*
  61 Mass. 116 (Mass. 1851) ...................................................................... 24

*Cacchillo v. Insmed,*
  638 F.3d 401 (2d Cir. 2011) ...................................................................... 9

*Calence, LLC v. Dimension Data Holding, PLC,*
  222 Fed. Appx. 563 (9th Cir. 2007) .......................................................... 25

*California by and through Becerra v. Azar,*
  927 F.3d 1068 (9th Cir. 2019),
  *reh'g en banc granted*, 927 F.3d 1045 (9th Cir. 2019) .............................. 38

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) ............................................................ 59, 60

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI                    ii
NO. 4:19-CV-05210-RMP

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

*Cardenas v. Anzai,*
  311 F.3d 929 (9th Cir. 2002) ................................................................ 16

*Caribbean Marine Servs. v. Baldrige,*
  844 F.2d 668 (9th Cir. 1988) ........................................................... 54, 58

*Chevron, U.S.A., Inc. v. NRDC,*
  467 U.S. 837 (1984) ...................................................................... 31, 36

*City and County of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) .............................................................. 60

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ....................................................................... 11, 13

*Clark v. Seattle,*
  899 F.3d 802 (9th Cir. 2018) ................................................................ 15

*Clarke v. Sec. Indus. Ass'n,*
  479 U.S. 388 (1987) ............................................................................ 17

*Colwell v. HHS,*
  558 F.3d 1112 (9th Cir. 2009) .............................................................. 16

*Competitive Enter. Inst. v. U.S. Dep't of Transp.,*
  863 F.3d 911 (D.C. Cir. 2017) .............................................................. 33

*Consumer Elecs. Ass'n v. FCC,*
  347 F.3d 291 (D.C. Cir. 2003) ......................................................... 40, 41

*Crane v. Johnson,*
  783 F.3d 244 (5th Cir. 2015) ................................................................ 12

*Cronin v. USDA,*
  919 F.2d 439 (7th Cir. 1990) .................................................................. 7

*Daniels Sharpsmart, Inc. v. Smith,*
  889 F.3d 608 (9th Cir. 2018) ................................................................ 52

*Davis v. PBGC,*
  571 F.3d 1288 (D.C. Cir. 2009) ............................................................ 52

*Defs. of Wildlife v. Zinke,*
  856 F.3d 1248 (9th Cir. 2017) .............................................................. 40

*Does 1-5 v. Chandler,*
  83 F.3d 1150 (9th Cir. 1996) ................................................................ 51

*Drakes Bay Oyster Co. v. Jewell,*
  747 F.3d 1073 (9th Cir. 2014) ......................................................... 56, 57

*East Bay Sanctuary Covenant v. Barr,*
  No. 19-16487, 2019 WL 3850928 (9th Cir. Aug. 16, 2019) ................. 59, 60

*Envtl. Def. Fund v. EPA,*
    922 F.3d 446 (D.C. Cir. 2019)..........................................................38

*Ex Parte Horn,*
    292 F. 455 (W.D. Wash. 1923) ..................................................22, 24

*Ex Parte Pugliese,*
    209 F. 720 (W.D.N.Y. 1913) ............................................................32

*Fed'n for Am. Immigration Reform, Inc. v. Reno,*
    93 F.3d 897 (D.C. Cir. 1996) ...........................................................18

*Food & Water Watch, Inc. v. Vilsack,*
    808 F.3d 905 (D.C. Cir. 2015) .........................................................13

*F.C.C. v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) .........................................................................40

*Gegiow v. Uhl,*
    239 U.S. 3 (1915) .............................................................................21

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018)......................................................................58

*Habeas Corpus Res. Ctr. v. U.S. DOJ,*
    816 F.3d 1241 (9th Cir. 2016)..........................................................15

*Harris Found v. FCC,*
    776 F.3d 21 (D.C. Cir. 2015)............................................................29

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) .........................................................................13

*Hellon & Associates v. Phoenix Resort Corp.,*
    958 F.2d 295 (9th Cir. 1992)............................................................51

*In Re: Application for Temporary Resident Status,*
    USCIS AAO, 2009 WL 4983092 (Sept. 14, 2009)...........................50

*In re Cirrus Logic Sec. Litig.,*
    946 F. Supp. 1446 (N.D. Cal. 1996).................................................24

*In re Feinknopf,*
    47 F. 447 (E.D. N.Y. 1891) ..............................................................23

*INS v. Jong Ha Wang,*
    450 U.S. 139 (1981) ...................................................................31, 36

*Inhabitants of Guilford v. Inhabitants of Abbott,*
    17 Me. 335 (Me. 1840) .....................................................................25

*INS v. Legalization Assistance Proj.,*
    510 U.S. 1301 (1993) .......................................................................18

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI                           iv
NO. 4:19-CV-05210-RMP

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

*Inv. Co. Inst. v. CFTC*,
   720 F.3d 370 (D.C. Cir. 2013) ................................................................. 40

*Iowa v. Block*,
   771 F.2d 347 (8th Cir. 1985) .................................................................... 12

*Iwata v. Intel Corp.*,
   349 F. sup. 2d 135 (D. Mass. 2004) ......................................................... 37

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019) .................................................................... 8

*Knutzen v. Eben Ezer Lutheran Hous. Ctr.*,
   815 F.2d 1343 (10th Cir. 1987) ......................................................... 50, 51

*L.A. Mem'l Coliseum Comm'r v. NFL*,
   634 F.2d 1197 (9th Cir. 1980) .................................................................. 57

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
   624 F.3d 1083 (9th Cir. 2010) ............................................................. 13, 14

*Lam Fung Yen v. Frick*,
   233 F. 393 (6th Cir. 1916) .................................................................. 21, 24

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ................................................................................. 17

*Lopez v. Brewer*,
   680 F.3d 1068 (9th Cir. 2012) .................................................................... 8

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................ 8, 9

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ................................................................................. 15

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ................................................................................. 59

*Martin v. California Dep't of Veterans Affairs*,
   560 F.3d 1042 (9th Cir. 2009) .................................................................. 50

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ........................................................................... 17, 18

*Matter of Harutunian*,
   14 I. & N. Dec. 583 (BIA 1974) ............................................................... 32

*Matter of Martinez-Lopez*,
   10 I & N Dec. 409 (A.G. 1962) .......................................................... 26, 44

*Matter of Perez*,
   15 I. & N. Dec. 136 (BIA 1974) ............................................................... 33

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI                    v
NO. 4:19-CV-05210-RMP

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

*Matter of Vindman*,
16 I & N Dec. 131 (Reg'l Comm'r 1977) ................................................ 32

*Munaf v. Geren*,
553 U.S. 674 (2008) ................................................................................... 8

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
696 F.3d 849 (9th Cir. 2012) .................................................................. 10

*New York v. U.S. Dep't of Labor*,
363 F. Supp. 3d 109 (D.D.C. 2019) ........................................................ 12

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998) ........................................................................... 15, 16

*Overseers of Princeton Twp. v. Overseers of S. Brunswick Twp.*,
23 N.J.L. 169 (N.J. 1851) ........................................................................ 20

*Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust*,
636 F.3d 1150 (9th Cir. 2011) ................................................................ 55

*People ex rel. Durfee v. Comm'rs of Emigration*,
27 Barb. 562 (N.Y. Gen. Term 1858) ..................................................... 29

*Pine Twp. Overseers v. Franklin Twp. Overseers*,
4 Pa. D. 715 (Pa. Quar. Sess. 1894) .................................................. 24, 42

*Poor Dist. of Edenburg v. Poor Dist. of Strattanville*,
5 Pa. Super. 516 (Pa. Super. Ct. 1897) ................................................... 29

*ProtectMarriage.com – Yes on 8 v. Bowen*,
752 F.3d 827 (9th Cir. 2014) .................................................................. 14

*Pub. Citizen, Inc. v. FAA*,
988 F.2d 186 (D.C. Cir. 1993) ................................................................ 39

*Regents of Univ. of Cal. v. DHS*,
279 F. Supp. 3d 1011 (N.D. Cal. 2018) .................................................. 10

*Rotenberry v. Commissioner of Internal Revenue*,
847 F.2d 229 (5th Cir. 1988) .................................................................. 37

*Sierra Forest Legacy v. Sherman*,
646 F.3d 1161 (9th Cir. 2011) ........................................................... 13, 54

*SIFMA v. CFTC*,
67 F. Supp. 3d 373 (D.D.C. 2014) .......................................................... 40

*Simpson v. Young*,
854 F.2d 1429 (D.C. Cir. 1988) .............................................................. 39

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009) ........................................................... 16, 57

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP                    vi

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ............................................................... 8, 9

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) .................................................. 59

*Thomas v. Anchorage Equal Rights Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) ............................................... 14

*Town of Chester v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017)............................................................ 58

*Town of Hartford v. Town of Hartland*,
    19 Vt. 392 (Vt. 1847)............................................................. 25

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018)....................................................... 10, 38

*U.S. v. Carona*,
    660 F.3d 360 (9th Cir. 2011) .................................................. 18

*U.S. v. Lipkis*,
    56 F. 427 (S.D.N.Y. 1893) ..................................................... 23

*US West Communications v. MFS Intelenet, Inc.*,
    193 F.3d 1112 (9th Cir. 1999) ............................................... 16

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ............................................... 14

*Wallis v. U.S. ex rel. Mannara*,
    273 F. 509 (2d Cir. 1921) ....................................................... 32

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ............................................................... 60

*Whitmore v. Ark.*,
    495 U.S. 149 (1990) ................................................................. 8

*Winter v. NRDC*,
    555 U.S. 7 (2008) ............................................................*passim*

*Wyoming v. U.S. Department of Interior*,
    674 F.3d 1220 (10th Cir. 2012)............................................. 12

**STATUTES**

5 U.S.C. § 705.......................................................................... 59

5 U.S.C. § 706.................................................................... 37, 38

6 U.S.C. § 542 note ................................................................... 4

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI              vii
NO. 4:19-CV-05210-RMP

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

6 U.S.C. § 557 ............................................................................................... 4

8 U.S.C. § 1182 ....................................................................................... *passim*

8 U.S.C. § 1183a ........................................................................................ 46

8 U.S.C. § 1252 ......................................................................................... 18

8 U.S.C. § 1551 note .................................................................................... 4

8 U.S.C. § 1601 ........................................................................... 3, 23, 41

8 U.S.C. § 1613 ......................................................................................... 43

8 U.S.C. § 1641 .................................................................................. 37, 43

29 U.S.C. § 794 ................................................................................ 50, 51, 52

Pub. L. No. 104-193, 110 Stat. 2105 (1996) ............................................ 5

Pub. L. No. 104-208, 110 Stat. 3009 (1996) ...................................... 2, 36

Pub. L. No. 107-296, 116 Stat. 2135 (2002) ........................................... 4

Immigration Act of 1882,
    22 Stat. 214 (1882) ....................................................................... 4, 5

Immigration Act of 1891,
    26 Stat. 1084 (1891) ............................................................... 4, 5, 21

Immigration Act of 1903,
    32 Stat. 1213 (1903) .......................................................................... 4

Immigration Act of 1917,
    39 Stat. 874 (1917) ............................................................... 4, 21, 22

Immigration and Nationality Act of 1952,
    66 Stat. 163 (1952) ........................................................................... 4

**REGULATIONS**

6 C.F.R. § 15.30 ........................................................................................ 50

22 C.F.R. § 42.91 ...................................................................................... 28

64 Fed. Reg. 28,676 (May 26, 1999) ................................................. *passim*

64 Fed. Reg. 28,689 (May 26, 1999) ................................................. *passim*

83 Fed. Reg. 51,114 (Oct. 10, 2018) ................................................. *passim*

84 Fed. Reg. 41,292 (Aug. 14, 2019) ................................................ *passim*

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI              viii
NO. 4:19-CV-05210-RMP

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

**LEGISLATIVE MATERIALS**

26 Cong. Rec. 657 (1894) ........................................................................ 23

H.R. Doc. No. 64-886 (1916) ............................................................ 26, 27

H.R. Rep. No. 104-829 (1996) (Conf. Rep.) ............................................ 2, 27

S. Rep. No. 81-1515 (1950) ......................................................... 31, 32, 33

**OTHER AUTHORITIES**

Arthur Cook, *et al.*, Immigration Laws of the U.S. (1929) ...................... 19, 23

C.H. Winfield, Words and Phrases, A Collection of Adjudicated Definitions of
Terms Used in the Law, with References to Authorities (1882).................. 19

Century Dictionary & Cyclopedia (1911) ................................................ 20

E. P. Hutchinson, Legislative History of American Immigration Policy,
1798-1965 (1981) .................................................................................. 5

Frederic Jesup Stimson, Glossary of the Common Law (1881).................... 19

Immigration Laws and Rules of January 1, 1930 with Amendments from January
1, 1930 to May 24, 1934 (1935).............................................................. 22

Stewart Rapalje *et al.*, Dict. of Am. and English Law (1888)...................... 19

## I.   INTRODUCTION

For over 135 years, Congress has restricted the admissibility of aliens who are likely, in the judgment of the Executive Branch, to become "public charges." Congress has never defined the term "public charge," but it has long been understood to mean a person who cannot provide himself with the basic needs of subsistence, and therefore imposes a burden on the public fisc to provide him with aid in obtaining those necessities. A major purpose of the public charge ground of inadmissibility is to set the expectation for immigrants that they be self-sufficient and refrain from entering the United States with the expectation of receiving public benefits, thereby ensuring that persons unable or unwilling to provide for themselves do not impose an ongoing burden on the American public. For the past two decades, the public charge ground of inadmissibility, which applies in various ways to both applications for admission to the United States and for adjustment of status to lawful permanent resident, has been governed by interim field guidance adopted without the benefit of notice-and-comment procedures.

