U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Oct 11, 2019

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON; COMMONWEALTH OF VIRGINIA; STATE OF COLORADO; STATE OF DELAWARE; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; DANA NESSEL, Attorney General on behalf of the people of Michigan; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; and STATE OF RHODE ISLAND, | NO: 4:19-CV-5210-RMP  ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY AND PRELIMINARY INJUNCTION |

                      Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, a federal agency; KEVIN K. MCALEENAN, in his official capacity as Acting Secretary of the United States Department of Homeland Security; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, a federal agency; and KENNETH T. CUCCINELLI, II, in his official capacity as Acting Director of United States Citizenship and Immigration Services,

                      Defendants.

1    Fourteen states challenge the Department of Homeland Security's expansive

2    revision of the Public Charge Rule.  Congress and the U.S. Constitution authorize

3    this Court to provide judicial review of agency actions.  The Plaintiff States ask the

4    Court to serve as a check on the power asserted by the Department of Homeland

5    Security to alter longstanding definitions of who is deemed a Public Charge.  After

6    reviewing extensive briefing and hearing argument, the Court finds that the Plaintiff

7    States have shown that the status quo should be preserved pending resolution of this

8    litigation.[1]  Therefore, the Court **GRANTS** the motion to stay the effective date of

9    the Public Charge Rule until the issues can be adjudicated on their merits.

10    The Motion for a Section 705 Stay and for Preliminary Injunction, ECF No.

11    34, is brought by Plaintiffs State of Washington, Commonwealth of Virginia, State

12    of Colorado, State of Delaware, State of Hawai'i, State of Illinois, State of

13

14    [1] The Court has reviewed the Motion for Preliminary Injunction, ECF No. 34, and
supporting declarations and materials, ECF Nos. 35−87; the Plaintiff States' First

15    Amended Complaint, ECF No. 31; the Briefs of Amici Curiae submitted in support
of the Plaintiff States' Motion, ECF Nos. 111 (from nonprofit anti-domestic

16    violence and anti-sexual assault organizations), 109 (from Health Law Advocates
and other public health organizations), 110 (from nonprofit organizations support

17    of the disability community), 149 (from hospitals and medical schools), 150 (from
nonprofit organizations supporting seniors), 151 (from health care providers and

18    health care advocates), 152 (from professional medical organizations), and 153
(from the Fiscal Policy Institute, the Presidents' Alliance on Higher Education and

19    Immigration, and other organizations addressing economic impact); the Federal
Defendants' Opposition to Preliminary Relief, ECF No. 155; and the Plaintiff

20    States' Reply, ECF No. 158.

21

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY
AND PRELIMINARY INJUNCTION ~ 2

Maryland, Commonwealth of Massachusetts, Attorney General Dana Nessel on behalf of the People of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, and State of Rhode Island (collectively, "the Plaintiff States").

Defendants are the United States Department of Homeland Security ("DHS"), Acting Secretary of DHS Kevin K. McAleenan, United States Citizenship and Immigration Services ("USCIS"), and Acting Director of USCIS Kenneth T. Cuccinelli II (collectively, "the Federal Defendants").  Pursuant to the Administrative Procedure Act and the guarantee of equal protection under the Due Process Clause of the U.S. Constitution, the Plaintiff States challenge the Federal Defendants' redefinition of who may be denied immigration status as a "public charge" in federal immigration law among applicants for visas or legal permanent residency.

## I.    BACKGROUND

On August 14, 2019, DHS published in the Federal Register a final rule, Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019) (to be codified at 8 C.F.R. pts. 103, 212, 213, 214, 245 and 248) ("Public Charge Rule"), that redefines whether a visa applicant seeking admission to the United States and any applicant for legal permanent residency is considered inadmissible because DHS finds him or her "likely at any time to become a public charge."  *See* 8

U.S.C. § 1182(a)(4).  The Public Charge Rule is scheduled to take effect on October 15, 2019.  84 Fed. Reg. at 41,292.

## A.    The Immigration and Nationality Act's Public Charge Ground of Inadmissibility

The Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. § 1101 *et seq.*, requires visa applicants and individuals applying to become permanent legal residents to demonstrate that they are not "inadmissible."  8 U.S.C. §§ 1361, 1225(a), and 1255(a).[2]  The INA sets forth ten grounds of inadmissibility, all of which make a person "ineligible to receive visas and ineligible to be admitted to the United States."  8 U.S.C. § 1182(a).  This case concerns one of those grounds: a likelihood of becoming a public charge.  *Id.* § 1182(a)(4)(A).

In its current form, the INA provides that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible."[3]  8 U.S.C. §

---

[2] The INA "established a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Chamber of Commerce of the United States v. Whiting*, 563 U.S. 582, 587 (2011) (quoting *De Canas v. Bica*, 424 U.S. 351, 353 (1976)).

[3] When Congress transferred the adjudicatory functions of the former Commissioner of the Immigration and Naturalization Service ("INS") to the Secretary of DHS, the Attorney General's authority regarding the public charge provision was delegated to the Director of USCIS, a division of DHS.  *See* 6 U.S.C. § 271(b)(5).

1182(a)(4)(A).  The same provision requires the officer determining whether an applicant is inadmissible as a public charge to consider "at a minimum" the applicant's

> (I) age;
> (II) health;
> (III) family status;
> (IV) assets, resources, and financial status; and
> (V) education and skills.

8 U.S.C. § 1182(a)(4)(B)(i).

The officer "may also consider any affidavit of support under section 213A [8 U.S.C. § 1183a] for purposes of exclusion" on the public charge ground.  *Id.* § 1182(a)(4)(B)(ii).

**B.    Public Charge Rulemaking Process and Content of the Public Charge Rule**

The Public Charge Rule followed issuance of a proposed rule on October 10, 2018.  Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114 (proposed Oct. 10, 2018) (to be codified at 8 C.F.R. pts. 103, 212, 213, 214, 245 and 248). According to the Public Charge Rule, DHS received "266,077 comments" on the proposed rule, "the vast majority of which opposed the rule."  84 Fed. Reg. at 41,297.

The final rule made several changes to the proposed rule.  *See* 84 Fed. Reg. at 41,297−41,300.  For instance:

> Under the proposed rule, DHS would not have considered the receipt of benefits below the applicable threshold in the totality of the circumstances.  As a consequence, USCIS would have been unable to consider an alien's past receipt of public benefits below the threshold at all, even if such receipt was indicative, to some degree, of the alien's likelihood of becoming a public charge at any time in the future.  Under this final rule, adjudicators will consider and give appropriate weight to past receipt of public benefits below the single durational threshold described above in the totality of the circumstances.

84 Fed. Reg. at 41,297.

In addition, while the proposed rule provided for consideration of the receipt of Medicaid benefits by applicants under age 21, the Public Charge Rule does not negatively assess applicants for being enrolled in Medicaid while under the age 21, while pregnant, or "during the 60-day period after pregnancy."  84 Fed. Reg. at 41,297.

### 1.    Redefinition of "Public Charge"

The Public Charge Rule, in its final format, defines "public charge" to denote "an alien who receives one or more public benefits, as defined in paragraph (b) of this section, for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months)."

84 Fed. Reg. at 41,501 (to be codified at 8 C.F.R. § 212.21(a))[4].  The Public Charge

Rule redefines "public benefit" to include: "(1) [a]ny Federal, State, local, or tribal

cash assistance for income maintenance (other than tax credits)," including

Supplemental Security Income ("SSI"), Temporary Assistance for Needy Families

("TANF") or state "General Assistance"; (2) Supplemental Nutrition Assistance

Program ("SNAP," colloquially known as "food stamps"); (3) housing assistance

vouchers under Section 8 of the U.S. Housing Act of 1937; (4) Section 8 "Project-

Based" rental assistance, including "Moderate Rehabilitation"; (5) Medicaid, with

exceptions for benefits for an emergency medical condition, services or benefits

under the Individuals with Disabilities Education Act ("IDEA"), school-based

services or benefits, and benefits for immigrants under age 21 or to a woman during

pregnancy or within 60 days after pregnancy; and (6) public housing under Section 9

of the U.S. Housing Act of 1937.  8 C.F.R. § 212.21(b).

## 2.    Weighted Factors for Totality of the Circumstances Determination

The Public Charge Rule instructs officers to evaluate whether an applicant is

"likely to become a public charge" using a "totality of the circumstances" test that

"at least entail[s] consideration of the alien's age; health; family status; education

---

[4] The Court's subsequent references to the provisions of the Public Charge Rule will use the C.F.R. citations scheduled to take effect on October 15, 2019.

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY AND PRELIMINARY INJUNCTION ~ 7

and skills; and assets, resources, and financial status" as described in the Rule. 8 C.F.R. § 212.22(a), (b). The Public Charge Rule then prescribes a variety of factors to weigh "positively," in favor of a determination that an applicant is not a public charge, and factors to weigh "negatively," in favor of finding the applicant inadmissible as a public charge. 8 C.F.R. § 212.22(a), (b), and (c); *see also, e.g.,* 84 Fed. Reg. 41,295 ("Specifically, the rule contains a list of negative and positive factors that DHS will consider as part of this determination, and directs officers to consider these factors in the totality of the alien's circumstances. . . . The rule also contains lists of heavily weighted negative factors and heavily weighted positive factors."). The Public Charge Rule attributes heavy negative weight to the following circumstances:

> (1) "not a full-time student and is authorized to work, but is unable to demonstrate current employment, recent employment history, or a reasonable prospect of future employment";
>
> (2) "certified or approved to receive one or more public benefits . . . for more than 12 months in the aggregate within any 36-month period, beginning no earlier than 36 months prior to the alien's application for admission or adjustment of status";
>
> (3) "diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide for himself or herself, attend school, or work; and . . . uninsured and has neither the prospect of obtaining private health insurance, nor the financial resources to pay for reasonably foreseeable medical costs related to such medical condition"; and
>
> (4) "previously found inadmissible or deportable on public charge grounds[.]"

