**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO; COUNTY OF SANTA CLARA, <br>           *Plaintiffs-Appellees*, <br><br> v. <br><br> UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, a federal agency; U.S. DEPARTMENT OF HOMELAND SECURITY, a federal agency; CHAD F. WOLF, in his official capacity as Acting Secretary of the United States Department of Homeland Security; KENNETH T. CUCCINELLI, in his official capacity as Acting Director of United States Citizenship and Immigration Services, <br>           *Defendants-Appellants.* | No. 19-17213 <br><br> D.C. No. 4:19-cv-04717-PJH |

| | |
|---|---|
| STATE OF CALIFORNIA; DISTRICT OF COLUMBIA; STATE OF MAINE; COMMONWEALTH OF PENNSYLVANIA; STATE OF OREGON, *Plaintiffs-Appellees*, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY, a federal agency; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, a federal agency; CHAD F. WOLF, in his official capacity as Acting Secretary of the United States Department of Homeland Security; KENNETH T. CUCCINELLI, in his official capacity as Acting Director of United States Citizenship and Immigration Services, <br><br> *Defendants-Appellants.* | No. 19-17214 <br><br> D.C. No. 4:19-cv-04975-PJH |

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, Chief District Judge, Presiding

| | |
|---|---|
| STATE OF WASHINGTON; COMMONWEALTH OF VIRGINIA; STATE OF COLORADO; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; DANA NESSEL, Attorney General on behalf of the People of Michigan; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF RHODE ISLAND; STATE OF HAWAII, *Plaintiffs-Appellees*, | No. 19-35914 D.C. No. 4:19-cv-05210-RMP OPINION |

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, a federal agency; CHAD F. WOLF, in his official capacity as Acting Secretary of the United States Department of Homeland Security; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, a federal agency; KENNETH T. CUCCINELLI, in his official capacity as Acting Director of United States Citizenship and Immigration Services,
                    *Defendants-Appellants.*

4      CITY & CTY. OF SAN FRANCISCO V. USCIS

Appeal from the United States District Court
for the Eastern District of Washington
Rosanna Malouf Peterson, District Judge, Presiding

Argued and Submitted September 15, 2020
San Francisco, California

Filed December 2, 2020

Before:  Mary M. Schroeder, William A. Fletcher, and
Lawrence VanDyke, Circuit Judges.

Opinion by Judge Schroeder;
Dissent by Judge VanDyke

---

**SUMMARY**[*]

---

**Immigration**

In cases in which two district courts issued preliminary
injunctions enjoining implementation of the Department of
Homeland Security's redefinition of the term "public charge,"
which describes a ground of inadmissibility, the panel:
1) affirmed the preliminary injunction of the District Court
for the Northern District of California covering the territory
of the plaintiffs; and 2) affirmed in part and vacated in part
the preliminary injunction of the District Court for the
Eastern District of Washington, vacating the portion of the
injunction that made it applicable nationwide.

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

Under 8 U.S.C. § 1182(a)(4)(A), any alien who, in the opinion of the Secretary of Homeland Security, at the time of application for admission or adjustment of status, is likely at any time to become a "public charge," is inadmissible. No statute has ever defined the term. In 1999, the Immigration and Naturalization Service issued guidance (Guidance) defining the term as one who "is or is likely to become primarily dependent on the government for subsistence." The Guidance expressly excluded non-cash benefits intended to supplement income.

In August 2019, the Department of Homeland Security (DHS) issued a rule (the Rule) that defines "public charge" to include those who are likely to participate, even for a limited period of time, in non-cash federal government assistance programs. The Rule defines the term "public charge" to mean "an alien who receives one or more [specified] public benefits . . . for more than 12 months in the aggregate within any 36-month period." Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019). The Rule also directs officials to consider English proficiency in making the public charge determination.

States and municipalities brought suits in California and Washington, asserting claims under the Administrative Procedure Act. The District Court for the Northern District of California issued a preliminary injunction covering the territory of the plaintiffs, and the District Court for the Eastern District of Washington issued a nationwide injunction. A divided motions panel of this court granted DHS's motion for a stay of those injunctions pending appeal.

The panel first concluded that the plaintiffs had established Article III standing. The plaintiffs are states and

6     CITY & CTY. OF SAN FRANCISCO V. USCIS

municipalities that alleged that the Rule is causing them continuing financial harm, as lawful immigrants eligible for federal cash, food, and housing assistance withdraw from these programs and instead turn to state and local programs. The panel concluded that this constituted sufficient injury. Addressing whether the injury is apparent or imminent, the panel explained that: 1) the Rule itself predicts a 2.5 percent decrease in enrollment in federal programs and a corresponding reduction in Medicaid payments of over one billion dollars per year; 2) the Rule acknowledges that disenrollment will cause other indirect financial harm to state and local entities; and 3) declarations in the record show that such entities are already experiencing disenrollment.

Next, the panel concluded that the interest of the plaintiffs in preserving immigrants' access to supplemental benefits is within the zone of interests protected by the "public charge" statute. The panel rejected DHS's suggestion that only the federal government and individuals seeking to immigrate are within the zone of interest. The panel also rejected DHS's suggestion that the purpose of the public charge statute is to reduce immigrants' use of public benefits. Addressing DHS's contention that the statute's overall purpose is to promote self-sufficiency, the panel concluded that providing access to better health care, nutrition, and supplemental housing benefits is consistent with precisely that purpose.

The panel next concluded that the plaintiffs had demonstrated a high likelihood of success in showing that the Rule is inconsistent with any reasonable interpretation of the public charge statute and therefore contrary to law. The plaintiffs pointed to repeated congressional reenactment of the provision after it had been interpreted to mean long-term dependence on government support, noting that the statute

had never been interpreted to encompass temporary resort to supplemental non-cash benefits. The plaintiffs contended that this repeated reenactment amounted to congressional ratification of the historically consistent interpretation.

The panel concluded that the history of the provision supported the plaintiffs' position, noting that: 1) from the Victorian Workhouse through the 1999 Guidance, the concept of becoming a "public charge" has meant dependence on public assistance for survival; 2) the term had never encompassed persons likely to make short-term use of in-kind benefits that are neither intended nor sufficient to provide basic sustenance; and 3) the Rule introduces a lack of English proficiency. The panel also noted that the opinions of the Second Circuit and the Seventh Circuit, in affirming preliminary injunctions of the Rule, agreed that the Rule's interpretation was outside any historically accepted or sensible understanding of the term.

The panel next concluded that the Rule's promulgation was arbitrary and capricious, explaining that DHS: 1) failed to adequately consider the financial effects of the Rule; 2) failed to address concerns about the Rule's effect on public safety, health, and nutrition, as well its effect on hospital resources and vaccination rates in the general population; and 3) failed to explain its abrupt change in policy from the 1999 Guidance.

The panel also concluded that the remaining preliminary injunction factors favored the plaintiffs. The panel explained that the plaintiffs had established that they likely are bearing and will continue to bear heavy financial costs because of withdrawal of immigrants from federal assistance programs and consequent dependence on state and local programs. The

panel also observed that the public interest in preventing contagion is particularly salient during the current global pandemic, and noted the financial burdens on the plaintiffs and the adverse effects on the health and welfare of the immigrant as well as general population.

Finally, the panel concluded that a nationwide injunction was not appropriate in this case because the impact of the Rule would fall upon all districts at the same time, and the same issues regarding its validity have been and are being litigated in multiple federal district and circuit courts. Accordingly, the panel vacated that portion of the District Court for the Eastern District of Washington's injunction making it applicable nationwide.