On August 14, 2019, the Department of Homeland Security ("DHS") published *Inadmissibility on Public Charge Grounds* ("Rule") in the Federal Register. 84 Fed. Reg. 41292. This final rule is the culmination of an extensive, multi-year process to adopt regulations that prescribe how DHS will determine whether an alien applying for admission or adjustment of status is inadmissible under section 212(a)(4) of the Immigration and Nationality Act ("INA") because he is "likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4). This Rule is long overdue: in 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

1

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (1996), "to expand the public charge ground of inadmissibility" after concluding that "only a negligible number of aliens who become public charges have been deported in the last decade." H.R. Rep. 104-828, at 240-241 (1996); *see also* IIRIRA § 531 (enumerating "minimum" factors to be considered in every public charge determination). Congress therefore provided the INS with a list of factors to consider "at a minimum" in forming an "opinion" about whether an alien is "likely at any time to become a public charge." Yet for two decades, DHS has provided its officers, current and prospective immigrants, and the public with nothing more than an interim guidance document to specify how the factors are being implemented.

The Rule revises an anomalous definition of "public charge" set forth for the first time in that 1999 interim guidance to better reflect Congress's legislated policy making aliens who are likely to require public support to obtain their basic needs inadmissible. The Rule also reflects Congress's delegation of broad authority to the Executive Branch concerning the meaning of "public charge" and the establishment of procedures for forming an "opinion" about whether individual aliens are "likely at any time to become a public charge." The Rule is the product of a well-reasoned process that considered the plain text of the statute, legislative intent, statistical evidence, and the substance of hundreds of thousands of comments submitted by the public. Finally, the Rule has a limited scope: it does not apply to naturalization applications for lawful permanent residents ("LPRs"), or lead to public charge inadmissibility determinations based on the

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

2

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

receipt of Emergency Medicaid, disaster assistance, school lunches, or benefits received by U.S.-born children. Nor does it apply to refugees or asylum recipients.

Plaintiffs—a group of twelve States and the Attorney General of another State— nevertheless seek a nationwide preliminary injunction against the Rule. This Court should deny the motion. Plaintiffs, who are States rather than aliens actually governed by the Rule, cannot meet basic jurisdictional requirements, and their claims in any event are meritless. The Rule accords with the longstanding meaning of "public charge" and complies with the APA and other relevant statutes. In short, Plaintiffs provide no basis for turning their abstract policy disagreement with the Executive Branch into a stay of the effective date or a nationwide injunction.

## II.   BACKGROUND

"Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes." 8 U.S.C. § 1601(1). "[T]he immigration policy of the United States [is] that aliens within the Nation's borders not depend on public resources to meet their needs." *Id*. § 1601(2)(A). Rather, aliens must "rely on their own capabilities and the resources of their families, their sponsors, and private organizations." *Id*. Relatedly, "the availability of public benefits [is] not [to] constitute an incentive for immigration to the United States." *Id*. § 1601(2)(B).

These statutorily enumerated policies are effectuated in part through the public charge ground of inadmissibility in the INA. With certain exceptions, the INA provides that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

3

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

or adjustment of status, is likely at any time to become a public charge is inadmissible." *Id*. § 1182(a)(4)(A).[1]  An unbroken line of predecessor statutes going back to at least 1882 has contained a similar inadmissibility ground for public charges, and those statutes have, without exception, delegated to the Executive Branch the authority to determine who constitutes a public charge for purposes of that provision. *See* Immigration Act of 1882, 47th Cong. ch. 376, §§ 1-2, 22 Stat. 214 ("1882 Act"); 1891 Immigration Act, 51st Cong. ch. 551, 26 Stat. 1084 ("1891 Act"); Immigration Act of 1903, 57th Cong. ch. 1012, 32 Stat. 1213, 1214; Immigration Act of 1917, 64th Cong. ch. 29 § 3, 39 Stat. 874, 876 ("1917 Act"); INA of 1952, 82nd Cong. ch. 477, section 212(a)(15), 66 Stat. 163, 183. In IIRIRA, Congress added to these predecessor statutes by instructing that, in making public charge determinations, "the consular officer or the Attorney General shall at a minimum consider the alien's: (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills," 8 U.S.C. § 1182(a)(4)(B) (Arabic numerals substituted), but otherwise left in place the broad delegation of authority to the Executive Branch to determine who constitutes a public charge.

The longstanding denial of admission of aliens believed likely to become public charges dates from the colonial era, when a principal "concern [in] provincial and state regulation of immigration was with the coming of persons who might become a burden

---

[1] As of March 1, 2003, references to the Attorney General in the INA "shall be deemed to refer to the Secretary" of Homeland Security where they describe functions transferred to DHS by the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002). *See* 6 U.S.C. § 557 (2003); 6 U.S.C. § 542 note; 8 U.S.C. § 1551 note.

to the community," and "colonies and states sought to protect themselves by [the] exclusion of potential public charges." E. P. Hutchinson, Legislative History of American Immigration Policy, 1798-1965 at 410 (1981). Provisions requiring the exclusion and deportation of public charges emerged in federal law in the late 19th century. *See, e.g.*, 1882 Act at 214 (excluding any immigrant "unable to take care of himself or herself without becoming a public charge"); 1891 Act § 11, 26 Stat. at 1086 (providing for deportation of "any alien who becomes a public charge within one year after his arrival in the United States from causes existing prior to his landing").

In 1996, Congress enacted immigration and welfare reform statutes that bear on the public charge determination. IIRIRA strengthened the enforcement of the public charge inadmissibility ground in several ways. Besides codifying mandatory factors for immigration officers to consider, *see supra*, it raised the standards and responsibilities for persons who must "sponsor" an alien by pledging to bear financial responsibility for that immigrant and requiring that sponsors demonstrate sufficient means to support the alien. Contemporaneously, the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), Pub. L. No. 104-193, 110 Stat. 2105 (1996), restricted most aliens from accessing many public support programs, including Supplemental Security Income ("SSI") and nutrition programs. PRWORA also made the sponsorship requirements in IIRIRA legally enforceable against sponsors.

In light of the 1996 legislative developments, the INS attempted in 1999 to engage in formal rulemaking to guide immigration officers, aliens, and the public in understanding public charge determinations. *See Inadmissibility and Deportability on*

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

5

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

*Public Charge Grounds*, 64 Fed. Reg. 28676 (May 26, 1999) ("1999 NPRM"). No final rule was ever issued, however. Instead, the agency adopted the 1999 NPRM interpretation on an interim basis by publishing *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28689 (May 26, 1999) ("1999 Interim Field Guidance"). The 1999 Interim Field Guidance dramatically narrowed the public charge inadmissibility ground by defining "public charge" as a person "primarily dependent on the government for subsistence," *id*., and by barring immigration officers from considering any non-cash public benefits, regardless of the value or length of receipt, as part of the public charge determination. *See* 64 Fed. Reg. at 28678-79. Under that standard, an alien receiving Medicaid, food stamps, and public housing, but no cash assistance, would have been treated as no more likely to become a public charge than an alien who was entirely self-sufficient.

The Rule revises this approach and adopts, through notice-and-comment rulemaking, a well-reasoned definition of public charge providing practical guidance to Executive Branch officials making public charge inadmissibility determinations. DHS began by publishing a Notice of Proposed Rulemaking, comprising 182 pages of description, evidence, and analysis. *See Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51114 (Oct. 10, 2018) ("NPRM"). The NPRM provided a 60-day public comment period, during which 266,077 comments were collected. *See* Rule at 41297. After considering these comments, DHS published the Rule, addressing comments, making several revisions to the proposed rule, and providing over 200 pages of analysis in support of its decision. Among the Rule's major components are provisions defining

"public charge" and "public benefit" (which are not defined in the statute), an enumeration of factors to be considered in the totality of the circumstances when making a public charge determination, and a requirement that aliens seeking an extension of stay or a change of status show that they have not received public support in excess of the Rule's threshold since obtaining nonimmigrant status. The Rule supersedes the Interim Field Guidance definition of "public charge," establishing a new definition based on a minimum time threshold for the receipt of public benefits. Under this "12/36 standard," a public charge is an alien who receives designated public benefits for more than 12 months in the aggregate within a 36-month period. *Id*. at 41297. Such "public benefits" are extended by the Rule to include many non-cash benefits: with some exceptions, an alien's participation in the Supplemental Nutrition Assistance Program ("SNAP"), Section 8 Housing Programs, Medicaid, and Public Housing may now be considered as part of the public charge inadmissibility determination. *Id.* at 41501-02. The Rule also enumerates a non-exclusive list of factors for assessing whether an alien is likely at any time to become a public charge and explains how DHS officers should apply these factors as part of a totality of the circumstances determination.

### III.  ARGUMENT

Plaintiffs move for a stay of the effective date of the Rule under Section 705 of the APA, or, in the alternative, for a preliminary injunction. *See* Mot. for Stay or Prelim. Inj. (Mot.), at 1, 19-20. As they correctly observe, "[t]he standard is the same whether a preliminary injunction against agency action . . . or a stay of that action is being sought." Mot. at 19 (quoting *Cronin v. USDA*, 919 F.2d 439, 446 (7th Cir. 1990)). "A plaintiff

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

7

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)); *see Munaf v. Geren*, 553 U.S. 674, 690 (2008) (likelihood of success requires far more than identifying "serious, substantial, difficult, and doubtful" questions, including as to jurisdiction). Further, a preliminary injunction or a § 705 stay is "an extraordinary and drastic remedy" that should not be granted "unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). Plaintiffs fail to meet any of these requirements.

### A. Plaintiffs Are Unlikely To Succeed On the Merits.

#### 1. Plaintiffs Lack Article III Standing And Their Claims Are Unripe.

As the party invoking federal jurisdiction, Plaintiff bears the burden of establishing standing, "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "To seek injunctive relief, a plaintiff must show that [it] is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action . . . ; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). The "threatened injury must be certainly impending to constitute injury in fact"; allegations of "possible future injury do not satisfy . . . Art. III." *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990). Where, as here, "the plaintiff

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

8

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

1  is not [itself] the object of the government action," standing "is ordinarily 'substantially

2  more difficult' to establish." *Lujan*, 504 U.S. at 562.

3         The States have not met, or even tried to meet, this burden. Neither their Complaint

4  nor their preliminary injunction motion references standing. Although Plaintiffs claim

5  irreparable harm, their assertions regarding such harm do not establish standing because

6  those allegations comprise potential future harms that, if they ever came to pass, would

7  be spurred by decisions of third parties not before the Court. Such speculative allegations

8  are insufficient, particularly at the preliminary injunction stage. *See Cacchillo v. Insmed*,

9  638 F.3d 401, 404 (2d Cir. 2011) ("When a preliminary injunction is sought, a plaintiff's

10  burden to demonstrate standing will normally be no less than that required on a motion

11  for summary judgment.") (internal quotation marks omitted). Here, the Rule governs

12  DHS personnel and certain aliens. It "neither require[s] nor forbid[s] any action on the

13  part of" Plaintiffs, *Summers*, 555 U.S. at 493, nor does it expressly interfere with any of

14  their programs applicable to aliens. To be sure, in discussing purported irreparable harms,

15  Plaintiffs allege such possibilities as a theoretical economic impact that might arise

16  should aliens choose to rely more on State services or a theoretical public health episode

17  that could occur should noncitizens choose to forgo health services altogether, but these

18  are insufficient to confer standing on any State. Indeed, finding standing based on the

19  allegations presented here would enable States to bring suit against the federal

20  government to challenge virtually any imaginable action based on similarly attenuated

21  and speculative chains of events.

22

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

9

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

For this reason, even when courts have found State standing to challenge federal immigration policies, they have limited it to circumstances in which the States' claims arise out of their proprietary interests as employers or operators of state universities. *See*, *e.g.*, *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 160-62 (E.D.N.Y. 2017) (rejecting state standing under "quasi-sovereign interests" and "injur[y] [to] a State's economy" theories where state proprietary interests were unidentified). And unlike other recent cases concerning immigration policy, no private parties directly affected by the Rule are named as plaintiffs here. *See*, *e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018) (plaintiffs included individuals claiming they were "separated from certain relatives who seek to enter the country"); *Regents of Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1027 (N.D. Cal. 2018) (plaintiffs challenging DACA rescission included several "Individual DACA recipients").

Plaintiffs' purported economic harms from the possibility that certain aliens may unnecessarily choose to forgo all federal benefits (thereby resulting in greater reliance on state housing and food benefits), Mot. at 54-55, also do not establish standing. As an initial matter, this theory is inconsistent with Plaintiffs' assertion that the Rule "will cause mass disenrollment and forbearance from enrollment by immigrants from federal *and state* benefit programs." Mot. at 51 (emphasis added). Further, a "causal chain involv[ing] numerous third parties whose independent decisions collectively" create injuries is "too weak to support standing." *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 867 (9th Cir. 2012); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 414 (2013) (courts are "reluctan[t] to endorse standing theories that rest on speculation about the

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

10

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

decisions of independent actors"). For any Plaintiff to suffer a net-increase in health benefit expenditures, (i) a material number of aliens in the State must unnecessarily choose to forgo all federal benefits (a result not required by the Rule); (ii) these aliens must then apply for, and receive, additional state benefits; and (iii) the increased state expenses for these aliens must be greater than the costs the State would have incurred for aliens who would have resided in the State, and consumed State resources, but for the Rule.