8 C.F.R. § 212.22(c)(1)(i)–(iv).

Conversely, the Public Charge Rule attributes heavy positive weight to three factors:

> (1) an annual household income, assets, or resources above 250 percent of the Federal Poverty Guidelines ("FPG") for the household size;
> (2) an annual individual income of at least 250 percent of the FPG for the household size; and
> (3) private health insurance that is not subsidized under the Affordable Care Act.

*See* 8 C.F.R. § 212.22(c)(2)(i)–(iii).

The Public Charge Rule also directs officers to consider whether the applicant (1) is under the age of 18 or over the minimum early retirement age for social security; (2) has a medical condition that will require extensive treatment or interfere with the ability to attend school or work; (3) has an annual household gross income under 125 percent of the FPG; (4) has a household size that makes the immigrant likely to become a public charge at any time in the future; (5) lacks significant assets, like savings accounts, stocks, bonds, or real estate; (6) lacks significant assets and resources to cover reasonably foreseeable medical costs; (7) has any financial liabilities; (8) has applied for, been certified to receive, or received public benefits after October 15, 2019; (9) has applied for or has received a USCIS fee waiver for an immigration benefit request; (10) has a poor credit history and credit score; (11) lacks private health insurance or other resources to cover reasonably foreseeable

1    medical costs; (12) lacks a high school diploma (or equivalent) or a higher education

2    degree; (13) lacks occupational skills, certifications, or licenses; or (14) is not

3    proficient in English.  *See* 8 C.F.R. § 212.22(b).

4         The officer administering the public charge admissibility test has the

5    discretion to determine what factors are relevant and may consider factors beyond

6    those enumerated in the rule.  *See* 8 C.F.R. § 212.22(a)

7         **C.    Applicability of the Rule**

8         The Public Charge Rule applies to any non-citizen subject to section 212(a)(4)

9    of the INA, 8 U.S.C. § 1182(a)(4), who applies to DHS anytime on or after October

10   15, 2019, for admission to the United States or for adjustment of status to that of

11   lawful permanent resident.  8 C.F.R. § 212.20.

12        **D.    Summary of the Counts of the First Amended Complaint**

13        On the same day that the Public Charge Rule was published in the federal

14   register, the fourteen Plaintiff States filed a lawsuit seeking to enjoin the Federal

15   Defendants from enacting the rule.  The Plaintiff States subsequently filed a First

16   Amended Complaint, ECF No. 31, stating four causes of action: (1) a violation of

17   the APA, 5 U.S.C. § 706(2)(C), for agency action "not in accordance with law"; (2)

18   a violation of the APA, 5 U.S.C. § 706(2)(C), for agency action "in excess of

19   statutory jurisdiction [or] authority" or "*ultra vires*"; (3) a violation of the APA, 5

20   U.S.C. § 706(2)(C), for agency action that is "arbitrary, capricious, [or] an abuse of

21   discretion"; and (4) a violation of the guarantee of equal protection under the U.S.

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY
AND PRELIMINARY INJUNCTION ~ 10

Constitution's Fifth Amendment Due Process Clause on the basis that the Public Charge Rule allegedly was motivated by an intent to discriminate based on race, ethnicity, or national origin.  ECF No. 31 at 161−70.

The Federal Defendants have not yet filed an answer, but they have responded to the pending motion.  ECF No. 155.  In their response, the Federal Defendants challenge the Plaintiff States' standing to bring this action.  *Id.* at 18.

## II.   JURISDICTION

The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## III.   STANDING AND RIPENESS

### A.   Standing Requirement

Article III, section 2 of the Constitution extends the power of the federal courts to only "Cases" and "Controversies."  U.S. Const., Art. III, sect. 2.  "Those two words confine 'the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process.'"  *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007) (quoting *Flast v. Cohen*, 392 U.S. 83, 95 (1968)).

To establish standing to sue under Article III, "a plaintiff must demonstrate 'that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury.'"  *Washington v. Trump*, 847 F.3d 1151,

1159 (9th Cir. 2017) (quoting *Massachusetts*, 549 U.S. at 517)).  While an injury

sufficient for constitutional standing must be concrete and particularized rather than

conjectural or hypothetical, "an allegation of future injury may suffice if the

threatened injury is certainly impending, or there is a substantial risk that the harm

will occur." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014)

(internal quotations omitted).

      The Federal Defendants assert that the Plaintiff States lack standing because

their injuries are speculative and do not qualify as injuries-in-fact.  ECF No. 155 at

18−21.  The Federal Defendants further maintain that the Plaintiff States' described

injuries would be the result of third parties' independent decisions to "unnecessarily

. . . forgo all federal benefits," which the Federal Defendants argue is too weak a

basis to support that the injury is fairly traceable to the Public Charge Rule.  ECF

No. 155 at 19−21.

      At this early stage in the litigation, the Plaintiff States may satisfy their burden

with allegations in their Amended Complaint and other evidence submitted in

support of their Motion for a Section 705 Stay and Preliminary Injunction.  *See*

*Washington*, 847 F.3d at 1159.  *Amici* briefs also may support the Plaintiff States'

showing of the elements of standing.  *See SEC v. Private Equity Mgmt. Grp., Inc.*,

No. CV 09-2901 PSG (Ex), 2009 U.S. Dist. LEXIS 75158, at *18 n.5, 2009 WL

2488044 (C.D. Cal. Aug. 10, 2009) (exercising the court's discretion to consider

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY
AND PRELIMINARY INJUNCTION ~ 12

evidence submitted by *amicus curiae* where it was "in a sense, the same evidence produced by a party").

## B.    Alleged Harms

### 1.    Missions of State Benefits Programs

The Plaintiff States allege that they "combine billions of dollars of federal funds from Medicaid with billions of dollars of state funds to administer health care programs for millions" of the Plaintiff States' residents.  ECF No. 34 at 26; *see* ECF Nos. 37 at 4; 38 at 4; 40 at 4.  The Plaintiff States argue that the health programs administered by them enable beneficiaries in varying degrees to access preventative care, chronic disease management, prescription drug treatment, mental health treatment, and immunizations.  *See, e.g.,* ECF No. 40 at 5−7.  The Plaintiff States contend that they administer their programs "to ensure the health, well-being, and economic self-sufficiency" of all of their residents and to provide "comprehensive and affordable health insurance coverage" to State residents.  ECF Nos. 41 at 7; 45 at 5.

Multiple submissions from the Plaintiff States and the *amici* briefs endorse an estimate that "the Public Charge Rule could lead to Medicaid disenrollment rates ranging from 15 percent to 35 percent" among Medicaid and Children's Health Insurance Program enrollees who live in mixed-status households, which  "equates to between 2.1 and 4.9 million beneficiaries disenrolling from the programs."  ECF No. 151 at 20−21; *see also* ECF Nos. 111-1 at 69; 149 at 15−16.  The Plaintiff States

argue that residents' disenrollment or foregoing enrollment "unwinds all the progress that has been achieved" and results "in a sicker risk pool and increase[d] premium costs for all remaining residents enrolled in commercial coverage" through the state plans.  ECF Nos. 37 at 14; 43 at 7.

As stated in the comments submitted to DHS by the Dana-Farber Cancer Institute, "regulations that will make immigrant families fearful of seeking health care services like primary care and routine health screenings will increase the burden of both disease and healthcare costs across the country."  ECF No. 35-2 at 3.

In addition to making receipt of Medicaid health insurance and other public benefit programs a negative factor, the Plaintiff States proffer that the Public Charge Rule disincentivizes individuals from seeking medical diagnoses and treatment because a diagnosis of a medical condition requiring extensive medical treatment or institutionalization will be weighed as a heavy negative factor when combined with a lack of health insurance or independent resources to cover the associated costs; or weighed as a negative factor even with health insurance or independent resources to cover the associated costs.  *See* ECF Nos. 35-2 at 3; 35-1 at 158, 165, and 168.

Health care professionals noted that the weighting of these factors "creates a strong incentive for immigrants to avoid medical examinations and tests to prevent identification of any serious health problem."  ECF No. 35-2 at 3; *see also* ECF No. 65 at 14 ("Fear of the rule change and its effects on utilizing cancer-screening services for people of a variety of citizenship status can lead to grave consequences

both in lives lost from treatable cancers and intensive financial costs of late stage treatment and related care."). Delaying diagnosis and treatment until a condition results in a medical emergency compromises the health and wellbeing of individuals and families and increases the cost of health care for the hospitals, the Plaintiff States, and the Plaintiff States' residents as a whole. *See* ECF Nos. 35-2 at 3; 109 at 18, 47.

Health care providers within the Plaintiff States' health systems likely will incur harms as well. A larger uninsured population is likely to "generate significant uncompensated care costs," which, in turn, are likely to "fall disproportionately on providers in low-income communities who rely on Medicaid for financial support." ECF No. 109 at 48. Service cuts to make up for the uncompensated care costs would then result in fewer patients being able to access primary care services. *Id.*

Another filing supports that the Public Charge Rule likely will burden the doctor-patient relationship. *See* ECF No. 151. First, *amici* health care providers highlight the "well-established state interest in protecting doctor-patient consultations from state intrusion so that patients and doctors may work together to determine the best course of medical care." *Id.* at 19. By "entwining medical decision-making" with immigration considerations, the health care providers maintain that the Public Charge Rule will constrain "clinicians' abilities to recommend public benefit programs as well as their access to reliable forthright disclosures from their patients." *Id.*; *see also* ECF No. 60 at 9 ("Families have asked

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY AND PRELIMINARY INJUNCTION ~ 15

our providers about applying for Medicaid or SNAP in the past, but our providers note that they rescinded these requests" after hearing about the proposed public charge rule.).  Furthermore, health care providers anticipate that "forcing non-citizens to choose between medical treatment or potential deportation or family separation" will induce "patients to miss follow-up appointments or forego treatment" that a clinician has prescribed.  *Id.* at 20.