Dissenting, Judge VanDyke, wrote that for the reasons ably articulated by this court in a December 2019 published opinion in this case, by the Fourth Circuit in *CASA de Maryland, Inc. v. Trump*, 971 F.3d 220 (4th Cir. 2020), and by a dissenting Seventh Circuit judge in *Cook County v. Wolf*, 962 F.3d 208, 234–54 (7th Cir. 2020) (Barrett, J., dissenting)—and implied by the Supreme Court's multiple stays this year of injunctions virtually identical to those the majority today affirms—he must respectfully dissent.

## COUNSEL

Gerard Sinzdak (argued), Daniel Tenny, Joshua Dos Santos, and Jack Starcher, Appellate Staff; David L. Anderson and William D. Hyslop, United States Attorneys; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington D.C.; for Defendants-Appellants.

H. Luke Edwards (argued), Raphael N. Rajendra, Julia B. Spiegel, and Hannah Kieschnick, Deputy County Counsels; Laura Trice, Lead Deputy County Counsel; Greta S. Hansen, Chief Assistant County Counsel; James R. Williams, County Counsel; Office of the County Counsel, County of Santa Clara, San Jose, California; Dennis J. Herrera, City Attorney; Jesse C. Smith, Chief Assistant City Attorney; Ronald P. Flynn, Chief Deputy City Attorney; Yvonne R. Mere, Chief, Complex & Affirmative Litigation; Sara J. Eisenberg, Chief of Strategic Advocacy; Matthew D. Goldberg, Deputy City Attorney; City Attorney's Office, San Francisco, California; for Plaintiffs-Appellees City and County of San Francisco; County of Santa Clara.

Xavier Becerra, Attorney General; Matthew Rodriguez, Chief Assistant Attorney General; Michael L. Newman, Senior Assistant Attorney General; Cherokee DM Melton, Supervising Deputy Attorney General; Jennifer C. Bonilla, Lisa Cisneros, Rebekah Fretz, Katherine Lehe, Marissa Malouff, Julia Harumi Mass, Anita Garcia Velasco, Brenda Ayon Verduzco, and Anna Rich, Deputy Attorneys General; Office of the Attorney General, Oakland, California; Karl A. Racine, Attorney General; Loren L. AliKhan, Solicitor General; Office of the Attorney General, Washington, D.C.; Aaron M. Frey, Attorney General; Susan P. Herman, Chief

Deputy Attorney General; Office of the Attorney General, Augusta, Maine; Ellen Rosenblum, Attorney General; Benjamin Gutman, Solicitor General; Nicole DeFever and Patricia Garcia Rincon, Attorneys; Oregon Department of Justice, Salem, Oregon; Josh Shapiro, Attorney General; Michael J. Fischer, Chief Deputy Attorney General; Aimee D. Thomson, Deputy Attorney General; Office of the Attorney General, Philadelphia, Pennsylvania; for Plaintiffs-Appellees State of California, District of Columbia, State of Maine, Commonwealth of Pennsylvania and State of Oregon.

Robert W. Ferguson, Attorney General; Noah G. Purcell, Solicitor General; Tera M. Heintz, Deputy Solicitor General; Jeffrey T. Sprung, Nathan K. Bays, and Joshua Weissman, Assistant Attorneys General; Office of the Attorney General, Seattle, Washington; Mark R. Herring, Attorney General; Michelle S. Kallen, Deputy Solicitor General; Jessica Merry Samuels, Assistant Solicitor General; Ryan Spreague Hardy, Alice Anne Lloyd, and Mamoona H. Siddiqui, Assistant Attorneys General; Office of the Attorney General, Richmond, Virginia; Phil Weiser, Attorney General, Eric R. Olson, Solicitor General; Office of the Attorney General, Denver, Colorado; Kathleen Jennings, Attorney General; Aaron R. Goldstein, State Solicitor, Monica A. Horton, Deputy Attorney General; Department of Justice, Wilmington, Delaware; Kwame Raoul, Attorney General; Liza Roberson-Young, Public Interest Counsel; Office of the Attorney General, Chicago, Illinois; Clare C. Connors, Attorney General; Lili A. Young, Deputy Attorney General; Department of the Attorney General, Honolulu, Hawaii; Brian E. Frosh, Attorney General; Jeffrey P. Dunlap, Assistant Attorney General; Office of the Attorney General, Baltimore, Maryland; Maura Healey, Attorney General; Abigail B. Taylor, Chief, Civil Rights Division; David Ureña,

Special Assistant Attorney General; Angela Brooks, Assistant Attorney General; Office of the Attorney General, Boston, Massachusetts; Dana Nessel, Attorney General; Fadwa A. Hammoud, Solicitor General; Toni L. Harris, First Assistant Attorney General; Michigan Department of Attorney General, Lansing, Michigan; Keith Ellison, Attorney General; R.J. Detrick, Assistant Attorney General; Attorney General's Office, St. Paul, Minnesota; Aaron D. Ford, Attorney General; Heidi Parry Stern, Solicitor General; Office of the Attorney General; Gurbir S. Grewal, Attorney General; Glenn J. Moramarco, Assistant Attorney General; Office of the Attorney General, Trenton, New Jersey; Hector Balderas, Attorney General; Tania Maestas, Chief Deputy Attorney General; Office of the Attorney General, Santa Fe, New Mexico; Peter F. Neronha, Attorney General; Lauren E. Hill, Special Assistant Attorney General; Office of the Attorney General, Providence, Rhode Island; for Plaintiffs-Appellees Washington, Virginia, Colorado, Delaware, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Rhode Island, and Hawaii.

Edward T. Waters, Phillip A. Escoriaza, and Amanda N. Pervine, Feldesman Tucker Leifer Fidell LLP, for Amici Curiae Public Health, Health Policy, Medicine, and Nursing Deans, Chairs, and Scholars; American Public Health Association; and American Academy of Nursing.

R. Adam Lauridsen, Chessie Thacher, Victor H. Yu, and Nicholas R. Green, Keker Van Nest & Peters LLP, San Francisco, California for Amici Curiae National Housing Law Project, Food Research & Action Center, and Center for Law & Social Policy, National Education Association, and Service Employees International Union.

Nicholas Espíritu, Linton Joaquin, Alvaro M. Huerta, Mayra B. Joachin, and Max S. Wolson, National Immigration Law Center, Los Angeles, California; Allon Kedem, Graham White, Jayce Born, Hillary Anderson, Arnold & Porter Kaye Scholer LLP, Washington, D.C., for Amici Curiae Immigrant and Healthcare Service Organizations.

Barbara J. Parker, City Attorney; Maria Bee, Chief Assistant City Attorney; Eric Bernstein, Senior Deputy City Attorney; Malia McPherson, Deputy City Attorney; Caroline Wilson, Fellow; Oakland, California; Michael N. Feuer, City Attorney; Kathleen A. Kenealy, Chief Deputy City Attorney; Danielle L. Goldstein, Deputy City Attorney, Los Angeles, California; Vince Ryan, County Attorney; Robert Hazeltine-Shedd, Assistant County Attorney; Harris County, Houston, Texas; Margaret L. Carter and Daniel R. Suvor, O'Melveny & Myers LLP, Los Angeles, California; Esteban A. Aguilar Jr., City Attorney, Albuquerque, New Mexico; Anne L. Morgan, City Attorney, Austin, Texas; Andre M. Davis, City Solicitor, Baltimore, Maryland; Mark A. Flessner, Corporation Counsel; Benna Ruth Solomon, Deputy Corporation Counsel, Chicago, Illinois; Barbara J. Doseck, Director of Law; John C. Musto, Chief Trial Counsel, Dayton, Ohio; Crystal Barnes, Acting City Solicitor, Holyoke, Massachusetts; Howard Phillip Schneiderman, Senior Deputy Prosecuting Attorney, King County, Seattle, Washington; Brian E. Washington, County Counsel, County of Marin, San Rafael, California; Charles J. McKee, County Counsel; William M. Litt, Anne K. Brereton, and Marina S. Pantchenko, Deputy County Counsels; County of Monterey, Salinas, California; Marc. P. Hansen, County Attorney, Montgomery County, Rockville, Maryland; Marcel S. Pratt, City Solicitor, Philadelphia, Pennsylvania; Susana Alcala Wood, City Attorney, Sacramento, California; John C. Beiers,

County Counsel; David A. Silverman, Chief Deputy County Counsel; Ilana Parmer Mandelbaum, Deputy County Counsel; County of San Mateo, Redwood City, California; Peter S. Holmes, City Attorney, Seattle, Washington; Michael Tubbs, Mayor, Stockton, California; Michael Jenkins, City Attorney, West Hollywood, California; for Amici Curiae 20 Counties, Cities, and Municipalities.