Plaintiffs' allegation that the Rule may harm the States' economies because more aliens may rely on uncompensated emergency room care, and fewer may receive and then spend federal funds within the Plaintiff States, Mot. at 53-54, is equally speculative and attenuated. So too are Plaintiffs' purported "food insecurity"-related harms. *Id.* at 54. Relying on a declarant, Plaintiffs claim that Illinois estimates a loss of "$95 to $222 million" in economic stimulus due to SNAP disenrollment. *Id*. To generate this estimate, however, the declarant relied on a Kaiser Family Foundation report for the claim that there would be a "15% to 35%" disenrollment rate. Hou Decl. ¶¶ 21-23, 25. That report, however, makes no such prediction. To the contrary, it states that there is "uncertainty about the actual impact" of the Rule and notes only that "*if* the [Rule] leads to disenrollment rates from 15% to 35%," there may be certain modest economic impacts. Samantha Artiga et al., Henry J. Kaiser Family Found., *Potential Effects of Public Charge Changes on Health Coverage for Citizen Children*, at 2, 12 (May 18, 2018) (emphasis added). In any event, Plaintiffs do not even allege that this speculative injury would noticeably affect their total state economies.

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP                        11

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

Numerous courts have concluded that analogous indirect economic effects are insufficient to confer standing on a State. In *Wyoming v. U.S. Department of Interior*, for example, the National Park Service set a cap on the number of snowmobiles permitted in certain national parks. 674 F.3d 1220 (10th Cir. 2012). The Tenth Circuit held that Wyoming's "speculative economic data" alleging "economic detriment" through reduced tourism and tax revenues was "conclusory" and "failed to . . . show[] direct injury to their . . . proprietary interests." *Id.* at 1231 & n.5, 1233-34. Nor could Iowa challenge USDA's refusal to implement disaster relief programs, because the State's allegation that it would "face increased responsibility for the welfare and support of its" citizens was "insufficiently proximate to the actions at issue." *Iowa ex. rel. Miller v. Block*, 771 F.2d 347, 353-54 (8th Cir. 1985); *see also Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (no standing for state challenge to DACA).

In their discussion of purported irreparable harms, Plaintiffs also speculate that the Rule could cause some aliens to forgo all health care, possibly leading to public health crises and "prevalence of disease." Mot. at 53. But this alleged harm does not suffice as a basis for standing, because such health effects would be borne by affected individuals, not States. *See New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d 109, 124 (D.D.C. 2019) ("[T]he States' general responsibility for their citizens' health and welfare . . . cannot directly support State standing because the underlying harms would be suffered by the States' citizens."). Further, like the alleged economic impacts, this allegation is too speculative to support standing—it turns on individual choices by aliens to forgo all federal health benefits and, as a result, contract and spread diseases, or otherwise cause a

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI                    12
NO. 4:19-CV-05210-RMP

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

1  public health crisis. *See Clapper*, 568 U.S. at 410 (rejecting "highly attenuated chain"

2  theory of standing).

3      As a separate category of harm, the States gesture towards an organizational

4  standing theory, claiming that the Rule will harm their "organizational missions," Mot.

5  at 12, 51, yet they provide no authority supporting the novel extension of this theory of

6  standing from the private organizations to whom it has always been applied to the

7  Plaintiffs here, sovereign *States*. Generally, "[a]n organization suing on its own behalf

8  can establish an injury when it suffered both a diversion of its resources and a frustration

9  of its mission." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,

10  624 F.3d 1083, 1088 (9th Cir. 2010). The alleged injury to its mission must be "more

11  than simply a setback to the organization's abstract social interests." *Havens Realty Corp.*

12  *v. Coleman*, 455 U.S. 363, 379 (1982). Such plaintiffs must show that the challenged

13  "conduct perceptibly impaired the organization's ability to provide services," not just that

14  its "mission has been compromised" in the abstract. *Food & Water Watch, Inc. v. Vilsack*,

15  808 F.3d 905, 919 (D.C. Cir. 2015). There is a compelling reason to believe that a State

16  may not avail itself of these principles by defining itself as an "organization"; namely,

17  the longstanding doctrines that tightly cabin the circumstances in which a State may bring

18  suit against the United States. *See Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178

19  (9th Cir. 2011) (explaining that *parens patriae* suits are unavailable and describing the

20  circumstances in which a State may sue to protect "its territory [or] its proprietary

21  interests"). Insofar as every State's mission includes the protection of its citizens'

22

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI                    13
NO. 4:19-CV-05210-RMP

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

interests, limitations on State standing would not be recognized in the law if a State could simply rely on "organizational" standing.

Not only have Plaintiffs failed to identify a case in which a State was recognized to have standing under their organizational-mission theory, but Plaintiffs do not even allege that the Rule frustrates the performance of any specific State activity. This case is thus distinguishable from *Valle del Sol Inc. v. Whiting*, on which Plaintiffs rely. 732 F.3d 1006 (9th Cir. 2013). There, certain organizations challenged an Arizona law criminalizing, under certain circumstances, the transportation or harboring of unauthorized aliens. *See id.* at 1012-13. The plaintiff organizations—whose volunteers helped transport and shelter aliens—submitted declarations stating that their employees were "deterred from conducting these functions." *Id.* at 1018. The challenged policy thus created staffing shortages, interfering with the plaintiffs' ability to provide their services. Plaintiffs here, by contrast, do not allege that they will be incapable of providing any particular service. They allege only a harm to their "abstract social interest" in public welfare. In addition, Plaintiffs do not allege that they were forced to divert resources, and thus fail to satisfy the second requirement for organizational standing. *See City of Lake Forest*, 624 F.3d at 1088.

"Constitutional ripeness," another prerequisite of justiciability, "is often treated under the rubric of standing because 'ripeness coincides squarely with standing's injury in fact prong.'" *Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1153 (9th Cir. 2017) (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc)). "[R]ipeness can be characterized as standing on a timeline," *Thomas*,

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

14

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

1   220 F.3d at 1138, and ripeness precludes "premature" review where "the injury at issue

2   is speculative, or may never occur." *ProtectMarriage.com – Yes on 8 v. Bowen*, 752 F.3d

3   827, 838 (9th Cir. 2014). For the same reasons stated above regarding lack of standing,

4   Plaintiffs' claims fail to demonstrate constitutional ripeness. *See, e.g., Clark v. City of*

5   *Seattle*, 899 F.3d 802, 809 (9th Cir. 2018).

6       Prudential ripeness also counsels against consideration of Plaintiffs' claims. This

7   doctrine "protect[s] agencies from judicial interference until an administrative decision

8   has been formalized and its effects felt in a concrete way by the challenging parties."

9   *Habeas Corpus Res. Ctr. v. U.S. DOJ*, 816 F.3d 1241, 1252 (9th Cir. 2016). "In resolving

10  ripeness questions, courts examine the 'fitness of the issues for judicial decision' and the

11  'hardship to the parties of withholding court consideration.'" *Id*. Fitness is generally

12  lacking where the reviewing court "would benefit from further factual development of

13  the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). "[A]

14  regulation is not ordinarily considered the type of agency action 'ripe' for judicial review

15  under the APA until the scope of the controversy has been reduced to more manageable

16  proportion, and its factual components fleshed out, by some concrete action applying the

17  regulation to the claimant's situation in a fashion that harms or threatens to harm him."

18  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). The "major exception" is a

19  "substantive rule which as a practical matter requires the plaintiff to adjust his conduct

20  immediately." *Id.* Plaintiffs' claims clearly do not fall into this exception because the

21  Rule does not apply to their conduct in any way, and indeed, there is no "adjust[ment] of

22

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI                    15
NO. 4:19-CV-05210-RMP

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

"conduct" that the States could undertake immediately to prevent or change the impact of the regulation.

Also, Plaintiffs' claims are all premised on speculation about the potential future effects of the Rule and disagreement with DHS's predictions based on the available evidence. *See, e.g.*, Mot. at 39, 44-47 (speculation about impact of the public charge totality of the circumstances test); *id.* at 10-12 (speculation about choices to disenroll from public benefits). "A question is fit for decision when it can be decided without considering 'contingent future events that may or may not occur as anticipated, or indeed may not occur at all.'" *Addington v. U.S. Airline Pilots Ass'n*, 606 F.3d 1174, 1179 (9th Cir. 2010) (quoting *Cardenas v. Anzai*, 311 F.3d 929, 934 (9th Cir. 2002)). Plaintiffs' claims rest entirely on speculation and contingencies, thus, "judicial appraisal of these [questions]" should await the "surer footing [of] the context of a specific application of this regulation." *Colwell v. HHS*, 558 F.3d 1112, 1127 (9th Cir. 2009).

In addition, withholding judicial consideration of Plaintiffs' claims will not cause them any significant hardship. With respect to Plaintiffs, the Rule "do[es] not create adverse consequences of a strictly legal kind, that is, effects of a sort that traditionally would have qualified as harm"; in fact, it does not apply to them at all, and therefore cannot serve as the basis for a ripe claim. *Ohio Forestry Ass'n*, 523 U.S. at 733. Moreover, even if Plaintiffs had alleged a cognizable type of harm, "[t]o meet the hardship requirement, a litigant must show that withholding review would result in direct and immediate hardship and would entail more than possible financial loss." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009) (quoting *US West Communications v.*

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

16

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

*MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999)). Plaintiffs cannot demonstrate that any of the harms they allege are either direct or immediate as described *supra*, and a substantial part of the alleged harms are merely possible financial loss to Plaintiffs over time, as potential cumulative side effects of third party individuals' decisions to take action not required by the Rule. These do not create a ripe facial challenge.

### 2.  Plaintiffs Are Outside the Zone of Interests Regulated by the Rule.

Even if Plaintiffs could meet their standing and ripeness burdens, Plaintiffs' claims would still fail because they are outside the zone of interests served by the limits of the "public charge" inadmissibility provision in § 1182(a)(4)(A) and related sections. The "zone-of-interests" requirement limits the plaintiffs who "may invoke [a] cause of action" to enforce a particular statutory provision or its limits. *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 129-30 (2014). Under the APA, a plaintiff falls outside this zone when its "interests are … marginally related to or inconsistent with the purposes implicit in the statute." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). This standard applies with equal force where, as here, Plaintiffs seek to challenge the government's adherence to statutory provisions in the guise of an APA claim. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).

Plaintiffs plainly fall outside the zone of interests served by the limits of the meaning of public charge in the inadmissibility statute. At issue in this litigation is whether DHS will deny admission or adjustment of status to certain aliens deemed inadmissible on public charge grounds. By using the term "public charge" rather than a broader term like "non-affluent," Congress ensured that only certain aliens could be

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

17

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

determined inadmissible on the public charge ground. It is aliens improperly determined inadmissible, not States, who "fall within the zone of interests protected" by any limitations implicit in § 1182(a)(4)(A) and § 1183, because they are the "reasonable—indeed, predictable—challengers" to DHS's inadmissibility decisions. *Patchak*, 567 U.S. at 227; *see* 8 U.S.C. § 1252 (providing individuals who have a final order of removal from the United States based on a public charge determination an opportunity to file a petition for review before a federal court of appeals to contest the definition of public charge as applied to them). The purported harms "ultimately to state treasuries" asserted by the States, Mot. at 52, are not even "marginally related" to those of an alien seeking to demonstrate that the "public charge" inadmissibility ground has been improperly applied to his detriment. *Cf. INS v. Legalization Assistance Proj.*, 510 U.S. 1301, 1304-05 (1993) (O'Connor, J., in chambers) (concluding that relevant INA provisions were "clearly meant to protect the interests of undocumented aliens, not the interests of organizations [that provide legal help to immigrants]," and that the fact that a "regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect"); *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone-of-interests test a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).

### 3.   Plaintiffs' Substantive Claims Lack Merit.

#### a. The Rule is Consistent With the Plain Meaning of "Public Charge."

The definition of "public charge" in the Rule is consistent with the plain meaning

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

18

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

1   of the statutory text, which is to "be determined with reference to its dictionary definition

2   at the time the statute was enacted." *U.S. v. Carona*, 660 F.3d 360, 367 (9th Cir. 2011).

3   Here, it is undisputed that, since 1882, Congress has consistently provided for the

4   exclusion of indigent aliens determined by the Executive Branch as likely to become

5   "public charges." *Compare* Mot. at 23, 26-27, *with* NPRM at 51125.