The Plaintiff States submitted declarations and copies of the comments submitted to DHS during the rulemaking process supporting the conclusion that disenrollment from publicly-funded health insurance programs and related benefits already has begun to occur in anticipation of the effective date of the Public Charge Rule.  *See* ECF Nos. 35-2 at 3; 35-3 at 11; *see also* ECF Nos. 152 at 8; 153 at 17.

### 2.    Health and Well-Being of Plaintiff State Residents

The Plaintiff States' evidence supports that decreased utilization of immunizations against communicable diseases "could lead to higher rates of contagion and worse community health," both in the immigrant population and the U.S. citizen population because of the nature of epidemics.  ECF No. 65 at 14 (further recounting that "[d]isease prevention is dependent upon access to vaccines and high vaccination rates"); *see also, e.g.,* ECF No. 44 at 9.

State health officials anticipate that the Public Charge Rule and its potential to incentivize disenrollment from "critical services" "will unduly increase the number

of people living in poverty and thus destabilize the economic health" of communities in the Plaintiff States.  ECF No. 37 at 14.

The *amici* briefs submitted for the Court's consideration, in addition to the Plaintiff States' submissions, detail harm specific to particular vulnerable groups in the Plaintiff States and throughout the country.

### a.    Children and Pregnant Women

Perhaps best documented in the extensive submissions in support of the instant motion are the anticipated harms to children from disenrollment as a result of the Public Charge Rule.  DHS acknowledges in the Public Charge Rule notice that the Public Charge Rule may "increase the poverty of certain families and children, including U.S. citizen children."  84 Fed. Reg. at 41,482.  The Plaintiff States focus on harm to children stemming from lack of access to health care, sufficient and nutritious food, and adequate housing.

A chilling effect from the Public Charge Rule will deter eligible people, including U.S. Citizen children of immigrant parents, from accessing non-cash public benefits, which will result in further injury to the Plaintiff States.  For instance, disenrolling from SNAP benefits and other supplemental nutrition services is likely to lead to food insecurity with resultant injuries.  *See, e.g.,* ECF No. 35-2 at 7.  Forgoing medical care for children or adult family members because of fear of using non-cash public benefits will lead to less preventative care and result in increased hospital admissions and medical costs, and poor health and developmental

delays in young children.  ECF No. 35-2 at 278−79.  Food insecurity and poor health care ultimately result in long-term health issues and lower math and reading achievement test scores among school children.  *Id.*

With respect to housing, fair market rent without non-cash public benefits may be unaffordable in higher-cost areas of the Plaintiff States even for a family with two household members who each work full-time minimum wage jobs.  *See* ECF No. 77 at 17 (providing detail regarding the Massachusetts housing market). Therefore, "[f]or immigrants who work low-wage jobs and their families, many of which include U.S. citizen children, dropping housing benefits to avoid adverse immigration consequences . . . can be reasonably expected to upend their financial stability and substantially increase homelessness."  *Id.*  The Plaintiff States submitted evidence that homelessness and housing instability during childhood "can have lifelong effects on children's physical and mental health."  ECF No. 35-2 at 39. When families lose their residences because they no longer receive financial assistance with rent, children in those households "are more likely to develop respiratory infections and asthma," among other harms.  ECF No. 37 at 14.

### b.    Disabled Individuals

*Amici* provide a compelling analysis of how the factors introduced by the Public Charge Rule disproportionately penalize disabled applicants by "triple-counting" the effects of being disabled.  ECF No. 110 at 23.  The medical condition and use of Medicaid or other services used to facilitate independence for disabled

individuals each may be assessed negatively against an applicant.  *See* 8 C.F.R. § 212.22(b); *see also* ECF No. 110 at 23.  An individual who is disabled with a medical condition likely to require extensive medical treatment would be disqualified from the positive "health" factor, even if he or she is in good health apart from the disability.  *See id.*  Therefore, there is a significant possibility that disabled applicants who currently reside in the Plaintiff States, or legal permanent residents who return to the U.S. after a 180-day period outside of the U.S., would be deemed inadmissible primarily on the basis of their disability.

In addition, the chilling effect arising out of predictable confusion from the changes in the Public Charge Rule may cause immigrant parents to refuse benefits for their disabled U.S. citizen children or legal permanent resident children.  ECF No. 110 at 26.  Notably, disenrollment of disabled individuals from services in childhood is the type of harm that may result in extra costs to Plaintiff States far into the future because of the citizen and legal permanent resident children reaching adulthood with untreated disabilities.

### c.    Elderly

*Amici* have argued convincingly that the Public Charge Rule will have a substantial negative impact on the elderly.  Many of the Public Charge Rule's negative factors inherently apply to the elderly.  For instance, being over the age of sixty-two may be weighed negatively against an applicant.  ECF No. 150 at 16; *see* 8 C.F.R. § 212.22(b)(1)(i).  Additionally, many elderly people rely on their

families for support.  *See id*. at 19–20.  Although immigration law in the United

States has traditionally favored family unification, the Public Charge Rule may

penalize people for living with their families, counting their family reliance against

them.  *See* ECF No. 150 at 19 (citing the "preference allocation for family-

sponsored immigrants" in 8 U.S.C. § 1153(a)).  Furthermore, the new rule

penalizes people with a medical diagnosis that will require extensive treatment,

and most adults over fifty years old have at least one chronic health condition.  *Id*.

at 18 (citing AARP Public Policy Institute, *Chronic Care: A Call to Action for*

*Health Reform*, 11–12, 16 (2009); University of New Hampshire Institute on

Disability/ UCED, 2017 *Disability Statistics Annual Report* (2018)); *see* 8 C.F.R. §

212.22(b)(2)(ii)(B).  Many elderly people rely on non-cash forms of public

assistance like Medicaid, SNAP, and public housing and rental assistance.  ECF

No. 150 at 15.  That assistance will be counted against them by the Public Charge

Rule, predictably leading to disenrollment from such programs.  *See id*. at 27; 8

C.F.R. § 212.22(d).  *Amici* persuasively argue that without assistance from

important programs like Medicaid elderly people will experience additional and

exacerbated medical problems, "creating a new and uncompensated care burden on

society."  ECF No. 150 at 27.

Moreover, many elderly people do not satisfy the Public Charge Rule's

positive factors.  For instance, one of the Rule's positive factors is having an

income that exceeds 250 percent of the federal poverty level.  *Id*. at 16; 8 C.F.R. §

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY
AND PRELIMINARY INJUNCTION ~ 20

212.22(c)(2)(ii).  *Amici* state that most people over the age of sixty-two live in moderate to low-income households, making them ineligible for this positive factor.  *See* ECF No. 150 at 16 (citing *Public Charge Proposed Rule: Potentially Chilled Population Data Dashboard*, Mannat (Oct. 11, 2018)).  Many people also will have their income level counted negatively against them because having an income of less than 125 percent of the federal poverty level is a negative factor.  *Id*.; *see* 8 C.F.R. § 212.22(b)(4)(i).

### d.  Domestic Violence Victims

*Amici* organizations who support victims of domestic violence identify an overlap between the assistance a woman may seek or receive as she leaves an abusive relationship and establishes independence and the new definition of "public benefit" in the Public Charge Rule.  *See* ECF No. 111 at 20−32.  In addition, the Public Charge Rule does not except health issues resulting from abuse from the negative medical condition factors.  *See id.*; 8 C.F.R. § 212.22(b).  The *amici* represent that the chilling effect is occurring in anticipation of the Public Charge Rule, with "victims . . . already foregoing critical housing, food, and healthcare assistance out of fear that it will jeopardize their immigration status."  ECF No. 111 at 22.  Foregoing non-cash public benefits by domestic violence victims risks "broader impacts" to the health and wellbeing of residents throughout the Plaintiff States "as a result of unmitigated trauma to victims and their families."  *Id.* at 24.

### 3.    Financial Harm to Plaintiff States

The Plaintiff States and the *amici* briefs make a cohesive showing of ongoing financial harm to the States as disenrollment from "safety net" benefits programs predictably occurs among vulnerable populations. As noted above, both immigrant and U.S. citizen children of immigrants are more likely to experience poorer long-term outcomes, including impaired growth, compromised cognitive development, and obesity without access to non-cash public benefits. ECF No. 149 at 21. Further, exposure to housing insecurity and homelessness often is associated with increased vulnerability to a range of adult diseases such as heart attacks, strokes, and smoking-related cancers. *Id.* at 22. Even if the immigrant children no longer reside in the Plaintiff States, the affected U.S. citizen children will remain entitled to live in the Plaintiff States, or in other states not plaintiffs before this Court, once they are adults. Therefore, the Plaintiff States face increased costs to address the predictable effects of the adverse childhood experiences over the course of these U.S. citizen children's lifetimes, potentially fifty years or more down the road.