Denny Chan, Justice in Aging, Los Angeles, California; Regan Bailey and Natalie Kean, Justice in Aging, Washington, D.C.; Russel L. Hirschhorn and Christopher Spadaro, Proskauer Rose LLP, New York, New York; for Amici Curiae Justice in Aging, American Society on Aging, Caring Across Generations, Jewish Family Service of Los Angeles, Jewish Federations of North America, National Asian Pacific Center on Aging, National Council on Aging, National Hispanic Council on Aging, Mazon, Phi, and Center for Medicare Advocacy.

Alexandra Wald, Cohen & Gresser LLP, New York, New York; Elizabeth B. Wydra, Brianne J. Gorod, and Dayna J. Zolle, Constitutional Accountability Center, Washington, D.C.; for Amici Curiae Legal Historians.

Simon Sandoval-Moshenberg and Kelly Salzmann, Legal Aid Justice Center, Falls Church, Virginia; Ariel Nelson and Chi Chi Wu, National Consumer Law Center, Boston, Massachusetts; for Amici Curiae National Consumer Law Center, Legal Aid Justice Center, Public Citizen Inc., Consumer Action, Equal Justice Society, Impact Fund, Secure Justice, Media Alliance, Americans for Financial Reform Education Fund, and New Economy Project.

Richard L. Revesz, Jack Lienke, and Max Sarinsky, New York, New York, as and for Amicus Curiae Institute for Policy Integrity.

Debra Gardner, Monisha Cherayil, Sally Dworak-Fisher, and Tyra Robinson, Baltimore, Maryland, as and for Amicus Curiae Public Justice Center.

Paul J. Lawrence and Alanna E. Peterson, Pacifica Law Group, Seattle, Washington, for Amici Curiae Nonprofit Anti-Domestic Violence and Sexual Assault Organizations.

Diana Kasdan, Pilar Herrero, Amy Myrick, and Elyssa Spitzer, New York, New York, as and for Amicus Curiae Center for Reproductive Rights.

Robert M. Loeb, Thomas M. Bondy, Peter E. Davis, and Emily Green, Orrick Herrington & Sutcliffe LLP, Washington, D.C.; Douglas N. Letter, General Counsel; Todd B. Tatelman, Principal Deputy General Counsel; Megan Barbero, Josephine Morse, Adam A. Grogg, and William E. Havemann, Deputy General Counsel; Office of General Counsel, U.S. House of Representatives, Washington, D.C., for Amicus Curiae United States House of Representatives.

Harry Lee, Mary Woodson Poag, Johanna Dennehy, Steptoe & Johnson LLP, Washington, D.C., for Amici Curiae Immigration Law Professors.

Emily Tomoko Kuwahara, Crowell & Moring LLP, Los Angeles, California; Austin J. Sutta, Crowell & Moring LLP, San Francisco, California; for Amici Curiae Asian Americans Advancing Justice, Asian American Legal Defense and

Education Fund, National Women's Law Center, and 38 Other Amici Curiae.

Sadik Huseny, Brittany N. Lovejoy, Joseph C. Hansen, Tess L. Curet, and Alexandra B. Plutshack, Latham & Watkins LLP, San Francisco, California, for Amici Curiae Fiscal Policy Institute, President's Alliance on Higher Education and Immigration, and 12 Other Amici Curiae.

Susan M. Krumplitsch, Elizabeth Stameshkin, and Priyamvada Arora, Cooley LLP, Palo Alto, California, for Amici Curiae American Academy of Pediatrics; American Medical Association; American College of Physicians; American College of Obstetricians and Gynecologists; California Medical Association; American Academy of Pediatrics, California; American Academy of Pediatrics, Hawaii Chapter; Alaska Chapter of the American Academy of Pediatrics; Arizona Chapter of the American Academy of Pediatrics; and Nevada Chapter, American Academy of Pediatrics.

Paul W. Hughes, Michael B. Kimberly, and Matthew A. Waring, McDermott Will & Emery LLP, Washington, D.C., for Amici Curiae 105 Businesses and Organizations.

**OPINION**

SCHROEDER, Circuit Judge:

The phrase "public charge" enjoys a rich history in Anglo-American lore and literature, one more colorful than our American law on the subject. There have been relatively few published court decisions construing the phrase, even though our immigration statutes have barred admission to immigrants who are likely to become a "public charge" for more than a century. Until recently, the judicial and administrative guidance has reflected the traditional concept—rooted in the English Poor Laws and immortalized by Dickens in the workhouse of *Oliver Twist*—of incapacity and reliance on public support for subsistence. The first comprehensive federal immigration law barred entry to "any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge." Immigration Act of 1882, 22 Stat. 214, Chap. 376 § 2 (1882). The 1999 Guidance (the Guidance) issued by the Immigration and Naturalization Service (INS), the predecessor of the current agency, defined a "public charge" as one who "is or is likely to become primarily dependent on the government for subsistence." *See* Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689 (May 26, 1999).

In 2019, the Department of Homeland Security (DHS) changed direction, however, and issued a rule (the Rule) that defines the term to include those who are likely to participate, even for a limited period of time, in non-cash federal government assistance programs. The programs designated by the Rule are not intended to provide for subsistence but instead to supplement an individual's ability to provide for

basic needs such as food, medical care, and housing. 8 C.F.R. § 212.21(b). Foreseeable participation for an aggregate of twelve months in any of the federal programs within a three-year span renders an immigrant inadmissible as a public charge and ineligible for permanent resident status. § 212.21(a). In other words, a single mother with young children who DHS foresees as likely to participate in three of those programs for four months could not get a green card.

Litigation followed in multiple district courts against DHS and U.S. Citizenship and Immigration Services (USCIS) as states and municipalities recognized that the immediate effect of the Rule would be to discourage immigrants from participating in such assistance programs, even though Congress has made them available to immigrants who have been in the country for five years. According to the plaintiffs in those cases, the Rule's effect would be to increase assistance demands on state and local governments, as their resident immigrants' overall health and welfare would be adversely affected by non-participation in federal assistance programs.

The challenges to the Rule in the district courts resulted in a chorus of preliminary injunctions holding the Rule to be contrary to law and arbitrary and capricious under the Administrative Procedure Act (APA). 5 U.S.C. § 706(2)(A). These included the two preliminary injunctions before us, one issued by the District Court for the Northern District of California (Northern District) covering the territory of the plaintiffs, and the other by the District Court for the Eastern District of Washington (Eastern District) purporting to apply nationwide. Our court became the first federal appeals court to weigh in when we granted DHS's motion for a stay of

those injunctions pending appeal. *City and Cnty. of San Francisco v. USCIS*, 944 F.3d 773, 781 (9th Cir. 2019). Preliminary injunctions were also issued by courts in the Northern District of Illinois and the Southern District of New York, and they were stayed by the United States Supreme Court before appeals could be considered by the circuit courts of appeals.