6       Contemporary dictionaries from the 1880s define "charge" as "an obligation or

7   liability," such as "a pauper being chargeable to the parish or town." Stewart Rapalje et

8   al., Dict. of Am. and English Law (1888) ("Rapalje 1888"); *accord* Frederic Jesup

9   Stimson, Glossary of the Common Law (1881) (defining "charge" as "[a] burden,

10  incumbrance, or lien; as when land is charged with a debt") ("Stimson 1881"). As to the

11  term "public," such dictionaries explain the term "public" as meaning "[t]he whole body

12  of citizens of a nation, or of a particular district or city, [or] [a]ffecting the entire

13  community." Rapalje 1888; *see also* C.H. Winfield, Words and Phrases, A Collection of

14  Adjudicated Definitions of Terms Used in the Law, with References . . ., 501 (1882)

15  ("[P]ublic" means "not any corporation like a city, town, or county but the body of the

16  people at large.") (quoting *Baker v. Johnston*, 21 Mich. 319, 335 (Mich. 1870)). Together,

17  these early definitions make clear that an alien becomes a "public charge" when his

18  inability to achieve self-sufficiency imposes an "obligation" or "liability" on "the body

19  of the citizens" to provide for his basic necessities, as reflected in early legal sources

20  addressing the term "public charge." *See* Arthur Cook et al., Immigration Laws of the

21  U.S., § 285 (1929) ("Public charge means any maintenance, or financial assistance,

22

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

19

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

rendered from public funds.").[2]

Nothing about the plain meaning of this term suggests that a person must be "unable to care for himself or herself and primarily dependent on the state for support," as Plaintiffs contend. Mot. at 4. When Congress originally enacted the public charge inadmissibility ground, the term "pauper" was in common use for a person in extreme poverty. *See, e.g.*, Century Dictionary & Cyclopedia (1911) (defining "pauper" as "[a] very poor person; a person entirely destitute"); *accord* Mot. at 23 (citing, *e.g.*, The Century Dictionary of the English Language (1889-91)). Contrary to Plaintiffs' argument, however, these terms were not "interchangeable." Mot. at 23; *see Overseers of Princeton Twp. v. Overseers of S. Brunswick Twp.*, 23 N.J.L. 169, 172 (N.J. 1851) (treating "a pauper" and "a person likely to become chargeable" as two separate classes). Congress made this clear in early versions of the statute by setting forth separate grounds of inadmissibility (or, in the parlance of immigration law at that time, "exclusion") for

---

[2] The original public meaning of "public charge," as derived from the definitions of "public" and "charge," is consistent with modern dictionary definitions of the term "public charge." For example, the online version "of the Merriam-Webster Dictionary defines public charge simply as 'one that is supported at public expense.'" NPRM at 51158 (quoting "Public Charge", http://www.merriam-webster.com/dictionary/public%20charge (last visited Sept. 19, 2019)). Similarly, "Black's Law Dictionary (6th ed.). . . defines public charge as 'an indigent; a person whom it is necessary to support at public expense by reason of poverty alone or illness and poverty.'" *Id.*

paupers and for public charges. For example, in 1891, Congress provided that:

> the following classes of aliens shall be excluded from admission . . . :
>
> All idiots, insane persons, paupers *or* persons likely to become a public charge, persons suffering from a loathsome . . . disease, [those] convicted of a felony or other infamous crime or misdemeanor involving moral turpitude, polygamists, and also any person whose ticket or passage is paid for with the money of another . . . unless it is affirmatively . . . shown . . . that such person does not belong to one of the forgoing excluded classes."

1891 Act at 1084 (emphasis added). Congress thereby made "clear that the term 'persons likely to become a public charge' is *not* limited to paupers or those liable to become such; 'paupers' are mentioned as in a separate class." *Lam Fung Yen v. Frick*, 233 F. 393, 396 (6th Cir. 1916) (emphasis added).[3] And in response to a 1916 Supreme Court opinion reasoning that the term "public charge" must be read as "generically similar" to terms "mentioned before and after" (such as "pauper"), *Gegiow v. Uhl*, 239 U.S. 3, 10 (1915), Congress relocated the term "public charge" in the statute.[4] *See* 1917 Act § 3 n.5,

---

[3] Plaintiffs note that Congress removed the separate inadmissibility ground of "pauper" in 1990. *See* Mot. at 27. This does not mean that "public charge" and "pauper" are "interchangeable," however. Mot. at 23. Rather, it is indicative of the fact that, by abolishing poorhouses and almshouses, society has revised public services in a way that negates the former distinctions among types of public support provided to individuals needing different amounts of aid.

[4] In *Gegiow*, the Court applied this "generically similar" analysis to reject a public charge determination made in reliance on the "overstocked" "state of the labor market" in plaintiffs' intended destination city of Portland, Oregon, because the determinations of

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

21

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

*reprinted in* Immigration Laws and Rules of January 1, 1930 with Amendments from January 1, 1930 to May 24, 1934 (1935) ("This clause . . . has been shifted . . . to indicate the intention of Congress that aliens shall be excluded upon said ground for economic as well as other reasons" and to "overcom[e] the decision of the Supreme Court in *Gegiow*").[5] Subsequent cases recognized that this alteration negated the Court's interpretation in *Gegiow* by underscoring that the term "public charge" is "not associated with paupers or professional beggars." *Ex Parte Horn*, 292 F. 455, 457 (W.D. Wash. 1923) (explaining that "public charge" in the 1917 Act "is differentiated from the application in *Gegiow*"). Neither the structure of the statute nor any other factor provides any evidence that Congress intended to cabin "public charge" more narrowly than the plain meaning of the term.

the other categories of exclusion (such as "professional beggars," "convicted felons," or "paupers," could be made "irrespective of local conditions." 239 U.S. at 9-10.

[5] The 1917 Act's lengthier list of exclusions included, *inter alia*:

> idiots, imbeciles, feeble-minded persons, epileptics, insane persons; . . . persons with chronic alcoholism; paupers; professional beggars; vagrants; persons afflicted with tuberculosis in any form or with a . . . disease; persons . . . certified by the examining surgeon as being mentally or physically defective . . . of a nature which may affect the ability . . . to earn a living; [felons]; polygamists . . . ; anarchists, or persons . . . who advocate . . . the unlawful destruction of property; . . . prostitutes . . .; persons . . . induced, assisted, encouraged, or solicited to migrate . . . by offers . . . of employment [or] . . . advertisements for laborers . . . in a foreign country; persons likely to become a public charge; persons . . . deported [within the previous year]; stowaways," and others.

1917 Act at 875-76.

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

22

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

Strikingly, although Plaintiffs contend that the definition of "public charge" as one "primarily dependent on the state" has endured "[f]rom colonial . . . through modern times," Mot. at 4, they fail to identify *any* source, let alone a set of longstanding or widespread sources, that defined "public charge" using the phrases "primarily dependent" or "primary dependence" prior to 1999, when INS issued the nonbinding, interim field guidance. In contrast, there is longstanding evidence that the term "[p]ublic charge means any maintenance, or financial assistance, rendered from public funds." Cook, Immigration Laws, § 285; *see also* 26 Cong. Rec. 657 (1894) (statement of Rep. Warner) (explaining that under the public charge inadmissibility ground, "[i]t will not do for [an alien] [to] . . . earn half his living or three-quarters of it, but that he shall presumably earn all his living . . . [to] not start out with the prospect of being a public charge"). Courts have also suggested that the exclusion of public charges extended to those who, although earning a modest living, might need assistance with "the ordinary liabilities to sickness, or . . . any other additional charges . . . beyond the barest needs of existence." *U.S. v. Lipkis*, 56 F. 427, 428 (S.D.N.Y. 1893) (holding that immigration officers properly required a bond from a poor family on account of poverty, even though the ultimate reliance on public aid occurred through commitment to an insane asylum); *see also In re Feinknopf*, 47 F. 447, 447 (E.D.N.Y. 1891) (determining that an alien was not likely to become a public charge after considering, as distinct evidence, whether the alien "received public aid or support" or had been an "inmate of an almshouse"). Such individuals impose a "liability" on "the body of the people at large," even if they are not fully destitute. This interpretation of "public charge" conforms with Congress's explicit

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

23

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

1  instruction that "the immigration policy of the United States [is] that . . . [a]liens within

2  the Nation's borders [should] not depend on public resources to meet their needs." 8

3  U.S.C. § 1601(2)(A).

4      Plaintiffs' reliance on a variety of state law sources from the 19th century to

5  support their cramped construction of "public charge" as "permanently incapable of

6  caring for themselves" is misplaced. *See* Mot. at 24-25. First, many of those cases equated

7  "paupers" with "public charges," as Congress explicitly did not do. *See Frick*, 233 F. at

8  396; *Horn*, 292 F. at 457. For example, *Boston v. Capen*, the lead case on which Plaintiffs

9  rely, explained that "those who have been paupers in a foreign land; that is, for those who

10 have been a public charge in another country" are those for whom "the word 'paupers'

11 [is] used . . . in its legal, technical sense." 61 Mass. 116, 121 (Mass. 1851). Second, other

12 cases and sources on which Plaintiffs rely recognized implicitly that a pauper may *also*

13 be a public charge, *i.e.*, that persons may be both paupers and public charges (which is

14 logical, because an extremely destitute person may also be a person who receives support

15 from public benefit programs for his basic necessities). *See* Mot. at 25 (quoting, *e.g.*, *Pine*

16 *Twp. Overseers v. Franklin Twp. Overseers*, 4 Pa. D. 715, 716 (Pa. Quar. Sess. 1894)

17 ("both mother and child, the present pauper, were public charges for maintenance and

18 support"); Act of Mar. 20, 1850 (Mass.) (same)).[6] Finally, other contemporaneous state

19 ─────────────────────────────

[6] Plaintiffs' effort to "incorporate . . . by reference" arguments made in their 163-page

20 First Amended Complaint and the Complaint in another case in a distant jurisdiction must

21 be disregarded. Mot. at 26 & n.12. Plaintiffs make explicit that they have omitted the

22 materials they wish to "incorporate" to comply with "page limitations" for their brief. *Id.*

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI        24
NO. 4:19-CV-05210-RMP

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

1  sources demonstrate that "public charge" had a far broader definition than the narrow

2  interpretation Plaintiffs urge. The Maine Supreme Court, for example, identified as

3  "likely to become chargeable" to a town to which he had travelled a person who required

4  only "a small amount" of assistance, based on his "age and infirmity." *Inhabitants of*

5  *Guilford v. Inhabitants of Abbott*, 17 Me. 335, 335-36 (Me. 1840) (reaching conclusion

6  despite recognizing that, at "the time of filing the complaint he . . . had strength to perform

7  some labor, [] was abundantly able to travel from town to town," and had a "house

8  provided for him" in another town). And the Vermont Supreme Court recognized that

9  receipt of public aid, not complete destitution, was the standard for chargeability. *See*

10  *Town of Hartford v. Town of Hartland*, 19 Vt. 392, 398 (Vt. 1847) (widow and children

11  with a house, furniture, and a likely future income of $12/year from the lease of a cow

12  were nonetheless public charges after receiving relief in "the amount of some five

13  dollars").

14      Nor do "agency interpretations"—apart from the novel and anomalous 1999

15  Interim Field Guidance—support the view that "public charge" means *only* "those

16  primarily dependent on the government," as Plaintiffs aver. Mot. at 31. From the

17  _____

18  Plaintiffs may not "so blatantly [] evade the page limitation," *In re Cirrus Logic Sec.*

     *Litig.*, 946 F. Supp. 1446, 1471 n.16 (N.D. Cal. 1996), particularly in a brief for which

19  the Court has already granted them a 500% increase of the standard length. *Accord*

20  *Calence, LLC v. Dimensional Data Holdings, PLC*, 222 F. App'x 563, 566 (9th Cir. 2007)

21  (affirming district court's refusal to consider materials that a party attempted to

22  "incorporate by reference into its motion for preliminary injunction").

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

25

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

beginning, immigration authorities have recognized that the plain meaning of the public charge ground of inadmissibility encompasses all of those likely to become a financial burden on the public, and that the purpose of the provision is to exclude those who are not self-sufficient. For example, in 1916 (during the drafting of legislation that became the 1917 Act), the Secretary of Labor explained in a letter to the House Committee on Immigration and Naturalization that a person is "likely to become a public charge" when "such applicant may be a charge (an economic burden) upon the community to which he is going." H.R. Doc. No. 64-886, at 3-4 (1916). The Secretary also explained that the public charge clause "for so many years has been the chief measure of protection in the law . . . intended to reach economic rather than sanitary objections to the admission of certain classes of aliens." *Id.* at 3. The Secretary therefore urged Congress to address the "defect in . . . the arrangement of the wording" identified in *Gegiow*, and Congress then did so. *Id.*; *see supra*.[7]  Several decades later, then-Attorney General Robert F. Kennedy explained that a "specific circumstance," which he described as any "fact reasonably tending to show that the burden of supporting the alien is likely to be cast on the public," is the standard for demonstrating a likelihood to become a public charge. *Matter of*

---

[7] Plaintiffs' position also finds scant support in *Public Charge Provisions of Immigration Law: A Brief Historical Background*, *available at* https://go.usa.gov/xVERe (last visited Sept. 19, 2019). This online description of the history of the public charge provision by USCIS explains directly that the "public charge" exclusion is rooted in "the cost of caring for" immigrants who are "poor," and that "officials applied the provision widely," albeit "inconsistently." *Id.*

*Martinez-Lopez*, 10 I. & N. Dec. 409, 421 (A.G. 1962) (rejecting argument that an alien's misrepresentation of an offer of employment was sufficient to render the alien deportable). The receipt of the public benefits enumerated in the Rule for 12 months within a 36-month period readily qualifies as such a fact.