The Plaintiff States further face likely pecuniary harm from contagion due to unvaccinated residents, resulting in outbreaks of influenza, measles, and a higher incidence of preventable disease among immigrants as well as U.S. citizens. ECF No. 38 at 7−8. It is reasonably certain that any outbreaks would result in "reduced days at work, reduced days at school, lower productivity, and long-term negative

economic consequences," as well as the cost of responding to an epidemic for state and local health departments.  *Id.*

The Plaintiff States also allege that they will incur additional administrative costs as a result of the Public Charge Rule, including "training staff, responding to client inquiries related to the Final Rule, and modifying existing communications and forms."  ECF No. 40 at 7−8 (declaration from the Deputy Commissioner of the New Jersey Department of Human Services, adding "Because the rules for determining whether someone is a public charge are technical and confusing, it will be extremely difficult to train frontline staff to have the requisite understanding necessary to help potential applicants determine whether they would be deemed a public charge under the proposed Final Rule.").  The Plaintiff States also may incur the expense of developing alternative programming and enacting new eligibility rules across multiple systems of benefits to "mirror" the effect of Medicaid and other federal programs and to mitigate the negative effects from the Public Charge Rule on individual and community health.  *See* ECF No. 37 at 15.

### C.    Application of Harms to Standing Requirements

The Plaintiff States argue that they have made a clear showing of each element of standing by showing that "the Rule will lead to a cascade of costs to states as immigrants disenroll from federal and state benefits programs, . . . thereby frustrating the States' mission in creating such programs and harming state residents."  ECF No. 158 at 11 (citing cases supporting state standing based on a

1    proprietary interest and a quasi-sovereign interest in the health and wellbeing of the

2    state's residents).   The Plaintiff States further allege future economic harm.  *Id.* at

3    35 (citing a declaration at ECF No. 66 at 19 estimating an annual reduction in total

4    economic output of $41.8 to $97.5 million and other damage to the Washington

5    State economy alone).

6        The Federal Defendants argue that the Plaintiff States' alleged harm is not

7    fairly traceable to the Public Charge Rule but would be the result of third-party

8    decisions, such as "unnecessarily choosing to forgo all federal benefits."  *See* ECF

9    No. 155 at 19−21.  The Supreme Court recently addressed the Federal Defendants'

10   traceability argument in *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), in

11   which a group of states and other plaintiffs challenged the Secretary of Commerce's

12   decision to inquire about citizenship status on the census questionnaire.  *Id.* at 2557.

13   There, the Government argued "that any harm to respondents is not fairly traceable

14   to the Secretary's decision, because such harm depends on the independent action of

15   third parties choosing to violate their legal duty to respond to the census."  139 S. Ct.

16   at 2565.  The Supreme Court rejected the Government's argument, concluding:

17        But we are satisfied that, in these circumstances, respondents have met
         their burden of showing that third parties will likely react in predictable
18        ways to the citizenship question, even if they do so unlawfully and
         despite the requirement that the Government keep individual answers
19        confidential. . . .  Respondents' theory of standing . . . does not rest on
         mere speculation about the decisions of third parties; it relies instead on
20        the predictable effect of Government action on the decisions of third
         parties.

21

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY
AND PRELIMINARY INJUNCTION ~ 24

139 S. Ct. at 2566.

The Plaintiff States have made a strong showing of the predictable effect of the Government action on individual residents who are not parties in this action, and in turn, the predictable effect on the Plaintiff States. The complexities of the multi-factor totality of the circumstances test and the new definition of "public charge" that USCIS officers must administer are not fully captured in this Order. Nevertheless, from the components of the rule that the Court already has closely examined, it is predictable that applying the multi-factor Public Charge Rule would result in disparate results depending on each USCIS officer. Moreover, the general message conveyed to USCIS officers, immigrants, legal permanent residents, and the general public alike is unmistakable: the Public Charge Rule creates a wider barrier to exclude individuals seeking to alter their immigration status.

Therefore, it is further predictable that individuals who perceive that they or their children may fall within the broadened scope of the public charge inadmissibility ground will seek to reduce that risk by disenrolling from non-cash public benefits. Otherwise stated, the chilling effect of the Public Charge Rule likely will lead individuals to disenroll from benefits, because receipt of those benefits likely would subject them to a public charge determination, and, equally foreseeably, because the Public Charge Rule will create fear and confusion regarding public charge inadmissibility.

Also predictable is that the chilling effect will negatively impact the Plaintiff States' missions, the health and wellbeing of their residents, citizens and non-citizens alike, and the Plaintiff States' budgets and economies. "'A causal chain does not fail simply because it has several 'links,' provided those links are not hypothetical or tenuous.'" *California v. Azar*, 911 F.3d 558, 571−72 (9th Cir. 2018) (quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (internal quotation omitted)). While the magnitude of the injuries may remain in dispute, the Plaintiff States have shown that their likely injuries are a predictable result of the Public Charge Rule. *See California*, 911 F.3d at 572 (citing *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n. 14 (1973), for the proposition that injuries of only a few dollars can establish standing).

## D.    Ripeness

A case is ripe for adjudication only if it presents "issues that are 'definite and concrete, not hypothetical or abstract.'" *Clark v. City of Seattle*, 899 F.3d 802, 809 (9th Cir. 2018) (quoting *Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d. 1144, 1153 (9th Cir. 2017)). Just as the Federal Defendants argue that the Plaintiff States' alleged harms are not concrete or imminent, they make the same arguments for purposes of ripeness. The Court applies the same analysis as discussed for standing and concludes that the alleged harms are sufficiently concrete and imminent to support ripeness.

The Federal Defendants also argue that the Court should decline to hear the case on the basis of prudential ripeness.  *See* ECF No. 155 at 25.  Courts resolve questions of prudential ripeness "in a twofold aspect," evaluating "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967).  Where review of an administrative action is at issue, "[f]itness for resolution depends on the nature of the issue and the finality of the administrative agency's action."  *Hotel Emples. & Rest. Emples. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1513 (9th Cir. 1993).  Once a court has found that constitutional ripeness is satisfied, the prudential ripeness bar is minimal, as "'a federal court's obligation to hear and decide' cases within its jurisdiction is 'virtually unflagging.'"  *Susan B. Anthony List*, 572 U.S. at 167 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125−26 (2014) (internal quotation omitted)).

The Federal Defendants misconstrue the issues raised by the Amended Complaint and the record on the instant motion.  Challenges to the validity of a rule under the judicial review provisions of the APA present issues fit for adjudication by a court.  *See Abbott Laboratories*, 387 U.S. at 149−52 (review of a rule before it has been applied and enforced is available where "the regulations are clear-cut," present a legal issue, and constitute the agency's formal and definitive statement of policy).  Moreover, the Plaintiff States' harm would only be exacerbated by delaying review.  For example, delaying review increases the potential for spread of infectious

1    diseases among the populations of the Plaintiff States, as well as to nearby states, as

2    a result of reduced access to health care and vaccinations.  Therefore, the Court finds

3    this matter is ripe for review.

4         **E.    Zone of Interests**

5         The Federal Defendants argue that the Plaintiff States do not fall within the

6    "zone of interests" of the INA because: "It is aliens improperly determined

7    inadmissible, not States, who 'fall within the zone of interests protected' by any

8    limitations implicit in § 1182(a)(4)(A) and § 1183 because they are the

9    'reasonable—indeed, predictable—challengers' to DHS's inadmissibility decisions."

10    ECF No. 155 at 28 (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*

11    *v. Patchak*, 567 U.S. 209, 227 (2012); 8 U.S.C. § 1252 (providing for appeal by an

12    individual of a final order of removal based on a public charge determination)).

13         However, the zone of interests test is "not 'especially demanding.'"  *Lexmark*

14    *Int'l*, 572 U.S. at 130 (quoting *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225).

15    Particularly where a plaintiff pursues relief through the APA, the Supreme Court has

16    directed that the test shall be applied "in keeping with Congress's 'evident intent'

17    when enacting the APA 'to make agency action presumptively reviewable.'"

18    *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225 (quoting *Clarke v. Sec. Indus. Ass'n*,

19    479 U.S. 388, 399 (1987)).  There is no requirement that a plaintiff show "any

20    'indication of congressional purpose to benefit the would-be plaintiff.'"  *Id.* (quoting

21    *Clarke*, 479 U.S. at 399−400).  Moreover, the "benefit of any doubt goes to the

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY
AND PRELIMINARY INJUNCTION ~ 28

1    plaintiff." *Id.* "The test forecloses suit only when a plaintiff's 'interests are so

2    marginally related to or inconsistent with the purposes implicit in the statute that it

3    cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.*

4    (quoting *Clarke*, 479 U.S. at 399).

5        The Plaintiff States meet this lenient standard by tracing the origins of the

6    public charge exclusion enacted by Congress in 1882 "to protect state fiscs." ECF

7    No. 158 at 14. The concept of a "public charge" exclusion originally was

8    incorporated into U.S. law by Congress in 1882 to protect states from having to

9    spend state money to provide for immigrants who could not provide for themselves.

10   ECF No. 158 at 14−15 n. 3. The Plaintiff States reasonably extrapolate: "By

11   imposing significant uncompensated costs on the Plaintiff States and undermining

12   their comprehensive public assistance programs, the Rule undermines the very

13   interests advanced by the statutes on which DHS relies." ECF No. 158 at 14−15

14   (citing *Texas v. United States*, 809 F.3d 124, 163 (5th Cir. 2015), *aff'd*, 136 S. Ct.

15   2271 (2016) for the proposition that it "recogniz[es] states' economic interests in

16   immigration policy"). Thus, states were at the center of the zone of interest for use

17   of the term "public charge" from the beginning of the relevant statutory scheme, and

18   the Plaintiff States continue to have interests that are sufficiently consistent with the

19   purposes implicit in the public charge inadmissibility policy to challenge its

20   application now.

21

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY
AND PRELIMINARY INJUNCTION ~ 29

1    The Court finds that the Plaintiff States have standing to pursue this action,

2  that the issues are ripe for adjudication, and that the Plaintiff States are within the

3  zone of interests of the Public Charge Rule.