When the Seventh Circuit and the Second Circuit did consider those preliminary injunction appeals, both courts affirmed the injunctions. Although their reasoning differed in some respects, both circuits concluded that the Rule's definition was both outside any historic or commonly understood meaning of "public charge," and arbitrary and capricious, in concluding that short-term reliance on supplemental benefits made immigrants dependent on public assistance within the meaning of the statutory public charge immigration bar. *Cook Cnty., Ill. v. Wolf*, 962 F.3d 208, 229, 232–33 (7th Cir. 2020); *New York v. DHS*, 969 F.3d 42, 80–81 (2nd Cir. 2020). The Second Circuit opinion was unanimous, while a dissenting opinion in the Seventh Circuit agreed with DHS that those who receive such supplemental benefits could be considered public charges because, by receiving some assistance, they are not completely self-sufficient. *Cook Cnty.*, 962 F.3d at 250–51 (Barrett, J., dissenting).

The district court in Maryland also enjoined enforcement of the Rule and was reversed by a divided decision of the Fourth Circuit. The majority looked in large measure to the fact that the Supreme Court had stayed the injunctions in the Seventh and Second Circuits. *CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 230 (4th Cir. 2020). In dissent, Judge King viewed the Rule as outside the longstanding meaning of

"public charge" and would have affirmed the injunction. He also disagreed with the majority about the significance of the Supreme Court's stay, explaining that "[i]f the Court's decision to grant a stay could be understood to effectively hand victory to the government regarding the propriety of a preliminary injunction, there would be little need for an intermediate appellate court to even consider the merits of an appeal in which the Court has granted a stay." *Id.* at 281 n.16 (King, J., dissenting) (citing *Cook Cnty.*, 962 F.3d at 234).

To understand the reason for this recent cascade of litigation after a relatively quiescent statutory and regulatory history, we review the historical background of the Rule. Such a review reveals the extent to which the Rule departs from past congressional and administrative policies.

## A.  Statutory and Administrative Background

This country has had a federal statutory provision barring the admission of persons likely to become a "public charge" since 1882.  The Immigration Act of 1882 barred entry to, among others, "any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge."  The Immigration and Nationality Act now provides that "[a]ny alien who, . . . in the opinion of the [Secretary of Homeland Security] at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible."  8 U.S.C. § 1182(a)(4)(A).  No statute has ever defined the term. For over a century, agencies have routinely applied these provisions in determining admissibility and removal as well as in issuing visas for entry.

In 1996, however, Congress amended the statute to add five factors for agencies to consider in determining whether an individual is likely to be a public charge: the non-citizen's age; health; family status; assets, resources and financial status; and education and skills. § 1182(a)(4)(B)(i). Congress also included a provision requiring applicants to produce an affidavit of support. *See* § 1182(a)(4)(C)–(D) (requiring most family-sponsored immigrants to submit affidavits of support); § 1183a (affidavit of support requirements).

At nearly the same time, Congress enacted major reforms of public benefit programs that, as relevant here, made only non-citizens with five or more years of residency in the United States eligible for public benefits such as Supplemental Nutrition Assistance Program (SNAP) and Medicaid. Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), Pub. L. No. 104-193, 110 Stat. 2105, 2265 (1996). Previously, lawful immigrants had generally been eligible for such benefits. Congress thus simultaneously reduced the number of immigrants eligible for this assistance and spelled out the factors to be considered in a public charge determination. The fact that Congress delineated the factors relevant to the public charge determination at the same time it adjusted certain immigrants' eligibility to receive specific supplemental assistance strongly suggests that Congress did not intend for such assistance to be considered as one of the public charge factors.

Judicial guidance in interpreting the phrase was apparently not in need or demand: There are relatively few such decisions. A leading early Supreme Court case resolved the important question of whether the adverse economic conditions in the location where the immigrant intends to live

can render an immigrant likely to become a "public charge." *Gegiow v. Uhl*, 239 U.S. 3 (1915). The Supreme Court's answer was no because the statute spoke to the permanent characteristics personal to the immigrant rather than to local labor market conditions. *Id.* at 10. We followed *Gegiow* in *Ex parte Sakaguchi*, 277 F. 913 (9th Cir. 1922), where we held that a person temporarily in need of family assistance should not have been excluded as likely to become a public charge. We so held because there was an absence of "any evidence whatever of mental or physical disability or any fact tending to show that the burden of supporting the appellant is likely to be cast upon the public." *Id.* at 916. Thus, our court in *Sakaguchi* understood the standard for determining whether someone is a public charge to be whether the "burden of support" falls on the public.

Administrative decisions followed the Supreme Court's lead by looking to the inherent characteristics of the individual rather than to external circumstances. The Board of Immigration Appeals thus held that only an individual with the inherent inability to be self-supporting is excludable as "likely to become a public charge" within the meaning of the statute. *Matter of Harutunian*, 14 I & N. Dec. 583, 589–90 (BIA 1974); *Matter of Vindman*, 16 I. & N. Dec. 131, 132 (B.I.A. 1977); *see also New York*, 969 F.3d at 69. There has been corollary administrative recognition that even if an individual has been on welfare, that fact does not in and of itself establish the requisite likelihood of becoming a public charge. An Attorney General decision collected authorities indicating that it is the totality of circumstances that must be considered in order to determine whether "the burden of supporting the alien is likely to be cast on the public." *Matter of Martinez-Lopez*, 10 I & N. Dec. 409, 421–22 (BIA 1962; A.G. 1964) (citing *Sakaguchi*, 277 F. at 916). Likely receipt

of some public benefits does not automatically render an immigrant a public charge because the public does not bear the "burden of support."

The 1996 amendments, which added factors to be considered and created the current public charge statutory provision, caused some confusion as to how big a change they represented. The INS, the agency then in charge of administering immigration, decided a regulatory definition would be helpful. It adopted the 1999 Guidance, the first regulatory guidance to interpret the rather ancient notion of "public charge" in light of the myriad, modern forms of public assistance. 64 Fed. Reg. 28,269.

The Guidance defined a "public charge" as a non-citizen who depends on the government for survival, either by receipt of income or confinement in a public institution. It described persons "primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long term care at government expense." *Id.* at 28,689. It thus embodied the traditional notion of primary dependence on the government for either income or institutional care.

The Guidance went on to identify the types of public assistance that would typically qualify as evidence of primary dependence: (1) Supplemental Security Income (SSI); (2) Temporary Assistance for Needy Families (TANF); (3) state and local cash assistance programs; and (4) programs supporting people institutionalized for long-term care. *Id.* at 28,692. The Guidance expressly excluded non-cash benefits intended to supplement income and not to provide primary support. The explanation lay with the changing times that

were bringing benefits to more and more families to improve their health and welfare. *See id.* ("[C]ertain federal, state, and local benefits are increasingly being made available to families with incomes far above the poverty level, reflecting broad public policy decisions about improving general public health and nutrition, promoting education, and assisting working-poor families in the process of becoming self-sufficient. Thus, participation in such non-cash programs is not evidence of poverty or dependence.").

The Guidance actually encouraged non-citizens to receive supplemental benefits in order to improve their standard of living and to promote the general health and welfare. The Guidance drew a sharp distinction between the receipt of such supplemental benefits and dependence on the government for subsistence income that would render the individual a "public charge." *Id.* at 28,692–93.

The 2019 Public Charge Rule we review in this case effectively reversed that policy by making receipt of supplemental benefits the very definition of a public charge. *See* Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019). The Rule defines the term "public charge" to mean "an alien who receives one or more [specified] public benefits . . . for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months)." *Id.* at 41,501. The public benefits specified by the Rule include most Medicaid benefits, SNAP benefits, Section 8 housing vouchers and rental assistance, and other forms of federal housing assistance. *Id.* Any receipt of such a benefit, no matter how small, will factor into the public charge determination. The Rule also directs officials to consider

English proficiency in making the public charge determination. *Id.* at 41,503–04.