Finally, it is not the case that usage of the "public charge" ground of inadmissibility has been rare historically. *See* Mot. at 1, 5 (contending that the "public charge" ground has been "rarely" used). As explained above, Congress and the Executive Branch have long recognized the "public charge" ground as a "chief measure" for ensuring the economic self-sufficiency of aliens. H.R. Doc. No. 64-886, at 3. Immigration statistics during the last century reveal both the ebbing and flowing of the use of the "public charge" ground of inadmissibility. For example, during the 1920s, the two separate categories of public charge deportation tracked by the Department of Labor amounted to the second largest category of those deported, behind those without a proper visa under the 1924 immigration statute, and ahead of those in the "criminal and immoral classes." *See* U.S. Nat'l Comm. on Law Observance and Enforcement, U.S. Wickersham Comm. Reports 124 (1931) ("Wickersham Comm.").[8] Further, to the extent public charge inadmissibility determinations have dwindled since the introduction of the novel "primarily dependent" standard in the 1999 Interim Field Guidance, *see* Mot. at 5 n.5, that undercuts Plaintiffs' argument that the 1999 Interim Field Guidance should be relied

---

[8] The Labor Department tracked separately those who were "public charges" "for causes existing prior to entry," and those for "likely to become a public charge, including professional beggars and vagrants." Wickersham Comm. at 124.

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

27

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

1  on to provide the plain meaning of public charge, particularly given that Congress in 1996

2  in IIRIRA had sought "to expand" the use of the public charge ground of inadmissibility.

3  H.R. Rep. 104-828 at 240-41.

4           **b. The Plain Meaning of Public Charge Does Not Require Long-**
             **Term Receipt Of Government Benefits Or That Such Benefits**

5                **Be Paid In Cash.**

6        An alien's temporary receipt of public benefits also constitutes an obligation on

7  the public to support the basic necessities of life and is therefore encompassed by the

8  plain meaning of public charge. Both administrative practice and the analysis in early

9  cases confirm that the "established meaning of 'public charge'" does not conflict with the

10  Rule's 12/36 standard, as Plaintiffs assert. *See* Mot. at 6.

11        First, as the NPRM in this case explained, short-term receipt has been "a relevant

12  factor under the [previous] guidance with respect to covered benefits." NPRM at 51165

13  & n.304 ("In assessing the probative value of past receipt of public benefits, 'the length

14  of time . . . is a significant factor.'") (quoting 1999 Interim Field Guidance at 28690). In

15  fact, the 1999 Field Guidance made no suggestion that an alien needed to receive cash

16  benefits for an extended period for the totality of the circumstances to trigger a public

17  charge determination and set no minimum period below which the receipt of such benefits

18  would be less meaningful. 1999 Interim Field Guidance at 28690. Nothing in the 1999

19  standard would ensure that an alien who received, in the previous 36 months, 12 months

20  of a public benefit considered relevant under that guidance (such as Supplemental

21

22

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP
      28
U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

Security Income) would not be treated as a public charge.[9] And nothing in the plain meaning of "public charge" precludes DHS from clarifying the standard by adopting a recognizable and meaningful threshold for receipt of public benefits in a given period. *Cf. Harris Found. v. FCC*, 776 F.3d 21, 28–29 (D.C. Cir. 2015) ("An agency does not abuse its discretion by applying a bright-line rule.").

DHS's treatment of recurring, but non-permanent, receipt of public relief is also consistent with early case law. For example, a lower court in New York in the mid-nineteenth century recognized that "the modes in which the poor become chargeable upon the public" extend to "all expenses lawfully incurred," including "temporary relief." *People ex rel. Durfee v. Comm'rs of Emigration*, 27 Barb. 562, 569-70 (N.Y. Gen. Term 1858). Similarly, in *Poor Dist. of Edenburg v. Poor Dist. of Strattanville*, a Pennsylvania appellate court recognized that even a landowner with a long track record of supporting herself as a teacher, artist, and writer, could become "chargeable to" the public by temporarily receiving "some assistance" while ill, despite having "plenty of necessaries to meet her immediate wants." 5 Pa. Super. 516, 520-24 (Pa. Super. Ct. 1897). Although the court ultimately rejected the landowner's classification as a pauper, it did so not because her later earnings or payment of taxes barred this conclusion, but because, under

---

[9] The likelihood of short-term receipt was also considered in past regulations defining public charge in the visa context. *See, e.g.*, 22 C.F.R. § 42.91(a)(15)(iii) (1976) ("An alien who does not establish that he will have an annual income above the income poverty guidelines . . . and who is without other adequate financial resources, shall be presumed ineligible" as a public charge).

1    the specific facts of the case, she was "without notice or knowledge" that receipt even of

2    limited assistance would "place[] [her] on the poor book." *Id*. at 527-28.

3         Nor does anything in the plain meaning of "public charge" suggest a distinction

4    between benefits provided in cash and benefits provided as services, as Plaintiffs suggest.

5    *See* Mot. at 7, 30. Both types of assistance create an obligation on the part of the public

6    and both equally relieve recipients from the conditions of poverty. For this reason,

7    consideration of an alien's receipt of public benefits for "housing, food and medical care,"

8    as "examples of the obvious basic necessities of life," falls within the reasonable

9    parameters of determining whether that person creates a liability on the body of the

10   public. *Am. Sec. & Tr. Co. v. Utley*, 382 F.2d 451, 453 (D.C. Cir. 1967). Plaintiffs

11   acknowledge that receipt of in-kind services such as health care, food, and housing—the

12   equivalents of modern benefits covered by the Rule such as Medicaid, SNAP, and public

13   housing—were among the types of public support that rendered a person a public charge

14   in the past, by recognizing that such persons included those who were "occupants of

15   almshouses." Mot. at 31. The fact that the modern mores governing public assistance

16   have appropriately deinstitutionalized the poor by providing assistance through subsidies

17   for private housing, private food purchases, and the like does not in any way change the

18   fact that the receipt of such subsidies imposes an "obligation" or "burden" on the body

19   of the public.

20         Although the 1999 Interim Field Guidance and the 1999 NPRM adopted a different

21   interpretation regarding non-cash benefits, those documents provide further support for

22   DHS's determination that inclusion of such benefits in the Rule is consistent with the

1   plain meaning of "public charge." Both documents describe the exclusion of "non-cash

2   public benefits" at that time as "reasonable," confirming that although they did not

3   conclude that the meaning of "public charge" *required* consideration of such benefits,

4   they also did not conclude that the meaning of public charge *foreclosed* their

5   consideration. 1999 NPRM at 28677; *see id.* at 28678 ("It has never been [the] policy

6   that the receipt of any public service or benefit *must* be considered.") (emphasis added).

7   Indeed, the only examples of prior exclusion of non-cash benefits from consideration that

8   the drafters of the interim guidance could identify were: (1) broadly-available public

9   benefits such as "public schools"; and (2) the exclusion of food stamps (i.e., "SNAP")

10  under State Department guidance that apparently did not exclude other forms of non-cash

11  benefits. *See, e.g.*, 1999 Interim Field Guidance at 28692.

12          **c. The Rule Properly Exercises Interpretive Authority That
                Congress Delegated, Implicitly and Explicitly, To The Executive
13              Branch.**

14          The statutory term "public charge" has "never been [explicitly] defined by

15  Congress in the over 100 years since the public charge inadmissibility ground first

16  appeared in the immigration laws." Rule at 41308. Congress implicitly delegates

17  interpretive authority to the Executive Branch when it omits definitions of key statutory

18  terms, thereby "commit[ting] their definition in the first instance to" the agency, *INS v.*

19  *Jong Ha Wang*, 450 U.S. 139, 144 (1981), to be exercised within the reasonable limits of

20  the plain meaning of the statutory term. *See Chevron, U.S.A., Inc. v. NRDC*, 467 U.S.

21  837, 844 (1984). Congress has long recognized this implicit delegation of authority to

22  interpret the meaning of "public charge." *See, e.g.*, S. Rep. No. 81-1515, at 349 (1950)

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI                    31
NO. 4:19-CV-05210-RMP

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

(recognizing that because "there is no definition of the term [public charge] in the statutes, its meaning has been left to the interpretation of the administrative officials and the courts"). This delegation is reinforced by Congress's explicit directive that the determination be made "in the opinion of the Attorney General" or a "consular officer." 8 U.S.C. § 1182(a)(4)(A). This expansive delegation of authority grants DHS wide latitude to interpret "public charge" within the reasonable limits set by the broad, plain meaning of the term itself.

Congress's comprehensive delegation of interpretive authority is well-established in precedent dating back to the early public charge statutes. S*ee, e.g., Ex Parte Pugliese*, 209 F. 720, 720 (W.D.N.Y. 1913) (affirming the Secretary of Labor's authority "to determine [the] validity, weight, and sufficiency" of evidence going to whether an individual was "likely to become a public charge"); *Wallis v. U.S. ex rel. Mannara*, 273 F. 509, 510 (2d Cir. 1921) (deference required even if "evidence to the contrary [is] very strong"). It is also recognized in Executive Branch practice. Administrative decisions have explained that Congress's broad delegation of authority in this area was necessary because "the elements constituting likelihood of becoming a public charge are varied." *Matter of Harutunian*, 14 I. & N. Dec. 583, 588-90 (BIA 1974) (quoting S. Rep. No. 81-1515 at 349 (1950) (holding that alien's receipt of "old age assistance benefits" in California was sufficient to render the alien a "public charge")); *see also Matter of Vindman*, 16 I. & N. Dec. 131 (BIA 1977) (citing regulations in the visa context, and explaining that the "elements constituting likelihood of an alien becoming a public charge are varied . . . [and] are determined administratively"). Indeed, Plaintiffs themselves seek

1  to preserve a *prior* exercise of this delegated interpretive authority by requiring DHS to

2  revert to the "primarily dependent" standard for public charge determinations that

3  appeared for the first time in the 1999 Interim Field Guidance and simultaneous 1999

4  NPRM. *See* Mot. at 56 (Plaintiffs "seek to keep in place [the 1999 Interim Field

5  Guidance] which [has] governed for the past 23 years.").

6          The long history of congressional delegation of definitional authority over the

7  meaning of "public charge" refutes Plaintiffs' claim that Congress has, by choosing not

8  to impose a definition of "public charge" when revising the statute, implicitly adopted

9  into the statute the definitions used by the Executive Branch (such as the standards

10 described in the 1999 Interim Field Guidance or other immigration regulations). *See* Mot.

11 at 29-30, 34. By inaction in 1996 and 2013, the occasions Plaintiffs cite, *see id.* at 29-30,

12 Congress left the public charge provision unchanged. Mot. at 30. This inaction left in

13 place the long-understood delegation to the Executive Branch to exercise definitional

14 authority over the "varied" elements of the meaning of "public charge," S. Rep. No. 81-

15 1515, at 349, as INS proposed to do in the 1999 NPRM and has done here. In this context,

16 at most, the "[c]ongressional inaction lacks persuasive significance" because competing

17 "inferences may be drawn from such inaction." *Competitive Enter. Inst. v. U.S. Dep't of*

18 *Transp.*, 863 F.3d 911, 917 (D.C. Cir. 2017). And the more plausible of the competing

19 inferences is that Congress has intended for DHS to retain the authority delegated to it to

20 analyze the "totality of the alien's circumstances" to make "a prediction" about the

21 likelihood that an alien will become a public charge, *Matter of Perez*, 15 I. & N. Dec.

22 136, 137 (BIA 1974), including the delegated authority for DHS to adopt further

procedures to guide its officers, aliens, and the public at large in understanding the application of the public charge ground of inadmissibility.

### d. The Rule's Weighted Criteria Are Not Contrary To Law.

The Rule could not be more clear that it retains the "totality of the circumstances" approach under which Executive Branch officials make individualized determinations regarding whether "in the opinion of [the officer] at the time of application for admission or adjustment of status, [the alien] is likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4)(A). In contending otherwise, *see* Mot. at 35, Plaintiffs disregard the plain text of the Rule.

Plaintiffs' assertion that the Rule improperly makes "poverty" a "paramount" factor is illogical and contradicts even their own interpretation of the plain meaning of "public charge" as a person whose poverty is sufficient to make him "primarily dependent" on public support. Mot. at 24, 36. There is no dispute in this litigation that, whether "public charge" is to be interpreted in accordance with its plain meaning as a person relying on public benefits to assist with the basic necessities, or in accordance with the "primary dependence" standard created in 1999, this is a determination related to poverty, to be made in consideration of the statutorily-enumerated and other factors. *See* 8 U.S.C. § 1182(a)(4); Part A.3.a., *supra*.

Plaintiffs' criticism of the financial factors as "dispositive," Mot. at 36, is also in error. The Rule, by its terms, "contains a list of negative and positive factors that DHS will consider as part of [the public charge] determination, and directs officers to consider these factors in the totality of the alien's circumstances." Rule at 41295. "The presence

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

34

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

of a single positive or negative factor, or heavily weighted negative or positive factor, *will never*, on its own, create a presumption that an applicant is inadmissible . . . or determine the outcome of the . . . inadmissibility determination. Rather, a public charge inadmissibility determination must be based on the totality of the circumstances presented." *Id*. (emphasis added); *see also id*. at 41309 ("DHS has established a systematic approach to implement Congress' totality of the circumstances standard."). In fact, DHS made changes between the NPRM and the final version of the Rule to emphasize that the "totality of the circumstances" approach is retained—for example, by "amend[ing] the definition of 'likely at any time to become a public charge'" by clarifying that this means "more likely than not at any time in the future . . . as determined based on the totality of the alien's circumstances." *Id*. at 41297.[10]

Plaintiffs also err in contending that the Rule's consideration of an alien's "medical condition" is contrary to law because it is "virtually dispositive." Mot. at 36-37. At the outset, Plaintiffs' argument directly contradicts their separate argument that it is financial

---

[10] It is also not contrary to law for DHS to have identified several factors that may "overlap." Mot. at 36. This is not an objection to the Rule, but rather, to the statute itself: Many of the specific factors that the statute requires DHS to consider—e.g., education, skills, and assets—will correlate highly with financial status. Further, it is highly unlikely that *any* evidence-based determination of "financial status" could be made without considering different kinds of evidence that would overlap in their tendency to demonstrate whether an individual is, or is not, likely at any time to become a public charge.

status, not medical condition, that the Rule has made "dispositive." *Id.* Further, this argument ignores the explicit discussion of the medical condition factor in the Rule, which explained that, because "the public charge inadmissibility determination is made on a case-by-case basis and in the totality of the alien's individual circumstances, an applicant could overcome this heavily weighted negative factor through presentation of other evidence," including "proof of income, employment, education and skills, private health insurance, and private resources." Rule at 41445.