## IV.    LEGAL STANDARDS FOR STAYS AND PRELIMINARY INJUNCTIONS IN CASES CHALLENGING AGENCY ACTION

The Administrative Procedure Act's stay provision states, in relevant part:

> On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705.[5]

The Court applies a closely similar standard in deciding whether to stay the

effect of a rule under section 705 as it does in deciding whether to issue a

preliminary injunction under Fed. R. Civ. P. Rule 65(a). *Nken v. Holder*, 556 U.S.

418, 425−26 (2009); *see also Hill Dermaceuticals, Inc. v. United States FDA*, 524 F.

Supp.2d 5, 8 (D.D.C. 2007). For a preliminary injunction, the moving party must

demonstrate: (1) likelihood of success on the merits; (2) likelihood of irreparable

harm in the absence of preliminary relief; (3) that the balance of equities tips in the

moving party's favor; and (4) that an injunction is in the public interest. *Winter v.*

---

[5] Alternatively, Section 705 authorizes an agency itself to temporarily stay the effective date of its rule pending judicial review, when it "finds that justice so requires." 5 U.S.C. § 705.

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY AND PRELIMINARY INJUNCTION ~ 30

1  *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).   For a stay, the traditional

2  test articulates the third factor in slightly different terms: "'whether issuance of the

3  stay will substantially injure the other parties." *Nken*, 556 U.S. at 419 (quoting

4  *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

5        Provided the Court considers all four parts of the *Winter* test, the Court may

6  supplement its preliminary injunction inquiry by considering whether "the likelihood

7  of success is such that 'serious questions going to the merits were raised and the

8  balance of hardships tips sharply in [the requesting party's] favor.'" *Alliance for the*

9  *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (quoting *Clear*

10 *Channel Outdoor, Inc. v. City of L.A.*, 340 F.3d 810, 813 (9th Cir. 2003)).   The Ninth

11 Circuit's "sliding scale" approach survives *Winter*, "so long as the [movant] also

12 shows that there is a likelihood of irreparable injury and that the injunction is in the

13 public interest." *Alliance for the Wild Rockies*, 632 F.3d at 1135.

14       Both a stay under section 705 and a preliminary injunction serve the purpose

15 of preserving the status quo until a trial on the merits can be held.  *Univ. of Texas v.*

16 *Camenisch*, 451 U.S. 390, 395 (1981); *Boardman v. Pac. Seafood Grp.*, 822 F.3d

17 1011, 1024 (9th Cir. 2016); *Sierra Club v. Jackson*, 833 F.Supp.2d 11, 28 (D.D.C.

18 2012) ("Such a stay is not designed to do anything other than preserve the status

19 quo.") (citing 5 U.S.C. § 705).

20       Section 705 and preliminary injunctions under Rule 65, although determined

21 by application of similar standards, offer different forms of relief.  *Nken*, 556 U.S. at

428.  An injunction "is directed at someone, and governs that party's conduct."  *Id.*  "By contrast, instead of directing the conduct of a particular actor, a stay operates upon the judicial proceeding itself.  It does so either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability."  *Id.*  "If nothing else, the terms are by no means synonymous."  *Id.*

One difference is that Fed. R. Civ. P. 65(c) requires the court to determine the amount that the movant must give in security for "the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Section 705 contains no such requirement.

In granting preliminary injunctive relief pursuant to Fed. R. Civ. P. 65, a court must consider whether the defendant shall be enjoined from enforcing the disputed rule against all persons nationwide, or solely against plaintiffs.  "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."  *Trump v. Intern. Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017).

There is "no bar against . . . nationwide relief in federal district or circuit court when it is appropriate."  *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987); *see also Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952) ("[T]he District Court in exercising its equity powers may command persons properly before it to cease or perform acts outside its territorial jurisdiction."); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 181 n. 12 (2010) (J. Stevens, dissenting) ("Although we have

not squarely addressed the issue, in my view there is no requirement that an injunction affect only the parties in the suit.  To limit an injunction against a federal agency to the named plaintiffs would only encourage numerous other regulated entities to file additional lawsuits in this and other federal jurisdictions.") (internal quotations omitted).  The primary consideration is whether the injunctive relief is sufficiently narrow in scope to "'be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs' before the court."  *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

The Ninth Circuit has "upheld nationwide injunctions when 'necessary to give Plaintiff a full expression of their rights.'"  *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (quoting *Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017), *rev'd on other grounds Trump v. Hawaii*, 138 S. Ct. 2392 (2018), and citing *Washington v. Trump*, 847 F.3d 1151, 1166−67 (9th Cir. 2017) (per curium)).  By contrast, the Ninth Circuit has vacated a nationwide injunction on a finding that the plaintiffs did not make "a sufficient showing of 'nationwide impact' demonstrating that a nationwide injunction is necessary to completely accord relief to them.'"  *Id.*

/ / /

/ / /

/ / /

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY AND PRELIMINARY INJUNCTION ~ 33

# V.   ANALYSIS

## A.   Likelihood of Success on the Merits

For purposes of the Motion for a Stay and Preliminary Injunction, the Plaintiff States highlight the likelihood of success on the merits of their first and third causes of action, both of which are pursuant to the APA.  ECF No. 34 at 21−51.

Under the APA, "[a] person suffering legal wrong because of agency action. . . is entitled to judicial review thereof."  5 U.S.C. § 702.  The APA further directs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### 1.   First Cause of Action: Violation of the Administrative Procedure Act—Action Not in Accordance with Law

An administrative agency "may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'"  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000), *superseded by statute on other grounds*, 21 U.S.C. § 387a.  When an administrative agency's action involves the construction of a statute that the agency administers, a court's analysis is governed by the two-step framework set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *Id.* at 125−26.

A reviewing court's first inquiry under *Chevron* is whether Congress has expressed its intent clearly and unambiguously in the statutory language at issue.

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY AND PRELIMINARY INJUNCTION ~ 34

*Brown & Williamson*, 529 U.S. at 132.  If Congress has spoken directly to the issue before the reviewing court, the court's inquiry need not proceed further, and the court "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 843.  If Congress has not addressed the specific question raised by the administrative agency's construction of a statute, "a reviewing court must respect the agency's construction of the statute so long as it is permissible." *Brown & Williamson*, 529 U.S. at 132 (citing *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999); *Auer v. Robbins*, 519 U.S. 452, 457 (1997)).

In analyzing the first step of *Chevron,* "whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation." *Brown & Williamson*, 529 U.S. at 133.  The reviewing court must read the words of a statute "'in their context and with a view to their place in the overall statutory scheme.'" *Id.* (quoting *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989)).  A court must interpret a particular statutory provision both in the context of other parts of the same regulatory scheme and with respect to other statutes that may affect the meaning of the statutory provision at issue.  *Id.*

In this case, the issue is whether Congress has expressed its intent regarding barring individuals from obtaining visas or changing their status to legal permanent residents based on a specific definition of public charge.  Congress has expressed its intent regarding the public charge statute in a variety of forms.  In 1986, Congress

included a special rule in a section of the INA addressing waivers of the public

charge inadmissibility ground for applicants seeking legal permanent residency

status. 8 U.S.C. § 1255a(d)(2)(B)(iii). The "special rule for determination of public

charge," excepts an immigrant seeking relief under that section from inadmissibility

as a public charge if he or she demonstrates "a history of employment in the United

States evidencing self-support without receipt of public cash assistance." *Id.*

Later, as part of the Personal Responsibility and Work Opportunity

Reconciliation Act of 1996 ("Welfare Reform Act"), Congress enacted a statutory

provision articulating the following "Statements of national policy concerning

welfare and immigration":

> The Congress makes the following statements concerning national policy with respect to welfare and immigration:
>
> (1) Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes.
> (2) It continues to be the immigration policy of the United States that—
>    (A) aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations, and
>    (B) the availability of public benefits not constitute an incentive for immigration to the United States.
> (3) Despite the principle of self-sufficiency, aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates.
> (4) Current eligibility rules for public assistance and unenforceable financial support agreements have proved wholly incapable of assuring that individual aliens not burden the public benefits system.
> (5) It is a compelling government interest to enact new rules for eligibility and sponsorship agreements in order to assure that aliens be self-reliant in accordance with national immigration policy.

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY
AND PRELIMINARY INJUNCTION ~ 36

(6) It is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits.

(7) With respect to the State authority to make determinations concerning the eligibility of qualified aliens for public benefits in this title, a State that chooses to follow the Federal classification in determining the eligibility of such aliens for public assistance shall be considered to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy.

8 U.S.C. § 1601.

The Welfare Reform Act further limited eligibility for many "federal means-tested public benefits," such as Medicaid and SNAP, to "qualified" immigrants, and Congress defined "qualified" to include lawful permanent residents and certain other legal statuses. *See* 8 U.S.C. § 1641(b). Most immigrants become "qualified" for benefits eligibility five years after their date of entry. 8 U.S.C. §§ 1612, 1613. States retain a significant degree of authority to determine eligibility for state benefits. *See* 8 U.S.C. §§ 1621−22, 1641.

Thus, in the course of significantly restricting access to public benefits by non-citizens, Congress expressly states that part of its national immigration policy is allowing public benefits to qualified aliens in "the least restrictive means available" in order to achieve the goal that the aliens "be self-reliant." 8 U.S.C. § 1601(7). Congress did not state that there should be no public benefits provided to qualified aliens, but rather that public benefits be provided in "the least restrictive means available." *See id.* The Public Charge Rule at issue here likely would chill qualified

aliens from accessing all public benefits by weighing negatively the use of non-cash public benefits for inadmissibility purposes.