The Rule was greeted with challenges in federal district courts throughout the country. We deal with those in this circuit.

## B. The District Court Injunctions

On appeal are two district court decisions granting preliminary injunctions barring enforcement of the Rule. The Northern District considered the challenges of California, the District of Columbia, Maine, Pennsylvania, and Oregon, consolidated with the challenges brought by the City and County of San Francisco, and the County of Santa Clara. The Eastern District heard the challenges brought by Washington, Virginia, Colorado, Delaware, Hawaii, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, and Rhode Island. Both district courts agreed that the plaintiffs had standing because they had shown that they would likely suffer economic harm and other costs and that their concerns were within the zone of interests of the statute. Both held that the new definition of "public charge" was likely not a permissible interpretation of the statute because it would depart from the longstanding, settled understanding that a person does not become a public charge by receiving short-term aid, and must instead demonstrate an inherent incapacity to provide subsistence. *City and Cnty. of San Francisco v. USCIS*, 408 F. Supp. 3d 1057, 1101 (N.D. Cal. 2019), *Washington v. DHS*, 408 F. Supp. 3d 1191, 1219 (E.D. Wash. 2019). Both found the Rule to be likely arbitrary and capricious because the agency failed to consider the burdens the Rule would impose on states and municipalities.

The Eastern District issued a nationwide injunction, and the Northern District declined to do so.

Within a few weeks of the district court rulings, a divided motions panel of this court, however, stayed both injunctions pending this appeal. *City and Cnty. of SF*, 944 F.3d 773. The panel majority wrote that DHS was likely to prevail because the Rule would probably be viewed as a reasonable interpretation of a statute that had no consistent historical application and gave the agency "considerable discretion." *Id.* at 796, 799. Judge Owens dissented in part and would have denied the stay. *Id.* at 809–10 (Owens, J., dissenting).

The stay was based on a prediction of what this panel would hold in reviewing the merits of the preliminary injunctions. The stay in this case was entered at a particularly early point, less than two months after the district court injunctions. Almost none of the extensive documentation relevant to this appeal was before the motions panel. The brief of the appellant DHS in the Northern District case had been filed only the day before the panel entered its stay, and the opening brief in the Eastern District case was not filed until the day after. Still to come were not only the answering and reply briefs in both appeals, but two dozen amicus briefs, many of which we have found very helpful.

At least equally important, no other circuit court opinions had yet considered the issues. By now we have heard from three. One of those opinions even discussed and disagreed with the reasoning of this court's motions panel stay opinion, pointing out that it "pinn[ed] the definition of 'public charge' on the *form* of public care provided" in concluding that there was no consistent interpretation of the Rule. *New York*, 969 F.3d at 73 (emphasis in original). The court there said

our motions panel thereby went "astray." *Id.* This was because the issue was not whether a "public charge" had always received similar assistance. *Id.* The issue should have been whether the "inquiry" under the statute had been consistent. *Id.* The Second Circuit concluded the public charge inquiry had always been whether the non-citizen "is likely to depend on that [assistance] system." *Id.*

We therefore turn to the appeal before us. We deal first with DHS's arguments that the plaintiffs may not maintain the suit because they lack Article III standing or are outside the zone of interests of the immigration statute in question.

## C.  Plaintiffs' Capacity to Maintain the Action

Plaintiffs are states and municipalities that allege the Rule is causing them to suffer continuing financial harm, as lawful immigrants eligible for federal cash, food, and housing assistance withdraw from these programs to avoid the impact of the Rule. Plaintiffs allege harm because such immigrants will instead turn to assistance programs administered by the state and local entities.

DHS argues that such injuries are speculative and represent only plausible future injury. There is no question that to have Article III standing to bring this action, the plaintiffs must allege that they have suffered, or will imminently suffer, a "concrete and particularized" injury in fact. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). There is also no question that an increased demand for aid supplied by the state and local entities would be such an injury. The only question is whether such demand is, as of yet, apparent or imminent.

That is not a difficult question to answer. The Rule itself predicts a 2.5 percent decrease in enrollment in public benefit programs and a corresponding reduction in Medicaid payments of over one billion dollars per year. Final Rule, 84 Fed. Reg. at 41,302, 41,463. The Rule itself further acknowledges that disenrollment will cause other indirect financial harm to state and local entities by increasing the demand for uncompensated indigent care. Declarations in the record show that such entities are already experiencing disenrollment as a result of the Rule. *See City and Cnty. of SF*, 408 F. Supp. 3d at 1122.

DHS nevertheless asserts that the Rule will result in a long-term cost savings after states compensate for the loss of federal funds by reforming their operations. But such long-term reforms would not remedy the immediate financial injury to the plaintiffs or the harms to the health and welfare of those individuals affected. As the Second Circuit explained, "this simplistic argument fails to account for the fact that the States allege injuries that extend well beyond reduced Medicaid revenue and federal funding to the States, including an overall increase in healthcare costs that will be borne by public hospitals and general economic harms." *New York*, 969 F.3d at 60. Thus, plaintiffs have established Article III standing.

Those suing under the APA, must also establish that the interest they assert is at least "arguably within the zone of interests to be protected or regulated by the statute" in question. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). The Supreme Court has described the test as "not meant to be especially demanding" and as "not

requir[ing] any 'indication of congressional purpose to benefit the would-be plaintiff.'" *Id.* at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–40 (1987)). A plaintiff's interest need only be "sufficiently congruent with those of the intended beneficiaries that the litigants are not 'more likely to frustrate than to further the statutory objectives.'" *First Nat. Bank & Tr. Co. v. Nat'l Credit Union Admin.*, 988 F.2d 1272, 1275 (D.C. Cir. 1993) (quoting *Clarke*, 479 U.S. at 397 n.12).

The statute in question is, of course, the immigration statute that renders inadmissible an individual likely to become a "public charge." 8 U.S.C. § 1182(a)(4)(A). DHS appears to contend that the only entities within the zone of interests are the federal government itself and individuals seeking to immigrate, because the provision deals with immigration and only the federal government controls immigration. If that were to define the zone of interests regulated by the statute, the scope of permissible immigration litigation against the government would be so narrow as to practically insulate it from many challenges to immigration policy and procedures, even those violating the Constitution or federal laws.

DHS suggests that the purpose of the public charge exclusion is to reduce immigrants' use of public benefits, and that the plaintiffs' suit therefore contradicts this purpose by seeking to make more federal benefits available. But this assumes that Congress's statutory purpose was the same as DHS's purpose here, which is the very dispute before us. As the Second Circuit pointed out, "DHS assumes the merits of its own argument when it identifies the purpose of the public charge ground as ensuring that non-citizens do not use public benefits . . . . Understood in context, [the public charge bar's]

purpose is to exclude where appropriate and to not exclude where exclusion would be inappropriate.") *New York*, 969 F.3d at 62–63.

Moreover, DHS maintains that the statute's overall purpose is to promote self-sufficiency. Providing access to better health care, nutrition and supplemental housing benefits is consistent with precisely that purpose. *See Cook Cnty.*, 962 F.3d at 220 (access to affordable basic health care may promote self-sufficiency); Hilary Hoynes, Diane Whitmore Schanzenbach & Douglas Almond, *Long-Run Impacts of Childhood Access to the Safety Net*, 106 Am. Econ. Rev. 903, 921 (2016) (access to food stamps in childhood significantly increases economic self-sufficiency among women). For these reasons, the interests of the plaintiffs in preserving immigrants' access to supplemental benefits is within the zone of interests protected by the statute.