Plaintiffs' other arguments regarding the "health" factor, Mot. at 37-38, are no more cogent in their analysis. The suggestion that Congress has forbidden the Rule to consider medical conditions other than those "expressly set forth as [the] basis of inadmissibility" under 8 U.S.C. § 1182(a)(1)(A), Mot. at 37, ignores the plain text of the statutory "public charge provision," § 1182(a)(4)(B)(i), which *requires* "health"— without any specific definition thereof[11]—to be considered as part of the "public charge" determination, *i.e.*, as part of an *entirely separate* ground of inadmissibility from the specific list enumerated in § 1182(a)(1)(A). And Congress's removal of certain health-related grounds of inadmissibility in a 1990 amendment cannot plausibly supersede the more-specific requirement added by Congress six years later in 1996 making consideration of the "health" factor mandatory as part of the public charge ground of

---

[11] As with "public charge" itself, Congress, by leaving the meaning of "health" undefined in § 1182(a)(4)(B)(i), has delegated to DHS the authority to reasonably interpret the term "health" as it relates to making an overall determination of the public charge ground of inadmissibility. *See Jong Ha Wang*, 450 U.S. at 144; *Chevron*, 467 U.S. at 844.

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

36

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

1    inadmissibility. *See* IIRIRA § 531. *See Hellon & Assocs. v. Phoenix Resort Corp.*, 958

2    F.2d 295, 297 (9th Cir. 1992).

3        The Rule's consideration of non-cash public benefits is not inconsistent with the

4    PRWORA's authorization of "qualified aliens" to receive certain public benefits five

5    years after entry, contrary to Plaintiffs' brief suggestion otherwise. *See* Mot. at 39. First,

6    there is no inconsistency because the "qualified aliens" to whom that authorization

7    applies are generally not subject to the public charge test. *See* 8 U.S.C. § 1641(b)

8    ("qualified alien" includes, *inter alia*, lawful permanent residents, asylum recipients, and

9    refugees). Also, the Rule does not prohibit anyone from receiving benefits to which they

10    are entitled, but rather appropriately takes such receipt into consideration among many

11    other factors in assessing an individual's likelihood of becoming a public charge. *See*

12    Rule at 41365-66. Notably, Congress implicitly recognized that past receipt of public

13    benefits can be considered in determining the likelihood of someone becoming a public

14    charge when it prohibited consideration of past benefits for certain "battered aliens." 8

15    U.S.C. § 1182(s). Congress, therefore, understood and accepted DHS's consideration of

16    past receipt of benefits in other circumstances.[12]

---

17    [12] Neither of the cases cited by Plaintiffs on this issue support their position. In *Iwata v.*

18    *Intel Corp.*, 349 F. Supp. 2d 135, 147-49 (D. Mass. 2004), the court interpreted the text

19    of the Americans with Disabilities Act so as not to preclude employees from receiving

20    the protections provided by that statute. Here, as noted, the Rule does not preclude anyone

21    from receiving public benefits. Nor does the Rule create a "trap for the unwary" akin to

22    that described in *Rotenberry v. Comm'r*, 847 F.2d 229, 233 (5th Cir. 1988). The receipt

### e. The Rule is Not Arbitrary and Capricious.

Many of Plaintiffs' arguments are raised as claims that the Rule is "arbitrary and capricious" under the APA, but Plaintiffs fail to meet this demanding standard. *See* 5 U.S.C. § 706(2)(A). Arbitrary and capricious review "is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *Aguayo v. Jewell*, 827 F.3d 1213, 1226 (9th Cir. 2016) (cleaned up). Plaintiffs' arguments repeatedly suffer from the same flaw: a disregard for the explanations presented in the NPRM and Rule. But the Court may not disregard DHS's "explanations, reasoning, and predictions" simply because Plaintiffs "disagree[] with the policy conclusions that flowed therefrom." *Calif. by & through Becerra v. Azar*, 927 F.3d 1068, 1079 (9th Cir. 2019), *reh'g en banc granted*, 927 F.3d 1045 (9th Cir. 2019). And if review here is warranted at all, *see* Part III.A.1-A.2, *supra*, an especially high degree of deference is required given that admission and exclusion of aliens is historically committed to the political branches. *See Hawaii*, 138 S. Ct. at 2418.

### 1. DHS Adequately Responded to Comments Concerning Potential Harms.

Plaintiffs argue that DHS failed to adequately address potential harms resulting from the Rule, particularly those related to impacts on public health. An agency's obligation to respond to comments on a proposed rulemaking is "not 'particularly demanding,'" however, and DHS did respond to the substance of the comments Plaintiffs identify. *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441–42 (D.C.

---

of public benefits by eligible aliens comes with no guarantees that there will not be immigration consequences based on the receipt of such benefits.

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

38

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

Cir. 2012). "Nothing in the APA saddles agencies with the crushing task of responding to every single example cited in every single comment." *Envtl. Def. Fund v. EPA*, 922 F.3d 446, 458 (D.C. Cir. 2019). Rather, "the agency's response to public comments need only enable [courts] to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did." *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (internal quotations omitted).

First, DHS adequately addressed comments concerning vaccinations. Mot. at 42. Indeed, based in part on its consideration of such comments, DHS decided to exclude receipt of Medicaid by aliens under the age of 21 or by pregnant women from the definition of public benefits. Rule at 41384, 41471. That change alone should eliminate much of the concern that children will forgo vaccinations as a result of the Rule. *See id.* at 41384. In addition, DHS noted that "[v]accinations obtained through public benefits programs are not considered public benefits" and "local health centers and state health departments provide preventive services that include vaccines that may be offered on a sliding scale fee based on income."  *Id.* at 41384-85. For these reasons, DHS concluded "that vaccines would still be available for children and adults even if they disenroll from Medicaid." *Id.* at 41385.[13]

---

[13] Plaintiffs take issue with DHS's reasoning that "local health centers and state health departments provide preventive services that include vaccines that may be offered on a sliding scale fee based on income" on the grounds that it supposedly lacks "analysis." Mot. at 44. But that conclusion met and, indeed, exceeded the standard governing an agency's response to comments. *See Simpson v. Young*, 854 F.2d 1429, 1435 (D.C. Cir.

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

39

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

Likewise, DHS sufficiently responded to comments about other potential negative health consequences resulting from disenrollment. Plaintiffs concede that DHS acknowledged these potential consequences but argue that DHS did not conduct an "adequate analysis" and did not "quantify the human and economic impact." Mot. at 43. But Plaintiffs cite no cases holding that, to comply with the APA, an agency must "quantify" all potential effects of a rule. *Id.* Nor could they. The APA does not require agencies to "obtain[] the unobtainable," *FCC v. Fox Television Statutes, Inc.*, 556 U.S. 502, 519 (2009), or "measure the immeasurable." *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013); *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1263 (9th Cir. 2017) (finding agency action was not arbitrary and capricious notwithstanding agency's "failure to quantify" effects). Notably, Plaintiffs fail to identify any methodology DHS could have used to reliably quantify the "human and economic impact" of speculative potential increases in "malnutrition, unintended pregnancies, substance abuse" and other similarly qualitative effects. Mot. at 42-43. "As predicting costs and benefits without reliable data is a 'primarily predictive' exercise, the [agency] need[s] only to acknowledge [the] factual uncertainties and identify the considerations it found persuasive in reaching its conclusions." *SIFMA v. CFTC*, 67 F. Supp. 3d 373, 432 (D.D.C. 2014). DHS did so here, explaining why data limitations and other factors made it difficult to predict disenrollment and discussing why the Rule was nevertheless justified by the strong public

1988) ("The agency need only state the main reasons for its decision and indicate it has considered the most important objections."). In any event, Plaintiffs do not dispute the accuracy of DHS's reasoning or present any evidence to rebut it.

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

40

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

interests served by the Rule. *See* Rule at 41312-14. DHS's decision to move forward notwithstanding potential, unquantifiable harms is a quintessential exercise of the agency's policymaking function and is neither arbitrary nor capricious. *See Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003) ("When . . . an agency is obliged to make policy judgments where no factual certainties exist . . . we require only that the agency so state and go on to identify the considerations it found persuasive.").[14]

For similar reasons, DHS adequately addressed comments raising concerns about the Rule's effects on children. Mot. at 44-45 (Bays Decl., Exs. S at 32-35, VV at 12-13). Those comments addressed harms to children resulting from disenrollment in benefits, *see id.*, but as discussed above, DHS provided a detailed response concerning the disenrollment impact and explained why the potential harms did not justify DHS inaction in providing a definition of "public charge" that accounts for the factors promulgated by Congress and Congress's direction that immigration policy promote the "basic principle" of self-sufficiency. 8 U.S.C. §§ 1182(a)(4); 1601; *see* Rule at 41312-14; *see also* Rule at 41371 (recognizing that parents may decide to disenroll their children from public benefits programs but noting the Rule's purpose to ensure aliens are self-sufficient).

---

[14] Moreover, DHS made a number of changes to the Rule to mitigate some of the concerns raised regarding disenrollment impacts, such as excluding certain benefits from the scope of the Rule. Rule at 41313-14, 41471. This process—full consideration of the issues and the evidence on both sides, the adoption of changes in response, and an articulated statement of the reasons for the agency's ultimate decision—was neither arbitrary nor capricious.

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

41

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

Plaintiffs also discuss comments questioning whether the Rule should apply to children at all because "they are too young to work and their use of public benefits is not probative of their likelihood of becoming a public charge when older." Mot. at 45. But DHS addressed the substance of those comments as well, noting that Congress explicitly required DHS to consider age in public charge determinations, *see* 8 U.S.C. § 1182(a)(4)(B)(i)(I), and that Congress has made children subject to the public charge ground of inadmissibility even while carving out other exceptions. *See* Rule at 41371.[15] Moreover, it was reasonable for DHS to conclude that a child's receipt of public benefits is relevant to assessing his or her likelihood at any time of becoming a public charge.

Plaintiffs also note that DHS exempted Medicaid benefits received by individuals under the age of 21 but not SNAP benefits or federal housing assistance. Mot. at 45. DHS, however, cited "strong legal and policy reasons to assume that Congress did not intend

---

[15] Notwithstanding the Plaintiffs' suggestion that DHS erred by applying a "rigid public charge analysis to children," Mot. at 45, their own argument recognizes that the meaning of "public charge" has *never* excluded children. *See, e.g.*, Mot. at 25 (discussing a "mother and child [who] were public charges" (quoting *Pine Twp. Overseers*, 4 Pa. D. at 716); Mot. at 32-34 (discussing 1999 Interim Field Guidance, which did not exclude children's receipt of public benefits even though it specifically addressed and excluded— as does the Rule—certain categories of benefits received exclusively by children, such as attending public schools or receiving school lunches, *compare* 1999 Interim Field Guidance at 28692 *with* Rule at 41389 (rejecting comments urging the inclusion of school lunches as a public benefit)).

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI                          42
NO. 4:19-CV-05210-RMP

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

DHS to treat receipt of Medicaid by alien children under the age of 21 in the same way as receipt of Medicaid by adult aliens." Rule at 41380. For example, Congress expressly provided that receipt of Medicaid by aliens under the age of 21 would not trigger a reimbursement requirement for the alien's sponsor under an Affidavit of Support but made no similar provision for SNAP or housing assistance. *Id*. at 41375 n.431, 41380; *see also id*. at 41374 (describing reasons for the Rule's inclusion of SNAP benefits); *id*. at 41376-78 (describing reasons for the Rule's inclusion of housing benefits). Moreover, Congress authorized states to expand Medicaid eligibility to aliens under the age of 21 without a waiting period, *id*. at 41380, whereas there is no similar authorization for housing benefits and the INA's waiver of the waiting period for SNAP applies only to "qualified aliens," 8 U.S.C. § 1613(a), (c)(2)(L), who are generally not subject to the public charge test, *see id*. § 1641(b).