One month after enactment of the Welfare Reform Act, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("Immigration Reform Act") reenacted the existing public charge provision and codified the five minimum factors approach to public charge determinations that remains in effect today and will continue to be in effect if the Public Charge Rule is not implemented on October 15, 2019. *See* 8 U.S.C. § 1182(a)(4).

In the course of enacting the Immigration Reform Act, members of Congress debated whether to expand the public charge definition to include use of non-cash public benefits. *See* Immigration Control & Financial Responsibility Act of 1996, H.R. 2202, 104th Cong. § 202 (1996) (early House bill that would have defined public charge for purposes of removal to include receipt by a non-citizen of Medicaid, supplemental food assistance, SSI, and other means-tested public benefits). However, in the Senate, at least one senator criticized the effort to include previously unconsidered, non-cash public benefits in the public charge test and to create a bright-line framework of considering whether the immigrant has received public benefits for an aggregate of twelve months as "too quick to label people as public charges for utilizing the same public assistance that many Americans need to get on their feet." S. Rep. No. 104-249, at *63−64 (1996) (Senator Leahy's remarks).

Congress's intent is reflected by the fact that the Immigration Reform Act that was enacted into law did not contain the provisions that would have incorporated into the public charge determination non-cash public benefits.  *See* 8 U.S.C. § 1182(a)(4).

After the Welfare Reform Act and the Immigration Reform Act took effect, Congress further demonstrated its intent regarding non-cash public benefits for immigrants by expanding access to SNAP benefits for certain immigrants who resided in the United States at the time that the Welfare Reform Act was enacted and to children and certain immigrants with disabilities regardless of how long they had been in the country.  *See* Agricultural Research, Extension, and Education Reform Act of 1998, Pub. L. No. 105-185, 112 Stat. 523; Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, 116 Stat. 134.

In 1999, to "help alleviate public confusion over the meaning of the term 'public charge' in immigration law and its relationship to the receipt of Federal, State, and local public benefits," the INS issued "field guidance" ("the 1999 field guidance") and a proposed rule to guide public charge determinations by INS officers.  INS, Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689 (Mar. 26, 1999).  The 1999 field guidance provided that a person may be deemed a public charge under the inadmissibility provision at 8 U.S.C. § 1182(a)(4) if the person is "primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for

income maintenance or (ii) institutionalization for long-term care at government expense." *Id*. at 28,692.

In issuing the field guidance and proposed rule, the INS reasoned as follows:

The Service is proposing this definition by regulation and adopting it on an interim basis for several reasons. First, confusion about the relationship between the receipt of public benefits and the concept of ''public charge'' has deterred eligible aliens and their families, including U.S. citizen children, from seeking important health and nutrition benefits that they are legally entitled to receive. This reluctance to access benefits has an adverse impact not just on the potential recipients, but on public health and the general welfare. Second, non-cash benefits (other than institutionalization for long-term care) are by their nature supplemental and do not, alone or in combination, provide sufficient resources to support an individual or family. In addition to receiving non-cash benefits, an alien would have to have either additional income—such as wages, savings, or earned retirement benefits—or public cash assistance. Thus, by focusing on cash assistance for income maintenance, the Service can identify those who are primarily dependent on the government for subsistence without inhibiting access to non-cash benefits that serve important public interests. Finally, certain federal, state, and local benefits are increasingly being made available to families with incomes far above the poverty level, reflecting broad public policy decisions about improving general public health and nutrition, promoting education, and assisting working-poor families in the process of becoming self-sufficient. Thus, participation in such noncash programs is not evidence of poverty or dependence.

64 Fed. Reg. at 28,692.

In addition, the INS noted: "In adopting this new definition, the Service does not expect to substantially change the number of aliens who will be found deportable or inadmissible as public charges." *Id.*

1    The proposed rule was never finalized, but the 1999 field guidance has

2    applied to public charge determinations since it was issued twenty years ago.  *See*

3    ECF No. 35-1 at 109.  During the past twenty-year period, Congress has not

4    expressly altered the working definition of public charge or the field guidance as to

5    how the public charge inadmissibility ground should be applied to applicants for

6    visas or permanent legal residency.

7        In 2013, Congress again considered and rejected a proposal to broaden the

8    public charge inadmissibility ground to require applicants to show that "they were

9    not likely to qualify even for non-cash employment supports such as Medicaid, the

10    SNAP program, or the Children's Health Insurance Program (CHIP)." S. Rep. No.

11    113-40 (Jun. 7, 2013).

12        The Plaintiff States also maintain that the Public Charge Rule "departs from

13    the unambiguously expressed intent of Congress" in statutes other than the Welfare

14    Reform Act and the INA, namely section 504 of the Rehabilitation Act and a statute

15    governing SNAP benefits.  ECF No. 31 at 169−71.

16        With respect to the Rehabilitation Act of 1973, the Plaintiff States assert that

17    the Public Charge Rule is not in accordance with section 504, which provides that

18    "[n]o otherwise qualified individual with a disability in the United States . . . shall,

19    solely by reason of her or his disability, be excluded from the participation in, be

20    denied the benefits of, or be subjected to discrimination . . . under any program or

21    activity conducted by an Executive agency."  29 U.S.C. § 794(a).  The SNAP statute

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY
AND PRELIMINARY INJUNCTION ~ 41

provides that "the value of benefits that may be provided under this chapter shall not be considered income or resources for any purpose under any Federal, State, or local laws." 7 U.S.C. § 2017(b).

The Federal Defendants broadly assert: "From the beginning, immigration authorities have recognized that the plain meaning of the public charge ground of inadmissibility encompasses all of those likely to become a financial burden on the public, and that the purpose of the provision is to exclude those who are not self-sufficient." ECF No. 155 at 35−36. The Federal Defendants rely on the statements of the Secretary of Labor to the House Committee on Immigration and Naturalization in 1916 to support that the goal behind the public charge inadmissibility ground is to support self-sufficiency:

> [(1)] a person is 'likely to become a public charge' when 'such applicant may be a charge (an economic burden) upon the community to which he is going.'[; and]
> [(2)] the public charge clause 'for so many years has been the chief measure of protection in the law . . . intended to reach economic rather than sanitary objections to the admission of certain classes of aliens.'

*Id.* (citing H.R. Doc. No. 64-886, at 3−4 (1916)); *see also* ECF No. 155 at 37 ("As explained above, Congress and the Executive Branch have long recognized the 'public charge' ground as a 'chief measure' for ensuring the economic self-sufficiency of aliens.").

The Federal Defendants' arguments to this Court replicate DHS's assertion in the rulemaking record that "self-sufficiency is the rule's ultimate aim." 84 Fed. Reg.

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY AND PRELIMINARY INJUNCTION ~ 42

at 41,313.  DHS attempts to reconcile the absence of the Welfare Reform Act's "self-sufficiency" language in the public charge inadmissibility provision at 8 U.S.C. § 1182(a)(4) by noting the temporal proximity between the Welfare Reform Act and the Immigration Reform Act:

> Although the INA does not mention self-sufficiency in the context of . . . 8 U.S.C. § 1182(a)(4), DHS believes that there is a strong connection between the self-sufficiency policy statements [in the Welfare Reform Act] (even if not codified in the INA itself) at 8 U.S.C. 1601 and the public charge inadmissibility language in . . . 8 U.S.C. 1182(a)(4), which were enacted within a month of each other.

84 Fed. Reg. at 41,355−56.

Notably, DHS cites no basis for interpreting the policy statements at 8 U.S.C. § 1601 beyond a belief in "a strong connection" between those policy statements and the public charge rule inadmissibility ground.

Essentially, at this early stage in the litigation, the Federal Defendants urge the Court to take two unsupported leaps of statutory construction.  First, they seek a legal conclusion that the purpose of the public charge inadmissibility provision is to "ensur[e] the economic self-sufficiency of aliens."  ECF No. 155 at 37.  Second, the Federal Defendants argue that Congress has delegated to DHS the role of determining what benefits programs, income levels, and household sizes or compositions, promote or undermine self-sufficiency.  However, the Federal Defendants have not cited any statute, legislative history, or other resource that supports the interpretation that Congress has delegated to DHS the authority to

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY AND PRELIMINARY INJUNCTION ~ 43

1   expand the definition of who is inadmissible as a public charge or to define what

2   benefits undermine, rather than promote, the stated goal of achieving self-

3   sufficiency.

4        By contrast, the Plaintiff States offer extensive support for the conclusion that

5   Congress unambiguously rejected key components of the Public Charge Rule,

6   including the consideration of non-cash public benefits and a rigid twelve-month

7   aggregate approach in determining whether someone would be deemed a public

8   charge.  In the pivotal legislative period of 1996, and again in 2013, Congress

9   rejected the provisions that the Public Charge Rule now incorporates.  In 2013, as

10  the Plaintiff States underscore, Congress rejected expansion of the benefits

11  considered for public charge exclusion with full awareness of the 1999 field

12  guidance in effect.  *See* ECF No. 158 at 18 (citing *Lorillard v. Pons*, 434 U.S. 575,

13  580 (1978) ("Congress is presumed to be aware of an administrative or judicial

14  interpretation of a statute and to adopt that interpretation when it re-enacts a statute

15  without change.")).

16       Furthermore, the Plaintiff States make a strong showing in the record that

17  DHS has overstepped its authority.  The Federal Defendants assert, without any

18  citation to authority, that "an individual who relies on Medicaid benefits for an

19  extended period of time in order 'to get up, get dressed, and go to work,' is not self-

20  sufficient.'"  ECF No. 155 at 54 (quoting from Plaintiff's motion at ECF No. 34).