We therefore conclude that the district courts correctly determined that the plaintiffs are entitled to maintain this action. All of the circuits to consider the validity of this Rule have reached a similar conclusion. *See Cook Cnty.*, 962 F.3d at 219–20, *CASA de Maryland*, 971 F.3d at 240–241, *New York*, 969 F.3d at 62–63. We now turn to the question whether they were entitled to the preliminary injunctions entered by the district courts.

## D. Contrary to Law

Both district courts concluded that the plaintiffs are likely to prevail in their contention that the Rule violates the statute's public charge provision, and that such a conclusion supports the entry of preliminary injunctions. See *Winter v.*

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). On appeal, DHS contends, as it has throughout the litigation, that the Rule is a permissible interpretation of the statute. The plaintiffs maintain that the Rule violates the statute because the Rule is not a reasonable interpretation of the meaning of "public charge."

History is a strong pillar supporting the plaintiffs' case. Plaintiffs point to repeated congressional reenactment of the provision after it had been interpreted to mean long-term dependence on government support, and had never been interpreted to encompass temporary resort to supplemental non-cash benefits. Plaintiffs contend that this repeated reenactment amounts to congressional ratification of the historically consistent interpretation. DHS disagrees, arguing that the repeated reenactments reflect congressional intent to have a flexible standard subject to various executive branch interpretations.

Our review of the history of the provision in our law suggests the plaintiffs have the better part of this dispute. From the Victorian Workhouse through the 1999 Guidance, the concept of becoming a "public charge" has meant dependence on public assistance for survival. Up until the promulgation of this Rule, the concept has never encompassed persons likely to make short-term use of in-kind benefits that are neither intended nor sufficient to provide basic sustenance. The Rule also, for the first time, introduces a lack of English proficiency as figuring into the equation, despite the common American experience of children learning English in the public schools and teaching their elders in our urban immigrant communities. 8 C.F.R. § 212.22(b)(5)(ii)(D). Indeed, in *Gegiow*, 239 U.S. 3, the Supreme Court found that the individuals in that case were

not likely to become public charges even though they spoke only Russian.

In *New York*, 969 F.3d 42, the Second Circuit essentially agreed with plaintiffs' historical analysis. The court recognized and explained the line of settled judicial and administrative interpretations of a public charge as one who is primarily dependent on the government for subsistence. *Id.* at 65–70. The court traced that history in far more detail than we have outlined and was "convinced" that there was a well-settled meaning of "public charge" even before congressional passage of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) in 1996, and that was a person "unable to support herself, either through work, savings, or family ties." *Id.* at 71. Receipt of cash benefits may be considered in deciding whether a person is dependent on the government but has never been determinative. The Second Circuit persuasively summarized:

> The Plaintiffs do not argue, and we do not hold, that the receipt of various kinds of public benefits is irrelevant to the determination of whether a non-citizen is likely to become a public charge. But defining public charge to mean the receipt, even for a limited period, of any of a wide range of public benefits – particularly . . . ones that are designed to supplement an individual's or family's efforts to support themselves, rather than to deal with their likely permanent inability to do so – is inconsistent with the traditional understanding

> of what it means to be a "public charge,"
> which was well-established by 1996.

*Id.* at 78 (emphasis removed).

A few months earlier, the Seventh Circuit had come to a similar conclusion that the Rule violates the statutory meaning of public charge. *Cook Cnty.*, 962 F.3d 208. The Seventh Circuit differed somewhat in its analysis. After a historical survey of court decisions and secondary sources, it determined that the phrase "public charge" was susceptible to various interpretations. *Id.* at 226. It concluded, however, that DHS's interpretation, quantifying the definition to mean receipt of twelve months' worth of benefits within three years, represented an understanding of its authority to define the phrase that "has no natural limitation." *Id.* at 228–29. If DHS's interpretation were to be accepted, then there is nothing in the statutory text that would prevent a zero-tolerance rule, where foreseeable receipt of a single benefit on one occasion would bar entry or adjustment of status. The majority forcefully rejected such an interpretation, stating:

> We see no warrant in the Act for this sweeping view. Even assuming that the term "public charge" is ambiguous and thus might encompass more than institutionalization or primary, long-term dependence on cash benefits, it does violence to the English language and the statutory context to say that it covers a person who receives only de minimis benefits for a de minimis period of

time.  There is a floor inherent in the words "public charge," backed up by the weight of history.

*Id.* at 229.

Although the opinions of the Second Circuit in *New York* and the Seventh Circuit in *Cook County* reflect some disagreement over whether there was any historically established meaning of the phrase "public charge," they agreed that the Rule's interpretation of the statute was outside any historically accepted or sensible understanding of the term.  In commenting on the difference between its historical review in *New York* and that of the Seventh Circuit in *Cook County*, the Second Circuit noted that the Seventh Circuit had not included the significant  administrative rulings that preceded the 1996 statute.  *New York*, 969 F.3d at 74.

The *New York* opinion was unanimous, but the *Cook County* opinion was not.  The lengthy dissenting opinion in *Cook County* focused on other statutory provisions aimed at preventing entry of persons who could become dependent on the government.  The most significant of these provisions is the requirement that family-sponsored immigrants, and employment-sponsored immigrants whose employment is tied to a family member, must furnish an affidavit from the sponsor.  8 U.S.C. §§ 1182(a)(4)(C)–(D).  In the affidavit, the sponsor must agree to support the immigrant at annual income of at least 125 percent of the poverty level and pay back the relevant governmental entity in the event the immigrant receives "any means-tested public benefit." 8 U.S.C. § 1183a(a)(1)(b).

The dissent focused on the fact that the affidavit provision forces sponsors to bear responsibility for "any means-tested public benefit" that an immigrant may receive. It concluded that the affidavit provision reflects Congress's view that "public charge" may encompass receipt of supplemental benefits as well as primary dependence. *See Cook Cnty.*, 962 F.3d at 246 (Barrett, J., dissenting).

In its focus on the provisions in a related but different section of the statute, the dissent did not address the significance of the history of the public charge provision itself, nor did it address the majority's objection to the duration of the receipt of benefits as a standard having no limiting principle. The dissent concluded only that the choice of an aggregate of twelve months is "not unreasonable." *Id.* at 253. Moreover, the dissent's interpretation of the affidavit requirement's application here seems to suggest that it would approve a public charge rule excluding individuals who received "any means-tested benefit," no matter how small, as in line with congressional intent.

In this appeal, DHS also relies upon the affidavit of support provisions to contend that the Rule is consistent with the statutory public charge bar. The public charge bar and affidavit of support provisions were parts of two separate acts. The two have no historic or functional relationship to each other. The public charge bar dates back to the 19th century, embodying an age-old concept of excluding those who may become primarily dependent on the government. Congress enacted the affidavit of support provision, however, in 1996 as part of more recent specific immigration reforms including the financial responsibilities of families and employers sponsoring individual immigrants. *See* PRWORA, Pub. L. No. 423, 110 Stat. 2271 (1996); IIRIRA, Pub. L. No.

104-208, 110 Stat. 3009 (1996). The section of the affidavit provision that refers to public benefits serves as a post-admission remedy to help local and federal governments recoup funds. § 1183a(b). The changes to the affidavit provisions were aimed at problems with the unenforceability of such affidavits prior to 1996. Michael J. Sheridan, *The New Affidavit of Support and Other 1996 Amendments to Immigration and Welfare Provisions Designed to Prevent Aliens from Becoming Public Charges*, 31 Creighton L. Rev. 741, 743-44, 752-53 (1998) (article by INS Associate General Counsel).

DHS also points to the provision that permits entry of battered women without regard to receipt of "any benefits." *See* 8 U.S.C. § 1182(s). DHS argues that this reflects Congress's belief that the receipt of any public benefits would be a consideration in admission for most other public charge determinations. Had Congress intended to make non-cash benefits a factor for admission or permanent residence, it would have done so directly and not through this ancillary provision. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes"). It is more likely that Congress created this provision in order to provide sweeping protections for battered migrant women, as it did throughout Section 1182. *See* § 1182(a)(6)(ii), (a)(9)(B)(iii)(IV).