DHS also adequately responded to comments concerning the Rule's effects on elderly and disabled individuals. As a threshold matter, the Rule's treatment of disabled individuals is not discriminatory, for the reasons discussed in Section III.A.3.e., nor does it mean "that anyone with a significant disability is likely to become a public charge," as Plaintiffs claim. Mot. at 46. The Rule does not deny any alien admission into the United States or adjustment of status simply because he or she is disabled. Only if an alien, disabled or not, is likely to use one or more covered federal benefits for the specified period of time will that individual be found inadmissible as a public charge. DHS will consider an alien's health as one factor among many under the totality of the circumstances. Rule at 41368. Plaintiffs also suggest it is somehow improper for the Rule

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI                          43
NO. 4:19-CV-05210-RMP

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

to consider receipt of Medicaid benefits by a disabled individual because Medicaid can assist that person in getting to work and therefore in attaining what Plaintiffs characterize as "self-sufficiency." Mot. at 46. But an individual who relies on Medicaid benefits for an extended period of time in order "to get up, get dressed, and go to work," *id.*, is not self-sufficient. Plaintiffs' argument also ignores that Congress's goal of ensuring that aliens do not rely on public resources, *i.e.*, of ensuring self-sufficiency, is not identical to the goal of self-sufficiency for those enrolled in public benefit programs. For aliens, Congress's intent is "that aliens should be self-sufficient before they seek admission or adjustment of status," Rule at 41308, not that they be able to work through the assistance of public benefits.

As for elderly aliens, Plaintiffs argue that DHS ignored non-economic "contributions they make to family stability," and, through the Rule, "[p]revents [them] from accessing benefits they have paid for." Mot. at 46. To the extent Plaintiffs contend that the Rule should not apply to elderly individuals, or that DHS should have exempted elderly individuals altogether, that claim is foreclosed by the statutory requirement that "age" be considered in making a public charge determination, 8 U.S.C. § 1182(a)(4)(B)(i), as well as the longstanding plain meaning of the term "public charge." *See, e.g.*, *Martinez-Lopez*, 10 I. & N. Dec. at 421 (then-A.G. Kennedy recognizing that "advanced age" is a "specific circumstance . . . reasonably tending to show that the burden of supporting the alien is likely to be cast on the public"). DHS explicitly "recognize[d] the tangible and intangible value" of intergenerational family support, adequately explained the Rule's treatment of elderly individuals, and further reiterated that, in the

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

44

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

application of the totality-of-the-circumstances determination, "other adequate means of support, such as from family members," would be treated "as positive factors." Rule at 41403.

### 2. Factors Considered as Part of the Public Charge Test Are Not Arbitrary or Capricious.

Plaintiffs argue that "DHS's multifactor test is itself arbitrary and capricious" and asserting that various factors described in the Rule are "poorly defined" or not "rational." Mot. at 47. The examples Plaintiffs identify, however, are each highly relevant in assessing an individual's likelihood of becoming at any time a public charge. DHS therefore reasonably incorporated them into the public charge analysis in the Rule.

First, the Rule logically considers an applicant's income in the totality of the circumstances. Under the Rule, "[a]ny household income between 125 percent and 250 percent of the [Federal Poverty Guidelines ("FPG")] is considered a positive factor in the totality of the circumstances." Rule at 41448. Income above 250 percent of FPG is considered a heavily weighted positive factor. *Id*. at 41446. If household income is less than 125 percent of the FPG, it will generally be a heavily weighted negative factor, *id*. at 41323, although DHS will consider whether the alien has sufficient assets and resources to offset the lower income, *id*. at 41413. Plaintiffs argue that the income thresholds are "arbitrary" and "irrational." Mot. at 48. To the extent that Plaintiffs are arguing that the Rule should not consider income at all, that argument is undermined by the statutory mandate that DHS consider, *inter alia*, an alien's "assets, resources, and financial status," 8 U.S.C. § 1182(a)(4), and also by common sense because income is

obviously relevant to whether someone is likely to become a public charge. *See* Rule at 41417.

To the extent that Plaintiffs are arguing that the income threshold should be set at a higher level, DHS has adequately explained why it chose 125 percent of FPG. That level is based on the income threshold set by Congress for sponsors of aliens. *Id.* at 41447-48. Specifically, the INA requires a sponsor of an alien to agree "to provide support to maintain the sponsored alien at an annual income that is not less than 125 percent of the Federal poverty line[.]" 8 U.S.C. § 1183a(a)(1)(A). The Rule's use of the 125 percent threshold therefore maintains consistency with the threshold in the sponsor context. Rule at 41448. In addition, the 125 percent threshold is supported by data establishing a correlation between low incomes and the receipt of public benefits. Rule at 41416-17; NPRM at 51204-06. Plaintiffs' response – that the data reflects the fact that eligibility for public benefits is generally means-tested based on income – only proves Defendants' point that individuals with lower incomes are more likely to qualify for and use public benefits. Mot. at 48. Plaintiffs also note that low-income aliens use certain benefits at a rate of less than 50%, *id.*, but that does not make the Rule's consideration of income, as part of the totality of circumstances, unreasonable. Last, Plaintiffs' contention that a low-income applicant who has never used public benefits "would be" "branded a public charge," Mot. at 48, ignores the fact that income is merely one of many factors considered in the totality of the circumstances and is not dispositive on its own. *See* Rule at 41413.

It was also entirely reasonable for DHS to include English proficiency as a factor to be considered as part of the totality of the circumstances, particularly given the

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

46

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

statutory requirement to consider an applicant's "education and skills." 8 U.S.C. § 1182(a)(4)(B)(i). The correlation between a lack of English language skills and public benefit usage, lower incomes, and lower rates of employment, is amply supported in the record. For instance, DHS discussed U.S. Census Bureau data showing a direct relationship between an individual's English fluency and his income, as well as data demonstrating that those who spoke a language other than English at home were less likely to be employed. Rule at 41448. Data considered by DHS also show that "among the noncitizen adults who speak a language other than English at home, the participation rates for both cash and non-cash benefits are higher among those who do not speak English well, or at all, than among those who speak the language well." *Id*. at 41432; *see also* NPRM at 51195-96. Thus, Plaintiffs' claim that "DHS cites no evidence" to support its position is simply wrong. Mot. at 49. Plaintiff also argues that by relying on the data discussed above, "DHS starts from its conclusion and works backward," Mot. at 49, but this restatement of Plaintiffs' policy disagreement with DHS does not undermine DHS's reasoned consideration of the data or DHS's judgment and conclusions.[16]

---

[16] Plaintiffs claim that DHS's data "undermines its conclusion" because the data "shows immigrants with limited English proficiency were more likely *not* to utilize public benefits." Mot. at 50. Plaintiffs appear to be referring to the fact that 31.3% -- *i.e.*, less than 50% -- of aliens in the survey who did not speak any English received public benefits. NPRM at 51195, at table 24. Of course, the fact that any one factor does not *by itself* show that a person is likely to become a public charge does not mean that factor is irrelevant. Because a lack of English language skills is correlated with, *inter alia*, receipt

47

Plaintiffs also contend that "language proficiency is not an immutable characteristic" and that the ability to speak another language may serve an applicant well economically "in the long run." Mot. at 49-50. But "DHS understands that aliens may improve their English skills in the future" and therefore it will consider evidence that a person is taking steps to improve these skills, such as by enrolling in English language courses. Rule at 41432. Moreover, Plaintiffs' argument incorrectly assumes that a person cannot be inadmissible on public charge grounds if he or she will be self-sufficient "in the long run." The pertinent statute, however, requires DHS to consider whether an alien "is likely *at any time* to become a public charge," 8 U.S.C. § 1182(a)(4)(A), not whether he has a possibility of someday attaining self-sufficiency after a period in which he is a public charge.

Plaintiffs also nod in the direction of a claim that the language proficiency requirement is vague. *See* Mot. at 49-50 (citing *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Service* ("*ACGA*"), 273 F.3d 1229 (9th Cir. 2001)). In *ACGA*, an agency action was held to be arbitrary and capricious in part because of the "vagueness of the condition itself[.]" *Id*. at 1251. But, here, the Rule's consideration of "[w]hether the alien is proficient in English or proficient in other languages in addition to English" is not at all vague. Rather, by specifying this and other factors to be considered in the public charge analysis, explaining which factors are to be afforded greater weight, and describing the

of public benefits, it is appropriate to consider it among other evidence as part of the totality of the circumstances.

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

48

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

1    types of evidence that may be considered, DHS has specifically explained how it will

2    implement the public charge ground of inadmissibility.

3        Last, DHS also appropriately included credit histories and credit scores as evidence

4    that may be considered as part of the totality of the circumstances. Plaintiffs argue that

5    "reliance on such evidence is not justified," Mot. at 50, but the INA expressly requires

6    consideration of an alien's "financial status." 8 U.S.C. § 1182(a)(4)(B)(i). DHS

7    reasonably concluded that an individual's credit history and credit score are relevant

8    evidence of his or her financial status, Rule at 41425-27, and Plaintiffs cannot show that

9    that conclusion was unreasonable. As the Rule explains, "[c]redit reports and credit

10   scores provide information about a person's bill paying history, loans, age of current

11   accounts, current debts, as well as work, residences, lawsuits, arrests, collections, actions,

12   outstanding debts and bankruptcies in the United States." *Id*. at 41425-26. "DHS's use of

13   the credit report or scores focuses on the assessment of these debts, liabilities, and related

14   indicators, as one indicator of an alien's strong or weak financial status[.]" *Id*. at 41426.

15       Contrary to Plaintiffs' suggestion, Mot. at 50, DHS also reasonably accounted for

16   the possibility that some aliens will have a thin or nonexistent credit history. Far from

17   penalizing aliens who lack a credit report or score, the Rule explains that "DHS

18   understands that not everyone has a credit history in the United States and would not

19   consider the lack of a credit report or score as a negative factor." Rule at 41426. Nor is it

20   the case that consideration of a credit report or credit score is improper because, as

21   Plaintiffs contend, credit reports might contain errors and a bad credit score may be the

22   result of a temporary circumstance. Mot. at 50. Neither of these possibilities changes the

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI          49
NO. 4:19-CV-05210-RMP

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

fact that, notwithstanding occasional flaws, credit reports are probative of an individual's financial condition, as evidenced by their widespread use throughout the American economy. Rule at 41426 ("A credit report generally is considered [a] reasonably reliable third-party record . . . for purposes of verifying" financial information).

### f.    The Rule Does Not Violate the Rehabilitation Act.

Plaintiffs argue that the Rule identifies "disability diagnosis" as a factor relevant to a public charge inadmissibility inquiry, and claim, incorrectly, that "disability will" thus "often be the 'but for' cause of a public charge determination" in violation of Section 504 of the Rehabilitation Act. Mot. at 39-40. That section provides that "[n]o otherwise qualified individual with a disability . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under . . . any program or activity conducted by any Executive agency . . . ." 29 U.S.C. § 794(a) (emphasis added); *see also* 6 C.F.R. § 15.30 (DHS implementing regulation). "The causal standard" for such a claim—that a plaintiff "show that [a disabled person] was denied services 'solely by reason of' her disability"—is a "strict[]" one, *Martin v. California Dep't of Veterans Affairs*, 560 F.3d 1042, 1049 (9th Cir. 2009), and Plaintiffs cannot satisfy it.

As a threshold matter, the INA explicitly lists "health" as a factor that an officer "shall . . . consider" in making a public charge determination. 8 U.S.C. § 1182(a)(4)(B)(i). "Health" certainly includes an alien's disability, and it is therefore Congress, not the Rule, that requires DHS to take this factor into account. *See*, *e.g.*, *In Re: Application for Temporary Resident Status*, USCIS AAO, 2009 WL 4983092, at *5 (Sept. 14, 2009)

(considered application for disability benefits in public charge inquiry). A specific, later statutory command, such as that contained in the INA, supersedes section 504's general proscription to the extent the two are in conflict (which they are not, as explained below). *See*, *e.g.*, *Knutzen v. Eben Ezer Lutheran Hous. Ctr.*, 815 F.2d 1343, 1353 (10th Cir. 1987) ("[A] general . . . statute, § 504" may not "revoke or repeal . . . a much more specific statute . . . absent express language by Congress[.]" (internal quotation marks omitted)); *Hellon*, 958 F.2d at 297 ("in case of an irreconcilable inconsistency between them the later and more specific statute usually controls the earlier and more general one").

In any event, the Rule is fully consistent with section 504 of the Rehabilitation Act. The Rule does not deny any alien admission into the United States, or adjustment of status, "solely by reason of" disability. All covered aliens, disabled or not, are subject to the same inquiry: whether they are likely to use one or more covered federal benefits for the specified period of time. Although disability is one factor (among many) that may be considered, it is not dispositive, and is relevant only to the extent that an alien's particular disability tends to show that he is "more likely than not to become a public charge" at any time, Rule at 41368. Further, any weight assigned to this factor may be counterbalanced by other factors, including "[an] affidavit of support," "employ[ment]," "income, assets, and resources," and "private health insurance." *Id.* It is well established that such a general standard does not violate the Rehabilitation Act simply because certain persons may not meet it, in part, because of a disability. *See Does 1-5 v. Chandler*, 83 F.3d 1150, 1155 (9th Cir. 1996) (citing, with approval, a Sixth Circuit case concluding

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

51

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

that a generally applicable standard "making 19-year-olds ineligible to compete in high school sports did not violate" the "Rehabilitation Act," even though it affected "learning disabled 19-year-olds who had been kept back in school"). Furthermore, to fall within the coverage of the Rehabilitation Act, an individual must be "otherwise qualified," 29 U.S.C. § 794(a), which means that the individual "must be able to meet all of a program's requirements in spite of his handicap." *St. Johnsbury Acad. v. D.H.*, 240 F.3d 163, 173 (2d Cir. 2001). An alien who is likely to become a public charge because of his or her medical condition is not otherwise qualified for admission or adjustment of status. *See Cushing v. Moore*, 970 F.2d 1103, 1109 (2d Cir. 1992) (explaining that "an institution is not required to disregard . . . disabilities . . . , provided the handicap is relevant to reasonable qualifications").