21  Yet, again, the Federal Defendants offer no authority to support that DHS's role, by

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY
AND PRELIMINARY INJUNCTION ~ 44

Congressional authorization, is to define self-sufficiency.  *See Comcast Corp. v. FCC*, 600 F.3d 642, 655 (D.C. Cir. 2010) (rejecting the FCC's interpretation of its authority because "if accepted it would virtually free the Commission from its congressional tether.").  The Federal Defendants also have not explained how DHS as an agency has the expertise necessary to make a determination of what promotes self-sufficiency and what amounts to self-sufficiency.

As further illustration of DHS's unmooring from its Congressionally delegated authority, DHS justifies including receipt of Medicaid in the public charge consideration by reciting that "'the total Federal expenditure for the Medicaid program overall is by far larger than any other program for low-income people.'" ECF No. 109 at 41 (brief from Health Law Advocates and other public health organizations, quoting 84 Fed. Reg. at 41,379).  However, "[t]he cost of Medicaid is not DHS's concern[, as] Congress delegated the implementation and administration of Medicaid, including the cost of the program, to HHS and the states."  *Id*. (citing 42 U.S.C. §§ 1396, 1396-1, 1315(a)).  Congress cannot delegate authority that the Constitution does not allocate to the federal government in the first place, and the states exercise a central role in formulation and administration of health care policy. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 636 ("[T]he facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed."); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996) (noting the "historic primacy of state regulation of matters of health

1  and safety").   Therefore, the Court finds a likelihood that the Plaintiff States will be

2  successful in proving that DHS acted beyond its Congressionally delegated authority

3  when it promulgated the Public Charge Rule.

4       Moreover, the Rehabilitation Act prohibits denying a person benefits,

5  excluding a person from participating, or discriminating against a person "solely by

6  reason of her or his disability[.]"  29 U.S.C. § 794(a).   Although DHS acknowledges

7  in the Public Charge Rule notice that the Public Charge Rule will have a "potentially

8  outsized impact" on individuals with disabilities, DHS rationalizes that "Congress

9  did not specifically provide for a public charge exemption for individuals with

10  disabilities and in fact included health as a mandatory factor in the public charge

11  inadmissibility consideration."  84 Fed. Reg. at 41,368.  The Federal Defendants

12  argue that the Public Charge Rule is consistent with the Rehabilitation Act because

13  disability is "one factor (among many) that may be considered."  ECF No. 155 at 61.

14       At this early stage in the litigation, the plain language of the Public Charge

15  Rule casts doubt that DHS ultimately will be able to show that the Public Charge

16  Rule is not contrary to the Rehabilitation Act.  First, contrary to the Federal

17  Defendants' assertion, the Public Charge Rule does not state that disability is a

18  factor that "may" be considered.  Rather, if the "disability" is a "medical condition

19  that is likely to require extensive medical treatment," it is one of the minimum

20  factors that the officer must consider.  *See* 8 C.F.R. § 212.22(b).  Second, as the

21  *amici* highlighted, an individual with a disability is likely to have the disability

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY
AND PRELIMINARY INJUNCTION ~ 46

counted at least twice as a negative factor in the public charge determination because receipt of Medicaid is "essential" for millions of people in the United States with disabilities, and "a third of Medicaid's adult recipients under the age of 65 are people with disabilities."  ECF No. 110 at 19 (emphasis in original removed).

*Amici* maintain that contrary to being an indicator of becoming a public charge, Medicaid is "positively associated with employment and the integration of individuals with disabilities, in part because Medicaid covers employment supports that enable people with disabilities to work."  ECF No. 110 at 19–20; *see also* 42 U.S.C. § 1396-1 (providing that grants to states for medical assistance programs for families with dependent children and aged, blind, or disabled individuals are for the purpose of "help[ing] such families and individuals attain or retain capability for independence or self-care[.]").  Therefore, accessing Medicaid logically would assist immigrants, not hinder them, in becoming self-sufficient, which is DHS's stated goal of the Public Charge Rule.

Given the history of the public charge provision at 8 U.S.C. § 1182(a)(4)(B), particularly the two recent rejections by Congress of arguments in favor of expanding the rule to include consideration of non-cash benefits for exclusion as the Public Charge Rule now does, the Court finds a significant likelihood that the language of the final rule expands beyond the statutory framework of what a USCIS officer previously was to consider in applying the public charge test. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987) ("'Few principles of statutory

construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.'") (quoting *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359 392−93 (1980) (Stewart, J. dissenting)).

The U.S. Constitution vests Congress with plenary power to create immigration law, subject only to constitutional limitations. *See* U.S. Const. Art. I, sect. 8, cl. 4; *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001).  An administrative agency may not make through rulemaking immigration law that Congress declined to enact. *See Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 533 (2009) (rejecting a federal agency's interpretation of a statute and finding that the agency had "attempted to do what Congress declined to do").

Therefore, the Court finds that the Plaintiff States have demonstrated a strong likelihood of success on the merits of their first cause of action.

### 2.    Count 3: Violation of the Administrative Procedure Act— Arbitrary and Capricious Agency Action

Review of a rulemaking procedure under section 706(2)'s arbitrary and capricious standard is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Nevertheless, an agency has a duty to examine "the relevant data" and to articulate "a satisfactory explanation for its action, 'including a rational connection between the facts found and the choice made.'"

1  *Dep't of Commerce*, 139 S. Ct. at 2569 (quoting *State Farm*, 463 U.S. at 43

2  (internal quotation omitted)).  An agency rule is arbitrary and capricious "if the

3  agency has ruled on factors which Congress has not intended it to consider, entirely

4  failed to consider an important aspect of the problem, offered an explanation for its

5  decision that runs counter to the evidence before the agency, or is so implausible that

6  it could not be ascribed to a difference in view or the product of agency expertise."

7  *State Farm*, 463 U.S. at 43.

8       Further, when an agency's prior policy has engendered "serious reliance

9  interests," an agency would be "arbitrary and capricious to ignore such matters," and

10  the agency must "provide a more detailed justification than what would suffice for a

11  new policy created on a blank slate." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502,

12  515−16 (2009).  For instance, in *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 29−30

13  (1996), the Supreme Court examined statutory text elsewhere in the INA

14  establishing minimum requirements to be eligible for a waiver of deportation.

15  Although the Court found that the relevant provision of the INA "imposes no

16  limitations on the factors that the Attorney General (or her delegate, the INS)  may

17  consider," the Court determined that the practices of the INS in exercising its

18  discretion nonetheless were germane to whether the agency violated the APA.  *Id.* at

19  31−32 (internal citation omitted).  "Though the agency's discretion is unfettered at

20  the outset, if it announces and follows—by rule or by settled course of

21  adjudication—a general policy by which its exercise of discretion will be governed,

an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion' within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)." *Id.* at 32.

The record on the instant motion raises concerns that the process that DHS followed in formulating the Public Charge Rule did not adhere to the requirements of the APA. First, based on the statutory and agency history of the public charge inadmissibility ground discussed above, it is likely that the status quo has engendered "serious reliance interests" and DHS will be held to the higher standard of providing "a more detailed justification." *FCC*, 556 U.S. at 515−16. Although DHS received over 266,000 comments, the agency's responses to those comments appear conclusory. Moreover, the repeated justification of the changes as promoting self-sufficiency of immigrants in the United States appears inconsistent with the new components of the Public Charge Rule, such as the negative weight attributed to disabled people who use Medicaid to become or remain self-sufficient. *See* ECF No. 110; 42 U.S.C. § 1396-1.

Therefore, the Court finds that there are serious questions going to the merits regarding whether DHS has acted in an arbitrary and capricious manner in formulating the Public Charge Rule. Moreover, the Plaintiff States have demonstrated a substantial likelihood of success on the merits of at least two of their causes of action in this matter.

**B.      Likelihood of Irreparable Harm**

The Plaintiff States are likely to incur multiple forms of irreparable harm if the Public Charge Rule takes effect as scheduled on October 15, 2019, before this case can be resolved on the merits.

First, the Plaintiff States provide a strong basis for finding that disenrollment from non-cash benefits programs is predictable, not speculative.  *See, e.g.,* ECF No. 35-1 at 98−140 (detailing the chilling effects of the Public Charge Rule on the use of benefits by legal immigrant families including those with U.S. citizen children); *see also Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (finding irreparable harm caused by denial of Medicaid and resulting lack of necessary treatment, increased pain, and medical complications).  Not only that, DHS's predecessor agency noted the harms resulting from a chilling effect twenty years before publication of the Public Charge Rule.  64 Fed. Reg. at 28,692 (" . . . reluctance to access benefits has an adverse impact not just on the potential recipients, but on public health and the general welfare.").

As discussed in terms of standing, the Public Charge Rule threatens a wide variety of predictable harms to the Plaintiff States' interests in promoting the missions of their health care systems, the health and wellbeing of their residents, and the Plaintiff States' financial security.  The harms to children, including U.S. citizen children, from reduced access to medical care, food assistance, and housing support particularly threaten the Plaintiff States with a need to re-allocate resources that will

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY AND PRELIMINARY INJUNCTION ~ 51

only compound over time.  Chronic hunger and housing insecurity in childhood is associated with disorders and other negative effects later in life that are likely to impose significant expenses on state funds.  *See* ECF No. 149 at 21−22.  As a natural consequence, the Plaintiff States are likely to lose tax revenue from affected children growing into adults with a compromised ability to contribute to their families and communities.  *See* ECF No. 35-1 at 171, 618.

Second, the Public Charge Rule notice itself acknowledges many of the harms alleged by the Plaintiff States.  DHS recognizes that disenrollment or foregone enrollment will occur.  84 Fed. Reg. at 41,463.  DHS also acknowledges that more individuals will visit emergency rooms for emergent and primary care, resulting in "a potential for increases in uncompensated care" and that communities will experience increases in communicable diseases.  *Id.* at 41,384.