For these reasons we conclude the plaintiffs have demonstrated a high likelihood of success in showing that the Rule is inconsistent with any reasonable interpretation of the statutory public charge bar and therefore is contrary to law.

## E. Arbitrary and Capricious

Both district courts also ruled that the plaintiffs were likely to succeed in their contention that the Rule is arbitrary and capricious. The APA standard in this regard is inherently deferential. The task of the courts is to ensure that the agency's action relied on appropriate considerations, considered all important aspects of the issue, and provided an adequate explanation for its decision. The Supreme Court summed it up in its leading decision, *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29 (1983). The Court explained the general rule:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 43.

The plaintiffs argue that DHS failed the test in three principal respects: It failed to take into account the costs the Rule would impose on state and local governments; it did not consider the adverse effects on health, including both the health of immigrants who might withdraw from programs and the overall health of the community; and it did not adequately explain why it was changing the policy that was thoroughly explained in the 1999 Guidance.

*1. Disenrollment and Financial Costs*

We first turn to DHS's consideration of the financial impact of the proposed Rule. During the comment period, there was repeated emphasis on the financial burdens that would befall state and local governments because immigrants fearing application of the Rule would disenroll from the supplemental programs, even if the Rule did not apply to them. DHS's response was a generality coupled with an expression of uncertainty. It said that, despite these effects, the Rule's "overriding consideration" of self-sufficiency formed "a sufficient basis to move forward." 84 Fed. Reg. at 41,312. DHS added that there was no way of knowing with any degree of exactitude how many individuals would disenroll or how much of a burden it would place on the state and local governments. *Id.* at 41,312–13.

DHS provided no analysis of the effect of the Rule on governmental entities like the plaintiffs in these cases. As the Northern District found, DHS had not "grapple[d] with estimates and credible data explained in the comments." *City and Cnty. of SF*, 408 F. Supp. 3d at 1106.

Our law requires more from an agency. A bald declaration of an agency's policy preferences does not discharge its duty to engage in "reasoned decisionmaking" and "explain the evidence which is available." *State Farm*, 463 U.S. at 52. The record before DHS was replete with detailed information about, and projections of, disenrollment and associated financial costs to state and local governments. *See, e.g.,* Ninez Ponce, Laurel Lucia, & Tia Shimada, How Proposed Changes to the 'Public Charge' Rule Will Affect Health, Hunger and the Economy in California, 32 (Nov. 2018), https://healthpolicy.ucla.edu/newsroom/Documents/

2018/public-charge-seminar-slides-nov2018.pdf (estimating over 300,000 disenrollments from Medicaid in California alone); Fiscal Policy Institute, Only Wealthy Immigrants Need Apply: The Chilling Effects of "Public Charge," 5 (Nov. 2019), http://fiscalpolicy.org/wp-content/uploads/2019/11/FINAL-FPI-Public-Charge-2019-MasterCopy.pdf (estimating over $500 million combined in lost state tax revenue). DHS was required to "reasonably reflect upon" and "grapple with" such evidence. *Fred Meyers Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017). But DHS made no attempt to quantify the financial costs of the Rule or critique the projections offered.

Similarly, DHS's repeated statements that the Rule's disenrollment impacts are "difficult to predict" do not satisfy its duty to "examine the relevant data" before it. *State Farm*, 463 U.S. at 43. The Supreme Court held in *State Farm* that an agency may not, without analysis, cite even "'substantial uncertainty' . . . as a justification for its actions." *Id.* at 52; *see also Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1200 (9th Cir. 2008) (rejecting as arbitrary and capricious agency's characterization of greenhouse gas reductions as "too uncertain to support their explicit valuation and inclusion" in analysis). DHS's analysis thus fell short of the standard established by the Supreme Court and recognized by our circuit. DHS did not adequately deal with the financial effects of the Rule.

## 2.  Health Consequences

Although DHS wrote the Rule was intended to make immigrants healthier and stronger, commenters stressed the Rule's likely adverse health consequences for immigrants and the public as a whole, including infectious disease outbreaks

and hospital closures.  While acknowledging these comments, DHS concluded, without support, that the Rule "will ultimately strengthen public safety, health, and nutrition." 84 Fed. Reg. at 41,314.  The Northern District aptly found that DHS impermissibly "simply declined to engage with certain, identified public-health consequences of the Rule." *City and Cnty. of SF*, 408 F. Supp. 3d at 1111–12.

Commenters provided substantial evidence that the Rule would in fact harm public safety, health, and nutrition.  DHS itself repeatedly acknowledged that hospitals might face financial harms as a result of the Rule, but DHS repeatedly declined to quantify, assess, or otherwise deal with the problem in any meaningful way.  *See, e.g.*, 84 Fed. Reg. at 41,313–14, 41,384, 41,475, 41,476.  This is inadequate and suggests that DHS's position was intractable.  As the D.C. Circuit has observed, making some mention of evidence but then coming to a contrary, "unsupported and conclusory" decision "add[s] nothing to the agency's defense of its thesis except perhaps the implication that it was committed to its position regardless of any facts to the contrary." *Chem. Mfrs. Ass'n. v. EPA*, 28 F.3d 1259, 1266 (D.C. Cir. 1994).  DHS responded by excluding certain programs for children and pregnant women from the ambit of the Rule, but never addressed the larger concerns about the Rule's effect on health as well as on hospital resources.

There were other serious health concerns.  For example, comments demonstrated that the Rule would endanger public health by decreasing vaccination rates in the general population.  DHS insisted that vaccines would "still be available" to Medicaid-disenrolled individuals because "local health centers and state health departments" would pick up the slack, *id.* at 41,385, despite objections voiced by such

local health centers and state health departments themselves showing that the Rule will put the populations they serve—citizens and non-citizens alike—in danger. *See, e.g.*, Mass. Dep't of Pub. Health, Comments on Inadmissibility on Public Charge Grounds (Dec. 2018), https://www.regulations.gov/document?D=USCIS-2010-0012-45697; Hilltown Cmty. Health Ctr., Comments on Inadmissibility on Public Charge Grounds (Dec. 2018), https://www.regulations.gov/docume nt?D=USCIS-2010-0012-45675.   A decision that "runs counter to the evidence" or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise" is arbitrary and capricious. *State Farm*, 463 U.S. at 43.  The promulgation of this Rule is such a decision.  DHS claims no expertise in public health, unlike the scores of expert commenters who weighed in against the Rule.

### 3.   Reversal of Position

Above all, DHS failed to explain its abrupt change in policy from the 1999 Guidance.  An agency reversing a prior policy "must show that there are good reasons for the new policy" and provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009).  The district courts below found that DHS had failed to satisfy this standard. *City and Cnty. of SF*, 408 F. Supp. 3d at 1111–12; *Washington v. DHS*, 408 F. Supp. 3d at 1220.

The 1999 Guidance had been issued after the 1996 statutory amendments setting out the general factors to be taken into account in making a public charge determination. The Guidance considered all of the different types of public assistance governments offered, including programs

providing subsistence income and those providing supplemental benefits. The Guidance expressly provided that receipt of supplemental assistance for food, healthcare and housing were not to be considered in assessing an immigrant's likelihood of becoming a public charge. As discussed above, this provision was consistent with over a century of judicial and administrative decisions interpreting the public charge bar. The Rule, however, provides that the prospect of receiving those same supplemental benefits, for even a few months, renders an individual inadmissible. This is directly contrary to the 1999 Guidance.