## B. Plaintiffs Fail to Establish Irreparable Harm.

"[P]laintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction." *All. For The Wild Rockies* ["AFWR"] *v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).[17]   To establish a

---

[17] Plaintiffs suggest that the Ninth Circuit's "sliding-scale" approach to the preliminary injunction factors permits them to overcome a weak showing on any factor with a strong showing on another, Mot. 20, but this is incorrect. Circuit precedent permits a reduced showing of likelihood of success on the merits only, and only when the balance of hardships tips sharply in Plaintiffs' favor. *See AFWR*, 632 F.3d at 1135. Plaintiffs must make full showings of a likelihood of irreparable injury and that the injunction is in the public interest in order to prevail. *Id.; see also Daniels Sharpsmart, Inc. v. Smith*, 889

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

52

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

likelihood of irreparable harm, plaintiffs "must do more than merely allege imminent harm sufficient to establish standing; [they] must *demonstrate* immediate threatened injury." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (citation omitted). Plaintiffs have failed to carry this burden because their alleged injuries are speculative and they have provided no evidence that such harms will occur immediately. Indeed, as explained above, Plaintiffs have not even established standing. *See supra* Part III.A.1.

Plaintiffs allege that the Rule will irreparably harm the "missions of state benefit programs," the "health and well-being of state residents," and the "financ[es]" of the States, Mot. at 12, but none of these allegations suffices to establish standing, let alone irreparable harm. First, as explained previously, Plaintiffs offer no basis for their assertion that a State may demonstrate irreparable harm (or standing) by asserting that a state-administered program might be frustrated in its mission. Unlike the organizations to which the States implicitly compare themselves, a State has neither a sole nor primary purpose of providing particular benefits to a certain subset of its population—particularly when the subset at issue is aliens whose presence in the United States is governed by federal immigration law. Not surprisingly, Plaintiffs have identified no case applying this novel theory of standing or irreparable injury to a State. And in any case, Plaintiffs also have not explained why any such harms would be irreparable.

---

F.3d 608, 615 (9th Cir. 2018). The sliding-scale approach is also erroneous, and the government preserves that issue for further review. *See Davis v. PBGC*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring).

Second, as discussed in Part III.A.1, Plaintiffs' alleged public health and financial harms are speculative, founded on an attenuated chain of inferences, and contingent on the aggregate decisions of independent third parties to take action not required by the Rule. "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Assuming Plaintiffs are correct that some individuals will forgo enrollment or disenroll from federal benefits as a result of the Rule, Plaintiffs must still demonstrate a likelihood that such disenrollment will occur at a sufficiently high rate and magnitude, and in some cases be associated with a concomitant take-up of state benefits, to cause harm to state-level, as opposed to individual, interests.[18] Given the size of the States' programs, the number of individuals involved, and the many other reasons that individuals (aliens or citizens) might choose to forgo or disenroll from federal benefits, Plaintiffs' assertions of significant harmful effects are unsupported.

Beyond failing to demonstrate the accuracy of this underlying premise, Plaintiffs have primarily alleged anticipated effects of the Rule on individual state residents and suggested the possibility that the Plaintiff States will be harmed through the harm to those individuals, or as a result of those individuals' decisions in response to the Rule. *See* Mot. at 53-54. The harm directly to individuals does not support standing for States under Article III, let alone irreparable harm. *See Sherman*, 646 F.3d at 1178 (explaining that

---

[18] Plaintiffs allege that loss of public health benefits alone constitutes irreparable injury, Mot. at 52, but the cases they rely on concern only the effects of the loss of benefits on individual people, not speculative, downstream, cumulative effects on states.

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

54

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

states cannot bring suit on behalf of their residents' interests because they "do[] not have standing as *parens patriae* to bring an action against the Federal Government" (citation omitted)). The attenuated and speculative chain of harms claimed from individual decisions is also insufficient for both standing and irreparable harm, particularly because the States have provided no evidence of the number of disenrollments necessary to produce the public health and economic effects they allege, let alone evidence that such disenrollments are likely to occur absent immediate emergency relief. This falls far short of the showing necessary to obtain a preliminary injunction. *See Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("An injunction will not issue if the person or entity seeking injunctive relief shows a mere 'possibility of some remote future injury'" (quoting *Winter*, 555 U.S. at 22)). Indeed, Plaintiffs' own declarations in support of their motion belie their assertion that they have alleged sufficient harms, as these filings explicitly use the language of possibility rather than probability. *See, e.g.*, Linke Decl. ¶¶ 22-23 ("[T]he economic impacts of an increase in the uninsured rate could be severe"; "[T]his policy may result in a sharp decline of immigrants accessing critical services…"); MacEwan Decl. ¶ 10; Groff Decl. ¶¶ 16-17.

Plaintiffs have also failed to demonstrate that the alleged harms will be "sufficiently immediate to warrant" preliminary relief because they will occur before "a decision on the merits can be rendered." *Boardman*, 822 F.3d at 1023. Plaintiffs have alleged no facts in support of their conclusory statements that the economic or public health harms they claim would likely develop so quickly. Any such harms, if they ever emerged, would be the cumulative effect of independent decisions of thousands of third-

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

55

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

party aliens over the course of years. Plaintiffs offer no prediction about when these harms might arise and why the Rule's effective date must be enjoined when record-review briefing could occur in a matter of months. Indeed, Plaintiffs' own motion and declarations acknowledge the logical conclusion that the speculative and attenuated alleged impacts of the Rule, such as more expensive emergency care and reductions in productivity due to hunger, would necessarily develop over time. *See, e.g.,* Mot. at 14 ("[T]reatment will be significantly more expensive than is people received care before emergencies materialized"); *id.* at 15-16 ("Plaintiff States will also bear the public health costs as more individuals suffer from malnutrition and hunger, and ultimately, a less productive workforce"); Johnston Decl. ¶ 14 ("Without affordable, stable housing non-citizens' health will pay the cost and eventually, so will communities…"); Fehrenbach Decl. ¶¶ 35-37; Bayatola Decl. ¶ 14. The absence of evidence of *imminent* alleged harms to public health or state economies is still another factor showing the States are not entitled to preliminary relief.

## C.    The Remaining Equitable Factors Require Denial of Plaintiffs' Motion.

Even if Plaintiffs had made a sufficient showing on either likelihood of success on the merits or likelihood of irreparable injury, and they have not, they would still be obligated to make a satisfactory showing both that the balance of equities tips in their favor and that the public interest favors injunction. *AFWR*, 632 F.3d at 1135. These two factors merge when the government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014), but Plaintiffs have not made a sufficient showing to meet the

standard for either factor—particularly applying the sliding-scale formulation of the test, under which they must show that the balance of equities tips *sharply* in their favor. *AFWR*, 632 F.3d at 1132. "In assessing whether the plaintiffs have met this burden, the district court has a 'duty . . . to balance the interests of all parties and weigh the damage to each.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *L.A. Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1203 (9th Cir. 1980)). Plaintiffs assert that the equities "weigh heavily in favor" of preliminary relief because it is "in the public interest to prevent lawfully-present individuals and families with children from abandoning myriad federal and state . . . benefits to which they are entitled by law because of fear of future repercussions to their immigration status," and a stay or injunction will not harm defendants because it allegedly preserves the status quo. Mot. at 56.[19]

This analysis is facially incorrect and self-serving. As explained in detail *supra*, the harms Plaintiffs allege will flow from individuals' decisions not to use benefits are wholly speculative, and there is no support for Plaintiffs' assertions that these harms will be immediate. Conversely, there can be no doubt that the Defendants have a substantial interest in administering the national immigration system, a *solely federal* prerogative,

---

[19] Plaintiffs also allege that the balance of equities favors them because "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." Mot. at 56. However, the interests of the Defendants, as federal regulators, are also served by proper compliance with the law, which was undertaken in this case. *See supra*. Thus this factor is at best neutral in the balance.

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

57

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

according to the expert guidance of the responsible agencies as contained in their regulations, and that the Defendants will be harmed by an impediment to doing so. Quite obviously, Defendants have made the assessment in their expertise that the "status quo" referred to by Plaintiffs is insufficient or inappropriate to serve the purposes of proper immigration enforcement. Therefore, imposing the extraordinary remedy of a preliminary injunction and requiring the prior practice to continue before a determination on the merits would significantly harm Defendants.

Plaintiffs' speculative harms have no weight in the balance of hardships compared to the Defendants' interest in avoiding roadblocks to administering the national immigration system. *See Baldrige,* 844 F.2d at 674. Consequently, Plaintiffs have failed to demonstrate that the balance of hardships tips in their favor or that the public interest favors injunction. On this ground alone, their motion for a preliminary injunction must fail. *See Winter*, 555 U.S. at 26.

### D. The Court Should Not Grant a Nationwide Injunction or Stay of the Effective Date.

Were the Court to order a preliminary injunction or a stay of the effective date of the Rule, it should be limited to redressing only any established injuries to Plaintiff States. Under Article III, a plaintiff must "demonstrate standing . . . for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1930, 1933 (2018) ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."). Plaintiffs have requested either a stay of the effective date of the regulation or a

1  preliminary injunction, but have neither requested nor alleged any facts in support of a

2  nationwide injunction or a stay with that effect. Equitable principles require that an

3  injunction "be no more burdensome to the defendant than necessary to provide complete

4  relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc*., 512 U.S. 753, 765 (1994).

5  Accordingly, the Ninth Circuit has repeatedly vacated or stayed the nationwide scope of

6  injunctions, including in a challenge to a federal immigration rule. *See, e.g., East Bay*

7  *Sanctuary Covenant v. Barr*, No. 19-16487, 2019 WL 3850928, at *2 (9th Cir. Aug. 16,

8  2019) ("Under our case law . . . all injunctions—even ones involving national policies—

9  must be 'narrowly tailored to remedy the specific harm shown.'"); *see also California v.*

10 *Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (collecting cases).

11        Relief under 5 U.S.C. § 705 is similarly limited, as that provision permits a court

12 to stay the effective date of an agency action only "to the extent necessary to prevent

13 irreparable injury." 5 U.S.C. § 705. Although Plaintiffs have requested a stay of the

14 effective date of the Rule without limitation, narrower relief is both available under

15 Section 705 and required by equitable principles applicable to extraordinary forms of

16 relief. *See Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (indicating that courts should

17 consider any "brief[ing] [regarding] how [to] craft a limited stay"); 5 U.S.C. § 705

18 (Courts "may issue all necessary and appropriate process to postpone the effective date

19 of an agency action *or* to preserve status or rights pending conclusion of the review

20 process." (emphasis added)). Plaintiffs acknowledge that relief under Section 705 is

21 governed by equitable principles under the "same" standards as govern preliminary

22 injunctions, Mot. at 18-19, and nothing in Section 705 speaks clearly enough to work "a

1  major departure from the long tradition of equity practice." *Weinberger v. Romero-*

2  *Barcelo*, 456 U.S. 305, 320 (1982).

3      Plaintiffs have not alleged, nor can their cited evidence establish, that nationwide

4  relief is necessary to remedy their alleged harms. Any stay or injunction should be

5  limited, at most, to the Plaintiff States and should be further limited to any relief necessary

6  to remedy those specific harms found to be non-speculative, irreparable, and tied to the

7  effects of the Rule. *See Azar*, 911 F.3d at 584 (rejecting argument that "complete relief"

8  for "plaintiff states" requires enjoining "all . . . applications nationwide" of challenged

9  regulations). It is the settled law of this Circuit that "all injunctions – even ones involving

10  national policies – must be 'narrowly tailored to remedy the specific harm shown.'" *East*

11  *Bay*, 2019 WL 3850928, at *2 (quoting *City and County of San Francisco v. Trump*, 897

12  F.3d 1225, 1244 (9th Cir. 2018). Here, Plaintiffs have neither shown nor attempted to

13  show any harm beyond their geographical borders, and any relief must therefore be

14  limited, at most, to the Plaintiff States.

### IV.  CONCLUSION

15

16  For the reasons stated herein, the Court should deny preliminary relief.

17

18

19

20

21

22

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI                    60
NO. 4:19-CV-05210-RMP

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533

1    Dated:  September 20, 2019                 Respectfully submitted,

2                                               JOSEPH H. HUNT
                                                Assistant Attorney General
3
                                                ALEXANDER K. HAAS
4                                               Branch Director

5                                                  _s/ Joshua M. Kolsky_____
                                                ERIC J. SOSKIN
6                                               Senior Trial Counsel
                                                KERI L. BERMAN
7                                               KUNTAL V. CHOLERA
                                                JOSHUA M. KOLSKY, DC Bar No. 993430
8                                               Trial Attorneys
9                                               United States Department of Justice
                                                Civil Division, Federal Programs Branch
10                                              1100 L Street NW
                                                Washington, D.C. 20005
11                                              Tel: (202) 305-7664
                                                Fax: (202) 616-8470
12                                              joshua.kolsky@usdoj.gov
13
                                                Attorneys for Defendants
14

15

16

17

18

19

20

21

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 20, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all users receiving ECF notices for this case.

*/s/ Joshua M. Kolsky*

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005

Attorney for Defendants

GOVT'S OPP'N TO MOTION FOR
§ 705 STAY OR FOR PI
NO. 4:19-CV-05210-RMP

U.S. DEPARTMENT OF JUSTICE
1100 L St. NW, Washington, DC, 20003
(202) 353-0533