In the Public Charge Rule notice, DHS attempts to justify the likely harms by invoking the goal of promoting "the self-sufficiency of aliens within the United States."  *See, e.g.,* 84 Fed. Reg. 41,309 (as underscored by the Plaintiff States at oral argument, the Public Charge Rule notice uses the word "self-sufficiency" 165 times and the word "self-sufficient" 135 times).  Whether DHS can use the stated goal of promoting self-sufficiency to justify this rulemaking remains an open question for a later determination, although, as the Court found above, the Plaintiff States have made a strong showing that DHS overstepped their Congressionally authorized role in interpreting and enforcing the policy statements in 8 U.S.C. § 1601.

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY AND PRELIMINARY INJUNCTION ~ 52

1    The operative question for this prong of both a section 705 stay and

2    preliminary injunction analysis is whether there is a likelihood of irreparable injury.

3    The Court finds this prong satisfied and notes that DHS itself recognizes that

4    irreparable injury will occur.  The Federal Defendants contest only the magnitude of

5    the harms claimed by the Plaintiff States and the *amici*.  However, the Federal

6    Defendants do not contest the existence of irreparable harm and DHS acknowledged

7    many of the harms in its own rulemaking notice.  *See Simula, Inc. v. Autoliv, Inc.*,

8    175 F.3d 716 (9th Cir. 1999) (requiring a party moving for a preliminary injunction

9    to demonstrate "a significant threat of irreparable injury, irrespective of the

10    magnitude of the injury").

11    Therefore, the Court finds that immediate and ongoing harm to the Plaintiff

12    States and their residents, both immigrant and non-immigrant, is predictable, and

13    there is a significant likelihood of irreparable injury if the rule were to take effect as

14    scheduled on October 15, 2019.

15    **C.    Balance of the Equities, Substantial Injury to the Opposing Party,**

16    **and the Public Interest[6]**

17    The third and fourth factors of both a section 705 stay and preliminary

18    injunction analysis also tip in favor of preserving the status quo until this litigation is

19

20    [6] When the federal government is a party, the balance of the equities and public
interest factors merge.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir.

21    2014) (citing *Nken*, 556 U.S. at 435).

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY
AND PRELIMINARY INJUNCTION ~ 53

resolved.  The Federal Defendants assert that they have "a substantial interest in administering the national immigration system, a *solely federal* prerogative," and that they "have made the assessment in their expertise that the 'status quo' referred to by Plaintiffs is insufficient or inappropriate to serve the purposes of proper immigration enforcement.'"  ECF No. 155 at 67−68 (emphasis in original).

However, the Federal Defendants have made no showing of hardship, injury to themselves, or damage to the public interest from continuing to enforce the status quo with respect to the public charge ground of inadmissibility until these issues can be resolved on the merits.  *See Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1186 (9th Cir. 2011) (reasoning that automatically deferring to federal agencies' expert assessment of the equities of an injunction would result in "nearly unattainable" relief from the federal government's policies, "as government experts will likely attest that the public interest favors the federal government's preferred policy, regardless of procedural failures.").

In contrast, the Plaintiff States have shown a significant threat of irreparable injury as a result of the impending enactment of the Public Charge Rule by numerous individuals disenrolling from benefits for which they or their relatives were qualified, out of fear or confusion, that accepting those non-cash public benefits will deprive them of an opportunity for legal permanent residency.  The Plaintiff States have further demonstrated how that chilling effect predictably would cause  irreparable injury by creating long-term costs to the Plaintiff States from

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY AND PRELIMINARY INJUNCTION ~ 54

providing ongoing triage for residents who have missed opportunities for timely diagnoses, vaccinations, or building a strong foundation in childhood that will allow U.S. citizen children and future U.S. citizens to flourish and contribute to their communities as taxpaying adults.

Further, the Court finds a significant threat of immediate and ongoing harm to all states because of the likelihood of residents of the Plaintiff States travelling through or relocating to other states. Consequently, the balance of equities tips sharply in favor of the Plaintiff States, and the third factor for purposes of a stay, threat of substantial injury to the opposing party, favors the Plaintiff States, as well.

The Court finds that the Plaintiff States and the dozens of *amici* who submitted briefs in support of the stay and injunctive relief have established that "an injunction is in the public interest" because of the numerous detrimental effects that the Public Charge Rule may cause. *See Winter*, 555 U.S. at 20; *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations.").

## VI.   FORM AND SCOPE OF RELIEF

The Plaintiff States have shown under the four requisite considerations of the *Winter* test that they are entitled to both a stay under 5 U.S.C. § 705 and a preliminary injunction under Fed. R. Civ. P. 65.

In section 705, Congress expressly created a mechanism for a reviewing court to intervene to suspend an administrative action until a challenge to the legality of that action can be judicially reviewed.  5 U.S.C. § 705.[7]  Here, postponing the effective date of the Public Charge Rule, in its entirety, provides the Plaintiff States' the necessary relief to "prevent irreparable injury," as section 705 instructs.  *See Nken*, 556 U.S. at 421 ("A stay does not make time stand still, but does hold a ruling in abeyance to allow an appellate court the time necessary to review it.").

Alternatively, if a reviewing court determines that a section 705 stay is not appropriate or timely, the Court also finds that the Plaintiff States offer substantial evidence to support a preliminary injunction from enforcement of the Public Charge Rule, without geographic limitation.

Just as the remedy under section 705 for administrative actions is to preserve the status quo while the merits of a challenge to administrative action is resolved, an injunction must apply universally to workably maintain the status quo and adequately protect the Plaintiff States from irreparable harm.  Limiting the scope of the injunction to the fourteen Plaintiff States would not prevent those harms to the Plaintiff States, for several reasons.  First, any immigrant residing in one of the

---

[7] *See* Frank Chang, *The Administrative Procedure Act's Stay Provision: Bypassing Scylla and Charybdis of Preliminary Injunctions*, 85 Geo. Wash. L. Rev. 1529, 1552 (2017) ("The nationwide stay is an acceptable and rational policy choice that Congress made: while it delegates certain rulemaking authority to the agencies, it does so on the premise that the judiciary will curb their excesses.").

ORDER GRANTING PLAINTIFF STATES' MOTION FOR SECTION 705 STAY AND PRELIMINARY INJUNCTION ~ 56

Plaintiff States may in the future need to move to a non-plaintiff state but would be deterred from accessing public benefits if relief were limited in geographic scope. Second, a geographically limited injunction could spur immigrants now living in non-plaintiff states to move to one of the Plaintiff States, compounding the Plaintiff States' economic injuries to accommodate a surge in social services enrollees. Third, if the injunction applied only in the fourteen Plaintiff States, a lawful permanent resident returning to the United States from a trip abroad of more than 180 days may be subject to the Public Charge Rule at a point of entry. Therefore, the scope of the injunction must be universal to afford the Plaintiff States the relief to which they are entitled. *See, e.g.*, *California*, 911 F.3d at 582 ("Although there is no bar against nationwide relief in federal district court . . . such broad relief must be necessary to give prevailing parties the relief to which they are entitled.") (internal quotation marks and citation omitted).

Finally, the Court declines to limit the injunction to apply only in those states within the U.S. Court of Appeals for the Ninth Circuit. In addition to the reasons discussed above, a Ninth Circuit-only injunction would deprive eleven of the fourteen Plaintiff States any relief at all. Colorado, Delaware, Illinois, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, Rhode Island, and Virginia are located in seven other judicial circuits (the First, Third, Fourth, Sixth, Seventh, Eighth, and Tenth Circuits) and would derive no protection from irreparable injury from relief limited to jurisdictions within the Ninth Circuit.

1   Accordingly, **IT IS HEREBY ORDERED**:

2   1.    The Plaintiff States' Motion for a Section 705 Stay Pending Judicial

3   Review and for Preliminary Injunction, **ECF No. 34**, is **GRANTED**.

4   2.    The Court finds that the Plaintiff States have established a likelihood of

5   success on the merits of their claims under the Administrative Procedure Act, that

6   they would suffer irreparable harm absent a stay of the effective date of the Public

7   Charge Rule or preliminary injunctive relief, that the lack of substantial injury to the

8   opposing party and the public interest favor a stay, and that the balance of equities

9   and the public interest favor an injunction.

10   3.    The Court therefore, pursuant to 5 U.S.C. § 705, **STAYS** the

11   implementation of the U.S. Department of Homeland Security's (DHS) Rule entitled

12   Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019) (to

13   be codified at 8 C.F.R. pts. 103, 212, 213, 214, 245 and 248), **in its entirety**,

14   pending entry of a final judgment on the Plaintiff States' APA claims.  The effective

15   date of the Final Rule is **POSTPONED** pending conclusion of these review

16   proceedings.

17   4.    In the alternative, pursuant to Rule 65(a) of the Federal Rules of Civil

18   Procedure, the Court **PRELIMINARILY ENJOINS** the Federal Defendants and

19   their officers, agents, servants, employees, and attorneys, and any person in active

20   concert or participation with them, from implementing or enforcing the Rule entitled

21   Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019), in

any manner or in any respect, and shall preserve the status quo pursuant to the regulations promulgated under 8 C.F.R. Parts 103, 212, 213, 214, 245, and 248, in effect as of the date of this Order, until further order of the Court.

5.    No bond shall be required pursuant to Federal Rule of Civil Procedure 65(c).

**IT IS SO ORDERED**.  The District Court Clerk is directed to enter this Order and provide copies to counsel.

**DATED** October 11, 2019.

*s/ Rosanna Malouf Peterson*
ROSANNA MALOUF PETERSON
United States District Judge