Yet DHS promulgated the Rule without any explanation of why the facts found, and the analysis provided, in the prior Guidance were now unsatisfactory. This is a practice the Supreme Court has rejected: an agency about-face with no "reasoned explanation . . . for disregarding" the findings underlying the prior policy. *Fox*, 556 U.S. at 516. Here is an illustration of the about-face. The 1999 Guidance had found that deterring acceptance of "important health and nutrition benefits" had yielded "an adverse impact . . . on public health and the general welfare." 64 Fed. Reg. at 28,692. In contrast, DHS now says that the new Rule "will ultimately strengthen public safety, health, and nutrition." 84 Fed. Reg. at 41,314. DHS provides no basis for this conclusion or for its departure from the empirical assessments underlying the prior policy.

In light of this policy change, coupled with the "serious reliance interests" engendered by over two decades of reliance on the Guidance, DHS was required to provide a "more detailed justification" for the Rule. *Fox*, 556 U.S. at 515. DHS provides no justification, other than the repeated conclusory mantra that the new policy will encourage self-sufficiency. DHS in effect says that by creating a

disincentive for immigrants to use available assistance, the Rule will "ensur[e] that [admitted immigrants] be self-sufficient and not reliant on public resources." 84 Fed. Reg. at 41,319. DHS does not substantiate, and the record does not support, this empirical prediction. *See, e.g.*, Hilary Hoynes, Diane Whitmore Schanzenbach & Douglas Almond, *Long-Run Impacts of Childhood Access to the Safety Net*, 106 Am. Econ. Rev. 903, 930 (finding that having access to food stamps during childhood leads to "significant improvement in adult health" and "increases in economic self-sufficiency," including decreased welfare participation). Plaintiffs urge that their experience is contrary to DHS's conclusion. Also to the contrary is the experience related in multiple amicus briefs. *See, e.g.*, Brief for the Institute for Policy Integrity as Amicus Curiae Supporting Petitioners at 9 (citing evidence that reductions in SNAP participation increase homelessness); Brief for National Housing Law Project et al. as Amici Curiae Supporting Petitioners at 13 (citing evidence that Medicaid made it easier for recipients to work and find work).

### 4. *Arbitrary and Capricious*

In sum, DHS adopted the Rule, reversing prior, longstanding public policy, without adequately taking into account its potential adverse effects on the public fisc and the public welfare. We must conclude that the Rule's promulgation was arbitrary and capricious as well as contrary to law within the meaning of the APA. 5 U.S.C. § 706(2)(A).

## F.  Remaining Injunction Factors

### 1.  Irreparable Harm

Plaintiffs have shown a likelihood of success on the merits of their claim that the Rule violates the standards of the APA in that it is both contrary to law and arbitrary and capricious.  To support entry of an injunction, Plaintiffs must also show a likely threat of irreparable injury in the absence of an injunction.  *Winter*, 555 U.S. at 22.  Plaintiffs have established that they likely are bearing and will continue to bear heavy financial costs because of withdrawal of immigrants from federal assistance programs and consequent dependence on state and local programs.

There is no dispute that such economic harm is sufficient to constitute irreparable harm because of the unavailability of monetary damages.  *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018); 5 U.S.C. § 702 (providing for relief "other than monetary damages").  DHS counters that such harm in this case is speculative, amounting to no more than the possibility of future injury.  *See Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011).

We have, however, already seen that in this case such harm is more than speculative.  Plaintiffs have presented evidence that they are already experiencing harm and DHS itself has projected significant disenrollment from federal programs, likely leading to enrollments in state and local ones.  The district courts both made factual findings as to harm that DHS does not refute with citations to the record.

### 2.  Balance of Equities and Public Interest

There was no error in finding that the balance of equities and public interest support an injunction.  The Northern District pointed to the need for "continuing the provision of medical services through Medicaid to those who would predictably disenroll absent an injunction" in light of the explanations given by "parties and numerous amici . . . [of the] adverse health consequences not only to those who disenroll, but to the entire populations of the plaintiff states, for example, in the form of decreased vaccination rates." *City and Cnty. of SF*, 408 F. Supp. 3d at 1127.  The public interest in preventing contagion is particularly salient during the current global pandemic.

Although DHS nevertheless argues that it is harmed by not being able to implement its new definition of public charge, if it is ultimately successful in defending the merits of the Rule, the harm will amount to no more than a temporary extension of the law previously in effect for decades.  Given the financial burdens that plaintiffs have persuasively demonstrated will befall them as a result of disenrollment from federal programs, coupled with adverse effects on the health and welfare of the immigrant as well as general population, we cannot say the district courts abused their discretion in finding that the balance of equities and public interest weigh in favor the injunction.

## G.  Propriety of a Nationwide Injunction

The Northern District issued a preliminary injunction limited to the territory of the plaintiff state and local entities before it.  The Eastern District issued a nationwide injunction, explaining that a more limited injunction would not prevent

all the harms alleged. The court was concerned about protecting immigrants from harm if they moved outside of the plaintiff jurisdictions, about the economic impact on plaintiff states if immigrants moved to them to evade the consequences of the Rule, and about lawful immigrants being subject to the Rule at points of entry after travel abroad. *Washington*, 408 F. Supp. 3d at 1223.

The appropriateness of nationwide injunctions in any case has come under serious question. *See, e.g.*, *DHS v. New York*, 140 S Ct. 599, 599–601 (2020) (Gorsuch, J., concurring); *Trump v. Hawaii*, 138 S. Ct. 2392, 2424–29 (2018) (Thomas, J., concurring). In explaining the limited scope of its injunction, the Second Circuit questioned the propriety of one court imposing its will on all:

> It is not clear to us that, where contrary views could be or have been taken by courts of parallel or superior authority entitled to determine the law within their own geographical jurisdictions, the court that imposes the most sweeping injunction should control the nationwide legal landscape.

*New York*, 969 F.3d at 88.

Whatever the merits of nationwide injunctions in other contexts, we conclude a nationwide injunction is not appropriate in this case. This is because the impact of the Rule would fall upon all districts at the same time, and the same issues regarding its validity have been and are being litigated in multiple federal district and circuit courts.

Accordingly, we vacate that portion of the Eastern District's injunction making it applicable nationwide, but otherwise affirm it.

## H. Rehabilitation Act

The plaintiffs also contend that the Rule violates the Rehabilitation Act, which bans discrimination on the basis of disabilities. 29 U.S.C. § 794(a). The Seventh Circuit looked favorably on this contention, and the Second Circuit expressly did not address it. *Cook Cnty.*, 962 F.3d at 228, *New York*, 969 F.3d at 64 n.20. Because we have held that the Rule violates the APA as contrary to law and arbitrary and capricious, we similarly do not address the Rehabilitation Act.

## I. Conclusion

The order of the District Court for the Northern District of California is **AFFIRMED**. The order of the District Court for the Eastern District of Washington is **AFFIRMED in part and VACATED in part**. Costs are awarded to the plaintiffs.

---

VANDYKE, Circuit Judge, dissenting:

For the reasons ably articulated by our court in a December 2019 published opinion,[1] by the Fourth Circuit in

---

[1] *City & County of San Francisco v. USCIS*, 944 F.3d 773 (9th Cir. 2019).

an August 2020 opinion,[2] and by a dissenting Seventh Circuit judge in a June 2020 opinion (particularly notable for its erudition)[3]—and implied by the Supreme Court's multiple stays this year of injunctions virtually identical to those the majority today affirms[4]—I must respectfully dissent.

---

[2] *CASA de Maryland, Inc. v. Trump*, 971 F.3d 220 (4th Cir. 2020).

[3] *Cook County v. Wolf*, 962 F.3d 208, 234–54 (7th Cir. 2020) (Barrett, J., dissenting).

[4] *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599 (2020); *Wolf v. Cook County*, 140 S. Ct. 681 (2020).